## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE:  PROCESSED EGG PRODUCTS : 
ANTITRUST LITIGATION :     MDL No. 2002
——————————————————— :     08-md-02002
                               :
THIS DOCUMENT APPLIES TO: :
All Actions :

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs T.K. Ribbing's Family Restaurant, LLC; John A. Lisciandro d/b/a Lisciandro's Restaurant; Goldberg and Solovy Foods, Inc.; Karetas Foods, Inc.; Nussbaum-SF, Inc.; Somerset Industries, Inc.; Wixon, Inc.; SensoryEffects Flavor Co. d/b/a SensoryEffects Flavor Systems; and Eby-Brown Company LLC, on behalf of themselves and all others similarly situated, by their undersigned attorneys, bring this action for treble damages and injunctive relief, as well as attorneys' fees and costs, under the antitrust laws of the United States against the Defendants named herein, and upon information and belief, and in connection therewith allege as follows:

## NATURE OF THE CASE

1.      For nearly a decade, Defendants have engaged in a contract, combination and conspiracy to fix, raise, maintain, and stabilize the prices at which shell eggs and egg products were sold in the United States.  The aim of Defendants' conspiracy was to conduct a supply control campaign through various means designed to reduce output and artificially fix and/or inflate the price of eggs in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Because of Defendants' unlawful conduct, Plaintiffs and similarly situated direct purchasers of shell eggs and egg products (collectively referred to herein as "eggs") were injured and paid artificially inflated prices that were more than they would have paid in a competitive market.

2.      This is a class action brought by Plaintiffs on behalf of two Subclasses: entities who purchased shell eggs directly from one or more of the Defendants during the Class Period; and entities who purchased egg products directly from one or more Defendants during the Class Period. Defendants include (a) trade groups that coordinated and facilitated the unlawful conspiracy; and (b) vertically integrated producers of shell eggs or egg products or both.

3.      Shell eggs are referred to generally as "table eggs" (generally purchased by retail entities for re-sale to the consuming public) or "breaking eggs" (generally purchased by food service entities for further processing).

4.      Egg products are generally composed of breaking eggs that have been removed from their shells and processed for convenience into dried, frozen or liquid forms.

5.      Defendants combined and conspired to collectively reduce the supply of shell eggs available for sale in the United States during a time of relatively steady and/or increased demand, which allowed Defendants to supracompetively increase the price of shell eggs and egg products from 2000 to record highs by 2007 and to the present more than they otherwise could have in a competitive market. Further, as a result of their conspiracy, Defendants have realized record profits.

6.      During the Class Period, Defendants conspired to and did reduce and constrain the supply of shell eggs in at least the following nine ways:

    (a)     agreeing to reduce the total number of hens at laying farms in order to decrease overall egg production;

    (b)     agreeing not to replace hens lost through increased cage space requirements;

2

(c)    agreeing to manipulate the molting, culling, and disposal of hens to keep egg production low;

(d)    agreeing not to "backfill" cages;

(e)    agreeing to delay or reduce chick hatching;

(f)    agreeing to reduce inventory;

(g)    agreeing not to expand or to curtail operations;

(h)    agreeing to restrain output in the United States; and

(i)    fixing prices through a horizontal agreement to restrain output.

7.    In addition, as detailed herein, during the Class Period, Defendants conspired to arrange for exports of shell eggs and processed egg products as a means to reduce supply in the United States and thereby raise prices in the United States for both shell eggs and processed egg products. These exports were often made to foreign markets where prices for shell eggs and processed egg products were lower than in the United States, or to foreign markets with an over-supply of, or decreasing demand for, shell eggs and processed egg products. The sole purpose of these exports, which would not have been in the independent economic self-interest of any of the Defendants, was to reduce supply in the United States and thereby supracompetitively maintain, stabilize, fix and/or raise prices in the United States market.

8.    These coordinated efforts by Defendants were designed to reduce the supply of shell eggs and constitute a price fixing agreement as to both shell eggs and egg products. These efforts allowed for the meteoric rise of egg prices over the last several years and permitted those prices to remain at supracompetitive levels throughout the Class Period. Not only did the conspiracy allow Defendants that produced and sold shell eggs to overcharge Plaintiffs and Class members for those shell eggs, it also allowed Defendants that produced and sold processed egg

products to overcharge Plaintiffs and Class members for those processed egg products, as well. Thus, Plaintiffs and members of both Subclasses, were injured by Defendants' unlawful conduct.

## JURISDICTION AND VENUE

9.      Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the injuries sustained by Plaintiffs and the members of the Class arising from violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 26.

10.      The Defendants are trade groups, their members, and co-conspirators. These entities are involved in the promotion, production, processing, and/or sale of shell eggs and egg products in interstate commerce. The Defendants' respective activities in the promotion, production, processing, and/or sale of shell eggs and egg products affect interstate commerce.

11.      Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c), because during the Class Period many of the Defendants resided, transacted business, were found, or had agents in this district and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

## PLAINTIFFS

### A.    Direct Purchasers of Shell Eggs

12.    Plaintiff T.K. Ribbing's Family Restaurant, LLC ("T.K. Ribbing's") is a New York limited liability company with its principal place business located in Falconer, New York. During the Class Period, T.K. Ribbing's purchased shell eggs directly from one or more of the Defendants.

13.    Plaintiff John A. Lisciandro d/b/a Lisciandro's Restaurant ("Lisciandro's") is a sole proprietorship with its principal place of business located in Jamestown, New York. During the Class Period, Lisciandro's purchased shell eggs directly from one or more Defendants.

14.    Plaintiff Eby-Brown Company LLC ("Eby-Brown") is an Illinois limited liability company with its principal place of business located in Naperville, Illinois. During the Class Period, Eby-Brown purchased shell eggs directly from one or more of the Defendants.

### B.    Direct Purchasers of Egg Products

15.    Plaintiff Goldberg and Solovy Foods, Inc. ("Goldberg") is a California corporation with its principal place of business located in Vernon, California.  During the Class Period, Goldberg purchased egg products directly from one or more Defendants.

16.    Plaintiff Karetas Foods, Inc. ("Karetas") is a Pennsylvania corporation with its principal place of business located in Reading, Pennsylvania.  During the Class Period, Karetas purchased egg products directly from one or more Defendants.

17.    Plaintiff Nussbaum-SF, Inc. ("Nussbaum"), formerly known as Southern Foods, Inc., is a North Carolina corporation with its principal place of business located in Greensboro, North Carolina.  During the Class Period, Nussbaum purchased egg products directly from one or more Defendants.

18.     Plaintiff Somerset Industries, Inc. ("Somerset") is a Nevada corporation with its principal place of business located in Spring House, Pennsylvania.  During the Class Period, Somerset purchased egg products directly from one or more Defendants.

19.     Plaintiff Wixon, Inc. ("Wixon") is a Wisconsin corporation with its principal place of business located in St. Francis, Wisconsin.  During the Class Period, Wixon purchased egg products directly from one or more of the Defendants.

20.     Plaintiff SensoryEffects Flavor Co. d/b/a SensoryEffects Flavor Systems ("SensoryEffects") is a Delaware corporation with its principal place of business located in Bridgeton, Missouri.  During the Class Period, SensoryEffects purchased egg products directly from one or more of the Defendants.

21.     During the Class Period, Eby-Brown (identified above) also purchased egg products directly from one or more of the Defendants.

## DEFENDANTS

22.     The acts charged in this Complaint have been done by the following Defendants and were ordered and performed by Defendants' officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of Defendants' business or affairs.

23.     Allegations as to "Defendants," "co-conspirators," or "UEP members" herein refer to all named Defendants above unless otherwise specified.

**A.     Trade Groups**

24.     Defendant United Egg Producers, Inc. ("UEP") is a cooperative corporation organized, existing, and doing business under the laws of the State of Maine with its office and principal place of business in Alpharetta, Georgia.

25.     Defendant United Egg Association ("UEA") is a nonprofit corporation organized, existing, and doing business under the laws of the District of Columbia, with its offices and principal place of business located in Alpharetta, Georgia.

26.     Defendant United States Egg Marketers, Inc. ("USEM") is a nonprofit corporation organized, existing, and doing business under the laws of the State of Georgia, with its offices and principal place of business located in Alpharetta, Georgia.

**B.     Producers of Shell Eggs or Egg Products or Both**

### *Michael Foods*

27.     Defendant Michael Foods, Inc. ("Michael Foods") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Minnetonka, Minnesota.  During the Class Period, Michael Foods sold shell eggs and egg products to purchasers in the United States directly or through its subsidiaries and affiliates, including members of the Class.

28.     Michael Foods is a diversified producer/distributor of food products in three areas—egg products, refrigerated distribution (including shell eggs, cheese, bagels, butter, margarine, muffins, potato products) and potato products.

29.     Michael Food Egg Products Company is a term used to refer collectively to subsidiaries of Michael Foods, Inc. that comprise Michael Foods Inc.'s Egg Products Division

30.     Michael Foods Egg Products is the largest producer of processed egg products in North America (the largest supplier of extended shelf-life liquid eggs, pre-cooked egg patties and omelets, dried eggs and hard-cooked eggs in North America and is a leading supplier of frozen and liquid whole eggs, whites and yolks) and fourth largest shell egg producer in North America.

31.     Michael Foods Egg Products produces, processes and distributes numerous egg products and shell eggs and is comprised of the following subsidiaries: M. G. Waldbaum Co. ("Waldbaum"), Papetti's Hygrade Egg Products, Inc. ("Papetti's"), MFI Food Canada, Ltd. and Trilogy Egg Products. Inc..

32.     In 2006, approximately 30% of Michael Foods's egg needs were satisfied by company owned hens with the balance purchased under third-party egg procurement contracts and on the spot market.

33.     Michael Foods maintains numerous trademarks and/or trade names for its products, including "Michael Foods," "Better 'n Eggs," "All Whites," "Papetti's," "Quaker State Farms," "Broke N' Ready," "Canadian Inovatech," "Centromay," "Emulsa," and "Inovatech." Ultrapasteurized liquid eggs are marketed using the "Easy Eggs" trade name. Refrigerated Distribution Division products are marketed principally under the "Crystal Farms" trade name. Other Refrigerated Distribution Division trademarks include "Crescent Valley, "Westfield Farms", and "David's Deli."

34.     Michael Foods is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of the organizations on behalf of Michael Foods. In 2008, Michael Foods employees served on UEP's Area #3, Government Relations Committee, Environmental Committee, Quality Assurance/Food Safety Committee, Producer Committee for Animal Welfare, and the Long Range Planning Committee. Michael Foods employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. Michael Foods has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Michael Foods has agreed to the conspiracy by selling UEP certified eggs and egg products and has reduced its egg supply as a result.

### Land O'Lakes, Moark, and Norco Ranch

35.     Defendant Land O'Lakes Inc. ("Land O' Lakes) is a Minnesota corporation organized, existing, and doing business under the laws of the State of Minnesota, with its offices and principal place of business located in Arden Hills, Minnesota.  During the Class Period, Land O' Lakes sold shell eggs and egg products to purchasers in the United States directly or through its subsidiaries and affiliates, including members of the Class.

36.     Land O' Lakes is the parent company of Moark LLC.  Land O' Lakes has been an active participant in and profited from its subsidiary's, as well as UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Moark Productions, the predecessor to Moark LLC, began in 1957.  Moark Productions joined with Land O'Lakes in 2000 to form Moark, LLC -- a national, consolidated egg company.  Moark developed a national LAND O' LAKES™ brand egg to complement other brands it marketed.  In 2006, Land O'Lakes acquired 100% of the ownership of Moark, LLC.   Moark LLC and its subsidiaries are referred to as the "Layer" or "Egg" division of Land O'Lakes.

37.     Defendant Moark LLC ("Moark") is a limited liability company organized, existing, and doing business under the laws of the State of Missouri, with its offices and principal place of business located in Norco, California.  During the Class Period, Moark sold shell eggs and egg products to purchasers in the United States, including members of the Class.

38.     Moark markets and processes 523 million dozen eggs from approximately 24 million layers (hens) per year.  Moark produces and markets shell eggs that are sold under corporate brands and national brand names such as LAND O' LAKES All-Natural Farm Fresh Eggs and Eggland's Best, as well as non-branded shell eggs.  Approximately 64% of the eggs

marketed are produced by layers owned by Moark. The remaining 36% are purchased on the spot market or from third-party producers.

39. Moark/Land O' Lakes is the nation's third-largest producer and marketer of shell eggs. Moark/Land O' Lake's annual egg sales are approximately $500,000,000.

40. Moark is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Moark. In 2008, Moark employees served on UEP's Executive Committee (secretary), Area #1, Area #4, Finance Committee, Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance/Food Safety Committee, and Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, and the United States Egg Marketers Export Committee. Moark employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. Moark has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Moark has agreed to the conspiracy by selling UEP certified eggs and egg products and has reduced its egg supply as a result. Moark has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies. Moark is the parent company of Norco Ranch, Inc.

41. Defendant Norco Ranch, Inc. ("Norco Ranch") is a corporation organized, existing, and doing business under the laws of the State of California, with its offices and principal place of business located in Norco, California. It is a subsidiary of Moark. During the Class Period, Norco Ranch sold shell eggs to purchasers in the United States, including members of the Class.

42. Norco is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Norco. In 2008, Norco

10

employees served on UEP's Government Relations Committee. Norco employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. Norco has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Norco has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result.

### *Rose Acre Farms*

43.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is a corporation organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located in Seymour, Indiana. During the Class Period, Rose Acre sold eggs and egg products to purchasers in the United States, including members of the Class.

44.     Rose Acre sells shell eggs and dried and liquid egg products for the foodservice industry.

45.     Rose Acre is a vertically integrated operation handling all of its own breeding chicks, milling feed, harvesting, cleaning, sorting, packing, and shipping eggs and egg products directly to retailers.

46.     Rose Acre's brands include: White Shell Eggs, GreatEgg's Vita-D, GOLDEN-PREMIUM, Brown Shell Eggs (Large & Jumbo), Christopher Eggs, Eggland's Best, and GreatEggs. Rose Acre's annual sales are estimated to be approximately $192,300,000.

47.     Rose Acre is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Rose Acre. In 2008, Rose Acre employees served on UEP's Area #3, Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Environmental Committee, Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning

11

Committee, Environmental Scientific Panel, and the United States Egg Marketers Export Committee. Rose Acre employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. Rose Acre has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Rose Acre has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result. Rose Acre has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies.

### *National Food Corporation*

48.     Defendant National Food Corporation ("National Food") is a corporation organized, existing, and doing business under the laws of the State of Washington with its offices and principal place of business located in Everett, Washington. During the Class Period, National Food sold eggs and egg products to purchasers in the United States, including members of the Class.

49.     National Food is a fully integrated producer and processor of eggs and egg products. National Food operates its own feed mills, pullet farms, layer farms, processing plants, and distribution centers in Washington, Oregon, Montana, and South Dakota and serves markets throughout the Pacific Northwest, Alaska, Hawaii, and the Midwest.

50.     National Food sells shell eggs and egg products (available in liquid or frozen form) including: whole eggs; egg whites (plain and EZ whipping whites); yolks (plain or with added salt or sugar); peptex; and fortified product (2 yolks to 1 white).

51.     National Food is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of National Food. During the time that the conspiracy was in effect, a National Food representative served as

chairman of the UEP and promoted the conspiracy as alleged herein. In 2008, National Food employees served on UEP's Area #2, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee (chair), Public Relations Committee, Long Range Planning Committee, United States Egg Marketers Export Committee (secretary). National Food employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. National Food has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein. National Food has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result. National Food has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies.

### *Cal-Maine*

52.     Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Jackson, Mississippi. During the Class Period, Cal-Maine sold shell eggs and egg products to purchasers in the United States, including members of the Class.

53.     Cal-Maine is the largest producer and marketer of shell eggs in the United States. It is also a leader in industry consolidation having completed 14 acquisitions since 1989. In fiscal year 2008, Cal-Maine sold approximately 678,000,000 dozen shell eggs (accounting for approximately 15.8% of domestic shell egg consumption). Fred Adams, founder and CEO of Cal-Maine, was a founding member of UEP.

54.     In fiscal year 2007, 20% of Cal-Maine eggs were not produced by Cal-Maine; 7% were grown under production contracts and the remainder were purchased on the spot market.

55.     Some of Cal-Maine's brands include Egg-Land's Best (Cal-Maine owns 25.9% non-voting equity interest and has an exclusive license agreement to market and distribute Egg-Land's Best in major metropolitan areas, including New York City, and a number of states in the South); Rio Grande; and Sun Up.  Cal-Maine's customers are 85% retail, 10% food-service and 5% egg products producers.

56.     Cal-Maine is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Cal-Maine.  During the time that the conspiracy was in effect, a Cal-Maine representative served as chairman of the UEP.  In 2008, Cal-Maine employees served on UEP's Executive Committee, Area #5, Finance Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance/Food Safety Committee, Producer Committee for Animal Welfare, Long Range Planning Committee, and the United States Egg Marketers Export Committee.  Cal-Maine employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Cal-Maine has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Cal-Maine has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result.  Cal-Maine has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies.

### Hillandale Farms and Ohio Fresh Eggs

57.     Hillandale Farms comprises various companies   including Defendants Hillandale Farms of Pa., Inc.; Hillandale-Gettysburg, L.P., Hillandale Farms East, Inc.; and Hillandale Farms, Inc. – that function as an integrated enterprise producing and selling shell eggs.  In addition, Hillandale Farms sells all of the shell eggs produced by its affiliate and supplier, Defendant Ohio Fresh Eggs, LLC.

58.     According to its website, Hillandale Farms was founded by Orland Bethel; has production facilities in the Northeast, Midwest, and Southeast; and is "a vertically integrated supplier . . . directly involved in every aspect of egg production and distribution." Each of the Hillandale Farms constituent companies is owned and/or controlled by Orland Bethel, Gary Bethel, and/or Don Hershey.

59.     Hillandale Farms is a producer, processor, and distributor of shell eggs. Specializing in corporate brands, Hillandale Farms packs for many leading retailers and distributors. Hillandale Farms also packs its own brands of eggs under the following labels: Hillandale Farms, Nearby Eggs, and Hartford Farms.

60.     A UEP newsletter identified Hillandale Farms as the 19th largest egg production company in the United States in 2003. UEP newsletters also reported that Hillandale Farms completed animal care certified audits, was a certified company and licensed marketer, and displayed the animal care certified logo on its packages.

61.     In 2008, individuals affiliated with Hillandale Farms, including Ron Ballew and James Minkin, served on UEP's Shell Egg Marketing Committee and Environmental Committee.

62.     Gary Bethel, an officer of several Hillandale Farms entities, was quoted in a December 13, 2003 article discussing increased egg prices, in which he explained how Hillandale Farms had reduced supply:

> "We've been taking a proactive approach towards allowing caged chickens more space," said Gary Bethel, a spokesman for Hillandale Farms of Pennsylvania and a North Versailles egg producer. "If we had a house that held 100,000 chickens five years ago, it would house 80,000 now, and that means quite a reduction in total egg numbers."[1]

---

[1]     Mackenzie Carpenter, "Shoppers Shelling Out More for Egg Price Tied to Diet, Reduced Supply," Pittsburgh-Post Gazette, (Dec. 13, 2003).

63.     Defendant Hillandale Farms of Pa., Inc. ("Hillandale PA") is a corporation organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania with its principal place of business located in North Versailles, Pennsylvania.  Hillandale PA is part of the Hillandale Farms integrated enterprise. It is owned by Orland Bethel, the company's president, and Gary Bethel, the company's vice president.

64.     Defendant Hillandale-Gettysburg, L.P. ("Hillandale-Gettysburg") is a limited partnership organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania with its principal place of business located in Gettysburg, Pennsylvania. The Hillandale Farms website lists a Gettysburg mailing address. Hillandale-Gettysburg is part of the Hillandale Farms integrated enterprise. Hillandale-Gettysburg is owned by Orland Bethel and Don Hershey, who is also the president of HGLP LLC, the general partner of Hillandale-Gettysburg.

65.     Defendant Hillandale Farms East, Inc. ("Hillandale East") is a corporation organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania with its principal place of business located in Spring Grove, Pennsylvania. Hillandale East is part of the Hillandale Farms integrated enterprise. It is owned by Gary Bethel, the company's president, and Orland Bethel, the company's secretary and treasurer.

66.     Defendant Hillandale Farms, Inc. is a corporation organized, existing, and doing business under the laws of the State of Ohio with its principal place of business located in Corry, Pennsylvania. Hillandale Farms invoices displayed a Corry mailing address. Hillandale Farms, Inc. is part of the Hillandale Farms integrated enterprise. It is owned by Orland Bethel and Gary Bethel, the company's president.

67.     Defendant Ohio Fresh Eggs. LLC ("Ohio Fresh") is a limited liability company organized, existing, and doing business under the laws of the State of Ohio with its principal place of business located in Croton, Ohio. It owns egg production facilities in Ohio and is a member of the UEP.

68.     During the relevant period, seventy percent of the interest in Ohio Fresh was held by Hillandale Farms LLC. the sole member of which is Orland Bethel. Thirty percent of the interest in Ohio Fresh was held by Eggs Manager LLC ("Eggs Manager"), the sole member of which is Don Hershey. Pursuant to agreements executed December 26, 2003, Hillandale PA purchases all eggs produced by Ohio Fresh and Eggs Manager manages and supervises the operations of Ohio Fresh.

69.     In June 2004. Ohio Fresh confirmed its intention to follow UEP's Marketing Committee recommendation to dispose of spent hens by 108 weeks and reported that it would dispose of spent hens between 80 to 84 weeks.

70.     In July 2005, an Ohio Fresh spokeperson. Harry Palmer. "said he was told there were too many birds – 12 million to 15 million too many – producing eggs nationally," resulting in higher supply and lower prices.

71.     Hillandale Farms, as an integrated enterprise, and its affiliate and supplier Ohio Fresh have been active participants in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Hillandale Farms and Ohio Fresh have agreed to the conspiracy by selling UEP certified eggs and have reduced their egg supply as a result.

### *Daybreak Foods*

72.     Defendant Daybreak Foods, Inc. ("Daybreak Foods") is a corporation organized, existing, and doing business under the laws of the State of Wisconsin with its offices and

principal place of business located in Lake Mills, Wisconsin. During the Class Period, Daybreak

Foods sold eggs to purchasers in the United States, including members of the Class.

73.     Daybreak is a member of UEP and its employees have served in key executive

positions and/or on committees of the organization on behalf of Daybreak. In 2008, Daybreak

employees served on UEP's Area #3, Government Relations Committee, Environmental

Committee, and Quality Assurance/Food Safety Committee. Daybreak has been an active

participant in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix

prices, as outlined herein. Daybreak has agreed to the conspiracy by selling UEP certified eggs

and has reduced its egg supply as a result.

### Midwest Poultry Services

74.     Defendant Midwest Poultry Services, L.P. ("Midwest") is a limited partnership

organized, existing, and doing business under the laws of the State of Indiana, with its offices

and principal place of business located in Mentone, Indiana. During the Class Period, Midwest

sold eggs to purchasers in the United States, including members of the Class.

75.     Midwest is a member of UEP and its employees have served in key executive

positions and/or on committees of the organization on behalf of Midwest. In 2008, Midwest

employees served on UEP's Executive Committee (first vice chairman), Area #3, Finance

Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee,

Environmental Committee, and the Producer Committee for Animal Welfare. Midwest

employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

Midwest has participated in and profited from UEP's and its co-conspirators' efforts to reduce

supply and fix prices, as outlined herein. Midwest has agreed to the conspiracy by selling UEP

certified eggs and has reduced its egg supply as a result. Midwest has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies.

### NuCal Foods

76.     Defendant NuCal Foods, Inc. ("NuCal Foods") is a corporation organized, existing, and doing business under the laws of the State of California, with its offices and principal place of business located in Ripon, California. During the Class Period, NuCal Foods sold eggs to purchasers in the United States, including members of the Class.

77.     NuCal is incorporated as an agricultural cooperative in California. Egg producers that are part of NuCal include: (1) Gemperle Enterprises of Turlock; (2) Sunrise Farms of Petaluma; (3) J. S. West Milling of Modesto (whose president is the current Chairman of UEP); and (4) Valley Fresh Foods of Turlock.

78.     NuCal is the largest distributor of shell eggs in the Western United States. NuCal is a totally integrated egg producer from production through distribution and processes approximately 7.5 million eggs per day.

79.     NuCal products include: Becky, Cal Egg, California Finest, Chefs Best, Clover Stornetta Farms, Crack A Smile Omega 3 & Lutein, Egg-Land's Best, Lucerne (Safeway), Nulaid (white), Supermarket private label eggs, and Santa Rosa.

80.     NuCal is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of NuCal. In 2008, NuCal employees served on UEP's Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance Food Safety Committee, and United States Egg Marketers Export Committee (vice-chair). NuCal employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. NuCal has participated in and profited from UEP's and its co-

conspirators' efforts to reduce supply and fix prices, as outlined herein. NuCal has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result. NuCal has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies.

### R.W. Sauder

81.     Defendant R.W. Sauder, Inc. ("Sauder") is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its offices and principal place of business located in Lititz, Pennsylvania. During the Class Period, Sauder sold shell eggs and/or egg products to purchasers in the United States, including members of the Class.

82.     Sauder sells the following products: Sauder's Gold Eggs, Sauder's Organic Eggs, Sauder's Deviled Egg Kit, Sauder's Hard Cooked Flavored Eggs (Red Beet, Mustard, & Southwestern), Sauder's Hard Cooked Eggs, Sauder's Hard Cooked Eggs - 10 Egg Pouch, Sauder's 8 pack Hard Cooked, Sauder's Twin 18 pack (3 doz.) and wholesale eggs and egg products in various sizes and packages.

83.     Sauder is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Sauder. In 2008, Sauder employees served on UEP's Shell Egg Price Discovery Committee, Producer Committee for Animal Welfare, and Public Relations Committee (chairman). Sauder employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. Sauder has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Sauder has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result. Sauder has also participated in the conspiracy by exporting shell eggs in order to reduce domestic supplies.

### *Sparboe Farms*

84.     Defendant Sparboe Farms, Inc. ("Sparboe Farms") is a corporation organized, existing, and doing business under the laws of the State of Minnesota, with its offices and principal place of business located in Litchfield, Minnesota.

85.     Sparboe Farms is recognized as the fifth largest shell egg producer and marketer in the United States.  Sparboe Farms serves retail, wholesale and foodservice customers in 26 states.  Sparboe Farms primarily services grocery distributors, retailers, foodservice, and processors with eggs and egg products, both branded and private label.  Sparboe Farms also operates Sparboe Foods, a leading egg breaking and further processing company.  Sparboe Foods operates plants in Iowa and California serving industrial and foodservice customers in the central and western United States.

86.     Sparboe is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Sparboe.  In 2008, Sparboe employees served on UEP's Shell Egg Marketing and Quality Assurance/Food Safety Committee.  Sparboe employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Sparboe has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Sparboe has agreed to the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result.

### UNNAMED CO-CONSPIRATORS

87.     Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

88.    At all relevant times, cage producers, egg trade groups, egg farm software companies, and other shell egg producers and egg product manufacturers or other entities, referred to herein as "co-conspirators," as well as various other persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

89.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

90.    All averments herein against any named defendant are also averred against these unnamed co-conspirators as though set forth at length.

## CLASS ACTION ALLEGATIONS

91.    Plaintiffs bring this action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Plaintiff Class and Subclasses:

All individuals and entities that purchased eggs, including shell eggs and egg products, produced from caged birds in the United States directly from Defendants during the Class Period from January 1, 2000 through the present.

a.) Shell Egg Subclasss
All individuals and entities that purchased shell eggs produced from caged birds in the United States directly from Defendants during the Class Period from January 1, 2000 through the present.

b.) Egg Products Subclass
All individuals and entities that purchased egg products produced from shell eggs that came from caged birds in the United States directly from Defendants during the Class Period from January 1, 2000 through the present.

92.    Excluded from the Class and Subclasses are the Defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities. Also

excluded from the Class and Subclasses are purchases of "specialty" shell egg or egg products (such as "organic," "free-range," or "cage-free") and purchases of hatching eggs (used by poultry breeders to produce breeder stock or growing stock for laying hens or meat)

93.    Plaintiffs reserve the right to amend the class definitions at the time Plaintiffs seek class certification.

**A.    Shell Egg Subclass**

94.    The following Plaintiffs seek to represent the Shell Egg Subclass: T.K. Ribbing's Family Restaurant, LLC; John A. Lisciandro d/b/a Lisciandro's Restaurant; and Eby-Brown Company LLC.

95.    The Shell Egg Subclass is so numerous that joinder of all members thereof is impracticable. Indeed, Plaintiffs aver, on information and belief, that during the Class Period, thousands of persons and entities located throughout the United States purchased shell eggs directly from the Defendants.

96.    The claims of Plaintiffs that seek to represent the Shell Egg Subclass are typical of the claims of the members of that Class because those Plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendants and their co-conspirators as alleged in this Complaint.

97.    The Plaintiffs that seek to represent the Shell Egg Subclass will fairly and adequately protect the interests of the classes. The interests of those Plaintiffs are coincidental with, and not antagonistic to, those of other members of the Class. In addition, Plaintiffs are represented by counsel experienced and competent in the prosecution of complex class action and antitrust litigation.

98.     There are questions of law and fact common to the Plaintiffs that seek to represent the Shell Egg Class and members of that Class and those common questions predominate over any questions which may affect only individual members of the Class, because Defendants have acted on grounds generally applicable to the entirety of the Class.  Among the predominant questions of law and fact common to the Shell Egg Subclass are:

    (a)     Whether the Defendants and their co-conspirators engaged in a contract, combination or conspiracy to raise, stabilize, fix and/or maintain prices of shell eggs sold in the United States;

    (b)     The duration and extent of the contract, combination or conspiracy alleged herein;

    (c)     Whether the Defendants and their co-conspirators were participants in the contract, combination or conspiracy alleged herein;

    (d)     Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act;

    (e)     The effect of the contract, combination or conspiracy upon the prices of shell eggs sold by Defendants in the United States during the Class Period;

    (f)     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the other members of the Shell Egg Subclass; and

    (g)     The appropriate measure of damages sustained by Plaintiffs and other members of the Shell Egg Subclass.

99.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large

number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford individually to litigate an antitrust claim such as that asserted herein.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no better alternative exists for the fair and efficient adjudication of this controversy.

**B.      Egg Products Subclass**

100.    The following Plaintiffs seek to represent the Egg Products Subclass: Goldberg and Solovy Foods, Inc.; Karetas Foods, Inc.; Nussbaum-SF, Inc.; Somerset Industries, Inc.; Wixon, Inc.; SensoryEffects Flavor Co. d/b/a SensoryEffects Flavor Systems; and Eby-Brown Company LLC.

101.    The Egg Products Subclass is so numerous that joinder of all members thereof is impracticable.  Indeed, Plaintiffs aver, on information and belief, that during the Class Period, thousands of persons and entities located throughout the United States purchased egg products directly from the Defendants.

102.    The claims of Plaintiffs that seek to represent the Egg Products Subclass are typical of the claims of the members of that Class because those Plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendants and their co-conspirators as alleged in this Complaint.

103.    The Plaintiffs that seek to represent the Egg Products Subclass will fairly and adequately protect the interests of the classes.  The interests of those Plaintiffs are coincidental with, and not antagonistic to, those of other members of the Class.  In addition, Plaintiffs are

represented by counsel experienced and competent in the prosecution of complex class action and antitrust litigation.

104.   There are questions of law and fact common to the Plaintiffs that seek to represent the Egg Products Subclass and members of that Class and those common questions predominate over any questions which may affect only individual members of the Class, because Defendants have acted on grounds generally applicable to the entirety of the Class.   Among the predominant questions of law and fact common to the Egg Products Subclass are:

 (a) Whether the Defendants and their co-conspirators engaged in a contract, combination or conspiracy to raise, stabilize, fix and/or maintain prices of egg products sold in the United States;

 (b) The duration and extent of the contract, combination or conspiracy alleged herein;

 (c) Whether the Defendants and their co-conspirators were participants in the contract, combination or conspiracy alleged herein;

 (d) Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act;

 (e) The effect of the contract, combination or conspiracy upon the prices of egg products sold by Defendants in the United States during the Class Period;

 (f) Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the other members of the Egg Products Subclass; and

(g)    The appropriate measure of damages sustained by Plaintiffs and other members of the Egg Products Subclass.

105.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford individually to litigate an antitrust claim such as that asserted herein. There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no better alternative exists for the fair and efficient adjudication of this controversy.

## CONCEALMENT AND TOLLING

106.    Because the Defendants' agreement, understanding and conspiracy was kept secret until recently, Plaintiffs and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially higher prices for shell eggs and egg products throughout the United States than they would have in a truly competitive market.

107.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

108.    By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

109.    Price increases for shell eggs and egg products before and during the Class Period were not unusual and were publicly reported in filings, press releases, news wire services, trade publications, and newspapers.  Plaintiffs were thus conditioned by experience in dealing with the Defendants in what they believed to be a competitive industry to expect price increases from time to time.  However, any increase that was openly collusive would not have been tolerated by Plaintiffs.

110.    Throughout the relevant period, Defendants have affirmatively concealed from Plaintiffs and Class members the unlawful combination, conspiracy and agreement among Defendants alleged herein.  Upon information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy through non-public means, agreed not to discuss or disclose the details of their conspiracy, and falsely represented to Plaintiffs and Class members that the prices they paid for eggs were fair and competitive.

111.    UEP, UEA, and USEM meetings were private and not open to members of the public.  UEP's newsletter, which urged compliance with and distributed information about the conspiracy, was limited to UEP members.

112.    Defendants' conspiracy, as outlined herein, was enforced primarily through non-public compliance reports that were submitted to UEP.  UEP solicited secret information about which members were committed to certain aspects of conspiracy and disclosed that some entities were involved to garner further support while deliberately concealing those company's names.

113.    Publicly, many Defendants and co-conspirators blamed high egg prices on circumstances beyond their control, while only privately acknowledging and celebrating coordinated industry efforts to reduce egg supplies.

114.    Defendants falsely represented to Plaintiffs and the members of the Class that the UEP certified program, one of the key elements of Defendants' conspiracy to reduce egg supply and fix prices, was implemented as a result of animal husbandry concerns.  In fact, however, Defendants' primary motivation was to develop a viable and enforceable method of reducing egg output through reducing hen supply.

115.    Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.

116.    Plaintiffs and the Class members could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination.  The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases and surreptitious communications between the Defendants by the use of non-public means or in-person meetings at trade association events (and elsewhere) in order to prevent the existence of written records.

117.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and the Class members had no knowledge of the alleged conspiracy or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed, until very recently.