**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION** | **MDL No. 2002**<br>**08-md-02002** |
| **THIS DOCUMENT APPLIES TO:  ALL INDIRECT PURCHASER ACTIONS** | |

**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# Table of Contents

**Page**

NATURE OF THIS ACTION ................................................................................. 1

JURISDICTION AND VENUE ............................................................................. 4

INTERSTATE TRADE AND COMMERCE ......................................................... 5

PLAINTIFFS ......................................................................................................... 6

DEFENDANTS .................................................................................................... 10

CLASS ACTION ALLEGATIONS ..................................................................... 24

THE ORGANIZATIONAL STRUCTURE AND ECONOMIC CONDITIONS WITHIN THE EGG INDUSTRY RENDER IT RIPE FOR COLLUSION ............................................. 30

DEFENDANTS' CONSPIRACY TO REDUCE OUTPUT ................................... 34

   A.     UEP and Other Trade Organizations Helped Formulate and Facilitate the Conspiracy 34

   B.     Defendants' Agreement to Reduce the Domestic Supply of Eggs ............................... 35

       1.     Defendants' Early Attempts at Industry Supply Restriction ...................................... 35

       2.     Defendants Continue to Collude to Reduce Supply, But Determine Concerted Long-Term Supply Reduction Solutions Are Required ........................................................ 39

       3.     In Furtherance of their Conspiracy, Defendants Implement a Supply Reduction Scheme Under the Pretext of Improved Animal Husbandry ..................................... 41

       4.     Defendants' Supply Suppression Scheme Is Successful ............................................ 46

       5.     2004 Brings Increased Hatching So Defendants Conspire to Suppress Supply ........ 52

       6.     Defendants Coordinate Immediate Supply Reduction Scheme at Egg Economic Summit in November 2004 ..................................................................................... 56

       7.     Defendants Implemented An Export Scheme to Reduce Domestic Supply and Fix, Maintain and/or Stabilize Prices ............................................................................. 67

   C.     UEP is not entitled to the limited protections of the Capper-Volstead Act .................. 71

   D.     Defendants Intentionally Misled Consumers that the "Animal Care Certified Program" was a Humane Standard of Care for Poultry When it Was Merely A Pretext for Supply Reduction .............................................................................................................. 81

i

1.   The Primary Purpose of the "Animal Care Certified Program" was Output Reduction .................................................................................................................. 81

2.   Defendants Made Misleading Statements Regarding The Origin of the "Animal Care Certified Program" ................................................................................... 82

3.   UEP Suspends Its Use of the "Animal Care Certified Program" After the FTC and State Attorneys Generals Challenge the Misleading Nature of the Program ............. 83

FRAUDULENT CONCEALMENT ................................................................................ 84

EFFECT OF DEFENDANTS' CONDUCT .................................................................... 86

COUNT I Violation of Sherman Act § 1, 15 U.S.C. § 1 .............................................. 86

COUNT II Claims Under Arizona Law ........................................................................ 88

COUNT III Claims Under California Law .................................................................... 90

COUNT IV Claims Under District of Columbia Law ................................................... 92

COUNT V Claims Under Florida Law .......................................................................... 95

COUNT VI Claims Under Iowa Law ............................................................................ 96

COUNT VII Claims Under Kansas Law ....................................................................... 98

COUNT VIII Claims Under Maine Law ..................................................................... 101

COUNT IX Claims Under Massachusetts Law ........................................................... 104

COUNT X Claims Under Michigan Law .................................................................... 105

COUNT XI Claims Under Minnesota Law ................................................................. 108

COUNT XII Claims Under Mississippi Law .............................................................. 110

COUNT XIII Claims Under Nebraska Law ................................................................ 112

COUNT XIV Claims Under Nevada Law ................................................................... 113

COUNT XV Claims Under New Mexico Law ............................................................ 115

COUNT XVI Claims Under New York Law ............................................................... 118

COUNT XVII Claims Under North Carolina Law ...................................................... 121

COUNT XVIII Claims Under North Dakota Law ....................................................... 123

COUNT XIX Claims Under Puerto Rico Law ........................................................................... 125

COUNT XX Claims Under South Dakota Law.......................................................................... 127

COUNT XXI Claims Under Tennessee Law............................................................................. 129

COUNT XXII Claims Under Utah Law .................................................................................... 131

COUNT XXIII Claims Under Vermont Law ............................................................................ 133

COUNT XXIV Claims Under West Virginia Law.................................................................... 134

COUNT XXV Claims Under Wisconsin Law .......................................................................... 137

REQUEST FOR RELIEF ......................................................................................................... 140

This Second Amended Consolidated Class Action Complaint ("Complaint") supercedes and amends all previously filed complaints. Indirect purchaser Plaintiffs ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, bring this action for damages and injunctive relief, as well as attorneys' fees and costs, where available by law, under federal and state antitrust law, consumer protection law, and the common law, where applicable, of Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Puerto Rico, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin ("Class Jurisdictions") as set forth below against the Defendants named herein (and their co-conspirators, hereinafter "Defendants"), and upon information and belief, and in connection therewith allege as follows:

## NATURE OF THIS ACTION

1.      This antitrust action arises out of a long-running conspiracy between and among Defendants and certain unnamed co-conspirators extending from at least January 1, 2000 through the present (the "Class Period"), with the purpose and effect of fixing, raising, and maintaining and/or stabilizing prices and restricting output of both shell eggs and egg products (collectively, "eggs") sold indirectly to Plaintiffs and other indirect purchasers in the United States, including the Class Jurisdictions.

2.      Eggs are a basic staple of the American diet, for which no substitute exists. Because eggs are fungible, consumers make purchase decisions based largely, if not entirely, on price. The demand for eggs is relatively inelastic, which means that egg prices are almost entirely dependent on supply and that consumers will purchase them regardless of most changes in price. Because the demand for eggs is relatively price inelastic, small reductions in supply can

1

lead to sharp increases in egg prices.[1]  For example, a July 2007 article in *Investor's Business Daily* discussed Defendant Cal-Maine Foods, Inc.'s efforts to reduce supply and its impact on prices:  "Cal-Maine has cut back its own egg supply 1% to 2%.  That's more than one might think.  One or two percent on the supply side affects prices 20% or 30%[.]"

3.       Most of the Defendants herein are vertically integrated producers of shell eggs or egg products, or both, including entities that are purportedly  horizontal competitors and others that are powerful trade groups.   One of those trade groups, Defendant United Egg Producers ("UEP"), is the largest egg trade organization in the United States, and had 198 members representing 96% of the nation's laying hens during the Class Period.  UEP's members consist of individual companies that controlled and were major decisional forces in the UEP during the Class Period.   These companies acted in concert with and through the UEP and other trade groups to implement and enforce the conspiracy alleged herein during the Class Period.

4.       The egg industry has undergone substantial consolidation in the last few years and a relatively small number of producers -- all members of the same organizations -- control a major share of the egg market.   The Defendants are aware of the impact of egg supply on the pricing of eggs; therefore, Defendants promote and discuss their efforts to reduce the supply of eggs with each other.

---

[1] Sam Krouse and Bob Krouse, *Infrastructure's Role in Keeping Egg Prices High*, Egg Industry Vol. 113 No. 2, Feb. 2008 (Bob Krouse is the current UEP First Vice Chairman and a member of the UEP Board of Directors and President of Defendant Midwest Poultry Services).   In October 2007, the publication reported that 2007 egg prices were "one for the record books."  Edward Clark, *2007 Egg Prices:  One for the Record Books - Has the Industry Finally Learned How Not to Overproduce?*, Egg Industry, Vol. 112 No. 10, Oct. 2007.

5.     These factors, and others discussed herein, enabled the Defendants during the Class Period to collectively and unlawfully agree to work in tandem to raise, fix, maintain and/or stabilize the prices of eggs through artificial production restraints, exportation, reduction of supply, and joint pricing.

6.     As shown below in detail, Defendants conspired to and did reduce and constrain the supply of eggs and artificially inflate the price of eggs by the following means:

(a)     In 1999, Defendants agreed to a 5% molting of the flock, a 5% reduction of the flock, and a hatch reduction to reduce the number of hens laying eggs;

(b)     In 2001, Defendants agreed to reduce the egg supply by implementing an emergency flock reduction of 5%;

(c)     In 2002, Defendants developed a plan to manage purported overproduction by additional molting and hen disposal;

(d)     Also in 2002, Defendants agreed to implement and comply with an animal husbandry program developed by UEP, which mandated cage space requirements and limits on the number of birds per cage, which in fact was designed  for the purpose of and resulted in a decrease in the supply of eggs -- all under the guise of an animal care program;

(e)     In 2004, in addition to the UEP certification program described in (d) above, UEP continued to urge getting "back to our regular molt and kill intervals," causing Defendants to engage in another early molt and flock reduction; and

(f)     At various times during the Class Period, Defendants agreed to arrange for exports of eggs as a means of reducing domestic supply.

7.     These coordinated efforts by Defendants were designed to and did reduce the supply of shell eggs, which increased the prices of shell eggs and egg products throughout the Class Period.

8.     Plaintiffs and members of the class have been forced to pay supra-competitive prices for shell eggs and egg products and, thus, as a result of Defendants' illegal actions, have suffered antitrust injury.

9.      To provide a remedy for the injury suffered as a result of Defendants' illegal actions, Plaintiffs bring this case on behalf of indirect purchasers of shell eggs and egg products in each of the Class Jurisdictions under their respective antitrust and consumer protection laws, and under common law for unjust enrichment to recover damages.  Plaintiffs seek damages, injunctive relief, disgorgement of illegally-obtained profits and the costs of pursuit of this action, including reasonable attorneys' fees, for the injuries that Plaintiffs and class members sustained as a result of the Defendants' conspiracy to fix, raise, maintain and/or stabilize the price, and limit, reduce and otherwise manipulate the supply, of shell eggs and egg products.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 for injunctive relief, including reasonable attorneys' fees and costs of this litigation, for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs also bring this action pursuant to the state antitrust and consumer protection laws for damages, the common law of unjust enrichment, for disgorgement of illegally-obtained profits, and, where available by law, reasonable attorneys' fees and costs of this litigation.

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

12.      This Court has supplemental subject matter jurisdiction over the pendent state antitrust and consumer protection law claims under 28 U.S.C. § 1367.

13.      The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d) because (a) the members of the Class exceed 100; (b) citizenship of at least one proposed Class member is different from that of any Defendant; and (c) matter in controversy,

4

after aggregating the claims of the proposed Class members, exceeds $5,000,000, exclusive of interest and costs.

14.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this district.  In addition, the litigation was transferred to this District for pretrial purposes pursuant to 28 U.S.C. § 1407.

15.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of eggs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Further jurisdictional contacts are alleged below.

## **INTERSTATE TRADE AND COMMERCE**

16.     During the Class Period, Defendants produced, manufactured, distributed and sold eggs through the means of interstate commerce in a continuous and uninterrupted flow to customers located in states other than the states in which Defendants market and sell such products.  Defendants' actions substantially affected the supply of eggs flowing into each of the Indirect Purchaser States and inflated the price of eggs purchased by Plaintiffs in each of these states.

17.     Defendants have used instrumentalities of interstate commerce to market and/or sell eggs, including shell eggs and/or egg products.

**PLAINTIFFS**

18.     Within the Class Period, each Plaintiff purchased shell eggs and/or egg products in the state in which they reside or conduct business and suffered an economic injury as a result of Defendants' illegal conduct described in this Complaint.

19.     Plaintiff Scott Friedson is a resident of Chandler, Arizona.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

20.     Plaintiff Adam Properties, Inc. (d/b/a, Primo Thunder Market) is a California corporation, with its principal place of business in Oceanside, California. This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

21.     Plaintiff Scott Druschke is a resident of Los Angeles, California.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

22.     Plaintiff Pilar M. De Castro & Co., Inc. is incorporated under California law, with its principal place of business in Anaheim, California.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

23.     Plaintiff Charles Zebrowski is a resident of the District of Columbia. This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

24.     Plaintiff Deborah Andrews is a resident of Tampa, Florida.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

25.     Plaintiff Joan Gibbons is a resident of Sewall's Point, Florida.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

26.     Plaintiff Donn Camlin is a resident of Shawnee, Kansas.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

27.     Plaintiff Thomas Williams is a resident of Liberal, Kansas.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

28.     Plaintiff Patricia Tarrance is a resident of Lynn, Massachusetts.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

29.     Plaintiff Colette Merdzinski is a resident of Fremont, Michigan.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

30.     Plaintiff Sharon Defren is a resident of Mendota Heights, Minnesota.   This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

31.     Plaintiff Zelda Rogers is a resident of Franklin County, Nebraska.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

32.     Plaintiff Rachelle L. Hagendorf is a resident of Las Vegas, Nevada.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

33.     Plaintiff Lydia Neuman is a resident of Albuquerque, New Mexico.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

34.     Plaintiff Teresa M. Collins is a resident of Albany, New York.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

35.     Plaintiff Thomas McManus is a resident of Manhasset, New York.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

36.     Plaintiff Mark Moynahan is a resident of New York, New York.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

37.     Plaintiff Lynsey Allen is a resident of Charlotte, North Carolina. This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

38.     Plaintiff Kate Barry is a resident of Raleigh-Durham, North Carolina. This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

39.     Plaintiff James Anderson is a resident of Nashville, Tennessee. This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

40.     Plaintiff Michael Dobson is a resident of Salt Lake City, Utah.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

41.     Plaintiff Sandra Drown is a resident of Northfield, Vermont.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

42.     Plaintiff Lester Skinner is a resident of New Cumberland, West Virginia.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

43.     Plaintiff Richard Bentley is a resident of Madison, Wisconsin. This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

44.     Plaintiff Zeqiri Corp. is a resident of Oak Creek, Wisconsin.  This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.

## DEFENDANTS

45.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

46.     Allegations as to "Defendants" and/or "co-conspirators" herein refer to all named Defendants unless otherwise specified.

### Industry Trade Association Defendants

47.     Defendant UEP is a Maine cooperative corporation, with its office and principal place of business located in Alphretta, Georgia.  According to its website, UEP's membership represents more than 95% of the nation's laying hens.  Membership in UEP is open to egg producers and to non-egg producers such as "owners of breeder flocks, hatcheries, and started pullets [young hens], as well as contract egg producers ...."[2]

48.     According to its website, UEP was formed in 1968 by a group of producers who were "[c]oncerned with the disastrous price cycles of the egg industry" and decided to form an organization that could provide industry leadership. UEP's website indicates that the services it supplies to the industry are as follows:  providing price discovery, production and marketing information, and unified industry leadership; establishing a strong relationship with USDA;

---

[2] United Egg Producers, http://www.unitedegg.org/about_history.aspx (last visited Apr. 7, 2010).

developing a Washington presence; and supporting strong industry promotion efforts.[3]  UEP issues a bi-weekly newsletter entitled, "United Voices" to its members, which is unavailable to the general public.

49.     During the Class Period, Defendants' representative and employees were active members serving on UEP's Board of Directors, Marketing Committee, Shell Egg Price Discovery Committee, U.S. Egg Marketers Export Committee, and other committees.

50.     Defendant United Egg Association ("UEA") is a District of Columbia nonprofit corporation with its offices and principal place of business located in Alpharetta, Georgia. UEP's annual meetings are held in conjunction with UEA's meetings and members of the organizations attend joint meetings.

51.     Defendant United States Egg Marketers, Inc. ("USEM") is a Georgia nonprofit corporation, with its principal place of business located in Alpharetta, Georgia.  During the Class Period, Defendants utilized USEM to coordinate exports of eggs to reduce domestic supply and increase prices.

### Individual Company Defendants

#### Cal-Maine Foods, Inc.

52.     Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation, with its offices and principal place of business located in Jackson, Mississippi. During the Class Period, Cal-Maine's eggs were sold to indirect purchasers in the United States, including members of the Class.

---

[3] *Id.*

53.     Cal-Maine is the largest producer and marketer of shell eggs in the United States. It is also a leader in industry consolidation having completed fourteen (14) acquisitions since 1989.  According to its 2009 10-K, Cal-Maine sold approximately 778 million dozen shell eggs (accounting for approximately 18% of domestic shell egg consumption in the United States). Fred Adams, founder and CEO of Cal-Maine, was a founding member of UEP.

54.     In fiscal year 2007, 20% of Cal-Maine eggs were not produced by Cal-Maine; 7% were grown under production contracts and the remainder was purchased on the spot market.

55.     Cal-Maine's customers are divided approximately into 85% retail markets, 10% food-service markets, and 5% to other types of entities.  Some of Cal-Maine's brands include Egg-Land's Best, Rio Grande, and Sun Up.  Cal-Maine owns 25.9% non-voting equity interest in Egg-Land's Best and has an exclusive license agreement to market and distribute the Egg-Land's Best brand in major metropolitan areas, including New York City, and a number of states in the South.

56.     Cal-Maine is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Cal-Maine.  During the time that the conspiracy was in effect, a Cal-Maine representative served as chairman of the UEP.  In 2008, Cal-Maine employees served on various UEP committees, including UEP's:  (a) Executive Committee; (b) Finance Committee; (c) Shell Egg Price Discovery Committee; (d) Shell Egg Marketing Committee; (e) Quality Assurance/Food Safety Committee; (f) Producer Committee for Animal Welfare; (g) Long Range Planning Committee; and (h) the United States Egg Marketers Export Committee.  Cal-Maine employees have attended UEP and Urner Barry, Inc.

("Urner Barry")[4] conferences and/or meetings and participated in industry efforts and programs designed to reduce the supply of eggs and to fix egg prices.  Cal-Maine has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Cal-Maine has furthered the conspiracy by, among other things, selling UEP certified eggs and reducing its egg supply as a result.  Cal-Maine has also furthered the conspiracy by exporting its proportionate share of eggs at below domestic prices in order to reduce domestic supplies.

<u>Michael Foods, Inc.</u>

57.     Defendant Michael Foods, Inc. ("Michael Foods") is a Delaware corporation, with its principal place of business located in Minnetonka, Minnesota.  During the Class Period, Defendant Michael Foods marketed and sold shell eggs and/or egg products to indirect purchasers in this district and the United States, including members of the Class.  Michael Foods is the largest North American producer of processed egg products, and is one of the largest North American eggs producers, with a 45% share of the egg products market.

58.     According to its 2009 10-K, Michael Foods' Egg Products Division (Food Services, and Food Ingredients) derived approximately 98% of their net sales from various egg products, with the remaining 2% coming from shell eggs.  Michael Foods' Processed Egg Products Division does business through several wholly-owned operating subsidiaries including: M.G. Waldbaum Company, Papetti's Hygrade Egg Products, Inc., Abbotsford Acquisition Corp.,

---

[4] Urner Barry is a publisher of daily and monthly newsletters and is a price reporting service for the egg industry, among others.  Urner Barry's newsletters publish egg price quotations that are widely relied on in the setting of wholesale egg prices under spot purchasers and long-term contracts.

MFI Food Canada, Ltd., and through its majority owned subsidiary Trilogy Egg Products Inc. Michael Foods follows  Urner Barry for its pricing of egg products in North American markets.

59.     Defendant Papetti's Hygrade Egg Products, Inc. ("Papetti's"), a wholly-owned subsidiary of Michael Foods, is a New Jersey corporation with its principal place of business located in Elizabeth, New Jersey.  Papetti's marketed and/or sold egg products in this district and the United States during the Class Period.

60.     Michael Foods has been an active participant in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

<u>Land O'Lakes Inc., Moark LLC, and Norco Ranch</u>

61.     Defendant Land O'Lakes Inc. ("Land O'Lakes") is a Minnesota corporation, with its offices and principal place of business located in Arden Hills, Minnesota.  During the Class Period, Land O'Lakes sold shell eggs and/or egg products to indirect purchasers in the United States directly or through its subsidiaries and affiliates, including members of the Class.

62.     Land O'Lakes is the parent company of Moark LLC ("Moark").  Land O'Lakes has been an active participant in and profited from Moark's, UEP's, and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Moark Productions, the predecessor to Moark LLC, was formed in 1957.  Moark Productions formed a joint venture with Land O'Lakes in 2000 to form Moark LLC -- a national, consolidated egg company.  Moark developed a national LAND O'LAKES<sup>TM</sup> brand egg to complement other brands it marketed.  In 2006, Land O'Lakes acquired 100% of the ownership of Moark.  Moark and its subsidiaries are referred to as the "Layer" or "Egg" division of Land O'Lakes.  During the time period of this joint venture, Moark was an active participant in the conspiracy, as alleged herein.

63.     Defendant Moark is a Missouri limited liability company, with its offices and principal place of business located in Norco, California.  During the Class Period, Moark sold shell eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

64.     Land O'Lakes, operating through its subsidiary, Moark, marketed and processed 523 million dozen eggs from approximately 24 million layers (hens) per year.  Moark produces and markets shell eggs that are sold under corporate brands and national brand names such as LAND O'LAKES All-Natural Farm Fresh Eggs and Eggland's Best, as well as non-branded shell eggs.

65.     Moark/Land O'Lakes is the nation's third-largest producer and marketer of shell eggs.  Moark/Land O'Lake's annual egg sales are approximately $500,000,000.

66.     Moark is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Moark. Moark employees have served on various UEP committees, including:  (a) the UEP Executive Committee (secretary); (b) Finance Committee; (c) Government Relations Committee; (d) Shell Egg Price Discovery Committee; (e) Shell Egg Marketing Committee; (f) Quality Assurance/Food Safety Committee; (g) Producer Committee for Animal Welfare; (h) Public Relations Committee; (i) Long Range Planning Committee; and (j)  the United States Egg Marketers Export Committee.  Throughout the Class Period, Moark employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Moark has participated in and profited from UEP's and its co-conspirators˙ efforts to reduce supply and fix prices, as outlined herein.   Moark has furthered the conspiracy by participating in the industry "certification" and "export" programs designed to reduce the supply of eggs in the market.

15

67.     Moark is the parent company of Norco Ranch, Inc.

68.     Norco Ranch, Inc. ("Norco Ranch") is a California corporation, with its offices and principal place of business located in Norco, California.  It is a subsidiary of Moark.  During the Class Period, Norco Ranch sold shell eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

69.     During the Class Period, Norco Ranch has been a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Norco Ranch, including on UEP's Government Relations Committee.  Norco Ranch employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Norco Ranch has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Norco Ranch has furthered the conspiracy by selling UEP certified eggs and has reduced its egg supply as a result.

Rose Acre Farms

70.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is an Indiana corporation, with its principal place of business located in Seymour, Indiana.  During the Class Period, Rose Acre marketed, sold, and/or distributed shell eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

71.     Rose Acre is one of the largest egg producers in the United States.

72.     Rose Acre is a vertically integrated operation handling all of its own breeding chicks, milling feed, harvesting, cleaning, sorting, packing, and shipping eggs directly to retailers.

73. Rose Acre's brands include: White Shell Eggs, GreatEgg's Vita-D, GOLDEN-PREMIUM, Brown Shell Eggs (Large & Jumbo), Christopher Eggs, Eggland's Best, and GreatEggs. Rose Acre's annual sales are estimated to be approximately $192,300,000.

74. Rose Acre is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Rose Acre. Rose Acre employees have served on UEP's Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Environmental Committee, and Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, Environmental Scientific Panel, and the United States Egg Marketers Export Committee. Rose Acre employees have attended UEP meetings and promoted efforts to reduce supply and artificially raise prices.

National Food Corporation

75. Defendant National Food Corporation ("National Food") is a Washington corporation, with its offices and principal place of business located in Everett, Washington. During the Class Period, National Food sold shell eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

76. National Food is a fully integrated producer and processor of eggs and egg products. National Food operates its own feed mills, pullet farms, layer farms, processing plants, and distributions centers in Washington, Oregon, Montana, and South Dakota and serves markets throughout the Pacific Northwest, Alaska, Hawaii, and the Midwest.

77. National Food sells shell eggs and egg products including, e.g., whole eggs, egg whites, yolks, and peptex.

78.     National Food is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of National Food. During the time that the conspiracy was in effect, a National Food representative served as chairman of the UEP and promoted the conspiracy as alleged herein.  National Food employees have served on UEP's Shell Egg Price Discovery Committee, Shell Egg Marketing Committee (chair), Public Relations Committee, Long Range Planning Committee, and the United States Egg Marketers Export Committee (secretary).  National Food has been an active participant in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

### Hillandale Farms and Ohio Fresh Eggs

79.     Hillandale Farms comprises various companies -- including Defendants Hillandale Farms of Pa., Inc.; Hillandale-Gettysburg, L.P., Hillandale Farms East, Inc.; and Hillandale Farms, Inc. -- that function as an integrated enterprise producing and selling shell eggs, including those produced by affiliate Defendant Ohio Fresh Eggs, LLC.

80.     According to its website, Hillandale Farms, with production facilities in the Northeast, Midwest, and Southeast, is "a vertically integrated supplier ... directly involved in every aspect of egg production and distribution."[5]  Each of the Hillandale Farms constituent companies is owned and/or controlled by Orland Bethel, Gary Bethel, and/or Don Hershey.

81.     Hillandale Farms sells eggs for resale under various of its own brands, such as Hillandale Farms, Nearby Eggs, and Hartford Farms, as well as corporate store brands.

---

[5] Hillandale Farms, http://www.hillandalefarms.com (last visited Apr. 7, 2010).

Hillandale Farms also packs its own brands of eggs under the following labels: Hillandale Farms, Nearby Eggs, and Hartford Farms.  During the Class Period, Hillandale Farms' eggs and/or egg products were sold to indirect purchasers in the United States, including members of the Indirect Purchaser Class.

82.     Defendant Hillandale Farms of Pa., Inc. ("Hillandale PA") is a Pennsylvania corporation, with its principal place of business located in North Versailles, Pennsylvania. Hillandale PA is part of the Hillandale Farms integrated enterprise.  It is owned by Orland Bethel, the company's president, and Gary Bethel, the company's vice president.

83.     Defendant    Hillandale-Gettysburg,    L.P.    ("Hillandale-Gettysburg")    is    a Pennsylvania limited partnership, with its principal place of business located in Gettysburg, Pennsylvania. Hillandale-Gettysburg is part of the Hillandale Farms integrated enterprise. Hillandale-Gettysburg is owned by Orland Bethel and Don Hershey, who is also the president of HGLP LLC, the general partner of Hillandale Gettysburg.

84.     Defendant Hillandale Farms East, Inc. ("Hillandale East") is a Pennsylvania corporation, with its principal place of business located in Spring Grove, Pennsylvania. Hillandale East is part of the Hillandale Farms integrated enterprise.  It is owned by Gary Bethel, the company's president, and Orland Bethel, the company's secretary and treasurer.

85.     Defendant Hillandale Farms, Inc. is an Ohio corporation, with its principal place of business located in Corry, Pennsylvania.  Hillandale Farms, Inc. is part of the Hillandale Farms integrated enterprise.  It is owned by Orland Bethel and Gary Bethel, the company's president.

86.     In 2008, individuals affiliated with Hillandale Farms, including Ron Ballew and James Minkin, served on UEP's Shell Egg Marketing Committee and Environmental Committee.

87.     Defendant Ohio Fresh Eggs, LLC ("Ohio Fresh") is an Ohio limited liability company, with its principal place of business located in Croton, Ohio.  It owns egg production facilities in Ohio and is a member of the UEP.

88.     During the Class Period, 70% of the interest in Ohio Fresh was held by Hillandale Farms LLC, the sole member of which is Orland Bethel.  30% of the interest in Ohio Fresh was held by Eggs Manager LLC ("Eggs Manager"), the sole member of which is Don Hershey. Pursuant to agreements executed December 26, 2003, Hillandale PA purchases all eggs produced by Ohio Fresh and Eggs Manager manages and supervises the operations of Ohio Fresh.

89.     Hillandale Farms, as an integrated enterprise, and its affiliate and supplier Ohio Fresh, have been active participants in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices as outlined herein.  During the Class Period, Hillandale Farms was a member and/or participated in egg exports for the purpose of reducing the domestic egg supply and raising prices, while sharing any financial losses incurred with other members.

Daybreak Foods

90.     Defendant Daybreak Foods, Inc. ("Daybreak Foods") is a Wisconsin corporation, with its offices and principal place of business located in Lake Mills, Wisconsin.

91.     Daybreak Foods is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Daybreak Foods.  In 2001, Bill Rehm of Daybreak Foods was appointed as Chairman for the Egg Products Price Discovery Committee.  Rehm was appointed to the UEP Board of Directors in at least 2001,

2002, 2004, 2005 and 2007. In 2008, Daybreak Foods employees served on several UEP committees, including Government Relations Committee, Environmental Committee, and Quality Assurance/Food Safety Committee.

92.     Daybreak Foods has been an active participant in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

Midwest Poultry Services

93.     Defendant Midwest Poultry Services, L.P. ("Midwest") is an Indiana limited partnership, with its offices and principal place of business located in Mentone, Indiana. During the Class Period, Midwest sold eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

94.     Midwest is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Midwest. Midwest employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. Midwest Poultry employees have served on UEP's Executive Committee (First Vice Chairman), Shell Egg Price Discovery Committee, Environmental Committee, and the Producer Committee for Animal Welfare. Midwest has been an active participant in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as shown herein.

NuCal Foods

95.     Defendant NuCal Foods, Inc. ("NuCal Foods") is a California corporation, with its offices and principal place of business located in Ripon, California. During the Class Period, NuCal Foods sold eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

96.     NuCal Foods is incorporated as an agricultural cooperative in California. Egg producers that are part of NuCal Foods include: (a) Gemperle Enterprises, Inc. of Turlock, California; (b) Sunrise Farms LLC of Petaluma, California; (c) J. S. West Milling Co. of Modesto, California (whose president was Chairman of UEP in at least 2008 and 2009); and (d) Valley Fresh Foods, Inc. of Turlock, California.

97.     NuCal Foods is one of the largest distributors of shell eggs in the Western United States. NuCal Foods is a totally integrated egg producer from production through distribution and processes approximately 7.5 million eggs per day.

98.     NuCal Foods products include: Becky, Cal Egg, California Finest, Chefs Best, Clover Stornetta Farms, Crack A Smile Omega 3 & Lutein, Egg-Land's Best, Lucerne (Safeway), Nulaid (white), Supermarket private label eggs, and Santa Rosa.

99.     NuCal Foods is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of NuCal Foods. NuCal employees have served on UEP's Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance Committee, and United States Egg Marketers Export Committee (Vice Chair). NuCal Foods employees have attended UEP meetings and promoted efforts to reduce supply and fix prices. NuCal Foods has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

<u>R.W. Sauder</u>

100.    Defendant R. W. Sauder, Inc. ("Sauder") is a Pennsylvania corporation, with its offices and principal place of business located in Lititz, Pennsylvania. During the Class Period, Sauder sold shell eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

101.    Sauder sells the following products: Sauder's Gold Eggs, Sauder's Organic Eggs, Sauder's Deviled Egg Kit, Sauder's Hard Cooked Flavored Eggs (Red Beet, Mustard, & Southwestern), Sauder's Hard Cooked Eggs, Sauder's Hard Cooked Eggs - 10 Egg Pouch, Sauder's 8 pack Hard Cooked, Sauder's Twin 18 pack (3 doz.) and wholesale eggs and egg products in various sizes and packages.

102.    Sauder is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Sauder.  Sauder employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Sauder has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

### Unidentified Co-Conspirators

103.    Various other persons, firms and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

104.    The true names and capacities, whether individual, corporate, associate, or representative is unknown to Plaintiffs at this time.  Plaintiffs will amend this Complaint to allege the true names and capacities of additional co-conspirators as their identities become known through discovery.

105.    At all relevant times, cage producers, egg trade groups, egg farm software companies, and other shell egg producers and egg product manufacturers or other entities, referred to herein as "co-conspirators," as well as other various persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

23

106.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this action on their own behalves and as a class action on behalf of indirect purchasers nationwide pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following class:

### Indirect Purchaser Injunctive Class

All individuals and entities in the Class Jurisdictions who indirectly purchased eggs, including shell eggs and/or egg products, produced from caged birds in the United States by Defendants' or their co-conspirators' during the Class Period from January 1, 2000 through the present.

108.    Plaintiffs also bring this action on their own behalves and as class actions on behalf of indirect purchasers in the Class Jurisdictions pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following classes (collectively the "Indirect Purchaser State Classes"):

### Arizona Indirect Purchaser Class

All individuals and entities residing in Arizona that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### California Indirect Purchaser Class

All individuals and entities residing in California that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### District of Columbia Indirect Purchaser Class

All individuals and entities residing in the District of Columbia that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Florida Indirect Purchaser Class

All individuals and entities residing in Florida that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Iowa Indirect Purchaser Class

All individuals and entities residing in Iowa that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Kansas Indirect Purchaser Class

All individuals and entities residing in Kansas that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Maine Indirect Purchaser Class

All individuals and entities residing in Maine that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Massachusetts Indirect Purchaser Class

All individuals and entities residing in Massachusetts that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Michigan Indirect Purchaser Class

All individuals and entities residing in Michigan that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Minnesota Indirect Purchaser Class

All individuals and entities residing in Minnesota that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Mississippi Indirect Purchaser Class

All individuals and entities residing in Mississippi that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Nebraska Indirect Purchaser Class

All individuals and entities residing in Nebraska that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Nevada Indirect Purchaser Class

All individuals and entities residing in Nevada that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### New Mexico Indirect Purchaser Class

All individuals and entities residing in New Mexico that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### New York Indirect Purchaser Class

All individuals and entities residing in New York that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### North Carolina Indirect Purchaser Class

All individuals and entities residing in North Carolina that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### North Dakota Indirect Purchaser Class

All individuals and entities residing in North Dakota that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Puerto Rico Indirect Purchaser Class

All individuals and entities residing in Puerto Rico that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### South Dakota  Indirect Purchaser Class

All individuals and entities residing in South Dakota that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Tennessee Indirect Purchaser Class

All individuals and entities residing in Tennessee that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Utah Indirect Purchaser Class

All individuals and entities residing in Utah that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### Vermont Indirect Purchaser Class

All individuals and entities residing in Vermont that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

### West Virginia Indirect Purchaser Class

All individuals and entities residing in West Virginia that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

**Wisconsin Indirect Purchaser Class**

All individuals and entities residing in Wisconsin that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period from January 1, 2000 through the present.

109.     The Indirect Purchaser Injunctive Class and the Indirect Purchaser State Classes are collectively referred to as the "Class" or "Classes" throughout this Complaint.

110.     Excluded from the Classes are Defendants' subsidiaries and affiliates and all persons who purchased eggs directly from any Defendant or any other producer of eggs.  Also excluded from the Classes are purchases of "specialty" shell eggs or egg products such as "organic," "free-range," or "cage-free," and hatching eggs purchased by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

111.     Plaintiffs reserve the right to amend the definitions of the Classes when Plaintiffs move for class certification.

112.     Plaintiffs do not know the exact size of the Classes at the present time.  However, due to the nature of the trade and commerce involved, there are thousands of class members, geographically dispersed throughout the United States such that joinder is impracticable.

113.     Plaintiffs' claims are typical of the claims of the Classes, and Plaintiffs will fairly and adequately protect the interests of those Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class members.  Plaintiffs have retained competent counsel experienced in complex antitrust and consumer protection class action litigation.

114.     Class treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged in this Complaint.  Class treatment will permit the large number of Class members to  prosecute their claims based on common legal and factual issues in

a single forum  and proceeding and thus to pursue such claims efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

115.    There are questions of law and fact common to the Classes, including, but not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy to raise, stabilize, fix and/or maintain prices of eggs, including shell eggs and/or egg products, sold in the United States, including the Class Jurisdictions;

(b)    The duration and extent of the contract, combination or conspiracy alleged herein;

(c)    Whether Defendants and their co-conspirators were participants in the contract, combination or conspiracy alleged herein;

(d)    Whether Defendants took steps to actively conceal the combination or conspiracy from Plaintiff and other class members;

(e)    The effect of the contract, combination or conspiracy upon the prices of eggs, including shell eggs and/or egg products sold by Defendants in the United States, including the Class Jurisdictions, during the Class Period; and

(f)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and other members of the Classes.

(g)    Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act; and

(h)    What type of injunctive relief is appropriate.

116.    Additional questions of law and fact common to the Indirect Purchaser State Classes respectively, include, but are not limited to:

(a)    Whether the alleged contract, combination or conspiracy violated the antitrust, consumer protection and/or unfair trade statutes of the Class Jurisdictions; and

    (b)     The appropriate measure of damages sustained by the Plaintiffs and other members of the Indirect Purchaser State Classes.

117.    Questions of law and fact common to members of the Classes predominate over any questions which may affect only individual members.

118.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## THE ORGANIZATIONAL STRUCTURE AND ECONOMIC CONDITIONS WITHIN THE EGG INDUSTRY RENDER IT RIPE FOR COLLUSION

119.    The ability of competitors in an industry to successfully collude by reducing output (and thereby increasing price) can be facilitated by certain structural aspects of an industry.  Several structural features of the egg industry make the likelihood of collusion greater and the chances of its success more probable.  These factors include:  (a)  the lack of product differentiation or high substitutability of product between different producers;  (b) the prevalence of cross marketing arrangements that facilitate price communication between rivals; (c) relative concentration within the industry; and (d) high demand price inelasticity.

120.    The U.S. egg industry is composed of two related sectors, the "shell egg" sector and the "egg products" sector, which also includes "liquid eggs."

121.    Shell eggs are commonly designated for one of three purposes: immediate consumption (commonly referred to as "table eggs"), processing (commonly referred to as "breaker eggs"), or hatching.  Shell eggs are purchased by grocery stores in cartons for resale to the consuming public.  Shell eggs are also purchased by entities such as hotels, restaurants and other institutions for meal preparation.

122.    In 2007, retail shell and foodservice eggs represented a total of 68% of the egg market share, with retail shell eggs accounting for 59% and foodservice accounting for 9%. There are only two major forms of delivery for shell eggs to the food at home retail egg market. They are (a) direct purchases by food retailing firms such as supermarkets and convenience stores; and (b) first-level indirect purchases by food retailing firms.

123.    Shell eggs sold to the food service industry represent a small but not insignificant share of total egg sales.  In restaurants such as Denny's, the use of shell eggs is essential to menu items and choices for preparation offered customers.

124.    Egg products are either shell eggs substitutes such as liquid, frozen, and dry eggs, or manufactured products incorporating processed eggs such as baked goods and mayonnaise. The egg products sector consists primarily of eggs that have been removed from their shells for processing.   The processing of egg products includes, but is not limited to, breaking eggs, filtering, mixing, stabilizing, blending, pasteurizing, cooling, freezing or drying, and packaging.

125.    In 2007, egg products, and broken eggs made up 31% of the market.[6]  Processed egg products are distributed through either grocery or foodservice channels.

126.    Both shell eggs and egg products are readily substitutable.  One producer's shell eggs or egg products may be easily substituted for product supplied by another supplier. Therefore, shell egg and egg product buyers make purchase decisions based largely, if not entirely, on price.

---

[6] The remaining 1% was attributable to exports.

127.    Demand for shell eggs and egg products is highly inelastic.  The demand for eggs is fundamentally driven by consumers seeking whatever actual and perceived benefits eggs offer compared to other food choices.  Eggs play in important part in the overall U.S. food system, often serving as an inexpensive alternative to competing products or as a source of protein or texture that adds little cost to other, more expensive processed products.  As a source of protein, for example, eggs are much cheaper than most or all meat and nut based protein alternatives.

128.    Given that eggs are considered a staple and essential food item, their low cost, the lack of substitutes and short shelf life of eggs, many consumers pay little to no attention to egg prices and simply purchase the desired quantity.  As such, consumption of eggs by indirect purchasers is not very responsive to changes in price.  Egg producers are aware of the inelasticity of demand and have been able to raise their prices without losing sales revenues.

129.    The egg industry has undergone substantial consolidation within the last few years.  For example, in 1997, Defendant Michael Foods acquired Defendant Papetti's.  In 2001, Moark acquired Cutler Egg Products, which gave Moark access to, among other things, a patented process that extended the shelf life of refrigerated liquid egg product.

130.    A December 2008 Star Tribune article indicated that there are about 250 businesses that produce 95% of the nation's eggs, and that because of this consolidation there are increasing barriers to entry.[7]

---

[7] Richard Meryhew and Chris Serres, *Our Hungry Planet: Golden Eggs*, Star Tribune, Dec. 8, 2008.

131.    Due to this consolidation, the egg industry consists largely of vertically integrated producers who have a tremendous amount of control over every stage of the production of their products.  The egg industry is distinctly different from many other animal industries in that egg producers often own and manage nearly every aspect of their business (e.g., hatching/rearing of birds, feeding, housing, husbandry, processing, packaging, and marketing of their product) and meticulously oversee the entire process.

132.    The United States International Trade Commission ("ITC") has stated that"[o]ver the past several years, the egg-processing industry has become increasingly vertically integrated. Most of the large firms now either own egg production facilities or have production contracts with local egg producers."  The ITC stated that, "[v]irtually all egg production is accounted for by vertically integrated operations."  According to the ITC, the primary reasons for this include the industry's "relatively short production cycle involving fast turnover and high production volumes that lead to economies of size) and the linkages between specialized, discrete production stages (hatching, raising of hens, laying, processing, and marketing)."

133.    The largest shell egg processors also have numerous cross-marketing agreements, private labeling agreements, and joint partnerships in various egg farms and processing plants. As a result of these arrangements, Defendants exchange pricing information between themselves that enables them to frequently communicate about price and monitor each others' price behavior and output.

## DEFENDANTS' CONSPIRACY TO REDUCE OUTPUT

A.  **UEP and Other Trade Organizations Helped Formulate and Facilitate the Conspiracy**

134.  Defendant UEP is the largest egg trade organization in the United States.  It was formed in 1968 after a group of egg producers got together to discuss the "disastrous price cycles of the egg industry."  The producers formed UEP to provide services to the egg industry, namely, "price discovery, production and marketing information, unified industry leadership, [ ] a strong relationship with USDA, [ ] a Washington presence, [and] strong industry promotion efforts."

135.  Initially formed by five (5) regional co-ops, in 1998 UEP amended its charter to become a group composed of individual members farms and producers.

136.  According to its October 26, 2007 newsletter, "[i]t was announced during UEP's Annual Membership Meeting that the organization's membership was at the highest level ever with 198 members representing 270 million hens or 96% of the nation's total hens."

137.  UEP's bi-weekly newsletter "United Voices" is distributed to its members and is not available to the general public.  The newsletter served a prominent role in fostering communication and coordination of output restriction among members in a manner that was shielded from the general public.  Gene Gregory, UEP's President, acknowledged his efforts to coordinate egg industry output: "I've been writing 'United Voices' since 1992 and have on many occasions written about managing the supply side of our business and attempted to give UEP members warnings of future problems if the supply side is not watched very carefully."

138.  Defendant UEA is a nonprofit corporation trade association managed by UEP. One of the other groups making up the UEP "alliance" is Defendant USEM, a nonprofit corporation that negotiates egg export sales.  USEM describes itself as "[a] producer cooperative

34

established specifically for the purpose of exporting large quantities of U.S. Shell Eggs."   In 2000, USEM merged with UEP and has since been managed by UEP as a "subsidiary" or "division" of the organization.

139.    UEP, UEA and USEM all share the same address: 1720 Windward Concourse, #230, Alpharetta, Georgia 30005.

### B.    Defendants' Agreement to Reduce the Domestic Supply of Eggs

#### 1.    Defendants' Early Attempts at Industry Supply Restriction

140.    Beginning as early as 2000 and continuing until the present time, the exact dates being currently unknown to Plaintiffs, certain egg processors and producers entered into a conspiracy in unreasonable restraint of trade and commerce in violation of the antitrust and unfair competition laws.

141.    Certain shell egg and egg products processors engaged in a conspiracy between and among themselves and non-cooperatives members to fix, maintain and increase prices through, among other things, reducing the supply of eggs by jointly reducing flock size by early molting, by agreeing to increase layer cage sizes under the pretext of animal husbandry standards, and by engaging in mass exporting in order to reduce gross flock and shell egg harvest sizes.

142.    UEP's poultry research economist, Donald Bell, advocated slowing the rate of increase of the hatching egg flock, thus reducing production and increasing prices.  In 1994, Bell wrote:  "More hens, less income! . . . The U.S. has no way to control its flock size other than

through the persuasive influence of trade associations such as UEP … Remember – in the egg industry, 'more means less' – it always has and it will always be so."[8]  The U.S. flock grew by only a fraction of a percent in 1995 and only 1% in 1996, compared with a 6% growth rate in 1991.  Therefore, prices rose in late 1995 and remained strong throughout 1996.[9]

143.    Recognizing the dramatic effect the quantity of eggs supplied to the market has on eggs price, as well as responding to concerns over low prices, UEP decided in 1999 to act as the conduit for an industry-wide supply control agreement.  According to an *Egg Industry* newsletter from November 1999, the following occurred at one of UEP's meetings:

> The Marketing Committee chaired by Dolph Baker, Cal-Maine Foods discussed and approved two extremely important issues. The current situation in the egg industry regarding price, as described by Chairman Baker, is in a crisis condition and the industry is hemorrhaging because of the low price.
>
> It was pointed out by both Chairman Baker and Ken Looper, who provided statistics for the meeting, that the industry is in a defensive mode regarding the price situation. It was suggested that action be taken immediately to go on the offense regarding this particular situation. Ken Looper provided numerous statistics showing the trends over the years regarding price vs. bird population.
>
> At the present time there are in excess of 7 million hens over what the economic limit should be.
>
> It was decided that a bold move should be made to immediately reduce the number of hens that are currently producing eggs. After considerable discussion, a motion was made and passed addressing the challenge in three phases:

---

[8] Donald Bell, *When More Means Less!*, An Egg Economics Update, No. 145, Apr. 15, 1994.

[9] *Industry and Market Reports - Chicken Eggs*, Goliath (updated Apr. 1, 2010)

- Immediate molt of 5% of the flock.

- Cut back 5% on flock inventory over the next 6-12 months.

- Develop a hatch reduction program.

********

Additionally UEP was encouraged to become more active in pushing the industry to accept responsibility of expansion and its educating the industry as to the ramifications of over-production. This relates to the increased production and building of new facilities that is now taking place.

144. UEP's members also voted to reduce flock size, which included an agreement to maintain flocks at a 6% reduced level through July 1, 2000. The December 4, 2000 UEP newsletter reported that the goal of a 6% reduction in chicks hatched "has been met." As a result, "[i]mproved egg prices have come with these changes. Large prices for the last five (5) months of 2000 are expected to average 10 cents per dozen over prices during the same period of 1999 …. Through a cooperative effort, everyone has benefitted."

145. A June 26, 2000 UEP newsletter discussed that starting in December 1999, there was a chick hatch reduction in comparison to the same month a year earlier. UEP's Marketing Committee had recommended a 6% chick hatch reduction program for this year and that the first four months indicated that the recommendation was being followed and they were on target to meet their goal. Moreover, that newsletter discussed a consumer focus group in which consumers were asked what price they considered "too high" for eggs. The response was that: "All would still buy eggs in the range of $2.00 to $3.00 per dozen." An industry article regarding this agreement indicated that it "worked" and "the year-end flock was just 3.7 million hens larger than the year before and producers experienced a good holiday run and profitable year.

146.    In its August 7, 2000 newsletter, the UEP discussed supply and demand in the following context.

> During the first six (6) months of 2000 we hatched 6.7 million less pullet chicks than during the same period a year earlier.  During the same period we have disposed of 3.3 million more spent hens than during the same period a year earlier.
>
> Despite these positive adjustments, the industry continues to suffer through prices that are below the cost of production.  We see no reason why prices should be below the cost of production when considering the increasing market demand.

147.    A September 4, 2000 UEP newsletter discussed the UEP's Producer Committee's recommendation of a 10 year phase-in plan regarding animal welfare guidelines involving a cost increase to move to a larger space allowance per hen.  The newsletter stated, "**[e]very producer is urged to determine their individual cost and pass this cost onto their customers**." (Emphasis in original). The newsletter also discussed egg prices and noted that, "[i]t's hard to make a case for prices higher than last year for the rest of 2000 unless the rate of production increases is slowed significantly."

148.    In September 2000, the UEP noted a "need to reduce flock size" and stated that "**[i]t appears that we may be only 4 million hens away from profitable prices.  A surplus of no more than 2% is creating severe economic conditions.  Would every producer consider ways in which they could reduce their flock size by 2%?**"  (Emphasis in original).  The newsletter also discussed that "on a good note" the chick hatch continued to decrease.

149.    The following month, the UEP noted that flock size had been reduced by 3.9 million hens since March 1, the chick hatch for August was 3% lower than the same month a year earlier and is 5% below 1999 levels for the eight months of the year.  In summary, "[b]ased

upon all facts of increasing people population, increasing per capita consumption and a flock reduction, egg prices should be improving."

150.    A year-end December 18, 2000 UEP newsletter congratulated egg producers on their collusive behavior:  "financial disaster was predicted for 2000 as we forecast egg prices to be below the cost of production for all 12 months."  However, the newsletter continued that as a result of implementation of UEP's Marketing Committee's recommended action plan, "[e]gg producers responded by making adjustments.  By August these changes began to pay off with prices moving up to levels above the cost of production for most producers for the balance of the year. **The industry benefited with revenues of approximately $400 million over the forecast for the year**."  (Emphasis in original).

### 2.    Defendants Continue to Collude to Reduce Supply, But Determine Concerted Long-Term Supply Reduction Solutions Are Required

151.    Coordinated efforts to improve egg prices continued in 2001. An April 30, 2001 UEP newsletter indicated that the "best solution for improving the current domestic egg prices may be molting and slaughter .... To avoid a prolonged period of depressed prices, every producer is encouraged to look at the statistics to make the flock adjustments to maximize the returns for their farm."

152.    In its June 25, 2001 newsletter, UEP continued to urge its members to "manage your supply side of the business for both the short and long term."  Specifically, the newsletter urged: **"SHORT TERM:  Dispose of old flocks 4 weeks earlier than scheduled starting with week of June 18th and continuing for 16 weeks.-Molt hens at 62 weeks of age starting with week of June 18 and continuing for 16 weeks.  LONG TERM:  By any means possible;**

**reduce the average age of your flock by 2 weeks and maintain this until the end of 2002."**
(Emphasis in original).

153.    The plan was addressed again in UEP's September 3, 2001 newsletter, which provided that "it would be wise to seriously consider the following recommendation:  (a) dispose of flocks 4 weeks earlier than scheduled; (b) molt hens at 62 weeks of age; and (c) reduce the intended day old pullet chick placement by 5%."

154.    Moreover, there was a UEP Annual Meeting & Executive Conference held during the week of October 15, 2001 in Lake Las Vegas Resort in Henderson, Nevada.  An October 15, 2001 UEP newsletter stated that at the conference, "[t]he marketing committee will be reviewing supply demand projections with hopes that producers will see the merits in reducing the flock size to meet the market demand."

155.    During this conference attended by Defendants' representatives, Urner Barry was invited to discuss egg pricing and pricing systems.  Richard Chilson, of AgriSoft|CMC (f/k/a, Chilson Management Controls), a consultancy and IT management firm for the chicken, egg, turkey and swine industries, also advised Defendants and other shell egg producers and egg processors about pricing and marketing.  As reported in UEP'S September 3, 2001 newsletter, "[w]ith price discovery being such a critical component of the industry's profitability, a great deal of time will be devoted to this subject at UEP's Annual Meeting and Executive Conference being held October 17 - 19 …. Bob Krouse and Dick Chilson will offer ideas and models for a cost plus program that has a proven record and potential for a percentage of your shell egg marketing."

156.    In late 2001 Defendants and co-conspirators attended a UEP meeting and agreed to an "emergency flock reduction" of 5%.  This "emergency plan ask[ed] producers to begin

running 100,000-hen houses at 95% capacity by de-stocking one bird per cage until houses reached the 95% capacity goal."

   **3. In Furtherance of their Conspiracy, Defendants Implement a Supply Reduction Scheme Under the Pretext of Improved Animal Husbandry**

  157. One problem that typically confronts a cartel involved in reducing output as a method of increasing or maintaining prices is that each cartel member has the incentive to "cheat," that is to fail to abide by their commitments to reduce output.  By cheating, a cartel member may benefit from the supra-competitive prices obtained as a result of other member's adherence to output restriction, while at the same time, reaping the advantages of the higher prices through expanded sales of their own.  To successfully confront the incentive to cheat, a successful cartel will frequently create enforcement mechanisms -- methods to ensure verification that each of the cartel members have abided by the output restrictions to which they have committed.

  158. Thus, at a UEP Board meeting on January 14-15, 2002, there were discussions regarding a space allowance phase-in-plan (which would have the effect of reducing output), a certification program, to identify farms that are meeting the guidelines, and, most importantly, an auditing procedure to verify farms as meeting guidelines and thereby being classified as "certified farms."  At the meeting, the Board approved a space allowance phase-in plan.

  159. The UEP adopted the "Animal Care Certified Program," including explicit output reduction practices as well as stringent audit requirements, to ensure that certified companies were implementing the output reduction practices.  Certification required a producer to  (a) meet cage space allowance on schedule as identified as "all day-old-chicks hatched after April 1, 2002 will be placed in the layer house based upon a house average of 56 square inches

41

per hen,…;" (b) commit to meeting the guideline for beak trimming as each flock reaches the age at which time the trimming will be conducted, beginning on July 1, 2002; (c) commit to meeting the guidelines for molting as each flock reaches the age at which the molt will be induced, beginning on July 1, 2002; (d) commit to meeting the guidelines for handling and transportation for both pullets and spent hens as each flock reaches the age at which time this must occur, beginning on July 1, 2002; (e) agree to be audited annually by a 3rd party independent auditor to confirm that the company is meeting guidelines; (f) agree to provide UEP with a copy of the audit results upon the completion of each audit; and (g) recognize that passing the audit is necessary in order to maintain the certification status.

160.     Six regional meetings were held between February 18 and February 28, 2002, whose purpose was to establish the timing for meeting UEP's output reduction guidelines, which included the schedule to meet the space allowance phase-in plan and the certification program, the opportunity to become recognized as a "certified company," and an auditing procedure for verification of meeting the guidelines.  The March 11, 2002 UEP newsletter reported that 250 people attended these meetings, representing 102 companies and approximately 200 million hens.

161.     After these meetings, UEP communicated to its membership that multiple companies had begun to adopt the output restriction guidelines.  In its February 25, 2002 newsletter, UEP reported that:  "Early indications, from the meetings, confirm that the industry is ready to begin implementing animal welfare guidelines as early as chicks hatched in April 2002.  Producers have begun filing applications to be recognized as 'Certified Companies.'"

162.     UEP tracked the adoption of the output restriction program and communicated the results to its members as the popularity of the program increased.  As of April 1, 2002, "100

companies representing the ownership of approximately 155 million layers had made a commitment to implement UEP's Animal Husbandry Guidelines."   As of May 6, 2002, 123 companies with ownership of 167 million hens filed for "Application of Certification" and agreed to implement the guidelines including increasing space allowance on 100% of their facilities.  As of July 1, 2002, it was 137 companies, representing 188 million layers.

163.   The following Defendants submitted applications for certification and agreed to implement the guidelines: as of March 22, 2002, Cal-Maine, Moark (Land O'Lakes), Norco Ranch, Midwest, and Gemperle, a subsidiary of NuCal; as of March 25, 2002, Sunrise Farms, J.S. West Milling of Modesto, an egg producer subsidiary, NuCal, Valley Fresh Foods of Turlock, an egg producer subsidiary, NuCal, and Sauder; as of April 8, 2002, Rose Acre, National Food and  Hillandale Farms, and Ohio Fresh and Michael's Food thereafter.

164.   On April 21-23, 2002, Urner Barry hosted a *Back to Basics Conference* at Caesar's Palace in Las Vegas, Nevada that included specific presentations on the level of egg exportation, and continued promotion of the output restriction certification program.   The participants included all the major shell egg and egg product processors, egg industry trade associations, as well as other entities providing services to the egg industry participants.  During the conference, panel discussions included:

> "**Feeding the World through Poultry and Egg Exports**," by Jim Sumner, President of USA Poultry and Egg Export Council, Gil Eckhoff, President and CEO of Henningson Foods, and Eric Joiner, President and CEO of AJC International, Inc.
>
> Eckhoff said that exports were down 20% compared to 1997 levels.  Joiner said that exports are 20% of the total US output; but Sumner said that 3% of US output shell eggs are being exported.

**"Cage Enhanced Production and its Affects [sic] on Selling Price, Production Costs and Consumption,"** moderator Al Pope, President of the UEP, whom encouraged all to join to increase cage sizes. Speakers include Amy Barr, Marr Barr Communications (consulting firm), Bob Krouse, CEO Midwest Poultry Services, Barrie Wilcox, co-President of Wilcox Family Farms, Joe Fortin, Kofkoff Egg Farm and VP of Shell Eggs for Moark LLC.

Joe Fortin also discussed the fact that market quotes will be necessary to cover the costs for certified eggs, and enthusiastically endorsed the certification program along with other members of the Panel.

165. On May 15-16, 2002 in Washington, D.C., representatives of Defendants Cal-Maine Midwest Poultry, NuCal, R.W. Sauder, and Moark attended a UEP Board of Directors meeting. At that meeting, members discussed two ways of reducing egg supply. It was noted that a crisis management plan had been communicated to the members calling for early molt and early hen disposal. The then-current egg prices indicated to members of the UEP Board that the plan to reduce output was working.

166. The companies continued to meet and discuss their output restriction agreement and its enforcement. For instance, there was a July 9, 2002 meeting of "All Husbandry Certified Companies" and other interested egg producers in Chicago. Producers representing ownership of approximately 170 million layers were in attendance and they discussed, among other things, record keeping and auditing of the program.

167. As adoption of the output restriction program became more widespread, UEP's members imposed more rigorous record-keeping requirements to document their "compliance." On July 15, 2002, the UEP Board of Directors approved a motion which, as a condition for certification, required all companies participating in the program to file monthly compliance

reports with the UEP.  As of that date, 140 egg producers had committed, representing 190 million laying hens or 69% of the nation's 275 million laying hens.

168.    As of September 9, 2002, 157 companies with approximately 200 million laying hens had filed applications for certification and thereby implementing UEP's Animal Husbandry Guidelines.  As of December 16, 2002, 296 companies had filed applications for certification.

169.    To ensure compliance with their supply management conspiracy, Defendants included strict auditing, compliance and oversight regimes in their proposal.  A November 2002 Egg Industry article covered a UEP meeting at which the program was discussed.  The article reported that: "There will be a monthly compliance report from certified producers to UEP which will be strictly adhered to.  There will be no tolerance on bird numbers in cages and houses …. It was emphasized that UEP needs to keep control of auditing the program …."  Thus, Defendants structured the UEP Certified Program to allow the cartel to carefully monitor member compliance.

170.    Defendants and their co-conspirators implemented their first major modification to the "Animal Care" program by adopting a 100% rule at its October 10-11, 2002 UEP Annual Board Meeting in Savannah, Georgia.  This 100% rule -- which had no basis in animal husbandry -- required that 100% of a producer's egg houses be maintained in accordance with the supply restriction guidelines in order for a company to sell "UEP Certified" eggs.   The auditing program discussed above, along with monthly reports from certified producers to the UEP, was designed to police compliance with the industry's supply reduction scheme.  Among the attendees at the October 10-11 meetings were Bob Krouse of Midwest Poultry, and Fred Adams, Dolph Baker, Ken Looper and Steve Storm of Cal-Maine.

171.     At that Marketing Committee meeting in Georgia, Ken Looper, Vice Chairman of Defendant Cal-Maine Foods presented detailed statistics on bird numbers and pricing.  *Egg Industry* reported Looper asserted that, "[t]he egg industry must reduce the flock or the price of the product will remain at depressed levels."

172.     In order to exclude producers who did not commit to restricting supply by selling UEP Certified eggs, Defendants misleadingly promoted the UEP Certified Program to retailers and consumers nationwide as making for better eggs.  On January 1, 2003, two major retailers, The Kroger Co. and Wal-Mart Stores, Inc., began buying only UEP Certified eggs.   Other retailers were expected to "follow the Kroger/Walmart lead in short time, making 100% compliance not only a program strength but necessary and practical."

### 4.     Defendants' Supply Suppression Scheme Is Successful

173.     The UEP Animal Welfare Committee held a special meeting in Las Vegas in February 2003 devoted to the 100% Rule.  Among the Defendant attendees at the meeting were Joe Fortin of Moark, Gene Gregory, Al Pope and Chad Gregory from UEP, Bob Krouse from Midwest Poultry, and representatives from Cal-Maine and Ohio Fresh Eggs.

174.     As Defendants' output reduction techniques led to improvement in egg prices, UEP also began to emphasize egg exportation as an additional method of increasing prices.  A May 1, 2003 UEP newsletter reported that producers obtained favorable results (i.e., higher prices) when they reduced supply and urged producers not to make up for lost production.  The UEP also reported that the "Animal Care" program was successfully reducing chick hatch, as desired and also emphasized exports.  The newsletter listed four major reasons for higher egg prices:  (1) UEP's Animal Husbandry Guidelines, which led to reduced chick hatch; (2) UEP's

Animal Care Certification Program; (3) Exotic Newcastle Disease; and (4) exports taken by Defendant USEM.

175.   UEP's June 4, 2003 newsletter reported success from Defendants' efforts to reduce supply and export product.  Egg market improvements were attributed to "(1) reduced pullet hatch finally making an impact upon supplies; (2) USEM exports reducing supplies at critical times; and (3) the Animal Care Certified program beginning to work like many had projected."

176.   Importantly, UEP also began to emphasize that output reduction attributable to increased cage size should not be sacrificed by constructing additional capacity.  In July 2003, UEP warned producers not to increase supply by building new space for hens in a July 17, 2003 article titled, "Word of Caution," stating, "[a]s producers continue to reduce their layer house capacity to meet the UEP Animal Husbandry Guidelines, please don't make the mistake of building new facilities to replace the lost number of birds."

177.   In 2003, as per UEP's October 21, 2002 newsletter, the following representatives of Defendants were elected and appointed as UEP Board Members and Committee Chairmen: Joe Arias (Valley Fresh Foods/NuCal); Dolph Baker (Cal-Maine); Roger Deffner (National Food); Bob Krouse (Midwest Poultry); Ken Looper (Cal-Maine); Mark Oldenkamp (Valley Fresh Foods/NuCal); Paul Osborne (Moark, LLC); Marcus Rust (Rose Acre Farms); and Gary West (J.S. West Milling Co./NuCal).

178.   In an August 2003 editorial, Gene Gregory of UEP wrote that implementation of the space allowance guidelines had "the greatest impact" on lowering supply and increasing price.  Gregory credited Defendants' widespread agreement to the UEP Certified Program as having successfully caused significant flock reductions:

The fact that approximately 200 companies have begun implementing the [UEPs Animal Husbandry Guidelines] . . ., has caused flock reduction and will continue to do so for some time. These 200 companies own approximately 226 million hens or more than 82% of the total hens in the country. The hatch reduction to meet the animal husbandry guidelines began with chicks hatched after April 2002. Since this beginning date the hatch has been reduced by 14.7 million pullets in comparison to the same period year earlier.

179. In September 2003, UEP told producers: "Don't Screw Up A Good Thing: One sure way of having poorer egg prices is by increasing egg supplies through holding hens longer and keeping hens that should be disposed. Don't screw up a good thing!!"

180. In the October 31, 2003 UEP newsletter, the outgoing chairman of the UEP credited the supply reduction program with stabilizing and raising prices for eggs, stating "*[o]ver the past year, slowly but surely, the egg supply began to moderate relative to strong demand through consistent reduction in chick hatch and, today we are enjoying market prices that are 60% higher than a year ago.*" (Emphasis in original).

181. In a November 12, 2003 an article entitled, "Egg Prices at Record Levels," the UEP touted the industry's efforts to reduce egg supply and raise prices:

Never in my more than 30 years in the egg industry have I ever seen egg prices at the current levels. We …. never anticipated that prices could sustain prices above $1.00 per dozen for any extended period. Large prices for all regions east of the Rockies have now been above $1.00 since September 25th and appeared headed for even higher levels.

Just a little over a year ago, Large prices were less than 70 cents per dozen and most of the industry was losing money. Since then many things have contributed to a change in both the supply and demand side of the business. Today, Large prices are more than $1.20 per dozen and Breaking Stock is being quoted over 80 cents per dozen. While supply has been reduced slightly, it appears that demand may be far greater than anyone can even calculate at this

time.  Consumers are still buying eggs and we have seen no resistance to price.

As we enter the holiday season the demand will likely become more aggressive and prices will likely go even higher.  With the increasing demand, increasing population and the continued phase-in of cage space to meet the industry's welfare guidelines, prices are likely to continue at levels far above the past few years.

182.   In a December 11, 2003 article, a UEP member admitted that the UEP's certification program was increasing egg prices:

Numerous industry experts have pointed to the popularity of low-carbohydrate, high-protein diets, but Scott Kreher, a partner in Kreher's Farm Fresh Eggs in Clarence, believes **the spike is due more to diminished supply** than diet-fueled demand.

"Eggs are primarily a non-elastic demand item. People always need eggs," said Kreher, whose egg farm supplies many local grocers. "What's really affecting egg prices are the houses chickens are being placed in."

Specifically, new guidelines adopted by United Egg Producers, a national cooperative of egg producers to which Kreher's belongs, have gradually raised the amount of space it recommends each egg-laying chicken be given inside its housing — from the current industry average of 53 square- inches per bird to 61 square-inches in April of 2005.[10]

(Emphasis added).

183.   UEP's December 30, 2003 newsletter discussed the industry's record high prices and warned producers to maintain restrictions on the supply of eggs.  The same newsletter warned producers not to "abandon the program" and produce more eggs.

---

[10] Kevin Purdy, *Egg Prices Crack 20 Year Highs - Low Supply More to Blame Than Demand From Dieters*, Buffalo News, Dec. 11, 2003.

184.    In a December 13, 2003 article, Fred Adams, the CEO of Defendant Cal-Maine, acknowledged that high prices were a result of industry efforts to hold down supplies:  "The supplies are adequate, but just barely …. The industry also says production is down as new guidelines … have reduced the number of hens allowed in a cage."[11]

185.    Gary Bethel, an officer of several Hillandale Farms entities, was quoted in a December 13, 2003 article discussing increased egg prices, in which he explained how Hillandale Farms had reduced supply:   "We've been taking a proactive approach towards allowing caged chickens more space …. If we had a house that held 100,000 chickens five years ago, it would house 80,000 now, and that means quite a reduction in total egg numbers."[12]

186.    Hillandale's subsidiaries also followed the agreements to reduce supply and comply with UEP flock reduction measures.  In June 2004, for example, Ohio Fresh confirmed its intention to follow UEP's Marketing Committee recommendation to dispose of spent hens by 108 weeks and reported that it would dispose of spent hens between 80 to 84 weeks.  Then later, in July 2005, an Ohio Fresh spokesperson, Harry Palmer, said he was told there were too many birds -- 12 million to 15 million too many -- producing eggs nationally, resulting in higher supply and lower prices.

187.    The President of Defendant R.W. Sauder, Paul Sauder, expressed similar sentiments: "The [UEP] program is one of several causes cited for the recent surge in egg prices,

---

[11] Dave L'Heureux, *High Egg Prices Beginning to Crack*, The State, Dec. 13, 2003.

[12] Mackenzie Carpenter, *Shoppers Shelling Out More for Egg Price Tied to Diet, Reduced Supply*, Pittsburgh-Post Gazette, Dec. 13, 2003.

because it's helping to dampen supply short-term …. A key guideline, which concerns the amount of space per hen in a cage, will result in reducing the number of hens per cage from nine to seven by April 2008.  Asked if that's a significant change, Sauder replied, 'Absolutely. That's a 22 percent reduction in capacity. That's huge.'"[13]

188.    On January 26, 2004, UEP's Shell Egg Marketing Committee met in Atlanta, Georgia.  The following Defendants were Marketing Committee members at this time, among others:  Dolph Baker (Cal-Maine); Joe Fortin (Moark); Bob Krouse (Midwest Poultry); Arnie Reibli (NuCal); Gary Bethel (Hillandale Farms); Ken Looper (Cal-Maine); Mark Oldenkamp (NuCal); Roger Deffner (National Food); Chuck Elste (NuCal); and Paul Osborn (Moark).

189.    Ken Looper of Cal-Maine discussed his January 16, 2004 "Supply Demand" comments.  In a paper he distributed to Committee members, Looper discussed hatch rates, cull rates, and flock inventories with many of Cal-Maine's competitors.  Looper also noted that exports had a significant impact on supply in November 2002 and March 2003.  Lastly, he concluded:  "One or two percent up or down in the supply of most any commodity produces a big difference in price.  Price is the primary tool that helps balance supply and demand.  We continue to be in uncharted waters and 2004 should be a very interesting year."

190.    At this meeting, Gene Gregory also gave a presentation prepared by Don Bell entitled "Supply/Demand Challenges - When Will We Ever Learn?"  Upon information and belief, this presentation urged producers to put industry concerns over individual concerns and to

---

[13] Tim Mekeel, *Improving conditions for egg-laying hens*, Lancaster New Era, Dec. 15, 2003.

understand that collective action was the key to decreasing supply and maintaining increased prices.

### 5. 2004 Brings Increased Hatching So Defendants Conspire to Suppress Supply

191. A March 2004 UEP newsletter cautioned about increased hatching and warned the industry against expansion: "Can we resist the temptation to expand too quickly?  UEP and USEM can only do so much to help the industry be profitable."

192. In a May 6th, 2004 email to Bob Krouse (Midwest Poultry), Chuck Elste (NuCal), Arnie Riebli (NuCal), Mark Oldenkamp (NuCal), Dolph Baker, (Cal-Maine), Ken Looper (Cal-Maine), Joe Fortin (Moark), Paul Osborn (Moark), and Roger Deffner (National Foods) (among others), Gene Gregory of UEP asked the industry to participate in a new supply restriction scheme:

> **The animal care certified program gave us a good roadmap for the future like no supply demand program could have.** While it was never intended as a supply demand program it can be a good way to manage our business if we just return to the old days of flock disposal and molt schedules.
>
> . . .
>
> During the Marketing Committee meeting in D.C. next week, **I'm asking you to give serious consideration to ideas and** recommendations that could adjust the supply side and return the industry to reasonably good profitable times.

193. On May 10, 2004, UEP's Marketing Committee met in Washington, D.C. with representatives from Defendants Cal-Maine, NuCal, Hillandale Farms, Midwest Poultry, National Food and Moark attending.  There, UEP introduced additional measures to assure egg producers that the industry would work together to adhere to its certification program and target reductions to the layers.

194.    The Marketing Committee also approved a new coordinated supply management scheme requiring all UEP members molt flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until Aug. 1, 2004. In order to prevent cheating and monitor compliance, UEP members were asked to sign and return an "intention form" to UEP that would manifest their agreement to engage in the output reduction proposal.

195.    After the 2004 meeting in Washington, UEP used its position as a trade association to disseminate the recommendations of the Marketing Committee while extolling the industry's participation.  In its May 19, 2004 newsletter, UEP noted:

> Egg production companies owning 177 million laying hens (63% of the industry) were in attendance at UEP's Spring Legislative Meeting in Washington, D.C. These companies along with attendees from UEA Allied and UEA Further Processor members participated in committee meetings, [and] board meeting.... The Government Relation, Environment, Marketing, Food Safety, Animal Welfare, and Egg PAC Committees met prior to the Board meeting and each brought forward motions for the Board to act upon…**The Marketing Committee recommended that the industry molt all flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until August 1, 2004.**

 (Emphasis added).

196.    In the same newsletter, Gene Gregory stated again that the "Animal Care Certified Program" was a "roadmap" for the industry supply reduction campaign and increased industry profits:  "[t]he Animal Care Certified program is the only roadmap the industry has ever had for future planning.  If you stay true to the program and manage it to meet the market demand, it can provide the industry with prolonged profits."

197.   Gregory also urged Defendants and their co-conspirators throughout the industry to stay "committed" to the program and encouraged the industry in the same newsletter:

> [A]re you committed to making a change?  Are you committed to staying the course even when egg prices begin to show some strength?  Whether you sell eggs in the shell or as egg products, **if you are in the production business, you need to be committed to doing whatever is necessary to have prices above the cost of production ….**
>
> We believe that the industry only needs to make a few minor adjustments but this needs to happen now.  If we do this over the next few weeks then the future looks very bright for a very profitable industry during the second half of this year.  **Are you committed or do you want to let someone else do the job and simply reap the benefits?**

(Emphasis added).

198.   Defendants Cal-Maine, Moark and Norco declared their commitment to the Marketing Committee's output reduction scheme.  National Food and Ohio Fresh also agreed to similar plans.

199.   The UEP June 2, 2004 newsletter exhorted producers to continue to act in accordance with the industry's supply reduction scheme:

> With the rapid declining egg prices, it became very clear to most egg producers that supply was exceeding demand and that quick actions were needed to bring supply and demand more into balance.  UEP's Marketing Committee recommended a voluntary program calling for flocks to be molted at 62 weeks of age and spent hens disposed of by 108 weeks of age and that this plan of action take place immediately and carry through until August 1, 2004.

200.   In mid-June 2004, UEP continued to urge producers to examine their costs and reduce flock size:  "Are your costs the same as they were a year ago?  The bottom line, are you still making a profit on your older flocks or any flocks?"

201.    In a July 2004 newsletter, UEP acknowledged that the UEP Certified Program was lowering supply: "[t]wo sources, one of which is the animal welfare audits, have confirmed to UEP that animal care certified companies have in fact reduced their hen numbers in existing houses."  The newsletter further urged "smart companies" to agree to further reductions: "[a] smart businessman finds ways to minimize his losses during unprofitable periods and ways to maximize his profits during profitable periods.  Who will be the companies that make the smart decisions in the coming months?"

202.    In the summer of 2004, UEP representatives met with 99 egg production companies in a number of meetings.  UEP encouraged "producers to look at management practices that could quickly adjust the oversupply problem."  Holding hens to older ages, backfilling cages to replace mortality, and placing new or molted hens into old depreciated houses were practices cited that added to the nation's flock size.  As discussed in UEP's September 2, 2004 newsletter, UEP Chairman, Roger Deffner, spoke at these meetings and stated, "the industry has an opportunity, like never before, to turn things around very quickly if they would simply consider changing those management practices."

203.    Gene Gregory wrote an editorial entitled, "Comparison of Past Year's Supply Demand," in UEP's September 15, 2004 newsletter.  In the editorial, Gregory discussed producers' available options, encouraging them to reduce supply and increase prices:

> I believe we need to find ways to give producers some encouragement of what could happen if we simply remove the older hens, sell hens at younger ages, do not backfill cages, do not continue to use old depreciated houses or to molt at younger ages.
>
> *******
>
> Our supply increases and flock size increase has come about because we simply have not disposed of hens.  We can turn this

55

around very quickly if we simply reduce the age of our flocks or
follow any of the above recommendations.

**6.      Defendants Coordinate Immediate Supply Reduction Scheme at Egg
Economic Summit in November 2004**

204.    In Fall 2004, UEP and UEA held a joint Annual Board Meeting in New Orleans,

listing UEP's new 2004-05 Board as including the following Defendants (among others):  Roger

Deffner (National Food)  - Chairman; Dolph Baker (Cal-Maine) - 1st Vice Chairman; Gary West

(NuCal) - 2nd Vice Chairman; Bob Krouse (Midwest Poultry Services) - Treasurer; Joe Fortin

(Moark) - Secretary; Marcus Rust (Rose Acre); Bill Rehm (Daybreak); Terry Baker (Michael

Foods); Steven Gemperle (NuCal); and Ken Looper (Cal-Maine).

205.    At the Annual Board Meeting, Defendants on the UEP Board approved the

following coordinated supply management proposals:  "[h]ens currently scheduled for disposal

between December 2004 and July 2005 must be disposed of four (4) weeks early or reduce your

flock size by 5%."  UEP Chairman Roger Deffner (National Food) and Marketing Committee

Chair Dolph Baker (Cal-Maine) scheduled an "Economic Summit" in Atlanta Georgia to

evaluate supply and demand further.

206.    *Feedstuffs* also reported on the Annual Board Meeting regarding the Defendants'

plans to reduce supply through early culling of hens and flock reductions.  UEP's Gene Gregory

was quoted as stating, **"We don't need a plan to reduce the hatch.  We don't need a

moratorium on new buildings.  We need a plan to get rid of old hens."**  (Emphasis in

original).

207.    Gene Gregory published an editorial in the November 11, 2004 UEP newsletter

entitled, "What Do The Numbers Tell Us?" as encouragement for the explicit supply reduction

scheme UEP expected producers to implement at the upcoming Economic Summit:

> We can change both the direction of the supply problems and our attitudes about egg prices by making adjustments to our flock size.
>
> *******
>
> **One of the continual problems with oversupply is that everyone believes they are not the problem.** (Emphasis added). If you ask any producer if they have contributed to the oversupply problem they will answer no. They however can point to someone else that is the problem. So if everyone believes they are not the problem then we will never make the necessary corrections. What has to happen is for enough producers to recognize that they have to become **<u>part of the solution</u>.** (Emphasis in original). Losing money while blaming someone else is not and has never been good business. Being able to look beyond your own farm gate and be part of the solution has always paid off.

208.   Defendants and their co-conspirators then held an "Egg Industry Economic Summit" on November 16, 2004 in Atlanta, Georgia under UEP's sponsorship. The Summit was held to coordinate an immediate supply reduction scheme and to obtain written commitment on a price-fixing scheme from co-conspirators.

209.   UEP's November 23, 2004 newsletter reported on the success of the "Economic Summit," noting that producers responsible for approximately 200 million hens attended. Attendees at the Economic Summit included representatives from Defendants Cal-Maine, Moark, Ohio Fresh Eggs, Hillandale Farms of PA, and Midwest Poultry Services. Defendants asked producers to make their intentions known to other co-conspirators and explicitly agree in writing to commit to one of two options: "Option # 1 **To dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled;**" or "Option # 2 **to reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."** (Emphasis in original).

210.    Defendants Cal-Maine Foods, Moark, Ohio Fresh Eggs, Hillandale Farms of PA, Midwest Poultry Services, and National Foods signed on to the written agreement to follow one of the two output reduction options.

211.    The following Defendants were appointed to the Board of Directors for 2005: Roger Deffner (National Foods) - Chair; Dolph Baker (Cal-Maine) - 1st Vice Chair; Gary West (J.S. West Milling/NuCal) - 2nd Vice Chair; Bob Krouse (MidWest Poultry) - Treasurer; Marcus Rust (RoseAcre); and Bill Rehm (DayBreak).  The following Defendants were appointed to chair UEP Committees for 2005:  Bob Krouse (Midwest Poultry) - Finance; Dolph Baker (Cal-Maine) - Price Discovery; Gary West (NuCal) - EggPAC; Mark Oldenkamp (NuCal) - Animal Welfare; and Paul Sauder (R.W. Sauder) - Public Relations.

212.    On December 3, 2004, UEP sent a follow-up letter to members that had not yet signed on to the supply reduction program:

> Either at the recently held "Egg Industry Economic" or in a letter since the summit, we offered you one of two options for being a part of the solution to reduce the nation's flock size.

> While producers with approximately 115 million hens have signed on to one or both of the options, we are disappointed that we have not heard from you.

> Just in case you missed it, we are enclosing the two options again.  If you feel you cannot participate in this program, would you at least drop me a note via the fax (770) 360-7058 or email me at gene@unitedegg.com.  Please tell me why you do not support the program.

> Better yet, fill one of the forms out and return it to me.

213.    This letter had two attachments entitled, "Intention to Meet Market Demands," which included a box for a company to check indicating agreement with the scheme outlined at the "economic summit," which were substantially similar to those discussed at the summit. Option #1 stated, "It is my company's intention to dispose of hens that are currently scheduled

for disposal between January 1 and April 30, 2005 - four (4) weeks earlier than previously scheduled."   Option #2 stated, "It is my company's intention to reduce my own December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."

214.    UEP's December 10, 2004 newsletter acknowledged that more and more companies were agreeing to the industry's supply restrictions, including Sunrise Farms and J.S. West Milling -- now part of Defendant NuCal.  The companies who had already explicitly signed on to this aspect of the output reduction scheme represented approximately 122 million laying hens -- or 42% of domestic production.

215.    UEP's Board of Directors met in Atlanta, Georgia on January 25, 2005.  The minutes reflect discussions about the price fixing proposal and other attempts to reduce supply. Defendant attendees and participants at this meeting included the following UEP Board Members:  Gary West (NuCal); Steve Gemperle (NuCal); Roger Deffner (Chairman of UEP and Vice President of National Food); Bob Krouse (Midwest Poultry); Joe Fortin (Moark); Dolph Baker (Cal-Maine); Ken Looper (Cal-Maine); Terry Baker (Michael Foods); Bill Rehm (Daybreak); Marcus Rust (Rose Acre); Danny Linville (Zephyr Egg - now Cal-Maine); and Mark Oldenkamp (NuCal) amount others.  The following representatives of Defendants were listed as members and guests at this meeting:  Fred Adams (Cal-Maine); Tim Bebee (Michael Foods); Jill Benson (NuCal); Toby Catherman (Michael Foods); Dave Cisneros (Moark); Chuck Elste (NuCal); Greg Hinton (Rose Acre); K.Y. Hendrix (Rose Acre); Jerry Kil (Moark); Dan Knutson (Land O'Lakes, Moark, and Norco Ranch); Dan Meagher (Moark); Paul Osborne (Moark); Bill Rehm (Daybreak Foods) Tony Rehm (Daybreak Foods; Tom Silva (NuCal); Patricia Stronger (Daybreak Foods); and Wayne Winslow (NuCal).

216.    According to the minutes of January 25, 2005 meeting, UEP Chairman Deffner (National Food) stated the following:

> It was just a year ago that we met in this very hotel and were so full of optimism.  All indicators were that we could sustain $1.00 plus eggs for an extended period and the price structures for the next 18 months.  (We took care of that.)  The market came full circle with prices from $1.35 to 59 cents.  We don't have to accept low prices and **we can have a good 2005 if we just make a few changes and work together**.  We sell ourselves short by spending a great deal of time talking the negatives.  Year-end flock size was actually less than forecast but still a problem.  **The Economic Summit highlighted some of the problems and some of you have already reacted in a positive manner.  We need more of you to participate in a positive change**.

217.    During the Marketing Committee Report at this meeting, a motion was made and seconded that extended through Labor Day the "intentions program" whereby members agreed to dispose of their flocks 4 weeks earlier than previously scheduled and/or reduce flock size by 5%. That motion carried with no recorded dissents.

218.    At this point, the Defendants had either explicitly or implicitly agreed to the industry's supply reduction scheme through affirmative commitments or through their participation in meetings discussing the supply reduction program and their actions in supporting the scheme.  Defendants that signed "intention forms" agreeing to the supply reduction/price-fixing agreement included:  Cal-Maine Foods; Moark LLC; Ohio Fresh Eggs; Hillandale Farms of PA; Midwest Poultry Services; National Food; and NuCal (through Sunrise Farms and J.S. West Milling).  Defendants present at the January 2005 Board and Committee meetings that expanded the supply reduction/price-fixing agreement included Michael Foods, Daybreak, Rose Acre, and Land O'Lakes.

219.    By February 2005, nearly every Defendant either agreed to reduce flock sizes by 5% or dispose of hens, or attended meetings where this price-fixing scheme was agreed upon. UEP announced that the supply restrictions would apply to all UEP members (including all Defendant UEP members herein) and not just apply to the 45 companies that had signed commitment sheets in response to the Economic Summit.    The Marketing Committee Recommendations section of the newsletter stated in pertinent part:  "It is good business to reduce your flock size during the low demand period and a period beginning Easter week and carry through Labor Day may be appropriate.  The above motion [that current intentions program for flocks to be disposed of 4 weeks earlier than previously scheduled and/or flock size reduction by 5% to be extended through Labor Day] does not apply to only the companies having signed the 'intention form,' but to all UEP members."

220.    In August 2005, in its Fourth Quarter results, Defendant Cal-Maine discussed egg industry cooperation on reducing flock sizes and resultant rising prices:

> In March 2005, the egg industry took action to reduce the size of the laying flocks …. U.S. Department of Agriculture statistics indicate a reduced flock size that is now more in line with the current demand [for eggs].

221.    In the March 17, 2005 UEP newsletter, Gregory encouraged egg producers to continue flock reduction in order to increase prices:  "I believe that there are producers at this moment selling and/or molting hens early.  If this is occurring then we will see better prices after Easter than before.  If you could make more money producing at 90-95% of capacity, or if you could minimize losses, or if you could turn a loss into a profit, wouldn't you do it?  I believe that smart businesses have and will figure this out very quickly.  If not, then we have a **Recipe For Disaster."**  (Emphasis in original).

222.  UEP's April 14, 2005 newsletter communicated further requests for supply reductions:

> Reducing the flock size by just a few million hens will have a major impact upon supply as well as our attitude and confidence in the market.
>
> ******
>
> If every egg producer simply reduced their flock size by as little as 3%, we could have a far better egg market in the coming months of 2005 than is currently projected.
>
> ******
>
> Reduced number of hens and an increased number of eggs broken may help improve economic conditions and improve our attitudes.
>
> *******

223.  The May 2, 2005 UEP newsletter noted that the size of hen flocks decreased in the amount of 3.9 million hens during the month of March.

224.  The UEP's Producer Committee for Animal Welfare met on April 19, 2005 in Chicago, Illinois.  Defendants present at the meeting included:  Tim Bebee (Michael Food); Joe Fortin (Moark); Ky Hendrix (Rose Acre); Bob Krouse (Midwest Poultry); Mark Oldenkamp (NuCal Foods); Paul Sauder (R.W. Sauder); and Steve Storm (Cal-Maine) among others.  At the meeting Defendants discussed the marketing of UEP certified eggs by non-certified producers. Mark Oldenkamp sponsored two motions which both passed.  One motion provided that, "[i]n order to protect the integrity of the ACC program and logo and in view of the difficulty in preventing the commingling of certified eggs with non-certified eggs and to treat all egg producers equally it is hereby moved that no new licenses to market Animal Care Certified eggs will be issued or renewed to producers who are not ACC certified."  The motion carried with 19 yes votes and 8 no's.  Oldenkamp's second motion provided that, "a license to market ACC eggs may be issued to shell egg processors and further egg processors who do not own or operate egg production facilities."  The motion carried 26 yes votes and 2 no votes.

225.    UEP's May 12, 2005 newsletter, like many before it, exhorted egg producers to continue cooperating with the industry's supply reduction scheme.

> With current egg prices, it is likely in every egg producer's best interest to reduce their flock size.  One company has provided UEP with a detailed list of their flock reduction over the past year.  They reported their flock to be 2.9 million hens less today than it was in April 2004.  They are doing their part to bring supply in line with demand and hopefully other companies are also paying close attention to their market needs.

226.    UEP's June 9, 2005 newsletter characterized the fact that less shell eggs were being sent to retail markets as "good news," but characterized an increased chick hatch as "bad news."  It stated that "UEP has issued an ___Economic Alert___ to the members in which some options for correcting the supply demand conditions were offered."  (Emphasis in original).

227.    Cal-Maine's August 2005 Fourth Quarter results noted that prices were rising as a result of the egg industry's agreement to reduce flocks and egg supply:

> **"Beginning in March 2005, the egg industry has taken action to reduce the size of the laying flocks and the supply of eggs," added Adams.**  At midsummer, U.S.D.A. statistics indicated a reduced flock size that is now more in line with the current demand for eggs.
>
> **As a result, egg prices have recovered nicely over the last six or seven weeks.  We believe the egg industry will continue to adjust supply to be more in line with demand, which should allow the industry to return to profitability.**

 (Emphasis added).

228.    The following representatives of Defendants were elected to the Board of Directors at UEP's annual meeting on October 6, 2005:  Dolph Baker (Cal-Maine) - Chairman; Gary West ((J.S. West Milling Co./NuCal) - First Vice Chairman; Bob Krouse (Midwest Poultry) - Second Vice Chairman; Joe Fortin (formerly of Moark) - Treasurer; and Steve Gemperle (Gemperle Enterprises, Inc./NuCal).

229. To buttress the UEP certification program and the scheme to coordinate joint reductions of supply and maintain prices, Defendants and their co-conspirators started circulating a UEP Production Planning Calendar in late 2005. In the November 2005 newsletter, UEP announced that it would print and circulate a 2006 Production Planning Calendar very soon. It stated, "its real purpose is to give producer/marketers a planning guide for the replacement of flocks or molting so that they may be able to maximize their annual returns." This Calendar continues to be used by Defendants and co-conspirators to coordinate their supply reduction activities: in UEP's February 2008 newsletter, Defendants proposed that producers reduce supply after Easter utilizing the coordinated "Production Planning Calendar" and noted that "Egg producers should strive to manage their supply to meet the market demand for both the lower and higher demand periods. Producers are encouraged to quickly review their individual company history, and, if needed, adjust their egg production to meet the expected demand between the weeks of Easter and Labor Day."

230. In January and February of 2006, Defendants and their co-conspirators, with and through the UEP, proposed another hen reduction plan. A UEP February 2006 newsletter stated: "Every egg producer reduces their hen population by 2% no later than March 10, from their average hen number for 2005, and maintains that 2% reduction all year long in 2006. So simple, so painless, so rewarding – why wouldn't it work?"

231. In April 2006 UEP issued a "Supply/Demand Alert" highlighting its Marketing Committee's new action plan to jointly reduce supply: **"(1) Dispose of flocks six (6) weeks earlier than previously scheduled;" and "(2) Molt flocks six (6) weeks earlier than previously scheduled."** (Emphasis in original). The May 2006 newsletter then reported the success of the February 2% plan and April flock disposal plan: "[t]he size of the nation's layer

flock declined by little more than 3 million hens in April.  **This is good news!!**" (Emphasis added).

232.    A July 2007 article in *Investor's Business Daily* discussed Defendant Cal-Maine's efforts to reduce supply and its impact on prices:  "'Cal-Maine has cut back its own egg supply 1% to 2%.  That's more than one might think.  One or two percent on the supply side affects prices 20% or 30%,' Adams (Cal-Maine CEO) said."

233.    In a February 2007 interview with *Egg Industry*, Bill Rehm, Defendant Daybreak's President, attributed high shell egg prices to the "'United Egg Producer's animal welfare program that most shell egg producers participate in.'"

234.    A May 2007 article in *Egg Industry* entitled, "Egg Executives Discuss Top Industry Concerns," contained an interview with Dolph Baker, President of Cal-Maine, who argued for further coordinated supply restrictions:

> For Cal-Maine Foods President, Dolph Baker, **the No. 1 challenge facing the egg industry is the need for supply management during low demand periods** to take some of the volatility and loss cycles out of the business.  This is particularly important, he says, if per capita egg consumption is leveling off.   "**We can do a better job,**" he says, "**with molting and emptying houses** . . . . [and] with costs where they are, we'll do a better job with supply this summer."

(Emphasis added).

235.    Chad Gregory, UEP's senior vice president, stated that high egg prices were the result of the egg industry's conspiracy to reduce output: "Producers are being really responsible, keeping supply in check[.] So this could last a while."

236.    Moreover, information continued to come to light that contradicted reasonable economic justifications for the historic run up of egg prices.  On May 1, 2008, U.S. Department of Agriculture Chief Economist Joseph Glauber testimony before Congress demonstrated that

high egg prices were caused by producers' decision to reduce supply, not by high feed costs: "In 2007, table-egg producers cut production. The decision to reduce production likely took place prior to the recent run-up in feed costs."

237.    Although many egg producers have blamed high egg prices on rising fuel or feed costs, Fred Adams, founder and chairman of Defendant Cal-Maine Foods, recently conceded that reducing the supply of eggs had driven price increases through the distribution chain:

> While it makes it easier to communicate that when feed costs are up egg prices should be up — that's really not the case. **Eggs are up because the supply and demand is in good balance and it's reflecting higher prices on its own**. If the supply of eggs remains in check, or favorable to the demand side, I think we will have minimum problems in raising prices. We have had no reaction from the consumer or the chain store operators as to price.

238.    A December 2008 Star Tribune article identified the industry's collective actions as the cause of high prices:

> [T]he most significant influence on pricing may well have been the industry's own doing.
>
> Over the past two years, after a several-year slump, egg farmers have cut back on the size of their hen flocks at a pace not seen in more than 20 years.
>
> The result: Fewer hens means fewer eggs, which in turn means higher prices.
>
> In dozens of interviews, poultry experts point to the industry's move in 2002 to give hens more room as an underlying cause of higher prices.
>
> The United Egg producers (UEP), the industry's leading trade group, adopted guidelines for hens to have at least 67 square inches of space.
>
> Many producers used cages of just 50 to 60 square inches.

*******

> [B]y 2007 more than 80 percent of the United States egg supply was operating under the new guidelines.  Many producers reduced the size of their flocks to comply.[14]

239.     During the Class Period, it was well-known in the egg industry that the largest shell egg and egg products processors entered into an agreement to increase cage sizes. Although Defendants purportedly did so under the guise of the adoption of animal husbandry standards, the real motive in reducing total flock sizes was the intended goal of supply reduction and price increases.[15]  Defendant Cal-Maine Foods' Fred Adams described in June 2008 the impact of the UEP Certified campaign and boasted about the success of the industry-wide agreement:

> [B]asically the agreement was that we would give the chickens more space in the laying cages. . . . The net effect of that was reducing the number of laying hens in existing facilities by some 20%. [ ] This has been a very successful program . . . .

### 7.     Defendants Implemented An Export Scheme to Reduce Domestic Supply and Fix, Maintain and/or Stabilize Prices

240.     Defendants realized that additional actions that would lower egg supply would have the effect of further supporting egg prices.  Thus, beginning in 2000 and continuing to September 2006, Defendant USEM and its members (many of the same Defendants here) began a concerted export campaign, whose purpose was to reduce domestic egg supplies and increase domestic egg prices.  The USEM program aimed to have its members export shell eggs even

---

[14] Richard Meryhew and Chris Serres, *Our Hungry Planet: Golden Eggs*, Star Tribune, Dec. 8, 2008.

[15] Sam Krouse and Bob Krouse, *Infrastructure's Role In Keeping Egg Prices High,* Egg Industry Vol. 113 No. 2, Feb. 2008.

when the export prices were lower than domestic egg prices because Defendants had determined that the benefits of raising domestic U.S. prices through reduced supply would offset, or more than offset, the lower prices received for exported eggs.

241.    For instance, an October 2001 UEP newsletter reported that the purpose of USEM's coordinated export efforts was to provide improvements in domestic prices.  The article cited a small export which, by way of example, moved the market up for domestic egg prices between 2 to 9 cents per dozen.

242.    A letter from Larry Seger, then USEM's Chairman, in the November 12, 2001 UEP newsletter stated that, "[t]he main purpose of exports is to strengthen the current market. Strengthening a weak market or raising a steady market is what exports are mean to accomplish in the short run.  Exporting is a critical tool in managing the profitability of our industry."

243.    As part of the export program, USEM members that did not provide eggs for the export would agree to "repay" or "reimburse" the USEM members that provided eggs for the export in order to "share" any losses incurred when exporting shell eggs at below-market prices. The loss reimbursed by USEM members was the price differential between the export price and the price that could have otherwise been obtained domestically.

244.    For example, on March 20, 2003, Gene Gregory sent a memo to all USEM members (including, at the time, Defendants Cal-Maine, Moark, Hillandale, and Sauder) discussing a new member that was going to help "share in the loss" incurred from a recent export and thanked members for the contribution exports made to better egg prices:

> **Good news!!!  During the latest export we gained a sizeable new member.  This member agreed to share in the loss.**  For those of you that requested UEP to purchase your case commitment, you will find a credit deduction on your invoice for the amount contributed

by the new member.  For those of you that packed and supplied your own case commitment, you will be sent a separate check for your share of the amount contributed by the new member.  There is no future export on the horizon at this time and therefore it may be best to consider reducing our flock size after the Easter Market.  Thank you for the contribution you made to better egg prices over the past few months.

245.    Representatives of Defendants Cal-Maine, Hillandale Farms, National Food, NuCal, Rose Acre, and Daybreak attended the UEP Board of Directors Legislative Meeting on May 12-15 2003 in Washington, D.C.  Gary Bethel (Hillandale Farms); Roger Deffner (National Food); Chuck Elste (NuCal); Ky Hendrix (Rose Acre); Ken Looper (Cal-Maine); Mark Oldenkamp (NuCal); Bill Rehm (Daybreak); and Gary West (NuCal) attended.  The minutes of that meeting reflect that the Chairman of the Marketing Committee (Dolph Baker, Cal-Maine) "closed his comments by saying, 'Everyone knows the market effect of the last two export.  Need every producer to be a USEM member.  Need more help pulling the wagon instead of riding.'"

246.    In 2006, UEP and its co-conspirators continued to conspire to keep egg prices high in the U.S. by causing eggs to be exported abroad.  The corresponding reduction in the domestic supply of eggs and artificial inflation of egg prices were more than enough to recoup any losses, even though the eggs were exported to markets where prices for eggs and egg products were lower than in the U.S. and where shipping costs were substantial.

247.    From their earlier experiences of diverting supply into exports, Defendants knew that that exporting as little as 1 or 2% of United States produced eggs was enough to have a significant impact on domestic egg prices.  As the *Wall Street Journal* reported on September 23, 2008:

The industry group [UEP] itself credited the campaign with helping to boost domestic egg prices, which rose more than 40% in the next

69

year.  Gene Gregory, the Georgia-based group's executive director, said export orders amounted to less than 2% of industry output. "But it is amazing how one or two percent can have an effect on the rest of your domestic price," he said.

248.    From the fall of 2006 until at least spring of 2008, a sufficient number of eggs were exported pursuant to Defendants' supply reduction scheme to further drive egg prices above free market levels.  By agreeing to export eggs that would have been bound for U.S. sales, Defendants jointly manipulated the supply of eggs through the USEM in order to tighten domestic supply and drive up the price of eggs throughout the country.

249.    A January 4, 2007 UEP newsletter stated that Defendant USEM's members again voted overwhelmingly to support a sizable export for delivery between January 8th and February 2nd 2007 and with the delivery of such a large volume export, "it is expected that prices will exceed UEP's forecast.  It is also believed that the announcement of USEM working on a sizable export may have helped hold prices at higher levels the last week of December."  The article noted that "USEM now has the membership support from producers owning approximately 139 million layers."

250.    *Egg Industry* magazine noted the effect that the export program was having on domestic U.S. egg prices.  A June 2007 issue article entitled, "Supply Management: the Key to Profits," reported that, "[e]arly [in] 2007, an export order obtained by U.S. Egg Marketers of 246,000 cases (less than about one-third day's egg supply) helped increase egg prices up to 50 cents or more."  Defendant Cal-Maine acknowledged that during the third quarter of fiscal 2007, ". . . the egg industry, through a marketing cooperative that included Cal-Maine, put together an

export sale to Europe, the United Kingdom and Japan that required approximately 16 million dozen eggs.  This *significant drawdown* of inventory put upward pressure on egg prices and resulted in more favorable market conditions for the quarter.[16]

251.    A January 2008 UEP newsletter reported in its review of 2007 Egg Prices that one of the reasons for increased domestic U.S. prices in 2007 was the "Timely exports of shell eggs by United States Egg Marketers."

### C.    UEP is not entitled to the limited protections of the Capper-Volstead Act

252.    Membership in the UEP is open to non-egg producers.  UEP's web site states that membership is open to "owners of breeder flocks, hatcheries, and started pullets, as well as contract egg producers . . . ."

253.    UEP's "Membership Agreement" also states that "membership is available to any person, firm or partnership (entity) engaged in the production of table eggs, breeder flocks, started pullets, or who is a contract egg producer on premises owned or operated by such entity." UEP does not ask what percentage of a prospective members' business is related to egg production or how much of a producer's egg business is related to contract production.

254.    As such, some members of UEP are not shell egg producers at all.  For example, M&C Anderson Pullets, a UEP board member, raises pullets for egg farms and does not produce or sell eggs.

---

[16] *Cal-Maine Foods 3Q Profit Swells*, AFX International Focus, Apr. 2, 2001.

255.    UEP's annual meetings are held in conjunction with the UEA's meetings and members of both organizations attend joint meetings.[17]  UEP's supply restriction scheme was discussed and implemented at these meetings with members of UEP and UEA.

256.    For example, in its April 2004 newsletter, UEP noted:  "UEP's Annual Meeting will be held in New Orleans on October 20-22.  UEA will schedule a time during the October dates to hold their annual membership meeting.  We hope the [UEA] Allied members will continue to attend UEP's Spring Legislative meeting because this meeting is so critically important to our customers (egg producers)."

257.    UEA members attended the Spring meetings.  In a May 2004 newsletter, UEP noted:

> Egg production companies owning 177 million laying hens (63% of the industry) were in attendance at UEP's Spring Legislative Meeting in Washington, D.C.   These companies along with attendees from UEA Allied and UEA Further Processor members participated in committee meetings, [and] board meeting. . . . The Government Relation, Environment, Marketing, Food Safety, Animal Welfare, and Egg PAC Committees met prior to the Board meeting and each brought forward motions for the Board to act upon. . . . The Marketing Committee recommended that the industry molt all flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until August 1, 2004

258.    The UEP Executive Committee was also invited to the UEA Further Processor's meeting on April 27, 2004.

---

[17] John Todd, "On the Road: UEP Debates Supply Management at Annual Meeting," *Egg Industry,* (Jan. 2007) ("The United Egg Association, Allied (UEA) Annual Meeting was held in conjunction with the UEP meeting in San Antonio. UEA now has 61 member companies. Representatives from these companies also attended the UEP Committee and Board meetings.")

259.     Many UEA members and executives are also members of the UEP and USEM. For example, in 2004, Toby Catherman of Michael Foods was elected chairman of UEA and Dan Meagher of Moark was elected vice chairman.  Michael Foods and Moark were also members of UEP and their employees held positions in the UEP, as well.

260.     In October 2005, Dan Meagher of Moark was elected chairman of UEA, and Greg Hinton of Rose Acre Farms was elected vice-chairman.  Rose Acre Farms was a member of UEP and its employees held positions in the UEP.

261.     Members of Defendant companies have held positions on the board of USEM and UEP.  For example, Fred R. Adams Jr., CEO and director of Defendant Cal-Maine since its formation in 1969 and Chairman of the Board of Directors since 1982, is a director and past chairman of USEM.  Richard K. Looper, President and COO of Cal-Maine from 1983 to 1997 and current Vice Chairman of Cal-Maine's Board of Directors, is a past chairman of USEM. Both have been on UEP's Board of Directors.

262.     In October 2006, the following Defendants' employees were elected as officers of USEM:    vice-chairman - Chuck Else (NuCal); secretary - Roger Deffner (NFC); and Executive/Export Committee Members were: Dolph Baker (Cal-Maine Foods); Roger Deffner (National Foods); Jerry Kil (Moark); and Chuck Elste (NuCal).  These individuals have also been involved with the Board of the UEP.

263.     The top executives of the UEP, as well as the UEA and the USEM, are not egg producers.

264.     Gene Gregory is the president and chief executive officer of UEP.  Gregory began his tenure with UEP in 1981 when he was appointed chairman of the animal welfare committee

and began developing an industry code of management practices and a producer certification program.  Gregory became Member Services Director for the Midwest region the following year. Gregory is also president of the UEA and the USEM and treasurer of the United Egg Association Political Action Committee.

265.    Gene Gregory's son, Chad Gregory, is senior vice president of UEP and the UEA.

266.    Neither Gene nor Chad Gregory are egg producers.

267.    UEP is governed by a board of three to fifty directors who are elected annually. Some, but not all, members of UEP's board of directors are affiliated with companies that produce eggs.  Some UEP member companies are merely processors or distributors and are not engaged in egg production as producers.

268.    In December 2004, UEP chairman Roger Deffner of National Food Corp. made appointments of the following Defendants' employees as committee Chairman to serve for 2004: Executive - Roger Deffner (NFC); Finance - Bob Krouse (Midwest Poultry Services); and Price Discovery & Marketing - Dolph Baker (Cal-Maine).  In making the appointments, Deffner said, "UEP is a producer organization that truly develops policy from input of individual producers up through committee meetings and ultimately through the Board of Directors.  Therefore, our members serving on UEP committees have an important role to play in the decision-making of all UEP policies."

269.    On September 30, 2008, UEP listed the following Defendants as "Certified Companies and Licensed Marketers" that had signed on to the UEP Certified scheme:  Cal-Maine Foods (certification no. 103); Michael Foods Egg Products Co. (certification no. 345 and license agreement 509); Midwest Poultry Services (certification no. 102); Moark Productions

(certification no. 116); National Food Corp. (certification no. 184); Norco Ranch (certification no. 133); NuCal Foods (license agreement 504) and each co-operative member (Gemperle Enterprises - certification no. 148, Sunrise Farms - certificate no. 135, Valley Fresh Foods - certificate no. 136, and J. S. West Milling - certificate no. 131); Rose Acre Farms (certification no. 198); and Sauder, R.W., Inc. (certification no. 121); Hillandale Farms (certification no. 200); Hillandale Farms of Pa. (certification no. 182); Ohio Fresh Eggs (certification no. 328).

270.    In June 2007, the following Defendants' employees were noted as UEP Committee Chairmen: Executive - Dolph Baker (Cal-Maine); Price Discovery - Dolph Baker (Cal-Maine); Marketing - Roger Deffner (NFC); Public Relations - Paul Sauder (Sauder); Long Range Planning - Roger Deffner (NFC).

271.    There is substantial overlap in leadership personnel between UEP and the UEA. Gene Gregory is president of all three entities (UEP, UEA, and USEM) and has directed, participated in, and authorized UEP's unlawful conduct as detailed herein.  This participation includes Gregory's attendance at numerous meetings with UEP, UEA and USEM and other participants in the conspiracy.  Further, Gregory has written numerous articles in "United Voices" urging egg industry output restrictions that are the focus of this Complaint.

272.    UEP and UEA share staff and UEA has provided financial support for many of UEP's projects, including those related to the output restriction scheme.

273.    For example, an October 2004 UEP newsletter reported on a joint UEP and UEA meeting:

> UEA-Allied members continue to be extremely supportive of UEP
> and of assistance to the egg industry.  The members held their
> annual membership meeting in New Orleans and voted to set aside
> $20,000.00 that may be used by UEP for animal welfare research

projects.  Additionally the organization approved a budget, which will provide $40,000.00 for UEPs management.

274.    UEP's October 2005 newsletter noted:    "UEA-Allied held their annual membership meeting on October 6th with 20 of the 57 member companies being represented. The association approved a budget which will provide approximately $70,000.00 support for UEP programs and management."

275.    UEP sometimes purports to be a "federated Capper-Volstead Agriculture Cooperative," yet it does not engage in any of the functions enumerated under the Capper-Volstead Act. UEP does not grow, harvest, ship, sell, bargain or compete for the sale of eggs or any agricultural products.

276.    UEP merely serves as an egg trade group and a forum for a price fixing agreement and a supply management scheme.  These activities fall outside the legitimate objectives of an agricultural marketing co-op. UEP often refers to itself publicly as a "trade organization" or "trade group" and not a "cooperative."

277.    Moreover, even if UEP were a proper Capper Volstead co-operative, its activities are still subject to the limited protections of the Act.  In a 1985 publication titled, "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that, "if an association of producers . . . restricts' members' agricultural output . . . [or] colludes with third parties to fix prices . . . [or] conspires with third parties to fix prices . . . [or] combines with other firms to substantially lessen competition . . . " then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

278.    Many UEP members are vertically integrated from the point of production through final marketing and sale.  These vertically integrated firms mill their own feed, hatch

chicks, rear pullets, confine hens, produce and/or purchase eggs, wash, candle, grade, store, market, transport and distribute their own eggs.

279.    UEP members are competitors rather than small farmers banding together to cut out the corporate middlemen who would otherwise market their eggs.   UEP members do not associate to collectively process, handle and market their products and UEP does not provide those services.

280.    UEP does not wash, candle, grade, break, pasteurize, package, store, transport, or distribute its members' eggs.

281.    UEP does not negotiate contracts of sale for its members.

282.    While USEM helps arrange the export sales of eggs for its members in furtherance of the conspiracy, it does not take direct ownership of the eggs but merely helps to facilitate these transactions.

283.    UEP has declared that it did not sell eggs to consumers.

284.    UEP does not "market" its members' products. Rather, as set forth in their promotional materials, publications, web sites and numerous public statements, UEP was founded for the express purpose of providing "services to the industry" and created the United National Advertising Division of the Council of Better Business Bureaus Case Report, "In the Matter of United Egg Producers, Inc. Animal Care Certified Eggs," Case #4108 (Nov. 6, 2003)

at 4.  Egg "Alliance" to "provide service to and represent the interests of all sectors of the egg industry[.]"[18]

285.    An August 2006 UEP newsletter noted a licensing agreement that would allow non-certified companies to license eggs purchased from certified companies.  The newsletter also acknowledged that not all UEP members own layers and produce eggs (a requirement for Capper-Volstead cooperatives):

> The Animal Welfare Committee approved the use of a Non-Certified License Agreement for UEP and UEA member companies that do not own layers as well as for UEP/UEA egg production companies having made a commitment to meet the 100% rule while in the process of implementing the cage space requirements of UEP's hatch schedule. The use of the "License Agreement" will allow Non-Certified companies to purchase eggs from "UEP Certified" companies for the marketing of "Certified" eggs. The Animal Welfare Committee also approved an additional option for companies to become recognized as a "UEP Certified" company. The new policy will allow any new company now making an "Application for Certification" to come on to the program by meeting UEP's currently required hatch schedule for cage space rather than depopulating existing flocks.

286.    In implementing the output restriction scheme discussed herein, UEP has conspired with non-member co-conspirators.  For example, UEP has conspired with UEA and its non-producer members and USEM to implement its unlawful supply control campaign at numerous industry meetings.

---

[18] United Egg Producers, Member Booklet, at 1, 7 ("Concerned with the disastrous price cycles of the egg industry and with no unified voice to address industry issues, a group of producers met in the fall of 1968 to discuss the formation of an organization that could provide the needed industry leadership. Their vision was to establish an organization that could provide the following services to the industry . . . . In order to provide service to and represent the interests of all sectors of the egg industry, UEP created the United Egg Association and all its divisions.")

287.    It was only after the filing of this action that UEP finally prohibited UEA and non-egg producers from participating in the discussions and meetings about the price-fixing scheme and supply restrictions.   In UEP's January 20, 2009 newsletter, UEP discussed the upcoming UEP Board and Committee meetings and noted that some meetings would be closed to non UEP members:

> It should be noted that the Animal Welfare and Marketing Committees will be closed to **UEP members only.**  Additionally, the Board of Directors meeting will include a time period at the close of the meeting, for **UEP Board members only.**  UEP meetings have always been open to everyone and therefore we apologize that circumstances now warrant some meetings or portions of some meetings to be closed to selected members.  We hope [UEA] allied members and others will be understanding.

288.    UEP has also conspired with non-member egg producers and has encouraged and allowed them to join the UEP certified program and reduce their own egg supplies.  For example, in November 2004, UEP discussed the assessments that producers would be required to pay for participation in the UEP certified program as $200 per company and 0.0004 cent per hen for UEP members and $400 per company and 0.002 cent per hen for non-UEP members.[19]

289.    UEP has also conspired with non-member cage manufacturers and other entities involved in egg production that are not agricultural producers.   Cage manufacturer representatives and other non-member co-conspirators were often invited to UEP meetings where supply management issues were discussed to provide input and support for the UEP

---

[19] Rod Smith, *UEP approves assessments to continue funding, promoting husbandry standards*, Feedstuffs, Nov. 1, 2004.

certified supply restriction scheme. Moreover, cage manufacturers held numerous leadership positions in the UEA.

290. A number of UEP members market eggs produced under production contracts with growers who possess their own egg-production facilities. Thus, some of these members (e.g., Michael Foods) do not produce a majority of the eggs they market, but act mostly as conduits for other producers' eggs.

291. In February of 2007, UEP newsletter discussed the fact that the organization considered forming a "supply-managed cooperative" that might have some protection under the Capper-Volstead Act (an implicit, if not explicit acknowledgement, that the present incarnation of UEP did not have such protections). The newsletter stated:

> Despite recent extremely good egg prices, the egg industry has a history of being unable to control supply and thereby suffering though difficult periods of severe financial losses. With this in mind, the idea of a supply-managed cooperative. . . was referred to UEP's Long Range Planning Committee for consideration.

292. As such, UEP is not entitled to the limited protections found in the Capper-Volstead Act for at least the following reasons:

(a) UEP is not a legitimate co-operative and does not market, process or sell eggs - it is a trade group designed to protect the interests of the egg industry;

(b) UEP consists mainly of vertically integrated members who market, process and sell their own eggs;

(c) UEP has members that are not involved in agricultural egg production;

(d) UEP has many members that process other producers' eggs or who supply eggs to members on a contract basis;

(e) UEP conspired with UEA and its members - a trade group explicitly made up of non-Capper-Volstead protected entities;

(f) UEP includes UEA members who are non-Capper-Volstead protected entities;

(g)     UEP conspired with non-member egg producers and other entities to assist in reducing egg supply and fixing prices;

(h)     UEP retaliated against producers that left the price-fixing scheme; and

(i)     UEP's supply restriction and price-fixing efforts fall outside of the limited purposes of the Capper-Volstead Act.

**D.     Defendants Intentionally Misled Consumers that the "Animal Care Certified Program" was a Humane Standard of Care for Poultry When it Was Merely A Pretext for Supply Reduction**

**1.     The Primary Purpose of the "Animal Care Certified Program" was Output Reduction**

293.     While coordinated molts and hen disposals had successfully raised egg prices periodically, Defendants concluded a more reliable method to reduce overall chick hatch was essential for the long-term success of their supply reduction scheme.  During the Class Period, the largest shell egg and egg products processors entered into an agreement to increase cage sizes, coordinate molting and reduce flock sizes, all under the guise of the "Animal Care Certified Program."  The real motive in implementing the program was to reduce supply and accomplish increases in both prices and profits.[20]

294.     The pretextual nature of the Animal Care Certified Program was underscored in the work of UEP's retained poultry economist, Donald Bell.  In his April 2002 report prepared under the "sponsorship" of the UEP, entitled "Reducing Cage Density - It's Effect on Egg Prices and Flock Performance," Bell concluded that keeping production down could result in increases in industry income of between $2.51 and $3.55 billion.

---

[20] Sam Krouse and Bob Krouse, *Infrastructure's Role In Keeping Egg Prices High,* Egg Industry Vol. 113 No. 2, Feb. 2008.

295.     Defendants implemented Donald Bell's supply restriction guidelines as a long-term output reduction program that eventually was known as the "Animal Care Certified Program" (or "ACC") and later known as the "UEP Certified Program."   In particular, Defendants determined that: 100% of their production had to comply with the UEP Certification Program (even if customers did not want Certified eggs) and that producers could not "backfill" to make up for the hens lost as a result of increased cage space.   These key aspects of the cage space output restrictions conspiracy were unconnected to any perceived animal husbandry benefits that might result from increased cage space.

### 2.     Defendants Made Misleading Statements Regarding The Origin of the "Animal Care Certified Program"

296.     In 2007 UEP's president, Gene Gregory, testified before a House Subcommittee in regard to a "scientific advisory committee" and its role in creating UEP's certification program:

> [T]o ensure its objectivity the committee did not include any producers as members.  The scientific committee recommended significant changes in egg production practices.  UEP accepted the recommendations and today about 85% of our industry has implemented them.  [ ]  As the years have gone by, the scientific committee has made a number of additional recommendations.  UEP has never rejected a recommendation by the committee - a remarkable track record that reflects our industry's determination to follow the best available science.  [ ]  The committee's recommendations became what is now know as the UEP Certified Program.

297.     However, this purported "independent scientific advisory committee," which was simply a guise to mislead consumers and lend the program an air of legitimacy, did not write the "animal husbandry" guidelines.   Instead, the UEP's "Animal Welfare" Committee, which is comprised entirely of egg producers, authored the guidelines based on the economic analysis

performed by Donald Bell, not based on any concern whatsoever for humane treatment of poultry.

> 3.  **UEP Suspends Its Use of the "Animal Care Certified Program" After the FTC and State Attorneys Generals Challenge the Misleading Nature of the Program**

298.   The Federal Trade Commission ("FTC") investigated UEP's use of the name "Animal Care Certified" (the original name for the Certification Program) as being potentially misleading.  On September 30. 2005, the FTC announced that the UEP had agreed that said logo could no longer be used on egg cartons.

299.   Later, in 2006, UEP was forced to pay $100,000 to settle claims brought by sixteen state Attorneys General, [21] who asserted that UEP's "Animal Care" claims were misleading." [22]  In the Assurance of Voluntary Compliance ("AVC") entered into by the sixteen States and Gene Gregory on behalf of UEP on September 26, 2006 in connection with the settlement, the States alleged that UEP violated their consumer protection laws by misleading or confusing consumers in its promotion of standards in conjunction with the use of the Animal Care Certified logo, as to

---

[21] The multi-state investigation, led by the District of Columbia Office of the Attorney General, included Oregon and the states of Alaska, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Massachusetts, Nevada, New Jersey, Ohio, Tennessee, Vermont and West Virginia. (Sept. 21, 2006 Oregon Dept. of Justice News Release).

[22] State of Alaska Dept. of Law News Release:  "United Egg Producers Run "A-Fowl" of Consumer Protection Laws…" (Sept. 21, 2006).  For example, Alaska State Attorney General David W. Marquez stated: "A certification program must not be promoted in a way that misleads the consumers."  Oregon Attorney General Hardy Myers stated, "[c]onsumer educators in Oregon have always encouraged shoppers not only to read labels and packaging carefully but to look for that extra certification that would indicate a better product …. Oregonians have relied on the plain meaning of a trade association logo to certify good conduct but UEP let them down." [22]

(a)     the level of care given to hens under the standards,

(b)     the nature of the auditing process used to ensure compliance with the standards,

(c)     the role of the scientific advisory committee in developing the standards,

(d)     the comparative benefits of eggs produced by farmers implementing the standards, and

(e)     the comparative quality of animal care for hens in UEP-certified facilities.

300.     UEP's agreement, pursuant to the AVC, included that in its promotion and marketing of standards to consumers, it would not misrepresent, directly or by implication, the level or type of care given to hens under the standards; the role of any scientific advisory committee in devising the standards ultimately adopted by UEP; or the comparative quality of animal care for hens in UEP certified facilities.

301.     UEP abandoned the pretense that its "Animal Care Certified Program" had any humane animal husbandry benefits.  Yet, Defendants continued to adhere to the program for its output reduction benefits.

## FRAUDULENT CONCEALMENT

302.     Throughout the Class Period, Defendants and their co-conspirators engaged in a successful, illegal price-fixing and supply control conspiracy that was self-concealing. Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination, conspiracy, and acts in furtherance thereof from Plaintiffs and the members of the Classes. Defendants effectuated their concealment by, among other things, touting their certification program under the guise of the adoption of "animal husbandry standards," while the real motive in reducing total flock sizes was the intended goal of supply reduction and price increases and misrepresenting the "scientific" origins of the program.

303.     Although Plaintiffs exercised due diligence throughout the Class Period, they could not have discovered Defendants' unlawful scheme and conspiracy at an earlier date because of Defendants' effective, affirmative, and fraudulent concealment of their activities. Defendants' wrongful conduct was carried out in part through means and methods that were designed and intended to avoid detection, and which in fact, successfully precluded detection.

304.     Defendants planned and implemented the conspiracy during non-public meetings and communications, monitored and enforced the conspiracy through non-public means, agreed not to discuss or disclose the details of their conspiracy, and falsely represented to Plaintiffs and members of the Class that the prices they paid for shell eggs were fair and competitive.  While at the same time, Defendants purposely misled consumers into believing that the certification program was instituted for humane reasons.

305.     Defendants' false representations and public statements attributed price increases to normal market conditions and factors other than their illegal conspiracy.  Plaintiffs and the members of the Class had no reason to disbelieve Defendants' explanations for the pricing behavior of these products.   Indeed, in some instances Defendants' explanations involved proprietary or otherwise non-public information within Defendants' exclusive control, leaving Plaintiffs and the members of the Class without means to verify their accuracy.

306.     Such explanations made by the Defendants include assertions that they could not effectively respond to supply reductions as a result of limitations imposed by animal husbandry guidelines that had the effect of reducing cumulative cage space, as well as their attributing price increases to other external factors including supply-side wear-and-tear, the increased price of fuel and feed, and the upward adjustment of other costs of production.  Given that Plaintiffs are

indirect purchasers of eggs -- not wholesalers or others involved in agriculture -- they had no means or reason to question the explanation s given for higher egg prices.

307.    Plaintiffs did not know nor could they have known that the prices for shell eggs and egg products were artificially inflated and maintained by virtue of Defendants' illegal price-fixing and supply control conspiracy, that was undertaken solely for financial gain and not for humane reasons as Defendants repeatedly claimed, and that Plaintiffs and members of the Classes were paying higher prices.

308.    Plaintiffs have exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy.

## EFFECT OF DEFENDANTS' CONDUCT

309.    The effect of Defendants' conduct as described herein was to artificially inflate the prices of eggs and egg products in the United States and the Class Jurisdictions.   By manipulating the supply and the indexes of pricing, price competition was suppressed and prices were supported at artificially high levels throughout the United States and the Class Jurisdictions.

## COUNT I

### Violation of Sherman Act § 1, 15 U.S.C. § 1

310.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this complaint.

311.    Beginning at least as early as January 1, 2000, the exact date being unknown to Plaintiff and at present exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain

trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States for shell eggs and egg products.

312.   As a result of Defendants' unlawful conduct, prices for shell eggs and egg products were raised, fixed, maintained and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this complaint.

313.   For purposes of formulating and effectuating their combination or conspiracy, defendants and their co-conspirators did those things they combined or conspired to do, including:  (a) an agreement to increase layer cage sizes in order to reduce gross flock sizes and, therefore, resulting in fixed prices; (b) manipulating egg market by reducing supply; (c) the exchange of pricing information; (d) additional actions, such as reducing the supply through exports; and (e) an agreement not to undermine the conspiracy or compete with one another.

314.   As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Indirect Purchaser Injunctive Class have been injured in their businesses and property in that they have paid more for shell eggs and processed egg products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

315.   As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Indirect Purchaser Injunctive Class have been injured and financially damaged in their respective businesses and property, in amounts, which are presently undetermined. Plaintiffs' injuries consist of paying higher prices to purchase shell eggs and processed egg products than it would have paid absent Defendants' conduct.

316.     Pursuant to Section 16 of the Clayton Act, 15, U.S.C. § 26, Plaintiffs and the other members of the Indirect Purchaser National Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

### Claims Under Arizona Law

### Violations of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

317.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

318.     By reason of the foregoing, Defendants and their co-conspirators have acted in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

319.     During the Class Period, each of the Defendants, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed shell eggs and egg products in Arizona.

320.     The combination and conspiracy alleged herein has substantially affected trade and commerce throughout Arizona and has had, *inter alia*, the following effects:

a.     Shell egg and egg products price competition was restrained, suppressed, and/or eliminated throughout Arizona;

b.     The supply of shell eggs and egg products was improperly reduced;

c.     Shell egg and egg product prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the Arizona; and

d.     Plaintiff and members of the Arizona Indirect Purchaser State Class were deprived of free and open competition.

88

321.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Arizona Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

## Unjust Enrichment

322.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Arizona than would have been possible absent the illegal conduct.

323.     The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Arizona indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Arizona was connected to and due to the increased prices paid for Defendants eggs by indirect purchasers in Arizona.

324.     The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.   To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from their sales to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT III

### Claims Under California Law

### Violations of California Business and Professions Code Section 16720, *et seq.*

325.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

326.    By reason of the foregoing, Defendants and their co-conspirators have acted in violation of Section 16720, California Business and Professions Code.

327.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

a.    Price competition in the sale of shell eggs and egg products has been restrained, suppressed, and/or eliminated in California;

b.    The supply of shell eggs and egg products was improperly reduced;

c.    Prices for shell eggs and egg products sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, noncompetitive levels in California and throughout the United States; and

d.    Those that purchased shell eggs and/or egg products directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

328.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the California Indirect Purchaser State Class have been injured in their business and/or property in that they paid more for shell eggs and egg products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Violations of Cal. Bus. & Prof. Code. §§ 17200, *et seq.***

329.    Defendants, and each of them, have acted in violation of Cal. Bus. & Prof. Code.

§§ 17200, by engaging in a continuing unlawful trust and concert of, the substantial terms of

which were to fix, raise, stabilize, and maintain prices of, allocate markets for, and restrain and

manipulate the supply of shell eggs and egg products at supra-competitive levels.

330.    By reason of the foregoing, Defendants and their co-conspirators committed

"unlawful, unfair or fraudulent business act[s] or practices[s]" in violation of California's Unfair

Competition Law.  Cal. Bus. & Prof. Code. §§ 17200, *et seq.*

331.    Defendants' unlawful conduct has substantially affected California commerce and

had, *inter alia*, the following effects:

a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout California;

b.    The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout California;

d.    Plaintiffs and members of the California Indirect Purchaser State Class were deprived of free and open competition.

332.    As a direct and proximate result of Defendants' unlawful practices, including

combinations and contracts to restrain trade and allocate relevant markets, Plaintiff and members

of the California Indirect Purchaser State Class have been injured in their business and/or

property in that they paid more for shell eggs and egg products than they otherwise would have

paid in the absence of Defendants' unlawful conduct.

**Unjust Enrichment**

333.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in California than would have been possible absent the illegal conduct.

334.     The Defendants were able to achieve their increased revenues and profits from their sales of eggs to California indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in California was connected to and due to the increased prices paid for Defendants eggs by indirect purchasers in Arizona.

335.     Defendants were enriched by their illegal activities at the expense of California indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

**COUNT IV**

**Claims Under District of Columbia Law**

**Violations of D.C. Code §§ 28-4501, *et seq.***

336.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

337.     By reason of the foregoing, Defendants and their co-conspirators have acted in violation of D.C. Code §§ 28-4501, *et seq.*

338.    Defendants' unlawful conduct has substantially affected District of Columbia commerce and had, *inter alia*, the following effects:

    a.    Shell egg and egg products price competition was restrained, suppressed, and/or eliminated throughout the District of Columbia;

    b.    The supply of shell eggs and egg products was improperly reduced;

    c.    Shell egg and egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the District of Columbia; and

    d.    Plaintiff and members of the District of Columbia Indirect Purchaser State Class were deprived of free and open competition.

339.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the District of Columbia Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

### Violations of D.C. Code §§ 28-3901, *et seq.*

340.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

341.    The foregoing conduct constitutes "unlawful trade practices" within the meaning of D.C. Code § 28-3904.

342.    Defendants' unlawful conduct had the following effects:

    a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout the District of Columbia;

b.     The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

c.     Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the District of Columbia; and

d.     Plaintiff and members of the District of Columbia Indirect Purchaser State Class were deprived of free and open competition.

343.   Defendants, acting in their position as the dominate domestic producers of shell eggs and egg products, place Plaintiff and members of the District of Columbia Indirect Purchaser State Class in a grossly unequal bargaining position by foreclosing their ability to purchase shell eggs and egg products at unrestrained, fair and competitive prices.

344.   As a direct and proximate result of Defendants' conduct, Plaintiff and members of the District of Columbia Indirect Purchaser State Class have been injured.

### Unjust Enrichment

345.   By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in the District of Columbia than would have been possible absent the illegal conduct.

346.   The Defendants were able to achieve their increased revenues and profits from their sales of eggs to District of Columbia indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in the District of Columbia was connected to and due to the increased prices paid for Defendants eggs by indirect purchasers in the District of Columbia.

347.   Defendants were enriched by their illegal activities at the expense of District of Columbia indirect purchasers of eggs and thus Defendants should be ordered to make restitution

94

for the benefit of District of Columbia indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT V

### Claims Under Florida Law

### Violations of F.S. §§ 501.201, *et seq.*

348.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

349.   By reason of the foregoing, Defendants and their co-conspirators committed actions that constitute unfair and deceptive trade practices in violation of F.S. § 501.204, and substantially affecting trade and commerce throughout Florida.

350.   Defendants' unlawful conduct has substantially affected Florida commerce and had, *inter alia*, the following effects:

351.   Defendants' unlawful conduct had the following effects:

a.   Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Florida;

b.   The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

c.   Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Florida; and

d.   Plaintiffs and members of the Florida Indirect Purchaser State Class were deprived of free and open competition.

352.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and members of the Florida Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

### Unjust Enrichment

353.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Florida than would have been possible absent the illegal conduct.

354.     The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Florida indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Florida was connected to and due to the increased prices paid for Defendants eggs by indirect purchasers in Florida.

355.     Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

### COUNT VI

### Claims Under Iowa Law

### Violations of Iowa Competition Law §§ 553.1, *et seq.*

356.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets

for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

357.   By reason of the foregoing, Defendants and their co-conspirators committed actions that constitute unfair and deceptive trade practices in violation of Iowa Competition Law §§ 553.1, *et seq.*

358.   Defendants' unlawful conduct has substantially affected Iowa commerce and had, *inter alia*, the following effects:

     a.     Shell egg and egg price competition was restrained, suppressed, and/or eliminated throughout Iowa;

     b.     The supply of shell eggs and egg products was improperly reduced;

     c.     Shell egg and egg product prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Iowa; and

     d.     Plaintiffs and members of the Iowa Indirect Purchaser State Class were deprived of free and open competition.

359.   As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Iowa Indirect Purchaser State have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

**Unjust Enrichment**

360.   By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Iowa than would have been possible absent the illegal conduct.

361.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Iowa indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Iowa was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Iowa.

362.    Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Iowa indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT VII

### Claims Under Kansas Law

### Violations of K.S.A. §§ 50-101 *et seq.*

363.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

364.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Kansas antitrust statutes, K.S.A. §§ 50-101 *et seq.*, substantially affecting trade and commerce throughout Kansas.

365.    Defendants' unlawful conduct has substantially affected Kansas commerce and had, *inter alia*, the following effects:

    a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Kansas;

    b.    The supply of shell eggs and egg products was improperly reduced;

    c.    Shell eggs and egg product prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Kansas; and

    d.    Plaintiffs and members of the Kansas Indirect Purchaser State Class were deprived of free and open competition.

366.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the Kansas Indirect Purchaser State Class and have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products

## Violations of K.S.A. § 50-623, *et seq.*

367.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

368.    By reason of the foregoing, Defendants and their co-conspirators have engaged in conduct that constitutes deceptive and unconscionable acts and practices within the meaning of K.S.A. § 50-623, *et seq.*

369.    Defendants' unlawful conduct has substantially affected Kansas commerce and had, *inter alia*, the following effects:

    a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Kansas;

b.      The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

c.      Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Kansas;

d.      Plaintiffs and members of the Kansas Indirect Purchaser State Class were deprived of free and open competition.

370.   Defendants, by the design, intent and nature of their conspiracy, unconscionably took advantage of Plaintiffs and members' of the Kansas Indirect Purchaser State Class inability to know of and thus protect themselves from Defendants' deceptive and unconscionable acts and practices.

371.   Defendants, acting in their position as the dominate domestic producers of shell eggs and egg products, by and through their conspiracy, place Plaintiffs and members of the Kansas Indirect Purchaser State Class in a grossly unequal bargaining position by foreclosing their ability to purchase shell eggs and egg products at unrestrained, fair and competitive prices.

372.   As a direct and proximate result of Defendants' unconscionable trade practice, Plaintiffs and members of the Kansas Indirect Purchaser State Class have been injured.

**Unjust Enrichment**

373.   By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Kansas than would have been possible absent the illegal conduct.

374.   The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Kansas indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Kansas was connected to

and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Kansas.

375.    Defendants were enriched by their illegal activities at the expense of Kansas indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Kansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT VIII

### Claims Under Maine Law

### Violation of 10 M.R.S. §§ 1101, *et seq.*

376.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

377.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Maine antitrust statutes, 10 M.R.S. §§ 1101, *et seq.*

378.    Defendants' unlawful conduct has substantially affected Maine commerce and had, *inter alia*, the following effects:

    a.    Shell eggs and egg products price competition was restrained, suppressed, and eliminated throughout Maine;

    b.    The supply of shell eggs and egg products was improperly reduced;

    c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; and

      d.    Plaintiff and members of the Maine Indirect Purchaser State Class were deprived of free and open competition.

379.    Plaintiffs and members of the Maine Indirect Purchaser State Class

380.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and members of the Maine Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

### Violations of 5 M.R.S. § 205-A, *et seq.*

381.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

382.    By reason of the foregoing, Defendants and their co-conspirators have engaged in conduct that constitutes unfair and/or deceptive methods of competition, acts and/or practices within the meaning of 5 M.R.S. § 205-A, *et seq.*

383.    Defendants' unlawful conduct has substantially affected Maine commerce and had, *inter alia*, the following effects:

      a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Maine;

      b.    The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

      c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Maine;

      d.      Plaintiffs and members of the Maine Indirect Purchaser State Class were deprived of free and open competition.

384.    Defendants, acting in their position as the dominate domestic manufacturers of shell eggs and egg products, through their conspiracy, placed and continue to place Plaintiff and members of the Maine Indirect Purchaser State Class in a position of being unable to reasonably avoid the effects of that conspiracy.

385.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including their unlawful and/or deceptive methods, acts, practices, and/or courses of conduct, Plaintiff and the Maine Indirect Purchaser State Class have been injured in their businesses and property in that they paid more for shell eggs and egg products than they otherwise would have paid in the absence of Defendants' unlawful and/or deceptive conduct.

**Unjust Enrichment**

386.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Maine than would have been possible absent the illegal conduct.

387.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Maine indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Maine was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Maine

388.    Defendants were enriched by their illegal activities at the expense of Maine indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the

benefit of Maine indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT IX

### Claims Under Massachusetts Law
### Violations of M.G.L.A. c. 93A, §§ 2, *et seq.*

389.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

390.    By reason of the foregoing, Defendants and their co-conspirators engaged in "unfair methods of competition and unfair or deceptive acts or practices" in knowing and willful violation of M.G.L.A c. 93A, *et seq.*

391.    Defendants' unlawful conduct has substantially affected Massachusetts trade and commerce and had, *inter alia*, the following effects:

a.      Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Massachusetts;

b.      The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

c.      Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Massachusetts; and

d.      Plaintiffs and members of the Massachusetts Indirect Purchaser State Class were deprived of free and open competition.

392.    As a direct and proximate result of Defendants' unlawful practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and members of the Massachusetts Indirect Purchaser State Class have been injured in their business

and/or property in that they paid more for shell eggs and egg products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Unjust Enrichment

393.   By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Massachusetts than would have been possible absent the illegal conduct.

394.   The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Massachusetts indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Massachusetts was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Massachusetts.

395.   Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT X

### Claims Under Michigan Law

### Violations of M.C.L. §§ 445.771, *et seq.*

396.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

105

397.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Michigan antitrust statutes, M.C.L. §§ 445.771, *et seq.*

398.    Defendants' unlawful conduct has substantially affected Michigan trade and commerce and had, *inter alia*, the following effects:

   a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Michigan;

   b.    The supply of shell eggs and egg products was improperly reduced;

   c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Michigan; and

   d.    Plaintiff and members of the Michigan Indirect Purchaser State Class were deprived of free and open competition.

399.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Michigan Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

400.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Michigan indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Michigan was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Michigan.

401.   The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  As an ancillary equitable remedy under MARA, Defendants should be ordered to disgorge the profits illegally obtained from sales to Michigan indirect purchasers of eggs.

**Violations of Mich. Comp. Laws Ann. §§ 445.901, *et seq.***

402.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.  Defendants' agreements were concealed from Plaintiff.  Further, Defendants' conduct had the effect of creating and fostering confusion and/or misunderstanding in the relevant markets for shell eggs and egg products, including within Michigan.

403.   By reason of the foregoing, Defendants and their co-conspirators have engaged in conduct that constitutes deceptive and unconscionable acts and practices within the meaning of Mich. Comp. Laws Ann. §§ 445.901, *et seq.*

404.   Defendants' unlawful conduct has substantially affected Michigan trade and commerce and had, *inter alia*, the following effects:

> a.   Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Michigan;
>
> b.   The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;
>
> c.   Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Michigan; and
>
> d.   Plaintiff and members of the Michigan Indirect Purchaser State Class were deprived of free and open competition in and markets for shell eggs and egg products.

405.   Defendants, by the design, intent and nature of their conspiracy failed to reveal material facts regarding the price and supply of shell eggs and egg products, the omission of which mislead and deceived Plaintiff and members of the Michigan Indirect Purchaser State Class into believing the markets for shell eggs and egg products were free of deceptive and unconscionable acts and practices and that prices for shell eggs and egg products were based on factors other than Defendants' illegal conduct.

406.   Defendants, acting in their position as the dominant domestic producers of shell eggs and egg products, by and through their conspiracy, took advantage of Plaintiff's and members of the Michigan Indirect Purchaser State Class inability to reasonably know of and thus protect themselves from Defendants' deceptive and unconscionable acts and practices.

407.   As a direct and proximate result of Defendants' unconscionable trade practice, Plaintiffs and members of the Michigan Indirect Purchaser State Class have been injured.

## COUNT XI

### Claims Under Minnesota Law

### Violations of Minn. Stat. §§ 325D.49 *et seq.*

408.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

409.   By reason of the foregoing, Defendants and their co-conspirators formed contracts, combinations or conspiracies in restraint of trade or commerce, in violation of Minnesota's Antitrust Law, Minn. Stat. §§ 325D.49 *et seq.*

410.    Defendants' unlawful conduct has substantially affected Minnesota trade and commerce and had, *inter alia*, the following effects:

a.    Shell eggs and egg products price competition was restrained, suppressed, and eliminated throughout Minnesota;

b.    The supply of shell eggs and egg products was improperly reduced;

c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; and

d.    Plaintiff and members of the Minnesota Indirect Purchaser State Class were deprived of free and open competition.

411.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Minnesota Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

**Unjust Enrichment**

412.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Minnesota than would have been possible absent the illegal conduct.

413.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Minnesota indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Minnesota was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Minnesota.

414.    Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

**COUNT XII**

**Claims Under Mississippi Law**

**Violations of Miss. Code Ann. §75-21-1, *et seq.***

415.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

416.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Mississippi antitrust statutes, Miss. Code Ann. §75-21-1, *et seq.*

417.    Defendants' unlawful conduct has substantially affected Mississippi trade and commerce and had, *inter alia*, the following effects:

a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Mississippi;

b.    The supply of shell eggs and egg products was improperly reduced;

c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Mississippi; and

d.    Plaintiffs and members of the Mississippi Indirect Purchaser State Class were deprived of free and open competition.

418.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Mississippi Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

## Unjust Enrichment

419.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Mississippi than would have been possible absent the illegal conduct.

420.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Mississippi indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Mississippi was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Mississippi.

421.    Defendants were enriched by their illegal activities at the expense of Mississippi indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Mississippi indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XIII

### Claims Under Nebraska Law

### Violations of Neb. Rev. Stat. § 59-1601, *et seq.*

422.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

423.     By reason of the foregoing, Defendants and their co-conspirators have committed actions that constitute continuing unfair and deceptive trade practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

424.     Defendants' unlawful conduct has substantially affected Nebraska trade and commerce and had, *inter alia*, the following effects:

    a.     Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Nebraska;

    b.     The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

    c.     Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Nebraska; and

    d.     Plaintiff and members of the Nebraska Indirect Purchaser State Class were deprived of free and open competition.

425.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and members of the Nebraska Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

112

**Unjust Enrichment**

426.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Nebraska than would have been possible absent the illegal conduct.

427.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Nebraska indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Nebraska was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Nebraska.

428.    Defendants were enriched by their illegal activities at the expense of Nebraska indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Nebraska indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XIV

**Claims Under Nevada Law**

**Violations of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.***

429.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

430.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Nevada antitrust statutes, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

431.    Defendants' unlawful conduct has substantially affected Nevada trade and commerce and had, *inter alia*, the following effects:

   a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Nevada;

   b.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Nevada;

   c.    The supply of shell eggs and egg products was improperly reduced; and

   d.    Plaintiffs and members of the Nevada Indirect Purchaser State Class were deprived of free and open competition.

432.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Nevada Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

**Unjust Enrichment**

433.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Nevada than would have been possible absent the illegal conduct.

434.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Nevada indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of

114

Defendants to profit from their sales of eggs to indirect purchasers in Nevada was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Nevada.

435.    Defendants were enriched by their illegal activities at the expense of Nevada indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Nevada indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XV

### Claims Under New Mexico Law

### Violations of N.M.S.A. 1978, §§ 57-1-1, *et seq.*

436.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

437.    By reason of the foregoing, Defendants and their co-conspirators formed contracts, combinations or conspiracies in restraint of trade or commerce, in violation of the New Mexico Antitrust Act, N.M.S.A. 1978, §§ 57-1-1, *et seq.*

438.    Defendants' unlawful conduct has substantially affected New Mexico trade and commerce and had, *inter alia*, the following effects:

a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout New Mexico;

b.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout New Mexico;

      c.      The supply of shell eggs and egg products was improperly reduced; and

      d.      Plaintiff and members of the New Mexico Indirect Purchaser State Class were deprived of free and open competition.

439.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the New Mexico Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

**Violations of N.M.S.A. § 57-12-1, *et seq.***

440.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

441.    The foregoing conduct constitutes "unconscionable trade practices" within the meaning of N.M.S.A. § 57-12-1, *et seq.*

442.    Defendants' unlawful conduct had the following effects:

      a.      Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout New Mexico;

      b.      The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

      c.      Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout New Mexico; and

      d.      Plaintiff and members of the New Mexico Indirect Purchaser State Class were deprived of free and open competition.

443.    Defendants, by the design and intent of their conspiracy, intentionally took advantage, to a grossly unfair degree, of Plaintiff's and members' of the New Mexico Indirect Purchaser State Class lack of knowledge, ability to know, experience and/or capacity to learn of Defendants' unconscionable trade practice.

444.    Defendants, acting in their position as the dominate domestic producers of shell eggs and egg products, through their conspiracy, place Plaintiff and the New Mexico Indirect Purchaser State Class in a grossly unequal bargaining position by foreclosing their ability to purchase shell eggs and egg products at unrestrained, fair and competitive prices.

445.    As a direct and proximate result of Defendants' unconscionable trade practices, Plaintiff and the New Mexico Indirect Purchaser State Class have been injured.

**Unjust Enrichment**

446.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in New Mexico than would have been possible absent the illegal conduct.

447.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to New Mexico indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in New Mexico was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in New Mexico.

448.    Defendants were enriched by their illegal activities at the expense of New Mexico indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the

benefit of New Mexico indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XVI

### Claims Under New York Law

### Violations of New York Gen. Bus. Law § 340, *et seq.* (The Donnelly Act)

449.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

450.    During the Class Period, each of the Defendants, directly or indirectly and through affiliates dominated and controlled, manufactured, sold and/or distributed shell eggs and egg products in the State of New York.

451.    The combination and conspiracy alleged herein has substantially affected trade and commerce throughout the State of New York and has had, *inter alia*, the following effects:

      a.      Shell egg and egg products price competition was restrained, suppressed, and/or eliminated throughout the State of New York;

      b.      The supply of shell eggs and egg products was improperly reduced;

      c.      Shell egg and egg product prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the State of New York; and

      d.      Plaintiffs and members of the New York Indirect Purchaser State Class were deprived of free and open competition.

452.    By reason of the foregoing, Defendants and their co-conspirators have acted in violation of New York Gen. Bus. Law. § 340, *et seq.*

453.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the New York Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

### Violations of New York General Business Law § 349

454.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

455.     The knowing and willful conduct of the Defendants described herein constitutes materially misleading consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349.  Defendants' actions materially misled New York consumers and resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

456.     Defendants' unlawful conduct has substantially affected New York trade and commerce and had, *inter alia*, the following effects:

   a.     Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout New York;

   b.     The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

   c.     Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout New York; and

119

      d.     Plaintiffs and members of the New York Indirect Purchaser State Class were deprived of free and open competition.

457.    As a result of Defendants' illegal conduct Plaintiffs and members of the New York Indirect Purchaser State Class paid supra-competitive, artificially inflated prices for shell eggs and egg products.

458.    Without prejudice to their contention that Defendants' unlawful conduct was willful and knowing, Plaintiffs and the New York Indirect Purchaser State Class are seeking actual damages only for their injuries.

## Unjust Enrichment

459.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in New York than would have been possible absent the illegal conduct.

460.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to New York indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in New York was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in New York.

461.    Defendants were enriched by their illegal activities at the expense of New York indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of New York indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## <u>COUNT XVII</u>

**Claims Under North Carolina Law**

**Violations of N.C. Gen. Stat. §§ 75-1, *et seq.***

462.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

463.     By reason of the foregoing, Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the North Carolina antitrust statutes, N.C. Gen. Stat. §§ 75-1, *et seq.*

464.     Defendants' unlawful conduct has substantially affected North Carolina trade and commerce and had, *inter alia*, the following effects:

a.     Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout North Carolina;

b.     Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout North Carolina;

c.     The supply of shell eggs and egg products was improperly reduced; and

d.     Plaintiffs and members of the North Carolina Indirect Purchaser State Class were deprived of free and open competition.

465.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the North Carolina Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

121

**Violations of N.C.G.S. §§ 75-1.1, *et seq.***

466.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

467.    By reason of the foregoing, Defendants and their co-conspirators engaged in unfair methods of competition and unfair or deceptive acts or practices which affected North Carolina commerce in violation of N.C.G.S. § 75-1.1.

468.    Defendants' unlawful conduct had the following effects:

    a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout North Carolina;

    b.    The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

    c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout North Carolina; and

    d.    Plaintiffs and members of the North Carolina Indirect Purchaser State Class were deprived of free and open competition.

469.    As a direct and proximate result of Defendants' unlawful practices, including combinations and contracts to restrain trade and allocate the relevant markets, Plaintiffs and members of the North Carolina Indirect Purchaser State Class have been injured in their business and/or property in that they paid more for shell eggs and egg products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

**Unjust Enrichment**

470.   By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in North Carolina than would have been possible absent the illegal conduct.

471.   The Defendants were able to achieve their increased revenues and profits from their sales of eggs to North Carolina indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in North Carolina was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in North Carolina.

472.   Defendants were enriched by their illegal activities at the expense of North Carolina indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of North Carolina indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XVIII

**Claims Under North Dakota Law**

**Violations of N.D. Cent. Code §§ 51-08.1-01, *et seq.***

473.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

474.   By reason of the foregoing, Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in

violation of the North Dakota antitrust statutes, N.D. Cent. Code §§ 51-08.1-01, *et seq.* substantially affecting trade and commerce throughout North Dakota.

475.   Defendants' unlawful conduct has substantially affected North Dakota trade and commerce and had, *inter alia*, the following effects:

a.   Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout North Dakota;

b.   Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout North Dakota;

c.   The supply of shell eggs and egg products was improperly reduced; and

d.   Plaintiffs and members of the North Dakota Indirect Purchaser State Class were deprived of free and open competition.

476.   As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the North Dakota Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

## Unjust Enrichment

477.   By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in North Dakota than would have been possible absent the illegal conduct.

478.   The Defendants were able to achieve their increased revenues and profits from their sales of eggs to North Dakota indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in North Dakota was

connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in North Dakota.

479.    The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.   To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from their sales to indirect purchasers in North Dakota, Defendants should be ordered to make restitution for the benefit of North Dakota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XIX

### Claims Under Puerto Rico Law

### Violations of P.R. 10 LPRA § 258, *et seq.*

480.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

481.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Puerto Rico antitrust statutes, P.R. 10 LPRA § 258, *et seq.* substantially affecting trade and commerce throughout Puerto Rico.

482.    Defendants' unlawful conduct has substantially affected Puerto Rico trade and commerce and had, *inter alia*, the following effects:

      a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Puerto Rico;

b.  Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Puerto Rico;

c.  The supply of shell eggs and egg products was improperly reduced; and

d.  Plaintiffs and members of the Puerto Rico Indirect Purchaser State Class were deprived of free and open competition.

483.  As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Puerto Rico Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

## Unjust Enrichment

484.  By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Puerto Rico than would have been possible absent the illegal conduct.

485.  The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Puerto Rico indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Puerto Rico was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Puerto Rico.

486.  Defendants were enriched by their illegal activities at the expense of Puerto Rico indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Puerto Rico indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XX

### Claims Under South Dakota Law

### Violations of S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*

487.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

488.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the South Dakota antitrust statutes, S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*,

489.    Defendants' unlawful conduct has substantially affected South Dakota trade and commerce and had, *inter alia*, the following effects:

    a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout South Dakota;

    b.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout South Dakota;

    c.    The supply of shell eggs and egg products was improperly reduced; and

    d.    Plaintiffs and members of the South Dakota Indirect Purchaser State Class were deprived of free and open competition.

490.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the South Dakota Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

**Violations of S.D. Codified Laws Ann. §37-24, *et seq.***

491.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

492.    Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as alleged herein, constituted unfair and/or deceptive methods of competition, acts and/or practices within the meaning of the South Dakota Deceptive Trade Practices and Consumer Protection statutes, S.D. Codified Laws Ann. §§ 37-24, *et seq.*

493.    During the Class Period, Defendants and their co-conspirators committed and continue to commit acts of unfair competition as alleged herein. This illegal conduct is continuing and there is no indication that Defendants will not continue such activity in the future.

494.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Defendants have caused and continue to cause Plaintiff and members of the South Dakota Indirect Purchaser State Class to pay supra-competitive and artificially inflated prices for shell eggs and egg products.

495.    As a direct and proximate result of Defendants' conduct, Plaintiff and the South Dakota Indirect Purchaser State Class have suffered an ascertainable loss of money and/or property and have been deprived the benefits of free and fair competition on the merits.

**Unjust Enrichment**

496.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in South Dakota than would have been possible absent the illegal conduct.

497.     The Defendants were able to achieve their increased revenues and profits from their sales of eggs to South Dakota indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in South Dakota was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in South Dakota.

498.     Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XXI

**Claims Under Tennessee Law**

**Violations of Tenn. Code Ann. §§ 47-25-101, *et seq.***

499.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

500.     By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Tennessee antitrust statutes, Tenn. Code Ann. §§ 47-25-101, *et seq.*

501.     Defendants' unlawful conduct has substantially affected Tennessee trade and commerce and had, *inter alia*, the following effects:

    a.     Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Tennessee;

    b.     Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Tennessee;

    c.     The supply of shell eggs and egg products was improperly reduced; and

    d.     Plaintiff and members of the Tennessee Indirect Purchaser State Class were deprived of free and open competition.

502.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Tennessee Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

## Unjust Enrichment

503.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Tennessee than would have been possible absent the illegal conduct.

504.     The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Tennessee indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of

Defendants to profit from their sales of eggs to indirect purchasers in Tennessee was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Tennessee.

505.   Defendants were enriched by their illegal activities at the expense of Tennessee indirect purchasers of eggs.  Because the parties from whom indirect purchasers bought the eggs directly were not, so far as indirect purchasers are aware, a party to Defendants' or involved in Defendants' illegal activities which caused the increased egg prices to Tennessee indirect purchasers, Defendants should be ordered to make restitution for the benefit of Tennessee indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XXII

### Claims Under Utah Law

### Violations of U.C.A. 1953 §§ 76-10-911, *et seq.*

506.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

507.   By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Utah antitrust statutes, U.C.A. 1953 §§ 76-10-911, *et seq.*

508.   Defendants' unlawful conduct has substantially affected Utah trade and commerce and had, *inter alia*, the following effects:

a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Utah;

b.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Utah;

c.    The supply of shell eggs and egg products was improperly reduced; and

d.    Plaintiff and members of the Utah Indirect Purchaser State Class were deprived of free and open competition.

509.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Utah Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

**Unjust Enrichment**

510.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Utah than would have been possible absent the illegal conduct.

511.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Utah indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Utah was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Utah.

512.    Defendants were enriched by their illegal activities at the expense of Utah indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Utah purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XXIII

### Claims Under Vermont Law

### Violations of 9 V.S.A. §§ 2451, *et seq.*

513.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

514.     By reason of the foregoing, Defendants and their co-conspirators engaged in a continuing combination and conspiracy in restraint of trade and commerce in violation of the Vermont Consumer Fraud Act, 9 V.S.A. §§ 2451, *et seq.*

515.     Defendants' unlawful conduct has substantially affected Vermont trade and commerce and had, *inter alia*, the following effects:

    a.     Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Vermont;

    b.     The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

    c.     Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Vermont; and

    d.     Plaintiff and members of the Vermont Indirect Purchaser State Class were deprived of free and open competition.

516.     Plaintiff and members of the Vermont Indirect Purchaser State Class paid supra-competitive, artificially inflated prices or portions of the price for shell eggs and egg products.

517.     As a direct, proximate and foreseeable cause of Defendants' conduct in violation of 9 V.S.A. §§ 2451, *et seq.*, Plaintiff and the Vermont Indirect Purchaser State Class have been

damaged in their property in that the price or a portion of the price which they have paid for or in respect of shell eggs and egg products has been inflated to a supra-competitive level.

## Unjust Enrichment

518.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Vermont than would have been possible absent the illegal conduct.

519.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Vermont indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.   Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Vermont was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Vermont.

520.    Defendants were enriched by their illegal activities at the expense of Vermont indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Vermont indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XXIV

### Claims Under West Virginia Law

### Violations of W. Va. Code §§ 47-18-1, *et seq.*

521.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

522.   By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the West Virginia antitrust statutes, W. Va. Code §§ 47-18-1, *et seq.*

523.   Defendants' unlawful conduct has substantially affected West Virginia trade and commerce and had, *inter alia*, the following effects:

    a.   Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout West Virginia;

    b.   Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout West Virginia;

    c.   The supply of shell eggs and egg products was improperly reduced; and

    d.   Plaintiff and members of the West Virginia Indirect Purchaser State Class were deprived of free and open competition.

524.   As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the West Virginia Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

### Violations of W. Va. Code §§ 46A-6-101, *et seq.*

525.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

526.   The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce", and has directly or

indirectly affected the people of West Virginia within the meaning of W. Va. Code §§ 46A-6-101, *et seq.*

527.     Defendants' unlawful conduct had the following effects:

a.     Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout West Virginia;

b.     The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

c.     Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout West Virginia; and

d.     Plaintiff and members of the West Virginia Indirect Purchaser State Class were deprived of free and open competition.

e.     Confusion and/or misunderstanding in the relevant markets for shell eggs and egg products.

528.     Defendants, by the design and intent of their conspiracy, intentionally took advantage, to a grossly unfair degree, Plaintiff's and members' of the West Virginia Indirect Purchaser State Class lack of knowledge, ability to know, experience and/or capacity to learn of Defendants' unfair methods of competition and unfair or deceptive acts or practices.

529.     Defendants, acting in their position as the dominate domestic manufacturers of shell eggs and egg products, through their conspiracy, intentionally fostered confusion and/or misunderstanding in the relevant markets for shell eggs and egg products thereby placing Plaintiff and members of the West Virginia Indirect Purchaser State Class in a grossly unequal bargaining position by foreclosing their ability to purchase shell eggs and egg products at unrestrained, fair and competitive prices.

530.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and the West Virginia Indirect Purchaser State Class have been injured.

## Unjust Enrichment

531.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in West Virginia than would have been possible absent the illegal conduct.

532.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to West Virginia indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in West Virginia was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in West Virginia.

533.    Defendants were enriched by their illegal activities at the expense of West Virginia indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of West Virginia indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## COUNT XXV

### Claims Under Wisconsin Law

### Violations of Wis. Stat. § 133.01, *et seq.*

534.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets

for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

535. By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Wisconsin antitrust statutes, Wis. Stat. § 133.01, *et seq.*

536. Defendants' unlawful conduct has substantially affected Wisconsin trade and commerce and had, *inter alia*, the following effects:

    a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Wisconsin;

    b.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Wisconsin;

    c.    The supply of shell eggs and egg products was improperly reduced; and

    d.    Plaintiffs and members of the Wisconsin Indirect Purchaser State Class were deprived of free and open competition.

537. As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the Wisconsin Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.

**Violations of Wis. Stat. §§ 100.18, *et seq.***

538. Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supra-competitive levels.

539.    The foregoing conduct constitutes deceptive and unfair competition and trade practices within the meaning of Wis. Stat. §§ 100.18, *et seq.*

540.    Defendants' unlawful conduct had the following effects:

a.    Shell eggs and egg products price competition was restrained, suppressed, and/or eliminated throughout Wisconsin;

b.    The supply of shell egg and egg products was improperly limited, reduced and otherwise manipulated;

c.    Shell eggs and egg products prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Wisconsin; and

d.    Plaintiffs and members of the Wisconsin Indirect Purchaser State Class were deprived of free and open competition.

541.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Wisconsin Indirect Purchaser State Class have been injured.

**Unjust Enrichment**

542.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in Wisconsin than would have been possible absent the illegal conduct.

543.    The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Wisconsin indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.    Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Wisconsin was connected to and due to the illegally inflated prices paid for Defendants' eggs by indirect purchasers in Wisconsin.

544. Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request the following:

A. That the Court determine that the claims alleged herein under the Sherman Act, the state antitrust laws, and the state consumer protection and/or unfair competition laws may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

B. That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes:

    a. A violation of the Sherman Act, 15 U.S.C. § 1, as alleged in Count I;

    b. A violation of the state antitrust, consumer protection and unfair competition laws, and an act of unjust enrichment as alleged in Counts II – XXV.

C. That Plaintiffs and the class members recover damages, as provided by the state antitrust laws and the state consumer protection and unfair competition laws, including actual damages, multiple damages where provided by law and/or statutory minimum damages where provided by law, and that a joint and several judgment in favor of Plaintiffs and the Classes be entered against the Defendants in an amount of damages in accordance with such laws;

D. That Plaintiffs and the relevant Class members obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

E. That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

F.    That Plaintiffs and Class members be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition, acts of unjust enrichment and where statutorily authorized;

G.    That Plaintiffs and Class members be awarded pre-judgment and post-judgment interest as permitted by law;

H.    That Plaintiffs and Class members recover their costs of suit, including reasonable attorneys' fees as provided by law; and

I.    That Plaintiffs and Class members be awarded such other and further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED:  April 8, 2010

Respectfully submitted,

Krishna B. Narine
**LAW OFFICE OF KRISHNA B. NARINE**
2600 Philmont Avenue
Suite 324
Huntingdon Valley, PA 19006
Tel:    (215) 914-2460
Fax:    (215) 914-2462
knarine@kbnlaw.com

Paul F. Novak
Peter Safirstein
Lauren Block
Elizabeth McKenna
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY 10119

141

Tel:    (212) 594-5300
Fax:    (212) 868-1229
pnovak@milberg.com
psafirstein@milberg.com
lblock@milberg.com
emckenna@milberg.com

Christopher Lovell
Craig Essenmacher
Victor Stewart
**LOVELL STEWART HALEBIAN LLP**
500 Fifth Avenue, Floor 58
New York, NY 10110
Tel:    (212) 608-1900
Fax:    (212) 719-4667
craigessenmacher@yahoo.com
victornj@ix.netcom.com

Timothy D. Battin
Mark Schirmer
Ian Otto
**STRAUS & BOIES, LLP**
4041 University Drive
5th Floor
Fairfax, VA 22030
Tel:    (703) 764-8700
Fax:    (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com
iotto@straus-boies.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*