UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | ) | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | ) ) ) ) | MDL No. 2002 08-md-02002 |
| THIS DOCUMENT APPLIES TO: All Indirect Purchaser Actions | ) ) ) ) | |

### DEFENDANT LAND O'LAKES, INC.'S MOTION TO DISMISS INDIRECT PURCHASERS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant Land O'Lakes, Inc. ("Land O'Lakes") moves for an order dismissing with prejudice the Second Amended Consolidated Class Action Complaint (the "Complaint") of the indirect purchaser plaintiffs.

1. In their 544-paragraph Complaint, plaintiffs allege a number of actions by United Egg Producers, some of its members, and certain other entities that plaintiffs contend amount to an illegal agreement to restrain the supply of eggs. *See* Complaint *generally*. Land O'Lakes, however, is mentioned in only 7 paragraphs of the Complaint. Complaint at ¶¶ 61, 62, 64, 65, 163, 215, 218.

2. In an attempt to make it less obvious that the allegations against Land O' Lakes fail to state a claim, plaintiffs lump Land O'Lakes in with what is now its wholly-owned subsidiary, Moark, LLC, a Missouri limited liability company that also is a defendant in this action. *See* Complaint at ¶ 63. While there are a number of allegations correctly describing Moark's egg production business, plaintiffs improperly attribute it to Land O'Lakes by misleadingly characterizing the companies as a combined entity that plaintiffs call "Moark/Land O'Lakes." *See* Complaint at ¶ 65 ("Moark/Land O'Lakes is the nation's third-largest producer and marketer

of shell eggs."[1]). But they are separate entities, and Missouri law is clear that a member or manager of a Missouri limited liability company is not liable for any "debt, obligation or liability of the limited liability company." MO. REV. STAT. § 347.057. Plaintiffs simply cannot maintain this action against Land O'Lakes without alleging some basis to hold it directly liable.

3. Without providing any factual support, plaintiffs weakly allege that Land O'Lakes is directly liable by summarily concluding that Land O'Lakes was a direct participant in the alleged conspiracy: "Land O'Lakes has been an active participant in and profited from Moark's, UEP's and its co-conspirators' efforts to reduce supply and fix prices . . . ." Complaint at ¶ 62. But there are no allegations anywhere in the Complaint indentifying any agreement by Land O'Lakes to reduce egg supply or any steps that Land O'Lakes took in furtherance of any such agreement.

4. Outside of the general introductory paragraphs describing each defendant, there are only three paragraphs in the entire complaint that even mention Land O'Lakes. Complaint at ¶¶ 163, 215, 218. In the first reference, plaintiffs simply inserted "Land O'Lakes" in a parenthetical following Moark, again attempting to misleadingly attribute Moark's conduct to Land O'Lakes. *See* Complaint at ¶ 163. The other two paragraphs relate to a single UEP meeting that took place on January 25, 2005 and are based on the minutes from that meeting. Complaint at ¶¶ 215, 218. Those minutes are attached as Exhibit 1.[2]

---

[1] Plaintiffs' unsupported allegations, like this one, are quoted verbatim from direct purchaser plaintiffs' Second Consolidated Amended Class Action Complaint. *See* Docket No. 225 at ¶ 55. Indirect purchaser plaintiffs appear not to have performed any independent analysis of the propriety of including Land O'Lakes in their lawsuit.

[2] Because the contents of the minutes are alleged in the Complaint, the Court may consider the minutes on a Rule 12(b)(6) motion. *Myers v. Garfield & Johnson Enter., Inc.*, No. 09-2569, 2010 WL 165867, at *4 (E.D. Pa. Jan. 14, 2010) (citing *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002).

5.      Based on the minutes, plaintiffs allege that "Dan Knutson (Land O'Lakes, Moark, and Norco Ranch)"[3] attended the January 25, 2005 UEP meeting. Complaint at ¶ 215. Importantly, plaintiffs allege, and the minutes confirm, that Mr. Knutson was simply "present" at the meeting (Complaint at ¶ 218) – plaintiffs omit Mr. Knutson from their alleged list of "participants" in the meeting (Complaint at ¶ 215). Plaintiffs do not allege that Mr. Knutson in any way participated in or took any action at this meeting nor do the minutes reveal any activity on his part. Plaintiffs do not allege, and the minutes do not reflect, that he made any agreement on any subject, let alone one to reduce the supply of eggs. This is the totality of plaintiffs' allegations that Land O'Lakes participated in some conspiracy – that during the entire ten-year class period, a single Land O'Lakes employee attended a single UEP meeting and did nothing at that meeting.

6.      In order to plead an antitrust claim, the plaintiff "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (citations and quotations omitted); *see also Hinds County v. Wachovia Bank, N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (to state a claim, plaintiffs "must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy"); *Jung v. Association of Am. Med. Colls.*, 300 F. Supp. 2d 119, 161 (D.D.C. 2004) (a plaintiff must allege that "each defendant knowingly joined or agreed to participate in the conspiracy."). "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). But plaintiffs here do not even allege that much. They have failed to plead a claim against Land O'Lakes under any pleading standard, let alone with the specificity required under *Twombly*.

---

[3] Norco Ranch, Inc., a Moark subsidiary, also is a defendant in this action.

7. In addition, given the expense of continued participation in a lawsuit in which it does not belong, Land O'Lakes also respectfully requests that if the Court grants this Motion, plaintiffs be denied the opportunity to re-plead for a fourth time. On April 30, 2009, Land O'Lakes filed a motion to dismiss plaintiffs' first Consolidated Amended Class Action Complaint on the same grounds that are raised in this Motion. [Docket No. 114.] Almost a year later, and despite adding almost 200 new paragraphs to their Complaint, plaintiffs did not add a single allegation showing any agreement by Land O'Lakes to reduce egg supply or any steps that Land O'Lakes took in furtherance of any such agreement.

**WHEREFORE**, for these reasons, defendant Land O'Lakes respectfully requests that plaintiffs' Complaint against it be dismissed with prejudice.

May 7, 2010
Respectfully submitted,

/s/ Nathan P. Eimer
Nathan P. Eimer
Scott C. Solberg
Vanessa G. Jacobsen
Michael B. MacKenzie
EIMER STAHL KLEVORN & SOLBERG, LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Tel: (312) 660-7600
Fax: (312) 692-1718

*Counsel for Defendant Land O'Lakes, Inc.*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | ) ) ) ) | MDL No. 2002 08-md-02002 |
| THIS DOCUMENT APPLIES TO: All Indirect Purchaser Actions | ) ) ) ) | |

**[PROPOSED] ORDER**

AND NOW, this ____ day of _____ 2010, upon consideration of Defendant Land O'Lakes, Inc.'s Motion to Dismiss Indirect Purchasers' Second Amended Consolidated Class Action Complaint, it is ORDERED that the Indirect Purchasers' Second Amended Consolidated Class Action Complaint is dismissed with prejudice as to Land O'Lakes, Inc.

BY THE COURT:

_____
GENE E.K. PRATTER
United States District Judge

## CERTIFICATE OF SERVICE

I, Nathan P. Eimer, hereby certify that on this 7th day of May 2010, the foregoing Defendant Land O' Lakes, Inc.'s Motion to Dismiss Indirect Purchasers' Second Amended Consolidated Class Action Complaint was filed, using the CM/ECF system, and (1) the Notice is available for viewing and downloading via the CM/ECF system and (2) the CM/ECF system will send notification of such filing to all attorneys of record who have registered for CM/ECF updates.

/s/ Nathan P. Eimer

# Exhibit 1

# UEP Board of Directors
## January 25, 2005
## Atlanta, GA.

## MINUTES

**Call To Order:** The meeting was called to order at 8:00 AM by Chairman Roger Deffner with the following being present:

**Board Members and Staff:** Gary West – Steven Gemperle – Richard Fassio – Galan Merrill Barrie Wilcox – Roger Deffner – Jim Dean – Amon Baer – Steve Herbruck – Tom Hertzfeld Jr. Bob Krouse – Bill Rehm – Marcus Rust – Al Schimpf – Larry Seger – Ron Truex – Joe Fortin Kurt Kreher – John Sperry – Wayne Mooney – Dolph Baker – Brian Barrett – Jim Brock Mike Bynum – David Lathem – Danny Linville – Ken Looper – Terry Baker – Gregg Clanton Wayne Carlson – Mark Oldenkamp – David Thompson – Al Pope – Chad Gregory – Linda Reickard – Phyllis Blizzard – Billie Jo Corell – Howard Magwire – Gene Gregory Randy Green – Mike McLeod – Don McNamara – Hilary Thesmar

**Members & Guest:** Fred Adams – Coke Anderson – Curtis Ange – Tim Bebee – Jill Benson Todd Boehne – Bill Bradley – Rick Brown – Richard Brownell – John Brunnquell Gilbert Burton – Toby Catherman – Jim Chakeres – Dave Cisneros – Jerry Claessens Peter Clarke – Jim Cook – Jim DenBleyker – Butch DeVries – Bruce Dooyema – Earl Dotson Chuck Dynes – David Elbel – Chuck Elste – Peter Fahrngruber – Luca Finco – Steve George Mike Gidley – Bob Gornichec – Carolyn Gray – Jerry Grove – Rich Hall – Ellen Hankes KY Hendrix – Greg Herbruck – Clint Hickman – Greg Hinton – Jim Hull – Joanne Ivy Cal Jackson – Brian Joyer – Jerry Kil – Frankie King – Dan Knutson – Henry Kuhl Doug Leifermann – Mike Lindsey – Julian Madeley – Ernest Mahard – Mohamed Mousa Dan Meagher – Hinda Mithcell – John Mueller – Greg Murch – Debbie Murdock Kevin Mussman – Chris Myles – Danny O'Day – Barbara Olejnik – Paul Osborne – Chris Pierce Bob Pike – Scott Braswell – Terry Profitt – Bob Randall – Larry Reding – Bill Rehm Tony Rehm – Loren Ashe – Keri Retallick – David Rettig – Doug Richardson – Clay Roszelle Gordon Satrum – Beth Schnell – Roger Seger – Jack Shuford – Tom Silva – Rod Smith Phil Sonstegard – Bob Sparboe – Norm Stocker – Tom Stoller – Gary Stoller – Diane Storey Carl Stromberg – Patricia Stonger – Monte Terry – John Thorne – Thayla Todd Kevin Vinchattle – Jason Wadsworth – Justin Whaley – Kevin Whaley – Ron Whaley Bud Wheeler – Fred Williams – Wayne Winslow – Derek Yancey – Eraldo Xausa – Bro. Stan Gumula

**Chairman's Comments:** Among the comments made by Chairman Deffner were the following: *It was just a year ago that we met in this very hotel and we were so full of optimism. All indicators were that we could sustain $1.00 plus eggs for an extended period and the price structures for the next 18 months. (We took care of that) The market came full circle with prices from $1.35 to 59 cents. We don't have to accept low prices and we can have a good 2005 if we just make a few changes and work together. We sell ourselves short by spending a great deal of time talking about the negatives. Year-end flock size was actually less than forecast but still a problem. The Economic Summit highlighted some of the problems and some of you have already reacted in a positive manner. We need more of you to participate in a positive change. Thanks to those that have prepaid your 2005 dues and assessments.*

**President's Report:** Al Pope thanked everyone for such a large attendance, introduced the staff and said we are prepared to carry out your missions for 2005. He stated that UEP is a producer organization and that we need not disenfranchise any members.

**Minutes:** Minutes of the October annual meeting and December 21st conference call were included in the meeting folder and referenced by Secretary Joe Fortin.
    **Motion:** It was moved by Fortin and seconded by West to accept the minutes. Carried.

**Vision Of Animal Welfare:** Gene Gregory presented his "vision" of the animal welfare issue and what the future may hold.

**Egg Safe Supplier Program:** Chad Gregory presented the concept of a program that could take all the issues & public policies and government programs and bring them together under one umbrella, the "Egg Safe Supplier Program". The steps of the program would include guidelines, assessments, audits, certification, and verification. The program could include components for animal welfare, food safety, employee standards, environment, and nutrition.

Chad then introduced Earl Dotson of EMS who then identified how EMS could help accomplish the industry goals and create a Safe Supplier program, website, etc.

    **Motion:** It was moved by Oldenkamp and seconded by West to authorize UEP staff to work on the Egg Safe Supplier Program and report back at the May meeting. Carried.

**Price Discovery Committee Report:** Dolph Baker reported that the Price Discovery Committee had met on December 6th and reviewed a Plant Grade Loose Large study conducted by Moore Stephens Frost CPA and a PCT survey conducted by Express Markets, Inc. He also reported that the committee considered the wide market price swings and attempted to do some "Thinking Out of the Box" for price discovery. He submitted two motions:

    **Motion:** It was moved by Baker and seconded by Mooney to endorse membership in Express Markets, Inc. for the purpose of gathering factual information to assist in the price discovery system. Carried.

    **Motion:** It was moved by Baker and seconded by Fortin to authorize the committee chairman and those he may select to join him in a meeting with Urner Barry at which time justification should be presented to Urner Barry for recognizing current conversion costs of plant grade loose large based upon the Moore Stephens Frost study and Express Markets most recent PCT. Carried.

Baker further stated the committee recommended the following to UEP staff and the industry:
1. Create a vehicle by which "Premium Retailer Specification" eggs are traded and that a carton quote be published by UEP based upon these trades. With the intent that if the model works then it would be turned over to Urner Barry if they were interested.
2. Encourage UEP egg traders to trade more carton eggs.
3. Encourage more flat rate trades.

**Marketing Committee Report:** Wayne Mooney presented the committee report and called upon Gene Gregory to review a number of industry statistics. Mooney reported on the number of companies that have made their intentions known to either sell flocks early or reduce their flocks by 5%. He also reported that egg producers may need some help in finding a market for their spent hens and help from USDA would be requested. He also reported that Michael Shears from

USDA Market News had met with the committee and proposed some changes to the market reports currently being provided by Market News. Mooney submitted the following motions:

**Motion:** It was moved by Mooney and seconded by Baker to authorize a request be made of USDA for assistance in the disposal of spent hens with a $10 million Bonus-Buy purchase of frozen diced chicken and/or canned boned poultry produced from light fowl. Carried.

**Motion:** It was moved by Mooney and seconded by Dean to recommend that the current "intentions program" for flocks to be disposed of 4 weeks earlier than previously scheduled and/or flock size reduction by 5% be extended through Labor Day. Carried.

**Egg Nutrition Center Report:** Dr. Don McNamara presented what he viewed as great marketing opportunities and titled his presentation, "The New & Improved Egg". He challenged egg producers for continuing to sell the same generic egg that has been sold for decades when there are opportunities to change the feed formulation and create an egg that could provide much higher levels of lutein.

**Government Relations Committee Report:** Chairman Ron Truex presented the committee report and called upon Mike McLeod for comments on the beef check-off challenge. McLeod stated a decision by the Supreme Court was expected in the spring and could provide answers for the egg industry check-off program. Truex called on EggPac Chairman, Gary West for comments. West reported that the industry had contributed $111,000.00 in 2004 and the committee had set a goal of $115,000.00 for 2005. Truex called upon Howard Magwire for comments about the upcoming May Legislative Meeting.

Truex presented six (6) motions, which were all seconded by Carlson and carried.

**Motion # 1 (FDA Proposed Egg Safety Rule):** That all UEP members contact appropriate U.S. Representatives, requesting that they sign the letter to FDA in support of UEP's positions on the proposed egg safety rule, especially the use of AMS and the need to recognize existing egg quality assurance plans.

**Motion # 2 – (Federal Budget)** – The Committee anticipates restrictions on the Federal government's budget this year that will likely reduce funds in fiscal year 2006 and beyond for agriculture and other programs. The Committee understands the need to prioritize spending and regards adequate funding for Avian Influenza programs (including producer indemnification), the National Poultry Improvement Plan and other APHIS programs, the Agricultural Marketing Service (including Section 32 purchases) research facilities and the Environmental Quality Incentives Program as priorities for egg producers.

**Motion # 3 – (Animal Identification)** Direct staff to support flock identification rather than individual bird identification for commercial egg laying chickens in any mandatory animal identification system. The committee supports legislation that would exempt certain information required for the animal ID program from the Freedom of Information Act.

**Motion # 4 – (FDA Feed Rule)** That UEP oppose restrictions on the use of avian protein, and insist that all regulations of feed ingredients must be based on the best available science, and take into account economic and environmental consequences.

**Motion # 5 – (Support for Legislation)** Encourage all egg producers to contact their Representatives and ask them to co-sponsor legislation that is expected to be introduced in the House of Representatives to increase penalties for ecoterrorism and animal rights-related terrorism.

**Motion # 6 – (Legislative Restrictions on Molting or Other Husbandry Practices).** To direct UEP staff to oppose legislative restrictions on molting or other husbandry practices.

**Food Safety Committee Report:** Chairman, Steve Herbruck reported that the committee had met and was in support of the motions made by the government relations committee in regard to food safety.

**Environmental Committee Report:** Chairman Barrie Wilcox presented the committee report saying that the committee had reviewed the big agenda item – the Consent Agreement and was recommending that all egg producers consult their personal attorney for advice. He called upon Chad Gregory to explain the package of information that will be sent to all egg producers within the next week.

Mike McLeod stated that the Consent Agreement is a contract between the individual producer and EPA and that each producer should consult their attorney in that UEP is not providing any legal advice of whether the Consent Agreement should or should not be signed.

Wilcox reported that the committee would have no motions to present.

**IEC Report:** Julian Madeley from the International Egg Commission reported the IEC membership represented egg producers and breakers from 56 countries with USA being the largest financial contributor. He stated that the IEC and UEP have a united position on animal welfare and the goal of keeping conventional cages.

**AEB Report:** Lou Raffel stated that AEB was proud to cooperate with UEP on programs. He highlighted AEB's advertising campaign to help increase eggs sales during the spring of 2005.

**Animal Welfare Committee Report:** Chairman Mark Oldenkamp presented the report and thanked Dr. Armstrong and the Scientific Committee for their leadership. He stated that the committee would meet within 30 days to finalize plans for the 2005 audit of Animal Care Certified companies, the audit of cage-free guidelines, and the audit of non-certified marketers. He announced that one feeder space research project had been approved for funding by the Midwest Poultry Consortium and that funding of a second study was being explored by the staff. He reported that Golin/Harris was in support of the use of the ACC logo on cage-free cartons.

Oldenkamp presented the following committee motions:

    **Motion # 1** – It was moved by Oldenkamp and seconded by Fortin that UEP only share the results of a passed animal care certified audit with any retail, foodservice, or other customer after having received a letter or signed form from the animal care certified company and the letter or form must be renewed annually. Carried unanimously.

    **Motion # 2** - It was moved by Oldenkamp and seconded by Fortin to approve the preamble and motion stating: "In order to protect the integrity of the ACC program and logo and in view of the difficulty in preventing the commingling of certified eggs with non-certified eggs and to treat all egg producers equally, it is hereby moved that no new licenses to market Animal Care Certified eggs will be issued or renewed to producers who are not ACC certified. The motion carried with a vote of 19 yes and 8 nos.

    **Motion # 3** – It was moved by Oldenkamp and seconded by Clanton that a license to market ACC eggs may be issued to shell egg producers and further egg processors who do not own or operate egg production facilities. The motion carried with 26 yes and 2 no votes.

    **Motion # 4** – It was moved by Oldenkamp and seconded by Thompson that all cage systems purchased by June 1, 2005 and installed after December 30, 2005 must have a minimum weighted average height of 16 inches and allow no manure pass through. The motion was

amended and the presented as: That all new cage systems purchased by **December 1, 2005** and installed after **June 30, 2006 for new construction** must have a minimum weighted average height of 16 inches and allow for no manure pass through. Motion carried with 15 yes votes and 11 no votes.

**Motion # 5** – It was moved by Oldenkamp and seconded by Barrett to accept the committee recommended addendum for cage-free guidelines as part of the Animal Care Certified program with the exception that the cage-free guidelines will be subject to an audit in 2006 but auditors will be asked to do an assessment in 2005 and producers must have implemented guidelines for the assessment. Carried.

**Public Relations Committee Report:** Committee Chairman Paul Sauder reported that the committee had met via conference call on January 20th and would submit the following motion:

**Motion:** It was moved by Fortin and seconded by Bynum to authorize the Public Relations Committee to submit a request to AEB for funding of $10 million over a 5-year period to be used in public relations and/or advertising of the Animal Care Certified program and that the funding be funneled through UEP for use by the public relations firm employed by UEP. The motion created considerable debate and finally passed with 17 yes and 10 no votes.

**Treasurer's Report:** Treasurer Bob Krouse reported that the Executive Committee had reviewed the year-end financial reports and found that income had exceeded expenses by $140,793.00. That UEP's equity position was now at $190,988.00.

**Motion:** It was moved by Krouse and seconded by Terry Baker to approve the treasurer's report. Carried.

**Executive Committee Report:** Chairman Deffner reported that the committee had met for three hours the previous day and spent most of the time reviewing employee benefit programs.

**FDA Update On SE Prevention Program:** John Sheehan from FDA-CFSAN provided an excellent review of plans for the SE Prevention Program stating that the department's priority was to develop the egg safety final rule for publication in fiscal year 2006. He stated that it was the department's intent to become more proactive in egg/food safety and would visit egg farms on a more routine basis even though the traceback program would continue. He suggested that in 2005 as many as 5 to 7 companies could expect to have a food safety/sanitation inspection done by FDA.

Sheehan offered to provide UEP with a reference of where information can be obtained to help producers understand what FDA may be looking for in the inspections. He referenced 21CFR-Section 110 as a good reference.

**Adjourn:** There being no further business, the meeting adjourned at 3:45 PM.

Recorded by: Gene Gregory