## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : | |
| ANTITRUST LITIGATION | : | |
| | : | **MDL No. 2002** |
| | : | **08-md-02002** |
| _____ | : | |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| ALL ACTIONS | : | |

### MEMORANDUM

**GENE E.K. PRATTER, J.**                                          **SEPTEMBER 26, 2011**

### I. Introduction

This multidistrict litigation concerns an alleged conspiracy by egg producers and trade

groups to restrict the domestic supply of eggs in violation of Section 1 of the Sherman Act.  A

half dozen motions to dismiss await resolution.[1]  The movants seek to dismiss the claimed

antitrust violation asserted against them individually in the direct purchaser plaintiffs' Second

Consolidated Amended Class Action Complaint (hereinafter, the "SAC") for not meeting the

---

[1]  The motions are:  Motion to Dismiss Direct Purchaser Second Consolidated Amended Complaint as to Defendant Michael Foods, Inc. (Doc. No. 236) (hereinafter, "Michael Foods Mot."); Defendant Daybreak Foods, Inc.'s  Motion to Dismiss Direct Purchasers' Second Consolidated Amended Class Action Complaint (Doc. No. 233) (hereinafter, "Daybreak Mot."); Motion to Dismiss the Direct Purchasers' Second Consolidated Amended Class Action Complaint on Behalf of Defendant Rose Acre Farms, Inc. (Doc. No. 234) (hereinafter, "Rose Acre Mot."); Defendant Ohio Fresh Eggs, LLC's Renewed Motion to Dismiss the Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint (Doc. No. 238) (hereinafter, "Ohio Fresh Mot."); Motion to Dismiss the Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint on Behalf of Defendants Hillandale-Gettysburg, L.P., Hillandale Farms, Inc., and Hillandale Farms East, Inc. (Doc. No. 240) (hereinafter, "Hillandale Entities Mot."); and United Egg Association's Motion to Dismiss the Claims Against it in Direct Purchasers' Second Consolidated Amended Class Action Complaint (Doc. No. 232) (hereinafter, "UEA Mot.").
    Plaintiffs' responded in opposition to these motions in a memorandum (Doc. No. 316) (hereinafter, "Pls.' Resp.").  Defendants also filed reply briefs (hereinafter, "Reply").

grade.  They argue that the SAC is like a curate's egg:  although the pleading arguably may have

alleged sufficient facts in support of the antitrust conspiracy claim as to some defendants, the

pleading is deficient with respect to each of the movants by failing to allege facts that they

specifically were parties to the conspiracy.  Cracking each motion *ad seriatim*, the Court grants

the motions of Hillandale Gettysburg L.P., Hillandale Farms Inc., and Hillandale Farms East,

Inc. (collectively, the "Hillandale Entities"), and United Egg Association, and denies the

remainder of the motions addressed in this Memorandum.[2]

## II.  Background

The Plaintiffs are direct purchasers of domestic eggs,[3] who brought suit in a number of

jurisdictions, charging that defendant egg producers and trade groups engaged in a conspiracy to

manipulate the supply of, and thereby fix prices for, domestically-sold eggs.  The Judicial Panel

on Multidistrict Litigation centralized the actions for coordinated pretrial proceedings before this

Court.  At the present stage, the SAC is the operative pleading for the direct purchaser plaintiffs,

replacing or superceding all of the previously-filed individual and consolidated complaints.  The

various named Defendants responded to the SAC by answers or motions to dismiss, or, in some

---

[2] Other pending motions in this litigation will be addressed separately in other memoranda.

[3] The direct purchaser plaintiffs are comprised of two subclasses—one subclass consists of entities that directly purchased shell eggs from Defendants and the other subclass consists of entities that directly purchased egg products from Defendants.  The SAC defines "shell eggs" as "both 'table eggs' (generally purchased by retail entities for re-sale [sic] to the consuming public) and 'breaking eggs' (generally purchased by food service entities for further processing)."  SAC ¶ 2. "Egg products" are defined as "breaking eggs that have been removed from their shells and processed into dried, frozen or liquid forms."  *Id.*  Although Defendants filed a separate joint motion seeking to dismiss Plaintiffs' claim pertaining to "egg products" (Doc. Nos. 235 and 237), because that motion is still pending, for present purposes the SAC's definition for "eggs" will apply.  The dispute over the definition is not germane to the resolution of the motions addressed in this Memorandum.

specific respects, both.  The six motions at bar have been fully briefed and illuminated by oral

argument[4] and the parties' submissions of supplemental authorities they wished to bring to the

Court's attention.  The Court commends all of the attorneys for their stimulating advocacy.

## III.  Factual Allegations

Given the complexity of, and level of nuanced detail provided in, the SAC concerning the

Defendants' alleged conduct, the industry structure and practices, and market implications, the

Court limits the discussion to the SAC's core allegations.[5]

Plaintiffs articulate their legal theory as follows:

Plaintiffs allege herein a conspiracy among Defendants and certain unnamed co-conspirators where they agreed to fix, raise, maintain and/or stabilize the prices at which shell eggs and egg products (collectively, "eggs") were sold in the United States, including by controlling the aggregate supply of domestic eggs.  Each Defendant knew that it could not do this by itself and that supply needed to be "restrained" by collective action.  Thus, Defendants entered into an overarching agreement to manage the aggregate supply of eggs in the United States.  During the Class Period [from January 1, 2000 to present], Defendants implemented this supply management conspiracy by agreeing to take several coordinated actions.

SAC ¶¶ 1, 481.[6]

---

[4] The transcripts of the oral argument on the motions to dismiss the SAC are contained in the record at Docket Nos. 490 and 424 (hereinafter, respectively, "Day 1 Tr." and "Day 2 Tr.").

[5] The SAC is certainly not vulnerable to any criticism for being too lean or brief.  Indeed, in some respects a thorough consideration of these motions demanded something of a hunt through a pleading that could be described as repetitious or organizationally puzzling.  However, the Court is not unaware of the good faith concern among the pleadings' drafters that brevity may expose the proponent to heightened risks of dismissal.  In any case, the generous inclusion of verbiage added to the Court's concern for careful examination.

[6] A propos of the immediate preceeding footnote, subsequent paragraphs in the 520-paragraph SAC reiterate this theory.  *See, e.g., id.* ¶ 10 ("During the Class Period, Defendants agreed to take many joint collective actions as part of the industry's overarching conspiracy that was designed to fix, raise, maintain, and/or stabilize the prices of shell eggs and egg products, including but not limited to significant efforts to manage and/or reduce supply."); *id.* ¶ 182

(continued...)

Specifically, Plaintiffs list eight alleged "collective actions" undertaken by Defendants to advance the purported "overarching conspiracy" to manipulate the supply of eggs thereby affecting the price of eggs. *See id.* ¶¶ 11-18. Those eight actions allegedly enhanced the conspiracy by, in and of themselves, altering the supply and, hence, the price, of eggs.

Plaintiffs claim that the first collective action took place in 1999 and 2000 when Defendants established a "supply adjustment program." Through this program participants agreed to engage in an immediate five-percent flock molt, a five-percent reduction of flock inventory in the ensuing six to twelve months, and the development of a hatch reduction program. *Id.* at ¶¶ 11, 187-89.

The second collective action allegedly involved the Defendants agreeing to a five-percent emergency flock reduction in 2001. *Id.* at ¶¶ 12, 195.

The third action occurred in 2002 when Defendants developed and undertook an early molt and hen disposal plan. *Id.* at ¶¶ 13, 198-200.

The fourth collective action involved Defendants agreeing to adopt guidelines on cage space densities for hens. These guidelines were part of an "animal husbandry" or "animal welfare" program that became known as the "United Egg Producers Certification Program"

---

(...continued)
("Defendants undertook a coordinated effort to restrict egg supply through various means that has artificially fixed, maintained and/or stabilized egg prices to supracompetitive levels throughout 2000 to the present."); *id.* ¶ 517 (" . . . Defendants and their co-conspirators engaged in a continuing contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, which had the purpose and effect of fixing, raising, maintaining and/or stabilizing the prices of eggs at artificially high, non-competitive levels in the United States."). Plaintiffs also state in their brief opposing the motions: "the Complaint alleges one comprehensive conspiracy to reduce the supply of eggs implemented through a variety of separate but related components." Pls.' Resp. at 34.

4

(hereinafter, the "UEP Certification Program" or the "Program"). *Id.* ¶ 14.  By complying with the guidelines, producers could sell "UEP-certified eggs" and affix a logo on packages to reflect that the eggs were certified under the Program. *Id.* ¶¶ 82, 310.  The Program figures prominently in the Plaintiffs' claims and is discussed in greater detail below.

The fifth alleged collective action involves the execution of an early molt and flock disposal plan in mid-2004. *Id.* ¶ 15.

For the sixth collective action, Plaintiffs claim that Defendants held an "Egg Industry Economic Summit" to coordinate an immediate supply reduction scheme via a written commitment to reduce supply.  *See id.* ¶¶ 16, 288-93.  The SAC appears to quote without citation the purported language on this "commitment sheet":   "Option #1 To dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled;" or "Option #2 To reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005." *Id.* ¶ 290; *see also id.* ¶ 293.

As part of the seventh collective action, according to Plaintiffs, Defendants required through the UEP Certification Program "that a company must commit to implementing the welfare guidelines on 100% of all production facilities." *Id.* ¶ 17. Specifically, the requirement was "that 100% of a producer's egg houses . . . be maintained in accordance with the [UEP Certification Program] guidelines in order for a company to sell 'UEP Certified' eggs." *Id.* ¶ 222.

Finally, the alleged eighth action was an export program.   Plaintiffs claim that Defendants allegedly agreed to export eggs at a loss in order to lower supply in the United States, and they agreed to reimburse each other to cover those losses.  *Id.* ¶¶ 18, 329, 333-34.

As described by Plaintiffs, the Defendants' trade groups, United Egg Producers ("UEP"), United Egg Association ("UEA"), and United States Egg Marketers ("USEM"), who are also named Defendants, were central to this conspiracy. Defendant egg producers' memberships and participation in those trade groups allegedly facilitated the Defendants' "collective actions" that advanced the conspiracy.

Under the Plaintiffs' theory, through their "collective actions" Defendants sought to raise the price of eggs by capitalizing on certain market conditions particular to the domestic egg market. In particular, Plaintiffs charge that Defendants' objective was to take advantage of consumers' relatively inelastic demand for eggs, as well as the fact that eggs are commodities and have no market substitutes. *Id.* at ¶¶ 6, 152-56, 158. Defendants' actions were supposedly prompted by a desire to stabilize the egg market's volatile prices and supply. Prior to Defendants' coordinated actions, supply allegedly was cyclical, depending on the increase or decrease of prices in the egg market. *Id.* at ¶ 7. Recognizing the market volatility and its impact on the industry and producers, Defendants allegedly pursued the coordinated actions to increase egg prices.

According to Plaintiffs, the Defendants' conduct purportedly achieved the desired outcome by decreasing egg production, thereby decreasing the supply of eggs and leading to increased egg prices. Plaintiffs point to various increases in egg prices from 2003 to 2009 and attribute those increases to reduced supply, claiming such a result is the ill-gotten product of the Defendants' conspiratorial conduct. *See, e.g.*, *id.* ¶¶ 162-63, 166-70, 367, 369, 375, 377. Defendants, who were both shell egg and egg products producers, supposedly benefited from the overall reduced supply of eggs. *Id.* ¶ 408. Those Defendants who were egg products producers

6

allegedly benefited by being able to market their egg products at an artificially increased price, even though they purchased shell eggs at inflated prices. *Id.* ¶ 409.

The Defendants, of course, have an entirely different take on the events recounted in the SAC, so much so that many of the Defendants challenge the sufficiency of the allegations in the SAC even while tacitly acquiescing in the continuation of the core of Plaintiffs' claim at least beyond the Rule 12(b)(6) stage.

## IV. Legal Standards

### A. Motion to Dismiss Standard

As is well acknowledged, a Rule 12(b)(6) motion tests the sufficiency of a complaint. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley*, 355 U.S. at 47). Nonetheless, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The question is not whether the claimant will ultimately prevail but whether the complaint is "sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (citation omitted).

To survive a motion to dismiss, a civil complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Matrixx Initiatives, Inc. v.*

7

*Siracusano*, 131 S. Ct. 1309, 1323 (2011).  In essence, this is equivalent to the math teacher's admonition to "show your work" to explain the proffered answer.  The complaint need allege "only enough facts to state a claim of relief that is plausible on its face" so as to test whether "plaintiffs . . . have . . . nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  In other words, there needs to be "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010) (alteration in original) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).  Certainly, such an assessment of the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief."  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citations omitted).

The applicable pleading standard also requires adherence to certain well-recognized parameters.  For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true."  *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *see also Twombly*, 550 U.S. at 589 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)").  Concomitantly, the Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party.  *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 995 (2011); *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989).

8

Nonetheless, the Court need not accept as true "unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp*., 232 F.3d 173, 183-84 (3d Cir. 2000) (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or the plaintiff's "bald assertions" or "legal conclusions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).  Finally, in considering a pleading's sufficiency, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)), *cert. denied*, 131 S. Ct. 1607 (2011).

While the foregoing discussion is familiar enough legal terrain—especially for the accomplished advocates involved in this litigation—given what follows in this opinion, it bears recounting the standards against which the pending motions and the SAC must be judged.

## B.  Application of Pleading Standard to Sherman Act § 1 Claims

Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  The Third Circuit Court of Appeals has held that in order to sufficiently plead a Sherman Act Section 1 claim "two essential requirements" must be satisfied.  *Ins. Brokerage*, 618 F.3d at 315.  "First, the plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy,'" and second, "that the conspiracy to which the defendant was party imposed an unreasonable restraint on trade."  *Id.* (citations omitted).

Ultimately, under the conventional Third Circuit case law, a plaintiff seeking to establish a Section 1 claim must prove: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir. 1993) and *Big Apple BMW, Inc. v. BMW of North Am. Inc.*, 974 F.2d 1358, 1364 (3d Cir. 1992)); *see also Ins. Brokerage*, 618 F.3d at 315 n.9 (recognizing that in addition to the "two essential requirements" plaintiffs must also prove two other elements relating to antitrust injury).

Considerable focus at the pleadings stage in antitrust suits—and particularly the present suit, given the motions at bar—is directed to the "crucial question" of whether "the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express" because Section 1 "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination or conspiracy." *Twombly*, 550 U.S. at 553 (alterations in original) (internal quotation marks omitted); *see also Ins. Brokerage*, 618 F.3d at 315 (stating that the "existence of an agreement is the hallmark of a Section 1 claim"); *Gordon*, 423 F.3d at 207 ("The essence of a Section 1 claim is the existence of an agreement." (citing *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 639 (3d Cir. 1996)). In Sherman Act litigation, an agreement is "sometimes also referred to as a 'conspiracy' or 'concerted action.'" *W. Penn Allegheny*, 627 F.3d at 99 (citing *Twombly*, 550 U.S. at 553; *Gordon*, 423 F.3d at 207 & n.16).

To fend off a motion to dismiss, plaintiffs must plead "enough factual matter (taken as true) to suggest than an agreement was made." *Twombly*, 550 U.S. at 556. "[I]f a plaintiff

10

expects to rely exclusively on direct evidence of conspiracy, its complaint must plead 'enough fact to raise a reasonable expectation that discovery will reveal' this direct evidence" of illegality. *Ins. Brokerage*, 618 F.3d at 324 (quoting *Twombly*, 550 U.S. at 556). "[I]f the plaintiff alternatively expects to rest on the circumstantial evidence of parallel behavior, the complaint's statement of facts must place the alleged behavior in 'a context that raises a suggestion of a preceeding agreement, not merely parallel conduct that could just as well be independent action.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

For example, allegations of merely parallel conduct and a "bare assertion of conspiracy" would be insufficient under the requisite pleading standard, because "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-57.[7] "*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior." *Ins. Brokerage*, 618 F.3d at 326. However, when a pleading alleges circumstantial facts, the pleading standard does not require consideration of "whether the circumstantial evidence . . . is sufficient to *compel* an inference of conspiracy; . . . [instead,] the test for whether to dismiss a case at [the pleading] stage turns on the complaint's 'plausibility.'" *Text Messaging*, 630 F.3d at 629 (emphasis in original).

---

[7] The Supreme Court has cited several examples of allegations of parallel conduct that might suggest collusion sufficient to allege a § 1 Sherman Act claim. *Twombly*, 550 U.S. at 556 n.4; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 2165 (2011). Given the nature of the conspiracy alleged in the SAC and the substance of the parties' arguments, however, no further discussion of these examples is required.

The concept of agreement, implicit or explicit, is also central to the inquiry of whether a complaint is sufficient with respect to an individual defendant in an antitrust conspiracy case. Here, as is true in many of these cases, in order to address the meat of a motion to dismiss, the key question is whether the SAC sufficiently alleges that the moving defendant joined the alleged agreement, conspiracy, or concerted action.

To evaluate the articulated allegations as to an individual defendant in the context of a multi-defendant, multi-faceted conspiracy, the conspiracy must not be "compartmentalized." The "character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also Jung v. Ass'n of American Med. Colls.*, 300 F. Supp. 2d 119, 160 (D.D.C. 2004) (recognizing the same and that this "maxim has been applied in a variety of contexts, including in consideration of motions to dismiss"); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) ("[A] district court must consider a complaint in its entirety without isolating each allegation for individualized review."); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630-31 (E.D. Pa. 2010) ("Defendants' briefing attempts to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility. However, . . . the allegations in the Complaint must be viewed as a whole. . . . *Twombly* emphasized context." (citations omitted)); *cf. Petruzzi's*, 998 F.2d at 1230 ("[A] court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action." (citation omitted)).  In this regard, the Court is mindful of the parable of the blind men and the elephant in which a group of

blind men try to agree on a description of an elephant solely on the basis of their own, individual limited perception, leading one (having felt only the tail) to assert that an elephant is rope-like, another (having felt only an ear) to declare that an elephant is a living fan, another (having felt only a leg) to describe the beast like a tree, another (having felt only a tusk) declaring an elephant to be a smooth, hard cone and so forth.

Similarly, courts have held that antitrust conspiracy allegations need not be detailed on a defendant-by-defendant basis. *See, e.g., In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed defendant by defendant."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (acknowledging that a "complaint need not contain detailed 'defendant by defendant' allegations"). Individual defendants must have reasonable, not exhaustive, notice of the allegations, and such notice is achieved when the plaintiff states a plausible claim for relief against those defendants. *See, e.g.*, *OSB*, 2007 WL 2253419, at *6 (citing *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 313-14 (D.N.J. 2004)); *see generally Twombly*, 550 U.S. at 555 (discussing fair notice of a claim to a defendant).

To provide reasonable notice to a specific defendant of the claim(s) against it, a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy. *See OSB*, 2007 WL 2253419, at *5 ("[T]he plaintiff must allege that each individual defendant joined the conspiracy and played some role in it."); *Jung*, 300 F. Supp. 2d at 161 (recognizing a plaintiff's "burden of adequately alleging that a conspiracy to restrain trade existed in the first instance and that each defendant knowingly joined or agreed to participate in the conspiracy"); *Flat Panel*, 586 F. Supp. 2d at 1117 (acknowledging that "the complaint 'must

allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it.'" (quoting *Elec. Carbon*, 333 F. Supp. 2d at 311-12)); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) ("[Plaintiffs] now [at the motion to dismiss stage] only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.").

At the same time, plaintiffs need not "plead each defendant's involvement in the alleged conspiracy in elaborate detail." *Flat Panel*, 586 F. Supp. 2d at 1117. Likewise, "[a]ntitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 212 (3d Cir.1992)); *see also Petruzzi's*, 998 F.2d at 1243 (recognizing that for an antitrust conspiracy, "defendants need not share the *same* motive. Rather, all that is required is that they each have a motive to conspire").

Instead, a plaintiff's pleading burden is to offer allegations that plausibly suggest that the defendant agreed to the conspiracy, which, in the antitrust context, is a conscious commitment to a common scheme designed to achieve an unlawful objective. *See Ins. Brokerage*, 618 F.3d at 315 ("[T]he plaintiff must show that the defendant was a party to a 'contract, combination . . . or conspiracy' . . . . in other words, a 'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme.'" (citations omitted) (internal quotation marks omitted)); *Jung*, 300 F. Supp. 2d at 158 (recognizing that "plaintiffs must allege 'that the challenged restraint is not the result of independent actions by the

defendants,' but rather that 'the defendants consciously committed to a common agreement of an

unreasonable restraint on trade'" (citations omitted)).  In short, the issue is whether the pleading

delineates to some sufficiently specific degree that a defendant purposefully joined and

participated in the conspiracy.

The Court properly looks for more than mere repetitive generic reference to

"Defendants" tacked on to a conclusory verb form to connect an individual defendant to an

actual agreement in an antitrust conspiracy.  "Simply using the global term 'defendants' to apply

to numerous parties without any specific allegations that would tie each particular defendant to

the conspiracy is not sufficient." *Elec. Carbon*, 333 F. Supp. 2d at 312 (internal quotation marks

omitted); *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009),

*cert. denied sub nom.*, *TAM Travel, Inc. v. Am. Airlines, Inc.*, 131 S.Ct. 896 (2011) (rejecting

plaintiffs' "attempt to implicate" certain defendants who are not "mentioned in the body of the

Amended Complaint," and with respect to whom plaintiffs fail to "specify how [they] are

involved in the alleged conspiracy," by "relying on several vague allegations contained in the

Amended Complaint that refer to 'defendants' or 'defendants' executives'"); *In re Digital Music*

*Antitrust Litig.*, No. 06 MD 1780, 2011 WL 2848195, at *20 (S.D.N.Y. July 18, 2011)

(recognizing that "generic references to 'defendants'" are "insufficient" in alleging direct

involvement of individual defendants in the alleged conspiracy); *Jung*, 300 F. Supp. 2d at 163

("Plaintiffs cannot escape their burden of alleging that each defendant participated in or agreed

to join the conspiracy by using the term 'defendants' to apply to numerous parties without any

specific allegations as to [an individual defendant]." (citing *Invamed, Inc. v. Barr Labs., Inc.*, 22

F. Supp. 2d 210, 221 (S.D.N.Y. 1998)).  Conclusory, collective language is too convenient, too

undisciplined, and too unfocused in light of exposures to litigation expense and disruption (even without ultimate liability) that are so great in antitrust (and other) cases. Such exposure ought to be limited to those who have been made at least reasonably aware of what they have done or failed to do, lest the litigants be left to wander aimlessly through the wilds and wilderness of discovery to no ultimate destination. *See Twombly,* 550 U.S. at 565 n.10 (recognizing that "a defendant seeking to respond to . . . allegations in the § 1 context would have little idea where to begin" when a complaint fails to give notice of the claims against it); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1318 n.23 (S.D. Fla. 2010) (observing that when allegations are "specific enough," they can "reduce the enormous discovery burden that concerned the Supreme Court in *Twombly*").

## V. Legal Discussion[8]

For the present motions, because Plaintiffs assert a theory of, in their words, an "overarching conspiracy" to restrict the supply of eggs, the question that each motion raises is

---

[8] There are several issues that this opinion does not address. For example, the Court does not confront here, or necessarily accept, that the SAC's allegations lead to the legal conclusion of a conspiracy, contrary to Plaintiffs' assertion that they allege facts of direct evidence of an actual agreement and parallel conduct suggestive of an agreement. Pls.' Resp. at 26-27. However, although the specific factual allegations proposing the existence of an overarching conspiracy and the "collective actions" in furtherance of the conspiracy are accepted as true for purposes of these motions, there is no basis for the Court to decide this issue because no motion at bar requires such a decision. Indeed, no movant has objected substantively to the sufficiency of the allegations of the antitrust § 1 claim generally, and their arguments actually presume on some level that the SAC pleads a conspiracy and its particular parameters.

Additionally, Plaintiffs make much ado about the fact that no Defendant moved to dismiss the claim of an overarching conspiracy, and the fact that nine Defendants have chosen to answer the SAC outright. Pls.' Resp. at 20-22. These circumstances are of no moment to the issues at hand. They may be anomalous in an antitrust case of this size and scope. Nevertheless, the Court recognizes that defendants often make strategic choices in defending litigation, and one of those choices includes the option, perhaps for reasons of time or expense, of answering a complaint regardless of whether it satisfies the pleading standard.

(continued...)

whether Plaintiffs adequately alleged particularized facts that each Defendant undertook certain

acts, or engaged in certain conduct, when viewed in the context of the entire SAC, that plausibly

suggest that particular Defendant's embrace of that overarching conspiracy.  Thus, the extent to

which Plaintiffs have met their burden under Rule 12(b)(6) as to each movant is now addressed.

## A.  Michael Foods' Motion to Dismiss

Michael Foods, Inc. claims that the SAC's specific allegations are insufficient to

plausibly support the claim against it.  According to Michael Foods, the "only factual allegations

made against it with any degree of specificity" are that the company was a member of two

---

(...continued)

Additionally, several of the individual Defendants argue that out of the SAC's hundreds of paragraphs, only a handful of those paragraphs name them specifically.  They urge the Court to examine only those few paragraphs and allegations in considering their motions.  To do so, however, would contradict the legal principles discussed, *supra*, that require consideration of the entire conspiracy as alleged throughout a complaint rather than compartmentalizing the allegations.

Finally, pervasive in their defense of the SAC is Plaintiffs' reliance on allegations that particular features of or conditions in the egg market favor collusion.  For example, Plaintiffs place much in the figurative basket that consumer demand for eggs is inelastic.  It may be that "[i]f demand is inelastic at the current market price, collusion to raise the price will be particularly attractive."  Richard A. Posner, *Antitrust Law* 71 (2d ed. 2001).  And it also may well be that "[a]llegations that a market is characterized by economic factors that courts and antitrust experts and economists have found are conducive to collusive behavior, support an inference of plausibility."  *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010) (citing *Standard Iron Works v. ArcelorMittal,*, 639 F. Supp. 2d 877, 883 (N.D. Ill. 2009), *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 (M.D. Pa. 2009), and *In re Aftermarket Filters Antitrust Litig.*, MDL Docket No. 1957, 2009 WL 3754041, at *3 (N.D. Ill. Nov. 5, 2009).  Nonetheless, under the applicable legal standards, Plaintiffs are not absolved from specifically pleading allegations that plausibly suggest each defendant's agreement to or participation in the alleged conspiracy.  While the Court certainly considers the alleged market conditions and their "ripeness" for collusion to be a notable factor in considering the totality of the allegations against each defendant and is cognizant of them in its analysis of the issues presented in the motions at bar, the Court does not find those allegations in and of themselves dispositive of whether an individual defendant joined or participated in the offending conspiracy.

defendant trade groups, UEP and UEA; that Michael Foods attended UEP and UEA meetings; and that Michael Foods partook in only one of the eight "coordinated actions" alleged to have advanced the overarching conspiracy—namely, joining the UEP Certification Program. Michael Foods Mot. at 4.[9]   These allegations, it contends, are insufficient to suggest that it actually joined the overarching conspiracy to restrict the supply of eggs.

Certainly, pertinent legal authority is clear that participation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of *agreement* to the conspiracy. *See Ins. Brokerage*, 618 F.3d at 349 ("[N]either defendants' membership in the [trade association], nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy. . . . While these allegations [of defendant-brokers' membership in a trade group and their common adoption of the trade group's suggestions], indicate that the brokers had an opportunity to conspire, they do not plausibly imply that each broker acted other than independently . . . ." (citations omitted)); *see also Travel Agent*, 583 F.3d at 910-11 ("The fact that [defendants] gathered at industry trade association meetings during the seven-year period when defendants reduced commission rates should not weigh heavily in favor of suspecting collusion. . . . Moreover, a mere opportunity to conspire does not, standing alone, plausibly suggest an illegal agreement because [the defendants'] presence at such trade meetings is more likely explained by their lawful, free-market behavior." (citation omitted)); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136 (E.D.N.Y. 2010) ("[M]embership and participation in a

---

[9] By a stipulation between Plaintiffs and Michael Foods, the SAC's reference in Paragraph 331 to Michael Foods as participating in the export program was removed from the SAC. *See* Stipulation (Doc. No. 432).  Thus, that feature of the alleged conspiracy is not discussed here.

trade association alone does not give rise to a plausible inference of illegal agreement." (citing *Twombly*, 550 U.S. at 567 n.12 and *In re Elevator Antitrust Litig.*, No. 04-CV-1178, 2006 WL 1470994, at *30-31 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d 47 (2d Cir. 2007)); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (determining that because "Plaintiffs have not pleaded that defendants ever met and agreed to fix prices; they plead at most that defendants had the opportunity to do so because they attended many of the same meetings.").

Indeed, the SAC alleges that Michael Foods' employees served on UEP or UEA committees, such as UEP's Area #3, Government Relations Committee, Environmental Committee, Quality Assurance/Food Safety Committee, and UEP Producer Committee for Animal Welfare, and the Long Range Planning Committee. SAC ¶ 48. At times, these employees are alleged to have held leadership positions in the trade groups as a whole, such as when Toby Catherman of Michael Foods was elected chairman of UEA in 2004 or when certain Michael Foods' employees served as UEP Board members. *Id.* ¶¶ 437, 284, 298. Plaintiffs also charge that Michael Foods, as represented by its employees, *inter alia*, was present at UEP Board meetings where Defendants purportedly "extolled the benefits of decreased supply on the price of eggs, discussing their own companies' participation in these collective schemes, and encouraging other companies to participate in industry supply restriction efforts," *id.* ¶ 191; attended UEP Animal Welfare Committee meetings where attendees articulated that the "'animal husbandry' program's express purpose was to reduce supply," *id.* ¶ 211; attended UEP Annual Board meetings where the "100% rule" was approved by a 19-to-1 vote and where the Board approved a schedule for early hen disposal or, alternatively, five-percent flock size reduction, *id.*

¶¶ 220-21, 284-85; and attended a meeting of UEP's Producer Committee for Animal Welfare where a motion that "no new licenses to market Animal Care Certified eggs will be issued or renewed to producers who are not ACC certified" was approved by a 19-to-8 vote and a 26-to-2 vote approved a motion to permit "a license to market ACC eggs [to] be issued to shell egg processors and further egg processors who do not own or operate egg production facilities," *id.* ¶ 310.

Given that mere membership in a trade group or attendance at a meeting cannot alone sufficiently plead agreement to a conspiracy, active participation, rather than merely passive presence, becomes key in inferring agreement to the conspiracy and potential liability.  With respect to the SAC, the only action that is attributed to Michael Foods at a trade group meeting was during an August 12, 2008 earnings conference call.  During the call a Michael Foods representative purportedly made comments that, "Another factor supporting high egg prices is a short-term contraction in supply due to broad adoption of animal well-being programs on bird density," *id.* ¶ 402, and that "'[s]upply has been pressured through the animal wellbeing efforts, I think by the industry' and that the UEP Certification Program was the contributor to these material supply restrictions over the last year."  *Id.* ¶ 403.  However, the SAC does not allege that Michael Foods engaged in any other conduct at the trade group meetings beyond attendance or making comments that can be consistent with mere observation or opinion.  As such, the SAC's allegations as to Michael Foods' involvement at trade group meetings are at best alleged facts of an opportunity to conspire, not of agreement to or participation in the alleged conspiracy. *Cf. Graphics Processing*, 527 F. Supp. 2d at 1023 ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more. .

. . Moreover, even where some competitors have admitted to meeting to fix prices at or near trade shows and conferences, it is not reasonable to infer that another competitor in attendance at the same meeting had done likewise." (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1097-98 (9th Cir. 1999))).

However, although "participation in various trade organizations . . . . cannot alone support Plaintiffs' claims, . . . such participation demonstrates how and when Defendants had opportunities to exchange information or make agreements." *SRAM*, 580 F. Supp. 2d at 903; *see also In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07–05634, 2011 WL 1753738, at *14 (N.D. Cal. May 9, 2011) (same). And a fair reading of the SAC demonstrates that, by alleging that Michael Foods was certified under the UEP Certification Program, Plaintiffs have alleged more than mere opportunity to conspire on the part of Michael Foods to suggest plausibly that Michael Foods joined the conspiracy.

The gravamen of the Michael Foods motion thus concerns whether the allegations that Michael Foods joined the UEP Certification Program plausibly suggest, in conjunction with the allegations of Michael Foods' involvement in the trade group associations and meetings, that the company joined the conspiracy. The SAC charges that Michael Foods was listed as a certified company under the UEP Certification Program as of September 30, 2008, and that Michael Foods "adopt[ed] UEP certified guidelines to reduce chick hatch (certification no. 345 and license agreement 509)," SAC ¶¶ 49, 448, yet the SAC lacks any alleged facts concerning when Michael Foods joined the Program and the context of its decision to join or seek certification. Noting the absence of such facts, Michael Foods argues that the SAC fails to "allege any facts suggesting that Michael Foods' eventual decision to sell UEP Certified Eggs was indicative of an

unlawful agreement." Michael Foods Mot. at 8. Instead, Michael Foods contends that the SAC itself suggests that Michael Foods had a pro-competitive justification for participating in the Program because "major retailers" such as Kroger Co. and Wal-Mart Stores, Inc. announced that they would only purchase UEP-certified eggs. *See id.* ¶ 236. Michael Foods further argues that such a pro-competitive justification is consistent with the possibility of independent action and the concomitant suggestion that it merely engaged in parallel conduct, rather than committed to a common conspiratorial and actionable scheme.

However, the Court concludes that the facts as set forth plausibly suggest that Michael Foods' certification under the Program, coupled with Michael Foods' other alleged conduct, can be seen as consistent with anti-competitive behavior and tend to exclude the possibility of independent action. This is because, at this stage of the litigation, the UEP Certification Program has been alleged to embrace anti-competitive features that have no apparent alternative pro-competitive rationale.[10] As the SAC alleges, a producer must follow the Program's guidelines, including those that are or would be inconsistent with independent self-interest, in order to attain and maintain certification under the Program. *See, e.g., id.* ¶ 222 (recognizing that in order for a

---

[10] This is not to say Plaintiffs' characterization of the Program in the SAC is necessarily true or without legitimate explanation, but determinations of such inquiries are not appropriate at this time. *See Standard Iron Works*, 639 F. Supp. 2d at 895, 902 ("While more innocent inferences can be drawn from [Defendants' conduct] it is not Plaintiffs' burden to allege facts that cannot be squared with the possibility of unilateral action. . . . Whether [Defendants' actions] were benign unilateral business decisions made by the individual Defendants or whether they represent concerted effort in violation of the Sherman Act are issues of fact which [this Court] cannot decide on the pleadings and which require discovery prior to resolution.'" (citations omitted)); *cf. Transpacific Passenger*, 2011 WL 1753738, at *14 ("The communications discussed herein, as well as numerous others, might well have legitimate explanations. But, at this stage in the litigation, they seem to show would-be competitors discussing the raising or matching of prices."). Moreover, while it is possible that there are innocent explanations for certain features of the Program, it is not within the Court's purview to weave them out of whole cloth in the absence of a documented factual record.

producer to sell "UEP-Certified" eggs, all "egg houses must be maintained in accordance with the supply restriction guidelines").

Without any legitimate business reasons for certain features of the UEP Certification Program, independent self-interest absent agreement tends to be excluded as an explanation for a defendant's certification and the requisite conduct to obtain such status.  Hence, agreement to the overarching conspiracy is plausibly suggested when a company, such as Michael Foods, that attended meetings where allegedly key decisions instrumental to the conspiracy were made or where effects of alleged coordinated actions were extolled, is alleged *also* to have been certified under and participated in the UEP Certification Program and concomitantly followed the Program's guidelines.  *See James Julian, Inc. v. Raytheon Co.*, 557 F. Supp. 1058, 1065 n.18 (D. Del. 1983) ("While mere membership, even when coupled with knowledge of wrongful conduct of the association, is insufficient to establish knowing participation . . . , once attendance is coupled with a consistent later act, an inference of knowing participation is permissible." (citing *Hunt v. Mobil Oil Co.*, 465 F. Supp. 195, 231 (S.D.N.Y.1978), *aff'd mem.*, 610 F.2d 806 (2d Cir.1979)).

Several conventional features of the UEP Certification Program lead the Court to this conclusion.

The Program, as a whole, purportedly implements animal welfare guidelines and reportedly was intended to increase cage space for hens, yet particular features of the Program as alleged in the SAC are methods of restricting egg supply without an apparent legitimate business reason.  As a point of reference for this discussion, the Court recognizes at the outset that, given the SAC's factual allegations concerning egg production, cage space guidelines to promote space

23

for egg-laying hens, in and of themselves and without measures for additional cages, necessarily decrease egg supply:  fewer hens per cage equate to fewer eggs produced.  In the absence of explanations that hens achieve greater egg yields with lower bird density, it is not difficult to accept the plausibility of Plaintiffs' theory of which came first, fewer hens or fewer eggs.

The Court recognizes that unrelated to commercial goals, such guidelines can have apparently legitimate explanations relating to promoting animal welfare.  However, other specific aspects of the Program ostensibly lack potentially pro-competitive justification.  In particular, the SAC alleges that the Program relied on certified producers to reduce bird density by reducing chick hatch over a phased period of time and thereby achieve the cage space requirements.  SAC ¶ 203 ("Defendants decided to implement . . . cage space recommendations as a long term chick hatch reduction program . . .[,] later known as the 'UEP Certified Program.'"); *see also id.* ¶ 253 (identifying chick hatch reduction as a feature of the Program); *id.* ¶ 206 (describing the desired cage space per hen); *id.* ¶ 464 (describing the Animal Welfare Committee's approval in 2006 of a policy that allows "any new company now making an 'Application for Certification' to come on to the program by meeting UEP's currently required hatch schedule for cage space rather than depopulating existing flocks").  Chick hatching is the means producers use to acquire their egg-layer stock.  *Id.* ¶¶ 125-28.  Thus, a producer's reduction in chick hatch would reduce the available stock of hens for egg production and, logically, the attendant output of eggs.  Michael Foods, like the other Defendants that have moved to dismiss, has not proffered any pro-competitive explanation (predicated upon the SAC or otherwise) for why the Program requires this particular vehicle to reduce bird density per cage.  Based on the facts recounted in the SAC, such an alternative explanation is not

discernable. Reducing the supply of egg-laying hens as a general practice, in the absence of

agreement, would be contrary to an individual egg producer's business interests. This is

particularly true because egg-layers have a short productive cycle—"the majority of hens are

between 100 and 130 weeks of age when they reach the end of their egg production cycle," *id.*

¶ 134, and new, younger egg-layers would continually be needed for egg production.[11]

Furthermore, the Program's requirement to reduce chick hatch, which, as alleged, has no

apparent limitations as to hatching numbers or duration of the practice, negates Michael Foods'

intimations that adherence to cage space limits would not prevent a producer from reallocating

its hens by increasing its overall number of cages or barns, thereby producing more eggs, and

demonstrating that its certification under the UEP Certification Program is not indicative of an

unlawful agreement. Michael Foods Mot. at 8. A certified producer could not fill additional

cages if it reduced its overall supply of egg-laying hens by engaging in chick hatch reduction.

Moreover, contrary to Michael Foods' argument on this score, Plaintiffs have alleged "*[a]s part*

*of these [UEP Certified] guidelines* . . . Defendants also agreed not to add capacity or make up

---

[11] Moreover, a rational individual producer would seek to maintain, if not increase, the number
of hens in order to promote its egg supply consistent with economic theory applicable to a
market where demand is inelastic. The SAC avers that the nature of demand for eggs is indeed
inelastic. *See id.* ¶ 153 ("[D]emand for eggs is relatively inelastic – that is, consumers do not
purchase fewer eggs when prices rise . . . ."); *see also id.* ¶¶ 154-56. An individual profit-
maximizing producer facing an inelastic demand curve has the incentive to maintain or increase
its individual product supply in order to maintain or increase market share. *See, e.g.*, *Blomkest
Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1039 (8th Cir. 2000) (Gibson,
J., dissenting) ("The effect of this inelastic demand is that low prices are bad for the producers
because the low price does not result in greater sales, except insofar as one producer can take
sales away from other producers.").

for the lost hens that would result through reduced cage densities . . . ." SAC ¶ 208 (emphasis

added).[12]

_____

[12] Michael Foods argues that "conclusory assertions or accusations of an agreement not to add capacity like the [assertions] in [P]aragraph 208 which are unaccompanied by any factual allegations cannot state a claim against Michael Foods." Day 1 Tr. at 77:11-14. However, although that factual claim in Paragraph 208 uses the generic "Defendants," the allegation goes on to describe the parameters of the UEP Certified Program's guidelines generally, and by virtue of being a certified producer, Michael Foods allegedly is required to follow the Program's guidelines in order to be certified.

Additionally, Michael Foods' argument that it could still increase its overall number of hens by simply having more hen houses is also discredited by the allegations in the SAC in other ways. For one, the argument has no factual basis in the SAC because the pleading does not contain any allegation that Michael Foods, or any other Defendant whose motion is pending, increased its hen numbers while participating in the UEP Certification Program.

Notably, the SAC also alleges that producers were discouraged from building new hen houses. *See, e.g. id.* ¶ 256 (describing a July 2003 UEP newsletter articled entitled, "Word of Caution" which purportedly stated: "As producers continue to reduce their layer house capacity to meet the UEP Animal Husbandry Guidelines, please don't make the mistake of building new facilities to replace the lost number of birds."). Plaintiffs additionally allege, albeit as to years prior to Michael Foods' alleged joining the Certification Program, that chick hatch reduction was credited for reducing overall hen numbers. *See, e.g., id.* ¶¶ 258-59 (describing an "August 2003 editorial by Gene Gregory of UEP entitled 'Reason Why Industry Could Have Period of Profitability'" articulating that "[s]ince th[e] beginning date [of the "hatch reduction to meet the animal husbandry guidelines" in April 2002] the hatch has been reduced by 14.7 million pullets in comparison to the same period year earlier"); *id.* ¶ 281 (noting that a July 16, 2004 UEP newsletter reported that "Two sources, one of which is the animal welfare audits, have confirmed to UEP that animal care certified companies have in fact reduced their hen numbers in existing houses").

Even assuming, *arguendo*, Michael Foods turned tail against the apparent trend of other certified producers' alleged reduction of chick hatch, and instead increased its overall hen population, the SAC's allegations still undermine Michael Foods' argument. The SAC suggests that there were philosophies prevalent in the egg industry that *not every* producer needed to engage in every activity geared to decrease supply in order for such a result to occur *and* that adding more hen housing would not be detrimental to achieving the alleged goal of decreasing supply. *See, e.g., id.* ¶ 193 (describing a document, dated August 2011, that Defendants allegedly distributed, which stated, "[T]here should be a *core segment* of the industry that is willing to reduce egg supply in order to achieve profitable egg prices" (emphasis added)); *id.* ¶ 305 (describing a November 15, 2004 *Feedstuffs* article that examined "problems of oversupply and backfilling" in the egg industry and noting that "[c]easing to backfill houses would fit [Gene] Gregory's suggestion to the [UEP] marketing committee that 'you don't need a plan to reduce the hatch; you don't need a moratorium on new housing: You need to get rid of

(continued...)

Another alleged feature of the Program involves guidelines that prohibit the practice of backfilling.  *Id.* ¶ 429; *see also id.* ¶ 306 (describing the UEP Board of Directors' decision in 2004 to incorporate a prohibition on backfilling in the Program's guidelines).  Backfilling is the practice of replacing hens lost from mortality or illness in a flock with "pullets," which are "young female chickens that will become egg-laying hens when they are sexually mature."  *Id.* ¶¶ 23 n.1, 126.  Thus, backfilling prevents the attrition of egg-laying hens, and, as a corollary, the prohibition of the practice promotes attrition and the consequent reduction in egg production. This prohibition, as described in the SAC, also appears consistent with supply restriction and further appears contrary to economic self-interest in the absence of an anti-competitive agreement.[13]  The Program allegedly places such an emphasis on prohibiting backfilling that the guidelines mandate a severe penalty for engaging in backfilling:  producers "automatically fail[] their audit" if they backfill.  *Id.* ¶ 429.[14]

---

(...continued)
old hens.'" (alterations in original)).  As such, in the world depicted by the SAC, the act of increasing hen numbers, even while UEP-certified, would not necessarily mean that Michael Foods had not consented to or participated in the alleged conspiracy.  Nonetheless, when considering all aspects of the Program as alleged (which the Court continues to discuss, *infra*) and in light of the other allegations as to Michael Foods and the overall alleged conspiracy as pled, the Court determines that Michael Foods' participation in the UEP Certified Program–even if Michael Foods did increase its hen numbers–would still suggest that Michael Foods agreed to and participated in the alleged conspiracy.

[13] The facts alleged in the SAC provide no grounds for the Court to infer that a prohibition on backfilling could serve some possible legitimate business purpose, such as animal husbandry practices, animal welfare, or otherwise.

[14] Reporting and auditing practices are alleged components of the UEP Certification Program to ensure compliance with the Program's guidelines.  Plaintiffs have alleged that such practices included certified producers self-reporting their compliance in monthly compliance reports to UEP.  *Id.* ¶¶ 232, 504.  Passing an annual audit, which the SAC never directly describes, also appears to be a predicate to becoming and remaining certified under the Program.  *Id.* ¶¶ 423,

(continued...)

The Program also required as a condition of certification that all of a producer's egg

houses be maintained in accordance with the Program, and, implicitly, with the guidelines

requiring chick hatch reduction and prohibiting backfilling. *Id.* ¶ 222. The SAC describes this

100% rule as requiring "a company [to] commit to implementing the welfare guidelines on 100%

---

(...continued)
428, 429.

    In their arguments, Plaintiffs broadly assert that the audit process was not based upon an interest in promoting animal welfare, and they attempt to assign some significance to the fact that there is an apparent disparity in the Program's penalties in the auditing process, claiming that the audits did not go to penalizing animal welfare violations, but instead to "ensur[ing] only that producers were restricting supplies." Pls.' Resp. at 11. In support, Plaintiffs contrast the guidelines on certain animal husbandry practices that purportedly promote humane treatment with those that ostensibly appear to promote supply restriction methods. They note that "toxic ammonia concentrations, cruel killing methods and failure to remove dead birds from cages daily only cost producers a five (5) point deduction on their annual audit,"*id.* ¶ 428, whereas "a producer automatically fails their [sic] audit if they [sic] violate cage spacing formulas, engage in a procedure known as 'backfilling.'" *Id.* ¶ 429.

    However, the SAC appears to undermine this argument because an audit failure is also the penalty for using starvation induced molting, which would surely seem to be an inhumane practice. *Id.* Generally, molting is a process employed by producers in an effort to obtain a higher level of egg production from a given flock of hens. *Id.* ¶ 130. The impact of molting is a temporary cessation in egg production for approximately eight weeks. *Id.* Following this period, "[p]ost-molt egg production will increase such that peak egg production in the flock reaches about 80 percent" for a short duration. *Id.* ¶ 132. As alleged in the SAC, in addition to starvation induced molting, producers can induce molting by "reduc[ing] light simulation (artificial day length) and impos[ing] dietary feed restrictions (including limiting food and water or providing diets of low nutrient density)." *Id.* ¶ 131. Plaintiffs contend that molting is a supply restrictive practice because it "reduces the supply of eggs." *Id.* ¶ 130.

    Accepting, *arguendo*, that the practice of molting restricts supply, it theoretically would be a desirable practice to promote generally in order to advance the alleged conspiracy. However, given that Plaintiffs plead that one method of molting triggers an automatic audit failure—notably, the method that, at least by virtue of comparison, appears to be inhumane since it relies on starving hens outright—the audit penalty system does not conform to the Plaintiffs' characterization that the audit penalties align uniformly with the goals of the alleged conspiracy. This particular line of argument thereby does little to support Plaintiffs' broader argument that the audit process was not based upon an interest in promoting animal welfare.

    Of course, this is not to say that the auditing process might not have been used in some form to further the alleged conspiracy. After all, the auditing process imposes a severe penalty for backfilling, which, as the Court discussed above, has no apparent legitimate business purpose as pled and appears consistent with supply restriction.

of all production facilities *regardless of how or where eggs may be marketed.*" *See id.* ¶ 221
(emphasis added)); *id.* ¶ 17 (same).[15]  It is unclear from the SAC's facts what the legitimate
business purpose may be in requiring that all of a producer's facilities meet certification
guidelines in order to obtain certification.  Indeed, there is no apparent reason, and there are no
allegations to suggest, why an independent, self-interested egg producer voluntarily would
constrain all of its facilities, and thereby its entire production, without regard for consumer egg
preferences, which could include desires for certified and non-certified eggs.  *See, infra*
(recognizing that the facts in the SAC do not allege that the entire universe of egg consumers
demanded UEP-certified eggs and that some consumers purchased non-certified eggs).  Plaintiffs
have averred that the 100% rule "was implemented solely to ensure that flock sizes were further
reduced in line with the goals of the conspiracy . . . ." *Id.* ¶ 223.

Also, the constructs of the UEP Certification Program and marketing licensing policies,
as alleged, are such that there is no apparent legitimate business purpose for companies to elect
to follow them absent agreement, and raise similar supply constraint issues as the 100% rule
because they preclude a company from producing non-certified eggs *and* marketing certified
eggs.  According to an August 2006 UEP newsletter, "The use of the 'License Agreement' will
allow Non-Certified companies to purchase eggs from 'UEP Certified' companies for the
marketing of 'Certified' eggs." *Id.* ¶ 464.  The SAC alleges that Michael Foods possessed just

---

[15] The Court recognizes that although Michael Foods participated in the UEP Certification
Program, 100% of its facilities may not have complied with the guidelines.  Plaintiffs aver that
an August 2006 UEP newsletter reported that the "Animal Welfare Committee approved the use
of a Non-Certified License Agreement for . . . UEP/UEA egg production companies having
made a commitment to meet the 100% rule while in the process of implementing the cage space
requirements of UEP's hatch schedule." *Id.* ¶ 464.  Because Michael Foods allegedly had a
license agreement, specifically, license agreement 509 (as well as certification no. 345), *id.*
¶¶ 49, 448, it may have only made the "commitment to meet the 100% rule."

such a marketing license under "license agreement 509." *Id.* ¶ 448.  Allegedly, however, the

Program would not allow a company that produced non-certified eggs to obtain a marketing

license for certified eggs, *id.* ¶ 310, with the apparent exception being, as reported by the August

2006 UEP newsletter, that licenses could be given to "UEP/UEA egg production companies

[that] hav[e] made a commitment to meet the 100% rule while in the process of implementing

the cage space requirements of UEP's hatch schedule." *Id.* ¶ 464.  In contrast, so long as a

company did "not own or operate egg production facilities," that company could receive a

marketing license for certified eggs. *Id.* ¶ 310.  Similar to the 100% rule, it is seemingly

inconsistent for rational companies that are both producers and marketers to restrict voluntarily

their product offerings, in both production and marketing capacities, only to certified eggs in the

absence of an agreement given the state of consumer demand for eggs.  Furthermore, that the

licensing agreement to market eggs was contingent on whether a company had production

facilities and the added requirement that those facilities comply with or be "committed to" the

100% rule equally appears to be without legitimate business explanation in the absence of an

anti-competitive agreement.[16]

---

[16]  The Court does not find that the SAC on its face alleges any alternative explanations for
becoming certified in order to obtain or retain a marketing license. The Court recognizes that in
2005 the UEP's Producer Committee for Animal Welfare voted to approve a motion that
instituted the policy "that no new licenses to market . . . Certified eggs will be issued or renewed
to producers who are not . . . certified."  *Id.* ¶ 310.  According to the SAC, the language of the
motion ostensibly articulated the purposes for doing so:  specifically protecting the integrity of
the Program and logo due to "the difficulty in preventing the commingling of" certified and
non-certified eggs and "to treat all egg producers equally."  *Id.* ("One motion stated, "In order to
protect the integrity of the ACC program and logo and in view of the difficulty in preventing the
commingling of certified eggs with non-certified eggs and to treat all egg producers equally it is
hereby moved . . . .").
        However, a fair reading of this allegation does not suggest that these were the Committee
members' actual reasons for voting for the motion.  Nonetheless, these "purported" explanations
(continued...)

Contrary to Michael Foods' contention that the SAC on its face provides a pro-competitive justification for joining the UEP Certification Program—namely, consumer demand—the pleading contains no allegations that would suggest that egg consumers so effectively clamored for UEP-certified eggs as to compel self-interested producers to choose to participate in the Program and thereby commit 100% of their facilities to the guidelines, particularly in the face of alternatives. The SAC does contain certain allegations that the Food Marketing Institute, a grocers' trade organization, "mandate[d] the UEP seal for all egg products used by organization members," *id.* ¶ 234, and that Kroger and Wal-Mart, who are "major retailers," announced that they would only purchase UEP-certified eggs, *id.* ¶ 236. Additionally, Plaintiffs averred that there was an expectation, as published by the industry publication, *Feedstuffs*, in 2004, that other consumers would follow Kroger and Wal-Mart's suit in demanding only UEP-certified eggs. *Id.* ¶ 236.

Apart from these allegations, however, nothing else in the SAC suggests that UEP-certified eggs were in high demand by consumers. Instead, the SAC contains the allegation that by failing to become certified, an egg producer "*may* not be able to market their eggs or sell them through many major retail outlets." *Id.* ¶ 235 (emphasis added). Indeed, the SAC contains several allegations that suggest that consumers purchased non-certified eggs. For example, the Albertson's grocery chain allegedly purchased eggs from Sparboe that were not UEP-certified. *Id.* ¶¶ 241-42. The SAC also contains the allegation—arguably of dubious significance—that

_____

(...continued)

for why the Committee approved the motion cannot be imputed as the rationale for why companies would choose to become or remain certified in order to have marketing licenses, and as such, the Court does not consider them alternative explanations for seeking to obtain a marketing license.

another producer, Kreider Farm Eggs, after it withdrew from the Program, sold non-certified eggs to an unnamed "loyal customer." *Id.* ¶ 244. Additionally, the SAC raises the inference that consumer preferences concerning UEP-certified eggs were malleable because Wal-Mart reportedly entertained the possibility of purchasing eggs produced under an alternative animal husbandry program developed by Sparboe in 2009. *See id.* ¶ 249.[17] Furthermore, on a more global level, there certainly exists an inherent consumer interest in, if not outright demand for, non-certified eggs because—and this is a fundamental premise of this litigation—they are cheaper than UEP-certified eggs and generally indistinguishable (notwithstanding marketing and production practices), given that they are homogenous, commodity goods, *id.* ¶ 158.[18] Thus, despite Michael Foods' urging to consider its participation in the Program to be an independent action prompted by consumer demand, the Plaintiffs' pleading on its face does not provide an "obvious alternative explanation," *Twombly*, 550 U.S. at 568, and cannot support inexorably the required inference that the level and elasticity of such demand prompted Michael Foods to become certified.

In a similar vein, Michael Foods' pro-competitive argument is also undermined by the SAC's allegation that alternative animal welfare programs could accomplish the welfare goals

---

[17] Ostensibly, the SAC also *could* be read to suggest that Wal-Mart, despite previously announcing that it would only purchase UEP-certified eggs as of January 1, 2003, *id.* ¶ 236, was one of Sparboe's active customers in 2009, apparently purchasing eggs from Sparboe when it was no longer UEP-certified. *See id.* ¶ 248 ("In 2009 . . . UEP contacted Sparboe customer, Wal-Mart, in an attempt to discourage the company from purchasing Sparboe's eggs that had not been certified by the UEP.").

[18] By recounting these SAC allegations, the Court is making no factual, legal or value judgments that would venture into the marketing or related fields or belief systems concerning "free-range," "cage free," "organic," or other concepts advanced in current day agricultural production, product advertising, marketing or consumption. *See also id.* ¶¶ 141, 483 (recognizing such "specialty" eggs are excluded from this suit).

32

through less restrictive means.  Specifically, the SAC avers, "Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply, in order to provide specific eggs to some customers (such as Wal-Mart) that wanted these kinds of products."  SAC ¶ 249.  It follows that the UEP Certification Program was not an exclusive, or even a sensible or successive, means of advancing animal welfare.  The alleged existence of such an alternative to the UEP Certification Program raises further inferences that the Program's design, as pled, is consistent with anti-competitive behavior.

Thus, despite Michael Foods' argument that there are pro-competitive reasons for joining the UEP Certification Program in the absence of an illegal agreement the Court cannot adopt them at this time, at least for definitive Rule 12(b)(6) purposes.  The allegations as to the Program raise enough of a plausible inference that certification in the Program was inconsistent with independent self-interest, at least because no non-conspiring, self-interested company would have followed the Program guidelines concerning chick hatch reduction, prohibiting backfilling, applying the guidelines to 100% of its facilities, and so on.  Upon careful consideration of the parties' arguments, and cognizant that this motion must be viewed through the lens of the conspiracy on the whole, the Court concludes that there are enough specific allegations in the SAC—those that explicitly name Michael Foods and its specific conduct, as well as those that cite specific facts and detailed circumstances concerning the nature and context of the entire conspiracy, particularly those pertaining to the UEP Certification Program—to plausibly suggest that Michael Foods joined the alleged conspiracy.  Accordingly, the Rule 12(b)(6) motion by Michael Foods must be denied.

**B.  Daybreak's Motion to Dismiss**

Daybreak Foods, Inc. argues that it "is situated quite differently from most, if not all, of the other defendants in the case."  Daybreak Mot. at 8.  It contends that one reason for this is because the SAC fails to link Daybreak to any of the eight "collective actions" that allegedly advanced the overarching conspiracy.  Instead, according to Daybreak, the SAC allegations that specifically identify it by name merely allege that Daybreak was a UEP member and held positions on the Board and certain committees, attended meetings, and expressed comments about the egg market and industry practices.  These allegations alone, Daybreak maintains, do not suggest that it agreed to the conspiracy.  Yet before the substance of Daybreak's arguments can be tested, an antecedent and dispositive issue requires resolution:  whether the SAC specifically alleges Daybreak participated—at least to some degree—in the UEP Certified Program.

## 1.  Whether Daybreak Participated in the UEP Certified Program

Plaintiffs and Daybreak dispute whether the SAC has specifically alleged that Daybreak participated in the UEP Certification Program and, if so, the extent of any such participation. In particular, this issue focuses on the SAC's Paragraph 93:

> Daybreak has participated in and benefited from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Daybreak has explicitly agreed to the conspiracy alleged herein by *adopting UEP Certified guidelines to reduce chick hatch* and has conspired to reduce its egg supply as a result. Daybreak participated in a UEP meeting which expanded a 2004 flock/disposal scheme.

SAC ¶ 93 (emphasis added).

Plaintiffs maintain that this Paragraph sufficiently alleges that "Daybreak participated in the [UEP Certification] program."  Pls.' Resp. at 40.[19]  Daybreak urges the Court to disregard this allegation on the grounds that it is rendered implausible by the SAC's other allegations and that it is a generalized, merely conclusory allegation.  Daybreak Mot. at 10; Daybreak Reply at 7.  Daybreak further notes that the SAC twice lists the names of certain Defendants that were certified under the UEP Certification Program in 2003 and 2008, but that Daybreak's name is conspicuously and meaningfully absent from those lists.  Daybreak also highlights that, unlike other Defendants who are alleged to have been certified under the Program and have a certification number attributed to them, the SAC does not provide any such certification number for Daybreak.

Given the familiar legal precepts governing pleading standards, the Court is constrained to accept the factual allegations quoted above from Paragraph 93 as true.  *Iqbal*, 129 S. Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  The statement that Daybreak "adopt[ed] UEP Certified guidelines to reduce chick hatch" constitutes just such a factual allegation that the Court thus must accept as true without an artificial or surgical parsing of the language Plaintiffs used.  Indeed, the allegation is a factually specific statement that supports a legal conclusion, "Daybreak has explicitly agreed to the conspiracy . . . , by *adopting UEP Certified guidelines to reduce chick hatch*."  SAC ¶ 93 (emphasis added); *see Iqbal*, 129 S.

---

[19] In contrast, at oral argument, Plaintiffs pushed the pleading envelope and argued that they "alleged explicitly that Daybreak was *in* the UEP certification program . . . ." Day 2 Tr. at 34:15-18 (emphasis).

Ct. at 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

As previously discussed with respect to Michael Foods, the SAC alleges specific factual details pertaining to chick hatch reduction, which further support this allegation's factual specificity.  It is thus not merely a bald statement or a legal conclusion couched as a factual allegation that the Court is not bound to credit.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citing *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981), *aff'd on other grounds*, 460 U.S. 325, (1983); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.07, at 12–64 & n.6 (1985)).

Furthermore, the allegation is not implausible, notwithstanding Daybreak's contention otherwise.  Daybreak's name may be absent from the paragraphs listing certain producers that were known to have been certified under the UEP Certification Program as of different dates, but Plaintiffs are not obliged to have the same quality or quantity of allegations as to one defendant as unto another.  *Cf. Beltz Travel Serv., Inc. v. Int'l Air Transport Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("Participation by each conspirator in every detail in the execution of the [antitrust] conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." (citing *Am. Tobacco Co. v. United States*, 147 F.2d 93, 119 (6th Cir. 1945))).  The SAC need not aver even similar allegations as to each applicable defendant in identical form or number.  *See In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 949 (E.D. Tenn. 2008) (recognizing that so long as plaintiffs plead the requisite contours of a claim against an antitrust defendant, "[t]hat they require only a few paragraphs or sentences to do so is of no consequence").

36

Moreover, there is no inconsistency between the allegation that Daybreak adopted UEP Certified guidelines on chick hatch reduction and the SAC's other allegations. A careful parsing of the parties' dispute reveals an issue of semantics. The Plaintiffs' position appears to be that the act of merely "adopting" certain UEP Certification guidelines constitutes "participation" in the UEP Certification Program. As such, while "adopting" guidelines may connote the most minute of actions, it can also reflect the most meaningful embrace of the object of an "adoption." In any event, even in the former interpretation, it is a least some "action" and not merely exclusively passive presence at a meeting where, for example, guidelines are only discussed. In contrast, Daybreak presumes that certification under the Program is an essential prerequisite to "participation" and that, because the SAC does not specifically allege that Daybreak obtained certification under the Program, Daybreak did not participate in it.

A fair reading of the SAC indicates that, while there is no specific factual allegation that Daybreak obtained UEP-certified status, Daybreak still could have "participated" in the Program consistent with Plaintiffs' definition and description of "participation" in the Program. As alleged, certification under the UEP Certification Program requires, *inter alia*, adherence to the Program's guidelines. However, no allegation in the SAC indicates that a producer is precluded from voluntarily "adopting" or following all or some of the Program's guidelines, as if they were a form of standards, even if that producer did not formally become certified under the Program or sell "UEP-Certified" eggs.[20]  Indeed, assuming, *arguendo*, that Daybreak never achieved

---

[20] Notably, other producers who are alleged to have joined the certification program and have assigned certification numbers, such as Michael Foods, Rose Acre, and Ohio Fresh, were also alleged to have "adopted" the chick hatch reduction guidelines under the Program with the identical language of ". . . by adopting UEP Certified guidelines to reduce chick hatch."  *See, e.g.*, SAC ¶¶ 48, 67, 90.  Thus, "adoption" of certain UEP guidelines does not necessarily equate

(continued...)

certification under the Program, Daybreak still plausibly could have adopted the guidelines concerning chick hatch reduction.  It follows that Daybreak's lack of a certification number and absence on any certified producer list would not be inconsistent with the allegation that it "adopt[ed] UEP Certified guidelines to reduce chick hatch."[21]

## 2.  Whether Daybreak Joined the Conspiracy

The SAC contains three categories of specific factual allegations with respect to Daybreak.  The first category pertains to Daybreak's alleged involvement in UEP as a member by holding positions on the Board and continual presence at UEP meetings where certain actions alleged to advance the conspiracy were adopted or where comments were made urging attendees to participate in actions alleged to promote the conspiracy.  The second category of allegations concerns Daybreak's alleged public and private comments about the egg market and industry practices.  And the third category involves the allegation that Daybreak adopted UEP Certification guidelines on chick hatch reduction.

It is not apparent that the first two categories of factual allegations when considered together sufficiently allege Daybreak's agreement to the conspiracy. As previously discussed, allegations of mere membership and attendance at meetings are insufficient to suggest agreement to a conspiracy.  Here, the SAC alleges that Daybreak employees served on UEP's Area #3,

---

(...continued)
to (or foreclose) the conclusion that a producer has certified-status.

[21] To buttress its argument, Daybreak has attempted to raise doubt as to the truthfulness of the allegation that it adopted the UEP Certified guidelines on chick hatch reduction.  In doing so, Daybreak asks the Court to look beyond the SAC at the UEP's Answer to the SAC, which states that Daybreak has never been certified under the UEP Certification Program.  Daybreak Reply at 7.  Suffice it to say, Daybreak may enlist the UEP pleading in a subsequent motion, but a co-defendant's Answer is unavailing in this Rule 12(b)(6) analysis of the SAC.

Government Relations Committee, Environmental Committee, and Quality Assurance/Food Safety Committee in 2008. SAC ¶ 92. The allegations also indicate that some of these employees held leadership positions, including a UEP Board position. *See, e.g.*, *id.* ¶ 284. Daybreak employees allegedly attended various UEP meetings. For example, a Daybreak representative attended UEP Animal Welfare Committee meetings where attendees articulated that the "'animal husbandry' program's express purpose was to reduce supply," *id.* ¶ 211. Another representative was present at a UEP Board of Directors Meeting held in May 2002 in Washington, D.C., during which the UEP Marketing Chairman purportedly "announced two ways of reducing egg supply, stating 'that we have a crisis and that a crisis management plan had been communicated to the members calling for early molt and early hen disposal. The current egg prices indicated that this plan was working.'" *Id.* ¶¶ 199-200. According to Plaintiffs, Daybreak representatives were present at UEP Annual Board meetings where the "100% rule" was approved by a 19-to-1 vote and where the Board approved a schedule for early hen disposal or, alternatively, five-percent flock size reduction, *id.* ¶¶ 220-21, 284-85, 93.

At another UEP Board of Directors meeting in Atlanta, Georgia in January 2005, Daybreak was allegedly present and the "minutes reflect discussions about the price fixing proposal and other attempts to reduce supply." *Id.* ¶ 298. Daybreak employees also allegedly attended UEP Marketing Committee meetings in Washington, D.C., at which the committee chairman supposedly made comments that "the industry must do a better job managing the supply between Easter and Labor Day and that perhaps the industry lost focus this year because of high prices," *id.* ¶¶ 398, 404,[22] and a UEP Board of Directors Legislative meeting in May

---

[22] The SAC alleges in separate paragraphs that the UEP Marketing Committee met in

(continued...)

2003 in Washington, D.C., at which the marketing committee chairman purportedly stated,

"Need every producer to be a USEM member.  Need more help pulling the wagon instead of

riding," *id.* ¶¶ 336-37.  As this summary reveals, none of these allegations suggest anything more

than Daybreak's passive attendance at these meetings.[23]

Similarly, although Plaintiffs suggest that Daybreak's alleged statements are indicative of

a conspiratorial purpose or state of mind, the statements, in and of themselves, appear equally

consistent with passive or reflective observations and opinions, even in light of Daybreak's

membership or attendance at UEP meetings.  One such allegation is that Daybreak's President

---

[22](...continued)
Washington, D.C., in May and October of 2008, where the committee chairman evidently made
virtually identical comments.  Despite alleging that identical company representatives were
present and the chairman's comments at both were verbatim, Plaintiffs appear to consider these
were indeed two separate meetings.  *See* Pls.' Resp. at 38.

[23] Plaintiffs challenge the defense view that Daybreak was only a passive attendee at UEP
meetings by conjuring up the inference that Daybreak twice voted at UEP Board meetings for
producers to coordinate and reduce flock sizes.  However, the alleged facts do not support this
argument by Plaintiffs.  The SAC is devoid of facts alleging that Daybreak undertook any
coordinated actions to reduce flock sizes, so Plaintiffs implicitly argue that Daybreak's vote to
approve such actions demonstrates its agreement to the overarching conspiracy.  *See* Pls.' Resp.
at 40 ("While Mr. Rehm was a Board member, the UEP twice approved coordinated actions to
reduce flock sizes in order to reduce supply and to raise prices . . . . At least one approval was
without recorded dissent.").  But such an argument is of no ultimate moment, because the SAC
does not specifically allege, directly or by inference, that Daybreak cast an affirmative vote at
any of these meetings.  For example, at one such meeting there was a motion "to extend through
Labor Day the current 'intentions program' for members' flocks to be disposed of 4 weeks
earlier than previously scheduled and/or flock size reduction by 5%" that was passed by the
Board with "no recorded dissents."  *Id.* ¶ 300.  Even when considering all inferences favoring
Plaintiffs, this allegation does not suggest Daybreak actually voted, particularly given that the
UEP Board was "governed by . . . three to fifty directors who are elected annually."  *Id.* ¶ 446.
A lack of recorded dissent cannot indicate whether all Board members were able to vote on the
given proposal or that any Board member may have abstained, temporarily left the meeting, or
other "unrecorded" action.  As such, Plaintiffs merely propose a very possibly false inference.
*Cf. Twombly*, 550 U.S. at 554 (warning against "false inferences" in the context of allegations of
parallel conduct without more).

made a comment to *Egg Industry* magazine in February 2007 that "I tend to think that consumers will buy eggs whether the price per dozen is 70 cents or $1.70." *Id.* ¶ 154.  On its face, of course, this comment could reflect only that he held the opinion that the demand for eggs is inelastic. Similarly, alleged statements that Daybreak personnel made during an earnings conference call on August 12, 2008 appear to manifest opinions of the market and industry practices:  "Another factor supporting high egg prices is a short-term contraction in supply due to broad adoption of animal well-being programs on bird density," *id.* ¶ 402, and "[s]upply has been pressured through the animal wellbeing efforts, I think by the industry," *id.* ¶ 403 (alteration in original). Likewise, an alleged comment attributed in a March 2007 *Egg Industry* article to Daybreak's President can be viewed as observational rather than suggestive of agreement.  In that article the president allegedly "credit[ed] high shell egg prices on the 'United Egg Producer's animal welfare program that most shell egg producers participate in.'"  *Id.* ¶ 376.

The SAC also avers that Daybreak may have discussed the UEP Certified Program's supply-related implications with another egg producer's in-house counsel:  "Mr. Mueller discussed the UEP Animal Welfare Program and its intersection with supply and price with representatives from a number of industry participants, including . . . Bill Rehm of Daybreak Foods." *Id.* ¶ 231.  Regardless of whether this allegation sufficiently supports Plaintiffs' characterization that "Sparboe, shared its concern with Daybreak that the program constituted price fixing and could cause trouble for the industry," Pls.' Resp. at 40 (citing SAC ¶ 231), the allegation may also describe more innocuous or observational conversations.  Indeed, the allegations suggest no more than that Daybreak representatives were cognizant of certain characteristics of the egg industry and opined about certain practices both publicly and privately.

41

Even considering these two categories of allegations together, it would only be reasonable to infer that Daybreak was in a position to observe and be aware of what other Defendants were doing, knew the implications of restricted supply and increased prices, and even likely benefited from the increased market prices. This would not be enough to make the requisite factual leap to say that awareness and beneficiary status suggest that Daybreak outright agreed to and participated in the conspiracy. However, those two categories of conduct must also be considered in light of Daybreak's alleged adoption of UEP Certified guidelines on chick hatch reduction.

As discussed above, the alleged guidelines specific to chick hatch reduction are inconsistent with the behavior of an independent, self-interested producer and do not have apparent pro-competitive benefits. In the state of the world described in the SAC, a producer following the guidelines as to chick hatch reduction would be reducing the supply of its egg-laying hens, and thereby limiting its egg production capabilities. In doing so, a producer would be unable to enlarge its operations, fill additional barns, and expand egg production. Even though Plaintiffs have not alleged that Daybreak adopted other elements of the UEP Certification Program, they have averred that it adopted a particular element that is highly restrictive of egg supply and without an apparent self-interested business rationale in the absence of agreement to the offending conspiracy.

Given Daybreak's alleged adoption of the guidelines on chick hatch reduction, in conjunction with the allegations that Daybreak was a UEP member and held positions on the UEP Board and certain committees, attended meetings, and expressed pointed comments about the egg market and industry practices, the SAC alleges minimally sufficient facts to plausibly

42

suggest that Daybreak assented to the alleged conspiracy.  It follows, again, given the governing

case law, that Daybreak's motion to dismiss must be denied.[24]

## C.  Rose Acre's Motion to Dismiss

Challenging the sufficiency of the SAC, Rose Acre Farms, Inc. embraces the Third

Circuit Court of Appeals' admonition that "a claim of conspiracy predicated on parallel conduct

should be dismissed if . . . the facts alleged in the complaint itself, show that independent self-

interest is an 'obvious alternative explanation' for defendants' common behavior."  *Ins.*

*Brokerage*, 618 F. 3d at 326.  Rose Acre recognizes that Plaintiffs specifically allege that it was a

member of UEP, UEA, and USEM; that its representatives attended UEP Board meetings and

committee meetings at which steps allegedly were undertaken to advance the conspiracy; that

some of its representatives held leadership positions on the Board and committees; and that it

was certified under the UEP Certification Program.[25]  The SAC also alleges that Rose Acre

---

[24] At oral argument, the Court raised the possibility that some of Daybreak's objections to the
SAC might be resolved more appropriately through another avenues, such as, *inter alia*,
attempting to resolve issues concerning accuracy directly with the Plaintiffs or later through
summary judgment.  *See* Day 2 Tr. at 30:7-36:8.  The Court is confident that the practical
professionals managing this case could address and resolve such disputes informally.  Insofar
that the parties are unable to resolve any of these specific issues on their own, summary
judgment "as soon as sufficient evidence is developed to establish or negate a point" can
"conserv[e] the resources of the parties and the courts."  2 Phillip E. Areeda & Herbert
Hovenkamp, *Antitrust Law* ¶ 307, at 99 (3d ed. 2007).  Likewise, an appropriate and closely
tailored discovery plan can aid in the efficient resolution of these issues.  *See In re Polyurethane
Foam Antitrust Litig.*, No. 10 MD 2196, 2011 WL 3204712, at *5 (N.D. Ohio July 19, 2011)
(recognizing that certain defendants "differ[] in important respects from the majority of
Defendants" and thus requiring that plaintiffs confer with those defendants "to develop a focused
and phased discovery plan to determine whether these Defendants should remain in the case"),
*clarified on denial of reconsideration on other grounds*, 2011 WL 4345926 (Sept. 15, 2011).

[25] Specifically, the allegations as to Rose Acre representatives' attendance at meetings,
leadership positions held, and conversations with other Defendants are similar, if not identical to,
allegations concerning other Defendants, discussed *supra.  See, e.g.*, SAC ¶¶ 66-67, 231, 252,

(continued...)

"consistently participated in the export program . . . and tried to encourage other egg producers to participate in the program." *Id.* ¶ 331.[26]  These allegations, according to Rose Acre, do not plausibly suggest that it agreed to the overarching conspiracy because the allegations, as well as certain materials incorporated into the SAC by reference, alternatively suggest that Rose Acre acted in its independent self-interest in undertaking those alleged actions.

## 1.  Rose Acre's Participation in the USEM Export Program

Neither Rose Acre nor Plaintiffs dedicate much attention to the export program and Rose Acre's alleged participation in it.  *See* Rose Acre Mot. at 22, 23; Pls.' Resp. at 15-18.  Indeed, there is arguably little purpose in engaging in an extensive analysis of the export program as to Rose Acre, given that Rose Acre's alleged participation in it constitutes only one facet of the SAC's depiction of Rose Acre in relation to the overarching conspiracy, and the Court must consider Rose Acre's alleged participation in the program in the broader context of the SAC. *See Pressure Sensitive*, 566 F. Supp. 2d at 373 ("[A] district court must consider a complaint in its entirety without isolating each allegation for individualized review.").  Notwithstanding this need to consider the allegations as to Rose Acre *in toto*, practicality requires that the Court

---

(...continued)
284-85, 298, 310, 336, 353, 380, 398, 404, 438.  For the same reasons, the Court concludes that these charges as to Rose Acre are insufficient on their own to plausibly articulate Rose Acre's agreement to the alleged conspiracy.

[26] The SAC claims that "Rose Acre was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members." *Id.* ¶ 67.  Rose Acre allegedly began participating in the USEM export program in late 2006. *Id.* ¶ 350.  The timing of Rose Acre's alleged participation in the export program coincides with the program's expansion in 2006, following a period of three years in which no exports were facilitated by the program. *Id.* ¶¶ 332, 348.

address this alleged facet of the conspiracy before evaluating it with all allegations asserted against Rose Acre.

Plaintiffs charge that the USEM export program is one of the eight coordinated actions that advanced the alleged overarching conspiracy. The SAC alleges that USEM is a cooperative group that negotiates egg exports on behalf of its members. *Id.* ¶¶ 179, 176 n.39. The export program, according to Plaintiffs, is designed to export eggs at a loss—due to lower prices in egg markets abroad and high transportation costs in shipping perishable and breakable products—for the exclusive purpose of reducing the domestic supply of eggs. *Id.* ¶¶ 147, 329-30, 332. Plaintiffs allege that the export program sought to capitalize on the inverse relationship that exists between domestic egg prices and domestic supply. *Id.* ¶ 330.[27] Through the export program, certain USEM members allegedly exported eggs at a loss, while other members contributed some substitute or replenishing remuneration to the exporters for those losses. *Id.* ¶ 333.

This characterization of the program may ring of anti-competitive design and effect—particularly since the exports are allegedly sold at a loss and loss sharing purportedly occurs among USEM members—yet this characterization is not fully supported by the SAC's averments. For example, the specific facts contained in the SAC about the program do not plausibly suggest that *all* exports were sold at a loss and that concomitantly loss sharing occurred. Indeed, just before Rose Acre allegedly joined the export program at the end of 2006, *id.* ¶ 350, USEM shipped its first exports in three years, selling the exports "at a price

---

[27] At times the SAC appears to misstate this phenomena, which the Court attributes to inadvertence rather than internal actual contradiction. *See, e.g., id.* ¶ 361 ("[T]he pace at which domestic U.S. prices dropped was proportional to supply . . . .").

*considerably better* than domestic breaking stock prices." *Id.* ¶ 348 (emphasis added). The SAC presumes that USEM exports were not necessarily always sold at a loss because the "program was designed to have USEM members export shell eggs *even where* the export prices were lower than domestic egg prices." *Id.* at ¶ 332.

Moreover, Plaintiffs broadly allege that exported eggs were sold at a loss, in part because "foreign egg and egg product prices were lower than in the United States," *id.* ¶ 346, but Plaintiffs provide specific facts that do not inexorably support such a conclusion about prices. Indeed, the only specific comparative pricing data in the SAC between exports and domestic sales places domestic prices higher *on average* than exports: "the average price per dozen for all eggs increased 52% from 58.2 cents in 2006 to 88.5 cents in 2007," while in August 2007 an export expected to be delivered the week of August 20, had a "sale price of 60 cents per dozen, 10 cents higher than any previous export." *Id.* ¶¶ 358, 364.[28] On the surface, these allegations would seem to advance Plaintiffs' theories, but an "average" necessarily implies that some domestic egg prices were lower than the average domestic price (just as some could be higher). It follows that some domestic prices could well have been lower than the export price of 50 cents or less in the first half of 2007. Accordingly, such limited and vague facts as to pricing do not suggest the broad conclusion that foreign egg prices were less than domestic prices. *Cf. In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-02143, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) ("Pricing trends and economic data present a potentially fertile ground for

---

[28] The SAC alleges other export-related price information, yet it does not provide any supporting comparative data. One such allegation is that the "average European Community price for eggs in 2003 was only 110.57 euros per hundred kilograms" and in 2005 the average per hundred kilograms was 86.08 euros. *Id.* at ¶ 148. There is no similar comparative data on domestic pricing in the SAC to meaningfully compare European and domestic prices in that time period.

inferences of price manipulation, but the information plaintiffs have presented at this juncture is ambiguous at best, and does not permit reliable conclusions to be drawn about the pricing of [the product at issue] in particular.").[29]

Given that the SAC does not foreclose the possibility that export pricing could have been higher than domestic prices at times of certain exports, it also does not exclude the possibility that Rose Acre's participation in the egg export program might have been for independent, legitimate business reasons. Plaintiffs charge that Rose Acre "participated in egg exports, sharing any associated financial losses with other members." SAC ¶ 67. But, again, not all exports necessarily involved losses (and thus loss sharing). Accordingly, at this juncture who can say—from the Plaintiffs' pleading—that Rose Acre's participation was not limited to exports that did not involve losses?

Furthermore, the SAC's allegations reflect that—unlike the UEP Certification Program, which as pled, mandated certain conduct—the nature and extent of a producer's participation in the export program was not mandated. The SAC claims only that providing eggs for export or loss sharing was encouraged, rather than required by virtue of membership in the program. Sparboe, for example, while a member of the export program merely received "pressure" to provide eggs for export, or in the alternative, "to provide money to make up for the loss that other UEP members experienced by participating in the egg export program." *Id.* ¶ 341. Another SAC allegation suggests that members *agreed* to share in losses on an export-by-export basis, but were not required to do so. *Id.* ¶ 334 (quoting a March 20, 2003 memorandum sent to

---

[29]   In contrast, for example, Plaintiffs allege, without any American comparative data, that "egg and egg product prices [were] far lower in Europe than in the United States" at a time when egg consumption in various European countries was low. *See id.* ¶ 360.

USEM members stating that an unnamed new member "*agreed* to share in the loss" from a "recent export" (emphasis added)). As phrased, the allegation that Rose Acre participated in the export program, "sharing *any* associated financial losses," leaves wide open the interpretation that there may not have been "any" losses for Rose Acre to share to the extent of its participation, or that Rose Acre did not actually make any such contributions when—and if—the opportunity was presented.

As a final point, the SAC alleges that exports of eggs occurred independently of the USEM export program. Prior to the existence of the USEM export program in 2000, "the United States was the second-largest exporter of eggs in 1998." *Id.* ¶ 145. In the three years prior to November 2006, according to the SAC, no eggs were exported through the program, and yet the SAC claims that 14 million dozen eggs were exported in January to April 2006. *Id.* ¶¶ 348, 354. The existence of such exports, apparently occurring independently of the USEM export program, suggest that at least some U.S. egg producers had independent reasons to export eggs, unrelated to the alleged conspiracy to reduce egg supply. Thus, Plaintiffs' bald statement that "[t]here would have been no independent business reason for each Defendant on its own to undertake costly exports at the expense of more profitable domestic sales" is contradicted by the SAC's own other allegations. *Id.* ¶ 346.

In summary, the specific facts pled as to the export program to some degree support the Plaintiffs' conclusory assertions about the program's anti-competitive attributes, but also they could be equally suggestive of the possibility that Rose Acre had an independent, legitimate business justification for participating in the program. Nonetheless, although Rose Acre's participation in the USEM export program *by itself* could be equally consistent with the

48

possibility of independent, legitimate business justification, the Court must proceed to consider

the additional facts that Plaintiffs allege to suggest that Rose Acre agreed to the overarching

conspiracy.

## 2.  Whether Rose Acre Joined the Conspiracy

Rose Acre's main arguments in support of its motion concentrate on its alleged

participation in the UEP Certification program.  Upon close consideration of those arguments,

the Court cannot agree with Rose Acre, but instead finds that Plaintiffs have sufficiently alleged

specific facts that plausibly suggest that Rose Acre joined the alleged conspiracy.

Rose Acre's primary argument is that joining and becoming certified under the UEP

Certification Program is consistent with rational self-interest as demonstrated by the facts that

consumers demanded eggs raised pursuant to animal welfare standards, and specifically

endorsed UEP-certified eggs, and that Rose Acre's business "expanded" while it participated in

the Certification Program.  This argument is akin to Michael Food's pro-competitive arguments,

and for the reasons the Court discussed, *supra*, concerning the nature of the UEP Certification

Program with respect to Michael Foods' motion, the Court likewise cannot agree with Rose Acre

that the SAC contains allegations that suggest an "obvious alternative explanation" for an egg

producer to join the UEP Certification Program.

Rose Acre's argument on this score, however, is, in part, distinguishable from Michael

Foods in that it relies on allegations derived from the Plaintiffs' First Amended Complaint and

news articles incorporated in the SAC "by reference," but not attached to it as exhibits.  For

example, the SAC cites a February 2008 *Egg Industry* article entitled, "Infrastructure's role in

keeping egg prices high," to support the allegation that Dolph Baker, president of Cal-Maine

Foods, made a statement that "What we learned in 2007 is that we have control of our destiny if we work at it, and as an industry, 2008 could be another super year." *Id.* ¶ 392. Excerpting a different portion of the same article, Rose Acres argues that, contrary to the UEP Certification Program's apparent prohibition on expanding facilities,[30] Marcus Rust of Rose Acre made a statement that Rose Acre's business expanded. Rose Acre Mot. at 9.

Despite relying on this excerpt and other materials that are not directly cited in the SAC, Rose Acre proffers no grounds or legal authority as to why the Court can or should consider these materials in connection with the motion to dismiss. Plaintiffs argue that the applicable pleading standard does not permit the consideration of these materials on the grounds that they are not part of the SAC but instead constitute "evidence" in support of an alternative explanation for Rose Acre's conduct, consideration of which would convert the motion to dismiss into a summary judgment motion. Day 2 Tr. at 98:1-4; 100:6-10.

Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). And as stated above, in evaluating the adequacy of a pleading, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer*, 605 F.3d at 230 (citation omitted). Here, the materials upon which Rose Acre relies to argue that an alternative legitimate explanation for its alleged conduct exists are not properly before the Court on the pending motion to dismiss. The materials were not

---

[30] Rose Acre does not identify the particular SAC paragraphs that allege this prohibition. As previously discussed, however, Plaintiffs averred that "[a]s part of these [UEP Certified] guidelines . . . Defendants also agreed not to add capacity or make up for the lost hens that would result through reduced cage densities . . . ." *Id.* ¶ 208.

attached to the SAC as exhibits; it is unclear whether their authenticity is unchallenged; and although some of the materials indeed were quoted in the SAC, their "limited quotation does not constitute incorporation by reference." *Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985).[31]

Furthermore, Plaintiffs' antitrust claims are not based upon or integral to these documents, or vice versa. In circumstances when courts do look beyond a pleading to entire documents that are merely cited in the complaint through isolated statements excerpted from such documents, only those documents that are central to the claim at issue, such as contracts for breach of contract claims or public offering documents containing alleged fraudulent statements in securities misrepresentation suits, are appropriate for that purpose. *See, e.g.*, *Burlington Coat Factory*, 114 F.3d at 1426 (recognizing that a "document *integral to or explicitly relied* upon in the complaint" may be considered in a motion to dismiss in relation to a securities fraud claim (citation omitted) (emphasis in original)); *Angstadt ex rel. Angstadt v. Mid-West School Dist.*, 377 F.3d 338, 342-43 (3d Cir. 2004) (determining that consideration of certain school regulations not attached to the complaint is permissible because the claim challenged the

---

[31] *Twombly* suggests that the Court *might* be able to take judicial notice pursuant to Fed. R. Evid. 201 of the "full contents of . . . published articles referenced in [a] complaint, from which . . . truncated quotations were drawn." *Twombly*, 550 U.S. at 568 n.13. This suggestion appears in that case in relation to a narrow factual context where a *Chicago Tribune* article reported on a defendant-speaker's thoughts on a matter that were only selectively excerpted in the complaint, and is inapplicable to the scenario at bar where Rose Acre appears to proffer them to the Court for purposes of examining the content of an article published in an unauthenticated industry periodical.

Furthermore, Rose Acre has not articulated any basis for the Court to consider these materials through judicial notice or any other grounds. Rose Acre merely attached the materials to its motion and cited them to support the substance of its arguments. Without an invocation of Fed. R. Evid. 201 and a basis for applying it here, "judicial notice remains discretionary with the trial judge," 21B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5107.1, and the Court adheres here to conventional Third Circuit case law in considering materials outside of a pleading.

reasonableness of those regulations). Here, Plaintiffs' antitrust claim against Rose Acre does not

rely on the referenced publications—such materials that may well win the day eventually for

Rose Acre or others—in such a way that the Court should consider them now at the motion to

dismiss stage.[32] Thus, to the extent that Rose Acre is interjecting factual assertions external to

the SAC, the Court declines to consider them. *See Flat Panel*, 586 F. Supp. 2d at 1117 ("[A]t

this stage of the litigation the Court's review is limited to the pleadings, and the Court may not

consider factual assertions about the nature of [a defendant]'s business.").

In support of its contention that an alternative legitimate explanation for its conduct

exists, Rose Acre also stresses that it was not part of the "core group" of defendants who

initiated the overarching conspiracy. Rose Acre argues that the pleading against it must allege

that it "knowingly joined in any agreement with the common purpose of achieving an illicit

restraint on competition" and the SAC fails to do so. Rose Acre Reply at 10. In other words,

because Rose Acre is not alleged to be an original member of the flock, but rather a latecomer,

its conduct alleged in the SAC and eventual certification under the UEP Certification Program

do not plausibly suggest Rose Acre knowingly joined or agreed to participate in the overarching

conspiracy to reduce the supply of eggs.[33] Notwithstanding this argument—which otherwise

---

[32] By illustrative contrast, the UEP Certification guidelines are arguably integral to Plaintiffs' antitrust claim under this standard. But this example is purely academic because, *inter alia*, no Defendant has offered authenticated guidelines in connection with a motion to dismiss.

[33] Plaintiffs appear to misconstrue this argument. In response to Rose Acre, Plaintiffs raise the unrelated issue of whether an antitrust conspirator needs to have participated in all aspects of the conspiracy in order to be vulnerable to liability, contending that "late entry into a conspiracy does not exonerate a defendant from liability for what previously occurred." Pls.' Resp. at 44. Given that Rose Acre argues that its alleged latecomer status is a factor that suggests that Rose Acre did *not* agree to the overarching conspiracy to reduce egg supply, Plaintiffs' argument as articulated is irrelevant to Rose Acre's Motion. It follows that the Court need not and shall not

(continued...)

may prevail on the merits at a later stage of this suit—"latecomer status" is not enough to undercut the SAC's overall allegations as to Rose Acre which plausibly suggest that it agreed to the overarching conspiracy.  As discussed above, certification under the UEP Certification Program, as alleged, is an act consistent with agreement to the offending conspiracy.  The SAC alleges that the companies who became certified under the UEP Certification Program were required to undertake, in order to obtain and maintain their certification, certain measures that have the effect of reducing that company's output of eggs and without apparent legitimate business rationale.

Moreover, Rose Acre's certified status does not exist in a vacuum.  The SAC alleges that Rose Acre was represented at meetings at which decisions were made and actions taken that advanced the conspiracy and where conspirators openly acknowledged the virtues of various coordinated actions.  Additionally, Rose Acre's representative allegedly made comments evincing awareness of certain features of the egg market that could be manipulated by actions that impacted supply.  Moreover, Rose Acre's participation in the export program, while

---

(...continued)
address here whether a latecomer can be liable for earlier alleged conspiratorial participation in a civil antitrust action, but observes that the Third Circuit Court of Appeals may not have directly weighed in on this issue in all pertinent respects.  *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 710 F. Supp. 152, 153-54 (E.D. Pa. 1989) ("[T]he general rule seems to be that civil liability, too, is unaffected by the duration of one's participation in the conspiracy.  Whether the Third Circuit Court of Appeals would apply this 'late joinder' rule is, however, not altogether clear."); *Daniel Boone Area Sch. Dist. v. Lehman Bros., Inc.*, 187 F. Supp. 2d 400, 414 (W.D. Pa. 2002) ("[C]o-conspirators might be liable for acts committed prior to their joining the conspiracy." (citation omitted)).  *But see Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1491 & n.16 (3d Cir. 1985) ("Conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. . . . Those who, with knowledge of the conspiracy, aid or assist in carrying out the purposes of the conspiracy make themselves parties thereto and are equally liable to or guilty with the original conspirators." (citation omitted)), *vacated*, 475 U.S. 1105, 1105 (1986), *remanded to* 823 F.2d 49 (3d Cir. 1987).

arguably consistent with legitimate, self-interested business conduct if viewed in a vacuum, also

must viewed within the framework of Rose Acre's overall alleged conduct.  Thus, the allegations

as to Rose Acre's mere attendance at meetings and public and private comments, when coupled

with the allegation of certification under the UEP Certification Program and participation in the

export program, plausibly suggest, at least at this stage of the litigation, that Rose Acre

knowingly agreed to join the alleged conspiracy.  *See Southeastern Milk*, 555 F. Supp. 2d at 943-

44 ("While viewing each of these factual allegations in isolation may lead one to the conclusion

drawn by the defendants, i.e., that there is a legitimate business justification for each of the acts,

a view of the complaint as a whole, which this Court must take, and accepting all of the factual

allegations as true, does support a plausible inference of a conspiracy or agreement made illegal

under § 1 of the Sherman Act. . . . [T]he fact that multiple instances of parallel conduct are

alleged makes it far less likely that a business justification exists for all of the acts taken in

total.").

**D.  *Ohio Fresh's Motion to Dismiss***

Ohio Fresh Eggs, LLC, takes a "Sam-I-am" approach in opposing the SAC, raising

numerous arguments in support of its one menu item, but even when considering the motion in a

house, with a mouse, in a box, or with a fox,[34] the Court is unpersuaded to bite.  First, Ohio Fresh

emphasizes that the SAC does not allege that it engaged in a wide range of conduct that is

purported to have advanced the offending conspiracy.  Ohio Fresh Mot. at 4; Ohio Fresh Reply

at 3.  For example, Ohio Fresh emphasizes that there is no allegation that it served on a UEP

Board or committee or that it participated in the USEM export program.  Ohio Fresh also argues

---

[34] *See* Dr. Seuss, *Green Eggs and Ham* (1960).

that there are no allegations that charge that it was part of the "core group" that devised or

advanced the alleged conspiracy.  Ohio Fresh likewise points out that there is no averment that it

participated in the coordinated actions alleged to have occurred in the early years of the

conspiracy.  As discussed above, however, there is no requirement that allegations pertaining to

one defendant mirror those against other defendants in terms of specific conduct or "quantity" of

alleged "bad acts."  Indeed, a defendant need not be accused of having engaged in all activities

alleged to have advanced the conspiracy.  In this respect, the absence of certain allegations as to

Ohio Fresh when compared to other named defendants does not represent a debilitating

deficiency in the SAC.[35]

Second, Ohio Fresh urges the Court to categorize it separately because it operates

pursuant to a federal court decree and a state consent order that apparently place restrictions on

Ohio Fresh's hen population:

> In its initial motion to dismiss *(Dkt. 152)*, [Ohio Fresh] noted that it was incorporated on
> April 21, 2003 and, since its inception, it has operated under a federal court decree and a
> state consent order which placed specific conditions and limits on the total number of
> birds which could be housed by [Ohio Fresh] at its facilities.  Nevertheless, in the [SAC],
> the Direct Purchaser Plaintiffs do not allege how [Ohio Fresh] participated in their

---

[35] Additionally, the Court notes that Plaintiffs have argued that their theory as alleged does not
require participation by all Defendants in all coordinated actions at all points throughout the time
period at issue.  They contend that Defendants agreed to manipulate supply and from there,
"looked around at the industry and the economy," and determined the means to best achieve the
alleged agreement, which resulted in Defendants engaging in "different means over the time to
control or manipulate supply."  Day 1 Tr. at 94:5-15.  It remains to be seen at a later stage in this
litigation if this theory ultimately proves too much or too little, such as if the evidence eventually
discloses so many different, differing, and distinct acts by the various remaining Defendants that
no image of a defined "conspiracy" emerges.
Additionally, the Court also notes that while Ohio Fresh appears to raise a latecomer-
esque argument in simple chronological terms, its claims in this regard do not have the same
implications as Rose Acre's latecomer argument.  The Court does not here credit Ohio Fresh
with authentic latecomer status for purposes of trying to avoid potential liability.

> alleged conspiracy given the federal and state operating restrictions of its facilities and its bird populations.

Ohio Fresh Mot. at 2 (emphasis in original). Although Ohio Fresh cross-references its prior motion to dismiss Plaintiffs' First Amended Consolidated Complaint, it does not explicitly request that the Court consider the substance of that prior motion. Likewise, it does not provide grounds or supporting legal authority as to why the Court can or should consider that mooted motion. *See* January 6, 2010 Order (Doc. No. 226). More to the point, the consent decrees are not made exhibits to the new motion, and Ohio Fresh neither asks, nor provides any basis for, the Court to consider these decrees in connection with its motion.

Even assuming, *arguendo,* that the consent orders are consistent with Ohio Fresh's advocacy here and, indeed, do limit the maximum number of birds that Ohio Fresh can house, it is unclear at this stage of litigation whether such a limitation would be at odds with the alleged conspiracy to reduce the supply of eggs and Ohio Fresh's alleged conduct that supposedly exposes its agreement to join the conspiracy.[36] While Ohio Fresh may ultimately prevail upon an argument premised upon the consent orders, the argument is an affirmative defense, more appropriate for resolution on the merits than for testing the sufficiency of the SAC. Without full explication as to the consent orders, the Court declines to consider and interpret them in connection with Ohio Fresh's current motion to dismiss.

---

[36] Similarly, as Plaintiffs argue, consideration of the Ohio Fresh's argument would require consideration of whether Ohio Fresh complied with the orders and to what extent its conduct is connected to the orders, which would be inappropriate at the motion to dismiss stage. *See* Pls.' Resp. at 64 n.22; *see also S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) ("Specifically, on a motion to dismiss, we may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity." (citations omitted)).

Third, Ohio Fresh attacks the SAC for failing to allege that Ohio Fresh "acted independently or separately from the alleged activity of Hillandale Farms—Ohio Fresh's alleged involvement is only as an 'affiliate and supplier' of Defendant Hillandale Farms as an 'integrated enterprise.'"  Ohio Fresh Mot. at 4; Ohio Fresh Reply at 3.  Indeed, the allegations as to the relationship between companies with the "Hillandale" name and Ohio Fresh are rather ambiguous.  The SAC alleges "[p]ursuant to agreements executed December 26, 2003, Hillandale PA purchases all eggs produced by Ohio Fresh" and that Ohio Fresh is an "affiliate and supplier" of Hillandale Farms.  SAC ¶¶ 79, 89-90.  As discussed, *infra*, with respect to the Hillandale Entities' motion to dismiss, the SAC alleges that "Hillandale Farms" is "a vertically integrated supplier . . . directly involved in every aspect of egg production and distribution."  *Id.* ¶ 80.

Ohio Fresh may protest that there are no allegations that it acted "independently or separately" from "Hillandale Farms," but this characterization of the SAC does not bear out upon a fair reading of its allegations.  The SAC is not ambiguous in pleading specific facts as to Ohio Fresh and its alleged conduct.  In order for the SAC to survive Ohio Fresh's motion, those specific facts need only plausibly suggest Ohio Fresh's agreement to the overarching conspiracy, notwithstanding its alleged relationship to "Hillandale Farms."  Plaintiffs have satisfied this requirement.  The SAC expressly avers that Ohio Fresh adopted the UEP Certification guidelines to reduce chick hatch and obtained a certification number.  Ohio Fresh also allegedly was a UEP member and attended UEP meetings at which aspects of the conspiracy supposedly were outlined.  *See, e.g.*, *id.* ¶¶ 225, 291.  As discussed above, these actions are enough to suggest plausibly Ohio Fresh's agreement to the conspiracy for initial pleadings' purposes.

Additionally, the SAC charges Ohio Fresh with other conduct that is consistent with the conspiracy.  As averred at least, Ohio Fresh agreed to a plan similar to one that required producers to "molt flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until Aug. 1, 2004." *Id.* ¶¶ 279-80.  Ohio Fresh also allegedly signed a written commitment agreeing to one of two options:  either to dispose of hens four weeks earlier than scheduled during the first quarter of 2005 or to reduce flock size by five percent during that same time period." *Id.* ¶¶ 290-91.  Notably, these management mechanisms—molting, disposal, and flock reduction—all, at least facially, function *to reduce hen numbers and ergo total egg supply (in the case of molting, hens cease egg output for about two months, id. ¶ 130).*  Through these agreements, it appears that producers consented to manage their flocks based upon fixed time periods or percentages because other producers agreed to do the same, rather than making flock management decisions based upon more typical factors—such as their own flocks' productivity—specific to an individual producer.  *See, e.g.*, *id.* ¶¶ 129-30 (describing that "post-peak egg production (after 30 to 32 weeks of age) continually decreases to approximately 50 percent around 60 to 70 weeks of age" and that "[w]hen the flock declines to around 50 percent production, producers may decide to molt the flock").  As alleged, the agreements seem to be mechanisms to cut egg supply deliberately and arbitrarily, without a legitimate, independent business explanation in the absence of agreement.  Accordingly, the SAC presents facts as to Ohio Fresh that establish sufficient grounds to infer at this stage of the litigation that Ohio Fresh agreed to the overarching conspiracy.

Fourth, Ohio Fresh argues that despite the SAC's allegations that it twice agreed to molt and dispose of hens in 2004, the SAC does not allege that Ohio Fresh actually reduced flock size

after making such agreements or ever "during any other timeframe [sic] throughout the alleged ten-year conspiracy at the request of UEP or a competitor."  Ohio Fresh Reply at 3.  According to Ohio Fresh, even if the SAC had alleged that Ohio Fresh disposed of hens pursuant to such a commitment, doing so "does not mean that you're not filling with p[u]llets, hatcheries, and increasing your supply in the future."  Day 2 Tr. at 134:8-11.  In raising these points, it appears that Ohio Fresh is arguing that agreement to engage in at least early hen disposal does not necessarily imply agreement to the overarching conspiracy to reduce egg supply because a producer could indeed increase its overall supply of eggs through other means.  As discussed above as to Michael Foods' and Rose Acre's motions, Ohio Fresh's argument that it could have increased its egg production while concurrently participating in the UEP Certification Program and making commitments to molt or reduce its flock is not consistent with the egg-producing world alleged in the SAC.

Because Plaintiffs have alleged specific facts sufficient to suggest that Ohio Fresh joined the alleged conspiracy to reduce the supply of eggs, Ohio Fresh is "on notice concerning the basic nature of [the Plaintiffs'] complaints against [it] and the grounds upon which their claims exist."  *See Southeastern Milk*, 555 F. Supp. 2d at 943.  Accordingly, the Court denies Ohio Fresh's motion.

### E.  Hillandale Entities' Motion to Dismiss

Hillandale Gettysburg L.P., Hillandale Farms Inc., and Hillandale Farms East, Inc. (collectively, the "Hillandale Entities") assert that they are entitled to dismissal because the SAC lacks sufficient allegations specific to these Defendants to support any inference that they each were a party to the agreement to restrict the supply of eggs.  They argue that Plaintiffs, by

lumping the three entities together, have failed to allege specific facts that either connect each or any individual entity to the overarching conspiracy, or alternatively, satisfy the requirements for imputing another affiliated entity's liability to the Hillandale Entities. They are, to the Court's satisfaction, correct.

The SAC alleges that although the three entities have separate legal forms and principal places of business located variously in Pennsylvania, *id.* ¶¶ 85-87, the Hillandale Entities have an affiliated relationship *inter se*. Plaintiffs aver that they share ownership or control in common through three individuals, Orland Bethel, Gary Bethel, and Don Hershey. *Id.* ¶ 80. Plaintiffs plead that Gary Bethel and Orland Bethel allegedly own Hillandale Farms East, and are, respectively, the company's president, and secretary and treasurer; Orland Bethel and Gary Bethel own Hillandale Farms, Inc. with Gary Bethel serving as the company's president; Orland Bethel and Don Hershey own Hillandale-Gettysburg with Mr. Hershey serving as president and general partner. *Id.* ¶¶ 85-87. The Hillandale Entities also together are purported to "function as an integrated enterprise producing and selling shell eggs" along with a fourth entity, Hillandale Farms of Pa., Inc.[37] *Id.* ¶ 79. The SAC refers to the four entities collectively as "Hillandale Farms." *Id.*

The concept of "vertical integration" is central to the Plaintiffs' theory that the Hillandale Entities are involved in the overarching conspiracy, and the SAC describes vertical integration in one of two contexts. As alleged, a business that is "vertically integrated" is "integrated from the point of production through final marketing and sale." *Id.* ¶ 457; *see also id.* ¶ 408. As such, according to Plaintiffs, "vertically integrated firms mill their own feed, hatch chicks, rear pullets,

---

[37] Hillandale Farms of Pa., Inc., is also a named Defendant and chose to answer the SAC. *See* Answer (Doc. No. 246).

confine hens, produce and/or purchase eggs, wash, candle, grade, store, market, transport and distribute their own eggs." *Id.* ¶ 457. Vertical integration is purportedly the predominant business model across the egg industry and "[m]ost of the large firms now either own egg production facilities or have production contracts with local egg producers." *Id.* ¶ 124. The SAC further pleads that "Hillandale Farms" is "a vertically integrated supplier . . . directly involved in every aspect of egg production and distribution," and that each of the Hillandale Entities "is part of the Hillandale Farms integrated enterprise." *Id.* ¶¶ 80, 85-87.

The SAC predominantly attributes alleged conduct that ostensibly advanced the conspiracy to "Hillandale Farms." For example, Plaintiffs charge that "Hillandale Farms" "adopt[ed] UEP Certified guidelines to reduce chick hatch (certification nos. 182 and 328)", "signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens", was a "member of USEM and/or participated in egg exports, sharing any associated financial losses with other members." *Id.* ¶ 90. As pled, "UEP newsletters also reported that Hillandale Farms completed animal care certified audits, was a certified company and licensed marketer, and displayed the animal care certified logo on its packages." *Id.* ¶ 82.

Although these factual allegations are rather specific in nature, more robust factual details explicitly link only Hillandale Farms of Pa., Inc. or "Hillandale Farms – PA" to these alleged activities. For example, the SAC alleges that "Hillandale Farms – PA" agreed to the UEP Certified Program as of 2003, maintains certification no. 182 under the program, and signed a written commitment sheet to either reduce flock size or dispose of hens earlier than scheduled. *Id.* ¶¶ 257, 291, 301, 448. The SAC also alleges that the *Pittsburgh-Post Gazette* reported that Gary Bethel, as "a spokesman for Hillandale Farms of Pennsylvania," commented that, "We've

been taking a proactive approach towards allowing caged chickens more space . . . . If we had a house that held 100,000 chickens five years ago, it would house 80,000 now, and that means quite a reduction in total egg numbers."  *Id.* ¶ 369.

The remaining, more specific SAC allegations that use the arguably non-specific or, alternatively, "umbrella" term "Hillandale Farms" refer to "Gary Bethel (Hillandale Farms)" as a member of the UEP marketing committee on January 26, 2004 and May 10, 2004, and as a board member who attended a Board of Directors Legislative Meeting on May 12-15, 2003.  *Id.* ¶¶ 264, 272, 336.  "Hillandale Farms" allegedly maintains Certification No. 182 under the UEP certification program.  *Id.* ¶ 448.  The SAC also alleges that "Hillandale," a name or term that is undefined in the SAC, was a USEM member that received a March 20, 2003 memorandum from Gene Gregory addressed to all USEM members.  *Id.* ¶ 334.

As this narrative of the SAC's allegations against the Hillandale Entities, "Hillandale Farms," and "Hillandale" demonstrates (and as Plaintiffs appear to concede), Plaintiffs have not directly alleged that any of the Hillandale Entities individually agreed to or participated in the conspiracy to reduce the supply of eggs.  There simply is an absence of specific factual allegations in the SAC to connect each (or any) of the Hillandale Entities directly to the conspiracy.  *See Digital Music*, 2011 WL 2848195, at *20 (granting motion to dismiss as to three defendant corporations, in part, because the complaint does not allege their "direct involvement" in the alleged conspiracy"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Nos. M 07-1827 SI, C 09-5609, 2010 WL 2629728, at *7 (N.D. Cal. June 29, 2010) (granting PENAC's individual motion to dismiss, in part, because "[t]here is nothing in paragraph 53 [the only allegation that "mentions" PENAC] or elsewhere alleging *how* PENAC participated in the conspiracy"); *see*

*also Invamed*, 22 F. Supp. 2d at 221, ("[Plaintiff] must allege some circumstances from which the existence of an anticompetitive agreement, express or implied, of which the Affiliates were a part can be inferred." (citation omitted)).

When defendant corporate entities "are not plausibly alleged to be directly liable—that is, are not plausibly alleged to have themselves entered into unlawful agreements," there must be some "other basis imputing § 1 liability to" those entities. *Ins. Brokerage*, 618 F.3d at 341 n.44; *cf. In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009) ("[T]o state a claim against the Parent Corporations, Plaintiffs either must set forth facts establishing direct participation in the alleged conspiracy or set forth sufficient allegations showing that the Parent Corporations are vicariously liable for the acts of their subsidiary corporations."). This is because "[a]s a matter of well-settled common law, a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship." *Ins. Brokerage*, 618 F.3d at 341 n.44 (citing William Meade Fletcher, *Cyclopedia of Law of Private Corporations* § 33, at 89 (perm. ed. rev. vol. 2006)); *Burks v. Lasker*, 441 U.S. 471, 478 (1979)). Indeed, absent some basis for imputing liability, subsidiary entities cannot automatically sustain liability "under § 1 for any agreements to which the parent is a party." *Id.*

In an attempt to assert some "other basis" for liability against the Hillandale Entities, Plaintiffs argue—without using the term—what is essentially a "single enterprise" theory for imputing liability. They claim that in the antitrust context separately incorporated legal entities may, as a practical matter, be treated as a single entity for purposes of illegal conduct and hence liability: "[T]he actions of the multiple Hillandale Defendants were really unilateral behavior

63

flowing from decisions of a single enterprise." Pls.' Resp. at 52.  It follows, they contend, that piercing the corporate veil or other established theories for imputing liability among corporate entities by permeating their borders are inapposite to the issue at hand.  Indeed, Plaintiffs expressly do not raise these theories in support of the SAC.  The issue, according to Plaintiffs, concerns whether the Hillandale Entities were "integrated," or in other words, operated together, with respect to alleged conduct that advanced the conspiracy.  Plaintiffs submit that the pleading requirements of "integration" for antitrust liability purposes apply a less stringent standard than those of veil piercing.  Their argument follows that they have sufficiently alleged that the entities played a role in the conspiracy through a "single enterprise" theory by alleging that through vertical integration and overlapping owners and management each of the Hillandale Entities is a part of an integrated enterprise.  Plaintiffs maintain that on the basis of their "single enterprise" theory the conduct alleged as to "Hillandale Farms" is thereby attributable to each of the Hillandale Entities.  As such, Plaintiffs contend, it is unnecessary for the SAC to allege additional facts that directly connect each of the Hillandale Entities to the conspiracy.

This argument is unpersuasive for several reasons.  As a predicate, Plaintiffs claim that the separately incorporated entities can constitute a single entity with respect to illegal antitrust conduct.  But this is unsupported by the spare legal authority Plaintiffs present in their brief and oral argument materials.  Notably, such legal authorities as Plaintiffs offer primarily entail excerpted case quotations, which when read in the context of the actual cases, do not carry the import of what Plaintiffs attempt to muster.

This is certainly true concerning Plaintiffs' reliance on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752.  Plaintiffs attempt to invoke the concept articulated in

64

*Copperweld* that "the concerted activity of two entities [within a corporate family] . . . is really

unilateral behavior flowing from decisions of a single enterprise," *id.* at 766-67, by asserting that

a parent and its wholly owned subsidiaries "are not unlike a multiple team of horses drawing a

vehicle under the control of a single driver," *id.* at 771.  Plaintiffs' application of *Copperweld* in

this manner is an attempt to unhitch the team from the harness.  Indeed, the Court of Appeals for

the Third Circuit recognized this when it confronted and rejected a virtually identical line of

argument:

> Plaintiffs argue that subsidiary companies "act[ ] at the common direction of the parent[]," Plaintiffs' Comm.  Reply Br. 12, and that "in reality a parent and a wholly owned subsidiary always have a unity of purpose or a common design," Plaintiffs' EB Reply Br. 35 (quoting *Copperweld*, 467 U.S. at 771) (internal quotation marks omitted). Emphasizing these features of the parent-subsidiary relationship, the Supreme Court held in *Copperweld* that parents and subsidiaries could not conspire for purposes of § 1 of the Sherman Act.  467 U.S. at 776; *see Am. Needle*, 130 S. Ct. at 2212 (noting that an "agreement" is cognizable under § 1 only if it "joins together 'independent centers of decisionmaking' " (quoting *Copperweld*, 467 U.S. at 769)).  Contrary to plaintiffs' suggestion, . . . it does not follow from *Copperweld* that subsidiary entities are automatically liable under § 1 for any agreements to which the parent is a party."

*Ins. Brokerage*, 618 F.3d at 341 n.44.  Other courts have likewise rejected this attempt to draw a

"single enterprise" theory from *Copperweld*.  *See Fla. Cement*, 746 F. Supp. 2d at 1324

(". . . Plaintiffs do not explain why, if *Copperweld* eliminated antitrust liability for cooperation

between parent corporations and subsidiaries . . . , [the parent] should be held liable for [the

subsidiary]'s alleged participation in the concrete conspiracy in this case." (relying on *Mitchael*

*v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir.1999)); *cf. Sun Microsystems Inc. v. Hynix*

*Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1185-86 (N.D. Cal. 2009) ("While true that a single

entity doctrine was announced in *Copperweld*, . . . [t]he doctrine . . . expressly deals with the

question whether a parent and subsidiary corporation may be charged with conspiring with each

other, and not, as is the case here, with the question whether those two entities may collectively

be treated as a single entity for purposes of jurisdictional antitrust standing.").

Furthermore, the allegations of "vertical integration" and overlapping ownership and

control, as they are advanced, do not support the heavy load that Plaintiffs have lifted upon them.

Vertical integration is a term that the SAC defines vaguely,[38] but in essence, it is alleged to be a

business model, one that is structured around the egg supply chain.  As used by Plaintiffs, the

term alone certainly does not intimate that the Hillandale Entities, by allegedly being a part of a

vertically integrated enterprise, are so linked that they effectively function as single entity with

respect to alleged antitrust conduct.

This conclusion remains undisturbed even considering Plaintiffs' contention that the

Hillandale Entities have common ownership and control.  Plaintiffs have not alleged that the

Hillandale Entities are a part of a conventional parent and wholly-owned-subsidiary corporate

structure.  Instead, the entities merely are alleged to have individuals in overlapping ownership

or controlling roles, and it cannot be said these allegations plausibly suggest that the entities are

under common ownership or control such that a single decision-making source exercises

definitive control over each of them.  *See* Fletcher, *supra* § 43 ("Common officers and

---

[38] The Hillandale Entities argue that the vagueness of "vertical integration" is akin to that of "governing sponsor," used by the plaintiffs in *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119.  Indeed, there are parallels between the terms. With respect to "governing sponsor" the *Jung* Court found:

> [The] meaning of the term "governing sponsor" is far from self-evident, and plaintiffs do not make any assertions with respect to what role governing sponsors play for [other individual defendants].  The Court will not speculate as to the purpose or activities of a "governing sponsor" or infer from this vague term that [an alleged sponsor engaged in certain alleged conduct] . . . . While all inferences are to be drawn in favor of plaintiffs on a motion to dismiss, the Court will not draw inferences from such vague, unsupported allegations."

*Id.* at 163.

management are not incompatible with separate entities or conclusive of identity . . . ."); *cf. In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 290 (E.D. Pa. 2009), *appeal denied,* Nos. 09-2257, 09-2258, 2011 WL 3672510 (3d Cir. Aug. 23, 2011) ("While some overlap existed in ownership between the affiliated distributors and the member growers, they were not under common control in the same sense as is a corporation and its wholly-owned subsidiary, a corporation and its divisions or as are two corporations owned in identical proportions by the same set of investors . . . . The affiliated distributors do not have 100% ownership or a de minimis deviation from complete ownership and there is no indication that the overlapping owners would have control independent of their co-owners." (citations omitted)). Moreover, the mere "fact that two corporations have common shareholders, officers or directors, or that their names are similar," does not "impose liability on one for the torts of the other or its agents." Fletcher, *supra* § 4878.  Without specific allegations that would support how or why overlapping, but non-identical, ownership and management combinations might intimate common ownership and control, Plaintiffs' contentions of common ownership are entirely unsupported by the SAC.

Due to the absence of allegations in the SAC suggestive of either independent liability or a basis for imputing liability, Plaintiffs have not met their pleading obligations as to the "Hillandale Entities."  Plaintiffs' proposed basis for imputing liability premised on a "single enterprise" theory is unsupported by legal authority and does not provide occasion to disregard the separate corporate forms of these entities and impose liability on them.

Additionally, the allegations in the SAC concerning vertical integration and the entities' ownership and control dynamics do not conform with the characterizations that Plaintiffs attempt

67

to assign them. Given that their basis for imputing liability is not cognizable and that Plaintiffs

raise no other theories for imputation of liability, general allegations as to "Hillandale Farms" or

"Hillandale" are insufficient to give notice to the Hillandale Entities of the claims against them.

*See TFT-LCD*, 586 F. Supp. 2d at 1117 ("[G]eneral allegations as to all defendants, to 'Japanese

defendants,' to a single corporate entity such as 'Hitachi' is insufficient to put specific

defendants on notice of the claims against them."); *cf. Flat Panel*, 2010 WL 2629728, at *7

("[A]llegations and assertions about [alleged related companies] are insufficient to state a claim

against PENAC unless the complaint alleges a specific connection between PENAC and the

alleged conspiracy."). The SAC's few specific allegations as to the Hillandale Entities in no way

imply that the entities directly agreed to or participated in the conspiracy, and as such, fail to

provide such notice so that any of the Hillandale Entities seeking to respond to the SAC "would

have little idea where to begin." *Twombly*, 550 U.S. at 565 n.10. Accordingly, the Court

concludes that the Hillandale Entities' motion should be granted in part but without prejudice for

Plaintiffs to seek leave to amend the complaint to more specifically plead how these defendants

allegedly joined the alleged conspiracy other than as a conveniently scrambled group.[39]

---

[39] "Leave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962), and *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993)). The Hillandale Entities urge the Court to dismiss the SAC with prejudice and without leave to amend the complaint, arguing that "[t]o allow Plaintiffs to amend their Complaint yet again, imposing still more expense and delay on the Moving Defendants for their own failures to plead, would not be fair to the Moving Defendants, to the other parties in this suit, or to the Court." Hillandale Entities Mot. at 11. At this juncture, while acknowledging that such arguments are not unexpected and are not without certain objective merit, the Court does not find that these arguments provide sufficient grounds to weigh against granting Plaintiffs leave to seek to amend the claims against the Hillandale Entities. Of course, the Court would expect any new effort by Plaintiffs to amend as to any of the Hillandale Entities would represent and entail a meaningfully more substantive claim as to the individual entities than was mounted against any one of—or all

(continued...)

*F.  UEA's Motion to Dismiss*

UEA argues that the SAC's allegations pertaining to it either are merely conclusory, or simply do not support the inference that UEA joined or participated in the alleged conspiracy. According to UEA, the SAC fails to allege any freestanding conduct that could suggest participation—namely, any conduct by UEA relating to the eight coordinated actions alleged to have advanced the conspiracy—and there are insufficient alleged facts to perceive UEA's participation through any imputation of liability theories.  The Court agrees.

Plaintiffs allege that UEA is a 501(c)(6) nonprofit corporation organized under the laws of the District of Columbia.  SAC ¶¶ 108, 178.[40]  Its principal place of business is located in Alpharetta, Georgia.  *Id.* ¶ 108.  The SAC twice mentions that UEA shares the same address with UEP and USEM.  *Id.* ¶¶ 181, 441.  UEA, as averred, "has three divisions: (I) Further Processors (egg breaking and further processing), (ii) Producers and Packers, and (iii) Allied Industries (products, services, and consulting)" and its IRS Form 990 allegedly states its "'primary exempt purpose' is to 'promote, educate [and] defend issues for [the] egg industry.'"  *Id.* ¶ 178; *see also id.* ¶ 410.  These three divisions are said to be part of "an 'alliance' of five separate organizations providing services to the egg industry" and "represent[ing] the interests of all sectors of the egg industry."  *Id.* ¶¶ 176, 463.  The other two alleged members of the "United Egg 'Alliance,'" *id.* ¶

---

(...continued)
of—them in the SAC.

[40] There is a conflict in the SAC concerning the UEA's state of incorporation.  In contrast to Paragraph 108, Paragraph 178 alleges that UEA is an "organization existing under the laws of Georgia."  *Id.* ¶ 178.  At oral argument, however, UEA's counsel noted that UEA was organized in the District of Columbia.  Day 2 Tr. at 145:6-8.

463, are UEP and USEM, *id.* ¶ 176.  The SAC further generally alleges that UEP "manages" and "oversees" the "United Egg 'Alliance'" and "manages" the UEA.  *Id.* ¶¶ 177-78.

Plaintiffs repeat throughout the SAC the general claim that there was overlap in membership and leadership across UEA, UEP, and USEM.  *Id.* ¶¶ 437, 450.  For example, the SAC alleges that "Gene Gregory is president of all three entities (UEP, UEA, and USEM)."  *Id.* ¶ 450; *see also id.* ¶ 443.  Additionally, Mr. Gregory's son, Chad Gregory, is said to be a senior vice president for UEA and UEP.  *Id.* ¶ 444.[41]  According to the SAC, "[i]n 2004, Toby Catherman of Michael Foods was elected chairman of UEA and Dan Meagher of Moark was elected vice chairman.  Michael Foods and Moark were also members of UEP and their employees held positions in the UEP, as well."  *Id.* ¶ 437.  As another example, the SAC avers "in October 2005, Dan Meagher of Moark was elected chairman of UEA, and Greg Hinton of Rose Acre Farms was elected vice-chairman. Rose Acre Farms was a member of UEP and its employees held positions in the UEP."  *Id.* ¶ 438.  Plaintiffs also broadly and unprecisely charge that "UEP and UEA share staff."  *Id.* ¶ 451.

Additionally, the SAC contains a hodgepodge of statements asserting that on occasions UEA members attended UEP Board and committee meetings, and that UEA and UEP held meetings at concurrent times and places.  For example, one such allegation avers that a UEP April 2004 newsletter implies that UEA members had attended past UEP meetings and expresses UEP's "hope the [UEA] Allied members will continue to attend UEP's Spring Legislative meeting because this meeting is so critically important to our customers (egg producers)."  *Id.* ¶ 434 (alteration in original).   The UEP's May 2004 newsletter allegedly reported that UEA

---

[41] There is a conflicting allegation in the SAC's Paragraph 331 that Chad Gregory was "Senior Vice President of the UEP and member of the UEA."  *Id.* ¶ 331.

members attended the UEP's Spring Legislative Meeting in Washington, D.C., and "participated in committee meetings [and] [the] board meeting." *Id.* ¶ 435 (first bracket in original).

Plaintiffs also plead that UEP and UEA scheduled their organizations' respective annual meetings to be held "in conjunction" with the others' "and members of both organizations attend joint meetings." *Id.* ¶ 433.   For example, UEA apparently held its annual meeting "in conjunction" with the UEP annual meeting in 2007 in San Antonio. *Id.* ¶ 433 n.96.   Another such occasion is mentioned as to when both annual meetings were held was on October 20-22, 2004 in New Orleans. *Id.* ¶¶ 284, 434.   The SAC generally refers to these meetings as "UEP's and UEA's joint Annual Board Meeting in New Orleans," *id.* ¶ 284, but specifically pleads that the meetings were distinct:   "[I]n its April 2004 newsletter, UEP noted: 'UEP's Annual Meeting will be held in New Orleans on October 20-22.   UEA will schedule a time during the October dates to hold their [sic] annual membership meeting.'" *Id.* ¶ 434.   Additionally, the SAC alleges that the UEA division for "Further Processors" invited the UEP Executive Committee to its meeting on April 27, 2004. *Id.* ¶ 436.

The SAC further alleges that "after the filing of this action . . . UEP . . . prohibited UEA and non-egg producers from participating in . . . meetings. . . ." *Id.* ¶ 466.   UEP's January 20, 2009 newsletter allegedly states:

> It should be noted that the Animal Welfare and Marketing Committees will be closed to UEP members only.   Additionally, the Board of Directors meeting will include a time period at the close of the meeting, for UEP Board members only.   UEP meetings have always been open to everyone and therefore we apologize that circumstances now warrant some meetings or portions of some meetings to be closed to selected members. We hope [UEA] allied members and others will be understanding.

*Id.* (emphasis and alteration in original).

The final category of allegations as to UEA concerns its purported "financial support for many of UEP's projects." *Id.* ¶ 451. Plaintiffs charge two such instances of UEA's alleged financial support. The first is recounted in an article reporting on what seems to be the New Orleans UEA annual meeting in the October 2004 UEP newsletter, which states:

> UEA-Allied members continue to be extremely supportive of UEP and of assistance to the egg industry. The members held their annual membership meeting in New Orleans and voted to set aside $20,000.00 that may be used by UEP for animal welfare research projects. Additionally the organization approved a budget, which will provide $40,000.00 for UEP[']s management.

*Id.* ¶ 452. The other instance referenced in the SAC as to UEA's alleged financial support entails UEA allegedly "approv[ing] a budget which will provide approximately $70,000.00 [in] support for UEP programs and management," as described by UEP's October 2005 newsletter. *Id.* ¶ 453.

Based on these allegations, the Court concludes that Plaintiffs have failed to suggest plausibly that UEA joined the alleged conspiracy. The specific facts alleged simply do not support the SAC's bald contention that "UEP has conspired with UEA and its non-producer members and USEM to implement its unlawful supply control campaign at numerous industry meetings." *Id.* ¶ 465. The SAC's allegation that "UEA and its members were aware of, supported, and participated in the conspiracy . . . ." is similarly unsupported. *Id.* ¶ 411.

A claim for a § 1 violation cannot merely rest upon allegations of common resources and membership between incorporated trade groups, much the same as such allegations cannot sustain a § 1 claim against corporate entities that have common management. There is nothing inherently illegal or actionable for separately incorporated trade groups to share a mailing address, a president, common leadership, or staff. Likewise, no nefarious conclusions can be

drawn necessarily from the fact that meetings are held at the same time in the same town.

Indeed, Plaintiffs provide no support for such a contention despite arguing that these factual

allegations demonstrate that the SAC "directly alleges UEA's role as a co-conspirator in

implementing the supply restriction scheme."  Pls.' Resp. at 65.  At most, such circumstances

suggest opportunities (and hardly exclusive opportunities as that) to conspire with arguably

greater convenience.

A trade association "can only be held liable for concerted action if it acted as an

entity . . . . [and] concerted action does not exist every time a trade association member speaks or

acts."  *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1007 (3d Cir. 1994) (citing

*Nanavati v. Burdette Tomlin Mem'l Hosp.*, 857 F.2d 96, 117-18 (3d Cir.1988)); *see also Jung*,

300 F. Supp. 2d at 165 (same).  Therefore, "the Court will not impute the activities of [an]

organization's members to the organization itself absent allegations that the entity participated in

the conspiracy."  *Jung*, 300 F. Supp. 2d at 165.  That UEA allegedly has overlapping members

with UEP and USEM, and that UEA members may have attended UEP and USEM meetings, or

vice versa, are not sufficient alone to plausibly suggest that UEA as an entity participated in the

conspiracy.  Moreover, the specific meetings that allegedly were attended jointly do not appear

to be connected to approving or discussing conduct that allegedly advanced the conspiracy.  The

Court recognizes that a possible exception to this may be the New Orleans UEP meeting where

the UEP Board in 2004 allegedly approved a flock disposal plan, SAC ¶¶ 284-85, and UEA

members *might* have been in attendance.  However, as stated above, mere attendance at a

meeting is not enough to sustain liability for an individual corporate defendant, and certainly

could not extend to UEA merely through its members' alleged attendance.

Similarly, the Court cannot automatically impute the conduct of UEA leadership or staff to UEA.  Certainly, a trade organization can be liable for antitrust violations of its agents premised on a theory of apparent authority.  *See Alvord-Polk, Inc.*, 37 F.3d at 1009 ("[A] principal will be liable for an antitrust violation if an agent acting with apparent authority violates the antitrust laws . . . by conspiring with another person." (citation omitted)).  As a corollary, however, Plaintiffs must allege facts sufficient to demonstrate the agents were acting with the apparent authority of UEA.  *Cf.* Restatement (Second) of Agency § 8 (1958) ("Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.").

The allegations as to UEA's leadership's actions do not raise the specter that they were conducted with UEA's apparent authority.  For example, the SAC alleges that Dolph Baker, Chad Gregory, and Joseph Fortin, who are each alleged to have held leadership positions in both UEA and UEP "were strong proponents and vocal advocates of exporting large amounts of eggs outside of the United States for the sole purpose of increasing domestic egg prices," SAC ¶ 331, however, there are no allegations that would suggest that these individuals' alleged advocacy was undertaken with UEA's apparent authority.  There also is no support for the notion that Mr. Gregory acted with UEA apparent authority when he purportedly wrote "numerous articles in 'United Voices' urging egg industry output restrictions."  *Id.* ¶ 450.  Indeed, "United Voices" is alleged to be solely a UEP bi-weekly publication.  *Id.* ¶ 175.

To the extent that the SAC specifically pleads that Mr. Gregory attended "numerous meetings with UEP, UEA and USEM and other participants in the conspiracy," *id.* ¶ 450, there

74

are no allegations that suggest that Mr. Gregory was acting in a dual capacity in his attendance at

such meetings—*i.e.*, that he might be acting as president to both UEA and UEP when attending a

UEP meeting.  Likewise, there is no allegation that Mr. Gregory acted in a dual capacity when he

allegedly "directed, participated in, and authorized UEP's unlawful conduct as detailed" in the

SAC.  *Id.* ¶ 450.  Nor do the facts alleged suggest, contrary to Plaintiffs' intimation at oral

argument, that Mr. Gregory (when acting as UEA president) applied the knowledge that he

might have acquired as president for UEP or USEM, and that such knowledge was imputable to

UEA. Day 2 Tr. at 166:7-21.

     Rather, the SAC frequently is explicit in deliberately delineating Mr. Gregory's

affiliation when alleging his actions, and throughout the SAC he is predominantly alleged to

have acted under the auspices of the UEP.  *See, e.g.*, *id.* ¶ 210 (describing that at "UEP meetings

around this time . . . Gene Gregory (UEP) publicly praised the economic benefits of decreased

supply from [the UEP Certified] program."); *id.* ¶ 271 ("In a May 6th, 2004 email . . . , Gene

Gregory of UEP wrote of his concerns with the current supply demand situation and asked the

industry to participate in a new supply restriction scheme . . . ."); *id.* ¶ 286 ("On November 1,

2004, *Feedstuffs* also reported on the October meeting . . . . UEP's Gene Gregory was

quoted . . . .").  On the few occasions when the SAC does not explicitly identify Mr. Gregory's

affiliation, there are no allegations from which to infer reliably that he acted under UEA's

apparent authority.  *See, e.g., id.* ¶¶ 272-75 (describing Mr. Gregory's presentation, entitled

"Market Analysis (Now & Future)," given at a UEP's Marketing Committee meeting on May 10,

2004 in Washington, D.C.); *id.* ¶ 334 ("[O]n March 20, 2003, Gene Gregory sent a memo to all

USEM members . . . ."); *id.* ¶ 353 ("On May 14, 2007, UEP hosted a Marketing Committee

meeting in Washington, DC [sic]. . . .   Minutes from this meeting reflect:  Gene Gregory reported on the sales since UEP assumed management of USEM.").

The Plaintiffs' defense of the SAC also highlights the allegation of UEA's purported "alliance" with UEP and USEM, and that UEP "manages" this alliance.  But it is unclear for what purpose or in support of what legal theory that Plaintiffs raise these allegations.  Plaintiffs merely cite these factual allegations to support their broader claim that the SAC "alleges the conspiracy to reduce supply involved UEA and other non-producers."  Pls.' Resp. at 64.  In any case, the Court concludes that generic allegations of "alliance" and UEP's management of the "alliance" and UEA are too vague to buoy any inference that there was such a close nexus between UEA, UEP, and USEM that would suggest that UEA, by virtue of association, agreed to or participated in the conspiracy.

As stated above, UEA can only sustain § 1 liability when it acted as an entity.  But even considering the few allegations of UEA's actual conduct as an entity in connection with overall allegations against UEA and the entirety of the alleged conspiracy, the Court cannot agree that Plaintiffs have adequately stated a claim against UEA.

Indeed, very little can be divined from the allegation that UEA's "Further Processors" division invited the UEP Executive Committee to a meeting on April 27, 2004, particularly because the allegation stands virtually unadorned by any additional factual context.  Plaintiffs do not allege any additional information about the meeting, such as whether it actually was held, whether the Executive Committee accepted the invitation, what was discussed at the meeting, and so forth.

76

Furthermore, UEA's alleged financial support of UEP similarly fails to provide indicia of agreement to or participation in the purported conspiracy. The vague allegations that UEA approved the provision of funds for UEP to apply to "animal welfare research projects," UEP's "management," and UEP's "programs and management" do not suggest that UEA has financially supported UEP projects relating to the alleged output restriction scheme. There are no allegations in the SAC from which to connect these broad terms of "management," "programs," and "animal welfare research project" to the eight collective actions that allegedly advanced the conspiracy, and certainly, the use of these generic terms do not support the inference that UEA agreed to the conspiracy. In particular, the SAC does not rule out the possibility that UEP, while allegedly participating in the conspiracy, actually undertook at least some animal welfare research projects for a legitimate purpose. The SAC alleges that UEP did engage in animal welfare research. *See, e.g.*, SAC ¶ 422 (describing a study involving "preference testing and use of space studies, [which] indicate that hens need and want more space than 72 sq. in.").

Accordingly, upon review of the SAC, the Court agrees that the pleading cannot survive UEA's motion to dismiss for failure to state a claim. The Court concludes that the UEA motion must be granted, but also without prejudice. Plaintiffs may endeavor to amend their complaint to enhance their claims against UEA if, after considered evaluation, such a request seems substantively warranted.

## VI. Conclusion

For the foregoing reasons, the Court concludes that Plaintiffs have adequately alleged that Michael Foods, Daybreak, Rose Acre, and Ohio Fresh joined in the alleged conspiracy to reduce the supply of eggs. The Court thereby denies these Defendants' motions to dismiss. In

doing so, the Court is certainly cognizant that "[i]n the end, it may be found that . . . certain . . .

defendant[s] [were] not involved in the conspiracy, or had a lesser, or greater, role in the

conspiracy.  Clearly, the plaintiffs will be required to prove each particular defendant's

culpability prior to obtaining relief from that defendant in this action."  *Elec. Carbon*, 333 F.

Supp. 2d at 313.

 Because the SAC fails to suggest plausibly that the Hillandale Entities and UEA joined

the conspiracy, the Court grants those Defendants' motions to dismiss, but without prejudice to

Plaintiffs to seek the Court's leave to amend their complaint against them, provided Plaintiffs do

so in a timely manner.[42]

 An Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[42]  Given that the SAC spans hundreds of paragraphs, many of which are themselves quite
lengthy, the Court advises Plaintiffs that if they elect to seek the Court's leave to amend their
pleading and attach a proposed amended version, in order to facilitate a comparative review of
any proposed version, they should also attach as an exhibit a "redline version" inline tracking
any revisions to the SAC and provide the Court with an electronically searchable version of the
amended pleading, *i.e.*, .pdf format.