IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : **MDL No. 2002** : **08-md-02002** |
| THIS DOCUMENT APPLIES TO: ALL ACTIONS | : : : : |

## MEMORANDUM

GENE E.K. PRATTER, J.                                          OCTOBER 14, 2011

## I.  Introduction

Pursuant to a Rule 12(b)(6) motion, Defendants ask the Court to enter an order dismissing any claim by the direct purchaser plaintiffs ("Plaintiffs") in the Second Consolidated Amended Class Action Complaint (hereinafter, the "SAC") that Defendants engaged in a conspiracy to reduce the production, or raise the price, of egg products—excepting that Plaintiffs could still pursue damages for higher egg product prices as an effect of the alleged conspiracy to reduce the output of shell eggs.[1] For the reasons set forth below, the Court denies the Motion without prejudice.

## II.  Factual Allegations

In this multidistrict litigation, Plaintiffs are alleged direct purchasers of domestic eggs and egg products, who assert that Defendants—egg producers, egg products producers, both, or trade

---

[1] Defendants filed this Motion to Dismiss Any Claim by Direct Purchasers of an Egg Products Conspiracy (Doc. No. 235).  Midwest Poultry Services, L.P. joined the Motion separately by filing their Joinder in Defendants' Motion to Dismiss Any Claim by Direct Purchasers of an Egg Products Conspiracy (Doc. No. 237).

Plaintiffs' responded in opposition to the Motion in a memorandum (Doc. No. 316) (hereinafter, "Pls.' Resp.").  Defendants also filed a reply brief (Doc. No. 297).  Additionally, the parties' submitted supplemental authorities to the Court.

The transcript of the oral argument on the Motion is in the record at Docket No. 490.

groups—have run afoul of Section 1 of the Sherman Act. Specifically, Plaintiffs contend that Defendants conspired to manipulate the supply of, and thereby fix prices for, domestically-sold eggs and egg products. Defendants allegedly advanced this conspiracy through eight alleged "collective actions," which included, *inter alia*, various flock reduction and early molting initiatives, the United Egg Producers Certification Program, and United States Egg Marketers export program.

The Court previously discussed the core allegations of the SAC in its Memorandum and Order issued on September 26, 2011, 2011 WL 4465355 (Doc. Nos. 562 and 563), which granted in part and denied in part six individual defendants' motions to dismiss the SAC. The Court references that decision here for the parties' convenience and supplemental background. However, because certain SAC allegations raised in the Defendants' Motion have not been previously discussed by the Court in-depth, a specific overview of the SAC's vocabulary and concepts concerning "eggs," "shell eggs," "breaking eggs," and "egg products" is warranted.

Plaintiffs commence the SAC by setting out the term "eggs" as a defined term in the context of articulating their legal theory:

> Plaintiffs allege herein a conspiracy among Defendants and certain unnamed co-conspirators where they agreed to fix, raise, maintain and/or stabilize the prices at which shell eggs and egg products (collectively, "eggs") were sold in the United States, including by controlling the aggregate supply of domestic eggs. Each Defendant knew that it could not do this by itself and that supply needed to be "restrained" by collective action. Thus, Defendants entered into an overarching agreement to manage the aggregate supply of eggs in the United States. During the Class Period [from January 1, 2000 to present], Defendants implemented this supply management conspiracy by agreeing to take several coordinated actions.

SAC ¶¶ 1, 481. Thus, the SAC defines "eggs" as entailing both shell eggs and egg products.

According to Plaintiffs, "[s]hell eggs include both 'table eggs' (generally purchased by retail entities for resale to the consuming public) and 'breaking eggs' (generally purchased by food service entities for further processing)." *Id.* ¶ 2. "Egg products," as alleged, "are breaking eggs that have been removed from their shells and processed into dried, frozen or liquid forms." *Id.* Processing eggs into egg products allegedly "involves breaking, filtering, mixing, stabilizing, blending, pasteurizing, cooling, freezing, drying, and/or packaging." *Id.* ¶ 117. More specifically:

> The production of liquid egg products involves egg breaking, pasteurizing, and/or packing. Liquid eggs are produced as whole eggs, as well as separated into whites and yolks. The production of frozen eggs involves breaking and pasteurizing eggs that are then put into large containers and frozen. The production of most dried eggs (including whole eggs, or separated whites and yolks) involves spray drying liquid eggs. However, egg whites are often dried on trays that result in a product that will more easily dissolve in water.

*Id.* ¶ 118. Given that breaking eggs are the central ingredient for egg products, and given that breaking eggs are allegedly a subset of the broader category of shell eggs, it comes as little surprise that Plaintiffs allege that "[s]hell eggs are the key component in processed egg products." *Id.* ¶ 406.

As further background, and as if it needed to be spelled out, the SAC alleges that shell eggs—whether table eggs or breaking eggs—originate with laying hens. Specialization has ostensibly made an appearance in the hen house. It appears that the egg production of laying hens is specialized in either table or breaking eggs. *See id.* ¶ 316 (discussing the existence of "hens dedicated to producing eggs for breaking"). Generally, once shell eggs have been produced, according to Plaintiffs, the eggs

are usually collected on nylon belts and sent to a storage cooler or egg processing center. Eggs generally arrive at the egg processing center within 12 to 14 hours postlay where they are washed, inspected (checked for eggshell problems, cracks, and blood spots), and then graded for packaging. . . . At this point, eggs are either placed into cartons for sale or separated for further processing.

*Id.* ¶¶ 135-36.   Further processing can take place with companies that are involved in egg production and processing because "[m]any egg producers are vertically integrated to the point of also owning their own processing facilities and may ship eggs directly to their own facilities for breaking and processing into dry, liquid or frozen forms." *Id.* ¶ 136; *see also id.* ¶¶ 123-24, 408, 457 (describing vertical integration).

There apparently are also companies that are not involved in the production of eggs, but engage in breaking and further processing of eggs into egg products. *See id.* ¶¶ 176 n.36, 310.  In those cases, egg processor companies apparently purchase breaking eggs to process into egg products. *See id.* ¶¶ 115, 409.[2]

Apart from the shell eggs purchased for the production of egg products, according to Plaintiffs, the consumers for shell eggs and egg products apparently differ. "Shell eggs are eggs generally purchased by grocery stores in cartons for resale to the consuming public. . . . [and] are also purchased by entities such as restaurants and hotels. *Id.* ¶ 115.  Meanwhile, consumers of egg products are involved in food manufacturing or food services industries. *Id.* ¶ 117.  Egg products, for example, are "often used as an ingredient in baked goods or in items such as mayonnaise, pasta, and salad dressings" in the "commercial food manufacturing industry"; "[f]oodservice industry operators such as fast food chains, restaurants, hospitals and nursing

---

[2] The SAC alleges that "[s]ome Defendants and co-conspirators purchased shell eggs to process into egg products . . . . [and t]hese purchase[r]s are excluded from the class." *Id.* ¶ 409.

homes use egg products for convenience and ease of handling and because egg products are pasteurized and thus ensure a higher level of food safety." *Id.* ¶ 119.

Plaintiffs allege that some Defendants sold "eggs," while others sold both shell eggs and egg products. *See, e.g., id.* ¶¶ 41, 62, 68, 73, 91, 94, 97.   Given the layout of the production of shell eggs and egg products and the industry generally, Plaintiffs contend that differently-positioned Defendants allegedly benefited from the conspiracy to reduce the supply of "eggs" differently.   Plaintiffs posit that because shell eggs are "the main inputs into egg products, the wholesale prices of shell eggs are closely linked to the prices of processed egg products.   As such, "the reduced quantity of shell eggs and resulting supracompetitively increased prices were reflected in supracompetitively increased prices for egg products, as well." *Id.* ¶ 407.   According to Plaintiffs, Defendants who both produce eggs and operate egg processing facilities benefited "from the supracompetitively increased prices for their shell eggs." *Id.* ¶ 408.   Those Defendants who only operated egg processing facilities, despite purchasing shell eggs at inflated prices, allegedly benefited by being able to "maintain their margins and profit from their sales of artificially inflated egg products." *Id.* ¶ 409.   The SAC further delineates as to each Plaintiff whether a company purchased shell eggs, egg products, or both "directly from one or more Defendants." *Id.* ¶¶ 28-38.

### III. Legal Standard

Defendants invoke Federal Rule of Civil Procedure 12(b)(6)[3] which allows parties to assert by motion, in response to a pleading, a defense of "failure to state a claim upon which

---

[3] Although the Defendants' Motion initially cites both Rule 12(b)(6) and Rule 9(b), Defs.' Mot. at 1, the Court concludes based upon the content of the Defendants' papers and oral argument that Rule 9(b) was referenced in error.

relief can be granted." In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded allegations in the complaint and construes the pleading in the light most favorable to the plaintiffs. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," providing the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted). This standard "does not require 'detailed factual allegations,'" but a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).

To survive a Rule 12(b)(6) motion, a complaint need allege "only enough facts to state a claim of relief that is plausible on its face" so as to test whether "plaintiffs . . . have . . . nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A complaint is subject to dismissal when the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

Because this suit is brought pursuant to Section 1 of the Sherman Act, Plaintiffs must allege enough factual matter to plausibly suggest: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citations omitted). In doing so, the Court must be mindful that the "character and effect of [the]

conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also* Sept. 26, 2011 Mem., 2011 WL 4465355, at *6.

## IV.  Discussion

Upon careful review of the parties' arguments made in their briefing and at oral argument, the Court concludes that it is appropriate to deny the Defendants' Motion but only insofar as the denial is without prejudice to Defendants to revisit these arguments when, and if, circumstances so warrant.  Several reasons motivate this decision.

Defendants contend that Plaintiffs have failed to state a claim as to a conspiracy to reduce the supply (or increase the price of) egg products, except as an ancillary outcome of an alleged conspiracy to reduce the supply of shell eggs.  As relief, Defendants ask the Court to announce that—notwithstanding the extent that "Plaintiffs may otherwise have [any right] to claim damages for allegedly higher egg products prices as an effect of the alleged conspiracy to reduce the output of shell eggs"—the "Complaint fails to state a claim that the Defendants, or any of them, conspired to reduce the supply or raise the price of egg products." Defs.' Proposed Order at 1-2.[4]

Defendants claim that their Motion is a vehicle with which to establish parameters around the Plaintiffs' claim so as to provide some sort of guidance during the pre-trial stage.  Ostensibly

---

[4]   The Court cannot resist noting the irony of a motion that seeks to dismiss any claims as to egg products in a litigation captioned *In re: Processed Eggs Products Antitrust Litigation.*

To paraphrase the Bard: But what is in a name?  That which we call an egg; By any other name would look as round.

Apparently, perhaps not if that egg is broken, pasteurized, mixed, blended, cooled, frozen, liquefied, or dried.

motivating the Defendants is their apprehension that following the pleadings stage, Plaintiffs will behave like foxes in a henhouse. Defendants are troubled that through the term "egg products," "Plaintiffs are trying to keep the door open to pursuing a distinct egg products conspiracy claim." Defs.' Mot. at 3. According to Defendants, absent the Court granting this Motion, Plaintiffs might leverage the SAC's use of "egg products" in order to revive claims that egg products companies allegedly agreed to allocate customers and markets, which some plaintiffs asserted in previously-filed individual complaints before the complaints were consolidated, but otherwise appear to have "abandoned." *Id.* Defendants also express concern that the SAC's references to "egg products" might be an entrée for Plaintiffs "to expand the scope of discovery to information that is not relevant to the only purported conspiracy for which any facts are alleged—the conspiracy to reduce the supply of shell eggs." *Id.*

Fundamentally, however, this Motion is not directed to the SAC, and as such does not implicate Rule 12(b)(6) issues. Defendants seek to circumscribe and delineate pre-trial issues, yet they are not using an appropriate vehicle to achieve their goal. Defendants have filed a motion that specifically requires an inquiry focused on whether the complaint states a claim. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §1356. It simply is not the best use of Rule 12(b) motion procedure to chisel issues for trial. That function is to be better "discharged by the responsive pleading, pretrial discovery, the pretrial conference, and other case management procedures." Wright & Miller, *supra*, § 1349; *see also id.* n.7 (citing *Colton v. Wonder Drug Corp.*, 21 F.R.D. 235, 236 (S.D.N.Y. 1957) for the proposition that: "[T]he task of limiting the issues or 'pruning off the surplusage' should be accomplished by pre-trial proceedings and not by motions addressed to the complaint.").

Defendants loosely cloak their arguments in *Twombly* and Rule 12(b)(6) terminology, but fail to cite much legal authority to support their cause. Insofar that Defendants rely on pleading standards in their arguments, they are expended on the contention that Plaintiffs fail to satisfy the pleading requirements in alleging "an egg products conspiracy that is distinct from the alleged conspiracy to reduce the supply of shell eggs." Defs.' Mot. at 3. In doing so, Defendants merely attack a non-existent claim. A fair reading of the SAC in sum does not actually suggest that Plaintiffs have brought two separate antitrust claims, one as to shell eggs and the other as to egg products. *See, e.g.*, SAC ¶ 1.

Furthermore, Plaintiffs seemingly agree that the SAC does not allege a distinct conspiracy as to egg products. They state: "Contrary to Defendants' arguments, the Complaint does not allege a conspiracy involving shell eggs that merely indirectly affected egg products; rather, the Complaint describes a multi-faceted supply reduction and price fixing conspiracy directed at and involving *both* shell eggs *and* egg products." Pls.' Resp. at 66 (emphasis in original). In short, Plaintiffs articulate that their claim is that Defendants have engaged in a single conspiracy to reduce the supply of shell eggs and egg products. It follows that if Plaintiffs are not asserting a distinct, separate claim as to egg products, there is no such claim to dismiss.[5]

---

[5] Thus, belying the parties' arguments is the implicit, yet mutual, recognition that Plaintiffs are not alleging a second, separate claim as to egg products. And from a practical standpoint, the Plaintiffs' response to the Motion should allay the Defendants' concerns to some degree, at least with respect to the possible existence of a second, separate claim. However, given the Defendants' aforementioned motivations for its Motion, the Court acknowledges that the Plaintiffs' account of their claim might only provide a small measure of comfort, a comfort that nonetheless that ought to continue on through the litigation.

The Defendants' arguments also fall short because, without articulating any grounds or legal authority for doing so, Defendants frame their arguments entirely as though Plaintiffs allege shell eggs and egg products to be separate, discrete product markets.  By attempting to segregate shell eggs and egg products from each other, Defendants fail to observe the admonition not to "dismember" or "compartmentalize" an alleged conspiracy into, as it were, separate cartons. Moreover, Defendants fundamentally mischaracterize the SAC.  As is evident from the face of the SAC and Plaintiffs' arguments, Plaintiffs articulate a single antitrust claim as to shell eggs and egg products.

Indeed, "Plaintiffs have the right to control their own complaints, and they are free to allege whatever products they can ultimately prove have been the subject of a[n antitrust] conspiracy." Report, Recommendations, and Tentative Rulings Regarding Defendants' Motions to Dismiss at *4 (Doc. No. 597), *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 3:07-5944 (N.D. Cal. Feb. 5, 2010) hereinafter "CRT Report"), *approved and adopted by* 738 F. Supp. 2d 1011 (N.D. Cal. 2010).  After all, in alleging an antitrust conspiracy, "Plaintiffs have the burden of defining the relevant market." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997).[6]  Here, Defendants do not challenge whether Plaintiffs have met the burden of alleging a "relevant market" of shell eggs and eggs products.  Defendants imply that their segmented treatment of shell eggs and egg products originates in the nascent stages of this litigation when some Plaintiffs' individual complaints alleged a conspiracy among egg products

---

[6] The dismissal of an antitrust claim for failure to plead a relevant market is required under Rule 12(b)(6), "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Id.* (citations omitted).

companies to allocate customers and markets. Defs.' Mot. at 1-2. Nevertheless, Defendants

have not put forth any contentions, predicated upon the SAC or case law, that shell eggs and egg

products are separate product markets. Defendants are simply silent as to why shell eggs and egg

products should not be considered as the relevant market, consistent with the Plaintiffs'

allegations.

This silence comes in stark relief with the Defendants' apparent acceptance that Plaintiffs

have alleged a § 1 Sherman Act claim at least with respect to the market for shell eggs. Indeed,

absent from the Defendants' arguments is any contention that the SAC is deficient in factually

alleging the elements of a claim of an antitrust conspiracy aimed at reducing the supply of shell

eggs. As such, Defendants implicitly accept, at least with respect to shell eggs, that Plaintiffs

have alleged enough factual matter to plausibly suggest: "(1) concerted action by the defendants;

(2) that produced anti-competitive effects within the relevant product and geographic markets;

(3) that the concerted actions were illegal; and (4) that [Plaintiffs were] injured as a proximate

result of the concerted action." *Gordon*, 423 F.3d at 207.

But if Defendants are willing to accept that the SAC's alleged facts are sufficient to

satisfy all of the elements of an antitrust claim as to a shell eggs conspiracy, the implicit question

is why those same allegations would not equally satisfy an antitrust claim premised on a relevant

market as defined by both shell eggs *and* egg products? This is particularly puzzling given that

Defendants recognize on some level that the SAC alleges some linkage between shell eggs and

egg products at least insofar that Plaintiffs might be able to recover for damages due to alleged

higher prices of egg products as an effect of the conduct alleged to have reduced the supply of

shell eggs.  The Defendants' silence on whether the SAC alleges shell eggs and egg products as a single market resounds loudly here.

Along the same lines, the Defendants do not raise any arguments that Plaintiffs have failed to plead facts as to any specific elements of an antitrust claim or other legal issues that would implicate the product(s) or market(s) at issue.  On motions to dismiss, courts typically have examined whether complaints have alleged antitrust conspiracies as to one or several products pled in order to determine the subject of the conspiracy as a predicate or subordinate step in resolving a discrete legal issue.  *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, No. 3:10–md–2143, 2011 WL 3894376, at *4-8 (N.D. Cal. Aug. 3, 2011) (addressing the "more fundamental disagreement as to whether plaintiffs can plausibly allege a conspiracy to fix not only ODD prices, but also those of ODD Devices" with respect to standing under *Illinois Brick* and whether the complaint's factual allegations plausibly support the existence of an "overarching" price-fixing conspiracy); *TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117-18 (N.D. Cal. 2008) (addressing whether "the term 'TFT-LCD product' is an artificial one designed to sweep together both TFT-LCD panels and finished products containing them" and whether "the complaint only alleges anticompetitive conduct in the markets for the raw panels" in determining if plaintiffs had antitrust standing); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, No. CV F 09-0560, 2010 WL 3521979, at *12-13 (E.D. Cal. Sept. 3, 2010) (confronting whether the complaint alleges that "Tin-Mill Products is the same relevant market as tin cans" for purposes of plaintiff standing);  CRT Report, *supra*, at *3 ("Identifying which products [CRTs and products in which CRTs are assembled] are the subject of the alleged conspiracy underlies the analysis of many of the grounds for defendants' motions' *e.g.*, adequacy

12

of pleading, jurisdiction, standing, *Illinois Brick*, statutes of limitation, application of state laws, and certain of the allegations against each defendant.").[7] Without the prism of a discrete legal issue through which to examine the SAC's allegations, Defendants' requested relief appears to be merely an invitation for the Court to interpret the SAC in a manner akin to a form of declaratory judgment or advisory opinion. A Rule 12(b)(6) motion is not intended to serve such a purpose because "under the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011).

Finally, the Defendants' Motion may ultimately be distilled as an attack nitpicking at the lack of factual specificity of the SAC's allegations as to the export program, one of the eight "collective actions" alleged to have advanced the conspiracy. Indeed, Defendants argue that the "Plaintiffs' factual allegations pertaining to egg product exports fail to cross the 'line from conceivable to plausible,'" and "[e]xcluding conclusory allegations, Plaintiffs' allegations regarding export orders relate exclusively to shell eggs, not egg products." Defs.' Mot. at 4.

---

[7] It appears, however, that at least one court has granted a motion to dismiss ostensibly similar to the Defendants' Motion *sub judice*. In *Bailey Lumber & Supply Co. v. Georgia-Pacific Corp.*, No. 1:08CV1394, 2009 WL 2872307 (S.D. Miss. Aug. 10, 2009), the district court addressed whether oriented strand board ("OSB") and plywood "should be viewed together as the 'structural panels' market rather than as separate markets," to determine whether an antitrust conspiracy claim based on plywood purchases should be dismissed under Rule 12(b)(6). *Id.* at *1-2. Nonetheless, this Court finds *Bailey* distinguishable. For one, the *Bailey* decision is suggestive of a relevant market analysis because the *Bailey* court evaluated the Plaintiffs' allegations and determined that OSB and plywood "have separate, dedicated mills or plants, are used in similar, but separate ways, and each Defendant has different market shares for OSB and plywood." *Id.* Additionally, the *Bailey* decision relies on factors apparently external to the complaint, namely that plywood "has been the subject of antitrust litigation in the past." *Id.* (citing *In re Plywood Antitrust Litig.*, 655 F.2d 627 (5th Cir. 1981)). Notably, both of these distinctions provide a useful contrast to the Defendants' Motion, which does not raise either such grounds in support of its charge that Plaintiffs fail to state a claim as to egg products.

(quoting *Twombly*, 550 U.S. at 547).[8] However, regardless of whether the allegations as to the

export program and egg products may or may not reflect "a model of the careful drafter's art,"

*Skinner*, 131 S. Ct. at 1296, the pleading standard does not require that each and every allegation

in a complaint satisfy some explicit level of factual specificity. After all, under the standard,

"[s]pecific facts are not necessary; the statement need only "'give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93

(2007) (quoting *Twombly*, 550 U.S. at 555). For a Rule 12(b)(6) motion, "[t]he test, as

authoritatively formulated by *Twombly*, is whether the complaint alleges "enough fact[ ] to state

a claim to relief that is plausible on its face," . . . which is to say, " 'enough fact to raise a

reasonable expectation that discovery will reveal evidence of illegal[ity],'" *In re Insur.*

*Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010) (citations omitted).

Given all of these considerations, the Court finds that denial of the Defendants' Motion is

appropriate at this time. However, this is not to say that the Defendants' animating concerns are

---

[8] The Defendants' general focus on egg products and the export program together apparently relies on a parsing of the SAC in terms of the alleged *conduct directed at* shell eggs and egg products in their final, end-user forms. Of the eight collective actions alleged to have advanced the antitrust conspiracy, only the export program is allegedly directed towards the end-user forms of shell eggs and egg products. *See e.g.*, SAC ¶ 330 ("Defendants . . . conspired to increase the quantity of eggs and processed egg products exported from the United States for the distinct purpose of reducing domestic supply and increasing shell egg and processed egg prices in the United States."). In contrast, the other seven collective actions, by focusing on, as examples, flock reduction, early molting, and the United Egg Producers Certification Program, are directed toward the production of shell eggs (*i.e.*, table eggs and breaking eggs), and concomitantly, egg products.

But segmenting the SAC in this manner runs contrary to not only the prohibition on "compartmentalizing" or "dismembering" a complaint, but also the Plaintiffs' articulation of their claim that these collective actions advanced an "overarching conspiracy" to reduce the supply of shell eggs and egg products. Plaintiffs do not claim that any of the eight collective actions, and more specifically the export program, gives rise to an antitrust claim on its own.

not warranted.  The Court does not "forget that proceeding to antitrust discovery can be expensive." *Twombly*, 550 U.S. at 558.  At the same time, this Motion is distinguishable from the archetypical motion to dismiss that asks a court to "tak[e] care to require allegations . . . reach the level suggesting conspiracy" so as "to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence to support a § 1 claim." *Id.* at 559 (internal quotations and citation omitted).  After all, as referenced above, Defendants implicitly agree that the SAC plausibly alleges a conspiracy claim, at least with respect to shell eggs.  Furthermore, because the Defendants' Motion is directed toward "pruning" the SAC and issues in advance of, rather than during, pre-trial proceedings, a Rule 12(b)(6) motion in this instance cannot serve as the Defendants' panacea.  Additionally, there is no indication that Defendants will suffer any prejudice or be unable to answer the SAC, the next requisite step, before the Court will able to address these issues through its "case-management arsenal," which includes, *inter alia*, Federal Rule of Civil Procedure 16.  *Twombly*, 550 U.S. at 594 n.13 (dissenting, Stevens, J.); *id.* ("Rule 16 invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia*, 'the elimination of frivolous claims or defenses,' Rule 16(c)(1); 'the necessity or desirability of amendments to the pleadings,' Rule 16(c)(2); 'the control and scheduling of discovery,' Rule 16(c)(6); and 'the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems,' Rule 16(c)(12)."). The Court is well aware of the Defendants' concern that "egg products" may be included *in terrorem* in the Plaintiffs' claim of a shell eggs and egg products antitrust conspiracy and will not

15

be surprised to see the concern articulated again in the course of discovery discussions—a chapter in which the concern may well be more appropriately addressed and put to use.

## V. Conclusion

Accordingly, the Court is denying the Defendants' Motion without prejudice to raise similar arguments at a later time in this ligation. The Court finds this appropriate because it does not appear that the issues raised, by virtue of the Defendants' own arguments, are appropriate for Rule 12(b)(6) disposition. The Court determines it is more prudent to address these issues through pretrial devices, such as conferences and discovery plans, which provide a more appropriate means for circumscribing the scope of discovery or defining the issues.

An Order consistent with this Memorandum follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge

16