**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : <br> : <br> :   MDL No. 2002 <br> _____   :   08-md-2002 <br> : <br> THIS DOCUMENT APPLIES TO   : <br> ALL DIRECT PURCHASER ACTIONS   : <br> _____   : |

**MEMORANDUM OPINION**

**TIMOTHY R. RICE**                                                                    **October 19, 2011**
**U.S. MAGISTRATE JUDGE**

Direct purchaser plaintiffs ("Plaintiffs") seek to compel defendant United Egg Producers,

Inc. ("UEP") to produce or remove from sequestration certain documents and information

involving defendant Sparboe Farms ("Sparboe").[1]  UEP maintains the attorney-client privilege,

the common-interest privilege, and the work-product doctrine shield the communications at issue

from disclosure.  All privilege questions, including those raised in this motion, have been

referred to me for resolution pursuant to Rule 72(a) of the Federal Rules of Civil Procedure.  See

Order, In re Processed Egg Prods. Antitrust Litig., No. 08-md-2002 (E.D. Pa. Mar. 2, 2011)

(Pratter, J.).[2]

This case presents issues concerning the existence and scope of the attorney-client

_____

[1] Plaintiffs filed their motion and the accompanying memorandum of law and exhibits under seal, and designated them "highly confidential."  The same is true for UEP's responsive brief, UEP's exhibits, Plaintiffs' reply, and UEP's surreply.  Copies of all of these documents (ECF Nos. 511, 513, 514, 520, 521, 528, 535) are on file with the Clerk.  I will cite to them as follows: Pls.' Br., UEP's Br., Pls.' Reply, and UEP's Surreply.  Oral argument on the motion was held on September 13, 2011.  See Am. Tr. of Oral Arg., ECF No. 548, In re Processed Egg Prods. Antitrust Litig., No. 08-md-2002 (E.D. Pa. Sept. 13, 2011) [hereinafter Oral Arg. Tr.].

[2] All factual findings are made by clear and convincing evidence.

privilege in the context of a trade industry cooperative of egg producers and related entities.  At issue are several communications involving UEP officials, one of its member entities, and, at various times, attorneys.  Although the parties debate the contours of nearly every aspect of privilege law, resolution of the pending motion depends on one fundamental question: Were any of the communications at issue made for the purpose of obtaining or providing legal advice?  If not, they cannot fall within the bounds of the attorney-client privilege, regardless whether UEP and its members are treated as a single corporate entity or a group of entities sharing a common legal interest.

For the reasons set forth below, I conclude UEP has failed to meet its burden of establishing the communications at issue are protected by the attorney-client privilege.  Only one of the documents at issue was related to a confidential request for legal advice, and any privilege as to that document was waived.  I further conclude the record does not permit resolution of the parties' disputes over information conveyed to Plaintiffs during interviews with Sparboe personnel.  Accordingly, the motion to compel is granted in part and denied without prejudice in part.[3]

---

[3] On July 1, 2010, after an in camera review in anticipation of this litigation, I ordered the return to UEP of documents "containing possible UEP privileged information."  See Order at 1, In re Processed Egg Prods. Antitrust Litig., No. 08-md-2002 (E.D. Pa. July 1, 2010).  Based on letters from the parties, and without the benefit of full briefing, additional exhibits, or a factual record, I observed that, as an agricultural cooperative, "UEP may assert attorney-client privilege over the legal advice from its counsel and shared with its members."  Id. at 3.  That observation does not dictate any particular result here, now that the parties have extensively briefed the nuances of privilege law as it applies to the specific communications at issue.  Although one could posit scenarios in which communications between UEP members and its counsel would be covered by a privilege held only by UEP, the record before me demonstrates none of the communications at issue are examples of such scenarios.

I.    BACKGROUND

The facts underlying this dispute are set forth in In re Processed Egg Products Antitrust Litigation, No. 08-md-2002, 2011 WL 4465355, at *1-3 (E.D. Pa. Sept. 26, 2011) (Pratter, J.), and I will not repeat them at length here.

Plaintiffs allege UEP, its members, and other defendants conspired to limit supply and fix prices of eggs in violation of federal antitrust laws. Id. at *1. To accomplish these violations, Plaintiffs allege UEP proposed, and its members adopted, an "animal welfare" program ("the Program"), which required egg producers to comply with guidelines reducing cage space densities for hens in order to sell "UEP-certified" eggs. Id. at *2. Sparboe, a member of UEP and a former participant in the Program, settled the claims against it by agreeing to cooperate and provide information to Plaintiffs. See Order on Preliminary Approval of Sparboe Settlement at 2-3, ECF No. 214, In re Processed Egg Prods. Antitrust Litig., No. 08-md-2002 (E.D. Pa. Oct. 23, 2009) (Pratter, J.). The information Sparboe disclosed to Plaintiffs -- both in documents and witness interviews -- in some instances included communications between Sparboe's officers and attorneys and UEP's officers and attorneys. See Pls.' Br. at 28-37; UEP's Br. at 18-44. Of particular interest here are communications from 2003 and later revealing Sparboe's concerns with, and objections to, the Program. See Pls.' Br. at 28-37; UEP's Br. at 18-44. UEP suggests those communications are protected by either the attorney-client privilege, the common-interest privilege, or the work-product doctrine. See generally UEP's Br.

Although Plaintiffs' motion to compel is focused on six specific documents and information conveyed in the interviews of four Sparboe witnesses, the parties assert much broader arguments. Specifically, Plaintiffs suggest UEP could not successfully invoke any

privilege for communications between its counsel and any of its members before 2009.  Pls.' Br. at 17-21.  Conversely, UEP suggests all communications between its counsel or officers and any of its members are entitled to blanket protection under a "single-entity" theory based on Upjohn Co. v. United States, 449 U.S. 383 (1981).  UEP's Br. at 4-15.  Neither of these sweeping pronouncements is necessary or appropriate to resolve the issues presented in Plaintiffs' motion.[4]

Plaintiffs' motion is properly resolved by examining the specific communications at issue and the circumstances under which they occurred.  Upjohn, 449 U.S. at 396-97 (applying a "case-by-case" analysis, which "obeys the spirit of the Rules [of Evidence]").  Those communications are:

- A January 2003 memorandum from Sparboe's vice president to UEP officers, board members, and counsel about scientific committee recommendations, UEP's Br. at Ex. F (submitted in camera);

- June and July 2003 letters from Sparboe's president to UEP's president, neither of which were ever sent, raising questions about the wisdom and legality of the Program, UEP's Br. at Exs. C, D (submitted in camera);

- An October 2003 E-mail from Sparboe's in-house counsel to its outside counsel summarizing a meeting between Sparboe representatives and UEP's president at which Sparboe's concerns about the Program were discussed, UEP's Br. at Ex. E (submitted in camera);

- A September 2005 fax from UEP's counsel to UEP's president, which was later forwarded to Sparboe's counsel and Sparboe's president in response to Sparboe's belief that a UEP representative was interfering with relationships between Sparboe and its customers, UEP's Br. at Ex. 6 to Ex. A (submitted in camera); Pls.' Br. at Ex. F p.6;

---

[4] Both parties conceded as much during oral argument.  See Oral Arg. Tr. at 38-40 (counsel for UEP admits categorical privilege determinations are inappropriate, and "the Court has to look at each specific communication and make a determination of all of the typical indicia of attorney-client privilege"); id. at 89 (counsel for Plaintiffs agrees the proper method is a "case-by-case [inquiry] applying the traditional principles of the attorney-client privilege").

- A series of October 2008 E-mails among Sparboe representatives summarizing a recent UEP meeting, including comments by UEP's counsel about topics at issue in this litigation, UEP's Br. at Ex. 7 to Ex. A (submitted in camera); and

- Information disclosed to Plaintiffs, following Sparboe's settlement, by Sparboe's counsel and three of its officers who were interviewed regarding Sparboe's concerns about the Program and the witnesses' interactions with UEP's counsel, Pls.' Br. at Exs. E, H, I.

Pursuant to its settlement agreement, Sparboe produced to Plaintiffs copies of all documents except the October 2003 and October 2008 E-mails.  See Oral Arg. Tr. at 107.

## II.  LEGAL FRAMEWORK

### A.    The Attorney-Client Privilege

The attorney-client privilege is intended to encourage "full and frank communication between attorneys and their clients."  Wachtel v. Health Net, Inc., 482 F.3d 225, 231 (3d Cir. 2007).  The privilege "applies to any communication that satisfies the following elements: it must be '(1) a communication (2) made between [the client and the attorney or his agents] (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.'"  In re Teleglobe Communications Corp., 493 F.3d 345, 359 (3d Cir. 2007) (quoting the Restatement (Third) of the Law Governing Lawyers § 68 (2000)); accord In re Application of Chevron Corp., 650 F.3d 276, 289 (3d Cir. 2011).

The privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance."  Fisher v. United States, 425 U.S. 391, 403 (1976).  "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  Upjohn, 449 U.S. at 390.  However, it "only protects the disclosure of communications; it does not protect

disclosure of the underlying facts." Id. at 385.  The communication between lawyer and client "is not, in and of itself, the purpose of the privilege; rather, it only protects the free flow of information because it promotes compliance with law and aids administration of the judicial system." Teleglobe, 493 F.3d at 360-61 (emphasis omitted).  "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn, 449 U.S. at 389.

Communications made both by a client and an attorney are privileged if the communications are "for the purpose of securing legal advice." See In re Ford Motor Co., 110 F.3d 954, 965 n.9 (3d Cir. 1997); United States v. Amerada Hess Corp., 619 F.2d 980, 986 (3d Cir. 1980).  Communications from an attorney are privileged for two reasons: first, to prevent "the use of an attorney's advice to support inferences as to content of confidential communications by the client"; and second, because "legal advice given to the client should remain confidential." Amerada Hess Corp., 619 F.2d at 986.

Nevertheless, the privilege obstructs the truth-finding process and should be "applied only where necessary to achieve its purpose."   Wachtel, 482 F.3d at 231; see Westinghouse Elec. Corp. v. Republic of Phil., 951 F.2d 1414, 1423 (3d Cir. 1991) (construing the privilege narrowly).  Because the privilege promotes the "dissemination of sound legal advice," it applies only where the advice is legal in nature, and not where the lawyer provides non-legal business advice. Wachtel, 482 F.3d at 231.  In addition, the privilege applies only to communications made in confidence, because "a client who speaks openly or in the presence of a third party needs no promise of confidentiality to induce a disclosure." Id.

"Rule 501 requires the federal courts, in determining the nature and scope of an

evidentiary privilege, to engage in the sort of case-by-case analysis that is central to common-law adjudication." Id. at 230; see Upjohn, 449 U.S. at 386, 396-97; see also Harper-Wyman Co. v. Conn. Gen. Life Ins. Co., No. 86-9595, 1991 WL 62510, at *5 (N.D. Ill. Apr. 17, 1991) (analysis of whether communications between a trade association's counsel and association members are privileged "must be on a case-by-case basis, employing the usual concepts of attorney-client privilege"). "The party asserting the privilege bears the burden of proving that it applies to the communications at issue." King Drug Co. of Florence, Inc. v. Cephalon, Inc., No. 06-1797, 2011 WL 2623306, at *4 n.5 (E.D. Pa. July 5, 2011) (Goldberg, J.) (citing In re Grand Jury Empanelled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979)).

B.      The Common-Interest Privilege[5]

The common-interest privilege "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." Teleglobe, 493 F.3d at 364; accord King Drug, 2011 WL 2623306, at *2. Although the doctrine originated in the context of criminal co-defendants, it now "applies in civil and criminal litigation, and even in purely transactional contexts." Teleglobe, 493 F.3d at 364.

To qualify for protection under the common-interest privilege, "the communication must be shared with the attorney of the member of the community of interest," and "all members of the community must share a common legal interest in the shared communication." Id. (emphasis

---

[5] The common-interest privilege is sometimes referred to as the "community-of-interest privilege" or the "joint-defense privilege." Teleglobe, 493 F.3d at 363-64. The three terms are synonymous. Id. They are distinct, however, from the "co-client privilege" or "joint-client privilege," which applies when two or more clients consult with the same attorney. Id. at 362-63. UEP has not invoked the co-client privilege here, so I need not discuss it. See Oral Arg. Tr. at 29, 100-01; Pls.' Br. at Exs. C-D.

omitted); accord King Drug, 2011 WL 2623306, at *2-3.  "The attorney-sharing requirement

helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure

rule when attorneys, not clients, decide to share information in order to coordinate legal

strategies."  Teleglobe, 493 F.3d at 365.  Meanwhile, the requirement that the parties to the

communication share "at least a substantially similar legal interest"[6] prevents abuse of the

privilege and "unnecessary information sharing."  Id.

      The common-interest privilege "does not apply unless the conditions of privilege are

otherwise satisfied."  In re Diet Drugs Prods. Liability Litig., MDL No. 1203, 2001 WL

34133955, at *5 (E.D. Pa. Apr. 19, 2001); accord In re Grand Jury Subpoenas, 902 F.2d 244, 249

(4th Cir. 1990).  This is so because -- despite its name -- the common-interest privilege "is not an

independent privilege, but merely an exception to the general rule that no privilege attaches to

communications that are made in the presence of or disclosed to a third party."  Robinson v. Tex.

Auto. Dealers Ass'n, 214 F.R.D. 432, 443 (E.D. Tex. 2003); accord United States v. BDO

Seidman, LLP, 492 F.3d 806, 815 (7th Cir. 2007); see Teleglobe, 493 F.3d at 365 (the privilege

is "an exception to the disclosure rule").  Thus, the party asserting the privilege has the burden of

establishing the elements of the attorney-client privilege generally, as well as those of the

common-interest privilege.  See United States v. LeCroy, 348 F. Supp. 2d 375, 382 (E.D. Pa.

2005); Diet Drugs, 2001 WL 34133955, at *4.

      C.     The Work-Product Doctrine

      "[A] party may not discover documents and tangible things that are prepared in

---

[6] The common interest binding parties to the communication must be legal in nature, and
not merely commercial or business related.  See King Drug, 2011 WL 2623306, at *3.

anticipation of litigation or for trial" unless otherwise discoverable or a party shows substantial

need for the material.  Fed. R. Civ. P. 26(b)(3).  Pursuant to the work-product doctrine,

documents reflecting the "mental impressions, conclusions, opinions, or legal theories of an

attorney or other representative concerning . . . litigation," Fed. R. Civ. P. 26(b)(3)(B), are

"generally afforded near absolute protection from discovery," Ford Motor Co., 110 F.3d at 962

n.7).  See Upjohn, 449 U.S. at 400 ("Rule 26 accords special protection to work product

revealing the attorney's mental processes.").  Such information is discoverable "only upon a

showing of rare and exceptional circumstances."  In re Cendant Corp. Sec. Litig., 343 F.3d 658,

663 (3d Cir. 2003).  "The burden of demonstrating that a document is protected as work-product

rests with the party asserting the doctrine."  Conoco, Inc. v. U.S. Dep't of Justice, 687 F.2d 724,

730 (3d Cir. 1982).

The work-product doctrine "is designed to protect material prepared by an attorney acting

for his client in anticipation of litigation."  United States v. Rockwell Int'l, 897 F.2d 1255, 1265

(3d Cir. 1990); see United States v. Nobles, 422 U.S. 225, 238 (1975) ("At its core, the work-

product doctrine shelters the mental processes of the attorney, providing a privileged area within

which he can analyze and prepare his client's case.").  The doctrine does not protect documents

prepared "'in the ordinary course of business, or pursuant to public requirements unrelated to

litigation, or for other nonlitigation purposes.'"  Martin v. Bally's Park Place Hotel & Casino,

983 F.2d 1252, 1260 (3d Cir. 1993) (quoting Fed. R. Civ. P. 26(b)(3) advisory committee note).

The doctrine recognizes a lawyer must have a "certain degree of privacy, free from unnecessary

intrusion by opposing parties and their counsel."  Hickman v. Taylor, 329 U.S. 495, 511 (1947).

For the doctrine to apply, Rule 26(b)(3) requires only "that the material be prepared in

9

anticipation of some litigation, not necessarily in anticipation of the particular litigation in which it is being sought." Ford Motor Co., 110 F.3d at 967 (emphasis omitted). "[T]he preparer's anticipation of litigation [must] be objectively reasonable." Martin, 983 F.2d at 1260. Litigation need not be threatened before a document can be found prepared in anticipation of litigation. Hydramar, Inc. v. Gen. Dynamics Corp., 115 F.R.D. 147, 150 n.3 (E.D. Pa. 1986). However, a document will fall within the scope of the work-product doctrine only if it was prepared primarily in anticipation of future litigation. See Diet Drugs, 2001 WL 34133955, at *5.

## III.   DISCUSSION

The parties implore me to draw broad conclusions about whether entire categories of communications are privileged. See Pls.' Br. at 37 (seeking a ruling "that UEP has not sustained its burden of demonstrating that a common interest privilege existed over pre-2009 communications"); UEP's Br. at 8 (arguing "communications between counsel for UEP and individual representatives of UEP members must be treated and protected like those among counsel for a corporation and its employees"). Although such conclusions might be helpful to guide the parties as they engage in future discovery in this litigation, I must confine my analysis to the actual disputes at hand. Cf. Upjohn, 449 U.S. at 386 ("[W]e sit to decide concrete cases and not abstract propositions of law. We decline to lay down a broad rule or series of rules to govern all conceivable future questions in this area, even were we able to do so."). Accordingly, I must focus on the specific contents of each disputed communication, coupled with "the unique context that led to [each document's] creation." Faloney v. Wachovia Bank, 254 F.R.D. 204, 210 n.7 (E.D. Pa. 2008).

UEP has the burden of establishing each document at issue is privileged. LeCroy, 348 F.

Supp. 2d at 382.  To satisfy its obligation, UEP primarily has chosen to rely on the content of the

documents themselves, as well as an affidavit of its current general counsel, Kevin Haley ("the

Haley affidavit").  See UEP's Br. at 19-44.  It offered no testimony or affidavits from the parties

to the communications at issue, or from any UEP members, revealing their understanding of their

relationship with UEP counsel or whether they intended such communications to be confidential.

As a general matter, "statements in briefs cannot be treated as evidence and a document for in

camera inspection cannot establish all the privilege's elements."  Faloney, 254 F.R.D. at 212-13.

With that in mind, I will address each communication in turn and explain how UEP has failed to

satisfy its burden of establishing privilege.[7]

      A.    January 2003 Memorandum

The earliest document at issue is a January 17, 2003 memorandum by Garth Sparboe,

Sparboe's vice president and a member of UEP's Animal Welfare Committee.  The

memorandum is addressed to UEP's senior vice president Gene Gregory, UEP's board and

executive committee chairman Mike Bynum, UEP's Animal Welfare Committee chairman Paul

Bahan, and UEP's general counsel Irving Isaacson.  It "provides information and analysis . . .

regarding the economic impact of the animal welfare program."  UEP's Br. at 32.

Although it would be possible for members of a UEP committee to engage in privileged

attorney-client discussions with UEP's general counsel about legal matters related to the

committee's work, see In re Rail Freight Surcharge Antitrust Litig., 268 F.R.D. 114, 116 (D.D.C.

---

      [7] Because I conclude only one of the communications could be protected by the attorney-client privilege in the first instance, see infra section III.D, I need not reach issues of waiver or common-interest privilege except as to that document.  See Ip Co. v. Cellnet Tech., Inc., No. C08-80126, 2008 WL 3876481, at *4 (N.D. Cal. Aug. 18, 2008); Diet Drugs, 2001 WL 34133955, at *5.

2010), "merely copying an attorney on [a communication] does not establish that the communication is privileged," Ip Co., 2008 WL 3876481, at *3.  UEP claims the memorandum is protected, arguing Isaacson was one of the recipients, Isaacson "understood [it] to be confidential and maintained it as such," and its topic was "the contours of the animal welfare program . . . which was, at least in part, a legal exercise."  Id. at 32-33 (citing and quoting the Haley affidavit).[8]

UEP's assertions fail to establish the memorandum is privileged.  First, nothing about the memorandum or its contents suggests -- either explicitly or implicitly -- that the document was prepared in connection with a request for, or the provision of, legal advice.  It is not marked "confidential" or "attorney-client privileged."[9]  It contains no requests for Isaacson's opinion about any legal matter.  It does not refer to any request by Isaacson for factual information from the committee related to a legal issue Isaacson was considering on behalf of UEP.  Rather, the memorandum describes certain decisions made by a "scientific committee," primarily regarding

---

[8] As to this document and others, the Haley affidavit contains paragraphs conveying Haley's description of what Isaacson "understood and intended."  See UEP's Br. at Ex. A ¶¶ 9-10.  According to UEP, ninety-six-year-old Isaacson is in poor health and "lacks the capacity to provide an affidavit on these issues."  UEP's Surreply at 4 n.5.  Although I may consider Haley's account of what Isaacson told him for purposes of this motion, see Fed. R. Evid. 104(a), I conclude those portions of Haley's affidavit are entitled to little weight.  First, they recount conversations between Haley and Isaacson that took place nearly a year ago.  UEP's Br. at Ex. A ¶ 9.  Second, they pertain to events that took place approximately eight years ago.  Id.  Third, I have no way of assessing whether, and to what extent, Isaacson's age and health problems may have impacted his ability to recall and accurately recount this information at the time of his conversations with Haley.  And finally, Haley's belief about Isaacson's thought processes is inherently unreliable.

[9] The absence of "privileged" or "confidential" markings on a document is not dispositive, but it is relevant to a privilege analysis.  Cf. Faloney, 254 F.R.D. at 211 (absence of "confidential" marking outweighed by evidence the information in the document "was not public knowledge").

12

cage density.  As UEP correctly observed, it describes the "economic impact" of the Program, not any of the Program's legal ramifications.  UEP's Br. at 32.  Thus, the memorandum is not facially "for the purpose of obtaining or providing legal assistance."  See Teleglobe, 493 F.3d at 359.

Second, nothing else in the record supplements the contents of the document and establishes the memorandum was, in fact, a request by Sparboe or his committee for legal advice or a response to a request by Isaacson for facts necessary to provide legal advice.  The Haley affidavit asserts only that Isaacson "understood the . . . memo . . . to be the provision of factual information to assist [him] in providing legal advice to UEP regarding the development and negotiation of the [Program]."  UEP's Br. at Ex. A ¶ 10; accord id. at Ex. B p.4.  Even if I were to credit that assertion, it sheds no light on the intent of the document's drafter or on the circumstances that led to the document's preparation.  The Haley affidavit does not establish Isaacson asked the committee for facts that were necessary to resolve a legal issue on behalf of UEP, or that the memorandum was related to a request by the committee for legal guidance from Isaacson.  Absent such evidence, UEP has not established a critical element of privilege.[10]  See Teleglobe, 493 F.3d at 359; Ip Co., 2008 WL 3876481, at *3.

B.       June & July 2003 Letters

The documents that appear to be at the heart of this motion, and the primary focus of the parties' briefs, are letters dated June 26 and July 10, 2003, from Robert Sparboe, Sparboe's president, to Al Pope, UEP's president.  The parties agree neither letter was ever sent.  See Pls.'

---

[10] UEP has not suggested this memorandum is protected by the work-product doctrine.  See UEP's Br. at 32-34; Pls.' Br. at Exs. C, D (entries 12 and 7-8, respectively).

13

Br. at 29, 31; id. at Ex. F pp. 3-4, 6.  Neither Sparboe nor Pope is an attorney.  The June letter is

designated "Personal & Confidential"; the July letter bears only a "Certified Mail" marking.

Sparboe's counsel was copied only on the July letter, while UEP's counsel was copied on

neither.  In both letters, Sparboe expresses concerns about the legality and economic impact of

the Program.  Similar -- and, in some instances, nearly identical -- concerns appear in a

November 5, 2003 letter from Sparboe's counsel to UEP's counsel.[11]

UEP claims the June and July 2003 letters are privileged, characterizing them as drafts of

the November 2003 letter, which it claims is privileged.  See UEP's Br. at 19-29.  Although

"preliminary drafts of a document that is ultimately sent to counsel" may constitute privileged

communications, Laethem Equip. Co. v. Deere & Co., 261 F.R.D. 127, 140 (E.D. Mich. 2009);

accord WebXchange Inc. v. Dell Inc., 264 F.R.D. 123, 127 (D. Del. 2010), not every document

containing facts later conveyed to counsel is automatically blanketed in privilege, cf. Upjohn,

449 U.S. at 395 (facts underlying an attorney-client communication are not privileged).  As the

party claiming the privilege, UEP must establish the June and July 2003 letters constitute drafts

of a privileged communication.  Cf. King Drug, 2011 WL 2623306, at *4 n.5.

To sustain its privilege claims, UEP must offer evidence showing: (1) Sparboe prepared

the June and July 2003 letters as drafts of the November 2003 letter; (2) Sparboe intended the

November 2003 letter to convey a privileged request for legal advice; and (3) Sparboe's

disclosure of the June and July 2003 letters to Plaintiffs did not constitute waiver of any

---

[11] Sparboe has not produced the November 2003 letter to Plaintiffs, and Plaintiffs have not sought to compel its production here.  See Pls.' Reply at 19, 21 & n.32.  It is relevant to my discussion, however, because UEP's claims of privilege regarding the June and July letters largely depend on the status of the November letter.

privilege.  UEP has not adduced sufficient evidence to support any of these findings.

First, UEP relies entirely on the text of the two letters at issue to support its view that they are drafts of the November 2003 letter.  Indeed, both letters contain passages that are echoed, sometimes verbatim, in the November 2003 letter.  Nevertheless, there are also substantial differences in the letters' content,[12] and several passages that UEP construes as "explicit[] requests" for legal advice in the November 2003 letter, UEP's Br. at 22, are absent from the two earlier letters.  UEP has offered no affidavits or other evidence showing Sparboe prepared the two earlier letters as drafts of the later one, or that Sparboe views them as such.[13]  Although UEP suggests Sparboe's claim of privilege with respect to the November 2003 letter implies its production of the earlier letters was inadvertent, Sparboe has not claimed inadvertence or sought to claw back the earlier letters.  Moreover, as Plaintiffs suggest, see Pls.' Reply at 19, Sparboe's production of the two letters while withholding the November 2003 letter could also imply it does not view the letters as drafts.  Without additional evidence resolving these ambiguities and clarifying Sparboe's intent, UEP has not established the June and July 2003 letters are drafts of a privileged communication.  Considered on their own, the two letters are merely communications from one executive to another with no apparent involvement by either executive's attorney and, therefore, are not privileged, even if Sparboe and UEP were viewed as parts of a "single entity" as UEP urges.  Cf. Upjohn, 449 U.S. at 394, 396 (finding communications between corporate

---

[12] For example, the June 2003 letter contains discussions of consumer confidence in the egg industry's "animal welfare friendliness," and the need for "consistent and thorough auditing procedures," neither of which appear in the subsequent letters.

[13] Although not dispositive, I note that the June and July 2003 letters were addressed to and apparently written by non-lawyers.  There is no evidence showing Sparboe's counsel assisted in their preparation.

employees and general counsel "made at the direction of corporate superiors in order to secure legal advice from counsel" are protected, and declining to extend ruling beyond facts presented).

Second, assuming the documents at issue are drafts of the November 2003 letter, UEP has offered nothing beyond the text of the November 2003 letter to establish its privileged nature. According to UEP, the November 2003 letter contains six separate requests for legal opinions from UEP's counsel.  UEP's Br. at 22.  UEP, however, has failed to acknowledge, and offer evidence to resolve, ambiguities apparent on the face of the letter.  Cf. Faloney, 254 F.R.D. at 212-13 (a party cannot establish all elements of privilege through the contested document itself). The November 2003 letter does not contain any "attorney-client privileged" markings.  In fact, the record suggests the author of the letter -- Sparboe's in-house counsel -- "did not think [UEP's counsel] was acting as Sparboe's lawyer."  Pls.' Br. at Ex. H (entry 14).  The language used by Sparboe's counsel suggests he was writing on behalf of Sparboe as a separate corporation with its own legal advisor, and not as an agent or quasi-employee of UEP.[14]  The letter itself contains some passages that resemble requests for legal advice, while other portions are better described as accusations and demands for explanations.  For example, the third paragraph of the letter appears to be seeking a legal opinion about UEP's status under the Capper-Volstead Act.  The fourth, fifth and sixth paragraphs, however, simply demand that UEP justify its legally questionable acts.  In fact, those demands are the portions of the letter that also appear, in some form, in the earlier letters, both of which also included what might be viewed as a threat by

---

[14] The letter refers to "UEP, or you as their counsel," and asks how "UEP has prepared itself" to respond to certain claims.  It does not use terms like "us," "we," or "our counsel" which would show Sparboe viewed itself and UEP as part of a single entity with the same attorney, as UEP maintains.

Sparboe to terminate its membership in UEP.  Without more, UEP has not established the

November 2003 letter is privileged in its entirety.[15]

Third, even if I were to conclude the June and July 2003 letters were privileged as drafts

of a protected attorney-client communication, Sparboe's production of the June and July 2003

letters to Plaintiffs would constitute waiver of any privilege.[16]  UEP has failed to adduce any

evidence showing Sparboe -- or any of its members -- intended to be a party to a privileged,

confidential, common-interest relationship with UEP's counsel for purposes of the letters at

issue.  The content of the letters suggests Sparboe, advised by its in-house counsel, was

protecting its own interests by challenging what it perceived to be questionable policies and

---

[15] To date, Sparboe has withheld the November 2003 letter from its production to
Plaintiffs.  Based on the language of the letter, it is difficult to imagine either UEP or Sparboe
establishing a legitimate privilege claim over the entire letter.  However, Plaintiffs are not
currently challenging Sparboe's privilege claim, so I will not evaluate it further.

[16] For purposes of these letters, the record could not reasonably support the finding, urged
by UEP, that Sparboe -- which it views as a quasi-employee of "single entity" UEP -- was
incapable of waiving any privilege.  See UEP's Br. at 26-27 (citing only cases holding dissenting
corporate officers cannot waive the corporation's privilege).  There is no evidence the letters
were drafted by Sparboe's counsel while he was wearing his "UEP member representative hat,"
and not his "in-house counsel for Sparboe hat."  Cf. Teleglobe, 493 F.3d at 372.  At most, he may
have been seeking legal advice for Sparboe from UEP's counsel, thus rendering Sparboe the
"client" for privilege purposes.  Any other view would extend Upjohn beyond its intended reach
and ignore Sparboe's separate corporate form.  See id. ("[A]bsent some compelling reason to
disregard entity separateness, in the typical case courts should treat the various members of [a]
corporate group as the separate corporations they are and not as one client.").  UEP has cited
cases acknowledging that, in some instances, communications between representatives of an
organization's member entities and the organization's counsel may be privileged.  See, e.g.,
United States v. Ill. Power Co., No. 99-833, 2003 WL 25593221, at *3 (S.D. Ill. Apr. 24, 2003)
(finding communications privileged where "[n]o one denie[d] that [the association] and its
members possessed an expectation of privacy in the information provided by [the association's
counsel]").  However, I have found no case categorically adopting the broad view espoused by
UEP, without regard for the facts and circumstances surrounding the specific documents under
consideration.

decision-making on the part of UEP.  UEP has not established Sparboe's counsel intended the November 2003 letter (or the earlier letters) to be "in furtherance of" a common-interest relationship.  See LeCroy, 348 F. Supp. 2d at 381; see also Robinson, 214 F.R.D. at 451-52 (assessing an association member's relationship with association counsel on a case-by-case basis, and requiring proof beyond association counsel's perception that "an actual or sought after attorney-client relationship" existed between all association members and association counsel before applying a common-interest privilege).

Finally, UEP's claim of work-product protection fails as to the June and July 2003 letters as well.  Neither letter reveals anything about the mental processes of UEP's counsel, nor is there any evidence they were prepared at the direction of UEP's counsel.  The only arguable link to any counsel is to Sparboe's in-house attorney -- if the letters are viewed as drafts of the November 2003 letter.  Sparboe has not claimed the letters are work-product protected, and it is not within UEP's power to invoke such a claim on Sparboe's behalf.[17]

C.     October 2003 and October 2008 E-mails

Two other disputed communications are related in content and subject to similar analyses. Both are internal Sparboe E-mails that summarize conversations to which both Sparboe and UEP representatives were parties.  The first, dated October 2, 2003, is from Sparboe's in-house counsel to its outside counsel, with Sparboe executives copied.  It relates to a previous conversation among Sparboe's counsel regarding aspects of the Program and a July 2003 meeting between Sparboe representatives and UEP's president.  The same meeting is referenced in the

---

[17] The parties dispute whether the letters were prepared "in anticipation of litigation."  See Pls.' Br. at 30; UEP's Br. at 28-29.  I need not reach that issue.  There is no basis for finding the letters were "prepared . . . by or for [UEP] or its representative."  Fed. R. Civ. P. 23(b)(3)(A).

July and November 2003 letters discussed above.  The E-mail is marked "attorney/client privileged communication."

The second set of E-mails are dated October 16 and 17, 2008, and were exchanged among a group of nine Sparboe executives.  None of Sparboe's in-house or outside counsel are copied.  The E-mails summarize a recent UEP Annual Meeting, and in two locations reference general comments made by UEP's counsel before the meeting about pending lawsuits.  The E-mails do not describe under what circumstances, or to whom, such comments were made, nor do they contain any "privileged" or "confidential" markings.

Although neither its counsel nor any of its representatives were parties to the October 2003 and 2008 E-mails, UEP asserts both E-mails are privileged.  See UEP's Br. at 30-32, 34-35. It argues the 2003 E-mail references a meeting between Sparboe and UEP, including "[n]o non-members," and is therefore a privileged communication under Upjohn.  Id. at 31.  It further suggests the E-mail is privileged because it reveals the substance of a subsequent "direct request for legal advice" made by Sparboe's counsel to UEP's counsel in the November 5, 2003 letter. Id.  UEP characterizes the 2008 E-mails as including "classic legal advice" from Haley, and further suggests they "memorialize Haley's proposed litigation strategy."  Id. at 34.  In his affidavit, Haley avers he "do[es] not recall making [the] statement [attributed to him] in any UEP Board or Committee meeting . . . or in the presence of non-UEP members."  Id. at Ex. A ¶ 12; see also id. at Ex. B pp.6-7 ("Haley does not recall specifically providing the legal advice attributed to him . . . [and] does not believe he would have communicated this advice to anyone other than UEP members, UEP staff, and UEP committee members or advisors.").

Again, UEP has failed to establish the E-mail communications are entitled to protection.[18]

In the October 2003 E-mail, Sparboe's in-house counsel describes the July 2003 meeting with

UEP's president as one in which Sparboe expressed its concerns about certain issues, but

specifically notes it made no formal request that UEP should obtain any legal opinions from its

counsel (who was not present at the meeting).[19]   UEP has offered no evidence to demonstrate

that, notwithstanding the language of the document itself, the 2003 E-mail reveals a request by

Sparboe for legal advice from UEP.   Its primary argument in support of its privilege claim

regarding the 2003 E-mail depends on UEP's view that the E-mail reveals the content of the

November 5, 2003 letter.   Although the concerns referenced in the E-mail are similar to those

outlined in the letter, for the reasons discussed above, see supra section III.B, UEP cannot rely on

the letter to retroactively render privileged all previous communications on certain topics or

containing certain facts.[20]

UEP fares no better with respect to the October 2008 E-mails.   The documents

---

[18] Sparboe has asserted its own attorney-client privilege as to both sets of E-mails.   See Oral Arg. Tr. at 107; Sept. 19, 2011 Letter from T. Hutchinson to Hon. T. Rice (on file with the Court).   The propriety of Sparboe's assertion of privilege is not before me, so I limit my analysis and my conclusions here to UEP's privilege claims only.

[19] Because Sparboe asserts this document is privileged, I have not quoted from it, but have summarized the portion of it which is relevant to my analysis of UEP's privilege claim.

[20] UEP's other privilege theories are inapplicable to the 2003 E-mail because its counsel was not present at the July 2003 meeting referenced therein, and it has offered no evidence the meeting took place at the request of its counsel or as part of a fact-gathering process initiated by its counsel.   Cf. Upjohn, 449 U.S. at 394-95 ("The communications at issue were made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel."); Teleglobe, 493 F.3d at 364 (common-interest privilege permits attorneys to share information with one another).   Additionally, UEP has not sought work-product protection for the 2003 E-mail.   See UEP's Br. at 30-32; Pls.' Br. at Ex. C (entry 19).

themselves shed no light on precisely who was present when UEP's counsel commented on the

pending litigation before the October 2008 meeting.  Plaintiffs have adduced evidence suggesting

UEP meetings, including committee meetings and sessions at which UEP's counsel spoke, were

open to the public and the trade press until 2009.  See Pls.' Br. at Ex. B (deposition transcript at

Ex. 10, announcing certain UEP committee meetings no longer "open to everyone" as of January

2009); see also id. (deposition transcript at Ex. 9, showing trade press present for UEP meetings,

including those at which UEP counsel discussed legal issues).  UEP's only evidence as to the

circumstances under which its counsel made the statements summarized in the October 2008 E-

mails is essentially an averment by counsel that he cannot recall the statements, but probably

would not have made them to anyone unaffiliated with UEP or its membership.  See UEP's Br. at

Ex. A ¶ 12; id. at Ex. B p.6-7.  That sort of speculation and conjecture cannot satisfy UEP's

burden of proving the 2008 E-mails contain confidential, privileged legal advice.[21]

       D.     September 2005 Fax

The final document at issue is a two-page fax dated September 12, 2005, sent to Al Pope

(UEP's president) by Haley (its general counsel).  The fax cover sheet contains boilerplate

language stating it "may contain information that is privileged, confidential, and exempt from

disclosure under applicable law."  The second page of the fax contains what appears to be advice

to UEP about its policies regarding contact with its members' customers.  If that were the end of

---

[21] Moreover, UEP greatly overstates the level of "advice" at issue.  My review of the 2008
E-mails reveals they contain no "proposed litigation strategy," UEP's Br. at 34; rather, the only
comment attributed to UEP's counsel is a general statement that discussion of topics related to
the litigation should occur privately.  Such a comment does not amount to the sort of "mental
processes" necessary to "analyze and prepare [a] client's case" that the work-product doctrine
was intended to shelter, see Nobles, 422 U.S. at 238, particularly where the record is devoid of
proof regarding where, and to whom, the statement was made.

the story, the document likely would be protected, and Plaintiffs probably would not be seeking to compel its production.

However, the fax was precipitated by Sparboe's withdrawal from the Program, as well as a September 6, 2005 letter from Sparboe's president to UEP's chairman accusing a UEP staff member of interfering with Sparboe's relationships with its customers, and threatening legal action if the interference continued.  See Pls.' Br. at Ex. A (UEPPRIV009).  Moreover, the record reveals UEP forwarded the fax, in its entirety, to Sparboe's president as an attachment to its September 12, 2005 response to Sparboe's letter.  See UEP's Br. at Ex. W; see also id. at Ex. B p.6.

UEP claims the fax is privileged, offering an E-mail from its counsel to its president discussing the fax as evidence it contained legal advice sought by a client from his attorney. UEP's Br. at 35-37 & Ex. V (submitted in camera).  Based on that evidence, I agree the fax would qualify for protection, assuming it remained confidential.  Plaintiffs argue, however, that any privilege was waived when UEP's president and chairman attached the fax to their letter to Sparboe.[22]  Pls.' Br. at 33-34.  UEP responds by invoking a broad view of the common-interest privilege, pointing to Sparboe's status as a UEP member at the time, and characterizing the exchange as "sharing [a] corporation counsel's advice with the person within the corporation who raised [a] concern."  UEP's Br. at 37 (citing Upjohn).

Although counsel for UEP suggested this document is the "closest call and probably the hardest one in the stack," Oral Arg. Tr. at 88, I disagree.  Sparboe's September 6, 2005 letter to

---

[22] The letter to Sparboe was not marked "confidential" or "attorney-client privileged."
See UEP's Br. at Ex. W.

UEP was essentially a cease-and-desist letter.  See Pls.' Br. at Ex. A (UEPPRIV009).  It cannot be characterized as "rais[ing] a legal question" or "concern."  UEP's Br. at 37.  The letter did not request legal advice or assistance.  It accused UEP of committing a tort, demanded that the actions cease, and threatened a lawsuit if they did not.  See Pls.' Br. at Ex. A (UEPPRIV009).  With respect to the issues raised in the letter and addressed in UEP's response, Sparboe and UEP shared no common legal interest; rather, they were poised as adversaries in threatened litigation.[23]  Thus, UEP has not established a central element of the common-interest privilege with respect to the September 2005 fax.[24]  See Teleglobe, 493 F.3d at 364 ("[A]ll members of the community must share a common legal interest in the shared communication.").

Moreover, for purposes of this exchange, there is no evidence Sparboe was acting as an agent of UEP, in its role as a member of the organization or any of its boards or committees.  Instead, Sparboe was acting in its own interests, as an independent corporation advised by its own counsel.  See Pls.' Br. at Ex. A (UEPPRIV009).  To treat Sparboe as "person within [the UEP] corporation," at least as to this communication, would "fail[] to respect the corporate form."  Teleglobe, 493 F.3d at 371.  There may be instances in which the principles from Upjohn would render privileged communications between UEP's counsel and employees of its member companies.  See supra note 16.  For example, if Sparboe's president, acting in his capacity as a

---

[23] Although counsel for both corporations were copied on Sparboe's letter and UEP's response, the letters were authored by and primarily addressed to executives of each company. This further calls into question the applicability of the common-interest privilege.  See Teleglobe, 493 F.3d at 364 ("Sharing the communication directly with a member of the community may destroy the privilege.").

[24] UEP has not suggested the fax is protected by the work-product doctrine.  See UEP's Br. at 35-37; Pls.' Br. at Ex. C (entry 32).

member of a UEP committee, sought advice about a legal issue confronting the organization as a whole; or if UEP's counsel were conducting a factual investigation related to a legal issue facing UEP, and in the course of his investigation interviewed Sparboe executives after making them aware of the purpose for the interview.  This, however, is not one of those instances.

      E.     <u>Witness Interviews</u>

In addition to the six documents discussed above, UEP has asserted that certain information shared during interviews of Sparboe's representatives by Plaintiffs' counsel is privileged.  UEP's Br. at 38-44.  Those interviews were apparently memorialized in notes taken by Plaintiffs' counsel, and then summarized with little detail in a chart prepared by Plaintiffs for UEP's review.  <u>See</u> Pls.' Br. at Ex. H.  After receiving the chart, UEP prepared its own chart raising potential privilege claims regarding many of the entries on Plaintiffs' chart.  <u>See</u> Pls.' Br, at Ex. E.

Neither chart is sufficient to allow me to determine whether, and to what extent, Plaintiffs have elicited privileged information from Sparboe witnesses.  Although the burden is on UEP to establish the elements of its privilege claim, it cannot be faulted for failing to satisfy its burden when it had limited information from which to assess its claims as to the content of the interviews.  I will deny Plaintiffs' motion with respect to the witness interviews without sustaining UEP's claims of privilege with respect to the chart.  The parties should revisit the issue, mindful of the following:

- Any statements by Sparboe witnesses during interviews or in interrogatories related to the six documents at issue in this motion are not privileged, as I have determined the underlying documents are not privileged.

- Any statements related to communications between a Sparboe representative and

UEP's counsel would be privileged only if UEP can establish either: (i) the Sparboe representative was acting in his capacity as a UEP member representative and communicated with UEP's counsel in connection with counsel's provision of legal advice to UEP; or (ii) the Sparboe representative intended to enter a privileged relationship with UEP's counsel and sought confidential legal advice.

•     Failure to adduce evidence showing Sparboe's intent and expectations in connection with any disputed communications will likely complicate, if not defeat, any future privilege claims by UEP.

If the parties are unable to resolve the privilege issues related to the witness interviews on their own, they may request that I review Plaintiffs' interview notes to determine what, if any, attorney-client privileged or work-product protected information they contain.

An appropriate order follows.