**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | |
| **ANTITRUST LITIGATION** | : | |
| | : | **MDL No. 2002** |
| | : | **08-md-02002** |
| _____ | : | |
| | : | |
| **THIS DOCUMENT APPLIES TO:** | : | |
| **ALL ACTIONS** | : | |

## OPINION

GENE E.K. PRATTER, J.                                           NOVEMBER 30, 2011

### I.  Introduction

The issue addressed here is whether the statute of limitations bars claims for damages occurring prior to September 24, 2004 in this civil antitrust litigation.  Defendants dispute the contention that Plaintiffs adequately have alleged facts under the pleading standards of Federal Rules of Civil Procedure 12(b)(6) and 9(b) that would justify tolling the statute pursuant to the fraudulent concealment doctrine.[1]  For the reasons set forth below, the Motion is granted without prejudice to Plaintiffs to seek leave to amend their pleading, if they in good faith believe they can, as to fraudulent concealment.

### II.  Background

This multidistrict litigation concerns an alleged conspiracy of various egg and egg product producers and trade groups to manipulate the supply of, and thereby fix prices for, domestically-sold eggs and egg products from 2000 to the present.  Plaintiffs are direct

---

[1]  Defendants filed this Motion to Dismiss Direct Purchasers' Claims for Damages Prior to September 24, 2004 (Doc. No. 241).  Plaintiffs' responded in opposition to the Motion (Doc. No. 317) (hereinafter, "Pls.' Resp.").  Defendants also filed a reply brief (Doc. No. 304). Additionally, the parties submitted various supplemental materials to the Court.  The transcript of the oral argument on the Motion is in the record at Docket No. 490.

purchasers of domestic eggs and egg products who claim that the Defendants' conduct violated

Section 1 of the Sherman Act.  In their Second Consolidated Amended Class Action Complaint

(hereinafter, the "SAC"), Plaintiffs allege that Defendants advanced the conspiracy through eight

alleged "collective actions," which included, *inter alia*, various flock reduction and early molting

initiatives, the United Egg Producers Certification Program, and the United States Egg Marketers

export program.

The Court references two of its prior decisions here for the parties' convenience and

supplemental background.  The Court described the SAC's core allegations in the September 26,

2011 Memorandum and Order, 2011 WL 4465355 (Doc. Nos. 562 and 563), which granted in

part and denied in part six individual Defendants' motions to dismiss the SAC.  Additional

discussion concerning the SAC's allegations as to "eggs" and "egg products" is in the Court's

Memorandum and Order issued on October 14, 2011, 2011 WL 4945864 (Doc. Nos. 581 and

582), which denied without prejudice the Defendants' motion to dismiss a distinct antitrust claim

as to egg products.  Consistent with that decision, the use of the term "eggs" in this litigation,

until further order, shall conform with the SAC's definition, *i.e.*, "eggs" is inclusive of "shell

eggs" and "egg products."  *See* SAC ¶ 1.

### III.  Discussion

### A.  *Statute of Limitations*

All parties agree that the Plaintiffs' antitrust claim is subject to the Clayton Act's four-

year statute of limitations.  *See* 15 U.S.C. § 15b.  Under that Act, damages for antitrust claims are

recoverable if the suit "commenced within four years after the cause of action accrued," *Zenith*

*Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (quoting 15 U.S.C. § 15b).

For a private antitrust suit, a "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Id.*  In the case of a continuing price-fixing conspiracy "that brings about a series of unlawfully high priced sales over a period of years," which Plaintiffs contend is the product of the subject conspiracy here, Pls.' Resp. at 1 n.1, "each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (citations omitted) (internal quotation marks omitted).  Thus, on a given date when a plaintiff purchases a product, the price of which was anticompetitively fixed, "a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date.  To recover those damages, he must sue within the requisite number of years from the accrual of the action." *Zenith*, 401 U.S. at 339.

Plaintiffs here are seeking damages for alleged injuries beginning in 2000 and continuing to the present.  SAC ¶ 182 ("Defendants undertook a coordinated effort to restrict egg supply through various means that has artificially fixed, maintained and/or stabilized egg prices to supracompetitive levels throughout 2000 to the present."); *see also id.* ¶ 518(e) (". . . Defendants took significant steps throughout 2000-2008, which resulted in supracompetitive prices for eggs throughout this period.").  Defendants have moved to dismiss, however, contending that the Plaintiffs' claims that accrued prior to September 24, 2004—a date which Plaintiffs appear not to dispute[2]—are barred by the four-year statute of limitations.  Defendants have calculated this date

---

[2] *See* Pls.' Resp. at 1 n.1 (referring to the period "outside the four-year statute of limitations" as
(continued...)

based upon the filing date of the first direct purchaser suit consolidated in these proceedings.  *See* Defs.' Mot. at 1 n.1.[3]

Although generally a statute of limitations defense is ill-suited for a Rule 12(b)(6) motion, the Third Circuit Court of Appeals has recognized that "an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading" *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994) (citations omitted); *see also Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (recognizing that a statute of limitations defense is permissible on a Rule 12(b)(6) motion "but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations'" (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)).  This exception applies in the case *sub judice*.  Based upon the operative statute of limitations and the SAC, it appears that the Plaintiffs' claims for damages that accrued prior to September 24, 2004 are untimely.[4]

_____

(...continued)
"*i.e.*, before September 24, 2004").

[3] Defendants consider the first plaintiff case consolidated in this multi-district litigation to be *ZAZA, Inc. v. Golden Oval Eggs LLC*, No. 08-cv-05262 (D. Minn), which was filed on September 24, 2008.

[4] Based upon the parties' arguments, it appears that Plaintiffs and Defendants presume that the Plaintiffs' cause of action accrued prior to September 24, 2004.  However, it is not clear from the face of the SAC when Plaintiffs allege their first claim for damages against Defendants accrued, and, hence, when the statute of limitations started to run on that claim.  *See Forbes v. Eagleson*, 228 F.3d 471, 486 (3d Cir. 2000) ("Equitable tolling . . . presumes claim accrual.  Equitable tolling steps in to toll, or stop, the running of the statute of limitations in light of established equitable considerations." (quoting *Oshiver*, 38 F.3d at 1390)); *see also Oshiver*, 38 F.3d at 1390 (recognizing that the determination of "the accrual date of a claim . . . [is] for ultimate purposes of determining, as a legal matter, when the statute of limitations begins to run").

The SAC has no specific allegations as to the Plaintiffs' purchases from Defendants,

(continued...)

**B.  Fraudulent Concealment Doctrine**

Ostensibly anticipating ruffled feathers over time-bar issues, Plaintiffs attempt in the SAC

to preempt this defense by invoking the fraudulent concealment doctrine.  The fraudulent

concealment doctrine operates to stop the statute of limitations from running in circumstances

when the accrual date of a claim has passed but the "plaintiff's cause of action has been obscured

by the defendant's conduct."  *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002);

*see Forbes*, 228 F.3d at 486 (citing *Oshiver*, 38 F.3d at 1387).  If a plaintiff pleads facts that

demonstrate fraudulent concealment in satisfaction of the requisite pleading standards, the

plaintiff may pursue antitrust claims for recovery of damages during the tolled period.  *See*

*Zenith*, 401 U.S. at 338 (recognizing that antitrust damages are recoverable outside the four-year

statute of limitations for "any additional number of years during which the statute of limitations

was tolled").

To invoke equitable tolling through fraudulent concealment at the pleading stage—to

state a claim of fraudulent concealment, as it were—a plaintiff must allege particularized facts

sufficient to suggest "(1) that the defendant actively misled the plaintiff; (2) which prevented the

---

(...continued)
including frequency, timing, and so forth.  Instead, the SAC merely alleges as to each Plaintiff
that "[d]uring the Class Period, [Plaintiff] purchased shell eggs directly from one or more
Defendants," or "purchased egg products directly," or purchased both products directly.  *See,*
*e.g.*, SAC ¶¶ 28, 31, 34, 38.  Still, given the nature of the Plaintiffs' claim, it is reasonable to
infer that Plaintiffs purchased from Defendants at times when prices were allegedly higher due to
the Defendants' allegedly anticompetitive conduct.
    Thus, when reviewing the specific allegations concerning times when prices were higher
as a result of the Defendants' allegedly anticompetitive conduct, it appears that the first time the
SAC implies that a price increase resulted from such conduct is some unspecified time in 2000.
*See id.* ¶¶ 189-90 (describing an article from an industry publication that stated that the
Defendants' agreed-upon flock reductions resulted in a "profitable year").  The first time that the
SAC explicitly alleges that prices increased was in 2003.  *See id.* ¶¶ 251, 253-54, 258, 261-62.

plaintiff from recognizing the validity of her claim within the limitations period; and (3) where

the plaintiff's ignorance is not attributable to her lack of reasonable due diligence in attempting

to uncover the relevant facts." *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494, 509 (3d Cir.

2006) (citing *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 256 (3d Cir. 2001)); *see also*

*Forbes*, 228 F.3d at 487; *Davis v. Grusemeyer*, 996 F.2d 617, 624 & n.13 (3d Cir. 1993),

*overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d

Cir. 1998).[5]

---

[5] The Court is following the conventional Third Circuit law concerning the federal fraudulent concealment standard as articulated in civil Racketeer Influenced and Corrupt Organizations Act ("RICO") cases because our court of appeals, although having touched on the standard, has not explicitly announced the requisite elements for pleading fraudulent concealment in the antitrust context. *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1178-79 (3d Cir. 1993) (commenting that "[w]e have not specifically elucidated the standards for pleading fraudulent concealment in the antitrust context" and referencing the fraudulent concealment standard under Pennsylvania law); *Linerboard*, 305 F.3d at 161 (citing the *American Law Reports* for the general elements of fraudulent concealment in deciding whether there were common issues of proof predominate for the issue of fraudulent concealment in the antitrust class certification context); *In re Aspartame Antitrust Litig.*, 416 F. App'x 208, 211 (3d Cir. 2011) (unpublished) (articulating that at the summary judgment stage a plaintiff must proffer evidence in support of the fraudulent concealment elements identified in *Linerboard*, 305 F.3d at 161).

The federal fraudulent concealment standard that the court of appeals has articulated in civil RICO cases provides appropriate guidance for the case at bar. That treatment of fraudulent concealment in civil RICO matters is consistent with the appellate court's treatment of the doctrine in antitrust cases thus far, and with the parties' proposed standard for establishing fraudulent concealment in this case. Moreover, many district courts in this circuit have applied the court of appeals' civil RICO fraudulent concealment case law to varying degrees in antitrust cases raising issues similar to the one at bar. *See, e.g.*, *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732-LDD, 2008 WL 4724094 (E.D. Pa. Aug. 11, 2008), *aff'd by* 416 F. App'x 208; *In re Aspartame Antitrust Litig.*, No. 2:06-CV-1732, 2007 WL 5215231 (E.D. Pa. Jan. 18, 2007); *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303 (D.N.J. 2004); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001); *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011).

Furthermore, the civil RICO fraudulent concealment standard is compatible with the challenges presented in the antitrust context in many ways because of the recognized parallels between the antitrust and civil RICO statutes. Those parallels have justified the use of antitrust law as an interpretative reference of civil RICO with respect to fraudulent concealment and

(continued...)

6

The first element of the fraudulent concealment standard goes to a defendant's alleged acts of concealment.  This element is subject to considerable differences in treatment among the circuits and even among courts within the Third Circuit in civil antitrust suits.  These differences have been chronicled elsewhere which the Court acknowledges by reference[6] but need not address at this time.  Suffice to say, the legal questions and application of this element present subtle and difficult issues in civil antitrust cases.  The Third Circuit Court of Appeals has not addressed these issues in the antitrust context and has provided only limited commentary on the issues implicated by this element in assessing fraudulent concealment in relation to other federal statutes.  *See, e.g., In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig.*, 242 F.3d 497, 502-03 (2001) (discussing self-concealing acts and affirmative acts in relation to ERISA).  Generally, however, this element embodies the concept that "if the defendant conceals *any* element of the offense, including, but not limited to, the injury itself, the four-year period will be tolled."  *Mathews*, 260 F.3d at 256 n.26 (emphasis in original).

The second element as articulated by the court of appeals requires a plaintiff to "show that he actually was 'mis[led] . . . into thinking that he d[id] not have a cause of action.'"

---

(...continued)
statute of limitations matters.  *See, e.g., Klehr*, 521 U.S. at 188-89; *id.* at 198-99 & n.2 (Scalia, J., dissenting); *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 150-53 (1987).

[6]  Courts and commentators have acknowledged that the varying approaches to this element can be allocated among three categories:  the "self-concealing" standard, the "separate and apart" standard, and the "affirmative acts" standard.  *See Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995); *Aspartame*, 2007 WL 5215231, at *4-5; *Mercedes-Benz*, 157 F. Supp. 2d at 368-69; 1 ABA Section of Antitrust Law, *Antitrust Law Developments* 867-69 (6th ed. 2007); Richard F. Schwed, *Fraudulent Concealment, Self-Concealing Conspiracy, and the Clayton Act*, 91 Mich. L. Rev. 2259 (1993); W. Glenn Opel, *A Reevaluation of Fraudulent Concealment and Section 4B of the Clayton Act*, 68 Tex. L. Rev. 649 (1990).

*Forbes*, 228 F.3d at 487 (quoting *Davis*, 996 F.2d at 624).  This element also is premised upon the principle that the "doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim." *Davis*, 996 F.2d at 624; *see also Forbes*, 228 F.3d at 487 (recognizing that if "plaintiffs either knew or reasonably should have known the facts supporting their [cause] of action," then equitable tolling is unwarranted).  It follows that a "key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim he now brings."  *Davis*, 996 F.2d at 624.  Accordingly, in pleading this element of fraudulent concealment, Plaintiffs must allege facts sufficient to demonstrate that they "were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint." *Forbes*, 228 F.3d at 487.

With respect to the third element, the court of appeals has held that "the exercise of due diligence must be shown in the antitrust context."  *See Lower Lake Erie*, 998 F.2d at 1179; *cf. Klehr*, 521 U.S. at 195 (recognizing that "many antitrust cases," without contradictory authority, have found that fraudulent concealment can be "satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense" (citation omitted)).  Indeed, the Supreme Court has observed that the purpose of the fraudulent concealment doctrine in antitrust cases is directed towards not only "compensat[ing] victims but also . . . encourag[ing] those victims themselves diligently to investigate and thereby to uncover unlawful activity."  *Klehr*, 521 U.S. at 195 (citation omitted).  In this respect the fraudulent concealment doctrine has long invoked the principle of laches.  *See generally Bailey v. Glover*,

88 U.S. (21 Wall) 342, 349-50 (1874) ("[W]hen there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud[,] . . . the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing, or those in privity with him."); Richard L. Marcus, *Fraudulent Concealment in Federal Court:  Toward a More Disparate Standard?*, 71 Geo. L.J. 829, 875 (1983) ("A plaintiff who has not acted reasonably to protect his own interests may not cry foul when his belated claim is barred.").  Accordingly, this element serves to ensure "that [plaintiff's] continuing ignorance was not attributable to lack of diligence on his part,"  *Davis*, 996 F.2d at 624 n.13 (citation omitted) (bracket in original), and a plaintiff must plead that she took "reasonable measures to uncover the existence of injury." *Forbes*, 228 F.3d at 486 (quoting *Oshiver*, 38 F.3d at 1390).[7]

### C.  Pleading Standards

Defendants have moved to dismiss the Plaintiffs' claim of fraudulent concealment under Federal Rule of Civil Procedure 12(b)(6), a standard with which the parties here are already familiar, as well as Federal Rule of Civil Procedure 9(b) for failing to "state with particularity the circumstances constituting fraud or mistake."[8]

---

[7]  The due diligence element has an intimate association with the second element of fraudulent concealment, specifically, as to whether the plaintiff should have known of her claim.  This interrelationship is illustrated in *In re Lower Lake Erie Iron Ore Antitrust Litigation*, in which the court of appeals held that a claim for fraudulent concealment was unavailing in an antitrust case when plaintiffs failed to show any facts as to their diligence, and that plaintiffs "*did* know" certain facts about an industry's rate-making that "should reasonably have made them aware of a basis for asserting the very claims now being raised."  998 F.2d at 1179 (emphasis added).

[8]  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded allegations in the complaint and construes the pleading in the light most favorable to the plaintiffs.  *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted).  Pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," providing the defendant "fair notice of what
(continued...)

The parties are in agreement that in pleading fraudulent concealment the strictures of Rule 9(b) apply.  *See* Defs.' Mot. at 4-5; Pls.' Resp. at 2-5; *see also Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984) ("We agree, of course, that fraud, and thus fraudulent concealment, must be pleaded with particularity." (citing Fed. R. Civ. P. 9(b) and *Walters v. Ditzler*, 227 A.2d 833 (1967))).  To satisfy the pleading requirements of Rule 9(b), a complaint may either describe "the circumstances of the alleged fraud with precise allegations of date, time, or place" or may use "some [other] means of injecting precision and some measure of substantiation into their allegations of fraud." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 n.10 (3d Cir. 2002) (citation omitted) (internal quotations omitted); *see also Rolo*, 155 F.3d at 658, *abrogation on other grounds recognized by Forbes*, 228 F.3d at 483-84; *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).  At the very least, "[p]laintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of Am.*, 361 F.3d 217, 224

---

(...continued)

the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted).  This standard "does not require 'detailed factual allegations,'" but a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555). Consistent with Rule 12(b)(6), the Court may consider the allegations contained in the complaint, exhibits attached to the complaint, matters of public record and records of which the Court may take judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

A complaint need allege "only enough facts to state a claim of relief that is plausible on its face" so as to test whether "plaintiffs . . . have . . . nudged their claims across the line from conceivable to plausible" to survive a Rule 12(b)(6) motion.  *Twombly*, 550 U.S. at 570.  Thus, a complaint is subject to dismissal when the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

(3d Cir. 2004), *abrogation on other grounds recognized by In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010). This pleading standard not only gives defendants notice of the claims against them, but also combats "frivolous suits brought solely to extract settlements" from defendants and "provides an increased measure of protection for their reputations." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

While the purpose of Rule 9(b) is to provide notice of the precise misconduct, courts "should . . . apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo*, 155 F.3d at 658. Accordingly, the particularity rule is somewhat relaxed when factual information remains within the defendant's control. *Burlington Coat*, 114 F.3d at 1418. "Relaxation," however, does not translate into, or otherwise authorize, boilerplate and conclusory allegations, and plaintiffs "must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Id.* Allegations "based upon information and belief" are permissible, "but only if the pleading sets forth specific facts upon which the belief is reasonably based." *Hollander v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 10-cv-0836-RB, 2010 WL 4159265, at *4 (E.D. Pa. Oct. 21, 2010) (citation omitted) (internal quotations omitted); *see also Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997) ("[A] boilerplate allegation that plaintiffs believe the necessary information 'lies in defendants' exclusive control,' if made, must be accompanied by a statement of facts upon which their allegation is based." (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1992) (internal quotations omitted)).

Likewise, Rule 8 continues to apply even when under Rule 9(b) "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P.

9(b).  For purposes of its meaningful presence in Rule 9(b) "'generally' is a relative term" and "it is to be compared to the particularity requirement applicable to fraud or mistake." *Iqbal*, 129 S. Ct. at 1954.  By way of example, "Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard.  It does not give him license to evade the less rigid-though still operative-strictures of Rule 8." *Id.*; *cf. Burlington Coat*, 114 F.3d at 1418 ("[P]laintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'"); *United States ex rel. Pilecki-Simko v. Chubb Instit.*, No. 10-3907, 2011 WL 3890975, at *3 (3d Cir. Sept. 6, 2011) (unpublished) (recognizing that under *Iqbal* "Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss." (quoting *Iqbal*, 129 S. Ct. at 1954)).[9]

---

[9] Although it appears that Rule 9(b) is generous in permitting a generalized pleading in this regard, one treatise has noted that this sentence "suggests that the [Rule's] draftsmen felt a need to qualify the first sentence to insure that it was not interpreted to require a party pleading fraud or mistake to allege the specific circumstances of fraudulent intent, knowledge of the falsity of a statement, or mistaken belief in its truth."  5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1301.

One commentator has suggested, the "operation of" the federal fraudulent concealment doctrine "depends on the procedural context," and that at the motion to dismiss stage, even with Rule 9(b) in effect, it is "impossible to resolve tolling issues on the pleadings in many cases" due to the requisite factual determinations, particularly those concerning whether a reasonably diligent plaintiff would have discovered the claim.  Marcus, *supra*, at 902-04.  Accordingly, "it appears that the principal function of [R]ule 9(b) is to require that the specifics of the tolling argument be spelled out promptly so that the court can reach the merits of tolling at an early date." *Id.* at 904.  This observation is consistent with the *Manual for Complex Litigation*'s recognition that statute of limitations issues in antitrust cases "may be appropriate for early resolution by summary judgment."  David F. Herr, *The Manual for Complex Litigation* § 30.1, at 741 (4th ed. 2011).  Nonetheless, this apparent function in no way detracts from a plaintiff's obligations under the pleading standards in invoking the fraudulent concealment doctrine.

**D.  *Request for Judicial Notice***

In their motion, Defendants argue that Plaintiffs plead certain facts drawn from excerpted

quotes of various publicly disseminated egg industry publications and regional newspapers

between 1999 and September 24, 2004.  According to Defendants, these articles demonstrate

both that Defendants did not take measures to conceal the conspiracy and that various "storm

warnings" existed prior to September 24, 2004 such that Plaintiffs should have been on notice of

their claim and exercised reasonable diligence.  *See* Defs.' Mot. at 7, 15-17; Defs.' Reply at 12-

14; Tr. at 22:9-21.  Defendants ask the Court to take judicial notice of these articles because the

"many public sources cited in the [SAC] also contain additional statements that Plaintiffs do not

quote or paraphrase, but that clearly and openly discuss the relevant facts and surrounding

circumstances that Plaintiffs allege constituted an illegal conspiracy." Defs.' Mot. at 7; *see also*

*id.* at 7 n.6, 9 n.10.  The Court declines this request.

Although as a general matter, "a district court ruling on a motion to dismiss may not

consider matters extraneous to the pleadings," *Burlington Coat*, 114 F.3d at 1426 (citation

omitted), the Court could take judicial notice of the published news articles proffered by

Defendants insofar that "[t]heir publication is 'not subject to reasonable dispute in that [they

are] . . . capable of accurate and ready determination by resort to sources whose accuracy cannot

be questioned.'" *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital*, 435 F.3d 396,

401 n.15 (3d Cir. 2006) (quoting Fed. R. Evid. 201(b)(2) and citing *Heliotrope Gen., Inc. v. Ford*

*Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999)); *see also Twombly*, 550 U.S. 568 n.13

(suggesting that under the appropriate circumstances a district court could take judicial notice

pursuant to Fed. R. Evid. 201 of the "full contents of . . . published articles referenced in [a]

complaint, from which . . . truncated quotations were drawn").

Even if the Court took judicial notice of the articles, however, the Court would not at this

stage consider the documents for the truth of the information contained therein.  *Cf. Lum*, 361

F.3d at 221 n.3 ("While a prior judicial opinion constitutes a public record of which a court may

take judicial notice, it may do so on a motion to dismiss only to establish the existence of the

opinion, not for the truth of the facts asserted in the opinion." (citation omitted)); *Anspach ex rel.

Anspach v. City of Philadelphia*, 503 F.3d 256, 273 n.11 (3d Cir. 2007) ("We consider [a

Commissioner of the Food and Drug Administration's announcement as published in the Federal

Register], not for the truth of its contents, but rather as evidence of the information provided by

the federal government to healthcare providers . . . ."); *Oran v. Stafford*, 226 F.3d 275, 289 (3d

Cir. 2000) (finding it persuasive that public disclosure documents filed with the SEC may be

judicially noticed on a motion to dismiss, in part, because "the documents are the very documents

alleged to contain the various misrepresentations or omissions and are relevant not to prove the

truth of their contents but only to determine what the documents stated" (quoting *Kramer v. Time

Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).[10]   Accordingly, even if the cited articles were

"sources whose accuracy cannot reasonably be questioned" and concerned matters that are

"capable of accurate and ready determination," the articles ought not be relied upon at this stage

of the litigation to determine whether or not Defendants concealed the conspiracy.  Such a

consideration is one appropriately withheld until it is time to consider the merits of the claim.

---

[10]  *But* s*ee, e.g.*, *Ieradi v. Mylan Labs*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (taking judicial
notice of certain facts published in a *New York Times* article that was not cited in the complaint).

On the other hand, the Court may take judicial notice of the articles for the purpose of establishing that the information, or at least statements of information, in the various documents were publicly available.[11] *See Benak*, 435 F.3d at 401 n.15 ("[T]he inquiry notice analysis is an objective one. Whether appellants read the articles or were aware of them is immaterial. They serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."). In considering the articles in this respect, Defendants are asking the Court to determine if Plaintiffs should have known of their claim before September 24, 2004. In other words, were Plaintiffs by then on inquiry notice of "storm warnings" or "red flags" that would alert Plaintiffs to investigate their claim? *See Mathews*, 260 F.3d at 252. "Storm warnings" are "essentially any information or accumulation of data 'that would alert a reasonable person to the probability that [culpable activity had transpired]'. . . . This is an objective inquiry and hinges not on a plaintiff's actual awareness of suspicious circumstances or even on the ability of a plaintiff to understand their import." *Cetel*, 460 F.3d at 507 (citing *Mathews*, 260 F.3d at 252).

In a RICO civil enforcement case based upon securities fraud, the court of appeals articulated that the objective standard for reasonableness in recognizing storm warnings, such as "misleading statements or significant omissions," is premised upon "a reasonable investor of ordinary intelligence," one who is presumed to "read[] prospectuses, reports, and other information related to the investments . . . and . . . [to have] knowledge of publicly available

---

[11]  Plaintiffs have not raised any arguments disputing that the publications cited in the SAC were publicly available. By way of notable contrast, with respect to other documents cited and liberally quoted throughout the SAC, such as the United Egg Producers' bi-weekly "United Voices" newsletter and UEP meeting minutes, the SAC explicitly states that these publications were "not available to the general public" and  "not distributed to the public." SAC ¶¶ 175, 503.

news articles and analyst's reports." *Id.* (citing *Mathews*, 260 F.3d at 252, and *Benak*, 435 F.3d at 400); *see also Benak*, 435 F.3d at 402 ("News reports are not given weight by courts in a vacuum, but rather have significance in cases where 'investors are presumed to have read prospectuses, quarterly reports, and other information related to investments.'" (quoting *Mathews*, 260 F.3d at 252)).

However, unlike the securities fraud context, there is no "reasonable antitrust plaintiff" with which to compare an antitrust plaintiff for purposes of evaluating reasonable diligence in connection with a motion to dismiss.  Ordinarily, in the absence of such a standard, "it is not possible to generalize as to what facts will suffice for suspension of the statute [of limitations] because in every application of the 'fraudulent concealment' exception there is included a judgment as to how far the plaintiff conformed to an external standard of conduct imposed by courts, with the wisdom acquired after the event."  John P. Dawson, *Fraudulent Concealment and Statutes of Limitation*, 31 Mich. L. Rev. 875, 886 (1933).  It is not surprising, then, that courts confronting fraudulent concealment arguments in antitrust cases often highlight the fact intensive inquiry required in ascertaining whether a plaintiff should have known of her claim and the reasonableness of a plaintiff's investigation.  *See, e.g., Aspartame*, 2007 WL 5215231, at *6 ("Issues of diligence and constructive notice, which are inherently factual, generally should not be decided on a motion to dismiss."); *Mercedes-Benz*, 157 F. Supp. 2d at 374 ("The issue of tolling of the statute of limitations due to defendants' alleged fraudulent concealment is an equitable one.  As such it is intimately bound up with the facts of the case." (citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979)); *Elec. Carbon*, 333 F. Supp. 2d at 317 ("The question of whether the plaintiffs exercised due diligence to uncover their claim

'implicates factual questions as to when plaintiff discovered or should have discovered the elements of the cause of action.'" (quoting *Davis*, 996 F.2d at 623 n.10)); *Bethlehem Steel Corp. v. Fischbach and Moore, Inc.*, 641 F. Supp. 271, 275 (E.D. Pa. 1986) ("Whether a party has exercised due diligence is a factual issue which cannot be decided on a motion to dismiss unless it appears beyond doubt that plaintiff can prove no facts to support the claim.").

Nonetheless, even if the Court were to take judicial notice of the articles, and even assuming that they were publicly available and are "sources whose accuracy cannot reasonably be questioned," such an endeavor would effectively hatch a "wind egg," in other words, a yolkless egg, for Defendants.  As Plaintiffs have argued, there are no grounds in the SAC from which to conclude that Plaintiffs contemporaneously knew of, or reasonably should have been expected to know of, those documents.

By way of example, Plaintiffs are alleged to be direct purchasers of eggs, and there is no inference that can be drawn from the SAC's allegations, despite the Defendants' contention otherwise, that Plaintiffs had subscriptions for, or should have otherwise read, egg industry publications.  It may well be that in the course of this litigation Defendants would be able to demonstrate that Plaintiffs, and other egg purchasers who are "involved in the industry," "consult [those particular industry publications] regularly," Tr. at 17:1-4, but no allegation in the SAC suggests such circumstances.  Whether a reasonable plaintiff would be expected to read regional newspapers or egg industry publications, akin to the reasonable securities investor who is expected to know of publicly available news articles about corporate activities, is simply not a question that can be resolved at this stage of the case because the answer would require looking to matters extraneous to the SAC.  *See, e.g., In re Fasteners Antitrust Litig.*, No. 08-md-1912,

2011 WL 3563989, at *6 (E.D. Pa. Aug. 12, 2011) ("A determination of whether these documents constituted sufficient 'red flags' so as to put Plaintiffs on notice must await a more complete record. The factual nature of the inquiry involves an evaluation of Plaintiffs' exposure to these articles, the circulation of various publications, and the likelihood that a reasonable plaintiff would have read such documents. . . . A determination at this juncture that Plaintiffs, as a matter of law, had notice of the referenced public documents . . . is premature." (citation omitted)).[12]

These articles ultimately may be appropriate in considering the merits of the Plaintiffs' fraudulent concealment claim. But because the articles proffered by Defendants would not lead to productive avenues of analysis on this motion, the Court finds it appropriate to limit its consideration to the SAC itself.

### E. Fraudulent Concealment as Alleged in the SAC

In proceeding to consider the motion, the Court need not address whether the SAC sufficiently alleges that Defendants actively misled Plaintiffs, *i.e.*, the first element of fraudulent

---

[12] Plaintiffs argue that even if the obligation to read those publications could be pinned on them through a reasonableness standard, or that they are actually found to have read those publications, these articles would still not have put them on inquiry notice of their claim because they would not have known of, *inter alia*, the Defendants' alleged agreement to reduce the supply of eggs, or that the export program involved selling exports at a loss. Tr. at 46:23-26, 47:1-6; Pl.'s. Resp. at 16-17. However, as addressed above, inquiry notice is not the same as actual knowledge of the contours of a claim, and there is no requirement that the full extent of an alleged conspiracy needs to be publicly available in order for inquiry notice to be in effect. *See also Cetel*, 460 F.3d at 507 (citing *Mathews*, 260 F.3d at 252); Defs.' Reply at 12-13. Furthermore, in many an antitrust case, the plaintiff does not have direct evidence of the defendants' agreement and, as a result, claims of conspiracy are permitted to rest on circumstantial evidence. *See Insur. Brokerage*, 618 F.3d at 324 (acknowledging that plaintiffs may rely on circumstantial evidence in pleading antitrust claims).

concealment,[13] because the Court concludes upon close consideration of the SAC that Defendants

are correct in their assessment that the SAC fails to sufficiently allege the fraudulent concealment

doctrine in other respects under Rule 12(b)(6) and Rule 9(b).

Specifically, the SAC is deficient with respect to pleading whether Plaintiffs are entitled

to tolling until a time within the limitations period. The SAC also fails to plausibly suggest that

Plaintiffs actually or constructively knew of no facts or information that might have alerted a

reasonable person to investigate the claim. Finally, the pleading does not sufficiently allege that

the Plaintiffs' ignorance is not attributable to their lack of reasonable due diligence in attempting

to uncover the relevant facts.

The SAC contains only two allegations concerning the Plaintiffs' alleged knowledge or

imputed knowledge of facts giving rise to their claim and their reasonable diligence. In their

entirety, these allegations are:

> 511.    Plaintiffs and the Class members could not have discovered the alleged contract,
> conspiracy or combination at an earlier date by the exercise of reasonable diligence
> because of the deceptive practices and techniques of secrecy employed by Defendants and
> their co-conspirators to avoid detection of, and fraudulently conceal, their contract,
> conspiracy or combination. The contract, conspiracy or combination as herein alleged
> was fraudulently concealed by Defendants by various means and methods, including, but
> not limited to, secret meetings, misrepresentations to customers concerning the reason for
> price increases and surreptitious communications between the Defendants by the use of
> non-public means or in-person meetings at trade association events (and elsewhere) in
> order to prevent the existence of written records.

> 512.    Because the alleged conspiracy was both self-concealing and affirmatively

---

[13]  Plaintiffs contend that they have pled a self-concealing conspiracy and affirmative acts of
concealment by alleging, *inter alia*, that Defendants held nonpublic meetings at which the
conspiracy was discussed, shared nonpublic verbal and written communications and documents
among each other about the conspiracy, engaged in nonpublic auditing and monitoring of
compliance with the UEP Certification Program, and made various misrepresentations to the
public and Plaintiffs. Pls.' Resp. at 10-13.

concealed by Defendants and their co-conspirators, Plaintiffs and the Class members had no knowledge of the alleged conspiracy or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed, until very recently.

SAC ¶¶ 511-12.

A discussion of these allegations in light of the SAC in its entirety and as compared to the requisite pleading standards follows.

### 1. Tolling Date

Tolling under the fraudulent concealment doctrine lasts only "*until* the plaintiff knows, or should reasonably be expected to know, in the exercise of due diligence, the concealed facts supporting the cause of action." *Forbes*, 228 F.3d at 487 (emphasis added) (citing *Oshiver*, 38 F.3d at 1392); *see also* Pls.' Resp. at 18; Defs.' Reply at 12-13. Thus, to allege, as Plaintiffs have, that they did not know and should not have known, in the exercise of reasonable diligence, of the elements of their claim "until very recently," or "at an earlier date" does not plausibly suggest under Rule 12(b)(6) that they are entitled to tolling until a time within the limitations period. Likewise, such language is not sufficiently substantial or precise for Rule 9(b) purposes.[14] These terms are relative, superlative, conclusory, and wholly subjective. Indeed, the SAC uses the word "recently" to refer to dates as different as 1998 and 2008. *See id.* ¶ 148

---

[14] One court in this circuit found that allegations virtually identical to those asserted in the SAC were defective in respect to Rule 9(b) because the allegations of discovery were not sufficiently particular. *See Magnesium Oxide*, 2011 WL 5008090, at *25 (determining that the allegation that "due to the secretive nature of the alleged MgO conspiracy, 'neither plaintiffs nor the class members had knowledge of any of the foregoing violations, and neither plaintiffs nor the class members, until recently, could have discovered through reasonable diligence that [D]efendants and their co-conspirators had engaged in the foregoing violations'" does not "satisfy the requirements of Rule 9(b)" because it "fails to encompass when and how Plaintiffs ultimately discovered the alleged MgO conspiracy" and thereby lacks "some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy").

("According to USDA reports, as recently as 1998 . . . ."); *id.* ¶ 506 (referring to "only recently" in relation to a June 4, 2008 audio recording of a presentation).  Although as a measurement for some purposes both ends of a span of a decade might fully merit the description of "recent," the Court does not see the chronology of this litigation's fact pattern as being that expansive.

In cases where such pleading language has been found to be adequate, among other factors, plaintiffs generally allege a specific tolling date to provide a reference point from which to gauge such terms.  *See, e.g.*, *Elec. Carbon*, 333 F. Supp. 2d at 317 (deeming sufficient the allegation that "Plaintiffs and members of the Class could not have discovered the violations at an earlier date through the exercise of due diligence" in a complaint that alleges "until shortly before the filing of this action, specifically until on or about November 4, 2002" "because, prior to that date, the defendants were so successful in their intentional efforts to conceal their conspiracy that the plaintiffs, a class of reasonable Electrical Carbon Products purchasers, had no reason to suspect that they were engaged in any wrongdoing"); *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, No. 00 Civ. 7804, 2004 WL 487222, at *5 (S.D.N.Y. Mar. 12, 2004) (allowing a fraudulent concealment claim to proceed which, *inter alia*, was based upon the allegation that "Plaintiffs and the members of the class had no knowledge of the said antitrust violations, or of any facts which might have led to the discovery thereof, until November, 1998 . . . .  Plaintiffs and the members of the class could not have discovered the violations at an earlier date by the exercise of due diligence . . . ."); *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 787-88 (N.D. Cal. 2007) ("Plaintiffs' allegation that they could not have discovered the alleged conspiracy 'at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and

their Co-Conspirators' to conceal the conspiracy . . . is a sufficient allegation of due diligence [as linked with the alleged non-discovery of the conspiracy until October 2002].").

Plaintiffs here do not plead a tolling date. Instead, as discussed above, Defendants have proposed September 24, 2004 as the date on which the statute of limitations commenced to run, and Plaintiffs have not disputed that date. However, September 24, 2004 cannot serve as the stand-in for the date on which equitable tolling ended because the designation of that date is based on the four-year statute of limitations period applied against the filing date of the first direct purchaser suit. Certainly, under some circumstances, a suit's filing date might signify that tolling ended in proximity to that date, yet the SAC provides no basis for suggesting that it is appropriate to make that assumption here.

Instead, the SAC's allegations concerning fraudulent concealment attempt to loosely suggest that Plaintiffs may have learned of their claim when Defendants stopped some of their allegedly furtive or deceptive conduct in 2008. For example, the SAC broadly alleges that "the Defendants' agreement, understanding and conspiracy was kept secret until recently." SAC ¶ 497. Plaintiffs also charge that "[p]ublicly, many Defendants and co-conspirators blamed high egg prices on circumstances beyond their control, while only privately acknowledging and celebrating coordinated industry efforts to reduce egg supplies." *Id.* ¶ 505.

This conduct apparently stopped, as alleged, at a June 4, 2008 Stephens Spring Investment Conference, when "Fred Adams, founder and chairman of defendant Cal-Maine Foods, candidly acknowledge[d] . . . that reduced supplies were the reason for high prices," and commented "[w]hile it makes it easier to communicate that when feed costs are up egg prices should be up – that's really not the case. Eggs are up because the supply and demand is in good

balance and it's reflecting higher prices on its own." *Id.* ¶ 506; *see also id.* ¶ 401 (describing other comments allegedly made by Mr. Adams at that same conference as to "the impact of the UEP Certified campaign and . . . the success of the 'agreement' reached in the industry"). However, Plaintiffs do not actually allege that they were exposed to or otherwise then knew of Mr. Adams' comments.

Furthermore, Plaintiffs emphasize what they learned from Sparboe Farms, Inc., with which they reached a settlement agreement in exchange for cooperation and "documents and information related to the allegations in Plaintiffs' initial Complaint." *Id.* ¶ 3. Plaintiffs claim that they "had to settle with . . . Sparboe[] to uncloak" specific facts about certain aspects of the alleged conspiracy." *Id.* ¶ 501. "But for settling with" Sparboe, as alleged, "Plaintiffs would never have discovered these facts publicly." *Id.* ¶ 502. The Plaintiffs' apparent purpose in highlighting what they learned from Sparboe appears to be a means of underscoring the notion that they did not know certain facts about their claim until that settlement, which occurred several years after September 24, 2008.

Nonetheless, the SAC's allegations concerning Mr. Adams' apparent disclosures to investors and the information gained from the Plaintiffs' settlement agreement with Sparboe do not translate into the conclusion that Plaintiffs are entitled to tolling until a time within the limitations period. Given the inadequacy of those allegations, and in the absence of other alleged facts that might support the Plaintiffs' claim for tolling up to the commencement of the statute of limitations period, Plaintiffs have failed to plausibly suggest, much less actually plead, that they did not know or could not have reasonably known, in the exercise of due diligence, of the facts supporting their claim until after September 24, 2004. *See Magnesium Oxide*, 2011 WL

5008090, at *25 ("Without some level of specificity regarding Plaintiffs' discovery of the alleged conspiracy, it is impossible to discern whether Plaintiffs could or should have discovered it within the limitations period.").

### 2.  Inquiry Notice

In light of the particular facts alleged in the SAC, Plaintiffs have not plausibly suggested that they did not have knowledge or did not possess any information about the conspiracy that would have given rise to inquiry notice.[15]  The Plaintiffs' claim in Paragraph 512 of the SAC that due to the nature of Defendants' concealing acts, they "had no knowledge of the alleged conspiracy or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed" is essentially conclusory.  It would be an insufficient response to the pleading demands for Plaintiffs to try to excuse their shortcomings in this regard by arguing that they should not be expected to plead "a negative."  If that were enough of an explanation by itself, then every pleader for fraudulent concealment would seek a blissful safe harbor in a general allegation of ignorance.

As explained above, while Rule 9(b) is relaxed concerning pleading "conditions of a person's mind," the Rule 8 standard continues to apply.  The lone allegation that Plaintiffs had no knowledge of facts to prompt reasonable inquiry is insufficient unless the SAC's overall factual allegations are "enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  In this case, the Plaintiffs' claim of their lack of actual and imputed knowledge rests on a theory that the Defendants' conspiracy to reduce egg supply "was both self-concealing and

---

[15]  As previously discussed above, inquiry notice also may be triggered by facts that were publicly available that a reasonable plaintiff would have discovered.  However, given the nature of the allegations contained in the SAC, it is not possible at this stage of the litigation to determine whether such inquiry notice existed.

affirmatively concealed by Defendants and their co-conspirators" due to their "deceptive

practices and techniques of secrecy."   Yet despite this theory, and although the SAC has virtually

no specific allegations about what information Plaintiffs contemporaneously knew during the

course of the alleged conspiracy about the Defendants' activities generally, and the eight

coordinated actions that allegedly advanced the conspiracy particularly, how they knew any such

information, and so forth,[16] it can appropriately be inferred that Plaintiffs knew *something* about

the Defendants' alleged conduct at the same time it was occurring.

     For example, Plaintiffs broadly plead that Defendants "represented to Plaintiffs . . . that

the prices they paid for eggs were fair and competitive." *Id.* ¶ 503.  As alleged, "[p]ublicly, many

Defendants and co-conspirators blamed high egg prices on circumstances beyond their control,"

*id.* ¶ 505, and "Defendants repeatedly and falsely represented to Plaintiffs . . . that the UEP

certified program . . . was implemented as a result of animal husbandry concerns." *Id.* ¶ 507; *see*

*also id.* ¶ 212 (Defendants "agreed to claim in public" that "animal husbandry" was the reason

that "retailers and food manufacturers" should "accept the program and the increased prices that

eventually resulted"); *id.* ¶ 508 (same).  Defendants also apparently "falsely claimed that their

activities were cloaked under the protections of the Capper-Volstead Act."  *Id.* ¶ 510. [17]

---

[16] Substantive references to the Plaintiffs essentially are absent from the SAC.  With Defendants
in the roles of antiheroes, even to describe Plaintiffs as minor supporting players of the SAC
would amount to overly prominent placement on the SAC marquee.

[17]  To the extent that Plaintiffs rely on these allegations to satisfy pleading the first element of the
fraudulent concealment doctrine, the allegations appear to suffer from pleading deficiencies
under Rule 9(b).  As previously explained, Rule 9(b) can be relaxed in circumstances when
factual information is under a defendant's control; however, certain information as to the
Defendants' alleged misrepresentations would be within the Plaintiffs' control, and thus some
particularity in pleading would be required.  *See Magnesium Oxide*, 2011 WL 5008090 at *20,
*22.  The SAC fails to allege that Defendants made any specific statements that allegedly were

(continued...)

The presence of these allegations in the SAC undercuts the Plaintiffs' general claim that there were not any facts or information that might have alerted a reasonable person to investigate. In reading the SAC, certain of the alleged misrepresentations—for example, that the prices that Plaintiffs paid for eggs were "fair and competitive" and that they were due to circumstances beyond the Defendants' control—emerge *ex nihilo* with no factual context and thus amount to what are essentially suspiciously specific anticipatory denials of wrongdoing rather than "cover up" statements. Furthermore, that Defendants had claimed to Plaintiffs in the marketplace that the Defendants' conduct was immune to antitrust claims under Capper-Volstead Act also appears to constitute an active denial of illegal conduct or wrongdoing. These references in the SAC suggest that there were at least some facts known to Plaintiffs about the very conduct that allegedly advanced the conspiracy—conduct that apparently could be nominally perceived as

---

(...continued)

misrepresentations directed to Plaintiffs or even generally, or when such statements might have occurred. It appears that Plaintiffs intended to raise the inference that each of the alleged misrepresentations or false statements were made to Plaintiffs, but without any specificity or particularity concerning the alleged misrepresentations Plaintiffs can hardly be said to have met the substantiation and precision needed to survive Rule 9(b) scrutiny.

Instead, in the time prior to the commencement of the four-year statute of limitations period, the SAC's only apparent allegations discussing the Defendants' direct interactions with their customers or customer trade groups involved "encourag[ing]" the Food Marketing Institute, a grocer's trade organization, "to mandate the UEP seal for all egg products used by organization members," SAC ¶ 234, meeting "directly with retailers and encourag[ing] them to not purchase eggs unless they were 'UEP certified'," *id.* ¶ 235, and "contact[ing] customers of . . . former members in order to convince them to buy only UEP Certified eggs," *id.* ¶ 237, *see also id.* ¶¶ 241-44, 248-50.

And as previously discussed, because the SAC provides no grounds for concluding that Plaintiffs ever read articles in industry publications or regional newspapers, alleged statements that Defendants may have made in those publications cannot necessarily be characterized as misrepresentations made to Plaintiffs, to the extent that Plaintiffs might try to contend that they are. *See, e.g., id.* ¶¶ 368-71. Furthermore, regardless of content, other statements that Defendants allegedly made to or in such publications, or in other public fora, apparently occurred within the four-year statute of limitations period. *See, e.g., id.* ¶¶ 153-54, 165, 375-77, 419.

violating antitrust laws absent any claim of immunity.  Indeed, Plaintiffs have argued that they

"were led to believe that *even if there was a claim*, it was subject to an iron-clad defense." Pls.'

Resp. at 15 (emphasis added).  Thus, Plaintiffs appear to intimate that they were not ignorant of

facts supporting their claim against Defendants, and instead may contemporaneously have had

actual knowledge, or imputed knowledge, of such a claim, and not investigated it, merely

because the supposed bad actors disclaimed bad acts or, at least, liability.  *Cf. Eagleson*, 228 F.3d

at 487 ("Although it is true that [defendant] denied wrongdoing, nonetheless, his denials do not

allow plaintiffs, who were aware of their potential claim, to allege ignorance.").

Insofar that Plaintiffs intended to claim that the facts *that they did know* about the

Defendants' conduct were not the operative facts that form the basis of their antitrust claim or

would not have prompted reasonable inquiry, the SAC contains no facts to support such an

assertion.  It certainly may be that what information that was known to Plaintiffs could not have

constituted inquiry notice because Plaintiffs were misled and their inquiry was relaxed by the

purported misrepresentations and other alleged affirmative acts of concealment, but such an

explanation likewise does not appear in the SAC.

For example, the SAC does not allege that Plaintiffs were so concerned for animal

welfare that the Defendants' alleged proclamations that the UEP Certification Program was

motivated by welfare concerns would mislead them.  Although Plaintiffs have alleged that "[a]ny

increase [in egg prices] that was openly collusive would not have been tolerated by Plaintiffs,"

SAC ¶ 499, they have not alleged, as an example, that increased prices attributed to animal

welfare efforts would have been acceptable to Plaintiffs or lulled them into a channel of

27

acceptance such that misrepresentations to that effect would have relaxed their inquiry.[18]  As

another example, the SAC fails to allege sufficient facts that the purported "circumstances

beyond the Defendants' control," were credible to Plaintiffs who thereby relaxed their guard.

Given what Plaintiffs apparently contemporaneously knew about the Defendants'

conduct, even as it was known to them through the alleged misrepresentations, Plaintiffs have

failed to plausibly suggest that due to the nature of Defendants' concealing acts, they "had no

knowledge of the alleged conspiracy or of any facts or information which would have caused a

reasonably diligent person to investigate whether a conspiracy existed."  *Cf. In re Publ'n Paper*

*Antitrust Litig.*, No. 304MD1631SRU, 2005 WL 2175139, at *5 (D. Conn. Sept. 7, 2005) ("The

plaintiffs have not offered any allegations . . . that they were not aware of those ["highly unusual"

or "dramatic"] circumstances (and consequently could not have been expected to investigate

them).").

### 3. Due Diligence

Because Plaintiffs have not sufficiently alleged that they were not aware and should not

have been aware of the facts supporting their claim until a time within the limitations period, it is

also unclear whether they exercised reasonable diligence, and whether their earlier ignorance of

their claim is not attributable to a lack of reasonable diligence.  The SAC contains no allegation

that Plaintiffs exercised any due diligence in discovering their claim throughout the time period

in which they claim the statute of limitations should be tolled.  Defendants argue that belying the

---

[18]   Given the generally careful and considered draftsmanship of the SAC's allegations, one might
imagine that this omission was intentional.  *See* September 26, 2011 Memorandum, 2011 WL
4465355, at *10 (discussing Defendant Michael Foods Inc.'s argument concerning a pro-
competitive justification for joining the UEP Certification Program premised upon consumer
demand for UEP-certified eggs).

SAC's allegations is the Plaintiffs' implicit concession that they did not exercise *any* due diligence.  Tr. at 22:18-21.

Generally, a plaintiff who fails to allege any due diligence is virtually foreclosed from invoking the fraudulent concealment doctrine.  After all, one feature of the doctrine's due diligence requirement is the invocation of the principle of laches, and the commensurate notion that, absent a valid justification, a plaintiff cannot sit on its rights and incubate its claim for damages for an undue period without exercising due diligence and pursuing judicial remedies.  Certainly, the determination of the requisite degree of diligence that Plaintiffs would need to satisfy this element is fact intensive because it involves a determination of reasonableness.  *See generally*, Marcus, *supra*, at 902 ("Even when diligence is pleaded with particularity, additional facts may be necessary to determine whether a reasonably diligent person would have discovered the claim.").  Even so, the calculus to determine whether diligence was "due" or reasonable includes an assessment of the "extent of inquiry undertaken with respect to due diligence." *Cetel*, 460 F.3d at 509 n.9.

Furthermore, the Third Circuit Court of Appeals commented in *Davis v. Grusemeyer* that the plaintiff's pleading of fraudulent concealment was deficient in one respect because "Plaintiff . . . *failed* to plead facts showing that he exercised due diligence in trying to uncover the nature of the [defendants'] allegedly self-concealing [actions], *as he was required to do*, *see, e.g.*, *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143 (1879)." *Davis*, 996 F.2d at 624 n.13 (emphasis added).[19]

---

[19]  By citing to the Supreme Court's *Wood* decision, our court of appeals appears to reference the Supreme Court's observation that with respect to pleading fraudulent concealment that "[t]here must be reasonable diligence," and that "the means of knowledge" is "the same thing in effect as knowledge itself." *Wood*, 101 U.S. (11 Otto) at 143.  The Court also stated that the "circumstances of the discovery must be fully stated and proved, and the delay which has

(continued...)

Other district courts within this circuit have explicitly recognized in antitrust suits that alleging a plaintiff's diligence is a required element for pleading fraudulent concealment. *See, e.g., Bethlehem*, 641 F. Supp. at 275; *Elec. Carbon*, 333 F. Supp. 2d at 317; *cf. City of Philadelphia v. Nucero Corp.*, No. 86-3628, 1987 WL 8046, at *3 (E.D. Pa. 1987).[20]

There is some suggestion, however, that under certain circumstances a failure to allege any diligence may not necessarily completely bar use of the fraudulent concealment doctrine. For example, "in causes of action 'fraudulently concealed' an important question in every case is whether the plaintiff could reasonably have been expected to discover facts at an earlier date; any circumstances, such as personal inequality of 'fiduciary' or confidential relationship, which would tend to explain credulity in actions based on fraud will have the same effect in claims that were fraudulently concealed." Dawson, *supra*, at 879.[21] Additionally, that no diligence may be reasonable under certain circumstances is consistent with the underpinning of reasonableness, *i.e.*, whether diligence was reasonable.[22]

---

(...continued)
occurred must be shown to be consistent with the requisite diligence." *Id.*

[20] The court of appeals has recognized that at the summary judgment stage "the [plaintiff's] exercise of due diligence must be shown in the antitrust context" for a fraudulent concealment claim. *Lower Lake Erie*, 998 F.2d at 1179; *see also Aspartame*, 2008 WL 4724094, at *5.

[21] Plaintiffs have not alleged any such circumstances akin to a fiduciary relationship or otherwise that might similarly explain their failure to undertake any diligence.

[22] For example, the Third Circuit Court of Appeals has held that "to determine what constitutes 'reasonable' due diligence, we must consider the magnitude of the existing storm warnings. The more ominous the warnings, the more extensive the expected inquiry." *Mathews*, 260 F.3d at 255. Reasonableness also may be cued to some degree from the defendants' conduct. *See* Dawson, *supra*, at 885 ("There is no formula for determining how completely defendant's [concealment] efforts must close all avenues to discovery. Where plaintiff's inquiries are repeatedly met with misstatement by all the parties from whom information could be derived, his credulity is of course excused."); *cf. Cetel*, 460 F.3d at 509 n.9 ("Nor do we suggest that

(continued...)

Apparently following this cue, Plaintiffs appear to rest on the argument that it is reasonable that no diligence was required of them because even if they had exercised the requisite diligence at an earlier time, they would not have discovered their claim due to the extent of the Defendants' alleged concealment of the conspiracy.  Pls.' Resp. at 18.  They argue that in the absence of any alleged "red flags" that "would have definitively alerted [P]laintiffs to the[ir] cause of action" they "are entitled to an inference that the conspiracy was concealed in such a manner that diligent investigation would not have yielded the facts necessary to support an antitrust claim." *Id.* (quoting *Aspartame*, 2007 WL 5215231, at *7) (emphasis omitted).  Presumably, this argument is meant to amount to something more than simply that because Plaintiffs say they did not know *x*, *x* must have been so cleverly concealed that they never could have known *x*.[23]

---

(...continued)

assurances made by [a defendant] will never toll the statute of limitations.  Rather, these types of questions are necessarily fact specific, based on the presence and exact type of storm warnings and the extent of inquiry undertaken with respect to due diligence.").

[23]   There is some authority that exposes another possible conceptual weakness in this argument.  Some courts have deemed that such an allegation standing on its own in a complaint would impermissibly "allow[] the allegations required to satisfy the first prong of fraudulent concealment to also satisfy the third prong." *Magnesium Oxide*, 2011 WL 5008090, at *24 (quoting *Hinds County, Miss. v. Wachovia Bank, N.A.*, 620 F. Supp. 2d 499, 521 (S.D.N.Y 2009)); *see also Hinds County*, 620 F. Supp. 2d at 522 ("[T]he Court cannot find that a brief reference to 'reasonable diligence,' coupled with general allegations of secrecy and deception directed towards the first prong of fraudulent concealment, satisfies the Named Plaintiffs' burden under Rule 9(b) to plead the third prong of fraudulent concealment with particularity.").  *But see S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 111 (S.D.N.Y. 2011) ("On the other hand, if fraud is so meticulously concealed that a plaintiff could not possibly have thought even to inquire about it, how could a plaintiff do anything *but* regurgitate the first prong of fraudulent concealment?"); *Aspartame*, 2007 WL 5215231, at *7 ("[P]laintiffs have sufficiently pled that the conspiracy was self-concealing and this Court can find no red flags that would have definitively alerted plaintiffs to the cause of action during the limitations period.  Therefore, plaintiffs were not required to plead specific investigative efforts and are entitled to the inference that the conspiracy was

(continued...)

Plaintiffs contend that the SAC contains no references to red flags, storm warnings, or other factual allegations that might prompt inquiry notice and thus impose an obligation on Plaintiffs to establish that they investigated their claim and that such investigation was reasonable. Pls.' Resp. at 16-17. However, as explained above, the nature of the misrepresentations allegedly made to Plaintiffs, particularly the Defendants' apparent claim that their conduct was immune under the Capper-Volstead Act, suggest at minimum that Plaintiffs were on inquiry notice of their claim and thereby would need to allege that they undertook some diligence in pleading fraudulent concealment. *See Aspartame*, 2007 WL 5215231, at *7 (recognizing that a plaintiff is "obliged to actually exercise diligence when he is aware of 'red flags' signaling a cause of action").

---

(...continued)
concealed in such a manner that diligent investigation would not have yielded the facts necessary to support an antitrust claim." (footnote and citation omitted)).

Furthermore, our court of appeals has suggested that, so long as some storm warnings might exist, an argument that diligence is not required is unavailing when considered in light of the motivations of a statute that authorizes civil enforcement of prohibited practices, such as RICO. *See Mathews*, 260 F.3d at 252 & n.16 ("[P]laintiffs must first show that they investigated the suspicious circumstances . . . . We are reluctant to excuse [Plaintiffs]' lack of inquiry because, in retrospect, reasonable diligence would not have uncovered their injury. Such a holding would, in effect, discourage investigation of potential [unlawful] activity." (citing *Rotella v. Wood*, 528 U.S. 549, 557 (2000)).

Antitrust statutes likewise appear to impose a similar obligation upon plaintiffs to investigate their claims. Indeed, the purpose of the fraudulent concealment doctrine in antitrust cases is directed towards not only "compensat[ing] victims but also . . . encourag[ing] those victims themselves diligently to investigate and thereby to uncover unlawful activity." *Klehr*, 521 U.S. at 195 (citation omitted). Moreover, the diligence element of fraudulent concealment serves to ensure "that [plaintiff's] continuing ignorance was not attributable to lack of diligence on his part." *Davis*, 996 F.2d at 624 n.13 (bracket in original) (citation omitted). In this way it could be said that by articulating their diligence efforts at the pleading stage, antitrust plaintiffs are demonstrating that they are not merely reaping the windfall of a treble damages lottery and instead that their prosecution is advancing purposes of the civil enforcement of antitrust law, rather than undermining the vitality of its statute of limitations.

It may be the case that Plaintiffs can sufficiently plead that there were no storm warnings that would have prompted a reasonable plaintiff to investigate, or alternatively, based on the presence and exact type of storm warnings and the extent of the Plaintiffs' inquiry undertaken with respect to due diligence, that nominal diligence would need to be alleged in order to adequately plead the reasonable diligence element.  However, in the absence of sufficient pleading concerning whether or not Plaintiffs knew or should have known of their claim, and due to the interrelationship between the second and third elements of fraudulent concealment, the Court concludes that because no diligence has been alleged, Plaintiffs have not sufficiently pled the reasonable diligence element of the fraudulent concealment doctrine.[24]

---

[24] Some case law suggests that a plaintiff may need to plead a rubric of certain categories of facts with respect to the due diligence.  For example, one court has recommended that plaintiffs plead "(1) when and how they discovered the alleged . . . conspiracy, and (2) that the self-concealing nature of the conspiracy and/or pretextual justifications for Defendants' price increases made it so that they were not alerted to any storm warnings that would otherwise trigger an obligation to perform due diligence."  *Magnesium Oxide*, 2011 WL 5008090, at \*25.   Other courts have held that plaintiffs need to indicate what activities they undertook to uncover their claims.  *Commonwealth of Pennsylvania v. Lake Asphalt and Petroleum Co. of Pa.*, 610 F. Supp. 885, 890 (M.D. Pa. 1985); *see also  Publ'n Paper*, 2005 WL 2175139, at \*6 n.7 (recognizing that although fraudulent concealment is not finally "resolvable on a motion to dismiss" does not "excuse plaintiffs from pleading the circumstances surrounding their diligence or lack thereof").

As another example, in *Wood v. Carpenter* the Supreme Court commented (albeit, under pleading standards that differ from those of today) that in pleading fraudulent concealment "[t]he circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence."  101 U.S. (11 Otto) at 143; *see also Stearns v. Page*, 48 U.S. (7 How.) 819, 829 (1849) (encouraging that "there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by the exercise of ordinary diligence, the discovery might not have been before made").  And, as discussed above, the Third Circuit Court of Appeals has cited the *Wood* pleading requirement favorably.  *Davis*, 996 F.2d at 624 n.13 (citing *Wood*, 101 U.S. (11 Otto) at 143); *cf. Lower Lake Erie,* 998 F.2d at 1179 (discussing the Sixth Circuit Court of Appeals' reference to *Wood*).  *Compare Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975) (applying the *Wood* pleading requirements) *with Pinney Dock and Transport Co. v. Penn Cent. Corp.*, 838 F. 2d 1445, 1468 (6th Cir. 1988) (observing that "according to *Rosenthal v. Walker*, [111 U.S. 185, 190-91 (1884)]

(continued...)

**IV. Conclusion**

Because Plaintiffs have failed to sufficiently allege that the fraudulent concealment doctrine should toll the statute of limitations, the Court grants the Defendants' Motion, recognizing that Plaintiffs may seek the Court's leave to amend their complaint as to fraudulent concealment.[25]

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

(...continued)

*Wood v. Carpenter* is limited to the particular case in which the [Supreme] Court was construing a state statute of limitations and following the adjudications of the Supreme Court of Indiana").

However, it is unnecessary at this time to draw any firm conclusions from existing case law as to whether the pleading standard for fraudulent concealment in the antitrust context requires specific categories of facts to be pled. Under any scenario, Rule 9(b) and Rule 8 require some degree of facts alleged to plausibly suggest and particularly support this element of fraudulent concealment.

[25] The Court advises Plaintiffs that if they seek the Court's leave to amend their pleading, they will have to do so in a timely manner. Additionally, because there are hundreds of allegations in the SAC, many of which involve lengthy paragraphs, Plaintiffs should attach to any motion petitioning for leave to amend, a proposed amended version of the SAC, which should be accompanied by a "redline version" inline tracking any revisions to the SAC and provide the Court with an electronically searchable version of the amended pleading, *i.e.*, .pdf format.