# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |  |
|---|---|---|---|
| **WINN-DIXIE STORES, INC., ROUNDY'S SUPERMARKETS, INC., C&S WHOLESALE GROCERS, INC., AND H.J. HEINZ COMPANY, L.P.,** | ) ) ) ) ) ) | | |
| | ) | **Case No. MDL No. 2002** | |
| | ) | **08-MD-02002** | |
| **Plaintiffs,** | ) | | |
| **v.** | ) ) | | |
| **MICHAEL FOODS, INC., ET AL.** | ) ) | | |
| **Defendants.** | ) | | |

## SECOND AMENDED COMPLAINT

This Second Amended Complaint supersedes and amends all previously filed Complaints. Plaintiffs Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P., ("Plaintiffs") by their undersigned attorneys, bring this action for treble damages and injunctive relief, as well as attorneys' fees and costs, under the antitrust laws of the United States against the Defendants named herein, and upon information and belief, and in connection therewith allege as follows:

## I.     NATURE OF THE CASE

1.     Plaintiffs allege herein a conspiracy among Defendants and certain unnamed coconspirators where they agreed to fix, raise, maintain and/or stabilize the prices at which shell eggs and egg products (collectively, "eggs") were sold in the United States, including by controlling the aggregate supply of domestic eggs.  Each Defendant

knew that it could not do this by itself and that supply needed to be "restrained" by collective action.  Thus, Defendants entered into an overarching agreement to manage the aggregate supply of eggs in the United States. From 2000 to the present (the "Conspiracy Period"), Defendants implemented this supply management conspiracy by agreeing to take several coordinated actions.

2.     Shell eggs include both "table eggs" (generally purchased by retail entities for resale to the consuming public) and "breaking eggs" (generally purchased by food service entities for further processing).  Egg products are breaking eggs that have been removed from their shells and processed into dried, frozen or liquid forms.

3.     Plaintiffs purchased shell eggs and egg products directly from one or more of the Defendants during the Conspiracy Period.

4.     Plaintiffs are victims of Defendants' illegal agreement to fix, raise, stabilize and/or maintain the prices for eggs.  Defendants are horizontal competitors, and include (1) vertically integrated producers of shell eggs or egg products, or both and (2) their trade groups.  One of those trade groups, the United Egg Producers ("UEP"), is the largest egg trade organization in the United States, and had 198 members representing 96% of the nations' laying hens during the Conspiracy Period.  The UEP consists of individual companies that controlled and were major decisional forces in the UEP during the Conspiracy Period.  Such companies acted with and through the UEP and other trade groups during the Conspiracy Period to implement and enforce the conspiracy alleged herein.

5.      Defendants understand that one of the most significant influences on egg pricing is supply.  Even small reductions in supply can cause egg prices to rise sharply. Excess supply in the face of relative inelastic demand for eggs causes egg prices to drop. For egg producers, "More hens, less income!"

6.      However, within the industry, higher egg prices historically triggered increased egg production as producers attempted to benefit from those prices.  This created a cyclical effect: higher prices leading to excess supply, which would then depress prices again.  The egg industry's "normal response to good times was to feverishly add capacity until prices drop like a rock."

7.      Defendants' long-time poultry research economist, Don Bell, calculated that if the industry collectively lowered the supply of eggs they could generate more income.  Bell told Defendants that the only way to control the supply of eggs would be through "industry cooperation... to correct the problem [of over-production] before it becomes one."  Joint collective action among egg producers was necessary to decrease production and supracompetitively raise prices.

8.      Overwhelming documentation reveals Defendants' cooperative and collective joint action:

> a.   "If the *industry stays committed*, we could manage ourselves into profits for a prolonged period;"
>
> b.   "We must *remain disciplined* in our approach to egg production. We must maintain responsible growth;"
>
> c.   "What has to happen is for enough *producers* to recognize that they have to *become part of the solution*;"

d.  "We can have a good 2005 if we just make a few changes and *work together*;"

e.  *"Collective Industry Action* is Credited for Record Price Increases;"

f.  "The best immediate answer *to assure profitable prices* is for the *industry to show some restraint*;"

g.   "The industry has become more responsible on the production side;"

h.  "The industry has been able to better manage its production and its inventories; trades of surplus product are finding the right market homes;"

i.  "Producers' past [production] restraint is paying off" (internal quotes omitted); and

j.  "What we learned in 2007 is that we have control of our own destiny if we work at it, and as an industry, 2008 could be another super year."

9.     During the Conspiracy Period, Defendants agreed to take many joint collective actions as part of the industry's overarching conspiracy that was designed to fix, raise, maintain, and/or stabilize the prices of shell eggs and egg products, including but not limited to significant efforts to manage and/or reduce supply.

10.     First, in 1999 and 2000, Defendants entered into a "supply adjustment program" to molt 5% of the flock, cut back 5% on flock inventory, and develop a hatch reduction program.

11.     Second, in 2001, Defendants agreed to reduce egg supply by agreeing to another emergency flock reduction of 5%, with many Defendants joining a "core group" willing to reduce supply and signing "commitment sheets" to the collective scheme.

4

12.     Third, in 2002, Defendants developed another crisis management plan, calling for further reduction in supply through another early molt and hen disposal. Defendants urged joint collective action by asserting that "[t]here are many older hens out there that 'should have gone to heaven'".

13.     Fourth, after realizing that their stopgap supply management measures could only provide short-term success in impacting egg prices, Defendants agreed to adopt cage space allowance guidelines, which limited the number of hens per cage, in order to provide a long term and stable reduction in the number of chicks hatched for laying farms. Defendants promoted this "UEP Certification Program" on purported "animal husbandry" grounds despite Defendants' private projections that these "welfare" guidelines were designed to reduce supply and lead to "market value improvements."  These guidelines became Defendants "roadmap" for reducing supply.

14.     Fifth, in mid-2004, after urging "[l]et's get back to our regular molt and kill intervals," Defendants agreed to adopt another early molt and flock disposal program.

15.     Sixth, in late-2004, Defendants hosted an "Economic Summit," the result of which was an explicit and immediate supply reduction scheme and written commitments from coconspirators agreeing to a price-fixing plan.  The companies signing on to this aspect of the price-fixing agreement represented approximately 122 million laying hens – or 42% of domestic production.  Nearly every Defendant signed on to this explicit supply reduction agreement or attended the meeting where it was further discussed and expanded, eventually to every UEP member, pursuant to a UEP vote.

16.     Eighth, Defendants agreed to export eggs to foreign markets "at a loss" in order to lower supply in the U.S. market and agreed to make payments to each other to cover that loss.

17.     These joint collective actions among Defendants were often focused, in their own words, on illegally managing, controlling and/or stabilizing the supply of eggs in the U.S.:

a.   "The **objective of supply management (SM)** is to prevent the over supply of eggs **which can reduce egg prices**. It is estimated that billions have been lost and will continue to be lost **unless better methods of SM become available**."

b.   "We are certainly sorry that you feel you can **no longer be supportive of a cooperative effort by producers** to occasionally **improve domestic supply demand** conditions with an export;"

c.   "Now the true test will come as **the industry** attempts to maximize returns while avoiding **the temptation of being too greedy and producing a supply** greater than demand will warrant at profitable prices."

d.   "Producers are **being really responsible**, keeping **supply** in check,"

e.   "The industry must **manage supply**;"

f.   "There should be **a core segment of the industry** that is willing to **reduce egg supply** in order to achieve profitable egg prices;"

g.   "[P]lease don't **make the mistake** of building new facilities to **replace** the lost number of birds."

h.   "We believe the **egg industry** will continue to **adjust supply** to be more in line with demand, which should allow **the industry** to return to profitability."

i.   Defendants' meeting minutes reflect that they "we're **managing the supply side** pretty well;"

      j.   "The **egg industry** must **reduce the flock** or the price of the product will remain at depressed levels;"

      k.   "It would be good business in 2008 for **producers to manage** their **supply** during what historically has been the lowest demand period of the year;"

18.    The joint and collective nature of Defendants' actions was credited with a "price turnaround."

19.    Defendants were aware of the possibility of antitrust violations as a result of their conduct.  Defendants' minutes reflect that some of the problems created/unanswered by the motions for the 100% Rule included "**Limits free trade of eggs**" and "Raises the question about the original purpose of ACC:  a husbandry practice program now **managing the marketing and economic restriction of movement of product**".

20.    Plaintiffs' Complaint includes classic indicia of a cartel, detailing Defendants' ability to collude and admitted collusion (through the agreements described above); ability to and admitted monitoring and policing of the cartel (through auditing and collection of commitment sheets); ability to affect and admitted impact on market price (as eggs were highly sensitive to supply variations given that demand remained relatively stable); and ability to and admitted retaliation (by foreclosing market access to non-Certified companies and interfering with customers of producers that left the conspiracy).

21.    In summary, during the Conspiracy Period, Defendants conspired to fix, stabilize and/or maintain egg prices in at least the following nine ways:

      a.   agreeing to reduce the total number of hens at laying farms in order to decrease overall egg production;

    b.  agreeing not to replace hens lost through increased cage space requirements;

    c.  agreeing to manipulate the molting, culling, and disposal of hens to keep egg production low;

    d.  agreeing not to "backfill" cages;[1]

    e.  agreeing to delay or reduce chick hatching;

    f.  agreeing to reduce inventory;

    g.  agreeing not to expand or to curtail operations;

    h.  agreeing to export eggs to restrain output in the United States; and

    i.  agreeing overall to manage supply and reduce output of eggs in the United States.

## II.    JURISDICTION AND VENUE

22.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the injuries sustained by Plaintiffs arising from violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 26.

23.     Defendants are shell and egg products producers and their trade groups. These entities are involved in the promotion, production, processing, and/or sale of shell eggs and egg products in interstate commerce.  Defendants' respective activities in the promotion, production, processing, and/or sale of shell eggs and egg products affect interstate commerce.

---

[1] Backfilling is the practice of adding extra pullets from growing houses to cages of older birds to replace mortality.

24.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c), because during the Conspiracy Period many of the Defendants resided, transacted business, were found, or had agents in this district and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

25.     This Court has personal jurisdiction over each Defendant because, inter alia, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of eggs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.   Further jurisdictional contacts are alleged below.

III.    **PLAINTIFFS**

26.     Plaintiff C&S Wholesale Grocers, Inc. ("CSWG"), is a Vermont corporation with its principal place of business in Keene, New Hampshire.   During the Conspiracy Period, CSWG purchased shell eggs and egg products directly from one or more of the Defendants.

27.     Plaintiff Winn-Dixie Stores, Inc. ("Winn-Dixie") is a Florida corporation with its principal place of business located in Jacksonville, Florida.   During the Conspiracy Period, Winn-Dixie purchased shell eggs and egg products directly from one or more Defendants.

28.     Plaintiff Roundy's Supermarkets, Inc. ("Roundy's") is a Wisconsin corporation with its principal place of business located in Milwaukee, Wisconsin.  During the Conspiracy Period, Roundy's purchased shell eggs and egg products directly from one or more of the Defendants.

29.     Plaintiff H.J. Heinz Company, L.P., ("Heinz") is a Delaware limited partnership with its principal place of business located in Pittsburgh, Pennsylvania. During the Conspiracy Period, Heinz purchased shell eggs and egg products directly from one or more of Defendants.

## IV.     DEFENDANTS

30.     The acts charged in this Complaint have been done by the following Defendants and were ordered and performed by Defendants' officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of Defendants' business or affairs.

31.     Allegations as to "Defendants," "co-conspirators," or "UEP members" herein refer to all named Defendants above unless otherwise specified.

## A.     Producers of Shell Eggs or Egg Products or Both

### *Michael Foods*

32.     Defendant Michael Foods, Inc. ("Michael Foods") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Minnetonka, Minnesota.  During the

Conspiracy Period, Michael Foods sold shell eggs and egg products to purchasers in the United States directly or through its subsidiaries and affiliates, including Plaintiffs.

33.     Michael Foods is a diversified producer/distributor of food products in three areas—egg products, refrigerated distribution (including shell eggs, cheese, bagels, butter, margarine, muffins, potato products) and potato products.

34.     Michael Food Egg Products Company is a term used to refer collectively to subsidiaries of Michael Foods, Inc. that comprise Michael Foods Inc.'s Egg Products Division.

35.     Michael Foods Egg Products is the largest producer of processed egg products in North America (the largest supplier of extended shelf-life liquid eggs, pre-cooked egg patties and omelets, dried eggs and hard-cooked eggs in North America and is a leading supplier of frozen and liquid whole eggs, whites and yolks) and fourth largest shell egg producer in North America.

36.     Michael Foods Egg Products produces, processes and distributes numerous egg products and shell eggs and is comprised of the following subsidiaries: M. G. Waldbaum Co. ("Waldbaum"), Papetti's Hygrade Egg Products, Inc. ("Papetti's"), MFI Food Canada, Ltd. and Trilogy Egg Products, Inc..

37.     In 2006, approximately 30% of Michael Foods' egg needs were satisfied by company owned hens with the balance purchased under third-party egg procurement contracts and on the spot market.

38.     Michael Foods maintains numerous trademarks and/or trade names for its products, including "Michael Foods," "Better 'n Eggs," "All Whites," "Papetti's," "Quaker State Farms," "Broke N' Ready," "Canadian Inovatech," "Centromay," "Emulsa," and "Inovatech."   Ultrapasteurized liquid eggs are marketed using the "Easy Eggs" trade name.   Refrigerated Distribution Division products are marketed principally under the "Crystal Farms" trade name.   Other Refrigerated Distribution Division trademarks include "Crescent Valley, "Westfield Farms", and "David's Deli."

39.     Michael Foods is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of the organizations on behalf of Michael Foods.   In 2008, Michael Foods employees served on UEP's Area #3, Government Relations Committee, Environmental Committee, Quality Assurance/Food Safety Committee, Producer Committee for Animal Welfare, and the Long Range Planning Committee.   Michael Foods employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

40.     Michael Foods has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.   Michael Foods has explicitly agreed to the conspiracy alleged herein by adopting UEP certified guidelines to reduce chick hatch (certification no. 345 and license agreement 509) and has conspired to reduce its egg supply as a result.

### Land O'Lakes, Moark, and Norco Ranch

41.     Defendant Land O'Lakes Inc. ("Land O' Lakes) is a Minnesota corporation organized, existing, and doing business under the laws of the State of Minnesota, with its

offices and principal place of business located in Arden Hills, Minnesota.  During the Conspiracy Period, Land O' Lakes sold shell eggs and egg products to purchasers in the United States directly or through its subsidiaries and affiliates, including the Plaintiffs. Land O' Lakes has been an active participant in and benefitted from its joint venture's, subsidiary's, and UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

42.     Moark Productions began in 1957.  Moark Productions formed a joint venture with Land O'Lakes in 2000 to form Moark, LLC ("Moark") -- a national, consolidated egg company.  The companies jointly operated this joint venture from 2000 until Land O' Lakes acquired 100% of the ownership of Moark in 2006.  During the time period of this joint venture, Moark was an active participant in the conspiracy as alleged herein.

43.     Moark developed a national LAND O' LAKES™ brand egg to complement other brands it marketed.  Moark LLC and its subsidiaries are referred to as the "Layer" or "Egg" division of Land O'Lakes.

44.     Defendant Moark LLC ("Moark") is a limited liability company organized, existing, and doing business under the laws of the State of Missouri, with its offices and principal place of business located in Norco, California.  During the Conspiracy Period, Moark sold shell eggs and egg products to purchasers in the United States, including the Plaintiff.

45.     Moark markets and processes 523 million dozen eggs from approximately 24 million layers (hens) per year.  Moark produces and markets shell eggs that are sold

under corporate brands and national brand names such as LAND O' LAKES All-Natural Farm Fresh Eggs and Eggland's Best, as well as non-branded shell eggs.  Approximately 64% of the eggs marketed are produced by layers owned by Moark.  The remaining 36% are purchased on the spot market or from third-party producers.

46.     Moark/Land O' Lakes is the nation's third-largest producer and marketer of shell eggs.  Moark/Land O' Lake's annual egg sales are approximately $500,000,000.

47.     Moark is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Moark.  In 2008, Moark employees served on UEP's Executive Committee (secretary), Area #1, Area #4, Finance Committee, Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance/Food Safety Committee, and Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, and the United States Egg Marketers Export Committee.  Moark employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Moark has participated in and benefitted from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

48.     Moark has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Moark has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 147 and 116) and has conspired to reduce its egg supply as a result.  Moark explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce supply.  Moark signed a commitment

sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply.   Moark participated in a UEP meeting which expanded the 2004 flock/disposal scheme.   Moark was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

49.    Moark is the parent company of Norco Ranch, Inc.

50.    Defendant Norco Ranch, Inc. ("Norco Ranch") is a corporation organized, existing, and doing business under the laws of the State of California, with its offices and principal place of business located in Norco, California.   It is a subsidiary of Moark. During the Conspiracy Period, Norco Ranch sold shell eggs to purchasers in the United States, including the Plaintiffs.

51.    Norco is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Norco.   In 2008, Norco employees served on UEP's Government Relations Committee.   Norco employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

52.    Norco has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.   Norco has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 133) and has conspired to reduce its egg supply as a result.   Norco explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce supply.   Norco was a member of USEM and/or

participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *Rose Acre Farms*

53.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is a corporation organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located in Seymour, Indiana.  During the Conspiracy Period, Rose Acre sold eggs and egg products to purchasers in the United States, including the Plaintiffs.

54.     Rose Acre sells shell eggs and dried and liquid egg products for the foodservice industry.

55.     Rose Acre is a vertically integrated operation handling all of its own breeding chicks, milling feed, harvesting, cleaning, sorting, packing, and shipping eggs and egg products directly to retailers.

56.     Rose Acre's brands include: White Shell Eggs, GreatEgg's Vita-D, GOLDEN-PREMIUM, Brown Shell Eggs (Large & Jumbo), Christopher Eggs, Eggland's Best, and GreatEggs.   Rose Acre's annual sales are estimated to be approximately $192,300,000.

57.     Rose Acre is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Rose Acre.  In 2008, Rose Acre employees served on UEP's Area #3, Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee,

Environmental Committee, Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, Environmental Scientific Panel, and the United States Egg Marketers Export Committee.  Rose Acre employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

58.     Rose Acre has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Rose Acre has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 198) and has conspired to reduce its egg supply as a result.  Rose Acre participated in a UEP meeting which expanded a coordinated 2004 flock/disposal scheme.  Rose Acre was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *National Food Corporation*

59.     Defendant National Food Corporation ("NFC") is a corporation organized, existing, and doing business under the laws of the State of Washington with its offices and principal place of business located in Everett, Washington.  During the Conspiracy Period, National Food sold eggs and egg products to purchasers in the United States, including the Plaintiffs.

60.     NFC is a fully integrated producer and processor of eggs and egg products.  NFC operates its own feed mills, pullet farms, layer farms, processing plants, and distribution centers in Washington, Oregon, Montana, and South Dakota and serves markets throughout the Pacific Northwest, Alaska, Hawaii, and the Midwest.

61.     NFC sells shell eggs and egg products (available in liquid or frozen form) including: whole eggs; egg whites (plain and EZ whipping whites); yolks (plain or with added salt or sugar); peptex; and fortified product (2 yolks to 1 white).

62.     NFC is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of NFC.  During the time that the conspiracy was in effect, a NFC representative served as chairman of the UEP and promoted the conspiracy as alleged herein.  In 2008, National Food employees served on UEP's Area #2, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee (chair), Public Relations Committee, Long Range Planning Committee, United States Egg Marketers Export Committee (secretary).  NFC employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

63.     NFC has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  NFC has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 184) and has conspired to reduce its egg supply as a result.  NFC explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce supply. NFC signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply.  NFC participated in a UEP meeting which expanded the 2004 flock/disposal scheme.  NFC was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

*Cal-Maine*

64.     Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Jackson, Mississippi.  During the Conspiracy Period, Cal-Maine sold shell eggs and egg products to purchasers in the United States, including the Plaintiffs.

65.     Cal-Maine is the largest producer and marketer of shell eggs in the United States.  It is also a leader in industry consolidation having completed 14 acquisitions since 1989.  In fiscal year 2008, Cal-Maine sold approximately 678,000,000 dozen shell eggs (accounting for approximately 15.8% of domestic shell egg consumption).  Fred Adams, founder and CEO of Cal-Maine, was a founding member of UEP.

66.     In fiscal year 2007, 20% of Cal-Maine eggs were not produced by Cal-Maine; 7% were grown under production contracts and the remainder were purchased on the spot market.

67.     Some of Cal-Maine's brands include Egg-Land's Best (Cal-Maine owns 25.9% non-voting equity interest and has an exclusive license agreement to market and distribute Egg-Land's Best in major metropolitan areas, including New York City, and a number of states in the South); Rio Grande; and Sun Up. Cal-Maine's customers are 85% retail, 10% food-service and 5% egg products producers.

68.     Cal-Maine is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Cal-Maine.

During the time that the conspiracy was in effect, a Cal-Maine representative served as chairman of the UEP. In 2008, Cal-Maine employees served on UEP's Executive Committee, Area #5, Finance Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance/Food Safety Committee, Producer Committee for Animal Welfare, Long Range Planning Committee, and the United States Egg Marketers Export Committee. Cal-Maine employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

69.     Cal-Maine has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Cal-Maine has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 103) and has conspired to reduce its egg supply as a result. Cal-Maine explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce supply. Cal-Maine signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply. Cal-Maine participated in a UEP meeting which expanded the 2004 flock/disposal scheme. Cal-Maine was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *Hillandale Farms and Ohio Fresh Eggs*

70.     "Hillandale Farms" comprises various companies—including Defendants Hillandale Farms of Pa., Inc. ("Hillandale PA"); Hillandale-Gettysburg, L.P. ("Hillandale-Gettysburg"), Hillandale Farms East Inc. ("Hillandale East"); and Hillandale

Farms, Inc.—that function as an integrated egg production enterprise that produces, sells, and markets shell eggs and egg products, under the direction and control of Hillandale PA.  According to the joint website for the integrated enterprise, Hillandale Farms was founded by Orland Bethel; has facilities in the Northeast, Midwest, and Southeast; and is "*a vertically integrated supplier* . . .  directly involved in every aspect of egg production and distribution."   UEP identified officers of these entities who participated in UEP meetings and committees as representing "Hillandale Farms" generically.

71.     Defendant Hillandale PA is a corporation organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania with its principal place of business located in North Versailles, Pennsylvania.   Hillandale PA is part of the Hillandale Farms integrated enterprise; it packs and sells eggs under the brand names Hillandale Farms, Nearby Eggs, and Hartford Farms.  Hillandale PA markets and sells UEP-certified shell eggs produced by Defendants Hillandale Gettysburg and Ohio Fresh Eggs, selling all of Ohio Fresh's production since late 2003.  In 2004, "Hillandale Farms of Pa."  was ranked by Egg Industry Magazine as the 19th in size among egg producers (not among egg marketers or distributors).     During the Conspiracy Period, Hillandale PA sold shell eggs and egg products to purchasers in the United States, including Plaintiffs.

72.     Hillandale PA is wholly owned by Orland Bethel and is operated by members of the Bethel family.  During the conspiracy alleged herein, Orland Bethel served as President of Hillandale PA.  Gary Bethel now serves in that role and has served as an officer of the company during the conspiracy as alleged herein. Steve Vendemia,

Gary Bethel's brother-in-law, serves as the company's Vice President, and has served as its treasurer.

73.     Hillandale PA has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein. Hillandale PA's officer Gary Bethel attended UEP board of directors meetings and served on the UEP's Shell Egg Marketing Committee. According to a United Voices newsletter, Hillandale PA has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 182) and has conspired to reduce egg supply as a result.  United Voices newsletters also reported that Hillandale PA completed animal care certified audits, was a UEP certified company or licensed marketer, and displayed the Animal Care Certified logo on its packaging.  As alleged *infra*, to maintain its UEP certification, Hillandale PA was required to ensure 100% compliance with UEP certified guidelines for all egg production entities and affiliates that it owned, controlled or managed.  According to a United Voices newsletter, Hillandale PA attended the November 2004 Economic Summit, during which it explicitly agreed to accelerate hen disposal and/or reduce flock size by 5% in 2005.

74.     The other Hillandale entities named herein as Defendants were owned, controlled, and/or managed by the owners and managers of Hillandale PA and formed a single integrated egg production and distribution enterprise.  Defendants Hillandale Gettysburg, Hillandale East, and Hillandale Farms, Inc., by and through the control exercised by Hillandale PA, agreed to participate in the conspiracy, including through the following actions:

a.    In 2002, the UEP Board of Directors adopted a requirement that the UEP certification requirement for 100% compliance with its animal welfare guidelines was inclusive of all of a certified company's entities or affiliates, requiring that UEP/ACC certified producers ensure that all entities and affiliates that the certified entity owns, manages or controls (even where there are multiple owners or partners of a facility) comply with the UEP "animal welfare" guidelines, regardless of how or where those eggs were marketed.  The owners and managers of Hillandale PA own and/or control affiliated producer Hillandale Gettysburg.  To maintain its UEP certification, Hillandale PA was required to ensure that Hillandale Gettysburg complied with the UEP certified guidelines and price fixing scheme alleged herein, and Hillandale Gettysburg did comply with UEP guidelines to reduce supply through increased cage space requirements and submitted monthly compliance reports to UEP even though Hillandale Gettysburg never itself obtained a UEP certification separate and apart from Hillandale PA's certification.

b.    UEP permitted non certified marketers to sell eggs bearing the UEP or ACC certified logo only if such entities obtained a UEP license to do so, paid annual licensing fees and submitted monthly compliance reports.  Hillandale East and Hillandale Farms Inc. were non-producer marketers of UEP certified eggs produced by

Defendants Hillandale Gettysburg and Ohio Fresh, which bore the UEP or ACC certified logo. These distributors marketed and sold eggs bearing the UEP certified logo even though neither entity has been identified by UEP as a licensed marketer of UEP certified eggs or as having paid licensing fees to UEP.  UEP would have permitted Hillandale East and Hillandale Farms, Inc. to sell these eggs only if they were part of a single integrated production enterprise controlled by a UEP-certified producer.  Here, that producer was Hillandale PA.  In other words, Hillandale East and Hillandale Farms operated under the banner of Hillandale PA's UEP Certification.

75.     Defendant Hillandale Gettysburg is a limited partnership organized, existing, and doing business under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in Gettysburg, Pennsylvania and a registered agent address at 370 Spicer Road, Gettysburg, Pennsylvania.  Hillandale Gettysburg packs and sells eggs for retailers and distributors and under its own brand names: Hillandale Farms, Nearby Eggs, and Hartford Farms.  During the Conspiracy Period, Hillandale Gettysburg sold shell eggs and egg products to purchasers in the United States, including Plaintiffs.

a.      Hillandale Gettysburg is majority owned by Orland Bethel (50% ownership share) and the Bethel Family Trust (30% ownership share).  Don Hershey holds the minority 20% shares.  The general partner of Hillandale Gettysburg is HGLP LLC, which is owned by Gary Bethel (Hillandale PA's officer and current President) and

Don Hershey, who serves as its President. Orland Bethel (the

owner of Hillandale PA) and Gary Bethel (the President of

Hillandale PA) serve on the Hillandale Gettysburg board of

directors.

b.    Hillandale Gettysburg is part of the Hillandale Farms integrated

enterprise, acting as a producer and processor of shell eggs, 95% of

which are sold by Defendant Hillandale East which is in turn

owned and controlled by Hillandale PA.  The only contact or

mailing address provided by the joint Hillandale Farms website,

HillandaleFarms.com, is a Gettysburg mailing address.

c.    Hillandale Gettysburg is a member of UEP.  Hillandale Gettysburg

staff and/or directors attended UEP Board Meetings in 2006 and

2008 (Gary Bethel), and served on UEP committees, including at

least the Shell Eggs Marketing Committee (Gary Bethel, from

2004-2005; Ron Ballew in 2008), the Environmental Committee

(Ron Ballew in 2008).

d.    Hillandale Gettysburg participated in, and benefitted from,

Defendants' conspiracy to reduce supply and fix prices, as outlined

herein. Though Hillandale Gettysburg does not hold its own UEP

certification (it operates under Hillandale PA's certification) in

order to satisfy Hillandale PA's certification obligations,

Hillandale Gettysburg adopted UEP's "animal welfare" guidelines,

including flock reduction requirements, which resulted in a 20%

25

flock size reduction compared to its original flock size prior to
Hillandale's acquisition of that facility, and conspired to reduce the
supply of eggs as a result. Eggs packed by Hillandale Gettysburg
are UEP certified.  Hillandale Gettysburg submitted monthly
compliance reports to UEP documenting compliance with UEP
animal husbandry and/or UEP certified guidelines in at least 2002
and 2008, as required to maintain UEP certified status.  The 2008
Compliance reports documented Hillandale-Gettysburg's
compliance with the UEP guidelines from 2005 to 2008.

76.     Defendant Hillandale East, d/b/a Nearby Eggs, is a corporation organized,
existing, and doing business under the laws of the Commonwealth of Pennsylvania with
its principal place of business located in Spring Grove, Pennsylvania. Hillandale East has
two locations:  Nearby Eggs in Spring Grove, Pennsylvania—Hillandale East's principal
place of business—and a facility in Reedsville, Pennsylvania.   During the Conspiracy
Period, Hillandale East sold shell eggs and egg products to purchasers in the United
States, including Plaintiffs.

a.     Hillandale East is part of the Hillandale Farms integrated
enterprise. Hillandale PA is the majority owner (57% share) of
Hillandale East, and controls Hillandale East.  Other owners
include Gary Bethel (23%); Steve Vendemia (Gary Bethel's
brother-in-law) and Susan Vendemia (Gary Bethel's sister) (12%)
and James Minkin (8%). Gary Bethel is the company's president;
Orland Bethel is the company's secretary and treasurer; and James

Minken is the Vice President and manager. All of Hillandale East's officers use a Codorus, Pennsylvania mailing address.

b.    Hillandale East is part of the Hillandale Farms integrated enterprise in that it is majority owned by Hillandale PA and markets and distributes UEP-certified eggs and egg products produced by Hillandale Gettysburg, which is in turn owned and controlled by the owners and managers of Hillandale PA. Hillandale East distributes 95% of Hillandale Gettysburg's egg production, which bore the UEP or ACC certified logo during the conspiracy.

c.    Though Hillandale East distributes and markets UEP-certified eggs produced by Hillandale Gettysburg that bear the UEP logo, Hillandale East is not, nor has it ever been, identified by UEP as a licensed marketer or distributor of UEP-certified eggs or as having paid licensing fees to UEP. As such, it operates under the Hillandale PA certification.

d.    Hillandale East employees were active participants in UEP. James Minken, served on the UEP Shell Egg Marketing Committee during at least 2008 and 2009 and on Environmental Committee at least during 2008 and attended at least one meeting where the need for industry-wide supply management was discussed. UEP staff communicated with James Minkin at his Hillandale East "Nearby Eggs" e-mail address. Minkin attended UEP committee, board and

membership meetings, including the May 12, 2008 Shell Egg

Marketing Committee at which the Committee Chairman discussed

the need for better supply management.  As noted Gary Bethel

attended a UEP Board Meeting and was a member of UEP's Shell

Egg Marketing Committee in at least 2004 and 2005.

e.      By and through the control of its majority owner (UEP-certified

Hillandale PA), Hillandale East has participated in and benefitted

from Defendants' and their co-conspirators' efforts to reduce

supply and fix prices, as outlined herein, by distributing UEP-

certified eggs produced by Hillandale Gettysburg without a UEP-

issued license to do so and without paying licensing fees to UEP.

Hillandale East was permitted to market UEP certified eggs

without a UEP-certified licensing agreement by virtue of

Hillandale PA's certification and its control of Hillandale East.

77.     Defendant Hillandale Farms, Inc. is a corporation organized, existing, and

doing business under the laws of the State of Ohio with its principal place of business

located in Flushing, Ohio, and registered offices in both Flushing, Ohio and Corry,

Pennsylvania. Hillandale Farms, Inc. invoices displayed a Corry mailing address.   All

officers of Hillandale Farms, Inc. have Corry, Pennsylvania addresses. During the

Conspiracy Period, Hillandale Farms, Inc. sold shell eggs and egg products to purchasers

in the United States, including Plaintiffs.

a.      Hillandale Farms, Inc. is part of the Hillandale Farms integrated

egg production enterprise. Hillandale Farms, Inc. markets and

distributes shell eggs and/or egg products produced by Defendants Hillandale Gettysburg and/or Ohio Fresh Eggs, to purchasers in the United States, including members of the class.  Hillandale Farms, Inc. invoices its customers under the name "Hillandale Farms." Hillandale Farms, Inc. is the wholly owned, Corry branch subsidiary of Hillandale PA, which is wholly owned by Orland Bethel.  During the time of the conspiracy, Orland Bethel served Hillandale Farms, Inc.'s President.  Gary Bethel, Hillandale PA's current President, served as the Hillandale Farms, Inc.'s  Secretary during the conspiracy and now serves as the its President and Secretary.  Steve Vendemia is Vice President of Hillandale Farms, Inc.  Gary Bethel served on UEP's Shell Egg Marketing Committee in at least 2004 and 2005.

b. Though Hillandale Farms, Inc., during the conspiracy, distributed and marketed UEP certified eggs produced by Hillandale Gettysburg and Ohio Fresh Eggs that bear the UEP logo, Hillandale Farms, Inc. is not, nor has it ever been, identified by UEP as a licensed marketer or distributor of UEP-certified eggs or as having paid licensing fees to UEP.

c. Hillandale Farms, Inc. employees participated in UEP and attended Board meetings.

d. By and through the control of its sole owner—UEP certified Hillandale PA—Hillandale Farms, Inc. has participated in and

29

benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein, by marketing and distributing UEP-certified eggs without a UEP-issued license to do so and without paying licensing fees to UEP.  Hillandale Farms, Inc. was permitted to market UEP certified eggs without a UEP certified licensing agreement by virtue of Hillandale PA's certification and its control of Hillandale Farms, Inc.

78.     Defendant Ohio Fresh Eggs, LLC ("Ohio Fresh") is a limited liability company organized, existing, and doing business under the laws of the State of Ohio with its principal place of business located in Croton, Ohio. It owns egg production facilities in Ohio and is a member of the UEP.

79.     During the Conspiracy Period, seventy percent of the interest in Ohio Fresh was held by Hillandale Farms LLC, the sole member of which is Orland Bethel. Thirty percent of the interest in Ohio Fresh was held by Eggs Manager LLC ("Eggs Manager"), the sole member of which is Don Hershey. Pursuant to agreements executed December 26, 2003, Hillandale PA purchases all eggs produced by Ohio Fresh and Eggs Manager manages and supervises the operations of Ohio Fresh.

80.     Hillandale PA and its affiliate and supplier Ohio Fresh have participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Ohio Fresh has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 328) and has conspired to reduce its egg supply as a result.  Ohio Fresh explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce

supply.  Ohio Fresh signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens as part of the conspiracy to reduce egg supply.

### *Daybreak Foods*

81.     Defendant Daybreak Foods, Inc. ("Daybreak") is a corporation organized, existing, and doing business under the laws of the State of Wisconsin with its offices and principal place of business located in Lake Mills, Wisconsin.  During the Conspiracy Period, Daybreak Foods sold eggs to purchasers in the United States.

82.     Daybreak is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Daybreak.  In 2008, Daybreak employees served on UEP's Area #3, Government Relations Committee, Environmental Committee, and Quality Assurance/Food Safety Committee.

83.     Daybreak has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Daybreak has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch and has conspired to reduce its egg supply as a result. Daybreak participated in a UEP meeting which expanded a 2004 flock/disposal scheme.

### *Midwest Poultry Services*

84.     Defendant Midwest Poultry Services, L.P. ("Midwest Poultry") is a limited partnership organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located in Mentone,

Indiana.   During the Conspiracy Period, Midwest sold eggs to purchasers in the United States.

85.    Midwest Poultry is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Midwest.   In 2008, Midwest Poultry employees served on UEP's Executive Committee (first vice chairman), Area #3, Finance Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Environmental Committee, and the Producer Committee for Animal Welfare.  Midwest Poultry employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

86.    Midwest Poultry has participated in and benefitted from Defendants' and their coconspirators' efforts to reduce supply and fix prices, as outlined herein. Midwest Poultry has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 102) and has conspired to reduce its egg supply as a result.  Midwest Poultry signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply.  Midwest Poultry was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *NuCal Foods*

87.    Defendant NuCal Foods, Inc. ("NuCal Foods") is a corporation organized, existing, and doing business under the laws of the State of California, with

its offices and principal place of business located in Ripon, California.  During the Conspiracy Period, NuCal Foods sold eggs to purchasers in the United States.

88.    NuCal is incorporated as an agricultural cooperative in California.  Egg producers that are part of NuCal include: (1) Gemperle Enterprises of Turlock; (2) Sunrise Farms of Petaluma; (3) J. S. West Milling of Modesto (whose president is the current Chairman of UEP); and (4) Valley Fresh Foods of Turlock.

89.    NuCal is the largest distributor of shell eggs in the Western United States.  NuCal is a totally integrated egg producer from production through distribution and processes approximately 7.5 million eggs per day.

90.    NuCal products include: Becky, Cal Egg, California Finest, Chefs Best, Clover Stornetta Farms, Crack A Smile Omega 3 & Lutein, Egg-Land's Best, Lucerne (Safeway), Nulaid (white), Supermarket private label eggs, and Santa Rosa.

91.    NuCal is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of NuCal.  In 2008, NuCal employees served on UEP's Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Quality Assurance Food Safety Committee, and United States Egg Marketers Export Committee (vice-chair).  NuCal employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

92.    NuCal has participated in and benefitted from Defendants' and their coconspirators' efforts to reduce supply and fix prices, as outlined herein.  NuCal has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified

guidelines to reduce chick hatch, as has each co-operative member (NuCal Foods (license agreement 504; Gemperle Enterprises - certification no. 148, Sunrise Farms - certificate no. 135, Valley Fresh Foods - certificate no. 136, and J. S. West Milling - certificate no. 131)), and has conspired to reduce its egg supply as a result.  NuCal members J.S. West and Sunrise Farms signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in a conspiracy to reduce egg supply. NuCal members also participated in a UEP meeting which expanded the 2004 flock/disposal scheme.  NuCal was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *R. W. Sauder*

93.     Defendant R.W. Sauder, Inc. ("Sauder") is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its offices and principal place of business located in Lititz, Pennsylvania.  During the Conspiracy Period, Sauder sold shell eggs and/or egg products to purchasers in the United States, including the Plaintiffs.

94.     Sauder sells the following products: Sauder's Gold Eggs, Sauder's Organic Eggs, Sauder's Deviled Egg Kit, Sauder's Hard Cooked Flavored Eggs (Red Beet, Mustard, & Southwestern), Sauder's Hard Cooked Eggs, Sauder's Hard Cooked Eggs - 10 Egg Pouch, Sauder's 8 pack Hard Cooked, Sauder's Twin 18 pack (3 doz.) and wholesale eggs and egg products in various sizes and packages.

95.     Sauder is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Sauder.  In 2008, Sauder employees served on UEP's Shell Egg Price Discovery Committee, Producer Committee for Animal Welfare, and Public Relations Committee (chairman).  Sauder employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

96.     Sauder has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Sauder has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 12 1) and has conspired to reduce its egg supply as a result. Sauder was a member of USEM and/or participated in egg exports, sharing any associated financial losses with other members, in order to reduce domestic egg supplies and fix, maintain, and raise prices.

### *Sparboe Farms*

97.     Sparboe Farms, Inc. ("Sparboe") is a corporation organized, existing and doing business under the laws of the State of Minnesota with its office and principal place of business in Litchfield, Minnesota.  Sparboe is, according to its website, the fifth largest shell egg producer and marketer in the United States.  During the time periods relevant to the allegations in this Complaint, Sparboe participated in the unlawful conduct alleged in this Complaint.

98.     Sparboe is a member of UEP and its employees have served in executive positions and/or on committees on behalf of UEP.  Sparboe employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

99.     Sparboe has participated in and profited from Defendants' and their co-conspirators' efforts to reduce supply and raise, fix, maintain and/or stabilize the price of eggs.  Sparboe was an active member of the UEP Animal Welfare Committee and was directly involved in the conception and development of the UEP's Animal Care Certification Program.  As a member of the Animal Welfare Committee, Sparboe had direct input into the creation and adoption of the UEP Certified Program and was active in and monitored the adoption of the program.  Sparboe has explicitly agreed to the conspiracy by, among other things, adopting the UEP Certified Program to reduce chick hatch and reduced its egg supply as a result; participating in a "supply adjustment program" to reduce capacity in 2000; participating in an egg export scheme, including sharing any associated financial losses with other members, in order to reduce domestic egg supplies and raise, fix, maintain and/or stabilize the price of eggs; and otherwise actively participating in the conspiracy to restrain egg supply which had the intended effect of suppressing competition and artificially elevating egg prices above competitive levels during the time period alleged in this Complaint.

**B.     Trade Groups**

100.     Defendant United Egg Producers, Inc. ("UEP") is a cooperative corporation organized, existing, and doing business under the laws of the State of Maine with its office and principal place of business in Alpharetta, Georgia.

101.    Defendant United Egg Association ("UEA") is a nonprofit corporation organized, existing, and doing business under the laws of the District of Columbia, with its offices and principal place of business located in Alpharetta, Georgia.

102.    Defendant United States Egg Marketers, Inc. ("USEM") is a nonprofit corporation organized, existing, and doing business under the laws of the State of Georgia, with its offices and principal place of business located in Alpharetta, Georgia.

### C.    Unnamed Co-Conspirators

103.    Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

104.    At all relevant times, cage producers, egg trade groups, egg farm software companies, and other shell egg producers and egg product manufacturers or other entities, referred to herein as "co-conspirators," as well as various other persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

105.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each co-

conspirator while actively engaged in the management, direction, or control of its affairs.

106.    All averments herein against any named defendant are also averred against these unnamed co-conspirators as though set forth at length.

## V.    EGG PRODUCTION, TRADE AND COMMERCE

### A.    The Domestic Egg Industry

107.    Egg production is characterized by two related sectors – the "shell egg" sector and the "egg products" (including "liquid eggs") sector.[2]

108.    The shell egg sector consists primarily of "table eggs" that are sold for immediate consumption.  Shell eggs are eggs generally purchased by grocery stores in cartons for resale to the consuming public.  Shell eggs are also purchased by entities such as restaurants and hotels.[3]  The shell egg sector also produces "breaking eggs" for the "egg products" sector.

109.    Of the 211.1 million cases (estimated) of shell eggs produced in 2007, 66 million cases (31.3%) were further processed (for foodservice, manufacturing, retail and export); 124.6 million cases (59%) went on to retail; 19 million cases (9%) went for foodservices use; and 1.5 million (.7%) were exported.

110.    The egg products sector consists primarily of eggs that have been removed from their shells and processed into dried, frozen or liquid forms. Processing eggs involves breaking, filtering, mixing, stabilizing, blending,

---

[2] U.S. Int'l Trade Comm., Industry & Trade Egg Summary 1 (Dec. 1999).

pasteurizing, cooling, freezing, drying, and/or packaging.  The primary purchasers of egg products are the food manufacturing or foodservices industries.

111.    The production of liquid egg products involves egg breaking, pasteurizing, and/or packing.  Liquid eggs are produced as whole eggs, as well as separated into whites and yolks.  The production of frozen eggs involves breaking and pasteurizing eggs that are then put into large containers and frozen.   The production of most dried eggs (including whole eggs, or separated whites and yolks) involves spray drying liquid eggs.  However, egg whites are often dried on trays that result in a product that will more easily dissolve in water.

112.    In the commercial food manufacturing industry, egg products are often used as an ingredient in baked goods or in items such as mayonnaise, pasta, and salad dressings.  Foodservice industry operators such as fast food chains, restaurants, hospitals and nursing homes use egg products for convenience and ease of handling and because egg products are pasteurized and thus ensure a higher level of food safety.

113.    The production, processing, packaging and distribution of shell eggs and egg products constitute and affect interstate trade and commerce.

114.    The value of all egg production in 2007 was $6.68 billion, up 51 percent from $4.43 billion in 2006.[4]

---

[3] *Id.*

[4] *See* <http://www.poultryegg.org/economic data/

### B.     Domestic Egg Production

115.   A vertically integrated enterprise is one in which different stages of production, which are usually carried out by different enterprises, are carried out in succession by different parts of the same enterprise.

116.   The egg industry consists largely of vertically integrated producers who have a tremendous amount of control over every stage of the production of their products.  The egg industry is distinctly different from many other animal industries in that egg producers often own and manage nearly every aspect of their business (e.g., hatching/rearing of birds, feeding, housing, husbandry, processing, packaging, and marketing of their product) and meticulously oversee the entire process.[5]

117.   The United States International Trade Commission ("ITC") has stated that "[o]ver the past several years, the egg-processing industry has become increasingly vertically integrated.  Most of the large firms now either own egg production facilities or have production contracts with local egg producers."  The ITC stated that "[v]irtually all egg production is accounted for by vertically integrated operations."  According to the ITC, the primary reasons for this include the industry's "relatively short production cycle (involving fast turnover and high production volumes that lead to economies of size) and the linkages between specialized, discrete production stages (hatching, raising of hens, laying, processing, and marketing)."[6]

---

[5] Ryan A. Meunier and Dr. Mickey A. Latour, "Commercial Egg Production and Processing."
[6] Industry & Trade Summary - Eggs, ITC (Dec. 1999).

118.    Integrated operations generally hatch their own layer stock.  Some egg producers also purchase their layer stock (i.e., day-old leghorn chicks) from an egg-type hatchery.  Hatcheries deliver chicks to the producer within one to two days of hatching.  Chicks are either placed in typical layer pens or reared in a pullet house.[7]

119.    Pullet is the term given to young female chickens that will become egg-laying hens when they are sexually mature.[8]

120.    Caged shell egg producers generally raise their pullets in cages for ease of production and to provide a barrier to separate them from their feces.  These pullets are reared on short days in light-controlled houses usually on a program of 8 hours of light and 16 hours of darkness (8L: 16D) until around 18 weeks of age to allow for adequate skeletal growth before the onset of egg laying.  These pullets are also fed limited amounts of feed to prevent them from accumulating excess body fat before egg production starts.[9]

121.    Daily light exposure begins to increase at Week 16 to at least 14 hours (14L:10D).  This increase in light exposure triggers hens to begin laying eggs, which occurs about two weeks after light stimulation.  In tandem with light manipulation, the diet is also altered in order to support egg production.[10]

122.    When a flock (group of layer hens) first enters egg production, the rate of egg lay is generally around 10 to 20 percent.  Thus, approximately 10 to 20

---

[7] Ryan A. Meunier and Dr. Mickey A. Latour, "Commercial Egg Production and Processing."
[8] Commercial Pullets and Layers – Poultry Study Guide UC Davis.
[9] *Id.*
[10] *Id.*

percent of the hens are laying eggs at 18 to 22 weeks of age.  The flock quickly reaches peak egg production (90 plus percent) around 30 to 32 weeks of age.  Post-peak egg production (after 30 to 32 weeks of age) continually decreases to approximately 50 percent around 60 to 70 weeks of age.[11]

123.    When the flock declines to around 50 percent production, producers may decide to molt the flock in order to achieve a higher level of egg production or to dispose of the birds.  Molting stops egg production while the chickens are growing new feathers.  A molt takes about 8 weeks to complete.12  Therefore, molting has the effect reduces the supply of eggs.

124.    In wild birds, molting is a natural seasonal event in which birds substantially reduce their feed intake, cease egg production, and replace their plumage.  Induced molting for layer hens is a process that attempts to simulate natural molting events.  To induce molting, producers may reduce light simulation (artificial day length) and impose dietary feed restrictions (including limiting food and water or providing diets of low nutrient density) that result in cessation of egg production.

125.    After a molt, the flock will again increase egg production.  Post-molt egg production will increase such that peak egg production in the flock reaches about 80 percent.  Peak production following a molt is short-lived and the flock generally returns to 50 percent production by 100 to 110 weeks of age.  Once flock egg

---

[11] n.5, *supra*.
[12] *Id.*

production falls below fifty percent, a cost/benefit analysis is made whether to molt the birds for a second time or to "depopulate" the building.

126.   "Spent hen" is the term given to egg-laying hens that are no longer able to perform at the desired level of production.  Two primary methods are used to depopulate and dispose of spent hens.  Hens are either killed on site or transported to a processing facility where they are processed into low-quality meat by-products or livestock feed.

127.   The majority of hens are between 100 and 130 weeks of age when they reach the end of their egg production cycle.  Hens may be molted a second time and then disposed of (approximately 120 to 130 weeks of age) or disposed of following peak production after the first molt (approximately 100 to 110 weeks of age).[13]

128.   Shell eggs are usually collected on nylon belts and sent to a storage cooler or egg processing center.  Eggs generally arrive at the egg processing center within 12 to 14 hours post-lay where they are washed, inspected (checked for eggshell problems, cracks, and blood spots), and then graded for packaging.

129.   At this point, eggs are either placed into cartons for sale or separated for further processing.  Many egg producers are vertically integrated to the point of also owning their own processing facilities and may ship eggs directly to their own facilities for breaking and processing into dry, liquid or frozen forms.

---

[13] *Id.*

130.    Following packaging, shell eggs are moved to a cooler room where they await shipment to retail outlets.   Egg producers commonly deliver eggs to purchasers within one week of lay.[14]

131.    The vast majority of eggs are produced from chickens that are raised their entire lives in cages with non-organic feed.

132.    USDA Organic eggs are produced by hens fed a 100 percent organic diet containing no hormones or animal by-products.   Organic hens must have some access to the outdoors.

133.    Approximately 5 percent of the country's egg-laying hens are allowed to roam "cage free" rather than being placed in cages.   "Free-range" hens also have access to the outdoors.

134.    Organic, free-range, and cage-free eggs are referred to as "specialty eggs" and purchases of those products are excluded from this lawsuit.

135.    The egg industry is dominated by a few major players.   In recent years, the tendency toward huge egg factories has become even more pronounced.   By the mid-2000s, 64 egg-producing companies had more than 1 million layers; 11 of those had more than 5 million layers.   Today, the largest egg producer in the country, defendant Cal-Maine Foods, has over 26 million layers.

136.    In the past twenty years, the egg industry has become increasingly consolidated.   In 1987 there were approximately 2,500 egg producing operations;

---

[14] *Id.*

today there are fewer than 250 producers who own 95 percent of the U.S. laying flock. Approximately 60 companies own 80 percent of the U.S. egg laying flock.

### C. Shell Egg Exports

137. Historically, the United States egg industry has been oriented toward local consumption. The relatively large size and affluence of the domestic market, the perishability of fresh shell eggs, and agricultural policies in major world markets have tended to discourage exports.

138. According to the ITC, while the United States was the second-largest exporter of eggs in 1998 and accounted for approximately one-third of total world exports, those exports represented only about 5% of total United States production. Prior to the Conspiracy Period, about two-thirds of United States egg exports were egg products, with table eggs (eggs for consumption) and hatching eggs (eggs for breeding) making up the other one-third. Prior to the conspiracy alleged herein, Canada, Mexico and Japan were the major markets for United States egg exports. As a result of their proximity to United States processing facilities, Canada and Mexico together accounted for 50% of United States exports in 1998, with Japan accounting for 15%.

139. World-wide egg production is concentrated in a few major countries, with 55% of egg production coming from the top three countries and 78% from the top ten. China is by far the world's largest egg producer, with a production share of about 34%. The European Union is the world's second-leading producer, with an 11% production share, closely followed by the United States, with a 10% share.

Japan (6%) and Russia (4%) are the world's fourth- and fifth-leading producers. Other major producing countries include India, Brazil, Mexico, Indonesia, and Turkey. Egg consumption is also highly concentrated. China, the European Union, the United States, Japan, and Russia are the top five largest egg consumers.

140. As a result of shipping costs, perishability and potential breakage, eggs typically have been exported to nearby countries. For instance, most of the exports from China and Malaysia typically have been shipped to markets in Asia, while the major markets for United States exports are Canada and Mexico. Also by way of example, Turkey's exports are concentrated in Central Asia and Eastern Europe.

141. Between 2002 and 2007, European Union member nations produced over 600,000 tons of eggs per year. The average European Community price for eggs in 2003 was only 110.57 Euros per hundred kilograms. By 2005 that average price fell to only 86.08 Euros. American egg producers have historically avoided sales to Europe because of relatively low prices and shipping costs. According to an International Trade Commission Report, "The EU is mainly an egg surplus region, and its imports are fairly limited." According to USDA reports, as recently as 1998 total European Union egg imports from the United States were negligible because of European oversupply and low prices in the European Union market. As discussed below, this changed during the Conspiracy Period, when defendants collectively utilized exports to Europe in a purposeful effort to reduce domestic egg supply in the United States and thereby raise the domestic United States prices for shell eggs and egg products.

### D.   Egg Consumption

142.   Although domestic annual per capita egg consumption fell substantially throughout the 1980s and early 1990s (from 275 in 1980 to 225 in 1992), it rose to 245 eggs in 1998.  By 2005, annual U.S. per capita egg consumption had reached about 255 eggs.  The United States produced almost 77 billion table eggs in 2005.

143.   The large majority of the U.S. table-egg production is consumed domestically.

144.   Egg products consumption has also continued to increase.  For example, 76.5 million cases of eggs were used in the manufacture of liquid, frozen, or dried egg products in 2004, compared to 53 million cases in 1997.[15]

### E.   Egg Supply Impacts Price

145.   One of the single greatest influences on egg price is supply.[16]  Even very small reductions in production can cause egg prices to rise sharply.  For example, in early 2007, USEM initiated an export order for 300 container loads (approximately 246,000 cases) of eggs (less than one-third of eggs produced daily in the U.S.) in order to drive up the domestic price for eggs by $0.31/dozen.  This order "changed the complexion of the market in a matter of days.  When producers started to fill the order . . . shell egg producers realized a $44,000,000 pay hike."[17]

---

[15] *Id.*

[16] Dr. David Roland, "Supply Management: The Key to Profits," Egg Industry (June 2007).

[17] John Todd, "What 2007 Has in Store: No Shortage of Challenges and Opportunities," Egg Industry, (Jan. 2007) at 1. See also "Happy & Profitable New Year: USEM Export, United Voices" (United Egg Producers, Alpharetta, GA), Jan. 4, 2007, at 1 ("[t]he United States Egg

146.   On the other hand, demand for eggs is relatively inelastic – that is, consumers do not purchase fewer eggs when prices rise. UEP member and first vice chairman, Bob Krouse (president of defendant Midwest Poultry Services), summarizes inelastic demand in the egg market saying: "[w]e sell as many eggs at $1.70 as we do at 65 cents."[18]

147.   According to Bill Rehm, UEP member and president of defendant Daybreak Foods, substantially high egg prices do not hurt consumer demand.  Rehm told Egg Industry magazine, "I tend to think that consumers will buy eggs whether the price per dozen is 70 cents or $1.70."[19]

148.   An interview with American Egg Board CEO, Joanne Ivy, confirmed this price inelasticity: "the demand for eggs is inelastic; that is, the quantity demanded does not change when the price changes."[20]

149.   Inelasticity of demand results in large part from there being no substitutes for eggs.[21]

---

Marketer (USEM) members have once again voted overwhelmingly to accept a sizable export. . . [to] be delivered between January 8th and February 2nd. USEM now has the membership support from producers owning approximately 139 million layers. . . . With the delivery of such large volume export, it is expected that prices will exceed UEP's forecast. It is also believed that the announcement of USEM working on a sizable export may have helped hold prices at higher levels the last week of December.").

[18] Edward Clark, "Despite High Feed Costs, Egg Executives Look for Profitable 2008," Egg Industry (Feb. 2008).

[19] "Egg Executives Optimistic in 2007," Egg Industry (February 2007).

[20] Egg Industry (April 2008) (bold emphases added throughout Complaint unless otherwise noted)

[21] According to the American Egg Board, there are no substitutes for eggs: "[e]ggs possess unique nutritional properties and contribute desirable functional attributes unequaled by any single egg alternative."  http://www.aeb.org/EggProducts/pdfs/ Functionality_ white_paper.pdf ("American Egg Board, Accept No Substitutes: Research Shows No Single Substitute Matches the Functionality of Egg Product").

150.    Eggs have attributes that are unmatched by other products.   These attributes differentiate eggs from potential substitutes.   Because of these qualities and characteristics, if the price of eggs is increased, purchasers cannot switch to other products to make the price increase unprofitable.   In the absence of substitutes, purchasers have little choice but to pay the asking price.

151.    Eggs at issue in this case are largely a homogeneous commodity product.

152.    An excess of supply in the face of a relatively inelastic demand for eggs causes egg prices to drop.  As reported by Egg Industry magazine in an article titled "Supply Management: the Key to Profits," Dr. David Roland stated, "[i]t is estimated that hundreds of millions of dollars have been lost and will continue to be lost unless better methods of supply management become available."[22]

153.    As Dr. Roland noted, in an effort to restrain output, "the United Egg Producers has promoted reducing hen numbers by emptying houses early, delaying refilling, and reducing cage density."[23]

154.    As a direct result of the Defendants' and co-conspirators' reduction in output of shell eggs, shell egg and egg product prices during the conspiracy were supracompetitively higher than they would have been with competition.

---

[22] Dr. David Roland, "Supply Management: the Key to Profits," Egg Industry (June 2007) ("[T]he single greatest influence on egg price and profits is egg supply[.]")
[23] Id.

155.    According to the Wall Street Journal's MarketWatch, egg prices increased 45 percent between August 2007 and March 2008.[24]

156.    On February 1, 2008, an industry trade magazine likened the economic prosperity currently enjoyed by egg producers to Greece's Golden Age: "It seems that the egg industry may find itself in a position of economic prosperity previously unmatched in its long, tumultuous history. [ ] Egg prices have soared at historic highs through months in which producers usually hold on for dear life."[25]

157.    In March of 2008, USDA economist David Harvey told MarketWatch that egg prices typically decline at the end of March after the Easter holiday, but had not this year: "Normally, we see a decline in prices after the Easter holiday. But with the number of birds in the laying flock continuing to be down, we may not see much of a drop."

158.    UEP's senior vice president, Chad Gregory, acknowledged that prices were high as a result of the egg industry's conspiracy to reduce output: "Producers are being really responsible, keeping supply in check[.] So this could last a while."[26]

---

[24]  Matt Andrejczak, "High-flying egg prices show no Egg Prices Show No Sign of cracking,"Cracking, MarketWatch, Mar. 28, 2008 ("If you haven't shopped for eggs lately, get ready for some sticker-shock: A dozen eggs cost $2 or more in most U.S. cities, up about 45% in just eight months.").

[25]  Sam Krouse and Bob Krouse, "Infrastructure's Role in Keeping Egg Prices High," Egg Industry (Feb. 2008). In October 2007, the publication reported that 2007 egg prices were "one for the record books." Edward Clark, 2007 Egg Prices: One for the Record Books - Has the Industry Finally Learned How Not to Overproduce?," Egg Industry, (Oct. 2007),  Id. (only quoted material included).

[26]  Mildred M. Haley, "Egg Prices Skyrocket," Livestock, Dairy, and Poultry Outlook (ERS/USDA), Mar. 2008.

159.    According to a March 2008 USDA Market Outlook Report, "egg prices [have] skyrocket[ed]."[27]

160.    On March 30, 2008, the Chicago Tribune reported that prices are climbing at rates faster than they've been in 30 years: "[e]gg eaters are feeling the pain of soaring chicken feed prices, which egg producers are successfully passing down to the grocery aisle. **What's more, the egg industry's normal response to good times, which is to feverishly add capacity until prices drop like a rock, hasn't materialized**. That could keep supplies tight and prices high well into 2009."[28]

161.    On May 1, 2008, U.S. Department of Agriculture Chief Economist Joseph Glauber testified before Congress and indicated that high feed prices were not to blame for reduced egg production:

> In 2007, table-egg producers cut production. The decision to reduce production likely took place prior to the recent run-up in feed costs. In 2007, the wholesale price for a dozen grade A large eggs in the New York market averaged $1.14 per dozen, 43 cents higher than the previous year. The strong increase in egg prices reflected lower production and strong domestic demand . . . . Given the current size of the table-egg flock and the number of birds available to add to the flock, no significant expansion in production is expected before the second-half of 2008. Wholesale table-egg prices (New York area) averaged $1.59 per dozen in the first-quarter, up 51 percent from the previous year.[29]

---

[27] Mike Hughlett, "Why Egg Prices are Cracking Budgets," Chi. Trib., Mar. 23, 2008, at 1.
[28] Mike Hughlett, "Why Egg Prices are Cracking Budgets," Chi. Trib., Mar. 23, 2008, at 1.
[29] Statement of Joseph Glauber, Chief Economist, Before the Joint Economic Committee, U.S. Congress (May 1, 2008).

162.    In May of 2008, USDA Secretary Ed Schaffer announced: "egg prices [ ] were extremely high last year and still are seeing some increase in prices this year."[30]

163.    In July of 2008, reports noted that after falling from March's record highs, egg prices shot up again 27 percent since mid-May again due to tightened supplies.[31]

## VI.    **DEFENDANTS' CONSPIRACY**

164.    UEP is the largest egg trade organization in the United States.[32]

165.    UEP was formed in 1968 after a group of egg producers got together to discuss the "disastrous price cycles of the egg industry."[33]  The producers formed UEP to provide services to the egg industry, namely, "price discovery, production and marketing information, unified industry leadership, [ ] a strong relationship with USDA, [ ] a Washington presence, [and] strong industry promotion efforts."[34]

166.    Initially formed by five regional co-ops, in 1998 UEP amended its charter to become a group composed of individual members farms and producers.

---

[30] Transcript of USDA Officials Briefing with Reporters on the Case for Food and Fuel (May 19, 2008) (No. 0130.08) ("There you can see some of the major components that have contributed to this increase. Certainly because of the high wheat prices that we've seen globally, cereal and bakery products are up considerably; fats and oils, vegetable oils have been very high; and also egg prices which were extremely high last year and still are seeing some increase in prices this year.")

[31] Jim Downing,"Wholesale egg prices take surprising Egg Prices Take Surprising Jump," Sacramento Bee, July 2, 2008.

[32] United Egg Producers, About United Egg, History & Background, http://www.unitedegg.org/abouthistory.aspx.

[33] *Id.*

167.   According to its October 2007 newsletter, "[i]t was announced during UEP's Annual Membership Meeting that the organization's membership was at the highest level ever with 198 members representing 270 million hens or 96% of the nation's total hens."

168.   UEP produces the bi-weekly "United Voices" newsletter which is distributed to its members and not available to the general public.

169.   UEP is now an "alliance" of five separate organizations providing services to the egg industry.[35]  The organizations are:

    a.   United Egg Producers;

    b.   United Egg Association Further Processor Division;[36]

    c.   United Egg Association Allied Industry Division;[37]

    d.   United Egg Association Producer and Packer Division;[38] and

    e.   United States Egg Marketers.[39]

---

[34] *Id.* UEP's original regional cooperative members were (1) National Egg Company; (2) Northeast Egg Marketing Association; (3) Midwest Egg Producers; (4) Northwest Egg Producers; (5) Southwest Egg Producers; and (6) Western Egg Company.

[35] United Egg Producers, About United Egg, http://www.unitedegg.org/about_ue.aspx

[36] United Egg Producers, About United Egg: Further Processors, http://www.unitedegg.org/about_processors.aspx ("UEA Further Processors was established in 1983 as a Trade Association to represent those companies engaged in breaking & further egg processing into egg products. [ ] Customers include bakeries, food service establishments and food manufacturers. [ ] 44 UEA Further Processor Members Represent Over 95% of all Shell Eggs Broken in the U.S.")

[37] United Egg Producers, About United Egg: UEA Allied, http://www.unitedegg.org/about_allied.aspx ("UEA Allied was organized in January 1995 as a trade association representing companies or individuals which are engaged in providing products, services, consulting and/or information services to the egg industry but do not produce eggs or engage in the processing of eggs into egg products. Staff Coordinator: Gene Gregory")

[38] United Egg Producers, About United Egg: Producers & Packers, http://www.unitedegg.org/about _prodpack.aspx ("The UEA Producers/Packers organization was organized in September 1995 as a trade association to represent companies or individuals who pack (and/or produce) eggs but do not qualify for membership in a Capper-Volstead Cooperative. Staff Coordinator: Chad Gregory").

170.   As noted on its website: "[m]anagement for this alliance is provided by United Egg Producers."[40]   Thus, UEP oversees the "alliance," which includes cage manufacturers, vaccine companies, poultry geneticists, manure conveyor belt manufacturers and others, under the "umbrella" of the United Egg Association.[41]

171.   The United Egg Association ("UEA") is a nonprofit IRS 501(c)(6) organization existing under the laws of Georgia created and managed by UEP to "serve those of the egg industry not qualified for United Egg Producers membership."   The UEA has three divisions: (i) Further Processors (egg breaking and further processing), (ii) Producers and Packers, and (iii) Allied Industries (products, services, and consulting).   According to its IRS Form 990, UEA's "primary exempt purpose" is to "promote, educate [and] defend issues for [the] egg industry" and lists its "exempt purpose achievements" as follows:

> a.   Further Processors – To enable concerns [and] competiteness [sic] of the further processor egg industry to be fairly represented. Client newsletters distributed, related issues updated, [and] information gathered.
>
> b.   Producer Packers – To enable egg producers that are packers to have a viable [and] competitive industry. Member newsletters distributed. Information and trends updated [and] issues addressed.

---

[39] United Egg Producers, About United Egg: US Egg Marketers, http://www.unitedegg.org/about_ marketer.aspx ("A producer cooperative established specifically for the purpose of exporting large quantities of U.S. Shell Eggs.")

[40] United Egg Producers, About United Egg, http://www.unitedegg.org/about_ue.aspx

[41]   United Egg Producers, About United Egg: History & Background, http://www.unitedegg.org/about _history.aspx ("United Egg is the umbrella or unified voice for all egg industry related issues and topics.").

c. Allied – To enable members, customers [and] businesses associated with the egg industry to have a viable business. Industry newsletters distributed.42

172.    One of the other groups making up the UEP "alliance" is the United States Egg Marketers, Inc. ("USEM").  USEM is a nonprofit corporation existing under the laws of the State of Georgia that negotiates egg export sales.[43]

173.    USEM was created in 1982 by Jerry Faulkner, who served as UEP's first executive vice president and general manager.  In 2000, USEM merged with UEP and has since been managed by UEP as a "subsidiary" or "division" of the organization.

### A.    Defendants Collectively Joined in "Supply Management" Efforts of Eggs to Fix, Raise, Maintain, and/or Stabilize Prices

#### 1.    Defendants' early attempts at industry supply restrictions included flock disposals and development of a long-term, chick hatch reduction program.

174.    UEP, UEA and USEM all share the same address at 1720 Windward Concourse #230, Alpharetta, Georgia 30005.

175.    Gene Gregory, UEP's President, acknowledged his attempts to coordinate egg industry supply management from 1992 to the present:  "I've been writing "United Voices" since 1992 and have on many occasions written about

---

42 United Egg Association, Tax Return, (Form 990), at 3 (2006).
43 Statement of the United Egg Producers: Before the Subcomm. On Livestock, Dairy, and Poultry of the H. Comm. on Agriculture, 110th Cong.(2007) (statement of Gene Gregory, President, United Egg Producers).

managing the supply side of our business and attempted to give UEP members warnings of future problems if the supply side is not watched very carefully."[44]

176.   In 1994, UEP's long-time poultry research economist, Don Bell, calculated that less eggs being produced meant more income for the egg industry, and that the only way to control supply would be through "industry cooperation" and the "influence of trade associations such as UEP.  Mr. Bell wrote: "More hens, less income!  .  .  .  The U.S. has no way to control its flock size other than through the persuasive influence of trade associations such as UEP  .  .  .  .  Remember - in the egg industry, 'more means less' - it always has and it will always be so."[45]

177.   UEP was originally made up of five regional cooperatives and had no other individual members.  In 1999, UEP changed its membership structure so that individual egg producers could join the organization as producers realized that this would be a beneficial structure through which to coordinate supply management schemes.  Defendants then decided to take immediate action regarding egg supply and cooperated to form an industry-wide supply control agreement.

178.   An August 2, 1999, UEP "United Voices" newsletter asked whether members would agree to reduce supply: "Will the industry participate in a program to bring supply more closely in line with demand over the next 12 months? This question was also presented to the producers attending the Chicago meeting. Their answer was to survey the membership. . . . . You will also be asked if you would participate in a supply adjustment program."

---

[44] United Voices (July 2004).

56

179.   In this same article, UEP's economist, Don Bell, suggested four ways that Defendants could coordinate to reduce supply: (1) an industry-wide growth policy; (2) removal of birds from the flock (as coordinated molting was only a "stopgap way of correcting the problem"); (3) a 2-3% reduction in chick purchases; and (4) a minimum floor space allowance.

180.   In late 1999, Defendants met to discuss Don Bell's proposals and ways to coordinate supply management schemes.  Dolph Baker (of Defendant Cal-Maine) was Chairman of UEP's Marketing Committee.  He and Ken Looper (also of Cal-Maine) presented the argument for adopting a coordinated supply management. UEP's members voted on these proposals and agreed to: (1) an immediate molt of 5% of the flock; (2) to cut back 5% on flock inventory over the next 6-12 months; and (3) to develop a hatch reduction program.  They also agreed to "bring this message" to the rest of the producers who were not present at the meeting.[46]

181.   In accord with UEP's membership, USEM's members also agreed to coordinate supply efforts at this time and voted unanimously to reduce egg supply within the groups' membership.  At the time, the members of USEM represented about 60 million layers or 23% of the nation's total egg production.  The members agreed "that each member immediately molt 5% of their total flock and achieve this goal no later than October 15, 1999; and each member reduce their total flock by 6% as quickly as possible, but no later than November 20, 1999 and maintain their flocks at the reduced levels through July 1, 2000."  Further, the chairman of USEM was

---

[45] "An Egg Economics Update – When More Means Less!," Number 145, April 15, 1994.
[46] "Overproduction is the Focus of UEP Meeting," *Egg Industry* (Nov. 1999), at 1-3.

asked to appoint a committee to study and develop a chick hatch reduction program for consideration by the membership no later than November 3, 1999.[47]

182.    According to an industry article about these plans, the response "worked" and "the year-end flock was just 3.7 million hens larger than the year before and producers experienced a good holiday run and profitable year" as a result.[48]

183.    John Mueller, Sparboe Farms Inc.'s former general counsel, attended UEP meetings in the late 1990s and early 2000s and recalls specific Defendants being among the members of the UEP Board of Directors, including Roger Deffner (NFC), Robert Krouse (Midwest Poultry), and Terry Baker (Michael Foods).  There, Defendants and other board members extolled the benefits of decreased supply on the price of eggs, discussing their own companies' participation in these collective schemes, and encouraging other companies to participate in industry supply restriction efforts, as well.

> **2.    Defendants formed a "core group" committed to reducing supply but realized longer term supply reduction solutions were needed.**

184.    Another flock supply issue occurred in 2001.  Supply was increasing. Defendants estimated that 10.8 millions hens would be added to the national flock by the end of the year.  Thus, Defendants sought to further coordinate supply management efforts.

---

[47] "U.S. Egg Marketers Vote to Reduce Supply," *Egg Industry* (Nov. 1999).
[48] "Egg producers looking at marketplace's options as industry again struggles with excess production," *Feedstuffs* (Nov. 5, 2001).

185.    Defendants distributed a document to members called "The Egg Industry" dated August, 2001.   This document examined how supply reduction would increase prices and stated that "[t]here should be a core segment of the industry that is willing to reduce egg supply in order to achieve profitable egg prices."   Further, the document noted "several tools" available to the industry to reduce supply including: "Reduce chick hatch," "Dispose of old flocks early," and "Molt early." Finally, the document asked recipients, **"Would you be willing to meet with this core group of egg producers to discuss an action plan to achieve profitable egg prices?"**

186.    Another document in these materials entitled "Supply Demand Recommendations," submitted by UEP's Marketing Committee, included the following proposal:

    a.  Starting the week of June 18th - dispose of old flocks 4 weeks earlier than scheduled and continue through the week of October 1st.

    b.  Starting the week of June 18th - molt hens at 62 weeks of age and continue the plan through the week of October 1st.

    c.  Effective September 1st - all members are urged to reduce their intended day old pullet chick replacement by 5% over the next six (6) months.

187.    At a UEP meeting in November 2001, Defendants and co-conspirators agreed to the "emergency flock reduction" of 5% that was called for in these materials.   This emergency plan asked producers to begin running 100,000 hen

houses at 95% capacity by de-stocking one bird per cage until houses reached the 95% capacity goal.[49]

188.    Ken Looper, vice chairman of Cal-Maine Foods, was present at this meeting and presented detailed statistics on bird numbers and pricing.  He asserted, "[t]he egg industry must reduce the flock or the price of the product will remain at depressed levels."[50]

189.    Many producers signed "commitment sheets" to the collective scheme and joined the "core group" willing to reduce supply while others agreed to it in secret not wanting to publicly associate with the program.

190.    Defendants developed another "crisis management plan" in 2002.

191.    Minutes from the UEP's Board of Directors Meeting held on May 15-16, 2002 in Washington, DC reflect the following Defendant attendees: Dolph Baker (Cal-Maine); Bob Krouse (Midwest Poultry); Chuck Elste (NuCal); Joe Fortin (Moark); Ken Looper (Cal-Maine); Mark Oldenkamp (NuCal); Bill Rehm (Daybreak); Paul Sauder (R.W. Sauder); and Gary West (NuCal).

192.    At this meeting, the minutes note that Marketing Chairman Dolph Baker (Cal-Maine) announced two ways of reducing egg supply, stating "that we have a crisis and that a crisis management plan had been communicated to the members

---

[49] "Egg producers looking at marketplace's options as industry again struggles with excess production," *Feedstuffs* (Nov. 5, 2001).
[50] *Id.*

calling for early molt and early hen disposal.  The current egg prices indicated that this plan was working."

193.    During a UEP "Marketing Committee Meeting" in October 2002, at the UEP annual meeting, then-chairman Dolph Baker, president of Cal-Maine Foods, called on California egg producer Arnie Riebli of NuCal Foods to speak to the crowd.  Mr. Riebli expressed frustration over the industry's previous flock reduction agreements and urged strong collective action by asserting that "[t]here are many older hens out there that 'should have gone to heaven.'"[51]

194.    Having succeeded in early attempts to control supply through coordinated molts and hen disposals, which raised prices as stopgap measures, Defendants realized they needed a more reliable way to reduce overall chick hatch for a longer term supply reduction solution.  As a result, Defendants decided to use "animal husbandry" as a pretext to reduce the flock and egg supply and to provide additional market incentives and enforcement mechanisms to ensure the effective joint implementation of the supply restriction scheme.

### 3.    Defendants used cage space allowances to implement a long term chick hatch reduction scheme.

195.    Defendants decided to implement Don Bell's cage space recommendations as a long term chick hatch reduction program that eventually became known as the "Animal Care Certified Program" (or "ACC") and later known as the "UEP Certified Program."

---

[51] *Id.*

196.    Defendants and their co-conspirators agreed to continue to restrict supply management through numerous means, as well, including early culls and hen disposals, general flock reductions, manipulation of molting schedules, production calendars, and exports.

197.    Every Defendant herein jointly participated in these schemes which were designed to (and did) reduce domestic egg supplies for the express purpose of fixing, raising maintaining, and/or stabilizing prices of shell eggs and egg products.

198.    In 2000, UEP members first purported to adopt "animal husbandry guidelines" based on recommendations from a committee appointed by UEP's board of directors and a producer animal welfare committee.[52]  The 2000 guidelines were actually revisions to UEP's performance-based guidelines adopted in the early 1980s.[53]  A key part of the 2000 guidelines was the recommendation that producers gradually increase cage space by transitioning from 48 square inch per hen to 67-86 square inch per hen according to a twelve-year phase-in schedule.[54]

---

[52] Donald Bell, "Don Bell's Table Egg Layer Flock Projections and Economic Commentary" – 2002, No. 16 (July 16, 2002) ("This report was written by Don Bell, University of California Poultry Specialist emeritus, under the sponsorship of United Egg Producers[.] ... United Egg Producer's has developed a set of cage space standards with the help of a scientific advisory committee and a producer animal welfare committee. The standards describe the stepwise introduction of increased space allowances, along with deadlines for the industry's adoption of the standards due to the extreme economic impact of such changes. [ ] The animal husbandry recommendations of the two committees are relative to minimum space allowances in cages.").

[53] "Egg Producers Adopt Animal Welfare Guidelines," *Feedstuffs*, Oct. 16, 2000. In 1981, UEP's current president, Gene Gregory, was appointed committee chairman of the newly formed animal welfare committee. The "all-industry task force" set out to "develop an industry code of good management practice...; develop industry situation brochure...; establish industry clearinghouse for animal welfare information; seek academic advisor to committee; develop producer certification program; develop egg industry press kit; establish communication network." UEP Designates Director of Welfare, Lancaster Farming, May 2, 1981.

[54] "Egg Producers Adopt Animal Welfare Guidelines," *Feedstuffs*, Oct. 16, 2000.

199.   These cage space guidelines were previously recommended by Don Bell, UEP's economist, in 1999 solely as a more permanent way to reduce chick hatch and raise egg prices.

200.   As part of these guidelines and Defendants' earlier commitments to reduce the number of hens that were producing eggs, Defendants also agreed not to add capacity or make up for the lost hens that would result through reduced cage densities in order to restrict output and fix and raise prices.  This agreement to curtail production had no basis in animal husbandry and was designed solely to reduce output and fix prices.

201.   In 2001, Defendants agreed to quicken the cage space phase-in period from twelve years to six.55   Eventually, over 80% of the egg industry became committed to this program including the Defendant producers herein.

202.   Mr. Mueller (Sparboe's former counsel) attended UEP meetings around this time where Gene Gregory (UEP), and Joe Fortin (Moark), publicly praised the economic benefits of decreased supply from this program.  Roger Deffner [NFC] and Mr. Gregory would tell UEP members that the "animal husbandry" program "would reflect well in higher prices."

203.   Garth Sparboe of Sparboe Farms was a regular attendee of UEP Animal Welfare Committee meetings starting in 1999, at which time the "animal welfare" program was conceived.  Representatives of Defendants who attended those meetings include: Tim Bebee (Michael Foods), Gene Gregory (UEP), William R.

Rehm (Daybreak Foods), and Robert Krouse (Midwest Poultry).  In those meetings, the participants privately discussed the fact that the "animal husbandry" program's express purpose was to reduce supply.  Mr. Sparboe recalled that the UEP leadership – and Gene Gregory in particular – saw the program as an opportunity to create a protocol that would allow egg producers to reduce flock sizes with a superficially legitimate public purpose of animal welfare.

204.   Defendants agreed to claim in public that the purpose of the program was for "animal husbandry" in order to convince retailers and food manufacturers to accept the program and the increased prices that eventually resulted.  Privately, however, Defendants acknowledged and discussed the fact that the program was conceived and intended to be one way for the industry to jointly reduce chick hatch given the supply problems that often plagued egg producers.

205.   As the program took shape, UEP often claimed in its newsletters that the program was never "intended" to be a supply restriction scheme, but would also extol the virtues of the program on reducing supply and repeatedly referred to the scheme as a "roadmap" for reduced supply and increased profits to the industry.  In settings that Defendants believed would be more private (such as industry meetings), Defendants were more candid about the fact that the cage space requirements were designed and implemented to reduce egg supply and fix prices.

---

[55] "Egg Producers to Quicken Phase-In: Hen Husbandry Standards," *Feedstuffs*, Dec. 12, 2001.

206.    Defendants not only intended for the cage program to be a way for the industry to conspire to reduce output, but it actually asked its economist, Don Bell, to study the economics of this issue.

207.    Thus, in April 2002, Don Bell drafted a report, under the "sponsorship" of the UEP, entitled, "Reducing Cage Density - It's Effect on Egg Prices and Flock Performance."  He concluded that the cage space guidelines would reduce flock size and that the industry would see numerous economic benefits as a result.

208.    In July of 2002, Don Bell, under the sponsorship of UEP, drafted another report entitled "Several Possible Scenarios Resulting From UEP's New Husbandry Guidelines."  The report noted that as of 2002, 70% of the nation's laying flock had been committed to UEP's scheme.  Don Bell ultimately concluded that if the UEP and its co-conspirators were able to keep production down by not replacing lost hens, the maximum industry income could be between $3.55 billion (100% compliance with no growth) and $2.51 billion (50% compliance with 10% growth).[56]

209.    In an article about his research, Mr. Bell said "the data are available for everyone to consider" and "we don't expect everyone to believe (these numbers), but the general directions in the numbers should be of interest to everyone involved in table egg production."[57]

---

[56] "Don Bell's Table Egg Layer Flock Projections and Economic Commentary – 2002; Several Possible Scenarios Resulting From UEP's New Husbandry Guidelines," No. 16, July 16, 2002.
[57] "Impact of hen husbandry on prices would be positive even in worst-case scenario," *Feedstuffs* (Aug. 5, 2002).

210.    Defendants set out to implement Don Bell's supply restriction projections and deal with the issues that impeded longer term success of their joint supply management efforts.  In particular, Defendants realized that they needed to agree to devote 100% of their production to the UEP Certification Program (even if customers did not want Certified eggs), not to "backfill," and not to make up for the hens lost as a result of increased cage space.  These were key aspects of the cage space output restriction conspiracy that were unconnected to any perceived animal husbandry benefits that might result from increased cage space.

> ### a.    Defendants modified the UEP Certification Program to require a producer to commit 100% of its production to the program in order to ensure reduced supplies.

211.    The first major modification to the "Animal Care" program that had no basis in animal husbandry and that was designed to further restrict supplies was the "100% rule."

212.    The "100% rule" was first implemented at UEP's Annual Board Meeting on October 10-11, 2002 in Savannah, Georgia.  The following Defendants were in attendance: Fred Adams (Cal-Maine); Dolph Baker (Cal-Maine); Tim Bebee (Michael Foods); Roger Deffner (NFC); Chuck Elste (NuCal); Joe Fortin (Moark); Ernie Gemperle (NuCal); Bob Krouse (Midwest Poultry); Ken Looper (Cal-Maine); Mark Oldenkamp (NuCal); Paul Osborne (Moark); Bill Rehm (Daybreak); Paul Sauder (R.W. Sauder); Steve Storm (Cal-Maine); and Gary West (NuCal).

213.    At this meeting, two producers moved "to reconfirm the status that a company must commit to implementing the welfare guidelines on 100% of all

production facilities regardless of how or where eggs may be marketed.  The 100% commitment is intended to be inclusive of all company entities, affiliates, etc. Motion carried by a vote of 19 yes and 1 no."

214.  The 100% rule required that 100% of a producer's egg houses must be maintained in accordance with the supply restriction guidelines in order for a company to sell "UEP Certified" eggs.

215.  The rule was implemented solely to ensure that flock sizes were further reduced in line with the goals of the conspiracy laid out herein.

216.  Sparboe received specific pressure regarding the 100% rule from Joseph Fortin (of defendant Moark LLC).  Mr. Fortin remarked that it would be an unfair system to other producers if there was not 100% compliance by companies such as Sparboe.  Steven Storm, Vice President of Operations at Cal-Maine, and Dolph Baker, President of Cal-Maine, also strongly advocated that to receive animal care certification a producer should have to be 100% compliant in order to help reduce supply.

217.  The UEP Animal Welfare Committee also held a special 2003 meeting in Las Vegas devoted to the 100% Rule.  Among the Defendant attendees at the Las Vegas meeting were Joe Fortin of Moark, Gene Gregory, Al Pope and Chad Gregory from UEP, Bob Krouse from Midwest Poultry, and representatives from Cal-Maine and Ohio Fresh Eggs.  In Las Vegas, Joe Fortin assured Mr. Bob Sparboe, former president of the Company, that the UEP Certification Program would take care of

Sparboe. Fortin explained that the Program would generate a wholesale increase in industry prices, and that as a result Sparboe would benefit overall.

218.    Sparboe's general counsel, John Mueller, was concerned that the 100% Rule was a "sham" that was likely to be viewed as an illicit supply-management program that would be violate federal antitrust laws. Mueller expressed his concerns to Gene Gregory on a number of occasions. Nevertheless, Al Pope, Gene Gregory and others pressured Sparboe to reduce supply and accept the 100% Rule, with Pope suggesting that if Sparboe did not participate, it would give Sparboe a black eye in the industry and make them a "bad player."

219.    In response to Sparboe's concerns about adopting the 100% Rule, and contrary to the animal welfare concerns purportedly driving implementation of the 100% Rule, Mr. Pope informed Sparboe at a Minneapolis meeting that UEP could "finesse the audit" to allow Sparboe to obtain UEP-certified status notwithstanding the company's failure to meet 100% Rule standards in the allotted time.

220.    Mr. Mueller, Sparboe's in-house counsel, had conversations and correspondence with Gene Gregory in which Mr. Gregory, in response to Mr. Mueller's concerns regarding the true, supply-restrictive nature of the UEP certified program, stated that Mr. Mueller needed to "understand" how supply and demand work and how reducing supply would affect price to the benefit of egg producers and UEP members.

221.    In addition, Mr. Mueller discussed the UEP Animal Welfare Program and its intersection with supply and price with representatives from a number of

industry participants, including: Bob Krause of Midwest Poultry; Ken Looper of Cal-Maine; Mark Oldenkamp of NuCal Foods; Paul Osborne of Moark; Bill Rehm of Daybreak Foods; Marcus Rust of Rose Acre Farms; Paul Sauder of R.W. Sauder; Terry Baker and Tim Bebee of Michael Foods; Roger Deffner of NFC; and Joe Fortin from Moark, among others.

> **b.      Defendants monitored compliance with the joint supply management program and sought to retaliate against those who did not go along with the scheme.**

222.    Defendants realized that their supply management scheme also needed strict auditing, compliance and oversight regimes and made sure to include those in their proposal.  A discussion of a 2002 UEP meeting at which the program was discussed was published in Egg Industry (Nov. 2002).  The article noted that: "There will be a monthly compliance report from certified producers to UEP which will be strictly adhered to. There will be no tolerance on bird numbers in cages and houses . . . . It was emphasized that UEP needs to keep control of the auditing program . . . ."[58]

223.    Thus, Defendants built in reporting and auditing mechanisms into the UEP Certified Program that allowed the cartel to monitor compliance and ensure members are not cheating.

224.    Defendants also pressured egg buyers to demand UEP Certified eggs in order to motivate egg producers to participate – and thus further reduce their egg supply.  For example, UEP members met with the Food Marketing Institute ("FMI"), a grocer's trade organization, and encouraged the group to mandate the UEP seal for

all egg products used by organization members.  This action by FMI would force egg producers to comply with the UEP program and further result in the desired flock reduction.  UEP promoted the program to FMI and others, however, as an "animal welfare" program when in actuality, the understood purpose of the program as far as producers were concerned was to decrease egg supply.

225.    Defendants also met directly with retailers and encouraged them to not purchase eggs unless they were "UEP certified", in an attempt to foreclose markets to those that did not go along with the Defendants' scheme.  If an egg producer does not sign on the agreement, they may not be able to market their eggs or sell them through many major retail outlets.

226.    For example, shortly after the program was adopted, two major retailers, The Kroger Co. and Wal-Mart Stores, Inc., indicated that starting January 1, 2003, they would only buy UEP Certified eggs.  Other retailers were expected to "follow the Kroger/Wal-Mart lead in short time, making 100% compliance not only a program strength but necessary and practical."[59]

227.    Sparboe acknowledged in 2002 that the true purpose of the UEP Certification Program, as understood by the egg producer industry, was to reduce flock size:" "[q]uite frankly, if UEP had quit playing games and called the program what it is - a voluntary cutback of animal numbers, I think the whole matter would

---

[58] John Todd, "Record Crowds and Heated Discussions at UEP," *Egg Industry*, Vol. 107, No. 11 (Nov. 2002).
[59] "Egg producers put husbandry program into motion as early model for others," *Feedstuffs* (Nov. 4, 2002).

have played out long ago and enough companies would have gone along with it to help the market."

228.    Soon thereafter, UEP President Gene Gregory contacted several of Sparboe's customers and complained about those customers' purchases of eggs from Sparboe that had not been certified by the UEP.

229.    For example, UEP representatives contacted the Albertsons grocery chain, a Sparboe customer, and attempted to convince Albertsons to no longer purchase Sparboe's eggs.

230.    On June 20, 2005, the UEP's Mr. Gregory wrote a letter to Canada Egg Marketing Agency, another Sparboe customer, stating: "I don't know whether CEMA is purchasing eggs from the Sparboe company but just in case you are, you need to know that effective June 28, 2005, that the Sparboe Company is no longer an Animal-Care Certified company.  I believe that any eggs purchased by CEMA should meet standards that meet the ACC guidelines and have been audited to confirm this."'

231.    The UEP also retaliated against Kreider Farm Eggs, another company that, like Sparboe, withdrew from the UEP certification program.  As reflected in an August 31,2005 email from Ron Kreider to Sparboe, Gene Gregory had contacted Kreider Farm Eggs customers in retaliation for Kreider Farm Eggs' withdrawal from the UEP program: "Yes Gene did write a letter to one of our customers about two months ago and we responded very quickly with a phone call and letter back to him. Our customer (still a loyal customer) was confused by the letter and copied us. I

forwarded it to our attorney and he took issue with UEP's 'intentional interference with contractual relations.'"

232.    Bob Sparboe, the former President of Sparboe, wrote a letter to UEP complaining about these acts of retaliation: **"it came to my attention that UEP staff member Gene Gregory contacted some of our customers informing them of our withdrawal from the program. Mr. Gregory's actions clearly step outside of UEP's stated procedures as outlined in the letter we received from Al Pope. Further, we interpret his actions as unethical and inappropriate for an industry organization to do to its membership."** Sparboe asked UEP to stop such activities immediately.

233.    Roger Deffner [NFC/UEP Chair] responded to Sparboe that "I am not aware of what Sparboe customers to which you are referring.  Our policy has been and continues to be not to make voluntary direct contact with customers of our members.  I have reemphasized that with all our UEP staff."

234.    Despite these letters, UEP staff continued to contact Sparboe's customers.  In 2009, after this initial lawsuit was filed, UEP contacted Sparboe's customer, Wal-Mart, in an attempt to discourage the company from purchasing Sparboe's eggs that had not been certified by the UEP.

235.    Gene  Gregory  of  UEP  called  Anthony  Airoso,  Divisional Merchandising Manager for Wal-Mart, to criticize Sparboe.

236.   During this call, Mr. Gregory expressed dismay at Wal-Mart's decision to buy shell eggs produced under a husbandry program not certified by the UEP.   Mr. Gregory further stated that he would be sending a letter to Wal-Mart indicating that Sparboe Farms is not part of the UEP Certified Program.   He also expressed disappointment that Wal-Mart would choose an alternative program after UEP spent ten years developing its UEP Certified Program.   Finally, Mr. Gregory accused Sparboe of "stealing" from UEP's Program.   Mr. Gregory was overtly attempting to dissuade Wal-Mart from purchasing eggs from Sparboe.

### 4.   Defendants' supply management schemes began to see results.

237.   Egg prices generally declined until mid-2002 when the Defendants' output restriction scheme began to see results and prices rose through the first part of 2003, as well.   Through the UEP, Defendants' furthered their joint supply management scheme and credited industry actions with helping to reduce supply.

238.   In its 2003 Directory, the UEP listed the following as Board Members and Committee Chairmen: Joe Arias (Valley Fresh Foods /NuCal); Dolph Baker (Cal-Maine-also a member of UEP Executive Committee and Chair of the Shell Egg Price Discovery Committee and Shell Egg Marketing Committee); Roger Deffner (NFC - also a member of the UEP executive committee); Bob Krouse (Midwest Poultry - also a member of the UEP executive committee and Chair of the Finance Committee); Ken Looper (Cal-Maine); Mark Oldenkamp (Valley Fresh Foods /NuCal); Paul Osborne (Moark, LLC); Marcus Rust (Rose Acre Farms); and Gary West (J.S. West Milling Co./NuCal).

239.    A May 1, 2003 UEP newsletter reported on the favorable results producers obtained through the supply reductions and urged producers not to make up for lost production.  Moreover, the UEP acknowledged that the "Animal Care" program was achieving its goals of reduced chick hatch.  The newsletter noted four major reasons for the higher egg prices: 1. Reduced chick hatch to meet UEP's Animal Husbandry Guidelines; 2. UEP's Animal Care Certification Program; 3. Exotic Newcastle Disease; and 4. Exports taken by United States Egg Marketers (USEM).

240.    UEP's June 2003 newsletter also noted: "The hatch reduction, to meet the space allowance guidelines of the Animal Care Certified Program are beginning to show egg market value improvements.  This trend should continue."

241.    The same newsletter noted that Defendants had earlier "projected" that these supply restrictions, hidden under a pre-text of "Animal Care Certified" eggs, would work:

These market improvements can be attributed to:

1.    **Reduced pullet hatch finally making an impact upon supplies.**

2.    **USEM exports reducing supplies at critical times.**

3.    **Animal Care Certified program beginning to work like <u>many had projected.</u>**

242.    UEP's July 2003 newsletter, Defendants warned producers not to make up for lost hens in an article titled "Word of Caution": "As producers continue to reduce their layer house capacity to meet the UEP Animal Husbandry Guidelines,

please don't make the mistake of building new facilities to replace the lost number of birds."

243.    By the end of 2003, there were 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) that had agreed to the UEP Certified Program.  These companies included Defendants Cal-Maine Foods; Hillandale Farms - PA; Midwest Poultry Service; Moark Productions; National Food Corp.; R.W. Sauder, Inc.; Norco Ranch; Rose Acre Farms; and the four companies making up NuCal (Sunrise Farms; Valley Fresh Foods, J.S. West Milling; and Gemperle Enterprises).

244.    An August 2003 editorial by Gene Gregory of UEP entitled "Reason Why Industry Could Have Period of Profitability" distributed to members noted that the primary reason for increased prices pointed to the same reasons for increasing prices: "1. Industry making adjustments after years of financial losses; 2.Exotic Newcastle disease outbreak in Southern California; 3. Timely exports by United States Egg Marketers (USEM); and 4. Implementing of space allowances to meet UEP's Animal Husbandry Guidelines."

245.    Gregory pointed to the implementation of the space allowance guidelines as having had "the greatest impact" on lowering supply and increasing price based upon the fact that the industry's previous supply management agreements had "never been endorsed by the majority of the industry and ultimately were discarded when prices improved for short period."   Finally, Gregory credited

Defendants that had agreed to the UEP Certified Program as having caused the most significant flock reductions:

> The fact that approximately 200 companies have begun implementing the [UEPs Animal Husbandry Guidelines]..., has caused flock reduction and will continue to do so for some time. These 200 companies own approximately 226 million hens or more than 82% of the total hens in the country.  The hatch reduction to meet the animal husbandry guidelines began with chicks hatched after April 2002. Since this beginning date the hatch has been reduced by 14.7 million pullets in comparison to the same period year earlier.

246.    UEP's September 2003 newsletter urged producers - "Don't Screw Up A Good Thing": **"One sure way of having poorer egg prices is by increasing egg supplies through holding hens longer and keeping hens that should be disposed. Don't screw up a good thing!!"**

247.    In October 2003, the outgoing chairman of the UEP, Mike Bynum, gave a farewell message to members crediting the UEP Certified agreement with reducing supply and raising prices: "Over the past year, slowly but surely, the egg supply began to moderate relative to strong demand through a consistent reduction in chick hatch and, today we are enjoying market prices that are 60% higher than a year ago."

248.    UEP's December 2003 newsletter discussed the record egg prices the industry was seeing and warned producers not to get "too greedy" and produce more eggs:

> Now the true test will come as the industry attempts to maximize returns while avoiding the temptation of being

> too greedy and producing a supply greater than demand
> will warrant at profitable prices.  History tells us that the
> industry doesn't have a good track record of producing
> for profits but more for volume.  Let's hope this trend
> doesn't continue.

249.   This same newsletter urged producers not to "abandon the program" and produce more eggs: "I think the biggest challenge will be maintaining the UEP Animal Welfare Guidelines for increased space per bird.  There will be a huge temptation to get greedy, and abandon the program by some of the companies."

250.   UEP's Shell Egg Marketing Committee met on January 26, 2004 in Atlanta, Georgia.  The following Defendants were Marketing committee members at this time, among others: Dolph Baker (Cal-Maine); Joe Fortin (Moark); Bob Krouse (Midwest Poultry); Arnie Reibli (NuCal); Gary Bethel (Hillandale Farms); Ken Looper (Cal-Maine); Mark Oldenkamp (NuCal); Roger Deffner (NFC); Chuck Elste (NuCal); and Paul Osborn (Moark).

251.   Ken Looper of Cal-Maine discussed his "Supply Demand" comments dated January 16, 2004.  In his paper distributed to committee members, he discussed hatch rates, cull rates, and flock inventories with many of his competitors.  He also noted that exports had a large impact on supply in November 2002 and March 2003.  Finally, he concluded: "One or two percent up or down in the supply of most any commodity produces a big difference in price. Price is the primary tool that helps balance supply and demand.  We continue to be in uncharted waters and 2004 should be a very interesting year."

252.   At this meeting, Gene Gregory also gave a presentation prepared by Don Bell entitled "Supply/Demand Challenges - When Will We Ever Learn?"  This presentation compared the individual company objective with that of the egg industry and noted that the "two objectives are not compatible."  Gregory and Bell urged attendees to realize that producers needed to think of the industry over individual concerns and realize that collective action to decrease supply was what caused egg prices to rise in 2003 compared to 2002.

> **5.     In 2004, after flocks began to increase again, Defendants agreed to additional supply management programs and closed loopholes in the UEP Certification Program.**
>
> > **a.      UPE's Marketing Committee agreed to a May 2004 early molt/hen disposal plan**

253.   After record high egg prices in 2003, egg flocks increased and egg prices were affected.

254.   UEP's March 2004 newsletter warned about increased hatching and urged the industry not to expand: "Can we resist the temptation to expand too quickly? UEP and USEM can only do so much to help the industry be profitable."

255.   UEP's April 8, 2004 newsletter asked "Can We Maintain Prices Above $1.00 Per Dozen?": "Is it now time to rethink our position?  Should we be disposing of those old hens and molting an increasing number of hens?  Your association (UEP) can only do so much."

256.   In order to regain control over prices, Defendants sought to renew their previous joint supply schemes including flock reductions, hen disposals, and molting

schemes to provide short term supply reductions and quick relief for depressed prices.

257.   In a May 6th, 2004 email to Bob Krouse (Midwest Poultry), Chuck Elste (NuCal), Arnie Riebli (NuCal), Mark Oldenkamp (NuCal), Dolph Baker (Cal-Maine), Ken Looper (Cal-Maine), Joe Fortin (Moark), Paul Osborn (Moark), and Roger Deffner (NFC) (among others), Gene Gregory of UEP wrote of his concerns with the current supply demand situation and asked the industry to participate in a new supply restriction scheme:

> **The animal care certified program gave us a good roadmap for the future like no supply demand program could have.** While it was never intended as a supply demand program it can be a good way to manage our business if we just return to the old days of flock disposal and molt schedules.
>
> ...
>
> **During the Marketing Committee meeting in D.C. next week,** I'm asking you to give serious consideration to ideas and recommendations that could adjust the supply side and return the industry to reasonably good profitable times.

258.   UEP's Marketing Committee then met on May 10, 2004 in Washington, DC. Committee members included: Dolph Baker - Chairman (Cal-Maine); Chuck Elste (NuCal); Bob Krouse (Midwest Poultry); Mark Oldenkamp (NuCal); Gary Bethel (Hillandale Farms); Roger Deffner (NFC); Joe Fortin (Moark); Ken Looper (Cal-Maine); Paul Osborn (Moark); and Arnie Riebli (Moark).

259.   Gene Gregory gave a presentation at this meeting called "Market Analysis (Now & Future)."  In one slide, he asked, "How can flock size be this large

with reduced hatch?"  While crediting the UEP Certification Program with resulting in a significant pullet hatch reduction, he noted four ways producers had continued to expand production:

- placed molted hens into depreciated (retired) houses.
- Back filled houses - replacing mortality when spent hens would normally have been sent to fowl processing or rendering.
- Holding hens to older ages. (about 4 wks. = 12 million hens)
- Delaying age at which pullets are placed in layer house.

260.    Gregory urged Defendants not to expand too rapidly: "Collectively as producers build facilities to replace loss production we will create a national surplus leading to egg prices below the costs of production even while still meeting guidelines of the Animal Care Certified Program."

261.    In the "Future Outlook" part of this presentation, Gregory noted that "The Animal Care Certified program is the only 'roadmap' for the future that the egg industry has ever had.  If the industry stays committed, we could manage ourselves into profits for a prolonged period."

262.    In UEP's May 2004 newsletter, Gregory again repeated this message referred to the "Animal Care Certified program" as a "roadmap" for the industry supply reduction campaign and increased profits:

> **[T]he Animal Care Certified program is the only roadmap the industry has ever had for future planning.** If you stay true to the program and manage it to meet the market demand, it can provide the industry with prolonged profits.

263.    Gregory urged Defendants to stay "committed" to the program and encouraged the industry to

> **[A]re you committed to making a change? Are you committed to staying the course even when egg prices begin to show some strength? Whether you sell eggs in the shell or as egg products, if you are in the production business, you need to be committed to doing whatever is necessary to have prices above the cost of production. . . .**
>
> We believe that the industry only needs to make a few minor adjustments but this needs to happen now. If we do this over the next few weeks then the future looks very bright for a very profitable industry during the second half of this year. **Are you committed or do you want to let someone else do the job and simply reap the benefits?**

264.   UEP Chairman Roger Deffner (of Defendant NFC) also encouraged Defendants to remain disciplined and follow coordinated molt and hen disposal schedules.: **"We must remain disciplined in our approach to egg production. We must maintain responsible growth . . . . There are a lot of old hens on the farms that need to be removed. Let's get back to our regular molt and kill intervals.'**

265.   UEP's newsletter detailed the new coordinated supply management scheme adopted by the Marketing Committee at their May meeting and asked members to return an "intention form" that they would agree to this scheme: "The Marketing Committee has recommended that all UEP members molt flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until Aug. 1, 2004."

266.   UEP identified some of the members that expressed commitments to the Marketing Committee's price fixing scheme described including Cal-Maine, Moark, and Norco.  Further, NFC and Ohio Fresh agreed to similar plans.

267.   UEP's July 16, 2004 newsletter acknowledged that the UEP Certified Program was lowering supply "Two sources, one of which is the animal welfare audits, have confirmed to UEP that animal care certified companies have in fact reduced their hen numbers in existing houses."  The newsletter further urged "smart companies" to agree to further reductions.

**b.      Defendants agree to reduce flocks in November 2004.**

268.   UEP's September 15, 2004 newsletter contained an editorial entitled "Comparison of Past Year's Supply Demand" written by Gene Gregory.  In this editorial, Mr. Gregory discussed the options available to producers to help reduce supply and fix prices and encouraged them to do so:

> I believe we need to find ways to give producers some encouragement of what could happen if we simply remove the older hens, sell hens at younger ages, do not backfill cages, do not continue to use old depreciated houses or to molt at younger ages.
>
> . . .
>
> Our supply increases and flock size increase has come about because we simply have not disposed of hens. We can turn this around very quickly if we simply reduce the age of our flocks or follow any of the above recommendations.

269.   Defendants jointly agreed to follow Gene Gregory's recommendations and implement plans for a new coordinated scheme to again curtail production to reduce short-term supplies.

270.   UEP's October 2004 newsletter reported UEP's and UEA's joint Annual Board Meeting in New Orleans and noted UEP's new 2004-05 Board as

including the following Defendants (among others): Roger Deffner [NFC] - Chairman; Dolph Baker [Cal-Maine] - 1st Vice Chairman; Gary West [NuCal] - 2nd Vice Chairman; Bob Krouse [Midwest Poultry Services] - Treasurer; Joe Fortin [Moark] Secretary; Marcus Rust [Rose Acre]; Bill Rehm [Daybreak]; Terry Baker [Michael Foods]; Steven Gemperle [NuCal]; Mark Oldenkamp [NuCal]; and Ken Looper [Cal-Maine].

271.    At this meeting, Defendants on the UEP Board approved the following action coordinated supply management proposal: "Hens currently scheduled for disposal between December 2004 and July 2005 must be disposed of four weeks early or reduce your flock size by 5%."  UEP Chairman Roger Deffner (NFC) and Marketing Committee Chair Dolph Baker (Cal-Maine) also scheduled an "Economic Summit" in Atlanta Georgia to further evaluate supply and demand.

272.    On November 1, 2004, Feedstuffs also reported on the October meeting of the Defendants' plans to reduce supply through early culling of hens and flock reductions.  UEP's Gene Gregory was quoted as stating, **"We don't need a plan to reduce the hatch. We don't need a moratorium on new buildings. We need a plan to get rid of old hens."**[60]

273.    In preparation for the explicit supply reduction scheme UEP would ask producers to follow at the upcoming "Economic Summit," Gene Gregory published an editorial entitled "What Do The Numbers Tell Us?" in UEP's November 11, 2004 newsletter,:

There is no question that the nations flock size is increasing to alarming numbers and if adjustments are not made the industry could face extremely poor prices in 2005.

. . .

We can change both the direction of the supply problems and our attitudes about egg prices by making adjustments to our flock size.

. . .

**One of the continual problems with oversupply is that everyone believes they are not the problem.** If you ask any producer if they have contributed to the oversupply problem they will answer no. They however can point to someone else that is the problem. So if everyone believes they are not the problem then we will never make the necessary corrections. **What has to happen is for enough producers to recognize that they have to become part of the solution.** Losing money while blaming someone else is not and has never been good business. Being able to look beyond your own farm gate and be part of the solution has always paid off.

274.    Defendants' UEP "Egg Industry Economic Summit," which took place on November 16, 2004 in Atlanta, Georgia, was held specifically to coordinate an immediate supply reduction scheme and to obtain a written commitment from co-conspirators agreeing a price fixing plan.

275.    UEP's November 23, 2004 newsletter reported on the success of the "Economic Summit" and noted that Producers with approximately 200 million hens were in attendance.   Producers shared information about the "bleak picture of the

---

[60] "UEP approves assessments to continue funding, promoting husbandry standards," *Feedstuffs* (Nov. 1, 2004).

supply side of the business" in order to encourage a written commitment to follow a new supply restriction scheme.

276.    In order to ensure that egg prices would not fall as predicted during this "Economic Summit," Defendants asked producers to make their intentions known to other coconspirators and ***explicitly*** agree to coordinate supply reductions by signing on to one of the following options: "Option #1 To dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled;" or "Option #2 To reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."

277.    According to UEP's November 23, 2004 newsletter, the following Defendants were in attendance at the Economic Summit and signed on to the written agreement to follow one of two options to reduce supply and fix prices: Cal-Maine Foods; Moark LLC; Ohio Fresh Eggs; Hillandale Farms of PA; and Midwest Poultry Services.

278.    On December 3, 2004, UEP sent a follow-up letter to members that had not yet signed on to the supply reduction program:

> Either at the recently held 'Egg Industry Economic" or in a letter since the summit, we offered you one of two options for being a part of the solution to reduce the nation's flock size.
>
> While producers with approximately 115 million hens have signed on to one or both of the options, we are disappointed that we have not heard from you.
>
> Just in case you missed it, we are enclosing the two options again. If you feel you cannot participate in this

program, would you at least drop me a note via the fax (770) 360-7058 or email me at

gene@unitedegg.com. Please tell me why you do not support the program.

Better yet, fill one of the forms out and return it to me.

279.    This letter had two attachments entitled "Intention to Meet Market Demands," which included a box for a company to check indicating agreement with the scheme outlined at the "economic summit." Option #1 stated, "It is my company's intention to dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 - four (4) weeks earlier than previously scheduled." Option #2 stated, "It is my company's intention to reduce  my own December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."

280.    Sparboe was one of the companies that received this letter after it had not agreed to sign on to this program.  Additionally, a contemporaneous, internal Sparboe memorandum written by Wayne Carlson noted that Fred Adams of Cal-Maine approached Sparboe about signing on to this agreement: "Bob [Sparboe] intimated last week that Fred Adams [Cal-Maine] approached him and requested our support for his supply management program, i.e., molt early, slaughter early, etc."

281.    UEP's December 10, 2004 newsletter referenced 16 additional companies that had signed on to the supply reduction/price fixing agreement including Defendants National Food Corp. and Midwest Poultry, as well as Sunrise Farms and J.S. West Milling - now of NuCal.  The companies explicitly signing on to

this aspect of the price fixing scheme represented approximately 122 million laying hens - or 42% of domestic production.

282.   Defendants further expanded this explicit conspiracy to restrain trade at subsequent meetings.

283.   UEP's December 20, 2004 newsletter indicated that the following Defendants were appointed to chair UEP committees for 2005: Bob Krouse (Midwest Poultry) - Finance; Dolph Backer (Cal-Maine) - Price Discovery; Gary West (NuCal) - EggPAC; Mark Oldenkamp (NuCal) - Animal Welfare; and Paul Sauder (R.W. Sauder) - Public Relations.

284.   UEP's Board of Directors met in Atlanta, Georgia on January 25, 2005.  The minutes reflect discussions about the price fixing proposal and other attempts to reduce supply.  Defendant attendees and participants at this meeting included the following UEP Board Members: Gary West (NuCal); Steve Gemperle (NuCal); Roger Deffner (Chairman of UEP and Vice President of NFC); Bob Krouse (Midwest Poultry); Joe Fortin (Moark); Dolph Baker (Cal-Maine); Ken Looper (Cal-Maine); Terry Baker (Michael Foods); Bill Rehm (Daybreak); Marcus Rust (Rose Acre); Danny Linville (Zephyr Egg - now Cal-Maine); and Mark Oldenkamp (NuCal) among others.  Furthermore, the following were listed as members and guests at this meeting: Fred Adams (Cal-Maine); Tim Bebee (Michael Foods); Jill Benson (NuCal); Toby Catherman (Michael Foods); Dave Cisneros (Moark); Chuck Elste (NuCal); Greg Hinton (Rose Acre); K.Y. Hendrix (Rose Acre); Jerry Kil (Moark); Dan Knutson (Land O' Lakes, Moark, and Norco Ranch); Dan Meagher

(Moark);  Paul  Osborne  (Moark);  Bill  Rehm  (Daybreak  Foods);  Tony  Rehm

(Daybreak  Foods);  Tom  Silva  (NuCal);  Patricia  Stonger  (Daybreak  Foods);  and

Wayne Winslow (NuCal).

285.    According  to  the  minutes  of  January  25,  2005  meeting,  among  the

comments made by UEP Chairman Deffner (NFC) were the following:

> It was just a year ago that we met in this very hotel and we
> were so full of optimism. All indicators were that we could
> sustain $1.00 plus eggs for an extended period and the
> price structures for the next 18 months. (We took care of
> that)  The  market  came  full  circulate  with  prices  from
> $1.35 to 59 cents. We don't have to accept low prices and
> **we can have a good 2005 if we just make a few changes
> and work together**. We sell ourselves short by spending a
> great deal of time talking the negatives. Year-end flock size
> was  actually  less  than  forecast  but  still  a  problem.  **The
> Economic  Summit  highlighted  some  of  the  problems
> and  some  of  you  have  already  reacted  in  a  positive
> manner.  We  need  more  of  you  to  participate  in  a
> positive change.**

286.    During  the  Marketing  Committee  Report  at  this  meeting,  Wayne

Mooney of Pilgrim's Pride reported on the number of companies that had made their

intentions known to sign on to the scheme to either sell flocks early or reduce their

flocks by 5%.   Mr. Mooney made a motion, seconded by Jim Dean of Fremont

Farms, to extend through Labor Day the current "intentions program" for members'

flocks to be disposed of 4 weeks earlier than previously scheduled and/or flock size

reduction by 5%.   That motion carried with no recorded dissents.

287.    Thus,  nearly  every  Defendant  either  signed  on  to  this  explicit  supply

reduction  scheme  or  attended  the  meeting  where  it  was  further  discussed  and

expanded pursuant to a UEP vote.  Those Defendants that signed commitment sheets

agreeing to the price fixing agreement were: Cal-Maine Foods; Moark LLC; Ohio Fresh Eggs; Hillandale Farms of PA; Midwest Poultry Services; National Food Corp., and NuCal (through Sunrise Farms and J.S. West Milling). Those additional Defendants at the UEP annual meeting that expanded the price fixing agreement included Michael Foods, Day Break, Rose Acre, and Land O'Lakes.

288. UEP's February 3, 2005 newsletter also discussed the commitment sheets to enter into a price fixing agreement and the motion to extend the time for this supply reduction to remain in place. UEP represented that at this point, 45 companies had agreed to reduce flock size or dispose of hens. UEP also stated that the supply restrictions would apply to all UEP members (including all Defendant UEP members herein) and not just those companies that had signed commitment sheets: "It is good business to reduce your flock size during the low demand periods and a program beginning Easter week and carrying through Labor Day may be appropriate. The above motion therefore, does not apply to only the companies having signed the intention form, but to all UEP members."

### c. UEP members agreed to ban backfilling

289. Defendants also set out to respond to the problems that backfilling was having on the chick hatch reduction scheme implemented through the UEP certified program.

290. In an editorial in the August 4, 2004 UEP newsletter, Al Pope urged that backfilling be banned because of the impact it had on flock sizes: "[T]he backfill provision in my opinion is contributing or even causing some of the disorderly

marketing and poor egg prices that we are currently experiencing.  Have we shot ourselves in the foot with this well intended provision?  Is it a "noose" that is 'strangling' the opportunity of enjoying once again the favorable prices for our product we expected this fall?"

291.   Feedstuffs presented a comprehensive look at the supply problems plaguing the egg industry on November 15, 2004, specifically focusing on the problems of oversupply and backfilling and noted that "[c]easing to backfill houses would fit [Gene] Gregory's suggestion to the [UEP] marketing committee that 'you don't need a plan to reduce the hatch; you don't need a moratorium on new housing: You need to get rid of old hens. '"[61]

292.   In a UEP Board of Directors Conference Call which took place on December 16, 2004, the following Board Members were present: Roger Deffner (NFC); Gary West (NuCal); Bob Krouse (Midwest Poultry); Joe Fortin (Moark); and Mark Oldenkamp (NuCal).  Fred Adams (Cal-Maine) was also present.  At this meeting, in response to the supply management concerns associated with backfilling discussed above, the UEP Board voted to prohibit backfilling as part of the UEP Certified program except in the case of a catastrophic mortality.  The Motion was made by Oldenkamp (NuCal), seconded by Fortin (Moark) and carried with one "no" vote.  Furthermore, the Board voted to treat backfilling along the same lines as cage space allowances (the two prohibitions most associated with reduced supply) and held that any unauthorized backfilling would result in a failed audit.

---

[61] "Eggs need dramatic, quick way to reduce flock size: 2005 outlook, "*Feedstuffs* (Nov. 15, 2004).

6.  **Defendants tightened up their joint supply restriction efforts.**

293.  After dealing with the major supply problems caused by backfilling, Defendants sought to tighten up its overall supply restriction scheme in other areas.

294.  UEP's March 3, 2005 newsletter noted that flocks were on the rise and blamed the increased egg supply on companies that were not following the UEP Certified program, given that those producers that were following the program had likely reduced their number of hens: **"It is my belief that Animal Care Certified companies (in total) have fewer hens today than they had two years ago. If this is true then we must conclude that they are not part of the layer flock size increase."**

295.  UEP's April 14, 2005 newsletter reported on further requests for producers to reduce supply:

> **Reducing the flock size by just few million hens will have a major impact upon supply as well as our attitude and confidence in the market.**
>
> **. . .**
>
> **If every egg producer simply reduced their flock size by as little as 3% we could have far better egg market in the coming months of 2005 than is currently projected.**

296.  On April 19, 2005, the UEP's Producer Committee for Animal Welfare met in Chicago, Illinois.  In attendance at the meeting were Tim Bebbee (Michael Foods); Joe Fortin (Moark); Ky Hendrix (Rose Acre); Bob Krouse (Midwest Poultry); Mark Oldenkamp (NuCal Foods); Paul Sauder (R.W. Sauder);

and Steve Storm (Cal-Maine) among others.  At the meeting, there was a discussion on marketing of UEP certified eggs by non-certified producers.  Mark Oldenkamp sponsored two motions which passed.  One motion stated, "In order to protect the integrity of the ACC program and logo and in view of the difficulty in preventing the commingling of certified eggs with non-certified eggs and to treat all egg producers equally it is hereby moved that no new licenses to market Animal Care Certified eggs will be issued or renewed to producers who are not ACC certified."  The motion carried with vote of 19 yes and 8 nos.  The second motion sponsored by Oldenkamp stated that "a license to market ACC eggs may be issued to shell egg processors and further egg processors who do not own or operate egg production facilities."  The motion carried with a vote of 26 yes and 2 nos.

297.   Some of the reasons cited for the motions included "effort to gain 100% participation" and "strengthen the program due to the poor economics ahead which will temp (sic) some to leave the program."

298.   Some of the "problems created/unanswered by the motions" included **"Limits free trade of eggs"** and **"Raises the question about the original purpose of ACC: a husbandry practice program now managing the marketing and economic restriction of movement of product."**

299.   Defendants price-fixing scheme produced positive results.  A May 2, 2005 UEP newsletter noted a flock reduction of 3.9 million hens.

300.   UEP's newsletter from May 12, 2005 asked producers, "Have you reduced your flock size yet?" and discussed one UEP member who was coordinating

with UEP to do so.  The article noted: "With current egg prices it is likely in every egg producers best interest to reduce their flock size."

301.   The same issue also noted: "We feel confident that Animal Care Certified companies that represent approximately 80% of all U.S layers have collectively reduced their flock size over the past two years . . . ."

302.   The May 26, 2005 UEP newsletter celebrated flock reductions but decried increase pullet hatches and urged another hatch reduction:

> The current flock is the smallest since July 2004. When considering the number of hens dedicated to producing eggs for breaking and the increased use of eggs for breaking, **it appears shell egg producers are quickly getting their supply in line with shell egg market demand.**
>
> . . .
>
> [But the] hatch has now exceeded the previous years comparable month for nine (9) consecutive months. **The industry is headed for possibly the worst economics ever experienced if we do not have considerable hatch reduction in the coming months.**

303.   UEP's June 9, 2005 newsletter found good news in the fact that less shell eggs were being sent to retail markets, but bad news in that there was an increased chick hatch.  It noted that "UEP has issued an **Economic Alert** to the members in which some options for correcting the supply demand conditions were offered."

304.    In August 2005, Cal-Maine reported its Fourth Quarter results and noted the egg industry had taken collective action to reduce flocks and egg supply and prices were rising as a result:

> **"Beginning in March 2005, the egg industry has taken action to reduce the size of the laying flocks and the supply of eggs," added Adams.** "At midsummer, U.S.D.A. statistics indicated a reduced flock size that is now more in line with the current demand for eggs.
>
> **As a result, egg prices have recovered nicely over the last six or seven weeks. We believe the egg industry will continue to adjust supply to be more in line with demand, which should allow the industry to return to profitability.**

305.    At UEP's annual meeting on October 6th, 2005, the following were elected to the Board of Directors: Dolph Baker (Cal-Maine) - Chairman; Gary West (NuCal) - First Vice Chairman; Bob Krouse (Midwest Poultry Services) - Second Vice Chairman; Joe Fortin (Moark) - Secretary; and Steve Gemperle (NuCal).

306.    UEP's November 2005 newsletter listed several individuals who had been appointed to chair UEP committees including: Dolph Baker (Cal-Maine) - Executive and Price Discovery; Joe Fortin (Moark) - Finance; Gary West (J.S. West/NuCal) - Finance; Steve Gemperle (Gemperle/NuCal) - Food Safety; Mark Oldenkamp (Valley Fresh Foods/NuCal) - Animal Welfare); and Paul Sauder (R.W. Sauder) - Animal Welfare Public Relations.

307.    This newsletter also discussed UEP's Production Planning Calendar, which was another tool Defendants jointly utilized in reducing supply and fixing prices:

> Very soon, UEP will have printed and distributed the 2006 Production Planning Calendar. While this annual calendar provides great deal of statistical data, **its real purpose is to give producer/marketers planning guide for the replacement of flocks or molting so that they may be able to maximize their annual returns.**

308.    In January of 2006, Gene Gregory discussed his "New Year's Resolution," which again urged members to reduce output:

> [M]y resolution is to provide shell egg producers with sufficient statistical information that will confirm that it is a bad business decision to produce at 100% capacity during the months of May through Aug.
>
> . . .
>
> **I challenge you to look at your own records. Over the past 10 years have you made money in the months of May through Aug.? If not, then why not reduce your production during those months?**
>
> . . .
>
> **Now I have a request of each UEP shell egg producer member. Help me make my 2006 New Year's Resolution become a reality.**

309.    In January and February of 2006, Defendants with and through the UEP proposed another 2 percent reduction in all members' hen populations in its February newsletter:

> **A 2% Solution:**
> **Every egg producer reduces their hen population by 2% no later than March 10, from their average hen number for 2005, and maintains that 2% reduction all year long in 2006.  So simple, so painless, so rewarding – why wouldn't it work?**

310.    In April 2006, UEP issued a "Supply/Demand Alert" and noted that UEP's Marketing Committee had proposed a new recommended plan of action to

jointly reduce supply:  "**1. Dispose of flocks six (6) weeks earlier than previously scheduled;**" and "**2. Molt flocks six (6) weeks earlier than previously scheduled .**"[62]

311.   One month later, a May 2006 newsletter report noted "[t]he size of the nation's layer flock declined by little more than 3 million hens in April.  This is good news!!"

312.   UEP's August 2006 newsletter noted new Marketing Committee recommendations on supply restriction:   "The UEP Marketing Committee's recommendation for the weeks between Easter and Labor Day were to molt and dispose of flock six weeks earlier than previously scheduled.   Members are encouraged to stay the course for the next four (4) weeks."

313.   A May 2007 article in Egg Industry entitled, "Egg Executives Discuss Top Industry Concerns," contained an interview with Dolph Baker, President of Cal-Maine.   In this interview, Mr. Baker advocated for further coordinated supply restrictions:

> For Cal-Maine Foods President, Dolph Baker, **the No. 1 challenge for the egg industry is the need for supply management during low demand periods** to take some of the volatility and loss cycles out of the business. This is particularly important, he says, if per capita egg consumption is leveling off. **"We can do a better job," he says, "with molting and emptying houses** . . . . [and] with costs where they are, we'll do a better job with supply this summer."

314.   In Defendants' UEP's February 2008 newsletter, Defendants proposed that producers reduce supply after Easter utilizing coordinated "Production Planning

---

[62] The only company identified as having 14 million layers is Michael Foods. *See* n. 98.

Calendar": "Egg producers should strive to manage their supply to meet the market demand for both the lower and higher demand periods.  Producers are encouraged to quickly review their individual company history and, if needed, adjust their egg production to meet the expected demand between the weeks of Easter and Labor Day."

### 7.    Sparboe's Participation in the Conspiracy.

315.    Defendant Sparboe had regularly attended the UEP's Animal Welfare Committee meetings where the "animal welfare" program was initially conceived. Sparboe had agreed to abide by the "supply reduction programs" in the beginning of 2000 and had agreed to abide by the "UEP Certificate Program."   Nevertheless, Sparboe questioned the "100% rule's" application to breaking eggs used for the production of egg products.

316.    On February 26, 2003, Gene Gregory, UEP President, explained to its membership that the implementation of the "100% rule" had provoked debate and that Sparboe had determined to adopt its own animal welfare guidelines.  Despite adopting its own husbandry guidelines, Sparboe participated in Defendants' and their co-conspirators' scheme to reduce egg supply beginning as early as January 1, 2000, and continued to adhere to the conspiracy through the present.  Sparboe's adoption of its own guidelines merely provided it with the flexibility to diverge from the "100% rule" at its choosing, but did not (and does not) negate the fact that Sparboe agreed to adhere to the egg supply reduction and price fixing scheme adopted by Defendants and their co-conspirators as otherwise alleged in this Complaint and did, in fact, reduce its production of eggs.

317.    Sparboe's actions after the conspiracy effectively reduced egg supply and increased egg prices graphically illustrates the nature and scope of Defendants' and their co-conspirators' egg supply reduction scheme.  It also highlights the cynical attempt by Sparboe to take advantage of the conspiracy-induced higher egg prices, while finding a way to avoid the supply-reducing effects on a portion of its business.  Even after Sparboe disagreed with a component of the supply restraint on one segment of its business, it was careful never actually with withdraw from the conscious commitment to the common scheme alleged in this Complaint or to reduce prices in a manner that would both thwart the effects of the conspiracy on egg purchasers, including Plaintiffs, and send a signal that Sparboe had withdrawn from the conspiracy.  Indeed, Sparboe's conduct was the opposite.

## 8.    Defendants implemented an export scheme to reduce domestic supply and fix, maintain and/or stabilize prices.

318.    Defendants also conspired to keep egg prices high in the U.S. by causing eggs to be exported abroad at a loss.  By removing eggs that would have been bound for U.S. sales, and arranging instead for their export, Defendants reduce domestic supply and supracompetitively increase the price of eggs throughout the country.

319.    During the Conspiracy Period the Defendants collectively, and in coordination with and through the UEP and USEM, conspired to increase the quantity of eggs and processed egg products exported from the United States, for the distinct purpose of reducing domestic supply and increasing shell egg and processed egg prices in the United States.  Both UEP and the USEM had recognized the effect

of exports on the domestic U.S. industry.  An October 2001 UEP newsletter reported that the purpose of USEM's cooperative efforts was to provide improvements in domestic prices.  The article cited a small export which, by way of example, moved the market up from current prices between 2 to 9 cents per dozen.

320.    Dolph Baker (President of Cal-Maine Foods), Gene Gregory (CEO of the UEP), Chad Gregory (Senior Vice President of the UEP and member of the UEA), and Joseph Fortin (Moark) were strong proponents and vocal advocates of exporting large amounts of eggs outside of the United States for the sole purpose of increasing domestic egg prices.  Cal-Maine, Michael Foods, Moark and Rose Acre, among others, consistently participated in the export program for eggs and tried to encourage other egg producers to participate in the program with the clear goal of attempting to use the export program to increase egg prices for domestic buyers.

321.    Beginning in 2000 and continuing to September 2006, USEM and its members began a concerted export campaign in an effort to reduce domestic egg supplies and increase domestic egg prices – though this effort would subsequently be expanded in late 2006 and thereafter.  The program was designed to have USEM members export shell eggs even where the export prices were lower than domestic egg prices.  Defendants determined that the benefits of raising domestic U.S. prices through reduced supply would offset the losses associated with the exports.

322.    As part of the export program, USEM members that did not provide eggs for the export would agree to "repay" or "reimburse" the USEM members that provided eggs for the export in order to "share" any losses incurred when exporting

shell eggs at below-market prices.  The loss reimbursed by USEM members was the price differential between the export price and the price that could have otherwise been obtained domestically

323.   For example, on March 20, 2003, Gene Gregory sent a memo to all USEM members (including, at the time, Defendants Cal-Maine, Moark, Hillandale, and Sauder) discussing a new member that was going to help "share in the loss" incurred from a recent export and thanked members for the contribution exports made to better egg prices:

> **Good news!!! During the latest export we gained a sizeable new member. This member agreed to share in the loss.** For those of you that requested UEP to purchase your case commitment, you will find a credit deduction on your invoice for the amount contributed by the new member. For those of you that packed and supplied your own case commitment, you will be sent a separate check for your share of the amount contributed by the new member. There is no future export on the horizon at this time and therefore it may be best to consider reducing our flock size after the Easter Market. Thank you for the contribution you made to better egg prices over the past few months.

324.   At a meeting in May 2003, USEM members reported on the positive impact exports were having on price.

325.   The UEP held a Board of Directors Legislative Meeting on May 12-15, 2003 in Washington, DC.  The following board members were in attendance: Dolph Baker (Cal-Maine); Gary Bethel (Hillandale Farms); Roger Deffner (NFC); Chuck Elste (NuCal); Ky Hendrix (Rose Acre); Ken Looper (Cal-Maine); Mark Oldenkamp (NuCal); Bill Rehm (Daybreak); and Gary West (NuCal).

326.   At this meeting, the minutes reflect that Dolph Baker (Cal-Maine), Chairman of the Marketing Committee, gave a report and "closed his comments by saying, 'Everyone knows the market effect of the last two exports.  Need every producer to be a USEM member.  Need more help pulling the wagon instead of riding."

327.   UEP's October 2004 newsletter reported on a USEM meeting and noted that USEM rejected one export because it was "very small and likely would not have positive impact upon domestic prices."

328.   In additional business, USEM's members elected the following officers: Chairman Larry Seger; Vice Chairman, Chuck Elste (NuCal); Secretary, Roger Deffner (NFC); Treasurer, Jim Brock.  Additional members elected to the Executive/Export Committee were Dolph Baker (Cal-Maine), Gregg Clanton, Jim Dean, Joe Fortin (Moark), Wayne Mooney, Bob Pike, David Thompson, and Derek Yancey.

329.   On May 27, 2005, Sparboe terminated its membership with United States Egg Marketers and stopped participating in the export scheme.  On June 21, 2005, Gene Gregory acknowledged the purpose of the exports was to raise domestic prices and thanked Sparboe for helping to participate in this "cooperative effort" to fix prices:

> We received John Mueller's letter stating Sparboe's decision to terminate your United States Egg Marketer's membership.  **We are certainly sorry that you feel you can no longer be supportive of a cooperative effort by producers to occasionally improve domestic supply**

**demand conditions with an export.**  Your past support
has been appreciated.

330.   Both before and after Sparboe left the export program, it received

pressure from UEP management, specifically Gene Gregory and Al Pope, as well as

from other members (for example, Joseph Fortin of Moark) to participate in the

export program by providing eggs for export.   Furthermore, if Sparboe was

disinclined to provide the actual eggs for export, the UEP pressured the company to

provide money to make up for the loss that other UEP members experienced by

participating in the egg export program.  USEM members also pressured companies

by emphasizing that "you shouldn't free-ride on others' exports."  In 2007, Dave

Thompson of Pearl Valley Eggs contacted Sparboe to again encourage the company

to rejoin the export program.

331.   UEP's October 2005 newsletter noted the elections of the following

members to the USEM Board: Chuck Elste (NuCal) - Vice Chairman; Roger Deffner

(NFC) - Secretary; Dolph Baker (Cal-Maine); and Jerry Kil (Moark).

332.   By mid-2006, the Defendants ramped up their efforts to export shell

eggs and processed egg products as a means to further reduce egg supply in the

United States.

333.   Defendants determined that even exporting a small percentage of

United States-produced eggs – as little as 1 or 2 percent – could reduce supply in the

United States enough to have a significant impact on domestic egg prices.  As the

Wall Street Journal reported on September 23, 2008:

> The industry group [UEP] itself credited the campaign with helping to boost domestic egg prices, which rose more than 40% in the next year. **Gene Gregory, the Georgia-based group's executive director, said export orders amounted to less than 2% of industry output. "But it is amazing how one or two percent can have an effect on the rest of your domestic price," he said**.[63]

334.    In October 2006, the following Defendants' employees were elected as officers of USEM: vice-chairman - Chuck Else (NuCal); secretary - Roger Deffner (NFC); and Executive/Export Committee Members were: Dolph Baker (Cal-Maine Foods); Roger Deffner (National Foods); Jerry Kil (Moark); and Chuck Elste (NuCal).

335.    In late 2006, Defendants agreed to expand the export program and pursued their plan to export more eggs and egg products, even though foreign egg and egg product prices were lower than in the United States, and even though Defendants would have to absorb shipping costs.   There would have been no independent business reason for each Defendant on its own to undertake costly exports at the expense of more profitable domestic sales.   But through their concerted conspiratorial efforts, Defendants determined that any lost profits from the export program would be markedly offset by the increase in United States domestic egg and egg product prices and corresponding reductions in domestic supply that the exports would trigger.

336.    Defendants fashioned, devised and implemented their conspiracy during USEM and UEP meetings in mid-2006 and the fall of 2006.   As a result of

---

[63] John Wilke, "Federal Prosecutors Probe Food-Price Collusion," Wall Street Journal (Sept. 23,

this conspiracy, exports suddenly increased dramatically from the United States to foreign markets such as Europe, where United States eggs traditionally had never been exported in any significant quantities.

337.    In November 2006, members of the USEM voted to approve an export for delivery of 90 container loads (76,500 cases) of shell eggs.  The November UEP newsletter noted:

> After more than three years without an export, the 55 members of United States Egg Marketers (USEM) were able to negotiate and approve an export for delivery of 90 container loads (approximately 76,500 cases) between the dates of October 30th and November 10th. **The export was taken at a price considerably better than domestic breaking stock prices in hopes that it would improve domestic prices.** For most of the U.S. egg industry, prices have been below the cost of production for nearly all months of the past two years. **Within one week after finalizing the export, domestic prices began to rise rapidly. Within a week Urner Barry's Large Carton quote had risen by more than 15 cents per dozen across all regions. Breaking stock prices rose by more than 10 cents per dozen.**

338.    This one export brought $44 million to shell egg producers due to the increased price.  The following Defendants were members of USEM and involved in this export: Cal-Maine Foods, Midwest Poultry Serv., Moark, National Food Corp., Norco, and NuCal Foods.

339.    UEP's January 4, 2007 newsletter also reported an agreement on a sizeable export, additional Defendants who had become involved in this scheme, and the positive impact of these exports on prices:

---

2008).

> The United States Egg Marketer (USEM) members have once again voted overwhelmingly to accept a sizable export of shell eggs. The sale of 300 container loads (approximately 246,000 cases) will be delivered between January 8th and February 2nd.
>
> Since the announcement of USEM members in the UEP "United Voices" newsletter of November 16, the following new USEM members have been added:
>
> . . .
>
> Rose Acre Farms
>
> R.W Sauder
>
> USEM now has the membership support from producers owning approximately 139 million layers.
>
> . . .
>
> **With the delivery of such large volume export it is expected that prices will exceed UEPs forecast. It is also believed that the announcement of USEM working on sizable export may have helped hold prices at higher levels the last week of December.**

340.    Between December 2006 and April 2007, members of USEM agreed to accept export orders for 800 additional containers of fresh eggs (each container holds approximately 800 cases), beyond those in the November 2006 shipment referenced above:

> d. In December 2006, USEM sold 300 containers for export that were to be delivered in January 2007.
>
> e. In February 2007, USEM sold 300 containers for export that were to be shipped to Germany, Italy, the United Kingdom, Israel, and Japan from mid-February 2007 through March 9, 2007.
>
> f. In April 2007, USEM sold 200 containers for export that were to be shipped in May 2007. Of these 200 containers, 150 containers were to be sent to Dubai, 20 to Europe, 15 to Israel, and 15 to Japan.

341.   UEP executive director Gregory acknowledged this sudden increase in exports. Egg Industry's May 2007 issue quoted Gregory as stating that "[t]he most [exports] we've had is one or two a year, and now we've had four in sixth months . . . . My gut feeling is that yes, there is more to come."

342.   On May 14, 2007, UEP hosted a Marketing Committee meeting in Washington, DC.  The following committee members were present: Roger Deffner (NFC); Dolph Baker (Cal-Maine); Chuck Elste (NuCal); Mark Oldenkamp (NuCal); Marcus Rust (Rose Acre) and Gary West (NuCal), among others.  In addition, the following staff and UEP members were also present: Gene Gregory (UEP); Bob Krouse (Midwest Poultry); Paul Sauder (R.W. Sauder); and Steve Storm (Cal-Maine), among others.  Minutes from this meeting reflect:

> Gene Gregory reported on the sales since UEP assumed management of USEM. Gregory went over chart that compared the UB MW Large quote for weeks between October 15 and April 23. He stated that the average price during the export period were 24 cents higher than a year earlier. **Gene stated that if we could put together another export this summer it could mean profitable year for producers.**

343.   The USDA's International Egg and Poultry Review, dated June 12, 2007, reported that shell egg exports were suddenly up 101 % in the first four months of 2007 compared to the same period in 2006.  The total eggs exported in January through April 2007 was nearly 28 million dozen, up from just under 14 million dozen during the same period in 2006.  Processed egg product exports increased 9% in the first four months of 2007, compared to the same period in 2006.  Total processed egg

product exports were just over 11,000 metric tons, up from just over 10,000 metric tons in 2006.

344.    The USDA's June 12, 2007 report attributed the increase in shell egg exports to several factors.   One was egg producers "willingness to sell eggs at a discount to other countries in order to reduce oversupply situations in the U.S."

345.    *Egg Industry* continued to observe increased exports of shell eggs and processed egg products in 2007.  The Magazine reported in its May 2007 issue that in the first six months of the year, exports of table eggs were up 139% by value and 100% by volume compared to the same period in 2006, with processed egg product exports up 32% by value and 12% by volume.

346.    In the same article, James Sumner, President of the USA Poultry & Egg Export Council, stated in response to this growth: "I've never seen such phenomenal growth in shell egg exports and sustained growth of processed eggs as well."  Looking ahead to the second half of 2007, he stated: "I don't see any reason why things will change."

347.    UEP's August 2007 newsletter reported that USEM approved the sale of 132 container loads of eggs for export starting with delivery the week of August 20, with a sale price of 60 cents per dozen, 10 cents higher than any previous export.

348.    In its September 2007 issue, Egg Industry reported on this export sale of table eggs approved by USEM.   Egg Industry commented that it is "no exaggeration to say that exports to Europe have skyrocketed, with January-June 2007

volume of table egg exports from the United States up an astounding 6,101 percent compared to previous-year levels, with egg product exports to Europe also strong, up 183 percent."

349.    That the Defendants agreed to arrange for exports to Europe reflects the pretextual nature of the scheme.  Not only were egg and egg product prices far lower in Europe than in the United States, and not only did such exports impose shipping costs, but these exports also came at a time of depressed European egg consumption and over-supply in the European markets.  Concerns over Avian Flu had depressed European egg consumption and slashed already low egg prices throughout the continent.  European Union per capita egg consumption from 2005 to 2006 decreased by 200,000 kg.  In some countries, such as Italy, the demand for eggs fell by as much as 70%.  In 2006 the European Commission was so concerned about a "glut" of poultry and eggs on European markets that it appropriated millions of Euros in aid for programs aimed at reducing production.  Fourteen countries applied for aid in the hopes of mitigating a free-fall in egg prices.

350.    Defendants' coordinated and conspiratorial efforts continued at least through spring 2008.  Since the pace at which domestic U.S. prices dropped was proportional to supply, Defendants agreed to use exports through USEM as a way to maintain supply during periods of lower demand.  When Defendants observed some softening of domestic egg prices in March 2008, Defendants responded by having USEM arrange another export of 100 containers of fresh eggs to the Far East, with deliveries beginning May 19, 2008.  The timing of these exports corresponded with a period in the U.S. when defendants were undertaking a forced molt of layers.  The

exports caused a reduced supply following the peak demand of the Easter holiday season.

351.    *Egg Industry* also noted the effect that the export program was having on domestic U.S. egg prices.  In its June 2007 issue, the Magazine reported, in an article titled "Supply Management: the Key to Profits," that "Early in 2007, an export order obtained by U.S. egg marketers of 246,000 cases (less than about 1/3 days egg supply) helped increase egg prices up to 50 cents or more."

352.    *The Food Institute Report*, dated July 2, 2007, discussed changes in food prices in 2007 and stated: "The largest price increase is seen in shell eggs, according to USDA, where prices during May were up nearly 30% from last year and on an annualized basis, USDA sees prices being up as much as 21%."

353.    The United States Poultry & Egg Association reported that the average price per dozen for all eggs increased 52% from 58.2 cents in 2006 to 88.5 cents in 2007.  The May 2007 issue of the Egg Industry Magazine reported that egg retail prices were up 33 cents to $1.51/dozen in the first quarter of 2007.

354.    The June 2008 UEP newsletter reported in its Review of 2007 Egg Prices that one of the reasons for increased domestic U.S. prices in 2007 was the "Timely export of eggs by United States Egg Marketers."

355.    In UEP's July 2008 newsletter, Gene Gregory acknowledged that Defendants had used exports in the past to get themselves "out of a bad situation" as it related to egg supply.

### 9. Defendants' collective action is credited for record egg price increases.

356. Defendants' agreement to reduce output enabled prices to soar to record levels. In November 2003, UEP's newsletter reported that "Egg Prices At Record Levels" in part due to the UEP Certification Program: **"With the increasing demand, increasing population and the continued phase-in of cage space to meet the industry's animal welfare guidelines, prices are likely to continue at levels far above the past few years."**

357. A November 2003 Feedstuffs article reported: "UEP senior vice president Gene Gregory argued that were it not for the egg industry's move to adopt and implement its hen husbandry standards, which call for deintensification, producers may have continued to overproduce and oversupply the market."

358. In a December 13, 2003 article discussing the increase in egg prices, Gene Gregory of UEP acknowledged that reductions in flocks "may have something to do with a decrease in supply, and therefore higher prices . . . ." The article also quoted Gary Bethel of Hillandale Farms discussing how his company had reduced supply:

> "We've been taking a proactive approach towards allowing caged chickens more space," said Gary Bethel, a spokesman for Hillandale Farms of Pennsylvania and a North Versailles egg producer. "If we had a house that held 100,000 chickens five years ago, it would house 80,000 now, and that means quite a reduction in total egg numbers."[64]

---

[64] Mackenzie Carpenter, "Shoppers Shelling Out More for Egg Price Tied to Diet, Reduced Supply," Pittsburgh-Post Gazette, (Dec. 13, 2003).

359.     Another December 13 article also acknowledged that high prices were

a result of industry efforts to hold supplies down:

> "We have more people eating eggs now, but fewer chickens laying eggs," said Ken Klippen, spokesman for the United Egg Producers industry group.
>
> . . .
>
> "The supplies are adequate, but just barely," said Fred Adams, CEO of Jackson, Miss.-based Cal-Maine Foods Inc., which operates an egg farm outside Bethune in Kershaw County. **The industry also says production is down as new guidelines**
>
> **. . . have reduced the number of hens allowed in a cage.**[65]

360.     On December 15, 2003, Paul Sauder discussed the fact that the UEP

program was keeping hen numbers down:

> **The [UEP] program is one of several causes cited for the recent surge in egg prices, because it's helping to dampen supply short-term.**
>
> **. . .**
>
> Sauder, president of Lititz-based R.W. Sauder Inc., a leading Northeast egg processor and marketer, and a UEP director, called it "a sweeping change, no question. You could even use the word 'radical.'"
>
> . . .
>
> A key guideline, which concerns the amount of space per hen in a cage, will result in reducing the number of hens per cage from nine to seven by April 2008.
>
> **Asked if that's a significant change, Sauder replied: "Absolutely. That's a 22 percent reduction in capacity. That's huge."**[66]

---

[65] Dave L'Huereux, "High Egg Prices Beginning to Crack," Columbia State (Dec. 13, 2002).

361.   In March of 2004 commentary, UEP noted that its co-conspirators' agreement to keep production low resulted in industry revenue of more than $1,000,000,000: "The industry successfully held hen numbers down. . . .Regardless of the causes, the industry would be wise to attempt to duplicate these conditions in the future.   The result was: a huge improvement in industry revenue of ONE BILLION DOLLARS (or more)!!"

362.   Prices were impacted, and the industry credited their collective efforts by working with and through the UEP to implement this supply management scheme.

363.   UEP's February 2007 newsletter evaluated "The Egg Market" and how to keep prices high.   The "best" answer was to ensure industry-wide restraint: "The best immediate answer to assure profitable prices is for the industry to show some restraint.   Producing more eggs than the market demands at profitable prices is never good business and everyone should study their own personal supply/demand conditions and adjust accordingly."

364.   A February 2007 article discussed the impact of exports on prices, stating that "Consumers who've been paying more for eggs recently could see another price increase soon," noting that U.S. producers exported one order of 86 million eggs in January, which reduced any excess supply.[67]

---

[66] Tim Mekeel, "Improving conditions for egg-laying hens," Lancaster New Era (Dec. 15, 2003).
[67] Monique Curet, "Demand for eggs expected to raise prices again soon," Columbus Dispatch (Feb. 13, 2007).

365.    A March 2007 Egg Industry article quoted Bill Rehm, president of Daybreak Foods, crediting high shell egg prices on the "United Egg Producer's animal welfare program that most shell egg producers participate in."[68]

366.    Another March 2007, Egg Industry article discussed egg price increases as being related to both exports and decreased bird numbers:

> Roger Deffner [of National Food Corp. and UEP] Marketing Chairman said that the $1.30-plus current egg price is not solely due to the export order. On Dec. 1, bird numbers were the lowest since 2003, he noted. Some of this is due to the supply side action that was taken prior to Christmas . . . . On exports, he said that 34 more container loads of eggs will be shipped by United States Egg Marketers, and urged that more producers join the organization.[69]

367.    UEP's April 2007 newsletter discussed the objective of supply management in an article entitled, "Failure To Control Egg Supply Is Costing Billions. Can Something Be Done?"

> **The objective of supply management (SM) is to prevent the over supply of eggs which can reduce egg prices. It is estimated that billions have been lost and will continue to be lost unless better methods of SM become available. UEP recognizes this and has promoted reducing hen numbers and molting to help control supply.**

368.    In April 2007, Cal-Maine released its Third Quarter results boasting that an export drew down egg inventory leading to increased profits:

---

[68] Edward Clark, "Egg Executives Optimistic on 2007," *Egg Industry* (March 2007).
[69] John Todd, "High Egg Prices Due to More Than Just Exports," *Egg Industry* (March 2007).

Fred Adams, Jr., chairman and chief executive officer of Cal-Maine Foods, Inc., stated, "During the third quarter of fiscal 2007, our egg supply was well balanced with good demand from our retail and food service customers. **In addition, the egg industry, through a marketing cooperative that included Cal-Maine, put together an export sale to Europe, the United Kingdom and Japan that required approximately 16 million dozen eggs. This significant drawdown of inventory put upward pressure on egg prices** and resulted in more favorable market conditions for the quarter.

369.   On May 14, 2007, UEP hosted a Marketing Committee meeting in Washington, DC.  The following committee members were present: Roger Deffner (NFC); Dolph Baker (Cal-Maine); Chuck Elste (NuCal); Mark Oldenkamp (NuCal); Marcus Rust (Rose Acre) and Gary West (NuCal), among others.  In addition, the following staff and UEP members were also present: Gene Gregory (UEP); Bob Krouse (Midwest Poultry); Paul Sauder (R.W. Sauder); and Steve Storm (Cal-Maine), among others.  Minutes from this meeting reflect that "[Roger] Deffner [of NFC] stated that Easter - Labor Day is a surplus of eggs. He stated that we were managing supply side pretty well."

370.   A July 2007 article in Investor's Business Journal discussed Cal-Maine's efforts to reduce supply and its impact on prices: "Cal-Maine has cut back its own egg supply 1% to 2%. That's more than one might think. 'One or two percent on the supply side affects prices 20% or 30%,' Adams said.[70]

371.   Midwest Poultry acknowledged that the UEP guidelines were helping to keep supplies low and prices high:

Krouse is optimistic on profits in the near term. 'Overall, I think the industry will be profitable over the next three years,' he says. One big reason why is animal welfare. . .

**Closely related, he says, is the capital outlay Midwest Poultry Services has invested over the past 5 years to increase cage space from 52 sq. in. to 64 sq. in. to meet new United Egg Producers animal welfare guidelines. Such shifts significantly contribute to why there was no surplus in eggs this summer, and strong profits for egg producers nationwide.**[71]

372.    Mark Oldenkamp, vice president, northwest operations for Valley Fresh Foods, a member of Defendant NuCal, told Egg Industry that high eggs prices were due to producers' efforts to control supply saying, "The industry is learning not to overproduce."[72]

373.    Paul Sauder, president of R.W. Sauder Inc., Lititz, Pa., admitted to the Egg Industry that he "has curtailed expansion."[73]  He also boasted that "we were the first egg producers in Pennsylvania to implement United Egg Producers Certified program."[74]

374.    In November of 2007, Larry Seger, chairman of United States Egg Marketers, acknowledged the agreement to restrict output.  In an interview in Egg Industry, he said "The industry has become more responsible on the production side, and, he says, the animal welfare guidelines will keep production from increasing

---

[70] Marilyn Alva, "High Corn Prices Drive Up Eggs and Help Cal-Maine Have Fun," Investor's Business Daily (July 10, 2007).
[71] *Id.*
[72] "2007 Egg prices: One for the Record Books," *Egg Industry*.
[73] Id.
[74] http://www.uepcertified.com/meet-the-farmers/northeast/farmer/sauders-eggs-pa

substantially.  All this has been occurring, he says, 'with demand that is as strong as it's ever been.'"[75]

375.   Craig Williardson, president and CEO of Mo-Ark, LLC, stated that "The industry has been able to better manage its production and its inventories; trades of surplus product are finding the right market homes. . ."[76]

376.   A November 2007 article in Feedstuffs discussed producers' efforts to manage supply:

> UEP marketing committee chair Roger Deffner [of National Food Corp.] said this year has brought together "a combination of events, . . . a multitude of factors" that have shown how to balance production with demand, including:
>
> . . .
>
> [T]he conditions are in place for 2008 to be another good year, Deffner said. **"We are in very good shape going forward" if producers continue modest production restraint, he said.**[77]

377.   A December 2008 article examined the high price of eggs and the egg industry's collective actions as the cause:

> [T]he most significant influence on pricing may well have been the industry's own doing.
>
> **Over the past two years, after a several-year slump, egg farmers have cut back on the size of their hen flocks at a pace not seen in more than 20 years. The result: Fewer hens means fewer eggs, which in turn means higher prices.**

---

[75] "2008: Lower prices than '07, but still a good year," Egg Industry (Nov. 2007).
[76] *Id.*
[77] "Egg producers manage supply.(Special Report: 2008 Outlook)," *Feedstuffs* (Nov 5 , 2007).

. . .

> In dozens of interviews, poultry experts point to the industry's move in 2002 to give hens more room as an underlying cause of higher prices. The United Egg Producers (UEP), the industry's leading trade group, adopted guidelines for hens to have at least 67 square inches of space. Many producers used cages of just 50 to 60 square inches.

. . .

> [B]y 2007 more than 80 percent of the United States egg supply was operating under the new guidelines. Many producers reduced the size of their flocks to comply . . .[78]

378.    In January of 2008, Egg Industry examined the factors leading to the record prices in 2007:

> The key reason for a profitable 2007: Despite the fact that the U.S. population grew by some 3 million, the number of layers decreased by 4 million. **Fewer hens make for a better price at the marketplace. . . . Egg producers also continued to maintain their schedules for the increase of cage space for their hens in compliance with the United Egg Producers (UEP) Certified Animal Welfare program.** This meant fewer hens housed, which brought the national inventory down.[79]

379.    UEP's January newsletter contained a partial list of reasons for why 2007 brought record egg prices including: "UEP's animal welfare guidelines continued to reduce the number of hens per house," "Producers reduced their egg supply during the week between Easter and Labor Day," "Timely exports of shell eggs by the United States Egg Marketers," "Very limited construction of new houses

---

[78] Richard Meryhew and Chris Serres, "Our Hungry Planet: Golden eggs," Star Tribune, (December 8, 2008).

[79] "Crystal ball has 2008 looking like another profitable year," *Egg Industry* (Jan. 2008).

or remodeled houses during 2006 and 2007," and "Producers did a far better job of managing their business to meet supply/demand."

380.   UEP's January newsletter noted discussed 2007's agreement to reduce output and encouraged producers to keep the agreement in 2008:

> **Even with currently profitable prices, it would be good business in 2008 for producers to manage their supply during what historically has been the lowest demand period of the year.**

381.   In February of 2008, Dolph Baker, president of Cal-Maine Foods said: "What we learned in 2007 is that we have control of our destiny if we work at it, and as an industry, 2008 could be another super year."[80]

382.   Another article in the February 2008 issue of Egg Industry recognized that the industry has kept prices artificially high through the case size restrictions: "Cage space attrition due to the requirements of the UEP guidelines and basic wear-and-tear have been the leading factors in keeping supply tight and prices high. . . . [F]rom 2002 to the present day, the shell egg industry has already lost 37 million cage spaces to the UEP guidelines alone."[81]

383.   A March 2008 posting on Sunny Hill Eggs' website (a UK-based egg producer) discussed a meeting with Fred Adams and Cal-Maine representatives:

> From Atlanta I headed to Jackson, Mississippi on the 25th to spend 4 days with Fred Adams of Cal-Main Foods, the largest egg producing company in the world with 26 million laying hens. . . . **Two major issues**

---

[80] "Infrastructure's role in keeping egg prices high," *Egg Industry* (Feb. 2008).
[81] *Id.*

> **which he stressed to me was that a country had to learn how to control the supply to meet demand. The US have over supplied the market often and now they seem to be working with one another. Egg prices in the US are at an all time high due to there being no spare eggs on the market and they are trying to keep it this way.**[82]

384.    In a March 2008 article, Chad Gregory of the UEP acknowledged that the industry was sticking together to reduce supplies in an attempt to raise prices and that UEP Certification Program had kept supply down:

> **"Producers are being really responsible, keeping supply in check," said Chad Gregory, senior vice president at United Egg Producers, a national trade group. "So this could last a while."**
>
> . . .
>
> "The overall supply is way down from two to three years ago," Gregory added.[83]

385.    A March 2008 article acknowledged that producer reductions as a result of the UEP certification program had caused egg prices to rise and, in particular, Midwest Poultry Services had reduced its hen supply as a result:

> United Egg Producers, the industry's trade group, adopted a set of animal welfare guidelines in 2002 and has been phasing them in. The bulk of the nation's eggmakers adhere to the guidelines.  One of the code's key provisions is to give birds more room, gradually increasing a hen's cage space from about 50 square inches, an industry norm in 2002, to 67 square inches by April. To do that, producers reduce the number of hens: **For instance, Midwest [Poultry Services] is gradually cutting back from eight birds per cage to six or even five, depending on cage size. The cumulative effect is big -- tens of millions of hens have been effectively**

---

[82] <http://www.sunnyhilleggs.com/christines_egg_diary/index.php>
[83] Matt Andrejczak, "High egg costs unlikely to crack," Daily Breeze, (March 31, 2008).

**taken out of production, which has put more upward pressure on egg prices.**[84]

386.    In May of 2008, Midwest Poultry acknowledged that producers were sticking to UEP's guidelines:

> 'When you look at the number of birds and the number of cage spaces we'll lose to animal welfare (UEP's program), it looks like prices for this year will look pretty similar to last year,' says Bob Krouse, president of Midwest Poultry Services, Meltone, Ind. **'The only way (the industry) could expand would be if people abandoned the UEP program and I don't see that happening.'**
>
>  . . . .
>
> So far, he has not seen any slackening of demand, and he believes that egg demand is largely inelastic unrelated to price. Helping egg demand in the face of high prices, he says, 'is that all prices are high. I don't see demand for shell eggs going down.'[85]

387.    On May 12, 2008, UEP's Marketing Committee met in Washington, DC.  The following were in attendance: Roger Deffner (NFC); Dolph Baker (Cal-Maine); Mark Oldenkamp (NuCal); Marcus Rust (Rose Acre); Bob Krouse (Midwest Poultry); Bill Rehm (Daybreak); Paul Sauder (R.W. Sauder); and Gary West (NuCal).  Marketing Committee Chair Roger Deffner (NFC) commented that **"the industry must do a better job managing the supply between Easter and Labor Day and that perhaps the industry lost focus this year because of high prices. Egg demand held up well during 2007 despite high prices at retail."**

---

[84] Mike Hughlett, "Why egg prices are cracking budgets - Demand is high, supplies are tight and soaring corn prices are driving up the cost of chicken feed. Guess who pays." Chicago Tribune (March 23, 2008).
[85] "Executives optimistic on prices," *Egg Industry* (May 2008).

388. In the June 2008 newsletter, UEP Marketing Committee chair, Roger Deffner (National Food), wrote about the industry working together "to accomplish great things" with regard to supply and prices:

> **It is imperative for us as producers to realize where we are headed and set a course where we keep the supply/demand relationship balanced. The good news is we have time to make the necessary corrections. Working together we can accomplish great things.**
>
> . . .
>
> The only way in which to recover increasing cost is to manage the supply side of the business to avoid production that exceeds a market at profitable prices.

389. In a June 2008 article, Gene Gregory of UEP acknowledged "We're doing a better job managing supply."[86]

390. In June of 2008, Fred Adams, founder and chairman of Cal-Maine Foods, described the impact of the UEP Certified campaign and boasted about the success of the "agreement" reached in the industry:

> **[B]asically the agreement was that we would give the chickens more space in the laying cages . . . . The net effect of that was reducing the number of laying hens in existing facilities by some 20%. [ ] This has been a very successful program . . . .**[87]

391. In an August 12, 2008 earnings conference call, Michael Foods stated that a factor in their profits was a reduction in bird supply as a result of industry cooperation on UEP's guidelines: "Another factor supporting high egg prices is a

---

[86] "Second half of 2008 still looks profitable," *Egg Industry* (June 2008).

[87] Audio Recording: Presentation by Fred Adams for Cal-Maine Foods, Inc. Stephens Spring Investment Conference (June 4, 2008).

short-term contraction in supply due to broad adoption of animal well-being programs on bird density."

392.   During the question and answer session of Michael Foods' earnings call, Michael Foods acknowledged that: "[s]upply has been pressured through the animal wellbeing efforts, I think by the industry," and that the UEP Certification Program was the contributor to these material supply restrictions over the last year.

393.   Minutes from an October 20, 2008, UEP Marketing Committee meeting in Washington, DC show that Defendant attendees included committee members from Defendants Cal-Maine, NFC, NuCal, Rose Acre, and UEP, among others.   Defendant attendees of the meeting also included representatives from Sauder, Midwest Poultry, Daybreak Foods, and NuCal.  The minutes of this meeting reflect UEP Chairman of the Board Deffner (of Defendant NFC) commenting "that the industry must do a better job managing supply between Easter and Labor Day and that perhaps the industry 'lost focus' this year of high prices. . . . Chairman Deffner reminded attendees that as consumers spendable income becomes tighter that their buying habits are changing and that the industry must manage supply."

> **10.   Defendants' supply restriction efforts similarly impact the prices of egg products.**

394.   In addition to its effect on the prices of shell eggs, the unlawful contract, combination and conspiracy described above resulted in supracompetitive prices for egg products sold by Defendants, further egg processors, and co-conspirators.

395.    Shell eggs are the key component in processed egg products.  Shell eggs are broken and separated to be processed into various dried, liquid or frozen egg products.

396.    As the main inputs into egg products, the wholesale prices of shell eggs are closely linked to the prices of processed egg products.  As such, the reduced quantity of shell eggs and resulting supracompetitively increased prices were reflected in supracompetitively increased prices for egg products, as well.

397.    The majority of the egg industry is highly integrated from the point of production through the final marketing of their shell eggs or egg products.  Many Defendants and coconspirators had their own laying hens and shell egg production facilities, as well as egg processing facilities.  As such, these entities benefitted from the supracompetitively increased prices for their shell eggs, as well as for their egg products, given the overall reduced supply of shell eggs.

398.    Some Defendants and co-conspirators purchased shell eggs to process into egg products: Michael Foods, Moark, Rose Acre, NFC, Cal Maine and RW Sauder.  These purchases are excluded from the class.  These entities were able to benefit from the conspiracy even though they purchased shell eggs at supracompetitively inflated prices because the conspiracy artificially increased prices in the market for their egg products as well.  Thus, these further processors who did not own hens or profit from the sales of artificially inflated shell eggs were able to maintain their margins and profit from their sales of artificially inflated egg products.

399.   UEA has a further processors division made up of companies that primarily process shell eggs into egg products.

400.   UEA and UEP held joint meetings, had joint members, and had joint executives.  UEA and its members were aware of, supported, and participated in the conspiracy to reduce egg output and assisted in artificially fixing, raising, maintaining, and stabilizing the prices for processed egg products, as well.

401.   The UEP, which includes producers and sellers of both shell eggs and egg products, viewed its efforts (and its efforts were viewed by the industry) as affecting both shell eggs and egg products and requiring the support and involvement of UEA and its members

402.   As alleged above, in May of 2004, Gene Gregory urged co-conspirators to stay "committed" to the program, emphasizing that "whether you sell eggs in the shell or as egg products, if you are in the production business, you need to be committed to doing whatever is necessary to have prices above the cost of production."

403.   Similarly, a June 2006 UEP newsletter stated that "egg producers, whether marketing shell egg or egg products, are going to have to come to terms with the oversupply problem."

404.   The November 2006 UEP newsletter recognized that efforts to reduce supply through exports also caused an increase in prices of egg products.

405.   In January of 2008, Egg Industry examined the factors leading to the record prices in 2007, concluding that "the very bright factor coming out of 2007 and carrying into 2008 is that the industry, both shell eggs and egg products, enjoyed record-breaking prices throughout the year.  The good news was that egg producers and processors made money, despite high feed costs."

**B.     Defendants' "animal husbandry" guidelines are a pretext for a naked price-fixing scheme**

406.   Defendants' "animal husbandry guidelines," implemented through the UEP Certification Program, were created as a front and pretext for the coordinated price fixing scheme as alleged herein.

407.   Defendants holds these guidelines out as a "comprehensive and progressive animal care program . . . developed from guidelines established by an independent advisory committee of some of the top animal welfare and behavioral scientific experts in the U.S."[88]   Defendants rely heavily on the role of this "independent scientific advisory committee" to lend the guidelines the facial appearance of legitimacy and neutrality.

408.   For example, in 2007 UEP's president, Gene Gregory, testified before a House Subcommittee in regard to the "scientific advisory committee" stating,

> [T]o ensure its objectivity, the committee did not include any producers as members. The scientific committee recommended significant changes in egg production practices. UEP accepted the recommendations and today about 85% of our industry has implemented them. [ ] As

---

[88] United Egg Producers Certified: We Care, http://www.uepcertified.com/ (last visited June 2, 2008).

the years have gone by, the scientific committee has made a number of additional recommendations. UEP has never rejected a recommendation by the committee – a remarkable track record that reflects our industry's determination to follow the best available science. [ ] The committee's recommendations became what is now known as the UEP Certified Program.[89]

409.   However, Gregory omitted important information and misstated the facts about the role of this committee.   The "independent scientific advisory committee" ("scientific committee") did not write the animal husbandry guidelines. UEP's "Animal Welfare Committee," which is made up entirely of egg producers, authored the guidelines utilizing Don Bell's economic analyses as the primary motivating factor – not animal husbandry.[90]

410.   The scientific committee was asked to review literature on specific topics and to develop recommendations based on existing management and husbandry practices and to make "recommendations for revision of [the] industry's animal care guidelines."[91]   Gregory claims that UEP accepted the recommendations of the scientific committee in their entirety, but UEP has never released the recommendations to the public.

---

[89] Statement of the United Egg Producers: Before the Subcomm. On Livestock, Dairy, and Poultry of the H. Comm. on Agriculture, 110th Cong. (2007)   statement of Gene Gregory, President, United Egg Producers).

[90] *See also* United Egg Producers, Animal Husbandry Guidelines for U.S. Egg Laying Flocks, at 2 (2006) ("The recommendations and guidelines found within this document have been accepted by and presented here by the Producer Committee using the recommendations from the Scientific Committee as a blueprint."). *See also* Don Bell, Don Bell's Table Egg Layer Flock Projections and Economic Commentary (July 16, 2002) (the report was made "under the sponsorship of United Egg Producers" and states "United Egg Producers has developed a set of cage space standards with the help of a scientific advisory committee and a producer animal welfare committee.")   Donald Bell is a member of the "independent scientific advisory committee."

[91] Testimony of Gail C. Golab, PhD, DVM, Before the Subcomm. On Livestock, Dairy, and Poultry of the H. Comm. on Agriculture, 110th Cong. (2007).

411.   The committee's recommendations were also constrained by limited data.   Two members of the scientific committee, Dr. Joy Mench and Dr. Janice Swanson, wrote that, "a different decision about the minimum [space] recommendation would have been reached had the committee given more weight to the information from the preference testing and use of space studies, since these indicate that hens need and want more space than 72 sq. in."[92]

412.   Gregory maintained that the scientific committee recommended "significant changes in egg production practices."   However, by June 2002, just six months after the program was announced, 135 companies had already attained "UEP Certified" status.[93]   By July 2003, 136 companies had been audited and only one failed – a 99 percent passage rate.[94]   The stunning swiftness with which egg producers complied with the guidelines belies UEP's assertion that the program required any "significant changes" other than removing hens from cages to reduce supply.

413.   The Federal Trade Commission investigated UEP's use of "Animal Car Certified" - its original name for the Certification Program, as being potentially misleading.   On September 30, 2005, the Federal Trade Commission announced an agreement with the UEP that the "Animal Care Certified" logo could no longer be used on egg cartons.

---

[92] Joy Mench, Janice Swanson, "Developing Science-Based Animal Welfare Guidelines." A speech delivered at the 2000 Poultry Symposium and Egg Processing Workshop.
[93] Press Release, Food Marketing Institute, U.S. Egg Industry Introduces Sweeping Changes to Animal Welfare Standards (June 27, 2002).
[94] United Egg Producers, United Voices, July 2, 2003 at p. 1.

414.    On September 21, 2006, UEP also paid $100,000 to settle claims from 16 state Attorneys General with regard to the misleading "Animal Care" claims.  In announcing the settlement, Robert J. Spagnoletti, Attorney General for the District of Columbia, stated, "A certification program must not be promoted in a way that misleads consumers."

415.    The Defendants then renamed the program to "UEP Certified" in order to keep the supply restrictive nature of the program going, even though the FTC and Attorneys General had found misleading the claims that the program offered humane care.

416.    The cartel's supply control guidelines are based on a simple premise: egg producers make more money when there are fewer hens in production.[95]  Strict obedience to the key supply control campaign is necessary in order to ensure the success of the scheme.  For that reason, rules that affect hen populations are the only rules UEP enforces.

417.    Guidelines that do not have a direct impact on hen populations – including those that purportedly address humane treatment – can be violated with near immunity. For example, toxic ammonia concentrations, cruel killing methods and failure to remove dead birds from cages daily will only cost producers a five (5) point deduction on their annual audit.

---

[95] R. Smith, *Cage Space Hardest of Hen Welfare Needs to Evaluate*, *Feedstuffs*, Mar. 12, 2001, at 1 (citing Don Bell's research showing that a decrease in flock size by 1 million hens increases prices 1 cent/doz.).

418.    In contrast, a producer automatically fails their audit if they violate cage spacing formulas, engage in a procedure known as "backfilling" (replacing hens for losses due to mortality) and starvation induced molting (to increase egg production).

**C.     UEP is not entitled to the limited protections of the Capper-Volstead Act.**

419.    Membership in the UEP is open to non-egg producers, as well.  UEP's web site states that membership is open to "owners of breeder flocks, hatcheries, and started pullets, as well as contract egg producers . . . ."

420.    UEP's "Membership Agreement" also states that "membership is available to any person, firm or partnership (entity) engaged in the production of table eggs, breeder flocks, started pullets, or who is a contract egg producer on premises owned or operated by such entity."  UEP does not ask what percentage of a prospective members' business is related to egg production or how much of a producer's egg business is related to contract production.

421.    As such, some members of UEP are not shell egg producers at all.  For example, M&C Anderson Pullets, a UEP board member, raises pullets for egg farms and does not produce or sell eggs.

422.    UEP's annual meetings are held in conjunction with the UEA's meetings and members of both organizations attend joint meetings.[96]  UEP's supply restriction

---

96      John Todd, "On the Road: UEP Debates Supply Management at Annual Meeting," *Egg Industry*, (Jan. 2007) ("The United Egg Association, Allied (UEA) Annual Meeting was held in conjunction with the UEP meeting in San Antonio. UEA now has 61 member companies. Representatives from these companies also attended the UEP Committee and Board meetings.")

scheme was discussed and implemented at these meetings with members of UEP and UEA.

423.   For example, in its April 2004 newsletter, UEP noted: "UEP's Annual Meeting will be held in New Orleans on October 20-22.   UEA will schedule a time during the October dates to hold their annual membership meeting. We hope the [UEA] Allied members will continue to attend UEP's Spring Legislative meeting because this meeting is so critically important to our customers (egg producers)."

424.   UEA members did attend the Spring meetings.   In a May 2004 newsletter, UEP noted:

> Egg production companies owning 177 million laying hens (63% of the industry) were in attendance at UEP's Spring Legislative Meeting in Washington, D.C. These companies along with attendees from UEA Allied and UEA Further Processor members participated in committee meetings, [and] board meeting. . . .   The Government Relation, Environment, Marketing, Food Safety, Animal Welfare, and Egg PAC Committees met prior to the Board meeting and each brought forward motions for the Board to act upon. . . . The Marketing Committee recommended that the industry molt all flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until August 1, 2004.

425.   The UEP Executive Committee was also invited to the UEA Further Processor's meeting on April 27, 2004.

426.   Many UEA members and executive are also members of the UEP and USEM.   For example, in 2004, Toby Catherman of Michael Foods was elected chairman of UEA and Dan Meagher of Moark was elected vice chairman.   Michael Foods and

Moark were also members of UEP and their employees held positions in the UEP, as well.

427.   In October 2005, Dan Meagher of Moark was elected chairman of UEA, and Greg Hinton of Rose Acre Farms was elected vice-chairman.   Rose Acre Farms was a member of UEP and its employees held positions in the UEP.

428.   Members of Defendant companies have held positions on the board of USEM and UEP.  For example, Fred R. Adams Jr., CEO and director of Defendant Cal-Maine since its formation in 1969 and Chairman of the Board of Directors since 1982, is a director and past chairman of USEM.   Richard K. Looper, President and COO of Cal-Maine from 1983 to 1997 and current Vice Chairman of Cal-Maine's Board of Directors, is a past chairman of USEM.  Both have been on UEP's Board of Directors.

429.   In October 2006, the following Defendants' employees were elected as officers of USEM: vice-chairman - Chuck Else (NuCal); secretary - Roger Deffner (NFC); and Executive/Export Committee Members were: Dolph Baker (Cal-Maine Foods); Roger Deffner (National Foods); Jerry Kil (Moark); and Chuck Elste (NuCal). These individuals have also been involved with the Board of the UEP.

430.   UEP, UEA, and USEM all share the same address at 1720 Windward Concourse #230, Alpharetta, Georgia 30005.

431.   The top executives of the UEP, as well as the UEA and the USEM, are not egg producers.

432.    Gene Gregory is the president and chief executive officer of UEP. Gregory began his tenure with UEP in 1981 when he was appointed chairman of the animal welfare committee and began developing an industry code of management practices and a producer certification program.[97]   Gregory became Member Services Director for the Midwest region the following year.  Gregory is also president of the UEA and the USEM and treasurer of the United Egg Association Political Action Committee.

433.    Gene Gregory's son, Chad Gregory, is senior vice president of UEP and the UEA.

434.    Neither Gene nor Chad Gregory are egg producers.

435.    UEP is governed by a board of three to fifty directors who are elected annually.  Some, but not all, members of UEP's board of directors are affiliated with companies that produce eggs.  Some UEP member companies are merely processors or distributors and are not engaged in egg production as producers.

436.    In December 2004, UEP chairman Roger Deffner of National Food Corp. made appointments of the following Defendants' employees as committee Chairman to serve for 2004: Executive - Roger Deffner (NFC); Finance - Bob Krouse (Midwest Poultry Services); and Price Discovery & Marketing - Dolph Baker (Cal-Maine).  In making the appointments, Deffner said, "UEP is a producer organization that truly develops policy from input of individual producers up through committee meetings and ultimately through the Board of Directors.  Therefore, our members serving on UEP committees have an important role to play in the decision-making of all UEP policies."

---

97        *Id.*

437.     On September 30, 2008, UEP listed the following Defendants as "Certified Companies and Licensed Marketers" that had signed on to the UEP Certified scheme: Cal-Maine Foods (certification no. 103); Michael Foods Egg Products Co. (certification no. 345 and license agreement 509); Midwest Poultry Services (certification no. 102); Moark Productions (certification no. 116); National Food Corp. (certification no. 184); Norco Ranch (certification no. 133); NuCal Foods (license agreement 504) and each co-operative member (Gemperle Enterprises - certification no. 148, Sunrise Farms - certificate no. 135, Valley Fresh Foods - certificate no. 136, and J.S. West Milling - certificate no. 131); Rose Acre Farms (certification no. 198); and Sauder, R.W., Inc. (certification no. 121); Hillandale Farms (Fla.) (certification no. 200); Hillandale PA (certification no. 182); Ohio Fresh Eggs (certification no. 328).

438.     In June 2007, the following Defendants' employees were noted as UEP Committee Chairmen: Executive - Dolph Baker (Cal-Maine); Price Discovery - Dolph Baker (Cal-Maine); Marketing - Roger Deffner (NFC); Public Relations - Paul Sauder (Sauder); Long Range Planning - Roger Deffner (NFC).

439.     There is substantial overlap in leadership personnel between UEP and the UEA.  Gene Gregory is president of all three entities (UEP, UEA, and USEM) and has directed, participated in, and authorized UEP's unlawful conduct as detailed herein.  This participation includes Gregory's attendance at numerous meetings with UEP, UEA and USEM and other participants in the conspiracy.  Further, Gregory has written numerous articles in "United Voices" urging egg industry output restrictions that are the focus of this Complaint.

440.    UEP and UEA share staff and UEA has provided financial support for many of UEP's projects, including those related to the output restriction scheme.

441.    For example, an October 2004 UEP newsletter reported on a joint UEP and UEA meeting:

> UEA-Allied members continue to be extremely supportive of UEP and of assistance to the egg industry.  The members held their annual membership meeting in New Orleans and voted to set aside $20,000.00 that may be used by UEP for animal welfare research projects.  Additionally the organization approved a budget, which will provide $40,000.00 for UEPs management.

442.    UEP's October 2005 newsletter noted: "UEA-Allied held their annual membership meeting on October 6th with 20 of the 57 member companies being represented.  The association approved a budget which will provide approximately $70,000.00 support for UEP programs and management."

443.    UEP sometimes purports to be a "federated Capper-Volstead Agriculture Cooperative," yet it does not engage in any of the functions enumerated under the Capper-Volstead Act.  UEP does not grow, harvest, ship, sell, bargain, or compete for the sale of eggs or any agricultural products.

444.    UEP merely serves as an egg trade group and a forum for a price fixing agreement and a supply management scheme.  These activities fall outside the legitimate objectives of an agricultural marketing co-op.  UEP often refers to itself publicly as a "trade organization" or "trade group" and not a "cooperative."

445.    Moreover, even if UEP were a proper Capper Volstead co-operative, its activities are still subject to the limited protections of the Act.  In a 1985 publication titled "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that "if an association of producers . . . restricts' members' agricultural output . . . [or] colludes with third parties to fix prices . . . [or] conspires with third parties to fix prices . . . [or] combines with other firms to substantially lessen competition . . . " then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

446.    The Capper Volstead Act does not protect entities that engage in production restriction in order to raise prices.

447.    Many UEP members are vertically integrated from the point of production through final marketing and sale.  These vertically integrated firms mill their own feed, hatch chicks, rear pullets, confine hens, produce and/or purchase eggs, wash, candle, grade, store, market, transport and distribute their own eggs.

448.    UEP members are competitors rather than small farmers banding together to cut out the corporate middlemen who would otherwise market their eggs.  UEP members do not associate to collectively process, handle, and market their products and UEP does not provide those services.

449.    UEP does not wash, candle, grade, break, pasteurize, package, store, transport, or distribute its members' eggs.

450.    UEP does not negotiate contracts of sale for its members.

451.    While USEM helps arrange the export sales of eggs for its members in furtherance of the conspiracy, it does not take direct ownership of the eggs but merely helps to facilitate these transactions.

452.    UEP has previously declared that it did not sell eggs to consumers.[98]

453.    UEP does not "market" its members' products.  Rather, as set forth in their promotional materials, publications, web sites and numerous public statements, UEP was founded for the express purpose of providing "services to the industry" and created the United Egg "Alliance" to "provide service to and represent the interests of all sectors of the egg industry[.]"[99]

454.    An August 2006 UEP newsletter noted a licensing agreement that would allow non-certified companies to license eggs purchased from certified companies.  The newsletter also acknowledged that not all UEP members own layers and produce eggs (a requirement for Capper-Volstead cooperatives):

> **The Animal Welfare Committee approved the use of a Non-Certified License Agreement for UEP and UEA member companies that do not own layers** as well as for UEP/UEA egg production companies having made a commitment to meet the 100% rule while in the process of implementing the cage space requirements of UEP's hatch

---

98      National Advertising Division of the Council of Better Business Bureaus Case Report, "In the Matter of United Egg Producers, Inc. Animal Care Certified Eggs," Case #4108 (Nov. 6, 2003) at 4.

99      United Egg Producers, Member Booklet, at 1, 7 ("Concerned with the disastrous price cycles of the egg industry and with no unified voice to address industry issues, a group of producers met in the fall of 1968 to discuss the formation of an organization that could provide the needed industry leadership. Their vision was to establish an organization that could provide the following services to the industry . . . . **In order to provide service to and represent the interests of all sectors of the egg industry, UEP created the United Egg Association and all its divisions.**").

schedule. The use of the "License Agreement" will allow
Non-Certified companies to purchase eggs from "UEP
Certified" companies for the marketing of "Certified" eggs.
The Animal Welfare Committee also approved an
additional option for companies to become recognized as a
"UEP Certified" company. The new policy will allow any
new company now making an "Application for
Certification" to come on to the program by meeting UEP's
currently required hatch schedule for cage space rather than
depopulating existing flocks.

455. In implementing the output restriction scheme discussed herein, UEP has

conspired with non-member co-conspirators. For example, UEP has conspired with UEA

and its non-producer members and USEM to implement its unlawful supply control

campaign at numerous industry meetings.

456. It was only after the filing of this action that UEP finally prohibited UEA

and non-egg producers from participating in the discussions and meetings about the

price-fixing scheme and supply restrictions. In UEP's January 20, 2009 newsletter, UEP

discussed the upcoming UEP Board and Committee meetings and noted that some

meetings would be closed to non UEP members:

It should be noted that the Animal Welfare and Marketing
Committees will be closed to **UEP members only**.
Additionally, the Board of Directors meeting will include a
time period at the close of the meeting, for **UEP Board
members only**. UEP meetings have always been open to
everyone and therefore we apologize that circumstances
now warrant some meetings or portions of some meetings
to be closed to selected members. We hope [UEA] allied
members and others will be understanding.

457. UEP has also conspired with non-member egg producers and has

encouraged and allowed them to join the UEP certified program and reduce their own egg

supplies. For example, in November 2004, UEP discussed the assessments that

producers would be required to pay for participation in the UEP certified program as $200 per company and 0.0004 cent per hen for UEP members and $400 per company and 0.002 cent per hen for non-UEP members.[100]

458.    UEP has also conspired with non-member cage manufacturers and other entities involved in egg production that are not agricultural producers.    Cage manufacturer representatives and other non-member co-conspirators were often invited to UEP meetings where supply management issues were discussed to provide input and support for the UEP certified supply restriction scheme.   Moreover, cage manufacturers held numerous leadership positions in the UEA.

459.    Companies that did not produce eggs were members in and/or actively participated in the UEP meetings and structure including Chore Time Egg, a manufacturer of egg equipment, and Cargill, a further processor of eggs.   Individuals such as John Mueller, former in-house counsel to egg producer Sparboe Farms, Inc. (a former Defendant), believed that the membership and participation of non-producing companies ran counter to the Capper-Volstead Act, and threatened the UEP's supposed antitrust immunity under the Act.   Mr. Mueller raised his concerns with UEP counsel Irving Isaacson and president Al Pope, but UEP continued to operate with non-producers as members and attending meetings where supply restrictions were discussed and implemented.

---

100    "UEP approves assessments to continue funding, promoting husbandry standards," *Feedstuffs* (Nov. 1, 2004).

460.    A number of UEP members market eggs produced under production contracts with growers who possess their own egg-production facilities.  Thus, some of these members (e.g., Michael Foods) do not produce a majority of the eggs they market, but act mostly as conduits for other producers' eggs.

461.    In February of 2007, UEP newsletter discussed the fact that the organization considered forming a "supply-managed cooperative" that might have some protection under the Capper-Volstead Act (an implicit, if not explicit acknowledgement, that the present incarnation of UEP did not have such protections).  The newsletter stated:

> Despite recent extremely good egg prices, the egg industry
> has a history of being unable to control supply and thereby
> suffering though difficult periods of severe financial losses.
> With this in mind, the idea of a supply-managed
> cooperative
> . . . was referred to UEP's Long Range Planning
> Committee for consideration.

462.    On August 7, 2007, UEP hosted a Long Range Planning Committee meeting in Salt Lake City, Utah and discussed this and other issues.  Committee member Defendant attendees included Roger Deffner (NFC); Terry Baker (Michael Foods); and Craig Willardson (Moark/Norco). Also present were Gene and Chad Gregory.  Minutes from the meeting stated that there was concern about this proposal being implemented through UEP and that USEM was the "perfect vehicle to initiate the process."  The idea was tabled for the time being.  It was acknowledged, however, that UEP could not function as a proper supply restriction co-operative.

463.     Non-privileged minutes from this meeting also reflect that UEP's outside attorney, Kevin Haley, detailed problems with UEP's status as a Capper-Volstead co-operative:

> Kevin Haley reviewed the Capper-Volstead compliance rules.  Haley clarified that if more than 50% of a company's sales or volume come from products outside of egg production then that [company is ineligible] for UEP membership. With regards to UEP membership the more than 50% rule only applies to egg production and sales of eggs. **Haley said if a company markets or sells more than twice as many eggs as they produce, then this company would be questionable for membership.**
>
> This generated a great deal of discussion.  It was suggested to send a survey out to all UEP members seeking more information pertaining to their production and marketing. This idea was tabled.  Haley indicated the only activities in questions have to do with price discovery and marketing committees and UEP Board votes on these issues.  **Haley said that supply management recommendations written up in UEP newsletters is also questionable.**
>
> After a considerable amount of discussion it was decided that Haley would review past price discovery and marketing committee minutes and see if any activity was taken that might be questionable.  In an attempt to not lose any current members and avoid any risks of questionable activity in the future, Haley would explore the possibility of better defining what the UEP Price Discovery and Marketing committees can do and who is eligible to serve on those committees.  Also, he would attempt to clarify how any motions from these committees should be addressed by the full UEP Board in the future.  The ultimate goal would be to keep UEP as a Capper-Volstead cooperative, maintain current members eligible status and clarify future activities to avoid any risks.

464.     UEP includes members that do not fit into Capper Volstead immunity as defined by Kevin Haley.  As discussed, some UEP members do not sell eggs at all. Moreover, other UEP members sell eggs as one small part of complex and integrated

business operations.  For example, according to UEP's October 2007 newsletter, J.S. West Milling Co. (a member of the NuCal cooperative and a UEP member) is "a multi-faceted farming business with egg production and processing, feed mills, a propane business, an Ace Hardware, a lumber company, and almond orchards."  Some members also process more eggs than they produce.

465.    UEP also continued to make supply management recommendations until those practices were stopped after the filing of this lawsuit.

466.    Mr. Isaacson, another UEP attorney, spoke at UEP meetings and discussed concerns about violations of antitrust principles.  Mr. Isaacson stated that UEP members should not discuss pricing at UEP meetings so as to avoid the implication of antitrust violations.  This advice was also not followed.

467.    For example, in minutes from a 2005 UEP Board of Directors meeting attended by several Defendants including Cal-Maine, Michael Foods, and Midwest Poultry, Chairman Deffner stated "It was just one year ago that we met in this very hotel and were so full of optimism.  All indicators were that we could sustain $1.00 plus eggs for an extended period and the price structures for the next 18 months (we took care of that). . . . We don't have to accept low prices and we can have a good 2005 if we just make a few changes and work together."

468.    As discussed in further detail above, UEP and its members also retaliated against egg producers that tried to or left the conspiracy.

469.    UEP's retaliatory activities against its own members that had repudiated the price fixing scheme alleged herein were beyond the legitimate objectives of a cooperative and further destroyed any Capper-Volstead protections to the extent any ever existed.

470.    As such, UEP is not entitled to the limited protections found in the Capper-Volstead Act for at least the following reasons:

(a)    UEP is not a legitimate co-operative and does not market, process or sell eggs - it is a trade group designed to protect the interests of the egg industry;

(b)    UEP consists mainly of vertically integrated members who market, process and sell their own eggs;

(c)    UEP has members that are not involved in agricultural egg production;

(d)    UEP has many members that process other producers' eggs or who supply eggs to members on a contract basis;

(e)    UEP conspired with UEA and its members - a trade group explicitly made up of non-Capper-Volstead protected entities;

(f)    UEP includes UEA members who are non-Capper-Volstead protected entities;

(g)    UEP conspired with non-member egg producers and other entities to assist in reducing egg supply and fixing prices;

(h)    UEP retaliated against producers that left the price-fixing scheme; and

(i)      UEP's supply restriction and price-fixing efforts fall outside of the limited purposes of the Capper-Volstead Act.

## VII.   FRAUDULENT CONCEALMENT AND TOLLING

471.    Prior to the disclosure of the contents of internal UEP documents in mid-2008, revealing for the first time critical facts about Defendants' conspiracy to control supply in order to inflate egg prices artificially, and prior to the disclosure of the fact of a government investigation into hidden cartel activity, as reported in a September 2008 *Wall Street Journal* article, Defendants' unlawful conspiracy to restrict supply and raise prices, as set forth in detail throughout this Complaint, was concealed and carried out in a manner that precluded detection.

472.    Defendants' conspiracy was self-concealing.  In addition, Defendants (and their co-conspirators) engaged in an affirmative course of conduct to conceal from egg purchasers, including Plaintiffs, their unlawful agreement to control supply and artificially maintain and increase egg prices.  At the same time, Defendants actively worked to mislead egg purchasers by giving them the false impression that Defendants were taking legitimate steps to address concerns about animal welfare, that they were engaged in legitimate export activities, and that any increases in egg prices were due to factors consistent with competition and beyond Defendants' control.

473.    Defendants' efforts to conceal their conduct from, and to actively mislead, egg purchasers, were successful for nearly a decade, allowing Defendants to reap hundreds of millions of dollars in supracompetitive overcharges from egg purchasers before Defendants' anticompetitive conduct came to light.  Defendants' conspiracy was successfully concealed until the contents of internal UEP documents came to light in

mid-2008, as reported in the *Wall Street Journal* in an article dated September 24, 2008.[101]

474.    In addition to discussing these internal UEP documents, this *Wall Street Journal* article also revealed, for the first time, that the Department of Justice was conducting a "*previously unreported*" investigation into the egg industry, and that this investigation had found that "a *hidden factor* may be driving food prices higher: *collusion among farmers, food processors or exporters*."

475.    Citing internal UEP documents, the article publicly revealed for the first time that producers were conspiring to export eggs in order to reduce supply: "producers of fresh eggs have coordinated their efforts to raise prices, according to industry participants and a *Wall Street Journal* review of industry documents. Fresh-egg farmers acted together through a series of export shipments, organized by United Egg Producers, an industry cartel whose 250-plus members include virtually all of the nation's big egg producers. By removing a small fraction of eggs that would have been bound for U.S. sales and arranging instead for their export, United Egg helped tighten domestic supply and drive up the price of eggs across the country, according to newsletters and other documents that United Egg sent to its members."

476.    Again citing internal UEP documents, the article also publicly revealed for the first time that UEP was utilizing a cage space program to reduce supply and that UEP members had agreed to not make up for this reduced capacity through additional facilities: "In 2004, according to members and internal documents, the group pressed its

---

101 *See* John Wilke, "Federal Prosecutors Probe Food-Price Collusion," *Wall Street*

members to increase the sizes of their hen cages, a response to the growing number of producers advertising 'cage free' eggs and the threat by some states to introduce new animal-treatment rules.  But bigger cages also mean farmers can keep fewer hens in the same space. United Egg warned its members not to build additional cage capacity to make up for these flock reductions, according to its internal newsletters. Producers that raised flock size risked being removed from United Egg's 'animal-care certified' logo program."

477.    Prior to mid-2008, Plaintiffs did not know and through the exercise of due diligence (which Plaintiffs did exercise) could not have known, about the existence of the conspiracy.  No public information was available that would have informed Plaintiffs of the nature of Defendants' price-fixing activities or the governmental investigation.  The first cases in this MDL were filed only after the *Wall Street Journal* article was published.  It would have been unreasonable to expect such actions to be uncovered by egg purchasers and filed prior to the disclosure of the information discussed in that article.

478.    Because the Defendants' conspiracy was concealed until mid-2008 (well within the four-year period prior to the filing of the first class action in this matter), Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially higher prices for shell eggs and egg products throughout the United States.

---

*Journal* (Sept. 23, 2008).

479.   Like many price-fixing and supply-restriction conspiracies, Defendants' conspiracy was self-concealing and would not have survived absent secrecy.   If Defendants had publicly disclosed their plan to raise egg prices by controlling supply - under the guise of animal welfare, exports, and explicit supply control programs - their conspiratorial program would have collapsed and failed.  If the true nature of Defendants' programs had not been concealed, egg purchasers, including Plaintiffs, would have refused to pay supracompetitive prices for Defendants' products.  Defendants knew that egg purchasers seek competitive prices for the eggs they purchase and that any price increase that was openly collusive would not have been tolerated by egg purchasers, including Plaintiffs.

480.   Defendants concealed the actual objectives of and important facts regarding the UEP animal welfare program, the USEM export program, and Defendants' other coordinated supply reduction efforts.   Defendants and co-conspirators were successful in concealing from egg purchasers the true nature of these programs – to develop a viable and enforceable method of reducing egg output through reducing hen supply.

481.   In addition to the self-concealing nature of Defendants' conspiratorial scheme, Defendants successfully took affirmative steps to conceal their conspiracy and actively mislead egg purchasers, including the Plaintiffs.

482.   Among other things, to hide their conspiratorial conduct, and their goal of raising prices through concerted behavior, Defendants exploited the fact that, at the time of the conspiracy's formation, animal welfare concerns had been raised about the egg

industry's practices.  In particular, animal activists were campaigning to ban caged egg production and to encourage purchasers to only buy cage-free products.  Defendants seized on these concerns as an opportunity to hide their true objectives and conduct from egg purchasers under the false pretense of an "animal welfare" program.  Defendants intended that this false pretense would be credible to egg purchasers, causing them to relax their guard, and Defendants' use of this pretense, in fact, had its intended effect.

483.    As discussed above, one major component of Defendants' conspiracy was their effort to reduce flock populations and chick hatching through the implementation of UEP's "Animal Care Certified" program (later renamed "UEP Certified"; collectively herein, the "Program").  The Program was falsely promoted to egg purchasers and the public as an "animal welfare" measure as part of Defendants' effort to ensure that egg purchasers (and others in the industry, including industry trade groups such as Food Marketers Institute and the National Council of Chain Restaurants) would support the Program and buy eggs bearing the UEP Certified seal.

484.    Defendants affirmatively misrepresented the nature of this Program in order to deceive egg purchasers, and others in the industry, and Defendants were successful in this objective.  UEP's own Guidelines noted that "Producers who adopt sound guidelines for the welfare of their hens and incorporate these into their production operations will have a solid base from which to reassure the public that they are practicing good management and care for their birds."[102]  By way of example:

---

102 (Animal Husbandry guidelines, 2004 ed.)

a.   On or about August 1, 2003, Defendants represented in a press release that "The [Animal Welfare] guidelines place top priority on the comfort, health and safety of the chickens."[103]

b.   On or about June 3, 2004, Defendants represented that the Program was part of egg farmers "commitment to caring for our hens and supplying our customers with the safest and best quality eggs in the world."[104]

c.   Starting on or about June 18, 2004, Defendants publicly represented that the "Animal Care Certified program is a commitment to:  Protect hens from disease and injury[;] Allow enough space so hens can stand comfortably upright[;] Provide space that allows all birds to eat at the same time[;] Assure continuous access to clean drinking water[;] Maintain a continuous flow of fresh air[;] Provide enclosures that keep hens clean[;] Prevent hens from injuring each other[;] Transport hens in a safe and protected manner[;] Undergo an annual audit by and independent, third-party to confirm our compliance."[105]

d.   In a press release on October 3, 2005, Defendants described the UEP Certified seal as "assur[ing] consumers that the eggs they are purchasing came from hens that were properly cared for under scientifically-based animal husbandry guidelines … This is one of the most proactive and progressive animal welfare programs in the food industry… ."[106]

---

103 Egg Industry Unveils New Animal Care Certification Logo, August 1, 2003
104 (June 3, 2004, December 1, 2004, www.animalcarecertified.com, "We Care" page)
105 (June 18, 2004, www.animalcarecertified.com, "Our Commitment" Page)
106 (October 3, 2005, "Egg Certified Seal Receives approval from federal regulators" PR)

  e. On April 11 & 12, 2007, Defendants continued their charade at UEP's first national Animal Welfare Conference for Grocery and Foodservice Executives at the Wigwam Golf Resort in Arizona.  Gene Gregory described the conference as "an opportunity for our customers to learn about the United Egg Producers Certified animal welfare program and hear the science-based facts from third party animal welfare experts."[107]

485. As revealed in UEP's January 2004 newsletter, the specific targets of this false and misleading campaign were "retail grocery CEO and egg buyers" and the "retail market."  GolinHarris bought print ads in grocer trade publications about the "animal welfare" aspects of the Program, sent letters to major retailers, and promoted television interviews touting the animal welfare nature of the Program.

486. In addition, Defendants (and their co-conspirators) made false statements about egg price increases designed to give the false impression that these price increases were due to factors consistent with competition and outside of Defendants' control. When prices rose during the conspiracy period, Defendants publicly attributed this increase to circumstances beyond Defendants' control, while only privately acknowledging and celebrating the coordinated industry efforts to reduce egg supply.

487. Defendants consistently and publicly attributed high egg prices to circumstances that were consistent with free-market competition—*e.g.,* increased feed and transportation costs and/or the inability to build new hen houses to meet demand due to a credit crunch and the actions of animal rights activists—in order to falsely give

---

107 (Nov. 2007 PR, "United Egg Producers Holds Animal Welfare Conference for Grocery and Foodservice Executives).

purchasers the impression that Defendants were engaged in price competition.  For example, in interviews and articles about the increased cost of eggs, Defendants and other egg producers frequently blamed the high cost of eggs on increases in the cost of corn (used as feed), attributable to the fact corn was being sold for ethanol use.  On other occasions, Defendants and other egg producers blamed the high cost of eggs on increases on the cost of soybeans or wheat.

488.   Defendants also concealed and actively misrepresented the anticompetitive nature of USEM's coordinated export program, which was designed to and did reduce domestic egg supplies.  Defendants concealed the fact that these exports were made at a loss and designed solely to reduce supply.  Plaintiffs did not learn until Sparboe settled that members of USEM agreed to compensate one another for these losses.

489.   Defendants also took steps to hide the fact that they were coordinating numerous other explicit flock reductions (such as at the "Egg Economic Summit," where Defendants agreed to specific flock reduction percentages), molting schedules, and other programs designed to reduce domestic egg supply.  Unlike the UEP Certified Program, these actions were never discussed outside of UEP.  Defendants often kept the identities of the companies agreeing to the specific plans a closely guarded secret – even from other UEP members.  For example, during UEP's "emergency flock reduction" of 5%, UEP's asked producers to remove birds until houses reached the 95% capacity goal.  Many producers agreed to the program in secret so that their names were not associated with this clearly anticompetitive and illegal scheme – even internally to other UEP members.

490.     Defendants kept the facts of their conspiracy mostly within the confines of their higher-level executives.   Defendants planned and implemented the conspiracy through private discussions and during meetings that were not open to egg purchasers. Defendants monitored and enforced the conspiracy through nonpublic means, and agreed not to discuss or disclose the details of their conspiracy.   Defendants' activities included, but are not limited to, the following:

a.   concealment of UEP audit and monitoring results (which were not publicly available),

b.   hosting private UEP, UEA, and USEM meetings at which the conspiracy was designed and implemented (which were not open to members of the public);

c.   concealment of UEP meeting minutes (which were not distributed to the public); and

d.   distribution of UEP's internal newsletter, which urged compliance with and distributed information about the conspiracy (and which was not distributed to the public).

491.     As discussed above, because of Defendants' efforts to conceal their conduct and mislead egg purchasers, Plaintiffs did not have knowledge of Defendants' conspiracy, as alleged herein, prior to the disclosure of the contents of internal UEP documents and the government investigations of various egg producers in mid-2008.   Nor did Plaintiffs have notice of information prior to that time that would have, in the exercise of reasonable diligence (which Plaintiffs, in fact, exercised), led to the discovery of facts constituting Defendants' conspiracy.

492.    At all relevant times, Plaintiffs were appropriately and reasonably diligent about their business operations and economic interests.  Plaintiffs took reasonable steps to be informed about issues and actions that affected their businesses and to attempt to ensure that they were receiving competitive prices for their purchasing needs. Defendants' efforts to conceal their conspiratorial conduct were successful despite Plaintiffs' exercise of reasonable diligence.

493.    Prior to mid-2008, there were no facts, circumstances, red flags, or "storm warnings" that did alert an egg purchaser, or would have alerted a reasonable egg purchaser, to actively investigate a price-fixing claim.   In addition, Defendants' misrepresentations, deceptive practices, and techniques of secrecy to avoid detection of, and conceal, their conspiracy, meant that even had there been any such red flags, egg purchasers would have been unable to discover the alleged contract, conspiracy or combination through the exercise of reasonable diligence.

494.    Even after the filing of this lawsuit, Defendants continued their efforts to conceal their unlawful conduct alleged herein with public statements that the UEP Certified program's "sole purpose was the establishment of science-based animal welfare standards for egg laying hens" and that the increase in prices was due to "historic record feed and transportation costs."   In fact, because Defendants were so successful in their intentional efforts to conceal their conspiracy, additional facts about Defendants' and co-conspirators' conspiracy that were not directly revealed in the initial public disclosure of government investigations in or around September 2008, only came to light after Sparboe and Moark settled, including that:

    a.   Defendants were making payments or reimbursements to each other for export losses.  The remaining Defendants, to date, have not made such export payments public;

    b.   UEP was retaliating against UEP members that exited the supply management scheme.  No Defendant has disclosed this fact publicly;

    c.   Some Defendants had expressed serious concerns about the applicability of the Capper-Volstead Act to UEP.  No Defendant had disclosed this fact publicly;

    d.   Defendants were contacted about the possibility of ongoing antitrust violations by at least one of its members. UEP, to date, has not made this fact public;

    e.   Defendants were aware of, and discussed, potential antitrust violations as a result of their conduct.  No Defendant has disclosed this fact publicly; and

    f.   Animal welfare was not the primary motivating factor for the UEP Certified Program.  No Defendant has disclosed this fact publicly.

495.   Prior to the disclosure of internal UEP documents and the fact of the government investigations, in mid-2008 and Plaintiffs' subsequent settlement with Sparboe, Plaintiffs were unaware and had no knowledge of any facts that would have led them to uncover that Defendants were exporting eggs at a loss and making payments or reimbursements to each other for those losses.

496.   Plaintiffs were unaware and had no reason to suspect that (or investigate whether) Defendants were conspiring to reduce the flock size and increase egg prices with collectively coordinated industry molts, early molts, and flock and hatch reduction

programs. Prior to mid-2008, Plaintiffs were unaware and had no knowledge of any facts that would lead them to uncover that Defendants were engaged in such unlawful conduct.

497.   As a result of Defendants' successful concealment of their conspiracy until a period well within the four-year period prior to the filing of the first complaint in this matter, the running of any statute of limitations has been equitably tolled with respect to Plaintiffs' claims.

## VIII.   EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT

498.   The aforesaid conspiracy had the following effects, among others:

a.   Price competition among the Defendants and their co-conspirators in the sale of shell eggs and egg products was restrained and suppressed;

b.   Prices of shell eggs manufactured and sold in the United States by the Defendants and their co-conspirators were fixed, raised, maintained and/or stabilized at supracompetitively higher, non-competitive levels;

c.   Prices of egg products manufactured and sold in the United States by the Defendants and their co-conspirators were likewise fixed, raised, maintained, and/or stabilized at supracompetitively higher, noncompetitive levels; and

d.    Direct purchasers of shell eggs and egg products from the Defendants and their co-conspirators, including Plaintiffs and Class members, were deprived of the benefits of free and open competition in the purchase of shell eggs and egg products.

## IX.   INJURY TO PLAINTIFFS

499.   As a direct and proximate result of the contract, combination and conspiracy alleged herein, Plaintiffs were, and continue to be, damaged in their business or property in that they paid supracompetitive prices for shell eggs and egg

products during the Conspiracy Period than they would have paid in the absence of such contract, combination and conspiracy.

## X.   VIOLATION ALLEGED

### Section 1 of the Sherman Act, 15 U.S.C. § 1

500.   Plaintiffs incorporate by reference as if fully set forth herein, the preceding allegations of this Complaint.

501.   In response to market conditions, and in an effort to stem declining prices and supracompetitively inflate the prices of eggs, beginning at least as early as 1999, the exact date being unknown to Plaintiffs, and continuing thereafter through the present, the Defendants and their co-conspirators engaged in a continuing contract, combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, which had the purpose and effect of fixing, raising, maintaining and/or stabilizing the prices of eggs at artificially high, non-competitive levels in the United States.

502.   The aforesaid contract, combination and conspiracy between and among the Defendants and their co-conspirators was furthered and effectuated, among other ways, by the following acts:

> a.   Throughout the 1990s, eggs prices could not be maintained due to a fluctuating imbalance of supply over demand - after spurts of high prices, producers would add more production capacity and prices would fall again.
>
> b.   Against this backdrop, the Defendants acted in concert with competitors, with and through the UEP and other trade groups, and with non-member conspirators and contracted, conspired,

and combined to effectuate a substantial reduction of the production and supply of eggs, which allowed for a series of substantial supracompetitive inflate in egg prices.

c. As part of Defendants' agreement to supracompetitively inflate the price of eggs, the Defendants drafted guidelines with animal husbandry as a pretext, but with the knowledge and understanding that the guidelines would be used by the co-conspirators to substantially reduce egg production; manipulated molting, backfilling, and hen disposal schedules to keep production low; manipulated and reduced chick hatching; coordinated with co-conspirators to reduce or delay the introduction of added egg capacity through the construction of new hen houses or other means; and reduced production rates at existing eggs farms. These actions were extraordinary, non-competitive, and contrary to economic fundamentals.

d. Defendants also conspired and agreed to export shell eggs and processed egg products abroad with no legitimate business purpose other than to supracompetitively increase the prices for shell eggs and processed egg products within the United States. These exports were normally, if not always, at prices below those for which the same eggs could have been sold in the U.S. domestic market.

e. To maintain their overarching conspiracy to supracompetitive raise the price of eggs, Defendants took significant steps throughout 2000-2008, which resulted in supracompetitive prices for eggs throughout this period.

503. The conspiracy had its intended effect, as Defendants benefitted from their collusively-set prices as described herein.

504. For the purpose of effectuating the aforesaid contract, combination and conspiracy, the Defendants and their co-conspirators:

a. agreed among themselves to fix, raise, maintain and/or stabilize the prices of shell eggs and egg products in the United States;

b. agreed among themselves to restrict the supply of shell eggs by implementing and coordinating output restrictions at their egg farms;

156

    c.  agreed among themselves to restrict the supply of eggs and processed egg products by exporting shell eggs abroad; and

    d.  agreed among themselves to implement and coordinate supracompetitive increases in the prices of shell eggs and egg products in the United States.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

    a.  Declaring that the unlawful contract, combination and conspiracy alleged herein be adjudged and decreed to be in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

    b.  Declaring that Plaintiffs recover treble their damages as caused by the conspiracy alleged herein, as provided by law, and that judgment in favor of Plaintiffs be entered against Defendants in that amount;

    c.  Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claims to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

    d.  That Plaintiffs recover their costs of this suit, including reasonable attorneys' fees and costs, as provided by law; and

    e.  That Plaintiffs be granted such other and further relief as the nature of the case may require or as may seem just and proper to this Court.

### TRIAL BY JURY

Trial by jury is demanded on all issues so triable.

Dated:  February 10, 2012                          Respectfully submitted,


                                                   /s/ Patrick J. Ahern
                                                   One of the Attorneys for the Plaintiffs


Patrick J. Ahern
BAKER & McKENZIE
300 East Randolph Street
Suite 5000
Chicago, Illinois 60601
(312) 861-3735
patrick.ahern@bakermckenzie.com

## CERTIFICATE OF SERVICE

I, Patrick J. Ahern, certify that the foregoing **Second Amended Complaint** was served upon counsel of record via e-mail on February 10, 2012.

Jan P. Levine, Esquire
**PEPPER HAMILTON LLP**
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
(215) 981-4714
(215) 981-4750 (fax)
levinej@pepperlaw.com
*Defendants' Liaison Counsel*

William J. Blechman, Esquire
**KENNY NACHWALTER, P.A.**
1100 Miami Center 201 South Biscayne
Boulevard Miami, Florida 33131
Telephone: 305-373-1000
Facsimile: 305-372-1861
wblechman@kennynachwalter.com
*Direct Action Plaintiffs' Liaison Counsel*

*/s/ Patrick J. Ahern*
One of the Attorneys for the Plaintiffs

Patrick J. Ahern
BAKER & McKENZIE
300 East Randolph Street
Suite 5000
Chicago, Illinois 60601
(312) 861-3735
patrick.ahern@bakermckenzie.com

CHIDMS1/2990694.3

159