**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

IN RE: PROCESSED EGG PRODUCTS      :
ANTITRUST LITIGATION              :
                                     :      **MDL No. 2002**
                                     :      **08-md-02002**
_____:
                                     :
THIS DOCUMENT APPLIES TO:        :
ALL INDIRECT PURCHASER          :
PLAINTIFF ACTIONS               :

## OPINION

GENE E.K. PRATTER, J.                                     MARCH 19, 2012

## I.  Introduction

Indirect purchasers[1] of domestic eggs and egg products charge producers of those goods, and the producers' trade groups, with conspiring to manipulate the supply of, and thereby fix prices for, domestically-sold eggs and egg products.  The Indirect Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint (hereinafter, the "IPSAC")[2] alleges violations of federal and state law.  The 22 state jurisdictions at issue geographically reach considerably farther than a rooster's most vigorous crows can be heard.  In total, the IPSAC contains 51 claims: a Section 1 Sherman Act claim for injunctive relief, 20 state antitrust claims, 9 state consumer protection claims, and 21 state unjust enrichment claims.[3]

---

[1] Indirect purchasers buy products not directly from the product's original source but from other parties further along the distribution chain.  *See generally Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726 (1977); IPSAC ¶¶ 19-44, 107-08, 505.

[2] The IPSAC is the operative pleading for the indirect purchaser plaintiffs, replacing or superseding all of the previously-filed individual and consolidated complaints.

[3] This inventory does not include the claims that Plaintiffs withdrew at oral argument.  At that time, Plaintiffs withdrew all of their claims arising under Maine or Puerto Rico law.  They also withdrew consumer protection claims based upon the laws of Michigan, South Dakota, or Wisconsin.

In response, Defendants have jointly filed the Motion *sub judice* which tries to crack, if not wholly topple, most of the Plaintiffs' claims by seeking full or partial dismissal of all counts.[4] Defendants argue that the IPSAC is deficient in a number of ways, *inter alia*, lack of standing (in the various applications of that term) and failure to state a claim consistent with the demands of Rules 8 and 9(b).  As outlined below and as delineated in the accompanying Order, the Court grants the Motion in part and denies it in part.

## II.  Background

This multidistrict litigation concerns numerous consolidated and coordinated actions based upon allegations of a conspiracy in violation of the Sherman Act among egg producers and trade groups to manipulate the supply of eggs and egg products and thereby affect the domestic prices of those goods.  *See In re Processed Egg Prods. Antitrust Litig.*, 588 F. Supp. 2d 1366, 1367 (J.P.M.L. 2008).  The plaintiffs are direct purchasers (such as grocery stores, commercial food manufacturers, restaurants, other food service providers, and other entities who purchase directly from Defendants or other egg producers) and indirect purchasers (individual consumers who purchased from other parties along the distribution chain) of eggs and egg products.  The direct purchaser plaintiffs fall into additional categories:  "Direct Purchaser Plaintiffs" who have brought a consolidated class action against Defendants, and "Direct Action Plaintiffs" who are pursuing individual actions against Defendants.

---

[4]  The Defendants' Motion to Dismiss the Indirect Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint is filed at Docket No. 332.  Plaintiffs responded to the Motion (Doc. No. 355), and Defendants filed a reply brief (Doc. No. 385).  The parties submitted several supplemental materials to the Court.  At oral argument all counsel ably presented on the Motion, and the transcript of the argument is in the record at Docket No. 597.

In this Opinion the Court addresses one, albeit a multifaceted one, of the Defendants'

pending motions to dismiss the IPSAC.[5]  The Court previously addressed motions to dismiss

filed by virtually the same group of Defendants concerning the Direct Purchaser Plaintiffs'

Second Consolidated Amended Class Action Complaint.  *See* Sept. 26, 2011 Mem. and Order,

2011 WL 4465355 (Doc. Nos. 562 and 563); Oct. 14, 2011 Mem. and Order, 2011 WL 4945864

(Doc. Nos. 581 and 582); Nov. 30, 2011 Opinion and Order, 2011 WL 5980001 (Doc. Nos. 593

and 594).  Much of the history and many of the dynamics of this litigation are outlined in detail

in those prior decisions, and will not be repeated here except as appropriate and necessary

predicates to the rulings here.

### III.  Factual Allegations[6]

As the parties are already well-aware, and indeed, have represented to the Court, the

IPSAC alleges virtually the same underlying facts as the Direct Purchaser Plaintiffs' complaint,

notwithstanding some (generally minor) factual distinctions, and as to be expected, authored in a

different drafting style.  Both pleadings set forth factual allegations concerning the Defendants'

alleged conspiracy to decrease the supply of eggs and thereby increase egg prices, the

Defendants' conduct undertaken in relation thereto, and the nature of the egg industry in terms of

structure, production practices, and market dynamics.  *See* Sept. 26, 2011 Mem. and Order, 2011

WL 4465355, at *1-3 (describing the Direct Purchaser Plaintiffs 'core allegations).  Although the

---

[5]  The Court is separately addressing the Defendants' other pending motions to dismiss relating to the IPSAC.

[6]  Except when distinctions are necessary for clarity, the general use of the term "eggs" and "egg" in this Opinion will be consistent with the IPSAC's definition, *i.e.*, "eggs" is inclusive of "shell eggs" and "egg products."

3

two pleadings have much in common, they are nonetheless separate and distinct complaints, and the Court briefly outlines the IPSAC's main allegations as follows.

Plaintiffs—to wit, 23 individuals and three corporations—bring this action on behalf of themselves individually and as class actions on behalf of other similarly situated indirect purchasers. These individual named Plaintiffs are residents of, or incorporated in, Arizona, California, the District of Columbia, Florida, Kansas, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Mexico, New York, North Carolina, Tennessee, Utah, Vermont, West Virginia, or Wisconsin. IPSAC ¶¶ 19-44. They each purportedly "indirectly purchased shell eggs and/or egg products during the Class Period" and suffered economic injury by paying "supra-competitive prices for shell eggs and egg products" as a result of the Defendants' alleged violations of federal and state law. *Id.* ¶¶ 8, 19-44.

Plaintiffs request federal injunctive relief pursuant to Section 16 of the Clayton Act on behalf of themselves and a nationwide class. As to the state law claims, Plaintiffs, individually and on behalf of members of the proposed classes,[7] seek a variety of remedies, including, *inter alia*, damages, restitution, and disgorgement.

As alleged, the Plaintiffs' federal and state claims are based upon the Defendants' conduct relating to

> a long-running conspiracy between and among Defendants and certain unnamed co-conspirators extending from at least January 1, 2000 through the present . . . with the purpose and effect of fixing, raising, and maintaining and/or stabilizing prices and restricting output of both shell eggs and egg products (collectively,

---

[7] The members of these proposed classes, individuals and entities, are defined by their state of residency with respect to each of the 22 state jurisdictions at issue and who "indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds during the Class Period." *Id.* ¶¶ 108.

"eggs") sold indirectly to Plaintiffs and other indirect purchasers in the United States, including the Class Jurisdictions.

IPSAC ¶ 1; *see also id.* ¶¶ 6, 140.  Defendants supposedly took "coordinated efforts" to advance the aims of the conspiracy.  *Id.* ¶ 7.  According to Plaintiffs, coordination among Defendants was facilitated by the trade group Defendants, United Egg Producers ("UEP"), United Egg Association ("UEA"), and United States Egg Marketers ("USEM"); most of the other named Defendants are allegedly members of some of these groups.  *See, e.g., id.* ¶¶ 49, 51, 137, 255, 286.  Many of the Defendants' decisions, discussions, and agreements concerning various aspects of the conspiracy apparently occurred at, or are connected to, these trade groups' committee and member meetings, and were communicated to Defendants through UEP's newsletter.  *See, e.g., id.* ¶¶ 143-47, 152-156, 158-167, 170, 173-76, 192-209, 212-17.

The Defendants' "coordinated efforts" allegedly were mechanisms to reduce the supply of eggs in terms of either egg production or availability in the egg market.  By reducing the supply of eggs, Defendants apparently sought to manipulate certain features of the domestic egg market as a means of increasing egg prices.  Those market features include the price inelasticity of demand for eggs, the lack of product substitutes for eggs, minimal product differentiation among eggs, and industry consolidation.  *Id.* ¶¶ 2, 127-31.  Because of these market features—and more particularly, the inelasticity of demand—"small reductions in supply can lead to sharp increases in egg prices."  *Id.* ¶ 2.

The specific "coordinated efforts" undertaken throughout the alleged conspiracy period entailed various flock reduction, chick hatch reduction, molting, and hen disposal initiatives, as

well as the adoption of and compliance with the United Egg Producers Certification Program and the United States Egg Marketers export program. *See, e.g.*, *id.* ¶¶ 6, 170, 219, 293.

The UEP Certification Program originated as an "animal husbandry program" that mandated lower cage space densities for hens, but evolved into a program whereby egg producers would comply with the Program's guidelines in order to be able to sell or market eggs with a logo indicating that the eggs were certified under the Program. *See*, *e.g., id.* ¶¶ 158, 160, 224, 298. The IPSAC alleges that initially

> [c]ertification required a producer to (a) meet [a] cage space allowance . . . [of an] average of 56 square inches per hen . . . ; (b) commit to meeting the guideline for beak trimming . . . ; (c) commit to meeting the guidelines for molting . . . ; (d) commit to meeting the guidelines for handling and transportation for both pullets and spent hens . . . ; (e) agree to be audited annually by a 3rd party independent auditor to confirm that the company is meeting guidelines; (f) agree to provide UEP with a copy of the audit results upon the completion of each audit; and (g) recognize that passing the audit is necessary in order to maintain the certification status.

*Id.* ¶ 159. The Certification Program's guidelines also required (or eventually came to require): reduction in chick hatch, 100% of an egg producers' egg production be in compliance with the guidelines, and a prohibition on the practice of "backfilling cages to replace mortality." *See, e.g., id.* ¶¶ 174-75, 202, 295.

The USEM export program "aimed to have its members export shell eggs even when the export prices were lower than domestic egg prices" with the alleged purpose of "raising domestic U.S. prices through reduced supply." *Id.* ¶ 240. One central feature of the export program was that "USEM members that did not provide eggs for the export would agree to 'repay' or 'reimburse' the USEM members that provided eggs for the export in order to 'share' any losses incurred when exporting shell eggs at below-market prices." *Id.* ¶ 243.

6

As described in the IPSAC, the Defendants' "coordinated efforts" enabled Defendants to realize the ultimate objectives of their conspiracy: decreased egg supply, and thus higher egg prices and greater revenues and profits. *See, e.g.*, *id.* ¶¶ 150, 181-83, 247, 312, 323.

## IV.  Legal Standards[8]

### A.  Rule 12(b)(6)

For purposes of this Rule 12(b)(6) motion, the Court must accept as true all well-pleaded allegations in the complaint and must construe the pleading in the light most favorable to the Plaintiffs. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). Of course, pursuant to Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief," providing the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (citation omitted).  This

---

[8]  The Court's jurisdiction over the Plaintiffs' state law claims is predicated on the diversity of the parties and supplemental jurisdiction. *See* 28 U.S.C. §§ 1332, 1367.  In such circumstances the Court is "required to apply the substantive law of the state whose law governs the action." *Spence v. ESAB Group, Inc.*, 623 F.3d 212, 217 (3d Cir. 2010) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

Yet many of the parties' arguments concerning the Motion at bar "put in mind of the concept of 'general' common law that prevailed in the era of *Swift v. Tyson*.  The assumption is that the common law of the 50 states and the District of Columbia . . . is basically uniform and can be abstracted in a single [encapsulation of 'law']." *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995).  Tempting as that potential shortcut might be in the face of such a significant task as presented by the Motion at hand, the Court simply cannot accept such notions.

The purpose of the *Erie* doctrine and "the intent of that decision was to insure that . . . the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 109 (1945).  Accordingly, the Court adheres to *Erie*'s guidance in evaluating the Defendants' Motion and exhorts the parties to do likewise as this litigation proceeds.

standard "does not require 'detailed factual allegations,'" but a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).  Consistent with Rule 12(b)(6), the Court may consider the allegations contained in the complaint, exhibits attached to the complaint, matters of public record and records of which the Court may take judicial notice.  *See Tellabs, Inc. v. Makor Issues & Rts.*, 551 U.S. 308, 322 (2007); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

A complaint need allege "only enough facts to state a claim of relief that is plausible on its face" so as to test whether "plaintiffs . . . have . . . nudged their claims across the line from conceivable to plausible" to survive a Rule 12(b)(6) motion.  *Twombly*, 550 U.S. at 570.  Thus, a complaint is subject to dismissal when the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

## B.  Rule 9(b)

To determine whether a particular claim is subject to and meets the Rule 9(b) pleading standard, the Third Circuit Court of Appeals has held that "where the plaintiff grounds [her] claims in allegations of fraud—and the claims thus 'sound in fraud'—the heightened pleading requirements of Rule 9(b) apply." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006); *see also Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 161-62 (3d Cir. 2004).  Conversely, "claims . . .  that do not sound in fraud are not held to the heightened pleading requirements of Fed. R. Civ. P. 9 (b)."  *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.5 (3d Cir. 2004) (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992)).

However, there is no requirement that fraud or mistake be a necessary element of a *prima facie* claim in order for Rule 9(b) to apply.  *See Chubb*, 394 F.3d at 161 (discussing this law with respect to a section 11 Securities Act claim); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct.  *In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim*. *In that event*, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." (emphasis added)).

The Third Circuit Court of Appeals illustrated the application of this standard in the context of an antitrust claim in *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004), *abrogation on other grounds recognized by In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.22 (3d Cir. 2010).  There, the Court of Appeals recognized that "antitrust claims generally are not subject to the heightened pleading requirement of Rule 9(b)," but that Rule 9(b) applies when "[f]raud is the basis for the antitrust violation alleged."  *Id.* at 220.  In *Lum*, the plaintiffs claimed that the defendant banks "allegedly violated the Sherman Act by agreeing to misrepresent the 'prime rate' [as] the lowest rate available to their most creditworthy borrowers, when in fact" other lower rates below the prime rate were offered to certain other borrowers, and by allegedly giving "false information about their 'prime rate' both to consumers who were seeking credit and to leading financial publications."  *Id.* at 220.  According to the plaintiffs, such alleged fraudulent conduct inflated the prime rate, and thereby resulted in the plaintiffs "being charged higher interest."  *Id.*  The Court of Appeals determined that the "antitrust claim is . . . based on

9

fraud—on misrepresentations in the information given to consumers and on misrepresentations in the information given to . . . independent financial publications," *id.* at 220, and "[b]ecause plaintiffs allege that the defendants accomplished the goal of their conspiracy through fraud, the Amended Complaint is subject to Rule 9(b)." *Id.* at 228; *see also Insur. Brokerage*, 618 F.3d at 347-48 (reaffirming the *Lum* rationale concerning the application of Rule 9(b) in an antitrust case).

To satisfy the Rule 9(b) pleading requirements, a complaint may either describe "the circumstances of the alleged fraud with precise allegations of date, time, or place" or may use "some [other] means of injecting precision and some measure of substantiation into their allegations of fraud." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 n.10 (3d Cir. 2002) (citation omitted) (internal quotation marks omitted); *see also Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998), *abrogation on other grounds recognized by Forbes v. Eagleson*, 228 F.3d 471, 483-84 (2000); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984). At the very least, "[p]laintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Lum*, 361 F.3d at 224. This pleading standard not only gives defendants notice of the claims against them, but also combats "frivolous suits brought solely to extract settlements" from defendants and "provides an increased measure of protection for their reputations." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

While a significant purpose of Rule 9(b) is to provide notice of the precise misconduct at issue, courts "should . . . apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Rolo*, 155 F.3d at 658.

Accordingly, the particularity rule is somewhat relaxed when key factual information remains within the defendant's control. *Burlington Coat*, 114 F.3d at 1418. "Relaxation," however, does not translate into, or otherwise authorize, boilerplate and conclusory allegations, and plaintiffs "must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Id.* Allegations "based upon information and belief" are permissible, "but only if the pleading sets forth specific facts upon which the belief is reasonably based." *Hollander v. Ortho-McNeil-Janssen Pharm., Inc.*, No. 10-cv-0836-RB, 2010 WL 4159265, at *4 (E.D. Pa. Oct. 21, 2010) (citation and internal quotation marks omitted); *see also Weiner v. Quaker Oats Co.*, 129 F.3d 310, 319 (3d Cir. 1997) ("[A] boilerplate allegation that plaintiffs believe the necessary information 'lies in defendants' exclusive control,' if made, must be accompanied by a statement of facts upon which their allegation is based." (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1992) (internal quotation marks omitted)); *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (determining that in cases of corporate fraud, "even under a non-restrictive application of [Rule 9(b)], pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based"). In other words, even a "relaxed fit" requires some tailoring.

Likewise, Rule 8 continues to apply even when under Rule 9(b) "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). For purposes of its meaningful presence in Rule 9(b) the word "'generally' is a relative term" and "it is to be compared to the particularity requirement applicable to fraud or mistake." *Iqbal*, 129 S. Ct. at 1954. By way of example, "Rule 9 merely excuses a party from pleading

discriminatory intent under an elevated pleading standard.  It does not give him license to evade

the less rigid—though still operative—strictures of Rule 8." *Id.*; *cf. Burlington Coat*, 114 F.3d at

1418 ("[P]laintiffs must still allege facts that show the court their basis for inferring that the

defendants acted with 'scienter.'"); *United States ex rel. Pilecki-Simko v. Chubb Instit.*, No. 10-

3907, 2011 WL 3890975, at *3 (3d Cir. Sept. 6, 2011) (unpublished) (recognizing that under

*Iqbal* "Rule 8 does not empower respondent to plead the bare elements of his cause of action,

affix the label 'general allegation,' and expect his complaint to survive a motion to dismiss."

(quoting *Iqbal*, 129 S. Ct. at 1954)).[9]

## V.  Legal Discussion[10]

### A.  Article III Standing as to Four State Antitrust Claims

Defendants contend that the 26 named Plaintiffs have no standing, as would be demanded

by Article III of the Constitution, to pursue antitrust claims under the laws of Iowa, Mississippi,

North Dakota, and South Dakota.  Specifically, Defendants argue that Plaintiffs have failed to

allege an injury that would provide a basis for constitutional standing to bring claims under those

four states' antitrust laws.  The defense argument is that the named Plaintiffs have "failed to

---

[9]  Although it appears that Rule 9(b) is generous in permitting a generalized pleading in
this regard, one treatise has noted that this sentence "suggests that the [Rule's] draftsmen felt a
need to qualify the first sentence to insure that it was not interpreted to require a party pleading
fraud or mistake to allege the specific circumstances of fraudulent intent, knowledge of the
falsity of a statement, or mistaken belief in its truth."  5A Charles Alan Wright & Arthur R.
Miller, *Federal Practice and Procedure* § 1301.

[10]  Before proceeding further on this Motion, the Court is compelled to comment upon the
parties' approach to articulating and supporting their arguments.  In many respects, the parties'
respective work is indeed impressive.  However, at other times, the parties' work product
contained deficiencies ranging from a dearth of meaningful (indeed, sometimes even unreliable)
citation to legal authority, erroneous characterizations of the opposing parties' arguments (or
worse, ignoring those arguments or failing to comprehend and directly address their substance),

show that they suffered any injury entitling them to bring the[] claims" because no named Plaintiffs are alleged to reside, or to have purchased eggs, *in* those four states.  Defs.' Mot. at 5.

Plaintiffs retort that the "named [class] representatives meet normal standing requirements," and that "each of the named Plaintiffs has been injured in the same way by the same conduct that has injured other members of the proposed classes." Pls.' Resp. at 56-57 & n.39.  Thus, the Plaintiffs' argument is that because Defendants have not objected to the named Plaintiffs' standing to pursue the IPSAC's federal antitrust claim and other state claims, and given that "each Plaintiff has standing to pursue an action under federal antitrust law and the laws of several states, there is no longer a question of the court having subject matter jurisdiction over the claims asserted by Plaintiffs on the basis of the facts alleged." *Id.* at 56, 58.  Plaintiffs claim that "[i]f a named plaintiff who has standing can, under Rule 23's criteria, represent the interests of out of state class members, then once the class is certified, a plaintiff from each state will be present and 'standing' will be established." *Id.* at 57.   Plaintiffs contend that this reasoning leads to the conclusion that at the motion to dismiss stage "it is not necessary that there be named plaintiffs in each state for which damages are sought." *Id.* at 59.

---

and complete omission of legal analysis.  In some respects this has led to additional challenges for the Court to try to evaluate the efficacy of the arguments.  Certainly that effort has been made more time consuming as a result—albeit, there was never quite a need to resort to soliciting all of the queen's horses and all of the queen's men to piece the parties' arguments together.  Such advocacy is, fortunately, uncharacteristic of the fine professionals who have, to date, appeared in this case.

At times, the press of business can make consistently high level performance extremely difficult.  The Court urges the litigators involved in this case to rededicate themselves to presenting their clients' positions in the most compelling light appropriate whenever possible and to have the well-earned and deserved confidence to forego arguments put forth merely for arguments' sake.

Plaintiffs characterize the defense arguments as raising "what are really [class] certification issues in the guise of standing at this point in the litigation," *id.* at 57, particularly the adequacy of an out-of-state named Plaintiff to serve as class representative as to a particular state claim, *id.* at 56 n.39; Tr. at 91:15-21.  They assert that consideration of such issues should be deferred until the class certification stage of this litigation on the grounds that the issues are "premature because class certification issues are 'logically antecedent' to questions about standing in that . . . the 'standing' asserted by Defendants would not exist but for Plaintiffs' asserting claims on behalf of a class."  Pls.' Resp. at 56-57.

Despite the divergent positions, amid the parties' arguments there is an apparent consensus that the Court may consider the standing of the *named Plaintiffs* at this time.  Indeed, Defendants make this assertion outright, whereas embedded in the Plaintiffs' arguments is the contention that named Plaintiffs have standing to bring the four states' antitrust claims at this time and have alleged that they have suffered an injury.  But, to the extent that Plaintiffs invoke "logically antecedent" language and charge that Defendants are actually raising questions as to the named Plaintiffs' adequacy as class representatives, they obfuscate the narrower issue raised by Defendants' motion, namely, whether the named Plaintiffs have alleged facts that plausibly demonstrate injury-in-fact sufficient to confer upon them individual Article III standing to bring antitrust claims under the laws of Iowa, Mississippi, North Dakota, and South Dakota.[11]  As to

---

[11]   Because the singular issue at bar is the named Plaintiffs' individual Article III standing to bring the antitrust claims under the laws of Iowa, Mississippi, North Dakota, and South Dakota, the issue presented does not arise as a result of, or invoke, issues relating to class certification or implicate the standing of proposed class members. Certainly, sometimes the factors and facts considered during a class certification inquiry overlap with Article III standing, but nonetheless Article III standing is analytically and conceptually distinct from those other matters. *See generally* Wright & Miller, *supra*, §1785.1 ("[B]oth standing and mootness also

14

this actual issue presented as explained *infra*, the Court concludes that the named Plaintiffs have

Article III standing to pursue causes of action under the four states' antitrust laws.

_____

frequently appear as threshold requirements for the maintenance of federal class actions and must be considered in addition to the requirements of Rule 23 when deciding whether a particular action may be certified.  It is important when considering the applicability of these two doctrines to class actions to keep in mind that these concepts serve both constitutional and prudential concerns:  they ensure that a justiciable or live issue is presented, thereby satisfying the Article III requirement that federal courts only entertain cases or controversies, and they seek to ascertain whether the person asserting the claim is sufficiently interested so that full litigation of the issues involved can be assumed. Notably, this latter concern also is addressed through the Rule 23 requirements that the class representative be a member of the class, and be an adequate representative for the class." (footnotes omitted)).

There is long-standing precedent to the effect that when a "class action" is introduced into the standing equation, the requirement that a named plaintiff must have standing to bring it is unaltered.  Insofar that a case "may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40, n. 20 (1976)). Simply put, "one cannot acquire individual standing by virtue of bringing a class action." *See* 1 A. Conte & H. Newberg, *Class Actions* § 2:5 (4th ed. 2002).

Accordingly, there is no reason to defer consideration of the particular Article III standing issue raised by Defendants until class certification.  The succinct conclusion in *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 534 (E.D. Pa. 2010), is also applicable here:  "Named plaintiffs must have case or controversy standing; the potential standing problem in this case is not created by class certification. Therefore class certification is not logically antecedent to the standing problem."  Other courts similarly have held that when the issue presented in a motion to dismiss concerns solely whether the named plaintiffs have standing to assert class action claims, the named plaintiffs' standing is a threshold issue, and there is no reason to defer the named plaintiffs' standing determination until class certification.  *See, e.g., In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 153-55 (E.D. Pa. 2009); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 211 (E.D. Pa. 2009) (hereinafter "*SMW*"); *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *10 (D.N.J. 2011); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 656 (E.D. Mich. 2011).

This Court agrees with the legal analysis articulated in *Flonase* and those other courts' decisions as to these issues involving named plaintiffs' standing, and determines that the rationale advanced by those courts is applicable to this case.  In short, the Court concludes that it is not required to defer an Article III standing inquiry as to the named Plaintiffs.

1. Requirements for Article III Standing

Generally, Article III standing is a threshold issue for any case, including class actions. *See Warth v. Seldin*, 422 U.S. 490, 498 (1975); *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 606 (3d Cir. 2010). Article III, § 2, of the Constitution limits the federal judicial power to the adjudication of "Cases" and "Controversies." "Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed." *Berg v. Obama*, 586 F.3d 234, 242 (3d Cir. 2009) (internal quotation marks omitted). Moreover, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006). Standing as to one claim is simply not "communicative" across other separate claims for relief. *Id.*[12]

The "irreducible constitutional minimum" of Article III standing entails three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Those constitutional standing requirements are: "(1) an 'injury in fact'; (2) 'a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court'; and (3) a showing that it 'be likely, as opposed to merely speculative, that the injury will be

---

[12] Generally, the Third Circuit Court of Appeals considers motions to dismiss for lack of standing as Rule 12(b)(1) motions. *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). Defendants here have classified their motion as one to dismiss for failure to state a claim under Rule 12(b)(6). Plaintiffs agree with this standard of review. The Court is willing to accept the categorization of the instant challenge as a Rule 12(b)(6) motion, recognizing that it could also be evaluated as a Rule 12(b)(1) claim. The difference between Rule 12(b)(1) and Rule 12(b)(6) does not change the analysis or the outcome. *See Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73 (3d Cir. 2011) (noting that "[a] dismissal for lack of statutory standing is effectively the same as a dismissal for failure to state a claim").

redressed by a favorable decision.'"  *N.J. Physicians, Inc. v. President of United States*, 653 F.3d 234, 238 (3d Cir. 2011) (quoting *Lujan*, 504 U.S. at 560-61).

Of these three elements, Defendants here place only the injury-in-fact element at issue. The Third Circuit Court of Appeals has articulated the nature of an injury that is sufficient to confer Article III standing:

> To establish injury in fact, a plaintiff must allege an injury that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not conjectural or hypothetical.' Each of these definitional strands imposes unique constitutional requirements. An injury is "concrete" if it is "real,", or "distinct and palpable, as opposed to merely abstract," while an injury is sufficiently "particularized" if it "affect[s] the plaintiff in a personal and individual way."  The second requirement—"actual or imminent, not conjectural or hypothetical"—makes plain that if a harm is not presently or "actual[ly]" occurring, the alleged future injury must be sufficiently "imminent." Imminence is "somewhat elastic," but requires, at the very least, that the plaintiffs "demonstrate a realistic danger of sustaining a direct injury." In other words, there must be a realistic chance—or a genuine probability—that a future injury will occur in order for that injury to be sufficiently imminent.

*Id.* at 238 (citations omitted).

The consideration of the injury-in-fact element bears particular significance because the nature of a party's injury "is relevant to the determination of whether she has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues.'" *Davis v. Passman*, 442 U.S. 228 (1979) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)); *see also Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 138 (3d Cir. 2009) ("While all three of these elements are constitutionally mandated, the injury-in-fact element is often determinative.").  "To meet the standing requirements of Article III, '[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'  For our purposes, the italicized words

17

in this quotation . . . are the key ones.  [This Court] ha[s] consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Raines*, 521 U.S. at 818-19 (citations omitted). Accordingly, the Court's attention must turn to the named Plaintiffs to ask whether they have a personal stake sufficient to confer Article III standing based upon "their specific allegations and the relief which they seek."  *Goode v. City of Phila.*, 539 F.3d 311, 316 (3d Cir. 2008) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)).

2.  Named Plaintiffs' Article III Standing

Defendants argue that all named Plaintiffs in this case lack Article III standing to pursue the four states' antitrust claims "because they do not and cannot allege to have been injured under the laws of these jurisdictions."  Defs.' Mot. at 5.  As a fundamental premise of their argument, Defendants claim that "each of the relevant states requires at least some part of the alleged injury to have occurred in that particular state," *id.* at 6, and Defendants further posit that meeting this in-state injury requirement can only be accomplished either by an allegation that named Plaintiffs are residents of, or actually purchased eggs in, those states.  Here, the IPSAC does neither.

While the Defendants' Motion only asks the Court to decide whether the named Plaintiffs have Article III standing as to the four specific state antitrust claims, their argument—by invoking elements of those claims and arguing that those elements impose certain in-state requirements as to injury—is pecking at similar, but conceptually distinct, questions.  These questions ask whether Plaintiffs have a right to maintain a private enforcement action under the states' statutes, and whether the Plaintiffs have a cause of action—which, by way of example, may ask more specifically whether the alleged injury is legally and judicially cognizable.  These

18

inquiries go to issues of whether the states' statutes authorize these named Plaintiffs to sue,

issues which are sometimes cloaked in terms such as "statutory standing" or "antitrust standing,"

and question whether the scope of the rights of action under the four states' antitrust statutes

include the Plaintiffs' alleged injury.

The Supreme Court has drawn some distinctions among these concepts.  In one opinion,

the Court defined "standing" and "cause of action" as follows:

> *standing* is a question of whether a plaintiff is sufficiently advers[e] to a defendant
> to create an Art[icle] III case or controversy, or at least to overcome prudential
> limitations on federal-court jurisdiction; *cause of action* is a question of whether a
> particular plaintiff is a member of the class of litigants that may, as a matter of
> law, appropriately invoke the power of the court . . . .

*Davis*, 442 U.S. at 239 n.18 (citation omitted).  The Court has generally described an issue of

"statutory standing" as involving whether a plaintiff comes "within the 'zone of interests'" for

which the cause of action was available."  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S.

83, 97 (1998) (citing *Nat'l R.R. Passenger Corp. v. Nat'l Assn. of R.R. Passengers*, 414 U.S. 453,

465 n.13 (1974)).[13]  The Court has further clarified that "the merits inquiry [such as whether a

private right of enforcement exists] and the statutory standing inquiry often 'overlap,'" and that

the "question whether *this* plaintiff has a cause of action under the statute, and the question

whether *any* plaintiff has a cause of action under the statute are closely connected—indeed,

depending upon the asserted basis for lack of statutory standing, they are sometimes identical, so

---

[13] *Accord Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 307 (3d Cir. Dec. 20, 2011) (en banc) (observing that "statutory standing" can be understood as "simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place"  (quotations omitted)).

that it would be exceedingly artificial to draw a distinction between the two." *Id.* 97 n.2 (citation

omitted).   Nonetheless, questions of Article III standing are distinguishable from both concepts.

Indeed, it is necessary for the Court to distinguish Article III standing  issues from

"statutory standing"  and cause of action issues because "the question whether a plaintiff states a

claim for relief 'goes to the merits' in the typical case, not the justiciability of a dispute,  and

conflation of the two concepts can cause confusion." *Bond v. United States*, 131 S. Ct. 2355,

2362 (2011) (citation omitted); *cf. Sullivan*, 667 F.3d at  307 & n.35 ("Statutory standing [*i.e.*,

"the possession of a viable claim or right to relief, not to a jurisdictional requirement,"] is distinct

from jurisdictional standing in that 'Article III standing is required to establish a justiciable case

or controversy within the jurisdiction of the federal courts,' whereas 'lack of antitrust standing

affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the

court.'" (quoting *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008)); *id.* at 349

n.15 (Jordan, J., dissenting) ("Whether a party has standing under Article III is a distinct inquiry

from whether the party may assert a cause of action under state or federal law. . . .  [T]he

Supreme Court made clear that a party may have standing under Article III, but fail to assert a

cause of action under state law.").

The Supreme Court's analysis continues:

> It is firmly established in our cases that the absence of a valid (as opposed to
> arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the
> courts' statutory or constitutional power to adjudicate the case. . . .
> '[J]urisdiction . . . is not defeated . . . by the possibility that the averments might
> fail to state a cause of action on which petitioners could actually recover.'  Rather,
> the district court has jurisdiction if "the right of the petitioners to recover under
> their complaint will be sustained if the Constitution and laws of the United States
> are given one construction and will be defeated if they are given another," unless

the claim "clearly appears to be immaterial and made solely for the purpose of
obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."

*Steel Co.*, 523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 678, 682, 685 (1946) (citations

omitted)).  The Supreme Court has "criticized the implications of treating the validity of a cause

of action as jurisdictional. . . . Under that approach, each element of every cause of action would

have a legitimate claim to being a jurisdictional requirement—essentially eviscerating the

distinction between the jurisdictional and merits inquiry (and requiring a court to dismiss a claim

for lack of jurisdiction whenever the plaintiff does not prevail)."  *Nesbit v. Gears Unlimited, Inc.*,

347 F.3d 72, 80 (3d Cir. 2003) (citation omitted) (discussing *Steel Co.,* 523 U.S. 83).  An

exception arises when a claim is "so insubstantial, implausible, foreclosed by prior decisions of

this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel

Co.,* 523 U.S. 83 (internal quotation marks omitted); *see also Nesbit*, 347 F.3d at 80.

Thus, even if Defendants are correct that the four states' statutes require an intrastate

injury—either due to in-state residency or in-state purchase of eggs—such an argument is beside

the point.  An *Article III* standing inquiry simply does not require considering the elements of a

state claim as "jurisdictional prerequisites."  To inject the condition that Plaintiffs must satisfy

certain elements of the state antitrust claims into a constitutional standing analysis would result

in an impermissible out-of-the-box merits inquiry.  "[T]he Article III requirement of remediable

injury in fact . . . (except with regard to entirely frivolous claims) has nothing to do with the text

of the statute relied upon." *Steel Co.*, 523 U.S. at 97 n.2.[14]

---

[14]  *Cf.* 2 Moore et al., *Federal Practice* § 12.30 (3d ed. 2011) ("Whether a statutory
provision that establishes a threshold for relief is jurisdictional or goes to the merits determines
whether a failure to comply with the provision is grounds for dismissal (at any time in the
litigation) under Rule 12(b)(1), or whether a failure to meet the threshold is merely a basis for

As it happens, the Article III constitutional standing criterion is met here as to the four states' antitrust claims.  The IPSAC alleges that the named Plaintiffs paid artificially inflated prices for eggs because of the Defendants' conspiracy.[15]  That is, the named Plaintiffs allegedly personally purchased eggs at artificially inflated prices—a monetary injury—which constitutes actual harm.  *Cf. Associated Gen. Contractors of Calif. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine.  Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact . . . .").  After all, "[m]onetary harm is a classic form of injury in fact.  Indeed, it is often assumed without discussion."  *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) (citation omitted).  Furthermore, this injury purportedly was caused by the Defendants' alleged conspiratorial conduct which named Plaintiffs complain violated the four states' laws.

This injury can be redressed, if granted, by the relief sought by named Plaintiffs, which includes, *inter alia*, monetary damages to compensate for their financial harm as a result of

---

summary judgment or for dismissal for failure to state a claim under Rule 12(b)(6), matters that are subject to very different procedural rules and limits. Under the "bright line" rule of *Arbaugh v. Y & H Corp.*, [federal] statutory threshold requirements should not be treated as jurisdictional unless Congress has clearly stated that they are.").

[15] *See, e.g.*, IPSAC ¶ 8 ("Plaintiffs . . . have been forced to pay supra-competitive prices for shell eggs and egg products and, thus, as a result of Defendants' illegal actions, have suffered antitrust injury."); *id.* ¶ 18 ("[E]ach Plaintiff purchased shell eggs and/or egg products in the state in which they reside or conduct business and suffered an economic injury as a result of Defendants' illegal conduct described in this Complaint."); *id.* ¶¶ 359, 411, 476, 490 ("As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff[s] . . . have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs and egg products.").

conspiracy.  *See, e.g.,* IPSAC ¶¶ 9, C, D, E (describing relief requested).[16]  *Cf. D.R. Ward Constr.*

*Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 492-93  (E.D. Pa. 2006) (finding that

constitutional standing to bring certain state antitrust claims was met because "Plaintiffs allege

that they paid inflated prices for products with plastics additives due to an overcharge on plastics

additives which was passed on to them from the intervening links within the distribution chain,

that plaintiffs' overpayment for products containing plastic additives was caused by the

conspiracy among defendants to charge inflated prices for plastics additives, and that judicial

relief will compensate plaintiffs for these injuries, restoring plaintiffs to the position they were in

prior to the price-fixing scheme").[17]

---

[16]  Furthermore, such relief is afforded in private enforcement actions brought under the four statutes.  *See* Iowa Code § 553.12 (". . . may bring suit to . . . 2.  Recover actual damages . . ."); Miss. Code Ann. § 75-21-9  (" . . . may recover all damages of every kind sustained by him or it . . ."); N.D. Cent. Code § 51-08.1-08 (". . .  may bring an action for . . . damages sustained . . ."); S.D. Codified Laws § 37-1-14.3 (". . . may bring an action for . . . damages sustained . . .").

[17]  To the extent that named Plaintiffs seek the redress of injunctive relief in relation to any of their federal or state claims, it is less clear from the IPSAC's allegations whether those Plaintiffs have Article III standing for such relief.  Article III standing is to be considered in light of the specific allegations and the relief sought, which with respect to injunctive relief requires consideration of whether a plaintiff is "likely to suffer future injury."  *Lyons*, 461 U.S. at 102; *see also Penn. Prison Soc. v. Cortes*, 508 F.3d 156, 165- 68 (3d Cir. 2007) (discussing case law concerning injury-in-fact and likelihood of facing personal injury); *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 924-35 (D.N.J. 2010) (dismissing for lack of Article III standing the portion of a California Unfair Competition Law claim seeking injunctive relief because plaintiff had cancelled her health insurance policy and thus "no longer face[d] a threat of continued harm with regard to [Defendant's] disclosures about the . . . policy").  The IPSAC does not explicitly allege facts that named Plaintiffs face the prospect of future injury, and the IPSAC only alleges that the named Plaintiffs suffered past harm.  *See, e.g.*, IPSAC ¶ 19 ("This Plaintiff indirectly purchas*ed* shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct." (emphasis added)).  Thus, if Plaintiffs seek leave to amend the IPSAC, clarifying amendments may be appropriate with respect to Article III standing for injunctive relief.

Moreover, the named Plaintiffs' four state antitrust claims at issue here are not wholly immaterial, frivolous, or devoid of merit for purposes of constitutional standing. The defense argument that the named Plaintiffs lack injury sufficient to confer standing is contingent upon the claim that the four states' laws do not allow named Plaintiffs to recover for their alleged injuries arising from the Defendants' alleged conspiratorial conduct. Defendants argue that "each of the relevant states requires at least some part of the alleged injury to have occurred in that particular state," and Defendants cite to certain statutory language and one case in support of their construction of the laws. *See* Defs.' Mot. at 6 & n.3.

However, on their faces the four states' statutory provisions can plainly be construed to not require in-state residency or an in-state purchase, but rather only that some of the Defendants' conduct occurred, or the effects of which were felt, within the state—thereby violating the statute.[18] Indeed, when read literally, the language of these respective provisions authorizes

---

[18] Not only the federal courts embrace the plain meaning rule of statutory construction, but so, too, do the appellate courts of the states here concerned. *See Murphy v. Millennium Radio Group, LLC.*, 650 F.3d 295, 302 (3d Cir. 2011) ("'Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute. . . . When the statute's language is plain, the sole function of the courts—at least where the disposition required by the test is not absurd—is to enforce it according to its terms.'") (quoting *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009)); *Boehme v. Fareway Stores, Inc.*, 762 N.W.2d 142, 146 (Iowa 2009) ("'When the language of a statute is plain and its meaning clear, the rules of statutory construction do not permit us to search for meaning beyond the statute's express terms.'" (quoting *Rock v. Warhank*, 757 N.W.2d 670, 673 (Iowa 2008)); *Buckel v. Chaney*, 47 So.3d 148, 158 (Miss. 2010) ("'The most fundamental rule of statutory construction is the plain meaning rule, which provides that if a statute is not ambiguous, then this Court must apply the statute according to its terms.'" (quoting *State* ex rel. *Hood v. Madison Cnty. Bd. of Supervisors*, 873 So. 2d 85, 90 (Miss. 2004)); *State v. Woodrow*, 803 N.W.2d 572, 575 (N.D. 2011) ("Words in a statute are given their plain, ordinary, and commonly understood meaning, unless they are defined by statute or unless a contrary intention plainly appears." (citing N.D. Cent. Code § 1-02-02)); *Chapman v. Chapman*, 713 N.W.2d 572, 576 (S.D. 2006) ("'We give words their plain meaning and effect, and read statutes as a whole, as well as enactments relating

broad private enforcement, and thereby can be read to afford relief to all persons whose injuries may have occurred outside of the state, but are causally related to an antitrust violation. As to these four statutes, Defendants fail to discount the existence of possible constructions of those statutes other than their own. They cite no legal authority to support their construction of the statutes, nor do they point to legal authority foreclosing alternative interpretations of those states' laws.

For example, under the Iowa Competition Law, "[t]he state or a person who is injured or threatened with injury by conduct prohibited under this chapter may bring suit" for various specified forms of relief. Iowa Code § 553.12. Such prohibited conduct includes a "contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market." *Id.* § 553.4. These provisions can be read to permit a broad class of persons to maintain a civil enforcement action so long as they suffer an injury resulting from a violation of the law. Upon an unadorned reading of the Competition Law, and contrary to the Defendants' position, a cognizable injury under the statute does not appear to be exclusively restricted to injuries of residents, or injuries sustained intrastate.

The North Dakota Antitrust Act contains similarly broad language: "[a] person threatened with injury or injured in that person's business or property by a violation of this chapter may bring an action for appropriate injunctive or other equitable relief, [and] damages sustained." N.D. Cent. Code § 51-08.1-08(2). The Act prohibits "[a] contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market." *Id.* § 51-08.1-02. As with the Iowa Competition Law, a cognizable injury does

_____

to the same subject.'" (quoting *State v. Anderson*, 693 N.W.2d 675, 681 (S.D. 2005)).

not appear to be restricted to residents' injuries, or injuries experienced due to transactions occurring within North Dakota's borders.

South Dakota's antitrust law also grants a private right of action for a person injured by a violation of that antitrust provision and does not contain statutory language that explicitly requires an intrastate injury. Under that law, "[a] person injured in his business or property by a violation of this chapter may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees." *See* S.D. Codified Laws § 37-1-14.3.  The law also provides: "A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce *any part of which* is within this state is unlawful."  *Id.* § 37-1-3.1 (emphasis added).

Furthermore, as to these three states' antitrust laws, there is a dearth of interpretative authority with respect to whether and to what extent, if any, there is an "intrastate" requirement as to a presumptive plaintiff's injury in order for that injury to be cognizable.  With respect to the Iowa Competition Law specifically, one commentator notes that an "unusual feature of both Sections 4 and 5 of the Iowa Competition Law is their explicit reference to 'relevant market,' which is defined in Section 3 of the law to mean 'the geographical area of actual or potential competition in a line of commerce, all or any part of which is within this state.'  Neither the phrase 'potential competition' nor the phrase 'within this state' is statutorily defined or judicially interpreted as yet . . . . [T]he latter *may* be a basis for restricting state jurisdiction."  1 ABA

Section of Antitrust Law, *State Antitrust Practice and Statutes*, ch. 18-1, § 17.a. (4th ed. 2009) (emphasis added) (footnotes omitted).[19]

The Mississippi antitrust law states: "[a]ny person, natural or artificial, injured or damaged by a trust and combine as herein defined, or by its effects direct or indirect, may recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars ($500.00)." Miss. Code Ann. §75-21-9. The statute defines a "trust or combine," as "a combination, contract, understanding or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be . . . [t]o restrain trade." *Id.* §75-21-1. Like the other three previously discussed statutes, one

---

[19]   As to the South Dakota antitrust law, some federal courts have determined that in order to allege that a plaintiff is entitled to bring suit thereunder, it must be alleged that *either* a part of the conspiracy or the conspiracy's restraint of trade occurred within South Dakota. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 172 (D. Me. 2004) ("The statutory language is ambiguous as to whether it is a part of the conspiracy or a part of the trade or commerce that must be within the state. Nevertheless, it is logical to assume that the state intended its antitrust coverage to be as broad as possible. Therefore, I conclude that the plaintiffs need only allege that a part of the trade or commerce occurred within South Dakota."); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 581 (M.D. Pa. 2009) ("[A] plaintiff must allege only that defendant's conduct produced anticompetitive effects within South Dakota"); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 414 (D. Del. 2007) (following other courts' determinations that "allegations that part of the trade or commerce occurred within South Dakota were sufficient to bring the related conspiracy into the reach of South Dakota law"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1098 (N.D. Cal. 2007) (agreeing "that South Dakota's antitrust statute should be read to cover unlawful anticompetitive conduct, as long as any part of it 'is within [South Dakota]'—i.e., as long as any part of it takes place or has an effect within the state").

plausible construction of this Mississippi statutory language does not require that cognizable injury be limited to residents' injuries or injuries suffered within the state.[20]

In support of their construction of the Mississippi antitrust law, Defendants cite *In re Microsoft Corporation Antitrust Litigation*, No. MDL 1332, 2003 WL 22070561, at *1-2 (D. Md. Aug. 22, 2003), for the proposition that "under Mississippi law, following *Standard Oil Co. of Ky. v. State*, 65 So. 468, 471 (Miss. 1914), that in order for a claim to come within the scope of the Mississippi antitrust statute, a plaintiff must allege "at least some conduct . . . which was performed wholly intrastate." Defs.' Mot. at 6 n.3.  However, this lone legal authority fails to buttress the Defendants' proposed construction of the law.  As a starting point, the Defendants' characterization of *Microsoft* is erroneous.  Indeed, the ellipses in the quote stand in the place of the words "by Microsoft."  That is, the *Microsoft* Court determined that Mississippi requires some of the *defendant's* conduct offensive to the antitrust statute be "performed wholly intrastate."  Moreover, the decision simply does nothing to support the Defendants' contention as

---

[20]  For purposes of this analysis, the Court need not decide at this time whether the Mississippi statute is ambiguous or whether its plain meaning applies. (This is true for all four state antitrust statutes at issue for that matter).  However, one Mississippi court has noted that one statutory provision sets forth the legislative intent of the antitrust statute, which may have some bearing on the construction of the statute:

> Even if the [antitrust] statute was ambiguous, which it clearly is not [with respect to the Attorney General's enforcement of the law], the legislative intent of the act is clearly to 'suppress' all trust and monopolies.  Miss. Code Ann. § 75-21-39 (1972).  The Mississippi Code states "[the Mississippi Antitrust Act] shall be liberally construed in all courts to the end that trusts and combines may be suppressed, and the benefits arising from competition in business preserved to the people of this state."

*Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *4 (Miss. Ch. Jan. 17, 2006) (unpublished).

to the permissible scope of a presumptive plaintiff's injuries for recovery under the law. Whether a defendant's *conduct* need be "performed wholly intrastate" is an entirely distinct issue from whether a plaintiff's *injury* need to have occurred in-state—*i.e.*, where the *effect* of the conduct transpires.  Defendants raise no legal authority other than *Microsoft* to support their construction of the law.

In sum, it appears that there is an absence of definitive legal authority as to whether *vel non* an extraterritorial injury that might be traced to an antitrust violation is cognizable under the Iowa, Mississippi, North Dakota, and South Dakota antitrust statutes.  Either construction of those four laws is possible and neither can be said to be strained or without appropriate attribute. Indeed, some "[s]tate antitrust laws can extend to transactions involving interstate commerce" and "some state statutes, or judicial interpretations of those provisions may expressly address the extraterritorial effects of a state's antitrust law." 1 ABA Section of Antitrust Law, *Antitrust Law Developments*, 625 (6th ed. 2007).  Moreover, the existence of these statutory construction issues certainly suggests that the named Plaintiffs' claims pursuant to these states' antitrust laws cannot be deemed foreclosed by case law, or otherwise completely devoid of merit.  *See Nesbit*, 347 F.3d at 80 ("'[D]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" (quoting *Growth Horizons, Inc. v. Delaware Cnty.*, 983 F.2d 1277, 1280-81 (3d Cir.1993) (internal quotation marks omitted).  And, accordingly, the

Plaintiffs have Article III standing to bring these claims, and the Court denies the Defendants' motion in this respect.[21]

## B.  Utah Antitrust Claim[22]

The Court concludes that it is appropriate to dismiss the Plaintiffs' Utah antitrust claims arising from damages that occurred before May 1, 2006.  According to Defendants, May 1, 2006 is the effective date of an amendment to the Utah Antitrust Act—specifically to amend Utah Code Ann. § 76-10-918(1)—which authorized indirect purchasers to recover for violations of the Act.  Such statutory provisions are sometimes known in antitrust parlance as an "*Illinois Brick* repealer" amendment because such plaintiffs could not, or were not explicitly authorized by law to, recover prior to the amendment.  Several courts have observed the nature of the Utah amendment is akin to an *Illinois Brick* repealer.  *See California v. Infineon Techs. AG*, No. C 06-

---

[21]  In light of this analysis, the Court is not proceeding to further consider prudential standing concerns at this time.  The Court concludes such analysis is also not required at present because Defendants have only challenged the named Plaintiffs' Article III constitutional standing.  Furthermore, there is no requirement that prudential standing issues must always be resolved before the merits—and certainly not, as in this case, when the parties have not framed prudential standing issues explicitly or suitably for the Court's consideration.  *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 346 F.3d 402, 416 (3d Cir. 2003) (recognizing that although the Supreme Court in *Steel Co.* "specifically indicated that 'Article III jurisdiction is always an antecedent question'" that decision "should not be understood as requiring courts to answer all questions of 'jurisdiction,' broadly understood, before addressing the existence of the cause of action sued upon." (footnote omitted) (citing *Steel Co.*, 523 U.S. at 97 n.2)); *Jordon v. Att'y Gen. of U.S.*, 424 F.3d 320, 325 n.8 (3d Cir. 2005) (recognizing same); *St. Matthew's Slovak Roman Catholic Congregation v. Most Reverend*, 106 F. App'x 761, 766 n.5 (3d Cir. 2004) (unpublished) (recognizing same).

[22]  Defendants have characterized this argument as a "standing" issue by claiming that "Plaintiffs have no standing to sue for damages arising before May 1, 2006."  Defs.' Mot. at 9.  Based on the Court's prior discussion of Article III constitutional standing, "statutory standing," and "antitrust standing," the Court refrains from using the term "standing" in the context of this issue to avoid possible confusion about the precise legal issue at bar.

4333, 2008 WL 1766775, at *4-5 (N.D. Cal. Apr. 15, 2008) (concluding that the amendment to

the Utah Antitrust Act was an *Illinois Brick* repealer and "that indirect purchaser standing was

not available prior to 2006"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010

WL 5094289, at *6 (N.D. Cal. Dec. 8, 2010) (reaching the same conclusion).  In Utah, a "statute

is not to be applied retroactively unless the statute expressly declares that it operates

retroactively." *Goebel v. Salt Lake City S. R.R. Co.*, 104 P.3d 1185, 1197-98 (Utah 2004).

Defendants contend that because the Utah Antitrust Act did not permit indirect purchasers to

recover for antitrust injuries prior to the amendment's effective date, dismissal of the Plaintiffs'

claims for damages suffered prior to May 1, 2006 is warranted.

Plaintiffs do not dispute the Defendants' characterization of Utah law in any of the

aforementioned respects; nor do they dispute the cited legal authority.  Indeed, Plaintiffs do not

raise any challenge to the defense contention that Plaintiffs cannot recover for claims arising

from damages accruing before May 1, 2006 under the Utah Antitrust Act.  Accordingly, the

Court determines that it is appropriate to grant the Defendants' motion to dismiss the Plaintiffs'

claims under the Utah Antitrust Act arising from damages that occurred prior to May 1, 2006.[23]

---

[23]  To the extent that the defense may have obliquely raised the issue in connection with
its Motion, the Court does not address whether the Plaintiffs' claims arising from *conduct* that
occurred prior to May 1, 2006 may be dismissed.  The Defendants' briefing and oral argument
did not present or frame this question in a sufficient fashion that would allow the Court to
address it.  Similarly, Plaintiffs have articulated only that they oppose the Defendants on this
score.

Defendants cite but a single legal authority in connection with this issue, *In re
Aftermarket Filters Antitrust Litigation*, No. 08-cv-04883, 2009 WL 3754041 (N.D. Ill. Nov. 5,
2009).  However, that case only addressed the question of whether "any claim *for relief* prior to
the effective date of [the Utah] statute[] must be dismissed" and not the separate and distinct
question of whether dismissal of claims arising from conduct occurring before May 1, 2006 was
warranted.  Mem. of Law in Support of Defs.' Joint Mot. to Dismiss the Consolidated Indirect
Purchaser Comp., at 17, *Aftermarket Filters*, No. 08-cv-04883 (Doc. No. 196) (N.D. Ill. Feb. 2,

### C.  *Scope of the IPSAC's Definition of "Egg Products"*

Defendants raise a challenge to the scope of the IPSAC's definition of "egg products" with respect to "manufactured products incorporating processed eggs such as baked goods and mayonnaise" on the basis of *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983), and its progeny. The IPSAC defines egg products as "either shell eggs substitutes such as liquid, frozen, and dry eggs, or manufactured products incorporating processed eggs such as baked goods and mayonnaise." IPSAC ¶ 124.  Defendants seek to partially dismiss certain of the Plaintiffs' federal and state antitrust claims with respect to alleged injuries relating to purchases of manufactured products incorporating processed eggs.

In response, Plaintiffs agree that the IPSAC definition of egg products is "overly inclusive" by including "manufactured products incorporating processed eggs such as baked goods and mayonnaise," and further "agree to limit the scope of egg products in this action to 'shell substitutes such as liquid, frozen, and dry eggs,' the portion of the definition of egg products set forth in the [IPSAC] that Defendants do not challenge."  Pls.' Mot. at 62.  Given the Plaintiffs' agreement to narrow the definition, the Court grants without prejudice the Defendants' Motion as to this issue.  Plaintiffs may seek leave to proceed with their proposed amendment with the appropriate motion or equivalent procedure to achieve pleading precision on this point as by for example, stipulation, and the Court expects that the amendment or stipulation will be respectful of the discussions among counsel on this point.

---

2009) (emphasis added).  Because this issue is largely undefined, particularly in light of the defense's failure to proffer any other supporting legal authority or analysis, the Court declines to undertake the burden of deciding this issue in its present posture.

### D.  Separate Egg Products Conspiracy

Defendants argue that Plaintiffs have alleged a separate conspiracy relating to egg products which should be dismissed for failure to state a claim.  However, because this challenge hinges—at least to some degree—upon the definition of "egg products" in the IPSAC, and given that the definition of egg products will be amended pursuant to Plaintiffs' aforementioned agreement to do so, it would be improvident for the Court to consider this argument at this time in the absence of the actual amendment or stipulation.  Accordingly, the Court denies the Motion in this respect without prejudice to Defendants to raise these or similar arguments based upon the amended definition of "egg products," if the circumstances so warrant.[24]

### E.  State Consumer Protection Claims

Defendants move to dismiss all of the Plaintiffs' alleged consumer protection claims under nine states' laws:  California, the District of Columbia, Florida, Kansas, Massachusetts, New Mexico, New York, North Carolina, and West Virginia.

#### 1.  California

Defendants mount a dual challenge to the Plaintiffs' claim under the California Unfair Competition Law ("UCL").  First, Defendants argue that the alleged claim fails to satisfy both Federal Rules of Civil Procedure 8 and 9(b) because the IPSAC does not contain adequate factual

---

[24]  To determine whether it might be appropriate to raise this or a similar issue again following the Plaintiffs' agreement to amend the definition of "egg products" and whether a Rule 12(b)(6) motion might be the appropriate means to do so, the Defendants should refer to the Court's prior decision on a motion in which most of the same Defendants here raised similar issues directed to the Direct Purchaser Plaintiffs' pleading in this multidistrict litigation.  *See* Oct. 14, 2011 Mem. and Order, 2011 WL 4945864 (denying without prejudice the motion to dismiss a distinct antitrust claim as to egg products in the direct purchaser class action plaintiffs' Second Consolidated Amended Class Action Complaint).

allegations of deceptive conduct and instead only relies on alleged antitrust violations. Second, Defendants contend that, even if the federal pleading standards are met, the IPSAC provides no grounds for the Plaintiffs' claim for restitution under the UCL.

The UCL prohibits engaging in "unfair competition," which is defined, *inter alia*, as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "[A] person who has suffered injury in fact and has lost money or property as a result of the unfair competition" may bring suit for such a violation. *Id.* § 17204; *see also id.* § 17203; *Californians for Disability Rights v. Mervy's, LLC*, 138 P.3d 207, 210 (Cal. 2006) (explaining how the Section 17204 "prescribes who may sue to enforce the UCL"); *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011) ("To satisfy the narrower standing requirements . . . , a party must now (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim." (emphasis in original)). Remedies include injunctive relief, civil penalties, and those remedies that "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203; *see also In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009) ("[P]revailing plaintiffs are generally limited to injunctive relief and restitution." (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003)).[25]

---

[25] Once a plaintiff has satisfied the injury requirement under Section 17203 of the UCL, "[s]uch injuries satisfy the plain meaning of section 17204's 'lost money or property' requirement, qualify as injury in fact, and would permit a plaintiff to seek an injunction against

Defendants argue that Plaintiffs cannot satisfy the pleading standards in alleging a UCL claim because Plaintiffs "are clearly attempting to restyle a supply control theory into [a] consumer fraud claim[]" by "dress[ing] their antitrust case in the clothes of a consumer fraud claim" and that certain allegations in the IPSAC of fraudulent conduct "are insufficient to comply with Federal Rule 8." Defs.' Mot at 22-23. Plaintiffs counter by arguing that the Defendants' alleged antitrust violations are the grounds for their UCL claim, and that the requisite alleged antitrust violation is the unlawful, unfair or fraudulent business act or practice.

Indeed, antitrust violations can constitute "unfair competition" under the UCL. *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 406 (E.D. Pa. 2010) (hereinafter "*SMW*") (finding that defendants "by filing sham lawsuits designed to prevent the entry of generic alternatives into the market for Wellbutrin SR," which plaintiffs allege to be "an unfair and illegal business practice," is "anti-competitive conduct [that] falls under the broad scope of the CUCL"); *see also Korea Supply*, 63 P.3d at 943 ("Section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices," and allows "'a practice [to be] deemed unfair even if not specifically proscribed by some other law.'" (quoting *Cel–Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999)); 1 *State Antitrust Practice*, *supra*, ch. 6-61 to -62, §§ 1.a., l.c. (describing the UCL to "operate[] as a consumer protection law with antitrust applications" and that "claims under the UCL often accompany, or arise out of, alleged antitrust violations"). Defendants do not directly dispute that the UCL prohibits antitrust violations. Instead, they

---

the offending business practice even in the absence of any basis for restitution." *Kwikset*, 246 P.3d at 895.

contend, more generically, that some consumer fraud causes of action "require Plaintiffs to plead more than simply the elements of an antitrust violation," such as deceptive conduct and reliance. Defs.' Reply at 8. Be that as it may, the Defendants do not demonstrate that such circumstances exist here, and they do not identify such additional elements for a UCL claim arising from an alleged antitrust violation.

The Court agrees that it is an analytically sensible and entirely fair operation of pleading standards and substantive law to conclude that the IPSAC's allegations giving rise to alleged antitrust violations also give rise to the Plaintiffs' UCL claim. Plaintiffs have alleged that they suffered injury in fact and lost money or property due to the Defendants' practices of "unfair competition." *See, e.g.*, IPSAC ¶ 332 ("As a direct and proximate result of Defendants' unlawful practices, including combinations and contracts to restrain trade and allocate relevant markets, Plaintiff [and class members] have been injured in their business and/or property in that they paid more for shell eggs and egg products than they otherwise would have paid in the absence of Defendants' unlawful conduct."). The IPSAC alleges, supported by other factually specific allegations concerning the contours of the conspiracy, that Defendants committed "unlawful, unfair or fraudulent business act[s] or practices[s] in violation of" the UCL by "engaging in a continuing unlawful trust and concert of, the substantial terms of which were to fix, raise, stabilize, and maintain prices of, allocate markets for, and restrain and manipulate the supply of shell eggs and egg products at supra-competitive levels." IPSAC ¶¶ 329-30. More specifically, such conduct entails the Defendants purportedly advancing the goals of their antitrust conspiracy through eight alleged "collective actions," which included various flock reduction and early molting initiatives, and actions taken in connection with the United Egg Producers Certification

Program and the United States Egg Marketers export program.  Whatever else it may be, if it occurred, the unlawful price-fixing alleged in the IPSAC surely would constitute unfair competition within the meaning of the UCL.

Defendants have not contended that the IPSAC fails to allege an antitrust violation for purposes of bringing a UCL claim (except with respect to injuries relating to certain egg products), nor have they raised any arguments that Plaintiffs have failed to sufficiently allege their separate California antitrust claim under Section 16720, California Business and Professions Code.  *See* IPSAC ¶¶ 325-28.  Thus, the Defendants' argument does not support the conclusion that Plaintiffs have failed to meet the Rule 8 pleading requirements as to their UCL claim.

Contrary to the Defendants' contention otherwise, case law from the Third Circuit does not require that the heightened pleading standard under Rule 9(b) be applied to the Plaintiffs' UCL claim.  This particular alleged violation of the UCL is simply not grounded in fraud nor does it "sound in fraud."  The Plaintiffs' UCL claim arises from the alleged conduct—namely, the alleged conspiracy to reduce the supply of eggs as allegedly advanced by the eight collective actions—which, as alleged, is not based on fraudulent acts.[26]  As such, the UCL claim does not entirely rely on a course of fraudulent conduct, in contrast to the Third Circuit's *Lum* case, so as to require the application of Rule 9(b).

---

[26]  Even Defendants argue that insofar that the IPSAC alleges that the logo for the Animal Care Certified program was misleading, "these allegations do not form the basis of Plaintiffs' consumer fraud claims" and that "Plaintiffs' causes of action make it exceedingly clear that Plaintiffs are seeking damages resulting only from the allegedly 'artificially high' egg prices and are concerned with Defendants' conduct only as it relates to the alleged reduction in the supply of eggs." Defs.' Mot. at 39-40.

As to the Defendants' second challenge to the Plaintiffs' UCL claim, the Court concludes that Plaintiffs have sufficiently alleged their eligibility for seeking restitution. The California Supreme Court has explained:

> Restitution under section 17203 [of the UCL] is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." (Italics added.) A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other. . . . But the economic injury that an unfair business practice occasions may often involve a loss by the plaintiff without any corresponding gain by the defendant, such as, for example, a diminishment in the value of some asset a plaintiff possesses. (*See Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal. App. 4th 688, 716 [a plaintiff who alleged that a defendant's defamatory statements diminished its assets and reduced its market capitalization adequately alleged UCL standing]; *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal. App. 4th 1228, 1240, 1262 [a plaintiff whose home and car were vandalized by defendant animal rights protesters adequately alleged lost property under Prop. 64].)

*Kwikset Corp.*, 246 P.3d at 895 (parentheticals and brackets in original).

Thus, the issue at hand is whether Plaintiffs have connected their alleged loss—which they claim is the loss of "money by paying more than they should have for eggs as a result of Defendants' unfair method of competition," Pls.' Resp. at 24—with a "corresponding gain" by and of the Defendants. Defendants argue that while such a gain might be demonstrated by alleging that Plaintiffs "purchased eggs originating from any of the Defendants," Plaintiffs have failed to do so. Defs.' Mot. at 33. For example, an allegation that a plaintiff "paid money to a retailer to purchase [defendant] Microsoft's product based on false or misleading statements on the product package" would demonstrate eligibility for restitution because it can be inferred that the plaintiffs' payment for the product to the retailer benefitted Microsoft. *Shersher v. Superior*

*Court*, 65 Cal. Rptr. 3d 634, 636 (Cal. Ct. App. 2007).  Presumably, Defendants here argue that

these Plaintiffs have not met the *Shersher* standards.

However, legal authority also exists to propose that a "corresponding gain" may be able

to be a more broadly-defined benefit conferred upon the defendant by a plaintiff.  *Troyk v.*

*Farmers Group, Inc.*, 90 Cal. Rptr. 3d 589 (Cal. Ct. App. 2009), reflects reasoning that

restitution under the UCL applies traditional restitution principles:

> " 'A person who has been unjustly enriched at the expense of another is required
> to make restitution to the other.' (Rest., Restitution, § 1.) 'A person is enriched if
> he receives a benefit at another's expense. (*Id.*, com. a, p. 12.) The term "benefit"
> "denotes any form of advantage." ( *Id.*, com. b, p. 12.) Thus, a benefit is conferred
> not only when one adds to the property of another, but also when one saves the
> other from expense or loss.  Even when a person has received a benefit from
> another, he is required to make restitution "only if the circumstances of its receipt
> or retention are such that, as between the two persons, it is unjust for him to retain
> it." ( *Id.*, com. c, p. 13.)' ( *Ghirardo v. Antonioli* [924 P.2d 996 (Cal. 1996)]) 'For
> a benefit to be conferred, it is not essential that money be paid directly to the
> recipient by the party seeking restitution.' (*California Federal Bank v. Matreyek*
> (1992) 8 Cal. App. 4th 125, 132 . . . .)" . . . .

*Id.* at 617 (quoting *County of Solano v. Vallejo Redevelopment Agency*, 90 Cal. Rptr. 2d 41, 52

(Cal. Ct. App. 1999)).

In this manner, the factual allegations that relate to the Plaintiffs' California unjust

enrichment claim are relevant as to the UCL claim.  As discussed in greater detail *infra*, in

relation to the arguments focused on the Plaintiffs' unjust enrichment claims—and specifically

the general discussion concerning the conferral of benefits upon Defendants[27]—there are factual

allegations in the IPSAC that suggest that Defendants acquired a "corresponding gain" resulting

---

[27]  The Court notes that Defendants have not sought dismissal of the California unjust
enrichment claim on the basis of failure to adequately plead the "conferral of a benefit,"
although, as discussed *infra*, the defense does challenge certain of the unjust enrichment claims
on that and other grounds.

from the Plaintiffs' alleged purchase of eggs at an over-inflated price due to the Defendants'

alleged unfair business practice.  *See* IPSAC ¶¶ 332-34.[28]  Accordingly, at this time, the Court

cannot conclude as a matter of law that the Plaintiffs' claim for restitution under the UCL must

be dismissed.  The Court denies the Defendants' motion to dismiss.

## 2.  District of Columbia

Defendants contest the Plaintiffs' claim under the District of Columbia Consumer

Protection and Procedures Act ("DCCPPA") for failure to state a claim under the pleading

standards of Rules 8 and 9(b) because, according to Defendants, "more than simply the elements

of an antitrust violation" must be alleged.  Defendants also argue that a DCCPPA claim requires

pleading unconscionable conduct but the IPSAC fails to sufficiently plead that element.

The DCCPPA prohibits "unlawful trade practices."  The Act defines "trade practice" to be

"any act which does or would create, alter, repair, furnish, make available, provide information

about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of

consumer goods or services."  D.C. Code § 28-3901(a)(6).  The Act enumerates a non-exclusive

list of specific practices that constitute violations of the Act.  *See* D.C. Code § 28-3904; *District*

*Cablevision Ltd. Partnership v. Bassin*, 828 A.2d 714, 723 (D.C. 2003).  Additionally, "the

---

[28]   The Court reads the reference to Arizona in the last sentence of the referenced pleading paragraph to be a typographical error, given that these allegations are essentially cookie-cutter as to each state unjust enrichment claim:

> The Defendants were able to achieve their increased revenues and profits from their sales of eggs to California indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in California was connected to and due to the increased prices paid for Defendants eggs by indirect purchasers in [California].

*Id*.

statute obviously contemplates that procedures and sanctions provided by the Act will be used to enforce trade practices made unlawful by other statutes." *See Atwater v. District of Columbia Dept. of Consumer & Regulatory Affairs*, 566 A.2d 462, 466 (D.C. 1989); *see also Bassin*, 828 A.2d at 723 ("Trade practices that violate other laws, including the common law, also fall within the purview of the CPPA.").

Just as the California UCL encompasses violations of the California antitrust law, violations of the District of Columbia Antitrust Act of 1980, D.C. Code § 28-4501, *et seq.*, can constitute unlawful trade practices within the purview of the DCCPPA. *See Marbry v. EMI Music Distrib.*, Civil Action No. 3731-00, 129 Daily Wash. L. Rptr. 2065, 2067 (D.C. Super. Ct. June 12, 2001) ("That a price fixing violation of the [District of Columbia] Antitrust Act is also a violation of the CPPA is apparent from the purpose and text of the consumer protection statute.")[29]; *Chocolate*, 602 F. Supp. 2d at 584 ("[T]he DCCPPA subsumes a Sherman Act claim and creates an indirect purchaser cause of action for conspiratorial price fixing regardless of whether defendants have engaged in deceptive conduct."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1126 (N.D. Cal. 2008) ("In light of this case law expansively interpreting the DCCPPA as a 'comprehensive' statute designed to remedy 'all improper trade practices,' the Court finds that plaintiffs may maintain a claim for defendant's alleged price-

---

[29]   *Marbry* explicitly addressed a defense argument on a motion to dismiss an indirect purchaser class action on a theory of a price-fixing conspiracy among distributors of compact discs ("CDs"), which contended that the DCCPPA "protects against deceptive trade practices, not unfair competition. Since plaintiff has not alleged any misrepresentation that deceived her, the consumer protection count, defendants say, must be dismissed." *Marbry*, 129 Daily Wash. L. Rptr. at 2067. The Court disagreed, noting, *inter alia*, that the "CPPA's list of unlawful trade practices is not exclusive and includes trade practices made illegal by later-enacted statutes. . . . If selling CDs is a trade practice, price fixing CDs, just as plainly, is an improper trade practice under the CPPA for which a consumer has the right to bring a lawsuit . . . ." *Id.*

fixing under the statute . . . ." (citing *Bassin*, 828 A.2d at 722-23)); *New Motor Vehicles*, 350 F.

Supp. 2d at 183 ("Since *Bassin* declares that the DCCPPA can be used as a remedy for improper

trade practices that violate other laws, the statute is broad enough to cover the alleged illegal

[antitrust] conspiracy here.").

Likewise, the Court's rationale which led to the conclusion that Defendants had not

demonstrated that Plaintiffs had failed to plead a California UCL claim also applies here.

Plaintiffs have alleged that their DCCPPA claim is based upon the alleged antitrust violation.

*See, e.g.*, IPSAC ¶ 340-41 (alleging that "Defendants agreed to, and did in fact, act in restraint of

trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices

of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg

products at supracompetitive levels" and that this "conduct constitutes 'unlawful trade

practices'" under the DCCPPA).  Defendants do not raise any objections to the effect that

Plaintiffs have inadequately alleged an antitrust violation.[30]

Defendants also have raised no valid arguments that an antitrust violation by itself cannot

comprise an unlawful trade practice within the meaning of the DCCPPA.  The DCCPPA

prohibits "unlawful trade practices," and, although certain of the enumerated "unlawful trade

practices" as defined by D.C. Code § 28-3904 may require the element of unconscionable

conduct to be alleged, Defendants have not identified any authority that suggests that an

allegation of "unconscionable conduct" is required in order for a violation of the Antitrust Act to

---

[30]  Plaintiffs have brought a District of Columbia antitrust claim (*see* IPSAC ¶¶ 336-39)
which they argue is the basis for their DCCPPA claim.  *See* Pls.' Resp. at 5 ("[T]he CPPA claims
in this case . . . are based on violation of another D.C. law (its antitrust law) . . . .").  Defendants
do not argue that Plaintiffs have failed to state a D.C. antitrust claim, except with respect to
injuries relating to certain egg products.

constitute an unlawful trade practice under the DCCPPA for pleading purposes.[31]   Indeed,

credible judicial analysis rejects this exact argument.  *See Aftermarket Filters*, 2009 WL

3754041, at *9 ("[T]he District of Columbia Consumer Protection Act . . . does not require a

showing of concealment or deception to support a claim.").  Consequently, both of the

Defendants' arguments—that Plaintiffs have failed to state a claim for relief consistent with the

demands of Rule 8 and that Plaintiffs "must plead that the defendant engaged in

'unconscionable' conduct" under the DCCPPA—are unpersuasive.

Furthermore, the Court's reasoning as to why a Rule 9 pleading standard does not apply

to the Plaintiffs' UCL claim applies to the DCCPPA claim as well.  The Plaintiffs' claim for the

DCCPPA violation is based upon factual allegations that do not entirely rely on fraud, and thus

---

[31]   The two cases upon which Defendants rely for this position are inapposite.  Neither of those cases, *In re Flash Memory Antitrust Litigation*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) and *In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007), addressed the question of whether a violation of the D.C. antitrust law is an unlawful trade practice under the DCCPPA.

For example, in *Flash Memory*, that court determined that the antitrust price-fixing theory at issue could be brought under the DCCPPA because the Act "proscribes the imposition of prices that are 'unconscionably high,' i.e., prices that are 'unreasonably favorable' to the seller, where 'the buyer did not have a meaningful choice of alternatives under the circumstances.'" *Id.* at 1157-58.  In reaching this conclusion, the court relied on a District of Columbia Court of Appeals case that addressed D.C. Code § 28-3904(r), a DCCPPA provision that prohibits "mak[ing] or enforc[ing] unconscionable terms or provisions of sales or leases."  *Id.* at 1158 (citing *Ford v. Chartone, Inc.*, 908 A.2d 72 (D.C. 2006)).  Because the court's attention was directed to those issues, *Flash Memory* did not speak to whether a violation of the D.C. antitrust law is an unlawful trade practice, which is what Plaintiffs argue here and, as discussed above, does not require alleging unconscionable conduct.

Moreover, to the extent that Defendants, by citing D.C. Code § 28-3904(r), contend that Plaintiffs have brought a DCCPPA claim pursuant to that provision, *see* Pls.' Reply at 16, they are in error. Plaintiffs confirmed at oral argument that their DCCPPA claim rests on the Defendants' alleged violation of the D.C. Antitrust Act and not subdivision (r).  *See* Tr. at 95:22-96:2; 96:17-21.

the Plaintiffs' DCCPPA claim does not sound in fraud so as to require the application of Rule 9

under Third Circuit case law.

Neither of the Defendants' objections to the Plaintiffs' DCCPPA claim are meritorious,

and the Court denies the Defendants' Motion as to the Plaintiffs' DCCPPA claim.

### 3.  Florida

Defendants move to dismiss the claim that their alleged conduct violated the Florida

Deceptive and Unfair Trade Practices Act ("FDUTPA").  They argue this claim is deficient under

the pleading standards of Rules 8 and 9(b), contending that a claim under the FDUTPA requires

Plaintiffs to plead allegations of fraudulent conduct, even when the unfair method of competition

is alleged to be antitrust violations.

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or

practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Fla. Stat. § 501.204(1).  The three elements of a FDUTPA claim are "'(1) a deceptive act or

unfair practice; (2) causation; and (3) actual damages.'" *In re Flonase Antitrust Litig.*, No. 08-

CV-3301, 2011 WL 4464823, at \*13 (E.D. Pa. Sept. 26, 2011) (quoting *Rollins, Inc. v. Butland*,

951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)).

The first element of the claim encompasses antitrust violations because "the acts

proscribed by subsection 501.204(1) include antitrust violations."  *Mack v. Bristol-Myers Squibb

Co.*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996); *see also In re Florida Microsoft Antitrust

Litig.*, No. 99-27340, 2002 WL 31423620, at \*2-3 (Fla. Cir. Ct. Aug. 26, 2002) (citing same);

*Marco Island Cable, Inc. v. Comcast Cablevision of South, Inc.*, No. 2:04-CV-26-FTM-29DNF,

2006 WL 1814333, at \*6 (M.D. Fla. July 3, 2006) (citing same); *Flonase*, 2011 WL 4464823, at

*14 (citing same); *RDK Truck Sales & Serv. Inc. v. Mack Trucks, Inc.*, No. 04-4007, 2009 WL

1441578, at *20 (E.D. Pa. May 19, 2009) (citing same).  Antitrust violations constitute FDUTPA

violations, in part, because "section 501.204(2) provides that in determining what constitutes an

'unfair method of competition' under subsection 501.204(1), 'due consideration and great weight

shall be given to the interpretations of the Federal Trade Commission and the federal courts

relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1).' Section 5(a)(1)

of the FTC Act encompasses violations of the antitrust laws." *Mack*, 673 So. 2d at 104.  It

follows that Florida law recognizes that a FDUTPA claim may arise from a violation of antitrust

laws such as the Sherman Act and other state antitrust laws because such a violation in and of

itself is an unfair method of competition. *See id.* (citing *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S.

447, 454 (1986)).[32]

Thus, contrary to the Defendants' arguments otherwise, no allegations of fraudulent

conduct must be pled in order for Plaintiffs to sufficiently allege under Rule 8 a FDUTPA claim

based upon an antitrust violation.  Indeed, once again, Plaintiffs are alleging that the Defendants'

alleged antitrust violation is itself the unfair method of competition prohibited by the FDUTPA.

*See, e.g.*, Pls.' Resp. at 4-5; IPSAC ¶¶ 348-49 (alleging that "Defendants agreed to, and did in

fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing,

and maintaining prices of, allocating markets for, and restraining and manipulating the supply of

shell eggs and egg products at supracompetitive levels . . . ." and such conduct "constitute[s]

---

[32] Although Defendants generally argue that "consumer fraud causes of action require Plaintiffs to plead more than simply the elements of an antitrust violation," Defs.' Reply at 8, they have not provided any authority that this is true under Florida law in circumstances where an alleged antitrust violation is the purported unfair method of competition.

unfair and deceptive trade practices in violation of [the FDUTPA]").  Defendants do not contend

that Plaintiffs wholly have failed to sufficiently allege antitrust violations.  Accordingly, their

argument that the IPSAC fails to state a FDUTPA claim falls short.[33]

The Court denies the Defendants' motion as to the FDUTPA claim.

## 4.  Kansas

Defendants argue for the dismissal of the Plaintiffs' claim under the Kansas Consumer

Protection Act ("KCPA") because "Kansas law does not permit Plaintiffs to reformulate or

rephrase their antitrust claims as [KCPA] claims" and thus the IPSAC's allegations do not

support a cognizable claim under the KCPA.  Defs.' Mot at 28-29.  They also contend that

Plaintiffs fail to state a KCPA claim in satisfaction of the pleading standards of Rules 8 and 9(b).

The KCPA prohibits a supplier from "engag[ing] in any deceptive act or practice in

connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a).  "Consumer transaction"

is defined as "a sale, lease, assignment or other disposition for value of property or services

within this state . . . to a consumer; or a solicitation by a supplier with respect to any of these

dispositions."  Kan. Stat. Ann. § 50-624(c).  The Act sets forth a non-exclusive list of conduct

that "whether or not any consumer has in fact been misled" constitutes "deceptive acts or

practices."  Kan. Stat. Ann. § 50-626(b).  One such "deceptive act or practice" is "the willful

failure to state a material fact, or the willful concealment, suppression or omission of a material

---

[33] Additionally, for the same reasons the Court already discussed in relation to the
consumer protections claims of California and the District of Columbia, the Plaintiffs' factual
allegations that give rise to their antitrust and consumer protection claims under Florida law do
not sound in fraud so as to require the application of Rule 9 under Third Circuit case law.

fact." Kan. Stat. Ann. § 50-626(b)(3).   Plaintiffs claim this provision as the basis for their

KCPA claim.  Pls.' Resp. at 21.

For Plaintiffs to establish their KCPA claim based upon Section 50-626(b)(3) they must

allege these elements: (1) Plaintiffs were consumers; (2) Defendants were suppliers; (3)

Defendants willfully failed to state, concealed, suppressed, or omitted, a certain matter or

information; and (4) that certain matter or information was a material fact.  *See* Pattern

Instructions Kan. 4th Civil § 129.04; *see also Cole v. Hewlett Packard Co.*, 84 P.3d 1047, at *7

(Kan. Ct. App. 2004).  The "use of 'willful' in the KCPA includes an intent to harm the

consumer."  *Unruh v. Purina Mills, LLC*, 221 P.3d 1130, 1139 (Kan. 2009).  For purposes of

Section 50-626(b)(3), a "'matter is material if it is one to which a reasonable person would attach

importance in determining his choice of action in the transaction involved.'" *Farrell v. Gen.*

*Motors Corp.*, 815 P.2d 538, 548 (Kan. 1991) (quoting *Griffith v. Byers Constr. Co.*, 510 P.2d

198, 205 (Kan. 1973)).  However, "K.S.A. 50-626(b)(3) does not proscribe mere nondisclosure

of a material fact."  *Heller v. Martin*, 782 P.2d 1241, 1244 (Kan. App. 1989); *see also* Pattern

Instructions Kan. 4th Civil § 129.04.

In contrast to the California, the District of Columbia, and Florida claims discussed

above, Plaintiffs contend that their KCPA claim is "not merely a restatement of [their] Kansas

antitrust claims."  Pls.' Resp. at 20.  Rather, Plaintiffs contend in their briefing that their KCPA

claim is one arising from a subset of the broader conduct attributed to the alleged conspiracy to

reduce the supply of eggs:

> Defendants engaged in unfair and deceptive acts by public[ly] claiming to reduce
> their flock size pursuant to recommended animal husbandry guidelines—which
> are by definition guidelines promoting the health of the chickens and quality of

47

the eggs—to obtain consumer-oriented certification from the UEP . . . when in fact the guidelines were nothing more than a cover for Defendants' illegal conspiracy to limit supply.

*Id.*  However, the Court need not consider whether a KCPA claim arising from such delineated conduct states a claim for relief consistent with the applicable pleading standards because the Plaintiffs' proffered description of their claim does not comport with the IPSAC.

As alleged in the IPSAC, the KCPA claim is premised upon allegations relating to the entire conspiracy to reduce the supply of eggs.  As alleged, "Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supracompetitive levels" and "[b]y reason of the foregoing, Defendants and their co-conspirators have engaged in conduct that constitutes deceptive and unconscionable acts and practices" under the KCPA.  IPSAC ¶¶ 367-68.

A fair reading of these allegations suggests that the purported deceptive activity is broadly comprised of the entire alleged agreement to reduce the supply of eggs and the collective various alleged actions undertaken to advance the object of the agreement.  These allegations (as well as the other IPSAC allegations specifically pled as to the KCPA claim which allege, *inter alia*, the effects of the conduct, unequal bargaining power, and so forth, *see id*. ¶¶ 369-72—none of which invoke any element of a KCPA claim under Section 50-626(b)(3)) simply do not plausibly suggest that Defendants willfully failed to state, concealed, suppressed, or omitted a certain matter or information to which a reasonable person would attach importance in determining his choice of action in the transaction involved.

48

Given that the Plaintiffs' KCPA claim as articulated in the operative pleading does not satisfy Rule 8, the Court grants the Defendants' motion to dismiss this claim without prejudice.[34]

## 5.  Massachusetts

Defendants attack Plaintiffs' Massachusetts Consumer Protection Act ("G.L. ch. 93A") claim because of the Plaintiffs' failure to allege compliance with the Act's pre-suit notification procedures.  They also claim that Plaintiffs have failed to state a claim consistent with the demands of Rules 8 and 9(b) because Plaintiffs do not sufficiently plead allegations of fraudulent conduct and that allegations of antitrust violations alone are inadequate to allege a violation of G.L. ch. 93A.

Generally, a plaintiff is required to provide a defendant with a written demand for relief of the specific deceptive practices claimed before commencing a suit for a G.L. ch. 93A violation.  The relevant statutory language provides:

> At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent.

Mass. Gen. Laws. ch. 93A § 9(3); *see also In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 539-40 (E.D. Pa. 2010).  "A demand letter listing the specific deceptive practices claimed is a prerequisite to suit and as a special element must be alleged and proved."  *Entrialgo v. Twin City Dodge, Inc.*, 333 N.E.2d 202, 204 (Mass. 1975); *see also Spring v. Geriatric Auth. of Holyoke*, 475 N.E.2d 727, 735 (Mass. 1985) (citing same).  However, this prerequisite does "not apply . . .

---

[34]  The Court need not determine or even address whether the pleading satisfies Rule 9(b) at this time.  However, the Court recognizes that Plaintiffs did not raise any objection to the Defendants' claim that Rule 9 pleading standards apply to the KCPA claim.

if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth."  Mass. Gen. Laws ch. 93A § 9(3); *see also Okoye v. Bank of New York Mellon*, No. 10-11563-DPW, 2011 WL 3269686, at *4 (D. Mass. July 28, 2011).

Invoking the exception, Plaintiffs contend that the requirement of pre-suit notification does not pertain to them because the IPSAC does not allege that Defendants, as the "prospective respondents," maintain places of business or keep assets within Massachusetts.  Defendants do not dispute this rebuttal.  Indeed, no such dispute would be sensible, given that the IPSAC plainly does not recite any factual allegations that the Defendants' places of business or assets are located in Massachusetts.  Accordingly, pleading pre-suit notification is not required here.

"A party alleging a violation of G.L. c. 93A, § 9(1), must establish (1) that the defendant has committed a violation of G.L. c. 93A, § 2; (2) injury; and (3) a causal connection between the injury suffered and the defendant's unfair or deceptive method, act, or practice."  *Herman v. Admit One Ticket Agency LLC*, 912 N.E.2d 450, 454 (Mass. 2009).  G.L. ch. 93A, § 2, provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful."

The Massachusetts Supreme Court has recognized:

> In analyzing what constitutes unfair methods of competition and unfair or deceptive acts or practices, which are not defined in G.L. c. 93A, this court looks to interpretations by the Federal Trade Commission and Federal courts of § 5(a)(1) of the Federal Trade Commission Act (FTC Act) . . . . The Federal Trade Commission may, under § 5(a)(1) of the FTC Act, enforce the antitrust laws, including the Sherman Act and the Clayton Act, but it is not confined to their specific prohibitions. . . .  It may bar incipient violations of those statutes, . . . , and conduct which, although not a violation of the letter or spirit of the antitrust laws, is nevertheless either an unfair method of competition, or an unfair or deceptive act or practice . . . .  To the extent that the same conduct may violate

both the antitrust laws and the FTC Act, such conduct may be the subject of
simultaneous parallel enforcement actions.

*Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 309 (Mass. 2002) (citations and footnote

omitted).  Consistent with this rationale, the court concluded that allegations that "in essence

state that the defendants engaged in price-fixing of . . . products at artificially inflated levels to

[the plaintiff's] detriment" plead an "unfair method of competition" in violation of G.L. ch. 93A.

*Id.*[35]  "Thus in Massachusetts, courts have not adhered to the premise that an indirect purchaser

cannot sue the manufacturer for antitrust violations."  *Flonase*, 692 F. Supp. 2d at 545.

This summary of Massachusetts law demonstrates that Defendants err in contending that

Plaintiffs are impermissibly bringing an antitrust case restyled as a consumer protection violation

under the Massachusetts Consumer Protection Act.  Plaintiffs are alleging that the purported

conspiracy to reduce the supply of eggs and egg products and thereby artificially increase those

products' prices is a G.L. ch. 93A violation.  *See* IPSAC ¶¶ 389-90 (pleading that "Defendants

agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing,

raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and

---

[35] The court summarized the plaintiff's complaint as follows:
> The plaintiff alleges that, beginning in January, 1990, the defendants conspired
> among themselves to restrain free trade of vitamin products by suppressing and
> eliminating competition.  The conspiracy consisted of formal and informal
> collusion by the defendants to: (1) fix, increase, and maintain prices for vitamin
> products; (2) coordinate price increases among themselves for the sale of vitamin
> products; (3) allocate among themselves the volume of sales and market shares of
> vitamin products; (4) allocate among themselves all or part of certain contracts to
> supply vitamin products to various customers; and (5) refrain from submitting
> bids, or submit collusive, noncompetitive, and rigged bids. The effect of the
> defendants' alleged conduct was to restrict competition in the sale of vitamin
> products in Massachusetts and to force consumers to pay prices for such products
> that were artificially inflated.

*Id.* at 306-07.

manipulating the supply of shell eggs and egg products at supracompetitive levels" and that as a result "Defendants and their co-conspirators engaged in "'unfair methods of competition and unfair or deceptive acts or practices'" in knowing and willful violation of M.G.L.A c. 93A").  As the Court has already noted, Defendants do not argue that the IPSAC's allegations are insufficient to state federal and other state antitrust claims (except as to injuries relating to certain egg products), and Defendants even appear to argue that the allegations plead antitrust violations. *See* Defs.' Reply at 8.  Given that Massachusetts allows indirect purchasers to bring what are in essence antitrust violations pursuant to G.L. ch. 93A, no allegations of fraudulent conduct must be pled in order to sufficiently allege a G.L. ch. 93A claim.[36]

In sum, the Defendants' arguments do not raise any valid basis for dismissing the Massachusetts law claim, and the Court denies their motion in this respect.

**6.  New Mexico**

Defendants also argue that Plaintiffs insufficiently plead an "unconscionable trade practice" within the meaning of the New Mexico Unfair Practices Act ("NMUPA"), and thus fail to state a claim based upon a violation of that Act.

The NMUPA provides:  "Unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful." N.M. Stat. Ann. § 57-12-3.  The Act separately defines both "unfair or deceptive trade practice" and "unconscionable trade practice," but the Court need evaluate only the latter concept in order to resolve this Motion.  The NMUPA defines an "unconscionable trade practice" as:

---

[36]  Furthermore, because the factual allegations of the contours of the alleged conspiracy and the "collective efforts," as discussed above in relation to the other state antitrust claims, do not sound in fraud, heightened pleading under Rule 9(b) is not required.

> an act or practice in connection with the sale, lease, rental or loan, or in
> connection with the offering for sale, lease, rental or loan, of any goods or
> services, including services provided by licensed professionals, or in the extension
> of credit or in the collection of debts that to a person's detriment:
>> (1) takes advantage of the lack of knowledge, ability, experience or
> capacity of a person to a grossly unfair degree; *or*
>> (2) results in a gross disparity between the value received by a person and
> the price paid.

N.M. Stat. § 57-12-2(E) (emphasis added).

These provisions of the NMUPA appear largely undeveloped, and there is only sparse

case law that has addressed either of the two definitions of "unconscionable trade practice." The

law has developed enough, however, for the Court to appreciate that an inquiry into either

definition is necessarily fact-intensive, and a multitude of factors may be appropriate for

consideration as to whether an act or practice is an "unconscionable trade practice."

For example, as to the second definition of an "unconscionable trade practice" involving

"gross disparity" between price paid and "value received," Defendants have argued that in

*Hernandez v. Wells Fargo Bank N.M., N.A.*, 128 P.3d 496, 499 (N.M. Ct. App. 2005), the

Court's single use of "benefit received" in place of "value received" is meaningful. *See id.*

(concluding that Plaintiff "does not raise an evidentiary issue that there was a gross disparity

between the overdraft fee and the benefit received"). That is, according to Defendants, "*value*

received" is defined as "*benefit* received." Expanding upon this notion, Defendants argue that,

assuming the truth of the IPSAC's allegations, the pleading highlights that egg consumers

actually receive the benefit of the bargain even when purchasing eggs at certain artificially

elevated prices because there are "many benefits of eggs" and the high inelasticity of consumer

demand serves to reflect consumers' perceived benefits from eggs. Defs.' Reply at 17 (citing

IPSAC ¶¶ 127, 145, 181); *see also* IPSAC ¶ 128.  In economic terms, Defendants appear to argue that consumers derive a high level of utility from eggs, and that this utility is the measure of "benefit received" and, thus, of "value received."

However, the Defendants' reading of *Hernandez* and arguments based upon that reading are not entirely, much less inexorably, justified.  Rather, the *Hernandez* usage of "benefit received" can be read as merely a synonym for "value received,"  not intended to convey any substantive difference of "message."  Indeed, although the *Hernandez* Court uses the term "benefit received," it does not further elaborate or provide any discussion that might illuminate the meaning of the term, including whether *vel non* it implicates consumer utility.[37]

At this time, the Court need only address whether the IPSAC's allegations plead the second definition of "unconscionable trade practice" under the NMUPA.  In this respect,

---

[37]  What Defendants appear to discount in *Hernandez* is that court's recognition that the value received for a good or service must be evaluated by considering the specific factual circumstances of the good or service and its purchase.  This includes considering factors specific to the production side of that good or service, including, *inter alia*, the provider's costs, industry regulation, general industry practices, actions of the providers' competitors, and a providers' business plan and marketing strategy.  *See Hernandez*, 128 P.3d at 498 (discussing how, at summary judgment, a defendant bank's proffered affidavit attesting to these factors in relation to the service at issue, a bank's overdraft fees, "meets the requirements of a prima facie showing that there is no gross disparity between the value received by Plaintiff and the fee he paid for that value").  Additionally, *Lenscrafters, Inc. v. Kehoe*, No. 28,145, 2010 WL 4924992, at *8 (N.M. Ct. App. Oct. 15, 2010), *writ. cert. granted*, 263 P.3d 902 (N.M. 2011), suggests that facts concerning the nature of the specific good or service at issue might also require evaluation.  *See id.* (determining that, to the extent that the NMUPA might apply to a lease of equipment, as a subpart of a lease for office space, to withstand summary judgment, a plaintiff would need to present "evidence to evaluate the equipment portion of the sublease agreement or any apportionment of the overall lease to the equipment" in order to determine whether a provision allowing for a $12,000 per year increase in rent "was a gross disparity in value between what [plaintiff] was paying in rent and what he received under the equipment portion of the agreement").  These cases, then, suggest that a variety of factors may be appropriately considered in determining whether gross disparity between value received and price paid exists.

Plaintiffs plead that the act or practice that constitutes the unconscionable trade practice in violation of the NMUPA is that "Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supracompetitive levels."  IPSAC ¶¶ 440-41.  The IPSAC alleges that "as a direct and proximate result of" that conduct, "Plaintiff and the New Mexico Indirect Purchaser State Class have been injured." *Id.* ¶ 445.  The IPSAC alleges that Plaintiffs "have been injured in their businesses and property in that they have paid more for shell eggs and processed egg products than they otherwise would have paid in the absence of Defendants' unlawful conduct." *Id.* ¶ 314; *see also id.* ¶ 8 (alleging that the injury is the payment of "supra-competitive prices for shell eggs and egg products").

Defendants quantify the alleged artificially-inflated price increase by example, alleging that Defendants attributed their alleged export program—one of the eight collective actions allegedly advancing the conspiracy to reduce the supply of eggs—to a 40% increase in the domestic prices of eggs.  *See id.* ¶ 247 ("As the *Wall Street Journal* reported on September 23, 2008:  The industry group [UEP] itself credited the [export] campaign with helping to boost domestic egg prices, which rose more than 40% in the next year.").  In light of these allegations, and given this early stage of the litigation, the Court concludes that dismissal of the NMUPA claim as a matter of law is not warranted at this time.[38]

---

[38]   Because the allegations that give rise to the NMUPA claim are based upon the second definition of "unconscionable trade practice" and those allegations do not sound in fraud, consideration of Rule 9(b) is not required here for reasons previously discussed *supra* in relation to other state antitrust claims.

The case law discussed above demonstrates that a fact-intensive inquiry is required to determine whether Defendants' engaged in conduct related to the sale of eggs that resulted in a "gross disparity" between the benefit received and the price paid.  Moreover, although Defendants have proposed one approach to pleading gross disparity (one not entirely supported by the legal authority cited), they have not identified any case law specific to the NMUPA that has held that gross disparity between value received and price paid cannot be sufficiently pled based upon factual allegations that Plaintiffs paid artificially-inflated prices for eggs as a result of a supply-side price-fixing conspiracy.[39]

Indeed, there is case law that has concluded otherwise.  Several federal courts that have considered similar factual allegations (some even less specific than those in the IPSAC) have determined that such allegations are sufficient to state a NMUPA claim based upon gross disparity and are sufficient to withstand a motion to dismiss.  *See, e.g.*, *TFT-LCD*, 586 F. Supp. 2d at 1127 (denying motion to dismiss NMUPA claim based upon allegations that "defendants' conspiracy resulted in significant artificial increases in the price of LCDs, which resulted in a 'gross disparity' between the value received by the New Mexico plaintiff and class and the prices paid by them for LCD"); *Chocolate*, 602 F. Supp. 2d at 586 (determining allegations that plaintiffs "paid 'artificially inflated prices for' chocolate candy products . . . , that defendants stabilized prices at noncompetitive levels . . ., and that plaintiffs 'paid more for [chocolate candy]

---

[39]  Although Defendants contend that the NMUPA requires Plaintiffs to plead "something more than merely alleging that the price of a product was unfairly high," the case cited by Defendants in support of this position does not appear to have reached that conclusion based upon consideration of New Mexico law.  *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 129-30 (N.D. Cal. 2007) (citing the consumer protection laws of Arkansas and the District of Columbia for the proposition that "pleading unconscionability requires something more than merely alleging that the price of a product was unfairly high").

products than they would have paid in the absence of [the alleged] antitrust violations,'" were

adequate to plead a claim under the NMUPA); *Aftermarket Filters*, 2009 WL 3754041, at *9

("[P]laintiffs plead that they paid 'supra-competitive' prices for the filters they received. This

allegation is sufficient to allege gross disparity [for purposes of pleading an NMUPA claim].").

Accordingly, the Court denies the motion to dismiss the NMUPA claim.[40]

## 7.  New York

Defendants move to dismiss the Plaintiffs' claim brought pursuant to General Business

Law § 349 of the New York Consumer Protection Statute.  They argue that Plaintiffs do not state

such a claim for relief because, *inter alia*, the IPSAC does not contain factual allegations that

plausibly suggest that the conduct purported to be the basis for the Section 349 claim caused the

Plaintiffs' harm.

General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus.

Laws § 349(a).  As the Court of Appeals of New York has summarized:

A plaintiff under section 349 must prove three elements:  first, that the
challenged act or practice was consumer-oriented; second, that it was misleading
in a material way; and third, that the plaintiff suffered injury as a result of the
deceptive act.  Whether a representation or an omission, the deceptive practice
must be "likely to mislead a reasonable consumer acting reasonably under the
circumstances." A deceptive practice, however, need not reach the level of
common-law fraud to be actionable under section 349.  In addition, a plaintiff
must prove "actual" injury to recover under the statute, though not necessarily
pecuniary harm.
Further, as we have repeatedly stated, reliance is not an element of a
section 349 claim.  The plaintiff, however, must show that the defendant's

---

[40]  In light of the Court's determination that Plaintiffs may proceed with their NMUPA
claim at this time, the Court does not determine whether Plaintiffs have also stated such a claim
pursuant to the first definition of an "unconscionable trade practice."

"material deceptive act" caused the injury.

*Stutman v. Chem. Bank*, 731 N.E.2d 608, 611-612 (N.Y. 2000) (internal citations omitted).

"[T]o qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." *Goshen v. Mutual Life Ins. Co. of New York*, 774 N.E.2d 1190, 1195 (N.Y. 2002). Furthermore, "[a]n antitrust violation may violate section 349, but only if it is deceptive." *New Motor Vehicles*, 350 F. Supp. 2d at 197; *see also New York v. Daicel Chem. Indus., Ltd.*, 42 A.D.3d 301, 303 (N.Y. App. Div. 2007) (" . . . General Business Law § 349 . . . only applies to anti-competitive conduct that is premised on the deception of consumers."); *In re Automotive Refinishing Paint Antitrust Litig.*, 515 F. Supp. 2d 544, 554 (E.D. Pa. 2007) ("A number of courts and commentators have observed that the absence of the reference to unfair competition or unfair practices in § 349 'indicates that anticompetitive conduct that is not premised on consumer deception is not within the ambit of the statute.'" (quoting *Leider v. Ralfe*, 387 F. Supp. 2d 283, 295 (S.D.N.Y. 2005)).

Plaintiffs argue that their Section 349 claim arises from "Defendants deceptively hid[ing] their price-fixing conspiracy from Plaintiffs, affecting the broad public interest in New York[,] . . . by provid[ing] pretextual reasons for rising prices, citing, among other reasons, animal husbandry guidelines as the reason for curtailments in supply." Pls.' Resp. at 26. However, this theory does not plainly emanate from the actual allegations pled by the Plaintiffs as to the Section 349 claim as articulated in the IPSAC. To the extent that the IPSAC arguably invokes concepts of "hiding" and "pretext," it appears that to do so Plaintiffs primarily rely on the vague, convenient catch-all adverb "deceptively" that does appear in their pleading.

The IPSAC alleges that "Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and *deceptively* fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of shell eggs and egg products at supracompetitive levels."  IPSAC ¶ 454 (emphasis added).  As alleged, this "knowing and willful conduct of the Defendants . . . constitutes materially misleading consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349 [because] Defendants' actions materially misled New York consumers and resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner."  *Id.* ¶ 455.  According to the IPSAC, "[a]s a result of Defendants' illegal conduct Plaintiffs and members of the New York Indirect Purchaser State Class paid supra-competitive, artificially inflated prices for shell eggs and egg products" and Plaintiffs are "seeking actual damages only for their injuries."  *Id.* ¶¶ 457-58.

Plaintiffs defend these allegations by claiming that there is case law to suggest that allegations that plead "in a conclusory fashion that defendants engaged in deceptive conduct" in order to conceal the alleged price-fixing conspiracy satisfies the requisite pleading standard.  Pls.' Resp. at 25.  But this argument is at odds with and is directly contradicted by the principle that in order to sufficiently plead a claim a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*,  550 U.S. at 555 (citation omitted).  Certainly, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950.  Arguably, some factual allegations in support of the Section 349 claim that are not

59

conclusory may be nesting in the IPSAC—but it is not clear from the IPSAC or the Plaintiffs' briefing on which precise factual allegations the Section 349 claim relies (and, accordingly, whether they plausibly suggest a Section 349 claim).

Regardless, there are insufficient factual allegations in the IPSAC to plausibly suggest that the alleged "hiding" of the antitrust conspiracy from Plaintiffs through pretextual explanations for rising egg prices actually caused the Plaintiffs' alleged injury.  "[W]hile the statute does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary, harm." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995); *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 56 (N.Y. 1999) (recognizing that actual harm must be caused by a defendant's material deceptive act or practice).  In other words, "deception does not, in and of itself, constitute an injury." *Cox v. Microsoft Corp.*, 809 N.Y.S.2d 480 (Table), 2005 WL 3288130, at *4 (N.Y. Sup. Ct.  2005).

As Defendants correctly argue, the IPSAC does not plausibly suggest that the purported pretextual explanations for the rising egg prices are the actual cause of the Plaintiffs' alleged harm of paying artificially-inflated prices for eggs.  Indeed, as this articulation of the Plaintiffs' Section 349 claim demonstrates, Plaintiffs would have paid artificially-inflated egg prices *before* Defendants allegedly began to offer pretextual reasons for those increases.  Moreover, there are no factual allegations, or causation theories proffered, by Plaintiffs that would suggest that the Defendants' alleged misleading conduct caused artificially-inflated egg prices *after* the challenged conduct allegedly occurred.  Because this element of a Section 349 claim has not been

sufficiently pled, Plaintiffs cannot have stated a claim that Defendants have violated Section 349 for purposes of meeting the demands of Rule 8.[41]  The Court grants without prejudice the Defendants' motion to dismiss this claim.

## 8.  North Carolina

Defendants urge that the Plaintiffs' claim under Section 75-1.1 of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") be dismissed on the grounds that the IPSAC does not allege facts suggesting that a plaintiff detrimentally relied on a deceptive statement or misrepresentation.  They assert this claim is deficiently pled under Rules 8 and 9(b).

Section 75-1.1 of the UDTPA provides:  "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  N.C. Gen. Stat. §75-1.1(a).  Certain violations of state and federal law can constitute a *per se* violation of Section 75-1.1.  *See generally* Noel L. Allen, *North Carolina Unfair Business Practice* § 9.04 (3d ed. 2004) (Oct. 2011 Supplement) (discussing *per se* violations of Section 75-1.1).

The Fourth Circuit Court of Appeals has found that one such *per se* violation is a violation of federal antitrust law.  *See ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 48 (4th Cir. 1983) ("[Plaintiff] asserts that anticompetitive actions which run afoul of the proscriptions of the Sherman Act—in particular, actions in furtherance of a horizontal conspiracy to fix prices—are also actions banned by the North Carolina act. We agree."), *aff'd on rehearing*, 742

---

[41]  Given the Court's decision, the Court need not address at this time whether Rule 9(b) applies here.

F.2d 170 (4th Cir. 1984); *see also* Allen, *supra*, §§ 16.10, 26.01.  In reaching this conclusion, the

Court of Appeals explained:

> Highly persuasive to us is the fact that the substantive provisions of the North
> Carolina act are reproduced *verbatim* from § 5 of the Federal Trade Commission
> Act, 15 U.S.C. § 45(a)(1), and that the North Carolina Supreme Court, consistent
> with that observation, had held that "[b]ecause of the similarity in language, it is
> appropriate for us to look to the federal decisions interpreting the FTC Act for
> guidance in construing the meaning of . . . § 75-1.1."  Of course, it is an accepted
> tenet of basic antitrust law that § 5 of the Federal Trade Commission Act sweeps
> within its prohibitory scope conduct also condemned by § 1 of the Sherman Act.

*ITCO Corp.*, 722 F. 2d at 48 (internal citations omitted). [42]

Apart from *per se* violations, plaintiffs have alternative recourse in pleading a *prima facie*

UDTPA violation in terms of "unfair methods of competition" and "unfair or deceptive acts or

practices."  The UDTPA distinguishes between these two concepts.  *See Henderson v. U.S.*

*Fidelity & Guar. Co.*, 488 S.E.2d 234, 239 (N.C. 1997).

As for the latter concept, to set forth the elements for a *prima facie* claim of "unfair or

deceptive practices," North Carolina law requires a plaintiff to demonstrate that:  "(1) defendant

committed an unfair or deceptive act or practice, (2) the action in question was in or affecting

commerce, and (3) the act proximately caused injury to the plaintiff."  *Dalton v. Camp*, 548

S.E.2d 704, 711 (N.C. 2001) (citing *Spartan Leasing Inc. v. Pollard*, 400 S.E.2d 476, 482 (N.C.

Ct. App. 1991)).

---

[42]   The legal authority is opaque as to whether a violation of North Carolina antitrust
constitutes a Section 75-1.1 claim.  *See* Allen, *supra*, § 27.01 (recognizing that "some courts and
commentators have viewed the Chapter 75 antitrust prohibitions to be coincidentally illegal
under § 75-1.1, [and] at least one court has regarded part of former N.C. Gen. Stat. § 75-5 to be
outside the scope of § 75.1-1" (footnote omitted)).

As to the former concept, according to the Court of Appeals of North Carolina, "[n]o precise definition of 'unfair methods of competition' as used in [Section 75-1.1] exists." *United Laboratories, Inc. v. Kuykendall*, 403 S.E.2d 104, 109 (N.C. Ct. App. 1991) (quoting *McDonald v. Scarboro*, 370 S.E.2d 680, 684 (N.C. Ct. App. 1988)). Rather, a case-by-case assessment is required:

> Unfair competition has been referred to in terms of conduct "which a court of equity would consider unfair." . . . Thus viewed, the fairness or unfairness of particular conduct is not an abstraction to be derived by logic. Rather, the fair or unfair nature of particular conduct is to be judged by viewing it against the background of actual human experience and by determining its intended and actual effects upon others.

*Id.*; *see also Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 439 (4th Cir. 2010) ("As used in the UDTPA, the words 'unfair methods of competition' encompass 'any conduct that a court of equity would consider unfair.' . . . More specifically, a 'practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive.'" (citing *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987))).[43]

The Defendants' objections to the UDTPA claim are based entirely upon the contention that Plaintiffs must allege their reliance on a defendant's statement or misrepresentation and have failed to do so. This argument directly invokes a *prima facie* claim for an "unfair or deceptive practice." However, as the foregoing summary of North Carolina law concerning the UDTPA demonstrates, a Section 75-1.1 claim may also arise in the form of a *per se* violation, such as a

---

[43] There is no unequivocal law in North Carolina that bars consumers from bringing a UDTPA claim based upon an "unfair method of competition." *See* John F. Graybeal, *Unfair Trade Practices, Antitrust and Consumer Welfare in North Carolin*a, 80 N.C. L. Rev. 1927, 1991-98 (2002) (discussing North Carolina law concerning whether consumers, as opposed to competitors, may pursue an unfair method of competition claim under the UDTPA). Defendants have raised no arguments for dismissal on this basis.

violation of the Sherman Act, or an "unfair or deceptive practice," which defies a precise legal

test.  As such, for a Section 75-1.1 violation, a plaintiff is not always obligated to plead

allegations of reliance on a statement or misrepresentation, and therefore, the Defendants'

argument does not compel dismissal as a matter of law.

Furthermore, given that a violation of the Sherman Act constitutes a *per se* violation of

Section 75-1.1, and acknowledging that Defendants have not raised any arguments on the

grounds that Plaintiffs entirely have failed to sufficiently allege federal antitrust violations, for

that reason alone the motion to dismiss this claim cannot succeed.  A fair reading of the IPSAC's

allegations suggests that the Defendants' alleged federal antitrust violation is the basis for the

Section 75-1.1 claim.  *See, e.g.*, Pls.' Resp. at 4-5; IPSAC ¶¶ 466-67, 469 (alleging that

"Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and

deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and

restraining and manipulating the supply of shell eggs and egg products at supracompetitive levels

. . . ." and that the "Defendants' unlawful practices, including combinations and contracts to

restrain trade and allocate the relevant markets" constitutes the violation of Section 75-1.1).[44]

Thus, it is appropriate to deny the Defendants' motion as to the Section 75-1.1 claim.

## 9.  West Virginia

Defendants argue for the dismissal of the Plaintiffs' West Virginia Consumer Credit and

Protection Act ("WVCCPA") on the grounds that Plaintiffs failed to allege that they satisfied the

statutorily-required pre-suit notice and provision for an opportunity to cure.

---

[44]  The Court determines that the antitrust conspiracy alleged does not sound in fraud for the reasons already discussed *supra* in relation to other state claims.  Thus, Rule 9(b) does not apply to this claim.

The WVCCPA requires that before bringing suit for a violation of the Act a consumer must notify the seller of the alleged violation at issue:

> [N]o action may be brought pursuant to the provisions of this section until the consumer has informed the seller or lessor in writing and by certified mail of the alleged violation and provided the seller or lessor twenty days from receipt of the notice of violation to make a cure offer: *Provided*, That the consumer shall have ten days from receipt of the cure offer to accept the cure offer or it is deemed refused and withdrawn.

W. Va. Code § 46A-6-106(b) (emphasis in original).[45]

Plaintiffs admit that they have failed to allege pre-suit notification. At oral argument, Defendants agreed to allow Plaintiffs to cure the omissions via amendment. Tr. 81:4-82:3. Accordingly, the Court grants the motion to dismiss the WVCCPA claim without prejudice to Plaintiffs to undertake to cure the acknowledged shortcoming.[46]

### F.  State Unjust Enrichment Claims

Defendants move to dismiss all 21 of the Plaintiffs' unjust enrichment claims. Plaintiffs have brought those claims under the laws of Arizona, California, the District of Columbia, Florida, Iowa, Kansas, Massachusetts, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

---

[45]   Considering a summary judgment motion, one court recently concluded that "the plaintiff's failure to comply with the mandatory prerequisite set forth in Section 46A-6-106(b) bar[red] her from bringing a claim." *Stanley v. Huntington Nat. Bank*, No. 1:11CV54, 2012 WL 254135, at *7 (N.D. W.Va. Jan. 27, 2012).

[46]   Because the Court is dismissing for lack of pre-suit notification allegations, the Court does not address Defendants' arguments for dismissal on the basis of Rules 8 and 9(b).

At the outset, the Court notes that the *prima facie* elements for various state unjust enrichment claims are not entirely birds of a feather. That is, it is well-accepted that the "elements necessary to allege unjust enrichment vary state by state." *Flonase*, 692 F. Supp. 2d at 541 (citing *Powers v. Lycoming Engines*, 245 F.R.D. 226, 230-31 (E.D. Pa. 2007), *vacated on other grounds*, 328 F. App'x 121 (3d Cir. 2009) (unpublished); and Restatement (First) of Restitution § 1 (1937)); *see also SMW*, 737 F. Supp. 2d at 424. Nonetheless, the common denominator is the shared principle that it is unjust for a defendant who is enriched at the expense of the plaintiff to accept and retain the ill-gotten benefit. *See Flonase*, 692 F. Supp. 2d at 541; *SMW*, 737 F. Supp. 2d at 424; *see generally* Restatement (First) of Restitution § 1; Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011).

As to virtually each of the Plaintiffs' unjust enrichment claims—excepting those brought under the laws of Arizona, North Dakota, and Tennessee—the IPSAC poses the following three cookie-cutter allegations:

> A.      By engaging in the unlawful conduct described herein, Defendants received higher prices for their eggs that were sold to indirect purchasers in the [*Name of State*] than would have been possible absent the illegal conduct. *See, e.g.,* IPSAC ¶¶ 333, 345, 353.
>
> B.      The Defendants were able to achieve their increased revenues and profits from their sales of eggs to [*Name of State*] indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in [*Name of State*] was connected to and due to the increased prices paid for Defendants eggs by indirect purchasers in [*Name of State*]. *See, e.g.,* IPSAC ¶¶ 334, 346, 354.
>
> C.      Defendants were enriched by their illegal activities at the expense of [*Name of State*] indirect purchasers of eggs and thus Defendants should be ordered to make restitution for the benefit of [*Name of State*] indirect purchasers because it

would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices. *See, e.g.*, IPSAC ¶¶ 335, 347, 355.

Defendants raise several arguments for dismissal of the unjust enrichment claims—some specific to certain state's laws and others more broadly generalized to the law of several states. The Court addresses these arguments in turn.

## 1.  Unjust Enrichment Claim:  North Dakota

Defendants have raised several grounds for the dismissal of the Plaintiffs' North Dakota unjust enrichment claim.  Plaintiffs have stated that they "do not contest dismissal of the North Dakota claims for unjust enrichment."  Pls. Resp. at 52 n.34.  Therefore, the Court grants the Defendants' motion to dismiss the unjust enrichment claim under North Dakota law, and will proceed to discuss in this decision the Plaintiffs' remaining 20 unjust enrichment claims.

## 2.  Unjust Enrichment as an Independent Cause of Action:  California and Mississippi

Defendants claim that neither the laws of California nor Mississippi recognize unjust enrichment as an independent cause of action.  Rather, in those states, Defendants contend, the principles of unjust enrichment apply only as a measure of damages.  Plaintiffs defend the IPSAC by asserting that both of these states' courts recognize a separate cause of action for unjust enrichment.  The Court concludes that the Plaintiffs' position on this point is the correct one.

California courts, including the Supreme Court of California, have acknowledged that parties may pursue causes of action arising from an unjust enrichment claim under California law. *See, e.g.*, *Ghirardo v. Antonioli*, 924 P.2d 996, 1002-03 (Cal. 1996) (recognizing that although plaintiff did not have a statutory claim for relief, he "was, however, entitled to seek relief under traditional equitable principles of unjust enrichment" and articulating the legal

67

standard for such a claim as one where "an individual may be required to make restitution if he is

unjustly enriched at the expense of another"); *F.D.I.C. v. Dintino*, 167 Cal. App. 4th 333, 346

(Cal. Ct. App. 2008) ("[U]njust enrichment is a common law obligation implied by law based on

the equities of a particular case and not on any contractual obligation."); *First Nationwide Sav. v.

Perry*, 11 Cal. App. 4th 1657, 1662-63 (Cal. Ct. App. 1992) (articulating the contours of an

unjust enrichment claim under California law); *Marina Tenants Assn. v. Deauville Marina Dev.

Co.*, 181 Cal. App. 3d 122, 134 (Cal. Ct. App. 1986) ("It is of course the law that when one

obtains a benefit which may not be justly retained, unjust enrichment results, and restitution is in

order.").[47]  Granted, there appears to be something of a schism among California state courts as

to this point of law.  *See Graphics Processing Units*, 527 F. Supp. 2d at 1029 (citing various state

appellate cases to demonstrate that "California courts are split on whether unjust enrichment can

exist as a separate claim").  Yet even Defendants concede that there are "cases that have allowed

unjust enrichment causes of action" in California. Defs.' Reply at 27.  Given that California

courts have not uniformly or definitively barred an independent cause of action for unjust

enrichment, this Court cannot agree with Defendants that as a matter of law Plaintiffs may not

pursue an unjust enrichment claim under California law.  The Court will permit this claim to

move ahead, and denies the Motion as to this issue.

---

[47] *See also* 1 Witkin Summary Cal. Law Contracts § 1013 ("The right to restitution or
quasi-contractual recovery is based upon *unjust enrichment*. Where a person obtains a *benefit*
that he or she may not *justly retain*, the person is unjustly enriched.  The quasi-contract, or
contract 'implied in law,' is an *obligation* (not a true contract . . .) created by the law without
regard to the intention of the parties, and is designed to restore the aggrieved party to his or her
former position by return of the thing or its equivalent in money."); *see generally* Douglas L.
Johnson & Neville L. Johnson, *What Happened To Unjust Enrichment In California? The
Deterioration of Equity in the California Courts*, 44 Loy. L.A. L. Rev. 277 (2010) (advancing the
thesis that an independent cause of action for unjust enrichment exists under California law).

Likewise, with respect to Mississippi, there is considerable authority that supports the existence of an independent state law claim for unjust enrichment. *See, e.g.*, *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 342-43 (Miss. 2004) (evaluating whether a Mississippi unjust enrichment claim survives summary judgment); *Omnibank of Mantee v. United Southern Bank*, 607 So. 2d 76, 92-93 (Miss. 1992) (summarizing Mississippi case law as to guiding principles pertaining to an unjust enrichment claim); *Dorsey Miss. Sales, Inc. v. Newell*, 168 So. 2d 645, 651 (Miss. 1964) (discussing Mississippi law as to an unjust enrichment claim based upon quasi-contract theory). One federal district court recently examined the precise issue *sub judice* with a thoughtful survey of Mississippi law, as applied by Mississippi courts and federal courts sitting in diversity, and concluded that "there is a substantial body of Mississippi case law that treats unjust enrichment as a separate cause of action." *See In re Light Cigarettes Mktg. Sales Practices Litig.*, 751 F. Supp. 2d 183, 194-95 (D. Me. 2010). This Court embraces that district court's sound analysis and ultimate conclusion of law by reference here. *See id.* 193-96. Accordingly, the Court will not dismiss as a matter of law the Plaintiffs' Mississippi unjust enrichment claim on these grounds.

### 3.   Absence of Adequate Remedy at Law:  10 Jurisdictions

Defendants move to dismiss the unjust enrichment claims under the laws of 10 states—Arizona, Florida, Massachusetts, Minnesota, Nevada, New Mexico, North Carolina, South Dakota, Utah, and Vermont—on the grounds that Plaintiffs have failed to allege the absence of an adequate remedy at law. According to Defendants, the absence of an adequate remedy at law is a "necessary element" of an equitable claim for unjust enrichment under these states' laws.

69

As discussed above, the elements necessary to establish an unjust enrichment vary state by state, and some jurisdictions require proof of elements that others do not require. Consequently, an evaluation of the Defendants' argument simply requires determining whether the absence of an adequate remedy at law is actually an element of the *prima facie* case for unjust enrichment under the law of a given state—for which Plaintiffs would have the burden of proof. Some jurisdictions may only recognize this legal precept as an affirmative defense or some other equitable consideration,[48] while others may not embrace it in any form.[49]

If the first scenario applies, the Plaintiffs must plead that element of the *prima facie* claim under state law. If the latter several scenarios apply, Plaintiffs have no obligation to plead the unavailability of an adequate remedy at law. Certainly, when a jurisdiction does not recognize such a legal principle in the context of unjust enrichment, it need not be pled. And even if a jurisdiction recognizes an adequate remedy at law as an affirmative defense or equitable

---

[48] *See* 66 Am. Jur. 2d Restitution and Implied Contracts § 28 (recognizing that an adequate remedy at law can be a defense to unjust enrichment); 3 Dan B. Dobbs, *Law of Remedies* §12.8(2) at 204 (2d ed. 1993) (recognizing that the adequacy test need not be a part of the *prima facie* case and can be "one factor to be considered in deciding whether relief is warranted").

[49] This latter proposition is illustrated by the *Restatement (Third) of Restitution* (2011). Section 4(2) of the Restatement provides that the unavailability of an adequate remedy at law is not a consideration in an unjust enrichment claim: "A claimant otherwise entitled to a remedy for unjust enrichment, including a remedy originating in equity, need not demonstrate the inadequacy of available remedies at law." *Id.* § 4(2). As the comment to Section 4(2) explains: "Although some remedies in restitution are indeed equitable in origin, there is no requirement that a claimant who seeks any of the remedies described in this Restatement must first demonstrate the inadequacy of a remedy at law. An argument to the contrary should appear antiquated today, but § 4(2) is included to remove any doubt." *See also* 1 George E. Palmer, Law of Restitution § 1.6 at 34 (1978) ("Although an occasional decision suggests that restitution will be denied when alternative remedies are considered adequate, innumerable cases demonstrate that this is incorrect." (footnote omitted)). Moreover, the Restatement does not include "adequate remedy at law" among the possible defenses to unjust enrichment. *See id.* §§ 62-70.

consideration, a plaintiff does not carry the burden of proof, and furthermore generally has no

obligation under Federal Rule of Civil Procedure 8 to anticipate and plead in opposition to that

defense—except, perhaps, when the defense will be an inevitable response given what is pled on

the face of the complaint.  *See* Fed. R. Civ. P. 8(a); Wright & Miller, *supra*, § 1276 (recognizing

that pleading "allegations that seek to avoid or defeat a potential affirmative defense . . . are not

an integral part of the plaintiff's claim for relief and lie outside his or her burden of pleading");

*id.* § 1226 ("The pleader must be careful not to allege facts that constitute a defense to his claim

for relief . . . .  A complaint containing [such] a built-in defense usually is vulnerable under Rule

12(b)(6) to a motion to dismiss for failure to state a claim upon which relief can be granted.");

*see also Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997)

(acknowledging that an affirmative defense must be apparent on the face of the complaint to be

subject to a Rule 12(b)(6) motion to dismiss).

Furthermore, under any of the aforementioned scenarios, that a complaint alleges an

unjust enrichment claim and also brings alternative claims for relief that might constitute

adequate remedies at law is of no consequence under the pleading constraints of the Federal

Rules of Civil Procedure.  Rule 8 allows plaintiffs to plead claims in the alternative despite

inconsistencies "in both legal and factual allegations."  *Indep. Enters. Inc. v. Pittsburgh Water

and Sewer*, 103 F.3d 1165, 1175 (3d Cir. 1997); *see* Fed. R. Civ. P. 8 (d)(2), (3).  The Rule "has

been interpreted to mean that a court may not construe a plaintiff's first claim as an admission

against another alternative or inconsistent claim."  *Indep. Enters.*, 103 F.3d at 1175 (internal

quotations and brackets omitted).  It follows that regardless of *whether or not* a jurisdiction

requires proving the absence of an adequate remedy at law as part of the *prima facie* claim for

unjust enrichment, an unjust enrichment claim cannot be deficient on the grounds that the

complaint also alleges claims at law for alternative forms of relief.

As a starting point, the Court concludes that the absence of an adequate remedy at law is

*not* an element of the *prima facie* case for unjust enrichment under the laws of 9 of the

jurisdictions at issue—Florida, Massachusetts, Minnesota, Nevada, New Mexico, North

Carolina, South Dakota, Utah, and Vermont.[50]  Defendants have cited no authority

_____

[50]   The Court reaches this conclusion based upon the following assessment of the laws of
the nine states.

Florida
        Plaintiffs need not plead the unavailability of remedy provided by law to state a claim for
unjust enrichment under Florida law. The Supreme Court of Florida has acknowledged that the
"elements of an unjust enrichment claim are 'a benefit conferred upon a defendant by the
plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention
of the benefit under circumstances that make it inequitable for him to retain it without paying the
value thereof.'" *Florida Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla.
2004). (citing *Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.*, 668 So. 2d 205, 207 (Fla. Dist.
Ct. App. 1995)).  Lower courts in Florida have held that to "state a claim for unjust enrichment, a
plaintiff must plead the following elements: 1) the plaintiff has conferred a benefit on the
defendant; 2) the defendant has knowledge of the benefit; 3) the defendant has accepted or
retained the benefit conferred; and 4) the circumstances are such that it would be inequitable for
the defendant to retain the benefit without paying fair value for it."  *Golden v. Woodward*, 15
So.3d 664, 670 (Fla. Dist. Ct. App. 2009); *see also Henry M. Butler, Inc. v. Trizec Properties,
Inc.*, 524 So. 2d 710, 711-12 (Fla. Dist. Ct. App. 1988) (articulating same).

Massachusetts
        The unavailability of an adequate remedy at law is not within the parameters of the *prima
facie* claim for unjust enrichment as articulated by Massachusetts courts:
                [T]he sine qua non of unjust enrichment is that the defendant has been
        unjustly enriched.

                "Even where a person has received a benefit from another, he is liable to
        pay therefor only if the circumstances are such that, as between the two persons, it
        is unjust for him to retain it."
        . . . . The term is not descriptive of conduct which, standing alone, would justify
        an action for recovery. Unjust enrichment is an essentially equitable doctrine
        requiring proof of some misconduct, fault or culpable action on the part of the
        defendant as "wrongdoer" which renders his retention of a benefit at the expense

of another contrary to equity and good conscience.

*DeSanctis v. Labell's Airport Parking Inc.*, 1991 Mass. App. Div. 37, 40 (Mass. App. Ct. 1991) (citation omitted). "Unjust enrichment, as a basis for restitution, requires more than benefit. The benefit must be *unjust*, a quality that turns on the reasonable expectations of the parties." *Community Builders, Inc. v. Indian Motocycle Assocs., Inc.*, 692 N.E.2d 964, 979 (Mass. App. Ct. 1998). The First Circuit Court of Appeals articulated the elements for unjust enrichment under Massachusetts law, which are in accord with the aforementioned standards: "To recover for unjust enrichment under Massachusetts law, [plaintiff] must show that (1) [defendant] knowingly received a benefit (2) at his expense (3) under circumstances that would make retention of that benefit unjust." *Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 58 (1st Cir. 2011) (citing *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009))).

Minnesota

The *prima facie* elements of an unjust enrichment claim, as articulated by the Supreme Court of Minnesota, do not include the absence of an adequate remedy at law. That court has held:

> To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant "in equity and good conscience" should pay. *Klass v. Twin City Fed. Sav. and Loan Ass'n*, 190 N.W.2d 493, 494-95 (1971). "[U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully." *First Nat'l Bank v. Ramier*, 311 N.W.2d 502 (Minn. 1981).

*ServiceMaster of St. Cloud v. GAB Business Services, Inc.*, 544 N.W.2d 302, 306 (Minn. 1996).

Nevada

Under Nevada law, the unavailability of an adequate remedy at law is not a part of the *prima facie* case for unjust enrichment. According to the Supreme Court of Nevada:

> "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nevada Industrial Dev. v. Benedetti*, 103 Nev. 360, 363 n.2, (1987). This court has observed that the essential elements of unjust enrichment "are a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit." *Unionamerica Mtg. v. McDonald*, 97 Nev. 210, 212 (1981).

*Topaz Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992).

New Mexico

The unavailability of an adequate remedy at law is not counted among the elements of an

unjust enrichment claim under New Mexico law. "To prevail on a claim for unjust enrichment, 'one must show that: (1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust.'" *City of Rio Rancho v. Amrep Southwest Inc.*, 260 P.3d 414, 428-429 (N.M. 2011) (citing *Ontiveros Insulation Co. v. Sanchez*, 3 P.3d 695 (N.M. Ct. App. 2000)).

Furthermore, in New Mexico, "[t]here is no requirement that the creation of a statutory remedy at law for a particular type of claim will automatically supplant an equitable remedy that addresses the same claim. [Any] major departure from the long tradition of equity practice should not be lightly implied." *Starko, Inc. v. Presbyterian Health Plan, Inc.*, Nos. 27,992, 29,016, 2011 WL 6429048 (N.M. Ct. App. Dec. 15, 2011) (quoting *Sims v. Sims*, 930 P.2d 153 (N.M. 1996)). "Likewise, . . . 'unjust enrichment constitutes an independent basis for recovery in a civil-law action, analytically and historically distinct from the other two principal grounds for such liability, contract and tort.'" *Id.* (quoting *Hydro Conduit Corp. v. Kemble*, 793 P.2d 855, 860 (N.M. 1990)).

North Carolina

As to unjust enrichment under North Carolina law, the pleading of an absence of an adequate remedy at law is not necessary to state a claim. The Supreme Court of North Carolina has observed:

> In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party. The benefit must not have been conferred officiously, that is it must not be conferred by an interference in the affairs of the other party in a manner that is not justified in the circumstances. The benefit must not be gratuitous and it must be measurable. . . . [T]he defendant must have consciously accepted the benefit.

*Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988); *see also Progressive American Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 647 S.E.2d 111, 116 (N.C. Ct. App. 2007) (quoting same).

South Dakota

The *prima facie* claim for unjust enrichment under South Dakota law does not necessarily involve addressing an adequate remedy at law. "In order to establish unjust enrichment, three elements must be proven: (1) a benefit was received; (2) the recipient was cognizant of that benefit; and (3) the retention of the benefit without reimbursement would unjustly enrich the recipient." *Mack v. Mack*, 613 N.W.2d 64, 69 (S.D. 2000); *see also Hofeldt v. Mehling*, 658 N.W.2d 783, 788 (S.D. 2003) (same).

Utah

Proof of an absence of an adequate remedy at law is not required to state a *prima facie* claim for unjust enrichment in Utah. The Supreme Court of Utah has held:

> In order to prevail on a claim for unjust enrichment, three elements must be met. *See Berrett v. Stevens*, 690 P.2d 553, 557 (Utah 1984). First, there must be a benefit conferred on one person by another. *See id.* Second, the conferee must

that disturbs this conclusion.  It follows that Plaintiffs are not required to plead factual allegations

suggesting such an absence as to those states' unjust enrichment claims.

As to the jurisdiction of Arizona, the Court determines that the absence of an adequate

remedy at law is a *prima facie* element of a claim for unjust enrichment.[51]  Plaintiffs must allege

facts which, taken as true, plausibly suggest this element of the claim in order to survive a

12(b)(6) motion to dismiss the unjust enrichment claim dependent upon Arizona state law.[52]

---

appreciate or have knowledge of the benefit.  *See id.*  Finally, there must be "the
acceptance or retention by the conferee of the benefit under such circumstances as
to make it inequitable for the conferee to retain the benefit without payment of its
value."  *Id.*  The plaintiff must prove all three elements to sustain a claim of unjust
enrichment.

*Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582-83 (Utah 2000).

Vermont

  To establish a *prima facie* claim for unjust enrichment under Vermont law, Plaintiffs are
not obliged to show the unavailability of an adequate remedy at law.  "[T]he elements of unjust
enrichment [are]:  whether '(1) a benefit was conferred on defendant; (2) defendant accepted the
benefit; and (3) defendant retained the benefit under such circumstances that it would be
inequitable for defendant not to compensate plaintiff for its value.'"  *Reed v. Zurn*, 992 A.2d
1061, 1066 (Vt. 2010) (quoting *Center v. Mad River Corp.*, 561 A.2d 90, 93 (Vt. 1989)).

[51]  In Arizona, the *prima facie* claim for unjust enrichment includes the element of the
absence of an adequate remedy at law.  "In Arizona, five elements must be proved to make a case
of unjust enrichment: (1) an enrichment; (2) an impoverishment; (3) a connection between the
enrichment and the impoverishment; (4) absence of justification for the enrichment and the
impoverishment and (5) *an absence of a remedy provided by law*."  *See Community Guardian
Bank v. Hamlin*, 898 P.2d 1005, 1008 (Ariz. Ct. App. 1995) (citing *City of Sierra Vista v.
Cochise Enter., Inc.*, 697 P.2d 1125, 1131 (Ariz. Ct. App. 1984)) (emphasis added); *accord State
v. Arizona Pension Planning*, 739 P.2d 1373, 1376 (Ariz. 1987).

[52]  Defendants contend that the standard for "determining whether a remedy is 'adequate"
is "the 'availability' of a remedy not the 'likelihood of its success.'"  Defs.' Mot. at 50 (quoting
*Tudor Development Group, Inc. v. U.S. Fidelity & Guar. Co.*, 968 F.2d 357, 364 (3d Cir. 1992)).
However, in proposing this legal standard, which appears to be an articulation of Pennsylvania
law, Defendants identify no legal authority that demonstrates that this standard is recognized
under the law of Arizona.  In the absence of legal authority, the Court cannot conclude that the
Defendants' proposed standard for "adequate remedy at law" is the standard applied in Arizona.
Certainly, the Court has insufficient basis to presume that the highest court in that state would

The Defendants' argument thus follows that the IPSAC's allegations specific to Arizona are insufficient to comply with the Plaintiffs' obligation to plead that "they lack an adequate remedy at law." The IPSAC's allegations as to Arizona specifically plead:

> The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification. *To the extent legal remedies do not sufficiently accomplish disgorgement* of Defendants' illegal profits from their sales to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of eggs at illegally inflated prices.

IPSAC ¶¶ 324 (emphasis added). In light of Rule 8(d)(2)'s permissiveness of alternative pleading, given the IPSAC's italicized language above, and allowing for all inferences to be drawn in favor of Plaintiffs, the Court cannot rule as a matter of law that Plaintiffs have failed to plausibly suggest that there is an absence of an adequate remedy at law. The factual allegations in the IPSAC are consistent with the absence of an adequate remedy at law as to the recovery of either all or part of the Defendants' enrichment as connected to the Plaintiffs' impoverishment.

In sum, the Court denies the Defendants' motion to dismiss the 10 state unjust enrichment claims on the grounds of the availability of an adequate remedy at law.

## 4.  Benefit of Bargain:  20 Jurisdictions

Defendants attack generally all 20 of the Plaintiffs' remaining unjust enrichment claims on the grounds that unjust enrichment is unavailable as an "independent cause of action" when Plaintiffs have received the "benefit of the bargain" for which they contracted. Based upon the lone two cases Defendants cite as authority for their argument, the Court discerns that

―――――――――――――――――――

embrace such a requirement.

Defendants are invoking the principle embodied in Section 107(1) of Restatement (First) of

Restitution:

> A person of full capacity who, pursuant to a contract with another, has performed services or transferred property to the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, unless the transaction is rescinded for fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain.

*See also New Motor Vehicles*, 350 F. Supp. 2d at 210 (citing same); *Intel Corp.*, 496 F. Supp. 2d

at 421 (citing same).

However, Defendants do not raise appropriate grounds for such a dismissal because their argument is based upon what is essentially a model law rather than actual law. Beyond raising the principle, as articulated by the First Restatement, and broadly contending that it should be the basis for dismissing all 21 unjust enrichment claims, Defendants have not cited any jurisdiction-specific authority to demonstrate that any of the 21 jurisdictions have actually adopted this legal principle as part of their unjust enrichment jurisprudence. Even assuming, *arguendo*, that all of those jurisdictions might have adopted the principle, Defendants have not established whether those jurisdictions apply it in the manner that Defendants propose. As repeated (and, indeed, already demonstrated) above, states have differing bodies of law on unjust enrichment. Because Defendants have expressed their argument in terms of a model principle of unjust enrichment—as opposed to the actual law of the 21 jurisdictions at issue—the Court determines that it cannot dismiss the Plaintiffs' unjust enrichment claims on these conceptual grounds as a matter of law. The Court denies the motion in this respect.

**5.   Exhaustion of Remedies:  Tennessee**

Under Tennessee law, although Plaintiffs "need not be in privity with a defendant to recover under a claim of unjust enrichment," Plaintiffs must allege that they have exhausted all remedies against parties with whom Plaintiffs were in privity of contract.  *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005); *see also Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966) ("[B]efore recovery can be had against the landowner on an unjust enrichment theory, the furnisher of the materials and labor must have exhausted his remedies against the person with whom he had contracted, and still has not received the reasonable value of his services.").  Alternatively, such exhaustion need not be demonstrated "if the pursuit of the remedies would be futile."  *Freeman*, 172 S.W.3d at 526; *see also Window Gallery of Knoxville v. Davis*, No. 03A01-9906-CH-00225, 1999 WL 1068730, at *2, 4 (Tenn. Ct. App. Nov. 24, 1999) (observing the same).  According to Defendants, dismissal of the Plaintiffs' Tennessee unjust enrichment claim is warranted because Plaintiffs have failed to allege facts that plausibly suggest either the satisfaction of the "exhaustion-of-remedies element" or the futility of such remedial efforts.

Courts interpreting Tennessee law have found that remedial efforts are futile in several kinds of circumstances.  For example, one Tennessee court has held that remedial efforts are futile when a plaintiff can demonstrate that the party with whom it was in privity of contract is "judgment proof."  *See Bank of Nashville v. Chipman*, No. M2010-01581-COA-R3-CV, 2011 WL 3433012, at *5-6 (Tenn. Ct. App. Aug. 5, 2011).  In that case, the plaintiff bank had entered into a loan agreement with a husband who never repaid the loan and then transferred all of his personal assets, except for his IRA, to his wife.  *Id.* at *5-6.  The appellate court recognized that

there was sufficient evidence that the husband had no personal assets, and hence sufficient evidence of futility, and upheld the trial court's finding that the wife was unjustly enriched.  *Id.* at *6.

Some federal courts sitting in diversity have found that consumer plaintiffs have adequately pled futility of pursuing remedies under Tennessee law by alleging, *inter alia*, that the resellers of a product (*i.e.*, the parties in privity of contract with plaintiffs) were not involved in the producer defendants' price-fixing conspiracy, and thus not liable for or the cause of the plaintiffs' alleged losses resulting from that conspiracy.  *See TFT-LCD (Flat Panel)*, 599 F. Supp. 2d 1179, 1192-93 (N.D. Cal. 2009); *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 242 (M.D. Pa. 2010).  Plaintiffs argue that these cases are instructive here, and the Court agrees.

The IPSAC sets forth factual allegations that plausibly suggest that Plaintiffs suffered losses due to the Defendants' alleged conspiracy to reduce the supply of eggs and thereby increase egg prices, and the Defendants' alleged conduct in furtherance of that conspiracy. Plaintiffs have also alleged that "the parties from whom indirect purchasers bought the eggs directly were not, so far as indirect purchasers are aware, a party to, or involved in, the Defendants' illegal activities which caused the increased egg prices to Tennessee indirect purchasers."  IPSAC ¶ 505.  In light of these facts pled, Plaintiffs have plausibly suggested that the pursuit of any remedies against the parties from whom they directly purchased eggs (and thus presumably with whom Plaintiffs were in privity of contract) would be futile because those parties are, as alleged, not directly or indirectly liable for the Plaintiffs' losses due to their lack of involvement in the conspiracy.  *Cf. TFT-LCD (Flat Panel)*, 599 F. Supp. 2d at 1192-93

("Plaintiffs respond that futility is self-evident in these circumstances where the alleged price-fixing was done by the defendants in the manufacture of LCD panels and LCD products, and there has been no allegation that the resellers were involved in the conspiracy. The Court agrees that under the facts alleged in the complaint, futility is evident.").[53]

Accordingly, the Court denies the Defendants' motion to dismiss the Tennessee unjust enrichment claim on these grounds.

### 6.   Unjust Enrichment Claim Prior to May 1, 2006:  Utah

In tandem with their previously-discussed argument that the Utah Antitrust Act does not permit indirect purchasers to recover damages accruing before May 1, 2006, Defendants also claim that the Plaintiffs' Utah claim for unjust enrichment arising from conduct occurring prior to May 1, 2006 should be dismissed.  It appears that Defendants are contending that, as a general rule of thumb, indirect purchasers should be barred from pursuing an unjust enrichment claim in those jurisdictions where indirect purchasers cannot obtain relief under that jurisdiction's antitrust and/or consumer protection laws due to lack of standing or otherwise.  Defendants contend that Utah qualifies as one such jurisdiction—at least prior to the May 1, 2006 effective date of the Utah Antitrust Act amendment that provides for indirect purchaser recovery under the Act.  *See* Utah Code Ann. § 76-10-918.  To be clear, Defendants do not challenge the Plaintiffs'

---

[53]  It does not appear that Plaintiffs must plead facts that demonstrate the futility of other types of remedies against the egg resellers because the IPSAC does not allege any facts that might suggest such alternative means of relief for the Plaintiffs' losses, such as, by way of example, an unjust enrichment claim against the resellers.  *Cf. Chocolate*, 749 F. Supp. 2d at 242 (determining that at the motion to dismiss stage the consumer "plaintiffs simply lack a *cognizable remedy* against the direct purchasers" (emphasis added)).  However, whether Plaintiffs will be able to successfully demonstrate *on the merits* the futility of exhausting all remedies against egg resellers (*assuming* that they were in privity of contract with Plaintiffs for purposes of Tennessee law) is an open question.

pursuit of an unjust enrichment claim for alleged conduct that occurred on or after May 1, 2006.

Thus, Defendants are only challenging the temporal scope of the Utah unjust enrichment claim

and seeking partial dismissal of this claim.[54]

At this time, the Court does not find that the Plaintiffs' unjust enrichment claim for

conduct occurring before May 1, 2006 must be dismissed as a matter of law.  Simply put,

Defendants have not presented this issue to the Court in a manner conducive to resolution.

Indeed, no party has called upon any legal authority specific to Utah law on this issue, and this

issue, by involving questions of common law preclusion and conflicts with statutory law, is one

that must be addressed by examining the specific body of law of the jurisdiction at issue.  *See*

*Erie*, 304 U.S. 64 (requiring federal courts to apply the substantive law of the state in which the

claim arose).

This analytical approach should not be remarkable given that courts have approached

similar questions as to a particular jurisdiction's preclusion of an unjust enrichment claim in the

context of indirect purchasers by examining the law of the specific jurisdiction.  *See, e.g.*, *In re*

*Microsoft Corp. Antitrust Litig.*, 241 F. Supp. 2d 563, 565 (D. Md. 2003) (concluding that

because a Kentucky court "held that a more specific statute controls over a more general one

---

[54] Defendants originally presented this argument in a far broader context, claiming
generally that the Court should dismiss the "Plaintiffs' tag-along unjust enrichment claims in
states where Plaintiffs' lack standing to bring their primary claims or where the primary claim
fail[s] as a matter of law.  Thus, for the same reasons that each of Plaintiffs['] statutory claims
fail, their unjust enrichment claims should be dismissed as well."  Defs.' Mot. at 43.  Defendants
did not identify the specific unjust enrichment claims that they were seeking to dismiss.
Following the Plaintiffs' response brief, Defendants limited their argument to a charge that
"Plaintiffs are attempting . . . an 'end run' around the *Illinois Brick* prohibitions of . . . Utah. . . .
As such, Plaintiffs may not bring an unjust enrichment claim under . . . Utah law for conduct that
occurred prior to May 1, 2006."  Defs.' Reply at 23.

[under Kentucky law]," "a claim for damages for antitrust violations cannot be asserted under the

Kentucky Consumer Protection Act where they cannot be asserted under Kentucky's version of

the Sherman Act" and "[t]his same reasoning equally applies to a common law claim for unjust

enrichment arising from antitrust violations"); *In re Microsoft Corp. Antitrust Litig.*, 401 F.

Supp. 2d 461, 464 (D. Md. 2005) (determining that "the specific bar on indirect purchaser

recovery incorporated into South Carolina's antitrust statutes prohibits Plaintiff's general

common-law claim [for unjust enrichment]" because South Carolina law recognizes that "Where

conflicting provisions exist, the last in point of time or order of arrangement prevails. . . .

Specific laws prevail over general laws"); *Aikens v. Microsoft Corp.*, 159 F. App'x 471, 477 (4th

Cir. 2005) (unpublished) (analyzing Louisiana's Civil Code, which provides that "the unjust

enrichment remedy is 'subsidiary' in nature and 'shall not be available if the law provides

another remedy for the impoverishment or declares a contrary rule'" and recognizing that "the

[indirect purchaser] plaintiffs cannot sue to recover monetary damages under Louisiana antitrust

law" to conclude plaintiffs "cannot employ a subsidiary unjust enrichment claim to circumvent

this rule"); *cf. Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d at 103 (concluding that the "DTPA

should . . . be construed harmoniously and consistently with the Florida legislature's clear intent

to allow only direct purchasers to sue for alleged price-fixing conspiracies" because the Florida

Supreme Court has observed that "[c]ourts should avoid a construction which places in conflict

statu[t]es which cover the same general field"; rather, where two statutes "relat[e] to the same

purpose" they should be construed in harmony" (quoting *City of Boca Raton v. Gidman*, 440 So.

2d 1277, 1282 (Fla. 1983)).

Defendants have referenced—through citation rather than analytical discussion—the rationales of several federal courts in support of their argument. Defs.' Mot. at 43 (citing *Flonase*, 692 F. Supp. 2d at 541-43; *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936-37 (3d Cir. 1999); and *TFT-LCD (Flat Panel)*, 599 F. Supp. 2d at 1191).  By invoking those authorities, Defendants appear to rely on those cases' expression of the general principle—albeit, a principle not based upon or attributed to the laws of any specific jurisdictions—that a common law claim cannot circumvent, "end run," undermine, or subvert a statute.  *See, e.g.*, *Flonase*, 692 F. Supp. 2d at 542 ("Certain states have adopted *Illinois Brick* and deny indirect purchaser plaintiffs recovery under their state antitrust statutes.  These states have adopted the policy of *Illinois Brick* to allow only direct purchasers, and not indirect purchasers, to recover from a defendant for antitrust violations. Allowing indirect purchasers to recover and recoup a benefit from the defendant under an unjust enrichment theory would circumvent the policy choice of *Illinois Brick*."); *TFT-LCD (Flat Panel)*, 599 F. Supp. 2d at 1191 (recognizing that "a number of cases . . . stand for th[e] general proposition" that indirect purchasers "may not circumvent the restrictions on antitrust claims under [certain states] by reframing those claims as unjust enrichment actions"); *see also New Motor Vehicles*, 350 F. Supp. 2d at 209 (recognizing that permitting "freestanding" unjust enrichment claims "could result in restitution undermining another body of substantive law, to the extent that the scope of antitrust laws and consumer protection statutes is designed to permit unfettered economic activity in matters that are not within their proscription"; and that permitting "parasitic" unjust

enrichment claims "would subvert the statutory scheme to allow these same indirect purchasers

to secure, for the statutory violation, restitutionary relief at common law (or in equity)").[55]

However, even if the general principles, as expressed by those cases, are recognized

across various state jurisdictions, that does not mean that a given jurisdiction, such as Utah, has

adopted a particular legal principle or whether that principle is the only guidance that bears

consideration.  *Compare* 2B N. Singer & J. Singer, *Sutherland on Statutory Construction* § 50.1

(7th ed. 2008) ("In cases of conflict between legislation and the common law, legislation governs

because it is the latest expression of the law.") *with id.* ("Where there is a limitation by statute

which is capable of more than one construction the statute must be given that construction which

is consistent with common law. . . .  The legislature is presumed to know the common law before

a statute was enacted.  Absent an indication that the legislature intends a statute to supplant

common law, courts should not give it that effect." (footnote omitted)).

---

[55]  To the extent that Defendants rely on *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d at 936-37, such reliance is misplaced.  In *Steamfitters*, the Third Circuit Court of Appeals, addressing Pennsylvania law, distinguished unjust enrichment claims based upon tort from unjust enrichment claims based upon breach of contract.  The Court of Appeals determined that when an unjust enrichment claim is based upon a tort, its causation analysis is essentially the same as the tort.  The court had earlier determined that the plaintiff's tort claim failed because causation was too remote.  And in applying that same causation analysis to the unjust enrichment claim, the court determined that, *like the tort claim*, the unjust enrichment claim could be dismissed for remoteness. The court was thus treating the analyses under the two claims as if they were the same.

As a result, the court held, "We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing." *Id.* at 937.  Consequently, this statement cannot be read, as Defendants appear to believe, to stand for the proposition that dismissal of the tort claim in itself was the reason why the unjust enrichment claim was dismissed.  Rather, the court dismissed both claims based on the same underlying rationale.

The cases upon which Defendants rely in no way indicate how *Utah law* treats the interplay between its statutory and common law schemes, and when common law might be precluded by statute (and statutory interpretation).  There is specific Utah law concerning statutory construction.  *See, e.g.*, Utah Code Ann. §§ 68-3-1, 68-3-2 (before and after May 11, 2010 amendment); *Daniels v. Gamma West Brachytherapy, LLC*, 221 P.3d 256, 270 (Utah 2009) ("A statute preempts a common law claim by specifically adopting a limitation or prohibition on a claim or by comprehensively addressing a particular area of law such that it displaces the common law.").  Furthermore, unjust enrichment claims have deep roots in Utah law both pre- and post-dating *Illinois Brick*.  *See, e.g.*, *Baugh v. Darley*, 184 P.2d 335, 337-40 (1947); *Desert Miriah, Inc. v. B & L Auto, Inc.*, 12 P.3d 580, 582-83 (Utah 2000).  Defendants have not broached such matters; nor have they addressed whether or what role, if any, equity and the court's jurisdiction in equity might bear upon or play in determining the issue presented.

Moreover, Defendants have not established that the law of Utah ever affirmatively adopted the rationale of *Illinois Brick* as a "policy", statute, or otherwise prior to May 1, 2006. *Cf. In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 723 (D. Md. 2001) ("Some states . . . have adopted the policy that . . . . '[a]llowing [plaintiffs] to sue under [the state deceptive trade practices act] on allegations that are virtually identical to the antitrust allegations . . . would essentially permit an end run around the policies allowing only direct purchasers to recover under the Antitrust Act.' . . .  Nevertheless, this policy has not been universally adopted. . . .  In my judgment, [defendant] Microsoft paints with too broad a brush in seeking to

extend this policy to states that have not affirmatively adopted it." (internal citations omitted)).[56]

Likewise, Defendants have not addressed whether the specific amendments to the Utah Antitrust

Act have any bearing on this issue.  *See, e.g.,* Utah Code Ann.§ 76-10-918 ("Actions may be

brought under this section regardless of whether the plaintiff dealt directly or indirectly with the

defendant.  This remedy is an additional remedy to any other remedies provided by law.  It may

not diminish or offset any other remedy.").

    This panoply of issues—and even others that have not been mentioned[57]—could have

considerable bearing upon the disposition of the Defendants' argument for dismissal.  But in the

absence of analysis of any of these matters or in the context of any law specific to Utah, the

Court cannot meaningfully discern their implications, and thus cannot appropriately or

confidently rule as a matter of law on the partial dismissal of the Plaintiffs' claim.  Therefore, the

Court denies the Defendants' motion in this respect.[58]

---

[56]  This Court earlier observed in this Opinion that there is legal authority that has determined that indirect purchasers cannot not recover for damages accruing prior to the May 1, 2006 effective date of the amendment to the Utah Antitrust Act.  However, the Court granted the Defendants' motion insofar that Plaintiffs did not dispute this authority and did not raise any objections to Defendants' arguments.  The Court's decision thus did not address or identify the specific operative law invoked by Defendants in support of their argument and whether such law constituted an affirmative adoption of *Illinois Brick* as a policy prior to May 1, 2006.

[57]  This category of factors might include, *inter alia*, consideration of the Plaintiffs' theory of their Utah unjust enrichment claim—whether the claim is "parasitic" or "freestanding"—and the factual allegations pled in support of the claim.  *See New Motor Vehicles*, 350 F. Supp. 2d at 209 (discussing how indirect purchasers could have brought their unjust enrichment claim under either theory); *D.R. Ward*, 470 F. Supp. 2d at 506 (recognizing that "equitable remedies for unjust enrichment claims are often awarded when state statutory claims prove unsuccessful" (citing *In re Cardizem Antitrust Litig.*, 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000)).

[58]  Of course, Defendants may renew this argument—insofar that Defendants choose to further and appropriately develop the argument—at another stage in this litigation.

**7.   Standing to Assert Unjust Enrichment Claim for Egg Products:  New York**

Defendants contend that the Plaintiffs' unjust enrichment claim under New York law fails

insofar that the Plaintiffs' alleged losses resulting from "egg products" purchases of

"manufactured products incorporating processed eggs such as baked goods and mayonnaise" are

too remote to support such a claim.  Defendants previously objected under *Associated General*

*Contractors* to the breadth of the IPSAC's definition of "egg products" due to its inclusion of

"manufactured products incorporating processed eggs," and now invoke those arguments as

grounds for dismissing the Plaintiffs' New York unjust enrichment claim as to injuries due to

purchases of "manufactured products incorporating processed eggs."

As previously discussed, Plaintiffs have agreed to narrow the IPSAC's definition of "egg

products" to not include "manufactured products incorporating processed eggs," and because this

definition is central to the Defendants' arguments, the Court will refrain from considering the

Defendants' argument at present without the actual amendment.  Consequently, Court denies the

Motion without prejudice to Defendants to raise these grounds for dismissal of the New York

unjust enrichment claim based upon the amended definition of "egg products" as may then

become appropriate.

**8.   Benefits Conferred on Defendants:  16 Jurisdictions**

All parties agree that an unjust enrichment claim under the laws of 16 jurisdictions—the

District of Columbia, Florida, Iowa, Kansas, Massachusetts, Minnesota, Nevada, New Mexico,

New York, North Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and

Wisconsin—requires Plaintiffs to plead as an element of the claim that they conferred a benefit

upon Defendants.  However, the parties dispute two matters concerning the requisites for

pleading this element as to the 16 claims: (1) whether the IPSAC is devoid of factual allegations that Plaintiffs *conferred any* benefit upon Defendants; and (2) whether 10 of the 16 jurisdictions at issue require (or likely would require) the conferral of a "direct benefit" as opposed to an "indirect benefit."   The Court discusses these narrow issues in turn.[59]

a.  Factual Allegations of Any Benefit Conferred

Defendants claim that the IPSAC does not allege that Plaintiffs conferred *any* benefit upon Defendants, and as a result, all 16 claims are deficient.  Defendants initially posit that the only way to satisfy this element is for Plaintiffs to allege that they either "(1) purchased eggs that originated from Defendants' birds or (2) purchased eggs directly from Defendants."  Defs.' Mot. at 23-24.  According to Defendants, these are the only types of allegations that can show that Plaintiffs conferred a benefit on Defendants for purposes of the law of each of the 16 jurisdictions. As the parties' briefing proceeded, Defendants recalibrated and narrowed their original argument.  Nonetheless, this argument in its original and modified forms does not provide appropriate grounds for dismissal of the 16 claims at this time.

To start, Defendants failed to cite any persuasive legal authority in support of their initial claim that the two particular types of factual allegations as to the origin of the eggs purchased are necessary in all 16 jurisdictions at issue.  Defendants have generally cited in a footnote one case per jurisdiction only to show that "a claim for unjust enrichment requires a plaintiff to plead and prove that it conferred a benefit upon the defendant." Defs.' Mot. at 44.  Instead, Defendants

---

[59]   The Defendants have presented these issues in such a way that the Court is *not* being asked to address any questions involving whether for purposes of Rule 12(b)(6) Plaintiffs have sufficiently alleged facts that plausibly suggest the "conferral of a benefit" element, as defined by each of the jurisdictions' law.

have only cited *Myzel v. Fields*, 386 F. 2d 718, 744 n.21 (8th Cir. 1967), for the proposition that

"Plaintiffs fail to meet this requirement [of pleading the conferral of benefit element] because no

named Plaintiff alleges that it purchased eggs originally for any of the Defendants, let alone a

specific Defendant." Defs.' Mot. at 44. Relying on the Restatement (First) of Restitution, *Myzel*

merely articulates the observation that "an action for money had and received or for unjust

enrichment differs at common law from tortious conversion primarily on the basis that all the

defendants may be held jointly liable in tort, while only those who have benefited are liable, and

then only to the extent thereof, in an action for unjust enrichment." *Id.* at 744 n.21. The case

simply does not do the legwork that is necessary to support Defendants' argument specific to

each of the 16 jurisdictions.

Although Defendants appear to narrow the issue presented in their reply brief, the

recalibrated argument does not comport with the IPSAC's allegations. Defendants raise no

objections to the Plaintiffs' rebuttal that it is unnecessary to plead factual allegations concerning

specifics about the origins of their purchases and that the 16 jurisdictions are permissive in

allowing the "conferral" to be non-monetary form of advantage. Indeed, Defendants accept this

proposition of law, stating that "restitution is typically available where—to take a textbook

example—a doctor provides medical assistance to the incapacitated victim of an automobile

accident." Defs.' Reply at 25. Even so, Defendants argue: "However, the IPSAC is devoid of

any allegations of any such non-monetary 'benefit' that Plaintiffs conferred on Defendants." *Id.*

The Defendants' characterization of the IPSAC is incorrect as the IPSAC has alleged

certain factual allegations to show that the Defendants' alleged benefit is conferred by virtue of

the *act* of the named Plaintiffs' purchasing eggs.  Specifically, Plaintiffs allege that the egg

market has particular "structural features":

> (a) the lack of product differentiation or high substitutability of product between
> different producers; (b) the prevalence of cross marketing arrangements that
> facilitate price communication between rivals; (c) relative concentration within
> the industry; and (d) high demand price inelasticity.

IPSAC ¶ 119.  Plaintiffs further plead as to each of the 16 jurisdictions that Defendants leveraged

these particular facets of the egg market to advance the aims of their alleged conspiracy, thereby

receiving the "benefit" of increased revenues and profits because the prices in the egg market as a

whole were artificially inflated:

> The Defendants were able to achieve their increased revenues and profits from
> their sales of eggs to [*Name of State*] indirect purchasers because the demand for
> eggs by indirect purchasers is relatively price inelastic, as Defendants understood.
> Thus, the ability of Defendants to profit from their sales of eggs to indirect
> purchasers in [*Name of State*] was connected to and due to the increased prices
> paid for Defendants eggs by indirect purchasers in [*Name of State*].

*See, e.g.,* IPSAC ¶¶ 346, 354, 361.

This narrative of factual allegations plausibly suggests that the Plaintiffs' losses in

purchasing eggs at artificially-inflated prices are connected to the Defendants' benefits.  A

fundamental function of the egg market as alleged in the IPSAC is the demand for eggs, as

manifested by consumer purchases of eggs.  Thus, even if Plaintiffs did not purchase eggs from a

retailer who purchased from a specific Defendant, Defendants nevertheless obtained the benefit

of Plaintiffs purchasing eggs at an artificially inflated price because each and every egg purchase

by consumers would contribute to increasing (or sustaining at an artificial level) egg prices in a

market in which the alleged supply of eggs was artificially decreased.  In other words, the claim

is that Defendants allegedly manipulated the supply curve of the market recognizing that because

demand was inelastic and eggs are essentially a commodity good (*i.e.*, minimal product differentiation), prices would increase in response to, and as a result of, consumer purchases regardless of whether they were purchased from a Defendant or a non-conspirator.  Accordingly, any demand-side activity in the egg market, *i.e.*, the Plaintiffs' purchases, would financially benefit Defendants generally because their eggs would be selling at a market price that was artificially inflated.  *See also* IPSAC ¶ 56 n.4 (describing the company, Urner Barry, Inc., as "a price reporting service for the egg industry . . . [which produces] newsletters [that] publish egg price quotations that are widely relied on in the setting of wholesale egg prices under spot purchasers and long-term contracts").[60]

---

[60]  However, to the extent that Plaintiffs also argue that the IPSAC has factual allegations from which it can be inferred that the eggs purchased originated with the Defendants, this approach is unsuccessful.  The Plaintiffs' characterizations of the IPSAC are inconsistent with the actual allegations.

In defining the various state class members, the IPSAC alleges as to each class that "[a]ll individuals and entities residing in [*Name of State*] that indirectly purchased shell eggs and/or egg products produced from shell eggs produced from Defendants' or their co-conspirators' caged birds." IPSAC ¶ 108.  However, as Defendants correctly argue, there are no factual allegations as to the origin of the eggs purchased by the *named individual Plaintiffs*.  *See* IPSAC ¶¶ 19-44 ("This Plaintiff indirectly purchased shell eggs and/or egg products during the Class Period and was injured as a result of Defendants' illegal conduct.").  The claims brought by the named individual Plaintiffs are the focus of this motion to dismiss.

Plaintiffs argue that "the policies at issue – the conspiracy—are the official policies of a membership organization[] representing 'more than 95% of [the] nation's laying hens' and essentially all the largest producers." Pls.' Resp. at 41 (citing IPSAC ¶¶ 47-51).  By highlighting this allegation, Plaintiffs attempt to imply that 95% of laying hens in the egg industry were subject to the alleged conspiracy, and as such, when Plaintiffs made any egg purchase, they more than likely were purchasing from the Defendants.  However, the factual allegation cited describes UEP alone and not the named Defendants as a group, so the allegation can only stand for what it says: UEP as an organization represents 95% of domestic laying hens (by representing 198 producer members, IPSAC ¶ 136).

While UEP as an organization might represent that percentage of laying hens, that does not necessarily mean that 95% of laying hens were covered by the alleged conspiracy.  As alleged, UEP was not an egg producer itself.  *See also id.* ¶ 283 ("UEP has declared that it did not sell eggs to consumers."); *id.* ¶ 284 ("UEP does not 'market' its members' products.").  And

Thus, contrary to the Defendants' argument otherwise, Plaintiffs have pled factual allegations that plausibly suggest that they conferred a non-monetary form of advantage—the act of purchasing eggs.  As alleged, these acts, given the conditions of the egg market and the Defendants' conduct in furtherance of the conspiracy, allowed Defendants to obtain the benefit of "increased revenues and profits from their sales of eggs."

The Defendants' final retuning of their argument also does not provide sufficient grounds for dismissal.   Defendants assert, "even if such allegations were found in the IPSAC, and even if Plaintiffs had explained how they 'conferred' this 'benefit' on Defendants, Plaintiffs have not cited a single authority permitting an unjust enrichment claim based on such an allegation." Defs.' Reply at 25 n.18.  Even assuming this is true, Defendants likewise have not cited any authority (and certainly no authorities specific to each of the 16 jurisdictions) that bars an unjust enrichment claim based upon such a factual premise as a matter of law.  But Defendants have accepted the Plaintiffs' legal proposition that a "'benefit' conferred can be *any form of advantage*, not just the indirect payment of money."  Defs.' Reply at 25 (emphasis added).  This legal proposition embraces the notion that a plaintiff can "confer" her conduct to enrich a

_____

given the alleged operation of the conspiracy, it would be incumbent upon producers to effectuate the eight "coordinated actions," and thus adopt and institute UEP's policies.  If follows that the hens that UEP "represents," are not hens controlled by UEP, and thus would not reflect the number of hens actually producing "conspiracy eggs."  *See also id.* ¶ 162 ("As of May 6, 2002, 123 companies with ownership of 167 million hens filed for "Application of Certification" and agreed to implement the guidelines including increasing space allowance on 100% of their facilities.  As of July 1, 2002, it was 137 companies, representing 188 million layers.").

Regardless, to the extent that Plaintiffs are attempting to intimate that the IPSAC alleges that the Defendants' laying hens collectively produced 95% (or an otherwise high percentage) of the egg market (including egg products as currently defined by the IPSAC) and thus that the Plaintiffs' alleged egg purchases were originally produced by Defendants, this is unproductive. There are no allegations that directly or inferentially support such a claim.

defendant.  It follows that the Court cannot conclude at this time as a matter of law as to the 16

jurisdictions at issue that the Plaintiffs' factual allegations that their acts of purchasing eggs

conferred the Defendants' benefit of increased revenues from their egg sales are insufficient to

show that plaintiffs conferred *any* benefit upon Defendants.[61]   In this respect, the Defendants'

motion to dismiss is denied.

b.  Conferral of a "Direct Benefit"

For reasons previously discussed, *supra*, Plaintiffs have not alleged that they directly

conferred a benefit upon Defendants.  In other words, Plaintiffs have not pled facts to show that

the named Plaintiffs' purchased eggs directly from Defendants.[62]   Defendants argue that this

deficiency is fatal to the Plaintiffs' unjust enrichment claims in 10 jurisdictions—the District of

Columbia, Florida, Kansas, Minnesota, New York, North Carolina, South Dakota, Utah,

Vermont, and West Virginia.  As to those jurisdictions, Defendants contend that only by pleading

a direct purchase from Defendants can Plaintiffs maintain this claim.

Thus, the issue presented by the Defendants' next argument is whether the law of those

10 jurisdictions require (or likely would require) the conferral of a "direct benefit" as opposed to

an "indirect benefit."  If a jurisdiction requires such a "direct benefit" to state a claim, then

dismissal of the Plaintiffs' claim is warranted.  The Court proceeds to examine what the law of

the 10 jurisdictions requires as to this element in terms of two categories: (1) 5 jurisdictions that

---

[61]  This is not to say that at another stage of the litigation that similar arguments—arguments further developed in relation to jurisdiction-specific law—might or might not prevail.

[62]  Defendants appear to argue that by definition only direct purchasers, and not indirect purchasers, can meet this "direct benefit" requirement.

Defendants claim require a "direct benefit," and (2) 5 jurisdictions that Defendants claim *likely* require a "direct benefit."

*i. Claimed "Direct Benefit" Jurisdictions*

Defendants claim that "Plaintiffs must prove that they *directly* conferred a benefit on Defendants" as to unjust enrichment claims brought under the laws of Florida, Kansas, New York, North Carolina, and Utah. The Court determines that none of these states' laws *necessarily* require as a matter of law for Plaintiffs to "prove that they *directly* conferred a benefit on Defendants" in order to state an unjust enrichment claim.

**aa. Florida**

Defendants rely on *Peoples National Bank of Commerce v. First Union National Bank of Florida*, 667 So. 2d 876 (Fla. Dist. Ct. App. 1996) and several cases that adopt its rationale, including *Extraordinary Title Services, LLC v. Florida Power & Light Co.*, 1 So.3d 400 (Fla. Dist. Ct. App. 2009), to argue that Florida law requires pleading that a plaintiff directly confer a benefit upon a defendant. In *Peoples National*, the state court determined that the plaintiff "could not and did not allege that it had directly conferred a benefit on the defendants" and that "if any benefit was conferred upon each [defendant] in the form of overpayments, it could only have been conferred upon them by [a third-party with which plaintiff and defendants had entered into a loan agreement], not [defendant]." *Peoples National*, 667 So. 2d at 879.

The Court agrees that it appears the courts in *Peoples National* and the cases cited by Defendants have determined that an allegation or evidence of a "direct benefit" is required. Nonetheless, there exists other valid Florida law that does not require direct interactions between the plaintiff and defendant in order for a benefit to have been conferred. *See Variety Children's*

94

*Hosp.*, 385 So. 2d 1052,1053-54 (Fla. Dist. Ct. App. 1980) (holding that a mother was unjustly

enriched when a "the hospital rendered its services to her child" because she received the "'legal'

benefit" of fulfilling her lawful "duty to provide support for a minor child"); *Hillman Const.*

*Corp. v. Wainer*, 636 So. 2d 576, 577-78 (Fla. Dist. Ct. App. 1994) (determining that a general

contractor plaintiff had sufficiently stated a claim for unjust enrichment against a commercial

rental property owner because contractor had made "several improvements [to the property]

which ha[d] enhanced the value of the premises and allowed the owner to relet them at an

increased rent" after a former commercial tenant, who had contracted with the contractor to

perform the services but failed to pay the contractor and filed for bankruptcy); *Merkle v. Health*

*Options, Inc.*, 940 So. 2d 1190, 1199 (Fla. Dist. Ct. App. 2006) (concluding that a medical

service provider plaintiff had an unjust enrichment claim against HMO defendants for medically

treating the HMOs' subscribers).

   *Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp.*, 899 So. 2d 1222 (Fla.

Dist. Ct. App. 2005), illustrates how Florida law allows unjust enrichment claims to arise from

the conferral of an indirect benefit.  In *Shands*, the state appellate court held that the plaintiff had

sufficiently pled that the defendant "was unjustly enriched at [the plaintiff's] expense." *Id.* at

1228.  The plaintiff, a hospital, alleged that it conferred a benefit on the defendant, a third-party

healthcare claims administrator, by providing medical services to the members of a PPO pursuant

to a hospital provider agreement. *Id.* at 1227.  The agreement's "terms conditioned [the

hospital's] obligation to give discounts on receipt of timely payments." *Id.*  The claims

administrator who was under a separate contract with the PPO, however, "did not make timely

payments" and "did not make undiscounted payments," which resulted in underpayments to the

hospital. *Id.* Thus, as alleged, the administrator, "despite the underpayments, . . . continued to reap the full benefit of [the hospital]'s services, which enabled [the administrator] to avoid breaching [its contract with the PPO] (and incurring liability for penalties)." *Id.* at 1227-28. Based upon these allegations, the court determined that, as pled, the administrator "was unjustly enriched by the value of services [the hospital] provided (in excess of the discounted rates at which [the hospital] was paid, when paid at all) to the extent they resulted in economic benefit conferred on [the administrator] under [the contract with the PPO]." *Id.* at 1228.

This line of cases demonstrates that Florida courts recognize "that *some* benefit must *flow* to the party sought to be charged." *Coffee Pot Plaza Partnership v. Arrow Air Conditioning and Refrigeration, Inc.*, 412 So. 2d 883, 884 (Fla. Dist. Ct. App. 1982) (emphasis added) (citing *Variety Children's Hosp.*, 385 So. 2d at 1053)); *see also Commerce P'ship 8098 LP v. Equity Contracting Co.*, 695 So. 2d 383, 386 (Fla. Dist. Ct. App. 1997) ("Because the basis for recovery does not turn on the finding of an enforceable agreement, there may be recovery under a contract implied in law even where the parties had no dealings at all with each other." (citing *Variety Children's Hosp.*, 385 So. 2d at 1053)).

Given that Florida law does not appear to require the conferral of a direct benefit exclusively, as Defendants claim, the Court cannot dismiss the Florida unjust enrichment claims as a matter of law by reason of a failure to adequately allege that Plaintiffs conferred a direct benefit upon Defendants.

**bb. Kansas**

The Court is not persuaded that Kansas law requires the pleading of a conferral of a direct benefit. In support of their position, Defendants cite one, unpublished decision from the Tenth

Circuit Court of Appeals, *Spires v. Hospital Corporation of America*, 289 F. App'x 269, 273

(10th Cir. 2008) (unpublished), that the Court finds to be inapposite.  That case addressed the

issue of "unjust enrichment against parent corporations in the context of veil-piercing." *Id.* at 273

& n.2.  No other legal authority to support such a theory of unjust enrichment under Kansas law

has been cited to the Court.

Moreover, Defendants have not raised any objections to the Plaintiffs' claim that "there is

no requirement of a 'direct benefit' or even an in-kind benefit passing from plaintiffs to

defendants under Kansas law," nor did Defendants challenge the cases cited by Plaintiffs in

support of that claim.  Pls.' Resp. at 45.[63]  Indeed, the Court confirms that the cases cited by

Plaintiffs demonstrate that Kansas law does not mandate the conferral of a direct benefit under an

unjust enrichment.  *See, e.g., Peterson v. Midland Nat'l Bank*, 747 P.2d 159, 166-67 (Kan. 1987)

(observing that unjust enrichment can "arise[] . . . where an expenditure by one person adds to

the property of another"  and that plaintiff's "delivery of hay to the cattle which otherwise would

have died" constituted a benefit to defendant, which had a security interest in the cattle, under

circumstances where a plaintiff was hired by a third-party upon defendant's promise that it

"would bear the cost" of delivering the feed); *Sec. Ben. Life Ins. Corp. v. Fleming Cos.*, 908 P.2d

1315, 1323 (Kan. App. 1995) (determining that allegations that plaintiff installed a new cash

register system to improve a grocery store owned by a party that transferred the store to the

defendants as collateral for an unpaid loan the day the system installation was completed were

sufficient to state an unjust enrichment claim).

---

[63]  Defendants do not address the Plaintiffs' argument on this point of Kansas law,
suggesting that Defendants have abandoned this argument.

In sum, Kansas unjust enrichment law allows claims for the conferral of indirect benefits. Thus, a failure to plead a "direct benefit" cannot be appropriate grounds for dismissal, and the Court will not dismiss the Plaintiffs' unjust enrichment claim under Kansas law.

**cc. New York**

In *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007), the Court of Appeals of New York held "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment," but their relationship cannot be "too attenuated." One federal court has explained that this means that "a product's indirect purchaser cannot assert an unjust enrichment claim against an entity that manufactured one of that product's ingredients," but that an "indirect purchaser can assert such an unjust enrichment claim against the manufacturer of the product itself." *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403-04 (E.D.N.Y. 2010); *see also SMW*, 263 F.R.D. at 216 (recognizing that "strict privity between the plaintiff and defendant is not required" and discussing instances when "New York courts have found numerous relationships 'too attenuated' to support" an unjust enrichment claim).

This case law demonstrates that the Defendants' contention that "Plaintiffs must prove that they *directly* conferred a benefit on Defendants" is misplaced as to New York law. New York law does not require such a direct relationship. Indeed, the solitary case that Defendants cited in support of their position, *In re Bayou Hedge Funds Investment Litigation*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007), was issued a month earlier than *Sperry*, and does not embody the current state of New York law. *Cf. Waldman*, 714 F. Supp. 2d at 403 ("Defendant accurately describes New York law in 1997, as the S.D.N.Y. understood it. But this is not the law today, as promulgated by New York's own courts.").

Thus, although Plaintiffs have not alleged facts suggesting the conferral of a direct benefit, such a deficit is not in and of itself fatal to a New York unjust enrichment claim as a matter of law.   The motion to dismiss on these grounds is denied.

**dd.  North Carolina**

Defendants argue that North Carolina law requires Plaintiffs to plead the conferral of a direct benefit in order to state an unjust enrichment claim as announced by *Effler v. Pyles*, 380 S.E.2d 149, 152 (N.C. Ct. App. 1989).  In *Effler*, in evaluating a summary judgment motion, the appellate court determined that the plaintiff did not confer a benefit upon the defendant.  The plaintiff was the former mother-in-law of a man who had remarried; the defendant was the man's second wife.  *Id.* at 150.  The mother-in-law was the co-signer of a note that enabled her daughter, the first wife, and her then-son-in-law to buy a house.  *Id.*  The man and the first wife had promised the mother-in-law that they would make the payments on the loan.  *Id.*  After the first wife died, the mother-in-law made loan payments for the property after the man stopped making the payments.  *Id.*  Later, the man conveyed the property to himself and his second wife as tenants by the entireties, and then the couple sold the house, but did not apply the proceeds to the note that plaintiff had co-signed.  *Id.*  The mother-in-law brought the unjust enrichment claim against the second wife, contending that the second wife benefitted from the funds that were not applied to the plaintiff's note.  *Id.*  The court concluded:

> Plaintiff has not shown that she conferred a benefit on defendant [second wife].
> [Second wife] received title to the property through her husband.  Although he had
> previously acquired his interest in this property with plaintiff's assistance, this does
> not satisfy plaintiff's burden of showing that she conferred a benefit directly on
> defendant [second wife].

*Id.* at 152.

99

Defendants rely on the holding's reliance on the word "directly" as an accurate embodiment of North Carolina law, and highlight that another court has recognized the same. *See* Defs.' Mot. at 45 n.23 (citing *Baker Const. Co., Inc. v. City of Burlington*, 683 S.E.2d 790 (N.C. Ct. App. 2009) (Table) (unpublished)).  In *Baker*, the appellate court remarked, citing *Effler*, that "this Court has limited the scope of a claim of unjust enrichment such that the benefit conferred must be conferred directly from plaintiff to defendant, not through a third party." 683 S.E.2d 790.  Indeed, several other state courts have read *Effler*'s usage of "directly" similarly. *See Norman Owen Trucking, Inc. v. Morkoski*, 506 S.E.2d 267, 274 (N.C. Ct. App. 1998) (recognizing that an "essential element of plaintiff's claim" requires showing the "direct receipt by [defendant] of any benefit in consequence of plaintiff's performance of its contract with [a third-party]" and "show[ing] that [defendant] 'consciously accepted'"); *see also Town of Carolina Shores v. Continental Ins. Co., Inc.*, No. 7:10-CV-13-D, 2010 WL 4338437, at *5 (E.D.N.C. Oct. 26, 2010) ("The benefit would not be conferred directly from [defendant] to [plaintiff].  Rather, the benefit would be conferred through a third party, the Town.  Furthermore, as mentioned, [plaintiff] acquired [the property] through a foreclosure sale.").

Nonetheless, the Court is not convinced at this time that the Supreme Court of North Carolina would agree with this narrow, highly technical, approach to an unjust enrichment theory of liability.  First, there is some indication in *Effler* itself that its usage of the word "directly" is an aberration in North Carolina law because the decision references no case law or legal authority that might explain its specific rationale on this point or word choice.  Indeed, "the *Effler* court relied on the North Carolina Supreme Court's decision in *Booe v. Shadrick*, 369 S.E.2d 554 (N.C. 1988).  *Booe* did not, however, require that a benefit be direct to state an unjust enrichment

100

claim." *TFT-LCD (Flat Panel)*, 599 F. Supp. 2d at 1190.  Another North Carolina court has

restricted the *Effler* holding to its facts, stating that the "'direct benefit' rule does not address

such a scenario [as presented by the facts of the case] and, accordingly, does not foreclose

equitable relief on these facts." *Perkins v. HealthMarkets, Inc.*, No. 06 CVS 21053, 2007 WL

2570242, at *9 (N.C. Super. Ct. July 30, 2007) (unpublished).

 Second, and more significantly, a Supreme Court of North Carolina decision issued

subsequent to *Effler* is instructive on that court's more expansive view of unjust enrichment and

the role or particulars of the conferral of a benefit element.  In *Embree Const. Group, Inc. v.

Rafcor, Inc.*, 411 S.E.2d 916 (N.C. 1992), the Supreme Court addressed the issue of whether a

general contractor plaintiff, which had entered into an agreement to build a restaurant with the

property owner and completed the construction before the owner defaulted on its construction

loan with bank defendant, had stated a claim for unjust enrichment against the defendant bank.

The defendant bank did not allegedly "benefit directly" from plaintiff within the meaning of

*Effler*.  The plaintiff alleged that the defendant bank was unjustly enriched at plaintiff's expense

because the bank did not disburse the funds remaining in the construction loan to plaintiff, but

also acquired the completed building as a security for the loan, thereby receiving the benefit it

had bargained under the loan agreement with the property owner.  *Id.* at 919, 922.  Based upon

those facts alleged, the court agreed that the bank defendant was unjustly enriched.  *Id.* at 922.

 That the claim in *Embree* arose in the context of an equitable lien is of little consequence

because it is still invokes the same principles of unjust enrichment that are recognized under

North Carolina law.[64]  Indeed, both the *Embree* and *Effler* decisions rely on *Booe*.  *See Embree*, 411 S.E.2d at 923 ("'A person who has been unjustly enriched at the expense of another is required to make restitution to the other.'" (quoting *Booe*, 369 S.E.2d at 555-56)); *Effler*, 380 S.E.2d at 152 ("In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party [and] the defendant must have consciously accepted the benefit.'" (quoting *Booe*, 369 S.E.2d at 570)).

Accordingly, the Court determines that North Carolina law embraces a broader definition of "conferral of a benefit" beyond only the conferral of a *direct* benefit.  *See also TFT–LCD (Flat Panel)*, 599 F. Supp. 2d at 1190 (following *Booe*'s articulation of an unjust enrichment claim in lieu of *Effler* and recognizing that *Booe*" did not . . .require that a benefit be direct to state an unjust enrichment claim"); *SMW*, 737 F. Supp. 2d at 442 ("Because the cases following *Effler* place into serious question any argument that *Effler* stands for a direct benefit requirement in North Carolina, I do not believe this is a valid ground for dismissal of plaintiffs' North Carolina unjust enrichment claim."); *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 72 F. App'x 916, 921 (4th Cir. 2003) (unpublished) (recognizing that *Embree* "suggests a broader approach to unjust enrichment than is indicated by *Effler*'s 'direct benefit' rule").  Therefore, the Court cannot agree that North Carolina law on unjust enrichment requires Plaintiffs to allege a "direct benefit," and denies the motion to dismiss in this regard.

---

[64]  *See id*. at 923 (recognizing that a remedy for unjust enrichment is an equitable lien); *see generally Restatement (First) of Restitution* § 4 ("In situations in which a person is entitled to restitution, he is entitled, in an appropriate case, to one or more of the following remedies: . . . (d) a decree by a court of equity that a lien upon the subject matter or its proceeds be established, enforced, discharged, or reduced."); *Restatement (Third) of Restitution & Unjust Enrichment* § 56 ("An equitable lien secures the obligation of the defendant to pay the claimant the amount of the defendant's unjust enrichment as separately determined.").

**ee. Utah**

The Court does not adopt the Defendants' claim that Utah law necessarily requires a plaintiff to plead the conferral of a "direct benefit." Defendants have cited several Utah Supreme Court cases that have used the term "direct benefit" in the decisions. However, in those cases the usage of the term does not conform with the Defendants' characterization of the law.[65]

In *Baugh v. Darley*, 184 P.2d 335 (Utah 1947), the Supreme Court determined that the real estate agent plaintiff had not unjustly enriched the defendant, a former owner of a property that was sold to plaintiff. The Court recognized:

> The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor. . . . Services officiously or gratuitiously furnished are not recoverable. . . . *Nor are services performed by the plaintiff for his own advantage, and from which the defendant benefits incidentally, recoverable.*
> . . . .
> Services performed by the plaintiff outside the terms of the agreement [of sale] would, of course, ordinarily be voluntary and, therefore, such services could not in any case be recoverable regardless of the statute of frauds. However, one might perform work or services intended for his own benefit, or for the benefit of another, in reliance upon as distinguished from in pursuance of an unenforceable agreement. Generally, unless such services enhance or benefit the property of the defendant or otherwise confer on him a direct benefit, they do not form the basis for a contract imposed by law because there is no 'unjust enrichment' as that term is used in law. Where such services operate to confer a direct benefit upon the defendant, they may be recoverable.

---

[65]   One of those cases cited, *Concrete Products Co. v. Salt Lake County*, 734 P.2d 910 (Utah 1987), is entirely inapposite because its facts are based upon the finding that the defendant received no benefit whatsoever. *See id.* at 912 (recognizing that as a result of the plaintiffs' supply of concrete for curbs and gutters for a development in the county, the defendant, the County, would not receive a benefit because the "County will raise no revenue from the curbs and gutters, nor will it acquire a building with intrinsic value. Instead, it will incur the expenses of cleaning and maintaining curbs and gutters with no resale value or intrinsic economic worth.").

*Id.* at 337 (emphasis added).

In another case cited by Defendants, *Jeffs v. Stubbs*, 970 P.2d 1234 (Utah 1998), the

Supreme Court more recently addressed the conception of "direct benefit" under Utah law.  In

*Jeffs*, the court observed that *Darley* spoke to the third element of unjust enrichment under Utah

law, "the acceptance or retention by the conferee of the benefit under such circumstances as to

make it inequitable for the conferee to retain the benefit without payment of its value," rather

than the first element, namely, "a benefit conferred on one person by another."  *Id.* (quoting *Am.*

*Towers Owners Ass'n v. CCI Mech., Inc.*, 930 P.2d 1182, 1192 (1996), *abrogated on other*

*grounds by Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims*

*Landing, LC*, 221 P.3d 234 (2009)).  The court further explained that "direct benefit" should be

understood in the broader context of the principles of unjust enrichment:

> We addressed the third element in *Baugh v. Darley*, 112 Utah 1 (1947).  This
> court stated:
>> Unjust enrichment of a person occurs when he has and retains money or
> benefits which in justice and equity belong to another. The benefit may be ...
> beneficial services conferred . . . .
> . . . .
> Services officiously or gratuitously furnished are not recoverable. Nor are *services*
> *performed by the plaintiff for his own advantage, and from which the defendant*
> *benefits incidentally, recoverable.*
>
> *Id.* at 337 (internal citations omitted).  Here, the claimants improved the land in
> reliance upon the [owner defendant]'s representations that they could live on the
> land for the rest of their lives. Even though the claimants intended to benefit from
> the improvements by occupying them during their lifetimes, the claimants'
> services still conferred a direct, not incidental, benefit on the [owner defendant].

*Id.* at 1248 (emphasis added).

Both of these decisions demonstrate that the use of "direct" is used to draw a distinction

from "incidental," as in the realm of a "by-product," specifically to explicate that "services

performed by the plaintiff for his own advantage" cannot constitute grounds for unjust

enrichment.  Indeed, the Supreme Court of Utah has articulated this principle another way:

> The benefit conferred satisfies this requirement if the defendant's retention of the
> benefit would be unjust without providing compensation. . . .
> [U]njust enrichment does not result if the defendant has received only an
> incidental benefit from the plaintiff's service . . . .

*Emergency Physicians Integrated Care v. Salt Lake County*, 167 P.3d 1080, 1086 (Utah 2007);

*see also Berrett v. Stevens*, 690 P.2d 553, 558 (Utah 1984) ("The value of services performed by

a person for his own advantage and from which another benefits incidentally are not

recoverable.").  Furthermore, Utah law recognizes that benefits under unjust enrichment are

broadly defined.  *Darby*, 184 P.2d at 337 ("The benefit may be an interest in money, land,

chattels, or choses in action; beneficial services conferred; satisfaction of a debt or duty owed by

him; or anything which adds to his security or advantage.").  Thus, neither of the cases cited by

Defendants provides sufficient support for their argument that under Utah law "Plaintiffs must

prove that they *directly* conferred a benefit on Defendants," *i.e.*, pleading that Plaintiffs

purchased directly from Defendants.

Accordingly, the Court concludes that Utah law does not mandate that a plaintiff

demonstrate that she directly conferred a benefit upon a defendant.  The Court denies the motion

in this respect.

*ii.  Likely "Direct Benefit" Jurisdictions*

Defendants argue that the courts of five jurisdictions—the District of Columbia,

Minnesota, South Dakota, Vermont, and West Virginia—"have not ruled on whether a plaintiff

must directly confer a benefit upon defendant."  Defs.' Mot. at 46.   Nonetheless, they contend

that it is appropriate for the Court to predict that these five jurisdictions would require a plaintiff to confer a direct benefit on a defendant in order to field an unjust enrichment claim solely because some other jurisdictions require the same unjust enrichment elements and have held that the conferral of a direct benefit is required.

The Third Circuit Court of Appeals has explained that when a federal court sitting in diversity must make a prediction as to a precise legal issue a certain legal standard must be satisfied.  In doing so, the Court is required to consult and evaluate particular sources of legal authority:

> In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply existing state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us.  *Kowalsky v. Long Beach Township*, 72 F.3d 385, 388 (3d Cir. 1995).  In the absence of guidance from the state's highest court, we must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue. *Wiley*, 995 F.2d at 459-60.  We must also consider "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *McGowan v. University of Scranton*, 759 F.2d 287, 291 (3d Cir. 1985) (quoting *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 663 (3d Cir. 1980)) (internal quotation marks omitted).

*Koppers Co., Inc. v. Aetna Cas. and Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996).

Defendants have urged the Court to predict that the five jurisdictions likely would require a "direct benefit" if the issue was presented to those jurisdictions' highest courts.  However, aside from arguing that the Court should look to the five jurisdictions that Defendants claim do require a direct benefit (a conclusion that the Court declined as to each of those jurisdictions, *supra*), Defendants have provided no other legal authority from which the Court might predict, consistent with the Third Circuit standard, whether those five jurisdictions would require

106

pleading a "direct benefit."  Certainly, especially in a far-ranging case such as this, the task is

decidedly daunting to collect and analyze non-definitive case law and then predict what various

courts around the country would do with a case, recognizing that it is entirely possible that those

predictions may—indeed, likely will—be not entirely consistent.  But given the posture of these

issues as presented to the Court at this time, it is virtually impossible for the Court to undertake

this task with any certainty now.  Plaintiffs have argued that "in light of the general principles

underlying such [unjust enrichment] actions—to prevent parties from benefitting from their

wrongdoing—[which] apply in all states, absent strong evidence from the relevant state courts,

this court should not imply such a requirement."  Pls. Resp. at 42.  Defendants have not raised

any argument disagreeing with this proposition.

      Furthermore, Plaintiffs contend the unjust enrichment claims do "not require such a direct

benefit," and provide moderate analysis of the "conferral of a benefit" requirement on a state-by-

state basis as to the District of Columbia, Minnesota, South Dakota, Vermont, and West Virginia.

Pls.' Resp. at 42-43, 47, 49-52.  In their reply brief, Defendants do not address such analyses

whatsoever with respect to the claims brought under the laws of the District of Columbia,

Minnesota, and Vermont.  Through their silence, it appears Defendants have no objections to the

Plaintiffs' justifications for their claims.  Insofar that Defendants have apparently protested

certain of the Plaintiffs' supporting legal authority as to unjust enrichment claims of South

Dakota and West Virginia, the Court does not agree with the Defendants' contention that *W.J.*

*Bachman Mechanical Sheetmetal Co., Inc. v. Wal-Mart Real*, 764 N.W.2d 722, 732-33 (S.D.

2009), or *Prudential Insurance Co. of America v. Couch*, 376 S.E.2d 104, 109 (W.Va. 1988),

support their claim that Plaintiffs must allege that they directly conferred a benefit on

Defendants.[66]

It follows that the Court declines at this time to make the predictions of law for which

Defendants advocate.  The Court determines that it is appropriate to deny the motion to dismiss

the unjust enrichment claims under the laws of the District of Columbia, Minnesota, South

Dakota, Vermont, and West Virginia on the grounds that Plaintiffs failed to allege that they

conferred a direct benefit upon Defendants.

## VI.  Conclusion

For the foregoing reasons, the Court denies in part and grants in part the Defendants'

motion consistent with the terms delineated in this Opinion.  Insofar that the Court grants in part

the Motion without prejudice, Plaintiffs may seek leave to amend their complaint upon the

appropriate motion, or stipulation, provided that they do so promptly.

An appropriate Order follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

[66]   The Defendants' contention that these two cases support their position is contradicted
by the Defendants' original position that these jurisdictions "have not ruled on whether a plaintiff
must directly confer a benefit upon defendant."  Defs.' Mot. at 46.