## IN THE UNITES STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : |
| ANTITRUST LITIGATION | : |
| | :    MDL No. 2002 |
| | :    08-md-02002 |
| _____ | : |
| | : |
| THIS DOCUMENT RELATES TO | : |
| ALL DIRECT ACTION PLAINTIFF ACTIONS | : |

### DEFENDANT SPARBOE FARMS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS EACH OF THE DIRECT ACTION PLAINTIFFS' COMPLAINTS

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Sparboe Farms, Inc. ("Sparboe") respectfully moves to dismiss each of the six Direct Action Plaintiffs' ("DAPs") complaints for failure to state a claim upon which relief can be granted.[1]

### INTRODUCTION

"*Twombly* and *Iqbal* teach that [] cut-and-paste jobs are not a substitute for real facts that plausibly 'show,' under Rule 8, that the Plaintiff is entitled to relief."[2]  The DAPs' complaints cut and paste allegations lifted verbatim from the direct purchaser plaintiffs' Second Consolidated Amended Class Action Complaint ("SAC").  (Doc. No. 291.)  Even more

---

[1] The DAPs have filed the following six actions:  *The Kroger Co., et al. v. United Egg Producers, Inc., et al.*, Case No. 10-cv-06705; *Giant Eagle, Inc. v. United Egg Producers, Inc., et al.*, Case No. 11-cv-820; *Kraft Foods Global, Inc., et al. v. United Egg Producers, Inc., et al.*, Case No. 11-cv-08808; *Publix Super Markets, Inc. v. United Egg Producers, et al.*, Case No. 10-cv-06737; *Supervalu, Inc. v. United Egg Producers, et al.*, Case No. 10-cv-06736; and *Winn-Dixie Stores, Inc., et al. v. Michael Foods, Inc., et al.*, Case No. 11-cv-0510.  One of the DAPs, Meijer, Inc., has voluntarily dismissed its claims.  (Doc. No. 5, 2:10-cv-06735-GP (E.D. Pa.).)

[2] *Gardner v. Appleton Baseball Club, Inc.*, No. 09-C-705, 2010 WL 1368663, at *6 (E.D. Wisc. March 31, 2010); *see also Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1277-80 (3d Cir. 1994).

troubling, the DAPs' complaints are inaccurate and misleading, as the DAPs selectively cut and paste allegations leaving out the SAC's explicit references to Sparboe's refusal to enter into any agreements with the other egg producer Defendants.

Sparboe understands that this Court, after careful consideration, spent significant time and effort disposing of the other Defendants' previously filed motions to dismiss both the SAC and the indirect purchaser class complaint.[3]   The purpose of this motion is not to peck away at the Court's prior rulings.   Instead, Sparboe highlights for the Court why Sparboe should be treated differently.   For example, as the Court acknowledged in its prior Order, "'Sparboe had designed its own internal "husbandry" program, which was not focused on restricting supply, in order to provide specific eggs to some customers....'"  (Order dated September 26, 2011 at 33) (quoting SAC ¶ 249) (emphasis supplied).  In addition, the direct purchaser plaintiffs made clear in the SAC that Sparboe "voted against the 100% Rule" and that Sparboe "had not agreed to sign on to [UEP's] program" that the SAC alleges other Defendants used to reduce supply.  (SAC at ¶¶ 228 and 294.)  The foregoing allegations are part of the Court's Record and directly refute the DAPs' few, conclusory allegations that Sparboe entered into any conspiracy.   The DAPs' complaints fail on this basis alone.

Dismissal of the DAPs' claims against Sparboe is warranted in this instance because even as currently pled, the DAPs' complaints fail to allege sufficient facts that plausibly suggest that Sparboe conspired with other egg producers.  The DAPs' few allegations pertaining to Sparboe were transparently cut and pasted from the direct purchaser plaintiffs' SAC, which alleged claims not against Sparboe, but against other Defendants.  Consequently, as used out of context in the DAPs' complaints, these same allegations lack any independent factual basis for the

---

[3] Sparboe was not named as a defendant in either of those complaints and, as such, has not previously responded to any complaint in this litigation.

DAPs' allegations against Sparboe.  Further, to the extent that the DAPs rely on the allegations in the SAC, they must rely on <u>all</u> of the allegations, including the allegations in the SAC that demonstrate that Sparboe was not involved in any conspiracy with other egg producers.  The DAPs cannot pick and choose only the parts of the SAC they like while ignoring the facts that squarely contradict their claims.  The DAPs' complaints were filed in bad faith and should be dismissed with prejudice and without leave to amend.

## <u>BACKGROUND</u>

**A.     SPARBOE'S INVOLVEMENT IN THE DIRECT PURCHASER CLASS ACTION.**

The first class action complaint in this litigation was filed on September 24, 2008.[4] Notably, Sparboe was not named as defendant in any of the initially-filed complaints.  On January 30, 2009, after all of the cases were consolidated by the MDL panel in this Court, the direct purchaser plaintiffs ("DPP") filed a Consolidated Amended Class Action Complaint. Sparboe was named for the first time in this complaint.  (Doc. No. 31.)[5]

On June 8, 2009, Sparboe executed a Settlement Agreement with the DPP.  (Doc. No. 184-1, at 3.)  Under the terms of the Settlement Agreement, the DPP class agreed to release all claims against Sparboe in exchange for receiving early discovery from Sparboe.  In their filings with the Court, the DPP have described in detail the volume of discovery received from Sparboe, which the DPP used in drafting their SAC.  (Doc. Nos. 172 at 2-7, 11, 15; 443-1 at 2-5.)  The Settlement Agreement prohibits DPP's counsel from sharing any information with counsel for any of the DAPs.  (Doc. No. 172-2 at ¶ 26.)

---

[4] *See ZaZa, Inc. v. Golden Oval Eggs, LLC, et al.*, 08-cv-5262 (D. Minn.)  One of the attorneys who filed this first class action complaint, has now filed complaints on behalf of several of the DAPs.  This attorney formerly represented the DPP at the time Sparboe settled with the DPP and provided information to the DPP.

[5] On February 27, 2009, the indirect purchaser plaintiffs filed a consolidated amended class action complaint, Sparboe has never been named as a defendant in any of the indirect purchaser plaintiffs' complaints.  (Doc. No. 69.)

**B.      DIRECT PURCHASER PLAINTIFFS' ALLEGATIONS IN THE SAC.**

Based on the information they obtained from Sparboe pursuant to the terms of the Settlement Agreement, on December 14, 2009, the DPP filed the SAC.[6]  In the SAC, the DPP distinguish Sparboe from the other egg producer Defendants in at least four material respects:

- **SPARBOE DEVELOPED ITS OWN ANIMAL WELFARE PROGRAM THAT DID NOT REDUCE SUPPLY.**  (SAC at ¶ 249.)

- **SPARBOE WAS THE ONLY DEFENDANT TO VOTE AGAINST THE 100% RULE.**  (SAC at ¶ 228.)

- **SPARBOE DID NOT AGREE TO SUPPLY RESTRICTIONS.**  (SAC ¶ 294.)

- **SPARBOE SOLD NON-CERTIFIED EGGS.**  (SAC ¶¶ 241-42.)

Sparboe was not named as a Defendant in the SAC.  Further, the DPP do not allege that Sparboe agreed to restrain supply or otherwise participate in the conspiracy.  For example, while it is alleged that other egg producers "agreed to reduce chick hatch" (SAC at ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102 and 106), it is not alleged anywhere that Sparboe agreed to reduce chick hatch.  It is also not alleged in the SAC that Sparboe agreed not to add capacity or make up for any lost hens, but the DPP do so allege against other Defendants.  (SAC at ¶ 208.)  The DPP also allege that other Defendants participated in an export program.  (SAC at ¶ 334.)  Sparboe is not listed among the Defendants that participated in the export program.  (SAC at ¶¶ 334 & 341.)

---

[6] Amended versions of the SAC were filed on January 6, 2010 and April 7, 2010.  (Doc. Nos. 221, 225, 291.)  A copy of the April 7, 2010 version of the SAC is attached as Exhibit A to the Declaration of Troy J. Hutchinson in support of Sparboe Farm, Inc.'s motion to dismiss.  The DPP recently moved to further amend their complaint.

4

**C.    THE COURT'S PRIOR RULING ON OTHER DEFENDANTS' MOTIONS TO DISMISS.**

On September 26, 2011, this Court issued an Order denying in part, and granting in part, the other Defendants' motion to dismiss the DPP's SAC.  (Doc. No. 562) ("Order").

In its Order, the Court did not find any one alleged aspect of the conspiracy as individually evidencing the existence of a conspiracy.  Instead, the Court correctly examined the totality of the allegations in the SAC asserted against each of the other Defendants.  The Court's analysis, however, focused on the alleged 100% rule and on the assertion that each Defendant agreed to sell only certified eggs.  (Order at 28-29.)  In contrast to those allegations, the Court acknowledged that Sparboe had unilaterally elected to sell non-certified eggs.  (*Id*. at 31.)  The Court further recognized that "'Sparboe had designed its own internal "husbandry" program, which was not focused on restricting supply, in order to provide specific eggs to some customers….'"  *Id*. at 33 (quoting SAC ¶ 249) (emphasis supplied).

In addition, the Court explicitly rejected some of the DPP's allegations in the SAC as not indicative of a conscious commitment to any conspiracy or agreement.  For example, the Court found that allegations regarding discussions regarding the relationship between the supply of eggs and egg prices "may [] describe more innocuous or observational conversations" and "suggest no more than that [industry members] were cognizant of certain characteristics of the egg industry and opined about certain practices both publicly and privately."  (Order at 41.)  The Court also found that participation in the egg export program "might have been for independent, legitimate business reasons."  (*Id*. at 47.)  The Court further concluded that some animal welfare policies could be indicative of nothing more than legitimate business practices.  (*Id*. at 77.)  All of the Court's prior findings and conclusions confirm that Sparboe played no role in any alleged conspiracy and support dismissal of the DAPs' claims against Sparboe.

5

### D.    THE DAPs' BARE, CUT AND PASTED ALLEGATIONS.

All of the DAPs' allegations relating to Sparboe were lifted from the DPP's SAC.  What is even more telling is that the DAPs selectively copied the DPP's allegations and intentionally omitted the factual averments in the SAC showing that Sparboe was not a complicit participant in any alleged conspiracy, including facts that Sparboe developed its own animal welfare program that was not aimed at reducing supply, voted against the 100% rule and did not agree to the UEP's supply restriction program.  (SAC ¶¶ 228, 249 and 294.)

### 1.    Plaintiff Giant Eagle, Inc. ("Giant Eagle").

Giant Eagle admits that it "incorporated much of the information provided by Sparboe to the Class Action Plaintiffs" into its own complaint.  (Giant Eagle Cmplt. ¶ 108) (Doc. No. 623).[7] Giant Eagle then copied most of DPP's allegations relating to Sparboe verbatim.[8]  Giant Eagle, however, omitted allegations that "Sparboe was the only company on the Animal Welfare Committee that officially objected to and voted against the 100% Rule (SAC ¶ 228), that "Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply" (SAC ¶ 249), and that Sparboe "had not agreed to sign on to [the] program" (SAC ¶ 294).  None of Giant Eagle's averments allege that Sparboe entered into an agreement with other egg producers.  Instead, Giant Eagle concedes that Sparboe terminated its trade association membership upon having initial concerns about other Defendants' potential, but

---

[7] While Giant Eagle claims that it "incorporated much of the information provided by Sparboe to the Class Action Plaintiffs," counsel for the Class Action Plaintiffs ("DPP") have confirmed by letter that they have not shared any information with any of the DAPs' counsel.  (Hutchinson Decl., Ex. B.)  As such, Giant Eagle has no firsthand knowledge of any information Sparboe provided to the DPP.  As such, when Giant Eagle alleges that it incorporated information provided by Sparboe, it can only mean that it merely copied the Class Action Plaintiffs' unconfirmed and unsubstantiated accounts of that information.  None of the DAPs should be allowed to rely on the DPP's unproven allegations.

[8] (*Compare* Giant Eagle Cmplt. ¶ 152 and SAC ¶ 226; Giant Eagle Cmplt. ¶¶ 184-85 and SAC ¶¶ 340-41; Giant Eagle Cmplt. ¶ 210 and SAC ¶ 469; Giant Eagle Cmplt. ¶ 47 and SAC ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106.)

unconfirmed, motivations.  (Giant Eagle Cmplt. ¶ 184.)  Even if this allegation was true, it does not assert that Sparboe conspired with other egg producers.

> ### 2.    The Kraft Plaintiffs.[9]

The Kraft Plaintiffs also cut and pasted from the SAC.[10]  These DAPs go one step even further and re-quote documents purportedly quoted in the SAC without identifying the document from which they purportly quote.  (*See, e.g.* Kraft Cmplt. ¶ 127.)  They give no indication that they have even seen the quoted document.  Under the terms of the Settlement Agreement, DPP were prohibited from sharing any documents or information with the DAPs' counsel.  Like Giant Eagle, the Kraft Plaintiffs intentionally failed to copy the SAC's exculpatory allegations that "Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply" (SAC ¶ 249) and that Sparboe "had not agreed to sign on to [the] program" (SAC ¶ 294).  The Kraft Plaintiffs do concede, as they must, that Sparboe was the only egg producer to vote against the 100% Rule.  (Kraft Cmplt. ¶ 127.)  They also concede that Sparboe promptly withdrew from the UEP once it developed concerns about the UEP's program, and only after Sparboe expressed concerns that the program may have "evolved" into something with which Sparboe did not agree.  (*Id*. ¶¶ 127, 138, 188.)  An allegation that the program "evolved," even if true, contradicts Sparboe's conscious commitment to that program.

---

[9] The "Kraft Plaintiffs" as used herein refers to Kraft Foods Global, Inc.; The Kellogg Company; General Mills, Inc.; and Nestle USA, Inc., all of which jointly filed a single complaint.  (Doc. No. 624.)

[10] (*Compare* Kraft Cmplt. (Doc. No. 624) ¶ 127 and SAC ¶ 228; Kraft Cmplt. ¶ 138 and SAC ¶¶ 241-243; Kraft Cmplt. ¶ 57 and SAC ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106.)

3.    **The Winn-Dixie Plaintiffs.**[11]

The Winn-Dixie Plaintiffs, like the other DAPs, copied their allegations verbatim from the SAC.[12]  They also then quote from documents purportedly quoted in the SAC without any indication that Winn-Dixie's counsel has ever seen the documents from which they quote.[13]  The Winn-Dixie Plaintiffs cut and pasted large sections of the SAC into their own pleading, they intentionally omitted those portions of the SAC that are favorable to Sparboe.  For example, in one section the Winn-Dixie Plaintiffs copy verbatim a string of eight paragraphs from the SAC, but only six of those eight paragraphs appear in the Winn-Dixie Complaint.  (*See* Winn-Dixie Cmplt. ¶ 216-21 and SAC ¶¶ 224-27, 230-231).  The missing paragraphs – Paragraphs 228 and 229 of the SAC – provide that "Sparboe was the only company on the Animal Welfare Committee that officially objected to and voted against the 100% Rule."  The Winn-Dixie Plaintiffs also quote verbatim a string of ten paragraphs – Paragraphs 227-236 of the Winn-Dixie Complaint.  These paragraphs are directly copied from Paragraphs 238-250 of the SAC.  While they copy every word verbatim from every other paragraph, they only selectively quoted from Paragraph 249 of the SAC and they omitted the portion of Paragraph 249 that reads:  "Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply." (SAC ¶ 249.)  This deliberate lack of candor is surprising.

---

[11] As used herein, the "Winn-Dixie Plaintiffs" shall mean Winn-Dixie Stores, Inc.; C&S Wholesale Grocers, Inc.; Roundy's Supermarkets, Inc.; and H.J. Heinz Company, L.P., all of which jointly filed a single complaint.  (Doc. No. 622.)

[12] (*Compare* Winn-Dixie Cmplt. (Doc. No. 624) ¶ 183 and SAC ¶ 191; Winn-Dixie Cmplt. ¶¶ 202-03 and SAC ¶¶ 210-11; Winn-Dixie Cmplt. ¶ 216-21 and SAC ¶¶ 224-27, 230-231; Winn-Dixie Cmplt. ¶¶ 227-236 and SAC ¶¶ 238-250; Winn-Dixie Cmplt. ¶ 280 and SAC ¶ 294; Winn-Dixie Cmplt. ¶¶ 329-30 and SAC ¶¶ 340-41; Winn-Dixie Cmplt. ¶ 459 and SAC ¶ 469; Winn-Dixie ¶ 99 and SAC ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106.)

[13] (*See, e.g.,* Winn-Dixie Cmplt. ¶¶ 227, 230-33, 280, 329-30.)

The Winn-Dixie Plaintiffs do concede that Sparboe refused to sign on to the UEP's supply reduction program.  (Winn-Dixie Cmplt. ¶¶ 280.)  They also admit that once Sparboe developed concerns it promptly terminated its membership with the trade association and that, despite pressure from other egg producers, Sparboe never agreed to anything.  (*Id*. ¶¶ 329-30.)

### 4.    Supervalu, Inc. ("Supervalu"), Publix Super Markets, Inc. ("Publix") and the Kroger Plaintiffs.[14]

Supervalu, Publix and the Kroger Plaintiffs each allege that Sparboe "disagreed" with other Defendants.  (Supervalu Cmplt. (Doc. No. 620) ¶ 150; Publix Cmplt. (Doc. No. 621) ¶ 150; and Kroger Cmplt., (Doc. No. 619) ¶ 158).[15]  This allegation demonstrates that the DAPs must try to explain away Sparboe's disagreement with other egg producers over issues of animal welfare.  Alleging disagreement is the antithesis of asserting a viable antitrust conspiracy claim.

Counsel for Supervalu, Publix and the Kroger Plaintiffs formerly represented the DPP at the time of the Sparboe settlement.  One must, therefore, necessarily conclude that counsel for Supervalu, Publix and the Kroger Plaintiffs, as a signatory to the SAC, was given access to all of the information that formed the basis for the DPP's allegations in the SAC.[16]  Notwithstanding their access to the information Sparboe provided to the DPP, the allegations made by Supervalu, Publix and the Kroger Plaintiffs pertaining to Sparboe are exceedingly thin.  Further, their allegations cast doubt on whether Sparboe agreed to anything.  For instance, it is alleged that

---

[14] As used herein, the "Kroger Plaintiffs" shall mean The Kroger Co.; Safeway, Inc.; Walgreen Co.; Hy-Vee, Inc.; Albertsons LLC; The Great Atlantic & Pacific Tea Company, Inc.; H.E. Butt Grocery Company and Conopco, Inc., which filed a single complaint (the "Kroger Cmplt.").  (Doc. No. 619.)

[15] This allegation, which appears in all three complaints, conclusively shows that the three complaints filed by Supervalu, Publix and the Kroger Plaintiffs are identical and were obviously drafted by the same attorney or attorneys.  (*Compare id*.; *see also* Supervalu Cmplt. ¶ 149; Publix Cmplt. ¶ 149; and Kroger Cmplt., ¶ 157) (acknowledging that "Sparboe had determined to adopt its own animal welfare guidelines").

[16] If counsel for Supervalu, Publix and the Kroger Plaintiffs now contends that he/she had no knowledge of the allegations made in the SAC or the information on which those allegations were based, then under Rule 11 said counsel should not have been listed as a signatory to the SAC.  Regardless, the attorney's representation of the DAPs is directly adverse to the attorney's former representation of the DPP.  *See, e.g., In re Corn Derivatives Antitrust Litig*., 748 F.2d 157, 161-62 (3d Cir. 1984).

Garth Sparboe advocated against a strict agreement on cage density, but instead, urged producers to "remain flexible and not develop a 'hard' requirement." (Supervalu Cmplt. ¶ 136; Publix Cmplt. ¶ 136; and Kroger Cmplt., ¶ 144). Supervalu, Publix and the Kroger Plaintiffs also concede that Sparboe had developed its own animal welfare program and rejected the 100% rule. (Supervalu Cmplt. ¶ 149; Publix Cmplt. ¶ 149; and Kroger Cmplt., ¶ 157). They also explicitly acknowledge Sparboe's disagreement with other producers. (Supervalu Cmplt. ¶ 150; Publix Cmplt. ¶ 150; and Kroger Cmplt., ¶ 158). These allegations evidence Sparboe's lack of agreement with other producers.

Supervalu, Publix and the Kroger Plaintiffs also copy allegations from the SAC:

| DAPs' Allegation | DAPs' Citation | SAC Allegation | SAC Citation |
|---|---|---|---|
| "Sparboe had determined to adopt its own animal welfare guidelines" | Supervalu Cmplt. ¶ 68; Publix Cmplt. ¶ 68; and Kroger Cmplt., ¶ 157 | "Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply" | ¶ 249 |
| "Sparboe has participated in and benefitted from Defendants' and their co-conspirators' efforts to curtail production, reduce supply and thereby, fix, raise, maintain and/or stabilize the price…. | Supervalu Cmplt. ¶ 68; Publix Cmplt. ¶ 68; and Kroger Cmplt., ¶ 75 | "[Defendant] has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices…. | ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106 |
| "Sparboe has explicitly agreed to the conspiracy, by among other things: adopting UEP Certified Program to reduce chick hatch (Certification Nos…." | Supervalu Cmplt. ¶ 68; Publix Cmplt. ¶ 68; and Kroger Cmplt., ¶ 75 | "[Defendant] has explicitly agreed to the conspiracy alleged herein by adopting UEP certified guidelines to reduce chick hatch (certification no…." | ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106 |

Of course, all of the allegations made by counsel for Supervalu, Publix and the Kroger Plaintiffs must be considered against the backdrop that, on behalf of the DPP, this counsel previously averred in the SAC that "Sparboe had designed its own internal 'husbandry' program,

which was <u>not focused on restricting supply</u>….."  (SAC at ¶ 249) (emphasis supplied).  Further, counsel for Supervalu, Publix and the Kroger Plaintiffs averred in the SAC that Sparboe did not agree to UEP's supply restriction program, but the allegations made in the DAPs' complaints are contradictory.  (SAC ¶ 294.)  Counsel for the DAPs should be judicially estopped from making new allegations that contradict allegations that counsel made in the SAC on behalf of DPP.  In any event, the allegations in the DAPs' complaints do not plausibly suggest that Sparboe agreed to an unlawful conspiracy.

Supervalu, Publix and the Kroger Plaintiffs also allege facts from which the Court can conclude that there is a legitimate, business reason for self-interested egg producers to seek the safety of the UEP flock and become UEP certified producers.  As alleged in the complaints, Sparboe was recently the target of attacks from animal rights activists.  (Supervalu Cmplt. ¶ 164; Publix Cmplt. ¶ 164; and Kroger Cmplt., ¶ 172).  As a result of the pressure exerted by the activists, Sparboe has lost several large customers.  Sparboe was singled out and targeted because it was not a member of the UEP Certified Program.  The DAPs' allegations in this regard only undermine their contention that Sparboe implemented animal welfare programs to reduce supply.  Instead, the allegations clearly show that there is vocal opposition to egg farmers, and strong customer support for animal welfare guidelines.  Unfortunately for Sparboe, they are stuck between their customers and the animal activists demanding increasingly more stringent animal welfare protocols and the DAPs, which have always required their egg suppliers to be UEP Certified, but now allege that the very animal welfare standards that they required now constitute anticompetitive agreements to which Sparboe was complicit – even though many of them refused to buy eggs from Sparboe because Sparboe was not UEP Certified.

**DISCUSSION**

## I.   PLEADING STANDARD.

The Court has previously set forth the pleading standard for conspiracy allegations in this antitrust litigation.  (*See* Order dated Sept. 26, 2011 (Doc. No. 562) at 9-16)[17] (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).  As this Court acknowledged, "the Court need not accept as true unsupported conclusions and unwarranted inferences, or the plaintiff's bald assertions or legal conclusions." *Id.* at 9.

The Court's analysis focuses on "whether 'the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express' because Section 1 'does not prohibit [all] unreasonable restraints of trade … but only restraints effected by a contract, combination or conspiracy.'" *Id.* at 10 (quoting *Twombly*, 550 U.S. at 553).  Simply put, "plaintiffs must 'plead enough factual matter (taken as true) to suggest that an agreement was made.'" *Id.* at 10 (quoting *Twombly*, 550 U.S. at 556).  Even consciously parallel conduct taken by competitors is not actionable in the absence of an agreement.  *See, e.g., Trueposition, Inc. v. LM Ericsson Tele. Co*., Civ. No. 11-4574, 2012 WL 33075, at \*20 (E.D. Pa. Jan. 6, 2012) (citing *In re Flat Glass Antitrust Litig*., 385 F.3d 350, 360 (3d Cir. 2004)).

The key inquiry is whether the allegations sufficiently allege that Sparboe joined the alleged conspiracy.  *Id.* at 12-13 ("a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy").  Each of the DAPs' complaints must plausibly suggest that Sparboe made "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 14 (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010)).  As discussed herein, the DAPs have failed to meet their burden and cannot show that Sparboe made the required commitment to a common scheme.

---

[17] *In re Processed Egg Products Antitrust Litig*., MDL No. 2002, 2011 WL 4465355 (E.D. Pa. Sept. 26, 2011).

As the Court also acknowledged, "[s]imply using the global term 'defendants' to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy is not sufficient." *Id*. at *8. Similarly, the "authority is clear that participation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of an agreement to the conspiracy." *Id*. at 15 (citing *Ins. Brokerage*, 618 F.3d at 349).

In considering a pleading's sufficiency, the Court may consider "matters of public record, as well as undisputedly authentic documents if the complainant's claims are based on these documents." (Order dated Sept. 26, 2011 at 9); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document").

## II.   CUT AND PASTED ALLEGATIONS CANNOT PROVIDE A SUFFICIENT BASIS FOR THE DAPs' CLAIMS.

A complaint lacks a sufficient independent factual basis when the allegations therein are cut and pasted from another complaint. *See, e.g., Garr v. U.S. Healthcare, Inc*., 22 F.3d 1274, 1277-80 (3d Cir. 1994) (upholding dismissal of complaints containing allegations copied from a previous class action complaint and affirming Rule 11 sanctions); *see also In re Connetics Corp. Sec. Litig*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (granting motion to strike and dismiss because complaint relied on the allegations of a prior SEC complaint); *Johns v. Bayer Corp.*, No. 09CV1935, 2010 WL 476688, at *3 (S.D. Cal. Feb. 9, 2010) (granting motion to dismiss because complaint "borrowed" from documents prepared by the Federal Trade Commission and the Center for Science in the Public Interest); *Fraker v. Bayer Corp*., No. CV 08-1464, 2009 WL

13

5865687, at *3-4 (E.D. Cal. Oct. 6, 2009) (granting motion to dismiss complaint where the allegations were quoted directly from a complaint in a separate action); *In re Karagianis*, No. 08-13704, 2009 WL 4738188, at *5 (D.N.H. Dec. 4, 2009) ("Aggregating summaries of several third party complaints and incorporating them by reference is simply insufficient.  At best they are hearsay or simply [plaintiff's] opinion on other suits.  They are not allegations of fact…."); *Del Giudice v. S.A.C. Capital Mgmt., LLC*, No. 06-1413, 2009 WL 424368, at *6-8 (D.N.J. Feb. 19, 2009) (dismissing complaint and awarding Rule 11 sanctions for cutting and pasting from a previously filed complaint); *Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *5-6 (N.D. Ill. Feb. 27, 2002) (dismissing complaint that recited facts taken from other complaints).

The Third Circuit, and every other court to confront the issue, has held that Rule 11 requires attorneys to conduct their own independent, pre-filing investigation and has expressly held that this duty is not discharged by copying allegations from another complaint.  *See Garr*, 22 F.3d at 1277-80 ("Rule 11 imposes a 'non-delegable duty upon the signing attorney to conduct his own independent analysis of the facts and law which form the basis of a pleading or motion.'") (quoting *Pavelic & LeFlore Marvel Entm't Grp.*, 493 U.S. 120, 125-27 (1989)); *see also Del Giudice*, 2009 WL 424368, at *6 ("A filing attorney, however, may not rely solely upon the inquiry conducted by another attorney, as the Rule 11 duty of investigation is personal and non-delegable.") (citing *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1314 (3d Cir. 1994)); *Geinko*, 2002 WL 276236, at *5 ("Plaintiffs attempt to piggyback on contested allegations made by third parties in independent actions rather than plead, as this Court instructed, more specific facts as their own allegations.  More importantly, by simply attaching complaints filed in other cases, Plaintiffs sidestep the requirements of Rule 11.")[18]

---

[18] In evaluating cut and pasted allegations, the accuracy of the allegations is immaterial.  *See Garr*, 22 F.3d at 1279 ("A shot in the dark is a sanctionable event, even if it somehow hits the mark.")  As the Third Circuit explained, "if

In the SAC, the DPP used information Sparboe provided pursuant to the Settlement Agreement, including exculpatory information that the DPP referenced in the SAC.  The DPP's counsel spoke to Sparboe's witnesses and reviewed Sparboe's documents before drafting the allegations in the SAC.  In contrast, the DAPs' counsel has not had access to Sparboe's witnesses or documents.[19]  Further, the terms of the Settlement Agreement bar DPP's counsel from sharing any information with the DAPs' counsel.  (Doc. No. 172-2 at ¶ 26.)  Sparboe disagrees with many of the DPP's allegations in the SAC and disputes their interpretation of witness statements, but at least DPP's counsel can in good faith contend that they investigated their allegations.  Conversely, the allegations in the DAPs' complaints are unreliable hearsay upon hearsay and the Court need not accept their cut and pasted allegations as true.  *See, e.g., Diener v. Renfrew Ctrs., Inc.*, 2011 WL 4401720, at *6 (E.D. Pa. Sept. 22, 2011) (noting that courts cannot consider hearsay evidence on a motion to dismiss).  Because the DAPs' counsel has not interviewed the witnesses and reviewed the documents on which the SAC is based, they have not satisfied their Rule 11 obligation to undertake an independent investigation of the facts.  Their reliance on the DPP's allegations is both legally and factually misplaced.

Not only do cut-and-pasted allegations violate Rule 11, under the *Twombly* pleading standard, allegations that are cut and pasted from another complaint lack the requisite suggestion of plausibility.  *See, e.g., Gardner v. Appleton Baseball Club, Inc.*, No. 09-C-705, 2010 WL 1368663, at *6 (E.D. Wis. Mar. 31, 2010) ("*Twombly* and *Iqbal* teach that [] cut-and-paste jobs

---

a lucky shot could save the signer from sanctions, the purpose of Rule 11 'to deter baseless filings' would be frustrated."  *Id*. (quoting *Vista Mfg., Inc. v. Trac-4 Inc*., 131 F.R.D. 134, 138 (N.D. Ind. 1990)).  Of course, here, the DAP's omission of averments in the SAC showing that Sparboe was not involved in the conspiracy illustrate why allegations copied from other complaints are untrustworthy.

[19] Unless, of course, counsel for Supervalu, Publix and the Kroger Plaintiffs admits to having used Sparboe's information in drafting the DAPs' complaints.

are not a substitute for real facts that plausibly 'show,' under Rule 8, that the Plaintiff is entitled to relief.")

There can be no dispute that each of the DAPs' complaints are copies, often verbatim, of the SAC, as set forth in the table below.

| Allegation in the DAPs' Complaint | Corresponding Allegation in the DPP's SAC |
|---|---|
| | |
| **Giant Eagle** | |
| ¶ 152 ("Sparboe … was concerned….") | ¶ 226 ("Sparboe … was concerned….") |
| ¶ 184-85 ("Sparboe terminated its membership with [USEM] ….") | ¶ 340-41 ("Sparboe terminated its membership with [USEM] ….") |
| ¶ 210 ("John Mueller, former in-house ….") | ¶ 469 ("John Mueller, former in-house ….") |
| ¶ 47 (Boilerplate allegation alleged in SAC as to all Defendants, except Sparboe) | ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106 |
| *Omitted* | ¶ 228 ("Sparboe was the only company on the Animal Welfare Committee that officially objected to and voted against the 100% rule.") |
| *Omitted* | ¶ 241-42 (Sparboe sold non-certified eggs) |
| *Omitted* | ¶ 249 ("Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply….") |
| *Omitted* | ¶ 294 (Sparboe "had not agreed to sign on to [the] program") |
| | |
| **The Kraft Plaintiffs** | |
| ¶ 127 ("Sparboe was the only member of the Animal Welfare Committee that voted against the 100% Rule.") | ¶ 228 ("Sparboe was the only company on the Animal Welfare Committee that officially objected to and voted against the 100% rule.") |
| ¶ 138 | ¶¶ 240-243 |
| ¶ 57 (Boilerplate allegation alleged in SAC as to all Defendants, except Sparboe) | ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106 |
| *Omitted* | ¶ 241-42 (Sparboe sold non-certified eggs) |
| *Omitted* | ¶ 249 ("Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply….") |
| *Omitted* | ¶ 294 (Sparboe "had not agreed to sign on to [the] program") |
| | |
| **The Winn-Dixie Plaintiffs** | |
| ¶ 183 (Discussing UEP meetings) | ¶ 191 (Discussing UEP meetings) |
| ¶¶ 202-03 (Discussing UEP meetings) | ¶¶ 210-11 (Discussing UEP meetings) |
| ¶ 216-21 ("Sparboe received specific pressure….") | ¶¶ 224-27, 230-231 ("Sparboe received specific pressure….") |

| | |
|---|---|
| *Omitted* | ¶ 228-229 ("Sparboe was the only company on the Animal Welfare Committee that officially objected to and voted against the 100% rule.") |
| ¶¶ 227-236 (copied verbatim, except SAC ¶ 249)<br>*Omitted* | ¶¶ 238-250<br>¶ 249 ("Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply….") |
| ¶ 280 (Sparboe "had not agreed to sign on to [the] program") | ¶ 294 (Sparboe "had not agreed to sign on to [the] program") |
| ¶¶ 329-30 ("Sparboe terminated its membership with [USEM] ….") | ¶¶ 340-41 ("Sparboe terminated its membership with [USEM] ….") |
| ¶ 459 (discussing Capper-Volstead) | ¶ 469 (discussing Capper-Volstead) |
| ¶ 99 (Boilerplate allegation alleged in SAC as to all Defendants, except Sparboe) | ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106 |
| *Omitted* | ¶ 241-42 (Sparboe sold non-certified eggs) |
| | |
| **Supervalu, Publix and the Kroger Plaintiffs** | |
| Supervalu Cmplt. ¶¶ 68, 146;<br>Publix Cmplt. ¶¶ 68, 146; and<br>Kroger Cmplt., ¶¶ 75, 154<br>(Boilerplate allegation alleged in SAC as to all Defendants, except Sparboe) | ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102, 106 |
| Supervalu Cmplt. ¶ 149;<br>Publix Cmplt. ¶149; and<br>Kroger Cmplt., ¶157<br>("Sparboe had determined to adopt its own animal welfare guidelines.")<br>*Omitted*:  "which was not focused on restricting supply…." | ¶ 249 ("Sparboe had designed its own internal 'husbandry' program which was not focused on restricting supply….") |
| *Omitted* | ¶ 228 ("Sparboe was the only company on the Animal Welfare Committee that officially objected to and voted against the 100% rule.") |
| *Omitted* | ¶ 241-42 (Sparboe sold non-certified eggs) |
| *Omitted* | ¶ 294 (Sparboe "had not agreed to sign on to [the] program") |

The DAPs have quite obviously copied allegations directly from the SAC.  In fact, all of the allegations made in each of the DAPs' complaints relating to Sparboe were lifted from the SAC.  Given the Third Circuit's decision in *Garr* and the additional authority cited *supra*, the Court must disregard the cut-and-pasted allegations.  Moreover, under *Twombly*, *Iqbal* and their progeny, there is no independent factual basis in any of the DAPs' complaints plausibly

suggesting that Sparboe consciously committed to a conspiracy with other egg producers to reduce supply.  That the DAPs had to resort to plagiarism in an attempt to assert claims against Sparboe speaks volumes as to the complete absence of any real evidence that Sparboe engaged in any wrongdoing.  The DAPs' complaints, like all plagiarized documents, are inherently unreliable, lack credibility and must be considered untrustworthy.  While the DAPs' plagiarism is troubling, what is even more troubling is that in cutting and pasting from the SAC, the DAPs intentionally ignored and omitted all averments in the SAC that exonerate Sparboe from any involvement in the alleged conspiracy.[20]  Given that the DAPs have shown their lack of a plausible basis as to any claim against Sparboe by resorting to plagiarism, Sparboe respectfully requests that the Court dismiss each of the DAPs' complaints with prejudice and without leave to amend.

## III.    THE COURT SHOULD CONSIDER ALL OF THE ALLEGATIONS IN THE SAC ON THIS RULE 12 MOTION TO DISMISS

All of the DAPs' allegations pertaining to Sparboe were lifted from the SAC.  If the Court considers any of those allegations on this motion to dismiss, then Court should refrain

---

[20] This is especially true for counsel for Supervalu, Publix and the Kroger Plaintiffs, who on behalf of the DPP in the SAC alleged that Sparboe voted against the 100% rule, created its own animal welfare program that was not designed to reduce supply, sold non-certified eggs, and did not sign on to the UEP's alleged supply reduction program.  (SAC ¶¶ 228, 249, 241-42, 294.)  This attorney must be judicially estopped from now asserting contradictory allegations on behalf of the DAPs.  *G–I Holdings, Inc. v. Reliance Ins. Co*., 586 F.3d 247, 261 (3d Cir .2009) (The doctrine of judicial estoppel "bar[s] a party from taking contradictory positions during the course of litigation.")  "Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, is a 'judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding.'"  *Hardee-Guerra v. Shire Pharm.*, 737 F. Supp. 2d 318, 328 (E.D. Pa. 2010) (quoting *Ryan Operations G.P. v. Santiam–Midwest Lumber Co*., 81 F.3d 355, 358 (3d Cir. 1996).  The doctrine recognizes the "intrinsic ability of courts to dismiss an offending litigant's complaint without considering the merits of the underlying claims when such dismissal is necessary to prevent a litigant from playing fast and loose with the courts."  *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. Gen. Motors*, 337 F.3d 314, 319 (3d Cir. 2003).  Here, counsel for Supervalu, Publix and the Kroger Plaintiffs is certainly playing fast and loose with the Court.  After settling claims against Sparboe on behalf of the DPP, and accepting the fruits of that settlement, said counsel now attempts to use some of the information received from Sparboe to bring claims against Sparboe on behalf of new clients while excluding from the new complaints all exculpatory information pertaining to Sparboe that said counsel previously asserted in the SAC.  Because the attorney was a signatory to the SAC, counsel for Supervalu, Publix and the Kroger Plaintiffs cannot now claim ignorance of the exculpatory information.

from considering the DAPs' allegations in a vacuum.  Instead, to give context to the DAPs' allegations, the Court should consider all of the SAC allegations, including the exculpatory allegations intentionally omitted by the DAPs.

As the Court has previously acknowledged, in considering a pleading's sufficiency, the Court may consider "matters of public record, as well as undisputedly authentic documents if the complainant's claims are based on these documents."  (Order dated Sept. 26, 2011 at 9); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc*., 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"); *Breyer v. Meissner*, 23 F. Supp. 2d 521, 527 (E.D. Pa. 1998) ("A court may take judicial notice, whether requested or not, of its own records and files, and facts which are part of its public records."); *Reeves v. PharmaJet, Inc.*, No. 1:11 CV 2347, 2012 WL 380186, at *2, n. 1 (N.D. Ohio Feb. 3, 2012) (stating that "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the Complaint may also be taken into account" in considering a Rule 12 motion); *Allegrino v. Conway E & S, Inc.*, No. 09-1507, 2010 WL 2035658, at * (W.D. Pa. May 18, 2010) ("In evaluating a Rule 12(b)(6) motion, a court may look beyond the complaint to matters of public record, including court files and records … and documents referenced in the complaint … or attached to either the complaint or the defendant's motion.") (citations and quotations omitted).  Courts' dockets and opinions have been deemed matters of public record that courts may consider on a Rule 12 motion without converting the motion into a Rule 56 motion for summary judgment.  *See Hunter v. U.S.*, No. 3:CV-00-0036, 2000 WL 1880257, at * 4 (E.D. Pa. Dec. 15, 2000).[21]

---

[21] Because the DAPs had full notice of all of the allegations in the SAC, the public policy rationale limiting the consideration of outside documents in a Rule 12 motion is not implicated here.  *Pension Ben. Guar. Corp*., 998 F.2d

In *Breyer v. Meisner*, Judge Yohn observed that "[a] district court deciding a Rule 12(b)(6) motion is entitled to take judicial notice of the factual record of a prior proceeding." 23 F. Supp. 2d at 572.  The court further remarked that "[i]t has often been observed that judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it."  *Id.*  If a court's records in prior litigation should be considered on a Rule 12 motion, then *a fortiori*, it is even more applicable here for the Court to take judicial notice of the allegations in the SAC, which was filed with the Court in this same litigation.

The SAC is undisputedly a matter of public record as it was publicly filed with the Court and is publicly available on the Court's docket.  (Doc. No. 291.)  Further, the SAC is attached to Sparboe's motion to dismiss.  (Hutchinson Decl., Ex. A.)  Most importantly, as set forth *supra*, much of the content of the SAC is cut and pasted verbatim into the DAPs' complaints and, as such, the DAPs' complaints rely on the SAC as the basis for the claims asserted.  Further, Giant Eagle incorporates by reference the SAC into its complaint.   (Giant Eagle Cmplt. ¶ 108.)  Therefore, there exists no dispute that the Court can, and indeed must, consider all of the SAC's allegations, including the allegations that exonerate Sparboe and that were omitted from the DAPs' complaints, without converting this Rule 12 motion into a Rule 56 motion for summary judgment.  Accordingly, in considering Sparboe's Rule 12 challenge to the DAPs' complaints, the Court should take judicial notice of the following factual averments:

- **SPARBOE DEVELOPED ITS OWN ANIMAL WELFARE PROGRAM THAT DID NOT REDUCE SUPPLY.**  (SAC at ¶ 249.)

- **SPARBOE WAS THE ONLY DEFENDANT TO VOTE AGAINST THE 100% RULE.**  (SAC at ¶ 228.)

- **SPARBOE DID NOT AGREE TO SUPPLY RESTRICTIONS.**  (SAC ¶ 294.)

at 1196 ("The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond.")

- **SPARBOE SOLD NON-CERTIFIED EGGS.** (SAC ¶¶ 241-42.)

These allegations, some of which some of the DAPs' complaints intentionally omitted, undermine the DAPs' theory of liability against Sparboe.[22]  Consistent with the Third Circuit's decision in *Garr*, and the other authority set forth *supra*, the Court should reject all of the DAPs' cut-and-pasted allegations and dismiss the DAPs' complaints.

Regardless, even if the Court considers any of the DAPs' lifted allegations pertaining to Sparboe, then the Court must also consider the exculpatory content, which directly contradicts and refutes the DAPs' claims against Sparboe.  Simply put, facts do not cease to exist because they are ignored.  The allegations that Sparboe developed its own animal welfare program, voted against the 100% rule, refused to agree to supply restrictions, and sold non-certified eggs undermine the plausibility of the DAPs' allegations.  The Court should grant Sparboe's motion to dismiss with prejudice.

## IV. THE DAPs' COMPLAINTS FAIL TO ALLEGE THAT SPARBOE ENTERED INTO A CONSPIRACY

Setting aside the cutting and pasting issue, even as currently pled, the DAPs' complaints fail to allege sufficient facts that plausibly suggest that Sparboe made "a conscious commitment to a common scheme designed to achieve an unlawful objective."  (Order dated September 26, 2011 at 14) (citing *Ins. Brokerage*, 618 F.3d at 315).

### A.  Allegations Regarding Sparboe's Participation in the UEP.

The DAPs' complaints focus on Sparboe's participation in the UEP.  The DAPs allege Sparboe's involvement with the UEP Animal Welfare Committee, contend that Sparboe attended UEP meetings, and specifically assert that Sparboe's employees served in unspecified executive

---

[22] While some of the DAPs omitted some of the exculpatory allegations, as discussed further *infra*, all of the DAPs assert factual allegations that contradict Sparboe's alleged role in any conspiracy.

positions or served on unidentified committees of the UEP.   (Kraft Cmplt. ¶ 57; Giant Eagle Cmplt. ¶ 46; Winn-Dixie Cmplt. ¶¶ 99, 183, 202-203; Supervalu Cmplt. ¶¶ 67-68; Publix Cmplt. ¶¶ 67-68; Kroger Cmplt. ¶¶ 74-75.)

As this Court has already observed, "participation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of agreement to the conspiracy."  (Order dated September 26, 2011 at 18) (*citing Ins. Brokerage*, 618 F.3d at 349).  "[A]llegations as to [Sparboe's] involvement at trade group meetings are at best alleged facts of an opportunity to conspire, not of agreement to or participation in the alleged conspiracy."  (Order at 20.)  Thus, allegations of Sparboe's attendance and participation at UEP meetings, even participation in the UEP Animal Welfare Committee, do not plausibly suggest that Sparboe agreed to any unlawful conduct.

### B.    Allegations Regarding Sparboe's Exports.

Five of the six DAPs' complaints allege that Sparboe participated in an export scheme. (Winn-Dixie Cmplt. ¶ 99); (Supervalu Cmplt. ¶ 68; Publix Cmplt. ¶ 68; and Kroger Cmplt., ¶ 75).[23]

In its Order denying the other Defendants' motions to dismiss the SAC, the Court recognized that each egg producer's "participation in the egg export program might have been for independent, legitimate business reasons."  (Order dated September 26, 2011 at 47) (acknowledging pleading deficiencies with the alleged export scheme).  The Court further explained that "the SAC's allegations reflect that—unlike the UEP Certification Program, which as pled, mandated certain conduct—the nature and extent of a producer's participation in the export program was not mandated. The SAC claims only that providing eggs for export or loss

---

[23] Giant Eagle does not allege that Sparboe participated in the egg export scheme.

sharing was encouraged, rather than required by virtue of membership in the program.  Sparboe, for example, while a member of the export program merely received 'pressure' to provide eggs for export, or in the alternative, 'to provide money to make up for the loss that other UEP members experienced by participating in the egg export program.'"  *Id.* (quoting SAC ¶ 341) (emphasis supplied).

The Court went on to note that "[a]s a final point, the SAC alleges that exports of eggs occurred independently of the USEM export program.  Prior to the existence of the USEM export program in 2000, 'the United States was the second-largest exporter of eggs in 1998.' [SAC ¶ 145.]  In the three years prior to November 2006, according to the SAC, no eggs were exported through the program, and yet the SAC claims that 14 million dozen eggs were exported in January to April 2006.  [SAC ¶¶ 348, 354.]  The existence of such exports, apparently occurring independently of the USEM export program, suggest that at least some U.S. egg producers had independent reasons to export eggs, unrelated to the alleged conspiracy to reduce egg supply.  Thus, [DPP's] bald statement that '[t]here would have been no independent business reason for each Defendant on its own to undertake costly exports at the expense of more profitable domestic sales' is contradicted by the SAC's own other allegations."  (Order at 48) (quoting SAC ¶ 346).

Based on the foregoing, Sparboe's alleged participation in the egg export program does not plausibly suggest that Sparboe consciously agreed to an unlawful agreement to reduce the supply of eggs.  Further, as some of the DAPs concede in their complaints, Sparboe was, outside of the UEP, engaged in the export of eggs to Canada through the Canada Egg Marketing Agency. (Winn-Dixie Cmplt. ¶ 230; Kraft Cmplt. ¶ 189.)  This further supports the Court's previous

finding that egg producers have a unilateral business reason for exporting eggs that has nothing to do with reducing the supply of eggs.

### C.      Allegations Regarding the UEP Certified Program.

Five of the six DAPs' complaints allege that "Sparboe has explicitly agreed to the conspiracy, by among other things, adopting the UEP Certified Program to reduce chick hatch." (Winn-Dixie Cmplt. ¶ 99); (Giant Eagle ¶ 47); (Supervalu Cmplt. ¶ 68; Publix Cmplt. ¶ 68; and Kroger Cmplt., ¶ 75).[24]   The Kraft Plaintiffs do not allege that Sparboe adopted the UEP Certified Program to reduce chick hatch.

In its Order denying the other Defendants' motions to dismiss the SAC, the Court repeatedly cited to the SAC allegations pertaining to Defendants' adoption of the UEP Certified Program and specifically the alleged agreement to reduce chick hatch.  (*See, e.g.,* Order dated September 26, 2011 at 24-26, 35, 42)  However, in its Order, the Court never relied exclusively on any Defendant's adherence to the alleged agreement to reduce chick hatch.  Instead, the Court focused on the totality of each Defendant's alleged involvement in various aspects of the UEP Certified Program.  For instance, in discussing Defendant Michael Foods' alleged agreement to reduce chick hatch, the Court explained that "Plaintiffs have alleged 'as part of these UEP Certified guidelines Defendants also agreed not to add capacity or make up for lost hens that would result through reduced cage densities." (Order at 25-26) (quoting SAC ¶ 208).  While five of the six DAPs' complaints allege that Sparboe was a certified producer and agreed to reduce chick hatch, none of the DAPs allege that Sparboe agreed not to add capacity or make up for lost hens.  Without an accompanying agreement not to add capacity, an agreement to reduce chick hatch alone would not constitute a reduction in supply.

---

[24] Of course, as a threshold matter, these boilerplate allegations are cut and pasted from the SAC, but for the purposes of this analysis we set that problem aside.  (SAC at ¶¶ 49, 55, 67, 72, 78, 90, 93, 96, 102 and 106).

The Court's analysis of the UEP Certified Program was particularly focused on the 100% rule.  (Order at 28-29.)  The Court remarked that the "SAC describes the 100% rule as requiring 'a company to commit to implementing the welfare guidelines on 100% of all production facilities regardless of how or where eggs may be marketed.'"  *Id*. (quoting SAC ¶ 221).  The Court went on to conclude that "there are no allegations to suggest, why an independent, self-interested egg producer voluntarily would constrain all of its facilities, and thereby its entire production, without regard for consumer egg preferences, which could include desires for certified and non-certified eggs."  (Order at 29.)[25]  As the DPP acknowledge in the SAC, and as the DAPs also concede, Sparboe was the only Defendant that voted against the 100% rule.  (SAC ¶ 249); (Kraft Cmplt. ¶ 127; Supervalu ¶¶ 146, 149; Publix ¶¶ 146, 149; Kroger Plaintiffs ¶¶ 154, 157; Winn-Dixie Cmplt. ¶¶ 216-19; Giant Eagle ¶ 152).[26]  It is not alleged that Sparboe ever commit 100% of its production to the UEP Program.  Thus, a critical aspect of the Court's Order denying Defendants' motions to dismiss the SAC is inapplicable to Sparboe.

The Court cannot ignore the averment that, in contrast to egg producers who adhered to the 100% rule, "'Sparboe had designed its own internal "husbandry" program, which was <u>not focused on restricting supply</u>, in order to provide specific eggs to some customers….'"  (Order dated September 26, 2011 at 33) (quoting SAC ¶ 249) (emphasis supplied).  The Court also cannot ignore the averment that Sparboe was selling non-certified eggs.  (Order at 31) (quoting

---

[25] Sparboe respectfully submits that it is the DAP that must allege facts that exclude the possibility of unilateral business reasons for becoming a UEP certified producer.  Sparboe submits that there are many reasons why, when confronted by pressures from animal rights activists, that independent, self-interested egg producers would seek the safety of the UEP flock.  To be a non-certified egg producer brings unwanted attention from animal rights activists, and limits a producer's ability to market its eggs.

[26] Giant Eagle devotes a section of its complaint to the 100% rule.  (Giant Eagle Cmplt. ¶¶ 150-52.)  Giant Eagle never alleges that Sparboe agreed to the 100% rule, but instead, submits that Sparboe merely received "pressure" to accept the 100% rule.  (*Id*. ¶ 152.)  Similarly, the Winn-Dixie Plaintiffs do not assert that Sparboe agreed to the 100% rule, but also contend that Sparboe merely received "pressure" regarding the 100% rule.  (Winn-Dixie Cmplt. ¶ 216.)  The Court has previously held that an allegation that Sparboe received "pressure" is not a sufficient allegation of agreement.  (Order dated September 26, 2011 at 47.)

SAC ¶¶ 241-42.)   These averments conflict with any suggestion that Sparboe, unlike other Defendants, was bound to follow the UEP Program's guidelines and was only selling certified eggs.  As such, neither standing alone, nor in combination with any of the DAPs' other bare, cut-and-pasted, boilerplate allegations do the DAPs' allegations plausibly suggest that Sparboe consciously committed to an unlawful scheme to reduce the supply of eggs.

### D.    The DAPs' Remaining Cut-and-Pasted Allegations.

Even if the Court ignores the exculpatory allegations in the SAC that the DAPs omitted from their complaints, the DAPs' remaining cut and pasted allegations contradict the existence of a conspiracy involving Sparboe.  The DAPs are bound by these contradictory allegations.  *See, e.g., In re New Motor Vehicles Canadian Export Antitrust Litig.*, 533 F.3d 1, 5 (1st Cir. 2008) ("What matters here is what plaintiffs pled in their complaints, and the facts alleged in those complaints contradict the existence of a vertical conspiracy.") (citing *Global NAPs, Inc. v. Fed. Ins. Co.*, 336 F.3d 59, 66 (1st Cir. 2003) ( "[W]e cannot credit a theory of [recovery] that flatly contradicts facts and assertions made explicit in the complaint.")).[27]

### 1.    The Kraft Plaintiffs

The Kraft Plaintiffs do not allege that Sparboe participated in the UEP Certified Program's agreement to reduce chick hatch or otherwise allege any specific agreement to which Sparboe agreed.  Instead, their allegations show that Sparboe rejected all such opportunities to enter into agreements with the UEP and other egg producers.  Significantly, they assert that

---

[27] *See also Soo Line R.R. Co. v. St. Louis Sw. Ry., Co.*, 125 F.3d 481, 483 (7th Cir. 1997) ( It is a "well-settled rule that a party is bound by what it states in its pleadings" and that "[a] plaintiff can plead himself out of court by alleging facts which show that he has no claim."); *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (noting that contradictory allegations are binding admissions); *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 n.10 (S.D.N.Y. 2003) ("A complaint may not allege inconsistent facts … because facts are binding judicial admissions.") (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985)).

"Sparboe Farms was the only member of the Animal Welfare Committee that voted against the 100% Rule." (*Id*. ¶ 127.) This admission alone warrants dismissal.

The Kraft Plaintiffs' allegations show that, far from agreeing with the UEP, Sparboe disagreed with the UEP over animal welfare issues. For instance, the Kraft Plaintiffs allege that the UEP interfered with Sparboe's customers and that Sparboe threatened the UEP with legal action. (*Id*. ¶ 189.) The Kraft Plaintiffs further allege that, as early as November 2003, once Sparboe had developed "concerns" about the UEP's program, Sparboe immediately severed ties with the UEP. (*Id*. ¶¶ 138, 188, 201.)[28] While the Kraft Plaintiffs suggest that Sparboe never brought the matter to the attention of law enforcement, they, like some of the other DAPs, try to contort Sparboe's decision to leave the UEP into a withdrawal from a conspiracy. (*Id*. ¶ 138.) Sparboe never agreed to enter into any conspiracy. Allegations plausibly suggesting Sparboe's involvement in any conspiracy are not found either in the Kraft Plaintiffs' complaint, or any of the other DAPs' complaints. As such, there was no conspiracy from which Sparboe could withdraw and nothing for Sparboe to report to law enforcement. The Kraft Plaintiffs' limited allegations pertaining to Sparboe fall far short of plausibly suggesting Sparboe's conscious commitment to an unlawful conspiracy to restrain egg supplies.[29]

---

[28] Notably, having "concerns" on any given matter is far from having concrete proof of facts that may substantiate the expressed concerns. Assuming for this motion as we must that the allegation that Sparboe had concerns is true, Sparboe's concerns neither evidence Sparboe's agreement to any conspiracy, nor plausibly suggest that Sparboe was even aware of any other egg producers' wrongful conduct. As alleged, Sparboe merely had "concerns." A concern is defined as "an uneasy state of blended interest, uncertainty, and apprehension." (Merriam-Webster Dictionary) (emphasis supplied). As such, to have a concern is necessarily to have uncertainty about the matter at issue. At best, the DAPs' allegations that Sparboe had "concerns" about the UEP's motives in implementing animal welfare guidelines evidences Sparboe's uncertainty and lack of knowledge with respect to those motives. As alleged, if Sparboe did not even know what the UEP and other Defendants were doing, the DAPs' allegations regarding Sparboe's concerns demonstrate that Sparboe could not possibly have been in agreement with the UEP and other Defendants.

[29] Further, the Kraft Plaintiffs' complaint does not rule out the possibility that Sparboe researched and discussed animal welfare issues through the UEP trade association for its own legitimate business reasons. (Order at 77) (noting that the SAC did not rule out the possibility of undertaking animal welfare research for a legitimate purpose).

### 2.   Giant Eagle.

Giant Eagle's allegations pertaining to Sparboe are similarly sparse and show that Sparboe was in disagreement with the UEP and other egg producers over animal welfare issues. Giant Eagle alleges that Sparboe raised mere "concerns" about the 100% rule and merely received "pressure" from the UEP and others to reduce supply.  (Giant Eagle Cmplt. ¶¶ 152, 185, 210.)[30]  These allegations fall short of alleging that Sparboe actually agreed to anything.  (Order dated September 26, 2011 at 47) (noting that an allegation of receiving "pressure" is not an allegation of agreement).  It is further alleged that Sparboe left the UEP programs – although there is no allegation that Sparboe ever agreed to join the UEP programs in the first instance – and that UEP interfered with Sparboe's customers.  (*Id.* ¶¶ 156, 157 184.)  Giant Eagle alleges that Sparboe left the USEM and stopped participating in the egg export scheme on May 27, 2005, but Giant Eagles submits that it was not until after Sparboe left the USEM, on June 21, 2005, that the UEP asserted that the UEP's purpose (not Sparboe's purpose) in exporting eggs was to raise prices.  (*Id.* ¶ 184.)  These are the sum total of Giant Eagle's allegations relating to Sparboe, none of which, either individually or collectively, plausibly suggest that Sparboe consciously agreed to an unlawful objective.

### 3.   The Winn-Dixie Plaintiffs.

The Winn-Dixie Plaintiffs' allegations show that Sparboe refused to agree with the UEP's animal welfare program.  (Winn-Dixie Cmplt. ¶¶ 278-280) ("Sparboe was one of the companies that received this letter after it had not agreed to sign on to this program.")  They also

---

[30] As discussed in footnote 27, *supra*, expressing "concerns" is to express uncertainty and evidences the lack of knowledge, which is necessarily a prerequisite to consciously, and knowingly, agreeing to anything.

allege that Sparboe received "pressure"[31] regarding the 100% rule, that UEP members said that they "would take care of Sparboe" and that the UEP warned Sparboe that "it would give Sparboe a black eye in the industry," but that Sparboe ultimately expressed "concerns"[32] with the 100% rule and other aspects of the UEP's program. (*Id*. ¶¶ 216-220, 330, 459.) The Winn-Dixie Plaintiffs further allege that Sparboe terminated its membership with USEM and stopped participating in the egg export scheme after expressing concerns with the export program and the UEP's animal welfare programs generally. (*Id*. ¶¶ 329, 459.) It is alleged that, even after Sparboe left the UEP, it received pressure to rejoin, but that Sparboe did not rejoin the UEP export program or the UEP Certified Program. (*Id*. ¶ 330.) Of course, Sparboe also voted against the 100% rule and refused to agree to the UEP's supply restriction program. Voicing opposition, refusing to vote in favor of proposals, and terminating its membership in the trade association is not conduct that plausibly suggests Sparboe's commitment to any common objective, much less a commitment to an antitrust conspiracy.

The Winn-Dixie Plaintiffs further allege that a Sparboe employee discussed the Animal Welfare Program and the relationship between supply and prices with other industry members. (*Id*. ¶¶ 183, 202-03, 221, 459.) The Court has already rejected this verbatim allegation in the SAC stating that "the allegation may also describe more innocuous or observational conversations. Indeed, the allegations suggest no more than that [other industry members] were

---

[31] Alleging that Sparboe merely received "pressure" does not support a assertion that Sparboe agreed to the alleged conspiracy. (Order dated September 26, 2011 at 47.) The Winn-Dixie fail to allege Sparboe entered into an agreement, but instead, they only allege Sparboe received "pressure" to agree. (Winn-Dixie Cmplt. ¶¶ 216, 330.)

[32] Again, as discussed in footnote 27, *supra*, expressing "concerns" is to express uncertainty and evidences the lack of knowledge, which is necessarily a prerequisite to consciously, and knowingly, agreeing to anything. (Winn-Dixie Cmplt. ¶¶ 218-220, 459.) These allegations of "concerns" cut against any assertion that Sparboe consciously committed to any conspiracy.

cognizant of certain characteristics of the egg industry and opined about certain practices both publicly and privately." (Order dated September 26, 2011 at 41.)[33]

In one paragraph, Winn-Dixie quotes verbatim an allegation from the SAC that, in turn, quotes an unidentified document regarding an unspecified individual's view of the UEP program. (Winn-Dixie Cmplt. ¶ 227; SAC ¶ 238.) Neither in the SAC, nor in the Winn-Dixie complaint is there any context or description of the documents purportedly quoted. The allegation is hearsay upon hearsay upon hearsay. In any event, especially considering the allegations evidencing Sparboe's refusal to agree with the UEP on issues of animal welfare and Sparboe's development of its own animal welfare guidelines that did not restrict supply, this cut and pasted allegation does not show that Sparboe agreed to anything.

The Winn-Dixie Plaintiffs further allege that there was a disagreement between the UEP and Sparboe regarding animal welfare issues, which allegedly resulted in the UEP contacting and interfering with Sparboe's customers. (Winn-Dixie Cmplt. ¶¶ 228-236.) Nothing in the Winn-Dixie Plaintiffs' allegations shows an agreement to an unlawful objective.

### 4.    Supervalu, Publix and the Kroger Plaintiffs.

The allegations made by Supervalu, Publix and the Kroger Plaintiffs do not plausibly suggest that Sparboe consciously committed to an unlawful objective in developing animal welfare guidelines. They allege that, instead of agreeing with other members of the Animal Welfare Committee, Garth Sparboe urged other members to "remain flexible and not develop a 'hard' requirement." (Supervalu Cmplt. ¶ 136; Publix Cmplt. ¶ 136; Kroger Cmplt. ¶ 144.) A proposal that does not require agreement, urges others to "remain flexible," and avoids agreement on any hard requirements shows Sparboe's intention to allow customer demand to

---

[33] Giant Eagle makes a similar allegation, which the Court should similarly reject as innocuous or observational discussions. (Giant Eagle Cmplt. ¶ 210.)

drive animal welfare guidelines. This allegation undermines the suggestion that Sparboe conspired with other egg producers. Instead, the allegation is consistent with Sparboe's conduct in voting against the 100% rule, refusing to sign on to supply restriction agreements, leaving the UEP after expressing concerns, selling certified eggs, and developing its own animal welfare programs that did not restrain supply.

Supervalu, Publix and the Kroger Plaintiffs concede that Sparboe did not agree with the 100% rule – an element of the alleged scheme that this Court recognized is critical to the alleged conspiracy to reduce the supply of eggs. (Supervalu Cmplt. ¶ 146, 149; Publix Cmplt. ¶ 146, 149; Kroger Cmplt. ¶ 154, 157.) Without an agreement to the 100% rule, the DAPs' entire case crumbles. It is not plausible to suggest that egg producers had no individualized economic incentive to implement animal welfare programs for customers who demanded adherence to such guidelines. Most of Sparboe's customers demanded that Sparboe comply with strict animal welfare programs. Indeed, Supervalu, Publix and the Kroger Plaintiffs plead facts on which this Court can conclude that Sparboe was, and is, under tremendous pressure from its customers to comply with animal welfare standards. (Supervalu Cmplt. ¶ 164; Publix Cmplt. ¶ 164; Kroger Cmplt. ¶ 172.) The allegations regarding Sparboe's customers dropping Sparboe as an egg supplier show that Sparboe had a legitimate reason for implementing animal welfare guidelines. (Order at 77) (noting that the SAC did not rule out the possibility of undertaking animal welfare research for a legitimate purpose). These allegations provide an obvious alternative explanation for Sparboe's implementation of animal welfare practices and, as such, dismissal is of the complaints is warranted. (Order at 11) ("'[A] claim of conspiracy predicated on parallel conduct should be dismissed if "common economic experience," or the facts alleged in the complaint

itself, show that independent self-interest is an "obvious alternative explanation' for defendants" common behavior.'") (quoting *Ins. Brokerage*, 618 F.3d at 326).

The allegations that Sparboe participated in supply reduction programs in each of the DAPs' complaints is undermined by the fact that Sparboe developed its own internal animal welfare program that was not aimed at reducing supply.  (Supervalu Cmplt. ¶ 148-151; Publix Cmplt. ¶ 148-151; Kroger Cmplt. ¶ 156-159; compare SAC ¶ 249.)

Other allegations made by Supervalu, Publix and the Kroger Plaintiffs further undermine their bare contention that Sparboe conspired with other egg producers.  They allege that Sparboe merely attempted "to take advantage of the conspiracy-induced higher egg prices, while maintaining the flexibility to market and sell eggs that were not subject to the UEP's animal husbandry guidelines."  (Supervalu Cmplt. ¶ 150; Publix Cmplt. ¶ 150; Kroger Cmplt. ¶ 158.)  In other words, while <u>disagreeing</u> with other industry members both vocally and through its actions, Sparboe attempted to take advantage of favorable market conditions while meeting its customers' demands.  This allegation sounds more like a company's legitimate mission statement and not a charging instrument for an antitrust conspiracy claim.  The DAPs allege nothing more than Sparboe's self-interest in maximizing its profits.  While even consciously parallel conduct cannot sustain a conspiracy claim, the DAPs' allegations do not even allege that Sparboe was conducting itself in the same manner as the other egg producers.  Instead, it alleges that Sparboe was not implementing parallel animal welfare programs, but instead, employing its own animal welfare program.  Moreover, the DAPs' complaints provide no facts to support their bare contention that egg producers, like Sparboe, that sold non-certified eggs could still charge higher prices without selling certified eggs.  The DAPs' bare allegation that Sparboe never reduced its prices is not supported by citation to actual prices charged by Sparboe for its non-

certified eggs or references to the market prices for certified eggs.  ((Supervalu Cmplt. ¶ 150; Publix Cmplt. ¶ 150; Kroger Cmplt. ¶ 158.)  In fact, the market was just the opposite and the Court could, although it is unnecessary to do so given the weakness of the claims against Sparboe, take judicial notice of the fact that non-certified eggs sold by Sparboe publicly traded at a huge discount to UEP certified eggs.  The Urner Barry index provides public price quotes for both certified and non-certified eggs.  There is no assertion of actual egg prices in the DAPs' pleadings.  It is the DAPs' obligation to support their bare contention with actual factual averments showing that Sparboe actually took advantage of higher egg prices.  Regardless, even if the bare allegation was true, charging market prices is, at best, parallel conduct.  None of the allegations in the complaints filed by Supervalu, Publix and the Kroger Plaintiffs put forth sufficient factual averments suggesting that Sparboe consciously committed to conspire with other egg producers to reduce the supply of eggs.

## V.   THE DAPs FAIL TO ALLEGE FACTS EXCLUDING THE POSSIBILITY THAT SPARBOE'S IMPLEMENTATION OF AN ANIMAL WELFARE PROGRAM WAS NOT INDEPENDENT BUSINESS CONDUCT.

The crux of the DAPs' allegations relating to Sparboe is that Sparboe implemented animal welfare guidelines.  Standing alone the implementation of animal welfare practices cannot support a finding that Sparboe conspired to fix prices or reduce supply.  Yet, when the DAPs' boilerplate, cut and pasted allegations are peeled away, all that is left is Sparboe's unilateral decision to meet its customers' demands by designing its own animal welfare program that had nothing to do with reducing egg supplies.

The DAPs allege that Sparboe's animal welfare program was similar to, but markedly different from, the UEP's Certified Program.  The DAPs concede that Sparboe voted against the 100% rule and never agreed to put 100% of its laying hens on the UEP Certified Program.  The

100% rule was a significant feature of the UEP Certified Program.   At best, the DAPs'
complaints allege that Sparboe engaged in similar, but not parallel, conduct.   Of course, even
consciously parallel conduct taken by competitors is not actionable in the absence of an explicit
agreement.   *See, e.g., Trueposition, Inc. v. LM Ericsson Tele. Co*., Civ. No. 11-4574, 2012 WL
33075, at *20 (E.D. Pa., Jan. 6, 2012) (citing *In re Flat  Glass Antitrust Litig*., 385 F.3d 350, 360
(3d Cir. 2004)).

Even where plaintiffs plead consciously parallel conduct, the "Third Circuit requires that
plaintiffs basing their claim of conspiracy on inferences from consciously parallel behavior show
that certain 'plus factors' also exist."  *Trueposition*, 2012 WL 33075, at *20 (citing *Flat Glass*,
385 F.3d at 360).   The Third Circuit has identified three plus factors that plaintiffs must allege:
1) evidence that the defendant had a motive to enter into a conspiracy; 2) evidence that the
defendant acted contrary to its interests; and 3) evidence implying a traditional conspiracy.   *Id*.
(citing *Flat Glass*, 385 F.3d at 360).

None of the DAPs allege that Sparboe had a motive to enter into any conspiracy or that
Sparboe acted contrary to its own interests.   Sparboe had a legitimate reason for implementing
animal welfare guidelines.   Sparboe's implementation of animal welfare guidelines did not
require it to conspire.   Sparboe simply desired to give its customers what they wanted and to try
avoid the scorn of animal rights activists.

The DAPs further fail to assert any evidence implying a traditional conspiracy.   Instead,
the DAPs' entire case hinges on Sparboe's participation in the UEP.   Participation in a trade
association, even conduct jointly undertaken through a standard setting organization, does not
support the assertion of conspiracy claims.  *See, e.g., Trueposition*, 2012 WL 33075; *see also*
(Eggs Order dated September 26, 2011 at 15) (citing *Ins. Brokerage*, 618 F.3d at 349); *Just New*

34

*Homes, Inc. v. Beazer Homes*, 293 Fed. App'x 931, 934 (3d Cir. 2008) ("Membership in a trade association, without more, does not violate antitrust laws.")  There is simply no allegation made by any of the DAPs that Sparboe "'got together and exchanged assurances of common action or otherwise adopted a common plan.'"  *Trueposition*, 2012 WL 33075, at *24 (quoting *Flat Glass*, 385 F.3d at 361).  To the contrary, the DAPs' allegations show that Sparboe vocally expressed its concerns with various proposals, voted against the 100% rule, refused to sign on to other programs, started its own animal welfare program that was not designed to reduce supply, and ultimately left the UEP altogether.  If Sparboe had actually gotten together and agreed with other egg producers, why would Sparboe repeatedly publicly voice its concerns with various proposals?  It is not plausible to suggest that someone vocally voicing opposition to various proposals and even casting votes against the proposals was in agreement with others.  The DAPs have plainly failed to meet their burden to plead sufficient facts plausibly suggesting that Sparboe conspired to reduce egg supplies, or facts excluding the possibility that Sparboe was simply acting independently in pursuit of its own legitimate business objectives.

## VI.   PUBLIC POLICY CONSIDERATIONS SUPPORT DISMISSAL.

The Third Circuit has observed that "there is an overriding public interest in settling class action litigation, and it should therefore be encouraged."  *In re Warfarin Sodium Antitrust Litig*. 391 F.3d 516, 535 (3d Cir. 2004); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 784 (3d. Cir. 1995) ("[T]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *Austin v. Pa. Dep't of Corr*., 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) ("[T]he extraordinary amount of judicial and private resources consumed by massive class action litigation elevates the general policy encouraging settlements to an overriding public

interest."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) ("The Court also notes that this settlement has significant value as an 'ice breaker' settlement – it is the first settlement in the litigation – and should increase the likelihood of future settlements.").

By cutting and pasting from the SAC, the DAPs attempt to garner the fruits of Sparboe's settlement with the DPP without the bargained for exchange of consideration.[34]  While the DAPs were free to exercise their right to request exclusion from the settlement, this right to opt-out does not permit them to copy the DPP's allegations.  To allow DAPs to blindly cut and paste allegations from the SAC and selectively use those allegations out of context against Sparboe would discourage other Defendants in this litigation from settling with the DPP.  More broadly, such a holding in this litigation would have chilling effects on early settlements in future class action litigation.  Furthermore, to expressly condone the DAPs' cutting and pasting of allegations from the SAC will encourage the filing of copy-cat lawsuits in contexts outside of class action litigation.  This is a practice that courts should not only discourage, but expressly prohibit.

## VII.  THE DAPs' COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE AND WITHOUT LEAVE TO AMEND.

The DAPs' complaints should be dismissed *with prejudice and without leave to amend* because it is clear further amendment would be futile.  *See Hill v. City of Scranton*, 411 F.3d 118, 134 (3d Cir. 2005) ("[A] district court has discretion to deny a request to amend if it is apparent from the record that . . . the amendment would be futile[.]").  The Plaintiffs have "presented their best allegations," and it is clear that "any further amendment would not cure the deficiencies."  *Dock v. Rush*, 432 Fed. Appx. 130, 134 (3d Cir. 2011); *see also Schwartz v. Upper Deck Co.*, 104 F. Supp. 2d 1228, 1231 (S.D. Cal. 2000) (dismissing without leave to

---

[34] This holds especially true for counsel for Supervalu, Publix and the Kroger Plaintiffs who, in exchange for the receipt of early discovery from Sparboe, promised not to sue Sparboe and not to share any information received from Sparboe with any DAPs.

amend when plaintiffs had opportunity to amend "for many months" and were "on notice of th[e] procedural defect.").

Each of the groups of DAPs have already filed at least one amended complaint each. The amended complaints, or in some instances second amended complaints, were drafted after counsel for DAPs had an opportunity to read the Court's September 26, 2011 Order denying the other Defendants' motions to dismiss. As such, the DAPs had full notice of precisely what allegations were necessary to survive dismissal. Further, the first class action complaint in this litigation was filed in September 2008 – nearly four years ago – by counsel for several of the DAPs. In the past four years the DAPs were evidently unable to discover any of their own evidence of any wrongdoing by Sparboe, but instead were forced to selectively cut-and-paste allegations from the DPP's SAC. If the DAPs are given leave to amend they may alter their cut and pasted allegations just enough to try to conceal the source of their allegations. Of course, the Record is now clear that the source of the DAPs' allegations is the DPP's SAC. No amendment of their complaints will alter the Record in that regard. Further, the DAPs' complaints allege facts that contradict Sparboe's involvement in any conspiracy. The DAPs must be judicially estopped from amending their complaint to remove these contradictory allegations. As such, Sparboe respectfully requests that the Court dismiss each of the six DAPs' complaints with prejudice and without leave to amend.

## **CONCLUSION**

Based on the foregoing, Sparboe respectfully requests that the Court issue an Order finding that the DAPs' have failed to allege facts plausibly suggesting that Sparboe entered into any agreement or conspiracy to reduce the supply of eggs and, on that finding, grant Sparboe's motions to dismiss each of the DAPs' six complaints with prejudice and without leave to amend.


Dated:  March 26, 2012                    RESPECTFULLY SUBMITTED,


                                    By:   s/Troy J. Hutchinson
                                        Troy J. Hutchinson (Minn. #0320420)
                                        **BRIGGS AND MORGAN, P.A.**
                                        2200 IDS Center
                                        80 South Eighth Street
                                        Minneapolis, Minnesota  55402-2157
                                        (612) 977-8400
                                        thutchinson@briggs.com

                                        *ATTORNEYS FOR SPARBOE FARMS,*
                                        *INC.*