IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | :<br>:<br>: MDL No. 2002<br>: 08-md-02002<br>: |
| THIS DOCUMENT APPLIES TO:<br>ALL INDIRECT PURCHASER PLAINTIFF ACTIONS | :<br>:<br>:<br>: |

MEMORANDUM

GENE E.K. PRATTER, J.                                          APRIL 4, 2012

**I. Introduction**

Defendant egg producers and trade groups move for the dismissal of claims for damages outside the statutes of limitations applicable in the various jurisdictions that recognize the Indirect Purchaser Plaintiffs' antitrust, consumer protection, and unjust enrichment claims in the Second Consolidated Amended Class Action Complaint (hereinafter, the "IPSAC").[1] Specifically, the motion seeks partial dismissal of 33 state law claims emanating from 17 different jurisdictions.[2] For the following reasons, the Court grants the motion without prejudice.

---

[1] The Defendants filed their Motion to Dismiss the Indirect Purchaser Plaintiffs' Claims for Damages Barred by the Statutes of Limitations of Various States at Docket No. 331. The Plaintiffs' response is at Docket No. 353, and the Defendants' reply brief is at Docket No. 384. The parties also submitted several supplemental materials to the Court. The transcript of the oral argument on the motion is contained in the record at Docket No. 597.

[2] Certain claims in the IPSAC are not, or are no longer, subject to this motion. Defendants have not moved to dismiss as time-barred the Sherman Act claim, the Wisconsin antitrust and unjust enrichment claims, the California unjust enrichment claim, and all claims brought under the laws of Massachusetts, Nevada, New Mexico, and West Virginia. *See* Defs.' Mot. at 3 n.4. Certain other claims also are not subject to this motion: those state claims which the Court dismissed by granting in part the Defendants' prior Motion—the consumer protection claims arising under the laws of Kansas and New York, the North Dakota unjust enrichment

(continued...)

## II. Background, Factual Allegations, and Legal Standards

The background of this litigation and the core factual allegations contained in the IPSAC are set forth at length in the Court's March 19, 2012 Opinion and Order, 2012 WL 935669 (Doc. Nos. 631 and 632). That Opinion also discussed the applicable legal standards for reviewing a motion to dismiss in this case, including the relevance of the *Erie* doctrine's precepts to the Court's consideration of the Plaintiffs' state law claims, as well as Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6). Therefore, the Court need not repeat that legal framework in this Memorandum except to incorporate the prior Opinion by reference. *See id.* at *1-6. Insofar that any such previously-discussed matters arise in-depth as a predicate to the Court's rulings here, the Court will include more explicit discussion as appropriate.

## III. Legal Discussion

In their briefing, Defendants have summarized the relevant limitations periods governing the 33 state law claims, which range from three to six years. *See* Defs.' Mot. at 2-3 & n.4. The Defendants have calculated their proposed limitations dates based upon the filing dates of the first direct purchaser suit consolidated in these proceedings to have first asserted claims under the various state laws. *See id.* at 2 & n.2; Defs.' Proposed Order at 1-3.

Plaintiffs have not raised any objections to those limitations periods or the calculation of the statutes of limitations dates as to each state claim at issue. Plaintiffs also have not contended

---

(...continued)
claim, and the Plaintiffs' Utah Antitrust Act claim with respect to alleged damages occurring prior to May 1, 2006—and those claims that Plaintiffs voluntarily withdrew, namely, all claims brought under Maine or Puerto Rico law, and the consumer protection claims brought under the laws of Michigan, South Dakota, and Wisconsin. To the extent that the motion *sub judice* sought to dismiss one of these claims that are no longer a part of the case, the Court does not address that aspect of this motion.

2

as a general matter that those statutes of limitations, as calculated and absent any applicable equitable tolling, would not curtail their claims for damages.

The parties' focal point of dispute, and the kernel of the motion to dismiss, concerns whether Plaintiffs sufficiently alleged facts that demonstrate their entitlement to equitably toll the various state statutes of limitations pursuant to those jurisdictions' respective fraudulent concealment doctrines, or comparable equitable tolling doctrines.[3] The parties implicitly agree that if Plaintiffs adequately plead facts in support of fraudulent concealment pursuant to the constraints of Rules 12(b)(6) and 9(b), then the doctrine functions so that Plaintiffs may pursue their state claims for recovery of damages during the tolled period.

The Court previously addressed the specific statute of limitations principles and the federal fraudulent concealment doctrine appurtenant to the Direct Purchaser Plaintiffs' Sherman Act claim in a prior decision. *See* Nov. 30, 2011 Opinion and Order, 2011 WL 5980001 (Doc. Nos. 593 and 594). The Court references here the explanation in that decision of the operation of certain legal precepts which the parties appear to presume are generally (although not necessarily

---

[3] To the extent that the Plaintiffs rely on equitable tolling doctrines other than the fraudulent concealment doctrine for certain jurisdictions (such as jurisdictions that recognize multiple equitable tolling doctrines, or those jurisdictions that embrace the principles of "fraudulent concealment" within the manifolds of another equitable tolling doctrine, such as, by way of example, equitable estoppel, or those that might incorporate the discovery rule into the fraudulent concealment doctrine), the parties appear to posit that the principles and standards that the Motion places at issue, and as discussed in this Memorandum, as to fraudulent concealment are, as a general matter, equally applicable across jurisdictions without consideration for the actual doctrine at issue. *See, e.g.,* Tr. at 16-17; 40-43; 54. In light of the Court's ruling here, which focuses on the actual facts pled in the IPSAC, the Court need not explore the distinctions between other equitable tolling doctrines and fraudulent concealment generally, or specifically as to any particular jurisdiction. Nonetheless, as this litigation proceeds and insofar that jurisdiction-specific laws on equitable tolling may arise again, the parties will need to be explicit as to what doctrine(s) in a given jurisdiction are at issue.

3

specifically) applicable to the various jurisdictions' jurisprudence concerning statutes of limitations and the fraudulent concealment doctrine.

The Defendants' motion can be distilled into three separate categories of arguments concerning (1) judicial notice of documents external to the IPSAC, (2) failure to plead affirmative acts of concealment, and (3) whether Kansas law recognizes the fraudulent concealment doctrine. The Court addresses each in turn.

## A. *Requests for Judicial Notice*

Defendants argue that the "Plaintiffs' allegations and judicially noticeable materials establish that, before and throughout the alleged class period, Defendants openly and publicly discussed the mechanisms purportedly used to implement the so-called conspiracy—the UEP Certification program, the UEP recommendations for flock reductions, and egg exports." Defs.' Mot. at 5 (footnote omitted). Defendants urge the Court to take judicial notice of "newspaper and magazine articles not referenced in Plaintiffs' complaints" for the "fact [of] that press coverage . . . without regard to the truth of their contents" so as to determine whether they constitute "storm warnings" that might trigger inquiry notice. *Id.* at 5 n.7 (emphasis omitted) (internal quotation marks omitted). According to Defendants, "[t]hese publications demonstrate that Defendants repeatedly, routinely, and freely discussed the facts underlying Plaintiffs' supposedly 'concealed' conspiracy." *Id.* at 6. Defendants contend that the publications ultimately demonstrate that "Defendants concealed nothing," and that the various fraudulent concealment doctrines of each jurisdiction at issue are not available to Plaintiffs for purposes of tolling the statutes of limitations. *Id.* at 11.

Plaintiffs do not object to the Defendants' request for judicial notice *per se*, but instead claim that the publications "to which the Defendants point in the Motion *are* the fraud." Pls.' Resp. at 2 (emphasis in original). Indeed, Plaintiffs appear to make their own request for judicial notice of a document called the "Assurance of Voluntary Compliance," which Plaintiffs have proffered for the Court's consideration as a means of illustrating the "misleading nature of Defendants' conduct." Pls.' Resp. at 2 (describing the document).

The Court previously considered similar requests for judicial notice in conjunction with a motion to dismiss the Direct Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint on the basis of a statute of limitations and fraudulent concealment. In that pleading, the Direct Purchasers had alleged "certain facts drawn from excerpted quotes of various publicly disseminated egg industry publications and regional newspapers between 1999 and September 24, 2004," and Defendants urged the Court to take judicial notice of those publications. Nov. 30, 2011 Opinion and Order, 2011 WL 5980001, at *5. The Court declined, recognizing that "as a general matter, 'a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.'" *Id.* at *6 (quoting *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

The Court also explained that "even if the cited articles were 'sources whose accuracy cannot reasonably be questioned' and concerned matters that are 'capable of accurate and ready determination,' the articles ought not be relied upon at this stage of the litigation to determine whether or not Defendants concealed the conspiracy" because such consideration would constitute a merits inquiry, which is appropriate for another, subsequent stage of the litigation. *Id.*

Insofar as the Court could properly consider the publications for the purpose of establishing that their content was publicly available, the Court nonetheless declined to take judicial notice of their contents. *Id.* at *7. The Court observed that the exercise of ascertaining whether the Direct Purchaser Plaintiffs were on inquiry notice requires a fact intensive inquiry as to "whether a plaintiff should have known of her claim and the reasonableness of a plaintiff's investigation." *Id.* The Court concluded that judicial notice of the documents in question would be unproductive because "there are no grounds in the [complaint] from which to conclude that Plaintiffs contemporaneously knew of, or reasonably should have been expected to know of, those documents." *Id.* at *8. The Court held that "because the articles proffered by Defendants would not lead to productive avenues of analysis on this motion, the Court finds it appropriate to limit its consideration to the [complaint] itself." *Id.*

Considering the IPSAC's entire allegations and recognizing that the parties' proffered documents are not a part of or attached to the IPSAC, nor are those documents integral to the Plaintiffs' claims, the Court concludes that its earlier rationale, as just summarized, equally applies to reject both parties' arguments for judicial notice here. To reiterate, taking judicial notice of the documents would constitute an impermissible merits inquiry and/or an unfruitful inquiry notice analysis.[4] Therefore, the Court declines to take judicial notice of the Defendants' proffered publications as well as the Plaintiffs' proffered document, and determines that those

---

[4] As will be discussed, *infra*, the parties have not discussed the specific laws of the various jurisdictions at issue with respect to this Motion, and, thus, they present no occasion for the Court to consider whether *vel non* a plaintiff's inquiry notice and reasonable diligence are operative principles of fraudulent concealment in those jurisdictions. Of course, to the extent that those jurisdictions might not embrace such principles, the Defendants' arguments in favor of the judicial notice of the publications would be further diminished.

materials do not provide appropriate grounds for concluding that the fraudulent concealment doctrines of the various jurisdictions are inapplicable or vice versa.

### B. *Failure to Plead Affirmative Acts of Concealment*

As a generalized legal principle, fraudulent concealment is understood to involve a defendant concealing the wrong at issue which prevents the plaintiff from discovering, with due diligence, her claim sooner. *See generally* 2 C. Corman, *Limitation of Actions* § 9.7.1 (1991); John P. Dawson, *Fraudulent Concealment and Statutes of Limitation*, 31 Mich. L. Rev. 875, 878-81 (1933). All parties agree that the fraudulent concealment or equitable tolling doctrine in each of the jurisdictions at issue here require Plaintiffs to plead facts that demonstrate that Defendants performed affirmative acts of concealment. *See* Defs.' Mot. at 11; Pls.' Resp. at 3-4. However, the parties dispute whether Plaintiffs have failed to sufficiently plead this element as to each of the 17 jurisdictions at issue: Arizona, California, the District of Columbia, Florida, Iowa, Kansas, Michigan, Minnesota, Mississippi, Nebraska, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, and Vermont.

Yet, despite agreeing that each jurisdiction requires "an affirmative act of concealment" element, the parties provide limited reference to the law concerning this element in each of the jurisdictions at issue. Still, the parties jointly appear to posit that the laws of each of the 17 jurisdictions can be abstracted into a single encapsulation of "law." However, this "cheaper by the dozen" approach verges on forging a kind of "common law" that is firmly discouraged by the *Erie* doctrine. Furthermore, neither party has presented any grounds—let alone well-documented, appropriate grounds—to treat all 17 jurisdictions' laws identically. Indeed, the

parties' own arguments suggest there are jurisdiction-specific variations to this element that conflict with the parties' endorsement of a common "law" applicable to all jurisdictions.[5]

In order to address the Defendants' motion to dismiss, the most conservative—indeed, hard boiled—analysis would require separately asking whether the IPSAC sufficiently pleads the "affirmative act of concealment" element as to each individual jurisdiction's fraudulent concealment claim.[6] However, given that the parties themselves eschewed this task, the

---

[5] As an example, Defendants generally describe this element of fraudulent concealment in two distinct ways: 1) an affirmative act "to conceal Plaintiffs' *causes of action*," Defs.' Mot. at 11 (emphasis added); or 2) an affirmative act that "conceals an *element* of the claim," Defs.' Reply at 2 (emphasis added), *see also id.* at 4-5, 7 (discussing same). Defendants ostensibly take the position that there is no meaningful difference between these characterizations. However, Defendants cite case authority as to the 17 jurisdictions at issue, which, as cited, suggests that many of the jurisdictions take differing approaches to this element—approaches that do not necessarily conform with the Defendants' singular broad characterization of the element. *See* Defs.' Mot. at 11-12 n.14. The Defendants' cited authorities illustrate that the first element of fraudulent concealment can involve consideration of the defendant's conduct in terms of whether the conduct, *inter alia*, occurred after the wrong transpired, was "calculated to operate" in a certain manner, or was the defendants' ultimate object.

Plaintiffs do not raise any targeted objections to the jurisdiction-specific case law cited by Defendants. Rather, Plaintiffs cite several federal court decisions that generally appear to have addressed matters relating to fraudulent concealment under federal law rather than the jurisdictions at issue in their claims. However, in contrast to the Defendants' position, the tenor of the Plaintiffs' arguments suggest that the 17 jurisdictions require that the alleged affirmative acts of concealment conceal *facts* about the Defendants' purported conduct as a general matter, rather than concealing facts that give rise to a claim or an element of that claim. Indeed, according to Plaintiffs, to establish this element, any facts concealed would merely need to be those that would prompt the Plaintiffs' inquiry notice, as opposed to facts that give rise to a cause of action. *See, e.g.*, Tr. at 40 ("Does lying about what you are doing to try and calm people to relax, is that a pretextual reason[.] [S]hould that create [grounds for] equitable tolling.").

[6] Indeed, when the Court asked the parties about the omission of jurisdiction-by-jurisdiction analyses in their papers, the parties appropriately conceded that a jurisdiction-by-jurisdiction analysis would have been appropriate. Tr. at 16:10-11 (responding "to a certain extent, yes" to the question of whether a state-by-state analysis of the law of concealment is necessary); *id.* at 43:1 (remarking that it "may have been a legal mistake" not to engage in a state-by-state analysis).

8

Court will not—and need not, under the circumstances here—assume the burden of meaningfully articulating the 17 jurisdictions' laws as to this element.

Instead, the Court observes that, notwithstanding that they are each unique legal jurisdictions and their respective "affirmative acts of concealment" elements may have additional and differing demands, the 17 jurisdictions can be divided into two categories as classified by one of two common *minimum* standards. That is, a given jurisdiction *at minimum* requires one of the following two standards: either that (a) a defendant concealed a material fact about the alleged wrong, *i.e.*, a fact that is material to the underlying claim at issue, to wit, a state antitrust, consumer protection, or unjust enrichment claim, *or* (b) a defendant concealed a fact that would prompt a plaintiff's inquiry notice, *i.e.*, information that might alert an individual to inquire into and discover whether a wrong exists.[7] Plaintiffs must meet the minimum threshold as to each

---

[7] *See Ulibarri v. Gerstenberger*, 871 P.2d 698, 709 (Ariz. App. Ct. 1993) ("The wrongful concealment sufficient to toll a statute of limitations requires a positive act by the defendant taken for the purpose of preventing detection of the cause of action."); *Sanchez v. South Hoover Hosp.*, 553 P.2d 1129, 1133-34 (Cal. 1976) ("It has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations . . . ."); *Bernson v. Browning-Ferris Indus.*, 873 P.2d 613, 616 n.3 (Cal. 1994) ("The rule of fraudulent concealment is applicable whenever the defendant intentionally prevents the plaintiff from instituting suit . . . ."); *Drake v. McNair*, 993 A.2d 607, 619 (D.C. 2010) ("It is well established that affirmative acts employed by a party to fraudulently conceal either the existence of a claim or facts forming the basis of a cause of action toll the running of limitations periods." (quoting *Estate of Chappelle v. Sanders*, 442 A.2d 157, 158 (D.C.1982))); *Berisford v. Jack Eckerd Corp.*, 667 So.2d 809, 811 (Fla. App. Ct.1995) ("'[T]he statute of limitations will be tolled when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him from discovering his injury.' . . . In order to establish fraudulent concealment sufficient to toll the statute, the plaintiff must show 'both successful concealment of the cause of action and fraudulent means to achieve that concealment.'" (quoting *Nardone v. Reynolds*, 333 So.2d 25, 37 (Fla. 1976), *modified on other grounds, Tanner v. Hartog*, 618 So.2d 177 (Fla. 1993))); *Langner v. Simpson*, 533 N.W.2d 511, 522 (Iowa 1995) ("Under Iowa law, proof of fraudulent concealment requires evidence of affirmative steps independent of and in addition to the original wrongdoing which prevented the

(continued...)

9

(...continued)
plaintiff from discovering the wrongdoing."); *Christy v. Miulli*, 692 N.W.2d 694, 702 (Iowa 2005) ("The foundational elements of equitable estoppel are well established: (1) The defendant has made a false representation or has concealed material facts . . . . With respect to the first element, a party relying on the doctrine of fraudulent concealment must prove the defendant did some affirmative act to conceal the plaintiff's cause of action independent of and subsequent to the liability-producing conduct." (citations omitted)); *Friends Univ. v. W. R. Grace & Co.*, 608 P.2d 936, 941 (Kan. 1980) ("To constitute concealment of a cause of action within the general rule tolling the statute of limitations on that ground the concealment must be fraudulent or intentional and, in the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action. There must be some actual artifice to prevent knowledge of the fact, some affirmative act of concealment, or some misrepresentation to exclude suspicion and prevent injury." (internal quotation marks and citation omitted)); *Bowen v. Westerhaus*, 578 P.2d 1102, 1105 (Kan. 1978) ("A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. . . ." (quoting *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 561 P.2d 792, 795 (Kan. 1977))); *Weast v. Duffie*, 262 N.W. 401, 402 (Mich. 1935) ("The fraudulent concealment which will postpone the operation of the statute must be the concealment of the fact that plaintiff has a cause of action."); *Draws v. Levin*, 52 N.W.2d 180, 183 (Mich. 1952) ("[T]he fraudulent concealment which will work a postponement of the statute must be a concealment produced by affirmative acts or misrepresentations. A mere silence on the part of the defendant is not enough. The plaintiff must show some arrangement or contrivance on the part of the defendant, of an affirmative character, designed to prevent subsequent discovery."); *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918 (Minn. 1990) (recognizing that fraudulent concealment tolls the statute of limitations "if it is the very existence of the facts which establish the cause of action which are fraudulently concealed" (quotations omitted)); Miss. Code Ann. § 15-1-67 ("If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered."); *Andres v. McNeil Co., Inc.*, 707 N.W.2d 777, 787 (Neb. 2005) ("[I]n order to successfully assert the doctrine of fraudulent concealment and thus estop the defendant from claiming a statute of limitations defense, the plaintiff must show the defendant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevent the plaintiff from discovering the [misconduct]." (internal quotations omitted)); *Rucker v. Ward*, 267 N.W. 191, 195 (Neb. 1936) (observing that "defendant cannot avail himself of the statutes of limitation as a defense," when defendant "wrongfully conceals a material fact necessary to the accrual of a cause of action against him, and such concealment causes the opposite party to delay the filing of suit, " (internal quotations omitted));
(continued...)

10

jurisdiction at issue for purposes of Rule 8. Furthermore, another common standard by which all of the Plaintiffs' fraudulent concealment claims must be assessed is Rule 9(b).[8] Based upon

---

(...continued)
*Putter v. North Shore University Hosp.*, 858 N.E.2d 1140, 1142 (N.Y. 2006) ("[E]quitable estoppel will preclude a defendant from using the statute of limitations as a defense 'where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.' A plaintiff seeking to apply the doctrine of equitable estoppel must 'establish that subsequent and specific actions by defendants somehow kept [him or her] from timely bringing suit.'" (citations omitted)); *In re Covington's Will*, 114 S.E.2d 257, 260 (N.C. 1960) ("[T]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert . . . ."); *Roether v. National Union Fire Ins. Co.*, 200 N.W. 818, 819 (N.D. 1924) ("[T]here must be some affirmative act or representation designed to prevent, and which does in fact prevent, discovery of the cause of action, or lulls suspicion as to its existence."); *Bruske v. Hille*, 567 N.W.2d 872, 879 (S.D. 1997) ("In the absence of some trust or confidential relationship between the parties there must be some affirmative act or conduct on the part of the defendant designed to prevent, and which does prevent, the discovery of the cause of action. Mere silence, in the absence of a duty to speak, is not ordinarily sufficient." (quoting *Koenig v. Lambert*, 527 N.W.2d 903, 905-06 (S.D.1995)); *Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn. 1992) ("Generally, a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite exercising reasonable diligence."); *Berenda v. Langford*, 914 P.2d 45, 51 (Utah 1996) ("[W]hen a plaintiff alleges that a defendant took affirmative steps to conceal the plaintiff's cause of action, . . . the plaintiff can avoid the full operation of the discovery rule by making a prima facie showing of fraudulent concealment and then demonstrating that given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier."); 12 V.S.A. § 555 ("When a person entitled to bring a personal action is prevented from so doing by the fraudulent concealment of the cause of such action by the person against whom it lies, the period prior to the discovery of such cause of action shall be excluded in determining the time limited for the commencement thereof.").

[8] The parties agree that in pleading fraudulent concealment the Plaintiffs must meet the requirements of Rule 9(b). *See also Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984) ("We agree, of course, that fraud, and thus fraudulent concealment, must be pleaded with particularity." (citing Fed. R. Civ. P. 9(b) and *Walters v. Ditzler*, 424 Pa. 445, 227 A.2d 833 (1967))).

11

these standards, the Court determines that Plaintiffs have failed to adequately plead the 17 fraudulent concealment claims because the alleged facts do not sufficiently demonstrate that Defendants concealed a material fact or a fact that would prompt a plaintiff's inquiry notice about the alleged wrong for purposes of Rules 8 and 9(b).

Plaintiffs contend that the Defendants' "affirmative acts of concealment" misrepresented the reasons for increased prices of eggs that allegedly occurred as a result of the Defendants' purported conspiracy. Plaintiffs argue that:

> Defendants issued misleading and false statements regarding the legitimacy of their actions and the cause of increased egg prices—in essence the statements concealed the conspiracy to restrict supply. Properly understood, the truly public statements . . . *are* the fraud. Defendants . . . launched a scheme . . . to explain the supply reductions using the pretexts of animal care and market conditions.

Pls.' Resp. at 2 (emphasis in original).

Plaintiffs claim that each of their 17 claims of fraudulent concealment, and more specifically, each of the elements of "affirmative acts of concealment," arise from the same factual allegations in the IPSAC. According to Plaintiffs, the alleged facts that demonstrate the Defendants' misrepresentations include:

> (a) "stamps" on egg cartons, (*E.g.*, ¶¶ 224, 298-300), (b) marketing and comments to the public and distributors attributing the price increases to legitimate actions or market factors (*E.g.*, ¶¶ 172, 182, 184, 185, 187, 238, 296-300, 304-07, 405; *see also* [Defs.'] Motion at 8-11 ), and (c) the fact that the statements and standards as communicated to the public were misleading and pretextual (*E.g.*, ¶¶ 192, 196, 239, 298-301, 304-07).

*Id.* at 9.

The Court will discuss the adequacy of these factual allegations for pleading purposes. The Court will assume, *arguendo*, that the reasons for the alleged offending increased egg prices, such as, by way of example, the "coordinated efforts" undertaken by Defendants to advance their conspiracy, constitute either material facts as to the state antitrust, consumer protection, and unjust enrichment claims at issue, or a fact that would prompt a plaintiff's inquiry notice into those claims.[9]

To start, the Court determines that many of the factual allegations that Plaintiffs contend demonstrate the Defendants' misrepresentations or false statements fail to satisfy Rule 9(b)'s particularity requirement. For example, the IPSAC's allegations as to the UEP Certification Program's "logo" or "stamp" are insufficiently particular. The IPSAC contains no specific allegations concerning the use of the logo in terms of what kinds of egg cartons were stamped, who stamped them, when the stamp was used, and so forth. As to what "message" the logo communicated, it can be fairly inferred from the IPSAC that the logo was supposed to indicate to its intended audience: "(a) the level of care given to hens under the [UEP Certification Program] standards, (b) the nature of the auditing process used to ensure compliance with the standards, (c) the role of the scientific advisory committee in developing the standards, (d) the comparative benefits of eggs produced by farmers implementing the standards, and (e) the comparative quality of animal care for hens in UEP-certified facilities." IPSAC ¶ 299. However, it is unclear from the IPSAC what the actual substance of the logo's "message" was in terms of type of alleged care, benefits, and so forth, and thus whether such a "message" was actually misleading.

---

[9] In light of the Court's ruling here, the Court need not decide at this time whether such alleged facts are material as to each of the state claims that Plaintiffs assert.

Although Plaintiffs have alleged that the UEP entered into agreements with the Federal Trade Commission ("FTC") and 16 states concerning the logo and the UEP Certification program, those allegations do not do the legwork that the Plaintiffs attempt to assign them. The allegations concerning the FTC simply outline that following an FTC investigation into the "use of the name 'Animal Care Certified' (the original name for the Certification Program) as being potentially misleading," UEP agreed to no longer use the logo on egg cartons. *Id.* ¶ 298. This allegation does not inexorably suggest, contrary to the Plaintiffs' insinuation otherwise, that the use of the logo was ever misleading; instead, this allegation stands only for what it states, that at some point the logo was no longer used on egg cartons.

The same is equally true for the IPSAC's allegations concerning the Plaintiffs' reliance on allegations that the UEP entered into an Assurance of Voluntary Compliance ("AVC") with 16 states. Under the AVC, UEP allegedly agreed to "not misrepresent, directly or by implication, the level or type of care given to hens under the standards; the role of any scientific advisory committee in devising the standards ultimately adopted by UEP; or the comparative quality of animal care for hens in UEP certified facilities." *Id.* ¶ 300. This allegation only signifies that UEP agreed not to engage in certain conduct, and thus does not provide any factual insight as to the actual nature of the Defendants' use of the logo or similar conduct prior to entering into the agreement.

Likewise, Plaintiffs have alleged certain other general facts as to the nature of the Defendants' alleged misrepresentations and false statements that are devoid of precise allegations of date, time, or place, fail to identify the speaker or the audience, provide no indication as to the

14

medium through which the statements were conveyed, and have no other measure of precision. These include the IPSAC allegations that :

- "... Defendants misleadingly promoted the UEP Certified Program to retailers and consumers nationwide as making for better eggs." *Id.* ¶ 172.

- "Defendants ... falsely represented to Plaintiffs and members of the Class that the prices they paid for shell eggs were fair and competitive." *Id.* ¶ 304.

- The "Defendants' false representations and public statements attributed price increases to normal market conditions and factors other than their illegal conspiracy." *Id.* ¶ 305.

- Defendants gave "explanations for the pricing behavior of [eggs]" which "in some instances ... involved proprietary or otherwise non-public information within Defendants' exclusive control." *Id.* ¶ 305. "Such explanations made by the Defendants include assertions that they could not effectively respond to supply reductions as a result of limitations imposed by animal husbandry guidelines that had the effect of reducing cumulative cage space, as well as their attributing price increases to other external factors including supply-side wear-and-tear, the increased price of fuel and feed, and the upward adjustment of other costs of production." *Id.* ¶ 306.

- The "Defendants' illegal price-fixing and supply control conspiracy ... was undertaken solely for financial gain and not for humane reasons as Defendants repeatedly claimed." *Id.* ¶ 307.[10]

- "Defendants, by the design, intent and nature of their conspiracy failed to reveal material facts regarding the price and supply of shell eggs and egg products ...." *Id.* ¶ 405.

There are simply no particularized facts in the IPSAC that serve to substantiate these particular allegations. The IPSAC contains no allegations that any of the Defendants made any specific

---

[10] The Court assumes that through this allegation Plaintiffs did not intend to imply that they were contemporaneously aware of the alleged conspiracy at the time it supposedly was occurring. It appears that Plaintiffs meant to allege that the "coordinated efforts" that advanced the conspiracy, to the extent Plaintiffs contemporaneously knew of them, such as the UEP Certification Program guidelines, were "undertaken solely for financial gain and not for humane reasons as Defendants repeatedly claimed."

15

statements that might appropriately correspond with any of these more general factual allegations.

Rather, there are specific facts in the IPSAC—facts that Plaintiffs also contend demonstrate the Defendants' misrepresentations or false statements—that undercut some of these allegations. For example, Plaintiffs allege that:

> In a December 11, 2003 article [in the *Buffalo News*], a UEP member admitted that the UEP's certification program was increasing egg prices:
>
>> Numerous industry experts have pointed to the popularity of lowcarbohydrate, high-protein diets, but Scott Kreher, a partner in Kreher's Farm Fresh Eggs in Clarence, believes the spike is due more to diminished supply than diet-fueled demand.
>>
>> "Eggs are primarily a non-elastic demand item. People always need eggs," said Kreher, whose egg farm supplies many local grocers. "What's really affecting egg prices are the houses chickens are being placed in."
>>
>> Specifically, new guidelines adopted by United Egg Producers, a national cooperative of egg producers to which Kreher's belongs, have gradually raised the amount of space it recommends each egg-laying chicken be given inside its housing—from the current industry average of 53 square-inches per bird to 61 square-inches in April of 2005.

*Id.* ¶ 182 (emphasis omitted). This allegation stands in direct contrast to the Plaintiffs' more general allegation that "Defendants' false representations and public statements attributed price increases to normal market conditions and factors other than their illegal conspiracy." *Id.* ¶ 305. Indeed, Mr. Kreher's alleged comment specifically identifies an alleged "coordinated effort" that purportedly advanced the Defendants' conspiracy, *i.e.*, the UEP Certification program guidelines, as the reason for the alleged increased egg prices.

As to the few specific allegations concerning the Defendants' purported comments that were published in regional newspapers or made during Congressional testimony—allegations

16

that Plaintiffs claim are illustrative of the Defendants' misrepresentations or false statements—those allegations are not sufficient to plausibly suggest that Defendants concealed a material fact or a fact that would prompt a plaintiff's inquiry notice about the alleged wrong for purposes of Rule 8.[11] In other words, while these allegations may pass Rule 9(b) muster, they fail to adequately plead the "affirmative act of concealment" element as to each jurisdiction. Mr. Kreher's comment illustrates this in that his comment spoke specifically to an alleged reason for the increased egg prices. *See id.* ¶ 183.

Indeed, the other specific Defendant statements published in regional newspapers, which Plaintiffs claim support their fraudulent concealment claims, suggest that increased egg prices were due to the cage space guidelines of the UEP Certification Program. *See id.* ¶ 184 ("In a December 13, 2003 article, Fred Adams, the CEO of Defendant Cal-Maine, acknowledged that high prices were a result of industry efforts to hold down supplies: 'The supplies are adequate, but just barely. . . . The industry also says production is down as new guidelines . . . have reduced the number of hens allowed in a cage.'" (alterations in original)); *id.* ¶ 185 ("Gary Bethel, an

---

[11] Insofar that Plaintiffs contend that IPSAC Paragraph 238 falls into this category of allegations that demonstrate the Defendants' alleged misrepresentations made in regional newspaper articles, the Court does not consider it sufficient for Rule 9(b) purposes because it does not contain any direct quote or comment made by a Defendant, but rather entails a generalized observation attributable to "poultry experts." *See id.* ¶ 238 ("A December 2008 Star Tribune article identified the industry's collective actions as the cause of high prices: [T]he most significant influence on pricing may well have been the industry's own doing. Over the past two years, after a several-year slump, egg farmers have cut back on the size of their hen flocks at a pace not seen in more than 20 years. The result: Fewer hens means fewer eggs, which in turn means higher prices. In dozens of interviews, poultry experts point to the industry's move in 2002 to give hens more room as an underlying cause of higher prices. The United Egg producers (UEP), the industry's leading trade group, adopted guidelines for hens to have at least 67 square inches of space. Many producers used cages of just 50 to 60 square inches." (alteration in original).

17

officer of several Hillandale Farms entities, was quoted in a December 13, 2003 article discussing increased egg prices, in which he explained how Hillandale Farms had reduced supply . . . ."); *id.* ¶ 187 ("The President of Defendant R.W. Sauder, Paul Sauder, expressed similar sentiments: 'The [UEP] program is one of several causes cited for the recent surge in egg prices, because it's helping to dampen supply short-term . . . .['] A key guideline, which concerns the amount of space per hen in a cage, will result in reducing the number of hens per cage from nine to seven by April 2008. Asked if that's a significant change, Sauder replied, 'Absolutely. That's a 22 percent reduction in capacity. That's huge.'" (alterations in original)). As alleged in the IPSAC, the cage space guidelines were part of the Defendants' "coordinated efforts" to advance the alleged conspiracy to decrease the supply of eggs and increase egg prices, and so the Defendants' comments in these newspapers articles cannot be fairly said to be false or misrepresentative.[12]

Similarly, allegations concerning Gene Gregory's testimony before a House Subcommittee in regard to the role a scientific advisory committee played in developing UEP's Certification Program do not plausibly suggest that the Defendants affirmatively concealed a material fact or a fact that would prompt a plaintiff's inquiry notice as to their wrongdoings. As pled in the IPSAC, Mr. Gregory testified:

---

[12] Plaintiffs do not argue that the Defendants' statements failed to enumerate all of the various coordinated efforts allegedly undertaken to advance the conspiracy, or the existence of the alleged agreement among Defendants, and that omissions of such information rise to the level of a misrepresentation.

Additionally, no parties have argued whether the Defendants' comments as published in newspaper articles (and ostensibly are excerpts from interviews with reporters) can constitute an affirmative act of concealment *made by* Defendants when the IPSAC does not allege that Defendants were the actual authors of the newspaper articles, nor plead any facts to suggest that Defendants exercised some control or influence over the drafting of the newspaper articles.

18

> [T]o ensure its objectivity the [scientific advisory] committee did not include any producers as members. The scientific committee recommended significant changes in egg production practices. UEP accepted the recommendations and today about 85% of our industry has implemented them. [ ] As the years have gone by, the scientific committee has made a number of additional recommendations. UEP has never rejected a recommendation by the committee - a remarkable track record that reflects our industry's determination to follow the best available science. [ ] The committee's recommendations became what is now know as the UEP Certified Program.

*Id.* ¶ 296 (alterations in original). Plaintiffs further plead that the author of the UEP Certification Program's guidelines was the UEP's "Animal Welfare" Committee and that its members drafted "the guidelines based on the economic analysis performed by Donald Bell, not based on any concern whatsoever for humane treatment of poultry." *Id.* ¶ 297. Contrary to the Plaintiffs' intimation otherwise, however, these factual allegations do not plausibly suggest that Mr. Gregory's testimony concerning the scientific committee was an affirmative concealment of a material fact. Indeed, it is entirely unclear from the IPSAC what the Animal Welfare Committee actually recommended in terms of "changes in egg production practices." In their arguments, Plaintiffs appear to suggest that the committee's recommendations concerned animal welfare and husbandry practices and did not contemplate economic considerations, but no allegations in the IPSAC suggest such a fact. Thus, although the IPSAC pleads that the guidelines were based upon economic analyses, such an allegation does not undermine the truth of Mr. Gregory's statement that the scientific committee's recommendations were never rejected by the UEP Animal Welfare Committee in developing the UEP Certified Program and that the committee's recommendations "became" the Program.

It follows from this assessment of the IPSAC's factual allegations that Plaintiffs have insufficiently addressed the demands of Rules 8 and 9(b) to plead the "affirmative act of

19

concealment" element as to each of the 17 jurisdictions at issue. Accordingly, the Court grants the Defendants' motion to dismiss without prejudice for Plaintiffs to seek leave to amend the IPSAC as to statutes of limitations and equitable tolling.

### C. Fraudulent Concealment Doctrine Under Kansas Law

Defendants seek the partial dismissal of the Plaintiffs' antitrust and unjust enrichment claims arising under Kansas law on the grounds that they are barred by the applicable statutes of limitation. They argue that fraudulent concealment in Kansas is unavailable to toll the statute of limitations for such claims.

However, the Court need not consider at this time whether Kansas courts recognize the fraudulent concealment doctrine in relation to the Plaintiffs' Kansas Restraint of Trade Act and unjust enrichment claims. Even assuming, *arguendo*, that the doctrine is available as to those claims, in accord with the discussion in Section B, *supra*, the Court has determined that Plaintiffs have failed to allege facts sufficient to plead fraudulent concealment under Kansas law.

### IV. Conclusion

The Court grants the Defendants' motion to dismiss without prejudice in light of the pleading deficiencies discussed herein with respect to Rules 8 and 9(b). Plaintiffs may seek leave to amend their complaint as to fraudulent concealment and equitable tolling so long as they do so expeditiously.

An Order consistent with this Memorandum follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge