## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** : | |
| **ANTITRUST LITIGATION** : | |
| : | **MDL No. 2002** |
| : | **08-md-02002** |
| : | |
| : | |
| **THIS DOCUMENT APPLIES TO:** : | |
| **ALL INDIRECT PURCHASER** : | |
| **PLAINTIFF ACTIONS** : | |

### MEMORANDUM

GENE E.K. PRATTER, J.                                           APRIL 24, 2012

### I. Introduction

Nine Defendant egg producers and trade groups raise specific arguments for dismissal of

the Indirect Purchaser Plaintiffs' Second Amended Consolidated Class Action Complaint

(hereinafter, the "IPSAC") as to the individual movants, contending, *inter alia*, that the pleading

fails to allege facts plausibly suggesting that they specifically were parties to an alleged federal

antitrust conspiracy.[1] On these grounds, Defendants respectively assert that all claims brought

---

[1] The Motions addressed here are: Motion to Dismiss Indirect Purchaser Second Amended Consolidated Complaint as to Defendants Michael Foods, Inc. and Papetti's Hygrade Egg Products, Inc. (Doc. No. 327) (hereinafter, "Michael Foods Mot."); Defendant Rose Acre Farm, Inc.'s Motion to Dismiss Indirect Purchasers' Second Consolidated Amended Class Action Complaint (Doc. No. 328) (hereinafter, "Rose Acre Mot."); Defendant Ohio Fresh Eggs, LLC's Renewed Motion to Dismiss the Indirect Purchasers' Second Consolidated Amended Class Action Complaint (Doc. No. 330) (hereinafter, "Ohio Fresh Mot."); Defendant Daybreak Foods, Inc.'s Motion to Dismiss Indirect Purchasers' Second Amended Consolidated Class Action Complaint (Doc. No. 324) (hereinafter, "Daybreak Mot."); Motion to Dismiss the Indirect Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint on Behalf of Defendants Hillandale-Gettysburg, L.P., Hillandale Farms, Inc., and Hillandale Farms East, Inc. (Doc. No. 326) (hereinafter, "Hillandale Entities Mot."); United Egg Association's Motion to Dismiss the Claims Against it in Indirect Purchasers' Second Consolidated Amended Class Action Complaint (Doc. No. 329) (hereinafter, "UEA Mot."); Defendant Land O'Lakes, Inc.'s Motion to Dismiss Indirect Purchasers' Second Amended Consolidated Class Action Complaint (Doc. No. 325) (hereinafter, "Land O'Lakes Mot."). The Plaintiffs' responded to the Motions

(continued...)

against them—a Sherman Act Section 1 claim, and 46 state antitrust, consumer protection, and unjust enrichment claims arising under the laws of 22 state jurisdictions[2]—should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

These motions, however, do not provide occasion for Defendants to entirely fly the coop of this case. The Court grants in part the four motions of Daybreak Foods, Inc., Hillandale-Gettysburg L.P., Hillandale Farms Inc., and Hillandale Farms East, Inc. (collectively, the "Hillandale Entities"), United Egg Association ("UEA"), and Land O'Lakes, Inc. as to the Sherman Act Section 1 claim and denies in part the remainder of their motions as to the state claims. The Court denies the other three motions brought by Defendants Michael Foods, Inc., Rose Acre Farms, Inc., and Ohio Fresh Eggs, LLC.[3] The Court's basis for these rulings is laid out in this Memorandum.

---

(...continued)
(Doc. No. 354), and the Defendants' filed reply briefs (Doc. Nos. 375, 377, 378, 379, 381, 382, 383). Additionally, the parties filed various supplemental materials in support of their positions. The transcript of the oral argument on the Motions is contained in the record at Docket No. 597.

[2] Certain claims in the IPSAC are presently not, or are no longer, subject to these motions, namely, those state claims which the Court dismissed by granting in part a prior joint defense motion to dismiss—the consumer protection claims arising under the laws of Kansas, New York, and West Virginia, the North Dakota unjust enrichment claim, the Plaintiffs' Utah Antitrust Act claim with respect to alleged damages occurring prior to May 1, 2006, and certain federal and state antitrust claims with respect to alleged injuries relating to purchases of manufactured products incorporating processed eggs—and those claims that Plaintiffs voluntarily withdrew, namely, all claims brought under Maine or Puerto Rico law, and the consumer protection claims brought under the laws of Michigan, South Dakota, and Wisconsin. *See* March 19, 2012 Op. and Order, 2012 WL 935669 (Doc. Nos. 631 and 632). The Court also has dismissed all damages for pending claims outside the various applicable statutes of limitation periods. *See* Apr. 4, 2012 Mem. and Order, 2012 WL 1137100 (Doc. Nos. 650 and 651). To the extent that the motions *sub judice* seek to dismiss any such claims that are no longer a part of the case, the Court does not address that aspect of these motions.

[3] Although movant Papetti's Hygrade Egg Products, Inc., identifies itself as a wholly-
(continued...)

## II. Background, Factual Allegations, and Legal Standards

The background of this litigation and the core factual allegations contained in the IPSAC are set forth at length in the Court's March 19, 2012 Opinion and Order, 2012 WL 935669 (Doc. Nos. 631 and 632). That Opinion also discussed the applicable legal standards for reviewing a motion to dismiss in this case, including the relevance of the *Erie* doctrine's precepts to the Court's consideration of the Plaintiffs' state law claims, as well as Federal Rules of Civil Procedure 8 and 12(b)(6). Therefore, the Court will not repeat that legal framework in this Memorandum except to incorporate the prior Opinion by reference. *See id.* at *1-6. Insofar as any such previously-discussed matters arise in-depth as a predicate to the Court's rulings here, the Court includes more explicit discussion as appropriate.

## III. Legal Discussion

The Court first addresses whether the IPSAC states a Sherman Act Section 1 claim as to each moving Defendant. The Court then addresses the Defendants' arguments for dismissal of the various state antitrust, consumer protection, and unjust enrichment claims.

### A. Sherman Act § 1 Claims

Each of the nine Defendants argues that the IPSAC's allegations are insufficient to support a Section 1 Sherman Act claim against it. They all contend that the allegations fail to

─ ─ ─ ─ ─ ─ ─ ─

(...continued)

owned subsidiary of Defendant Michael Foods and has jointly filed a motion to dismiss with Michael Foods, Michael Foods Mot. at 1, this movant is not named as a defendant in the IPSAC. Only Paragraph 129 refers to Papetti's Hygrade Egg Products, Inc. as a "Defendant," but given the structure of the IPSAC, the Court concludes such a reference is an editorial oversight. Ergo, Papetti's Hygrade Egg Products, Inc. is not a party in this suit and lacks standing to bring a motion to dismiss. As such, the Court denies Papetti's Hygrade Egg Products, Inc.'s motion to dismiss insofar that it seeks dismissal from the suit. The Court does not include Papetti's Hygrade Egg Products, Inc. in its count of the nine moving Defendants.

plausibly suggest that the individual Defendants were respectively parties to the alleged

conspiracy to manipulate the supply of, and thereby fix prices for, domestically-sold eggs, by

joining and participating in it. The Court addressed similar, if not identical, arguments once

before with respect to the Direct Purchaser Plaintiffs' case. *See* Sept. 26, 2011 Mem., 2011 WL

4465355 (Doc. No. 562). In that decision, the Court also explained the relevant legal framework

pertinent to a Sherman Act Section 1 claim, which the Court references here. *See id.* at *5-8.

  In that case, many of the same defendants individually moved to dismiss the Direct

Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint (hereinafter, the

"SAC") on the grounds that the facts pled against them were insufficient to demonstrate that

they joined and participated in the alleged conspiracy. The Court concluded that, in light of the

entirety of the complaint, a defendant's agreement to join and participate in the conspiracy was

plausibly suggested by allegations that the defendant was involved with trade group associations

and attended trade group meetings where allegedly key decisions fundamental to the alleged

conspiracy were made or where effects of alleged coordinated actions were extolled, in

conjunction with allegations that the defendant participated in, or complied with, the guidelines

of the United Egg Producers Certification Program ("UEP Certification Program"). *See id.* at

*11, 24, 26; *see also id.* at *19 (concluding that a defendant's adoption of the Certification

Program's chick hatch reduction guidelines, in addition to involvement with trade group

associations and certain meetings, was consistent with agreement to the conspiracy). As alleged,

the UEP Certification Program guidelines, which mandated lower cage space densities for hens,

embraced particular features which were anti-competitive with no apparent alternative pro-

competitive benefits, including, *inter alia*, chick hatch reduction, prohibition on the practice of

4

backfilling, and requirement that egg producers to commit 100% of their facilities to the guidelines. *Id.* at *12-14. The Court also found additional allegations against certain defendants suggestive of agreement to the conspiracy, such as public and private comments reflecting awareness of certain features of the egg market that could be manipulated by actions that impacted supply, participation in the United States Egg Marketers export program, a commitment with other egg producers to undertake an early molting and disposal initiative, and a written commitment agreeing to disposal or flock reduction within fixed time periods. *Id.* at *18-19, 22-24, 26.

Based upon this assessment, the Court held that Direct Purchaser Plaintiffs sufficiently alleged that Defendants Michael Foods, Daybreak, Rose Acre, and Ohio Fresh joined and participated in the conspiracy to reduce the supply of eggs. Accordingly, the Court denied the corresponding motions to dismiss.

As to the other defendants that moved to dismiss the Direct Purchaser Plaintiffs' SAC, the Court considered whether the alleged facts sufficiently connected those defendants to the conspiracy on the grounds of either independent liability, or some other basis for imputing liability, *i.e.*, secondary liability. In considering the motion to dismiss filed by the Hillandale Entities, the Court first determined that "[t]here simply is an absence of specific factual allegations in the [complaint] to connect each (or any) of the Hillandale Entities directly to the conspiracy." *Id.* at *28. Additionally, the Court recognized that the SAC's "general allegations as to 'Hillandale Farms' or 'Hillandale' are insufficient to give notice to the Hillandale Entities of the claims against them." *Id.* at *32.

The Court then determined that allegations that the Hillandale Entities were "vertically integrated" and had overlapping ownership and control were insufficient to support a claim that the Hillandale Entities and a fourth entity, Defendant Hillandale Farms of Pa., Inc., "were so linked that they effectively function as a single entity with respect to alleged antitrust conduct." *Id.* at *31. The Court also concluded that Direct Purchaser Plaintiffs had not presented any legal authority that would support a "single enterprise" theory for imputing liability, and indeed, that there was legal authority to the contrary. *Id.* at *29-30. Accordingly, the Court granted the Hillandale Entities' motion to dismiss without prejudice to Direct Purchaser Plaintiffs to seek leave to amend their complaint.

The Court similarly granted without prejudice UEA's motion to dismiss, concluding that the allegations in the SAC were insufficient to state a claim against the trade group. *Id.* at *37. The Court found that the complaint's allegations of, *inter alia*, common resources in terms of leadership, staff, and membership between incorporated trade groups, United Egg Producers ("UEP") and United States Egg Marketers ("USEM"), as well as allegations that UEA and UEP held meetings at concurrent times and places and was in an "alliance" with UEP and USEM, could not sustain a claim that UEA joined or participated in the alleged conspiracy. *Id.* at *35-36. Moreover, the Court found that allegations concerning the conduct of certain UEA leaders or staff did not plausibly suggest that UEA could be liable for antitrust violations of its agents premised on a theory of apparent authority. *Id.* at *36. As to the facts pled against UEA that alleged "UEA's actual conduct as an entity," which included allegations that UEA's "Further Processors" division invited the UEP Executive Committee to a meeting on April 27, 2004 and that UEA approved the provision of funds for UEP to apply to "animal welfare research

6

projects," UEP's "management," and UEP's "programs and management," the Court determined that they were inadequate to support a claim against UEA. *Id.* at *37.

Here, the IPSAC's allegations against the nine moving Defendants are generally almost identical to—and certainly, in most respects, not materially different from—those allegations that the Court previously examined in its ruling on the individual motions to dismiss the Direct Purchaser Plaintiffs' complaint. Indeed, many parties explicitly acknowledge that the two complaints are on the whole factually identical. *See, e.g.*, Daybreak Mot. at 1, 4-5; Ohio Fresh Mot. at 1; Tr. at 126:10-17; *see also* March 19, 2012 Op., 2012 WL 935669, at *2 (recognizing the similarities between the two pleadings). By way of example, the complaints contain virtually identical allegations about the various facets of the UEP Certification Program guidelines, ranging from the reduced cage densities of hens to the 100% facilities commitment rule, prohibition on backfilling, and chick hatch reduction. *See, e.g.*, IPSAC ¶¶ 159, 174–75, 202, 295; *see also* March 19, 2012 Op., 2012 WL 935669, at *2-3.

Akin to the Direct Purchaser Plaintiffs' SAC, the IPSAC alleges that Michael Foods, Rose Acres, and Ohio Fresh were involved with egg trade group associations as members and leaders of committees or boards, attended trade group meetings where allegedly key decisions instrumental to the conspiracy were made or where effects of alleged coordinated actions were extolled, and participated in the UEP Certification Program. *See, e.g.*, IPSAC ¶¶ 74, 163, 177, 204, 209, 211, 215, 218, 224, 245, 259, 260, 269. Additionally, Plaintiffs allege that Ohio Fresh both (1) made a commitment with other egg producers to undertake an early molting and disposal

initiative, and (2) made a written commitment agreeing to disposal or flock reduction within

fixed time periods. *Id.* ¶¶ 198, 210, 218.[4]

_____

    [4] At this time, the Court notes that several Defendants request the Court's judicial notice of certain documents in order to bolster their arguments in support of dismissal. However, the Court declines to consider any of the proffered documents for purposes of evaluating the adequacy of the IPSAC.

    Michael Foods asks for notice of a Declaration of William L. Greene, counsel for Michael Foods, and several attachments purportedly comprising certain UEP meeting minutes, for the purposes of demonstrating that "Michael Foods was selling egg products made with non-UEP Certified eggs" prior to its joining the UEP Certified Program. Michael Foods Mot. at 11; *see also id.* at 6-7. Michael Foods also cites the Declaration in relation to arguments concerning whether trade group meeting attendance allegations can sustain the claim that Michael Foods joined the alleged conspiracy. Michael Foods Reply at 7. In seeking to refute factual allegations suggestive of its agreement to the alleged conspiracy, Rose Acre seeks judicial notice of several documents cited in the IPSAC—four news or periodical articles and a document purported to be UEP's Animal Husbandry Guidelines for U.S. Egg Laying Flocks (2000 ed.). Rose Acre Mot. at 6-7 & n.7, 12; *see also id.*, Ex. C; Rose Acre Reply at 7. Additionally, Land O'Lakes asks the Court to judicially notice January 25, 2005 UEP meeting minutes to demonstrate that its representative was present at the meeting but did not participate. Land O'Lakes Mot. at 3.

    Neither these materials, nor the Defendants' arguments in support of judicial notice of these materials, provide occasion for the Court to deviate from the general rule that "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (citation omitted). In ruling on a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted). Here, the Court need not consider the Defendants' proffered materials because none of the exceptions apply. Plaintiffs did not attach the materials to the IPSAC as exhibits; the materials are not incorporated through citation or limited quotation; and it is unclear whether the authenticity of the materials are unchallenged. *See* Sept. 26, 2011 Mem., 2011 WL 4465355, at *23. Additionally, the Plaintiffs' federal and state claims are not central to, based upon, or integral to these proffered materials. *See id.*

    The Court recognizes that if any of the proffered materials verges on being central to the Plaintiffs' claims, it would be Rose Acre's proffered UEP Animal Husbandry Guidelines. *See id.* at *23 n. 32 ("By illustrative contrast [to certain other documents offered for judicial notice], the UEP Certification guidelines are arguably integral to Plaintiffs' antitrust claim . . . . . But this example is purely academic . . . ."). However, as is true of the other Defendants' extrinsic documents, it is unclear whether the authenticity of Rose Acre's document is challenged or not. Moreover, as alleged in the IPSAC, the UEP Certification guidelines are not static, but instead constitute an ever-evolving set of documented standards that over time were modified to

(continued...)

8

Based upon these allegations and in consideration of the complaint in its entirety, the Court concludes that the allegations as to these three Defendants are sufficient to give notice of the contours of the Sherman Act Section 1 claim against them. The IPSAC's allegations plausibly suggest that those Defendants joined and participated in the alleged conspiracy to reduce the supply of eggs. Accordingly, the Court denies the Motions of Michael Foods, Rose Acres, and Ohio Fresh.

However, unlike the Direct Purchaser Plaintiffs' SAC, the IPSAC does not allege that Daybreak adopted or followed the UEP Certification guidelines generally, or specifically as to chick hatch. Instead, Plaintiffs allege that Daybreak was a member of and held leadership positions in UEP and attended UEP meetings where allegedly key decisions instrumental to the conspiracy were made or where effects of alleged coordinated actions were extolled. *Id.* ¶¶ 91, 204, 211, 215, 218, 245. Additionally, the IPSAC alleges that Daybreak's President made a comment published in *Egg Industry* "attributed high shell egg prices to the 'United Egg Producer's animal welfare program that most shell egg producers participate in.'" *Id.* ¶ 233. These allegations alone are insufficient to plausibly suggest that Daybreak participated or joined the conspiracy. *See* Sept. 26, 2011 Mem., 2011 WL 4465355, at \*9, 18. Thus, the Court grants without prejudice Daybreak's Motion as to the Sherman Act Section 1 claim.

———————————

(...continued)

incorporate many of the features that the Court has concluded are anti-competitive, such as the prohibition on backfilling, the 100% rule, and so forth. *See, e.g.*, *id.* ¶¶ 62, 170, 174–75, 202, 224, 295. So although the "UEP Certification guidelines" as a general concept are central to the Plaintiffs' claims, as the guidelines are described in the IPSAC, no single version of the guidelines as embodied by a single document could be so integral to the Plaintiffs' claims as to be properly before the Court on a motion to dismiss.

Additionally, the IPSAC does not contain sufficient facts to state a claim against the Hillandale Entities or UEA. Plaintiffs point to the same facts upon which Direct Purchaser Plaintiffs relied in defending the SAC and which the Court found unpersuasive. Like the SAC, the IPSAC lacks factual allegations that connect any of the Hillandale Entities directly to the conspiracy, and general allegations as to "Hillandale Farms" or "Hillandale" are inadequate to plausibly suggest that the Hillandale Entities joined or participated in the conspiracy. *See id.* at *32. For the same reasons the Court articulated as to the Direct Purchaser Plaintiffs' SAC, the Court finds that the IPSAC's allegations concerning "vertical integration" and overlapping ownership and control across the Hillandale Entities and Defendant Hillandale Farms of Pa., Inc. do not sustain a claim against the Hillandale Entities on basis of imputed Section 1 liability. *See id.* at *31; *cf. id.* *25. Thus, the Court concludes that it is appropriate to grant the Hillandale Entities' Motion, again without prejudice, subject to the same provisos. *See id.* at *32 n.39 ("[T]he Court would expect any new effort by Plaintiffs to amend as to any of the Hillandale Entities would represent and entail a meaningfully more substantive claim as to the individual entities than was mounted against any one of—or all of—them in the [complaint].").

As in the Direct Purchaser Plaintiff's SAC, the IPSAC alleges that UEA had overlapping membership, leadership, and staff with UEP and USEM, held meetings at concurrent times and locations as UEP, invited the UEP Executive Committee to a meeting on April 27, 2004, and provided financial support to UEP projects. *See, e.g.*, IPSAC ¶¶ 50, 138, 139, 255-60, 271-74. Like the SAC, the IPSAC sets forth facts concerning the conduct of certain UEA leaders and staff, as well as UEA members' attendance at UEP meetings. *See, e.g., id.* ¶¶ 195, 206, 257, 264-65. As the Court has already determined, such allegations, in light of the entirety of the facts

10

pled, do not sustain a claim that UEA joined or participated in the alleged conspiracy, nor that it can be liable for Section 1 violations on account of secondary liability. *See* Sept. 26, 2011 Mem., 2011 WL 4465355, at *33-37. The Court thereby grants UEA's Motion without prejudice.

As a final matter, the Court concludes that the IPSAC does not adequately state a Section 1 claim against Land O'Lakes. Although the Court previously has not ruled on a motion to dismiss by Land O'Lakes as to any complaint in this litigation, nor has the Court considered factual allegations specific to Land O'Lakes before, the Court already has assessed facts similar to those made against Land O'Lakes and found them deficient for pleading purposes. In the IPSAC, the specific facts pled as to Land O'Lakes include charges that a Land O'Lakes employee attended as a member or guest[5] a January 25, 2005 meeting of the UEP Board of Directors at which "a motion was made and seconded that extended through Labor Day the 'intentions program' whereby members agreed to dispose of their flocks 4 weeks earlier than previously scheduled and/or reduce flock size by 5%" and no dissents to the vote were recorded. IPSAC ¶¶ 215-218. The IPSAC also alleges that Land O'Lakes formed Moark LLC in a "joint venture" with Moark Productions in 2000, "acquired 100% of the ownership" of Moark LLC in 2006, is the parent company of Moark LLC, and "operat[ed] through its subsidiary, Moark [LLC]," to market and process eggs. IPSAC ¶¶ 62, 64. The IPSAC sets forth various alleged facts as to Moark LLC, including its membership in UEP and UEA, attendance at trade group meetings, and

---

[5] The IPSAC designates the Land O'Lakes employee's attendance at the meeting as either a UEP member or guest. IPSAC ¶ 215. The IPSAC, however, does not explicitly allege that Land O'Lakes was ever a member of UEP.

11

so forth, however, without reference to Land O'Lakes.[6]  These allegations, when considered in

view of the entirety of the IPSAC, do not plausibly suggest that Land O'Lakes is independently

liable for a Section 1 violation.[7]  Likewise, there are insufficient allegations that would sustain a

claim that Land O'Lakes is secondarily liable for Moark's alleged conduct as a parent company

or otherwise.[8]  Accordingly, the Court grants Land O'Lake's Motion without prejudice.

### B.  State Antitrust, Consumer Protection, and Unjust Enrichment Claims

All moving Defendants essentially have placed their arguments as to all federal and state

claims in one basket.  To wit, Defendants seek dismissal of the various state claims brought

---

[6]  As an exception to this, Land O'Lakes is ambiguously referred to parenthetically in an allegation that Moark LLC applied and was certified under the UEP Certification Program:  "The following Defendants submitted applications for certification and agreed to implement the [UEP Certification Program] guidelines: as of March 22, 2002, . . .  Moark (Land O'Lakes) . . . ." *Id.* ¶ 163.  However, this allegation is simply too vague to provide adequate notice to Land O'Lakes of its supposed offense.

[7]  Because the applicable pleading standards do not allow the Court to consider allegations that are unsupported and bald conclusions, the Court cannot appropriately consider the IPSAC's allegation that  "Land O'Lakes has been an active participant in . . . Moark's, UEP's, and its co-conspirators' efforts to reduce supply and fix prices" as anything more than a conclusory allegation.  *Id.* ¶ 62.  There are simply no specific facts in the IPSAC to support Land O'Lakes' alleged "active participation" in the conspiracy, and as such the Court need not accept such a charge as true.  *See Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

[8]  To the extent that Plaintiffs seek to premise secondary liability on a "joint venture" liability theory, Pls.' Resp. at 57-58, and assuming, *arguendo*, this theory is applicable in the federal antitrust context, there are insufficient facts to adequately plead such a form of liability. In the absence of any other specific facts pled, the conclusory and vague accusation that Land O'Lakes and Moark were in a "joint venture" simply does not suffice for pleading purposes.  *See generally, e.g.,* Restatement (Third) of Agency § 3.03 cmt. (e)(2) (2006) ("An association limited to a single project is a joint venture.  A joint venture is treated as a form of partnership, in which duties and authority are limited by the scope of the venture."); Uniform Partnership Act § 202 (1997) (discussing criteria for forming a partnership); *id.* § 306 ("Except as otherwise provided in subsections (b) and (c), all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law.").

against them on the grounds that Plaintiffs have not alleged facts that plausibly suggest that any of the moving Defendants joined or participated in the alleged conspiracy to reduce the supply of eggs—the same standard upon which they rely in urging the dismissal of the Sherman Act Section 1 claims. The Court does not find that such arguments provide appropriate grounds for dismissal of the various state claims at this time.

Defendants have not provided any appropriate legal authority to demonstrate that the federal antitrust conspiracy principles that they appear to invoke apply to any of the state antitrust, consumer protection, or unjust enrichment claims. The case law upon which Defendants rely is focused upon Sherman Act claims.[9] And indeed, the issue of whether a defendant has joined or participated in an alleged antitrust conspiracy is consistent with a Section 1 claim because such a claim is contingent upon the existence of an agreement to the conspiracy. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553 (2007) ("Because § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,'‘[t]he crucial question' is whether the

---

[9] Defendants cite case law that speaks to Section 1 claims in support of the proposition that a defendant must have joined and participated in the alleged conspiracy in order for a claim against them to be sufficiently pled. *See* Michael Foods Mot. at 3-4 (citing *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 161 (D.D.C. 2004), *Hinds County v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009), *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008)); Ohio Fresh Mot. at 2 (citing *TFT-LCD (Flat Panel)*, 586 F. Supp. 2d at 1117 and *Jung*, 300 F. Supp. 2d at 161); Rose Acre Mot. at 8-9 (citing *TFT-LCD (Flat Panel)*, 586 F. Supp. 2d at 1110, *In re Travel Agent Comm'n Antitrust Litig.*, No. 03-30000, 2007 WL 3171675, at *1-2, *3 n.4 (N.D. Ohio 2007), *aff'd*, 583 F.3d 896 (6th Cir. 2009), and *Jung*, 300 F. Supp. 2d at 161); Daybreak Mot. at 3 (citing *Jung*, 300 F. Supp. 2d at 160-61); Hillandale Entities Mot. at 5 (citing *TFT-LCD (Flat Panel)*, 586 F. Supp. 2d at 1117); UEA Reply at 2 (citing *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) and *TFT-LCD (Flat Panel)*, 586 F. Supp. 2d at 1117); Land O'Lakes Mot. at 3 (citing *TFT-LCD (Flat Panel)*, 586 F. Supp. 2d at 1117, *Hinds County*, 620 F. Supp. 2d at 513, and *Jung*, 300 F. Supp. 2d at 161).

challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express," (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984) and *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (stating that the "existence of an agreement is the hallmark of a Section 1 claim"); *see also* note 9, *supra* (citing cases that recognize the same).

Defendants, however, have not demonstrated the propriety of applying federal antitrust conspiracy principles to the particular 46 state antitrust, consumer protection, or unjust enrichment claims posed here. Defendants have not established whether any of the 22 jurisdictions under which Plaintiffs have brought their state claims have adopted, follow, or would follow this standard as to each type of claim asserted.

The Court certainly recognizes that federal antitrust law often serves as an analogue to, or controlling in the interpretation of, jurisdiction-specific antitrust law, and that, accordingly, it is not an unreasonable proposition to argue that the principles of federal antitrust law might apply in determining whether a defendant joined or participated in the alleged conspiracy. *See* 1 ABA Section of Antitrust Law, *Antitrust Law Developments*, 624 (6th ed. 2007) ("Many states have statutory provisions that require varying degrees of deference to federal precedent in applying state antitrust law to practices also subject to federal law. These statutes are often called 'harmonization statutes.' Some courts in states without harmonization statutes have adopted similar policies of deference, also varying in degree, to federal antitrust precedent.").[10]

---

[10] Ostensibly, this observation also would hold true for the Plaintiffs' consumer protection claims that arise from violations of antitrust law in jurisdictions that follow or have

(continued...)

14

Nonetheless, in some jurisdictions, state antitrust law is not always a symbiont of federal antitrust law. Moreover, the parties have not presented this issue in the context of jurisdiction-specific law that would permit the Court draw the conclusion that each of the state antitrust claims should be treated consistently with the Plaintiffs' Section 1 claim for purposes of stating a state antitrust claim against each Defendant.

Furthermore, any symbiosis that the Plaintiffs' state law claims generally might have with federal antitrust law becomes more attenuated when considering the state consumer protection and unjust enrichment claims at issue. As demonstrated by the Court's March 19, 2012 Opinion, which assessed many of the Plaintiffs' state consumer protection and unjust enrichment claims, these types of claims proscribe conduct that is not exclusively limited to anticompetitive activities among conspirators akin to antitrust law. The Court's earlier decision also exemplifies the degree of variation among these claims across jurisdictions. It follows that the various jurisdictions' laws as to consumer protection or unjust enrichment claims may not necessarily embrace any federal conspiracy principles (or any principles of civil conspiracy for that matter).[11] But, in the absence of any meaningful jurisdiction-specific legal authority and given the spare nature of the Defendants' arguments as presented to the Court, the Court cannot conclude at this time that the various state consumer protection and unjust enrichment claims (or any claims that Defendants conspired to violate those laws) embrace federal antitrust conspiracy principles in

_____

(...continued)
adopted federal antitrust conspiracy principles.

[11] The same would be true for various jurisdictions' civil conspiracy claims—in the event that Plaintiffs are relying on civil conspiracy to establish the individual Defendants' vicarious or joint liability for the underlying consumer protection or unjust enrichment claims, as opposed to individual liability.

determining whether Plaintiffs have stated these claims against individual Defendants.[12]

Accordingly, the Court denies each of the Defendants' Motions as to the state claims.

## IV. Conclusion

For the foregoing reasons, the Court denies the Motions of Defendants Michael Foods,

Inc., Rose Acre Farms, Inc., and Ohio Fresh Eggs, LLC.  The Court also grants in part the

Motions of Daybreak Foods, Inc., Hillandale-Gettysburg L.P., Hillandale Farms Inc., and

Hillandale Farms East, Inc., United Egg Association, and Land O'Lakes, Inc. as to the Sherman

Act Section 1 claim without prejudice to Plaintiffs to seek leave to amend their pleading[13] and

denies in part their Motions as to the state claims.

---

[12]  It may well be that each and every one of the jurisdictions at issue has adopted federal antitrust conspiracy principles or follows similar, if not identical, principles of civil conspiracy as to the various antitrust, consumer protection, and unjust enrichment claims.  Yet, in light of the Defendants' failure to proffer any meaningful legal authority in support of their arguments, the Court presently has no means of evaluating or recognizing the validity *vel non* of those arguments.  The Court simply is not in a position to rule as a matter of law as to any state claim that Plaintiffs must plausibly suggest that Defendants joined or participated in the alleged conspiracy in order to state a claim against each moving Defendant.  The Court shall not and cannot assume the burden of deciding this matter as to the 46 state claims when the Defendants have elected not to do so.

The Court recognizes that Plaintiffs also rely on similar legal authority as Defendants in responding to the Defendants' individual motions.  Nonetheless, a motion to dismiss requires a defendant to bear the onus of raising and properly supporting arguments for dismissal.  As such, in these circumstances, the Plaintiffs' equivalent failure to address relevant jurisdiction-specific case law cannot constitute grounds for dismissal.

[13]  "Leave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962), and *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993)).  No Defendant has raised arguments that provide sufficient grounds to weigh against permitting Plaintiffs to seek leave to amend those claims that the Court dismisses without prejudice.

An Order consistent with this Memorandum follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge

17