**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | |
| **ANTITRUST LITIGATION** | : | |
| | : | **MDL No. 2002** |
| | : | **08-md-02002** |
| _____ | : | |
| | : | |
| **THIS DOCUMENT APPLIES TO:** | : | |
| **ALL DIRECT PURCHASER** | : | |
| **PLAINTIFF ACTIONS** | : | |

**MEMORANDUM**

**GENE E.K. PRATTER, J.**                                   **JULY 16, 2012**

Direct Purchaser Plaintiffs move the Court for final approval of a proposed settlement

agreement between the Plaintiffs and Defendant Sparboe Farms, Inc. ("Sparboe").[1]  Under the

proposed Sparboe Settlement, Plaintiffs will release Sparboe from all pending claims in

exchange for cooperation in prosecuting the Plaintiffs' claims against the remaining Defendants,

such cooperation being in the form of documents and witness testimony.  For the reasons set

forth below, the Court grants the motion for final approval of the Sparboe Settlement.

**I.   Factual and Procedural Background[2]**

This litigation embraces numerous consolidated and coordinated actions based upon

allegations of a conspiracy in violation of the Sherman Act among egg producers and trade

groups to manipulate the supply of eggs and egg products and thereby affect the domestic prices

---

[1]  Plaintiffs filed a Motion for Final Approval of Settlement Agreement with Sparboe Farms, Inc. (Doc. No. 443) (hereinafter, "Mot.").  They also submitted filings supplementing this Motion.  (Doc. Nos. 483 and 485).

[2]  The background discussed here is drawn from the exhibits and materials submitted in relation to the Motion *sub judice*, the hearing on the Motion, and the overall record of this case, including the Plaintiffs' Motion for Final Approval of the Class Action Settlement Between Plaintiffs and Defendants Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc. (Doc. No. 465) (hereinafter, "Moark Final Approval Mot.").

of those goods.  *See In re Processed Egg Prods. Antitrust Litig.*, 588 F. Supp. 2d 1366, 1367 (J.P.M.L. 2008).  The plaintiffs are direct purchasers (such as grocery stores, commercial food manufacturers, restaurants, other food service providers, and other entities who purchase directly from Defendants or other egg producers) and indirect purchasers (individual consumers who purchased from other parties along the distribution chain) of shell eggs, egg products, or both. The direct purchaser plaintiffs are categorized as "Direct Purchaser Plaintiffs" who have brought a consolidated class action against Defendants, and "Direct Action Plaintiffs" who are pursuing individual actions against Defendants.

### A.  Direct Purchaser Plaintiffs' Suit

The moving Plaintiffs are Direct Purchaser Plaintiffs who accuse defendant egg producers, including Sparboe, and certain trade groups, of violating Section 1 of the Sherman Act and seek injunctive relief, treble damages, attorneys' fees and costs.  They have demanded a jury trial. These Plaintiffs filed a consolidated class action complaint, which they have amended.  The allegations of the consolidated complaint superseded or replaced all of the previously-filed individual and consolidated complaints.

The most recent iteration of the Plaintiffs' claim is the Second Consolidated Amended Class Action Complaint (Doc. No. 291) which prompted extensive motion practice.  The culmination of this motion activity resulted in the Court dismissing without prejudice claims brought against individual Defendants Hillandale-Gettysburg, L.P., Hillandale Farms, Inc., and Hillandale Farms East, Inc. and United Egg Association.  *See* Sept. 26, 2011 Mem. and Order, 821 F. Supp. 2d 709 (Doc. Nos. 562 and 563).  The Court also dismissed without prejudice

claims against all Defendants for damages barred by the four-year statute of limitations.  *See* Nov. 30, 2011 Opinion and Order, 2011 WL 5980001 (Doc. Nos. 593 and 594).[3]

As a result of these rulings, Plaintiffs presently proceed on the core of their Section 1 Sherman Act claims against Defendants.  At the time the parties' filed their motions to dismiss, the Court partially lifted the stay of discovery previously entered at the outset of this litigation. Lifting the stay permitted the parties to exchange requests for production of documents and confer as to various aspects of a discovery plan.  *See* Order (Doc. No. 320); Pls.' Mot. for an Award of Attorneys' Fees and for Reimbursement of Expenses (Doc. No. 493) (hereinafter, "Fees Mot."), Ex. 1, Asher Decl. ¶¶ 21-22 (Doc. No. 493-2) (hereinafter, "Asher Decl."). Following the Court's rulings on the motions to dismiss the Second Consolidated Amended Class Action Complaint, the parties requested a further partial lifting of the discovery stay.  The Court entered Orders further partially lifting the discovery stay, commencing the discovery period, and setting forth various discovery deadlines and parameters concerning, *inter alia*, document production, interrogatories, depositions, non-party discovery, class certification, and class certification experts.  *See* Case Mgmt. Orders Nos. 18 and 19 (Doc. Nos. 656 and 676).

## B.  Sparboe Settlement Negotiations

Sparboe was named as a Defendant in the Consolidated Amended Class Action Complaint (Doc. No. 41).  Less than two months after the Consolidated Amended Class Action

---

[3]  Plaintiffs have filed a motion seeking leave to file a Third Consolidated Amended Class Action Complaint that seeks, *inter alia*, to revive claims against Defendants Hillandale-Gettysburg, L.P., Hillandale Farms, Inc., and Hillandale Farms East, Inc. and to amend claims of fraudulent concealment and tolling of the statute of limitations. Opposition briefing has been filed, and the Court will address that motion separately.

3

Complaint was filed, Interim Co-Lead Counsel[4] and Sparboe's counsel began engaging in settlement negotiations.  Mot., Ex. A, Hausfeld Decl. ¶ 8 (Doc. No. 443-2) (hereinafter, "Hausfeld Decl.").  Spanning three months, these negotiations included numerous telephone conferences and four in-person meetings.  *Id.* ¶¶ 6, 7.  The negotiations centered upon Sparboe cooperating with Plaintiffs in the prosecution of the claims against the other Defendants by providing to Plaintiffs information in the form of documents and witness testimony.  *Id.* ¶¶ 8-9.

Sparboe made an initial proffer to Interim Co-Lead Counsel in Washington, D.C. "regarding what Sparboe's information would show and how it would assist Plaintiffs' in the prosecution of their case."  *Id.* ¶ 9.  A month later, Sparboe "proffered both hundreds of pages of documents and live witness testimony from Sparboe employee Wayne Carlson in Minneapolis" to Plaintiffs.  *Id.* ¶ 10.  Plaintiffs have represented that Interim Co-Lead Counsel was "not initially convinced that they should enter into a settlement agreement" at that time, and Interim Co-Lead Counsel and Sparboe's counsel held several telephone conferences concerning the nature of Sparboe's cooperation.  *Id.* ¶ 11.

Following these conferences, Sparboe then proffered "hundreds of pages of additional documents, as well as identifying several executives and current and former Sparboe employees who could offer testimony in the case that may corroborate the information contained in the documents, as well as provide additional information."  *Id.* ¶ 12.  Shortly thereafter, Sparboe's

---

[4]  In Case Management Order No. 1, the Court approved the following law firms to serve as Interim Co-Lead Counsel: Weinstein Kitchenoff & Asher LLC; Hausfeld LLP; Bernstein Liebhard LLP; and Susman Godfrey LLP.  It appears there are additional counsel that Interim Co-Lead Counsel have directed to work on this case.  *See* Fees Mot. at 1.  Thus, reference herein to "Interim Co-Lead Counsel" may also encompass the efforts of other counsel who represent Plaintiffs and acted at the direction of Interim Co-Lead Counsel.

counsel proffered documents and "additional descriptions of expected witness testimony." *Id.*
¶ 13.

In addition to the proffers concerning documents and witness testimony, at some point during negotiations Interim Co-Lead Counsel made a demand for monetary compensation that "was based on what an econometric analysis would have produced with regard to the production of transaction data and then an analysis of the market and the transaction data as it related to Sparboe with the traditional approach as well of having Sparboe, if it were the first [party to settle], have a discount off its actual damages."  Prelim. Hr'g Tr. at 7:16-21. (Doc. No. 198). Sparboe consistently maintained the position that it would not agree to a settlement that provided direct monetary compensation to the Class Members.  *See* Prelim. Hr'g Tr. at 7:12-14; *id.* at 7:22-23.

Based upon the conferences and proffers, Interim Co-Lead Counsel concluded that Sparboe's cooperation in advance of discovery would provide information that would supplement and enhance the information that Interim Co-Lead Counsel previously had uncovered through their own independent investigation prior to filing the First Consolidated Amended Complaint.  *See* Hausfeld Decl.¶ 14; Mot. at 3.  Thereafter, the parties reached an agreement and executed the Sparboe Settlement Agreement.  Hausfeld Decl. ¶ 15.

The day after the parties executed the Agreement, Sparboe produced documents to Interim Co-Lead Counsel for inspection and review in Minneapolis, Minnesota.  *Id.* ¶ 16.  In the next months, Sparboe made available for interviews four witnesses, who, according to Interim Co-Lead Counsel, "provided invaluable information about Defendants' conspiracy."  *Id.* ¶ 17. Based upon the information that Interim Co-Lead Counsel obtained from Sparboe, they prepared

the Second Consolidated Amended Class Action Complaint.  *Id.* ¶ 18.   Sparboe is not presently

named in this Complaint.  *See* Second Consol. Am. Class Action Compl. ¶ 3.[5]  Presumably,

Sparboe's absence is the result of the pending settlement.  The following discussion of the nature

of the case presupposes Sparboe would indeed occupy in the claims going forward the role it was

assigned in the claims initially if the settlement had not been achieved.

The Court preliminarily approved the Sparboe Settlement and certified the Class and

Subclasses for settlement purposes following a hearing.  *See* Order on Preliminary Approval of

Sparboe Settlement (Doc. No. 214).  In the same Order, the Court stayed the Plaintiffs' suit

against Sparboe pending further Order of the Court.  *See id.* at ¶ E.1.  In a separate Order, the

Court also approved the form of notice of the Sparboe Settlement.  *See* Order Approving

Dissemination of Notice of Settlements Between Direct Purchaser Plaintiffs and (i) Defendant

Sparboe Farms, Inc. and (ii) Defendants Moark, LLC, Norco Ranch, Inc. and Land O'Lakes, Inc.

(Doc. No. 388) (hereinafter, "Notice Approval Order").

Following the notice period established by the Court, Plaintiffs filed the motion *sub*

*judice*, and the Court held the final fairness hearing on the Sparboe Settlement as required by

Fed. R. Civ. P. 23(e)(2).  *See* Sparboe Final Approval Hr'g Tr. (Doc. No. 463) (hereinafter,

"Final Hr'g Tr.").  No objections were filed to the proposed Sparboe Agreement.  No objectors

---

[5]  Paragraph 3 of the Second Consolidated Amended Class Action Complaint states:

Plaintiffs entered into a Settlement Agreement with Sparboe Farms, Inc.
("Sparboe"), a formerly named Defendant, which this Court has preliminarily
approved.  As part of that Settlement Agreement, Sparboe agreed to cooperate
with Plaintiffs and provide documents and information related to the allegations
in Plaintiffs' initial Complaint. Plaintiffs have incorporated much of that
information into this Second Consolidated Amended Class Action Complaint.

appeared at the fairness hearing.  Plaintiffs filed supplemental briefing and materials in support

of their motion for final approval.  Following the hearing, the Court withheld ruling on the

motion until the notice period required pursuant to 28 U.S.C. § 1715(d) under the Class Action

Fairness Act ("CAFA") had elapsed.

### C.  Moark Settlement

As further background, following the Sparboe Settlement, Defendants Moark, LLC,

Norco Ranch, Inc., and Land O'Lakes, Inc. (collectively, "Moark") entered into a settlement

agreement.  Following a hearing, the Court entered Orders preliminarily approving that

agreement and the form of notice.  *See* Order on Preliminary Approval of Settlement with Moark,

LLC, Norco Ranch, Inc., and Land O'Lakes Inc. (Doc. No. 387); Notice Approval Order.

Following the notice period, Plaintiffs filed a motion seeking final approval of the Moark

Settlement, and the Court held a final fairness hearing.  *See* Moark Final Approval Hr'g Tr. (Doc.

No. 688) (hereinafter, "Moark Final Hr'g Tr.").  In a separate Memorandum and Order issued

this same date, the Court is granting the Plaintiffs' motion for final approval of the Moark

Settlement.

## II.  Proposed Sparboe Settlement Agreement[6]

The proposed Settlement Class for settlement purposes under the Sparboe Settlement is

defined as:

> All persons and entities that purchased eggs, including shell eggs and egg
> products, produced from caged birds in the United States directly from any
> producer during the Class Period from January 1, 2000 through the present.

---

[6] The terms used in this Order that are defined in the Sparboe Settlement Agreement are,
unless otherwise defined herein, used in this Order consistent with the definitions of the
agreement.

a.)     Shell Egg Subclass
All individuals and entities that purchased shell eggs produced from caged
birds in the United States directly from any during the Class Period from
January 1, 2000 through the present.

b.)     Egg Products Subclass
All individuals and entities that purchased egg products produced from
shell eggs that came from caged birds in the United States directly from
any producer during the Class Period from January 1, 2000 through the
present.

Excluded from the class and subclasses are the Defendants, their co-conspirators,
and their respective parents, subsidiaries and affiliates, all government entities, as
well as the Court and staff to whom this case is assigned, and any member of the
Court's or staff's immediate family.  Also excluded from the Class and Subclasses
are purchases of "specialty" shell egg or egg products (such as "organic," "free-
range" or "cage-free") and purchases of hatching eggs (used by poultry breeders to
produce breeder stock or growing stock for laying hens or meat).

Mot., Ex. A, Settlement Agreement Between Direct Purchaser Plaintiffs and Sparboe Farms, Inc.

¶ 11 (hereinafter, "Sparboe Settlement Agreement").[7]  As mentioned earlier, the Court

preliminarily certified the Settlement Class for settlement purposes under Fed. R. Civ. P.

23(b)(3).  *See* Order on Preliminary Approval of Sparboe Settlement.  The agreement's principal

terms require Sparboe to cooperate with the Plaintiffs' preparation for and prosecution of their

---

[7]   In the Agreement, "Class Period" is defined as "the period from and including January
1, 2000 up to and including the date when Notice of the Court's entry of an order preliminarily
approving this settlement and certifying a class for settlement purposes is first published."  *Id.*
¶ 5.  Thus, the Class Period for the Sparboe Settlement is from January 1, 2000 through October
23, 2009.
    This actual Class Period contrasts with the end date for the Class Period listed in the
Notice of the Sparboe Settlement, which is stated as July 15, 2010.  *See* Mot., Ex. 2.A., Notice of
Sparboe Settlement at 2 (Doc. No. 443-6) (hereinafter, "Sparboe Notice").  It appears that the
date listed in the Sparboe Notice is an inadvertent typo.  July 15, 2010 is the end date of the class
period for the Moark Settlement (and the date on which the Court preliminarily approved the
Moark Settlement and the notices of the Sparboe and Moark Settlements).  *See* Order on
Preliminary Approval of Settlement with Moark, LLC, Norco Ranch, Inc., and Land O'Lakes
Inc.; Notice Approval Order; Mot., Ex. 2.A., Notice of Moark Settlement at 2.

class action.  *See* Moark Settlement Agreement ¶ 23.  The Agreement details the extent of Sparboe's cooperation in terms of "making documents related to the claims asserted in this action available for review and making witnesses with knowledge related to the claims asserted in this action available for informal interviews and, as necessary, consultation with Plaintiffs' Counsel." *Id.*  "Sparboe Farms agree[d] to provide discovery to Plaintiffs in the pending Action as if Sparboe Farms were a party subject to all rules for discovery."  *Id.*  Sparboe agreed to "use its best efforts to produce interviewees . . . who are current or former directors, officers, or employees of Sparboe Farms for deposition at the time discovery in this Action commences . . . and make those person available for trial testimony."  *Id.* ¶ 23(a).

In consideration, Plaintiffs and their counsel "agree not to assert that Sparboe Farms waived its attorney-client privilege, work product immunity or any other privilege or protection with respect to information or documents provided or identified" to Plaintiffs pursuant to the Agreement. *Id.* ¶ 24.

Furthermore, Plaintiffs agree that they "shall not . . . seek to recover against [Sparboe] for any of the Released Claims." *Id.* ¶ 17.  Under the Agreement, "Released Claims" are defined as any and all claims arising out of injuries or damages that occurred "from the beginning of time to the date of this Agreement" and that arose out of or resulted from "conduct concerning any agreement among Defendants, the reduction or restraint of supply, the reduction of or restrictions on production capacity, or the pricing, selling, discounting, marketing, or distributing of Shell Eggs and Processed Egg Products in the United States or elsewhere.  *Id.*  The Agreement sets forth non-exclusive examples of  Released Claims by providing that such claims "includ[e] but [are] not limited to any conduct alleged, and causes of action asserted, or that could have been

alleged or asserted, whether or not concealed or hidden, in the Complaints filed in the

Action . . . ,  which arise from or are predicated on the facts and/or actions described in the

Complaints under any federal, state, or foreign antitrust, unfair competition, unfair practices, price

discrimination, unitary pricing, trade practice, consumer protection, fraud, RICO, civil

conspiracy law, or similar laws, including, without limitation, the Sherman Antitrust Act, 15

U.S.C. § 1 *et seq.*" *Id.*  Plaintiffs also agree to waive California Civil Code Section 1542 and

similar provisions in other states. *Id.* ¶ 17(a).  Additionally, Plaintiffs agree to waive and release

"any and all defenses, rights, and benefits that [Plaintiffs] may have or that may be derived from

the provisions of applicable law which, absent such waiver, may limit the extent or effect of the

release" set forth in the Agreement. *Id.* ¶ 18.  The release excludes "claims relating to payment

disputes, physical harm, defective product or bodily injury . . . and do[es] not include any Non-

Settling Defendant." *Id.* ¶ 19.

     The settlement proposes an opt-out provision which sets forth the procedures through

which possible class members could opt out of the settlement. *Id.* ¶ 14; *see also* Sparboe Notice

at 1, 4.  Class members had 75 days from the postmark date that the notice of the settlement was

mailed by first-class mail to the final postmark date designated in the Claims Notice to return an

exclusion request or submit an objection to the Settlement. *See* Sparboe Notice at 1, 3, 4; Mot.,

Ex. 2, Affidavit of Jennifer M. Keough re: Notice and Settlement Administration ¶¶ 9, 17 (Doc.

No. 443-5) (hereinafter, "Keough Aff.").

     Finally, the Agreement delineates Sparboe's agreement to reimburse Plaintiffs up to a

maximum of $350,000.00 towards the cost of notice of the Settlement." Sparboe Settlement

Agreement ¶ 28.  However, this provision is subject to several provisos, one of which provides

that "[i]n the event Plaintiffs enter into a cash settlement with any Non-Settling Defendant and receive preliminary approval of that settlement prior to the issuance of notice under this Agreement (such that the settlement notices can be combined), Plaintiffs shall apply those settlement funds towards the cost of notice, thus reducing or eliminating Sparboe Farms' obligation to reimburse Plaintiffs for the notice costs of this Agreement."  *Id.* ¶ 29.

### III.  Notice of Sparboe Settlement

Notice of the Sparboe Settlement was disseminated to possible members of the Settlement Class through a variety of means ranging from direct mailings, publications, press releases, a website and a toll-free information and request telephone line.  *See* Keough Aff. ¶¶ 5-6; *see also* Sparboe Settlement Agreement ¶ 13.  The Notice explained that any possible Class Members wishing to be excluded from or to object to the terms of the Sparboe Settlement Agreement should postmark their exclusion requests or objections no later than a specific date that was 58 days before the final fairness hearing on the Sparboe Settlement.  *See* Sparboe Notice at 1, 3-4.  Notices of the Moark and Sparboe Settlements were jointly distributed to the putative Class members, and $170,000 was spent on notice expenses with respect to the Sparboe Settlement Agreement.  *See* Moark Final Hr'g Tr. at 31:3-31-23.  No other information has been provided to the Court concerning whether other administrative costs and expenses were (or were not) incurred in relation to the Sparboe Settlement.

The Claims Administrator received no objections to the Sparboe Settlement and received 364 requests for exclusion from the Sparboe Settlement Class.  *See* Keough Aff. ¶ 17.  Some of those parties who opted-out of the class have filed their own complaints against Defendants, including Sparboe, such as Direct Action Plaintiffs Giant Eagle, Inc., Winn-Dixie Stores, Inc.,

Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., H.J. Heinz Company, L.P., Publix Super Markets, Inc., Kraft Foods Global, Inc., The Kellogg Company, General Mills, Inc., and Nestle USA, Inc., The Kroger Co., The Great Atlantic & Pacific Tea Co., Inc., Hy-Vee, Inc., H.E. Butt Grocery Co., Conopco, Inc., Safeway Inc., Albertsons LLC, and Walgreen Co., and Supervalu, Inc., as well as plaintiffs in a state court action proceeding in Kansas.[8]  Interim Co-Lead Counsel has represented that the potential Class for the Moark Settlement "is composed of thousands of entities nationwide, many of which are sophisticated companies with their own in-house legal counsel," Fees Mot. at 12, a descriptor which the Court recognizes can be applied to the Sparboe Settlement Class, given that both settlements' classes are defined virtually identically.

---

[8]  *See* Am. Compl. (Doc. No. 623) (Giant Eagle, Inc.); Second Am. Compl.(Doc. No. 622) (Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P.); Am. Compl. (Doc. No. 621) (Publix Super Markets, Inc.); First Am. Compl. (Doc. No. 624) (Kraft Foods Global, Inc., The Kellogg Company, General Mills, Inc., and Nestle USA, Inc.); Am. Compl. (Doc. No. 619) (The Kroger Co., The Great Atlantic & Pacific Tea Co., Inc., Hy-Vee, Inc., H.E. Butt Grocery Co. and Conopco, Inc., Safeway Inc., Albertsons LLC, and Walgreen Co.); Am. Compl. (Doc. No. 620) (Supervalu, Inc.); Dec. 19, 2011 Mem. and Order, 2011 WL 6396462, at *5 n.8 (Doc. Nos. 601 and 602) (explaining that six direct purchasers opted out of the Sparboe and Moark Settlements and filed an action against Defendants in Kansas state court, which, after being removed to federal court by Defendants, was remanded to state court); Direct Action Plaintiff Status Report (Doc. No. 457).

The Direct Action Plaintiff Status Report states that "[a]ll of the Direct Action Plaintiffs . . . have opted out of the Sparboe class settlement and will play no role in the fairness hearing." *Id.* at 2.  This statement applies only to the presently pending Direct Action Plaintiff cases brought by The Kroger Co. and co-plaintiffs (Civil Action No. 10-7605 (E.D. Pa.)), Supervalu Inc. (Civil Action No. 10-6736 (E.D. Pa.)), Publix Super Markets, Inc. (Civil Action No. 10-6737 (E.D. Pa.)), and Giant Eagle, Inc. (Civil Action No. 10-1698 (W.D. Pa.)).

The statement does not apply to the pending Direct Action Plaintiff cases brought by Kraft Foods Global, Inc. and its co-plaintiffs (Civil Action No. 11-8808 (E.D. Pa.)), and Winn-Dixie Stores, Inc. (Civil Action No. 11-0510 (E.D. Pa.)).  Both of these cases were filed after the Status Report.  However, it appears that Kraft Foods Global, Inc. and its co-plaintiffs, and Winn-Dixie Stores, Inc. and its co-plaintiffs, have opted out of the Sparboe Settlement.  *See* Keough Aff. ¶ 17.

The Claims Administrator mailed Notice and Claim Forms to 13,211 direct purchasers of shell eggs and egg products, whose names and addresses were obtained from various electronic data files that contained potential Class Member names and addresses from 17 named egg producer Defendants that were given to the Claims Administrator at the direction of the Court. *See* Keough Aff. ¶ 7, 9; Notice Approval Order ¶ 3.  Eighty-three (83) Notice and Claim Forms, returned by the U.S. Postal Service with forwarding address information, were re-mailed. *See id.* ¶ 12.  In contrast, twenty-three hundred thirty-nine (2,339) Notice and Claim Forms were returned without forwarding address information and, according to Interim Co-Lead Counsel, could not be re-mailed.  *See id.*[9]

Additionally, during the notice period a Summary Notice was published in several publications with a total circulation of over 2,316,000.  *See id.* ¶ 11.  The Summary Notice was published in a monthly issue of fifteen (15) industry journals thought to be likely to reach potential purchasers of shell eggs and egg products.  *See id.*  Those publications are:  *PetFood Industry*, *Restaurant Business*, *Convenience Store News*, *Hotel F&B*, *Nation's Restaurant News*, *Food Service Director*, *Progressive Grocer*, *Food Manufacturing*, *Supermarket News*, *Stores*, *Egg Industry Magazine*, *Modern Baking*, *Baking Buyer*, *Food Processing*, and *Long Term Living*.  *See id.*

The Summary Notice was also published for one day in the *Wall Street Journal*.  *See id.* That same day, the Claims Administrator distributed a press release for the Sparboe Settlement, as well as a separate release about the Moark Settlement, to approximately 1,000 journalists in

---

[9] The Court recognizes that the statistics provided here slightly differ with the equivalent statistics that the Plaintiffs provided in connection with their motion for approval of the Moark Settlement.  However, the Court deems these minor differences to be inconsequential.

the restaurant and food industries through the US1 Newsline on the PR Newswire.  *See id.* ¶ 13.

The press releases resulted in some 335 articles that reported on the two settlements.  *See id.*

A publicly-available website specifically devoted to the Sparboe and Moark Settlements

was established.  *See id.* ¶ 14.  The website makes available for review and downloading the

Notice Packet, the Sparboe Settlement Agreement, and various Court orders and filings relating

to the Sparboe Settlement.  *See id.*  In the first 106 days of operation, the website received 2,821

"visits."  *See id.*

The Claims Administrator and Plaintiffs established a toll-free 24-hour telephone number

and call center for potential Class Members to obtain information about the settlement and to

request the Notice and Claim Form.  *See id.* ¶ 15.  The automated number received 328 calls, and

61 callers requested and received a Notice Packet during the first 106 days of operation.  *See id.*

Additionally, Sparboe served notice of the settlement to federal and state officials of the

settlement pursuant to 28 U.S.C. § 1715(d) under CAFA.  *See* Final Hr'g Tr. at 26:23-26:24,

38:1-38:6.  No federal or state officials filed objections to the Sparboe Settlement, nor requested

a hearing following the issuance of the CAFA notice.  The statutory period elapsed prior to the

date of this Memorandum and accompanying Order.[10]

---

[10] Although Sparboe served notice of the settlement to the appropriate officials, it did not
do so promptly after the Agreement was filed, as required by 28 U.S.C. § 1715(b).  Mot. at 7.
Section 1715(b) provides:  "Not later than 10 days after a proposed settlement of a class action is
filed in court, each defendant that is participating in the proposed settlement shall serve upon the
appropriate State official of each State in which a class member resides and the appropriate
Federal official, a notice of the proposed settlement . . . ."  Under Section 1715(d), an order
granting final approval of a settlement agreement may not take place earlier than ninety days after
the appropriate federal and state officials have been served with notice.
    Plaintiffs advised the Court about the timing of the CAFA notice requirement on the
Sparboe and Moark Settlements, and requested the Court proceed with the final approval hearing
(continued...)

## IV.  Discussion

Federal Rule of Civil Procedure 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1)     The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2)     If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3)     The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4)     If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5)     Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

_____

(...continued)
on the Sparboe Settlement as scheduled and to hold its decision on the Plaintiffs' motion for final approval in abeyance until the ninety-day expiration date passed without any objections or requests for hearings being received from any relevant authority pursuant to 28 U.S.C. § 1715(d).  *See* Mot. at 7.  Over ninety days have elapsed since Sparboe served the appropriate state or federal officials with the CAFA notice, and there have been no requests for hearings or objections to the settlement.  It follows that, although the notice requirements under CAFA have not been fully met on a technical basis, the substance of the requirements have been satisfied insofar as giving federal and state officials sufficient notice and opportunity to be heard concerning the Sparboe Settlement.  *See D.S. ex rel. S.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 80 (E.D.N.Y. 2008) (approving the settlement on a provisional basis until the CAFA notice deadline passes and no federal or state official requests a hearing); *Kay Co. v. Equitable Prod. Co.*, No. 06 Civ. 00612, 2010 WL 1734869, at *4 (S.D. W.Va. Apr. 28, 2010) ("Since more than 100 days have passed since service was perfected and since there have been no adverse comments from any of the aforesaid State or Federal officials, the Court FINDS that compliance with CAFA is satisfactory.").  *But see True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1083 (C.D. Cal. 2010) (determining that its authority to approve a settlement was "questionable" when the defendant gave CAFA notice only ten days prior to the final settlement approval hearing).

*Id.*  The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.  In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)).  "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998) (quoting *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975)).

### A.  *Class Certification*

Where, as here, the Court has not already certified a class prior to evaluating a settlement, the Court initially must determine whether the proposed settlement classes satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) ("[A] district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.").  The Third Circuit Court of Appeals recently summarized the demands of Rule 23 as follows:

> Rule 23(a) contains four threshold requirements, which every putative class must satisfy:
>
>> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Fed. R. Civ. P. 23(a); *see also Amchem*, 521 U.S. at 613.  Upon finding each of these prerequisites satisfied, a district court must then determine that the

16

proposed class fits within one of the categories of class actions enumerated in Rule 23(b).

As mentioned, Rule 23(b)(2) authorizes class actions seeking injunctive relief in instances where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see In re Comm. Bank of N. Va.* (*Comm. Bank I*), 418 F.3d 277, 302 n.14 (2005). Separately, certification pursuant to Rule 23(b)(3) seeking monetary compensation is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 180 (3d Cir. 1994). These twin requirements are commonly referred to as predominance and superiority.

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc).

1.  Federal Rule of Civil Procedure 23(a)

First, under Rule 23(a), the Court determines that the Class Members are ascertainable

from objective criteria, such as various electronic data files that contained names and addresses

of customers that purchased shell eggs or egg products produced from caged birds in the United

States, which were provided by 17 named egg producer Defendants, and that the Class Members

thus ascertained are so numerous that their joinder before the Court would be impracticable.

Plaintiffs "need not precisely enumerate the potential size of the proposed class, nor [are]

plaintiff[s] required to demonstrate that joinder would be impossible." *Cannon v. Cherry Hill

Toyota, Inc.*, 184 F.R.D. 540, 543 (D.N.J. 1999) (citation omitted); *see also* 7A Charles Alan

Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2005)

("'[I]mpracticable' does not mean 'impossible.' The representatives only need to show that it is

extremely difficult or inconvenient to join all the members of the class."); 1 A. Conte & H.

Newberg, *Class Actions* § 3:14 (5th ed. 2011) ("Plaintiffs bear the burden of demonstrating that

joinder is impracticable, but *impracticable* does not mean *impossible*.").  "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citation omitted).  Here, thousands of direct purchasers of shell eggs and egg products located across the United States were identified, based upon consumer information provided by 17 named Defendants, as proposed members of the Settlement Class.  This information certainly demonstrates that a class of this size makes individual joinder of all members impracticable and that the numerosity requirement is satisfied.

Second, the commonality requirement is satisfied insofar as Plaintiffs have alleged one or more questions of fact and law common throughout the Class.  The commonality prerequisite does not require that all members of the prospective class share identical claims. *Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988) (relying on *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)).  Rather, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).  Also, class members can assert such a single common complaint if they demonstrate that all class members are subject to the same harm. *Id.*[11]

As is also further discussed in regards to the superiority requirement under Rule 23(b)(3), *infra*, the Plaintiffs' claims against Sparboe are based upon its alleged conduct during the period

---

[11] The Supreme Court recently explained:  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

in question, which Plaintiffs contend constituted an agreement to and furtherance of an unlawful conspiracy to manipulate the supply and prices of domestic eggs and egg products in violation of Section 1 of the Sherman Act.  *See generally* Sept. 26, 2011 Mem., 821 F. Supp. 2d at 713-15 (discussing the specific alleged conduct of Defendants generally in furtherance of alleged conspiracy).[12]  Additionally, Plaintiffs allegedly were subjected to the same type of harm by directly purchasing eggs and egg products at artificially inflated prices due to the alleged conspiracy.  Because the class members' claims arise from the same nucleus of operative facts and involve the same legal theories against Sparboe, the Court finds that the commonality prong under Rule 23(a)(2) is met.

Third, the Court finds that the claims of the named Plaintiffs—companies, corporations, and businesses that purchased shell eggs, egg products, or both, from one or more of the Defendants—are typical of the claims of the Class Members and the respective Subclass members.  "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences."  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001).  The Third Circuit Court of Appeals has recognized that the "jurisprudence 'assures that a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those

---

[12]  For purposes of this Motion and in considering the Plaintiffs' claims against Sparboe, the Court considers Sparboe as a named Defendant in this suit even though it is not named as a defendant in the operative pleading, the Second Consolidated Amended Class Action Complaint. The Court recognizes that the Order preliminarily approving the Sparboe Settlement stayed the suit against Sparboe and was entered prior to the filing of the Second Consolidated Amended Class Action Complaint.  As explained above, the Court determines that if Sparboe had been named as a defendant in the Second Consolidated Amended, the claims against it would not have substantively differed from the essence of the claims against it asserted in the First Consolidated Amended Class Action Complaint.

injuries can all be linked to the practice.'" *Id.* at 184 (quoting *Baby Neal*, 43 F.3d at 63). In this action, the claims of the class representatives are aligned with those of the Class Members, and members of the Subclasses, inasmuch as the claims of the representatives arise out of the same alleged misconduct of the Defendants and core facts and events. Further, the representative Plaintiffs' claims and the absent Class Members' claims rely on the same legal theories and arise from the same alleged "conspiracy" and "illegal agreement" by Defendants. Moreover, named Plaintiffs, like all putative Class Members, allegedly have suffered the same injury—namely, economic damages arising from alleged artificially-inflated purchase prices—as a result of the Defendants' alleged anticompetitive conduct.

Fourth, the final prerequisite under Rule 23(a), the adequacy of the representative parties requirement, "has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 182 (3d Cir. 2012) (citing *Comm. Bank I*, 418 F.3d at 303). Essentially, the inquiry into the adequacy of the representative parties examines whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine*, 846 F.2d 169 at 179 (citations omitted); *see also Dewey*, 681 F.3d at 182 (recognizing that "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class"). In other words, "Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. If any conflicts "undercut the representative plaintiffs' ability to adequately represent the class"

20

they are "fundamental," such that class representation is structurally faulty and Rule 23(a)(4)

cannot be satisfied.  *Dewey*, 681 F.3d at 184-85.

The Court determines that the representative Plaintiffs indeed will fairly and adequately

protect the interests of the Settlement Class.  Here, the interests of the representative Plaintiffs

are consistent with those of the Class members, and respective Subclass members, and there

appear to be no conflicts between or among these groups.  As discussed, the representative

Plaintiffs were damaged as a result of the Defendants' allegedly unlawful conduct, including

Sparboe's alleged conduct, and the named Plaintiffs would have had to prove the same

wrongdoing as the putative Class Members to establish the Defendants' (and Sparboe's) liability.

Moreover, all representative Plaintiffs and Class Members have present claims (and no future

claims) and have suffered economic damages.  Furthermore, there is no apparent conflict among

Class Members, or Subclasses, with respect to the allocations for distribution of monetary

consideration because the Agreement does not set forth such consideration.  The representative

and putative Class Members have a common interest in Sparboe's cooperation in assisting with

the prosecution of the class claims against the non-settling Defendants.[13]  It follows that the

---

[13] The possible diversity among the Class members in terms of financial resources—for example, a national corporate entity as compared to the proprietor of a neighborhood restaurant—and the implications of that diversity was discussed during the preliminary approval hearing.  In particular, the possibility was raised that a class member with less financial resources might find a monetary settlement with Sparboe more beneficial than a class member with greater financial resources.  In response, Interim Co-Lead Counsel explained that all Class members equally benefit from advancing the entire suit against the remaining Defendants which would enable them to obtain the "aggregate damages" the Class members would be entitled to, and that, indeed, a Class member with less financial resources might obtain greater benefit from Sparboe's cooperation than a larger producer in this nonmonetary consideration when considered in light of the relative scale of the costs of bringing this suit.  Prelim. Hr'g Tr. 22:7-22:13.

representative Plaintiffs' interests are directly aligned with those of other members of the Class and Subclasses.

Additionally, the representative Plaintiffs have been, have the incentive, and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this suit against Sparboe, if the case had continued, and against the remaining Defendants.  To assist them, Plaintiffs have retained attorneys who are highly qualified, experienced, and able to conduct this litigation.  The Court analyzes the capabilities and performance of Interim Co-Lead Counsel under Rule 23(a)(4) based upon the factors set forth in Rule 23(g).  *See Sheinberg v. Sorensen*, 606 F.3d 30, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)." (citing Fed. R. Civ. P. 23(g) note (2003))).

Here, the Court concludes that Interim Co-Lead Counsel satisfies Rule 23(g).  Rule 23(g) requires consideration of four factors:  "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation, and "the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  The Court "must also ensure that '[c]lass counsel [will] fairly and adequately represent the interests of the class.'" *Sheinberg*, 606 F.3d at 132-33 (quoting Fed. R. Civ. P. 23(g)(4)).[14]

---

[14]  The Court may also consider other possibly relevant information as to the adequacy of counsel, such as proposed terms for attorneys' fees and nontaxable costs and "any other matter
(continued...)

Interim Co-Lead Counsel have extensive documented experience in complex class action litigation, including those based upon violations of antitrust law, and are well-respected law firms in the plaintiffs' class action bar who have demonstrated considerable dedication and ability thus far in this litigation. Interim Co-Lead Counsel have capably managed this suit on behalf of Plaintiffs since the Court formally appointed them to that role. Their work has included the consolidation of the individual cases, negotiating the Sparboe and Moark Settlements, handling the motion to dismiss stage, and preparing for and commencing discovery. In sum, Interim Co-Lead Counsel's work on behalf of the Plaintiffs has been extensive and involved the dedication of substantial resources and energy. Interim Co-Lead Counsel's work thus far in this suit and prior experience demonstrate that these attorneys have fairly and adequately represented the interests of the Sparboe Settlement Class, and Subclasses, and will continue to do so.

Accordingly, the Court finds that four threshold requirements of Rule 23(a) have been satisfied.

2.  Federal Rule of Civil Procedure 23(b)

Having determined that the requirements of Rule 23(a) are met, the Court next must consider whether the requirements of at least one subsection of Rule 23(b) are met. Here, Plaintiffs are seeking certification under Rule 23(b)(3). *See also* Pls.' Mem. of Law on Prelim. Approval of Sparboe Settlement at 24 (Doc. No. 172). Rule 23(b)(3) permits class actions where "the court finds that the questions of law or fact common to Class members predominate over any questions affecting only individual members, and that a class action is superior to other

---

(...continued)
pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (C).

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  These requirements are commonly separated into the so-called "predominance" and "superiority" requirements.  *See Ins. Brokerage*, 579 F.3d at 257-58.

*a.  Predominance*

To evaluate the predominance requirement, a court must determine whether common questions of law or fact predominate over any questions affecting only individual members.  *See Hydrogen Peroxide*, 552 F.3d at 311-12.  "Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation [than Rule 23(a)(2)'s commonality element] upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members.  *Sullivan*, 667 F.3d at 297 (quoting *Ins. Broker.*, 579 F.3d at 266).  As such, the Third Circuit Court of Appeals "consider[s] the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem[s] it appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.'"  *Id.* (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004)).  Third Circuit precedent "provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  *Id.*

"Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."  *Amchem*, 521 U.S. at 625.  This is because these types of claims typically arise from an alleged common course of conduct on the part of the defendant, and depend upon common proof of liability, such as evidence of the defendants' conduct.  *See, e.g., Warfarin*, 391 F.3d at 528 (questions of fact and law are common to the class because the claims at issue and proof of

24

liability depend upon the defendants' alleged conduct).  Furthermore, that Plaintiffs have

allegedly suffered "purely an economic injury"—in contrast to a physical injury—such

overpayment for a product on account of the Defendants', and more specifically, Sparboe's,

alleged anticompetitive conduct can "further support[] a finding of commonality and

predominance because there are little or no individual proof problems in this case otherwise

commonly associated with physical injury claims."  *Id.* at 529.

Indeed, this same rationale leads the Court to conclude here that the common issues of

Class Members predominate over any individual issues as to their antitrust claim against

Sparboe.  The task at hand requires the Court to "examine the elements of plaintiffs' claim

through the prism of Rule 23."  *Hydrogen Peroxide*, 552 F.3d at 311 (internal quotation marks

omitted).  Here, the Plaintiffs' claim arises under Section 1 of the Sherman Act.  "To establish a

violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that

produced anticompetitive effects within the relevant product and geographic markets; (3) that the

concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted

action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

The reasoning in *In re Insurance Brokerage Antitrust Litigation* is applicable here.  In

*Insurance Brokerage*, our Court of Appeals concluded that "[b]ecause each of the elements of a

Sherman Act violation involves common questions of law and fact, . . . common questions

predominate over individual ones with respect to the federal antitrust claim." 579 F.3d at 269.

The Court determined that since "the first and third elements of a Sherman Act violation focus on

the conduct of the defendants, we find that common questions abound with respect to whether

the defendants engaged in illegal, concerted action." *Id.* at 268.  This is true in this case, because

25

the common questions relevant to these elements include, *inter alia*, whether Sparboe and the other Defendants agreed to the alleged conspiracy to manipulate the supply and prices of domestic eggs and egg products in violation of Section 1 of the Sherman Act, and whether the alleged conspirators' conduct amounted to an illegal restraint of trade.  Furthermore, with respect to the second element of the Plaintiffs' Section 1 claim, there are at the very least the common questions relating to whether the alleged conspirators' actions reduced the supply of and increased prices for domestic eggs and egg products.

Also, like *Insurance Brokerage*, here, the fourth element of the Sherman Act claim "focuses on whether the plaintiffs were injured by the defendants' conduct," and as a result "it may still involve common questions of law and fact if proof of injury can be established on a class-wide basis." *Id.* at 269.  As the Court of Appeals recognized, "for purposes of class certification pursuant to Rule 23(b)(3), 'the task for plaintiffs . . . is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Id.* (citing *Hydrogen Peroxide*, 552 F.3d at 311-12. The issue here is whether the Class Members were proximately injured by the conduct of Sparboe and other Defendants, which is a question that is capable of proof common to the class members.  Thus, even though the amount of damage that each plaintiff allegedly suffered could not necessarily be established by common proof, nonetheless, "the element of antitrust injury—that is, the fact of damages—is susceptible to common proof." *Id.*  The reasoning in *Insurance Brokerage* applies here:

> [W]e are not as concerned with "formulat[ing] some prediction" as to how this element of a Sherman Act violation would "play out" at trial, [*Hydrogen Peroxide*,] 552 F.3d at 311 (internal quotation marks omitted), "for the proposal is

26

> that there be no trial," *Amchem*, 521 U.S. at 620, and instead our inquiry into the element of antitrust injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones.  As the foregoing analysis demonstrates, common questions exist even with respect to the element of antitrust injury and therefore any individual issues do not overwhelm the common ones.

*Id.*

Furthermore, the Court does not find that the use of Subclasses of direct purchasers of eggs and direct purchasers of egg products alters any of the foregoing analysis because the claims with respect to each Subclass rely upon the same alleged conduct of Sparboe and other Defendants, common proof of such conduct, and economic harm of overpayment for the respective products resulting from such conduct.   Accordingly, the Court concludes that the predominance requirement is satisfied here because each element of the Plaintiffs' federal antitrust violation involves common questions of law and fact, and these common questions predominate over individual issues.

*b.  Superiority*

To meet the superiority requirement, Plaintiffs must show that a class action, rather than individual litigation or other available methods of adjudication, is the best method for achieving a fair and efficient adjudication of the controversy.  *See Newton*, 259 F.3d at 191.  Several factors are relevant to the superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  In effect, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the

merits of a class action against those of alternative available methods of adjudication." *Prudential*, 148 F.3d at 316 (internal quotations omitted).

The Court makes no determination at this time concerning the manageability of the Plaintiffs' suit as a class action if this action were to go to trial in a single forum or, to the extent this possibility remains, be remanded to the various transferor courts. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

In considering the other relevant factors, the Court finds that the Class, and Subclasses, satisfy the superiority requirements of Rule 23(b)(3). Here, there is a potentially large number of class members—perhaps numbering over 13,000—who as a whole are geographically widely disbursed. *See* Pls.' Mem. of Law on Prelim. Approval of Sparboe Settlement at 20. These factors represent a potentially crushing strain on and inefficient application of judicial resources if the putative class members' claims were prosecuted individually. Furthermore, when "each consumer has a very small claim in relation to the cost of prosecuting a lawsuit. . . , a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes." *Warfarin*, 391 F.3d at 534. Under the present circumstances, a class action device enables individual direct purchasers to pursue their claims in an economically feasible manner, with greater efficacy in achieving enforcement and deterrence goals, and with greater bargaining power for settlement purposes.[15]

---

[15] For these same reasons, to the extent that consideration of Rule 23(b)(3)(C) is pertinent here, and, for now, without regard to the remand mechanisms for an MDL action, it would be
(continued...)

Putative Class Members were free to opt out of the settlement to pursue their own claims individually if they so chose, and some of the direct purchasers who opted out of the Sparboe Settlement, namely, Direct Action Plaintiffs, indeed have filed individual actions that name Sparboe as a defendant and that have been consolidated or coordinated in this multi-district litigation.  Another case brought by opt-out parties against Sparboe for its alleged conduct is pending in Kansas state court as a result of a ruling of this Court.  *See* Dec. 19, 2011 Mem., 2011 WL 6396462 (Doc. No. 601).  That there are only six pending Direct Action Plaintiff suits and one state court suit pending against Sparboe based upon its alleged antitrust conduct suggests that few Class Members have significant individual claims, or interest in bringing their claims separately, and that there is a lack of interest in the individual prosecution of claims among Class Members on the whole.  *See id.*

For these reasons, a class action resolution in the manner proposed in the Sparboe

---

(...continued)

preferable to adjudicate these claims in one judicial proceeding and in one forum as a class action.  *See Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 543 (3d Cir. 1973) ("The 'superiority requirement' was intended to refer to the preferability of adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit, and possibly requiring a defendant to answer suits growing out of one incident in geographically separated courts.").  *See generally* Fed. R. Civ. P. 23(b)(2) note (1966) ("Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought.").  However, as one commentator has discussed, in light of 28 U.S.C. § 1407, as a general matter, "[t]his factor should . . . be of little or no significance in resolving the superiority issue." Newberg, *supra*, §4:31.  Indeed, this factor appears to have limited bearing under the present circumstances because the United States Judicial Panel on Multidistrict Litigation previously considered, pursuant to 28 U.S.C. § 1407, the desirability of centralizing the various initially-filed direct purchaser class action suits in this particular forum, *see In re Processed Egg Prods. Antitrust Litig.*, 588 F. Supp. 2d 1366, 1367 (J.P.M.L. 2008), and a consolidated class action complaint was filed which superseded all previously-filed direct purchaser complaints.

29

Settlement would be superior to other available methods for a fair and efficient adjudication of the case against Sparboe.

### 3.  Conclusion as to Class Certification for Settlement Purposes

Because the Court concludes that all of the Rule 23(a) and (b)(3) requirements have been met, the Court certifies the Class, and Subclasses, as defined above for settlement purposes.

### B.  Notice

 "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *Prudential*, 148 F.3d at 306.  Fed. R. Civ. P. 23 sets forth two provisions concerning notice to class members.

First, Fed. R. Civ. P. 23(c)(2)(B) requires that class members be given the best notice practicable under the circumstances, including individual notice to all potential class members identifiable through reasonable effort.  This notice is to be given to all potential members of a Rule 23(b)(3) class.  *Prudential*, 148 F.3d at 326.  Specifically, the Rule provides that such notice

> must clearly and concisely state in plain, easily understood language:  (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

Second, Rule 23(e) requires all members of the class be notified of the terms of any proposed settlement.  Fed. R. Civ. P. 23(e). This "notice is designed to summarize the litigation and the settlement" and "to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (quoting 2 Newberg, *supra*, § 8.32 at 8-109).

Here, the Notice of the Sparboe Settlement contained the information required by Rules 23(c)(2) and 23(e).   The Notice appropriately detailed the nature of the action, the Class claims, the definition of the Class and Subclasses,[16] the terms of the proposed settlement agreement, and the class members' right to object or request exclusion from the settlement and the timing and manner for doing so.  The Notice also informed Class Members of their opportunity to be heard at the fairness hearing and to enter an appearance through an attorney, and stated that the settlement would be binding on Class Members who did not opt out of it.

Furthermore, the extent of the Plaintiffs' efforts to notify potential Class Members is adequate.  The Notice was mailed to potential Class Members individually based upon consumer information provided by Sparboe and the other Defendants.  *See Larson v. AT&T Mobility LLC*, No. 10-1285, 2012 WL 2478376, at *9 (3d Cir. June 29, 2012) (recognizing that "'individual notice to identifiable class members is not a discretionary consideration to be waived in a

---

[16]  As discussed earlier, the Notice of the Sparboe Settlement appears to contain an inadvertent typo as to the end date for the Class Period.  However, because the actual Class Period was set forth in the Settlement Agreement, which was made available for the putative Class Members' examination, and because the Notice as disseminated defined the Class broader, rather than narrower, than the actual Class definition, the Court does not find the oversight sufficient to have prevented putative class members from failing to understand the Settlement Agreement terms or prevent them from opportunity to opt out or object to the Agreement.  It follows that the Court does not find that the existence of this typo requires additional notice to new class members as to the Class Period.

particular case.  It is, rather, an unambiguous requirement of Rule 23. . . . Accordingly, each class member who can be identified through reasonable effort must be notified.'" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974))).  In addition, the parties published a notice of the settlement on the same day in several appropriate publications, and distributed a press release concerning the Sparboe Settlement to approximately 1,000 journalists in the restaurant and food industries, which resulted in some 335 articles that reported on both the Sparboe and Moark Settlements.  *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirement of both Fed. R. Civ. P. 23 and the due process clause.").

Accordingly, the Court determines that the notice provided to the putative Class Members constitutes adequate notice in satisfaction of the demands of Rule 23.

### C. Fair, Reasonable, and Adequate

To grant final approval, the Court must conclude that the proposed settlement is fair, reasonable and adequate.  *Ins. Brokerage*, 579 F.3d at 258; Fed. R. Civ. P. 23(e)(2).  Trial courts generally are afforded broad discretion in determining whether to approve a proposed class action settlement.  *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995).[17]

Although no opposition has been filed to the Motion and no objectors have contested the settlement, pursuant to Rule 23(e), the Court has the duty of protecting absentee class members,

---

[17]   The Third Circuit Court of Appeals recognizes that "[g]reat weight is accorded [the] views [of the trial judge] because he is exposed to the litigants, and their strategies, positions and proofs.  He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly."  *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir. 1983) (quoting *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971)).

and the Court executes this duty by independently "assuring the settlement represents adequate

compensation for the release of the class claims." *Prudential*, 148 F.3d at 316-17.[18]  Indeed,

certain requirements of Rule 23 "demand undiluted, even heightened, attention in the settlement

context."  *Amchem*, 521 U.S. at 620.  Cognizant of this duty, the Court evaluates the fairness,

reasonableness, and adequacy of the Sparboe Settlement as follows.

---

[18]   The *Manual for Complex Litigation* observes that the "task is demanding because the adversariness of litigation is often lost after the agreement to settle."  David F. Herr, *The Manual for Complex Litigation* § 21.61, at 487 (4th ed. 2011).  Indeed, the observation that "'[c]ourts applying [a multifactor] test [ ] often recite the litany and engage in pro forma analyses, but their hearts are not in it,'" could be an equally a propos statement for those parties advancing unopposed motions for final settlement approval.  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 605 n.10 (3d Cir. 2010) (dissenting, Smith, J.) (quoting *Jonathan R. Macey & Geoffrey P. Miller, Judicial Review of Class Action Settlements*, 1 J. of Legal Analysis 167, 172 (2009)).

Here, there is an absence of any objectors or any adversarial challenge to the Motion at bar, which appears to account for the dearth of any arguments criticizing, exposing, or meaningfully addressing possible flaws or drawbacks to the settlement agreement appearing in the record.  Nonetheless, the Court recognizes that although the final settlement approval process may have lacked an edgy or adversarial demeanor, this does not necessarily bear on whether the settlement negotiation process was adversarial and resulted in a fair, reasonable, and adequate settlement.  This is because the focus here is on the settlement agreement, and "[w]hether or not there are objectors or opponents to the proposed settlement, the court must make an independent analysis of the settlement terms." Herr, *supra*, at 488.  Furthermore, the Court notes that, in response to the Court's inquiries for additional facts and development of the record, Interim Co-Lead Counsel fully and appropriately cooperated in the Court's efforts to consider and analyze the proposed settlement.

Nonetheless, in the event that any other partial or complete settlements are reached in the future of this case, or in this multi-district litigation generally, all parties' counsel are well-advised, again, to continue to be responsive and attentive to the Court's inquiries as to settlement agreements during the various approval processes, and also to anticipate and be cognizant of what appropriate, specific information the Court needs—particularly in light of recent case law developments—in order to perform the *fact intensive* inquiry required for executing its duty to protect absentee class members.  After all, the burden lies with the movants to demonstrate that the settlement is fair, reasonable, and adequate.

1.  Initial Presumption of Fairness

Based upon the record, the Court concludes that an initial presumption of fairness attaches to the Settlement.  The Third Circuit Court of Appeals has "directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'"  *Warfarin*, 391 F.3d at 535 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

These criteria have been met here.  The proposed class settlement was negotiated at arm's length over the course of four months by the Plaintiffs' Interim Co-Lead Counsel and Sparboe's counsel.  As further discussed, *infra*, although no formal discovery was conducted in this case during the time of the Sparboe Settlement negotiations or agreement, Plaintiffs' Interim Co-Lead Counsel conducted informal discovery, including, *inter alia*, independently investigating the merits prior to filing the complaint, which enabled counsel to have sufficient background in the facts of the case, including Sparboe's alleged role in it.  As previously discussed, Interim Co-Lead Counsel are extremely experienced in class action litigation, and specifically, similar antitrust litigation.  Furthermore, no member of the purported class objected to the settlement.

Given that the Court finds that the four factors are sufficiently met, the presumption of fairness applies to the settlement.

2.  Standards for Determining Fairness of Proposed Settlement

The Third Circuit Court of Appeals has set forth nine factors, known as the *Girsh* factors, to be considered when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

*Girsh*, 521 F.2d at 157 (internal quotations and punctuation marks omitted); *Prudential*, 148 F.3d at 317. "The settling parties bear the burden of providing that the *Girsh* factors weigh in favor of approval of the settlement." *Pet Food*, 629 F.3d at 350 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).

In *In re Prudential Insurance Company of America Sales Practice Litigation Agent Actions*, the Third Circuit Court of Appeals also identified additional non-exclusive factors for courts to consider for a "thoroughgoing analysis of a settlement's terms." *See Pet Food*, 629 F.3d at 350. Those factors, known as the *Prudential* factors, include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provision for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323.[19]  While the Court must make findings as to the *Girsh* factors to approve a settlement as fair, reasonable, and adequate, the *Prudential* factors are illustrative of additional factors that may be useful even though they are not essential or inexorable depending upon the specific circumstances.

Although there is an overriding public interest in settling class actions, district courts should apply "an even more rigorous, heightened standard in cases where settlement negotiations precede class certification, and approval for settlement and class certification are sought simultaneously." *Pet Food*, 629 F.3d at 350 (internal quotations omitted).  "This heightened standard is designed to ensure that class counsel has demonstrated 'sustained advocacy' throughout the course of the proceedings and has protected the interests of all class members." *Prudential*, 148 F.3d at 317.

Thus, the Court is required to make an independent analysis of the settlement to determine whether it is fair, reasonable, and adequate by independently evaluating all of the *Girsh* factors (and the *Prudential* factors, as appropriate), recognizing that the Court cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms.  *Pet Food*, 629 F.3d at 351.  Accordingly, the Court "may find it necessary to drill down into the case and into the agreement to make an independent 'scrupulous' analysis of the settlement terms" and affirmatively seek out information to the extent that the parties have either not supplied it or have provided only conclusory statements.  *See id.*

---

[19]  The Court of Appeals invites individualized analysis by noting that "[o]ther related factors . . . also may be relevant to this inquiry." *Prudential*, 148 F. 3d at 323 n.73.

3.  Discussion of *Girsh* and *Prudential* Factors

The Court's analysis of the *Girsh* factors, and the *Prudential* factors, as appropriate, leads to the conclusion that the relevant considerations weigh in favor of a finding of fairness under Rule 23(e).

*a.  The Complexity, Expense and Likely Duration of the Litigation*

The first *Girsh* factor, which evaluates the complexity, expenses and likely duration of the litigation, "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 535-36 (citation omitted).  At the outset, the Court appreciates that antitrust suits, like this one, are often complex actions to prosecute.  *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003).  Furthermore, given that the settlement agreement occurred at an early stage of this litigation, prior to the active commencement of discovery, Plaintiffs have avoided such expense and delay as may have attached to these settling Defendants.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007) (recognizing that "antitrust discovery can be expensive").  Discovery in this case against Sparboe would entail—which would demand reasonably the same and similar discovery that will occur as to the remaining Defendants in this suit—considerable expenditures of financial resources and hours of attorney time relating to discovery for liability and damages, including extensive electronic discovery and scores of witness depositions, experts, class certification, further pre-trial motions, and potentially a trial on the merits.  The Court determines that such an undertaking "would not only further prolong the litigation but also reduce the value of any recovery to the class." *Warfarin*, 391 F.3d at 536.  Accordingly, this factor weighs in favor of the Sparboe Settlement.

*b.  The Reaction of the Class to the Settlement*

"In an effort to measure the class's own reaction to the settlement's terms directly, courts

look to the number and vociferousness of the objectors."  *Gen. Motors*, 55 F.3d at 812.

Considering this factor from a somewhat different angle, the Third Circuit Court of Appeals has

recognized the practical conclusion that it is generally appropriate to assume that "silence

constitutes tacit consent to the agreement" in the class settlement context.  *See Bell Atlantic*

*Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993).  By using these considerations as a gauge

of class reaction to the Sparboe Settlement, the Court determines that the class reaction here

favors settlement.  Indeed, there were no objections filed to the Settlement and thus no negative

feedback to the settlement.  Moreover, as Interim Co-Lead Counsel has represented, many of the

Class Members are sophisticated entities with their own in-house counsel, and  ostensibly have

the resources and ability to assess the settlement agreement beyond the average layperson or

enterprise.

Moreover, there were only 364 requests for exclusion from the Class, which is 2.76% of

the Notice addressees, or virtually *di minimis* in light of the over 13,200 Notices of settlement

that were sent (as well as published notices and press releases about the settlement).

Furthermore, many of the 364 requests for exclusion come from entities or subsidiaries

organizationally related to other opt-out filers, and so the Court understands that the number of

distinct, independent parties who have excluded themselves likely is less than 364 in number.

Keogh Aff. ¶ 17.  As such, this factor weighs in favor of the proposed settlement's fairness and

adequacy.  *See Cendant Corp.*, 264 F.3d at 234-35 (recognizing that low number of objectors and

opt-outs strongly favors settlement and that "[t]he vast disparity between the number of potential

class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement").

c.   *The Stage of the Proceedings and the Amount of Discovery Completed*

This *Girsh* factor requires the Court to evaluate whether Plaintiffs had an "adequate appreciation of the merits of the case before negotiating" settlement.  *Prudential*, 148 F.3d at 319 (quoting *Gen. Motors*, 55 F.3d at 813).  "To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken."  *Id.*  The Third Circuit Court of Appeals has recognized that, even if a settlement occurs in an early stage of litigation, there are means for class counsel to apprise themselves of the merits of the litigation, such as "conduct[ing] significant independent discovery or investigations to develop the merits of their case (as opposed to supporting the value of the settlement)" or retaining their own experts or interviewing witnesses.  *See Gen. Motors*, 55 F.3d at 814.

Here, the Court is satisfied that Interim Co-Lead Counsel had adequate knowledge of the litigation and informed negotiations.  Interim Co-Lead Counsel has represented to the Court that they "conducted extensive investigations into the case in preparation for filing of the complaint."  Mot. at 17-18; *see also* Mot., Ex. A, Hausfeld Decl. ¶ 5 ("Plaintiffs entered the negotiations with Sparboe with a significant amount of knowledge of Defendants' antitrust conspiracy, as a result of months of investigations into the conspiracy conducted by the numerous experienced law firms representing them."); Asher Decl. ¶ 6 (recounting that the counsel's investigations included research into the egg industry, egg trade associations, such as United Egg Producer ("UEP"), UEP's animal welfare programs, the economics underlying the alleged conspiracy, and the legal

issues relating to the conspiracy).  *See Prudential*, 148 F.3d at 319 (recognizing that informal discovery methods can support adequate appreciation of the merits).

Several Defendants filed motions to dismiss the Consolidated Amended Class Action Complaint in the midst of the negotiations for the Sparboe Settlement.  Indeed, the Court granted Sparboe an extension of the deadline to respond to that very pleading.  *See* Order (Doc. No. 98) (granting Defendant Sparboe Farms, Inc.'s Motion to Extend Defendant Sparboe's Time to Respond to Direct Purchasers' Consolidated Amended Class Action Complaint and to Extend Subsequent Deadlines (Docket No. 90)).  These motions provided Interim Co-Lead Counsel with an additional platform from which to ascertain Sparboe's and the other Defendants' positions on the case and thereby to evaluate further the merits of the litigation.

As a result, the Court is satisfied that Interim Co-Lead Counsel, as highly experienced antitrust litigators, were in such a position prior to negotiating and entering into the Sparboe Settlement that they had an adequate understanding and appreciation of strengths and weaknesses of the Plaintiffs' case.  Accordingly, the Court determines this factor weighs in favor of settlement.

*d. Risks of Establishing Liability, Damages, and Maintaining the Class Action Through Trial*

These three *Girsh* factors concern the risks of establishing liability, damages, and maintaining a class action through trial.  The factors require the Court to "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  *Warfarin*, 391 F.3d at 537.  The inquiry requires balancing "the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement."  *Prudential*, 148 F.3d at 319.  For example,

the Court assesses the risks of establishing liability to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Gen. Motors*, 55 F.3d at 814.  As another example, the inquiry into establishing damages "attempts to measure the expected value of litigating the action rather than settling it at the current time."  *Id.* at 816.

> In cases of settlements with only a subset of defendants to the suit, as is the case here:
>
> [g]iven that the litigation might continue against other defendants, the parties may be reluctant to disclose fully and candidly their assessment of the proposed settlement's strengths and weaknesses that led them to settle separately.  The adequacy of the settlement depends in part on the relative exposure and resources of other parties. An informed evaluation is extremely difficult if discovery is incomplete or has been conducted against only a few of the defendants.

Herr, *supra*, § 21.651, at 505.  Thus, the Court understands why Plaintiffs decline to provide a detailed assessment of any risks perceived in establishing liability and damages, and instead emphasize that the Court should consider Interim Co-Lead Counsel's estimation of the probability of success in assessing these factors.  *See* Mot. at 18-19 & n.5.  Indeed, the Court gives credence to counsel's representation that although "they believe [Plaintiffs] will prevail at trial, they recognize that antitrust cases, like all complex litigation against large companies with highly talented defense counsel, have inherent risks."  *Id.* at 19.  The record demonstrates that counsel have significant experience in antitrust cases such as this one which ought to enable them to appreciate the strengths and weakness of the case and the risks of maintaining the action through trial.

Furthermore, antitrust class action litigation is complex, and, especially at its early stages, inherently rife with risk and unpredictability in terms of ultimately prevailing to establish liability

41

and damages and achieve class certification.  The Court finds that this suit presents no exception.  Indeed, this settlement was executed prior to the amendment of the Consolidated Amended Class Action Complaint and the extensive motion to dismiss practice that followed.  At present, the bulk of discovery, dispositive motion practice, expert discovery, class certification, and trial are on the horizon of this case with the attendant expense and uncertainties.  Thus, there is a genuine risk of not prevailing in establishing class certification, liability, or damages.  As all experienced litigators and jurists know, that a jury will be the ultimate fact-finder at trial presents further risks and uncertainties.

The motion practice that has already transpired is indicative of the future risk that Plaintiffs face in prosecuting their case against Sparboe.  Plaintiffs have already engaged with several of the other Defendants in extensive motion practice concerning the Second Consolidated Amended Class Action Complaint.  The Plaintiffs' pending motion for leave to file a Third Consolidated Amended Class Action has been challenged in part by one group of defendants as to the claims against them individually.  Moreover, Sparboe itself has filed motions to dismiss the six complaints brought by Direct Action Plaintiffs as to the individual claims against it.  *See* Docket Nos. 635-637, 639-643, and 645.

Based on the detailed allegations in the Second Consolidated Amended Class Action Complaint, Plaintiffs appear to have evidence to support their theory that Defendants conspired to reduce the supply of eggs and egg products, and thereby increase prices.  *See* Fed. R. Civ. P. 11(b) (concerning representations to the Court in pleadings).  Nonetheless, even assuming Plaintiffs could establish their theory of an overarching conspiracy at trial, their success in

42

establishing liability and damages as to individual defendants, such as Sparboe, is by no means assured.

Through the Sparboe Settlement, Plaintiffs may have secured cooperation in prosecuting their case, which, according to Interim Co-Lead Counsel, "significantly reduces the risks associated with discovery." *See* Mot. at 20. Nonetheless, such cooperation is no guarantee to success in proving liability and damages in this complex litigation, and Plaintiffs still must show that Defendants individually agreed to join the alleged conspiracy. Indeed, the other Defendants' individual motions to dismiss raised issues concerning whether they individually actually joined the conspiracy. Furthermore, Defendants jointly challenged at the motion to dismiss stage whether Plaintiffs could recover damages outside the statute of limitations. These issues remain live subjects for discovery and additional dispositive motion practice, and any trial on these issues would be protracted and involve a significant amount of testimony and documentary evidence, particularly given the time period at issue, which spans almost a decade, and the number of parties involved.

In addition to challenging the Plaintiffs' complaints, Defendants also have demonstrated an intent to vigorously defend against this suit—including by raising privilege issues relating to the Sparboe Settlement, *see, e.g.*, Order (Doc. No. 361); Order (Doc. No. 403), and other discovery-related issues, *see, e.g.*, Conf. Tr. (Doc. No. 591); Conf. Tr. (Doc. No. 675); Case Mgmt Order Nos. 16 to 19 (Doc. Nos. 604, 626, 656, and 676). Furthermore, Defendants have indicated during the course of these proceedings, particularly during the development of a discovery plan, that they intend to advance defenses, such as an agricultural cooperative immunity defense under the Capper-Volstead Act and a defense involving standard-setting

43

conduct, that will present difficult factual and legal issues for the parties, creating their own brand and quantity of uncertainty for the Plaintiffs' case. *See, e.g.*, Case Mgmt Order No. 19. The parties also contemplate expert discovery on damages, which likely will result in competing expert opinions representing very different damage estimates that will present further ambiguity as to resolution on damages as to each Defendant. *See, e.g.,* Conf. Tr. (Doc. No. 675).

It is entirely likely that Plaintiffs would face similar, if not identical, legal challenges and uncertainties in their claims again Sparboe. Indeed, as mentioned above, Sparboe has filed motions to dismiss the individual claims asserted against it in the six Direct Action Plaintiffs' complaints, and has joined the Defendants' joint motion to dismiss the Direct Action Plaintiffs' complaints for recovery of damages outside the statute of limitations period.

Finally, Plaintiffs not only face the risk that they will not succeed in establishing liability and damages, but also the risks associated with certifying and maintain a class. *See Warfarin*, 391 F. 3d at 537. Indeed "'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action.'" *Id.* (quoting *Gen. Motors*, 55 F.3d at 817). "The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *Gen. Motors*, 55 F.3d at 817. Thus, this *Girsh* "factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial," recognizing that a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Warfarin*, 391 F.3d at 537 (citing *Prudential*, 148 F.3d at 321).

Many, if not all, Defendants no doubt will vigorously oppose class certification.  If Sparboe remained in this litigation, in all likelihood it would join those defense efforts in this respect just as it has joined the joint defense in the suits brought by the Direct Action Plaintiffs. The Court of Appeals for the Third Circuit has recognized:  "There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement."  *Prudential*, 148 F.3d at 321.[20]  Thus, there are inherent difficulties in bringing a class action to trial that apply here.

Because the Plaintiffs would face genuine risks and uncertainties in establishing liability and damages against Sparboe, and in obtaining and maintaining class certification, should the claims against Sparboe continue without settlement, these three factors weigh in favor of settlement.

*e.  The Ability of the Defendant to Withstand a Greater Judgment*

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement."  *Cendant*, 264 F.3d at 240.  Thus, the Court must consider here whether Sparboe could withstand a judgment for an amount significantly greater than the costs associated with the proposed cooperation.

The limited evidence in the record suggests that Sparboe would be able to withstand a greater judgment, namely some sort of monetary payment.  Indeed, in the Consolidated Amended Class Action Complaint, Sparboe is alleged to be the fifth largest shell egg marketer and producer in the United States.  *See* Consol. Am. Class Action Compl. at ¶ 85.  There is no

---

[20]  Based on this observation, the Court of Appeals has questioned the significance of this factor in "settlement-only" class actions following the Supreme Court's decision in *Amchem*. *See Prudential*, 148 F.3d at 321.

evidence concerning the financial or other possible impacts a greater judgment amount would have on Sparboe.  *See, e.g.*, *Cendant*, 264 F.3d at 240-41 (discussing the possibility of bankruptcy for a settling defendant).

Furthermore, the Plaintiffs' arguments tacitly suggest that Sparboe could withstand a larger judgment.  They argue that "[t]his factor deserves little weight, especially in light of the risks of continued litigation against remaining Defendants without the cooperation obtained from Sparboe."  Mot. at 21.

Thus, the record suggests that Sparboe could pay monetary consideration as opposed to only providing the nonmonetary consideration set forth in the Settlement terms.  Accordingly, this factor does not weigh in favor of approval.

*f.  The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation*

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial."  *Prudential*, 148 F.3d at 322.  In other words, the Court evaluates "whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  *Warfarin*, 391 F.3d at 538 (citing *Prudential*, 148 F.3d at 322).

Here, the Court evaluates the settlement in light of its nonmonetary consideration—namely, Sparboe's cooperation in the prosecution of the Plaintiffs' case against the other remaining Defendants by providing documents and witness testimony.  "Settlements

46

involving nonmonetary provisions for class members . . . deserve careful scrutiny to ensure that these provisions have actual value to the class," which can be accomplished through a Rule 23(e) analysis.  Fed. R. Civ. P. 23(h) note (2003).  "Despite the difficulties they pose to measurement, nonpecuniary benefits . . . may support a settlement."  *Bolger*, 2 F.3d at 1311.[21]

        As this settlement is structured, it is difficult to determine accurately the actual value of the proposed settlement.  Nonetheless, the Court determines that Sparboe's conferral of the nonpecuniary benefits to class members that is proposed under the settlement is valuable consideration, and reasonable both in light of the best possible recovery against Sparboe and in light of the risks the parties would face if the case went to trial against Sparboe.  Certainly, calculating the best possible recovery against Sparboe for the class in the aggregate is "exceedingly speculative" at this point in time given the previously-discussed risks of establishing liability and damages associated with this complex litigation, even when considering that treble damages are technically available for recovery under the Plaintiffs' Sherman Act claim.

        According to Interim Co-Lead Counsel, in cooperating with Plaintiffs, Sparboe

        guide[s] [Plaintiffs] through not only the nature of the industry and the market, but as well the workings of the UEP and the relationship of all of the defendants to the UEP and to the market.  They're able to tell us how the domestic market or with regard to the export market and how the supply in both markets effected price domestically. They will be able to tell us others who were of like mind with them that the program was an effort to control supply and increase price. They will be able to identify those entities—those persons for us or those companies as well as others within other portions of the market

────────────────

        [21]  By contrast, ordinarily, "[i]n order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'"  *Prudential*, 148 F.3d at 322. (citing *Gen. Motors*, 55 F.3d at 806).

that would have testimony that would be beneficial to the class which we otherwise would not know clearly for quite some time into the litigation.

Prelim. Hr'g Tr. at 17:22-18:10.  Furthermore, "Sparboe produced documents from its in-house counsel that it may have otherwise withheld had Sparboe litigated this case."  Hausfeld Decl. ¶ 14.  Indeed, "[t]he information Sparboe disclosed to Plaintiffs—both in documents and witness interviews—in some instances included communications between Sparboe's officers and attorneys and UEP's officers and attorneys."  Oct. 19, 2011 Mem. Op., 278 F.R.D. 112, 116 (Rice, J.) (Doc. No. 585).

At the same time, the Court recognizes that Sparboe's agreement to cooperate with Plaintiffs throughout the course of pre-trial proceedings and trial is valuable consideration in light of the risks in proceeding with this suit against the remaining Defendants.[22]

At the Court's hearing on preliminary approval of the settlement, Interim Co-Lead Counsel noted Sparboe did not have an interest in offering any monetary consideration even though there was a demand for such consideration.  Counsel explained that this case's unique attributes create greater value for a defendant's cooperation:  "In a majority of antitrust cases who are on behalf of classes, there is either a government investigation that precedes the filing of the complaint or a government indictment or even a guilty plea.  There is none of that here."  Prelim. Hr'g Tr. at 8:12-8:15.

Interim Co-Lead Counsel also noted that the pleading standards as set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, and its progeny raise the value of cooperation in that the information provided by Sparboe comes in advance of discovery.  *Id.* at 9:17-9:25, 10:1-10:5.

---

[22]  The Court does not comment on whether the information and facts that Sparboe may provide would be established, or even admissible, at trial, based upon counsel's representations.

There is greater efficiency in the Plaintiffs proceeding with their case with Sparboe's cooperation then with monetary consideration from an early settlement.  Obtaining such information also assists in "lay[ing] out for [Plaintiffs,] with greater clarity and the force of having witnesses and documents[,] what this case is about[,] so that [Plaintiffs] can move it more expeditiously as opposed to going through a protracted process even on an expedited basis of discovery one defendant at a time with possible motion and practice in between."  *Id.* at 12:11-12:16.

Granted, the Court observes that much of Sparboe's information provided under the Settlement Agreement would otherwise be available eventually through discovery as required under the federal rules, if Sparboe remained in this suit.  Nonetheless, Sparboe's cooperation reduces costs and time associated with formal discovery.  Plaintiffs are saved expenses by avoiding motion practice to obtain documents and having more focused depositions on subjects relevant to the claims' merits.  *Id.* at 13:24-25, 14:1-8.  Moreover, the Sparboe Settlement likely has short-circuited at least some of the expense and delay of future discovery by securing Sparboe's cooperation and removing the Sparboe forces from those who would contest or complicate Plaintiffs' discovery efforts.  Plaintiffs also gain a clear tactical advantage in obtaining Sparboe's information through non-traditional discovery mechanisms, including, by way of example, the advantage of having this information to formulate strategy in taking discovery from the remaining Defendants, specific tailoring the scope and focus of discovery.

Furthermore, the settlement prevents Plaintiffs from having to defend against Sparboe, which has indicated that it may raise defenses involving service of process, venue, and personal jurisdiction, and abandonment of the conspiracy. *Id.* at 15:8-12, 17:13-17.  Interim Co-Lead

Counsel also indicated that on average Plaintiffs could save on average $100,000 to $200,000 for each motion. *Id.* at 15:19-15:20.

The Court recognizes that a nonpecuniary settlement presents certain concerns because it may merely be a means of expediting the receipt of attorneys fees, and thereby is of dubious value to the class members. *Cf. Bolger*, 2 F.3d at 1318 ("Although nonmonetary relief is adequate consideration for settling a derivative or class action, the risks of concealment and collusion are not insignificant. Derivative actions may settle for cosmetic changes and no tangible relief to the corporation in exchange for large attorneys' fees."); *Gen. Motors*, 55 F.3d at 778 (rejecting settlement where each class member would receive a $1,000 coupon towards a new truck but attorneys requested fees of $ 9.5 million). However, the Court determines that such a concern is not present here because the Settlement Agreement does not set forth provisions concerning the collection of attorneys' fees relating to the settlement, and Interim Co-Lead Counsel has represented they do not intend to seek fees resulting from this Settlement Agreement.

While the value of this cooperation is certainly of tangible value, it is not entirely without compare. Moark, too, has agreed to cooperate with Plaintiffs with information that purportedly pertains to a longer time period than Sparboe's information. *See* Second Consol. Am. Class Action Compl. ¶ 240 (alleging that "Sparboe ended its participation in both the UEP Certified Program and exports made through USEM that reduced domestic egg supply" sometime shortly after July 2003). Second, Sparboe's cooperation does not appear to assure that Plaintiffs will have conclusive evidence in support of their claims against the remaining Defendants. Indeed, Sparboe is a named Defendant in other cases in this litigation for the Direct Action Plaintiffs, and

the Sparboe Settlement does not impact those plaintiffs' claims against which Sparboe must continue to defend.

Nonetheless, when considering these two *Girsh* factors in light of the record *in toto*, the Court is persuaded that Sparboe's cooperation confers real and substantial benefits upon the Class.  The Court further concludes that the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial against Sparboe.  These factors weigh in favor of approval of the settlement.

*g.* Prudential *Factors*

The relevant *Prudential* factors weigh in favor of approving the Sparboe Settlement, or, at worst, are neutral factors.  First, the Court has already addressed the impact that the limited extent of discovery on the merits thus far has on this litigation and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages.

Second, the settlement agreement allows putative class members the right to opt out of the settlement.  Indeed, some parties exercised this right by filing requests for exclusion.  Furthermore, the Notice Packet included both a Notice of the Sparboe Settlement and a Notice of the Moark Settlement, thereby simultaneously notified class members of the Moark Settlement and enabling class members to assess the adequacy of the two settlements in conjunction with one another and as to the whole suit.

Third, the results achieved by the settlement for the Class and Subclasses are immediate, concrete, and realized without the costs and delays associated with extensive discovery and other later stages of litigation.  Sparboe's cooperation pursuant to the settlement aids the Plaintiffs in prosecuting and resolving their claims against the other Defendants.  Indeed, Interim Co-Lead

51

Counsel describe the Sparboe Settlement as an "ice-breaker" settlement, which is a term used to describe "the first settlement in the litigation—and [a settlement that] should increase the likelihood of future settlements." *Linerboard*, 292 F. Supp. 2d at 643.  By contrast, it is unclear, given the aforementioned risks and uncertainties, *supra*, whether Direct Action Plaintiffs who are individually prosecuting their claims apart from the Class, or other parties who opted-out of the Sparboe Settlement, will be successful in their claims against Moark and the other Defendants, and whether that result will be immeasurably better than the result for class members under the settlement agreement and as to the entire suit.  For the same reasons, it is unclear whether those opt-out parties might achieve better settlements than the class to resolve similar claims against Sparboe.

Fourth, the Sparboe Settlement only releases Class Members' claims against Sparboe for claims arising out of injuries or damages that occurred "from the beginning of time to the date of th[e] Agreement" *and* that resulted from the conduct asserted in the Plaintiffs' suit.  As such, future claims for injuries or damages against Sparboe arising outside this time period but resulting from the alleged conduct giving rise to the class claims are not barred.  Moreover, the Release does not apply to those parties who opted-out of the Sparboe Settlement, such as Direct Action Plaintiffs.

Fifth, all segments of the class are being treated equally relative to the consideration under the Sparboe Settlement.  Sparboe is conferring its cooperation upon all class members. There is no differentiation among class members in terms of Subclasses or class representatives in terms of the information received.

*h.  Summary of* Girsh *and* Prudential *Factors*

Upon considering the Sparboe Settlement Agreement in light of all of the *Girsh* and the relevant *Prudential* factors, the Court is satisfied that the settlement is fair, reasonable, and adequate.  As discussed, a few of the factors are neutral or weigh against settlement approval.  However, all of the factors considered in determining the fairness of a settlement "are a guide; an unfavorable conclusion regarding one or more factors does not automatically render the settlement unfair."  2 Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* § 6:8 (6th ed. 2010); *see also Ehrheart*, 609 F.3d at 605 (dissenting, Smith, J.) (quoting same).  Accordingly, not every factor need weigh in favor of settlement in order for the settlement to be approved by the Court.  *See Cendant*, 264 F. 3d at 242-43 (affirming a final settlement approval when not all factors weighed in favor of approval).  Because, on balance, the factors as considered above weigh in favor of settlement, the Court concludes that approval of the settlement is appropriate pursuant to Fed. R. Civ. P. 23(e).

**V.  Conclusion**

For the foregoing reasons, the Court determines that the Class and Subclasses meet the certification requirements of Rule 23 for settlement purposes, and concludes that the proposed settlement agreement is fair, reasonable, and adequate.  Accordingly, the Court grants the Plaintiffs' motion for final approval of the class action settlement with Defendant Sparboe Farms, Inc.

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge