**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : | |
| ANTITRUST LITIGATION | : | |
| | : | **MDL No. 2002** |
| | : | **08-md-02002** |
| _____ | : | |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| ALL DIRECT PURCHASER | : | |
| PLAINTIFF ACTIONS | : | |

**MEMORANDUM**

GENE E.K. PRATTER, J.                                   JULY 16, 2012

Direct Purchaser Plaintiffs move the Court for final approval of a proposed settlement

agreement between the Plaintiffs and Defendants Moark, LLC, Norco Ranch, Inc., and Land

O'Lakes, Inc. (collectively, "Moark").[1]  Under the proposed Moark Settlement, Plaintiffs will

release Moark from all pending claims in exchange for monetary consideration as well as

information and documents.  For the reasons set forth below, the Court grants the motion for

final approval of the Moark Settlement.

**I.  Factual Background[2]**

This litigation embraces numerous consolidated and coordinated actions based upon

allegations of a conspiracy in violation of the Sherman Act among egg producers and trade

---

[1]  Plaintiffs filed a Motion for Final Approval of the Class Action Settlement Between
Plaintiffs and Defendants Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc. (Doc. No.
465) (hereinafter, "Mot.").  They also submitted filings supplementing this Motion.  (Doc. Nos.
483, 484, and 690).

[2]  The factual background discussed here is drawn from the exhibits and materials
submitted in relation to the Motion *sub judice*, the hearing on the Motion, and the overall record
of this case.  The Court also considered the Plaintiffs' Motion for Final Approval of the Sparboe
Settlement (Doc. No. 443) (hereinafter, "Sparboe Final Approval Mot."), and the pending
Plaintiffs' Motion for an Award of Attorneys' Fees and for Reimbursement of Expenses (Doc.
(continued...)

groups to manipulate the supply of eggs and egg products and thereby affect the domestic prices of those goods.  *See In re Processed Egg Prods. Antitrust Litig.*, 588 F. Supp. 2d 1366, 1367 (J.P.M.L. 2008).  The plaintiffs are direct purchasers (such as grocery stores, commercial food manufacturers, restaurants, other food service providers, and other entities who purchase directly from Defendants or other egg producers) and indirect purchasers (individual consumers who purchased from other parties along the distribution chain) of shell eggs, egg products, or both. The direct purchaser plaintiffs are categorized as "Direct Purchaser Plaintiffs" who have brought a consolidated class action against Defendants, and "Direct Action Plaintiffs" who are pursuing individual actions against Defendants.

## A.  *Direct Purchaser Plaintiffs' Suit*

The moving Plaintiffs are Direct Purchaser Plaintiffs who accuse defendant egg producers, including Moark, and certain trade groups, of violating Section 1 of the Sherman Act and seek injunctive relief, treble damages, attorneys' fees and costs.  They have demanded a jury trial. These Plaintiffs filed a consolidated class action complaint which they have amended.  The allegations of the consolidated complaint superseded or replaced all of the previously-filed individual and consolidated complaints.

The most recent iteration of the Plaintiffs' claim is the Second Consolidated Amended Class Action Complaint which prompted extensive motion practice.[3]  The culmination of this

_____

(...continued)
No. 493) (hereinafter, "Fees Mot."), in which Plaintiffs seek attorneys' fees and reimbursement of expenses relating to the litigation to be paid from the Moark Settlement.  As to the motion for fees, the Court does not address here the substantive arguments, which will be addressed separately.

   [3]  Land O'Lakes Inc. filed an individual motion to dismiss this complaint (Doc. No. 239)
(continued...)

motion activity resulted in the Court dismissing without prejudice claims brought against individual Defendants Hillandale-Gettysburg, L.P., Hillandale Farms, Inc., and Hillandale Farms East, Inc. and United Egg Association.  *See* Sept. 26, 2011 Mem. and Order, 821 F. Supp. 2d 709 (Doc. Nos. 562 and 563).  The Court also dismissed without prejudice claims against all Defendants for damages barred by the four-year statute of limitations.  *See* Nov. 30, 2011 Opinion and Order, 2011 WL 5980001 (Doc. Nos. 593 and 594).[4]

As a result of these rulings, Plaintiffs presently proceed on the core of their Section 1 Sherman Act claims against Defendants.  At the time the parties' filed their motions to dismiss, the Court partially lifted the stay of discovery previously entered at the outset of this litigation.  Lifting the stay permitted the parties to exchange requests for production of documents and confer as to various aspects of a discovery plan.  *See* Order (Doc. No. 320); Fees Mot., Ex. 1, Asher Decl. ¶¶ 21-22 (Doc. No. 493-2) (hereinafter, "Asher Decl.").  Following the Court's rulings on the motions to dismiss the Second Consolidated Amended Class Action Complaint, the parties requested a further partial lifting of the discovery stay.  The Court entered Orders further partially lifting the discovery stay, commencing the discovery period, and setting forth

---

(...continued)

and joined Moark, LLC and Norco Ranch, Inc., as well as several other Defendants, in certain joint motions to dismiss the complaint.  The individual motion and the joint motions respect to Moark were withdrawn with subject to reinstatement if the proposed Moark Settlement is not finally approved.  *See* Stipulation (Doc. No. 338).  Although they had joined several joint motions to dismiss, Moark, LLC and Norco Ranch, Inc. also filed an answer to the complaint. *See* Answer (Doc. No. 245).

[4]  Plaintiffs have filed a motion seeking leave to file a Third Consolidated Amended Class Action Complaint that seeks, *inter alia*, to revive claims against Defendants Hillandale-Gettysburg, L.P., Hillandale Farms, Inc., and Hillandale Farms East, Inc. and to amend claims of fraudulent concealment and tolling of the statute of limitations. Opposition briefing has been filed, and the Court will address that motion separately.

various discovery deadlines and parameters concerning, *inter alia*, document production, interrogatories, depositions, non-party discovery, class certification, and class certification experts.  *See* Case Mgmt. Orders Nos. 18 and 19 (Doc. Nos. 656 and 676).

**B.  Sparboe Settlement**

 Following the earlier partial lift of discovery that permitted the parties to exchange requests for production of documents and meet and confer as to certain matters, Defendant Sparboe Farms, Inc. and Plaintiffs entered into a settlement agreement ("Sparboe Settlement"), the terms of which provided that Sparboe would produce certain documents and make certain witnesses available to Plaintiffs.  In turn, Plaintiffs used the information that they obtained from Sparboe to draft their Second Consolidated Amended Class Action Complaint.  *See* Mot., Ex. 1, Bernstein Decl. ¶ 4 (hereinafter, "Bernstein Decl."); Asher Decl. ¶ 11; Sparboe Final Approval Mot., Ex. A, Hausfeld Decl. ¶ 18 (hereinafter, "Hausfeld Decl.").  The Court preliminarily approved the Sparboe Settlement and held a final fairness hearing.  *See* Order on Preliminary Approval of Sparboe Settlement (Doc. No. 214); Sparboe Final Approval Hr'g Tr. (Doc. No. 463).  In a separate Memorandum and Order issued this same date, the Court is granting the Plaintiffs' motion for final approval of the Sparboe Settlement.

**C.  Moark Settlement Negotiations and Preliminary Approval**

 Subsequent to the Sparboe Settlement, Moark's counsel reportedly contacted Interim Co-Lead Counsel for Plaintiffs[5] about a potential settlement, and the parties had a meeting during

---

 [5]  In Case Management Order No. 1, the Court approved the following law firms to serve as Interim Co-Lead Counsel: Weinstein Kitchenoff & Asher LLC; Hausfeld LLP; Bernstein Liebhard LLP; and Susman Godfrey LLP.  It appears there are additional counsel that Interim Co-Lead Counsel have directed to work on this case.  *See* Fees Mot. at 1.  Thus, reference herein
                                                                              (continued...)

which Moark provided Plaintiffs with their sales data and other financial information.  *See*
Bernstein Decl. ¶¶ 8, 9.  Some five months later, the parties began to engage in settlement
negotiations.  *See id.* ¶ 10.

Over the course of the ensuing three months, the parties negotiated through telephone
conferences and in-person meetings on multiple occasions.  *See id.* ¶¶ 11, 12.  They discussed
potential settlement terms, including possible settlement amounts and the extent of Moark's
cooperation, and exchanged information, such as sales data for the alleged class period.  *See id.*
At the conclusion of these efforts, the parties reached an agreement and executed the Moark
Settlement documents.  *See id.* ¶ 13.[6]

The parties submitted the proposed settlement to the Court for preliminary approval.
Following a hearing, the Court entered an Order preliminarily approving the proposed Moark
agreement and preliminarily certifying the class and subclasses for settlement purposes.  *See*
Order on Preliminary Approval of Settlement with Moark, LLC, Norco Ranch, Inc., and Land
O'Lakes Inc. (Doc. No. 387) (hereinafter, "Moark Preliminary Approval Order").  The Order also
stayed the litigation against Moark pending further order of the Court.  *Id.*   In a separate Order,
the Court approved the form of notice of the Moark Settlement in conjunction with a separate
form of notice for the Sparboe Settlement.  *See* Order Approving Dissemination of Notice of

---

(...continued)
to "Interim Co-Lead Counsel" may also encompass the efforts of other counsel who represent
Plaintiffs and acted at the direction of Interim Co-Lead Counsel.

[6] Eleven days following the execution of the Moark Settlement, the parties executed a
First Addendum to Settlement Agreement Between Direct Purchaser Plaintiffs and Defendants
Moark, LLC, Norco Ranch, Inc. and Land O'Lakes, Inc.  Mot., Ex. 1B (Doc. No. 465-4).  The
Addendum extended the date that obliged Moark to transfer the Settlement Amount to an escrow
account from ten days following the execution date of the Moark Settlement to sixteen days.  *Id.*

5

Settlements Between Direct Purchaser Plaintiffs and (i) Defendant Sparboe Farms, Inc. and (ii) Defendants Moark, LLC, Norco Ranch, Inc. and Land O'Lakes, Inc.  (Doc. No. 388) (hereinafter, "Notice Approval Order").

Plaintiffs filed the motion *sub judice*, and the Court held the final fairness hearing on the Moark Settlement as required by Fed. R. Civ. P. 23(e)(2).  *See* Moark Final Approval Hr'g Tr. (Doc. No. 688) (hereinafter, "Final Hr'g Tr.").  No objections were filed to the proposed Moark Agreement.  No objectors appeared at the fairness hearing.  Plaintiffs filed supplemental briefing and materials in support of their motion for final approval.  Following the hearing, the Court withheld ruling on the motion until the notice period required pursuant to 28 U.S.C. § 1715(d) under the Class Action Fairness Act ("CAFA") had elapsed.  After the expiration of the notice period, Plaintiffs filed a motion for approval of attorneys' fees, which the Court will address apart from this Memorandum.

## II.  Proposed Moark Settlement Agreement[7]

The proposed Settlement Class for settlement purposes under the Moark Settlement is defined as:

> All persons and entities that purchased eggs, including Shell Eggs and Egg Products, produced from caged birds in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date when notice of the Court's entry of an order preliminarily approving this settlement and certifying a Class for settlement purposes is first published.

---

[7]  The terms used in this Order that are defined in the Moark Settlement Agreement are, unless otherwise defined herein, used in this Order consistent with the definitions of the agreement.

a.)    Shell Egg SubClass
All individuals and entities that purchased Shell Eggs produced from
caged birds in the United States directly from any Producer including any
Defendant, during the Class Period from January 1, 2000 through the date
when notice of the Court's entry of an order preliminarily approving this
settlement and certifying a Class for settlement purposes is first published,
excluding individuals and entities that purchased only "specialty" Shell
Eggs (certified organic, nutritionally enhanced, cage-free, free-range, and
vegetarian-fed types) and "hatching" Shell Eggs (used by poultry breeders
to produce breeder stock or growing stock for laying hens or meat).

b.)    Egg Products SubClass
All individuals and entities that purchased Egg Products produced from
Shell Eggs that came from caged birds in the United States directly from
any Producer, including any Defendant, during the Class Period from
January 1, 2000 through the date when notice of the Court's entry of an
order preliminarily approving this settlement and certifying a Class for
settlement purposes is first published, excluding individuals and entities
that purchased only "specialty" Egg Products (certified organic,
nutritionally enhanced, cage-free, free-range, and vegetarian-fed types).

Excluded from the Class and SubClasses are Producers, and their respective
parents, subsidiaries and affiliates, all government entities, as well as the Court
and staff to whom this case is assigned, and any member of the Court's or staff's
immediate family.

Mot., Ex. A, Settlement Agreement Between Direct Purchaser Plaintiffs and Defendants Moark,

LLC, Norco Ranch, Inc., and Land O'Lakes, Inc. ¶ 19 (hereinafter, "Moark Settlement

Agreement"). As mentioned earlier, the Court preliminarily certified the Settlement Class for

settlement purposes under Fed. R. Civ. P. 23(b)(3). *See* Moark Preliminary Approval Order.

The agreement's principal terms require Moark to pay the Settlement Amount of twenty-five

million dollars ($25,000,000). *See* Moark Settlement Agreement ¶¶ 15, 33. The Settlement

Amount has been deposited into an interest-bearing escrow account. *See* Bernstein Decl. ¶ 15;

Fees Mot. at 2. Any interest, net realized gains and other earnings accrued on the Settlement

Amount are part of the funds available for disbursement to the Class and Subclass Members. *See*

Moark Settlement Agreement ¶ 33; Moark Settlement Agreement, Ex. A, Escrow Agreement, Schedule A, at 1-4 (Doc. No. 690-1) (hereinafter, "Escrow Agreement").

According to the Notice of the Moark Settlement, which is discussed in more detail, *infra*, the Settlement Amount, with any interest earned, and less administrative expenses, escrow expenses, taxes, and attorneys' fees, will be distributed on a *pro rata* basis to the settlement class members who timely and properly submit a valid Claim Form, which is a form documenting a member's claim for damages. *See* Mot., Ex. 2.1, Notice of Moark Settlement at 3-4 (Doc. No. 465-8) (hereinafter, "Moark Notice"); *see also* Mot. at Ex. 2.1, Moark Claim Form (hereinafter, "Claim Form"); Escrow Agreement at 3-4. The *pro rata* share is based upon the dollar amount of a Class Members' direct purchases of shell egg and egg products in the United States from any producer, including Defendants, during the period designated in the Agreement. *See* Notice at 3; Claim Form at 1. The Claims Notice provided that "[b]ecause the alleged overcharge is only a portion of the price paid for eggs and egg products, your recovery will be less than the total amount you paid." Notice at 3.[8]

Additionally, pursuant to the agreement, Moark will cooperate with the Plaintiffs' preparation for and prosecution of their class action. *See* Moark Settlement Agreement ¶ 39. The Agreement details the extent of Moark's cooperation in terms of production of certain non-privileged documents and ensuring the availability of current Moark directors, officers, and employees to give non-privileged testimony through interviews, depositions, declarations and

---

[8] The agreement provided that Settlement Fund may be reduced if "class members whose sales equal 7.5% or more of the total US egg sales" opt out of the Moark Settlement. Moark Notice at 3. However, this reduction provision is inapplicable because the condition that would otherwise trigger that provision did not occur. *See* Final Hr'g Tr. at 35:10-35:20.

affidavits, and appearance at trial.  *See id.*  Moark also agrees to assist Plaintiffs in arranging for

non-privileged testimony from former directors, officers, and employees.  *See id.* ¶ 39(b).

      In consideration, Plaintiffs agree that they "shall not . . . seek to recover against [Moark]

for any of the Released Claims." *Id.* ¶ 25.  Under the Agreement, "Released Claims" are defined

as any and all claims arising out of injuries or damages that occurred "from the beginning of time

to the date when notice of the Court's entry of an order preliminarily approving this Agreement is

first published" and that resulted from the conduct asserted in the Plaintiffs' suit.  *See id.*  The

Agreement delineates the conduct asserted by the Plaintiffs' suit as: "(i) any agreement or

understanding between or among two or more Producers of eggs, including any Defendants,

including any entities or individuals that may later be added as a defendant to the Action, (ii) the

reduction or restraint of supply, the reduction of or restrictions on production capacity, or (ii) the

pricing, selling, discounting, marketing, or distributing of Shell Eggs and Egg Products in the

United States or elsewhere."  *Id.*  The Agreement sets forth non-exclusive examples of  Released

Claims by providing that such claims "includ[e] but [are] not limited to any conduct alleged, and

causes of action asserted, or that could have been alleged or asserted, whether or not concealed or

hidden, in the Complaints filed in the Action, which in whole or in part arise from or are related

to the facts and/or actions described in the Complaints, including under any federal or state

antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice,

consumer protection, fraud, RICO, civil conspiracy law, or similar laws, including without

limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*"  *Id.*  Plaintiffs also agree to waive

California Civil Code Section 1542 and similar provisions in other states.  *Id.* ¶ 26.  Additionally,

Plaintiffs agree to waive and release "all defenses, rights, and benefits that [Plaintiffs] may have

or that may have been derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the release" of the aforementioned claims. *Id.* ¶ 27. The release excludes "claims relating to payment disputes, physical harm, defective product or bodily injury . . . and do[es] not include any Non-Settling Defendant." *Id.* ¶ 28.

The settlement proposes an opt-out provision which sets forth the procedures through which possible class members could opt out of the settlement. *Id.* ¶ 22; *see also* Moark Notice at 1, 5-6. Class members had 75 days from the postmark date that the notice of the settlement was mailed by first-class mail to the final postmark date designated in the Claims Notice to return an exclusion request. *See* Moark Notice at 1, 5-6. Class Members had 127 days from the postmark date that the notice of the settlement was mailed by first-class mail to the final postmark date designated in the Claims Notice to return a completed Claim Form to make a claim for benefits. *See id.* at 3-4.

Finally, the parties set forth certain provisions in their agreement concerning attorneys' fees, specifically:

> Class Counsel may seek an award of attorneys' fees and reasonable litigation expenses approved by the Court, to be paid out of the Settlement Amount after the Final Approval of the Agreement. Moark Defendants agree not to object to Class Counsel's petition to the Court for payment of attorneys' fees, costs, and expenses from the Settlement Amount. The Moark Defendants shall have no obligation to pay any fees or expenses from Class Counsel.

Moark Settlement Agreement ¶ 35.

### III.  Notice

Notice of the Moark Settlement was disseminated to possible members of the Settlement Class through a variety of means ranging from direct mailings, publications, press releases, a

website and a toll-free information and request telephone line.  *See* Mot., Ex. 2, Affidavit of

Jennifer M. Keough re: Notice and Settlement Administration ¶¶ 5-6 (Doc. No. 465-7)

(hereinafter, "Keough Aff."); *see also* Moark Settlement Agreement ¶ 21.  The Notice explained

that any possible Class Members wishing to be excluded from or to object to the terms of the

Moark Settlement Agreement should postmark their exclusion requests or objections no later

than a specific date that was 104 days before the final fairness hearing on the Moark Settlement.

*See* Moark Notice at 1, 5-6.  A maximum of $350,000 of the Settlement Amount was authorized

to be used for costs of notice.   *See* Moark Settlement Agreement ¶ 45.  Ultimately, $170,000 was

spent on notice expenses with respect to the Moark Settlement Agreement.  *See* Final Hr'g Tr. at

30:21-30-23.  No other information has been provided to the Court concerning whether other

administrative costs and expenses were (or were not) incurred.

     The Claims Administrator received 905 Claim forms by the time of the hearing for final

approval of the settlement; 881 of those Claim Forms met the deadline set forth for filing such

forms and 24 Claim Forms did not.  *See* Final Hr'g Tr. 14:4-14:6.[9]  The Claims Administrator

received no objections to the settlement and received 150 requests for exclusion from the class.

*See id.* at 14:7-14:9.  Some of those parties who opted-out of the class have filed their own

complaints against Defendants, including Moark, such as Direct Action Plaintiffs Giant Eagle

Inc., Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and

H.J. Heinz Company, L.P., as well as plaintiffs in a state court action proceeding in Kansas.  *See*

---

[9]  The Plaintiff's Motion stated that 894 Claim Forms had been submitted.  *See* Keough
Aff. ¶ 16.  However, because the Plaintiffs provided updated numbers during their presentation in
the final fairness hearing, the Court references those numbers here.  Plaintiffs intend to make
recommendations as to the treatment of late Claims Forms in a plan of allocation that will be
submitted for the Court's approval.

Am. Compl. (Doc. No. 623) (Giant Eagle Inc.); Second Am. Compl. (Doc. No. 622) (Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P.), Dec. 19, 2011 Mem. and Order, 2011 WL 6396462, at *5 n.8 (Doc. Nos. 601 and 602) (explaining that six direct purchasers opted out of the Sparboe and Moark Settlements and filed an action against Defendants in Kansas state court, which, after being removed to federal court by Defendants, was remanded to state court); Direct Action Plaintiff Status Report (Doc. No. 457).[10]   Interim Co-Lead Counsel has represented that the "potential Class is composed of thousands of entities nationwide, many of which are sophisticated companies with their own in-house legal counsel." Fees Mot. at 12.

---

[10]   The Direct Action Plaintiff Status Report states that "[a]ll of the Direct Action Plaintiffs except Giant Eagle have remained in the Moark class settlement based on the statements in the Moark Class Settlement Agreement and Notice that remaining in that settlement class "does not prejudice their rights to exclude themselves from any other past, present or future settlement class or certified litigation class" in this case.  To be clear, only Giant Eagle has opted out of the Moark settlement class." *Id.* at 2.  This statement applies only to the presently pending Direct Action Plaintiff cases brought by The Kroger Co. and co-plaintiffs (Civil Action No. 10-7605 (E.D. Pa.)), Supervalu Inc. (Civil Action No. 10-6736 (E.D. Pa.)), Publix Super Markets, Inc. (Civil Action No. 10-6737 (E.D. Pa.)), and Giant Eagle, Inc. (Civil Action No. 10-1698 (W.D. Pa.)).

The statement does not apply to the pending Direct Action Plaintiff cases brought by Kraft Foods Global, Inc. and its co-plaintiffs (Civil Action No. 11-8808 (E.D. Pa.), and Winn-Dixie Stores, Inc. (Civil Action No. 11-0510 (E.D. Pa.).  Both of these cases were filed after the Status Report.  However, because Kraft Foods Global, Inc. and its co-plaintiffs' names do not appear on the list of names of those parties who filed requests for exclusion from the Moark Settlement, Exhibit 4 to the Plaintiffs' Motion (Doc. No. 465-10), it appears that this group of Direct Action Plaintiffs did not opt-out of the Moark Settlement.  However, the names of Winn-Dixie Stores, Inc. and its co-plaintiffs do appear on that list, and it appears they have opted out of the Settlement.  *See* Keough Aff. ¶ 17.

Moark and Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P. recently reported reaching a settlement of the claims against Moak and submitted a stipulation of dismissal that the Court is approving this same date.

The Claims Administrator mailed Notice and Claim Forms to 13,211 direct purchasers of shell eggs and egg products, whose names and addresses were obtained from various electronic data files that contained potential Class Member names and addresses from 17 named egg producer Defendants that were given to the Claims Administrator at the direction of the Court. *See* Keough Aff. ¶ 7, 9; Notice Approval Order ¶ 3.  Eighty-three (83) Notice and Claim Forms, returned by the U.S. Postal Service with forwarding address information, were re-mailed. *See id.* ¶ 12.  In contrast, twenty-three hundred thirty-three (2,333) Notice and Claim Forms were returned without forwarding address information and, according to Interim Co-Lead Counsel, could not be re-mailed.  *See id.* [11]

Additionally, during the notice period a Summary Notice was published in several publications with a total circulation of over 2,316,000.  *See id.* ¶ 11.  The Summary Notice was published in a monthly issue of fifteen (15) industry journals thought to be likely to reach potential purchasers of shell eggs and egg products.  *See id.*  Those publications are: *PetFoodIndustry*, *Restaurant Business*, *Convenience Store News*, *Hotel F&B*, *Nation's Restaurant News*, *Food Service Director*, *Progressive Grocer*, *Food Manufacturing*, *Supermarket News*, *Stores*, *Egg Industry Magazine*, *Modern Baking*, *Baking Buyer*, *Food Processing*, and *Long Term Living*.  *See id.*

The Summary Notice was also published for one day in the *Wall Street Journal*.  *See id.* That same day, the Claims Administrator distributed a press release for the Moark Settlement, as well as a separate release about the Sparboe Settlement, to approximately 1,000 journalists in the

---

[11] The Court recognizes that the statistics provided here slightly differ with the equivalent statistics that the Plaintiffs provided in connection with their motion for approval of the Sparboe Settlement.  However, the Court deems these minor differences to be inconsequential.

restaurant and food industries through the US1 Newsline on the PR Newswire.  *See id.* ¶ 13.  The press releases resulted in some 335 articles that reported on the two settlements.  *See id.*

A publicly-available website specifically devoted to the Moark and Sparboe Settlements was established.  *See id.* ¶ 14.  The website makes available for review and downloading the Notice Packet, the Moark Settlement Agreement, and various Court orders and filings relating to the Moark Settlement.  *See id.*  In the first 148 days of operation, the website received 4,820 "visits." *See id.*

The Claims Administrator and Plaintiffs established a toll-free 24-hour telephone number and call center for potential Class Members to obtain information about the settlement and to request the Notice and Claim Form.  *See id.* ¶ 15.  The automated number received 549 calls, and 95 callers requested and received a Notice Packet during the first 148 days of operation.  *See id.*

Additionally, Moark served notice of the settlement to federal and state officials of the settlement as required by 28 U.S.C. § 1715(d) under CAFA.  *See* Mot. at 9.  No federal or state officials filed objections to the Moark Settlement, nor requested a hearing following the issuance of the CAFA notice.  The statutory period elapsed prior to the date of this Memorandum and accompanying Order. [12]

---

[12] Although Moark served notice of the settlement to the appropriate officials, it did not do so promptly after the Agreement was filed, as required by 28 U.S.C. § 1715(b).  Mot. at 9.  Section 1715(b) provides: "Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement . . . ."  Under Section 1715(d), an order granting final approval of a settlement agreement may not take place earlier than ninety days after the appropriate federal and state officials have been served with notice.

Plaintiffs advised the Court about the timing of the CAFA notice requirement on the Moark and Sparboe Settlements, and requested the Court proceed with the final approval hearing

(continued...)

Following approval of the settlement, Plaintiffs intend to submit for the Court's approval a plan of allocation relating to the Claims Administration process for evaluating the procedure for processing individual claims under the settlement, the allocation of the Settlement Fund distributions, administrative costs and expenses, and so forth.  *See* Mot. at 1 n.1.  The Claims Notice provided that the "Court retains the power to approve or reject, in part or in full, any individual claim of a class member based on equitable grounds."  Moark Notice at 3.  The Notice also stated that the Settlement Amount "may be reduced by court-ordered attorneys' fees and reimbursement of litigation expenses, including administration of the Settlement, as approved by the Court" and reduced "by the expense of providing notice to the Class."  *Id.*

The Claims Notice also explained that "Class Counsel will apply to the Court for an award from the Settlement Funds of attorneys' fees and for reimbursement of litigation costs and expenses incurred, including fees and costs expended while providing Notice to the Class and

---

(...continued)

on the Moark Settlement as scheduled and to hold its decision on the Plaintiffs' motion for final approval in abeyance until the ninety-day expiration date passed without any objections or requests for hearings being received from any relevant authority pursuant to 28 U.S.C. § 1715(d). *See* Mot. at 9.  Over ninety days have elapsed since Moark served the appropriate state or federal officials with the CAFA notice, and there have been no requests for hearings or objections to the settlement made.  It follows that, although the notice requirements under CAFA have not been fully met on a technical basis, the substance of the requirements have been satisfied insofar as giving federal and state officials sufficient notice and opportunity to be heard concerning the Moark Settlement. *See D.S. ex rel. S.S. v. New York City Dep't of Educ.*, 255 F.R.D. 59, 80 (E.D.N.Y. 2008) (approving the settlement on a provisional basis until the CAFA notice deadline passes and no federal or state official requests a hearing); *Kay Co. v. Equitable Prod. Co.*, No. 06 Civ. 00612, 2010 WL 1734869, at *4 (S.D. W.Va. Apr. 28, 2010) ("Since more than 100 days have passed since service was perfected and since there have been no adverse comments from any of the aforesaid State or Federal officials, the Court FINDS that compliance with CAFA is satisfactory.").  *But see True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1083 (C.D. Cal.2010) (determining that its authority to approve a settlement was "questionable" when the defendant gave CAFA notice only ten days prior to the final settlement approval hearing).

while administering the Settlement Fund (including the plan of allocation)." *Id.* at 4.  The Notice stated that Interim Co-Lead Counsel intends to apply for attorneys' fees "in an amount not to exceed thirty percent of $25 million as well as the costs and expenses incurred." *Id.*

## IV.  Discussion

Federal Rule of Civil Procedure 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e).  The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1)   The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2)   If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3)   The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4)   If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5)   Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection maybe withdrawn only with the court's approval.

*Id.*  The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.  In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)).  "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the

district court." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998) (quoting *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975)).

## A.   Class Certification

Where, as here, the Court has not already certified a class prior to evaluating a settlement, the Court initially must determine whether the proposed settlement classes satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) ("[A] district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met.").  The Third Circuit Court of Appeals recently summarized the demands of Rule 23 as follows:

> Rule 23(a) contains four threshold requirements, which every putative class must satisfy:
>
> > (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Fed. R. Civ. P. 23(a); *see also Amchem*, 521 U.S. at 613.  Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b).
>
> As mentioned, Rule 23(b)(2) authorizes class actions seeking injunctive relief in instances where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see In re Comm. Bank of N. Va.* (*Comm. Bank I*), 418 F.3d 277, 302 n.14 (2005).  Separately, certification pursuant to Rule 23(b)(3) seeking monetary compensation is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Collins v. E.I. DuPont*

*de Nemours & Co.*, 34 F.3d 172, 180 (3d Cir. 1994).  These twin requirements are commonly referred to as predominance and superiority.

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc).

1.   Federal Rule of Civil Procedure 23(a)

First, under Rule 23(a), the Court determines that the Class Members are ascertainable from objective criteria, such as various electronic data files that contained names and addresses of customers that purchased shell eggs or egg products produced from caged birds in the United States, which were provided by 17 named egg producer Defendants, and that the Class Members thus ascertained are so numerous that their joinder before the Court would be impracticable. Plaintiffs "need not precisely enumerate the potential size of the proposed class, nor [are] plaintiff[s] required to demonstrate that joinder would be impossible." *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 543 (D.N.J. 1999) (citation omitted); *see also* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2005) ("'[I]mpracticable' does not mean 'impossible.' The representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class."); 1 A. Conte & H. Newberg, *Class Actions* § 3:14 (5th ed. 2011) ("Plaintiffs bear the burden of demonstrating that joinder is impracticable, but *impracticable* does not mean *impossible*.").  "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citation omitted).  Here, thousands of direct purchasers of shell eggs and egg products located across the United States were identified, based upon information provided by 17 named Defendants, as proposed members of the Settlement Class, and 905 Claim Forms were submitted to the Claims

18

Administrator.  This information certainly demonstrates that a class of this size makes individual joinder of all members impracticable and that the numerosity requirement is satisfied.

Second, the commonality requirement is satisfied insofar as Plaintiffs have alleged one or more questions of fact and law common throughout the Class.  The commonality prerequisite does not require that all members of the prospective class share identical claims.  *Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988) (relying on *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)).  Rather, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).  Also, class members can assert such a single common complaint if they demonstrate that all class members are subject to the same harm. *Id.*[13]

As is also further discussed in regards to the superiority requirement under Rule 23(b)(3), *infra*, the Plaintiffs' claims here are based upon Moark's alleged conduct during the period in question, which Plaintiffs contend constituted an agreement to and furtherance of an unlawful conspiracy to manipulate the supply and prices of domestic eggs and egg products in violation of Section 1 of the Sherman Act.  *See generally* Sept. 26, 2011 Mem., 821 F. Supp. 2d at 713-15 (discussing the specific alleged conduct of Defendants generally in furtherance of alleged conspiracy).  Additionally, Plaintiffs allegedly were subjected to the same type of harm by directly purchasing eggs and egg products at artificially inflated prices due to the alleged

---

[13] The Supreme Court recently explained:  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009))

conspiracy.  Because the class members' claims arise from the same nucleus of operative facts and involve the same legal theories against Moark, the Court finds that the commonality prong under Rule 23(a)(2) is met.

Third, the Court finds that the claims of the named Plaintiffs—companies, corporations, and businesses that purchased shell eggs, egg products, or both, from one or more of the Defendants—are typical of the claims of the Class Members and the respective Subclass members.  "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001).  The Third Circuit Court of Appeals has recognized that the "jurisprudence 'assures that a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice.'"  *Id.* at 184 (quoting *Baby Neal*, 43 F.3d at 63).  In this action, the claims of the class representatives are aligned with those of the Class Members, and members of the Subclasses, inasmuch as the claims of the representatives arise out of the same alleged misconduct of the Defendants and core facts and events.  Further, the representative Plaintiffs' claims and the absent Class Members' claims rely on the same legal theories and arise from the same alleged "conspiracy" and "illegal agreement" by Defendants.  Moreover, named Plaintiffs, like all putative Class Members, allegedly have suffered the same injury—namely, economic damages arising from alleged artificially-inflated purchase prices—as a result of the Defendants' alleged anticompetitive conduct.

Fourth, the final prerequisite under Rule 23(a), the adequacy of the representative parties requirement, "has two components: (1) concerning the experience and performance of class

20

counsel; and (2) concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 182 (3d Cir. 2012) (citing *Comm. Bank I*, 418 F.3d at 303). Essentially, the inquiry into the adequacy of the representative parties examines whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine*, 846 F.2d 169 at 179 (citations omitted); *see also Dewey*, 681 F.3d at 182 (recognizing that "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class"). In other words, "Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. If any conflicts "undercut the representative plaintiffs' ability to adequately represent the class" they are "fundamental," such that class representation is structurally faulty and Rule 23(a)(4) cannot be satisfied. *Dewey*, 681 F.3d at 184-85.

The Court determines that the representative Plaintiffs indeed will fairly and adequately protect the interests of the Settlement Class. Here, the interests of the representative Plaintiffs are consistent with those of the Class Members, and respective Subclass members, and there appear to be no conflicts between or among these groups. As discussed, the representative Plaintiffs were damaged as a result of the Defendants' allegedly unlawful conduct, including Moark's alleged conduct, and the named Plaintiffs would have had to prove the same wrongdoing as the putative Class Members to establish the Defendants' (and Moark's) liability. Moreover, all representative Plaintiffs and Class Members have present claims (and no future claims) and have suffered economic damages. Furthermore, there is no apparent conflict among

Class Members, or Subclasses, with respect to the allocations for distribution of the Settlement Amount because such allocations are based upon a *pro rata* share determined by purchases of shell eggs and egg products from any producer, including any Defendant, in the United States during the period designated in the Agreement.   The representative and putative Class Members have a common interest in Moark's cooperation in assisting with the prosecution of the class claims against the non-settling Defendants.   It follows that the representative Plaintiffs' interests are directly aligned with those of other members of the Class and Subclasses.

Additionally, the representative Plaintiffs have been, have the incentive, and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this suit against Moark, if the case had continued, and against the remaining Defendants.   To assist them, Plaintiffs have retained attorneys who are highly qualified, experienced, and able to conduct this litigation.   The Court analyzes the capabilities and performance of Interim Co-Lead Counsel under Rule 23(a)(4) based upon the factors set forth in Rule 23(g).   *See Sheinberg v. Sorensen*, 606 F.3d 30, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since 2003, been governed by Rule 23(g)." (citing Fed. R. Civ. P. 23(g), advisory comm. note (2003))).

Here, the Court concludes that Interim Co-Lead Counsel satisfies Rule 23(g).   Rule 23(g) requires consideration of four factors:   "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation, and "the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R.

22

Civ. P. 23(g)(1)(A)(i)-(iv). The Court "must also ensure that '[c]lass counsel [will] fairly and adequately represent the interests of the class.'" *Sheinberg*, 606 F.3d at 132-33 (quoting Fed. R. Civ. P. 23(g)(4)).[14]

Interim Co-Lead Counsel have extensive documented experience in complex class action litigation, including those based upon violations of antitrust law, and are well-respected law firms in the plaintiffs' class action bar who have demonstrated considerable dedication and ability thus far in this litigation. Interim Co-Lead Counsel have capably managed this suit on behalf of Plaintiffs since the Court formally appointed them to that role. Their work has included the consolidation of the individual cases, negotiating the Moark and Sparboe Settlements, handling the motion to dismiss stage, and preparing for and commencing discovery. In sum, Interim Co-Lead Counsel's work on behalf of the Plaintiffs has been extensive and involved the dedication of substantial resources and energy. Interim Co-Lead Counsel's work thus far in this suit and prior experience demonstrate that these attorneys have fairly and adequately represented the interests of the Moark Settlement Class, and Subclasses, and will continue to do so.

Accordingly, the Court finds that four threshold requirements of Rule 23(a) have been satisfied.

2. Federal Rule of Civil Procedure 23(b)

Having determined that the requirements of Rule 23(a) are met, the Court next must consider whether the requirements of at least one subsection of Rule 23(b) are met. Here,

---

[14] The Court may also consider other possibly relevant information as to the adequacy of counsel, such as proposed terms for attorneys' fees and nontaxable costs and "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (C).

Plaintiffs are seeking certification under Rule 23(b)(3).  *See also* Pls.' Mem. of Law on Prelim.

Approval of Moark Settlement at 24 (Doc. No. 349).  Rule 23(b)(3) permits class actions where

"the court finds that the questions of law or fact common to Class members predominate over

any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  These requirements are commonly separated into the so-called "predominance" and

"superiority" requirements.  *See Ins. Brokerage*, 579 F.3d at 257-58.

*a.  Predominance*

To evaluate the predominance requirement, a court must determine whether common

questions of law or fact predominate over any questions affecting only individual members.  *See*

*Hydrogen Peroxide*, 552 F.3d at 311-12.  "Rule 23(b)(3)'s predominance requirement imposes a

more rigorous obligation [than Rule 23(a)(2)'s commonality element] upon a reviewing court to

ensure that issues common to the class predominate over those affecting only individual class

members.  *Sullivan*, 667 F.3d at 297 (quoting *Ins. Broker.*, 579 F.3d at 266).  As such, the Third

Circuit Court of Appeals "consider[s] the Rule 23(a) commonality requirement to be

incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore

deem[s] it appropriate to 'analyze the two factors together, with particular focus on the

predominance requirement.'"  *Id.*  Third Circuit precedent "provides that the focus of the

predominance inquiry is on whether the defendant's conduct was common as to all of the class

members, and whether all of the class members were harmed by the defendant's conduct."  *Id.*

"Predominance is a test readily met in certain cases alleging . . . violations of the antitrust

laws."  *Amchem*, 521 U.S. at 625.  This is because these types of claims typically arise from an

alleged common course of conduct on the part of the defendant, and depend upon common proof of liability, such as evidence of the defendants' conduct. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (questions of fact and law are common to the class because the claims at issue and proof of liability depend upon the defendants' alleged conduct). Furthermore, that Plaintiffs have allegedly suffered "purely an economic injury"—in contrast to a physical injury—such overpayment for a product on account of the Defendants', and more specifically, Moark's, alleged anticompetitive conduct can "further support[] a finding of commonality and predominance because there are little or no individual proof problems in this case otherwise commonly associated with physical injury claims." *Id.*

Indeed, this same rationale leads the Court to conclude here that the common issues of Class Members predominate over any individual issues as to their antitrust claim against Moark. The task at hand requires the Court to "examine the elements of plaintiffs' claim through the prism of Rule 23." *Hydrogen Peroxide*, 552 F.3d at 311 (internal quotation marks omitted). Here, the Plaintiffs' claim arises under Section 1 of the Sherman Act. "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

The reasoning in *In re Insurance Brokerage Antitrust Litigation* is applicable here. In *Insurance Brokerage*, our Court of Appeals concluded that "[b]ecause each of the elements of a Sherman Act violation involves common questions of law and fact, . . . common questions predominate over individual ones with respect to the federal antitrust claim." 579 F.3d at 269.

The Court determined that since "the first and third elements of a Sherman Act violation focus on the conduct of the defendants, we find that common questions abound with respect to whether the defendants engaged in illegal, concerted action." *Id.* at 268.  This is true in this case, because the common questions relevant to these elements include, *inter alia*, whether Moark and the other Defendants agreed to the alleged conspiracy to manipulate the supply and prices of domestic eggs and egg products in violation of Section 1 of the Sherman Act, and whether the alleged conspirators' conduct amounted to an illegal restraint of trade.  Furthermore, with respect to the second element of the Plaintiffs' Section 1 claim, there are at the very least the common questions relating to whether the alleged conspirators' actions reduced the supply of and increased prices for domestic eggs and egg products.

Also, like *Insurance Brokerage*, here, the fourth element of the Sherman Act claim "focuses on whether the plaintiffs were injured by the defendants' conduct," and as a result "it may still involve common questions of law and fact if proof of injury can be established on a class-wide basis." *Id.* at 268.  As the Court of Appeals recognized, "for purposes of class certification pursuant to Rule 23(b)(3), 'the task for plaintiffs . . . is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Id.* (citing *Hydrogen Peroxide*, 552 F.3d at 311-12. The issue here is whether the Class Members were proximately injured by the conduct of Moark and other Defendants, which is a question that is capable of proof common to the class members. Thus, even though the amount of damage that each plaintiff allegedly suffered could not necessarily be established by common proof, nonetheless, "the element of antitrust injury-that is,

the fact of damages-is susceptible to common proof." *Id.*  The reasoning in *Insurance Brokerage*

applies here:

> [W]e are not as concerned with "formulat[ing] some prediction" as to how this
> element of a Sherman Act violation would "play out" at trial, 552 F.3d at 311
> (internal quotation marks omitted), "for the proposal is that there be no trial,"
> *Amchem*, 521 U.S. at 620, and instead our inquiry into the element of antitrust
> injury is solely for the purpose of ensuring that issues common to the class
> predominate over individual ones.  As the foregoing analysis demonstrates,
> common questions exist even with respect to the element of antitrust injury and
> therefore any individual issues do not overwhelm the common ones.

*Id.*

Furthermore, the Court does not find that the use of Subclasses of direct purchasers of

eggs and direct purchasers of egg products alters any of the foregoing analysis because the claims

with respect to each Subclass rely upon the same alleged conduct of Moark and other

Defendants, common proof of such conduct, and economic harm of overpayment for the

respective products resulting from such conduct.   Accordingly, the Court concludes that the

predominance requirement is satisfied here because each element of the Plaintiffs' federal

antitrust violation involves common questions of law and fact, and these common questions

predominate over individual issues.

*b.  Superiority*

To meet the superiority requirement, Plaintiffs must show that a class action, rather than

individual litigation or other available methods of adjudication, is the best method for achieving

a fair and efficient adjudication of the controversy.  *See Newton*, 259 F.3d at 191.  Several factors

are relevant to the superiority inquiry: "(A) the class members' interests in individually

controlling the prosecution or defense of separate actions; (B) the extent and nature of any

litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum;

and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3).  In effect,

"[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the

merits of a class action against those of alternative available methods of adjudication."

*Prudential*, 148 F.3d at 316 (internal quotations omitted).

The Court makes no determination at this time concerning the manageability of the

Plaintiffs' suit as a class action if this action were to go to trial in a single forum or, to the extent

this possibility remains, be remanded to the various transferor courts.  "Confronted with a request

for settlement-only class certification, a district court need not inquire whether the case, if tried,

would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the

proposal is that there be no trial."  *Amchem*, 521 U.S. at 620.

In considering the other relevant factors, the Court finds that the Class, and Subclasses,

satisfy the superiority requirements of Rule 23(b)(3).  Here, there is a potentially large number of

class members—perhaps numbering over 13,000—who as a whole are geographically widely

disbursed.  *See* Pls.' Mem. of Law on Prelim. Approval of Moark Settlement at 14.  These factors

represent a potentially crushing strain on and inefficient application of judicial resources if the

putative class members' claims were prosecuted individually.  Furthermore, when "each

consumer has a very small claim in relation to the cost of prosecuting a lawsuit. . . , a class action

facilitates spreading of the litigation costs among the numerous injured parties and encourages

private enforcement of the statutes."  *Warfarin*, 391 F.3d at 534.  Under the present

circumstances, a class action device enables individual direct purchasers to pursue their claims in

an economically feasible manner, with greater efficacy in achieving enforcement and deterrence goals, and with greater bargaining power for settlement purposes.[15]

Putative Class Members were free to opt out of the settlement to pursue their own claims individually if they so chose, and some of the direct purchasers who opted out of the Moark Settlement, namely, a subset of the Direct Action Plaintiffs, indeed have filed individual actions that name Moark as a defendant and that have been consolidated or coordinated in this multi-district litigation. Another case brought by opt out parties against Moark for its alleged conduct is pending in Kansas state court as a result of a ruling of this Court. *See* Dec. 19, 2011 Mem., 2011 WL 6396462, (Doc. No. 601). That there are only two pending Direct Action Plaintiff suits and one state court suit pending against Moark based upon its alleged antitrust conduct suggests that few Class Members have significant individual claims, or interest in bringing their claims

---

[15] For these same reasons, to the extent that consideration of Rule 23(b)(3)(C) is pertinent here, and, for now, without regard to the remand mechanisms for an MDL action, it would be preferable to adjudicate these claims in one judicial proceeding and in one forum as a class action. *See Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 543 (3d Cir. 1973) ("The 'superiority requirement' was intended to refer to the preferability of adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit, and possibly requiring a defendant to answer suits growing out of one incident in geographically separated courts."). *See generally* Fed. R. Civ. P. 23(b)(2) 1966 note ("Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought."). However, as one commentator has discussed, in light of 28 U.S.C. § 1407, as a general matter, "[t]his factor should . . . be of little or no significance in resolving the superiority issue." Newberg, *supra*, §4:31. Indeed, this factor appears to have limited bearing under the present circumstances because the United States Judicial Panel on Multidistrict Litigation previously considered, pursuant to 28 U.S.C. § 1407, the desirability of centralizing the various initially-filed direct purchaser class action suits in this particular forum, *see In re Processed Egg Prods. Antitrust Litig.*, 588 F. Supp. 2d 1366, 1367 (J.P.M.L. 2008), and a consolidated class action complaint was filed which superseded all previously-filed direct purchaser complaints.

separately, and that there is a lack of interest in the individual prosecution of claims among Class Members on the whole.  *See id.*

For these reasons, a class action resolution in the manner proposed in the Moark Settlement would be superior to other available methods for a fair and efficient adjudication of the case against Moark.

3.  Conclusion as to Class Certification for Settlement Purposes

Because the Court concludes that all of the Rule 23(a) and (b)(3) requirements have been met, the Court certifies the Class, and Subclasses, as defined above for settlement purposes.

**B.  Notice**

 "In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *Prudential*, 148 F.3d at 306.  Fed. R. Civ. P. 23 sets forth two provisions concerning notice to class members.

First, Fed. R. Civ. P. 23(c)(2)(B) requires that class members be given the best notice practicable under the circumstances, including individual notice to all potential class members identifiable through reasonable effort.  This notice is to be given to all potential members of a Rule 23(b)(3) class.  *Prudential*, 148 F.3d at 326.  Specifically, the Rule provides that such notice

> must, in clear, concise and plain language, state: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues or defenses; (iv) the class member's right to enter an appearance by an attorney; (v) the class member's right to be excluded from the class; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of settlement on class members.

Fed. R. Civ. P. 23(c)(2)(B).

Second, Rule 23(e) requires all members of the class be notified of the terms of any proposed settlement.  Fed. R. Civ. P. 23(e). This "notice is designed to summarize the litigation and the settlement" and "to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation."  *Prudential*, 148 F.3d at 327 (quoting 2 Newberg, *supra*, § 8.32 at 8-109).

Here, the Notice of the Moark Settlement contained the information required by Rules 23(c)(2) and 23(e).   The Notice appropriately detailed the nature of the action, the Class claims, the definition of the Class and Subclasses, the terms of the proposed settlement agreement, and the class members' right to object or request exclusion from the settlement and the timing and manner for doing so.  The Notice also informed Class Members of their opportunity to be heard at the fairness hearing and to enter an appearance through an attorney, and stated that the settlement would be binding on Class Members who did not opt out of it.

Furthermore, the extent of the Plaintiffs' efforts to notify potential Class Members is adequate.  The Notice was mailed to potential Class Members individually based upon consumer information provided by Moark.  *See Larson v. AT&T Mobility LLC*, No. 10-1285, 2012 WL 2478376, at *9 (3d Cir. June 29, 2012) (recognizing that "'individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case.  It is, rather, an unambiguous requirement of Rule 23. . . . Accordingly, each class member who can be identified through reasonable effort must be notified. . . .'" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974))).  In addition, the parties published a notice of the settlement on the same

31

day in several appropriate publications, and distributed a press release concerning the Moark

Settlement to approximately 1,000 journalists in the restaurant and food industries, which

resulted in some 335 articles that reported on both the Moark and Sparboe Settlements.   *See*

*Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir.1985) ("It is

well settled that in the usual situation first-class mail and publication in the press fully satisfy the

notice requirement of both Fed. R. Civ. P. 23 and the due process clause.").

Accordingly, the Court determines that the notice provided to the putative Class Members

constitutes adequate notice in satisfaction of the demands of Rule 23.

### C.  Fair, Reasonable, and Adequate

To grant final approval, the Court must conclude that the proposed settlement is fair,

reasonable and adequate.  *Ins. Brokerage*, 579 F.3d at 258; Fed. R. Civ. P. 23(e)(2).  Trial courts

generally are afforded broad discretion in determining whether to approve a proposed class action

settlement.  *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995).[16]

Although no opposition has been filed to the Motion and no objectors have contested the

settlement, pursuant to Rule 23(e), the Court has the duty of protecting absentee class members,

and the Court executes this duty by independently "assuring the settlement represents adequate

compensation for the release of the class claims." *Prudential*, 148 F.3d at 316-317.[17]  Indeed,

---

[16]   The Third Circuit Court of Appeals recognizes that "[g]reat weight is accorded [the] views [of the trial judge] because he is exposed to the litigants, and their strategies, positions and proofs. He is aware of the expense and possible legal bars to success. Simply stated, he is on the firing line and can evaluate the action accordingly."  *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 965 (3d Cir. 1983) (quoting *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 34 (3d Cir. 1971)).

[17]   The *Manual for Complex Litigation* observes that the "task is demanding because the
(continued...)

certain requirements of Rule 23 "demand undiluted, even heightened, attention in the settlement

context." *Amchem*, 521 U.S. at 620.  Cognizant of this duty, the Court evaluates the fairness,

reasonableness, and adequacy of the Moark Settlement as follows.

1.  Initial Presumption of Fairness

      Based upon the record, the Court concludes that an initial presumption of fairness

attaches to the Settlement.  The Third Circuit Court of Appeals has "directed a district court to

apply an initial presumption of fairness when reviewing a proposed settlement where: '(1) the

---

(...continued)

adversariness of litigation is often lost after the agreement to settle."  David F. Herr, *The Manual for Complex Litigation* § 21.61, at 487 (4th ed. 2011).  Indeed, the observation that "'[c]ourts applying [a multifactor] test [ ] often recite the litany and engage in pro forma analyses, but their hearts are not in it,'" could be an equally a propos statement for those parties advancing unopposed motions for final settlement approval.  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 605 n.10 (3d Cir. 2010) (dissenting, Smith, J.) (quoting *Jonathan R. Macey & Geoffrey P. Miller, Judicial Review of Class Action Settlements*, 1 J. of Legal Analysis 167, 172 (2009)).

      Here, there is an absence of any objectors or any adversarial challenge to the Motion at bar, which appears to account for the dearth of any arguments criticizing, exposing, or meaningfully addressing possible flaws or drawbacks to the settlement agreement appearing in the record.  Nonetheless, the Court recognizes that although the final settlement approval process may have lacked an edgy or adversarial demeanor, this does not necessarily bear on whether the settlement negotiation process was adversarial and resulted in a fair, reasonable, and adequate settlement.  This is because the focus here is on the settlement agreement, and "[w]hether or not there are objectors or opponents to the proposed settlement, the court must make an independent analysis of the settlement terms." Herr, *supra*, at 488.  Furthermore, the Court notes that, in response to the Court's inquiries for additional facts and development of the record, Interim Co-Lead Counsel fully and appropriately cooperated in the Court's efforts to consider and analyze the proposed settlement.

      Nonetheless, in the event that any other partial or complete settlements are reached in the future of this case, or in this multi-district litigation generally, all parties' counsel are well-advised to, again, continue to be responsive and attentive to the Court's inquiries as to settlement agreements during the various approval processes, and also to anticipate and be cognizant of what appropriate, specific information the Court needs—particularly in light of recent case law developments—in order to perform the *fact intensive* inquiry required for executing its duty to protect absentee class members.  After all, the burden lies with the movants to demonstrate that the settlement is fair, reasonable, and adequate.

settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the

proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of

the class objected.'" *Warfarin*, 391 F.3d at 535 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201,

232 n.18 (3d Cir. 2001)).

These criteria have been met here.  The proposed class settlement was negotiated at arm's

length over the course of four months by the Plaintiffs' Interim Co-Lead Counsel and Moark's

counsel.  As further discussed, *infra*, although no formal discovery was conducted in this case

during the time of the Moark Settlement negotiations or agreement, Plaintiffs' Interim Co-Lead

Counsel conducted informal discovery, including, *inter alia*, independently investigating the

merits prior to filing the complaint (with additional investigation prior to filing amended

complaints) and exercising opportunities to review records provided by Sparboe, all of which

enabled counsel to have sufficient background in the facts of the case, including Moark's alleged

role in it.  As previously discussed, Interim Co-Lead Counsel are extremely experienced in class

action litigation, and specifically, similar antitrust litigation.  Furthermore, no member of the

purported class objected to the settlement.

Given that the Court finds that the four factors are sufficiently met, the presumption of

fairness applies to the settlement.

2.  Standards for Determining Fairness of Proposed Settlement

The Third Circuit Court of Appeals has set forth nine factors, known as the *Girsh* factors,

to be considered when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of
> the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of

establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . .

*Girsh*, 521 F.2d at 157 (internal quotations and punctuation marks omitted); *Prudential*, 148 F.3d at 317. "The settling parties bear the burden of providing that the *Girsh* factors weigh in favour of approval of the settlement." *Pet Food*, 629 F.3d at 350 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).

In *In re Prudential Insurance Company of America Sales Practice Litigation Agent Actions*, the Third Circuit Court of Appeals also identified additional non-exclusive factors for courts to consider for a "thoroughgoing analysis of settlement terms." *See Pet Food*, 629 F.3d at 350. Those factors, known as the *Prudential* factors, include:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provision for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323.[18]  While the Court must make findings as to the *Girsh* factors to approve a settlement as fair, reasonable, and adequate, the *Prudential* factors are illustrative of

---

[18]   The Court of Appeals invites individualized analysis by noting that "[o]ther related factors . . . also may be relevant to this inquiry." *Prudential*, 148 F. 3d at 323 n.73.

additional factors that may be useful even though they are not essential or inexorable depending upon the specific circumstances.

Although there is an overriding public interest in settling class actions, district courts should apply "an even more rigorous, heightened standard in cases where settlement negotiations precede class certification, and approval for settlement and class certification are sought simultaneously." *Pet Food*, 629 F.3d at 350 (internal quotations omitted). "This heightened standard is designed to ensure that class counsel has demonstrated 'sustained advocacy' throughout the course of the proceedings and has protected the interests of all class members." *Prudential*, 148 F.3d at 317.

Thus, the Court is required to make an independent analysis of the settlement to determine whether it is fair, reasonable, and adequate by independently evaluating all of the *Girsh* factors (and the *Prudential* factors, as appropriate), recognizing that the Court cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms. *Pet Food*, 629 F.3d at 351. Accordingly, the Court "may find it necessary to drill down into the case and into the agreement to make an independent 'scrupulous' analysis of the settlement terms" and affirmatively seek out information to the extent that the parties have either not supplied it or have provided only conclusory statements. *See id.*

3.  Discussion of *Girsh* and *Prudential* Factors

The Court's analysis of the *Girsh* factors, and the *Prudential* factors, as appropriate, leads to the conclusion that the relevant considerations weigh in favor of a finding of fairness under Rule 23(e).

*a.  The Complexity, Expense and Likely Duration of the Litigation*

The first *Girsh* factor, which evaluates the complexity, expenses and likely duration of

the litigation, "captures the probable costs, in both time and money, of continued litigation."

*Warfarin*, 391 F.3d at 536 (citation omitted).  At the outset, the Court appreciates that antitrust

suits, like this one, are often complex actions to prosecute.  *See In re Linerboard Antitrust Litig.*,,

292 F. Supp. 2d 631, 639 (E.D. Pa. 2003).  Furthermore, given that the settlement agreement

occurred at an early stage of this litigation, prior to the active commencement of discovery,

Plaintiffs have avoided such expense and delay as may have attached to these settling

Defendants.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007) (recognizing that

"antitrust discovery can be expensive").  Discovery in this case against Moark would

entail—which would demand reasonably the same and similar discovery that will occur as to the

remaining Defendants in this suit—considerable expenditures of financial resources and hours of

attorney time relating to discovery for liability and damages, including extensive electronic

discovery and scores of witness depositions, experts, class certification, further pre-trial motions,

and potentially a trial on the merits.  The Court determines that such an undertaking "would not

only further prolong the litigation but also reduce the value of any recovery to the class."

*Warfarin*, 391 F.3d at 536.  Accordingly, this factor weighs in favor of the Moark Settlement.

*b.  The Reaction of the Class to the Settlement*

 "In an effort to measure the class's own reaction to the settlement's terms directly, courts

look to the number and vociferousness of the objectors."  *Gen. Motors*, 55 F.3d at 812.

Considering this factor from a somewhat different angle, the Third Circuit Court of Appeals has

recognized the practical conclusion that it is generally appropriate to assume that "silence

constitutes tacit consent to the agreement" in the class settlement context.  *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993).  By using these considerations as a gauge of class reaction to the Moark Settlement, the Court determines that the class reaction here favors settlement.  Indeed, there were no objections filed to the Settlement and thus no negative feedback to the settlement.  Moreover, as Interim Co-Lead Counsel has represented, many of the Class Members are sophisticated entities with their own in-house counsel, and ostensibly have the resources and ability to assess the settlement agreement beyond the average layperson or enterprise.

Moreover, there were only 150 requests for exclusion from the Class, which is 1.14% of the Notice addressees, or virtually *di minimis* in light of the over 13,200 Notices of settlement that were sent (as well as published notices and press releases about the settlement). Additionally, 150 opt-outs is low in comparison to the 905 Claims Forms that were returned.[19] Furthermore, as Interim Co-Lead Counsel discussed at the final fairness hearing, many of the 150 requests for exclusion come from entities or subsidiaries organizationally related to other opt-out filers, and so "the approximate number of individual parties that have excluded [themselves from the settlement] resembles more like approximately 74 [parties] as opposed to 150."  Final Hr'g

---

[19] Although the response rate to the Notice of Settlement (as measured by the number of Claim Forms returned in relation to number of Notices distributed) is low, the Court does not draw any inferences of negative class reaction to the settlement from this response rate.  *Cf. Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 92-93 (3d Cir. 1985) (recognizing that an ostensibly low response rate may not in fact be low in light of other similar settlements).  As previously discussed, the Court has determined that Class Members had adequate notice and opportunity to submit claims, opt out, or file objections.  Furthermore, by comparison there were an additional 222 Class Members who only requested exclusion from the Sparboe Settlement.  *See* Keogh Aff. ¶ 17.

Tr. at 12:2-12:4.[20]  As such, this factor weighs in favor of the proposed settlement's fairness and adequacy.  *See Cendant Corp.*, 264 F.3d at 234-35 (recognizing that low number of objectors and opt-outs strongly favors settlement and that "[t]he vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement").

c.  *The Stage of the Proceedings and the Amount of Discovery Completed*

This *Girsh* factor requires the Court to evaluate whether Plaintiffs has an "adequate appreciation of the merits of the case before negotiating" settlement.  *Prudential*, 148 F.3d at 319 (quoting *Gen. Motors*, 55 F.3d at 813).  "To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken."  *Id.*  The Third Circuit Court of Appeals has recognized that, even if a settlement occurs in an early stage of litigation, there are means for class counsel to apprise themselves of the merits of the litigation, such as "conduct[ing] significant independent discovery or investigations to develop the merits of their case (as opposed to supporting the value of the settlement)" or retaining their own experts or interviewing witnesses.  *See Gen. Motors*, 55 F.3d at 814.

---

[20] Interim Co-Lead Counsel has represented that several of the parties that opted out of the settlement, and that have now filed suits as Direct Action Plaintiffs, were in contact with counsel prior to the filing of this class action suit and so "Plaintiffs and [those parties] knew exactly what [the suit] was about.  So . . . everyone was well familiar with what the settlement was, what the terms of settlement were, and what the litigation was about."  *See* Final Hr'g Tr. at 42:19-43:2.

Here, the Court is satisfied that Interim Co-Lead Counsel had adequate knowledge of the litigation and informed negotiations.[21]  First, Interim Co-Lead Counsel has represented to the Court that they "conducted extensive investigations into the case in preparation for filing of the complaint."  Sparboe Final Approval Mot. at 17-18; *see also* Hausfeld Decl. ¶ 5 ("Plaintiffs entered the negotiations with Sparboe with a significant amount of knowledge of Defendants' antitrust conspiracy, as a result of months of investigations into the conspiracy conducted by the numerous experienced law firms representing them."); Asher Decl. ¶ 6 (recounting that the counsel's investigations included research into the egg industry, egg trade associations, such as United Egg Producers ("UEP"), UEP's animal welfare programs, the economics underlying the alleged conspiracy, and the legal issues relating to the conspiracy).[22]

Second, although virtually all formal discovery was stayed in this case until after the execution of the Sparboe and Moark Agreements, Interim Co-Lead Counsel pursued informal discovery prior to negotiating settlement with Sparboe which enabled counsel to obtain the information that Plaintiffs needed concerning the merits of the case.  *See Prudential*, 148 F.3d at

---

[21] As to this *Girsh* factor, the Plaintiffs' Motion argues that this factor weighs in favor of final approval because of "the cooperation that will be provided by Moark as a result of this Settlement."  Mot. at 17.  Because this factor requires assessment of the adequacy of counsel's knowledge and appreciation for the merits *before* settlement negotiations to ensure those negotiations are informed, the Court does not find this particular *post hoc* argument dispositive of whether Interim Co-Lead Counsel was adequately informed entering into and during settlement negotiations.

[22] The Court recognizes that once experienced litigators, such as Interim Co-Lead Counsel, have acquired certain knowledge or insights about the litigation, such information will continue to inform Counsel's understanding of the case and appreciation of the merits.  Accordingly, the Court determines it is appropriate to cross-reference here its observations and findings made in its separate Memorandum concerning final approval of the Sparboe Settlement as it is relevant to the Court's independent assessment of this *Girsh* factor.

319 (recognizing that informal discovery methods can support adequate appreciation of the merits). Indeed, Interim Co-Lead Counsel has attested that they benefited from information exchanged during negotiations preceding the Sparboe settlement "including the production of hundreds of pages of highly pertinent documents, prior to entering the Settlement Agreement" and an interview with a Sparboe employee. *See* Sparboe Final Approval Mot. at 18; Hausfeld Decl. ¶¶ 7, 10, 12, 13. The information disclosed in that process pertained to the egg industry and specific conduct of the remaining Defendants. Asher Decl. ¶ 11. Interim Co-Lead Counsel represented that the documents Sparboe produced preceding and during the course of settlement negotiations, "support Plaintiffs' allegations that there was a conspiracy to reduce egg supply through various means." Hausfeld Decl. ¶ 14.

Indeed, Plaintiffs apparently used the information acquired from the Sparboe negotiations in drafting their Second Consolidated Amended Class Action Complaint. *See* Sparboe Final Approval Mot. at 2 ("As a result of Sparboe's significant cooperation, Plaintiffs were able to file the now-operative Complaint, unprecedented in size and detail, explaining, in over 500 paragraphs and 140 pages, the intricate workings of Defendants' conspiracy, as well as the statements made, meetings held and actions taken in furtherance thereof."). According to Plaintiffs, "Moark produced transactional data and over 3,200 other documents to [Plaintiffs]. Those materials contained general descriptions of times, places and corporate participants relating to the conspiracy, as well as details regarding [United Egg Producer]'s participation in the conspiracy for the entire length of the class period." Final Hr'g Tr. at 15:13-15:18.[23]

_____

[23] Additionally, Moark "provided sales data and other financial information" in advance of settlement negotiations "that permitted Plaintiffs to accurately estimate the range of damages that
(continued...)

Third, prior to the commencement of the Moark Settlement negotiations, Moark, LLC and Norco Ranch, Inc. had answered the Second Consolidated Amended Class Action Complaint and set forth their affirmative defenses.  Land O'Lakes, Inc. had moved for a Rule 12(b)(6) dismissal. These pleadings and motion provided Interim Co-Lead Counsel with an additional platform from which to ascertain Moark's positions on the case and thereby to evaluate the merits of the litigation.

Based upon the foregoing, the Court is satisfied that Interim Co-Lead Counsel, as highly experienced antitrust litigators, were in such a position prior to negotiating and entering into the Moark Settlement that they had an adequate understanding and appreciation of the strengths and weaknesses of the Plaintiffs' case.  Accordingly, the Court determines this factor weighs in favor of settlement.

### d.  Risks of Establishing Liability, Damages, and Maintaining the Class Action Through Trial

These three *Girsh* factors concern the risks of establishing liability, damages, and maintaining a class action through trial.  The factors require the Court to "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  *Warfarin*, 391 F.3d at 537.  The inquiry requires

_____

(...continued)
could be proven at trial." Bernstein Decl. ¶ 9.  This particular information exchange appears primarily to have assisted Interim Co-Lead Counsel in supporting the value of the settlement. *See, e.g., id.* ¶ 16 (framing the settlement amount in terms of Moark egg sales, net profits, and availability of "reliable data"); Mot. at 11-12 ("The Settlement Agreement was only entered into after careful review of Moark's sales figures, net profits and market share during the damages period, and balanced them against the likely expense of litigating claims against Moark through trial.").  However, this does not appear to be the only result of the information exchange because such information also would have furthered counsel's appreciation for the merits of the case as well as establishing damages and identification of potential class members.

balancing "the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement." *Prudential*, 148 F.3d at 319.  For example, the Court assesses the risks of establishing liability to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Gen. Motors*, 55 F.3d at 814.  As another example, the inquiry into establishing damages "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Id.* at 816.

> In cases of settlements with only a subset of defendants to the suit, as is the case here:
>
> [g]iven that the litigation might continue against other defendants, the parties may be reluctant to disclose fully and candidly their assessment of the proposed settlement's strengths and weaknesses that led them to settle separately.  The adequacy of the settlement depends in part on the relative exposure and resources of other parties. An informed evaluation is extremely difficult if discovery is incomplete or has been conducted against only a few of the defendants.

Herr, *supra*, § 21.651, at 505.  Thus, the Court understands why Plaintiffs decline to provide a detailed assessment of any risks perceived in establishing liability and damages, and instead emphasize that the Court should consider Interim Co-Lead Counsel's estimation of the probability of success in assessing these factors.  *See* Mot. at 18-19 & n.8.  Indeed, the Court gives credence to counsel's representation that although "they believe [Plaintiffs] will prevail at trial, they recognize that antitrust cases, like all complex litigation against large companies with highly talented defense counsel, have inherent risks." *Id.* at 18-19.  The record demonstrates that counsel have significant experience in antitrust cases such as this one which ought to enable them to appreciate the strengths and weakness of the case and the risks of maintaining the action through trial.

Furthermore, antitrust class action litigation is complex, and, especially at its early stages, inherently rife with risk and unpredictability in terms of ultimately prevailing to establish liability and damages and achieve class certification.  The Court finds that this suit presents no exception. The bulk of discovery, dispositive motion practice, expert discovery, class certification, and trial are on the horizon of this case with the attendant expense and uncertainties.  Thus, there is a genuine risk of not prevailing in establishing class certification, liability, or damages.  As all experienced litigators and jurists know, that a jury will be the ultimate fact-finder at trial presents further risks and uncertainties.

The motion practice that has already transpired is indicative of the future risk that Plaintiffs face in prosecuting their case against Moark.  The parties have already engaged in extensive motion practice concerning the Second Consolidated Amended Class Action Complaint, which initially included Land O'Lakes, Inc.'s individual motion to dismiss before it was withdrawn subject to final approval of the Moark Settlement.  The Plaintiffs' pending motion for leave to file a Third Consolidated Amended Class Action has been challenged in part by one group of defendants as to the claims against them individually.

Based on the detailed allegations in the Second Consolidated Amended Class Action Complaint, Plaintiffs appear to have evidence to support their theory that Defendants conspired to reduce the supply of eggs and egg products, and thereby increase prices.  *See* Fed. R. Civ. P. 11(b) (concerning representations to the Court in pleadings).  Nonetheless, even assuming Plaintiffs could establish their theory of an overarching conspiracy at trial, their success in establishing liability and damages as to individual defendants, such as Moark, is by no means assured.

44

Through the Sparboe Settlement, Plaintiffs may have secured cooperation in prosecuting their case, which, according to Interim Co-Lead Counsel, "significantly reduces the risks associated with discovery." *See* Sparboe Final Approval Mot. at 20. Nonetheless, such cooperation is no guarantee to success in proving liability and damages in this complex litigation, and Plaintiffs still must show that Defendants individually agreed to join the alleged conspiracy. Indeed, the other Defendants' individual motions to dismiss raised issues concerning whether they individually actually joined the conspiracy. Furthermore, Defendants jointly challenged at the motion to dismiss stage whether Plaintiffs could recover damages outside the statute of limitations. These issues remain live subjects for discovery and additional dispositive motion practice, and any trial on these issues would be protracted and involve a significant amount of testimony and documentary evidence, particularly given the time period at issue, which spans almost a decade, and the number of parties involved.

In addition to challenging the Plaintiffs' complaints, Defendants also have demonstrated an intent to vigorously defend against this suit—including by raising privilege issues relating to the Sparboe Settlement, *see, e.g.*, Order (Doc. No. 361); Order (Doc. No. 403), and other discovery-related issues, *see, e.g.*, Conf. Tr. (Doc. No. 591); Conf. Tr. (Doc. No. 675); Case Mgmt Order Nos. 16 to 19 (Doc. Nos. 604, 626, 656, and 676). Furthermore, Defendants have indicated during the course of these proceedings, particularly during the development of a discovery plan, that they intend to advance defenses, such as an agricultural cooperative immunity defense under the Capper-Volstead Act and a defense involving standard-setting conduct, that will present difficult factual and legal issues for the parties, creating their own brand and quantity of uncertainty for the Plaintiffs' case. *See, e.g.*, Case Mgmt Order No. 19.

The parties also contemplate expert discovery on damages, which likely will result in competing expert opinions representing very different damage estimates that will present further ambiguity as to resolution on damages as to each Defendant.  *See, e.g.,* Conf. Tr. (Doc. No. 675).

It is entirely likely that Plaintiffs would face similar, if not identical, legal challenges and uncertainties in their claims again Moark.  Moark's counsel has represented that Moark would otherwise vigorously defend itself against the Plaintiffs' claims, but for reaching a settlement agreement.  Indeed, according to counsel, "the Moark employees feel as though they have never done anything unlawful.  They have never engaged in any price fixing.  And [insofar that they may cooperate with Plaintiffs pursuant to the Moark Settlement] they will not come into any interview or deposition saying that they had ever done anything wrong."  Final Hr'g Tr. at 43:9-43:16.

Finally, Plaintiffs not only face the risk that they will not succeed in establishing liability and damages, but also the risks associated with certifying and maintain a class. *See Warfarin*, 391 F. 3d at 537.  Indeed "'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action.'"  *Id.* (quoting *Gen. Motors*, 55 F.3d at 817).  "The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *Gen. Motors*, 55 F.3d at 817.  Thus, this *Girsh* "factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial," recognizing that a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id.* (citing *Prudential*, 148 F.3d at 321).

46

Many, if not all, Defendants no doubt will vigorously oppose class certification.  As Interim Co-Lead Counsel has recognized, Moark, if it remained in this litigation, would join those defense efforts in this respect.  *See* Mot. at 20 ("Interim Counsel acknowledges that had Moark not settled, it would have joined the non-settling Defendants in contesting class certification.").  The Court of Appeals for the Third Circuit has recognized:  "There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321.[24]  Thus, there are inherent difficulties in bringing a class action to trial that apply here.

Because Plaintiffs would face genuine risks and uncertainties in establishing liability and damages against Moark, and in obtaining and maintaining class certification, should the claims against Moark continue without settlement, these three factors weigh in favor of settlement.

*e.  The Ability of the Defendant to Withstand a Greater Judgment*

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement."  *Cendant*, 264 F.3d at 240.  Thus, the Court must consider here whether Moark could withstand a judgment for an amount significantly greater than $25 million and the costs associated with the proposed cooperation.

The limited evidence in the record suggests that Moark would be able to withstand a greater judgment.  Indeed, the "$25,000,000 Settlement Amount represents almost 1% of total Moark egg sales during the class period and almost 28% of Moark's cumulative net profits in the egg division for the last six years."  Bernstein Decl. ¶ 16.  "For the full time period in which

---

[24]  Based on this observation, the Court of Appeals has questioned the significance of this factor in "settlement-only" class actions following the Supreme Court's decision in *Amchem*. *See Prudential*, 148 F.3d at 321.

reliable data was available (2002-2008), Moark's total shell egg sales to non-defendants from 2002-2008 were approximately $2,456,200,000.  Moark's net profits from shell eggs and egg products were approximately $90,516,000." *Id.*  There is no evidence concerning the financial or other possible impacts a greater judgment amount would have on Moark.  *See, e.g.*, *Cendant*, 264 F.3d at 240-41 (discussing the possibility of bankruptcy for a settling defendant).

Furthermore, the Plaintiffs' arguments tacitly suggest that Moark could withstand a larger judgment.  They argue that even if Moark could withstand a larger judgment, it is "not an obstacle to approving the Settlement."  Mot. at 20.

Thus, the record suggests that Moark could pay substantially more than the consideration set forth in the Settlement terms.  Accordingly, this factor does not weigh in favor of approval.

*f.  The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation*

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial."  *Prudential*, 148 F.3d at 322.  In other words, the Court evaluates "whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial."  *Warfarin*, 391 F.3d at 538 (citing *Prudential*, 148 F.3d at 322).

Here, the Court evaluates the settlement in light of its monetary and nonmonetary consideration.  Ordinarily, "[i]n order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if

48

successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *Prudential*, 148 F.3d at 322. (citing *Gen. Motors*, 55 F.3d at 806).[25]  "Settlements involving nonmonetary provisions for class members . . . deserve careful scrutiny to ensure that these provisions have actual value to the class," which can be accomplished through a Rule 23(e) analysis. Fed. R. Civ. P. 23(h) advisory committee note (2003).  "Despite the difficulties they pose to measurement, nonpecuniary benefits . . . may support a settlement." *Bolger*, 2 F.3d at 1311.

        As this settlement is structured to provide both monetary and nonmonetary consideration, it is difficult to determine accurately the actual total value of the proposed settlement.  The traditional calculus for ascertaining the value of monetary settlements under Third Circuit law is inappropriate under these circumstances because it would not entirely capture the value of the relief afforded by this settlement.  *Cf. Prudential*, 148 F.3d at 323 (recognizing that "both the structure of the settlement and the uncapped nature of the relief provided make it difficult to determine accurately the actual value of the settlement" and as such, "the traditional calculus suggested by the *Manual for Complex Litigation 2d* and adopted by this Court in *G.M. Trucks* [*Gen. Motors*] cannot be applied to this case").[26]

---

        [25]  The Third Circuit Court of Appeals expects that "settling parties . . . should . . . provide[] information to determine the range of reasonableness of the [settlement] allocation 'in light of the best possible recovery,' and 'in light of all the attendant risks of litigation.'" *Pet Food*, 629 F.3d at 354 (citations omitted).  The Court further explains that "'[t]his figure should generate a range of  reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside.' Precise value determinations are not required.'" *Id.*

        [26]  Plaintiffs have not proffered any evidence for the record concerning such a present value analysis.

The Court determines that the $25 million monetary relief in conjunction with the additional, valuable consideration of Moark's agreement to cooperate with Plaintiffs is reasonable both in light of the best possible recovery against Moark and in light of the risks the parties would face if the case went to trial against Moark.  Certainly, calculating the best possible recovery against Moark for the class in the aggregate is "exceedingly speculative" at this point in time given the previously-discussed risks of establishing liability and damages associated with this complex litigation, even when considering that treble damages are technically available for recovery under the Plaintiffs' Sherman Act claim.

At the same time, the Court recognizes that Moark's agreement to cooperate with Plaintiffs throughout the course of pre-trial proceedings and trial is valuable consideration in light of the risks in proceeding with this suit against the remaining Defendants.[27]  Interim Co-Lead Counsel has attested that "[o]ne such benefit [of Moark's cooperation] is information regarding the conspiracy and Defendant UEP's participation in it for the length of the Class Period" and the provision of "important information and witnesses that bolster Plaintiffs' claims against the non-settling Defendants will be made available to Plaintiffs without the time and expense involved in pursuing formal discovery."  Bernstein Decl. at ¶ 18.  Indeed, Moark produced some 3,200 documents with transactional data to Plaintiffs already, as well as making available employees for Plaintiffs to interview.  *Id.*  Granted, it seems that much of this non-privileged information would otherwise be available eventually through discovery as required under the federal rules, if Moark remained in this suit.  Nonetheless, such cooperation reduces

---

[27]  The Court does not comment on whether the information and facts that Moark may provide would be established, or even admissible, at trial, based upon counsel's representations.

costs and time associated with formal discovery.  Indeed, the Moark Settlement likely has short-circuited at least some of the expense and delay of future discovery by securing Moark's cooperation and removing the Moark forces from those who would contest or complicate Plaintiffs' discovery efforts.  Additionally, Plaintiffs gain a clear tactical advantage in obtaining such information through non-traditional discovery mechanisms, including, by way of example, the advantage of having this information to formulate strategy in taking discovery from the remaining Defendants, specific tailoring the scope and focus of discovery, and so forth.  Finally, Plaintiffs have represented to the Court that Moark has helped Interim Co-Lead Counsel in resolving privilege issues relating to the Sparboe Settlement.   Final Hr'g Tr. at 15:19-16:3.

    While the value of this cooperation is certainly of tangible value, it is not entirely without compare.  First, Sparboe, too, has agreed to cooperate with Plaintiffs—albeit the information that Sparboe purportedly can provide pertains to a shorter time period than Moark's information.  Second, Moark's cooperation does not appear to assure that Plaintiffs will have conclusive evidence in support of their claims against the remaining Defendants.  Moark's counsel represented concerning the nature of Moark's cooperation as follows:  "No one will come in and say there was this giant conspiracy and people conspired and were all sitting in a room conspiring.  [B]ut they will say exactly what happened, when it happened and who did what.  Whatever that means.  It means whatever it is."  Final Hr'g Tr. at 43:9-43:16.  Indeed, Moark is a named Defendant in other cases in this litigation for the Indirect Purchaser Plaintiffs and Direct Action Plaintiff Giant Eagle Inc., Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P., and the Moark Settlement does not impact those plaintiffs' claims against which Moark must continue to defend.

51

Nonetheless, when considering these two *Girsh* factors in light of the record *in toto*, the Court is persuaded that the $25 million settlement amount and Moark's cooperation confer real and substantial benefits upon the Class. The Court further concludes that the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial against Moark. These factors weigh in favor of approval of the settlement.

*g.* Prudential *Factors*

The relevant *Prudential* factors weigh in favor of approving the Moark Settlement, or, at worst, are neutral factors. First, the Court has already addressed the impact that the limited extent of discovery on the merits thus far has on this litigation and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages.

Second, the settlement agreement allows putative class members the right to opt out of the settlement. Indeed, some parties exercised this right by filing requests for exclusion. Furthermore, the Notice Packet included both a Notice of the Moark Settlement and a Notice of the Sparboe Settlement, thereby simultaneously notified class members of the Sparboe Settlement and enabling class members to assess the adequacy of the two settlements in conjunction with one another and as to the whole suit.

Third, the results achieved by the settlement for the Class and Subclasses are immediate, concrete, and realized without the costs and delays associated with extensive discovery and other later stages of litigation. Moark's cooperation pursuant to the settlement aids the Plaintiffs in prosecuting and resolving their claims against the other Defendants. Indeed, Interim Co-Lead Counsel describe the Moark Settlement (in conjunction with the Sparboe Settlement) as an "ice-breaker" settlement, which is a term used to describe "the first settlement in the litigation—and

52

[a settlement that] should increase the likelihood of future settlements." *Linerboard*, 292 F. Supp. 2d at 643. By contrast, it is unclear, given the aforementioned risks and uncertainties, *supra*, whether Direct Action Plaintiffs who are individually prosecuting their claims apart from the Class, or other parties who opted-out of the Moark Settlement, will be successful in their claims against Moark and the other Defendants, and whether that result will be immeasurably better than the result for class members under the settlement agreement and as to the entire suit. For the same reasons, it is unclear whether those opt-out parties might achieve better settlements than the class to resolve similar claims against Moark.

Fourth, the Moark Settlement only releases Class Members' claims against Moark for claims arising out of injuries or damages that occurred "from the beginning of time to the date when notice of the Court's entry of an order preliminarily approving this Agreement is first published" *and* that resulted from the conduct asserted in the Plaintiffs' suit. As such, future claims for injuries or damages against Moark arising outside this time period but resulting from the alleged conduct giving rise to the class claims are not barred. The Release does not apply to those parties who opted-out of the Moark Settlement, such as Direct Action Plaintiffs Giant Eagle Inc., Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P.

Fifth, all segments of the class are being treated equally relative to the monetary relief under the Moark Settlement. The distribution of the Settlement Amount, after administrative costs and expenses and counsel fees, is a *pro rata* share proportionate to the dollar amount of a class members' direct purchases of shell egg and egg products in the United States during the

period designated in the Agreement.  There is no differentiation among class members in terms of subclasses or class representatives.

The Moark Settlement sets forth a method for calculating the distribution for recovery by Class Members based upon *pro rata* allocations, which appears to conform with a common formula used in class actions:

> [A] common formula in class actions for damages is to distribute the net settlement fund after payment of counsel fees and expenses, ratably among class claimants according to the amount of their recognized transactions during the relevant time period. A typical requirement is for recognized loss to be established by the filing of proofs of claim, or statements of intention to prove claims, based on a specified value of transactions involved. . . . [I]n antitrust class actions, a proof of claim form may be utilized in disseminating the settlement proceeds among class members."

*Newberg*, supra, § 12.35.   Although the record demonstrates that the distribution allocation will be based upon *pro rata* shares after costs and expenses and that the amount of recovery "will be less than the total amount you paid" for the eggs and egg products, given that the recovery represents "overcharge," Notice at 5, Plaintiffs have not submitted a formal plan of allocation with the settlement agreement concerning the procedure for processing individual claims under the settlement, addressing administrative costs and fees for the settlement, and so forth.  "The plan of allocation is usually submitted with the settlement agreement for consideration at the settlement hearing, though it may be deferred until a later date with court approval."  Newberg, *supra*, § 12.35.  Here, Plaintiffs have represented they intend to separately apply to the Court to approve a final plan of allocation following settlement approval.[28]

---

[28] *See generally In re Ikon Office Solutions, Inc., Secs. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.' " (quoting *In re Computron Software, Inc.*, 6 F.
(continued...)

Sixth, the Moark Settlement's provision for the possible award of attorneys' fees and costs from the Settlement Amount is a neutral factor at this time.  The Court cannot ascertain based upon the Agreement, which merely provides that Plaintiffs may seek attorneys' fees, whether such unspecified fees and costs impact the fairness, reasonableness, and adequacy of the settlement.[29]  As a general matter, that the parties have agreed the attorneys' fees and costs may be awarded from the Settlement Amount would not weigh against approving the settlement.  *Cf.* Newberg, *supra*, § 12:3 ("The defendants in a class action settlement may properly agree to pay the plaintiffs' attorneys' fees and expenses . . . .  Such an agreement may take the form of an agreement to pay reasonable fees, to be subsequently determined by the court . . . .").  The Settlement Agreement specifically provides that "Class Counsel may seek an award of attorneys' fees and reasonable litigation expenses approved by the Court, to be paid out of the Settlement Amount after the Final Approval of the Agreement."  Moark Settlement ¶ 35.  The Notice of Settlement expands upon the agreement's language, stating that "Class Counsel will apply to the Court for an award from the Settlement Fund of attorneys' fees and for reimbursement of litigation costs and expenses incurred, including fees and costs expended while providing Notice

_____

(...continued)
Supp. 2d 313, 321 (D.N.J. 1998)); Newberg, *supra*, § 12.35 (same).

[29]  As discussed earlier, following the final fairness hearing Plaintiffs filed a Motion for an Award of Attorneys' Fees and for Reimbursement of Expenses, in which Plaintiffs seek specific amounts for attorneys' fees and reimbursement of expenses relating to the litigation to be paid from the Moark Settlement.  The Court intends to address this Motion separately, and does not consider here the substantive arguments presented in that Motion in relation to considering whether the Moark Settlement is fair, reasonable, and adequate.  After all, the Court's inquiry as to this *Prudential* factor focuses on whether the settlement agreement's *provision* for attorneys' fees are reasonable, and that provision only sets forth that attorneys' fees and expenses are subject to Court approval.

to the Class and while administering the Settlement Fund (including the plan of allocation)." Notice at 4. The Notice also stated that the application would be for an award "in an amount not to exceed thirty percent of $25 million as well as the costs and expenses incurred." *Id.* Because, here, the Moark Settlement Agreement provides that the attorneys' fees and expenses ultimately will be determined upon approval of the Court, which will require the assessment of the reasonableness of any such fees and expenses sought pursuant to Fed. R. Civ. P. 23(h) (and Fed. R. Civ. P. 54(d)(2)), the Moark Settlement's provisions concerning attorneys' fees and expenses do not raise issues at this time that would weigh against approving the settlement.

*h. Summary of* Girsh *and* Prudential *Factors*

Upon considering the Moark Settlement Agreement in light of all of the *Girsh* and the relevant *Prudential* factors, the Court is satisfied that the settlement is fair, reasonable, and adequate. As discussed, a few of the factors are neutral or weigh against settlement approval. However, all of the factors considered in determining the fairness of a settlement "are a guide; an unfavorable conclusion regarding one or more factors does not automatically render the settlement unfair." 2 Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* § 6:8 (6th ed. 2010); *see also Ehrheart*, 609 F.3d at 605 (dissenting, Smith, J.) (quoting same). Accordingly, not every factor need weigh in favor of settlement in order for the settlement to be approved by the Court. *See Cendant*, 264 F. 3d at 242-43 (affirming a final settlement approval when not all factors weighed in favor of approval). Because, on balance, the factors as considered above weigh in favor of settlement, the Court concludes that approval of the settlement is appropriate pursuant to Fed. R. Civ. P. 23(e).

## V.  Conclusion

For the foregoing reasons, the Court determines that the Class and Subclasses meet the certification requirements of Rule 23 for settlement purposes, and concludes that the proposed settlement agreement is fair, reasonable, and adequate.  Accordingly, the Court grants the Plaintiffs' motion for final approval of the class action settlement with Defendants Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc.

An Order consistent with this Memorandum follows.


BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge