IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS : <br> ANTITRUST LITIGATION : <br> : MDL No. 2002 <br> : 08-md-2002 <br> _____: <br> : <br> THIS DOCUMENT APPLIES TO: : <br> ALL ACTIONS : | |

M E M O R A N D U M

**GENE E.K. PRATTER, J.**                                         OCTOBER 3, 2012

## I.  Introduction

This multidistrict litigation involves allegations that egg producers and trade groups violated Section 1 of the Sherman Act by conspiring to restrict the supply of eggs in this country. The direct action plaintiffs ("Plaintiffs") in the litigation are pursuing non-class relief against various defendants ("Defendants"), including Sparboe Farms, Inc. ("Sparboe") and Land O' Lakes, Inc. ("Land O' Lakes"). Sparboe now moves to dismiss six complaints filed by the Plaintiffs for failure to state a claim.[1] Land O' Lakes seeks to dismiss Giant Eagle's complaint on the same grounds. For the reasons that follow, the Court denies Sparboe's motions to dismiss and grants in part and denies in part the Land O' Lakes motion.

---

[1] The specific complaints at issue are: Kroger Co. v. United Egg Producers, Inc., No. 08-md-2002 (Docket No. 619) (hereinafter, "Kroger Cmplt."); Supervalu, Inc. v. United Egg Producers, Inc., No. 08-md-2002 (Docket No. 620) (hereinafter, "Supervalu Cmplt."); Publix Super Markets, Inc. v. United Egg Producers, Inc., No. 08-md-2002 (Docket No. 621) (hereinafter, "Publix Cmplt."); Winn-Dixie Stores, Inc. v. Michael Foods, Inc., No. 08-md-2002 (Docket No. 622) (hereinafter, "Winn-Dixie Cmplt."); Giant Eagle, Inc. v. United Egg Producers, Inc., No. 08-md-2002 (Docket No. 623) (hereinafter, "Giant Eagle Cmplt."); and Kraft Foods Global, Inc. v. United Egg Producers, Inc., No. 08-md-2002 (Docket No. 624) (hereinafter, "Kraft Cmplt.").

**II.  Factual Allegations**

The six complaints at issue here all contain differently worded versions of the same core allegations.  The Plaintiffs claim that, "[s]tarting in at least 1999 and continuing through at least 2008, Defendants unlawfully agreed to and did engage in a conspiracy to control supply and artificially maintain and increase the price of eggs," and that "[a]s direct purchasers of eggs, Plaintiffs were injured by Defendants' . . . agreements to control supply and . . . increase the price of eggs."  Kraft Cmplt., ¶ 3.  Specifically, the Plaintiffs allege that each defendant participated in the conspiracy through at least one of approximately eight collective actions.[2]  *Cf.* Kroger Cmplt., ¶ 126.

The first collective action occurred in 1999 and 2000 when the Defendants allegedly created a "supply adjustment program" and agreed to a five-percent flock molt, a five-percent reduction in flock inventory, and the development of a chick hatch reduction program.  *Id.*, ¶¶ 126(a), 132-33.

The second action supposedly began in 2000 and involved the development and implementation of a program that would increase the size of hen cages through chick hatch reduction.  This program became known as the "Animal Care Certified Program" and was subsequently called the "UEP Certified Program."  *Id.*, ¶¶ 126(b), 138.  The program eventually involved a prohibition of the practice of backfilling, which the United Egg Producers (UEP), a trade group, enforced through compliance audits.  *Id.*, ¶ 168.

---

[2] Although the complaints differ in the number of collective actions alleged, the Court notes that the allegations regarding the actions at issue in these motions are substantively similar. For instance, the Kroger Plaintiffs allege that the Defendants' "100 percent rule" constituted a separate collective action, while the Winn-Dixie Plaintiffs allege that rule was part of a larger action involving certified eggs.

The third collective action occurred in 2001, when the Defendants implemented an "emergency flock reduction."  *Id.*, ¶¶ 126(c), 141.

The fourth action occurred in 2002, when the Defendants allegedly carried out another reduction in supply by implementing an early molt and hen disposal plan.  *Id.*, ¶¶ 126(d), 150.

The fifth collective action involved an agreement to accelerate hen disposal or implement a five-percent flock reduction in 2004.  *Id.*, ¶ 126(e).[3]

The sixth collective action allegedly involved the Defendants implementing the "Animal Care Certified Program" at all of their production facilities.  *Id.,* ¶¶ 126(f), 154.

The seventh action occurred in 2004, when the Defendants gathered at an "Egg Industry Economic Summit" and agreed to either an early disposal of hens or a five-percent flock reduction.  *Id.*, ¶¶ 126(h), 167.

Finally, the eighth collective action involved an alleged scheme in which the Defendants used a trade group, the United States Egg Marketers ("USEM"), to export eggs at a loss for the purpose of increasing domestic egg prices.  *Id.*, ¶¶ 126(j), 128, 184-85.

As stated above, the Plaintiffs allege that the Defendants coordinated and facilitated their conspiracy through two trade groups, the UEP and the USEM.  The Plaintiffs claim that the conspiracy caused the price of eggs to rise, and that they were damaged because they directly purchased eggs from the Defendants at inflated prices.  *Id.*, ¶¶ 5, 19, 163, 181-83.

## III.  Legal Standards

### A.  *Motion to Dismiss for Failure to State a Claim*

A motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of a complaint.  *See Bell Atl. Corp. v. Twombly*,  550 U.S. 544, 554-55 (2007).   To

---

[3] The Kraft Plaintiffs allege that similar supply reductions occurred two other times in 2004 and 2005.  *See* Kraft Cmplt., ¶ 7.

survive a Rule 12(b)(6) motion, a civil complaint must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint need allege "only enough facts to state a claim to relief that is plausible on its face" so as to test whether "plaintiffs . . . have . . . nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  In other words, there needs to be "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 319 (3d Cir. 2010) (alteration in original) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).  Assessing the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citations omitted).

The Court must adjudicate a motion to dismiss within certain parameters.  For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true."  *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *see also Twombly*, 550 U.S. at 589 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)"). Furthermore, the Court must accept all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party.  *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 995 (2011); *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989).  However, the Court need not accept as true "unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (quoting *City of Pittsburgh v.*

*W. Penn Power Co.*, 147 F.3d 256, 263 n.13 (3d Cir. 1998)), or the plaintiff's "bald assertions" or "legal conclusions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

### B. *Application of Pleading Standard to Sherman Act § 1 Claims*

Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is . . . declared to be illegal." 15 U.S.C. § 1. A plaintiff bringing a Section 1 claim must prove: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1229 (3d Cir. 1993) and *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1364 (3d Cir. 1992)).

At the pleadings stage in antitrust suits, a key question is whether "the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express," because Section 1 "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy." *Twombly*, 550 U.S. at 553 (alterations in original) (internal quotation marks omitted); *see also Ins. Brokerage*, 618 F.3d at 315 (stating that "the existence of an agreement is the hallmark of a Section 1 claim").[4] A plaintiff must therefore offer allegations that plausibly suggest that the defendant agreed to the conspiracy, which, in the antitrust context, is a conscious commitment to a common scheme designed to achieve an unlawful objective. *See Ins. Brokerage*, 618 F.3d at 315 ("[T]he plaintiff

---

[4] In Sherman Act litigation, an agreement is "sometimes also referred to as a 'conspiracy' or 'concerted action.'" *W. Penn Allegheny*, 627 F.3d at 99 (citing *Twombly*, 550 U.S. at 553 and *Gordon*, 423 F.3d at 207 & n.16).

must show that the defendant was a party to a contract, combination . . . or conspiracy. . . . [I]n other words, [the plaintiff must show] a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme." (citations omitted) (internal quotation marks omitted)).  Put differently, a plaintiff's complaint must plausibly suggest that each individual defendant agreed to participate in the conspiracy.  *See Twombly*, 550 U.S. at 556 (plaintiffs must plead "enough factual matter (taken as true) to suggest that an agreement was made"); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 161 (D.D.C. 2004) (recognizing a plaintiff's "burden of adequately alleging that a conspiracy to restrain trade existed in the first instance and that each defendant knowingly joined or agreed to participate in the conspiracy").

In evaluating an allegation that a defendant agreed to an alleged conspiracy, a court should not "compartmentalize" the conspiracy.  The "character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630-31 (E.D. Pa. 2010) ("Defendants' briefing attempts to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility.  However, . . . the allegations in the Complaint must be viewed as a whole. . . . *Twombly* emphasized context." (citations omitted)).

Similarly, courts have held that antitrust conspiracy allegations need not be detailed on a defendant-by-defendant basis.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (acknowledging that a "complaint need not contain detailed 'defendant by defendant' allegations"); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust conspiracy allegations need not be detailed

6

defendant by defendant."). Furthermore, plaintiffs need not "plead each defendant's involvement in the alleged conspiracy in elaborate detail." *Flat Panel*, 586 F. Supp. 2d at 1117. Finally, the Court notes that "[a]ntitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220-21 (5th Cir. 2001) (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 212 (3d Cir. 1992)); *see also Petruzzi's*, 998 F.2d at 1243 (recognizing that for an antitrust conspiracy, "defendants need not share the *same* motive. Rather, all that is required is that they each have a motive to conspire.") (emphasis in original).

However, as the litigants in this action know from the Court's previous rulings, the Court "properly looks for more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy. . . . [Such c]onclusory, collective language is too convenient, too undisciplined, and too unfocused in light of exposures to litigation expense and disruption (even without ultimate liability) that are so great in antitrust (and other) cases." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011). Therefore, a complaint that simply "us[es] the global term 'defendants' to apply to numerous parties without any specific allegations that would tie each particular defendant to the conspiracy is not sufficient." *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 312 (D.N.J. 2004) (internal quotation marks omitted).

## IV. Legal Discussion

Here, in adjudicating the present motions to dismiss, the Court must determine whether the various complaints sufficiently allege that Sparboe and Land O' Lakes joined a conspiracy to

7

restrict the supply of eggs. First, however, the Court addresses what it may consider in adjudicating the motions of these defendants.

*A. Matters Considered in Deciding a Motion to Dismiss*

As stated above, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *CCAIR*, 29 F.3d at 859. Moreover, in considering a pleading's sufficiency, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)), *cert. denied*, 131 S. Ct. 1607 (2011). Despite these well-established rules, Sparboe argues that the Court should wholly disregard portions of the Plaintiffs' complaints, and that it should consider allegations from the second amended complaint of the direct purchaser plaintiffs (the "SAC"). The Court rejects both contentions and will base its decisions on the face of the actual complaints before it that are the subjects of the motions made by Sparboe.

While Sparboe recognizes that courts must accept the truth of the allegations in a complaint, it argues nonetheless that the Court should not do so here. Instead, Sparboe urges the Court to disregard the allegations in the Plaintiffs' complaints that are similar to allegations in the SAC, because such similarities show that the Plaintiffs simply cut-and-pasted allegations from the SAC into their own complaints. To support this argument Sparboe cites *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274 (3d Cir. 1994). In *Garr*, uncontested evidence showed that two attorneys filed a complaint based solely on a *Wall Street Journal* article and the allegations in a prior securities class action complaint. *Id.* at 1276. The new complaint entirely duplicated the allegations of the prior complaint, "except that the names of the plaintiffs and the number of

8

shares they owned were changed." *Id.* The Third Circuit Court of Appeals held that the attorneys violated Rule 11 of the Federal Rules of Civil Procedure, *id.* at 1280, and affirmed the decision of the district court, which had dismissed the latter complaint as part of Rule 11 sanctions, *id.* at 1278.

Contrary to Sparboe's assertion, *Garr* does not require the Court to ignore the Plaintiffs' allegations here. In *Garr*, the evidentiary record showed that the attorneys filed a complaint without undertaking any investigation, thus subjecting them to sanctions addressing their professionalism. *Id.* at 1276. Here, no Rule 11 motion has been filed and no evidentiary record exists. Instead, all the Plaintiffs assert that they investigated their claims prior to filing suit, and many Plaintiffs note that they supplemented those investigations with documents they received after settling their claims against Moark LLC. Moreover, the complaints at issue here do not precisely mimic the SAC, whereas the complaints in *Garr* were entirely duplicative of each other. Given these distinctions and differences, *Garr* is inapposite, and the Court will accept the truth of these Plaintiffs' well-pled factual allegations. *See CCAIR*, 29 F.3d at 859.

Sparboe also argues that the Court may consider the allegations of the SAC in adjudicating the Plaintiffs' motions to dismiss.[5] First, Sparboe asserts that the Court may consider the SAC's allegations because the SAC is a "matter[] of public record." *Mayer*, 605 F.3d at 230. In *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004), a district court considered deposition testimony from another case in deciding a motion to dismiss because the testimony was a "public record." *Id.* at 221 n.3. The Third Circuit Court of Appeals held that the district court erred. *Id.* It found that "[w]hile a prior judicial opinion constitutes a public record of which a court may take judicial notice, it may do so on a motion to dismiss only to establish the

---

[5] The SAC contains certain allegations that arguably suggest that Sparboe may not have joined the conspiracy.

existence of the opinion, not for the truth of the facts asserted in the opinion." *Id.*; *see also S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 427 n.7 (3d Cir. 1999) (finding that courts may take notice of a judicial record to establish its existence, not the "truth of facts averred"). In light of these persuasive authorities, the Court will not consider the factual averments of the SAC simply because it is a "public record."

Second, Sparboe asks the Court to consider the allegations of the SAC because it is an "undisputedly authentic document[] [that] the [Plaintiffs'] claims are based upon." *Mayer*, 605 F.3d at 230. The Court previously has noted that when a defendant claims that a complaint is "based upon or integral to" certain documents, courts will only consider those documents in deciding a motion to dismiss if they "are central to the claim at issue, such as contracts for breach of contract claims or public offering documents containing alleged fraudulent statements in securities misrepresentation suits." *Processed Egg Prods.*, 821 F. Supp 2d at 740 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), and *Angstadt ex rel. Angstadt v. Midd-West Sch. Dist.*, 377 F.3d 338, 342-43 (3d Cir. 2004)). Here, clearly the SAC is not as integral to the Plaintiffs' complaints as a written contract is to a breach of contract suit.[6] Therefore, the Court will adjudicate the motions to dismiss based solely on the well-pled allegations in the four corners of the Plaintiffs' complaints.

## B. *Sparboe's Motion to Dismiss the Kroger Complaint*

The Kroger Plaintiffs allege that Sparboe participated in multiple hen supply reduction efforts, adopted the guidelines of the UEP's Animal Care Certified Program, served in leadership positions within the UEP, actively participated in the creation of the UEP's animal husbandry

---

[6] By way of contrast, UEP documents pertaining to cage size guidelines arguably are integral to the Plaintiffs' complaints. However, Sparboe does not rely on such documents in its motions to dismiss.

program, and joined in the USEM plan to export eggs at a loss. The Court finds that these allegations plausibly suggest that Sparboe joined the conspiracy to reduce the supply of eggs.

First, the Kroger Plaintiffs allege that the Defendants agreed to reduce the domestic supply of eggs by molting five percent of their hens and reducing five percent of their flock inventory in 1999 and 2000, and by agreeing to an early molt and hen disposal in 2002. Kroger Cmplt., ¶¶ 126, 132-33, 150. Furthermore, the Kroger Plaintiffs specifically allege that Sparboe participated in both of these supply reductions. *Id.*, ¶¶ 75, 156. The Court previously has held that such "agreements seem to be mechanisms to cut egg supply deliberately and arbitrarily, without a legitimate, independent business explanation[.]" *Processed Egg Prods.*, 821 F. Supp. 2d at 744. Sparboe's alleged participation in the supply reductions thus suggests that it agreed to the overarching conspiracy.

Second, the Kroger Plaintiffs allege that in 2000, the Defendants, acting through the UEP, agreed to a program that increased cage sizes by reducing chick hatch. Kroger Cmplt., ¶ 138.[7] This program eventually became known as the "Animal Care Certified Program" and also involved an agreement to not add capacity[8] or replace lost hens. *Id.*, ¶¶ 138-39. As alleged, the program contained no limitations as to hatching numbers or the duration of the chick hatch reduction efforts. *Id.* The plaintiffs further allege that Sparboe "adopt[ed] . . . the Animal Care Certified Program to reduce chick hatch." *Id.*, ¶ 154.

---

[7] Chick hatch "is the process of birthing chicks which eventually become egg-laying hens." *Id.*, ¶ 83.

[8] In its briefing, Sparboe claims that the Plaintiffs fail to allege that it agreed to not add capacity to its existing production facilities. However, the Plaintiffs all allege that Sparboe not only agreed to increase cage sizes through chick hatch reduction, but that the Defendants who agreed to this scheme also agreed "not to add capacity." Kroger Cmplt., ¶¶ 138-39, 154; Supervalu Cmplt., ¶¶ 130-31, 146; Publix Cmplt., ¶¶ 130-31, 146; Winn-Dixie Cmplt., ¶¶ 99, 195, 198, 200; Kraft Cmplt., ¶¶ 7D, 57; Giant Eagle Cmplt., ¶¶ 47, 143-44.

11

While the Court recognizes that egg producers may legitimately choose to increase cage sizes for animal welfare purposes, doing so by reducing chick hatch while agreeing to not increase production capacity would, "in the absence of agreement, . . . be contrary to an *individual* egg producer's business interests." *Processed Egg Prods.*, 821 F. Supp. 2d at 725 (emphasis supplied); *see also id.* at 735 ("[A] producer following the [UEP] guidelines as to chick hatch reduction [while agreeing to not add capacity] would be reducing the supply of its egg-laying hens, and thereby limiting its egg production capabilities. In doing so, a producer would be unable to enlarge its operations, fill additional barns, and expand egg production."). Such a decision would, however, serve the interests of a *group* of producers who want to reduce the overall supply of eggs. When a defendant's action is only economically beneficial if considered from a group perspective, a reasonable inference of conspiracy exists. *See Re/Max Int'l v. Realty One*, 173 F.3d 995, 1009-10 (6th Cir. 1999). Therefore, the Kroger Plaintiffs' allegation that Sparboe participated in a program that involved chick hatch reduction and an agreement to not add production capacity suggests that Sparboe joined the overarching conspiracy.[9]

Third, the Kroger Plaintiffs allege that Sparboe held a leadership position in the UEP during the beginning years of the alleged conspiracy. Kroger Cmplt., ¶ 75. Moreover, their complaint alleges that "Garth Sparboe . . . was directly involved in the conception and development of the UEP's Animal Care Certification Program . . . and was active in enlisting others to join the conspiracy and monitored the adoption progress of the program." *Id.*

---

[9] The Court recognizes that the Kroger Plaintiffs allege that, following its adoption of the chick hatch reduction guidelines, Sparboe resigned from the UEP and was not listed as a certified egg producer by the UEP because it chose to have fewer than 100 percent of its eggs comply with UEP guidelines. *See id.*, ¶¶ 154, 159, 169. However, these allegations do not undercut the inference that Sparboe *initially* joined the conspiracy and remained in it for a time by agreeing to a program of chick hatch reduction, a program which lacked a legitimate business purpose.

Standing alone, allegations that a defendant merely joined a trade group or attended its meetings do not give rise to a reasonable inference that the defendant agreed to a conspiracy. *See Ins. Brokerage,* 618 F.3d at 349; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009).  However, the Kroger Plaintiffs allege that Sparboe did not merely belong to UEP, but that it communicated with fellow UEP members to encourage them to participate in the Animal Care Certified Program, which involved chick hatch reduction and an agreement to not increase egg-production capacity.  *See* Kroger Cmplt., ¶¶ 138-39, 142 (noting features of the Animal Care Certified Program).  Such alleged conversations give rise to an inference that Sparboe participated in the conspiracy.  *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 07-5634, 2011 WL 1753738, at *14 (N.D. Cal. May 9, 2011) (holding that alleged conversations in which defendants encouraged coordinated action "might well have legitimate explanations . . . [but c]onstrued in the light most favorable to Plaintiffs, these communications support an inference that Defendants joined and participated in the conspiracy").

Finally, the Kroger Plaintiffs allege that Sparboe participated in an egg export program facilitated by USEM that reduced the supply of domestic eggs.  Kroger Cmplt., ¶ 156.  According to the complaint, if certain USEM members exported eggs at a loss, other members would reimburse them for those losses.  *Id.*, ¶ 185.  However, the Kroger Complaint does not allege that USEM members *solely* exported eggs at a loss, that Sparboe exported eggs at a loss, or that USEM members were required to reimburse producers who did make such exports.  Without such averments, the complaint leaves open the possibility that Sparboe limited its participation in the USEM program to profitable exports, as well as the possibility that Sparboe simply declined to reimburse fellow USEM members when losses did arise.  Under either

scenario, Sparboe could have joined the export program for legitimate business reasons, not as part of the conspiracy.

Sparboe's alleged participation in the USEM program is thus not sufficient, in and of itself, to plausibly suggest that it joined the conspiracy. However, the Court also must consider the Kroger Plaintiffs' allegations that Sparboe participated in supply reductions, adopted UEP guidelines, and initially took an active role in encouraging others to adopt those guidelines. The Court finds that these allegations, taken together, give rise to a plausible inference of conspiracy. *See In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008) ("While viewing each of these factual allegations in isolation may lead one to the conclusion . . . that there is a legitimate business justification for each of the acts, a view of the complaint as a whole, which this Court must take . . . does support a plausible inference of conspiracy.").

## C. *Sparboe's Motions to Dismiss the Supervalu and Publix Complaints*

The complaints filed by Supervalu and Publix are substantively identical to the Kroger Complaint.[10] The complaints share the same allegations regarding supply reduction agreements, the UEP cage-size plan, and USEM exports as the Kroger Complaint. *See* Supervalu Cmplt., ¶¶ 124-25, 130-31, 142, 176-77; Publix Cmplt., ¶¶ 124-25, 130-31, 142, 176-77. Moreover, Supervalu and Publix repeat Kroger's allegations regarding how Sparboe reduced its cage sizes, joined the USEM program, coordinated action among UEP members, and participated in supply reductions. *See* Supervalu Cmplt., ¶¶ 67-68, 146, 148; Publix Cmplt., ¶¶ 67-68, 146, 148. Given these similarities and the foregoing analysis, the Court also finds that Supervalu and Publix plausibly suggest that Sparboe joined the conspiracy and denies Sparboe's motions to dismiss their complaints.

---

[10] The Court notes that Sparboe seems to admit as much, as it analyzes all three complaints collectively in its briefing.

### D. *Sparboe's Motion to Dismiss the Winn-Dixie Complaint*

Sparboe also asserts that the allegations of the Winn-Dixie Plaintiffs fail to support an inference that it agreed to the conspiracy. The Winn-Dixie Plaintiffs allege that Sparboe participated in a supply reduction program in 2000, that it adopted UEP cage-size guidelines by reducing chick hatch while agreeing not to add to its egg-production capacity, that it held leadership positions within the UEP, and that it participated in the USEM export program. The Court finds that these allegations plausibly suggest that Sparboe agreed to the conspiracy.

To begin, the Winn-Dixie Complaint alleges that Sparboe "participat[ed] in a 'supply reduction program' to reduce capacity in 2000[.]" Winn-Dixie Cmplt., ¶ 99. Defendants who partook in this program molted five percent of their flock, reduced their flock inventory by five percent, and developed a chick hatch reduction program. *Id.*, ¶¶ 10, 180. As stated above, such actions indicate that Sparboe deliberately agreed to reduce egg supply by an arbitrary amount, and thus create an inference that it joined the conspiracy.

Furthermore, the Winn-Dixie Plaintiffs allege that Sparboe "adopt[ed] the UEP Certified Program to reduce chick hatch and reduced its egg supply as a result." *Id.*, ¶ 99. This program allegedly began in 2000 and involved agreements to reduce chick hatch *and* to not increase production capacity. *Id.*, ¶¶ 195, 198, 200.[11] Such allegations also suggest that Sparboe agreed to the conspiracy, because an individual egg producer who unilaterally agreed to reduce chick

---

[11] According to the Winn-Dixie Complaint, Sparboe subsequently stopped participating in the UEP's certified egg program and decided to not implement UEP animal welfare guidelines at all of its facilities. *See id.*, ¶¶ 230, 316. However, the complaint plausibly suggests that Sparboe participated in the conspiracy prior to taking these actions. While a complaint "'must allege that each individual defendant joined the conspiracy and played *some* role in it,'" it need not allege that each defendant was involved in every aspect of the conspiracy. *See Flat Panel*, 586 F. Supp. 2d at 1117 (emphasis supplied) (quoting *Elec. Carbon*, 333 F. Supp. 2d at 311-12); *see also Processed Egg Prods.*, 821 F. Supp. 2d at 742 ("[T]here is no requirement that allegations pertaining to one defendant mirror those against other defendants in terms of specific conduct or the 'quantity' of alleged 'bad acts.'")

hatch and not increase capacity could not enlarge its operations or expand its production. Therefore, "[e]ven though the [the Winn-Dixie] Plaintiffs have not alleged that [Sparboe] adopted other elements of the UEP Certification Program, they have averred that it adopted a particular element that is highly restrictive of egg supply and without an apparent self-interested business rationale in the absence of agreement to the offending conspiracy." *Processed Egg Prods.*, 821 F. Supp. 2d at 735.

The Winn-Dixie Complaint also alleges that Sparboe belonged to the UEP, served in leadership positions within the UEP, and attended various meetings in which the conspiracy was discussed. Winn-Dixie Cmplt., ¶¶ 98, 183, 202-03. While such allegations are not enough, in and of themselves, to support an inference that Sparboe joined the conspiracy, they do indicate that Sparboe had an opportunity to do so. *See In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008). And by alleging that Sparboe participated in the chick hatch reduction and a supply adjustment program, the Winn-Dixie Plaintiffs plausibly suggest that Sparboe took advantage of this opportunity and agreed to a common scheme to restrict the supply of eggs.[12] Therefore, the Court denies Sparboe's motion to dismiss the Winn-Dixie Complaint.

### E. Sparboe's Motion to Dismiss the Kraft Complaint

The Kraft Plaintiffs allege that Sparboe agreed to adopt the UEP Certification Guidelines, attended UEP meetings and held leadership positions within the trade group, and participated in

---

[12] The Court notes that the Winn-Dixie Plaintiffs allege that Sparboe participated in the same egg export scheme discussed by the Kroger Plaintiffs. *See* Winn-Dixie Cmplt., ¶ 99. However, the Winn-Dixie Complaint alleges that Sparboe left the export program in 2005, *id.*, ¶ 329, and fails to allege that Sparboe was required to reimburse USEM members who exported eggs at a loss, *id.*, ¶ 330. Moreover, like the Kroger Complaint, the Winn-Dixie Complaint leaves open the possibility that Sparboe limited its participation in the program to profitable exports, and many of its allegations regarding foreign egg prices postdate Sparboe's exit from the USEM export program. *See id.*, ¶¶ 335, 337, 344, 349.

the USEM export program. Based on these assertions, the Court finds that the Kraft Complaint plausibly suggests that Sparboe agreed to join the conspiracy.

According to the Kraft Complaint, Sparboe "agreed to adopt the UEP Certified Guidelines." Kraft Cmplt., ¶ 57. These guidelines "required Defendants to increase the cage space for each laying hen." *Id.*, ¶ 7D. The Kraft Plaintiffs further allege that participants in the UEP Certified Program agreed to increase cage sizes through chick hatch reduction and that "hens displaced by lower density cages would not be replaced by building new facilities." *Id.* According to the Kraft Complaint, the UEP Certified Program began in 2002, *see id.*, and Sparboe did not withdraw from the program until after November 2003, *see id.*, ¶ 188. For the reasons set forth above, these allegations indicate that Sparboe agreed to restrict its production capabilities without an apparent independent business rationale from 2002 until at least November 2003, and therefore suggest that Sparboe agreed to the overarching conspiracy.

The Kraft Plaintiffs also allege that Sparboe was a UEP member, served in UEP leadership positions, and attended UEP meetings at which the alleged conspiracy was discussed. *Id.*, ¶¶ 57, 153. Furthermore, they allege that Sparboe participated in the USEM export program. *Id.*, ¶ 57.[13] Taken alone, such allegations cannot raise an inference that Sparboe agreed to the conspiracy. However, the "character and effect of [the] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at is as a whole." *Cont'l Ore*, 370 U.S. at 699; *see also Blood Reagents*, 756 F. Supp. 2d at 630-31 ("[T]he allegations in the Complaint must be viewed as a whole. . . . *Twombly* emphasized context."); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) ("[A] district

---

[13] As with the previously discussed complaints, the Kraft Complaint fails to allege that the USEM program *solely* involved unprofitable exports, and thus leaves open the possibility that Sparboe limited its participation in the program to exports that did not involve losses. *See id.*, ¶ 142.

court must consider a complaint in its entirety without isolating each allegation for individualized review."). Given this principle, and viewing the allegations regarding UEP meetings and the USEM program together with the allegation that Sparboe agreed to the UEP Certification Guidelines, the Court finds that the Kraft Complaint plausibly suggests that Sparboe agreed to join the conspiracy.[14]

### F. *The Sparboe and Land O' Lakes Motions to Dismiss the Giant Eagle Complaint*

Both Sparboe and Land O' Lakes have moved to dismiss the complaint filed by Giant Eagle. For the reasons the follow, the Court denies Sparboe's motion to dismiss, but grants in part and denies in part Land O' Lakes' motion.

Giant Eagle specifically alleges that Sparboe was a member of the UEP and that its employees attended UEP meetings, served on UEP committees, and held executive positions within the UEP. Giant Eagle Cmplt., ¶ 46. Such allegations do not plausibly suggest that Sparboe agreed to the overarching conspiracy, but they do indicate that Sparboe had opportunities to join the conspiracy. *See SRAM*, 580 F. Supp. 2d at 903.

Additionally, Giant Eagle alleges that Sparboe "adopt[ed] UEP Certified guidelines to reduce chick hatch." Giant Eagle Cmplt., ¶ 47. According to the complaint, these guidelines were instituted in 2000, and Defendants who adopted them "also agreed to not add cage capacity or otherwise make up for the hens that would be lost through implementing the guidelines." *Id.*, ¶¶ 143-44. For the reasons previously discussed, such allegations indicate that Sparboe agreed to

---

[14] The Kraft Complaint also alleges that Sparboe participated in unspecified supply reduction programs. As thus alleged, the Court can neither determine which programs the complaint refers to nor conclude that Sparboe's alleged participation in such programs suggests that it joined the conspiracy. Therefore, the Court will not rely on this vague allegation. *See Coulter v. Allegheny Cnty. Bar Ass'n*, No. 12-2988, 2012 U.S. App. LEXIS 19217, at *5 (3d Cir. Sept. 13, 2012) ("[V]ague inferences and allegations . . . of joint action or a conspiracy are not sufficient . . . at the pleading stage.").

a program which no non-conspiring, self-interested producer would have followed, because it foreclosed Sparboe's ability to increase its egg production. Therefore, the Court finds that Sparboe's alleged adoption of the UEP guidelines on chick hatch reduction, taken together with the allegations of its involvement in the UEP, plausibly suggest that it joined the conspiracy.[15]

As for Land O' Lakes, Giant Eagle makes the same allegations regarding its participation in the conspiracy as the Indirect Purchaser Plaintiffs.[16] *See Processed Egg Prods.*, 2012 WL 1443625, at *5. In adjudicating the Land O' Lakes motion to dismiss the IPSAC, the Court held that such allegations "do not plausibly suggest that Land O' Lakes is independently liable for a Section 1 violation . . . [or] that Land O' Lakes is secondarily liable" for such a violation. *Id.* Therefore, the Court grants Land O' Lakes' motion to dismiss Giant Eagle's complaint as to its Sherman Act claim, but does so without prejudice. However, since Giant Eagle also brings a claim under Ohio law, and Land O' Lakes fails to discuss the merits of this claim, the Court will not dismiss Giant Eagle's state law claim. *See Processed Egg Prods.*, 2012 WL 1443625, at *5-7.

**V.  Conclusion**

For the foregoing reasons, the Court denies Sparboe's motions to dismiss. The Court grants in part the motion of Land O' Lakes as to Giant Eagle's Section 1 Sherman Act claim without prejudice to Giant Eagle seeking leave to amend, and denies in part the motion as to Giant Eagle's state law claim. An Order consistent with this Memorandum follows.

---

[15] Giant Eagle also alleges that Sparboe violated the Ohio Valentine Act. *Id.*, ¶¶ 231-35. Because Sparboe's motion contains no discussion of this alleged state-law violation, the Court will not consider whether Giant Eagle adequately states a claim against Sparboe under Ohio law. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2012 WL 1443625, at *5-7 (E.D. Pa. Apr. 24, 2012).

[16] In fact, the Indirect Purchaser Plaintiffs' Second Amended Complaint (IPSAC) contains more extensive allegations than the Giant Eagle Complaint, including an allegation that a Land O' Lakes employee attended a UEP meeting.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge