EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MDL No. 2002 08-md-02002 |
| THIS DOCUMENT APPLIES TO:  ALL INDIRECT PURCHASER ACTIONS | Oral Argument Requested |

**INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SECOND MOTION TO DISMISS THE INDIRECT PURCHASER PLAINTIFFS' CLAIMS FOR DAMAGES BARRED BY THE STATUTES OF LIMITATIONS OF VARIOUS STATES**

# TABLE OF CONTENTS

<u>PAGE</u>

I. INTRODUCTION ................................................................................................. 1

    A. The Discovery Rule and the Doctrine of Fraudulent Concealment Toll the Statute of Limitations or Delay the Accrual of IP Plaintiffs' Claims ................................................. 1

    B.  It is Premature to Determine These Issues on a Motion to Dismiss ........................... 4

II.  STATEMENT OF FACTS ................................................................................... 6

III.  LEGAL ARGUMENT ....................................................................................... 12

    A.  The 3-CAC Pleads Facts Establishing the Applicability of State Discovery Rules and Fraudulent Concealment with Sufficient Specificity. ...................................................... 12

    B.  Questions of Fact Regarding the States' Discovery Rules and Fraudulent Concealment Doctrines Require Denial of Defendants' Motion to Dismiss ................... 20

    C.  The 3-CAC Sufficiently Alleges Facts Establishing the Earliest Date That IP Plaintiffs Could have Discovered Their Claims ........................................................................... 27

    D.  Application of the States' Discovery Rules and Fraudulent Concealment Doctrines 30

        1.  Arizona ...................................................................................................... 31.

        2.  California ................................................................................................... 36

        3.  District of Columbia ................................................................................. 40

        4.  Florida ...................................................................................................... 43

        5.  Iowa.......................................................................................................... 45

        6.  Kansas ...................................................................................................... 46

        7.  Massachusetts ........................................................................................... 47

        8.  Michigan .................................................................................................. 50

        9.  Minnesota................................................................................................. 52

        10.  Mississippi ............................................................................................. 54

11. Nebraska ................................................................................................ 57

12. Nevada ................................................................................................... 60

13. New Mexico ........................................................................................... 62

14. New York ............................................................................................... 65

15. North Carolina ....................................................................................... 68

16. North Dakota ......................................................................................... 69

17. South Dakota ......................................................................................... 71

18. Tennessee .............................................................................................. 74

19. Utah ....................................................................................................... 78

20. Vermont ................................................................................................. 79

21. West Virginia ......................................................................................... 80

22. Wisconsin .............................................................................................. 83

IV. CONCLUSION .............................................................................................. 85

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                             **PAGE**

*Abel v. Allen*,
651 N.W.2d 635 (N.D. 2002) ...........................................................................71

*Alakayak v. British Columbia Packers, Ltd.*,
48 P.3d 432 (Alaska 2002)...............................................................................53

*America's Collectibles Network, Inc. v. Sterling Commerce Inc.*,
No. 09-143, 2011 U.S. Dist. LEXIS 56719 (E.D. Tenn. May 26, 2011)....................................77

*Anzai v. Chevron Corp.*,
168 F. Supp. 2d 1180 (D. Haw. 2001) ...............................................................52

*Appletree Square I Ltd. P'ship v. Investmark, Inc.*,
494 N.W.2d 889 (Minn. Ct. App. 1993) ............................................................54

*Alston v. Hormel Foods Corp.*,
730 N.W.2d 376 (Neb. 2007)............................................................................58

*Andres v. McNeil Co.*,
707 N.W.2d 777 (Neb. 2005)......................................................................59, 60

*Angle v. Koppers, Inc.*,
42 So.3d 1 (Miss. 2010)....................................................................................55

*Apodaca v. Unknown Heirs of the Tome Land Grant*,
651 P.2d 1264 (N.M. 1982) .............................................................................63

*Baker v. Board of Regents*,
991 F.2d 628 (10th Cir. 1993) .........................................................................47

*Barnes v. Koppers, Inc.*,
534 F.3d 357 (5th Cir. 2008) ...........................................................................55

*Barnes v. Singing River Hosp. Sys.*,
733 So.2d 199 (Miss. 1999)..............................................................................55

*Baye v. Diocese of Rapid City*,
630 F.3d 757 (8th Cir. 2011) ...........................................................................72

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................5, 13, 34

*Bemis v. Estate of Bemis*,
967 P.2d 437 (Nev. 1998) ........................................................................................61

*Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*,
435 F.3d 396 (3d Cir. 2006) .......................................................................................2

*Benton v. Snyder*,
825 S.W.2d 409 (Tenn. 1992) .............................................................................77, 78

*Berisford v. Jack Eckerd Corp.*,
667 So. 2d 809 (Fla. Ct. App. 1995) .......................................................................44

*Blea v. Fields*,
120 P.3d 430 (N.M. 2005) .......................................................................................65

*Bonin v. Vannaman*,
929 P.2d 754 (Kan. 1996) ........................................................................................47

*Brennan v. Boston Mut. Ins. Co.*,
No. 09-74, 2010 Mass. App. Unpub. LEXIS 891 (Mass. App. Aug. 3, 2010) ............48

*Brin v. S.E.W. Investors*,
902 A.2d 784 (D.C. 2006) ........................................................................................42

*Butler v. Deutsche Morgan Grenfell, Inc.*,
*140 P.3d 532* (N.M. Ct. App. 2006) ...................................................................63, 64

*Carder v. BASF Corp.*,
919 So. 2d 258 (Miss. Ct. App. 2003) ..........................................................24, 56, 57

*Cart v. Marcum*,
423 S.E.2d 644 (W.Va. 1992) ..................................................................................82

*City of Tucson v. Clear Channel Outdoor, Inc.*,
181 P.3d 219 (Ariz. App. 2008) ...............................................................................33

*City of Wichita v. United States Gypsum Co.*,
72 F.3d 1491 (10th Cir. 1996) .................................................................................47

*Coble v. Cohen & Slamowitz, LLP*,
824 F. Supp. 2d 568 (S.D.N.Y. 2011) ..................................................................66, 67

*Conmar Corp. v. Mitsui & Co. Inc.*,
858 F.2d 499 (9th Cir. 1988) ...................................................................................62

*Cont'l. Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ........................................................................................................7

*Continental Potash v. Freeport-McMoran, Inc.*,
*858 P.2d 66* (N.M. 1993) ................................................................................................65

*Cullen v. Auto-Owners Ins. Co.*,
189 P.3d 344 (Ariz. 2008) ..............................................................................................34

*Dapkus v. Dapkus*,
No. 07-1385, 2008 Mass. App. Unpub. LEXIS 595 (Mass. App. Dec. 18, 2008) ........23

*Diamond v. Davis*,
680 A.2d 364 (D.C. 1996) ........................................................................................42, 43

*Dist. Cablevision Ltd. P'ship v. Bassin*,
828 A.2d 714 (D.C. 2003) ..............................................................................................41

*Doe v. Medlantic Healthcare Grp., Inc.*,
814 A.2d 939 (D.C. 2003) ..............................................................................................41

*Doe v. Roe*,
955 P.2d 951 (Ariz. 1998) ..............................................................................................32

*Doe v. Roman Catholic Archbishop*,
*692 N.W.2d 398* (Mich. Ct. App. 2004) ....................................................................51, 52

*Dunford v. Tryhus*,
776 N.W.2d 539 (N.D. 2009) ..........................................................................................70

*Dunn v. Rockwell*,
689 S.E.2d 255 (W. Va. 2009) ..................................................................................81, 82

*Elm Retirement Cent., LP v. Callaway*,
246 P.3d 938 (Ariz. Ct. App. 2010) ................................................................................33

*Estate of Chappelle v. Sanders*,
442 A.2d 157 (D.C. 1982) ..............................................................................................42

*EZ Roll Off, LLC v. Oneida*,
785 N.W.2d 645 (Wis. Ct. App. 2010) ............................................................................85

*Fahrner v. SW Mfg., Inc.*,
48 S.W.3d 141 (Tenn. 2001) ..........................................................................................74

*Florida Dep't of Health and Rehabilitative Servs. v. S.A.P.*,
835 So. 2d 1091 (Fla. 2002)...........................................................................................44

*Fox v. Ethicon Endo-Surgery, Inc.*,
110 P.3d 914 (Cal. 2005) ...............................................................................................37

*Franzen v. Deere and Co.*,
377 N.W.2d 660, 662 (Iowa 1985) .................................................................................45

*Friends Univ. v. W. R. Grace & Co.*,
608 P.2d 936 (Kan. 1980) .......................................................................................46, 27

*Gaither v. City Hospital, Inc.*,
487 S.E.2d 901 (W. Va. 1997)........................................................................................81

*Gelof v. Smith*,
No. 11-483, U.S. Dist. LEXIS 13231 (D. Del. Feb. 3, 2012) ........................................13

*Gerdau Ameristeel, Inc. v. Ratliff*,
368 S.W.3d 503 (Tenn. 2012) ..................................................................................75, 76

*Gillam v. Firestone Tire & Rubber Co.*,
489 N.W.2d 289 (Neb. 1992)..........................................................................................25

*Gilmore v. Davis*,
185 F. App'x. 476 (6th Cir. 2006) ..................................................................................76

*Gordon v. Connell*,
545 N.W.2d 722 (Neb. 1996)..........................................................................................58

*Gorski v. Gorski*,
262 N.W.2d 120 (Wis. 1978)..........................................................................................84

*Graham v. Haughey*
568 F.3d 425 (3d Cir. 2009)..............................................................................................1

*Green v. Lisa Frank Inc.*,
211 P.3d 16 (Ariz. App. 2009).......................................................................................34

*Griffin v. McNiff*,
744 F. Supp. 1237 (S.D.N.Y.1990).................................................................................67

*Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*,
898 P.2d 964 (Ariz. 1995).........................................................................................32, 33

vi

*Hansen v. AH Robbins, Inc.*,
335 N.W.2d 578 (Wis. 1983) ...................................................................84

*Hardin v. Farris*,
530 P.2d 407 (N.M. Ct. App. 1974) .........................................................64

*Harris v. Bernad*,
275 F. Supp.2d 1 (D.D.C. 2003) ..............................................................16

*Harris v. Jones*,
550 S.E.2d 93 (W. Va. 2001) ...................................................................81

*Hinkle v. Hargens*,
81 N.W.2d 888 (S.D. 1957) .....................................................................73

*Huss v. Huss*,
230 S.E.2d 159 (N.C. App. 1976) ............................................................69

*In-Line Suspension, Inc. v. Weinberg & Weinberg, P.C.*,
687 N.W.2d 418 (Neb. Ct. App. 2004) .....................................................58

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ......................................................66

*In re Estate of Shields*,
584 P.2d 139 (Kan. 1978) .........................................................................47

*In re Mercedes-Benz Anti-trust Litig.*,
157 F. Supp.2d 355 (D.N.J. 2001) ............................................................22

*In re Nine West Shoes Antitrust Litig.*,
80 F. Supp. 2d 181 (S.D.N.Y. 2000) ..................................................66, 67

*In re Packaged Ice Antitrust Litigation*,
723 F. Supp 987 (ED MI 2010) ................................................................52

*In re Polyurethane Foam Antitrust Litig.*,
799 F. Supp. 2d 777 (S.D. Ohio 2011) .....................................................22

*In re Rubber Chemicals Antitrust Litig.*,
504 F. Supp.2d 777 (N.D. Cal. 2007) .................................................21, 22

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) .................................................................22

*In re TFT-LCD Antitrust Litig.*,
586 F. Supp.2d 1109 (N.D. Cal. 2008) ...................................................................22, 43

*In re Urethane Antitrust Litig.*,
683 F. Supp.2d 1214 (D. Kan. 2010) ...............................................................................22

*In re Vitamins Antitrust Litig.*,
398 F. Supp. 2d 209 (D.D.C. 2005) .............................................................................43, 47
No. 99-197, 2000 U.S. Dist. LEXIS 11351 (D.D.C. July 14, 2000) ...........................47

*International Union United Auto. Workers of America v. Wood*,
59 N.W.2d 60 (Mich. 1953) ...........................................................................................52

*Iron Wing v. Catholic Diocese*,
807 N.W.2d 108 (S.D. 2011) ..........................................................................................72

*J.A. Street & Assocs. v. Thundering Herd Dev., LLC*,
724 S.E.2d 299 (W.Va. 2011) .........................................................................................82

*Jones v. ConocoPhillips*,
130 Cal.Rptr.3d 571 (Cal. Ct. App. 2011) ....................................................................38

*Jones v. Meridian Towers Apts., Inc.*,
816 F. Supp. 762 (D.D.C. 1993) .....................................................................................43

*Kaiser Found. Health Plan, Inc. v. Medquist, Inc.*,
No. 08-4376, 2009 U.S. Dist. LEXIS 29124 (D.N.J. Apr. 8, 2009) .......................15, 20

*Kennedy v. Goffstein*,
815 N.E.2d 646 (Mass. Ct. App. 2004) ..........................................................................49

*Kern v. St. Joseph Hospital, Inc.*,
697 P.2d 135 (N.M. 1985) ..............................................................................................65

*Kronfeld v. First Jersey Nat. Bank*,
638 F. Supp. 1454 (D.N.J. 1986) ...............................................................................15, 20

*Lambert v. Fleet Nat'l Bank*,
865 N.E.2d 1091 (Mass 2007) ........................................................................................48

*Larson v. Norkot Mfg., Inc.*,
627 N.W.2d 386 (N.D. 2001) .................................................................................23, 24, 70

*LG Electronics, Inc. v. Asko Appliances, Inc.*,
No. 08-828, 2010 U.S. Dist. LEXIS 31571 (D. Del. Mar. 29, 2010) ............................15

*Lindsey v. Allstate Ins. Co.*,
34 F. Supp. 2d 636 (W.D. Tenn. 1999).................................................................................77

*London v. Green Acres Trust*,
765 P.2d 538 (Ariz. Ct. App. 1988)....................................................................................35

*Long v. City of Glendale*,
93 P.3d 519 (Ariz. Ct. App. 2004).......................................................................................34

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007)............................................................................................53

*Luccarelli v. DVA Renal Healthcare, Inc.*,
No. 08-2067, 2008 U.S. Dist. LEXIS 67211 (W.D. Tenn. March 17, 2008) ...............75

*Lum v. Bank of America*,
361 F.3d 217 (3d Cir. 2004)................................................................................................14

*Mandolfo v. Mandolfo*,
796 N.W.2d 603 (Neb. 2011)..............................................................................................57

*Manker v. Manker*,
*644 N.W.2d 522* (Neb. 2002) ............................................................................................59

*Marshall-Lucas v. Goodwill*,
No. 04-1536, 2005 Iowa App. LEXIS 959 (Iowa Ct. App. Aug. 31, 2005)..................46

*Martinez v. Martinez*,
83 P.3d 298 (N.M. App. 2004) ...........................................................................................65

*Martinez v. SCI Arizona Funeral Servs., Inc.*,
No. 08-0466, 2009 Ariz. App. Unpub. LEXIS 81 (Ariz. Ct. App. April 9, 2009) .................23, 33

*Martinez v. Showa Denko, K.K.*,
964 P.2d 176 (N.M. Ct. App. 1998) ...................................................................................63

*Martinez-Sandoval v. Kirsch*,
*884 P.2d 507* (N.M. Ct. App. 1994) ..................................................................................65

*Martrano v. Quizno's Franchise Co., L.L.C.*,
No. 08-0932, 2009 U.S. Dist. LEXIS 52025 (W.D. Pa. June 15, 2009)..................14, 20

*McClellan v. Stanley*,
978 S.W.2d 943 (Tenn. Ct. App. 1998) ............................................................................75

*McCoy v. Miller*,
578 S.E.2d 355 (W.Va. 2003) ............................................................................82

*McGill v. Am. Life and Casualty Ins. Co.*,
619 N.W.2d 874 (S.D. 2000) ..............................................................................73

*McKelvey v. Boeing North Am., Inc.*
86 Cal. Rptr. 2d 645 (Cal. Ct. App. 1999) .........................................................37

*McNeill v. Rice Eng'g & Operating Inc.*,
*128 P.3d 476* (N.M. Ct. App. 2005) ...................................................................65

*Medhin v. Hailu*,
36 A.3d 307 (D.C. 2011) ....................................................................................41

*MetroPCS Wireless, Inc. v. AU Optronics Corp.*,
No. 07-1827, 2011 U.S. Dist. LEXIS 124164 (N.D. Cal. Oct. 26, 2011) ...................22

*Miller v. Monongalia Cnty. Bd. of Educ.*,
556 S.E.2d 427 (W. Va. 2001) ............................................................................83

*Millspaugh v. Millspaugh*,
611 P.2d 201 (Nev. 1980) ...................................................................................61

*Minnesota Twins Partnership v. State by Hatch*,
592 N.W.2d 847 (Minn. 1999) ...........................................................................53

*Mohave Elec. Coop., Inc. v. Byers*,
942 P.2d 451 (Ariz. Ct. App. 1997) .......................................................... 32, 34-36

*M&T Mortg. Corp. v. White*,
736 F. Supp. 2d 538 (E.D.N.Y. 2010) ..........................................................66, 67

*Muller v. Thaut*,
430 N.W.2d 884 (Neb. 1988) ..............................................................................59

*New York v. Hendrickson Bros., Inc.*,
840 F.2d 1065 (2d Cir. 1988) .............................................................................66

*Nicolopoulos v. Town of Saugus*,
No. 08-2350, 2009 Mass. Super. LEXIS 257 (Mass. Super. Sep. 14, 2009) ...............48

*Norgart v. Upjohn Co.*,
981 P.2d 79 (Cal. 1999) ......................................................................................37

*Ohio Valley Elec. Corp. v. General Elec. Co.*,
244 F. Supp. 914 (S.D.N.Y. 1965) ...................................................................21

*One Star v. Sisters of St. Francis*,
752 N.W.2d 668 (S.D. 2008) .........................................................................72

*Owens-Illinois, Inc. v. Edwards*,
573 So.2d 704 (Miss. 1990)...........................................................................54

*Paterson v. Paterson*,
73 Wis.2d 150 (Wis. 1976)............................................................................84

*People v. Liberty Mut. Ins. Co.*,
861 N.Y.S.2d 294 (N.Y. Ct. App. 2008) ...................................................... 66

*Perez v. First Amer. Tit. Ins. Co.*,
810 F. Supp. 2d 986 (D. Ariz. 2011) ...........................................................35

*Perrine v. E. I. du Pont de Nemours & Co.*,
694 S.E.2d 815 (W.Va. 2010)........................................................................82

*Phillips 66 Co. v. Lofton*,
94 So. 3d 105 (Miss. App. 2012)...................................................................55

*PNC Multifamily Capital Institutional Fund v. Bluff City Cmty. Development Corp.*,
No. 11-3252012, 2012 Tenn. App. LEXIS 288 (Tenn. App. Ct. May 4, 2012) ..........................75

*Porter v. Spader*,
239 P.3d 743 (Ariz. App. 2010).....................................................................33

*PPG Architectural Finishes, Inc. v. Lowery*,
909 So. 2d 47 (Miss. 2005)........................................................................54, 55

*Quinonez v. Remington Arms Co., LLC*,
2012 U.S. Dist. LEXIS 64864 (D. Ariz. May 9, 2012) ..............................34

*Redwing v. Catholic Diocese of Memphis*,
363 S.W.3d 436 (Tenn. 2012).............................................................74, 75, 77

*Riley v. Presnell*,
565 N.E.2d 780 (Mass. 1991) ........................................................................48

*Robinson v. Shaw*,
936 P.2d 784 (Kan. Ct. App. 1997) ...............................................................47

*Riddell v. Riddell Washington Corp.*,
866 F.2d 1480 (D.C. Cir. 1989) ...................................................................21

*Rodriquez v. Manoil*,
450 P.2d 737 (Ariz. Ct. App. 1969) .............................................................33

*Rose v. United Equitable Ins. Co.*,
632 N.W.2d 429 (N.D. 2001) .......................................................................70

*Russell v. Household Mortg. Serv.*,
No. 08-01703, 2012 Tenn. App. LEXIS 371 (Tenn. App. June 27, 2012) ....76

*Sanderson Farms Inc. v. Ballard*,
917 So.2d 783 (Miss. 2005) ..........................................................................57

*Santos v. George Washington Univ. Hosp.*,
980 A.2d 1070 (D.C. 2009) .....................................................................41, 42

*S. Broward Hosp. Dist. v. Medquist Inc.*,
516 F. Supp.2d 370 (D.N.J. 2007) ................................................................15

*Serrano v. Serrano*,
No. 10-0649, 2012 Ariz. App. Unpub. LEXIS 31 (Ariz. Ct. App. Jan. 10, 2012) .......................33

*Seville Indus. Machinery v. Southmost Machinery*,
742 F.2d 786 (3d Cir. 1984) .........................................................................14

*Shadrick v. Coker*,
963 S.W.2d 726 (Tenn. 1998) ..................................................................75, 77

*Shanilec v. Grand Forks Clinic, Ltd.*,
599 N.W.2d 253 (N.D. 1999) .......................................................................69

*Shlien v. Bd. of Regents*,
640 N.W.2d 643 (Neb. 2002) ........................................................................58

*Sills v Oakland General Hosp*,
559 N.W.2d 348 (Mich. 1996) ......................................................................50

*Silvestris v. Tantasqua Reg'l Sch. Dist.*,
847 N.E.2d 328 (Mass. 2006) .......................................................................48

*Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*,
181 F.3d 410 (3d Cir. 1999) ..........................................................................13

*Spears v. Moore*,
551 S.E.2d 483 (N.C. App. 2001) ...................................................................68

*Speight v. Walters Dev. Co., Ltd.*,
744 N.W.2d 108 (Iowa 2008) ........................................................................45

*Spencer v. Estate of Spencer*,
759 N.W.2d 539 (S.D. 2008) .........................................................................71

*Stanbury v. Bacardi*,
953 S.W.2d 671 (Tenn. 1997) ........................................................................77

*Stankiewicz v. Estate of LaRose*,
561 A.2d 400 (Vt. 1989) ................................................................................80

*Stark v. Advanced Magnetics, Inc.*,
736 N.E.2d 434 (Mass. App. Ct. 2000) ....................................................49, 50

*State Farm Mut. Auto. Ins. Co. v. Ficchi*,
No. 10-555, 2012 U.S. Dist. LEXIS 63282 (E.D. Pa. May 4, 2012) ......................14, 20

*State Farm Mut. Auto. Ins. Co. v. Kugler*,
No. 11-80051, 2011 U.S. Dist. LEXIS 107005 (S.D. Fla. Sep. 21, 2011) ....................45

*Strassburg v. Citizens State Bank*,
581 N.W.2d 510 (S.D. 1998) ......................................................................71-73

*Streeks, Inc. v. Diamond Hill Farms, Inc.*,
605 N.W.2d 110 (Neb. 2000) .........................................................................59

*Stroh Die Casting Co. v. Monsanto Co.*,
502 N.W.2d 132 (Wis. Ct. App. 1993) ............................................................84

*Szymanski v. Boston Mut. Life Ins. Co.*,
778 N.E.2d 16 (Mass. App. Ct. 2002) .......................................................23, 48

*Taygeta Corp. v. Varian Assocs., Inc.*,
763 N.E.2d 1053 (Mass. 2002) ......................................................................48

*Terry v. Niblack*,
979 S.W.2d 583 (Tenn. 1998) .........................................................................75

*Trafalgar House Constr., Inc. v. ZMM, Inc.*,
567 S.E.2d 294 (W. Va. 2002) ........................................................................83

*Trentadue v. Buckler Automatic Lawn Sprinkler Co,*
738 N.W.2d 664 (Mich. 2007) ........................................................................50

*Trustmark Nat'l. Bank v. Meador,*
81 So.3d 1112 (Miss. 2012) ...........................................................................57

*Turcotte v. Estate of LaRose,*
569 A.2d 1086 (Vt. 1989) .........................................................................79, 80

*Turi v. Main St. Adoption Servs., LLP,*
No. 11-03761, 2012 U.S. Dist. LEXIS 141770 at *17-18 (E.D. Pa. Oct. 1, 2012) ......................14

*Turner v. Roman Catholic Diocese of Burlington, Vermont,*
987 A.2d 960 (Vt. 2009) ...........................................................................79, 80

*United Power Ass'n. Inc. v. L.K. Comstock & Co.,*
No. 89-CIV-766, 1992 U.S. Dist. LEXIS 18874 (D. Minn. Oct. 27, 1992). ...............................22

*United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.,*
238 F. Supp. 2d 258 (D.D.C. 2002) ...................................................................16

*United States v. Potts,*
2007 U.S. App. LEXIS 22843 (3d Cir. Sep. 26, 2007) ...................................................4

*United States ex rel. Harrison v. Westinghouse Savannah River Co.,*
352 F.3d 908 (4th Cir. 2003) .........................................................................20

*Vachon v. State,*
514 N.W.2d 442 (Iowa 1994) ..........................................................................45

*Van Buskirk v. Carey Canadian Mines, Ltd.,*
760 F.2d. 481 (3d Cir. 1985) .........................................................................13

*Veltri v. Bldg. Serv. 32b-J Pension Fund,*
393 F.3d 318 (2d Cir. 2004) ..........................................................................66

*Volk v. D.A. Davidson & Co.,*
816 F.2d 1406 (9th Cir. 1987) ........................................................................61

*Vt. Agency of Nat. Res. v. Towns,*
724 A.2d 1022 (Vt. 1998) ............................................................................79

*Walk v. Ring,*
44 P.3d 990 (Ariz. 2002) .........................................................................32-36

*Ward v. Alliance,*
*417 N.W.2d 327* (Neb. 1988) ...........................................................................58

*Wells v. First Am. Bank West,*
598 N.W.2d 834 (N.D. 1999) ....................................................................69, 70

*W. Mountain Oil, Inc. v. Gulf Oil Corp.,*
575 F. Supp. 813 (D. Nev. 1983) ......................................................................62

*Wilde v. Westland Dev. Co.,*
*241 P.3d 628* (N.M. Ct. App. 2010) ................................................................63

*Williams v. Houses of Distinction,*
714 S.E.2d 418 (N.C. Ct. App. 2011) ..............................................................69

*Williams v. Stewart,*
112 P.3d 281 (N.M. Ct. App. 2005) ...........................................................63, 64

*Willers v. Willers,*
No. 09-0362, 2010 Ariz. App. Unpub. LEXIS 56 (Ariz. Ct. App. April 15, 2010) ...............33, 34

*Winfield v. Brandon HMA, Inc.,*
No. 01676, 2012 Miss. App. LEXIS 63 (Miss. Ct. App. Jan. 31, 2012) ................................55, 56

*Winn v. Sunrise Hosp. & Med. Ctr.,*
277 P.3d 458 (Nev. 2012) .................................................................................61

*Witherspoon v Guilford,*
511 N.W.2d 720 (Mich. Ct. App. 1994) ...........................................................51

*Wyatt v. ACandS, Inc.,*
910 S.W.2d 851 (Tenn. 1995) ...........................................................................76

*Zawaideh v. Neb. HHS Regulation & Licensure,*
792 N.W.2d 484 (Neb. 2011) ............................................................................59

## STATUTES

CALIF. BUS. & PROF. CODE § 16720 (2012) .................................................36

CALIF. BUS. & PROF. CODE § 17200 (2012) .................................................36

FLA. STAT. ANN. § 501.201 (2012) ................................................................43

MASS. GEN. LAWS ANN. CH. 260 § 12 (2012) ..............................................49

Minn. Stat. § 325D.64 (2012) ........................................................................52

Miss. Code Ann. § 15-1-67 (2012) ................................................................56

NM Stats. Ann. § 57-1-12(B) (2012) ............................................................63

N.Y. Gen. Bus. Law § 340 (2012) .................................................................66

S.D. Codified Laws § 37-1-14.4 (2012) ........................................................71

Tenn. Code Ann. § 47-25-101 (2012) ............................................................74

Vt. Stat. Ann. tit. 12, § 555 (2012) ................................................................79

W. Va. Code § 47-18-11 (2012) .....................................................................81

## OTHER SOURCES

Fed. R. Civ. P. 8(a) .............................................................................3, 12, 13

Fed. R. Civ. P. 9(b) ................................................................2, 3, 12, 14, 15, 28

Indirect Purchaser Plaintiffs ("IP Plaintiffs") respectfully submit this Memorandum of Law in Opposition to the Defendants' Second Motion to Dismiss the Indirect Purchaser Plaintiffs' Claims for Damages Barred by the Statutes of Limitations of Various States (Dkt. No. 729) (hereinafter the "Motion").[1]

## I.   INTRODUCTION

Defendants have moved to dismiss a portion of the claims filed by IP Plaintiffs arguing that the applicable state statutes of limitation in each indirect purchaser state cut off a portion of IP Plaintiffs' claim for damages or other relief.  Defendants' Motion presents the Court with the following question: do the factual allegations in the Third Amended Consolidated Class Action Complaint (the "3-CAC"),[2] and the reasonable inferences that can be drawn from those allegations, provide a plausible basis for tolling applicable state statutes of limitations?  As shown herein, state law discovery rules, doctrines of fraudulent concealment, and/or continuing violations rule require denial of Defendants' Motion because application of those doctrines to the facts as alleged in the 3-CAC raise factual issues that the Court should not determine in connection with a motion to dismiss.

**A.    The Discovery Rule and the Doctrine of Fraudulent Concealment Toll the Statute of Limitations or Delay the Accrual of IP Plaintiffs' Claims.**

The first doctrine that operates to delay the operation of the relevant statutes of limitations is the discovery rule.  Discovery rules rest upon the commonsense notion that when it is difficult for a potential plaintiff to discern that he or she has been injured by wrongful conduct, it would be unfair to start the statute running until a reasonable person in the same position could discern that he or she has been injured by some "culpable activity."  *See Graham v. Haughey*,

---

[1] References to specific page numbers in Defendants' Motion shall be cited as "Defs' Brief at __."

[2] All references to "¶" are references to paragraphs in the 3-CAC.

568 F.3d 425, 438 (3d Cir. 2009) (quoting *Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006). The discovery rule does not rest on allegations of fraud, although allegations of concealment and other illicit activity can provide context for its application. Because allegations concerning the discovery rule do not sound in fraud, they are subject to the normal notice pleading rules of Rule 8(a) of the Federal Rules of Civil Procedure – not the heightened pleading standards of Fed. R. Civ. P. 9(b).

The second doctrine (or set of doctrines) that operates in many of the states to toll the running of the relevant statutes of limitations is fraudulent concealment. In some ways, the operation of state fraudulent concealment doctrines parallel the operation of discovery rules as the affirmative acts of concealment (in some states, only secrecy is required) toll the applicable statutes of limitations until a plaintiff could have reasonably discovered the truth.

As demonstrated herein, state fraudulent concealment doctrines also justify denial of the Motion. The 3-CAC sets forth Defendants' overall scheme in some detail. It provides the motive for concealing and misrepresenting the nature of Defendants' actions to the public. It identifies and details multiple affirmative acts that go beyond mere silence, including but not limited to: (a) keeping critical information confidential; (b) communicating through means that would not be read or available to the public; (c) making statements falsely attributing the price of eggs to factors other than the Defendants' conspiracy; (d) setting up a website to tout its animal care certification program; (e) falsely stating that the animal care program was scientifically based; and (f) making public statements that the Defendants were vigorously competing with each other; when, in fact, they were collaborating to reduce egg supply.

Given the lengthy time period over which this conspiracy operated and the fact that much information remains in Defendants' hands, the 3-CAC does not identify every example of these

actions.  Instead, the 3-CAC specifically delineates a number of representative press releases, public statements and other actions in furtherance of the conspiracy, with relevant dates, places and participants.  The 3-CAC provides substantial detail as to the Defendants' actions and misstatements that satisfy both the general standards of Fed. R. Civ. P. 8 and the heightened standards of Fed. R. Civ. P. 9(b).

In addition, the doctrine of laches, rather than statutes of limitations, applies in determining the timeliness of IP Plaintiffs' West Virginia and Wisconsin unjust enrichment claims.  The doctrine of laches in both states requires that Defendants establish that they in some way relied to their detriment on IP Plaintiffs' inaction.  Thus, these doctrines require that Defendants suffered some sort of legally cognizable prejudice from any purported delay in filing lawsuits – a prejudice that goes beyond having to defend otherwise meritorious litigation. Defendants have made no such showing and, in any event, such issues should not be addressed in the context of a motion to dismiss.[3]

While the Defendants provide a state-by-state recitation of the various doctrines that could possibly apply to delay the accrual of the IP Plaintiffs' claims or toll the statutes of limitations, they fail to apply any of those doctrines to the facts of this case – and they make no attempt to apply the discovery rule doctrines to the issues at hand.[4]  Defendants do not address

---

[3] Minnesota's antitrust statute specifically states that in cases of continuing violations, the cause of action is "deemed" to arise at any time "during the period of the violation."  As noted below, because of the plain language of the statute and the Minnesota Supreme Court's statement that Minnesota law can and does diverge from federal law on who is entitled to sue and when, IP Plaintiffs' claims for damages under Minnesota's antitrust law are timely.

[4] Defendants' legal discussions attempt to outline the discovery rules in the IP Plaintiffs' home states, yet the Defendants do not apply the standards they identify to the facts as alleged in the 3-CAC.  While the allegations of the 3-CAC meet the requirements for delaying the accrual of the relevant statutes of limitation under the applicable discovery rules as noted in the discussions of the law of each state herein, Defendants should not be allowed to address the application of these standards – which they identify – for the first time in their reply.  *See, e.g., Reis v. Barley, Snyder, Senft & Cohen*, LLC, 426 F. App'x. 79, 83 (3d Cir. 2011) (issues not addressed in an opening brief are not considered if addressed for the first time

the allegations of the 3-CAC as a whole and in context.  Nor do they explain why the allegations are insufficient to create relevant factual issues under state tolling doctrines to pass muster under federal pleading standards.  Instead, in their "argument" section, Defendants make a number of assertions that supposedly apply to all the causes of action in all the various states.  Lastly, Defendants fail to make a credible argument that IP Plaintiffs should have discovered their conspiracy before the first indications of wrongdoing identified in the 3-CAC: the September 2006 charges by various state attorneys general that Defendants' promotion of their animal care program was misleading and inappropriate.  Thus, applying the relevant doctrines to the applicable state limitations period should require denial of Defendants' Motion.

**B.      It is Premature to Determine These Issues on a Motion to Dismiss.**

As suggested above, the 3-CAC raises factual issues that should not be decided on a motion to dismiss.  Such issues include the degree to which the state discovery rules and tolling doctrines prevent accrual of or toll the statutes of limitations for IP Plaintiffs' state law causes of action.  The 3-CAC alleges that the nature of the injury is one that is difficult to discern – i.e., it is difficult for a consumer to tell when prices are "artificially high" because of wrongful activity.  Further, "injury" in an antitrust context is defined by the violation.  An antitrust injury is an injury of the type the antitrust laws are designed to remedy – one that occurs because of a collusive restraint of trade.  And, by nature, such illicit collusion is secret.  The 3-CAC alleges that Defendants concealed critical information and that IP Plaintiffs lacked access to information critical to determining that they had been injured by some wrongful activity.  Thus, simple evidence of price levels, absent any evidence of the type of wrongdoing alleged in a complaint, should not be construed to put the IP Plaintiffs on notice of an antitrust conspiracy.  *See In re:*

---

in a reply brief); *United States v. Potts*, 2007 U.S. App. LEXIS 22843, at *3-4 (3d Cir. 2007) (an issue not raised and argued in an opening brief is abandoned).

*Bulk Extruded Graphite Prod. Antitrust Litig.*, 2007 U.S. Dist. LEXIS 25070, at *8-15 (D.N.J. 2007) (denying summary judgment on statute of limitations grounds; no public information about the type of wrongdoing alleged); *cf. Bell Atlantic v. Twombly*, 550 U.S. 544, 553-54 (2007) (rejecting allegations that parallel pricing or other behavior in and of itself are sufficient to establish an antitrust conspiracy because of the ambiguity of parallel behavior). Accordingly, the 3-CAC's allegations are sufficient to invoke the discovery rules and tolling doctrines of the various states and to identify factual issues that should not be resolved on a motion to dismiss.

The 3-CAC identifies when the first evidence of wrongful activity or collusion came into the public sphere. The 3-CAC alleges that on September 21, 2006, a group of state attorneys general[5] charged that the promotion of Defendants' animal care certification program was misleading. In a settlement entered into days after that announcement, Defendants agreed (through their trade association) not to misrepresent the nature and basis of their animal care guidelines and to change the logo put on each carton of certified eggs by or at the behest of Defendants.

It is important to note that, at the time, there was no public information that the animal care program was a ruse – or any other wrongdoing by Defendants. The September 21, 2006 charges of misleading behavior identified in the 3-CAC provide the first public clue of some *wrongdoing* by the Defendants – that some injury may have occurred. Moreover, these announcements mark the first point in time when any duty to inquire could *possibly* arise. The Defendants' only response is that the 3-CAC does not contain a *conclusory* allegation specifically identifying the tolling date. Defs Brief at 104, 106. But the 3-CAC identifies *facts that raise a question* as to when the IP Plaintiffs should have discovered their causes of action.

---

[5] Unlike the IP Plaintiffs, state attorneys general possess pre-suit civil investigative demand authority that enables them to subpoena Defendants' documents and otherwise obtain information that private citizens are unable to access and would not have been aware of under an inquiry notice or discovery rule standard.

Because when a plaintiff could have reasonably "discovered" the potential wrong presents an

issue of fact under the laws of each of the IP Plaintiff states, dismissal is inappropriate.  Further,

as IP Plaintiffs noted in response to the Defendants' original motion to dismiss, the allegations of

the 3-CAC allow an inference that the statutes of limitations did not begin to run, at the earliest,

until September 21, 2006, when the first allegations of some tangentially-related potential

wrongdoing became public.

## II.    STATEMENT OF FACTS

In the 3-CAC, the IP Plaintiffs allege that Defendants conspired to restrain the supply of

eggs, thereby artificially raising and maintaining the price of eggs.  According to the 3-CAC,

these actions successfully raised the price of eggs to IP Plaintiffs above what they should have

been absent Defendants' illegal conduct.  The 3-CAC lays out the actions taken by Defendants to

reduce egg supply, in chronological order, to illustrate how the conspiracy came into being, how

it operated, and how it policed compliance over the course of the "Class Period" (from at least

January 1, 2000 to the present).  It alleges that Defendants had a compelling, long-running

incentive to unite together to limit the supply of eggs in order to increase egg prices and

products.  The 3-CAC also alleges that Defendants were acutely aware the egg market was ripe

for conspiracy and that even the smallest reduction in supply would benefit them exponentially

in terms of the price of eggs.

The Court has already ruled that the allegations contained in the 3-CAC sufficiently state

claims under federal and state antitrust laws, state consumer protection laws and the common

law of most of the IP Plaintiffs' home states (the "IP Plaintiff states").  The issue before the

Court here is whether and to what extent the Defendants' efforts to conceal their actions and the

lack of information regarding Defendants' conspiracy available to consumers prevents

6

Defendants from raising defenses based upon the statutes of limitations.  Given this Court's familiarity with the basic allegations underlying the IP Plaintiffs' claims, the following recitation highlights those facts most relevant to the issue at hand, but these facts must be evaluated together and in the context of the overall conspiracy identified in the 3-CAC, including its objectives, aims and operation as a whole.[6]

The 3-CAC explains that the egg industry was ripe for conspiracy because eggs are a basic staple food item with no substitutes, and end user demand for eggs is highly inelastic.  (3-CAC ¶ 2.)  The egg market is also susceptible to collusion because there are substantial barriers to entry into the market.  (*Id*. at ¶ 148.)  Further, the egg industry has become increasingly concentrated, with a relatively small number of companies controlling the supply of eggs.  Most of these companies are, along with others, members of the United Egg Producers ("UEP"), the largest egg trade organization in the United States, which had 198 members representing 96% of the nations' laying hens during the Class Period.  (*Id*. at ¶ 154.)  UEP was formed in 1968 after a group of egg producers got together to discuss the "disastrous price cycles of the egg industry." (*Id*. at ¶ 51.)  The producers formed UEP to provide services to the egg industry, namely, "price discovery, production and marketing information, unified industry leadership, [ ] a strong relationship with USDA, [ ] a Washington presence, [and] strong industry promotion efforts." (*Id*. at ¶¶ 51, 309.)[7]

---

[6] *Cont'l. Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (antitrust conspiracies "are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

[7] Two other entities, United States Egg Marketers, Inc. ("USEM") and United Egg Association ("UEA"), make up the UEP "alliance."  USEM, is a nonprofit corporation that negotiates egg export sales.  USEM describes itself as "[a] producer cooperative established specifically for the purpose of exporting large quantities of U.S. Shell Eggs."  During the Class Period, Defendants utilized USEM to coordinate exports of eggs to reduce domestic supply and increase prices.  (3-CAC ¶138.)  UEA is a trade association managed by UEP.

Critically, while UEP styles itself as a "cooperative" of egg producers, during the Class Period, it performed none of the activities characteristic of real cooperatives. (*Id*. at ¶¶ 276, 300-01, 305, 317(a).) For example, it had a membership open to persons and entities who were not egg farmers or who were large integrated entities (*Id*. at ¶¶ 277-79, 303-04, 315, 317(b)-(d)); acted in concert with people and entities who were not cooperatives or cooperative members (until a time after the filing of the actions in the MDL) (*Id*. at ¶¶ 155-56, 158, 280-99, 310-15, 319(e)-(g)); and engaged in activities, including the pre-production supply restraint conspiracy outlined herein, that are not legitimate activities for cooperatives. (*Id*. at ¶¶ 159, 275-76, 301-02, 317(h)-(i).)

The 3-CAC alleges that over the course of the Class Period the Defendants repeatedly urged each other to reduce the supply of eggs and sought and reached tacit or explicit agreements to limit the supply of eggs to increase egg prices. (*Id*. at ¶¶ 152-274.) The 3-CAC identifies statements in industry publications, meetings and internal industry communications (including emails and memoranda) designed to facilitate the conspiracy. (*Id*. at ¶¶ 162-174, 176-85, 187-90, 195-202, 204, 209-222, 224-242, 244-49, 252-257.)[8] As noted in the 3-CAC, these publications were not available to the general public and shielded Defendants' conspiracy from the general public. (*Id*. at ¶ 155.) Obviously, the internal industry emails were not available to the general public, nor were UEP meetings or their minutes generally available to the public. (*Id*. at ¶¶ 336, 348.) Even UEP's membership lists are confidential and not available to the public. (*Id*. at ¶ 348.) The identities of those companies agreeing to specific supply reductions was kept secret and producers agreed to the program in secret so that they would not be

---

[8] Defendants argue that the fact that communications in the industry and UEP audits made it difficult for them to hide any cheating on supply management schemes must demonstrate the available of same information to consumers. (Defs' Brief at 110-11.) But the 3-CAC alleges (and common sense suggests) that such detailed business information was not available to Defendants' direct customers or consumers.

associated with the illegal scheme.  Indeed, their identities were even kept secret from other UEP members.  (*Id*. at ¶ 355.)  Further, and as noted in the 3-CAC, the Defendants did not publicly discuss the details of their conspiracy.  (*Id*. at ¶¶ 336, 355.)

Similarly, as alleged in the 3-CAC, the nature of the harm caused by the Defendants' conspiracy is not one that readily lends itself to a conclusion of collusion.  (*Id*. at ¶ 350.)  The retail prices among competitors who sell directly to plaintiffs are competitive, meaning that the prices among sellers are relatively uniform over time, though they reflect changes in wholesale prices and changes in supply.  (*Id*. at ¶ 349.)  Moreover, as alleged in the 3-CAC, given the IP Plaintiffs' place in the distribution system, their access to market information at the producer level is such that it is essentially impossible for consumers to discover illegal collusion in the ordinary course of exercising due diligence in their purchases of eggs.  (*Id*. at ¶¶ 350, 352.)  Further, the 3-CAC alleges that the IP Plaintiffs exercised due diligence in making their purchases by doing what consumers should do – looked at retail prices and shopped around, and none learned of any collusion among egg producers.  (*Id*. at ¶¶ 351, 366.)  Thus, given the secret nature of many of the agreements, many of the exact details of the supply management scheme remain largely in Defendants' hands, even today after several Defendants have settled with various parties.  Accordingly, the IP Plaintiffs remained ignorant of Defendants' wrongdoing and their own injury.

The 3-CAC also alleges that the Defendants misrepresented the reasons for high egg prices in public statements – statements that deflected attention from the Defendants' supply management scheme.  For example, articles from December 11, 2003 and November 28, 2003, cite Ken Klippen of UEP as stating among the key factors driving egg prices was the popularity of low carb diets and decreasing concerns regarding cholesterol.  (*Id*. at ¶ 362.)  At the same

time, Defendants also directly misrepresented the reasons for high egg prices to their direct customers.  (*Id.* at ¶ 356.)  In addition, while they were engaged in a collusive effort to reduce the supply of eggs, various Defendants filed annual reports with the SEC in 2002-2007 – identified specifically in the 3-CAC – falsely claiming that the industry was intensely competitive.  (*Id.* at ¶ 357.)

As part of the scheme, Defendants discussed in their meetings, communications and newsletters an "animal care" certification program.  The real purpose of that program was to reduce the number of egg producing chickens, thus reducing supply and increasing prices.  (*Id.* at ¶¶159, 175-81, 184-93, 217, 237, 247, 256, 318-20, 322.)  In fact, the 3-CAC alleges that the animal care certification program was designed to provide a "cover story" for the overall reductions in egg supply, even though many of the Defendants' actions were not a necessary part of animal care standards.  For example, as alleged in the 3-CAC, increases in cage size need not reduce the supply of eggs or the number of hens laying eggs – because egg producers could simply acquire more cages.  (*Id.* at ¶ 328.)  Over the course of the Class Period, the 3-CAC alleges that the Defendants engaged in a series of actions that misleadingly portrayed the legitimacy of the animal care program in an effort to avoid public suspicion of potential industry collusion and high egg prices.  (*Id.* at ¶¶ 328, 333-35.)  These efforts, according to allegations in the 3-CAC and reasonable inferences that can be drawn from those allegations, included explicit or implicit representations as to the quality of care the hens were receiving and the scientific bases for the guidelines. (*Id.* at ¶¶ 330-31, 335.)  For example:

a)  As part of the conspiracy, Defendants selling "certified eggs" either put an animal care logo on every carton of "certified" eggs sold to consumers or had others put such logos on the eggs cartons.  (*Id.* at ¶ 334.)

b)  In a press release dated November 26, 2003, Ken Klippen of the UEP stated that through the animal care certification program, the egg industry is

leading the animal welfare movement, that the producers voluntarily entered the program and that consumers should draw comfort from the program.  (*Id*. at ¶ 337.)

c)  In a March 6, 2003 press release, UEP stated that consumers concerned with animal welfare could "be assured" that the eggs with the animal care logo came from certified farms.  (*Id*. at ¶ 338.)

d)  The Defendants established a website www.animalcarecertified.com.  On June 3, 2004, the website contained a representation that the UEP program was designed to show a commitment to caring for the hens and to produce the highest quality eggs in the world.  (*Id*. at ¶ 341.)  Starting on or about June 18, 2004, the website noted that the program represented a commitment to the health and safety of the hens and required an "independent audit" of compliance with its standards.  *Id*.

e)  In an October 3, 2005 press release, Defendants confirmed that the UEP program and logo were designed to assure consumers "that the eggs they are purchasing came from hens that were properly cared for under scientifically-based animal husbandry guidelines…."  (*Id*. at ¶ 342.)

f)  The Defendants engaged a PR firm to monitor public communications and to ensure its message was getting to the public.  (*Id*. at ¶ 344.)

g)  In an October 3, 2005 press release, UEP representatives described its agreement with the Federal Trade Commission ("FTC") to change UEP's logo as providing assurance that its scientifically based guidelines had "won approval from federal regulators," which was simply untrue.  (*Id*. at ¶¶ 345-46.)

The 3-CAC also alleges how these were false or misleading: (a) the animal care program was based on an economic analysis of the market, not the work of a scientific advisory committee (*Id*. at ¶¶ 319-320, 322), (b) that key aspects of the program, such as the requirement that producers could not backfill or make up for the reduced numbers of hens in a given space by adding more hens was unrelated to the humane treatment of the hens (*Id*. at ¶¶ 175-77, 189, 320, 322), and (c) that UEP is not in fact a legitimate farmers' cooperative (*Id*. at ¶¶ 275-317.)

The 3-CAC also alleges that the success of Defendants' conspiracy depended on concealing their actions.  As alleged in the 3-CAC, had the reality of the Defendants' conduct

become public, they would have faced actions – such as the cases in this MDL – to recoup their illicit gains.  (*Id*. at ¶¶ 354, 359-60.)

Finally, the 3-CAC identifies facts establishing when the wrongdoing of the Defendants, and thus the injury, became apparent, starting with allegations on September 21, 2006 by various state attorneys general that Defendants' promotion of its animal care guidelines were misleading. (*Id*. at ¶¶ 323-26.)  The scheme was brought more fully to light in the months following those charges though articles in the press and Congressional testimony suggesting that Defendants' collective action to reduce egg supply was responsible for increasing egg prices.  (*Id*. at ¶¶ 259-62, 323-26.)

### III.   <u>LEGAL ARGUMENT</u>

**A.**   **The 3-CAC Pleads Facts Establishing the Applicability of State Discovery Rules and Fraudulent Concealment with Sufficient Specificity**.

Although this case was filed in 2008, formal discovery has just begun.  The issue presented by this motion is whether the allegations in the 3-CAC are sufficient to allow IP Plaintiffs to proceed with discovery to further develop the time frame of Defendants' conspiracy and the time frame for which they should be held liable.  In its decision on the first motion to dismiss, the Court granted the Defendants' motion, without prejudice, on grounds that the 2-CAC did not allege the fraud with sufficient detail.  (Decision, Dkt. No. 562 at 78.)  Despite the length of Defendants' renewed motion to dismiss, it does very little to address whether the allegations of the 3-CAC meet the requirements for pleading facts that are sufficient to toll the statutes of limitations under either Fed. R. Civ. P. Rule 8 – which (as noted herein) is applicable to allegations necessary to invoke the relevant states' discovery rules – or Fed. R. Civ. P. Rule 9(b).

Issues as to the applicability of statutes of limitations usually raise "factual questions as to when a plaintiff discovered or should have discovered the elements of its cause of action." *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999). Thus, because they raise the statute of limitations defenses on a motion to dismiss, the "defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Id*. at 425 (quoting *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d. 481, 498 (3d Cir. 1985)). If the allegations of the 3-CAC, taken as true, identify facts that could lead a jury to conclude the statutes of limitations could be tolled and/or create factual questions as to when the statutes of limitations began to run, Defendants' Motion should be denied. Simply because the Defendants "contend that IP Plaintiffs should have known" of the injuries and wrongdoing "at an earlier time, the court cannot draw that conclusion," at the motion to dismiss stage, that the discovery rule and fraudulent concealment doctrines should not apply to toll the statutes of limitations. *See Gelof v. Smith*, No. 11-483, 2012 U.S. Dist. LEXIS 13231, at *8-10 (D. Del. 2012).

Allowing all the IP Plaintiffs' claims to go forward and be tested in discovery meets the underlying purposes of the pleading rules of the Federal Rules of Civil Procedure. In general, the Federal Rules of Civil Procedure require that a complaint provide a short, plain statement summarizing the plaintiff's entitlement to relief. Fed. R. Civ. P. 8(a). Rule 8 requires that plaintiffs set out sufficient facts to plead a plausible claim and provide notice to defendants of the claims against them so they can formulate a defense. *See Twombly*, 550 U.S. at 570. This Court has ruled that the allegations of the 2-CAC, on which the 3-CAC expands, were sufficient to state claims against the remaining Defendants. (Decision Dkt. No. 562.)

In cases where a plaintiff alleges some form of fraud, Rule 9(b) supplements Rule 8, requiring that allegations resting on "fraud" shall be stated with particularity, although intent may be averred generally.  Fed. R. Civ. P. 9(b).  The main purposes of the pleading requirements of Rule 9(b) are to provide Defendants with specific notice of the misconduct alleged against them and to protect Defendants against unsubstantiated charges of wrongdoing and fraud.  *See Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004); *Turi v. Main St. Adoption Servs., LLP*, No. 11-03761, 2012 U.S. Dist. LEXIS 141770 at *17-18 (E.D. Pa. Oct. 1, 2012); *Martrano v. Quizno's Franchise Co., L.L.C.*, No. 08-0932, 2009 U.S. Dist. LEXIS 52025, at *29 (W.D. Pa. June 15, 2009) (citing *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984)).  Because this Court has ruled that the IP Plaintiffs have stated a claim against the Defendants, a fulsome development of the facts regarding the length and breadth of their supply management scheme will do no additional "harm" to their reputations.  The *only* result of granting Defendants' motion would be to rule out otherwise legitimate claims of millions of consumers who really had no chance at all to discern that they were harmed.  Where, as here, Defendants' conduct is identified with sufficient precision that they know the nature of the charges and provided with specific exemplary acts and communications, courts should apply Rule 9(b) flexibly.  *See State Farm Mut. Auto. Ins. Co. v. Ficchi*, No. 10-555, 2012 U.S. Dist. LEXIS 63282 at * 17-24 (E.D. Pa. May 4, 2012) (noting that while boilerplate fraud allegations are insufficient, courts should apply Rule 9(b) flexibly to meet the underlying goals of the federal rules).

While statutes of limitations are designed, in part, to cut off stale claims and provide certainty for businesses and individuals in the pursuit of their legitimate affairs, where a conspiracy is of long-standing duration, with a relatively stable organization and consistent goals

14

that are alleged to have continued to the date of filing the plaintiffs' actions, there is much less

chance that the claims will be stale or that that critical evidence will have been lost, other than

through deliberate actions by conspirators.  Further, if the allegations of the 3-CAC are true and

Defendants have carried on an illegal output restriction scheme over a period of years, there is no

value in providing stability to Defendants' expectations that they can go on with their illegal

activities safe in the knowledge that their efforts to conceal wrongdoing effectively shielded

them from responsibility for their actions.

In light of these policy considerations, the strictures of Rule 9(b) should be read flexibly,

understanding that "Rule 9(b) does not require an 'exhaustive catalog of facts,' it merely requires

'sufficient factual specificity to provide assurance that plaintiff has 'investigated and reasonably

believes that a fraud has occurred.'" *LG Electronics, Inc. v. Asko Appliances, Inc.*, No. 08-828,

2010 U.S. Dist. LEXIS 31571, at *6-7 (D. Del. Mar. 29, 2010).   In cases such as this, where the

complaint identifies a complex scheme with multiple facets occurring over a long period of time,

"courts in this Circuit have long held … that less specificity in pleading fraud is required."

*Kaiser Found. Health Plan, Inc. v. Medquist, Inc.,* No. 08-4376, 2009 U.S. Dist. LEXIS 29124,

at *20-22 (D.N.J. Apr. 8, 2009) (quoting *Kronfeld v. First Jersey Nat. Bank*, 638 F. Supp. 1454

(D.N.J. 1986)); *S. Broward Hosp. Dist. v. Medquist Inc*., 516 F. Supp. 2d 370, 385 (D.N.J. 2007)

(complaint held sufficient even though it did not identify which of multiple fraudulent activities

applied to each plaintiff, the complaint alleged the defendant carried out its fraudulent scheme

against all plaintiffs using some or all of the methods).

So long as a complaint identifies the nature of the scheme, its elements, and the time

period with sufficient specificity so that a response to the complaint can be formulated, the

complaint should not be dismissed.  *See Kaiser Found. Health Plan, Inc.*, No. 08-4376, 2009

U.S. Dist. LEXIS 29124, at *20-22 (D.N.J. Apr. 8, 2009); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 7-9 (D.D.C. 2003) (collecting cases); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 258, 268-70 (D.D.C. 2002) (complaint alleging complex scheme occurring over a period of years not dismissed so long as there was sufficient specificity to allow a response).  All these requirements are met here.

In their renewed motion to dismiss, instead of examining whether the allegations of fraudulent concealment are sufficiently specific – which was the primary basis for this Court's decision to grant their first motion – the Defendants summarize the "new" allegations of the 3-CAC in isolation and allege that those new allegations do not justify delaying the accrual of the relevant causes of actions or toll the relevant statutes of limitations.  The Defendants do not specifically address whether the allegations of the 3-CAC outline the fraud with sufficient "particularity" beyond calling many allegations of fact "conclusory."  (Defs' Brief at 104, 106.) The 3-CAC adds details to the allegations from the 2-CAC, providing specific examples of Defendants' statements and other actions with dates, places and identified speakers.  Additional factual allegations relating to both the misleading nature of Defendants' claims and their scienter are added.  For example, the 3-CAC alleges that

> In a *press release* dated *November 26, 2003*, *Ken Klippen* of the UEP stated that the "egg industry is leading the animal welfare movement" through its certification program. The UEP's press release described the scope of the program by stating that "egg farmers that voluntarily implement the guidelines and pass a stringent annual audit become an Animal Care Certified company and can display the Animal Care logo on their egg cartons and products. More than 200 egg farmers currently participate in the program, representing more than 84 percent of the nation's total laying hens (229 million layers).

(3-CAC at ¶ 337) (emphasis added).  The 3-CAC includes a plethora of new allegations similarly specifying Defendants' conduct and representations with dates, places and identified speakers.

16

(*e.g. Id.* at ¶¶ 338-45, 347.)  Furthermore, additional factual allegations relating to both the

misleading nature of Defendants' claims and their scienter were also added to the 3-CAC.  For

example:

> Moreover, even after the Federal Trade Commission objected to the "Animal Care Certified" logo, the conspirators continued to feed misinformation to the public. For example, in a press release dated October 3, 2005, UEP representatives described UEP's revised logo as an implicit approval of the legitimacy of their claims. As described in the article from PR Newswire: "[t]he egg industry's new seal which assures consumers that the eggs they are purchasing came from hens that were properly cared for under scientifically-based animal husbandry guidelines has won approval from federal regulators, the United Egg Producers (UEP) announced today."

> This announcement that the FTC had somehow approved of the new seal was misleading. As the FTC noted in a letter to Al Pope and Gene Gregory, the change in the logo simply resolved the specific complaint regarding the then-existing logo. And the FTC noted, its decision "should not be construed as a formal Commission determination of whether the challenged actions comply with Section 5 of the FTC Act."

> Gene Gregory of the UEP was quoted as saying that the change in the logo in 2005 from "Animal Care Certified" to "United Egg Producers Certified" with a tagline "[p]roduced in compliance with United Egg Producers' Animal Husbandry Guidelines" "will help remove any lingering doubts or concerns" about the animal care program. This statement was misleading in that it perpetuated the canard that the supply reductions agreed upon and effectuated by the Defendants were a necessary part of the animal welfare standards – which they were not. It was also misleading in that many of the practices that consumers might find objectionable in the treatment of layers did not cease.

(*Id*. at ¶¶ 345-47.)  Again, a plethora of new allegations of Defendants' intentionally misleading

conduct were added in the 3-CAC.  (*See, e.g., Id.* at ¶¶ 331-32, 335-36, 341-47.)

The 3-CAC satisfies all the relevant tests for whether a complaint meets 9(b)'s standards.

It provides specific dates for specific exemplary statements and press releases issued in

furtherance of the conspiracy.  The 3-CAC, like the 2-CAC, identifies each of the Defendants

individually, describes their relevant businesses, their participation in the scheme and the nature

of the fraud in substantial detail:

- The time frame of the long-running scheme is identified (*e.g.*, *id.* at ¶¶ 158-274);

- Each defendant is identified and described, so that its role in the industry and scheme to reduce the supply of eggs under the pretext of animal husbandry standards is clear (*e.g.*, *id.* at ¶¶ 50-121);

- The role of trade organizations in organizing and facilitating the conspiracy and fraud is described in detail (*e.g.*, *id.* at ¶¶ 50-54, 152-157);

-  The participation of various Defendants in relevant industry trade groups and decision-making groups creating and implementing the scheme, is identified (*e.g.*, *id.* at ¶¶ 59-62, 66, 68, 72-75, 78-79, 84, 88, 90, 92, 94, 97, 100-102, 104-107, 110-111, 113, 118, 121);

- The participation of industry members in various programs is described in detail (*e.g.*, *id.* at ¶¶ 175-193);

- The facts showing that the trade groups were not legitimately entitled to engage in collective actions to reduce supply are specifically identified (*e.g.*, *id.* at ¶¶ 275-317);

- The nature and general mechanisms of the scheme are identified, including phony animal husbandry standards and flock reductions in the guise of animal husbandry, as well as export programs (*e.g.*, *id.* at ¶¶ 152-274, 318-322);

- The misleading nature of Defendants' conduct is identified through reference to charges by state attorneys' general that Defendants were making arguably misleading claims and through allegations that Defendants had a motive to mask or cover-up their scheme (*e.g.*, *id.* at ¶¶ 323-326);

- The Defendants monitored the market and understood the effects of their actions (*e.g.*, *id.* at ¶¶ 199 – 211, 222 – 225, 252-258);

- The efforts undertaken by Defendants to monitor and control the "story" being delivered to the public (*e.g.*, *id.* at ¶¶ 331-347);

- The importance to Defendants that the nature of their actions remain secret (*e.g.*, *id.* at ¶¶ 353-362);

-  The "places" and nature of the misstatements in furtherance of the scheme as implemented are identified, including

    - Displaying the logo on egg cartons that are specifically alleged to be have been placed on those cartons by or on behalf of Defendants (*e.g.*, *id.* at ¶¶ 9, 94, 337),

18

- o Press releases and public comments by the Defendants made to the public and distributors attributing the price increases to legitimate actions, market factors, or misrepresenting the nature and basis for the animal care standards, including specific exemplary releases identifying the date and the speaker (*e.g.*, *id.* at ¶¶ 172, 182, 184, 185, 187, 238, 296-300, 304-07, 405);

- o Statements contained in specific public filings that suggested that the Defendants were vigorously competing with each other for market share, when in fact they were collaborating to reduce the supply of eggs on the market to increase egg prices (*e.g.*, *id.* at ¶¶ 357-358);

- o Statements on a specifically identified website, identified by time, touting the benefits of animal care standards; and

- • Allegations that the statements and standards as communicated to the public were misleading and pretextual – and the Defendants knew it (*e.g.*, *id.* at ¶¶ 331-347).

The 3-CAC, like the 2-CAC also alleges what was gained as a result of the scheme: millions of dollars in increased revenues and profits derived from increased prices paid by IP Plaintiffs.[9]  Further, as the 3-CAC points out, Defendants have agreed in settlements with the FTC and state attorneys general to abandon the UEP Animal Care Certified logo and no longer claim that this UEP program was scientifically designed to or actually provided a superior standard of care for the hens.  (3-CAC ¶¶ 324-326).[10]

The detail in the 3-CAC, including the identification of specific times and dates of exemplary communications or the substance and recipients of communications (where more precise information was not available absent formal discovery), more than meets the strictures of Rule 9(b) in the context of a conspiracy such as this one.  It injects sufficient precision for

---

[9] *E.g.*, 3-CAC at ¶ 168.

[10] Not only does the fact of the investigations and the settlements indicate that the Defendants are on notice of *precisely* the misconduct alleged to have misled consumers, the date on which the attorneys general's announcement was publicly released (Sept. 21, 2006) provides one potential date that a jury could find is the "tolling" date from which *consumers* and others outside the egg industry might possibly have been on notice of the misleading nature of Defendants' "animal husbandry" campaign.  The initial complaints were filed well within every applicable statute of limitations from that date.

19

Defendants to understand the misconduct alleged both through its description of the scheme and misstatements designed to mislead the public as to the nature of Defendants' actions. Under all the circumstances here, the 3-CAC meets the tests for precision under Rule 9(b). *See Kaiser*, 2009 U.S. Dist. LEXIS 29124, at *20-22; *see United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 921 (4th Cir. 2003); *Kronfeld,* 638 F. Supp. at 1465. *Bogart v. National Community Banks, Inc*., 1992 U.S. Dist. LEXIS 14958, at *22-27 (D.N.J. Apr. 28, 1992); *CIT Group/ Equip. Fin., Inc. v. Krones, Inc*., 2009 U.S. Dist. LEXIS 84427, at *15-19 (W.D. Pa. Sept. 16, 2009); *Martrano v. Quizno's Franchise Co*., L.L.C., 2009 U.S. Dist. LEXIS 52025, at *39 (W.D. Pa. June 15, 2009); *see also State Farm Mut. Auto. Ins. Co. v. Ficchi*, 2012 U.S. Dist. LEXIS 63282, at * 17-24.

## B. Questions of Fact Regarding the States' Discovery Rules and Fraudulent Concealment Doctrines Require Denial of Defendants' Motion to Dismiss.

When the facts as pled in the 3-CAC are applied to the relevant states' law, questions of fact are raised that render dismissal on the pleadings inappropriate. First, under the relevant discovery rules, a plaintiff discovers a cause of action when they have sufficient information to recognize they have been injured and that their injury results from some wrongful conduct of defendants. Further, a plaintiff is only constructively held to have "discovered" his or her causes of action when a reasonable investigation under the circumstances would have revealed the injury and Defendants' wrongdoing.

As the discussion of each state's law below confirms, determinations regarding both the application of the various states' discovery rules and the fraudulent concealment doctrines are inherently factual questions. These questions include  (a) when a party could have discovered the wrongdoing; (b) whether potentially ambiguous actions were misleading; (c) what a reasonable investigation is and what it would reveal; and (d) whether the facts a potential

plaintiff has or might learn through a reasonable investigation puts the plaintiff on notice of

wrongdoing.  In order for dismissal to be proper, the facts as pled must establish *as a matter of*

*law* that (a) Defendants' actions and the resulting "injury," taken in context, were not sufficiently

secret to delay discovery of their conspiracy; and (b) IP Plaintiffs could have discovered the

nature of their injury and that Defendants' *wrongdoing* was the cause.

Similarly, the doctrine of fraudulent concealment, whether viewed as equitable tolling,

equitable estoppel or as an independent doctrine, demonstrates dismissal of this action is

inappropriate.  The doctrine of fraudulent concealment tolls relevant statutes of limitations when

Defendants engaged in conduct designed to conceal their misconduct.  Thus, if a *reasonable*

*inference* can be drawn from the 3-CAC's allegations that Defendants' actions were misleading

and that they effectively hid the reality of their actions, then the 3-CAC sufficiently pleads

"fraud" or "concealment.  *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480 (D.C. Cir.

1989); *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp.2d 777, 788-89 (N.D. Cal. 2007)

(concluding that plaintiffs' allegations of numerous acts of concealment including "pretextual

justifications for the inflated prices of rubber chemicals" provided a sufficient basis to assert

tolling on the basis of fraudulent concealment); *see also Ohio Valley Elec. Corp. v. Gen. Elec.*

*Co.*, 244 F. Supp. 914, 932 (S.D.N.Y. 1965) (finding fraudulent concealment where defendants

falsified expense accounts to hide the true nature of their actions).

Therefore, the Court must determine whether all of the allegations in the 3-CAC, when

taken together, establish that IP Plaintiffs could have discovered their causes of actions as a

matter of law.  It is clear when examining the allegations contained in the 3-CAC that IP

Plaintiffs could not have discovered their causes of action for purposes of the discovery rules of

the various states.  As a result, they cannot be held to have learned sufficient facts to alert them

of Defendants' fraud until, and at the earliest, when various state attorneys general announced that Defendants had engaged in misleading conduct in connection with the animal husbandry guidelines.  Accordingly, IP Plaintiffs were not put on notice of Defendants' wrongdoing as a matter of law and the Motion should be denied.  *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 803-04 (S.D. Ohio 2011) (noting whether or not sources of information was concealed and the level of concealment would be issues for discovery, not for a motion to dismiss); *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1235 (D. Kan. 2010) (keeping real motives secret from plaintiffs and providing pretexts for price increases states a claim for fraudulent concealment); *In re TFT-LCD Antitrust Litig.*, 586 F. Supp.2d 1109, 1132 (N.D. Cal. 2008) (keeping real facts secret from objects of the conspiracy and providing pretextual statements for prices state fraudulent concealment sufficient to toll the statute of limitations for purposes of 12(b)(6) motion); *In re Rubber Chem. Antitrust Litig.*, 504 F. Supp.2d 777, 789 (N.D. Cal. 2007) (where pretextual statements have been identified and level of secrecy identified, inappropriate to dismiss); *see also MetroPCS Wireless, Inc. v. AU Optronics Corp.*, No. 07-1827, 2011 U.S. Dist. LEXIS 124164, at *23-24 (N.D. Cal. Oct. 26, 2011) (allegations that plaintiffs could not have known about an antitrust conspiracy until the date investigations were disclosed  because defendants concealed their conspiracy are sufficient to toll the statutes of limitations for the purposes of a motion to dismiss).[11]

   The nature of the discovery and fraudulent concealment doctrines as applied to the facts alleged in the 3-CAC, establishes the hollow nature of Defendants' argument that public

---

[11] In a conspiracy case, the acts of fraudulent concealment by one defendant on behalf of the conspiracy are imputed to all the members of the conspiracy and thus toll the statute as to all defendants.  *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 538 (6th Cir. 2008); *In re Mercedes-Benz Anti-trust Litig.*, 157 F. Supp.2d 355, 375 (D.N.J. 2001); *United Power Ass'n. Inc. v. L.K. Comstock & Co*., No. 89-CIV-766, 1992 U.S. Dist. LEXIS 18874, at *19-20 (D. Minn. Oct. 27, 1992).

knowledge of some aspects of their actions means that the statutes of limitations must have run. These arguments erroneously assume that as a matter of law public knowledge of animal husbandry standards, that some producers followed such standards, and that egg supply ultimately was reduced, should indicate to a reasonable consumer that Defendants engaged in a conspiracy to reduce the supply of eggs. Defendants' argument also assumes that the Court can find, *as a matter of law*, an investigation that was reasonable for consumers to undertake on the basis of such information would have discovered the Defendants' conspiracy or that such standards were not misleading. The 3-CAC alleges IP Plaintiffs could not have discovered the nature of Defendants' conspiracy because they did not have ready access to internal industry communications nor have access to the nature of information required to assess the Defendants' claims regarding the purported animal husbandry standards. The Defendants ignore these allegations other than to call them conclusory, which they are not.

In addition, the cases Defendants cite for the proposition that the mere availability of some public information regarding what they were doing simply do not support their argument.[12] For example, *Larson v. Norkot Mfg., Inc.*, 627 N.W.2d 386, 389 (N.D. 2001), supports IP Plaintiffs' argument. *See* Defs' Brief at 22. The *Larson* court noted that plaintiffs must have information that suggests *a plaintiff has a claim against defendants* to start the statute of

---

[12] *Martinez v. SCI Arizona Funeral Servs., Inc.*, 2009 Ariz. App. LEXIS 619 at *6-9 (Ariz. App. 2009), is discussed in the section of this brief addressing Arizona law. In that case, evidence showing plaintiff had notice of the alleged wrongdoing was that *he had previously filed a complaint alleging the very wrongdoing at issue*. *Szymanski v. Boston Mut. Life Ins. Co.*, 778 N.E.2d 16, 20-21 (Mass. Ct. 2002), did not address when affirmative acts of fraudulent concealment could toll the statute of limitations – the only question was whether an insurance company had a fiduciary duty that required it to disclose all the facts regarding a vanishing premium policy so that silence could constitute fraudulent concealment. *Id*. at 22-23. Moreover, the insurance company furnished the plaintiff the information he claimed he did not know when he asked for the information. *Id*. *Dapkus v. Dapkus*, No. 07-1385, 2008 Mass. App. Unpub. LEXIS 595 (Mass. App. 2008), addressed a situation where the claims based on failure to disclose property transfers were not viable in light of searchable public records that would have revealed that the property had in fact been transferred – i.e., that the plaintiff *could have discovered the wrongful conduct alleged*. *Id*. at * 6-9.

limitations running, not merely facts that could relate to a claim depending on the circumstances. 627 N.W.2d at 389-90.  In *Larson*, merely having copies of incompetently prepared agreements which did not contain the proper exculpatory language did not put the plaintiff on notice of a potential malpractice claim.  Only the receipt of a notice of a suit against plaintiff that should have been foreclosed by proper drafting actually triggered the running of the statute of limitations.  *Id*.[13]  Here, it was only when information came to light regarding the true nature of Defendants' actions that  Plaintiffs could possibly be deemed to have knowledge of any claim against Defendants.  Even then, it took extensive investigation and cooperation from parties with relevant information to permit plaintiffs to allege the facts that now constitute the 3-CAC.

*Carder v. BASF Corp.*, 919 So. 2d 258 (Miss. App. 2003), cited in Defs' Brief at 42-44, 112 n. 28, is inapposite *and* explicitly rejects the argument that the Defendants make here.  First, the "publication" creating notice of the antitrust claims in *Carder* was a Wall Street Journal article, not described by the court but likely relating a Reuters report of the DOJ's issuance of subpoenas issued in connection the DOJ's "global vitamin price fixing probe."[14]  *Carder*, 919 So.2d at 262 (noting that the information regarding the cartel was published for the first time in an October 7, 1998 Wall Street Journal article).  A report suggesting the existence of a global price-fixing cartel is simply not similar to discussions of a presumably legitimate animal care program.  Moreover, the *Carder* court *explicitly* rejected the argument that publication of some information in the public sphere is sufficient to commence the running of the statute of limitations.  *Id.* ("This opinion *is not intended to suggest* that information published in a newspaper located anywhere automatically is sufficient to commence the running of the statute

---

[13] Further, because the record in *Larson* was not clear as to when the plaintiff received the relevant notice, summary judgment was inappropriate.  *Id.*

[14] *See* http://www.oralchelation.com/methyl/data/data5.htm#october

of limitation on a latent injury, *but is limited solely to the facts of this case*." (emphasis added)). *Gillam v. Firestone Tire & Rubber Co.*, 489 N.W.2d 289, 293 (Neb. 1992), cited by Defendants at 52, 112, involved an appeal from a bench trial where the trial court had *excluded plaintiff's evidence of fraudulent concealment and the plaintiff did not contest that decision on appeal. Id.*

Defendants similarly assert that UEP audits of compliance with its animal care guidelines were "public" in 2002 and this establishes IP Plaintiffs' claims are time barred as a matter of law. Defs' Brief at 110. Such an argument ignores the facts as alleged in the 3-CAC that Defendants made misleading statements regarding the guidelines, that the logos advertising the guidelines were misleading, and that the IP Plaintiffs could not check whether such guidelines were a sham or part of a conspiracy to reduce supply. In light of the totality of the allegations in the 3-CAC, the fact that a trade association examined producers who were claiming to comply with its announced animal husbandry guidelines should not, *as a matter of law*, start the statutes of limitations running. *See In re: Bulk Extruded Graphite Products Antitrust Litig.n*, 2007 U.S. Dist. LEXIS 25070 at *8-15.

Nor do the allegations regarding the concerns about the program expressed by Sparboe Farms have anything to do with whether the relevant statutes of limitations bar the IP Plaintiffs' causes of action. Defs' Brief at 108. The allegations regarding letters from Sparboe Farms have nothing to do with whether IP Plaintiffs were on notice of wrongdoing by the Defendants. Defendants do not contend that such letters were available to IP Plaintiffs prior to Sparboe's settlement with the Direct Purchasers. Indeed, Defendants could not make such a claim because they have previously argued that such letters were confidential and privileged. Even the *allegations* in the Direct Purchasers Plaintiffs' complaint relating to what was learned from Sparboe were initially filed under seal so the public would not see them *and* were *redacted from*

*the version provided to the IP Plaintiffs.*[15]  Further, as the Defendants note, the 3-CAC alleges that in materials that could become public, the Defendants attempted to conceal the nature of the program by not referring to it as a supply management program.  To the extent that Defendants argue that the Sparboe letters did not give them notice of the illegality of their conduct, it does not allow a determination of their "scienter" as a matter of law.  This argument simply ignores other allegations in the 3-CAC, including that, the Defendants (a) understood the effects of their actions on egg prices paid by wholesale purchasers and consumers; (b) agreed to keep their communications regarding supply management hidden from consumers; (c) were members of an organization that allowed non-producers as members; and (d) were members of an organization that did not perform any of the basic activities of an real cooperative.  These allegations together provide an at least an inference of the relevant scienter.

Finally, Defendants may not point to allegations in the 3-CAC reciting evidence revealed over several years of informal investigations as somehow demonstrating the ease of discovering their wrongdoing.  These allegations reflect information gathered after the state attorneys general issued press releases that alleged the promotion of the animal care guidelines were at least misleading, and later stories in the media and subsequent Congressional testimony raising questions as to whether the prices of eggs were being artificially propped up by the collective actions of the egg industry.  They also include material from parties who decided to cooperate after their wrongdoing was revealed in these public sources.

---

[15] As the Court will recall, IP Plaintiffs were required to make a motion to unseal the documents and get access to the pleadings they were entitled to as parties to the MDL under the terms of the protective orders governing this action.  Dkt. No. 229.

**C.**     **The 3-CAC Sufficiently Alleges Facts Establishing the Earliest Date That IP Plaintiffs Could have Discovered Their Claims.**

IP Plaintiffs have sufficiently alleged facts establishing the earliest date at which they could have discovered their claims.  Despite Defendants' insistence that a singular "tolling date" be alleged (Defs' Brief at 105), accrual under the relevant discovery rules and the length of time the relevant statutes of limitations were tolled under the relevant fraudulent concealment doctrines is an inherently factual question.  The 3-CAC pleads *facts* identifying the dates on which various aspects of Defendants' wrongdoing was revealed.  Specifically, the 3-CAC alleges that on September 21, 2006, various state attorneys general asserted that claims made regarding Defendants' animal care certification program were misleading.  (3-CAC ¶ 324 and n. 22.)  The 3-CAC also alleges that on or around September 26, 2006, the Defendants "abandoned the pretense that its 'Animal Care Certified Program' had any humane animal husbandry benefits" – the only *wrongdoing* that was arguably public at the time.[16]  (*See* 3-CAC, ¶¶ 324-26.)[17]

Of course, the CAC also alleges that critical information remained unavailable to IP Plaintiffs, because information that would have pointed to a supply management conspiracy did not become public until May of 2008 and was confirmed by other information that became available in 2008.  (*See* 3-CAC ¶¶ 259-62.)  Nor do the Defendants point to any action or date that they claim should have alerted IP Plaintiffs of possible *wrongdoing* – probably because the

---

[16] Whether or not the facts of the settlement and the press releases are sufficient evidence that the UEP animal care program was a sham is not the issue.  That issue, like the question of whether the information regarding the attorneys general's assertions regarding the program and the implications of the settlement for providing notice, should not be determined on a motion to dismiss because the meaning and import of these actions and press releases are at least ambiguous.

[17] Prior to that date, as the 3-CAC notes, the Defendants issued press releases that falsely asserted their animal husbandry claims had implicit FTC approval.  (*See* 3-CAC ¶¶ 345-46.)

Defendants claim that they did nothing wrong.[18]  Since the exact accrual dates under the discovery rules and the length of time tolling operates involve multiple factual questions – including when a reasonable person would have "discovered" Defendants' wrongdoing – there is no good reason to require IP Plaintiffs to make a conclusory allegation of a specific date from which all the statutes of limitations run.  While IP Plaintiffs suggest a number of potential dates, the ultimate resolution should await full discovery and development of the relevant facts.

Thus, the allegations of the 3-CAC are sufficient to establish a "tolling date.  First, the specificity requirements of Rule 9(b) *do not* apply to *state discovery rules*.  The United States Court of Appeals for the Fifth Circuit directly addressed this question in *Brandau v. Howmedica Osteonics Corp.*, 439 Fed. Appx. 317, 320 (5th Cir. 2011).  The Fifth Circuit held that: "'[t]he discovery rule need not be specifically pleaded in federal court.' Under Federal Rule of Civil Procedure 8, 'it is enough that the plaintiff plead sufficient facts to put the defense on notice of the theories on which the complaint is based.'"  439 Fed. Appx. 320 ((citations omitted) *quoting TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008));[19] *Long v. Ford Motor Co.*, 2008 U.S. Dist. LEXIS 59742 at 25 (D. Ariz. 2008) (plaintiff need only plead facts giving notice of application of discovery rule, and if more is required to give notice, leave for amendment would have to be granted); *DDMS Techs. v. Anacomp, Inc.*, No. 06-0070, 2006 U.S. Dist. LEXIS 78786 at *11-12 (S.D. Tex. Oct. 30, 2006).

Second, this Court's previous decision did not hold that plaintiffs must make conclusory allegations of a "tolling date," as the Defendants characterize it.  Rather in the context of

---

[18] For example, notice of animal care certification standards and their effect, in and of itself, should not constitute "notice" sufficient to begin the running of the statute of limitations as a matter of law.

[19] In *TIG*, the 5th Circuit rejected an argument that the specifics of the discovery rule need be pled or that the argument is waived, since under Rule 8(a), a Complaint must only identify the facts on which a claim is based.  *TIG*, 521 F.3d at 357.

determining whether the Direct Purchaser's pleading of fraudulent concealment to meet federal equitable tolling requirements – *not state law discovery rules* or state law fraudulent concealment doctrines – the Court held that a two paragraph conclusory statement that the harm could not have been discovered until recently would not suffice absent factual pleading that would indicate how and when the Defendants' fraud was discovered.  *In Re: Processed Egg Products Antitrust Litigation*, 2011 U.S. Dist. LEXIS 139995, at *35-40 (E.D. Pa. 11/30/2011).  The 3-CAC, however, contains extensive factual pleadings regarding why IP Plaintiffs – actually reasonable consumers like IP Plaintiffs[20] – could not have discovered any wrongdoing – because the facts were unavailable to them and because of Defendants' pretextual statements in the press, websites and elsewhere.  Moreover, the 3-CAC also alleges specific facts as to when the wrongdoing came to light – starting in September of 2006 when the state attorneys general accused the Defendants of misleading the public and continuing through a series of articles in the press through early 2008.  These facts go well beyond the facts the Court addressed in its previous decision. These facts provide the Defendants reasonable notice of the minimum extent of "tolling" alleged by IP Plaintiffs.  Thus, to the extent a "tolling date" is required, the earliest reasonable date is September 21, 2006 – a fact plead with specificity in the 3-CAC.

---

[20] Under all the state law discovery rules and fraudulent concealment doctrines, the ultimate standard is what a "reasonable person" would have known.  The meaning of a reasonable person in a consumer context is not one that lacks definition – it is commonly used in jury instructions and other contexts involving what a consumer knew or how a consumer would have acted.  *See, e.g., Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) (what is misleading to a "reasonable consumer" is an objective standard); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087,1089-92 (9th Cir. 2010) (standard of what would mislead a reasonable consumer under the consumer protection laws was objective, not particularized to an individual consumer); *Rivera v. Grossinger Autoplex*, 274 F.3d 1118, 1121-22 (7th Cir. 2001) (sufficiency of disclosures examined on an objective test, what a reasonable consumer would understand); *Batts v. Tow-Motor Forklift Co.*, 978 F.2d 1386, 1389 (5th Cir. 1992) (objective, reasonable consumer standard used to determine assumption of risk); Steele v. Ford Motor Credit Co., 783 F.2d 1016, 1019 (11th Cir. 1986) (materiality of misrepresentation was an objective standard based on what a "reasonable consumer" would have found significant); *Jordan v. Paul Fin., LLC*, 2012 U.S. Dist. LEXIS 119899 at *30-32 (N.D. Cal. 2012) (using an ordinary consumer to determine what was misleading).

**D.    Application of the States' Discovery Rules and Fraudulent Concealment Doctrines**

The following lists provide the Court with a "road map" as to what doctrines apply under

the laws of each of the IP Plaintiffs' states.[21]

The discovery doctrine precludes dismissal of the allegedly time-barred portions of the

following claims:

    a) All Arizona claims;
    b) All California claims;
    c) All District of Columbia claims;
    d) All Iowa claims;
    e)  All Massachusetts claims;
    f) All Mississippi claims;
    g) All Nebraska claims;
    h) All Nevada claims;
    i) All New Mexico claims;
    j)  Statutory North Carolina claims;
    k) Statutory North Dakota claims;
    l) All South Dakota claims;
    m) All Tennessee claims;
    n) All Vermont claims;
    o) Statutory West Virginia claims; and
    p) Statutory Wisconsin claims.

The doctrine of fraudulent concealment precludes dismissal of the allegedly time-barred

portions of the following claims:

    a) All Arizona claims;
    b) All California claims;
    c) All District of Columbia claims;
    d) Claims under Kansas's antitrust statute;
    e) All Massachusetts claims;
    f) Claims under Michigan's antitrust statute;
    g) All Minnesota claims;
    h) All Mississippi claims;
    i) All Nebraska claims;
    j) All Nevada claims;
    k) All New Mexico claims;
    l) Claims under New York's antitrust statute;
    m) All South Dakota claims;

---

[21] For the purposes of this motion, IP Plaintiffs do not dispute Defendants' representations as to the length of the states' statute of limitations.

n) All Tennessee claims;
o) All Vermont claims; and
p) Statutory West Virginia claims.

In addition, the since the doctrine of laches applies to unjust enrichment claims in West Virginia and Wisconsin and Defendants do not establish the elements for those affirmative defenses as a matter of law, the unjust enrichment claims in West Virginia and Wisconsin should not be dismissed.

Finally, under the continuing violation rule contained in Minnesota's antitrust statute, the Minnesota statutory antitrust claims should not be dismissed.

### 1.    Arizona

Under Arizona law, IP Plaintiffs' cause of action accrued no earlier than the date that the Defendants entered into their settlement with the state attorneys general regarding the use of their animal care certified logo.  As noted above, the injury suffered by the IP Plaintiffs' – an artificially increased price for the eggs they purchased – is not an injury that is easily discovered by consumers.  And even if the cause of action technically accrued at an earlier time, Defendants' efforts to hide their illegal actions effectively tolls Arizona's statute of limitations. Further, under Arizona law, the essential issues as to when the causes of actions accrued and what period Defendants' actions tolled the statute of limitations are questions of fact for the jury, not for determination on a motion to dismiss.[22]

The Defendants correctly note that Arizona courts would likely apply Arizona's discovery rule in determining when a plaintiff's cause of action accrues.  Arizona courts, as with courts in many other states, apply the discovery rule in circumstances where a plaintiff's injury

---

[22] The discussion of the application of the discovery rule and the doctrine of fraudulent concealment are somewhat extended with this first state, to provide an illustration of how the facts interrelate with state law standards.  In later sections, IP Plaintiffs will be more succinct in their arguments, referring, as possible, to previous sections of the brief, such as this one.

or the specifics of the defendants' conduct is not easily detected by a plaintiff.  *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 967-68 (Ariz. 1995); *see also Walk v. Ring*, 44 P.3d 990, 995 (Ariz. 2002) (same).  The underlying purpose of Arizona's discovery rule is the injustice of barring a cause of action before the plaintiff has a "reasonable basis" for believing that a claim exists.  *Doe v. Roe*, 955 P.2d 951, 960 (Ariz. 1998); *Gust* 898 P.2d at 967 (affirming judgment for plaintiff applying discovery rule).

A simple formulation of Arizona's discovery rule is as follows: the statute of limitations begins to run at that point in time when a plaintiff knows, or in the exercise of reasonable diligence should have known, of the defendants' wrongdoing.  *Gust,* at 968; *see also Walk,* 44 P.3d at 995 (same).  Arizona courts have expanded on this simple definition in a number of ways.  For example, a claim does not accrue until the information a plaintiff has, or should be presumed to have, would allow a reasonable person to understand that a "wrong" had occurred and that the wrong caused them some injury.  *Gust,* at 996.  Moreover, the information that the plaintiff has, or is imputed to have, must provide "reason to connect the 'what' to a particular 'who' in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault."  *Id.*; *Mohave Elec. Coop., Inc. v. Byers,* 942 P.2d 451, 470 (Ariz. Ct. Ct. App. 1997) (to merit summary judgment, the evidence must establish as a matter of law that the plaintiff knew or should have known both what caused him or her injury and which parties caused that injury).

Because the focus of this inquiry is on what a reasonable person would have understood, Arizona courts have consistently held that when a cause of action accrues under the discovery rule is almost always a question of fact for the jury.  *Walk*, 44 P.3d at 996; *Doe,* 955 P.2d at 960 ("When discovery occurs and a cause of action accrues are usually and necessarily questions of

fact for the jury").  Moreover, because Arizona public policy favors resolution of disputes on the merits, statute of limitations defenses are "generally disfavored."  *In re Marriage of Willers,* No. 09-0362, 2010 Ariz. App. Unpub. LEXIS 56, at *14 (Ariz. Ct. App. Apr. 15, 2010); *City of Tucson v. Clear Channel Outdoor, Inc.*, 181 P.3d 219, 225 (Ariz. Ct. App. 2008) (Arizona courts disfavor statute of limitations defenses, preferring to decide issues on their merits); *see Gust*, 898 P.2d at 968 ("The defense of statute of limitations is never favored by the courts, and if there is doubt as to which of two limitations periods should apply, courts generally apply the longer.").

Thus, only where the facts as pled in a complaint establish a duty to investigate and a reasonable investigation would lead to the conclusion that a wrong has been committed can a decision on the discovery rule be made as a matter of law.  *See, e.g.*, *Serrano v. Serrano*, No. 10-0649, 2012 Ariz. App. Unpub. LEXIS 31 at *18 (Ariz. Ct. App. Jan. 10, 2012) (plaintiff was presumed to know the financial affairs of the small business she was running); *Elm Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 940-41 (Ariz. Ct. App. 2010) (contract appended to complaint required buyer to verify square footage of structure if that information was material to buyer; buyer failed to do so); *Porter v. Spader*, 239 P.3d 743 (Ariz. Ct. App. 2010) (plaintiff *conceded* she filed her complaint after any potential discovery date and claimed only excusable law office neglect should allow her to reopen the judgment to file her complaint); *Martinez v. SCI Ariz. Funeral Servs., Inc.*, No. 08-0466, 2009 Ariz. App. Unpub. LEXIS 81, at *6-9 (Ariz. Ct. App. 2009) (in a case asserting illegal "harvesting" of organs, in his complaint, plaintiff admitted that he had filed a previous complaint stating his wife's organs may have been illegally harvested – court held that statute ran from the date of the previous complaint); *Rodriquez v. Manoil*, 450 P.2d 737, 738 (Ariz. Ct. App. 1969) (plaintiff's malpractice complaint she had surgery to correct problems created by the first surgery two weeks after the first).  Absent such facts, a plaintiff has

no duty to investigate and summary judgment is inappropriate.  *See Mohave Elec.*, 942 P.2d at

470; *Willers*, 2010 Ariz. App. Unpub. LEXIS 56, at *16-17.[23]

Application of these principles to the facts as outlined in the 3-CAC establish, at the very

least, that when the Arizona IP Plaintiffs' cause of action accrued is a question of fact for trial or

at least summary judgment – and is not appropriate for determination on this motion.  The type

of injury alleged in the 3-CAC – increased market prices – are hard to trace and attribute to

Defendants' wrongful actions absent access to wholesale market information (prices and

communications) and sometimes expert analysis.  This type of injury is not the type that a

reasonable investigation would reveal.  *See, e.g.*, *Green v. Lisa Frank, Inc.*, 211 P.3d 16, 27

(Ariz. Ct. App. 2009) (party has no duty to do a forensic investigation of its computers to see the

other party made copies of its files).

The facts alleged in the 3-CAC allow for the conclusion that reasonable consumers

would not have discovered that they were injured by *wrongful* actions.  First, the pretextual

nature of the justifications for Defendants' actions and the price increases in the market could

reasonably lead a jury to the conclusion that plaintiffs would have believed that market forces

were driving prices, not wrongful conduct by the Defendants.  *See Quinonez v. Remington Arms*

*Co., LLC*, No. 11-02319, 2012 U.S. Dist. LEXIS 64864, at *7 (D. Ariz. May 9, 2012) ("A core

question is whether a reasonable person would have been on notice to investigate whether the

---

[23] Thus, Arizona does not require a plaintiff to plead facts establishing that he or she performed an investigation unless the facts as alleged show a duty to investigate.  Even then, if there is no investigation, the courts evaluate only what the plaintiff could have reasonably learned had they investigated.  *Doe*, 955 P.2d at 962-63 (noting that defendant is "charged" with a duty to investigate).  *See also Walk*, 44 P.3d at 996 (what is required as a reasonable investigation and what the effect of lack of reasonable investigation means are questions for the jury).  Moreover, the 3-CAC contains far more than the type of legal conclusions that Arizona courts have held are insufficient to state claims or allow factual inferences to be drawn in plaintiffs' favor.  *See Cullen v. Auto-Owners Ins. Co.*, 189 P.3d 344, 345-46 (Ariz. 2008) (*rejecting Twombly* requirements, noting however that statements that are effectively legal conclusions are not statements of fact from which inferences can be drawn).

injury was wrongfully inflicted.").  Further, whether information technically in the public sphere would create sufficient notice to start the running of a statute of limitations is a question for the jury.  *Long v. City of Glendale*, 93 P.3d 519, 526 (Ariz. Ct. App. 2004) (whether materials contained in records of public meetings and in published reports is sufficient to put a reasonable person on notice and start the statute of limitations running is a question for the jury).  Nor does Arizona law require consumers to seek out all published information regarding all potential defendants and potential wrongdoing.  *See Perez v. First Am. Title Ins. Co.*, 810 F. Supp. 2d 986, 995 (D. Ariz. 2011).[24]  Finally, because the "injury" is one that is not obvious – the price of goods may or may not reflect wrongdoing – consumers would not be on notice of anything to investigate.

In addition, as noted by the Defendants, wrongful "concealment" of the nature of defendants' actions also tolls the relevant statutes of limitations.  *See Mohave Elec.*, 942 P.2d at 469; *Walk*, 44 P.3d at 999 (noting that the alternative to the discovery rule, the theory of "fraudulent concealment . . . . is also well-rooted in Arizona law").  Moreover, if fraudulent concealment is established, the court need not examine what the plaintiff could have discovered through reasonable diligence.  *Id.* at 994.  In examining whether the defendants' actions wrongfully concealed the cause of action, it is sufficient to establish that the defendants' actions "masked the true nature of the transaction" involved.  *London v. Green Acres Trust*, 765 P.2d 538, 546 (Ariz. App. 1988).  Determining whether a particular set of actions constitutes fraudulent concealment is generally a jury question.  *Walk*, 44 P.3d at 999-1000.

---

[24] Requiring consumers to seek out all information regarding potentially questionable actions by producers, middlemen or others in the distribution chain is simply not reasonable.  Given the number of transactions each consumer enters into each day and the volume of information technically in the public sphere, consumers would have little time to sleep, eat or work if they had to investigate every price they are paying in every transaction.

At the very least, the allegations in the 3-CAC allow a reasonable inference that the actions taken by the Defendants would have "masked the true nature" of the underlying transactions.  The 3-CAC alleges that the Defendants engaged in a series of actions designed to mislead the public and prevent the true nature of their conduct from coming to light.  The 3-CAC alleges that these actions included: (a) misrepresenting the nature and consequences of the animal care program; (b) using a logo that could reasonably be described as misleading; (c) agreeing not to discuss other aspects of the supply management scheme outside the confines of egg industry meetings; (d) making public statements in publicly filed documents that egg producers were aggressively competing when in fact they were not; and (e) making public statements attributing the price of eggs to legitimate market forces rather than the defendants' supply management scheme.  At the very least, these allegations and the facts alleged in the 3-CAC – and the inferences to be drawn from them – are questions of fact that should be left to a jury viewing all the representations and actions in context.  *See Mohave Elec.* 942 P.2d at 454, 465 (all the evidence together created questions of fact; reversing summary judgment); *Walk*, 44 P.3d at 999-1000 (reversing grant of summary judgment).

### 2.   **California**

IP Plaintiffs' 3-CAC alleges with particularity the specific unlawful conduct Defendants engaged in when violating the Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq*. (3-CAC, at  ¶¶ 383-86); the state Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq*. (3-CAC, at ¶¶ 387-90; and the claim for unjust enrichment under California common law (3-CAC, at ¶¶ 391-93).  Defendants' Second Motion to Dismiss based on the statute of limitations should be denied for the reasons discussed below.

Generally speaking, a cause of action accrues at "the time when the cause of action is complete with all of its elements." *Fox v. Ethicon Endo-Surgery, Inc.,* 110 P.3d 914, 919 (Cal. 2005) (quoting *Norgart v. Upjohn Co.* 981 P.2d 79 (Cal. 1999)). An important exception to the general rule of accrual is the "discovery rule." The discovery rule postpones accrual of a cause of action until the plaintiff discovers (or has reason to discover), the cause of action. *Grisham v. Philip Morris U.S.A., Inc.,* 151 P.3d 1151, 1156 (Cal. Ct. App. 2007). Thus, the rule avoids finding a claim to be time-barred when a plaintiff is "blamelessly ignorant of his cause of action." *April Enterprises, Inc. v. KTTV,* 195 Cal. Rptr. 421, 432-33 (Cal Ct. App. 1983).

To rely on the discovery rule for delayed accrual of a cause of action, "[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox* at 921 (quoting *McKelvey v. Boeing North American, Inc.,* 86 Cal. Rptr. 2d 645 (Cal. Ct. App. 1999)).

The California Supreme Court has not decided whether the discovery rule applies to a claim under the UCL[25]. Recent decisions by California appellate courts, however, have held that the doctrine applies to such a claim. *See Broberg v. Guardian Life Ins. Co. of Am.,* 90 Cal. Rptr. 3d 225, 231(Cal. Ct. App. 2009) (opining that the "better view" is that the discovery rule applies to UCL claims); *Mass. Mut. Life Ins. Co. v. Superior Court,* 119 Cal. Rptr. 2d 190, 199 (Cal. Ct. App. 2002) (discovery rule "probably" applies to UCL claim). As the Court noted in *Broberg*:

---

[25] The California Supreme Court has noted that the question remains unresolved. *Grisham v. Philip Morris U.S.A., Inc.,* 151 P.3d 1151, 1157 (Cal. 2007). Without any analysis, one California appellate decision has held to the contrary. *Snapp & Assoc. Ins. Services, Inc. v. Malcolm Bruce Burlingame Robertson*, 96 Cal. App. 4th 884 (Cal. Ct. App. 2002). Defendant correctly notes that federal cases are divided on this issue. Defs' Brief at 18, n8. However, federal decisions interpreting California law are not binding on California courts. *See, West v. Johnson & Johnson Products, Inc*., 174 Cal. App. 3d 831, 860 (Cal. Ct. App. 1985). *Broberg* remains the only reasoned California case on point.

At least in the context of unfair competition claims based on the defendant's allegedly deceptive marketing materials and sales practices, which is simply a different legal theory for challenging fraudulent conduct and where the harm from the unfair conduct will not reasonably be discovered until a future date, we believe the better view is that the time to file a section 17200 cause of action starts to run only when a reasonable person would have discovered the factual basis for a claim.

Here, IP Plaintiffs filed their initial complaint as soon as they reasonably suspected Defendants' unlawful conduct. First, IP Plaintiffs have pled extensive facts detailing the time and manner of their discovery of unlawful price fixing. Specifically, IP Plaintiffs could not reasonably have been expected to discover the underlying conspiracy to artificially reduce egg supplies and increase prices until, at the earliest, when sixteen (16) attorneys generals asserted that claims made regarding Defendants' animal care certification program were misleading. (3-CAC ¶¶ 323-324.)

Second, it was impossible for IP Plaintiffs to have discovered the conspiracy through any affirmative "diligent" act. As pled throughout IP Plaintiffs' complaint, Defendants conspired at private trade meetings, where the public was not welcome and only paying trade members were permitted entry. (3-CAC ¶¶ 336, 348.)

"A close cousin of the discovery rule is the 'well accepted principle ... of fraudulent concealment.'" *Bernson v. Browning-Ferris Industries,* 873 P.2d 613 (1994) (*quoting Sanchez v. South Hoover Hospital,* 553 P.2d 1129 (1976)). "Like the discovery rule, the rule of fraudulent concealment is an equitable principle designed to effect substantial justice between the parties; its rationale 'is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an 'otherwise diligent' plaintiff in discovering his cause of action.'" *Id.* The doctrine is "available 'in all cases,' that is to say, in actions at law as well as suits in

equity." [26] *Investors Equity Life Holding Co. v. Schmidt,* 126 Cal. Rptr. 3d 135, 145 (Cal. Ct. App. 2011) (internal citations omitted).

Under California law, fraudulent concealment will toll the applicable statute of limitations for the period of time during "which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." *Sanchez*, *supra*, 553 P.2d at 1133-34.

Here, Defendants repeatedly concealed and suppressed material facts relating to artificial price inflation and manipulation by communicating on multiple occasions to the public that price increases were a result of recently adopted animal husbandry standards coupled with rising costs in feed and other production costs.  (3-CAC ¶¶ 9, 327-349.)  Defendants held closed door meetings and disseminated among themselves private newsletters emphasizing the importance of reducing hen populations to reduce supply and increase price – a correlation calculated at the rate of a 1-2% reduction corresponding to a 20-30% increase in price.  (3-CAC ¶¶ 2, 51, 361.)  Some Defendants such as Sparboe, internally voiced concerns to Defendants Al Pope and UEP regarding potential violations of established antitrust law should Defendants' plan be executed improperly.  (3-CAC ¶ 193.)  Furthermore, Defendants falsely informed IP Plaintiff-consumers that egg prices were increasing due to reasons unrelated to any conspiracy such as increases in feed and production costs as well as increased demand due to market trends such as the Atkins diet. (3-CAC ¶¶ 9, 329.)   Defendants disseminated this information repeatedly, knowing full well that these were not the causes for increasing prices.  (3-CAC ¶¶ 327-344.)

As is true in most conspiracies, it was impossible for IP Plaintiffs to know the true underlying facts leading to the increased egg prices.  Defendants' conspiracy to artificially fix

---

[26] Defendant does not appear to dispute that fraudulent concealment properly applies to every cause of action asserted in IP Plaintiffs' complaint.

prices was conducted at private trade association meetings and communications also took place in private industry newsletters.  (3-CAC ¶¶ 51, 155, 174.)  Defendants cannot seriously contend that IP Plaintiffs should have somehow discovered the true facts earlier in the face of such concerted action to conceal the truth.

Moreover, under California law, a defense based upon the statute of limitations ordinarily will not be resolved at the pleading stage.  "A demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred. In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint; it is not enough that the complaint shows that the action may be barred."  *Geneva Towers Ltd. Partnership v. City of San Francisco*, 60 P.3d 692, 700 (Cal. Ct. App. 2003); *see also Transport Ins. Co. v. TIG Ins. Co.*, 202 Cal.App.4th 984 (Cal. Ct. App. 2012) ("[W]e are hard pressed to think of more fact-specific issues than 'accrual' and 'tolling.'"); *Marcario v. County of Orange,* 155 Cal. App. 4th 397, 408–409 (2007) ("Equitable tolling is a fact intensive issue and it is determined based upon evidence.").

### 3.   **District of Columbia**

Under D.C. law, IP Plaintiffs' cause of action accrued no earlier than the date that the Defendants entered into their settlement with the state attorneys general regarding the use of their animal care certified logo.  As noted above, the injury suffered by the IP Plaintiffs – an artificially increased price for the eggs they purchased – is not an injury that is easily discovered by consumers.  And even if Defendants argue that any cause of action accrued at an earlier time, Defendants' efforts to hide their illegal actions effectively tolls the relevant D.C. statutes of limitations.  Moreover, the essential issues as to when the causes of actions accrued, and for what

period Defendants' actions tolled the statute of limitations, are questions of fact for the jury, not for determination on a motion to dismiss.

      D.C. courts are likely to apply the D.C. "discovery" rule to the causes of action asserted by IP Plaintiffs.  As Defendants note, D.C. courts have applied the discovery rule to claims under the D.C. consumer protection law – which creates an additional cause of action for other violations of D.C. law, such as D.C.s antitrust law. Defs' Brief at 22.  *Dist. Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 723 (D.C. 2003).  (D.C. Consumer Protection Procedures Act provides a cause of action for all improper trade practices, including those that violate other laws and the common law).  Further, given the nature of the injuries alleged, D.C. courts would likely apply the discovery rule to all the IP Plaintiffs' causes of action.  When the relationship between a potential defendant's conduct and an injury suffered by the plaintiff is not immediately clear, D.C. applies its discovery rule to the causes of action, so that the claim does not accrue until the claimant knows or by the exercise of reasonable diligence should know of (1) the injury; (2) its cause in fact' and (3) some evidence of wrongdoing.  *Doe v. Medlantic Healthcare Grp., Inc*., 814 A.2d 939, 945 (D.C. 2003).  *See also Santos v. George Washington Univ. Hosp.,* 980 A.2d 1070, 1074 (D.C. 2009) (reversing summary judgment on statute of limitations grounds).  While the Defendants correctly note that IP Plaintiffs need not understand the full breadth of defendants' wrongdoing to trigger the running of the statute of limitations (Defs' Brief at 23), potential plaintiffs must be on notice of some *wrongdoing*, so that plaintiffs are on notice that they "might have suffered an actionable injury."  *Medhin v. Hailu*, 26 A.3d 307, 310 (D.C. 2011).

      When the link between a defendant's wrongdoing and a plaintiff's injuries is sufficiently beyond the understanding of a layperson so as to require expert analysis, "discovery" of the

claim occurs only when the wrongdoing and the resulting injury are sufficiently explicit for the layperson to suspect wrongdoing. *See Brin v. S.E.W. Investors*, 902 A.2d 784, 793-94 (D.C. 2006). Moreover, if the plaintiff could not have discovered the injury caused by defendants' actions through the information reasonably available, the claim does not accrue. *See id.* at 801-02. In making the determination as to when causes of action accrues, courts must take the overall factual context facing plaintiffs, including the defendants' "conduct and misrepresentations." *See Santos,* 980 A.2d at 1074; *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996). For these reasons, the date an action accrues is inherently context-specific and presents questions of fact for a jury. *Brin*, 902 A.2d at 801-02. Thus, unless a court can rule *as a matter of law* that a plaintiff should have learned of some wrongdoing as well as establish the link between the wrongdoing and an injury, dismissal or summary judgment is inappropriate. *Id.* at 794-95, 801-02 (the factual issues relevant to application of the discovery rule are "almost always" jury questions; reversing summary judgment). Much as in the states discussed above, the facts as pled in the 3-CAC establish that the discovery rule should prevent dismissal of this action.

For similar reasons, the Defendants' actions toll the statute of limitations under the D.C. fraudulent concealment doctrine. As Defendants note, D.C. courts apply the fraudulent concealment doctrine to toll the running of statutes of limitations. Defs' Brief at 22; *Estate of Chappelle v. Sanders,* 442 A.2d 157, 158 (D.C. 1982). Courts applying D.C. law have noted that the doctrine of fraudulent concealment applies where defendants have engaged in some conduct to conceal the wrongdoing and that a plaintiff does not have actual knowledge or could not have discovered defendants' wrongdoing through reasonable diligence. Defs' Brief at 22. Under D.C. law, there are two ways fraudulent concealment can occur: "first, the wrong itself can be by

42

its nature self-concealing or, second, defendants can take some active step to conceal the wrong." *Jones v. Meridian Towers Apts., Inc.*, 816 F. Supp. 762, 770 (D.D.C. 1993) (applying both federal and D.C. law).  While a plaintiff has a duty to act reasonably under the circumstances, the relevant facts may be such that it may be reasonable to conduct no investigation at all.  *Diamond*, 680 A.2d at 372 (a plaintiff has a "duty to act reasonably under the circumstances in investigating matters affecting [his or her] affairs").  For example, *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209 (D.D.C. 2005), the Court rejected the defendants' claim that market trends put plaintiffs on notice of defendants' alleged price-fixing, noting that secrecy was plainly integral to the formation and implementation of the world-wide conspiracy.

Here the allegations of the 3-CAC indicate both the "self-concealing" nature of Defendants' actions and identifies specific misstatements designed to mislead the public as to the Defendants' actions.  The allegations in the 3-CAC as discussed above allow a reasonable inference that the actions taken by the Defendants were designed to prevent inquiry or evade suspicion as to their actions.

### 4.   Florida

While Florida's discovery rule likely does not apply to the IP Plaintiffs' claims, Florida's fraudulent concealment doctrine tolls the statute of limitations at least until the date the state attorneys general asserted that the Defendants' animal care representations were misleading.

As the Defendants recognize, Florida courts have applied the doctrine of fraudulent concealment under the rubric of equitable tolling to claims under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201-13, which is the statute under which IP Plaintiffs are asserting their statutory claims. Defs' Brief at 25.  In addition, given the variety of contexts in which Florida courts have applied the fraudulent concealment doctrine it is likely that

the Florida Supreme Court would apply it to all IP Plaintiffs' claims. *See In re TFT-LCD Flat Panel Antitrust Litig.*, No. 1827, 2011 U.S. Dist. LEXIS 108810, at *16-23 (N.D. Cal. Sep. 20, 2011) (surveying Florida law and determining that the Florida Supreme Court would likely apply the fraudulent concealment doctrine to toll indirect purchasers' antitrust claims; denying motion for partial summary judgment); *see also Florida Dep't of Health and Rehabilitative Servs. v. S.A.P.*, 835 So.2d 1091, 1096-99 (Fla. 2002) (noting that the doctrine of fraudulent concealment as a form of equitable estoppel is "a basic tenet of the common law" that has effectively universal application); *Berisford v. Jack Eckerd Corp.*, 667 So.2d 809, 811-12 (Fla. Dist. Ct. App. 1995) (noting that the doctrine of fraudulent concealment has been applied in a wide variety of situations and to a wide variety of causes of action; reversing grant of summary judgment).

Defendants identify the elements of fraudulent concealment under Florida law: fraudulent concealment requires proof of affirmative conduct designed to conceal the nature of the wrong and that the inability to discover defendants' wrongful conduct through reasonable diligence. Defs' Brief at 25-26. If conflicting inferences can be drawn from the information available to plaintiffs – if the information does not show "conclusively" that the available information placed the plaintiff on notice of a defendants' wrongdoing – dismissal or summary judgment is inappropriate. *See Berisford*, 667 So.2d at 812 (reversing grant of summary judgment).

As is the case with respect to the fraudulent concealment doctrines of other states, the factual allegations of the 3-CAC discussed above allow a reasonable inference that the Defendants took actions designed to mislead the public and prevent inquiry or evade suspicion as to their actions. As alleged in the 3-CAC, the first indication of any wrongdoing by the Defendants came when the state attorneys general labeled Defendants conduct misleading. At

44

the very least, differing inferences may be drawn from the allegations of the 3-CAC, and thus resolution of whether the doctrine of fraudulent concealment prevents the Defendants from asserting defenses based upon statutes of limitations will "implicate factual issues which the court cannot resolve on a motion to dismiss." *State Farm Mut. Auto. Ins. Co. v. Kugler*, No. 11-80051, 2011 U.S. Dist. LEXIS 107005, at *43-44 (S.D. Fla. Sep. 21, 2011) (applying Florida law and denying motion to dismiss).

### 5. **Iowa**

As Defendants correctly note (Defs' Brief at 28), under Iowa's discovery rule "a cause of action does not accrue until the injured party has actual or imputed knowledge of the facts that would support a cause of action."[27] *Speight v. Walters Dev. Co., Ltd.*, 744 N.W.2d 108, 116 (Iowa 2008). More specifically, under the discovery rule, the statute of limitations "does not begin to run [(1)] until the injured party has actual or imputed knowledge of [facts establishing (2)] all of the elements of action." *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985).

As noted above, mere knowledge of what one paid and even knowledge that some portion of the price paid may have been influenced by Defendants' animal care program should not serve to start the statute of limitations running. These facts, in and of themselves, do not suggest key elements of the cause of action – i.e., injury caused by any wrongdoing, nor do such facts suggest illegal concerted action. *See Vachon v. Iowa*, 514 N.W.2d 442, 446 (Iowa 1994) ("Mere knowledge of an injury is not always sufficient to alert reasonably diligent persons to the basis of their claims. Such decisions turn on the circumstances of each case.) (citations omitted).

---

[27] As is the case with the laws of many of the states discussed, Defendants' Motion is based upon an incorrect or incomplete application of Iowa's discovery rule and its doctrine of fraudulent concealment. As Defendants note, Iowa's antitrust law provides that a cause of action accrues after the cause of action becomes "known." (Defs' Brief at 27.) While this might argue for actual knowledge, for purposes here IP Plaintiffs suggest that this should be interpreted as incorporating Iowa's discovery rule for the purposes of determining when a cause of action accrues.

In addition, IP Plaintiffs have pled that they in fact acted with the due diligence that one would expect of consumers.  Further, in the context of Defendants' efforts to keep their actions secret, their public statements regarding the causes of egg prices, their assurances in publicly filed financial reports that they were engaged in vigorous competition and given Defendants' efforts to explain the animal care guidelines as voluntary, scientifically based  programs – when they were neither – it at least creates an issue of fact as to when a reasonable consumer would have been on inquiry notice that an antitrust cause of action existed.  *See Marshall-Lucas v. Goodwill*, No. 04-1536, 2005 Iowa App. LEXIS 959, at *9-13 (Iowa Ct. App. Aug. 31, 2005) (where reasonable minds could differ as to whether the facts available to a plaintiff gave him or her notice of his injury and potential wrongdoing, summary judgment was inappropriate).

>     **6.      Kansas**

The Kansas Supreme court laid out the doctrine of fraudulent concealment in *Friends Univ. v. W. R. Grace & Co.,* 608 P.2d 936 (Kan. 1980).  The court held that in order to toll the statute of limitations, "the concealment must be fraudulent or intentional and, in the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action.  There must be some actual artifice to prevent knowledge of the fact, some affirmative act of concealment, or some misrepresentation to exclude suspicion and prevent injury."  *Id*. at 564.  "Where some affirmative act of concealment takes place, it is not material whether the concealment was previous or subsequent to the accruing of the cause of action.  The question is whether there was a design to prevent the discovery of the facts which gave rise to the action, and whether the act operated as a means of concealment." *Id*.  In addition, "the party seeking to toll the statute of

limitations must explain why due diligence did not lead or could not have led to discovery of the facts and the cause of action." *Id.*

Whether Kansas would apply fraudulent concealment to a Kansas Restraint of Trade Act ("KRTA") claim is unclear.  As Defendants point out, some Kansas cases have limited the doctrine of fraudulent concealment to claims based in fraud.[28]  In *Bonin v. Vannaman*, 929 P.2d 754 (Kan. 1996), the Kansas Supreme Court addressed the application of fraudulent concealment in a medical malpractice context and held that its application was inappropriate because the plaintiff had not pled fraud.  Another Kansas appellate court noted "it appears that in Kansas the only tort which is not tolled by fraudulent concealment is the one involving medical malpractice."  *Robinson v. Shah*, 936 P.2d 784, 795 (Kan. Ct. App. 1997).  Several federal courts, however, have cited *Friends* in applying fraudulent concealment to non-fraud cases.  *See, e.g., In re Vitamins Antitrust Litig.*, No. 99-197, 2000 U.S. Dist. LEXIS 11351 (D.D.C. July 14, 2000)(applying it to antitrust claims); *Wichita v. United States Gypsum Co.*, 72 F.3d 1491 (10th Cir. 1996).  To allow Defendant's concealment of their conspiracy to protect them from liability here would be patently unjust.  *In re Estate of Shields*, 584 P.2d 139, 143 (Kan. 1978) ("That no man shall be permitted to profit by his own wrong is a basic tenet of our system of jurisprudence.").

### 7.    Massachusetts

As with the discovery rules available in other states, application of Massachusetts' discovery rule precludes dismissal on statute of limitations grounds.  Similarly, application of

---

[28] Most of the cases Defendants cite were decided before *Friends*.  Defs' Brief at 30-32.  As the 10th Circuit noted in *Baker v. Bd. of Regents*, 991 F.2d 628, 633 (10th Cir. 1993), the *Friends* case was a departure from the limited application of fraudulent concealment.  *Id.* ("that statement of the law no longer appears to be true.  Now, under Kansas law, in order to constitute concealment of a cause of action within the general rule tolling the statute of limitations, . . . there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action.").

Massachusetts' doctrine of fraudulent concealment requires a determination of factual issues that is inappropriate on a motion to dismiss.

Under Massachusetts law, "[a]ctions in both contract and tort may be tolled until such time as the plaintiff discovers the facts giving rise to the cause of action. The discovery rule also applies to actions based on G. L. c. 93A [the Massachusetts Consumer Protection Act]." *Szymanski v. Boston Mut. Life Ins. Co.*, 778 N.E.2d 16, 20 (Mass. Ct. App. 2002) (citations omitted).[29]  As the Defendants note, under the Massachusetts discovery rule, the statute of limitations does not run until the plaintiff knows or should have known that he has been harmed by the defendant.  *Silvestris v. Tantasqua Reg'l Sch. Dist.*, 847 N.E.2d 328, 336-37 (Mass. 2006).  While a plaintiff need not understand all the facts of a defendant's misconduct in order to trigger the running of the statute of limitations, a plaintiff must have knowledge sufficient to allow a reasonable person in his or her position to conclude he or she has a cause of action against the defendant.  *Riley v. Presnell*, 565 N.E.2d 780, 784-87 (Mass. 1991).  This means something more than merely understanding the facts of a matter – the plaintiff must be on notice of some "suspicious" or "wrongful" activities.  *Nicolopoulos v. Town of Saugus*, No. 08-2350, 2009 Mass. Super. LEXIS 257, at *3-4 (Mass. Super. Sep. 14, 2009) (plaintiff must be on notice of some type of "wrongful" conduct that caused harm).[30]

The question of when a reasonable person in the plaintiff's position should have connected the link between a defendant's improper conduct and the injury he or she has suffered is a question for the jury.  *Id.*  (reversing grant of summary judgment); *Taygeta Corp. v. Varian*

---

[29] *See Lambert v. Fleet Nat'l Bank*, 865 N.E.2d 1091, 1097 (Mass. 2007) (applying the discovery rule to Massachusetts Consumer Protection Act ("MCPA")); *Brennan v. Boston Mut. Life Ins. Co.*, No. 09-74, 2010 Mass. App. Unpub. LEXIS 891, at *12-13 (Mass. App. Ct. Aug. 3, 2010) (denying summary judgment under MCPA under discovery rule).

[30] This clarification of the discovery rule makes sense.  It would be illogical to hold that a plaintiff must file suit on the basis of conduct that appears innocent, legal or legitimate.

*Assocs., Inc.*, 763 N.E.2d 1053, 1063-64 (Mass. 2002) (vacating summary judgment); *see Kennedy v. Goffstein*, 815 N.E.2d 646, 650-51 (Mass. Ct. App. 2004) (reversing dismissal prior to submission to the jury, noting that in some cases one must hire an expert to determine extent or existence of harm, and because of the determination of the accrual date is inherently a question of fact and reasonability, it should be left to the jury if there is any doubt).  Again, here, applying these principles to the facts as alleged in the 3-CAC, the discovery rule should toll the statute of limitations at least until September of 2006.

For similar reasons, the Massachusetts doctrine of fraudulent concealment serves to toll the statutes of limitations in this case.  As Defendants note, Massachusetts statutory law provides that "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."  Defs' Brief at 34 (citing Mass. Gen. Laws Ann. ch. 260, § 12).  Under this law, the statute of limitations is "tolled if [1] the wrongdoer either 'concealed the existence of a cause of action through some affirmative act done with intent to deceive' or [2] breached a fiduciary duty of full disclosure.'" *Stark v. Advanced Magnetics, Inc.,* 736 N.E.2d 434, 442 (Mass. App. Ct. 2000).  "The statute of limitations, however, is not tolled if the plaintiff has actual knowledge of the facts giving rise to his cause of action." *Id.*

IP Plaintiffs exhaustively pled the facts enumerating the manner by which Defendants fraudulently concealed the discovery of the underlying conspiracy.  In addition to the facts as discussed above regarding the Defendants' representations regarding the animal care certification program, their use of modes of communication that IP Plaintiffs would not see and statements that they were competing when they were not constitute the type of affirmative

misrepresentations necessary to toll the statutes of limitations.[31]  Further, given the allegations in the 3-CAC concerning Defendants' need to conceal their actions or face suit by parties who would be adversely affected, and the information contained in the Sparboe letters, the 3-CAC raises factual issues that should not be resolved on a motion to dismiss.  *See Stark*, 736 N.E.2d at 443-44 (reversing grant of summary judgment on consumer protection claim because there were material issues of fact as to date when plaintiff should have known of his cause of action).

### 8.     Michigan

Although Michigan no longer recognizes a common law discovery rule,[32] the statute of limitations for IP Plaintiffs' antitrust claims are tolled because of Defendants' efforts to conceal their anticompetitive actions.  Michigan codified the doctrine of fraudulent concealment in MCLS § 600.5855, which provides:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Under Mich. Comp. Laws § 600.5855, "the statute of limitation is tolled when a party conceals the fact that the plaintiff has a cause of action."  *Sills v. Oakland Gen. Hosp*, 220 Mich.

---

[31] While the Defendants correctly note that in general one parties' fraudulent concealment does not toll the statute of limitations, the court in *Passatempo v. McMenimen*, 960 N.E.2d 275, 289-90 (Mass. 2012) discussed that in cases where the parties are part of a conspiracy, the actions of one defendant have been imputed to all defendants for statute of limitations purposes.  *See id.* at 290  (distinguishing the case from cases involving agency and conspiracy).  This is consistent with the general rule of co-conspirator liability.  *See Powell v. Ocwen Loan Servicing, LLC*, No. 10-2069, 2012 Mass. Super. LEXIS 2, at *14 (Mass. Super. Jan. 4, 2012) (co-conspirators can be liable for acts in furtherance of a conspiracy to violate the consumer protection laws).

[32] *See Trentadue v. Buckler Automatic Lawn Sprinkler Co*, 738 N.W.2d 664 (Mich. 2007) (the legislature's incorporation of the discovery rule into specific statutes preempted the general application of the common law doctrine).

App. 303, 310; 559 N.W.2d 348 (1996).  To invoke this provision, "[t]he fraud must be manifested by an affirmative act or misrepresentation."  *Witherspoon v. Guilford*, 511 N.W.2d 720, 724 (Mich. Ct. App. 1994).  In addition, a plaintiff "must exercise reasonable diligence to discover [his] cause of action.  If the plaintiff was negligent in failing to timely discover the claim, fraudulent concealment will not apply."  *Doe v. Roman Catholic Archbishop*, 692 N.W.2d 398, 411 (Mich. Ct. App. 2004).

Here, IP Plaintiffs allege that "Defendants effectively, affirmatively, and fraudulently mislead the public and concealed the reality of their unlawful combination, conspiracy, and acts in furtherance thereof from IP Plaintiffs and the members of the Classes.  Although IP Plaintiffs exercised due diligence throughout the Class Period, they could not have discovered Defendants' unlawful scheme and conspiracy at an earlier date because of Defendants' effective, affirmative, and fraudulent actions and concealment of the actual nature of their activities."  (3-CAC ¶¶ 329-330.)  IP Plaintiffs' further allege and explain that as consumers purchasing from retailers "were not in a position to monitor prices at the producer level in the egg industry . . . and the prices paid by retailers or other middlemen were "generally not disclosed to the public."  (3-CAC ¶¶ 349-352.)  Finally, IP Plaintiffs allege that Defendants publicly and falsely attributed egg price increases to other causes, such as increased feed and transportation costs, to further mislead IP Plaintiffs and class members.  (3-CAC ¶¶ 361-364.)  For the reasons discussed above, the nature of the injury, the Defendants' efforts to conceal their conspiracy and mislead the public as to the nature of what they were doing at least allow a reasonable inference that a reasonable person would not have discovered the Defendants' supply management conspiracy before 2006.

This is especially true because, under Michigan law, the issues involved in determining whether defendants have fraudulently concealed plaintiffs' claims, including issues of

concealment and diligence, are questions of fact.  *Doe*, 264 Mich. App. at 652 (citing *Int'l Union United Auto. Workers of Am. v. Wood*, 59 N.W.2d 60 (1953)); *see also In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1018 (E.D. Mich 2010).  Accordingly, it is a jury question when a reasonable plaintiff would have recognized his or her claim.  Given the multitude of misleading and secret activities used to disguise their scheme to reduce egg production and raise egg prices, a trier of fact should be the final decision-maker on IP Plaintiffs' claims under Michigan law.

> 9.   **Minnesota**

Two doctrines available under Minnesota law establish that this Court should deny Defendants' Motion to dismiss the IP Plaintiffs' claims under the Minnesota Antitrust Law of 1971 ("MAL").  The first is Minnesota's continuing violation doctrine.  MAL states that a claim seeking relief under its provisions "shall be forever barred unless commenced within four years of the date upon which the cause of action arose."  Minn. Stat. § 325D.64, (1).  However, the relevant subdivision qualifies this language by stating: "[f]or the purpose of this section, a cause of action for a continuing violation *is deemed to arise at any time during the period of the violation*."  *Id*.  Under the plain terms of the statute, all damages from the period of the conspiracy should be recoverable under the continuing violations language.  If the Minnesota legislature had intended to mirror the federal rules on this issue they could have worded MAL in the same way as relevant statute of limitations under federal law – but the legislature instead added the continuing violations language.  *Cf. Anzai v. Chevron Corp.*, 168 F. Supp. 2d 1180, 1183-87 (D. Haw. 2001) (interpreting similar language in Hawaii's antitrust law); but *cf. Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432 (Alaska 2002) (rejecting the analysis in *Anzai* and holding the federal rule applies to similar language in the Alaska Antitrust law).

In support of the conclusion that the "continuing violations" language does not mean

what it says, Defendants cite *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007), for

the proposition that because Minnesota generally follows federal precedent in its interpretation of

antitrust law, it would follow the federal continuing violations rule which simply holds that each

act is a new injury.  Defs' Brief at 39.  But *Lorix's* language and holding leads to the opposite

conclusion.  After stating that Minnesota generally follows federal law, the *Lorix* court qualified

that general rule, holding that it would not follow federal antitrust standing analysis and stated:

> Minnesota is not required, however, to abide by federal antitrust standing limitations. The
> desire for harmony between federal and state antitrust law *relates more to prohibited
> conduct than to who can bring a lawsuit*. "'The purpose behind both state and federal
> antitrust law is to apply a uniform standard of conduct so that businesses will know what
> is acceptable conduct,'" but "'to achieve this uniformity or predictability, we are not
> required to define who may sue in our state courts in the same way federal courts have
> defined who may maintain an action in federal court.'"

*See Lorix,* 736 N.W.2d at 626 (emphasis added) (citations omitted).  Under the same analysis

and given Minnesota's explicitly stated policy of broad interpretation of its antitrust laws, *see

Minnesota Twins P'ship v. State by Hatch*, 592 N.W.2d 847, 851-52 (Minn. 1999), this Court

should apply the plain language of the statute unless the Minnesota Supreme Court gives some

indication that an opposite result is required.  Since the 3-CAC explicitly alleges the conspiracy

was ongoing at the time the complaint was filed, the continuing violation exception allows all the

IP Plaintiffs' Minnesota claims to be pursued.

Defendants concede that Minnesota Courts will apply the doctrine of fraudulent

concealment to state antitrust law claims and the unjust enrichment claims asserted in the 3-

CAC.  Defs' Brief at 40.  They also correctly note the requirements for establishing the

application of the doctrine: (1) there was an affirmative statement or act that concealed the cause

of action; (2) the act or statement was known to be false; and (3) the concealment could not have

been discovered with reasonable diligence. Defendants do not, however, explain why the factual allegations in the 3-CAC do not meet the requirements for application of the doctrine under Minnesota law. In fact, the allegations of the 3-CAC do meet the requirements for application of the doctrine to toll the statute of limitations. The 3-CAC alleges a number of affirmative actions and statements that served to "conceal" or mask the Defendants' wrongdoing. The 3-CAC also alleges that the Defendant knew that they had to hide the true nature of their conduct or face lawsuits like this one and that IP Plaintiffs could not have discovered the truth because of lack of access to relevant information. At the very least, factual questions as to the application of this doctrine should prevent dismissal of IP Plaintiffs' Minnesota claims. *See, e.g.*, *Appletree Square I Ltd. P'ship v. Investmark, Inc.*, 494 N.W.2d 889, 894 (Minn. Ct. App. 1993) (whether a person has exercised reasonable diligence is a question of fact for the jury; reversing summary judgment).

### 10. Mississippi

As Defendants correctly note, both Mississippi's discovery rule and its fraudulent concealment doctrine apply to the IP Plaintiffs' Mississippi claims. *See* Defs' Brief at 42-44. And the facts as pled in the 3-CAC fit within each doctrine, creating issues of fact that should lead to dismissal of Defendants' Motion.

The Mississippi discovery rule is easily described: "In its most simplistic form, if aggrieved persons do not know of their injury the statute of limitation does not begin running until they 'can reasonably be held to have knowledge of the injury…'" *PPG Architectural Finishes, Inc. v. Lowery*, 909 So.2d 47, 50 (Miss. 2005) (citing *Owens-Illinois, Inc. v. Edwards*, 573 So.2d 704, 709 (Miss. 1990)). Because the question is what would a reasonable person have known, the question as to "[w]hether the plaintiff knew about the injury has typically been

reserved as a jury question." *PPG*, 909 So.2d at 50 (*Barnes v. Singing River Hosp. Sys.*, 733 So.2d 199, 205 (Miss. 1999)).

While the Defendants' admission that the discovery rule applies is correct, their discussion of how Mississippi's discovery rule applies overstates their case. The Defendants claim that the statute of limitations runs from the point when a potential plaintiff discovers an injury, not the cause of the injury or any wrongful conduct. (*See* Defs' Brief at 42-43 citing *Barnes v. Koppers, Inc.*, 534 F.3d 357, 361 (5th Cir. 2008) and *Angle v. Koppers, Inc.*, 42 So.3d 1, 7 (Miss. 2010) (holding that the discovery rule found in Section 15-1-49(2) "focuses on discovery of an injury, not discovery of its cause.")). Technically, this might be true. But what does it mean to discover an injury? Both the *Barnes* and *Angle* courts were faced with diagnosed diseases that required treatment – not merely symptoms that might suggest a disease. *See Barnes*, 534 F.3d at 361 (wrongful death from cancer caused by toxic substances); *Angle*, 42 So.2d at 8 (diseases caused by toxic substances).

However, when the nature of the "injury" is not one that is easily perceivable by a "layman," the statute of limitations does not run until the "injury" is fully understood. The best example of this is a decision of the Mississippi Court of Appeals from June of this year which applied the analysis required by *Angle*. *See Phillips 66 Co. v. Lofton*, 94 So. 3d 1051 (Miss. 2012). In *Lofton*, the plaintiff first began suffering shortness of breath in 1995, but the evidence as to when the plaintiff was told this was caused by the specific condition he was suffering was conflicting. *Id*. citing *Angle*, the *Lofton* court upheld a jury finding that the statute of limitations began to run when the plaintiff learned of the injury – the condition not the symptoms – on the ground that such a decision is an issue of fact for the jury. *Id*. Similarly, in *Winfield v. Brandon HMA, Inc.*, the Mississippi Court of Appeals held that when the conduct causing the plaintiff

harm is difficult to detect and the injury not obvious to a layman, the statute of limitations runs from the point when a plaintiff discovers the nature of injury suffered and can appreciate that the injury might be due to fault. *Winfield v. Brandon HMA, Inc*., No. 01676, 2012 Miss. App. LEXIS 63, at *8-11 (Miss. App. Jan. 21, 2012) (reversing summary judgment).

Applying the analysis in *Lofton* and *Winfield* to the facts here, the symptom would be the prices of eggs themselves which a reasonable person might have found to have some relation to the animal husbandry standards. But the "injury" is the amount by which the price was overstated would have to wait until IP Plaintiffs learned that there was some quantum of overcharge. This analysis is also consistent with the analysis in *Carder*, *supra*. The *Carder* plaintiffs could have been on notice of some injury when they learned of an antitrust conspiracy from the publication of an investigation being conducted by the federal government. Similarly, IP Plaintiffs could arguably be on inquiry notice of some "latent injury" in *Carder's* terms, when the state attorneys general's allegations of fraud in the promotion of the animal care program were published. *See Carder*, at 261 (looking for the date of discovery of the "latent injury"). In any case, because the circumstances of what constitutes an "injury" are ambiguous, this at least creates an issue of fact as to the date of accrual that this Court should not decide on a motion to dismiss.

In addition, Mississippi law provides "a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered." Miss. Code Ann. § 15-1-67. The Supreme Court of Mississippi has interpreted the statute to require a showing that "(1) some affirmative act of conduct was done and prevented discovery of the

56

claim; and (2) due diligence was performed on [plaintiff's] part to discover the claim." *Trustmark Nat'l. Bank v. Meador*, 81 So.3d 1112, 1119 (Miss. 2012) citing *Sanderson Farms Inc. v. Ballard*, 917 So.2d 783, 790 (Miss. 2005).

Here, IP Plaintiffs' complaint contains myriad examples of Defendants' affirmative conduct as well as IP Plaintiffs' due diligence. First, Defendants affirmatively acted to conceal and mislead the public regarding the nature of their actions. This conduct included planning and implementing their unlawful conduct at member-only closed-door trade meetings, communicating via member-only newsletters, publicly disseminating information that egg prices were rising as a result of increasing feed costs, production costs, and through falsely promoting their animal care certification program. Defendants simultaneously employed a public relations firm to monitor the public media and make sure that their story was getting to the public. IP Plaintiffs could not have discovered this wrongdoing because of the unavailability of information until the publication of the charges by the state attorneys general that Defendants had engaged in misleading promotion of the animal care program. Thus, as in *Carder*, the critical publication for notice purposes was when the investigation into some wrongdoing by the Defendants was announced, not when the seemingly legitimate activities were announced or the eggs sold.

### 11. Nebraska

The Nebraska Supreme Court has held that "under the discovery rule, the statute of limitations runs from the time that the potential plaintiff discovers, or with reasonable diligence should have discovered, the injury." *Alston v. Hormel Foods Corp*., 730 N.W.2d 376, 384 (Neb. 2007); *see also Mandolfo v. Mandolfo*, 796 N.W.2d 603, 610 (Neb. 2011). "The rationale behind the discovery rule is that in certain categories of cases, the injury is not obvious and the individual is wholly unaware that he or she has suffered an injury or damage. In such cases, it is

manifestly unjust for the statute of limitations to begin to run before a claimant could reasonably become aware of the injury." *Alston*, at 385 (citing *Shlien v. Bd. of Regents*, 640 N.W.2d 643 (Neb. 2002)).

In applying the discovery rule, Nebraska courts consider the "the nature of the injury and the difficulty inherent in discovering certain types of injuries." *Ward v. Alliance*, 417 N.W.2d 327, 336 (Neb. 1988) (Shanahan dissenting).  Here, IP Plaintiffs have alleged that the type of injury, paying supracompetitive prices for eggs, is inherently difficult for consumers to discover. (3-CAC, ¶¶ 327-366.)  Although plaintiffs must act with reasonable diligence, "'[i]f an injured party is wholly unaware of the nature of his [or her] injury or the cause of it, it is difficult to see how he [or she] may be charged with lack of diligence or sleeping on his [or her] rights.'" *Alston*, 730 N.W.2d at 385.  Given the nature of the injuries and the general applicability of the discovery rule in Nebraska, it seems likely that the discovery rule would apply to each of the IP Plaintiffs causes of action under Nebraska law.

"Discovery," in the context of statutes of limitations, refers to the fact that one knows of the existence of an injury.  *Gordon v. Connell*, 545 N.W.2d 722, 726 (Neb. 1996).  As such, "the point at which a statute of limitations begins to run must be determined from the facts of each case."  *Id*.  Here, IP Plaintiffs have alleged that their injury could not have been reasonably discovered and any challenge to reasonableness of plaintiffs' exercise of diligence should not be decided at the motion to dismiss stage, both because of the nature of the injury and the nature of the conduct causing injury.  To the extent competing inferences can be drawn from the allegations in the 3-CAC, dismissal is inappropriate.  *See In-Line Suspension, Inc. v. Weinberg & Weinberg, P.C.*, 687 N.W.2d 418, 427 (Neb. Ct. App. 2004) (holding it was appropriate for the

trial court not to decide the statute of limitations as a matter of law when there was a question of fact regarding the discovery rule).

Further, under Nebraska law "the doctrine of fraudulent concealment may estop a defendant from asserting a statute of limitations defense when the defendant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevent the plaintiff from discovering [the misconduct]." *Manker v. Manker*, 644 N.W.2d 522, 535 (Neb. 2002); *Andres v. McNeil Co.*, 707 N.W.2d 777, 786 (Neb. 2005); ("[w]here there has been fraudulent concealment from a plaintiff, the statute [of limitations] is suspended only until his rights are discovered or until they could have been discovered by the exercise of due diligence.").[33]  Nebraska's Supreme Court has held that fraudulent concealment applies to all causes of action. *Muller v. Thaut,* 430 N.W.2d 884, 892 (Neb. 1988).  In establishing a claim for fraudulent concealment, the concealment must be manifested by an affirmative act or misrepresentation and the plaintiff must have exercised due diligence to discover his or her claim. *Andres v. McNeil Co.*, at 744.

Here, IP Plaintiffs' claims are not barred by the statute of limitations because they have sufficiently alleged that they could not have learned of their claim through the exercise of reasonable diligence. *See Muller*, at 891-92.  IP Plaintiffs could not have uncovered Defendants' conspiracy earlier than they did, because Defendants and their co-conspirators affirmatively created smokescreens to conceal its existence. *See* 3-CAC ¶¶ 327-366.  Defendants undertook affirmative acts to mislead the public about the nature and effect of their actions in order to avoid public scrutiny of their actions and discovery of their supply management conspiracy.  *Id.*  In this context, there is no explanation for the notion that a reasonable consumer should have

---

[33] It is important to note that Nebraska also recognizes a tort claim of fraudulent concealment, which is different from the tolling doctrine.  *See Zawaideh v. Neb. HHS Regulation & Licensure*, 792 N.W.2d 484, 495 (Neb. 2011); s*ee also Streeks, Inc. v. Diamond Hill Farms, Inc*., 605 N.W.2d 110, 118 (Neb. 2000).

investigated the factors driving the price of eggs unless there was some indication somewhere in the public sphere that a consumer might reasonably see that the explanations given for the price of eggs in the market were a pretense or somehow false or misleading. There was no indication in the public sphere. Nor was there any information readily obtainable to a consumer that reasonably indicated that increased egg prices resulted from illegal actions or that the explanations for prices were a sham. At the very least, the allegations of the 3-CAC create issues of fact that should not be resolved on a motion to dismiss. None of Defendants' cases support dismissal because IP Plaintiffs have adequately alleged fraudulent concealment under Nebraska law.

These facts establish a basis for tolling the relevant statutes of limitations under Nebraska law, at least for the purposes of this motion. For example, in *Andres*, the Nebraska Supreme Court reversed the district court's grant of summary judgment based on the statute of limitations. The court held that there was a genuine issue as to whether the defendant fraudulently concealed pertinent information regarding the home's construction that prevented the plaintiffs from timely filing of the suit. *Id.* Similarly, here, there are questions of fact – at least as to the inferences to be drawn from the facts plead – that make dismissal inappropriate.

### 12. Nevada

IP Plaintiffs' claims are not barred by the statute of limitations because IP Plaintiffs have sufficiently alleged facts justifying application of Nevada's discovery rule and the doctrine of fraudulent concealment under Nevada law. As Defendants correctly note, IP Plaintiffs' claims under Nevada law are covered by Nevada's discovery rule: the statutory actions expressly incorporate them and the default for determining when causes of action accrue under Nevada law is to apply its discovery rule. Defs' Brief at 54.

Under Nevada's "discovery rule," a cause of action arises only when the facts available would have led a reasonable person to investigate where they have an injury that could be caused by another's fault. *See Winn v. Sunrise Hosp. & Med. Ctr.*, 277 P.3d 458, 462-63 (Nev. 2012) (noting a cause of action does not accrue until a plaintiff is on notice of some injury that may have been caused by a defendant's negligence).  Issues regarding when a cause of action accrues under the discovery rule are questions of fact to be "determined by the jury or trial court after a full hearing."  *Bemis v. Bemis*, 967 P.2d 437, 440 (Nev. 1998) (reversing decision granting motion to dismiss; quoting *Millspaugh v. Millspaugh*, 611 P.2d 201, 203 (Nev. 1980)). Moreover, judgment as a matter of law on discovery issues is appropriate only when the facts "irrefutably demonstrate" that a plaintiff should have discovered his or her cause of action. *Winn*, 277 P.3d at 463.

Until September 21, 2006, when the state attorneys general issued their press releases, there was nothing – and Defendants point to nothing – that would have indicated that IP Plaintiffs suffered an injury due to Defendants' wrongdoing.  The difficulty of discerning an antitrust injury, the lack of access to information and the Defendants' efforts to forestall suspicion are all alleged specifically and repeatedly in the 3-CAC.  Under the circumstances, dismissal of IP Plaintiffs' claims would be inappropriate.

Similarly, Nevada's doctrine of fraudulent concealment should prevent dismissal of IP Plaintiffs' Nevada claims.  Under Nevada law, IP Plaintiffs can invoke the doctrine of fraudulent concealment to toll the statutes of limitations when the circumstances include "affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief."  *Volk v. D.A. Davidson & Co.,* 816 F. 2d 1406, 1415 (9th Cir. 1987) (internal citations omitted).  The doctrine of fraudulent

concealment incorporates the doctrine of due diligence that forms the basis for the discovery rule.  *See W. Mountain Oil, Inc. v. Gulf Oil Corp*., 575 F.Supp. 813, 815 (D. Nev. 1983). However, under Nevada law, an affirmative act of denial is enough to toll the statute of limitations if the circumstances make the plaintiff's reliance on the denial reasonable – a determination that is inherently fact-based.  *See Conmar Corp. v. Mitsui & Co., Inc*., 858 F.2d 499, 505 (9th Cir. 1988).

Of course, the allegations of the 3-CAC go beyond mere denial of wrongdoing.  They include affirmative misstatements regarding the fact that the Defendants were competing, misleading statements in public press releases and on websites regarding the Defendants' animal care certification program, use of private forms of communication and industry publications not generally available, and agreements not to discuss their supply management efforts outside the confines of egg industry circles.  Giving IP Plaintiffs the benefit of reasonable inferences from the facts as plead, such allegations support the application of fraudulent concealment and the denial of Defendants' Motion to dismiss the Nevada claims.  For example, in *Conmar*, the Court determined that "a jury could believe [] the filing of false customs forms was affirmative conduct sufficient for a finding of fraudulent concealment which prevented Conmar from being alerted to the manipulation of PC-strand prices."  *Id*.  IP Plaintiffs' allegations included numerous affirmative acts of concealment that sufficiently establish that defendants were actively seeking to conceal any evidence of wrongdoing making it was impossible for the IP Plaintiffs, exercising reasonable diligence, to discover their conspiracy.  *See id*.

### 13.   New Mexico

Under New Mexico's discovery rule, a cause of action accrues for purposes of calculating the limitations period when "the plaintiff discovers, or should have discovered in the exercise of

reasonable diligence, the facts that underlie his or her claim." *Butler v. Deutsche Morgan Grenfell, Inc.*, 140 P.3d 532, 539 (N.M. Ct. App. 2006). *See, e.g.*, N.M. Stat. Ann. § 57-1-12(B) (applying the discovery rule to antitrust claims). As the Defendants note, this rule applies generally to all causes of action. Defs' Brief at 58.

In *Butler*, the court addressed what a plaintiff must plead to invoke the discovery rule at the motion to dismiss stage. *Butler*, 140 P.3d at 539. The court held that dismissal is appropriate "where it is clearly apparent on the face of the pleading that the action is barred." *Id*. (citing *Apodaca v. Unknown Heirs of the Tome Land Grant*, 651 P.2d 1264, 1267-68 (N.M. 1982)). At that point, the plaintiff has the burden to show "that *if* he or she had diligently investigated the problem he or she would have been unable to discover the facts underlying the claim." *Id*. (quoting *Martinez v. Showa Denko, K.K.,* 964 P.2d 176, 181 (N.M. Ct. App. 1998)) (emphasis added). This is an objective test, and courts will apply a reasonable person standard to whether a plaintiff should have known of the cause of action. *Wilde v. Westland Dev. Co*., 241 P.3d 628, 635 (N.M. Ct. App. 2010). Here, IP Plaintiffs have alleged the conspiracy could not have reasonably been discoverable before September 21, 2006.

For example in *Williams v. Stewart*, 112 P.3d 281, 285 (N.M. Ct. App. 2005), the court concluded that publicity concerning a program to use body parts removed in autopsies without consent did not give rise to a duty to inquire as a matter of law and that the district court therefore erred in determining that the statute of limitations bars the claims. *Id*. at 283. The court relied on plaintiffs' allegations that the various articles, reports, and broadcasts described the program with varying degrees of specificity and the publicity appeared to have been lacking pertinent details, such as the secretive nature of the program. *Id*. at 287.

Here, like in *Williams*, IP Plaintiffs have alleged that they could not have uncovered Defendants conspiracy earlier than they did, because Defendants and their co-conspirators affirmatively concealed the existence of the combination and conspiracy from IP Plaintiffs. *See* 3-CAC, ¶¶ 327-66. From the information available to IP Plaintiffs, there was no reason to investigate the factors driving up the price of eggs because there was no indication anywhere in the public sphere that a consumer might reasonably see that the explanations given for the price of eggs in the market were a pretense or somehow false or misleading. IP Plaintiffs cannot be required to have a degree in agricultural economics – or hire someone who does – to examine such issues absent some reason to believe that egg producers were engaging in conduct outside of what the market and normal animal husbandry required. Simply put, it would be unreasonable in an antitrust violation action, to require consumers to investigate every fluctuation in the price of a product to determine whether producers or wholesalers might be using pretexts to raise their prices. Moreover, once the plaintiff has alleged disputed facts, "it is generally the province of a jury to determine the date on which a plaintiff became aware or should have become aware of the facts underlying his or her claim [and], granting a motion to dismiss on statute of limitations grounds would be improper." *Butler*, 140 P.3d at 539. Dismissal is inappropriate here.

Similarly, in New Mexico, "where a party against whom a cause of action accrues prevents the one entitled to bring the cause from obtaining knowledge thereof by fraudulent concealment, . . . or where the cause is known to the injuring party, but is of such character as to conceal itself from the injured party, . . . the statutory limitation on the time for bringing the action will not begin to run until the right of action is discovered, or, by the exercise of ordinary diligence, could have been discovered." *Hardin v. Farris*, 530 P.2d 407, 410 (N.M. Ct. App. 1974). The New Mexico Supreme Court discussed fraudulent concealment as a branch of

equitable estoppel with different elements, namely: "(1) the use of fraudulent means by the party who raises the bar of the statute; (2) successful concealment from the injured party; and (3) that the party claiming fraudulent concealment did not know or by the exercise of reasonable diligence could not have known that he might have a cause of action." *Continental Potash v. Freeport-McMoran, Inc.*, 858 P.2d 66, 74 (N.M. 1993).[34] In addition, fraudulent concealment must be plead with particularity and that there was an affirmative act that frustrated the discovery of his claim. *Id.* Moreover, evidence of a defendant's wrongful act can serve as evidence of a motivation for fraudulent concealment. *See Blea v. Fields*, 120 P.3d 430, 440-41 (N.M. 2005) (evidence of negligence is relevant to motive to conceal actions).

As noted repeatedly herein, the 3-CAC pleads facts identifying a variety of actions that are misleading, that controlled the mix of information available to the public, thus concealing the causes of action and that IP Plaintiffs could not have discovered the reality of Defendants' conduct through reasonable efforts. *See Kern v. St. Joseph Hosp., Inc.*, 697 P.2d 135, 139-40 (N.M. 1985) (reversing grant of summary judgment where evidence existed that could be construed as concealment and ignorance of cause of action); *see also Martinez v. Martinez*, 83 P.3d 298, 301 (N.M. Ct. App. 2004) (when parties' affidavits set out conflicting facts and lead to conflicting inferences, summary judgment on fraudulent concealment was inappropriate).

### 14. New York

As the Defendants note, New York recognizes that actions taken by defendants to conceal the nature of their actions – including engaging in activities that by their nature must be concealed – operates to toll the statutes of limitations. Defs' Brief at 61-62. *See also People v.*

---

[34] The close treatment of the two doctrines of equitable estoppel and fraudulent concealment has caused some confusion in the lower courts. Compare *Martinez-Sandoval v. Kirsch*, 884 P.2d 507, 515 (N.M. Ct. App. 1994) (applying the elements as stated by the Supreme Court in *Potash*) with *McNeill v. Rice Eng'g & Operating Inc.*, 128 P.3d 476, 482 (N.M. Ct. App. 2005) (adding a reliance requirement from equitable estoppel generally to fraudulent concealment).

*Liberty Mut. Ins. Co.*, 861 N.Y.S.2d 294, 296 (N.Y. App. Div. 2008) (holding that Donnelly Act

claims for bid-rigging were tolled because bid-rigging is an activity that is inherently self-

concealing; analogizing to federal law under New York principles of harmonizing state and

federal antitrust law).[35]   To toll the Donnelly Act's statute of limitations, IP Plaintiffs need to

establish: (1) the defendant concealed the existence of the cause of action; (2) the plaintiff

brought suit within the applicable limitations period upon learning of the cause of action; and (3)

the plaintiff's ignorance of the claim did not result from a lack of diligence.[36]   *New York v.

Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *Coble v. Cohen & Slamowitz, LLP*,

824 F. Supp. 2d 568, 571 (S.D.N.Y. 2011); *M&T Mortg. Corp. v. White*, 736 F. Supp. 2d 538,

556 (E.D.N.Y. 2010).

Ultimately, the question for the Court is "whether a reasonable plaintiff in the

circumstances would have been aware of the existence of a cause of action."  *Veltri v. Bldg. Serv.

32b-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004).   As the Defendants note, a plaintiff may

meet the first requirement for establishing fraudulent concealment by showing either that

defendants engaged in affirmative misconduct in order to conceal their misconduct or that the

nature of the actions had to remain concealed to be successful.  *See* Defs' Brief at 63 (citing

*Hendrickson*, 840 F.2d at 1084, *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192-

93 (S.D.N.Y. 2000), *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 224

(E.D.N.Y. 2003) and *People v. Liberty Mut. Ins. Co.*, 861 N.Y.S.2d at 296)); *see also M&T*

---

[35] In *Liberty Mutual*, the New York appellate court looked to Second Circuit law on fraudulent
concealment, as do Defendants.  Because New York state courts have expounded upon the doctrine of
fraudulent concealment in the context of Donnelly Act claims (N.Y. Gen. Bus. Law § 340), IP Plaintiffs
will look to the law of the Second Circuit on equitable tolling for guidance, as did the *Liberty Mutual*
court.  New York does not apply its discovery rule to cases other than fraud.

[36] Defendants list four requisites for equitable tolling for fraudulent concealment under *Hendrickson*.
*Hendrickson* and the cases following it, however, list only the three elements discussed above.

*Mortg. Corp.* 736 F. Supp. 2d at 556.  The second prong is established ultimately through factual proof of the date of discovery.  *Coble*, 824 F. Supp. 2d at 572 (for purposes of a motion to dismiss, the court held that the facts alleged indicated tolling until actual discovery of misconduct).  Finally, IP Plaintiffs satisfy the third element by establishing that a reasonable investigation could not have led to discovery of the misconduct.  *See M&T Mortg. Corp.*, 736 F. Supp. 2d at 556.[37]  *See also Hendrickson*, 840 F.2d at 1083-84; *Nine West*, 80 F. Supp. 2d at 193 ("The Court of Appeals held that since bid-rigging and price-fixing conspiracies are deemed self-concealing, a plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct.").

The 3-CAC pleads facts that meet all of the requirements to toll the statute of limitations.  First, as noted above, the 3-CAC alleges *both* affirmative misrepresentations *and* that the Defendants concealed the actual nature of their actions for the conspiracy to be successful.  The affirmative conduct to conceal the true nature of their actions included pretextual statements regarding false explanations for egg prices, false statements regarding their animal care standards, monitoring the media to ensure their message was being disseminated to the public, and agreeing to keep their other supply reduction agreements confidential.  The 3-CAC also alleges that had the nature of the conspiracy been public, Defendants would have faced lawsuits or other actions to force them to cease their activities, as shown by the complaints filed by their direct consumers.

Second, the IP Plaintiffs have alleged facts sufficient to toll the statute of limitations until September 26, 2006, when the Defendants abandoned their pretense that the animal care

---

[37] Defendants cite the opinion of the district court in *Griffin v. McNiff*, 744 F. Supp. 1237, 1256 (S.D.N.Y. 1990) *aff'd*, 996 F.2d 303 (2d Cir. 1993), as support for the proposition that IP Plaintiffs must plead due diligence.  *Griffin*, however, involved a situation *where the IP Plaintiffs were on notice of facts they claimed were indicative of fraud* and did not allege that they had been unable, despite due diligence, to discover the fraud.  *Id.* at 1256.

standards implied a certain level of care for the chickens or the scientific backing for such standards pursuant to their agreement with the state attorneys general.  Until that time the Defendants continued to use and defend the Animal Care logo and IP Plaintiffs were not on notice of any wrongdoing by Defendants – and Defendants do not argue that IP Plaintiffs were so aware.

Finally, as noted in the 3-CAC, because of the nature of the injury, the private nature of most of the communications and the lack of access to relevant information, IP Plaintiffs could not have discovered Defendants' conspiracy through reasonable diligence.  In addition, IP Plaintiffs allege that they acted as reasonable consumers would have acted, monitoring the mass media and paying attention to what they were purchasing and its price.  As noted above IP Plaintiffs are not required, nor should be required, to launch full-scale investigations into every price increase for a particular good.

### 15.    North Carolina

Under North Carolina law, as with the law of most of the states herein, both the discovery rule and the doctrine of fraudulent concealment should prevent dismissal of IP Plaintiffs' statutory cause of action.  As the Defendants correctly note, the discovery rule applies to both of IP Plaintiffs' statutory claims under North Carolina law, but does not apply to the North Carolina unjust enrichment claims.  Defs' Brief at 66.  Defendants also correctly note under the discovery rule, a cause of action does not accrue until a cause of action is discovered or should have been discovered through reasonable inquiry.  Defs' Brief at 66-7.  However, "[w]hether a plaintiff has exercised due diligence is ordinarily an issue of fact for the jury absent *dispositive or conclusive evidence indicating neglect by the plaintiff as a matter of law.*"  *Spears v. Moore*, 551 S.E.2d 483, 485 (N.C. Ct. App. 2001) (emphasis added).  Further, when a "plaintiff in the exercise of

due diligence should have discovered the facts…is ordinarily for the jury when the evidence is not conclusive or is conflicting." *Huss v. Huss*, 230 S.E.2d 159, 163 (N.C. Ct. App. 1976) (reversing decision on a motion to dismiss).

The 3-CAC alleges that critical evidence was not readily available to IP Plaintiffs, because, *inter alia,* Defendants agreed to keep their actions confidential and communicated regarding their conspiracy through private means.  Further, by providing at least arguably false justifications for the prices of eggs and their animal husbandry guidelines, as well as issuing statements that they were competing when they were not, the Defendants contributed to the inability of IP Plaintiffs to determine they had a cause of action, at least until the state attorneys general issued their press releases stating that they believed Defendants' public representations regarding their animal care program were misleading.  Thus, where – as here – the facts are in doubt or there is "any evidence sufficient to justify the inference that the cause of action is not barred," a jury should decide when the cause of action accrued and when the statute of limitations expired.  *Williams v. Houses of Distinction*, *Inc.,* 714 S.E.2d 438, 442-46 (N.C. Ct. App. 2011) (reversing grant of summary judgment on statute of limitations grounds).  The Defendants' motion to dismiss the North Carolina statutory claims should be denied.

### 16.  North Dakota

North Dakota adopted the discovery rule because the strict application of a statute of limitation is often harsh and unjust.  *Wells v. First Am. Bank West,* 598 N.W.2d 834 (N.D. 1999) (citing *Shanilec v. Grand Forks Clinic, Ltd.,* 599 N.W.2d 253, 255 (N.D. 1999)).  "The discovery rule postpones a claim's accrual until the plaintiff knew, or with the exercise of reasonable diligence should have known, of the wrongful act and its resulting injury. Courts generally apply the discovery rule when it would have been difficult for the plaintiff to have learned of the

negligent act or omission that gave rise to the legal injury." *Wells,* 598 N.W.2d at 838; s*ee also Dunford v. Tryhus*, 776 N.W.2d 539, 542 (N.D. 2009).  North Dakota courts have applied the discovery rule in a wide range of actions based in both tort to contract and would likely apply it to the antitrust claims here.  *See Wells* at 838.  As alleged in the 3-CAC, the nature of the Defendants' conspiracy as well as the nature of the injury caused by the Defendants' conspiracy made it difficult for IP Plaintiffs to discover that they had a claim.  Under the circumstances, it is likely that the North Dakota Supreme Court would apply the discovery rule to determine when the cause of action accrued in this case.

"In applying the discovery rule, the focus is upon whether the plaintiff has been apprised of facts which would place a reasonable person on notice that a potential claim exists. It is not necessary that the plaintiff be subjectively convinced that he has been injured and that the injury has been caused by the defendant's negligence." *Larson v. Norkot Mfg. Inc.,* 627 N.W.2d 386, 389 (N.D. 2001) (internal citations omitted); *see also Schanilec*, 599 N.W.2d at 255.  Further, a plaintiff does not need to fully appreciate the defendant's potential liability; she only needs to know enough to be on notice of a potential claim.  *Schanilec* at 256.  As noted, the type of injury alleged in the 3-CAC – increased market prices – are hard to trace and attribute to Defendants' wrongful actions absent access to wholesale market information (prices and communications) and sometimes expert analysis.  This type of injury would not put a reasonable person on notice that a claim exists.  Moreover, the application of the discovery rule raises numerous questions of fact and is not appropriate to be dismissed at the pleading stage.  *Abel v. Allen*, 651 N.W.2d 635, 638 (N.D. 2002) ("Determining when a plaintiff's cause of action has accrued is generally a question of fact"); *see also Rose v. United Equitable Ins. Co*., 632 N.W.2d 429, 434 (N.D. 2001) ("A statute of limitations defense is fact-driven and not ordinarily susceptible of summary

disposition."). Accordingly, IP Plaintiffs' claims did not accrue until, at the earliest, September 21, 2006, when the state attorneys' general issued their press releases identifying Defendants' defense and promotion of their animal care guidelines were misleading. The Defendants' motion to dismiss the North Dakota claims should be denied.

### 17.    South Dakota

IP Plaintiffs' South Dakota antitrust claims did not accrue until, at the earliest, September 21, 2006. South Dakota's antitrust statute provides that an action for damages can be commenced "within four years after the claim for relief *accrues*." S.D. Codified Laws § 37-1-14.4 (emphasis added); compare S.D. Codified Laws § 15-2-14.1 (medical malpractice statute provides that claim must be brought within 2 years after the malpractice "occurred"). "A cause of action accrues when the right to sue arises. This means that '[i]n all events, a claim accrues and limitations become its course when a person has some notice of his cause of action, an awareness either that he has suffered an injury or that another person has committed a legal wrong which ultimately may result in harm to him.'" *Spencer v. Estate of Spencer*, 759 N.W.2d 539, 544 (S.D. 2008). (internal citations omitted). The specific use of the term "accrues" in the antitrust statute indicates South Dakota's intent for the statute of limitations not to run until discovery or notice of the claim.[38]

In *Strassburg v. Citizens State Bank*, 581 N.W.2d 510 (S.D. 1998), the South Dakota Supreme Court interpreted the word "accrued" and held that the plaintiff's claim accrued when he could have commenced an action. *Id*. at 514. The court held the "statute of limitations ordinarily begins to run when the plaintiff either has actual notice of a cause of action or is charged with notice." *Id*. Actual notice consists in express information of a fact. S.D. Codified

---

[38] Although the 8th Circuit has noted that South Dakota requires statutory authorization to invoke the discovery rule, the use of the term "accrues" is such an authorization. *Baye v. Diocese of Rapid City*, 630 F.3d 757, 760 (8th Cir. 2011).

Laws § 17-1-2. Constructive notice is notice imputed by the law to a person not having actual notice.  S.D. Codified Laws § 17-1-3.  "Either actual or constructive notice… will… start the statute of limitations clock running."  *Strassburg,* 581 N.W.2d 514.  Accordingly, the clock will start running once IP Plaintiffs are put on inquiry notice to the degree that reasonable person would have learned of the claim.  *Id.* (citing S.D. Codified Laws § 17-1-4).

Here, IP Plaintiffs were not put on inquiry notice until at earliest September 21, 2006.  The type of injury alleged in the 3-CAC – increased market prices – are hard to trace and attribute to Defendants' wrongful actions absent access to wholesale market information (prices and communications) and sometimes expert analysis.  This type of injury would not put a reasonable person on notice that that a claim exists.  IP Plaintiffs could not have investigated the chicken coops.  Nor could they be required to investigate molting schedules and communications among egg producers and at egg producers' private meetings to determine whether the egg supply was being artificially manipulated.  IP Plaintiffs did what reasonable consumers should do – they shopped around and saw nothing that would alert them to Defendants' conspiracy.  Because there is a genuine dispute of fact as to when IP Plaintiffs may have been put on inquiry notice of the wrongful conduct, dismissal is improper under South Dakota law.  *Iron Wing v. Catholic Diocese*, 807 N.W.2d 108, 111 (S.D. 2011) ("When issues of material fact remain, the statute of limitations question is for the jury.").

In addition, IP Plaintiffs' claims are not barred by the statute of limitations because IP Plaintiffs have sufficiently alleged fraudulent concealment under South Dakota law.  In South Dakota, fraudulent concealment "tolls the statute of limitations until the cause of action is discovered or might have been discovered by the exercise of diligence."  *One Star v. Sisters of St. Francis*, 752 N.W.2d 668, 681 (S.D. 2008).  "The burden is upon the plaintiff to prove (1) the

defendant fraudulently concealed the cause of action from the plaintiff and (2) the plaintiff exercised diligence to discover the cause of action.  In the absence of some trust or confidential relationship between the parties there must be some affirmative act or conduct on the part of the defendant designed to prevent, and which does prevent, the discovery of the cause of action." *Hinkle v. Hargens*, 81 N.W.2d 888, 891 (S.D. 1957).

In the instant case, the requirements are satisfied because Defendants repeatedly concealed and suppressed material facts relating to artificial price inflation and manipulation by communicating on multiple occasions to the public that increases in prices were a result of recently adopted animal husbandry standards coupled with rising costs in feed and other production costs.  (3-CAC at ¶¶ 9, 327-349.)  The second element of fraudulent concealment is also satisfied because it was impossible for IP Plaintiffs to know of the true underlying facts leading to the increased egg prices.  As pled in the 3-CAC, Defendants conspired to artificially fix prices at private trade association meetings or through correspondence and communicated such intentions accordingly and/or through private industry newsletters.  (3-CAC, at ¶¶ 51, 155, 174.)

In *Strassburg,* the court held that summary judgment could not be granted based on the statute of limitations "because whether plaintiff knew or should have known of his cause of action […] is a question of fact."  581 N.W.2d 511; *see also McGill v. Am. Life and Cas. Ins. Co.*, 619 N.W.2d 874, 879 (S.D. 2000) (Whether a party's actions rose to the level of fraudulent concealment is a question of fact.).  Similarly, here there are questions of fact regarding when IP Plaintiffs could have learned of their claim.

18.     **Tennessee**

Defendants seek to dismiss IP Plaintiffs' claims for damages under the Tennessee Trade Practices Act, Tenn. Code Ann. § 47-25-101 *et seq.*, and under unjust enrichment principles arising before December 2, 2005.  While there are no specific statute of limitations for either of these causes of action, as the Defendants note, the Tennessee Supreme Court is likely to apply its discovery rule in determining the date when the statute of limitations on these causes of action accrue.  *See* Defs' Brief, at 81.  In addition, Tennessee courts will also apply the doctrine of fraudulent concealment to toll the statute of limitations when "the defendant has taken steps to prevent the plaintiff from discovering he [or she] was injured."  *Fahrner v. SW Mfg., Inc.,* 48 S.W.3d 141, 145 (Tenn. 2001).  Thus, we discuss how application of each of these doctrines applies to prevent the statutes of limitations from barring IP Plaintiffs' claims.

Because of the nature of the injury, the difficulty of identifying Defendants' conduct, and which parties engaged in illegal conduct, Tennessee's discovery rule prevents IP Plaintiffs' claims from being time-barred.  Earlier this year, in *Redwing v. Catholic Diocese of Memphis*, 363 S.W.3d 436 (Tenn. 2012), the Tennessee Supreme Court described current Tennessee law on the accrual of causes of action and the tolling of statutes of limitations.[39]  As the *Redwing* court noted, these issues of accrual under the discovery rule and tolling are inter-related and "should not be considered in isolation."  *Id.* at 456.

---

[39] Defendants cite *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614 (Tenn. 2002) and *Quality Auto Parts Co., Inc. v. Bluff City Buick Co., Inc.*, 876 S.W.2d 818 (Tenn. 1994) (Defs' Brief at 80-82), to explain the nature of the discovery rule in Tennessee.  But the question in *Pero's Steak* was whether the accrual rules for the statute of limitations for conversion claims under the UCC includes a discovery rule – not the nature of the discovery rule.  *Id.* at 616, 622-24 (discovery rule is not available in UCC conversion cases).  Similarly, *Quality Auto Parts*, did not address whether the accrual rules for the statute of limitations for slander claims include a discovery rule, not its scope or application.  *See id.* at 821-22 (language of statute of limitations for slander precludes use of the discovery rule).

While the Defendants only partially describe the discovery rule, the entire formulation of Tennessee's discovery rule is important to understanding its application to the facts as alleged in the 3-CAC.  Under Tennessee's discovery rule, the "statute of limitations does not expire before the plaintiff discovers a claim."  *Gerdau Ameristeel, Inc. v. Ratliff*, 368 S.W.3d 503, 507 (Tenn. 2012) (reversing grant of summary judgment).  Thus, the discovery rule prevents the accrual of the cause of action until plaintiffs know or in the exercise of reasonable care should know that he or she has suffered an injury as a result of a defendants' "wrongful conduct."  *Redwing*, 363 S.W.3d at 459[40]; *PNC Multifamily Capital Institutional Fund v. Bluff City Cmty. Dev. Corp.*, No. 11-3252012, Tenn. App. LEXIS 288, at *37 (Tenn. Ct. App. May 4, 2012).  As the formulation implies, while plaintiffs need not understand the legal specifics of their claim, plaintiffs must understand that they have sustained an injury due to some wrongful conduct by some specific defendant.  *See PNC Multifamily Capital*, 2012 Tenn. App. LEXIS 288, at *41-42 (must have knowledge of specific wrongdoers; reversing grant of motion to dismiss); *McClellan v. Stanley*, 978 S.W.2d 943, 944 (Tenn. Ct. App. 1998) (must know identity of wrongdoer; reversing grant of summary judgment); *Shadrick v. Coker*, 963 S.W.2d 726, 733-34 (Tenn. 1998) (evidence did not establish as a matter of law that facts established knowledge of the wrongful nature of the injury; reversing summary judgment); *Terry v. Niblack*, 979 S.W.2d 583, 586-87 (Tenn. 1998) (facts must give plaintiff notice that she had been wronged and injured; affirming decision to overturn dismissal); *Luccarelli v. DVA Renal Healthcare, Inc.*, No. 08-2067, 2008 U.S. Dist. LEXIS 67211, at * 9-10 (W.D. Tenn. Mar. 17, 2008) (discovery rule requires that the plaintiff understand the "wrongful nature of that injury"; denying motion to dismiss).

---

[40] Tennessee courts define constructive knowledge as what a reasonable investigation would have disclosed.  *Id.*

Tennessee courts have made it clear that questions as to when a "reasonable person" would have discovered an injury that flows from wrongful conduct of a defendant present issues of fact for the jury or trier of fact. *Russell v. Household Mortg. Serv.*, No. 08-01703, 2012 Tenn. App. LEXIS 371, at *14 (Tenn. Ct. App. Jun. 7, 2012) (issue of when plaintiff should have discovered the injury is a question of fact and inferences are for the jury; reversing grant of summary judgment). *See Gerdau Ameristeel*, 368 S.W.3d at 509 (issues as to whether a reasonable investigation was done and what it would have discovered are questions of fact; reversing a grant of summary of judgment); *Wyatt v. ACandS, Inc.*, 910 S.W.2d 851, 854 (Tenn. 1995) (questions as to discovery are questions of fact for the jury).

These principles establish, at the very least, that when the Tennessee IP Plaintiffs' cause of action accrued is not appropriate for determination on this motion to dismiss. The type of injury alleged in the 3-CAC – increased market prices – are hard to trace and attribute to Defendants' wrongful actions absent access to wholesale market information (prices and communications) and expert analysis. Further, the 3-CAC alleges many of the communications in furtherance of the conspiracy were made through media (industry meetings and newsletters) not available to the general public. In addition, various Defendants' public statements that they were vigorously competing create further factual questions as to when a reasonable consumer could or would have discovered Defendants' conspiracy. Nor should or could consumers "investigate" whether the chickens' morbidity and mortality (not to mention quality of life) was materially affected by "animal care" standards proclaimed on the Defendants' eggs packaging. As discussed above, the facts allow for the conclusion that reasonable consumers would not have discovered that they were injured or that their injury resulted from *wrongful* actions prior to the filing of this suit. *See Gilmore v. Davis*, 185 F. App'x. 476, at *19-20 (6th Cir. 2006) (stating

that under Tennessee law "it is well-established that the discovery rule ordinarily raises issues of

fact" and reversing summary judgment; *see also America's Collectibles Network, Inc. v. Sterling*

*Commerce Inc.*, No. 09-143, 2011 U.S. Dist. LEXIS 56719, at * 8-9 (E.D. Tenn. May 26, 2011)

(granting plaintiffs all reasonable inferences, discovery rule could delay the accrual of the cause

of action, denying motion to dismiss).[41]

      The *Redwing* court also summarized Tennessee law regarding the "tolling" of statutes of

limitations, essentially laying out the elements of fraudulent concealment.  As applied to this

case, the elements are:  (1) an affirmative act of concealment by the defendant; (2) the plaintiff

could not have discovered the cause of action despite reasonable care and diligence or wrongdoer

through reasonable care or diligence; (3) knowledge by the defendant(s) of the facts giving rise

to the cause of action; and (4) concealment of material information or use of "some device to

mislead'" plaintiffs in order to "exclude suspicion" or "prevent inquiry."  *Redwing*, 363 S.W.3d

at 462-63 (citing *Pero's,* 90 S.W.3d at 625; *Shadrick,* 963 S.W.2d at 735 (Tenn. 1998), and

*Benton v. Snyder*, 825 S.W.2d 409, 414 (Tenn. 1992)).

---

[41] This does not mean that a court may never grant summary judgment or a motion to dismiss in a discovery rule case, as exemplified by the cases cited by the Defendants – cases clearly distinguishable from this one and where the facts were actually in the hands of the plaintiff could lead to only to the inference that the plaintiff should have known.  For example in *Lindsey v. Allstate Ins. Co.*, 34 F. Supp.2d 636 (W.D. Tenn. 1999) (Defs' Brief at 82), the plaintiff admitted that the defendants had not engaged in concealing their illegal actions and that he discovered the defendants' fraud two years before filing the complaint, more than a year after the one year statute of limitations had run from the date of discovery.  In *Schmank v. Sonic Auto., Inc.*, No. 01857, 2008 Tenn. App. LEXIS 291 at * 9-11 (Tenn. App. May 16, 2008) (Defs' Brief at 81), the plaintiff reviewed and signed a document buying insurance.  Since the fact that she was buying insurance was disclosed and all the other facts were obvious to her on the day she made her purchase, the application of the discovery rule was inappropriate.  Similarly, *Stanbury v. Bacardi*, 953 S.W.2d 671, 677-78 (Tenn. 1997) (Defs' Brief at 81), involved claims for battery based on unauthorized and unnecessary surgeries.  There, the plaintiff was held to have immediately discovered the doctor's wrongful conduct because the patient gave consent for limited surgery on one foot and woke up to find the doctor had operated on both feet.

.

As the elements suggest, the "affirmative act" by a defendant need not be a verbal expression, per se – it need only be a "trick or contrivance" designed to throw potential plaintiffs off the scent. *See Benton*, 825 S.W.2d at 414 (for fraudulent concealment, "[t]here must be some trick or contrivance intended to exclude suspicion and prevent inquiry . . . ."); *Redwing*, 363 S.W.3d at 462-63. As with the discovery rule, questions as to whether the defendants' actions are misleading and whether the plaintiff could have discovered the facts through a reasonable investigation are questions of fact for the jury. *See id.* at 464 (question as to reasonable diligence is a question of fact for the jury); *Benton*, 825 S.W.2d at 415 (reversing directed verdict where there was circumstantial evidence of defendants' knowledge and concealment).

The allegations in the 3-CAC allow a reasonable inference that the actions taken by the Defendants constitute a trick or contrivance designed to prevent inquiry or evade suspicion as to their actions. The Defendants' alleged misrepresentations regarding the animal care program, that they were competing, that the price of eggs was attributable to factors other than their actions, and use of a potentially misleading logo constituted a contrivance designed to evade detection of their scheme. The allegations regarding Defendants' attendance at meetings, the discussions in industry meetings and publications of the effects of their actions on supply and price create at least an inference of the knowledge of wrongdoing needed. And whether consumers acted reasonably in light of reasonably accessible information is also an issue of fact.

### 19. Utah

As the Defendants note, issues regarding the accrual of the cause of action under the Utah Antitrust Act are not relevant to this motion, since the IP Plaintiffs have conceded that such claims only became viable with the enactment of the amendment to Utah's antitrust law allowing indirect purchasers to sue on May 1, 2006. Because the IP Plaintiffs have decided not to pursue

claims under Utah unjust enrichment law (*see* IP Plaintiffs' Statement of Law), this portion of Defendants Motion is moot.

### 20.    Vermont

As the Defendants note, Vermont's discovery rule applies in determining the date IP Plaintiffs' causes of action under Vermont's Consumer Fraud Act (which provides the basis for IP Plaintiffs' claims) and under the common law theory of unjust enrichment.  Defs' Brief at 87. As the Defendants note, the purposes of Vermont's discovery rule is to protect plaintiffs' rights to a remedy in cases where they may not be aware of their "legal injuries."  Defs' Brief at 88. Vermont courts have held that this standard means that the cause of action does not accrue until a plaintiff is on notice of an "injury," its cause, and that the "injury" is caused by some particular defendant's breach of duty or negligence.  *See Turner v. Roman Catholic Diocese of Burlington, Vt.*, 987 A.2d 960, 980-82 (Vt. 2009).  As Defendants note, plaintiffs are charged with information that could have been obtained through reasonable diligence.  Defs' Brief at 88.  But, in the end, "the determination of the accrual date of a claim is generally a question reserved for the trier of fact."  *Vt. Agency of Natural Res. v. Towns*, 724 A.2d 1022, 1025 (Vt. 1998) (noting the burden of establishing a statute of limitations defense rests with the party asserting it).

In addition to the discovery rule, Vermont's doctrine of fraudulent concealment also applies to IP Plaintiffs' claims so as to prevent their dismissal, at least at this stage of the litigation.  (*See* Defs' Brief at 88, noting that 12 Vt. Stat. Ann. Tit. § 555 applies to "any personal action").  12 V.S.A. § 555, serves to toll the statute of limitations until potential plaintiffs can discovers their "cause of action."  *Id*.  To take advantage of 12 V.S.A. § 555, plaintiffs must establish "concealment" and an intent to prevent discovery of a cause of action.  *Turcotte v. LaRose*, 569 A.2d 1086, 1087 (Vt. 1989).  In practice, this means that the statutory tolling

applies where there is evidence that "defendants did not want to be found out; accordingly, they concealed their actions intending to prevent anyone from discovering their complicity."  *Id.*[42]

For reasons discussed above, the facts as pled in the 3-CAC at least allow inferences that IP Plaintiffs could not have "discovered" their cause of action until after September 21, 2006. The nature of the injury makes it difficult to discern that it could be caused by any wrongdoing – much less the wrongdoing of any particular defendant or group of defendants. The 3-CAC alleges that much of the information critical to determining whether a cause of action existed was not in IP Plaintiffs' hands and there was no indication of any breach of duty – any wrongdoing – until at least the state attorneys general alleged that the animal husbandry standards were potentially misleading.  When combined with allegations that the Defendants deliberately sought to cover-up their conspiracy, claimed they were competing and monitored public information to make sure their story was emphasized in the media, the 3-CAC at least creates a factual issue as to when the cause of actions accrued that should not be decided on a motion to dismiss.  *See Turner*, 987 A.2d at 983 ("Because the inquiry notice question was appropriately for the jury, the trial court erred in granting plaintiff judgment as a matter of law on this issue."); *Towns*, 724 A.2d at 1025 (reversing grant of summary judgment).

### 21.    West Virginia

IP Plaintiffs have asserted claims under West Virginia antitrust law and for restitution under the West Virginia's unjust enrichment doctrine.  As the Defendants correctly note (Defs' Brief at 90), under West Virginia law, statutes of limitations do not apply to unjust enrichment as

---

[42] The Defendants cite *Stankiewicz v. LaRose*, 561 A.2d 400, 402 (Vt. 1989) for the proposition that "third parties" cannot be held to account for the concealment of others.  Defs' Brief at 89.  But the Stankiewicz court clarified what it meant by "third parties" – a person that is not among those from whom a "recovery is sought."  *Id*. at 402. Since the 3-CAC alleges a conspiracy among Defendants and seeks recovery from all of them, 12 V.S.A. § 555 applies to all of them.  *See Turcotte v. Estate of LaRose*, 569 A.2d at 1087 (defendants sought to hide their "complicity" in the actions that harmed plaintiffs).

an equitable cause of action. *Dunn v. Rockwell*, 689 S.E.2d 255, 266 (W. Va. 2009). Defendants

also note that the only potential time bar to the unjust enrichment cause of action could arise

from the application of the equitable doctrine of laches. Defs' Brief at 91. However, because

laches is an affirmative defense, the burden is on Defendants to show it applies in a particular

case. In addition, to establish a defense based upon laches, the Defendants must establish that

they detrimentally changed their positions vis-à-vis their actions relevant to this case because of

any "delay" in IP Plaintiffs' filing of this action. *Dunn v. Rockwell*, 689 S.E.2d at 267. This

they do not do.

  Thus, with regard to the IP Plaintiffs' West Virginia causes of action, the Defendants'

Motion addresses only the statutory causes of action. As the Defendants note, West Virginia's

discovery rule applies to the causes of action asserted – both under the specific direction of W.

Va. Code § 47-18-11 and under general principles of West Virginia law. *See* Defs' Brief at 91-

92. If the discovery rule does not apply, then the Court must examine whether fraudulent

concealment or some other "tolling" doctrine applies to IP Plaintiffs' claims under West Virginia

law. *Dunn v. Rockwell*, 689 S.E.2d at 256.

  West Virginia's discovery rule delays accrual of the statute of limitations until plaintiffs

know or should know: (1) that they have been injured, (2) the identity of the parties who may

have engaged in wrongful conduct that harmed the plaintiffs and (3) that the conduct of that

parties who may have engaged in wrongful conduct "has a causal relation" to plaintiffs injuries.

*Harris v. Jones*, 550 S.E.2d 93, 98 (W. Va. 2001) (quoting Syllabus Point 4, in part, *Gaither v.

City Hospital, Inc.,* 487 S.E.2d 901, 906 (W. Va. 1997)). The test as to whether the plaintiff

"'knows of' or 'discovered' a cause of action is an objective test, and the plaintiff is charged with

knowledge of the factual, rather than the legal, basis for the action. This objective test focuses

upon whether a reasonable prudent person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action." *Dunn v. Rockwell*, 689 S.E.2d at 265.  The discovery rule, *per se*, does not create an "affirmative duty" to investigate the facts.  It is only where a plaintiff is fully aware of the injury, the potential wrongdoing and the identity of the wrongdoer that the "duty" comes into play, thus "shifting the burden" of establishing the applicability of the discovery rule to plaintiff by establishing due diligence or fraud.  *See Rockwell*, 689 S.E.2d at 263-65; *McCoy v. Miller*, 578 S.E.2d 355, 359-60 (W.Va. 2003).[43]  A determination as to what plaintiffs should have reasonably known is generally an issue of fact for the jury.  *Perrine v. E. I. du Pont de Nemours & Co*., 694 S.E.2d 815, 852 (W.Va. 2010) (reversing grant of summary judgment: "this Court has clearly established that the determination of when the plaintiff possessed the requisite knowledge to trigger the running of the statute of limitations is a question of fact for the jury.").  For example, when the information available to plaintiff is ambiguous or could be interpreted in a manner inconsistent with wrongful conduct by a defendant (such as containing inconsistent explanations for any injury suffered by a plaintiff), the question as to when the cause of action accrued should go to the jury.

For reasons noted repeatedly above, these principles establish that the discovery rule should apply here.  At most, the information available to IP Plaintiffs was ambiguous and incomplete.  Under such circumstances, dismissal on statute of limitations grounds is inappropriate.  *See J.A. Street & Assocs. v. Thundering Herd Dev., LLC*, 724 S.E.2d 299, 310

---

[43] In fact, it appears that the *Rockwell* court *explicitly overruled* the rule recited by the Defendants from *McCoy v. Miller*, 578 S.E.2d 355, 359 (W. Va. 2003).  *Rockwell*, 689 S.E.2d at 263-65.  The rule recited by the Defendants from *McCoy v. Miller* was a recitation of a rule from syllabus point 3 in *Cart v. Marcum*, 423 S.E.2d 644 (W.Va. 1992) ("*Cart*"); *see McCoy v. Miller*, at 360 (noting the rule came from Cart).  But *Rockwell* abrogated the underlying holding in *Cart*, expressly making proof of due diligence or fraud necessary only when the discovery rule in its basic formulation does not apply.  *See Rockwell*, 689 S.E.2d at 263-65.

(W. Va. 2011) (because the information available to the plaintiff could have been interpreted in a manner consistent with and inconsistent with wrongful conduct by a defendant, the issue should have gone to the jury).

If the discovery rule does not apply because the connection between a defendants' wrongful conduct and a plaintiffs' injury is obvious, then plaintiffs must show that they affirmatively investigated the matter and did not discover facts that should have led them to file an action or show that defendants committed fraud.  As the Defendants note, in order to establish fraud sufficient to toll the statute of limitations "any act or omission tending to suppress the truth is enough."  Defs' Brief at 94, quoting *Miller v. Monongalia Cnty. Bd. of Educ.*, 556 S.E.2d 427, 428 (W. Va. 2001).  As noted above, the underlying facts of the conspiracy was effective and that the public was successfully being misled support tolling the statute of limitations for fraud.[44]

### 22.  **Wisconsin**

Wisconsin courts are inconsistent in their statements as to whether the equitable doctrine of laches or Wisconsin's statute of limitations applies to unjust enrichment claims.  As Defendants note, some Wisconsin courts have held unjust enrichment claims to be equitable claims barred only by the operation of the doctrine of laches, while other Wisconsin courts have held unjust enrichment claims to be contract claims governed by a six year statute of limitations.  Defs' Brief at 96-97.[45]  IP Plaintiffs' unjust enrichment claim seeks disgorgement of profits

---

[44] As explained in *Trafalgar House Constr., Inc. v. ZMM, Inc.*, 567 S.E.2d 294, 301 (W. Va. 2002) (cited by Defendants at 93), the court makes clear the nature of the duty imposed on plaintiffs in the case of fraud.  If a plaintiff establishes fraud, a plaintiff's claim is barred only if an "independent investigation" of facts would have discovered facts which are "easily ascertainable." *Id.*

[45] IP Plaintiffs suggest such confusion results from the varying doctrines encompassed under the label of "unjust enrichment."  Where an unjust enrichment claim seeks recovery for services rendered or recovery of some share of profits or earnings, the claim is really an action for "contract" implied in fact.  Under such circumstances, it makes sense to apply the statute of limitations governing contract claims because the essence of the plaintiffs' claims is contractual.  On the other hand, where, as here, an unjust

received from illegal activities (i.e. restitution), and is therefore an equitable claim barred only by the doctrine of laches.

Under the doctrine of laches, to determine whether the claim is timely, Defendants must establish:  (1) an unreasonable delay in filing the case; (2) plaintiffs' knowledge of the course of events and acquiescence therein; and (3) prejudice to the Defendants from the delay.  *See Gorski v. Gorski*, 262 N.W.2d 120, 126 (Wis. 1978) (citing *Paterson v. Paterson,* 242 N.W.2d 907 (Wis. 1976)).  Defendants do not even attempt to carry this burden and accordingly IP Plaintiffs' claims are timely under the doctrine of laches.

Alternatively, if the Court determines the timeliness of IP Plaintiffs' unjust enrichment claim is governed by Wisconsin's statute of limitations for claims sounding in contract rather than the equitable doctrine of laches, the same rules that apply to IP Plaintiffs' antitrust claim should apply to their unjust enrichment claim.  In such circumstances, and as Defendants correctly note, Wisconsin's discovery rule governs the time of accrual for Plaintiffs' Wisconsin antitrust claims.  Defs' Brief at 97.  Under the discovery rule, "a claim does not accrue until the injury is discovered or in the exercise of reasonable diligence should be discovered." *Hansen v. AH Robins, Inc.*, 335 N.W.2d 578, 581 (Wis. 1983).  Accordingly, the question as to the actual date of discovery "is a question of fact for the jury."  *Stroh Die Casting Co. v. Monsanto Co.,* 502 N.W.2d 132, 137 (Wis. Ct. App. 1993).

The Wisconsin Court of Appeals has noted, "[b]y the very nature of WIS. STAT. ch. 133 antitrust claims, aggrieved parties often will not immediately know of the circumstances giving rise to a claim. The prohibited deals and conspiracies will be secret and, thus, the legislature has provided for tolling commencement of the limitations period for bringing claims until discovery

---

enrichment claim seeks disgorgement of profits received from illegal activities (i.e. restitution) the cause of action is more clearly equitable.  Under such circumstances, the doctrine of laches, rather than a statute of limitations should apply to a determination of whether the IP Plaintiffs' claims are timely.

of the conduct." *EZ Roll Off, LLC v. Oneida*, 785 N.W. 2d 645 (Wis. Ct. App. 2010).  Such tolling applies here.    IP Plaintiffs' injury is one that could not be readily perceived as coming from the antitrust violation or any type of wrongful conduct and because of Defendants' efforts to conceal the conspiracy, including *inter alia*, misleading statements issued by Defendants in connection with their animal husbandry guidelines as well as their public disclosures,  the statutory tolling provided for by the statutory discovery rule requires denial of Defendants' motion to dismiss IP Plaintiffs' Wisconsin claims.

## IV.    CONCLUSION

For all the foregoing reasons, IP Plaintiffs respectfully request that this Court enter an Order denying the Defendants' Second Motion to Dismiss the Indirect Purchaser Plaintiffs' Claims for Damages Barred by the Statutes of Limitations of Various States.  If the Court grants the Defendants' motion to dismiss on the grounds that IP Plaintiffs have improperly pled their fraudulent concealment claims or need to make a conclusory allegation of a specific tolling date, IP Plaintiffs respectfully request they be granted leave to replead and amend the Complaint.  IP Plaintiffs request oral argument on this Motion.

Dated:  October 12, 2012

Respectfully submitted,


By: _____/s/_____.
Mark Schirmer
Timothy D. Battin
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA  22030
Tel.:  (703) 764-8700
Fax:  (703) 764-8704
mschirmer@straus-boies.com
tbattin@straus-boies.com

Paul F. Novak
Elizabeth McKenna
Charles Slidders
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY  10119
Tel:  (212) 594-5300
Fax:  (212) 868-1229
pnovak@milberg.com
emckenna@milberg.com
cslidders@milberg.com

Christopher Lovell
Craig Essenmacher
**LOVELL STEWART HALEBIAN LLP**
500 Fifth Avenue, Floor 58
New York, NY  10110
Tel:  (212) 608-1900
Fax:  (212) 719-4677
clovell@lshllp.com
craigessenmacher@yahoo.com

*Interim Co-Lead Counsel for the Indirect
Purchaser IP Plaintiffs*

Krishna B. Narine
**MEREDITH & NARINE**
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Tel:  (215) 564-5182
Fax:  (215) 569-0958
knarine@m-npartners.com

*Co-Lead and Liaison Counsel for the Indirect
Purchaser IP Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2012, the foregoing Indirect Purchaser Plaintiffs'
Memorandum of Law in Opposition To Defendants' Second Motion to Dismiss the Indirect
Purchaser Plaintiffs' Claims for Damages Barred by the Statutes of Limitations of Various States
was filed using the CM/ECF system, and (1) the filing is available for viewing and downloading
via the CM/ECF system and (2) the CM/ECF system will send notification of such filing to all
attorneys of record who have registered for CM/ECF updates. On this date, the aforementioned
document was also served by e-mail on all attorneys listed on the Panel Attorney Service List.

Respectfully submitted,

By: _____/s/_____.
Krishna B. Narine
**MEREDITH & NARINE**
1521 Locust St., 8th Floor
Philadelphia, PA 19102
Tel:  (215) 564-5182
Fax:  (215) 569-0958
knarine@m-npartners.com

*Liaison Counsel for the Indirect Purchaser
IP Plaintiffs*