## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PROCESSED EGG PRODUCTS      :
ANTITRUST LITIGATION      :
     :    **MDL No. 2002**
     :    **08-md-2002**
_____ :
     :
THIS DOCUMENT APPLIES TO:      :
ALL DIRECT PURCHASER      :
PLAINTIFF ACTIONS      :

### MEMORANDUM

GENE E.K. PRATTER, J.           NOVEMBER _9th_ , 2012

Direct Purchaser Plaintiffs move the Court for an award of attorneys' fees and

reimbursement of litigation expenses from the common fund created by the settlement agreement

between Plaintiffs and Defendants Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc.

(collectively, "Moark"). For the reasons set forth below, the Court awards the attorneys' fees

and most of the costs sought, and now satisfactorily explained, by Plaintiffs' counsel.

### I. Factual Background

This litigation encompasses numerous actions based upon an alleged conspiracy among

egg producers and trade groups to manipulate the supply of egg products and thereby affect the

domestic prices of those goods. *See In re Processed Egg Prods. Antitrust Litig.*, 588 F. Supp. 2d

1366, 1367 (J.P.M.L. 2008). The plaintiffs are direct purchasers (such as grocery stores,

commercial food manufacturers, restaurants, other food service providers, and other entities who

purchase directly from Defendants or other egg producers) and indirect purchasers (individual

consumers who purchased from other parties along the distribution chain) of shell eggs, egg

products, or both. The Direct Purchaser Plaintiffs are referred to in this memorandum as

"Plaintiffs" and have brought a consolidated class action against various egg producers and trade groups.

The Plaintiffs accuse defendant egg producers, including Moark, of violating Section 1 of the Sherman Act and seek injunctive relief, treble damages, attorneys' fees and costs. In August 2009, Moark's counsel reportedly contacted Interim Co-Lead Counsel for the Plaintiffs about a potential settlement. Two months later, the parties had a meeting during which Moark provided Plaintiffs with sales data and other financial information. In March 2010, these parties began to engage in settlement negotiations. Over the course of the ensuing three months, the parties negotiated through telephone conferences and in-person meetings on multiple occasions. They discussed potential settlement terms, including possible settlement amounts and how Moark could cooperate with Plaintiffs. They also exchanged information. At the conclusion of these efforts, the parties reached an agreement and executed the Moark Settlement documents.

On July 15, 2010, the Court entered an Order preliminarily approving the proposed Moark settlement agreement. In a separate Order issued that same day, the Court approved the form of notice of the Moark Settlement. On July 16, 2012, the Court granted final approval of the settlement, which provided $25 million in monetary relief to class members and obligated Moark to cooperate with the Plaintiffs' preparation for and prosecution of their case.

On April 14, 2011, Plaintiffs' counsel filed their motion for attorneys' fees and reimbursement of expenses from the fund created by the Moark Settlement. The motion requested that the Court award attorneys' fees of $7.5 million, an amount equal to 30 percent (30%) of the settlement fund, and that it allow Interim Co-Lead Counsel for the Plaintiffs to control the distribution of the fees. Plaintiffs' counsel argued that an award of $7.5 million was appropriate based on several factors, but failed to discuss other factors that the Third Circuit

2

Court of Appeals requires district courts to consider in approving attorneys' fees in a class action settlement based on the percentage-of-recovery method. Additionally, the motion requested reimbursement of $566,530.37 for litigation expenses.

By way of its July 18, 2012 Order, the Court held its ruling on the motion for attorneys' fees in abeyance and required Plaintiffs' counsel to furnish additional information in support of their requests for fees and costs, and to more fully discuss certain factors that assist the Court in evaluating attorneys' fees in class action settlements. On August 15, 2012, the Court ordered the Garden City Group, the third party administrator retained to assist with ministerial duties associated with the settlement, to post this supplemental brief online, and to send notice of the motion for attorneys' fees to class members by September 17, 2012. Class members were permitted to object to the motion for attorneys' fees until November 1, 2012, and the notice clearly established that class members must make such objections through a writing submitted to the Court and Plaintiffs' counsel. No class members have undertaken to so object to the proposed award.

Plaintiffs' counsel's supplemental brief in support of their motion for fees and costs includes dozens of declarations that identified the attorneys and staff who worked on the case, their experience, their hourly rates, and the number of hours they worked on the case. The declarations also included itemized expense reports for each of the law firms that represented the Plaintiffs. In their supplemental briefing, Plaintiffs' counsel seek $487,720.30 in litigation expenses, a downward revision of $78,810.07 from their initial request.

3

## II. Petition for Attorneys' Fees

### A. Percentage-of-Recovery Method

Courts must perform a "thorough judicial review of fee applications . . . in all class action settlements." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 819 (3d Cir. 1995). In assessing attorneys' fees, courts may use the percentage-of-recovery method or the lodestar method. The percentage-of-recovery method "applies a certain percentage to the settlement fund." *In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 540 (3d Cir. 2009) (citations and quotations omitted). When evaluating fees in a case where the attorneys' "efforts create, discover, increase, or preserve a fund to which others also have a claim . . . the percentage-of-recovery method is generally favored." *Id.* (citation omitted); *see also In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *3 (E.D. Pa. Jan. 3, 2008) ("In this Circuit, the percentage of recovery method is 'generally favored' in cases involving a common settlement fund[.]") (quoting *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001)).

The Third Circuit Court of Appeals has held that district courts "must consider" ten factors "[i]n determining what constitutes a reasonable percentage fee award[.]" *In re Diet Drugs*, 582 F.3d at 541. The factors are:

(1)     the size of the fund created and the number of beneficiaries;

(2)     the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel;

(3)     the skill and efficiency of the attorneys involved;

(4)     the complexity and duration of the litigation;

(5)     the risk of nonpayment;

4

(6)     the amount of time devoted to the case by plaintiffs' counsel;

(7)     the awards in similar cases;

(8)     the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;

(9)     the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained; and

(10)    any innovative terms of settlement.

*Id.* (*citing Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000), and *In re Prudential Ins. Co. Am. Sales Practice Litig. Against Agent Actions*, 148 F.3d 283, 336-40 (3d Cir. 1998)). Here, the Court's analysis of these factors supports awarding the requested attorneys' fees.

### 1.    The Size of the Fund and the Number of Beneficiaries.

Due to the Moark Settlement, a nationwide group of thousands of direct purchasers of egg products has obtained a $25 million recovery. Additionally, the terms of the settlement supplement the monetary size of the fund by obligating Moark to cooperate with the Plaintiffs in preparing their case against others. Such cooperation could help egg purchasers recover additional monies in the future. Therefore, the Court finds that this factor supports the fees request.

### 2.    The Absence of Objections.

In their initial motion for an award of attorneys' fees, Plaintiffs' counsel noted that the class notice regarding the Moark Settlement stated that counsel would petition for an award of up to 30 percent of the cash value of the settlement, and that no class members objected to the settlement. Nonetheless, cognizant of its duty to undertake a "thorough judicial review of fee applications," *GMC Pick-Up*, 55 F.3d at 819, the Court ordered the Garden City Group to send a

separate notice of the fees motion to class members. The notice gave class members 45 days to object to the requested award and expressly established the procedure for making such an objection. Because the Court has received no objections to the proposed award, this factor favors granting the motion.[1]

### 3. The Skill and Efficiency of the Attorneys.

The Court previously stated that the Interim Co-Lead Counsel "have extensive documented experience in complex class action litigation," are "well-respected law firms in the plaintiffs class action bar," and have "capably managed this suit on behalf of Plaintiffs since the Court formally appointed them." *In re Processed Egg Prods.*, 2012 U.S. Dist. LEXIS 98301, at *39. Moreover, the Court notes that "successful settlement negotiations . . . demonstrate[] the significant skill and expertise of counsel." *Auto. Refinishing*, 2008 WL 63269, at *4. Here, the robust cash value obtained by the Moark Settlement and the cooperation procured from Moark indicate that, at least in this regard, Plaintiffs' counsel have handled their obligations to this point and their clients' interests skillfully.

Additionally, Plaintiffs' counsel have used their supplemental briefing to discuss how they managed this litigation efficiently. Counsel note that they submitted monthly time and expense reports to Interim Co-Lead Counsel, who reportedly thoroughly reviewed those reports. Interim Co-Lead Counsel also held weekly conference calls to give assignments to other attorneys, monitor the progress of the performance of those assignments, and ensure that different lawyers did not perform duplicative work. Therefore, Plaintiffs' counsel have acted

---

[1] The Court notes that "many of the class members are sophisticated entities with their own in-house counsel, and ostensibly have the resources and ability to assess the settlement agreement beyond the average layperson or enterprise." *In re Processed Egg Prods. Antitrust Litig.*, MDL No. 2002, 2012 U.S. Dist. LEXIS 98301, at *65 (E.D. Pa. July 16, 2012).

skillfully and efficiently, and this factor also supports the proposed award of 30 percent of the settlement fund.

### 4.    The Complexity and Duration of the Litigation.

This litigation, "like most antitrust cases, has been exceedingly complex, expensive, and lengthy." *Id.* at *5 (citing *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003, and *In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 U.S. Dist. LEXIS at *17 (S.D.N.Y. Nov. 18, 1983)). By the time the Court granted final approval of the Moark Settlement, the parties had engaged in over three years of consolidated MDL litigation. Among other tasks, Plaintiffs' counsel investigated claims, briefed and argued motions to dismiss, negotiated this settlement, and successfully obtained its approval by the Court. Given the complexity that necessarily accompanies consolidated antitrust litigation and the duration of the case, the Court finds that this factor favors granting the motion.

### 5.    The Risk of Nonpayment.

The Court recognizes that "[a]ny contingency fee [arrangement] includes a risk of non-payment." *O'Keefe v. Mercedes-Benz USA, LLC,* 214 F.R.D. 266, 309 (E.D. Pa. 2003); *see also In re Processed Egg Prods.*, 2012 U.S. Dist. LEXIS 98301, at *75 ("[A]ntitrust class action litigation is complex, and, especially at its early stages, inherently rife with risk and unpredictability in terms of ultimately prevailing to establish liability and damages and achieve class certification."). Here, Plaintiffs' counsel undertook their representation in a risky antitrust case on a purely contingent basis and thereby assumed a significant risk of nonpayment. Moreover, counsel have incurred hundreds of thousands of dollars in costs and expenses, and they ran the risk of not being reimbursed for any of these expenditures. Therefore, the Court finds that this factor supports the proposed award of attorneys' fees.

7

## 6.    The Amount of Time Devoted to the Case.

In ordering Plaintiffs' counsel to provide supplemental information regarding their

motion for attorneys' fees, the Court required counsel to identify the total number of hours that

the lawyers and staff of each firm spent working on the case.  Upon reviewing the declarations

submitted by 35 different law firms,[2] it appears that these firms collectively spent 22,772.81

hours working on this matter through February 28, 2011, the date that the Court held a final

fairness hearing for the Moark Settlement.  As stated above, Plaintiffs have taken several steps to

make their work on this litigation as efficient as possible.  The amount of time spent on this case

prior to final approval of the settlement most likely reflects the complexity of the Plaintiffs'

claims, not the inefficiency of their counsel.  Presumably, the thousands of hours counsel spent

working on this matter prevented those individuals from litigating other cases.  This factor thus

strongly favors granting the motion for attorneys' fees.

## 7.    Awards in Similar Cases.

The initial motion for attorneys' fees cursorily noted that several district courts within the

Third Circuit have awarded fees ranging from 30 to 35 percent of a settlement fund.  In their

supplemental briefing, Plaintiffs' counsel have expanded their discussion of this factor.  Counsel

now note that many of the cases they initially cited resemble this matter because they involved

complex issues and had few or no objectors, not merely because the litigants in those cases

received awards that are similar to what Plaintiffs' counsel are seeking.  *See, e.g., Auto.*

*Refinishing*, 2008 WL 63269, at \*4-5; *In re Ravisent Techs., Inc., Sec. Litig.*, No. 00-1014, 2005

WL 906361, at \*10-11 (E.D. Pa. Apr. 18, 2005); *In re Remeron Direct Purchaser Antitrust*

*Litig.*, No. 03-0085, 2005 WL 3008808, at \*12-13 (D.N.J. Nov. 9, 2005).  The supplemental

---

[2] The Court notes that Klehr Harrison LLP has submitted a hard copy declaration that
does not appear on ECF.

8

briefing also identifies attorneys' fees awards in antitrust cases that Plaintiffs' counsel did not initially discuss. *See, e.g., McDonough v. Toys "R" Us, Inc.*, 834 F. Supp. 2d 329, 340-43 (E.D. Pa. 2011) (approving attorneys' fees of 33 percent of the settlement fund and noting that fees may range as high as 45 percent of a common fund). Given this expanded analysis, the Court finds that awards in similar cases support the proposed award here.

### 8.     The Value of Benefits Attributable to Class Counsel.

The eighth factor the Court must consider is the degree to which the benefits of the settlement are attributable to Plaintiffs' counsel as opposed to the efforts of other actors, such as, for example, government investigators. *See In re Diet Drugs*, 582 F.3d at 541. Plaintiffs' counsel did not discuss this factor in their initial briefing. However, in his second declaration in support of the fees motion, Steven Asher, Interim Co-Lead Counsel for the Plaintiffs, confirms that "Designated Counsel filed the initial complaints in this matter . . . without the benefit of a governmental investigation or related indictments." Furthermore, Plaintiffs' counsel state in their supplemental brief that their claims are "wholly unrelated" to public reports regarding a "narrow investigation" into the egg products industry. However, Plaintiffs' counsel do not elaborate on how their claims are "wholly unrelated" to other investigations. Given their failure to do so, this factor provides only limited or partial support for their proposed award.

### 9.     Private Contingent Fee Arrangement.

Ninth, the Court must analyze "the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained." *Id.* Although Plaintiffs' counsel did not initially discuss this factor, they now argue that contingency fees of 30 percent or higher are standard in litigation. This contention finds support in case law. *In re Merck & Co. Vytorin ERISA Litig.*, No. 08-285, 2010 U.S. Dist. LEXIS 12344,

at *41-42 (D.N.J. Feb. 9, 2010) ("[T]he 33.33% fee award requested reflects commonly negotiated fees in the private marketplace."). Moreover, counsel for Susman Godfrey and Hausfeld LLP have now submitted affidavits stating that their firms routinely charge a contingency fee of at least 33 percent upon offering legal services in individual litigation. The Court thus finds that this factor favors granting the motion for attorneys' fees.

## 10. Innovative Terms of Settlement.

In their supplemental brief, Plaintiffs' counsel admit that the Moark Settlement does not contain any particularly "innovative" terms. Therefore, "this factor neither weighs in favor nor detracts from a decision to award attorneys' fees." *Id.* at *42.

The Court finds that the factors it has analyzed collectively support granting the proposed award of 30 percent of the settlement fund.

## B. Lodestar Cross-Check

The Third Circuit Court of Appeals has "suggested that district courts cross-check the percentage award at which they arrive against the 'lodestar' award method." *Gunter*, 223 F.3d at 195 n.1. A lodestar award "is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Chakejian v. Equifax Info. Servs., LLC*, 275 F.R.D. 201, 216 (E.D. Pa. 2011) (internal quotation omitted). The reasonableness of an hourly rate depends on the experience and skill of the attorneys and staff who worked on the litigation. *See id.* The reasonableness of the number of hours worked requires counsel to not spend excessive time on a case and to not use top legal talent for routine work that associates or paralegals could perform. *See id.* at 217. In calculating a lodestar award to evaluate a settlement that occurs before the conclusion of a case, courts may

10

include the time spent by counsel performing tasks that are not directly related to the settlement. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 282-85 (3d Cir. 2009).

The Court previously noted the high level of skill of the attorneys involved in this litigation. Moreover, the dozens of supplemental declarations filed by Plaintiffs' counsel indicate the experience of the attorneys and staff who have worked on this case. Based on this information, the Court finds that the stated hourly rates of these attorneys and staff, some of whom are described as national leaders in the field of class action litigation, are reasonable.

As for the reasonableness of the hours worked by Plaintiffs' counsel, the Court noted above that counsel took several steps to litigate this case efficiently. Moreover, Plaintiffs' counsel appear to have reasonably divided their work between partners and other lawyers and staff. For instance, all but two of the firms who submitted supplemental declarations directed at least some of their work to associates or staff.[3] Additionally, the ratio of non-partner personnel who worked on the case to partners who did so is approximately 1.65:1.[4] Given the complexity of this litigation and the corresponding appropriate need for and use of heavy involvement by experienced attorneys, the Court finds that this ratio is reasonable, and that Plaintiffs' counsel sufficiently directed work to lower-level personnel.

Plaintiffs' counsel represent that, based on their hourly rates and hours worked, their total lodestar through the date of the final fairness hearing on the Moark Settlement amounts to $11,001,332.40. In performing an independent calculation of the lodestar, the Court calculates it as $10,817,088.90. The difference between these two figures is insignificant, as the lodestar of Plaintiffs' counsel generates a multiplier of 0.68, while that of the Court generates one of 0.69. Both multipliers indicate that the Court should approve the proposed award. *See Milliron v. T-*

---

[3] These two firms, Edelson & Associates, LLC and Giuliano Law Firm, P.C., only spent 35.4 hours working on the case.

[4] For purposes of this calculation, the Court treats *of counsel* as partners.

11

*Mobile USA, Inc.*, 423 F. App'x 131, 135 (3d Cir. 2011) ("Although the lodestar multiplier need not fall within any pre-defined range, we have approved a multiplier of 2.99 in a relatively simple case.") (quotations and citations omitted).  Because the lodestar cross-check supports the Court's analysis under the percentage-of-recovery method, the Court grants the motion and awards Plaintiffs' counsel attorneys' fees of 30 percent of the settlement fund.

## III.  Petition for Reimbursement of Costs and Expenses

In addition to an award of attorneys' fees, Plaintiffs' counsel also seek $487,720.30 for reimbursement of litigation expenses.  The Court "may award reasonable attorney's fees and nontaxable costs" to Plaintiffs' counsel.  Fed. R. Civ. P. 23(h); *see also In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *40 (E.D. Pa. Jan. 4, 2001) ("Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund.").  Reimbursement is particularly appropriate in situations where, as here, no class members have objected to it.  *See Auto. Refinishing*, 2008 WL 63269, at *6.

The plain language of Federal Rule of Civil Procedure 23(h) allows the Court to award only *nontaxable* costs.  Although Plaintiffs' counsel identify several cases in which courts awarded taxable costs under Rule 23(h), none of those cases even attempt to reconcile such an award with the plain language of Rule 23(h).  Indeed, in those cases no attention is paid to the language of the Rule.  Moreover, while counsel try to distinguish *In re Apollo Grp. Inc. Sec. Litig.*, No. 04-2147, 2012 U.S. Dist. LEXIS 55622 (D. Ariz. Apr. 20, 2012), the district court in that case held without fanfare that "Rule 23(h) only allows the Court to award nontaxable costs." *Id.* at *29.  In short, recognizing the role, import, and language of Rule 23(h), the Court discerns no reason to ignore or to try to avoid the Rule's provision, and declines to do so.

Because only nontaxable costs may be awarded to Plaintiffs' counsel by Rule, the Court

has reviewed the dozens of declarations submitted by counsel to disentangle their nontaxable and

taxable costs,[5] and to evaluate the reasonableness of their nontaxable costs. Based on this

review, the Court finds that the nontaxable costs sought by Plaintiffs' counsel are reasonable, and

therefore awards Plaintiffs' counsel $434,944.79, the amount of nontaxable costs that the Court

calculates counsel has accrued.

## IV.  Allocation of Fees

The motion also seeks to allow Interim Co-Lead Counsel to distribute the awarded

attorneys' fees among counsel for the Plaintiffs.  Courts "generally approve joint fee applications

which request a single aggregate fee award with allocations to specific firms to be determined by

Co-Lead Counsel," because such counsel "are most familiar with the work done by each firm

and each firm's overall contribution to the litigation."  *Id.* at *7.  Additionally, such an approach

to allocating fees "conserves the time and resources of the courts."  *Id.*  Therefore, the Court will

allow Interim Co-Lead Counsel to distribute the fees awarded from the Moark Settlement Fund.

## V.  Conclusion

For the foregoing reasons, the Court awards attorneys' fees of 30 percent of the

settlement fund and a reimbursement of $434,944.79.  An Order consistent with this

Memorandum follows.

---

[5]  As Plaintiffs' counsel admit in their briefing, costs for process and filing fees, copying, and court transcripts are all taxable under 28 U.S.C. § 1920.