## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS<br>ANTITRUST LITIGATION | :<br>:<br>:    **MDL No. 2002**<br>:    **08-md-2002**<br>: |
| THIS DOCUMENT APPLIES TO:<br>ALL DIRECT PURCHASER ACTIONS | :<br>:<br>: |

## M E M O R A N D U M

**GENE E.K. PRATTER, J.**                               **DECEMBER 14, 2012**

### I. Introduction

Direct Purchaser Plaintiffs have brought suit against defendant egg producers and certain trade groups based upon alleged violations of Section 1 of the Sherman Act. The Court previously granted certain Defendants' individual motions to dismiss without prejudice to Direct Purchaser Plaintiffs to seek leave to amend their Second Amended Consolidated Class Action Complaint ("SAC"). *See In re Processed Egg Prods. Antitrust Litig.*, 821 F.Supp.2d 709, 745 (E.D. Pa. 2011). The Court also dismissed without prejudice claims against all Defendants for damages barred by the four-year statute of limitations. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2011 WL 5980001, at *1 (E.D. Pa. Nov. 30, 2011).

Thereafter, Plaintiffs moved for leave to file a proposed Third Amended Consolidated Class Action Complaint ("TAC"), which seeks, *inter alia*, to revive claims against Defendants Hillandale-Gettysburg, L.P. ("Hillandale-Gettysburg"), Hillandale Farms, Inc., and Hillandale Farms East, Inc. ("Hillandale East") (collectively, the "Hillandale Entities") that the Court previously dismissed from the litigation. Apart from the Hillandale Entities and Defendant

1

Hillandale Farms of Pa., Inc. ("Hillandale PA"),[1] no other Defendants have objected to the Motion.[2]  The Court grants the Motion in part and denies it in part with  prejudice for the reasons explained below.

## II. Legal Standard

Granting leave to amend is within the discretion of the district court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330 (1971).  Federal Rule of Civil Procedure 15(a) provides that the Court should "freely give leave" for a party to file an amended pleading "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

Under the Rule, "[l]eave to amend must generally be granted unless equitable considerations render it otherwise unjust." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962), and *Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993)).  A court may deny a request to amend a complaint in circumstances when: "(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other part[ies]." *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000).

Under Rule 15 jurisprudence, "prejudice to the non-moving party is the touchstone for the denial of [an] amendment." *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (internal citations and quotations omitted).  For example, delay alone typically is an insufficient basis on which to deny a plaintiff's motion to amend a complaint. *USX Corp. v. Barnhart*, 395 F.3d 161,

---

[1] Hillandale PA answered the SAC and joined the Defendants' joint motion to dismiss on statute of limitations grounds.  It now moves to challenge the sufficiency of the Plaintiffs' claim against it in the TAC given that the factual predicates of that claim differ from those in the SAC.

[2] The motion *sub judice* is Direct Purchaser Plaintiffs' Motion for Leave to File Third Amended Complaint (Doc. No. 613) (hereinafter, "Mot."), which Plaintiffs additionally support with a reply brief (Doc. No. 628) (hereinafter, "Reply").  The four defendants jointly opposed with a response and surreply briefing (Doc. Nos. 618 and 629) (hereinafter, "Resp." and "Surreply").

167 (3d Cir. 2004). However, if "delay . . . [has] become 'undue,' placing an unwarranted burden on the court, or [has] become 'prejudicial,' placing an unfair burden on the opposing party," delay may be sufficient to deny a motion to amend. *Adams v. Gould, Inc.*, 739 F.2d 858, 868 (3d Cir. 1984).[3]

    To demonstrate prejudice, the non-movant must show that an unfair disadvantage, deprivation, or hardship will result by allowing the amendment. *See Cureton v. NCAA*, 252 F.3d 267, 273 (3d Cir. 2001) ("The issue of prejudice requires that we focus on the hardship to the defendants if the amendment were permitted."); *Dole v. Arco Chem. Co.*, 921 F.2d 484, 488 (3d Cir. 1990) (determining that non-movant "is required to demonstrate that its ability to present its case would be seriously impaired were amendment allowed"); *Heyl & Patterson Int'l, Inc. v. F.D. Rich Hous. of the V.I., Inc.*, 663 F.2d 419, 426 (3d Cir. 1981) (holding that the non-moving party has the burden of establishing "that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the [movant's] amendments been timely"). In determining whether prejudice exists as a result of amending a pleading, the Court may consider, *inter alia*, whether the amendment "would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004); *see also Kiser v. GE*, 831 F.2d 423, 428 (3d Cir. 1987) (determining no prejudice arises from a proposed amendment because the amendment would "not affect [the plaintiff's] tactics or case theories," and would "not cause [the defendant] undue difficulty in preparing its defense").

---

[3] "Limited delays and the prejudice to a defendant from the pendency of a lawsuit are realities of the system that have to be accepted." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 171-72 (3d Cir. 2004) (quotation omitted).

3

In the absence of substantial prejudice, denial instead may be based on "truly undue or unexplained delay . . . or futility of amendment." *Lorenz*, 1 F.3d at 1414; *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434-35 (3d Cir. 1997). By way of example, leave to amend may be denied when a movant fails to exercise earlier opportunities to amend, with no adequate justification. *See Arthur*, 434 F.3d at 204; *see also Cureton*, 252 F.3d at 273 ("Delay may become undue when a movant has had previous opportunities to amend a complaint."). Nonetheless, eschewing denial premised merely on exasperation, the Third Circuit Court of Appeals has observed that the mere "fact that a complainant has had 'three bites at the apple' is not itself a justification for dismissing a complaint with prejudice." *Worldcom, Inc. v. Graphnet, Inc.*, 343 F.3d 651, 657 n.3 (3d Cir. 2003).

To determine whether an amendment would be futile, the Court applies the same analysis that it would invoke in the context of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Burlington Coat*, 114 F.3d at 1434. "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Id.* at 1434. The Court has previously discussed the governing legal standards for reviewing a motion to dismiss in this case and incorporates them by reference here. *See Egg Prods.*, 821 F.Supp.2d at 715-20. Given the relevance of the Court's prior rulings with respect to the Hillandale Entities, the Court includes more explicit discussion of the legal standards relating to Federal Rule of Civil Procedure 12(b)(6) as appropriate.

## III. Discussion

The Court previously dismissed the Plaintiffs' claims against the three Hillandale Entities because the "SAC lack[ed] sufficient allegations specific to these Defendants to support any inference that they each were a party to the agreement to restrict the supply of eggs." *Id.* at 745.

4

In considering the motion to dismiss filed by the Hillandale Entities, the Court first determined that "[t]here simply is an absence of specific factual allegations in the [complaint] to connect each (or any) of the Hillandale Entities directly to the conspiracy." *Id.* at 747. Additionally, the Court recognized that the SAC's "general allegations as to 'Hillandale Farms' or 'Hillandale' are insufficient to give notice to the Hillandale Entities of the claims against them." *Id.* at 750.

The Court determined that allegations that the Hillandale Entities were "vertically integrated" and had overlapping ownership and control were insufficient to support a claim that the Hillandale Entities and Defendant Hillandale PA, "[were] so linked that they effectively function[ed] as a single entity with respect to alleged antitrust conduct." *Id.* at 749. The Court also concluded that Direct Purchaser Plaintiffs had not presented any legal authority that would support a "single enterprise" theory for imputing liability, and indeed, that there was legal authority to the contrary. *Id.* at 748.

In sum, the Court found that Plaintiffs "failed to allege specific facts that either connect each or any individual entity to the overarching conspiracy, or alternatively, satisfy the requirements for imputing another affiliated entity's liability to the Hillandale Entities." *Id.* at 745. Accordingly, the Court granted the Hillandale Entities' motion to dismiss without prejudice to Plaintiffs to seek leave to amend their complaint. The Court determined that Plaintiffs could seek leave to amend their pleading as to the Hillandale Entities with the proviso that "the Court would expect any new effort by Plaintiffs to amend as to any of the Hillandale Entities would represent and entail a meaningfully more substantive claim as to the individual entities than was mounted against any one of—or all of—them in the SAC." *Id.* at 750 n.39.

The Hillandale Entities and Hillandale PA (collectively, the "Hillandale Defendants") challenge the Plaintiffs' motion for leave to file their proposed TAC on individualized grounds,

5

claiming both prejudice and futility of amendment. The Court addresses their joint equitable

arguments first, and then the individual arguments that have been raised concerning futility.

## A. Equitable Considerations as to All Hillandale Defendants

According to the four Hillandale Defendants, shortly after the Plaintiffs' initial

complaints were filed in 2008, they made several attempts to inform Plaintiffs' counsel that

"Hillandale Gettysburg is an egg producer and UEP [United Egg Producer] member" and that

Hillandale PA, Hillandale East, and Hillandale Farms, Inc. are distributors of shell eggs, and

neither producers nor members of the UEP. Resp. at 1. They also claim that they apprised

Plaintiffs' counsel that "while there are overlapping ownership interests among these

Defendants, they remain separate entities." Resp. at 2.

The Hillandale Defendants complain that despite their disclosures, "Plaintiffs ignored

these facts and instead dragged these Defendants through three iterations of a complaint and now

asks this Court for leave to file a fourth." *Id.* They contend, "Plaintiffs cannot offer any

justification for their belated request to add information that they have had for years, information

they had before filing both the Consolidated Amended Complaint and Second Amended

Complaint." *Id.* at 14.

As to the TAC's allegations concerning Hillandale-Gettysburg and Hillandale PA,

specifically, the Hillandale Defendants intimate that the allegations are discordant with the

Hillandale Defendants' prior disclosures to Plaintiffs' counsel, and contend that "Plaintiffs are

required to submit a pleading that they know has evidentiary support, particularly where, as here,

they have had the pertinent information for three years." *Id.* at 9.

6

The Hillandale Defendants further add that they "have expended a great deal of time and resources in litigating their dismissal motions," and acknowledge the Court's expenditure of resources in ruling on eight motions to dismiss the SAC. *Id.* at 14.

As authentic and justified as they very well may be, the Court cannot conclude under governing Third Circuit case law that any of these arguments give cause to deny amendment on the basis of equitable considerations such as undue delay, bad faith, or prejudice. In one respect, the Hillandale Defendants are raising merits issues by contesting the validity of factual allegations, something that must remain immaterial to a Rule 15 analysis. Indeed, unfortunately for the economically-minded, a merits inquiry, such as being tendered here, is more appropriately reserved for a later stage of this litigation, such as summary judgment.

Additionally, the Hillandale Defendants' arguments appear to invoke principles of Rule 11(b), but those principles are without distinct bearing on the Plaintiffs' Rule 15 motion. The Hillandale Defendants' arguments seem to implicate the notion that by "presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b). However, the Hillandale Defendants stop short of charging that Plaintiffs committed a Rule 11 violation by proposing another amended complaint. Moreover, they do not claim that to the extent the TAC's factual allegations are unsupported (or even untrue) Defendants have been prejudiced with an unfair disadvantage, deprivation, or hardship, or that Plaintiffs acted in bad faith.

7

The Hillandale Defendants simply have not demonstrated how the proposed TAC is prejudicial to them, or inequitable, so that denial of amendment would be appropriate. The commitment of resources to dismissal motions for prior pleadings, as the Hillandale Entities have dedicated thus far in this litigation, does not equate to the nature and extent of the prejudice that is required to deny a Rule 15 motion. It is not clear how engaging in such motion practice prevents the Hillandale Defendants from presenting their case and defending the merits, given that this litigation was still at a nascent stage when this motion was filed, i.e., before the Court partially lifted the stay on discovery. *See* Case Management Order No. 18 (Doc. No. 656).

Similarly, the Defendants' claims of undue delay, as measured from the time of their purported disclosure of information to the filing of the motion, also must fail. There has been no delay that impedes the Hillandale Defendants' ability to prepare for the case because this case has not advanced greatly beyond the pleading stage; discovery has only recently commenced in earnest after considerable preliminary negotiations by the parties.[4] In light of the procedural posture of this case, delay as has occurred is not prejudicial to the Hillandale Defendants, and would not warrant precluding the proposed TAC. Additionally, following the Court's rulings on the Defendants' motion to dismiss the SAC, the parties jointly and promptly requested the Court to enter a deadline for Plaintiffs to file a motion for leave to amend—a deadline with which Plaintiffs complied. *See* Case Management Order No. 16 (Doc. No. 604).

Finally, although the procedural history of this case superficially might suggest that the Plaintiffs claims against the Hillandale Defendants are no spring chickens, the equities do not warrant the Court exercising its discretion to deny the amendment at this time. After filing their

_____

[4] Moreover, this case was stayed as to the Hillandale Defendants insofar that the parties agreed to treat the Hillandale Defendants as non-parties with respect to discovery obligations. *See* Docket No. 655.

Consolidated Amended Complaint, which consolidated and superseded all prior individually-filed class complaints, Plaintiffs shortly thereafter filed the SAC incorporating information learned pursuant to a settlement with Defendant Sparboe Farms, Inc. The TAC may represent a third attempt at a substantive amendment of the Plaintiffs' complaint, and hence "three bites at the apple," but, as previously discussed, there are no other grounds that would appropriately justify denying the amendment. Moreover, the Court is particularly cognizant that this is no ordinary case, but one that involves a complex area of law, multiple defendants, and a dense factual narrative. Furthermore, the Court's first and only ruling on the sufficiency of the Plaintiffs' claims under Rule 12(b)(6) was based on a review of the SAC. In response to that review, Plaintiffs have made a good faith attempt in this amendment to cure their deficient claims against the Hillandale Entities—whether or not they have actually stated a claim—and to comply with the Court's directive that the Plaintiffs' amendment should "represent and entail a meaningfully more substantive claim as to the individual entities than was mounted against any one of—or all of—them in the SAC." *Egg Prods.*, 821 F.Supp.2d at 750 n.39.

## B. Futility of Amendment

Given that the Hillandale Defendants have not demonstrated they would suffer prejudice, or that the circumstances are otherwise inequitable so as to necessitate denying amendment, the possible ground that remains for denying the Plaintiffs' Motion as to the Hillandale Defendants is futility of amendment. Specifically, as to each Defendant, the issue presented is whether the TAC's allegations plausibly suggest that the individual Defendants were, respectively, parties to the alleged conspiracy to manipulate the supply of, and thereby fix prices for, domestically-sold eggs, by joining and participating in it. If the proposed amendments would not satisfy the Rule 12(b)(6) pleading standard, which the Court has previously delineated, then amendment would

9

be futile and the Court should deny leave to amend.  Whether amendment as to each Hillandale

Defendant is futile is discussed below.

1. Hillandale-Gettysburg, L.P.

    The Court concludes that the proposed TAC sets forth sufficient facts to plausibly

suggest that Hillandale Gettysburg directly participated in or joined the conspiracy to reduce the

supply of eggs.  The TAC contains virtually identical facts as those in the SAC concerning the

core allegations of the purported conspiracy to decrease the supply of eggs and thereby increase

egg prices, the various Defendants' conduct undertaken in relation thereto, and the nature of the

egg industry in terms of structure, production practices, and market dynamics.  In contrast to the

SAC, however, Plaintiffs now allege that Hillandale Gettysburg is a Pennsylvania limited

partnership that "packs and sells eggs for retailers and distributors and under its own brand

names[.]"  TAC ¶ 72.  Additionally, Hillandale Gettysburg allegedly produces and processes

shell eggs and egg products.  *Id.* ¶ 72(b) ("Hillandale Gettysburg . . . act[s] as a producer and

processor of shell eggs, 95% of which are sold by Defendant Hillandale East[.]"); *id.* ¶ 68

("Hillandale PA markets and sells UEP-certified shell eggs produced by Defendants Hillandale

Gettysburg . . . ."); *id.*  ¶ 73(b) ("Hillandale East . . . markets and distributes UEP certified eggs

and egg products produced by Hillandale Gettysburg . . . .").

    As pled in the TAC, Hillandale Gettysburg is a member of the UEP, and its staff and/or

directors held leadership positions in the UEP and attended UEP meetings where allegedly key

decisions instrumental to the conspiracy were made or where effects of alleged coordinated

actions were extolled.[5]  *Id.* ¶¶ 72(c), 254, 262, 326.  The TAC alleges that although "Hillandale

---

    [5]  The TAC often specifies the names of individuals who attended these meetings with an
accompanying parenthetical listing the four names of the Hillandale Defendants. *See, e.g.*, *id.*
¶ 326 ("The UEP held a Board of Directors Legislative Meeting on May 12-15, 2003 in

Gettysburg does not hold its own UEP certification . . . [it] adopted UEP's 'animal welfare' guidelines, including flock reduction requirements, which resulted in a 20% flock size reduction compared to its original flock size prior to Hillandale's acquisition of that facility" and "submitted monthly compliance reports to UEP documenting compliance with UEP animal husbandry and/or UEP certified guidelines in at least 2002 and 2008." *Id.* ¶ 72(d); *see also id.* ¶ 71(a). The 2008 Compliance report allegedly documents "Hillandale Gettysburg's compliance with the UEP guidelines from 2005 to 2008." *Id.* ¶ 72(d). According to Plaintiffs, Hillandale Gettysburg "operates under Hillandale PA's certification," has adopted the UEP guidelines in order to meet Hillandale PA's certification obligations, and packages eggs that are UEP-certified. *Id.*

As the Court previously ruled in relation to the SAC, a defendant's agreement to join and participate in this alleged conspiracy is plausibly suggested by allegations that the defendant was involved with trade group associations and attended trade group meetings where allegedly key decisions fundamental to the alleged conspiracy were made or where effects of alleged coordinated actions were extolled, in conjunction with allegations that the defendant participated in, or complied with, the guidelines of the UEP Certification Program, a program that embraced particular features which were anti-competitive with no apparent alternative pro-competitive benefits. *See Egg Prods.*, 821 F. Supp. 2d at 724; *see also id.* at 735-36 (concluding that a defendant's adoption of the Certification Program's chick hatch reduction guidelines, in addition

Washington, DC. The following board members were in attendance: . . . Gary Bethel (Hillandale PA, Hillandale Gettysburg, Hillandale East and Hillandale Farms, Inc.) . . . . "). It is unclear to the Court precisely what this parenthetical is supposed to convey—whether these staff or directors were attending specifically on behalf of Hillandale Gettysburg, or any of the other Hillandale Defendants, or whether Plaintiffs are merely signifying the defendants with which an individual is associated. Given that Hillandale Gettysburg is the only Hillandale Defendant that was a member of UEP, the Court can generally infer that it could have been in attendance by virtue of its officers or staffs' presence at those meetings.

to involvement with trade group associations and certain meetings, was consistent with agreement to the conspiracy); *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2012 WL 1443625, at *4 (E.D. Pa. Apr. 24, 2012) (applying the Court's holding in relation to certain defendants' motions to dismiss the Indirect Purchaser Plaintiffs' complaint). Thus, the TAC's allegations against Hillandale Gettysburg, when considered in light of the entirety of the complaint, are consistent with anti-competitive behavior, tend to exclude the possibility of independent action, and are suggestive of agreement to the conspiracy to reduce the supply of eggs. Accordingly, the Court grants the motion to amend the complaint as to Hillandale Gettysburg.

## 2. Hillandale Farms of Pa., Inc.

For similar reasons, the Court finds that the TAC sets forth allegations that plausibly suggest that Hillandale PA directly agreed to join and participate in the alleged conspiracy to reduce the supply of eggs. As pled in the TAC, Hillandale PA, a Pennsylvania corporation, "packs and sells eggs under the brand names Hillandale Farms, Nearby Eggs, and Hartford Farms," "markets and sells UEP-certified shell eggs produced by Defendants Hillandale Gettysburg and Ohio Fresh Eggs," and was an egg producer.[6] TAC ¶ 68; *see id.* ¶ 71(b).

Although the TAC never explicitly alleges that Hillandale PA was a member of the UEP, Hillandale PA is allegedly a member of USEM and adopted UEP Certified guidelines to reduce chick hatch. *Id.* ¶¶ 70, 247, 324, 359, 444. Following the UEP Certification program, "Hillandale PA completed animal care certified audits, was a UEP certified company or licensed marketer, and displayed the Animal Care Certified logo on its packaging." *Id.* ¶ 70.

---

[6] As previously discussed, the parties dispute whether Hillandale PA was a producer. However, the Court accepts as true for purposes of this Motion that Hillandale PA was a producer in light of the TAC's Paragraph 71(b)'s statement: "Here, that [UEP-certified] producer was Hillandale PA."

Additionally, Hillandale PA purportedly "attended the November 2004 Economic Summit, during which it explicitly agreed to accelerate hen disposal and/or reduce flock size by 5% in 2005." *Id.* ¶ 70.

According to Plaintiffs, Hillandale PA complied with the UEP Certification Program's "100% compliance requirement," which obliged "UEP/ACC certified producers [to] ensure that all entities and affiliates that the certified entity owns, manages or controls (even where there are multiple owners or partners of a facility) comply with the UEP 'animal welfare' guidelines, regardless of how or where those eggs were marketed." *Id.* ¶ 71(a). For example, "[t]o maintain its UEP certification, Hillandale PA was required to ensure that Hillandale Gettysburg complied with the UEP certified guidelines and price fixing scheme alleged herein, and Hillandale Gettysburg did comply with UEP guidelines to reduce supply through increased cage space requirements and submitted monthly compliance reports to UEP[.]" *Id.*

As alleged, "Hillandale PA's officer Gary Bethel attended UEP board of directors meetings and served on the UEP's Shell Egg Marketing Committee." *Id.* ¶ 70; *see also id.* ¶¶ 254, 326.[7] Mr. Bethel, acting as a representative of Hillandale PA, also purportedly commented to the *Pittsburgh-Post Gazette*: "We've been taking a proactive approach towards allowing caged chickens more space . . . . If we had a house that held 100,000 chickens five

---

[7] As the Court noted above with respect to Hillandale Gettysburg, the TAC is unclear whether Mr. Bethel was attending on behalf of Hillandale PA or any other Hillandale Defendants. Plaintiffs ambiguously list the names of the four defendants in a parenthetical next to Mr. Bethel's name when listing attendees at meetings without clarifying whether this means that those entities were actually in attendance or not, or whether Plaintiffs are merely signifying the defendants with which Mr. Bethel is associated on some undefined basis. Even though Plaintiffs do not explicitly plead in the TAC whether or not Hillandale PA was a member of UEP, it seems that its officers could have attended UEP meetings on its behalf as a non-member and it is not unreasonable to infer based upon the allegations, including *inter alia* that it was a USEM member and UEP certified, that it was in attendance. *See id.* ¶¶ 462-63 (alleging that there were non-members of the UEP who were conspirators and that UEP meetings were not closed to non-members until 2009).

years ago, it would house 80,000 now, and that means quite a reduction in total egg numbers."
*Id.* ¶ 359. Additionally, Hillandale PA allegedly received a March 20, 2003 Memorandum
addressed to all USEM members which concerned the USEM export program and stated that
there was "a new member that was going to help 'share in the loss' incurred from a recent export
and thanked members for the contribution exports made to better egg prices." *Id.* ¶ 324.

Consistent with the Court's prior rulings, these allegations, when considered in the
context of the entire TAC, are sufficient to plausibly suggest that Hillandale PA joined and
participated in the alleged conspiracy to reduce the supply of eggs. Thus, the Court grants the
motion to amend the complaint as it pertains to Hillandale PA.[8]

### 3. Hillandale Farms, Inc. and Hillandale Farms East, Inc.

Although the facts describing Hillandale Farms, Inc. and Hillandale East are considerably
more robust in the TAC than in its prior version, they are nonetheless quite circumscribed. As
pled, Hillandale Farms, Inc. and Hillandale East are "non-producer marketers" that market and
distribute shell eggs and egg products produced by Hillandale Gettysburg and/or Ohio Fresh
Eggs. *Id.* ¶ 71(b); *see also id.* ¶ 73 ("Hillandale East sold shell eggs and egg products to
purchasers . . . ."); *id.* ¶ 74 ("Hillandale Farms, Inc. sold shell eggs and egg products to
purchasers . . . ."). The eggs they marketed and distributed allegedly displayed the UEP-certified
logo. *Id.* ¶ 71(b). Neither entity is alleged to be a UEP member, nor a holder of UEP
certification. Nonetheless, UEP ostensibly permitted the two defendants to market and sell eggs
bearing the UEP-certified logo without a UEP-issued license, despite the UEP Program's

---

[8] In light of this conclusion, the Court need not reach the Plaintiffs' argument that they
have stated a claim against Hillandale PA based on a theory that Hillandale Gettysburg,
Hillandale Farms, Inc., and Hillandale East acted as Hillandale PA's agents and that Hillandale
PA would be liable for the harm resulting from their conduct. *See* Reply at 7-8.

strictures providing that non-producer marketing companies could sell UEP-certified eggs only if they held a license and paid licensing fees to the UEP. *Id.* ¶ 71(b).

Allegedly, Hillandale Farms, Inc. and Hillandale East are separately incorporated corporations of Ohio and Pennsylvania, respectively. *Id.* ¶¶ 73, 74. Hillandale PA is the parent and 100% owner of Hillandale Farms, Inc. *Id.* ¶ 74(a). It also is the majority owner of Hillandale East, holding a 57% share of the company, with Gary Bethel holding the next largest share of the company with a 23% stake. *Id.* ¶ 73(a). According to Plaintiffs, the three entities shared common officers during the period of the alleged conspiracy. One such officer was Orland Bethel, who served as president of Hillandale PA, secretary and treasurer of Hillandale East, and president of Hillandale Farms, Inc. *Id.* ¶¶ 69, 73(a), 74(a). Another officer common to all three defendants was Gary Bethel, who allegedly was an officer of Hillandale PA (now its president), president of Hillandale East, and secretary of Hillandale Farms, Inc. *Id.* ¶¶ 69, 73(a), 74(a). Additionally, Gary Bethel allegedly held leadership positions in the UEP and attended UEP meetings where allegedly key decisions instrumental to the conspiracy were made or where effects of alleged coordinated actions were extolled.[9] *Id.* ¶¶ 72(c), 254, 262, 326.

Contrary to the Plaintiffs' contention otherwise, the Court does not find that the TAC's allegations as to Hillandale Farms, Inc. and Hillandale East plausibly suggest that either of these two defendants joined the alleged conspiracy to decrease the supply of eggs. When considered in light of the entirety of the TAC, the allegations as to Hillandale Farms, Inc. and Hillandale East simply do not exclude the possibility that two defendants were undertaking legitimate business decisions independent of an agreement to conspire.

---

[9] The Court previously noted above with respect to Hillandale Gettysburg and Hillandale PA that the TAC is unclear about whether Mr. Bethel was attending on behalf of Hillandale Farms, Inc. and Hillandale East or any other Hillandale Defendants.

The fallacies of the Plaintiffs' arguments appear to arise from Plaintiffs attempting to divine more from the facts pled than is warranted. For example, Plaintiffs argue that "allegations concerning the overlapping ownership and management among the Hillandale Defendants make it plausible that both Hillandale [Farms,] Inc. and Hillandale East marketed certified eggs to effectuate and benefit from the conspiracy." Reply at 6. Plaintiffs contend:

> In addition to securing elevated prices from purchasers, these entities [Hillandale Farms, Inc. and Hillandale East] benefitted from the conspiracy to reduce supply because their owners (or related owners) also owned or controlled Hillandale Gettysburg, the production entity, giving them a direct interest in ensuring the use of the UEP-certified logo and the marketing of eggs bearing the UEP logo. And the officers that controlled Hillandale PA – which held the certification – held similar leadership or management roles in Hillandale Inc. and Hillandale East. As noted, the use of the UEP logo along with marketing to promote its acceptance were components of the conspiracy. *See* TAC ¶¶ 224–26. Thus the owners and officers of the marketing entities had both an interest in ensuring the marketers' compliance with the UEP-certification program and the ability to do so, rendering their knowing and direct participation in the conspiracy plausible.

Reply at 6.

However, several of these factual claims do not bear out upon a fair reading of the TAC. For instance, there is no suggestion in the TAC that either Hillandale Inc. or Hillandale East "secured elevated prices from purchasers." The pleading certainly provides no illumination as to whether and how Hillandale Farms, Inc. and Hillandale East, as "marketers" or "sellers" (but not producers) might have financially benefitted from the artificially-inflated price of eggs, or, as a general matter, how they achieve revenues and realize profits from their marketing and distributing activities.

Furthermore, Plaintiffs claim that Hillandale Farms, Inc. and Hillandale East benefited from the conspiracy merely because their common overlapping owners and officers with Hillandale PA and Hillandale Gettysburg purportedly benefited. But this claim is not supported by the TAC. Plaintiffs simply have not pled facts that would suggest that Hillandale Farms, Inc.

16

or Hillandale East necessarily benefitted because their common owners or officers allegedly benefitted. For that matter, the TAC sets forth no factual allegations that suggest that the individual owners and officers, rather than the companies, directly benefitted from the conspiracy. The Plaintiffs' allegations as to common ownership and management simply are not sufficient alone to give rise to the inference that Hillandale Farms, Inc. or Hillandale East obtained some benefit as a result of the conspiracy.

Additionally, Plaintiffs imbue considerable significance upon the UEP-certified logo, and argue that the display of the logo on packaging and the promotion of the logo to the Food Marketing Institute and retailers "were components of the conspiracy." Reply at 6 (citing TAC ¶¶ 224-26). However, "component" is both a generous and ambiguous description. The TAC's allegations concerning the logo suggest that displaying the logo on egg packaging is merely ancillary, even entirely subordinate, to the alleged conspiracy to reduce the supply of eggs. Indeed, it is altogether unclear from the TAC how displaying the logo serves to advance the conspiratorial purpose of reducing the supply of eggs, particularly in light of the eight alleged "joint collective actions" that purportedly advanced the conspiracy, which involved efforts directed towards the production practices relating to shell eggs (*e.g.*, flock reduction, early molting, and the UEP Certification Program) and the exports of shell eggs and egg products (*i.e.*, the USEM export program).

Instead, the general facts pled as to the logo suggest that the logo would be displayed on egg packaging. *See, e.g.,* TAC ¶¶ 70, 71(b). It can be inferred in favor of Plaintiffs that, by complying with the guidelines, producers were permitted to affix a logo on the packaging of their eggs to reflect that the eggs were "certified" under the Program. *See id.* ¶¶ 70, 300, 420, 499. Furthermore, the TAC alleges that non-certified marketers could "sell eggs bearing the UEP or

ACC certified logo only if such entities obtained a UEP license to do so, paid annual licensing fees and submitted monthly compliance reports" or, as to Hillandale East and Hillandale Farms, Inc., specifically, "only if they were part of a single integrated production enterprise controlled by a UEP-certified producer." *Id.* ¶ 71(b).

The remaining facts describing the logo simply fail to provide a cohesive depiction of what role, if any, the logo played in the conspiracy to reduce supply. Plaintiffs have alleged that the "Federal Trade Commission investigated UEP's use of 'Animal Car[e] Certified' – [UEP's] original name for the Certification Program, as being potentially misleading. On September 30, 2005, the Federal Trade Commission announced an agreement with the UEP that the 'Animal Care Certified' logo could no longer be used on egg cartons." *Id.* ¶ 420. Additionally, as pled, UEP's Producer Committee for Animal Welfare passed two motions concerning the logo:

> One motion stated, "In order to protect the integrity of the ACC program and logo and in view of the difficulty in preventing the commingling of certified eggs with non-certified eggs and to treat all egg producers equally it is hereby moved that no new licenses to market Animal Care Certified eggs will be issued or renewed to producers who are not ACC certified." . . . The second motion . . . stated that "a license to market ACC eggs may be issued to shell egg processors and further egg processors who do not own or operate egg production facilities."

*Id.* ¶ 300.

Finally, according to Plaintiffs, "UEP members met with the Food Marketing Institute ('FMI'), a grocer's trade organization, and encouraged the group to mandate the UEP seal for all egg products used by organization members." *Id.* ¶ 224. Defendants also allegedly "met directly with retailers and encouraged them to not purchase eggs unless they were 'UEP certified', in an attempt to foreclose markets to" producers who were not participating in the conspiracy. *Id.* ¶ 225. But absent from the TAC are any facts that might describe whether these persuasive efforts were successful *vel non*, or generally if the logo actually had any effect on egg purchases.

18

Given the disjointed and narrow array of facts pled about the logo, it would take considerable inference and assumption to reach the conclusion, as Plaintiffs claim, that the "use of the UEP logo along with marketing to promote its acceptance were components of the conspiracy." Reply at 6 (emphasis omitted). It follows that the TAC does not depict the logo as a central "component" of a conspiracy that is based upon reducing the supply of eggs through conduct relating to egg production and exports.

Consequently, that Hillandale Farms, Inc. and Hillandale East sold eggs bearing the UEP-certified logo, a practice that is in their legitimate economic self-interest absent an agreement to conspire, is insufficient to suggest that the scope of their affiliation with the UEP certified program was consistent with agreement to the conspiracy. Indeed, it is unclear how Hillandale Farms, Inc. or Hillandale East as *non-producers* could participate in the facets of the UEP Certification Program that the Court has found are anti-competitive with no apparent alternative pro-competitive benefits.[10] A non-producer would not be able to effectuate lower cage space

---

[10] Although the TAC alleges that UEP-certified producers were required to "ensure that all entities and affiliates that the certified entity owns, manages or controls (even where there are multiple owners or partners of a facility) comply with the UEP 'animal welfare' guidelines, regardless of how or where those eggs were marketed," *id.* ¶ 71(a), Plaintiffs did not allege that Hillandale Farms, Inc. or Hillandale East actually complied with the guidelines in any manner. By contrast, Plaintiffs do charge that Hillandale Gettysburg complied with the guidelines on account of that requirement: "Hillandale PA was required to ensure that Hillandale Gettysburg complied with the UEP certified guidelines . . . , and Hillandale Gettysburg did comply with UEP guidelines to reduce supply through increased cage space requirements . . . ." *Id.*

Instead, Plaintiffs have alleged that "UEP would have permitted Hillandale East and Hillandale Farms, Inc. to sell these eggs only if they were a part of a single integrated production enterprise controlled by a UEP-certified producer. . . . In other words, Hillandale East and Hillandale Farms operated under the banner of Hillandale PA's UEP Certification." *Id.* ¶ 71(b). This allegation may allege that Hillandale East and Hillandale Farms were under the "control" of Hillandale PA in a "single integrated production enterprise" but it does not plausibly suggest that the two defendants participated in the conspiracy. For one, what "control" means precisely here is entirely unclear, if not vague, as it is a word with many definitions and the TAC does not provide any non-conclusory factual allegations in the TAC that might clarify its meaning. *See, e.g.*, *id.* ¶ 71 ("Defendants . . . Hillandale East, and Hillandale Farms, Inc., by and through the

19

densities for hens by engaging in chick hatch reduction, ceasing to backfill, engaging in early molting and disposal initiatives, or committing 100% of its production facilities to the UEP Certification guidelines.  The conspiracy as alleged simply has not been framed such that conduct relating to the marketing and sale of eggs could advance the anti-competitive aspects of the UEP Certification Program.  As such, the TAC does not exclude the possibility that Hillandale East and Hillandale Farms, Inc.'s conduct in marketing and distributing eggs with the UEP-certified logo was independent of an agreement to conspire.

Given that Hillandale East and Hillandale Farms, Inc.'s conduct does not plausibly suggest participation in the conspiracy, the allegations concerning Mr. Bethel, who allegedly is a shareholder of Hillandale East and was an officer of Hillandale East and Hillandale Farms, Inc., and his purported attendance at particular UEP meetings stand alone.  Although allegedly key decisions instrumental to the conspiracy were made and effects of alleged coordinated actions were extolled at those UEP meetings, such allegations merely suggest opportunity to conspire. Such alleged facts by themselves are insufficient to plausibly suggest conspiracy.  *See Egg Prods.*, 821 F. Supp. 2d at 722.

Accordingly, upon consideration of the facts alleged as to these two defendants in light of the TAC in its entirety, the Court concludes that the TAC's allegations do not give rise to the inference that Hillandale East and Hillandale Farms, Inc. agreed to the conspiracy.  The Court

---

control exercised by Hillandale PA, agreed to participate in the conspiracy . . . .").  Regardless, to the extent that inferences fairly can be drawn in Plaintiffs' favor that the TAC alleges that Hillandale PA "controlled" Hillandale East and Hillandale Farms, Inc. to comply with the UEP guidelines, these defendants were non-producers and thus could not have engaged in the features of the guidelines that the Court has determined are anti-competitive without apparent alternative pro-competitive benefits.  Indeed, there are no allegations in the TAC that describe how a non-producer's compliance with the guidelines, when it is not licensed, would alter its routine self-interested business decisions or conduct.  Indeed, the facts pled about the UEP guidelines are generally limited to guidelines that concern producers and the production of eggs.

thereby denies the Plaintiffs' motion for leave to amend to state claims against Hillandale East and Hillandale Farms, Inc. with prejudice.

**IV. Conclusion**

For the foregoing reasons, the Court determines that Plaintiffs have plausibly suggested that Hillandale Gettysburg and Hillandale PA participated and joined in the alleged conspiracy to reduce the supply of eggs, but have failed to adequately plead claims against Hillandale East and Hillandale Farms, Inc. The Court denies the motion in part with prejudice with respect to the proposed claims against Hillandale East and Hillandale Farms, Inc. In all other respects, the Courts concludes it is appropriate that the Plaintiffs' motion for leave to amend be granted to permit Plaintiffs to make amendments for fraudulent concealment, to which no defendant voiced opposition, and amendments to assert claims against Hillandale Gettysburg and Hillandale PA.

An Order consistent with this Memorandum follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge