**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION** | **MDL No. 2002**<br>**08-md-02002** |
| **THIS DOCUMENT APPLIES TO: ALL INDIRECT PURCHASER ACTIONS** | |

**FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**Table of Contents**

**Page**

NATURE OF THIS ACTION .................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................... 5

INTERSTATE TRADE AND COMMERCE ........................................................................... 6

PLAINTIFFS ........................................................................................................................... 6

DEFENDANTS ...................................................................................................................... 12

A.     Industry Trade Association Defendants.................................................................. 13

B.     Individual Company Defendants ........................................................................... 14

       Cal-Maine Foods, Inc................................................................................. 14

       Michael Foods, Inc...................................................................................... 16

       Moark LLC and Norco Ranch ................................................................... 16

       Rose Acre Farms.......................................................................................... 19

       National Food Corporation ......................................................................... 20

       Hillandale Farms and Ohio Fresh Eggs ..................................................... 21

       Midwest Poultry Services ........................................................................... 25

       NuCal Foods ............................................................................................... 26

       R.W. Sauder ................................................................................................ 27

       Unidentified Co-Conspirators .................................................................... 28

CLASS ACTION ALLEGATIONS ....................................................................................... 28

THE ORGANIZATIONAL STRUCTURE AND ECONOMIC CONDITIONS WITHIN THE
EGG INDUSTRY RENDER IT RIPE FOR COLLUSION ................................................... 34

DEFENDANTS' CONSPIRACY TO REDUCE OUTPUT.................................................... 37

A.     UEP and Other Trade Organizations Helped Formulate and Facilitate the Conspiracy... 37

B.     Defendants' Agreement to Reduce the Domestic Supply of Eggs .................................. 39

C.     UEP is Not Entitled to the Limited Protections of the  Capper-Volstead Act .................. 76

D.      Defendants Intentionally Misled Consumers that the "Animal Care  Certified Program" was a Humane Standard of Care for Poultry  When it Was Merely A Pretext for Supply Reduction ................................................................................................................ 87

FRAUDULENT CONCEALMENT ............................................................................... 90

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT ....................................... 103

REQUEST FOR RELIEF ........................................................................ 143

This Fourth Amended Consolidated Class Action Complaint ("Complaint") supersedes and amends all previously filed complaints. Indirect purchaser plaintiffs ("Plaintiffs"), on behalf of themselves and all others similarly situated, by their undersigned attorneys, bring this action for damages and injunctive relief, as well as attorneys' fees and costs, where available by law. This action is brought under federal and state antitrust law, consumer protection law, and the common law, where applicable, of Arizona, California, District of Columbia, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin ("Class Jurisdictions") as set forth below against the defendants named herein (hereinafter "Defendants") and their co-conspirators. Upon information and belief, Plaintiffs allege as follows:

## NATURE OF THIS ACTION

1.      This antitrust action arises out of a long-running conspiracy between and among Defendants and certain unnamed co-conspirators extending from at least January 1, 2000 through the present (the "Class Period"). The conspiracy had, and has, the purpose and effect of fixing, raising, and maintaining and/or stabilizing prices of eggs in the United States

2.      Plaintiffs seek damages as indirect purchasers of shell eggs. Shell eggs are defined as eggs purchased in their natural state in the shell. Excluded from this definition are purchases of "specialty" shell eggs such as "organic," "free-range," or "cage-free," and hatching eggs purchased by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

3.      Eggs are a basic staple of the American diet, for which no substitute exists. Because eggs are fungible, consumers make purchase decisions based largely, if not entirely, on

price.  The demand for eggs is relatively inelastic, which means that egg prices are almost

entirely dependent on supply and that consumers will purchase them regardless of most changes

in price.  Because the demand for eggs is relatively price inelastic, small reductions in supply can

lead to sharp increases in egg prices.[1]  For example, a July 2007 article in *Investor's Business*

*Daily* discussed Defendant Cal-Maine Foods, Inc.'s efforts to reduce supply and its impact on

prices:  "Cal-Maine has cut back its own egg supply 1% to 2%.  That's more than one might

think.  One or two percent on the supply side affects prices 20% or 30%[.]"

4.    Most of the Defendants are vertically integrated producers of shell eggs or egg

products, or both, including entities that are purportedly horizontal competitors and others that

are powerful trade groups.  One of those trade groups, Defendant United Egg Producers

("UEP"), is the largest egg trade organization in the United States, and had 198 members

representing 96% of the nation's laying hens during the Class Period.  UEP's members consist of

individual companies that controlled and were major decisional forces in the UEP during the

Class Period.  These companies acted in concert with and through the UEP and other trade

groups to implement and enforce the conspiracy alleged herein during the Class Period.

5.    The egg industry has undergone substantial consolidation in the last few years and

a relatively small number of producers – all members of the same organizations – control a major

share of the egg market.  The Defendants are aware of the impact of egg supply on the pricing of

---

[1] Sam Krouse and Bob Krouse, *Infrastructure's Role in Keeping Egg Prices High*, Egg Industry
Vol. 113 No. 2, Feb. 2008 (Bob Krouse is the current UEP First Vice Chairman and a member of
the UEP Board of Directors and President of Defendant Midwest Poultry Services).  In October
2007, the publication reported that 2007 egg prices were "one for the record books."  Edward
Clark, *2007 Egg Prices:  One for the Record Books - Has the Industry Finally Learned How Not
to Overproduce?* Egg Industry, Vol. 112 No. 10, Oct. 2007.

eggs; therefore, Defendants promote and discuss their efforts to reduce the supply of eggs with each other.

6.      These factors, and others discussed herein, enabled the Defendants during the Class Period to collectively and unlawfully agree to work in tandem to raise, fix, maintain and/or stabilize the prices of eggs through artificial production restraints, exportation, reduction of supply, and joint pricing.

7.      As shown below in detail, Defendants conspired to and did reduce and constrain the supply of eggs and artificially inflate the price of eggs by the following means:

> (a)   In 1999, Defendants agreed to a 5% molting of the flock (taking chickens out of production), a 5% reduction of the flock, and a hatch reduction to reduce the number of hens laying eggs;
>
> (b)   In 2001, Defendants agreed to reduce the egg supply by implementing an emergency flock reduction of 5%;
>
> (c)   In 2002, Defendants developed a plan to manage purported overproduction by additional molting and hen disposal;
>
> (d)   Also in 2002, Defendants agreed to implement and comply with an animal husbandry program developed by UEP, which mandated cage space requirements and limits on the number of birds per cage, which in fact was designed  for the purpose of and resulted in a decrease in the supply of eggs – all under the guise of an animal care program;
>
> (e)   In 2004, in addition to the UEP certification program described in (d) above, UEP continued to urge getting "back to our regular molt and kill intervals," causing Defendants to engage in another early molt and flock reduction; and
>
> (f)   At various times during the Class Period, Defendants agreed to arrange for exports of eggs as a means of reducing domestic supply.

8.      These coordinated efforts by Defendants were designed to and did reduce the supply of eggs, which increased the prices of eggs throughout the Class Period.

9.      In addition, in order to lull the public and their customers into inquiring about Defendants' activities, the Defendants either directly or through various co-conspirators, engaged

3

in a pattern of misrepresentation regarding the reasons for their actions and for the increase in the price of eggs.

10.     These misrepresentations included misstatements about the purpose of their actions, falsely claiming that their actions in reducing the supply of eggs were part of a legitimate animal husbandry program.  These misrepresentations were contained in press releases made on behalf of the conspiracy by various co-conspirators, websites describing the program, statements made to customers, and even on logos put on cartons of shell eggs sold to the public that indicated the eggs had been produced under "certified" animal care standards.  In addition, various representatives of members of the Defendants and their co-conspirators made public statements falsely blaming high egg prices on factors such as high feed or other production costs, rather than on the conspiracy.

11.     By keeping their real motivations for their actions secret and by issuing these misleading public statements, Defendants prevented consumers, such as Plaintiffs, from learning that they had been injured in any way cognizable at law.  In fact, had the true nature of Defendants' actions been made clear even to their direct customers, those customers would have taken actions to prevent Defendants and their co-conspirators from artificially reducing egg supply and thus increasing the prices for shell eggs for consumers, such as Plaintiffs.

12.     Plaintiffs and members of the Class have been forced to pay, in discernible and reasonably measurable amounts, supra-competitive prices for shell eggs and, thus, as a result of Defendants' illegal actions, have suffered antitrust injury.

13.     To provide a remedy for the injury suffered as a result of Defendants' illegal actions, Plaintiffs bring this case on behalf of indirect purchasers of shell eggs in each of the Class Jurisdictions under their respective antitrust and consumer protection laws, and under

common law for unjust enrichment to recover damages.  Plaintiffs seek damages, injunctive

relief, disgorgement of illegally-obtained profits and the costs of pursuit of this action, including

reasonable attorneys' fees, for the injuries that Plaintiffs and Class members sustained as a result

of the Defendants' conspiracy to fix, raise, maintain and/or stabilize the price, and limit, reduce

and otherwise manipulate the supply, of eggs.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15 and 26 for injunctive relief, including reasonable attorneys' fees and costs of this

litigation, for Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs

also bring this action pursuant to the state antitrust and consumer protection laws for damages,

the common law of unjust enrichment, for disgorgement of illegally-obtained profits, and, where

available by law, reasonable attorneys' fees and costs of this litigation.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and

1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.     This Court has supplemental subject matter jurisdiction over the pendent state

antitrust and consumer protection law claims under 28 U.S.C. § 1367.

17.     The Court also has jurisdiction under the Class Action Fairness Act of 2005, 28

U.S.C. §1332(d) because (a) there are more than 100 members of the Class; (b) citizenship of at

least one proposed Class member is different from that of any Defendant; and (c) matter in

controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000,

exclusive of interest and costs.

18.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b) and (c) because, during the Class Period, one or more of the Defendants resided, transacted business, was found, or had agents in this district.  In addition, the litigation was transferred to this District for pretrial purposes pursuant to 28 U.S.C. § 1407.

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant:  (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of eggs throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  Further jurisdictional contacts are alleged below.

## INTERSTATE TRADE AND COMMERCE

20.     During the Class Period, Defendants produced, manufactured, distributed and sold eggs through the means of interstate commerce in a continuous and uninterrupted flow to customers located in states other than the states in which Defendants market and sell such products.  Defendants' actions substantially affected the supply of eggs flowing into each of the Plaintiffs' States and inflated the price of eggs purchased by Plaintiffs in each of these states.

21.     Defendants have used instrumentalities of interstate commerce to market and/or sell eggs.

## PLAINTIFFS

22.     Within the Class Period, each Plaintiff purchased shell eggs in the state in which they reside or conduct business and suffered an economic injury as a result of Defendants' illegal conduct described in this Complaint.  All Plaintiffs intend to purchase shell eggs in the future.

23.     Plaintiff Scott Friedson is a resident of Chandler, Arizona.  This Plaintiff purchased shell eggs for his own use and not for resale during the Class Period and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

24.     Plaintiff Morris Clement is a resident of Los Angeles, California.  This Plaintiff purchased shell eggs for his own use and not for resale during the Class Period and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

25.     Plaintiff Jessica Swift is a resident of San Diego, California.  This Plaintiff purchased shell eggs for her own use and not for resale during the Class Period and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

26.     Plaintiff Pilar M. De Castro & Co., Inc. is incorporated under California law, with its principal place of business in Anaheim, California.  This Plaintiff purchased shell eggs during the Class Period for its own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

27.     Plaintiff Charles Zebrowski is a resident of the District of Columbia.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

28.     Plaintiff Jeanne Rice is a resident of Boca Raton, Florida.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured

as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

29.     Plaintiff Joan Gibbons is a resident of Sewall's Point, Florida.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

30.     Plaintiff Julia McGuire is a resident of West Des Moines, Iowa.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

31.     Plaintiff Donn Camlin is a resident of Shawnee, Kansas.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

32.     Plaintiff Thomas Williams is a resident of Liberal, Kansas.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

33.     Plaintiff Patricia Flynn is a resident of Hingham, Massachusetts.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

34.     Plaintiff Elizabeth Priest is a resident of Sunderland, Massachusetts.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

35.     Plaintiff Thomas Roth is a resident of Grand Rapids, Michigan.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

36.     Plaintiff Sharon Defren is a resident of Mendota Heights, Minnesota.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

37.     Plaintiff Leanne Hardin is a resident of Columbus, Mississippi.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

38.     Plaintiff John Anthony Spracklin is a resident of Omaha, Nebraska.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

39.     Plaintiff Dustin Crenshaw is a resident of La Vista, Nebraska.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured

as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

40.     Plaintiff Rachelle L. Hagendorf is a resident of Las Vegas, Nevada.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

41.     Plaintiff Charles Shoten is a resident of Las Vegas, Nevada.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

42.     Plaintiff Trudy Solo is a resident of Albuquerque, New Mexico.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

43.     Plaintiff Thomas McManus is a resident of Manhasset, New York.  This Plaintiff purchased shell eggs for his own use and not for resale during the Class Period and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

44.     Plaintiff Mark Moynahan is a resident of New York, New York.  This Plaintiff purchased shell eggs for his own use and not for resale during the Class Period and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

45.     Plaintiff Lynsey Allen is a resident of Charlotte, North Carolina.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future,

46.     Plaintiff Kate Barry is a resident of Raleigh-Durham, North Carolina.  This Plaintiff purchased shell egg during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

47.     Plaintiff Rhonda McGrath is a resident of Lead, South Dakota.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

48.     Plaintiff James Anderson is a resident of Nashville, Tennessee.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

49.     Plaintiff Michael Dobson is a resident of Salt Lake City, Utah.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

50.     Plaintiff Sandra Drown is a resident of Northfield, Vermont.  This Plaintiff purchased shell eggs during the Class Period for her own use and not for resale and was injured

as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

51.     Plaintiff Lester Skinner is a resident of New Cumberland, West Virginia.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

52.     Plaintiff Robert Nelson is a resident of DeForest, Wisconsin.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

53.     Plaintiff Jason Oldenburg is a resident of Milwaukee, Wisconsin.  This Plaintiff purchased shell eggs during the Class Period for his own use and not for resale and was injured as a result of Defendants' illegal conduct.  This Plaintiff intends to purchase shell eggs in the future.

## **<u>DEFENDANTS</u>**

54.     Whenever this Complaint alleges that a corporation has engaged in an act, deed or transaction, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

55.     Allegations as to "Defendants" and/or "co-conspirators" herein refer to all named Defendants unless otherwise specified.

A.     **Industry Trade Association Defendants**

56.     Defendant UEP is a Maine cooperative corporation, with its office and principal place of business located in Alpharetta, Georgia.  According to its website, UEP's membership represents more than 95% of the nation's laying hens.  Membership in UEP is open to egg producers and to non-egg producers such as "owners of breeder flocks, hatcheries, and started pullets [young hens], as well as contract egg producers …."[2]

57.     According to its website, UEP was formed in 1968 by a group of producers who were "[c]oncerned with the disastrous price cycles of the egg industry" and decided to form an organization that could provide industry leadership.  UEP's website indicates that the services it supplies to the industry are as follows:  providing price discovery, production and marketing information, and unified industry leadership; establishing a strong relationship with USDA; developing a Washington presence; and supporting strong industry promotion efforts.[3]  UEP issues a bi-weekly newsletter entitled, "United Voices" to its members, which is unavailable to the general public.

58.     During the Class Period, Defendants' representative and employees were active members serving on UEP's Board of Directors, Marketing Committee, Shell Egg Price Discovery Committee, U.S. Egg Marketers Export Committee, and other committees.

59.     Defendant United Egg Association ("UEA") is a District of Columbia nonprofit corporation with its offices and principal place of business located in Alpharetta, Georgia.

---

[2] United Egg Producers, http://www.unitedegg.org/about_history.aspx (last visited Apr. 7, 2010).

[3] *Id.*

UEP's annual meetings are held in conjunction with UEA's meetings and members of the organizations attend joint meetings.

60.     Defendant United States Egg Marketers, Inc. ("USEM") is a Georgia nonprofit corporation, with its principal place of business located in Alpharetta, Georgia.  During the Class Period, Defendants utilized USEM to coordinate exports of eggs to reduce domestic supply and increase prices.

### B.     Individual Company Defendants

### Cal-Maine Foods, Inc.

61.     Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a Delaware corporation, with its offices and principal place of business located in Jackson, Mississippi. During the Class Period, Cal-Maine's shell eggs were sold to indirect purchasers in the United States, including members of the Class.

62.     Cal-Maine is the largest producer and marketer of shell eggs in the United States. It is also a leader in industry consolidation having completed at least fourteen (14) acquisitions since 1989.  According to its 2009 10-K, Cal-Maine sold approximately 778 million dozen shell eggs (accounting for approximately 18% of domestic shell egg consumption in the United States).  Fred Adams, founder and CEO of Cal-Maine, was a founding member of UEP.

63.     In fiscal year 2007, 20% of Cal-Maine eggs were not produced by Cal-Maine; 7% were grown under production contracts and the remainder was purchased on the spot market.

64.     Cal-Maine's customers are divided approximately into 85% retail markets, 10% food-service markets, and 5% to other types of entities.  Some of Cal-Maine's brands include Egg-Land's Best, Rio Grande, and Sun Up.  Cal-Maine owns 25.9% non-voting equity interest in Egg-Land's Best and has an exclusive license agreement to market and distribute the Egg-Land's

14

Best brand in major metropolitan areas, including New York City, and a number of states in the South.

65.     Cal-Maine is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Cal-Maine.  During the time that the conspiracy was in effect, a Cal-Maine representative served as chairman of the UEP.  In 2008, Cal-Maine employees served on various UEP committees, including UEP's:  (a) Executive Committee; (b) Finance Committee; (c) Shell Egg Price Discovery Committee; (d) Shell Egg Marketing Committee; (e) Quality Assurance/Food Safety Committee; (f) Producer Committee for Animal Welfare; (g) Long Range Planning Committee; and (h) the United States Egg Marketers Export Committee.

66.     Cal-Maine employees have attended UEP and Urner Barry, Inc. ("Urner Barry")[4] conferences and/or meetings and participated in industry efforts and programs designed to reduce the supply of eggs and to fix egg prices.

67.     Cal-Maine has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

68.     Cal-Maine has furthered the conspiracy by, among other things, selling UEP certified eggs and reducing its egg supply as a result.  Cal-Maine has also furthered the conspiracy by exporting its proportionate share of eggs at below domestic prices in order to reduce domestic supplies.

---

[4] Urner Barry is a publisher of daily and monthly newsletters and is a price reporting service for the egg industry, among others.  Urner Barry's newsletters publish egg price quotations that are widely relied on in the setting of wholesale egg prices under spot purchasers and long-term contracts.

**Michael Foods, Inc.**

69.     Defendant Michael Foods, Inc. ("Michael Foods") is a Delaware corporation, with its principal place of business located in Minnetonka, Minnesota.  During the Class Period, Defendant Michael Foods marketed and indirectly sold eggs to indirect purchasers in this district and the United States, including members of the Class.  Michael Foods is the largest North American producer of processed egg products, and is one of the largest North American eggs producers.

70.     According to its 2009 10-K, Michael Foods' Egg Products Division (Food Services, and Food Ingredients) derived approximately 98% of their net sales from various egg products, with the remaining 2% coming from shell eggs.  Michael Foods' Processed Egg Products Division does business through several wholly-owned operating subsidiaries including: M.G. Waldbaum Company, Papetti's Hygrade Egg Products, Inc., Abbotsford Acquisition Corp., MFI Food Canada, Ltd., and through its majority owned subsidiary Trilogy Egg Products Inc. Michael Foods follows Urner Barry for its pricing of egg products in North American markets.

71.     Defendant Papetti's Hygrade Egg Products, Inc. ("Papetti's"), a wholly-owned subsidiary of Michael Foods, is a New Jersey corporation with its principal place of business located in Elizabeth, New Jersey.  Papetti's marketed and/or sold egg products in this district and the United States during the Class Period.

72.     Michael Foods has been an active participant in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

**Moark LLC and Norco Ranch**

73.     Defendant Moark LLC ("Moark") is a Missouri limited liability company, with its offices and principal place of business located in Norco, California.  During the Class Period,

Moark indirectly sold shell eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

74.     Moark processed 523 million dozen eggs from approximately 24 million layers (hens) per year.  Moark produces and markets shell eggs that are sold under corporate brands and national brand names such as LAND O'LAKES All-Natural Farm Fresh Eggs and Eggland's Best, as well as non-branded shell eggs.

75.     Moark is the nation's third-largest producer and marketer of shell eggs.  Moark's annual egg sales are approximately $500,000,000

76.     Moark is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Moark. Moark employees have served on various UEP committees, including:  (a) the UEP Executive Committee (secretary); (b) Finance Committee; (c) Government Relations Committee; (d) Shell Egg Price Discovery Committee; (e) Shell Egg Marketing Committee; (f) Quality Assurance/Food Safety Committee; (g) Producer Committee for Animal Welfare; (h) Public Relations Committee; (i) Long Range Planning Committee; and (j)  the United States Egg Marketers Export Committee.

77.     For example, Joe Fortin and Paul Osborne of Moark attended the UEP's Annual Board Meeting on October 10-11, 2002 in Savannah, Georgia where the "100% Rule" was adopted.  At UEP's 2003 Annual Membership Meeting, Joe Fortin was elected to UEP's Board and to serve as its Secretary.  At UEP's 2004 Annual Membership Meeting, Mr. Fortin again was elected to UEP's Board and to serve as its Secretary.  In October 2004, Defendants on the UEP Board approved a coordinated supply management proposal at the UEP-UEA joint Annual Board Meeting in New Orleans.

78.     Throughout the Class Period, Moark employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Moark has participated in and profited from UEP's and its co-conspirators⁻ efforts to reduce supply and fix prices, as outlined herein.  Moark has furthered the conspiracy by participating in the industry "certification" and "export" programs designed to reduce the supply of eggs in the market.  For example, Moark agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation's laying flock) also had agreed to the UEP Certified Guidelines.   At the October 24, 2003 USEM annual meeting, it was noted that a total of 836 container loads of eggs had been sold as part of USEM-sponsored exports since UEP took over management of USEM in late 2000.  At that same meeting, Joe Fortin was elected to serve on the Executive/Export Committee for the next year.

79.     Similarly, Moark explicitly agreed to the mid-2004 early molt and flock disposal plan and in November 2004, signed a written commitment to the UEP's programs.  As of January 11, 2008, UEP listed Moark Productions among "Certified Companies" and "Licensed Marketers" that had signed on to the UEP Certified scheme.

80.     Moark is the parent company of Norco Ranch, Inc.

81.     Norco Ranch, Inc. ("Norco Ranch") is a California corporation, with its offices and principal place of business located in Norco, California.  It is a subsidiary of Moark.  During the Class Period, Norco Ranch indirectly sold eggs and/or egg products to indirect purchasers in the United States, including members of the Class.

82.     During the Class Period, Norco Ranch has been a member of UEP and its employees have served in key executive positions and/or on committees of the organization on

18

behalf of Norco Ranch, including on UEP's Government Relations Committee.  Norco Ranch employees have attended UEP meetings and promoted efforts to reduce supply and fix prices.

83.     Norco Ranch has participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  For example, Norco Ranch agreed to the UEP Certified Guidelines by 2003, when at least 202 companies with ownership of 226.2 million layers (or approximately 82% of the nation' laying flock) also had agreed to the UEP Certified Guidelines.  Norco Ranch also explicitly agreed to the mid-2004 early molt and flock disposal plan.  As of January 11, 2008, UEP listed Norco among Certified Companies and Licensed Marketers that had signed on to the UEP Certified scheme.  Through these actions and others, Norco Ranch has furthered the conspiracy by selling UEP certified eggs and has reduced its shell egg supply as a result.

**Rose Acre Farms**

84.     Defendant Rose Acre Farms, Inc. ("Rose Acre") is an Indiana corporation, with its principal place of business located in Seymour, Indiana.  During the Class Period, Rose Acre marketed, indirectly sold, and/or distributed shell eggs to indirect purchasers in the United States, including members of the Class.

85.     Rose Acre is one of the largest egg producers in the United States.

86.     Rose Acre is a vertically integrated operation handling all of its own breeding chicks, milling feed, harvesting, cleaning, sorting, packing, and shipping eggs directly to retailers.

87.     Rose Acre's brands include: White Shell Eggs, GreatEgg's Vita-D, GOLDEN-PREMIUM, Brown Shell Eggs (Large & Jumbo), Christopher Eggs, Eggland's Best, and GreatEggs.  Rose Acre's annual sales are estimated to be approximately $192,300,000.

88.     Rose Acre is a member of UEP and UEA and its employees have served in key executive positions and/or on committees of these organizations on behalf of Rose Acre.  Rose Acre employees have served on UEP's Government Relations Committee, Shell Egg Price Discovery Committee, Shell Egg Marketing Committee, Environmental Committee, and Producer Committee for Animal Welfare, Public Relations Committee, Long Range Planning Committee, Environmental Scientific Panel, and the United States Egg Marketers Export Committee.  Rose Acre employees have attended UEP meetings and promoted efforts to reduce supply and artificially raise prices.

### National Food Corporation

89.     Defendant National Food Corporation ("National Food") is a Washington corporation, with its offices and principal place of business located in Everett, Washington.  During the Class Period, National Food indirectly sold shell eggs to indirect purchasers in the United States, including members of the Class.

90.     National Food is a fully integrated producer and processor of eggs and egg products.  National Food operates its own feed mills, pullet farms, layer farms, processing plants, and distributions centers in Washington, Oregon, Montana, and South Dakota and serves markets throughout the Pacific Northwest, Alaska, Hawaii, and the Midwest.

91.     National Food sells shell eggs and egg products including, e.g., whole eggs, egg whites, yolks, and peptex.

92.     National Food is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of National Food. During the time that the conspiracy was in effect, a National Food representative served as chairman of the UEP and promoted the conspiracy as alleged herein.  National Food employees have served on UEP's Shell Egg Price Discovery Committee, Shell Egg Marketing Committee (chair), Public Relations Committee, Long Range Planning Committee, and the United States Egg Marketers Export Committee (secretary).  National Food has been an active participant in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix prices, as outlined herein.

### Hillandale Farms and Ohio Fresh Eggs

93.     "Hillandale Farms" comprises various companies – including Defendants Hillandale Farms of Pa., Inc. and Hillandale-Gettysburg, L.P – that function as part of an integrated enterprise that produces and sells shell eggs.

94.     According to the joint website for the integrated enterprise, Hillandale Farms, with production facilities in the Northeast, Midwest, and Southeast, is "a vertically integrated supplier ... directly involved in every aspect of egg production and distribution."[5]  Each of the Hillandale Farms constituent companies is owned and/or controlled by Orland Bethel, Gary Bethel, and/or Don Hershey.  UEP identified officers of the Hillandale Farms entities as representing "Hillandale Farms" generically.

---

[5] Hillandale Farms, http://www.hillandalefarms.com (last visited Apr. 7, 2010).

95.     A UEP newsletter identified Hillandale Farms of Pennsylvania as the 19th largest egg production company in the United States in 2003.

96.     Individuals affiliated with Hillandale Farms, including Ron Ballew and James Minkin, served on UEP's Shell Egg Marketing Committee and Environmental Committee.

97.     Hillandale Farms sells eggs for resale under various brands, such as Hillandale Farms, Nearby Eggs, and Hartford Farms, as well as corporate store brands.  During the Class Period, Hillandale Farms' shell eggs were sold to indirect purchasers in the United States, including members of the Indirect Purchaser Class.

98.     Defendant Hillandale Farms of Pa., Inc. ("Hillandale PA") is a Pennsylvania corporation, with its principal place of business located in North Versailles, Pennsylvania. Hillandale PA is part of the Hillandale Farms integrated enterprise.  It packs and sells shell eggs under the brand names Hillandale Farms, Nearby Eggs, and Hartford Farms.  Hillandale PA markets and sells UEP-certified eggs produced by Defendants Hillandale Gettysburg and Ohio Fresh Eggs, selling all of Ohio Fresh's production since late 2003.  During the Class Period, Hillandale PA indirectly sold shell eggs to indirect purchasers in the United States, including members of the Indirect Purchaser Classes.

99.     Hillandale PA is wholly owned by Orland Bethel and is operated by members of the Bethel family.  During the conspiracy, Orland Bethel served as President of Hillandale PA. Gary Bethel now serves in that role and has served as an officer of the company during the conspiracy.  Steve Vendemia, Gary Bethel's brother in law, serves as the company's Vice President and has served as its treasurer.

100.     Hillandale PA has participated in and benefitted from Defendants' and their co-conspirators' efforts to reduce supply and fix prices, as outlined herein.  Hillandale PA's officer Gary Bethel attended UEP board of directors meetings and served on the UEP's Shell Egg Marketing Committee. According to a United Voices newsletter, Hillandale PA has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification no. 182) and has conspired to reduce egg supply as a result. United Voices newsletters also reported that Hillandale PA completed animal care certified audits, was a UEP certified company or licensed marketer, and displayed the Animal Care Certified logo on its packaging. As alleged *infra*, to maintain its UEP certification, Hillandale PA was required to ensure 100% compliance with UEP certified guidelines for all egg production entities and affiliates that it owned, controlled or managed. According to a United Voices newsletter, Hillandale PA attended the November 2004 Economic Summit, during which it explicitly agreed to accelerate hen disposal and/or reduce flock size *by 5*% in 2005.

101.     Defendant Hillandale-Gettysburg, L.P. ("Hillandale-Gettysburg") is a Pennsylvania limited partnership, with its principal place of business located in Gettysburg, Pennsylvania and a registered agent address at 370 Spicer Road, Gettysburg, Pennsylvania. Hillandale-Gettysburg is part of the Hillandale Farms integrated enterprise, acting as a producer and/or processor of shell eggs. The only contact or mailing address provided by the joint Hillandale Farms website, HillandaleFarms.com, is a Gettysburg mailing address.

102.     Hillandale-Gettysburg packs and sells eggs for retailers and distributors and under its various brand names including: Hillandale Farms, Nearby Eggs, and Hartford Farms. During the Class Period, Hillandale-Gettysburg sold shell eggs to purchasers in United States, including indirect sales to members of the Indirect Purchaser Classes.  Hillandale Gettysburg is majority

23

owned by Orland Bethel (50% ownership share) and the Bethel Family Trust (30% ownership share). Don Hershey holds the minority 20% shares. The general partner of Hillandale Gettysburg is HGLP LLC, which is owned by Gary Bethel (Hillandale PA's officer and current President) and Don Hershey, who serves as its President. Orland Bethel (the owner of Hillandale PA) and Gary Bethel (the President of Hillandale PA) serve on the Hillandale Gettysburg board of directors.

103.    Hillandale Gettysburg is part of the Hillandale Farms integrated enterprise, acting as a producer and/or processor of shell eggs.

104.    Hillandale Gettysburg participated in, and benefitted from, Defendants' conspiracy to reduce supply and fix prices, as outlined herein. Though Hillandale Gettysburg does not hold its own UEP certification (it operates under Hillandale PA's certification), in order to satisfy Hillandale PA's certification obligations, Hillandale Gettysburg adopted UEP's "animal welfare" guidelines, including flock reduction requirements, which resulted in a 20% flock size reduction compared to its original flock size prior to Hillandale's acquisition of that facility, and conspired to reduce the supply of eggs as a result. Eggs packed by Hillandale Gettysburg are UEP certified. Hillandale Gettysburg submitted monthly compliance reports to UEP documenting compliance with UEP animal husbandry and/or UEP certified guidelines in at least 2002 and 2008, as required to maintain UEP certified status. The 2008 Compliance reports documented Hillandale-Gettysburg's compliance with the UEP guidelines from 2005 to 2008.

105.    Defendant Ohio Fresh Eggs, LLC ("Ohio Fresh") is an Ohio limited liability company, with its principal place of business located in Croton, Ohio. It owns egg production facilities in Ohio and is a member of the UEP.

106.     During the Class Period, 70% of the interest in Ohio Fresh was held by Hillandale Farms LLC, the sole member of which is Orland Bethel.  30% of the interest in Ohio Fresh was held by Eggs Manager LLC ("Eggs Manager"), the sole member of which is Don Hershey. Pursuant to agreements executed December 26, 2003, Hillandale PA purchased all eggs produced by Ohio Fresh and Eggs Manager managed and supervised the operations of Ohio Fresh.  Hillandale  PA and its affiliate and supplier Ohio Fresh, have been active participants in and profited from UEP's and its co-conspirators' efforts to reduce supply and artificially raise egg prices.  Ohio Fresh has explicitly agreed to the conspiracy alleged herein by adopting UEP Certified guidelines to reduce chick hatch (certification nos. 182 and 328) and has conspired to reduce its egg supply as a result. Ohio Fresh explicitly agreed to a May 2004 early flock disposal and coordinated molting schedule in order to reduce supply. Hillandale Farms and Ohio Fresh signed a commitment sheet in late 2004 to either reduce flock size or dispose of hens in as part of the conspiracy to reduce egg supply.

107.     During the Class Period, Hillandale Farms was a member and/or participated in egg exports for the purpose of reducing the domestic egg supply and raising prices, while sharing any financial losses incurred with other members.

**Midwest Poultry Services**

108.     Defendant Midwest Poultry Services, L.P. ("Midwest") is an Indiana limited partnership, with its offices and principal place of business located in Mentone, Indiana.  During the Class Period, Midwest indirectly sold shell eggs to indirect purchasers in the United States, including members of the Class.

109.     Midwest is a member of UEP and its employees have served in key executive positions and/or on committees of the organization on behalf of Midwest.  Midwest employees

have attended UEP meetings and promoted efforts to reduce supply and fix prices.  Midwest

Poultry employees have served on UEP's Executive Committee (First Vice Chairman), Shell

Egg Price Discovery Committee, Environmental Committee, and the Producer Committee for

Animal Welfare.  Midwest has been an active participant in and profited from UEP's and its co-

conspirators' efforts to reduce supply and fix prices, as shown herein.

### NuCal Foods

110.   Defendant NuCal Foods, Inc. ("NuCal Foods") is a California corporation, with

its offices and principal place of business located in Ripon, California.  During the Class Period,

NuCal Foods indirectly sold shell eggs to indirect purchasers in the United States, including

members of the Class.

111.   NuCal Foods is incorporated as an agricultural cooperative in California.  Egg

producers that are part of NuCal Foods include:  (a) Gemperle Enterprises, Inc. of Turlock,

California; (b) Sunrise Farms LLC of Petaluma, California; (c) J. S. West Milling Co. of

Modesto, California (whose president was Chairman of UEP in at least 2008 and 2009); and (d)

Valley Fresh Foods, Inc. of Turlock, California.

112.   NuCal Foods is one of the largest distributors of shell eggs in the Western United

States. NuCal Foods is a totally integrated egg producer from production through distribution

and processes approximately 7.5 million eggs per day.

113.   NuCal Foods products include: Becky, Cal Egg, California Finest, Chefs Best,

Clover Stornetta Farms, Crack A Smile Omega 3 & Lutein, Egg-Land's Best, Lucerne

(Safeway), Nulaid (white), Supermarket private label eggs, and Santa Rosa.

114.    NuCal Foods is a member of UEP and its employees have served in key executive

positions and/or on committees of the organization on behalf of NuCal Foods.  NuCal employees

have served on UEP's Shell Egg Price Discovery Committee, Shell Egg Marketing Committee,

Quality Assurance Committee, and United States Egg Marketers Export Committee (Vice

Chair).  NuCal Foods employees have attended UEP meetings and promoted efforts to reduce

supply and fix prices.  NuCal Foods has participated in and profited from UEP's and its co-

conspirators' efforts to reduce supply and fix prices, as outlined herein.

### R.W. Sauder

115.    Defendant R. W. Sauder, Inc. ("Sauder") is a Pennsylvania corporation, with its

offices and principal place of business located in Lititz, Pennsylvania.  During the Class Period,

Sauder indirectly sold shell eggs to indirect purchasers in the United States, including members

of the Class.

116.    Sauder sells the following products: Sauder's Gold Eggs, Sauder's Organic Eggs,

Sauder's  Deviled Egg Kit, Sauder's Hard Cooked Flavored Eggs (Red Beet, Mustard, &

Southwestern), Sauder's Hard Cooked Eggs, Sauder's Hard Cooked Eggs - 10 Egg Pouch,

Sauder's 8 pack Hard Cooked, Sauder's Twin 18 pack (3 doz.) and wholesale eggs and egg

products in various sizes and packages.

117.    Sauder is a member of UEP and its employees have served in key executive

positions and/or on committees of the organization on behalf of Sauder.  Sauder employees have

attended UEP meetings and promoted efforts to reduce supply and fix prices.  Sauder has

participated in and profited from UEP's and its co-conspirators' efforts to reduce supply and fix

prices, as outlined herein.

27

## Unidentified Co-Conspirators

118.    Various other persons, firms and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in the violations alleged herein, and aided, abetted and performed acts and made statements in furtherance of the conspiracy.

119.    The true names and capacities, whether individual, corporate, associate, or representative are unknown to Plaintiffs at this time.  Plaintiffs will amend this Complaint to allege the true names and capacities of additional co-conspirators as their identities become known through discovery.

120.    At all relevant times, cage producers, egg trade groups, egg farm software companies, and other shell egg producers and egg product manufacturers or other entities, referred to herein as "co-conspirators," as well as other various persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

121.    The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

## CLASS ACTION ALLEGATIONS

122.    Plaintiffs bring this action on their own behalves and as a class action on behalf of indirect purchasers – individuals and entities who did not purchase shell eggs directly from Defendants – nationwide pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following class:

**Indirect Purchaser Injunctive Class**

All individuals and entities in the Class Jurisdictions that purchased shell eggs, for their own use and not for resale, during the Class Period from January 1, 2000 through the present, and who intend to purchase shell eggs in the future.

123.     Plaintiffs also bring this action on their own behalves and as class actions on behalf of indirect purchasers – individuals and entities who did not purchase shell eggs directly from Defendants – in the Class Jurisdictions pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following classes (collectively the "Indirect Purchaser State Classes"):

**Arizona Indirect Purchaser Class**

All individuals and entities residing in Arizona that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**California Indirect Purchaser Class**

All individuals and entities residing in California that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**District of Columbia Indirect Purchaser Class**

All individuals and entities residing in the District of Columbia that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Florida Indirect Purchaser Class**

All individuals and entities residing in Florida that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Iowa Indirect Purchaser Class**

All individuals and entities residing in Iowa that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Kansas Indirect Purchaser Class**

All individuals and entities residing in Kansas that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Massachusetts Indirect Purchaser Class**

All individuals and entities residing in Massachusetts that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Michigan Indirect Purchaser Class**

All individuals and entities residing in Michigan that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Minnesota Indirect Purchaser Class**

All individuals and entities residing in Minnesota that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Mississippi Indirect Purchaser Class**

All individuals and entities residing in Mississippi that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Nebraska Indirect Purchaser Class**

All individuals and entities residing in Nebraska that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**Nevada Indirect Purchaser Class**

All individuals and entities residing in Nevada that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**New Mexico Indirect Purchaser Class**

All individuals and entities residing in New Mexico that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

**New York Indirect Purchaser Class**

All individuals and entities residing in New York that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### North Carolina Indirect Purchaser Class

All individuals and entities residing in North Carolina that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### North Dakota Indirect Purchaser Class

All individuals and entities residing in North Dakota that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### South Dakota Indirect Purchaser Class

All individuals and entities residing in South Dakota that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### Tennessee Indirect Purchaser Class

All individuals and entities residing in Tennessee that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### Utah Indirect Purchaser Class

All individuals and entities residing in Utah that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### Vermont Indirect Purchaser Class

All individuals and entities residing in Vermont that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### West Virginia Indirect Purchaser Class

All individuals and entities residing in West Virginia that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

### Wisconsin Indirect Purchaser Class

> All individuals and entities residing in Wisconsin that purchased shell eggs for their own use and not for resale, during the Class Period, and that intend to purchase shell eggs in the future.

124.    The Indirect Purchaser Injunctive Class and the Indirect Purchaser State Classes are collectively referred to as the "Class" or "Classes" throughout this Complaint.

125.    Excluded from the Classes are Defendants' subsidiaries and affiliates and all persons who purchased eggs directly from any Defendant or any other producer of eggs.  Also excluded from the Classes are purchases of "specialty" shell eggs or egg products such as "organic," "free-range," or "cage-free," and hatching eggs purchased by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

126.    Plaintiffs reserve the right to amend the definitions of the Classes when Plaintiffs move for class certification.

127.    Plaintiffs do not know the exact size of the Classes at the present time.  However, due to the nature of the trade and commerce involved, there are many thousands of Class members, geographically dispersed throughout the United States such that joinder is impracticable.

128.    Plaintiffs' claims are typical of the claims of the Classes, and Plaintiffs will fairly and adequately protect the interests of those Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class members.  Plaintiffs have retained competent counsel experienced in complex antitrust and consumer protection class action litigation.

129.    Class treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged in this Complaint.  Class treatment will permit the large number of Class members to prosecute their claims based on common legal and factual issues in

a single forum and proceeding and thus to pursue such claims efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

130.    There are questions of law and fact common to the Classes, including, but not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a contract, combination or conspiracy to raise, stabilize, fix and/or maintain prices of eggs sold in the United States, including the Class Jurisdictions;

(b)    The duration and extent of the contract, combination or conspiracy alleged herein;

(c)    Whether Defendants and their co-conspirators were participants in the contract, combination or conspiracy alleged herein;

(d)    Whether Defendants took steps to actively conceal the combination or conspiracy from Plaintiff and other Class members;

(e)    The effect of the contract, combination or conspiracy upon the prices of eggs sold by Defendants in the United States, including the Class Jurisdictions, during the Class Period;

(f)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and other members of the Classes;

(g)    Whether the alleged contract, combination or conspiracy violated Section 1 of the Sherman Act; and

(h)    What type of injunctive relief is appropriate.

131.    Additional questions of law and fact common to the Indirect Purchaser State Classes respectively, include, but are not limited to:

(a)    Whether the alleged contract, combination or conspiracy violated the antitrust, consumer protection and/or unfair trade statutes of the Class Jurisdictions; and

(b)    The appropriate measure of damages sustained by the Plaintiffs and other members of the Indirect Purchaser State Classes.

33

132.     Questions of law and fact common to members of the Classes predominate over any questions which may affect only individual members.

133.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

## THE ORGANIZATIONAL STRUCTURE AND ECONOMIC CONDITIONS WITHIN THE EGG INDUSTRY RENDER IT RIPE FOR COLLUSION

134.     A number of factors present in the egg industry increase the likelihood of collusion and the chances of members of the industry to succeed in collusive efforts.  These factors include:  (a) the prevalence of cross marketing arrangements that facilitate price communication between rivals; (b) relative concentration within the industry; and (c) high demand price inelasticity.

135.     Eggs are commonly designated for one of three purposes: immediate consumption (commonly referred to as "table eggs"), processing (commonly referred to as "breaker eggs"), or hatching.  Eggs are purchased by grocery stores in cartons for resale to the consuming public.  Eggs are also purchased by entities such as hotels, restaurants and other institutions for meal preparation.

136.     In 2007, retail and foodservice shell eggs represented a total of 68% of the egg market share, with retail shell eggs accounting for 59% and foodservice accounting for 9%.  There are only two major forms of delivery for shell eggs to the food at home retail egg market.  They are (a) direct purchases by food retailing firms such as supermarkets and convenience stores; and (b) first-level indirect purchases by food retailing firms.  Those retailing firms then sell the shell eggs to consumers such as Plaintiffs.

34

137.    Eggs sold to the food service industry represent a small but not insignificant share of total egg sales.  In restaurants such as Denny's, the use of shell eggs is essential to menu items and choices for preparation offered customers.

138.    Eggs are commodity items in that one producer's eggs may be easily substituted for those of another supplier.  Therefore, egg buyers make purchase decisions based largely, if not entirely, on price.

139.    Demand for eggs is highly inelastic.  This means that a change in the price of eggs does not materially affect the quantity of eggs that purchasers demand. As Defendant Cal-Maine stated in its August 4, 2011 Form 10-K (p. 21), "[t]he non-specialty shell egg market is characterized by an inelasticity of demand."  At the same time, Defendants recognized, as Cal-Maine stated in its August 4, 2011 Form 10-K (p. 21), "small increases in production or decreases in demand can have a large adverse effect on prices and vice versa."  In an August 8, 2011 prospectus filed with the SEC, Michael Foods similarly stated that "[i]n general, the pricing of eggs is affected by an inelasticity of supply and demand, often resulting in small changes in production or demand having a large effect on prices."

140.    The demand for eggs is fundamentally driven by consumers seeking whatever actual and perceived benefits eggs offer compared to other food choices.  Eggs play an important part in the overall U.S. food system, often serving as a source of protein or texture that adds little cost to other, more expensive processed products.  As a source of protein, for example, eggs are much cheaper than most or all meat and nut based protein alternatives.  Given that eggs are considered a staple and essential food item, their low cost, the lack of substitutes and short shelf life of eggs, many consumers pay little to no attention to egg prices and simply purchase the desired quantity.  As such, consumption of eggs by indirect purchasers is not very responsive to

changes in price.  An article from the Associated Press wire on September 3, 2003 noted that

"[e]ven with a jump in egg prices, grocery store managers said customers are continuing to buy

just as many eggs."  Egg producers are aware of the inelasticity of demand and have been able to

raise their prices without losing sales revenues.

141.    The egg industry has undergone substantial consolidation within the last few

years.  For example, in 1997, Defendant Michael Foods acquired Defendant Papetti's.  In 2001,

Moark acquired Cutler Egg Products, which gave Moark access to, among other things, a

patented process that extended the shelf life of refrigerated liquid egg product.

142.    A December 2008 Star Tribune article indicated that there are about 250

businesses that produce 95% of the nation's eggs, and that because of this consolidation there are

increasing barriers to entry.[7]  Similarly, the American Egg Board estimated in 2010 that there

were about 205 companies (accounting for 95% of the layer hens in the United States) with

flocks of 75,000 hens or more.  That number, which is down from 2,500 in 1987, reflects a clear

and accelerating trend of horizontal consolidation (and vertical integration) in the industry.

143.    Due to this consolidation, the egg industry consists largely of vertically integrated

producers who have a tremendous amount of control over every stage of the production of their

products.  This includes both backward integration in the feed, chick hatching, and pullet

growing sectors, and forward integration in the egg processing and marketing stages.  Most large

egg processors in the United States either own egg production facilities or have production

contracts with local egg producers.  Generally, integrated producers hatch all or most of their

---

[7] Richard Meryhew and Chris Serres, *Our Hungry Planet: Golden Eggs*, Star Tribune, Dec. 8, 2008.

layer stock.  The egg industry is distinctly different from many other animal industries in that

egg producers often own and manage nearly every aspect of their business (e.g., hatching/rearing

of birds, feeding, housing, husbandry, processing, packaging, and marketing of their product)

and meticulously oversee the entire process.

144.    The United States International Trade Commission ("ITC") has stated that"[o]ver

the past several years, the egg-processing industry has become increasingly vertically integrated.

Most of the large firms now either own egg production facilities or have production contracts

with local egg producers."  The ITC stated that, "[v]irtually all egg production is accounted for

by vertically integrated operations."  According to the ITC, the primary reasons for this include

the industry's "relatively short production cycle involving fast turnover and high production

volumes that lead to economies of size and the linkages between specialized, discrete production

stages (hatching, raising of hens, laying, processing, and marketing)."

145.    The largest egg producers also have numerous cross-marketing agreements,

private labeling agreements, and joint partnerships in various egg farms and processing plants.

As a result of these arrangements, Defendants exchange pricing information between themselves

that enables them to frequently communicate about price and monitor each others' price behavior

and output.

## DEFENDANTS' CONSPIRACY TO REDUCE OUTPUT

### A.    UEP and Other Trade Organizations Helped Formulate and Facilitate the Conspiracy

146.    Defendant UEP is the largest egg trade organization in the United States.  It was

formed in 1968 after a group of egg producers got together to discuss the "disastrous price cycles

of the egg industry."  The producers formed UEP to provide services to the egg industry, namely,

"price discovery, production and marketing information, unified industry leadership, [ ] a strong relationship with USDA, [ ] a Washington presence, [and] strong industry promotion efforts."

147.   Initially formed by five (5) regional co-ops, in 1998 UEP amended its charter to become a group composed of individual members farms and producers.

148.   According to its October 26, 2007 newsletter, "[i]t was announced during UEP's Annual Membership Meeting that the organization's membership was at the highest level ever with 198 members representing 270 million hens or 96% of the nation's total hens."

149.   UEP's bi-weekly newsletter "United Voices" is distributed to its members and is not available to the general public.  The newsletter served a prominent role in fostering communication and coordination of output restriction among members in a manner that was shielded from the general public.  Gene Gregory, UEP's President, acknowledged his efforts to coordinate egg industry output: "I've been writing 'United Voices' since 1992 and have on many occasions written about managing the supply side of our business and attempted to give UEP members warnings of future problems if the supply side is not watched very carefully." Defendant UEA is a nonprofit corporation trade association managed by UEP.  UEA is a nonprofit IRS 501(c)(6) organization existing and doing business under the laws of the District of Columbia, with its offices and principal place of business located in Alpharetta, Georgia. UEA was created by UEP to "serve those of the egg industry not qualified for United Egg Producers membership."  The UEA is made up of three divisions:  (i) Further Processors (egg breaking and further processing), (ii) Producers and Packers, and (iii) Allied Industries (products, services, and consulting).

150.   UEP manages UEA, and UEA is co-located with UEP at UEP's Alpharetta, Georgia address.  Both entities share the same website, and visitors to the website are asked to

"Contact United Egg."  Gene Gregory, the President and CEO of UEP, represents himself as the

President of UEA. Chad Gregory, Gene Gregory's son, the Senior Vice President of UEP,

represents himself as Vice President of UEA and also serves as the staff coordinator for the UEA

Allied Division and UEA Producers and Packers Division.  Chad and Gene Gregory, as well as

other common UEP/UEA staff, use the same e-mail address, with the domain unitedegg.com, for

all e-mail communications, and communicate using those addresses without indicating in which

capacity, as staff or UEA or UEP, they are communicating.  UEA and UEP share the same

government relations team and consultants to carry out the common policy objectives.  Members

of both organizations contribute to the same Political Action Committee.  UEA members provide

financial support to UEP in furtherance of the UEP Certified Program.  Both UEA and UEP

members receive the same publication, United Voices, used in furtherance of the conspiracy to

coordinate and communicate about the scheme to reduce egg supply.

151.     One of the other groups making up the UEP "alliance" is Defendant USEM, a

nonprofit corporation that negotiates egg export sales.  USEM describes itself as "[a] producer

cooperative established specifically for the purpose of exporting large quantities of U.S. Shell

Eggs."  In 2000, USEM merged with UEP and has since been managed by UEP as a "subsidiary"

or "division" of the organization.

**B.      Defendants' Agreement to Reduce the Domestic Supply of Eggs**

**1.      Defendants' Early Attempts at Industry Supply Restriction**

152.     Beginning as early as 2000 and continuing until the present time, the exact dates

being currently unknown to Plaintiffs, certain egg processors and producers entered into a

conspiracy in unreasonable restraint of trade and commerce in violation of the antitrust and

unfair competition laws.

39

153.    Certain egg producers engaged in a conspiracy between and among themselves and non-cooperatives members to fix, maintain and increase prices through, among other things, reducing the supply of eggs by jointly reducing flock size by early molting, by agreeing to increase layer cage sizes under the pretext of animal husbandry standards, and by engaging in mass exporting in order to reduce gross flock and egg harvest sizes.

154.    UEP's poultry research economist, Donald Bell, advocated slowing the rate of increase of the hatching egg flock, thus reducing production and increasing prices.  In 1994, Bell wrote:  "More hens, less income! . . . The U.S. has no way to control its flock size other than through the persuasive influence of trade associations such as UEP … Remember – in the egg industry, 'more means less' – it always has and it will always be so."[8]  The U.S. flock grew by only a fraction of a percent in 1995 and only 1% in 1996, compared with a 6% growth rate in 1991.  Therefore, prices rose in late 1995 and remained strong throughout 1996.[9]

155.    Recognizing the dramatic effect the quantity of eggs supplied to the market has on eggs price, as well as responding to concerns over low prices, UEP decided in 1999 to act as the conduit for an industry-wide supply control agreement.  According to an *Egg Industry* newsletter from November 1999, the following occurred at one of UEP's meetings:

> The Marketing Committee chaired by Dolph Baker, Cal-Maine
> Foods discussed and approved two extremely important issues.
> The current situation in the egg industry regarding price, as
> described by Chairman Baker, is in a crisis condition and the
> industry is hemorrhaging because of the low price.

---

[8] Donald Bell, *When More Means Less!* An Egg Economics Update, No. 145, Apr. 15, 1994.

[9] *Industry and Market Reports - Chicken Eggs*, Goliath (updated Apr. 1, 2010).

It was pointed out by both Chairman Baker and Ken Looper, who provided statistics for the meeting, that the industry is in a defensive mode regarding the price situation. It was suggested that action be taken immediately to go on the offense regarding this particular situation. Ken Looper provided numerous statistics showing the trends over the years regarding price vs. bird population.

At the present time there are in excess of 7 million hens over what the economic limit should be.

It was decided that a bold move should be made to immediately reduce the number of hens that are currently producing eggs. After considerable discussion, a motion was made and passed addressing the challenge in three phases:

- Immediate molt of 5% of the flock.
- Cut back 5% on flock inventory over the next 6-12 months.
- Develop a hatch reduction program.

********

Additionally UEP was encouraged to become more active in pushing the industry to accept responsibility of expansion and its educating the industry as to the ramifications of over-production. This relates to the increased production and building of new facilities that is now taking place.

156.    UEP's members also voted to reduce flock size, which included an agreement to maintain flocks at a 6% reduced level through July 1, 2000.  The December 4, 2000 UEP newsletter reported that the goal of a 6% reduction in chicks hatched "has been met."  As a result, "[i]mproved egg prices have come with these changes.  Large prices for the last five (5) months of 2000 are expected to average 10 cents per dozen over prices during the same period of 1999 ….  Through a cooperative effort, everyone has benefitted."

157.    A June 26, 2000 UEP newsletter discussed that starting in December 1999, there was a chick hatch reduction in comparison to the same month a year earlier.  UEP's Marketing Committee had recommended a 6% chick hatch reduction program for this year and that the first four months indicated that the recommendation was being followed and they were on target to

meet their goal.  Moreover, that newsletter discussed a consumer focus group in which consumers were asked what price they considered "too high" for eggs.  The response was that: "All would still buy eggs in the range of $2.00 to $3.00 per dozen."  An industry article regarding this agreement indicated that it "worked" and "the year-end flock was just 3.7 million hens larger than the year before and producers experienced a good holiday run and profitable year."

158.   In its August 7, 2000 newsletter, the UEP discussed supply and demand in the following context.

> During the first six (6) months of 2000 we hatched 6.7 million less pullet chicks than during the same period a year earlier.  During the same period we have disposed of 3.3 million more spent hens than during the same period a year earlier.
>
> Despite these positive adjustments, the industry continues to suffer through prices that are below the cost of production.  We see no reason why prices should be below the cost of production when considering the increasing market demand.

159.   A September 4, 2000 UEP newsletter discussed the UEP's Producer Committee's recommendation of a 10 year phase-in plan regarding animal welfare guidelines involving a cost increase to move to a larger space allowance per hen.  The newsletter stated, "[e]very producer is urged to determine their individual cost and pass this cost onto their customers."  (Emphasis in original).  The newsletter also discussed egg prices and noted that, "[i]t's hard to make a case for prices higher than last year for the rest of 2000 unless the rate of production increases is slowed significantly."

160.   In September 2000, the UEP noted a "need to reduce flock size" and stated that "[i]t appears that we may be only 4 million hens away from profitable prices.  A surplus of no more than 2% is creating severe economic conditions.  Would every producer consider ways in

which they could reduce their flock size by 2%?"  (Emphasis in original).  The newsletter also discussed that "on a good note" the chick hatch continued to decrease.

161.    The following month, the UEP noted that flock size had been reduced by 3.9 million hens since March 1, the chick hatch for August was 3% lower than the same month a year earlier and is 5% below 1999 levels for the eight months of the year.  In summary, "[b]ased upon all facts of increasing people population, increasing per capita consumption and a flock reduction, egg prices should be improving."

162.    A year-end December 18, 2000 UEP newsletter congratulated egg producers on their collusive behavior:  "financial disaster was predicted for 2000 as we forecast egg prices to be below the cost of production for all 12 months."  However, the newsletter continued that as a result of implementation of UEP's Marketing Committee's recommended action plan, "[e]gg producers responded by making adjustments.  By August these changes began to pay off with prices moving up to levels above the cost of production for most producers for the balance of the year.  The industry benefited with revenues of approximately $400 million over the forecast for the year."  (Emphasis in original).

### 2.    Defendants Continue to Collude to Reduce Supply, But Determine Concerted Long-Term Supply Reduction Solutions Are Required

163.    Coordinated efforts to improve egg prices continued in 2001.  An April 30, 2001 UEP newsletter indicated that the "best solution for improving the current domestic egg prices may be molting and slaughter .... To avoid a prolonged period of depressed prices, every producer is encouraged to look at the statistics to make the flock adjustments to maximize the returns for their farm."

164.    In its June 25, 2001 newsletter, UEP continued to urge its members to "manage your supply side of the business for both the short and long term."  Specifically, the newsletter urged:  "SHORT TERM:  Dispose of old flocks 4 weeks earlier than scheduled starting with week of June 18th and continuing for 16 weeks.-Molt hens at 62 weeks of age starting with week of June 18 and continuing for 16 weeks.  LONG TERM:  By any means possible; reduce the average age of your flock by 2 weeks and maintain this until the end of 2002."  (Emphasis in original).

165.    The plan was addressed again in UEP's September 3, 2001 newsletter, which provided that "it would be wise to seriously consider the following recommendation:  (a) dispose of flocks 4 weeks earlier than scheduled; (b) molt hens at 62 weeks of age; and (c) reduce the intended day old pullet chick placement by 5%."

166.    Moreover, there was a UEP Annual Meeting & Executive Conference held during the week of October 15, 2001 in Lake Las Vegas Resort in Henderson, Nevada.  An October 15, 2001 UEP newsletter stated that at the conference, "[t]he marketing committee will be reviewing supply demand projections with hopes that producers will see the merits in reducing the flock size to meet the market demand."

167.    During this conference attended by Defendants' representatives, Urner Barry was invited to discuss egg pricing and pricing systems.  Richard Chilson, of AgriSoft|CMC (f/k/a, Chilson Management Controls), a consultancy and IT management firm for the chicken, egg, turkey and swine industries, also advised Defendants and other egg producers and egg processors about pricing and marketing.  As reported in UEP'S September 3, 2001 newsletter, "[w]ith price discovery being such a critical component of the industry's profitability, a great deal of time will be devoted to this subject at UEP's Annual Meeting and Executive Conference being held

October 17 - 19 …. Bob Krouse and Dick Chilson will offer ideas and models for a cost plus program that has a proven record and potential for a percentage of your egg marketing."

168.    In late 2001 Defendants and co-conspirators attended a UEP meeting and agreed to an "emergency flock reduction" of 5%.  This "emergency plan ask[ed] producers to begin running 100,000-hen houses at 95% capacity by de-stocking one bird per cage until houses reached the 95% capacity goal."

### 3.    In Furtherance of their Conspiracy, Defendants Implement a Supply Reduction Scheme Under the Pretext of Improved Animal Husbandry

169.    One problem that typically confronts a cartel involved in reducing output as a method of increasing or maintaining prices is that each cartel member has the incentive to "cheat," that is to fail to abide by their commitments to reduce output.  By cheating, a cartel member may benefit from the supra-competitive prices obtained as a result of other member's adherence to output restriction, while at the same time, reaping the advantages of the higher prices through expanded sales of their own.  To successfully confront the incentive to cheat, a successful cartel will frequently create enforcement mechanisms – methods to ensure verification that each of the cartel members have abided by the output restrictions to which they have committed.

170.    Thus, at a UEP Board meeting on January 14-15, 2002, there were discussions regarding a space allowance phase-in-plan (which would have the effect of reducing output), a certification program, to identify farms that are meeting the guidelines, and, most importantly, an auditing procedure to verify farms as meeting guidelines and thereby being classified as "certified farms."  At the meeting, the Board approved a space allowance phase-in plan.

171.    The UEP adopted the "Animal Care Certified Program," including explicit output reduction practices as well as stringent audit requirements, to ensure that certified companies were implementing the output reduction practices.  Certification required a producer to  (a) meet cage space allowance on schedule as identified as "all day-old-chicks hatched after April 1, 2002 will be placed in the layer house based upon a house average of 56 square inches per hen,…;" (b) commit to meeting the guideline for beak trimming as each flock reaches the age at which time the trimming will be conducted, beginning on July 1, 2002; (c) commit to meeting the guidelines for molting as each flock reaches the age at which the molt will be induced, beginning on July 1, 2002; (d) commit to meeting the guidelines for handling and transportation for both pullets and spent hens as each flock reaches the age at which time this must occur, beginning on July 1, 2002; (e) agree to be audited annually by a 3rd party independent auditor to confirm that the company is meeting guidelines; (f) agree to provide UEP with a copy of the audit results upon the completion of each audit; and (g) recognize that passing the audit is necessary in order to maintain the certification status.

172.    Six regional meetings were held between February 18 and February 28, 2002, whose purpose was to establish the timing for meeting UEP's output reduction guidelines, which included the schedule to meet the space allowance phase-in plan and the certification program, the opportunity to become recognized as a "certified company," and an auditing procedure for verification of meeting the guidelines.  The March 11, 2002 UEP newsletter reported that 250 people attended these meetings, representing 102 companies and approximately 200 million hens.

173.    After these meetings, UEP communicated to its membership that multiple companies had begun to adopt the output restriction guidelines.  In its February 25, 2002

newsletter, UEP reported that:  "Early indications, from the meetings, confirm that the industry is ready to begin implementing animal welfare guidelines as early as chicks hatched in April 2002. Producers have begun filing applications to be recognized as 'Certified Companies.'"

174.    UEP tracked the adoption of the output restriction program and communicated the results to its members as the popularity of the program increased.  As of April 1, 2002, "100 companies representing the ownership of approximately 155 million layers had made a commitment to implement UEP's Animal Husbandry Guidelines."  As of May 6, 2002, 123 companies with ownership of 167 million hens filed for "Application of Certification" and agreed to implement the guidelines including increasing space allowance on 100% of their facilities.  As of July 1, 2002, it was 137 companies, representing 188 million layers.

175.    The following Defendants submitted applications for certification and agreed to implement the guidelines: as of March 22, 2002, Cal-Maine, Moark, Norco Ranch, Midwest, and Gemperle, a subsidiary of NuCal; as of March 25, 2002, Sunrise Farms, J.S. West Milling of Modesto, an egg producer subsidiary, NuCal, Valley Fresh Foods of Turlock, an egg producer subsidiary, NuCal, and Sauder; as of April 8, 2002, Rose Acre, National Food and  Hillandale Farms, and Ohio Fresh and Michael's Food thereafter.

176.    On April 21-23, 2002, Urner Barry hosted a *Back to Basics Conference* at Caesar's Palace in Las Vegas, Nevada that included specific presentations on the level of egg exportation, and continued promotion of the output restriction certification program.  The participants included all the major egg and egg product processors, egg industry trade associations, as well as other entities providing services to the egg industry participants.  During the conference, panel discussions included:

- "**Feeding the World through Poultry and Egg Exports**," by Jim Sumner, President of USA Poultry and Egg Export Council, Gil Eckhoff, President and CEO of Henningson Foods, and Eric Joiner, President and CEO of AJC International, Inc.

- Eckhoff said that exports were down 20% compared to 1997 levels.  Joiner said that exports are 20% of the total US output; but Sumner said that 3% of US output shell eggs are being exported.

- "**Cage Enhanced Production and its Affects [sic] on Selling Price, Production Costs and Consumption,**" moderator Al Pope, President of the UEP, whom encouraged all to join to increase cage sizes.  Speakers include Amy Barr, Marr Barr Communications (consulting firm), Bob Krouse, CEO Midwest Poultry Services, Barrie Wilcox, co-President of Wilcox Family Farms, Joe Fortin, Kofkoff Egg Farm and VP of Shell Eggs for Moark LLC.

Joe Fortin also discussed the fact that market quotes will be necessary to cover the costs for certified eggs, and enthusiastically endorsed the certification program along with other members of the Panel.

177.    On May 15-16, 2002 in Washington, D.C., representatives of Defendants Cal-Maine Midwest Poultry, NuCal, R.W. Sauder, and Moark attended a UEP Board of Directors meeting.  At that meeting, members discussed two ways of reducing egg supply.  It was noted that a crisis management plan had been communicated to the members calling for early molt and early hen disposal.  The then-current egg prices indicated to members of the UEP Board that the plan to reduce output was working.

178.    The companies continued to meet and discuss their output restriction agreement and its enforcement.  For instance, there was a July 9, 2002 meeting of "All Husbandry Certified Companies" and other interested egg producers in Chicago.  Producers representing ownership of approximately 170 million layers were in attendance and they discussed, among other things, record keeping and auditing of the program.

179.    As adoption of the output restriction program became more widespread, UEP's members imposed more rigorous record-keeping requirements to document their "compliance." On July 15, 2002, the UEP Board of Directors approved a motion which, as a condition for certification, required all companies participating in the program to file monthly compliance reports with the UEP.  As of that date, 140 egg producers had committed, representing 190 million laying hens or 69% of the nation's 275 million laying hens.

180.    As of September 9, 2002, 157 companies with approximately 200 million laying hens had filed applications for certification and thereby implementing UEP's Animal Husbandry Guidelines.  As of December 16, 2002, 296 companies had filed applications for certification.

181.    To ensure compliance with their supply management conspiracy, Defendants included strict auditing, compliance and oversight regimes in their proposal.  A November 2002 Egg Industry article covered a UEP meeting at which the program was discussed.  The article reported that: "There will be a monthly compliance report from certified producers to UEP which will be strictly adhered to.  There will be no tolerance on bird numbers in cages and houses …. It was emphasized that UEP needs to keep control of auditing the program …."  Thus, Defendants structured the UEP Certified Program to allow the cartel to carefully monitor member compliance.

182.    Defendants and their co-conspirators implemented their first major modification to the "Animal Care" program by adopting a 100% rule at its October 10-11, 2002 UEP Annual Board Meeting in Savannah, Georgia.  This 100% rule – which had no basis in animal husbandry – required that 100% of a producer's egg houses be maintained in accordance with the supply restriction guidelines in order for a company to sell "UEP Certified" eggs.  The auditing program discussed above, along with monthly reports from certified producers to the UEP, was designed

to police compliance with the industry's supply reduction scheme.  Among the attendees at the October 10-11 meetings were Bob Krouse of Midwest Poultry, and Fred Adams, Dolph Baker, Ken Looper and Steve Storm of Cal-Maine.

183.    Customer demand was not the driving force behind the "100% Rule."  As UEP explained in an internal January 30, 2003 memorandum summarizing the 100% Rule, "[m]any producers said they would only commit to the program if 100% of facilities were required." Describing what would happen if the 100% Rule were revoked.  UEP concluded that "[t]he program would then become a customer driven program and the guidelines would only be implemented for customers requiring it."

184.    At that Marketing Committee meeting in Georgia, Ken Looper, Vice Chairman of Defendant Cal-Maine Foods presented detailed statistics on bird numbers and pricing.  *Egg Industry* reported Looper asserted that, "[t]he egg industry must reduce the flock or the price of the product will remain at depressed levels."

185.    In order to exclude producers who did not commit to restricting supply by selling UEP Certified eggs, Defendants misleadingly promoted the UEP Certified Program to retailers and consumers nationwide as making better eggs.  On January 1, 2003, two major retailers, The Kroger Co. and Wal-Mart Stores, Inc., began *buying only U*EP Certified eggs.  Other retailers were expected to "follow the Kroger/Walmart lead in short time, making 100% compliance not only a program strength but necessary and practical."

186.    In 2002, Sparboe Farms, Inc., acknowledged  that the true purpose of the UEP Certification Program, as understood by the egg producer industry, was to reduce flock size: "[q]uite frankly, if UEP had quit playing games and called the program what it is - a voluntary

50

cutback of animal numbers, I think the whole matter would have played out long ago and enough companies would have gone along with it to help the market."

187.    On July 10, 2003, Sparboe drafted a letter to Al Pope and the UEP which expressed concerns about the "hidden agenda" of the UEP Certified Program: "[W]hat concerns us is the 'hidden agenda' of the Animal Welfare Program.  In short, we believe that if not carried forward properly a strong case could be made that the Animal Welfare Program is, in essence, a program being offered by our trade association and its members to reduce outputs in an effort to increase prices.  Naturally that strikes of price fixing to us and we have concerns about future claims of this sort being made against the association and/or its members."

### 4.    Defendants' Supply Suppression Scheme Is Successful

188.    The UEP Animal Welfare Committee held a special meeting in Las Vegas in February 2003 devoted to the 100% Rule.  Among the Defendant attendees at the meeting were Joe Fortin of Moark, Gene Gregory, Al Pope and Chad Gregory from UEP, Bob Krouse from Midwest Poultry, and representatives from Cal-Maine and Ohio Fresh Eggs.

189.    As Defendants' output reduction techniques led to improvement in egg prices, UEP also began to emphasize egg exportation as an additional method of increasing prices.  A May 1, 2003 UEP newsletter reported that producers obtained favorable results (i.e., higher prices) when they reduced supply and urged producers not to make up for lost production.  The UEP also reported that the "Animal Care" program was successfully reducing chick hatch, as desired and also emphasized exports.  The newsletter listed four major reasons for higher egg prices:  (1) UEP's Animal Husbandry Guidelines, which led to reduced chick hatch; (2) UEP's Animal Care Certification Program; (3) Exotic Newcastle Disease; and (4) exports taken by Defendant USEM.

51

190.     UEP's June 4, 2003 newsletter reported success from Defendants' efforts to reduce supply and export product.  Egg market improvements were attributed to "(1) reduced pullet hatch finally making an impact upon supplies; (2) USEM exports reducing supplies at critical times; and (3) the Animal Care Certified program beginning to work like many had projected."

191.     Importantly, UEP also began to emphasize that output reduction attributable to increased cage size should not be sacrificed by constructing additional capacity.  In July 2003, UEP warned producers not to increase supply by building new space for hens in a July 17, 2003 article titled, "Word of Caution," stating, "[a]s producers continue to reduce their layer house capacity to meet the UEP Animal Husbandry Guidelines, please don't make the mistake of building new facilities to replace the lost number of birds."

192.     In 2003, as per UEP's October 21, 2002 newsletter, the following representatives of Defendants were elected and appointed as UEP Board Members and Committee Chairmen: Joe Arias (Valley Fresh Foods/NuCal); Dolph Baker (Cal-Maine); Roger Deffner (National Food); Bob Krouse (Midwest Poultry); Ken Looper (Cal-Maine); Mark Oldenkamp (Valley Fresh Foods/NuCal); Paul Osborne (Moark, LLC); Marcus Rust (Rose Acre Farms); and Gary West (J.S. West Milling Co./NuCal).

193.     In an August 2003 editorial, Gene Gregory of UEP wrote that implementation of the space allowance guidelines had "the greatest impact" on lowering supply and increasing price.  Gregory credited Defendants' widespread agreement to the UEP Certified Program as having successfully caused significant flock reductions:

> The fact that approximately 200 companies have begun
> implementing the [UEPs Animal Husbandry Guidelines] . . ., has
> caused flock reduction and will continue to do so for some time.

52

These 200 companies own approximately 226 million hens or more than 82% of the total hens in the country.  The hatch reduction to meet the animal husbandry guidelines began with chicks hatched after April 2002.  Since this beginning date the hatch has been reduced by 14.7 million pullets in comparison to the same period year earlier.

194.    In September 2003, UEP told producers: "Don't Screw Up A Good Thing:  One sure way of having poorer egg prices is by increasing egg supplies through holding hens longer and keeping hens that should be disposed. Don't screw up a good thing!!"

195.    In the October 31, 2003 UEP newsletter, the outgoing chairman of the UEP credited the supply reduction program with stabilizing and raising prices for eggs, stating "*[o]ver the past year, slowly but surely, the egg supply began to moderate relative to strong demand through consistent reduction in chick hatch and, today we are enjoying market prices that are 60% higher than a year ago.*"  (Emphasis in original).

196.    In a November 12, 2003 an article entitled, "Egg Prices at Record Levels," the UEP touted the industry's efforts to reduce egg supply and raise prices:

> Never in my more than 30 years in the egg industry have I ever seen egg prices at the current levels.  We .... never anticipated that prices could sustain prices above $1.00 per dozen for any extended period.  Large prices for all regions east of the Rockies have now been above $1.00 since September 25th and appeared headed for even higher levels.
>
> Just a little over a year ago, Large prices were less than 70 cents per dozen and most of the industry was losing money.  Since then many things have contributed to a change in both the supply and demand side of the business.  Today, Large prices are more than $1.20 per dozen and Breaking Stock is being quoted over 80 cents per dozen.  While supply has been reduced slightly, it appears that demand may be far greater than anyone can even calculate at this time.  Consumers are still buying eggs and we have seen no resistance to price.
>
> As we enter the holiday season the demand will likely become more aggressive and prices will likely go even higher.  With the

> increasing demand, increasing population and the continued phase-
> in of cage space to meet the industry's welfare guidelines, prices
> are likely to continue at levels far above the past few years.

197.    In a December 11, 2003 article, a UEP member admitted that the UEP's

certification program was increasing egg prices:

> Numerous industry experts have pointed to the popularity of low-
> carbohydrate, high-protein diets, but Scott Kreher, a partner in
> Kreher's Farm Fresh Eggs in Clarence, believes **the spike is due
> more to diminished supply** than diet-fueled demand.

> "Eggs are primarily a non-elastic demand item. People always
> need eggs," said Kreher, whose egg farm supplies many local
> grocers. "What's really affecting egg prices are the houses
> chickens are being placed in."

> Specifically, new guidelines adopted by United Egg Producers, a
> national cooperative of egg producers to which Kreher's belongs,
> have gradually raised the amount of space it recommends each
> egg-laying chicken be given inside its housing — from the current
> industry average of 53 square- inches per bird to 61 square-inches
> in April of 2005.[10]

(Emphasis added).

198.    UEP's December 30, 2003 newsletter discussed the industry's record high prices

and warned producers to maintain restrictions on the supply of eggs.  The same newsletter

warned producers not to "abandon the program" and produce more eggs.

199.    In a December 13, 2003 article, Fred Adams, the CEO of Defendant Cal-Maine,

acknowledged that high prices were a result of industry efforts to hold down supplies:  "The

---

[10] Kevin Purdy, *Egg Prices Crack 20 Year Highs - Low Supply More to Blame Than Demand
From Dieters*, Buffalo News, Dec. 11, 2003.

supplies are adequate, but just barely …. The industry also says production is down as new guidelines … have reduced the number of hens allowed in a cage."[11]

200.    Gary Bethel, an officer of the Hillandale Farms entities, was quoted in a December 13, 2003 article discussing increased egg prices, in which he explained how Hillandale Farms had reduced supply:  "We've been taking a proactive approach towards allowing caged chickens more space …. If we had a house that held 100,000 chickens five years ago, it would house 80,000 now, and that means quite a reduction in total egg numbers."[12]

201.    Hillandale's subsidiaries also followed the agreements to reduce supply and comply with UEP flock reduction measures.  In June 2004, for example, Ohio Fresh confirmed its intention to follow UEP's Marketing Committee recommendation to dispose of spent hens by 108 weeks and reported that it would dispose of spent hens between 80 to 84 weeks.  Then later, in July 2005, an Ohio Fresh spokesperson, Harry Palmer, said he was told there were too many birds – 12 million to 15 million too many – producing eggs nationally, resulting in higher supply and lower prices.

202.    The President of Defendant R.W. Sauder, Paul Sauder, expressed similar sentiments: "The [UEP] program is one of several causes cited for the recent surge in egg prices, because it's helping to dampen supply short-term …. A key guideline, which concerns the amount of space per hen in a cage, will result in reducing the number of hens per cage from nine

---

[11] Dave L'Heureux, *High Egg Prices Beginning to Crack*, The State, Dec. 13, 2003.

[12] Mackenzie Carpenter, *Shoppers Shelling Out More for Egg Price Tied to Diet, Reduced Supply*, Pittsburgh-Post Gazette, Dec. 13, 2003.

to seven by April 2008.  Asked if that's a significant change, Sauder replied, 'Absolutely.  That's a 22 percent reduction in capacity.  That's huge.'"[13]

203.    On January 26, 2004, UEP's Shell Egg Marketing Committee met in Atlanta, Georgia.  The following Defendants were Marketing Committee members at this time, among others:  Dolph Baker (Cal-Maine); Joe Fortin (Moark); Bob Krouse (Midwest Poultry); Arnie Reibli (NuCal); Gary Bethel (Hillandale PA and Hillandale Gettysburg,); Ken Looper (Cal-Maine); Mark Oldenkamp (NuCal); Roger Deffner (National Food); Chuck Elste (NuCal); and Paul Osborn (Moark).

204.    Ken Looper of Cal-Maine discussed his January 16, 2004 "Supply Demand" comments.  In a paper he distributed to Committee members, Looper discussed hatch rates, cull rates, and flock inventories with many of Cal-Maine's competitors.  Looper also noted that exports had a significant impact on supply in November 2002 and March 2003.  Lastly, he concluded:  "One or two percent up or down in the supply of most any commodity produces a big difference in price.  Price is the primary tool that helps balance supply and demand.  We continue to be in uncharted waters and 2004 should be a very interesting year."

205.    At this meeting, Gene Gregory also gave a presentation prepared by Don Bell entitled "Supply/Demand Challenges - When Will We Ever Learn?"  Upon information and belief, this presentation urged producers to put industry concerns over individual concerns and to understand that collective action was the key to decreasing supply and maintaining increased prices.

---

[13] Tim Mekeel, *Improving conditions for egg-laying hens*, Lancaster New Era, Dec. 15, 2003.

### 5. 2004 Brings Increased Hatching So Defendants Conspire to Suppress Supply

206.    A March 2004 UEP newsletter cautioned about increased hatching and warned the industry against expansion:  "Can we resist the temptation to expand too quickly?  UEP and USEM can only do so much to help the industry be profitable."

207.    In a May 6th, 2004 email to Bob Krouse (Midwest Poultry), Chuck Elste (NuCal), Arnie Reibli (NuCal), Mark Oldenkamp (NuCal), Dolph Baker, (Cal-Maine), Ken Looper (Cal-Maine), Joe Fortin (Moark), Paul Osborn (Moark), and Roger Deffner (National Food) (among others), Gene Gregory of UEP asked the industry to participate in a new supply restriction scheme:

> **The animal care certified program gave us a good roadmap for the future like no supply demand program could have.**
> While it was never intended as a supply demand program it can be a good way to manage our business if we just return to the old days of flock disposal and molt schedules.
>
> . . .
>
> During the Marketing Committee meeting in D.C. next week, **I'm asking you to give serious consideration to ideas and recommendations that could adjust the supply side and return the** industry to reasonably good profitable times.

208.    On May 10, 2004, UEP's Marketing Committee met in Washington, D.C. with representatives from Defendants Cal-Maine, NuCal, the Hillandale Farms entities, Midwest Poultry, National Food and Moark attending.  There, UEP introduced additional measures to assure egg producers that the industry would work together to adhere to its certification program and reductions to the supply of eggs.

209.    The Marketing Committee also approved a new coordinated supply management scheme requiring all UEP members molt flocks at 62 weeks and dispose of spent hens by 108

weeks and that this plan of action take place immediately and carry through until Aug. 1, 2004.

In order to prevent cheating and monitor compliance, UEP members were asked to sign and

return an "intention form" to UEP that would manifest their agreement to engage in the output

reduction proposal.

210.    After the 2004 meeting in Washington, UEP used its position as a trade

association to disseminate the recommendations of the Marketing Committee while extolling the

industry's participation.  In its May 19, 2004 newsletter, UEP noted:

> Egg production companies owning 177 million laying hens (63%
> of the industry) were in attendance at UEP's Spring Legislative
> Meeting in Washington, D.C. These companies along with
> attendees from UEA Allied and UEA Further Processor members
> participated in committee meetings, [and] board meeting.... The
> Government Relation, Environment, Marketing, Food Safety,
> Animal Welfare, and Egg PAC Committees met prior to the Board
> meeting and each brought forward motions for the Board to act
> upon…**The Marketing Committee recommended that the
> industry molt all flocks at 62 weeks and dispose of spent hens
> by 108 weeks and that this plan of action take place
> immediately and carry through until August 1, 2004.**

(Emphasis added).

211.    In the same newsletter, Gene Gregory stated again that the "Animal Care

Certified Program" was a "roadmap" for the industry supply reduction campaign and increased

industry profits:  "[t]he Animal Care Certified program is the only roadmap the industry has ever

had for future planning.  If you stay true to the program and manage it to meet the market

demand, it can provide the industry with prolonged profits."

212.    Gregory also urged Defendants and their co-conspirators throughout the industry

to stay "committed" to the program and encouraged the industry in the same newsletter:

[A]re you committed to making a change?  Are you committed to staying the course even when egg prices begin to show some strength?  Whether you sell eggs in the shell or as egg products, **if you are in the production business, you need to be committed to doing whatever is necessary to have prices above the cost of production….**

We believe that the industry only needs to make a few minor adjustments but this needs to happen now.  If we do this over the next few weeks then the future looks very bright for a very profitable industry during the second half of this year.  **Are you committed or do you want to let someone else do the job and simply reap the benefits?**

(Emphasis added).

213.    Defendants Cal-Maine, Moark and Norco declared their commitment to the Marketing Committee's output reduction scheme.  National Food and Ohio Fresh also agreed to similar plans.

214.    The UEP June 2, 2004 newsletter exhorted producers to continue to act in accordance with the industry's supply reduction scheme:

With the rapid declining egg prices, it became very clear to most egg producers that supply was exceeding demand and that quick actions were needed to bring supply and demand more into balance.  UEP's Marketing Committee recommended a voluntary program calling for flocks to be molted at 62 weeks of age and spent hens disposed of by 108 weeks of age and that this plan of action take place immediately and carry through until August 1, 2004.

215.    In mid-June 2004, UEP continued to urge producers to examine their costs and reduce flock size:  "Are your costs the same as they were a year ago?  The bottom line, are you still making a profit on your older flocks or any flocks?"

216.    UEP enforced the UEP Certified Guidelines through mandatory, non-public compliance audits.  UEP controlled the auditing program.  These mandatory audits – the results

of which Defendants kept from the general public – allowed UEP to ensure that all Defendants were following the agreed-upon supply controls. By way of example, according to a January 5, 2005 internal UEP newsletter, the 2004 audits included 474 facilities and included 2,388 separate layer houses.

217.    Defendants also were aware of each other's operations, including the size and location of their facilities, the size of their flocks, and their production. It was very difficult for any producer to keep its operations secret from other producers.

218.    In a July 2004 newsletter, UEP acknowledged that the UEP Certified Program was lowering supply: "[t]wo sources, one of which is the animal welfare audits, have confirmed to UEP that animal care certified companies have in fact reduced their hen numbers in existing houses."  The newsletter further urged "smart companies" to agree to further reductions: "[a] smart businessman finds ways to minimize his losses during unprofitable periods and ways to maximize his profits during profitable periods.  Who will be the companies that make the smart decisions in the coming months?"

219.    In the summer of 2004, UEP representatives met with 99 egg production companies in a number of meetings.  UEP encouraged "producers to look at management practices that could quickly adjust the oversupply problem."  Holding hens to older ages, backfilling cages to replace mortality, and placing new or molted hens into old depreciated houses were practices cited that added to the nation's flock size.  As discussed in UEP's September 2, 2004 newsletter, UEP Chairman, Roger Deffner, spoke at these meetings and stated, "the industry has an opportunity, like never before, to turn things around very quickly if they would simply consider changing those management practices."

220.   Gene Gregory wrote an editorial entitled, "Comparison of Past Year's Supply Demand," in UEP's September 15, 2004 newsletter.  In the editorial, Gregory discussed producers' available options, encouraging them to reduce supply and increase prices:

> I believe we need to find ways to give producers some encouragement of what could happen if we simply remove the older hens, sell hens at younger ages, do not backfill cages, do not continue to use old depreciated houses or to molt at younger ages.
>
> *******
>
> Our supply increases and flock size increase has come about because we simply have not disposed of hens.  We can turn this around very quickly if we simply reduce the age of our flocks or follow any of the above recommendations.

**6.      Defendants Coordinate Immediate Supply Reduction Scheme at Egg Economic Summit in November 2004**

221.   In Fall 2004, UEP and UEA held a joint Annual Board Meeting in New Orleans, listing UEP's new 2004-05 Board as including the following Defendants (among others):  Roger Deffner (National Food)  - Chairman; Dolph Baker (Cal-Maine) - 1st Vice Chairman; Gary West (NuCal) - 2nd Vice Chairman; Bob Krouse (Midwest Poultry Services) - Treasurer; Joe Fortin (Moark) - Secretary; Marcus Rust (Rose Acre); Terry Baker (Michael Foods); Steven Gemperle (NuCal); and Ken Looper (Cal-Maine).

222.   At the Annual Board Meeting, Defendants on the UEP Board approved the following coordinated supply management proposals:  "[h]ens currently scheduled for disposal between December 2004 and July 2005 must be disposed of four (4) weeks early or reduce your flock size by 5%."  UEP Chairman Roger Deffner (National Food) and Marketing Committee Chair Dolph Baker (Cal-Maine) scheduled an "Economic Summit" in Atlanta Georgia to evaluate supply and demand further.

223.   *Feedstuffs* also reported on the Annual Board Meeting regarding the Defendants' plans to reduce supply through early culling of hens and flock reductions.  UEP's Gene Gregory was quoted as stating, "We don't need a plan to reduce the hatch.  We don't need a moratorium on new buildings.  We need a plan to get rid of old hens."  (Emphasis in original).

224.   Gene Gregory published an editorial in the November 11, 2004 UEP newsletter entitled, "What Do The Numbers Tell Us?" as encouragement for the explicit supply reduction scheme UEP expected producers to implement at the upcoming Economic Summit:

> We can change both the direction of the supply problems and our attitudes about egg prices by making adjustments to our flock size.
>
> *******
>
> One of the continual problems with oversupply is that everyone believes they are not the problem.  (Emphasis added). If you ask any producer if they have contributed to the oversupply problem they will answer no.  They however can point to someone else that is the problem.  So if everyone believes they are not the problem then we will never make the necessary corrections.  What has to happen is for enough producers to recognize that they have to become **part of the solution.**  (Emphasis in original). Losing money while blaming someone else is not and has never been good business.  Being able to look beyond your own farm gate and be part of the solution has always paid off.

225.   Defendants and their co-conspirators then held an "Egg Industry Economic Summit" on November 16, 2004 in Atlanta, Georgia under UEP's sponsorship.  The Summit was held to coordinate an immediate supply reduction scheme and to obtain written commitment on a price-fixing scheme from co-conspirators.

226.   UEP's November 23, 2004 newsletter reported on the success of the "Economic Summit," noting that producers responsible for approximately 200 million hens attended.  Attendees at the Economic Summit included representatives from Defendants Cal-Maine, Moark, Ohio Fresh Eggs, Hillandale Farms of PA, and Midwest Poultry Services.  Defendants

asked producers to make their intentions known to other co-conspirators and explicitly agree in writing to commit to one of two options:  "Option # 1 To dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 four (4) weeks earlier than previously scheduled;" or "Option # 2 to reduce their December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."  (Emphasis in original).

227.    Defendants Cal-Maine Foods, Moark, Ohio Fresh Eggs, Hillandale Farms of PA, Midwest Poultry Services, and National Food signed on to the written agreement to follow one of the two output reduction options.

228.    The following Defendants were appointed to the Board of Directors for 2005: Roger Deffner (National Food) - Chair; Dolph Baker (Cal-Maine) - 1st Vice Chair; Gary West (J.S. West Milling/NuCal) - 2nd Vice Chair; Bob Krouse (MidWest Poultry) - Treasurer; and Marcus Rust (Rose Acre).  The following Defendants were appointed to chair UEP Committees for 2005:  Bob Krouse (Midwest Poultry) - Finance; Dolph Baker (Cal-Maine) - Price Discovery; Gary West (NuCal) - EggPAC; Mark Oldenkamp (NuCal) - Animal Welfare; and Paul Sauder (R.W. Sauder) - Public Relations.

229.    On December 3, 2004, UEP sent a follow-up letter to members that had not yet signed on to the supply reduction program:

> Either at the recently held "Egg Industry Economic" or in a letter since the summit, we offered you one of two options for being a part of the solution to reduce the nation's flock size.
>
> While producers with approximately 115 million hens have signed on to one or both of the options, we are disappointed that we have not heard from you.
>
> Just in case you missed it, we are enclosing the two options again. If you feel you cannot participate in this program, would you at least drop me a note via the fax (770) 360-7058 or email me at

gene@unitedegg.com.  Please tell me why you do not support the program.

Better yet, fill one of the forms out and return it to me.

230.     This letter had two attachments entitled, "Intention to Meet Market Demands," which included a box for a company to check indicating agreement with the scheme outlined at the "economic summit," which were substantially similar to those discussed at the summit. Option #1 stated, "It is my company's intention to dispose of hens that are currently scheduled for disposal between January 1 and April 30, 2005 - four (4) weeks earlier than previously scheduled."  Option #2 stated, "It is my company's intention to reduce my own December 1, 2004 flock size by 5% between the dates of January 1 through April 30, 2005."

231.     UEP's December 10, 2004 newsletter acknowledged that more and more companies were agreeing to the industry's supply restrictions, including Sunrise Farms and J.S. West Milling – now part of Defendant NuCal.  The companies who had already explicitly signed on to this aspect of the output reduction scheme represented approximately 122 million laying hens – or 42% of domestic production.

232.     UEP's Board of Directors met in Atlanta, Georgia on January 25, 2005.  The minutes reflect discussions about the price fixing proposal and other attempts to reduce supply. Defendant attendees and participants at this meeting included the following UEP Board Members:  Gary West (NuCal); Steve Gemperle (NuCal); Roger Deffner (Chairman of UEP and Vice President of National Food); Bob Krouse (Midwest Poultry); Joe Fortin (Moark); Dolph Baker (Cal-Maine); Ken Looper (Cal-Maine); Terry Baker (Michael Foods); Marcus Rust (Rose Acre); Danny Linville (Zephyr Egg - now Cal-Maine); and Mark Oldenkamp (NuCal) amount others.  The following representatives of Defendants were listed as members and guests at this meeting:  Fred Adams (Cal-Maine); Tim Bebee (Michael Foods); Jill Benson (NuCal); Toby

64

Catherman (Michael Foods); Dave Cisneros (Moark); Chuck Elste (NuCal); Greg Hinton (Rose

Acre); K. Hendrix (Rose Acre); Jerry Kil (Moark); Dan Knutson (Moark and Norco Ranch);

Dan Meagher (Moark); Paul Osborne (Moark); Tom Silva (NuCal); and Wayne Winslow

(NuCal).

233.    According to the minutes of January 25, 2005 meeting, UEP Chairman Deffner

(National Food) stated the following:

> It was just a year ago that we met in this very hotel and were so
> full of optimism.  All indicators were that we could sustain $1.00
> plus eggs for an extended period and the price structures for the
> next 18 months.  (We took care of that.)  The market came full
> circle with prices from $1.35 to 59 cents.  We don't have to accept
> low prices and **we can have a good 2005 if we just make a few
> changes and work together**.  We sell ourselves short by spending
> a great deal of time talking the negatives.  Year-end flock size was
> actually less than forecast but still a problem.  **The Economic
> Summit highlighted some of the problems and some of you
> have already reacted in a positive manner.  We need more of
> you to participate in a positive change**.

234.    During the Marketing Committee Report at this meeting, a motion was made and

seconded that extended through Labor Day the "intentions program" whereby members agreed to

dispose of their flocks 4 weeks earlier than previously scheduled and/or reduce flock size by 5%.

That motion carried with no recorded dissents.

235.    At this point, the Defendants had either explicitly or implicitly agreed to the

industry's supply reduction scheme through affirmative commitments or through their

participation in meetings discussing the supply reduction program and their actions in supporting

the scheme.  Defendants that signed "intention forms" agreeing to the supply reduction/price-

fixing agreement included:  Cal-Maine Foods; Moark; Ohio Fresh Eggs; Hillandale Farms of

PA; Midwest Poultry Services; National Food; and NuCal (through Sunrise Farms and J.S. West

Milling).  Defendants present at the January 2005 Board and Committee meetings that expanded the supply reduction/price-fixing agreement included Michael Foods and Rose Acre.

236.    By February 2005, nearly every Defendant either agreed to reduce flock sizes by 5% or dispose of hens, or attended meetings where this price-fixing scheme was agreed upon. UEP announced that the supply restrictions would apply to all UEP members (including all Defendant UEP members herein) and not just apply to the 45 companies that had signed commitment sheets in response to the Economic Summit.  The Marketing Committee Recommendations section of the newsletter stated in pertinent part:  "It is good business to reduce your flock size during the low demand period and a period beginning Easter week and carry through Labor Day may be appropriate.  The above motion [that current intentions program for flocks to be disposed of 4 weeks earlier than previously scheduled and/or flock size reduction by 5% to be extended through Labor Day] does not apply to only the companies having signed the 'intention form,' but to all UEP members."

237.    In August 2005, in its Fourth Quarter results, Defendant Cal-Maine discussed egg industry cooperation on reducing flock sizes and resultant rising prices:

> In March 2005, the egg industry took action to reduce the size of the laying flocks …. U.S. Department of Agriculture statistics indicate a reduced flock size that is now more in line with the current demand [for eggs].

238.    In the March 17, 2005 UEP newsletter, Gregory encouraged egg producers to continue flock reduction in order to increase prices:  "I believe that there are producers at this moment selling and/or molting hens early.  If this is occurring then we will see better prices after Easter than before.  If you could make more money producing at 90-95% of capacity, or if you could minimize losses, or if you could turn a loss into a profit, wouldn't you do it?  I believe that

smart businesses have and will figure this out very quickly.  If not, then we have a Recipe For Disaster."  (Emphasis in original).

239.    UEP's April 14, 2005 newsletter communicated further requests for supply reductions:

> Reducing the flock size by just a few million hens will have a major impact upon supply as well as our attitude and confidence in the market.
>
> ******
>
> If every egg producer simply reduced their flock size by as little as 3%, we could have a far better egg market in the coming months of 2005 than is currently projected.
>
> ******
>
> Reduced number of hens and an increased number of eggs broken may help improve economic conditions and improve our attitudes.
>
> *******

240.    The May 2, 2005 UEP newsletter noted that the size of hen flocks decreased in the amount of 3.9 million hens during the month of March.

241.    The UEP's Producer Committee for Animal Welfare met on April 19, 2005 in Chicago, Illinois.  Defendants present at the meeting included:  Tim Bebee (Michael Foods); Joe Fortin (Moark); Ky Hendrix (Rose Acre); Bob Krouse (Midwest Poultry); Mark Oldenkamp (NuCal Foods); Paul Sauder (R.W. Sauder); and Steve Storm (Cal-Maine) among others.  At the meeting Defendants discussed the marketing of UEP certified eggs by non-certified producers. Mark Oldenkamp sponsored two motions which both passed.  One motion provided that, "[i]n order to protect the integrity of the ACC program and logo and in view of the difficulty in preventing the commingling of certified eggs with non-certified eggs and to treat all egg producers equally it is hereby moved that no new licenses to market Animal Care Certified eggs

will be issued or renewed to producers who are not ACC certified." The motion carried with 19

yes votes and 8 no's. Oldenkamp's second motion provided that, "a license to market ACC eggs

may be issued to shell egg processors and further egg processors who do not own or operate egg

production facilities." The motion carried 26 yes votes and 2 no votes.

242. UEP's May 12, 2005 newsletter, like many before it, exhorted egg producers to

continue cooperating with the industry's supply reduction scheme.

> With current egg prices, it is likely in every egg producer's best
> interest to reduce their flock size. One company has provided UEP
> with a detailed list of their flock reduction over the past year. They
> reported their flock to be 2.9 million hens less today than it was in
> April 2004. They are doing their part to bring supply in line with
> demand and hopefully other companies are also paying close
> attention to their market needs.

243. UEP's June 9, 2005 newsletter characterized the fact that less eggs were being

sent to retail markets as "good news," but characterized an increased chick hatch as "bad news."

It stated that "UEP has issued an ***Economic Alert*** to the members in which some options for

correcting the supply demand conditions were offered." (Emphasis in original).

244. Cal-Maine's August 2005 Fourth Quarter results noted that prices were rising as a

result of the egg industry's agreement to reduce flocks and egg supply:

> **"Beginning in March 2005, the egg industry has taken action to
> reduce the size of the laying flocks and the supply of eggs,"
> added Adams.** At midsummer, U.S.D.A. statistics indicated a
> reduced flock size that is now more in line with the current demand
> for eggs.
>
> **As a result, egg prices have recovered nicely over the last six or
> seven weeks. We believe the egg industry will continue to
> adjust supply to be more in line with demand, which should
> allow the industry to return to profitability.**

(Emphasis added).

245.   The following representatives of Defendants were elected to the Board of Directors at UEP's annual meeting on October 6, 2005:  Dolph Baker (Cal-Maine) - Chairman; Gary West ((J.S. West Milling Co./NuCal) - First Vice Chairman; Bob Krouse (Midwest Poultry) - Second Vice Chairman; Joe Fortin (formerly of Moark) - Treasurer; and Steve Gemperle (Gemperle Enterprises, Inc./NuCal).

246.   To buttress the UEP certification program and the scheme to coordinate joint reductions of supply and maintain prices, Defendants and their co-conspirators started circulating a UEP Production Planning Calendar in late 2005.  In the November 2005 newsletter, UEP announced that it would print and circulate a 2006 Production Planning Calendar very soon.  It stated, "its real purpose is to give producer/marketers a planning guide for the replacement of flocks or molting so that they may be able to maximize their annual returns."  This Calendar continues to be used by Defendants and co-conspirators to coordinate their supply reduction activities: in UEP's February 2008 newsletter, Defendants proposed that producers reduce supply after Easter utilizing the coordinated "Production Planning Calendar" and noted that "Egg producers should strive to manage their supply to meet the market demand for both the lower and higher demand periods.  Producers are encouraged to quickly review their individual company history, and, if needed, adjust their egg production to meet the expected demand between the weeks of Easter and Labor Day."

247.   In January and February of 2006, Defendants and their co-conspirators, with and through the UEP, proposed another hen reduction plan.  A UEP February 2006 newsletter stated: "Every egg producer reduces their hen population by 2% no later than March 10, from their average hen number for 2005, and maintains that 2% reduction all year long in 2006.  So simple, so painless, so rewarding – why wouldn't it work?"

248.    In April 2006 UEP issued a "Supply/Demand Alert" highlighting its Marketing Committee's new action plan to jointly reduce supply:  "(1) Dispose of flocks six (6) weeks earlier than previously scheduled;" and "(2) Molt flocks six (6) weeks earlier than previously scheduled."  (Emphasis in original).  The May 2006 newsletter then reported the success of the February 2% plan and April flock disposal plan: "[t]he size of the nation's layer flock declined by little more than 3 million hens in April.  This is good news!!"  (Emphasis added).

249.    A July 2007 article in *Investor's Business Daily* discussed Defendant Cal-Maine's efforts to reduce supply and its impact on prices:  "'Cal-Maine has cut back its own egg supply 1% to 2%.  That's more than one might think.  One or two percent on the supply side affects prices 20% or 30%,' Adams (Cal-Maine CEO) said."

250.    In a February 2007 interview with *Egg Industry*, Bill Rehm, Daybreak Foods Inc.'s President, attributed high egg prices to the "'United Egg Producer's animal welfare program that most shell egg producers participate in.'"

251.    A May 2007 article in *Egg Industry* entitled, "Egg Executives Discuss Top Industry Concerns," contained an interview with Dolph Baker, President of Cal-Maine, who argued for further coordinated supply restrictions:

> For Cal-Maine Foods President, Dolph Baker, **the No. 1 challenge facing the egg industry is the need for supply management during low demand periods** to take some of the volatility and loss cycles out of the business.  This is particularly important, he says, if per capita egg consumption is leveling off.  "**We can do a better job,**" he says, "**with molting and emptying houses** . . . . [and] with costs where they are, we'll do a better job with supply this summer."

(Emphasis added).

252.    Chad Gregory, UEP's senior vice president, stated that high egg prices were the result of the egg industry's conspiracy to reduce output: "Producers are being really responsible, keeping supply in check[.] So this could last a while."

253.    Moreover, information continued to come to light that contradicted reasonable economic justifications for the historic run up of egg prices.  On May 1, 2008, U.S. Department of Agriculture Chief Economist Joseph Glauber testimony before Congress demonstrated that high egg prices were caused by producers' decision to reduce supply, not by high feed costs:  "In 2007, table-egg producers cut production.  The decision to reduce production likely took place prior to the recent run-up in feed costs."

254.    Although many egg producers have blamed high egg prices on rising fuel or feed costs, Fred Adams, founder and chairman of Defendant Cal-Maine Foods, recently conceded that reducing the supply of eggs had driven price increases through the distribution chain:

> While it makes it easier to communicate that when feed costs are up egg prices should be up — that's really not the case.  **Eggs are up because the supply and demand is in good balance and it's reflecting higher prices on its own**.  If the supply of eggs remains in check, or favorable to the demand side, I think we will have minimum problems in raising prices. We have had no reaction from the consumer or the chain store operators as to price.

255.    A December 2008 Star Tribune article identified the industry's collective actions as the cause of high prices:

> [T]he most significant influence on pricing may well have been the industry's own doing.
>
> Over the past two years, after a several-year slump, egg farmers have cut back on the size of their hen flocks at a pace not seen in more than 20 years.
>
> The result: Fewer hens means fewer eggs, which in turn means higher prices.

> In dozens of interviews, poultry experts point to the industry's
> move in 2002 to give hens more room as an underlying cause of
> higher prices.
>
> The United Egg Producers (UEP), the industry's leading trade
> group, adopted guidelines for hens to have at least 67 square inches
> of space.
>
> Many producers used cages of just 50 to 60 square inches.
>
> *******
>
> [B]y 2007 more than 80 percent of the United States egg supply
> was operating under the new guidelines.  Many producers reduced
> the size of their flocks to comply.[14]

256.     During the Class Period, it was well-known in the egg industry that the largest

egg producers and processors entered into an agreement to increase cage sizes.  Although

Defendants purportedly did so under the guise of the adoption of animal husbandry standards,

the real motive in reducing total flock sizes was the intended goal of supply reduction and price

increases.[15]  Defendant Cal-Maine Foods' Fred Adams described in June 2008 the impact of the

UEP Certified campaign and boasted about the success of the industry-wide agreement:

> [B]asically the agreement was that we would give the chickens
> more space in the laying cages. . . . The net effect of that was
> reducing the number of laying hens in existing facilities by some
> 20%. [ ] This has been a very successful program . . . .

---

[14] Richard Meryhew and Chris Serres, *Our Hungry Planet: Golden Eggs*, Star Tribune, Dec. 8, 2008.

[15] Sam Krouse and Bob Krouse, *Infrastructure's Role In Keeping Egg Prices High,* Egg Industry Vol. 113 No. 2, Feb. 2008.

### 7.   Defendants Implemented An Export Scheme to Reduce Domestic Supply and Fix, Maintain and/or Stabilize Prices

257.   Defendants realized that additional actions that would lower egg supply would have the effect of further supporting egg prices.  Thus, beginning in 2000 and continuing to September 2006, Defendant USEM and its members (many of the same Defendants here) began a concerted export campaign, whose purpose was to reduce domestic egg supplies and increase domestic egg prices.  The USEM program aimed to have its members export eggs even when the export prices were lower than domestic egg prices because Defendants had determined that the benefits of raising domestic U.S. prices through reduced supply would offset, or more than offset, the lower prices received for exported eggs.

258.   For instance, an October 2001 UEP newsletter reported that the purpose of USEM's coordinated export efforts was to provide improvements in domestic prices.  The article cited a small export which, by way of example, moved the market up for domestic egg prices between 2 to 9 cents per dozen.

259.   A letter from Larry Seger, then USEM's Chairman, in the November 12, 2001 UEP newsletter stated that, "[t]he main purpose of exports is to strengthen the current market. Strengthening a weak market or raising a steady market is what exports are mean to accomplish in the short run.  Exporting is a critical tool in managing the profitability of our industry."

260.   As part of the export program, USEM members that did not provide eggs for the export would agree to "repay" or "reimburse" the USEM members that provided eggs for the export in order to "share" any losses incurred when exporting eggs at below-market prices.  The loss reimbursed by USEM members was the price differential between the export price and the price that could have otherwise been obtained domestically.

261.    For example, on March 20, 2003, Gene Gregory sent a memo to all USEM

members (including, at the time, Defendants Cal-Maine, Moark, Hillandale, and Sauder)

discussing a new member that was going to help "share in the loss" incurred from a recent export

and thanked members for the contribution exports made to better egg prices:

> **Good news!!!  During the latest export we gained a sizeable**
> **new member.  This member agreed to share in the loss.**  For
> those of you that requested UEP to purchase your case
> commitment, you will find a credit deduction on your invoice for
> the amount contributed by the new member.  For those of you that
> packed and supplied your own case commitment, you will be sent
> a separate check for your share of the amount contributed by the
> new member.  There is no future export on the horizon at this time
> and therefore it may be best to consider reducing our flock size
> after the Easter Market.  Thank you for the contribution you made
> to better egg prices over the past few months.

262.    Representatives of Defendants Cal-Maine, Hillandale Farms, National Food,

NuCal, and Rose Acre attended the UEP Board of Directors Legislative Meeting on May 12-15

2003 in Washington, D.C.  Gary Bethel (Hillandale Farms); Roger Deffner (National Food);

Chuck Elste (NuCal); Ky Hendrix (Rose Acre); Ken Looper (Cal-Maine); Mark Oldenkamp

(NuCal); and Gary West (NuCal) attended.  The minutes of that meeting reflect that the

Chairman of the Marketing Committee (Dolph Baker, Cal-Maine) "closed his comments by

saying, 'Everyone knows the market effect of the last two export.  Need every producer to be a

USEM member.  Need more help pulling the wagon instead of riding.'"

263.    In 2006, UEP and its co-conspirators continued to conspire to keep egg prices

high in the U.S. by causing eggs to be exported abroad.  The corresponding reduction in the

domestic supply of eggs and artificial inflation of egg prices were more than enough to recoup

any losses, even though the eggs were exported to markets where prices for eggs were lower than

in the U.S. and where shipping costs were substantial.

264.    From their earlier experiences of diverting supply into exports, Defendants knew that that exporting as little as 1 or 2% of United States produced eggs was enough to have a significant impact on domestic egg prices.  As the *Wall Street Journal* reported on September 23, 2008:

> The industry group [UEP] itself credited the campaign with helping to boost domestic egg prices, which rose more than 40% in the next year.  Gene Gregory, the Georgia-based group's executive director, said export orders amounted to less than 2% of industry output. "But it is amazing how one or two percent can have an effect on the rest of your domestic price," he said.

265.    From the fall of 2006 until at least spring of 2008, a sufficient number of eggs were exported pursuant to Defendants' supply reduction scheme to further drive egg prices above free market levels.  By agreeing to export eggs that would have been bound for U.S. sales, Defendants jointly manipulated the supply of eggs through the USEM in order to tighten domestic supply and drive up the price of eggs throughout the country.

266.    A January 4, 2007 UEP newsletter stated that Defendant USEM's members again voted overwhelmingly to support a sizable export for delivery between January 8th and February 2nd 2007 and with the delivery of such a large volume export, "it is expected that prices will exceed UEP's forecast.  It is also believed that the announcement of USEM working on a sizable export may have helped hold prices at higher levels the last week of December."  The article noted that "USEM now has the membership support from producers owning approximately 139 million layers."

267.    *Egg Industry* magazine noted the effect that the export program was having on domestic U.S. egg prices.  A June 2007 issue article entitled, "Supply Management: the Key to Profits," reported that, "[e]arly [in] 2007, an export order obtained by U.S. Egg Marketers of

246,000 cases (less than about one-third day's egg supply) helped increase egg prices up to 50

cents or more." Defendant Cal-Maine acknowledged that during the third quarter of fiscal 2007,

". . . the egg industry, through a marketing cooperative that included Cal-Maine, put together an

export sale to Europe, the United Kingdom and Japan that required approximately 16 million

dozen eggs. This *significant drawdown* of inventory put upward pressure on egg prices and

resulted in more favorable market conditions for the quarter."[16]

268.    A January 2008 UEP newsletter reported in its review of 2007 Egg Prices that one

of the reasons for increased domestic U.S. prices in 2007 was the "Timely exports of shell eggs

by United States Egg Marketers."

## C.    UEP is Not Entitled to the Limited Protections of the Capper-Volstead Act

269.    The type of pre-production supply control programs, such as sham animal

husbandry guidelines adopted here, are not protected by the Capper-Volstead Act as reflected by

the plain language of the statute, its legislative history, as well as by statements and actions of

the United States Department of Justice's Antitrust Division, the Federal Trade Commission, and

the United States Department of Agriculture. The legislative history of the Capper Volstead Act

and similar state statutes indicate that their two principal purposes are to: (1) provide farmers

with countervailing power to bargain effectively with processors and middlemen; and (2) enable

farmers to eliminate middlemen all together. Pre-production restraints, such as Defendants' joint

supply control program, are unrelated to the furtherance of these goals and are, therefore, outside

the scope of the exemption.

---

[16] *Cal-Maine Foods 3Q Profit Swells*, AFX International Focus, Apr. 2, 2001.

270.    Furthermore, there was no legitimate business justification for the collective supply control scheme and conspiracy among Defendants.  Indeed, UEP's counsel opined that, under Capper-Volstead compliance rules, some of UEP's practices were "questionable." Moreover, the UEP Certified Guidelines did not, nor were they intended to, serve any legitimate or lawful purpose under the Capper-Volstead Act, such as marketing Defendants' eggs. Defendants' conspiracy enabled Defendants to artificially increase and maintain prices for eggs at artificially high levels.

271.    Membership in the UEP is open to non-egg producers.  UEP's web site states that membership is open to "owners of breeder flocks, hatcheries, and started pullets, as well as contract egg producers . . . ."

272.    UEP's "Membership Agreement" also states that "membership is available to any person, firm or partnership (entity) engaged in the production of table eggs, breeder flocks, started pullets, or who is a contract egg producer on premises owned or operated by such entity." UEP does not ask what percentage of a prospective members' business is related to egg production or how much of a producer's egg business is related to contract production.

273.    As such, some members of UEP are not egg producers at all.  For example, M&C Anderson Pullets, a UEP board member, raises pullets for egg farms and does not produce or sell eggs.

274.    UEP's annual meetings are held in conjunction with the UEA's meetings and members of both organizations attend joint meetings.[17]   UEP's supply restriction scheme was discussed and implemented at these meetings with members of UEP and UEA.

275.    For example, in its April 2004 newsletter, UEP noted:  "UEP's Annual Meeting will be held in New Orleans on October 20-22.  UEA will schedule a time during the October dates to hold their annual membership meeting.  We hope the [UEA] Allied members will continue to attend UEP's Spring Legislative meeting because this meeting is so critically important to our customers (egg producers)."

276.    UEA members attended the Spring meetings.  In a May 2004 newsletter, UEP noted:

> Egg production companies owning 177 million laying hens (63% of the industry) were in attendance at UEP's Spring Legislative Meeting in Washington, D.C.  These companies along with attendees from UEA Allied and UEA Further Processor members participated in committee meetings, [and] board meeting. . . . The Government Relation, Environment, Marketing, Food Safety, Animal Welfare, and Egg PAC Committees met prior to the Board meeting and each brought forward motions for the Board to act upon. . . . The Marketing Committee recommended that the industry molt all flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until August 1, 2004.

277.    The UEP Executive Committee was also invited to the UEA Further Processor's meeting on April 27, 2004.

---

[17] John Todd, "On the Road: UEP Debates Supply Management at Annual Meeting," *Egg Industry,* (Jan. 2007) ("The United Egg Association, Allied (UEA) Annual Meeting was held in conjunction with the UEP meeting in San Antonio. UEA now has 61 member companies. Representatives from these companies also attended the UEP Committee and Board meetings.").

278.     Many UEA members and executives are also members of the UEP and USEM. For example, in 2004, Toby Catherman of Michael Foods was elected chairman of UEA and Dan Meagher of Moark was elected vice chairman.  Michael Foods and Moark were also members of UEP and their employees held positions in the UEP, as well.

279.     In October 2005, Dan Meagher of Moark was elected chairman of UEA, and Greg Hinton of Rose Acre Farms was elected vice-chairman.  Rose Acre Farms was a member of UEP and its employees held positions in the UEP.

280.     Members of Defendant companies have held positions on the board of USEM and UEP.  For example, Fred R. Adams Jr., CEO and director of Defendant Cal-Maine since its formation in 1969 and Chairman of the Board of Directors since 1982, is a director and past chairman of USEM.  Richard K. Looper, President and COO of Cal-Maine from 1983 to 1997 and current Vice Chairman of Cal-Maine's Board of Directors, is a past chairman of USEM.  Both have been on UEP's Board of Directors.

281.     In October 2006, the following Defendants' employees were elected as officers of USEM:  vice-chairman - Chuck Else (NuCal); secretary - Roger Deffner (National Food); and Executive/Export Committee Members were: Dolph Baker (Cal-Maine Foods); Roger Deffner (National Food); Jerry Kil (Moark); and Chuck Elste (NuCal).  These individuals have also been involved with the Board of the UEP.

282.     The top executives of the UEP, as well as the UEA and the USEM, are not egg producers.

283.     Gene Gregory is the president and chief executive officer of UEP.  Gregory began his tenure with UEP in 1981 when he was appointed chairman of the animal welfare committee

and began developing an industry code of management practices and a producer certification program.  Gregory became Member Services Director for the Midwest region the following year. Gregory is also president of the UEA and the USEM and treasurer of the United Egg Association Political Action Committee.

284.    Gene Gregory's son, Chad Gregory, is senior vice president of UEP and the UEA.

285.    Neither Gene nor Chad Gregory are egg producers.

286.    UEP is governed by a board of three to fifty directors who are elected annually. Some, but not all, members of UEP's board of directors are affiliated with companies that produce eggs.  Some UEP member companies are merely processors or distributors and are not engaged in egg production as producers.

287.    In December 2004, UEP chairman Roger Deffner of National Food Corp. made appointments of the following Defendants' employees as committee Chairman to serve for 2004: Executive - Roger Deffner (NFC); Finance - Bob Krouse (Midwest Poultry Services); and Price Discovery & Marketing - Dolph Baker (Cal-Maine).  In making the appointments, Deffner said, "UEP is a producer organization that truly develops policy from input of individual producers up through committee meetings and ultimately through the Board of Directors.  Therefore, our members serving on UEP committees have an important role to play in the decision-making of all UEP policies."

288.    On September 30, 2008, UEP listed the following Defendants as "Certified Companies and Licensed Marketers" that had signed on to the UEP Certified scheme:  Cal-Maine Foods (certification no. 103); Michael Foods Egg Products Co. (certification no. 345 and license agreement 509); Midwest Poultry Services (certification no. 102); Moark Productions

(certification no. 116); National Food Corp. (certification no. 184); Norco Ranch (certification no. 133); NuCal Foods (license agreement 504) and each co-operative member (Gemperle Enterprises - certification no. 148, Sunrise Farms - certificate no. 135, Valley Fresh Foods - certificate no. 136, and J. S. West Milling - certificate no. 131); Rose Acre Farms (certification no. 198); and Sauder, R.W., Inc. (certification no. 121); Hillandale Farms (certification no. 200); Hillandale Farms of Pa. (certification no. 182); Ohio Fresh Eggs (certification no. 328).

289.    In June 2007, the following Defendants' employees were noted as UEP Committee Chairmen: Executive - Dolph Baker (Cal-Maine); Price Discovery - Dolph Baker (Cal-Maine); Marketing - Roger Deffner (NFC); Public Relations - Paul Sauder (Sauder); Long Range Planning - Roger Deffner (NFC).

290.    There is substantial overlap in leadership personnel between UEP and the UEA. Gene Gregory is president of all three entities (UEP, UEA, and USEM) and has directed, participated in, and authorized UEP's unlawful conduct as detailed herein.  This participation includes Gregory's attendance at numerous meetings with UEP, UEA and USEM and other participants in the conspiracy.  Further, Gregory has written numerous articles in "United Voices" urging egg industry output restrictions that are the focus of this Complaint.

291.    UEP and UEA share staff and UEA has provided financial support for many of UEP's projects, including those related to the output restriction scheme.

292.    For example, an October 2004 UEP newsletter reported on a joint UEP and UEA meeting:

> UEA-Allied members continue to be extremely supportive of UEP
> and of assistance to the egg industry.  The members held their
> annual membership meeting in New Orleans and voted to set aside
> $20,000.00 that may be used by UEP for animal welfare research

projects.  Additionally the organization approved a budget, which will provide $40,000.00 for UEPs management.

293.    UEP's October 2005 newsletter noted:  "UEA-Allied held their annual membership meeting on October 6th with 20 of the 57 member companies being represented. The association approved a budget which will provide approximately $70,000.00 support for UEP programs and management."

294.    UEP sometimes purports to be a "federated Capper-Volstead Agriculture Cooperative," yet it does not engage in any of the functions enumerated under the Capper-Volstead Act. UEP does not grow, harvest, ship, sell, bargain or compete for the sale of eggs or any agricultural products.

295.    UEP merely serves as an egg trade group and a forum for a price fixing agreement and a supply management scheme.  These activities fall outside the legitimate objectives of an agricultural marketing co-op. UEP often refers to itself publicly as a "trade organization" or "trade group" and not a "cooperative."

296.    Moreover, even if UEP were a proper Capper Volstead co-operative, its activities are still subject to the limited protections of the Act.  In a 1985 publication titled, "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that, "if an association of producers . . . restricts' members' agricultural output . . . [or] colludes with third parties to fix prices . . . [or] conspires with third parties to fix prices . . . [or] combines with other firms to substantially lessen competition . . ." then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

297.    Many UEP members are vertically integrated from the point of production through final marketing and sale.  These vertically integrated firms mill their own feed, hatch

chicks, rear pullets, confine hens, produce and/or purchase eggs, wash, candle, grade, store, market, transport and distribute their own eggs.

298.   UEP members are competitors rather than small farmers banding together to cut out the corporate middlemen who would otherwise market their eggs.  UEP members do not associate to collectively process, handle and market their products and UEP does not provide those services.

299.   UEP does not wash, handle, grade, break, pasteurize, package, store, transport, or distribute its members' eggs.

300.   UEP does not negotiate contracts of sale for its members.

301.   While USEM helps arrange the export sales of eggs for its members in furtherance of the conspiracy, it does not take direct ownership of the eggs but merely helps to facilitate these transactions.

302.   UEP has declared that it did not sell eggs to consumers.

303.   UEP does not "market" its members' products. Rather, as set forth in their promotional materials, publications, web sites and numerous public statements, UEP was founded for the express purpose of providing "services to the industry" and created the United National Advertising Division of the Council of Better Business Bureaus Case Report, "In the Matter of United Egg Producers, Inc. Animal Care Certified Eggs," Case #4108 (Nov. 6, 2003)

at 4.  Egg "Alliance" to "provide service to and represent the interests of all sectors of the egg industry[.]"[18]

304.   An August 2006 UEP newsletter noted a licensing agreement that would allow non-certified companies to license eggs purchased from certified companies.  The newsletter also acknowledged that not all UEP members own layers and produce eggs (a requirement for Capper-Volstead cooperatives):

> The Animal Welfare Committee approved the use of a Non-Certified License Agreement for UEP and UEA member companies that do not own layers as well as for UEP/UEA egg production companies having made a commitment to meet the 100% rule while in the process of implementing the cage space requirements of UEP's hatch schedule. The use of the "License Agreement" will allow Non-Certified companies to purchase eggs from "UEP Certified" companies for the marketing of "Certified" eggs. The Animal Welfare Committee also approved an additional option for companies to become recognized as a "UEP Certified" company. The new policy will allow any new company now making an "Application for Certification" to come on to the program by meeting UEP's currently required hatch schedule for cage space rather than depopulating existing flocks.

305.   In implementing the output restriction scheme discussed herein, UEP has conspired with non-member co-conspirators.  For example, UEP has conspired with UEA and its non-producer members and USEM to implement its unlawful supply control campaign at numerous industry meetings.

---

[18]United Egg Producers, Member Booklet, at 1, 7 ("Concerned with the disastrous price cycles of the egg industry and with no unified voice to address industry issues, a group of producers met in the fall of 1968 to discuss the formation of an organization that could provide the needed industry leadership. Their vision was to establish an organization that could provide the following services to the industry . . . . In order to provide service to and represent the interests of all sectors of the egg industry, UEP created the United Egg Association and all its divisions.")

306.     It was only after the filing of this action that UEP finally prohibited UEA and non-egg producers from participating in the discussions and meetings about the price-fixing scheme and supply restrictions.  In UEP's January 20, 2009 newsletter, UEP discussed the upcoming UEP Board and Committee meetings and noted that some meetings would be closed to non UEP members:

> It should be noted that the Animal Welfare and Marketing Committees will be closed to **UEP members only.**  Additionally, the Board of Directors meeting will include a time period at the close of the meeting, for **UEP Board members only.**  UEP meetings have always been open to everyone and therefore we apologize that circumstances now warrant some meetings or portions of some meetings to be closed to selected members.  We hope [UEA] allied members and others will be understanding.

307.     UEP has also conspired with non-member egg producers and has encouraged and allowed them to join the UEP certified program and reduce their own egg supplies.  For example, in November 2004, UEP discussed the assessments that producers would be required to pay for participation in the UEP certified program as $200 per company and 0.0004 cent per hen for UEP members and $400 per company and 0.002 cent per hen for non-UEP members.[19]

308.     UEP has also conspired with non-member cage manufacturers and other entities involved in egg production that are not agricultural producers.  Cage manufacturer representatives and other non-member co-conspirators were often invited to UEP meetings where supply management issues were discussed to provide input and support for the UEP certified supply restriction scheme.  Moreover, cage manufacturers held numerous leadership positions in the UEA.

---

[19]Rod Smith, *UEP approves assessments to continue funding, promoting husbandry standards*, Feedstuffs, Nov. 1, 2004.

309.    A number of UEP members market eggs produced under production contracts with growers who possess their own egg-production facilities.  Thus, some of these members (e.g., Michael Foods) do not produce a majority of the eggs they market, but act mostly as conduits for other producers' eggs.

310.    In February of 2007, UEP newsletter discussed the fact that the organization considered forming a "supply-managed cooperative" that might have some protection under the Capper-Volstead Act (an implicit, if not explicit acknowledgement, that the present incarnation of UEP did not have such protections).  The newsletter stated:

> Despite recent extremely good egg prices, the egg industry has a
> history of being unable to control supply and thereby suffering
> though difficult periods of severe financial losses.  With this in
> mind, the idea of a supply-managed cooperative . . . was referred to
> UEP's Long Range Planning Committee for consideration.

311.    As such, UEP is not entitled to the limited protections found in the Capper-Volstead Act for at least the following reasons:

(a)    UEP is not a legitimate co-operative and does not market, process or sell eggs - it is a trade group designed to protect the interests of the egg industry;

(b)    UEP consists mainly of vertically integrated members who market, process and sell their own eggs;

(c)    UEP has members that are not involved in agricultural egg production;

(d)    UEP has many members that process other producers' eggs or who supply eggs to members on a contract basis;

(e)    UEP conspired with UEA and its members - a trade group explicitly made up of non-Capper-Volstead protected entities;

(f)    UEP includes UEA members who are non-Capper-Volstead protected entities;

(g)    UEP conspired with non-member egg producers and other entities to assist in reducing egg supply and fixing prices;

(h)    UEP retaliated against producers that left the price-fixing scheme; and

(i)    UEP's supply restriction and price-fixing efforts fall outside of the limited purposes of the Capper-Volstead Act.

**D.    Defendants Intentionally Misled Consumers that the "Animal Care Certified Program" was a Humane Standard of Care for Poultry When it Was Merely A Pretext for Supply Reduction**

**1.    The Primary Purpose of the "Animal Care Certified Program" was Output Reduction**

312.    While coordinated molts and hen disposals had successfully raised egg prices periodically, Defendants concluded a more reliable method to reduce overall chick hatch was essential for the long-term success of their supply reduction scheme.  During the Class Period, the largest egg producers and processors entered into an agreement to increase cage sizes, coordinate molting and reduce flock sizes, all under the guise of the "Animal Care Certified Program."  The real motive in implementing the program was to reduce supply and accomplish increases in both prices and profits.[20]

313.    The pretextual nature of the Animal Care Certified Program was underscored in the work of UEP's retained poultry economist, Donald Bell.  In his April 2002 report prepared under the "sponsorship" of the UEP, entitled "Reducing Cage Density - It's Effect on Egg Prices and Flock Performance," Bell concluded that keeping production down could result in increases in industry income of between $2.51 and $3.55 billion.

314.    Defendants implemented Donald Bell's supply restriction guidelines as a long-term output reduction program that eventually was known as the "Animal Care Certified Program" (or "ACC") and later known as the "UEP Certified Program."  In particular, Defendants determined that: 100% of their production had to comply with the UEP Certification

---

[20] Sam Krouse and Bob Krouse, *Infrastructure's Role In Keeping Egg Prices High,* Egg Industry Vol. 113 No. 2, Feb. 2008.

Program (even if customers did not want Certified eggs) and that producers could not "backfill" – or make up for the hens lost as a result of increased cage space. These key aspects of the cage space output restrictions conspiracy were unconnected to any perceived animal husbandry benefits that might result from increased cage space.

### 2. Defendants Made Misleading Statements Regarding The Origin of the "Animal Care Certified Program"

315. In 2007 UEP's president, Gene Gregory, testified before a House Subcommittee in regard to a "scientific advisory committee" and its role in creating UEP's certification program:

> [T]o ensure its objectivity the committee did not include any producers as members. The scientific committee recommended significant changes in egg production practices. UEP accepted the recommendations and today about 85% of our industry has implemented them. [ ] As the years have gone by, the scientific committee has made a number of additional recommendations. UEP has never rejected a recommendation by the committee - a remarkable track record that reflects our industry's determination to follow the best available science. [ ] The committee's recommendations became what is now know as the UEP Certified Program.

316. However, this purported "independent scientific advisory committee," which was simply a guise to mislead consumers and lend the program an air of legitimacy, did not write the "animal husbandry" guidelines. Instead, the UEP's "Animal Welfare" Committee, which is comprised entirely of egg producers, authored the guidelines based on the economic analysis performed by Donald Bell, not based on any concern whatsoever for humane treatment of poultry.

**3.     UEP Suspends Its Use of the "Animal Care Certified
Program" After the FTC and State Attorneys Generals
Challenge the Misleading Nature of the Program**

317.    The Federal Trade Commission ("FTC") investigated UEP's use of the name

"Animal Care Certified" (the original name for the Certification Program) as being potentially

misleading.  On September 30, 2005, the FTC announced that the UEP had agreed that said logo

could no longer be used on egg cartons.

318.    Later, in 2006, UEP was forced to pay $100,000 to settle claims brought by

sixteen state Attorneys General,[21] who asserted that UEP's "Animal Care" claims were

misleading."[22]  In the Assurance of Voluntary Compliance ("AVC") entered into by the sixteen

States and Gene Gregory on behalf of UEP on September 26, 2006 in connection with the

settlement, the States alleged that UEP violated their consumer protection laws by misleading or

confusing consumers in its promotion of standards in conjunction with the use of the Animal

Care Certified logo, as to

(a)     the level of care given to hens under the standards;

(b)     the nature of the auditing process used to ensure compliance with the
standards;

---

[21] The multi-state investigation, led by the District of Columbia Office of the Attorney General,
included Oregon and the states of Alaska, California, Connecticut, Delaware, Hawaii, Illinois,
Iowa, Maine, Massachusetts, Nevada, New Jersey, Ohio, Tennessee, Vermont and West
Virginia. (Sept. 21, 2006 Oregon Dept. of Justice News Release).

[22] State of Alaska Dept. of Law News Release:  "United Egg Producers Run "A-Fowl" of
Consumer Protection Laws…" (Sept. 21, 2006).  For example, Alaska State Attorney General
David W. Marquez stated: "A certification program must not be promoted in a way that misleads
the consumers."  Oregon Attorney General Hardy Myers stated, "[c]onsumer educators in
Oregon have always encouraged shoppers not only to read labels and packaging carefully but to
look for that extra certification that would indicate a better product …. Oregonians have relied on
the plain meaning of a trade association logo to certify good conduct but UEP let them down."

(c)     the role of the scientific advisory committee in developing the standards;

(d)     the comparative benefits of eggs produced by farmers implementing the standards; and

(e)     the comparative quality of animal care for hens in UEP-certified facilities.

319.    UEP's agreement, pursuant to the AVC, included that in its promotion and marketing of standards to consumers, it would not misrepresent, directly or by implication, the level or type of care given to hens under the standards; the role of any scientific advisory committee in devising the standards ultimately adopted by UEP; or the comparative quality of animal care for hens in UEP certified facilities.

320.    UEP abandoned the pretense that its "Animal Care Certified Program" had any humane animal husbandry benefits.  Yet, Defendants continued to adhere to the program for its output reduction benefits.

## FRAUDULENT CONCEALMENT

321.    Throughout the Class Period, Defendants and their co-conspirators engaged in a successful, illegal price-fixing and supply control conspiracy that was self-concealing.

322.    On information and belief, the Defendants understood that the reduction in supply of eggs that they were orchestrating would increase the wholesale and retail prices of eggs, including shell eggs bought by indirect purchasers.  The Defendants thus realized that they would have to come up with a cover story to explain the reduced supply and increased prices of shell eggs.  Defendants then proceeded to use the animal husbandry standards set up under the certification program as the public explanation for the overall program of supply reduction they were undertaking, even though many of the Defendants' actions – such as reducing the size of their flocks – were not a necessary part of the animal husbandry standards, since farmers could

just purchaser more cages.  Indeed, the ability of producers to circumvent the purpose of the standards through increasing supply was one of the primary motivations for the 100% rule.

323.    Thus, Defendants effectively, affirmatively, and fraudulently mislead the public and concealed the reality of their unlawful combination, conspiracy, and acts in furtherance thereof from Plaintiffs and the members of the Classes.  Defendants further effectuated this program of misinformation by touting their certification program as scientifically based and providing other explanations for increases in the price of shell eggs, such as the Atkins diet, the price of feed and other factors.

324.    Although Plaintiffs exercised due diligence throughout the Class Period, they could not have discovered Defendants' unlawful scheme and conspiracy at an earlier date because of Defendants' effective, affirmative, and fraudulent actions and concealment of the actual nature of their activities.  Defendants' wrongful conduct was carried out in part through means and methods that were designed and intended to avoid detection, and which, combined with their affirmative statements designed to mislead the public, in fact, successfully precluded detection.

325.    To hide their conspiratorial conduct and their goal of raising prices through concerted behavior, Defendants exploited the fact that, at the time of the conspiracy's formation, animal welfare concerns had been raised about the egg industry's practices.  In particular, animal activists were campaigning to ban caged egg production and to encourage purchasers to only buy cage-free products.  Defendants seized on these concerns as an opportunity to hide their true objectives and conduct from egg purchasers under the false pretense of an "animal welfare" program.  Defendants intended that this false pretense would be credible to egg purchasers and

fool the public, causing them to relax their guard, and Defendants' use of this pretense had its intended effect.

326.    As discussed above, one major component of Defendants' conspiracy was their effort to reduce flock populations and chick hatching through the implementation of UEP's "Animal Care Certified" program (later renamed "UEP Certified").  This program was falsely promoted to egg purchasers and the public as an "animal welfare" measure as part of Defendants' effort to ensure that egg purchasers (and others in the industry, including industry trade groups such as Food Marketers Institute and the National Council of Chain Restaurants) would support the Program and buy eggs bearing the UEP Certified seal.

327.    Parties who sold eggs explicitly "certified" under UEPs sham animal welfare program put the following logo on every carton of eggs sold to consumers or had the logo put on cartons of eggs to be sold to consumers.  During the period 2003-2006, the animal care logo was on more than 80% of the eggs sold to consumers.

328.    The animal care logo, copied below, at least implicitly represented to consumers that Defendants were engaged in a program that provided for extensive, humane treatment of layer hens.



329.    The use of this type of logo implies that the animals are being treated humanely – or at least in a manner that the average consumer would consider humane.  The use of this logo

thus misdirected consumer attention from the reduction in supply caused by Defendants' actions to the marginal animal care utility of the new industry standards.

330.    Consumers who investigated the "animal care" claims might discover that animal welfare groups did not think that the standards materially improved the conditions for the chickens.  But the same consumer would not have access to and would not discover the confidential and actual supply management scheme that used the animal husbandry standards as a cover.  The reason that consumers would not discover the underlying supply management scheme lies in the nature of the Defendants' actions.  Defendants had planned and implemented the core of the conspiracy during non-public meetings and communications, monitored and enforced the conspiracy through non-public means, agreed not to discuss or disclose the details of their conspiracy, and falsely represented to Plaintiffs and members of the Class that the prices they paid for eggs were fair and competitive and based upon legitimate market conditions and animal welfare programs.

331.    As part of this scheme, the industry continually defended its certification program as having a strong scientific and animal welfare basis.  In a press release dated November 26. 2003, Ken Klippen of the UEP stated that the "egg industry is leading the animal welfare movement" through its certification program.  The UEP's press release described the scope of the program by stating that "egg farmers that voluntarily implement the guidelines and pass a stringent annual audit become an Animal Care Certified company and can display the Animal Care logo on their egg cartons and products.  More than 200 egg farmers currently participate in the program, representing more than 84 percent of the nation's total laying hens (229 million layers)."  Klippen specifically noted consumers and retailers as those who should draw comfort

from the UEP logo – clearly indicating that consumers were part of the target audience for these statements.

332.     In a press release dated March 6, 2003 describing the program, Klippen stated that "[e]gg producers are very concerned about hen welfare."  The press release left no doubt as to whom the UEP was trying to convince on behalf of members of the conspiracy – consumers and retailers.  The press release stated directly: "[c]onsumers and retailers concerned about animal welfare can now be assured that the eggs they purchase come from an animal care certified farm."  In defending the program, the press release stated that the number of eggs covered by the program "represents 100 percent of the shell eggs needed to meet consumer demand at America's supermarkets and restaurants."

333.     In addition, the March 6, 2003 press release described the UEP in a manner designed to lull consumers into believing that the program was a legitimate action by a legitimate farmers' cooperative.  In describing the certification program, the UEP press release falsely stated that "the UEP is a farmer cooperative that represents more than 85 percent of commercial egg production in the United States.  UEP provides a unified voice for America's egg producers on a wide range of industry and public policy issues such as the environment and animal welfare."

334.     In another example, on or about August 1, 2003, Defendants represented in a press release that "The [Animal Welfare] guidelines place top priority on the comfort, health and safety of the chickens."

335.     Similarly, on or about June 3, 2004 on the website www.animalcarecertified.com, Defendants represented that the program was part of egg farmers "commitment to caring for our hens and supplying our customers with the safest and best quality eggs in the world."  Similarly,

on the same website starting on or about June 18, 2004, Defendants publicly represented that the animal care certified program represented a commitment to the health and safety of the hens and to allow "an annual audit by and independent, third-party to confirm our compliance."

336.    Defendants confirmed in a press release on October 3, 2005, that the UEP certification logo and program were designed to "assur[e] consumers that the eggs they are purchasing came from hens that were properly cared for under scientifically-based animal husbandry guidelines ... This is one of the most proactive and progressive animal welfare programs in the food industry..."  On April 11 and 12, 2007, at UEP's first national Animal Welfare Conference for Grocery and Foodservice Executives at the Wigwam Golf Resort in Arizona.  Gene Gregory described the conference as "an opportunity for our customers to learn about the United Egg Producers Certified animal welfare program and hear the science-based facts from third party animal welfare experts."

337.    UEP's January 2004 newsletter revealed that the targets of this false and misleading campaign were "retail grocery CEO and egg buyers" and the "retail market." The PR firm GolinHarris bought print ads in grocer trade publications about the "animal welfare" aspects of the Program, sent letters to major retailers, and promoted television interviews touting the animal welfare nature of the Program.

338.    On information and belief, UEP directed GolinHarris to aggressively monitor the industry media coverage and to ensure UEP's false and misleading cover story about the Animal Care Program was disseminated to the public.  GolinHarris monitored thousands of daily newspapers, TV stations, radio stations and wire services, so it could quickly respond to any report that raised any questions about the program.  By mid 2006, GolinHarris reported that it had delivered a "stronger message with more direct results against those target audiences" with

regard to promoting the program. GolinHarris's activities included 4 national forum presentations, 5 regional forums, 1 on-line training program for chef educators, 336 articles in newspapers promoting UEP certified, 18 advertisements in major retail and foodservice publications, 10 online advertisements, 3 publicity articles in food service publications, 4 press releases, 766,500 hits on the UEP Certified website, 21 media interviews, 10 producer/grocer/industry crises support, 6 deskside visits with top foodservice editors in New York City, 68 communiques to university and foodservice operators, and other programs.

339.    Moreover, even after the Federal Trade Commission objected to the "Animal Care Certified" logo, the conspirators continued to feed misinformation to the public.  For example, in a press release dated October 3, 2005, UEP representatives described UEP's revised logo as an implicit approval of the legitimacy of their claims.  As described in the article from PR Newswire:  "[t]he egg industry's new seal which assures consumers that the eggs they are purchasing came from hens that were properly cared for under scientifically-based animal husbandry guidelines has won approval from federal regulators, the United Egg Producers (UEP) announced today."

340.    This announcement that the FTC had somehow approved of the new seal was misleading.  As the FTC noted in a letter to Al Pope and Gene Gregory, the change in the logo simply resolved the specific complaint regarding the then-existing logo.  And the FTC noted, its decision "should not be construed as a formal Commission determination of whether the challenged actions comply with Section 5 of the FTC Act."

341.    Gene Gregory of the UEP was quoted as saying that the change in the logo in 2005 from "Animal Care Certified" to "United Egg Producers Certified" with a tagline "[p]roduced in compliance with United Egg Producers' Animal Husbandry Guidelines"  "will

96

help remove any lingering doubts or concerns" about the animal care program.  This statement was misleading in that it perpetuated the canard that the supply reductions agreed upon and effectuated by the Defendants were a necessary part of the animal welfare standards – which they were not.  It was also misleading in that many of the practices that consumers might find objectionable in the treatment of layers did not cease.

342.    These efforts were designed to mislead and misdirect the attention of Defendants' direct customers and the public regarding the Defendants' reductions in the size of their producing flock and their holding back production.  As noted above, information that might have undermined UEP's position as a legitimate standard setting body or cooperative was not readily available to the general public.  Lists of members are confidential.  Egg industry group meeting minutes were not circulated to the general public nor were the discussions regarding the effects of the UEP led programs among UEP members available to consumers.

343.    The nature of the injury suffered by Plaintiffs reduced the opportunity for Plaintiffs to discover that they had been injured by Defendants' illegal conduct.   The retail grocery industry is competitive, meaning that prices among various competitors are relatively uniform over time and reflect changes in wholesale prices caused by changes in supply in a predictable and measurable manner.

344.    However, because consumers see only retail prices and behavior by retailers, their opportunity to discover that they have been injured by antitrust violations at levels of the distribution system with which they do not have direct contact or information is necessarily limited.  Moreover, it is essentially impossible for a consumer to discover illegal collusion in such markets that would give rise to an antitrust injury in the normal course of diligent shopping unless the fact of the antitrust violation has been made clear.  In fact, it is difficult, if not

impossible, for a consumer to discern an injury that would form a basis for an action absent disclosure of an antitrust violation.

345.    Each of the Plaintiffs compared prices and shopped for low grocery prices.  Each Plaintiff was exposed to advertisements and on-site pricing displays reflecting the retail sales prices of the shell eggs they purchased.  Each was exposed to media reports concerning food prices and economic conditions in general.  None of the Plaintiffs read or learned of any information regarding potential artificial inflation in the prices of shell eggs due to collusion among egg producers.  In fact, to the extent they read anything, they read articles touting the Defendants' efforts at animal husbandry.

346.    Thus, Plaintiffs were not in a position to monitor prices at the producer level in the egg industry.  As noted above, for the most part, shell eggs are sold to substantial retailers or middlemen who sell to retailers.  The prices at which they buy are not generally disclosed to the public.

347.    In addition to the inherent lack of information regarding wholesale shell egg prices that would face consumers, the very nature of the markets required Defendants to engage in affirmative, covert actions in furtherance of the conspiracy in order to conceal the conspiracy's existence.  Many of the Defendants sales were made to substantial, sophisticated entities with strong incentives to monitor and reduce their costs.  These entities, especially the retail sellers, have purchasing departments that employ individuals to comparison shop, follow the market and obtain the best prices on grocery items possible.  On information and belief, these employees monitor the markets specifically to insure competitive prices and stable supplies of eggs and other grocery items.

348.     On information and belief, given the sophistication of their customers, the success of the conspiracy depended upon concealing it from the direct purchasers of eggs.  Had news of Defendants' conspiracy and the sham of the certification program become clear, the Defendants' customers – as shown by the proceedings here – would have taken actions to recoup any overcharges, seek redress for past overcharges and renegotiate any existing contracts.  The length of time the Defendants were able to use the UEP program to artificially reduce the supplies of eggs shows the Defendants' success in keeping the sham alive.

349.     Consistent with their misrepresentations designed to conceal the true reasons for their actions, Defendants also took steps to hide the fact that they were coordinating numerous other explicit flock reductions, molting schedules, and other programs designed to reduce domestic egg supply.  Unlike the UEP Certified Program, these actions were never discussed outside of UEP.  Defendants often kept the identities of the companies agreeing to the specific plans a closely guarded secret — even from other UEP members.  For example, during UEP's "emergency flock reduction" of 5%, UEP asked producers to remove birds until houses reached the 95% capacity goal.  Many producers agreed to the program in secret so that their names were not associated with this clearly anticompetitive and illegal scheme — even internally to other UEP members.

350.     Moreover, Defendants misrepresented the purposes and effects of these actions to their customers.  For example, Mr. Moran, a buyer for Giant Foods, spoke with Gary Bethel of Hillandale PA and Tim Weaver of Weaver Bros. about what was going on with market prices for eggs on various occasions ranging between 2003 or 2004 and 2008 or 2009.  In these conversations, Mr. Bethel and/or Mr. Weaver represented to Mr. Moran that exports of eggs and the phase-in of the UEP's cage-size program were causing supply effects that were contributing

99

to these price effects.  Mr. Bethel and/or Mr. Weaver represented the programs as only having inadvertent effects on prices, and they did not reveal that the intended purpose of these programs was to further a conspiracy to reduce the supply and increase the market price of eggs in the United States.

351.   In addition, at the same time the Defendants engaged in a cooperative effort to reduce the supply of eggs going into the market, annual reports filed by Cal-Maine emphasized that the company faced intense competition on price and service – supply.  *See*, *e.g.*, Cal Maine Form 10-K dated August 16, 2002, p. 6; Cal-Maine Form 10-K dated August 12, 2003, p. 7; Cal-Maine Form 10-K dated August 18, 2004, pp. 7, 11; Cal-Maine Form 10-K dated August 11, 2005, pp. 9,12; Cal Maine Form 10-K dated August 17, 2006, pp. 10,14;  Cal-Maine Form 10-K dated August 16, 2007, pp. 10, 14.  Similarly, Michael's foods described the markets in which it competed, including the egg market as "extremely competitive."  *See, e.g.*, Michael Foods, Inc. Form 10-K dated March 30, 2005, p. 5; Michael Foods, Inc., Form 10-K, dated March 29, 2007, p. 5.

352.   On the other hand, where Cal-Maine's 10-Ks discuss factors influencing the supply of eggs, they mention only changes in space requirements that will be implemented by 2008 under guidelines established by "trade associations" (and other factors regarding the complexity of bringing layers into production), but do not address the guidelines as agreed upon actions set by a vote of the "trade associations"' members.    Nor does Cal-Maine discuss the other supply reduction efforts.  Defendants undertook in connection with these "trade associations."  *See*, *e.g.*, Cal Maine Form 10-K dated August 16, 2002, p. 6; Cal-Maine Form 10-K dated August 12, 2003, p. 7; Cal-Maine Form 10-K dated August 18, 2004, p. 5; Cal-Maine Form 10-K dated August 11, 2005, p. 5; Cal Maine Form 10-K dated August 17, 2006, p.7; Cal-

Maine Form 10-K dated August 16, 2007, p. 7.  Michael Foods Inc.'s 10-Ks noted above are silent on all these matters.

353.    Defendants' customers, including Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., H.J. Heinz Company, L.P., have confirmed that Defendants' misdirection and misrepresentations were essential to the success of the conspiracy.  In their filings with this Court, they have stated that "[i]f Defendants had publicly disclosed their plan to raise egg prices by controlling supply - under the guise of animal welfare, exports, and explicit supply control programs - their conspiratorial program would have collapsed and failed.  If the true nature of Defendants' programs had not been concealed, egg purchasers, including [Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P.] would have refused to pay supra-competitive prices for Defendants' products.  Defendants knew that egg purchasers seek competitive prices for the eggs they purchase and that any price increase that was openly collusive would not have been tolerated by egg purchasers…."

354.    Defendants' acts of concealment and misrepresentation, which were effective in keeping major companies such as Kellogg's, Nestle, Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., H.J. Heinz Company, L.P. and Kraft in the dark, were more than sufficient to preclude suspicion by retail purchasers of shell eggs.

355.    In addition, Defendants (and their co-conspirators) made false statements about shell egg price increases designed to give the false impression that these price increases were due to factors consistent with competition and outside of Defendants' control. When prices rose during the conspiracy period, Defendants publicly attributed this increase to circumstances

beyond Defendants' control, while only privately acknowledging and celebrating the coordinated industry efforts to reduce egg supply.

356.   Defendants consistently and publicly attributed high shell egg prices to circumstances that were consistent with free-market competition—*e.g.,* increased feed and transportation costs and/or the inability to build new hen houses to meet demand due to a credit crunch and the actions of animal rights activists—in order to falsely give purchasers the impression that Defendants were engaged in price competition.  For example, in interviews and articles about the increased cost of eggs, Defendants and other egg producers frequently blamed the high cost of eggs on increases in the cost of corn (used as feed), attributable to the fact corn was being sold for ethanol use.  On other occasions, Defendants and other egg producers blamed the high cost of eggs on increases on the cost of soybeans or wheat.  These explanations were credible to egg purchasers, including Plaintiffs, because Defendants carefully tied their explanations to events that were occurring in the market at the time and not as a result of any coordinated or collective actions designed to drive up egg prices.  For example, a December 11, 2003 article in the Chicago Tribune and a November 28, 2003 article in the Boston Globe, cite Ken Klippen as stating that among the key factors driving up egg prices was the popularity of low carb diets and diminishing concerns regarding the cholesterol in eggs.

357.   Thus, Plaintiffs and the members of the Class had no reason to disbelieve Defendants' explanations for the pricing behavior of these products.  Indeed, in some instances Defendants' explanations involved proprietary or otherwise non-public information within Defendants' exclusive control, leaving Plaintiffs and the members of the Class without means to verify their accuracy.

102

358.     Such explanations made by the Defendants include assertions that they could not effectively respond to supply reductions as a result of limitations imposed by animal husbandry guidelines that had the effect of reducing cumulative cage space, as well as their attributing price increases to other external factors including supply-side wear-and-tear, the increased price of fuel and feed, and the upward adjustment of other costs of production.  Given that Plaintiffs are indirect purchasers of shell eggs – not wholesalers or others involved in agriculture – they had no means or reason to question the explanations given for higher shell egg prices.

359.     As a result of Defendants' affirmative actions to conceal their actions and mislead the public as to the purpose of their actions, the Plaintiffs did not and could not discover that they had been harmed, much less that they had been harmed by the illegal actions of the Defendants until it became clear that the Defendants' explanations for their conduct were a sham.  These actions of the Defendants delay the accrual of Plaintiffs' causes of actions and toll the running of any statute of limitations with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

360.     Plaintiffs followed up on the now public information dismissing the validity of the UEP certified program.  They have exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants' conspiracy.

**ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT**

361.     The effect of Defendants' conduct as described herein was to artificially inflate the prices of eggs in the United States and the Class Jurisdictions.  By manipulating the supply and the indexes of pricing, price competition was suppressed and prices were supported at artificially high levels throughout the United States and the Class Jurisdictions.  This enabled the

103

Defendants, their co-conspirators and other suppliers of eggs to reap the benefits of higher egg prices – as the Defendants intended and for which they should be responsible to consumers who paid higher prices for shell eggs than they would have absent Defendants' actions.

## COUNT I

## Violation of Sherman Act § 1, 15 U.S.C. § 1

362.   Plaintiffs incorporate by reference, as if fully set forth herein, the allegations contained in the preceding paragraphs of this complaint.

363.   Beginning at least as early as January 1, 2000, the exact date being unknown to Plaintiff and at present exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States for eggs.

364.   As a result of Defendants' unlawful conduct, prices for eggs were raised, fixed, maintained and stabilized in the United States at a level higher than they would have been in the absence of the anti-competitive conduct alleged in this complaint.

365.   For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:  (a) an agreement to increase layer cage sizes in order to reduce gross flock sizes and, therefore, resulting in fixed prices; (b) manipulating egg market by reducing supply; (c) the exchange of pricing information; (d) additional actions, such as reducing the supply through exports; and (e) an agreement not to undermine the conspiracy or compete with one another.

366.     As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Indirect Purchaser Injunctive Class have been injured in their businesses and property in that they have paid more for shell eggs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

367.     As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Indirect Purchaser Injunctive Class have been injured and financially damaged in their respective businesses and property, in amounts, which are presently undetermined. Plaintiffs' injuries consist of paying higher prices to purchase shell eggs than they would have paid absent Defendants' conduct.

368.     Pursuant to Section 16 of the Clayton Act, 15, U.S.C. § 26, Plaintiffs and the other members of the Indirect Purchaser National Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT II

## Claims Under Arizona Law

## Violations of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

369.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

370.     By reason of the foregoing, Defendants and their co-conspirators have acted in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*

371.     During the Class Period, each of the Defendants, directly or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed eggs in Arizona.

372.     The combination and conspiracy alleged herein has substantially affected trade and commerce throughout Arizona and has had, *inter alia*, the following effects:

      a.     Egg price competition was restrained, suppressed, and/or eliminated throughout Arizona;

      b.     The supply of eggs was improperly reduced;

      c.     Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the state of Arizona; and

      d.     Plaintiff and members of the Arizona Indirect Purchaser State Class were deprived of free and open competition.

373.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Arizona Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## **Unjust Enrichment**

374.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Arizona than would have been possible absent the illegal conduct.

375.     The Defendants were able to achieve their increased revenues and profits from their sales of eggs to Arizona indirect purchasers because the demand for eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Arizona was

connected to and due to the increased prices paid for Defendants' shell eggs by indirect purchasers in Arizona.

376.    The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from their sales to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT III

## Claims Under California Law

## Violations of California Business and Professions Code Section 16720, *et seq.*

377.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

378.    By reason of the foregoing, Defendants and their co-conspirators have acted in violation of Section 16720, California Business and Professions Code.

379.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

   a.    Price competition in the sale of eggs has been restrained, suppressed, and/or eliminated in California;

   b.    The supply of eggs was improperly reduced;

   c.    Prices for eggs sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, noncompetitive levels in California and throughout the United States; and

      d.     Those that purchased eggs directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

380.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the California Indirect Purchaser State Class have been injured in their business and/or property in that they paid more for shell eggs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## Violations of Cal. Bus. & Prof. Code. §§ 17200, *et seq.*

381.    Defendants, and each of them, have acted in violation of Cal. Bus. & Prof. Code. §§ 17200, by engaging in a continuing unlawful trust and concert of, the substantial terms of which were to fix, raise, stabilize, and maintain prices of, allocate markets for, and restrain and manipulate the supply of eggs at supra-competitive levels.

382.    By reason of the foregoing, Defendants and their co-conspirators committed "unlawful, unfair or fraudulent business act[s] or practices[s]" in violation of California's Unfair Competition Law.  Cal. Bus. & Prof. Code. §§ 17200, *et seq.*

383.    Defendants' unlawful conduct has substantially affected California commerce and had, *inter alia*, the following effects:

      a.     Egg price competition was restrained, suppressed, and/or eliminated throughout California;

      b.     The supply of eggs was improperly limited, reduced and otherwise manipulated;

      c.     Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout California; and

      d.     Plaintiffs and members of the California Indirect Purchaser State Class were deprived of free and open competition.

384.    As a direct and proximate result of Defendants' unlawful practices, including combinations and contracts to restrain trade and allocate relevant markets, Plaintiff and members

of the California Indirect Purchaser State Class have been injured in their business and/or property in that they paid more for shell eggs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## **Unjust Enrichment**

385.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in California than would have been possible absent the illegal conduct.

386.    The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to California indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in California was connected to and due to the increased prices paid for Defendants' shell eggs by indirect purchasers in California.

387.    Defendants were enriched by their illegal activities at the expense of California indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT IV

### Claims Under District of Columbia Law

### Violations of D.C. Code §§ 28-4501, *et seq.*

388.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

389.    By reason of the foregoing, Defendants and their co-conspirators have acted in violation of D.C. Code §§ 28-4501, *et seq.*

390.    Defendants' unlawful conduct has substantially affected District of Columbia commerce and had, *inter alia*, the following effects:

a.    Egg price competition was restrained, suppressed, and/or eliminated throughout the District of Columbia;

b.    The supply of eggs was improperly reduced;

c.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the District of Columbia; and

d.    Plaintiff and members of the District of Columbia Indirect Purchaser State Class were deprived of free and open competition.

391.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the District of Columbia Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## Violations of D.C. Code §§ 28-3901, *et seq.*

392.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

393.   The foregoing conduct constitutes "unlawful trade practices" within the meaning of D.C. Code § 28-3904.

394.   Defendants' unlawful conduct had the following effects:

   a.   Egg price competition was restrained, suppressed, and/or eliminated throughout the District of Columbia;

   b.   The supply of eggs was improperly limited, reduced and otherwise manipulated;

   c.   Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the District of Columbia; and

   d.   Plaintiff and members of the District of Columbia Indirect Purchaser State Class were deprived of free and open competition.

395.   Defendants, acting in their position as the dominate domestic producers of eggs, place Plaintiff and members of the District of Columbia Indirect Purchaser State Class in a grossly unequal bargaining position by foreclosing their ability to purchase shell eggs at unrestrained, fair and competitive prices.

396.   As a direct and proximate result of Defendants' conduct, Plaintiff and members of the District of Columbia Indirect Purchaser State Class have been injured.

## Unjust Enrichment

397.   By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in the District of Columbia than would have been possible absent the illegal conduct.

398.     The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to District of Columbia indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in the District of Columbia was connected to and due to the increased prices paid for Defendants' shell eggs by indirect purchasers in the District of Columbia.

399.     Defendants were enriched by their illegal activities at the expense of District of Columbia indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of District of Columbia indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT V

### Claims Under Florida Law

### Violations of F.S. §§ 501.201, *et seq.*

400.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

401.     By reason of the foregoing, Defendants and their co-conspirators committed actions that constitute unfair and deceptive trade practices in violation of F.S. § 501.204, and substantially affecting trade and commerce throughout Florida.

402.     Defendants' unlawful conduct has substantially affected Florida commerce and had, *inter alia*, the following effects:

      a.     Egg price competition was restrained, suppressed, and/or eliminated throughout Florida;

b. The supply of eggs was improperly limited, reduced and otherwise manipulated;

c. Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Florida; and

d. Plaintiffs and members of the Florida Indirect Purchaser State Class were deprived of free and open competition.

403. As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and members of the Florida Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## **Unjust Enrichment**

404. By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Florida than would have been possible absent the illegal conduct.

405. The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Florida indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of eggs to indirect purchasers in Florida was connected to and due to the increased prices paid for Defendants' shell eggs by indirect purchasers in Florida.

406. Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT VI

## Claims Under Iowa Law

## Violations of Iowa Competition Law §§ 553.1, *et seq.*

407.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

408.     By reason of the foregoing, Defendants and their co-conspirators committed actions that constitute unfair and deceptive trade practices in violation of Iowa Competition Law §§ 553.1, *et seq.*

409.     Defendants' unlawful conduct has substantially affected Iowa commerce and had, *inter alia*, the following effects:

  a.     Egg price competition was restrained, suppressed, and/or eliminated throughout Iowa;

  b.     The supply of eggs was improperly reduced;

  c.     Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Iowa; and

  d.     Plaintiffs and members of the Iowa Indirect Purchaser State Class were deprived of free and open competition.

410.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Iowa Indirect Purchaser State have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

**Unjust Enrichment**

411.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Iowa than would have been possible absent the illegal conduct.

412.    The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Iowa indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Iowa was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Iowa.

413.    Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Iowa indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT VII

### Claims Under Kansas Law

### Violations of K.S.A. §§ 50-101 *et seq.*

414.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

415.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and

commerce in violation of the Kansas antitrust statutes, K.S.A. §§ 50-101 *et seq.*, substantially affecting trade and commerce throughout Kansas.

416.    Defendants' unlawful conduct has substantially affected Kansas commerce and had, *inter alia*, the following effects:

     a.    Egg price competition was restrained, suppressed, and/or eliminated throughout Kansas;

     b.    The supply of eggs was improperly reduced;

     c.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Kansas; and

     d.    Plaintiffs and members of the Kansas Indirect Purchaser State Class were deprived of free and open competition.

417.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the Kansas Indirect Purchaser State Class and have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## Unjust Enrichment

418.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Kansas than would have been possible absent the illegal conduct.

419.    The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Kansas indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Kansas was connected

to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Kansas.

420.    Defendants were enriched by their illegal activities at the expense of Kansas indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Kansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT VIII

### Claims Under Massachusetts Law

### Violations of M.G.L.A. c. 93A, §§ 2, *et seq.*

421.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

422.    By reason of the foregoing, Defendants and their co-conspirators engaged in "unfair methods of competition and unfair or deceptive acts or practices" in knowing and willful violation of M.G.L.A c. 93A, *et seq.*

423.    Defendants' unlawful conduct has substantially affected Massachusetts trade and commerce and had, *inter alia*, the following effects:

a.    Egg price competition was restrained, suppressed, and/or eliminated throughout Massachusetts;

b.    The supply of eggs was improperly limited, reduced and otherwise manipulated;

c.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Massachusetts; and

d.    Plaintiffs and members of the Massachusetts Indirect Purchaser State Class were deprived of free and open competition.

424.     As a direct and proximate result of Defendants' unlawful practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and members of the Massachusetts Indirect Purchaser State Class have been injured in their business and/or property in that they paid more for shell eggs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## **Unjust Enrichment**

425.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Massachusetts than would have been possible absent the illegal conduct.

426.     The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Massachusetts indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Massachusetts was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Massachusetts.

427.     Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT IX

## Claims Under Michigan Law

## Violations of M.C.L. §§ 445.771, *et seq.*

428.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

429.   By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Michigan antitrust statutes, M.C.L. §§ 445.771, *et seq.* (the Michigan Antitrust Reform Act, "MARA").

430.   Defendants' unlawful conduct has substantially affected Michigan trade and commerce and had, *inter alia*, the following effects:

a.   Egg price competition was restrained, suppressed, and/or eliminated throughout Michigan;

b.   The supply of eggs was improperly reduced;

c.   Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Michigan; and

d.   Plaintiff and members of the Michigan Indirect Purchaser State Class were deprived of free and open competition.

431.   As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Michigan Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

432. The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Michigan indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Michigan was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Michigan.

433. The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification. As an ancillary equitable remedy under MARA, Defendants should be ordered to disgorge the profits illegally obtained from sales to Michigan indirect purchasers of shell eggs.

## COUNT X

## Claims Under Minnesota Law

## Violations of Minn. Stat. §§ 325D.49 *et seq.*

434. Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

435. By reason of the foregoing, Defendants and their co-conspirators formed contracts, combinations or conspiracies in restraint of trade or commerce, in violation of Minnesota's Antitrust Law, Minn. Stat. §§ 325D.49 *et seq.*

436. Defendants' unlawful conduct has substantially affected Minnesota trade and commerce and had, *inter alia*, the following effects:

    a. Egg price competition was restrained, suppressed, and eliminated throughout Minnesota;

      b.      The supply of eggs was improperly reduced;

      c.      Egg prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; and

      d.      Plaintiff and members of the Minnesota Indirect Purchaser State Class were deprived of free and open competition.

437.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Minnesota Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## Unjust Enrichment

438.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Minnesota than would have been possible absent the illegal conduct.

439.    The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Minnesota indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Minnesota was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Minnesota.

440.    Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT XI

## Claims Under Mississippi Law

## Violations of Miss. Code Ann. §75-21-1, *et seq.*

441.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

442.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Mississippi antitrust statutes, Miss. Code Ann. §75-21-1, *et seq.*

443.    Defendants' unlawful conduct has substantially affected Mississippi trade and commerce and had, *inter alia*, the following effects:

   a.    Egg price competition was restrained, suppressed, and/or eliminated throughout Mississippi;

   b.    The supply of eggs was improperly reduced;

   c.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Mississippi; and

   d.    Plaintiffs and members of the Mississippi Indirect Purchaser State Class were deprived of free and open competition.

444.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Mississippi Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

**Unjust Enrichment**

445.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Mississippi than would have been possible absent the illegal conduct.

446.    The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Mississippi indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Mississippi was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Mississippi.

447.    Defendants were enriched by their illegal activities at the expense of Mississippi indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Mississippi indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

**COUNT XII**

**Claims Under Nebraska Law**

**Violations of Neb. Rev. Stat. § 59-1601, *et seq.***

448.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

449. By reason of the foregoing, Defendants and their co-conspirators have committed actions that constitute continuing unfair and deceptive trade practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*

450. Defendants' unlawful conduct has substantially affected Nebraska trade and commerce and had, *inter alia*, the following effects:

  a. Egg price competition was restrained, suppressed, and/or eliminated throughout Nebraska;

  b. The supply of eggs was improperly limited, reduced and otherwise manipulated;

  c. Eggs prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Nebraska; and

  d. Plaintiff and members of the Nebraska Indirect Purchaser State Class were deprived of free and open competition.

451. As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and members of the Nebraska Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## Unjust Enrichment

452. By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Nebraska than would have been possible absent the illegal conduct.

453. The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Nebraska indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood. Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Nebraska was

connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Nebraska.

454.    Defendants were enriched by their illegal activities at the expense of Nebraska indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Nebraska indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT XIII

## Claims Under Nevada Law

## Violations of Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

455.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

456.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Nevada antitrust statutes, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*

457.    Defendants' unlawful conduct has substantially affected Nevada trade and commerce and had, *inter alia*, the following effects:

   a.   Egg price competition was restrained, suppressed, and/or eliminated throughout Nevada;

   b.   Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Nevada;

   c.   The supply of eggs was improperly reduced; and

   d.   Plaintiffs and members of the Nevada Indirect Purchaser State Class were deprived of free and open competition.

458.     As a direct and proximate result of Defendants' unlawful and anticompetitive

practices, including combinations and contracts to restrain trade and monopolize the relevant

markets, Plaintiff and the Nevada Indirect Purchaser State Class have been injured in their

business and/or property in that they paid supra-competitive, artificially inflated prices for shell

eggs.

## Unjust Enrichment

459.     By engaging in the unlawful conduct described herein, Defendants received

higher prices for their shell eggs that were sold to indirect purchasers in Nevada than would have

been possible absent the illegal conduct.

460.     The Defendants were able to achieve their increased revenues and profits from

their sales of shell eggs to Nevada indirect purchasers because the demand for shell eggs by

indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of

Defendants to profit from their sales of eggs to indirect purchasers in Nevada was connected to

and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in

Nevada.

461.     Defendants were enriched by their illegal activities at the expense of Nevada

indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for

the benefit of Nevada indirect purchasers because it would be unjust to allow Defendants to

retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT XIV

### Claims Under New Mexico Law

### Violations of N.M.S.A. 1978, §§ 57-1-1, *et seq.*

462.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

463.     By reason of the foregoing, Defendants and their co-conspirators formed contracts, combinations or conspiracies in restraint of trade or commerce, in violation of the New Mexico Antitrust Act, N.M.S.A. 1978, §§ 57-1-1, *et seq.*

464.     Defendants' unlawful conduct has substantially affected New Mexico trade and commerce and had, *inter alia*, the following effects:

    a.     Egg price competition was restrained, suppressed, and/or eliminated throughout New Mexico;

    b.     Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout New Mexico;

    c.     The supply of eggs was improperly reduced; and

    d.     Plaintiff and members of the New Mexico Indirect Purchaser State Class were deprived of free and open competition.

465.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the New Mexico Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## Violations of N.M.S.A. § 57-12-1, *et seq.*

466.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

467.     The foregoing conduct constitutes "unconscionable trade practices" within the meaning of N.M.S.A. § 57-12-1, *et seq.*

468.     Defendants' unlawful conduct had the following effects:

   a.      Egg price competition was restrained, suppressed, and/or eliminated throughout New Mexico;

   b.      The supply of eggs was improperly limited, reduced and otherwise manipulated;

   c.      Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout New Mexico; and

   d.      Plaintiff and members of the New Mexico Indirect Purchaser State Class were deprived of free and open competition.

469.     Defendants, by the design and intent of their conspiracy, intentionally took advantage, to a grossly unfair degree, of Plaintiff's and members' of the New Mexico Indirect Purchaser State Class lack of knowledge, ability to know, experience and/or capacity to learn of Defendants' unconscionable trade practice.

470.     Defendants, acting in their position as the dominate domestic producers of shell eggs, through their conspiracy, place Plaintiff and the New Mexico Indirect Purchaser State Class in a grossly unequal bargaining position by foreclosing their ability to purchase shell eggs at unrestrained, fair and competitive prices.

471.     As a direct and proximate result of Defendants' unconscionable trade practices, Plaintiff and the New Mexico Indirect Purchaser State Class have been injured.

**Unjust Enrichment**

472.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in New Mexico than would have been possible absent the illegal conduct.

473.     The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to New Mexico indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in New Mexico was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in New Mexico.

474.     Defendants were enriched by their illegal activities at the expense of New Mexico indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of New Mexico indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT XV

### Claims Under New York Law

**Violations of New York Gen. Bus. Law § 340, *et seq.* (The Donnelly Act)**

475.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

476.     During the Class Period, each of the Defendants, directly or indirectly and through affiliates dominated and controlled, manufactured, sold and/or distributed eggs in the State of New York.

477.     The combination and conspiracy alleged herein has substantially affected trade and commerce throughout the State of New York and has had, *inter alia*, the following effects:

    a.    Egg price competition was restrained, suppressed, and/or eliminated throughout the State of New York;

    b.    The supply of eggs was improperly reduced;

    c.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout the State of New York; and

    d.    Plaintiffs and members of the New York Indirect Purchaser State Class were deprived of free and open competition.

478.     By reason of the foregoing, Defendants and their co-conspirators have acted in violation of New York Gen. Bus. Law. § 340, *et seq.*

479.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the New York Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## COUNT XVI

## Claims Under North Carolina Law

## Violations of N.C. Gen. Stat. §§ 75-1, *et seq.*

480.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

481.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the North Carolina antitrust statutes, N.C. Gen. Stat. §§ 75-1, *et seq.*

482.    Defendants' unlawful conduct has substantially affected North Carolina trade and commerce and had, *inter alia*, the following effects:

      a.    Egg price competition was restrained, suppressed, and/or eliminated throughout North Carolina;

      b.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout North Carolina;

      c.    The supply of eggs was improperly reduced; and

      d.    Plaintiffs and members of the North Carolina Indirect Purchaser State Class were deprived of free and open competition.

483.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the North Carolina Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## Violations of N.C.G.S. §§ 75-1.1, *et seq.*

484.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

485.    By reason of the foregoing, Defendants and their co-conspirators engaged in unfair methods of competition and unfair or deceptive acts or practices which affected North Carolina commerce in violation of N.C.G.S. § 75-1.1.

486.    Defendants' unlawful conduct had the following effects:

a.      Egg price competition was restrained, suppressed, and/or eliminated throughout North Carolina;

b.      The supply of eggs was improperly limited, reduced and otherwise manipulated;

c.      Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout North Carolina; and

d.      Plaintiffs and members of the North Carolina Indirect Purchaser State Class were deprived of free and open competition.

487.      As a direct and proximate result of Defendants' unlawful practices, including combinations and contracts to restrain trade and allocate the relevant markets, Plaintiffs and members of the North Carolina Indirect Purchaser State Class have been injured in their business and/or property in that they paid more for shell eggs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

### Unjust Enrichment

488.      By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in North Carolina than would have been possible absent the illegal conduct.

489.      The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to North Carolina indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in North Carolina was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in North Carolina.

490.      Defendants were enriched by their illegal activities at the expense of North Carolina indirect purchasers of shell eggs and thus Defendants should be ordered to make

restitution for the benefit of North Carolina indirect purchasers because it would be unjust to

allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

**COUNT XVII**

**Claims Under North Dakota Law**

**Violations of N.D. Cent. Code §§ 51-08.1-01, *et seq.***

491.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets

for, and restraining and manipulating the supply of eggs at supra-competitive levels.

492.    By reason of the foregoing, Defendants and their co-conspirators have engaged in

a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in

violation of the North Dakota antitrust statutes, N.D. Cent. Code §§ 51-08.1-01, *et seq.*,

substantially affecting trade and commerce throughout North Dakota.

493.    Defendants' unlawful conduct has substantially affected North Dakota trade and

commerce and had, *inter alia*, the following effects:

a.    Egg price competition was restrained, suppressed, and/or eliminated
        throughout North Dakota;

b.    Egg prices were raised, fixed, maintained, and stabilized at artificially
        high, non-competitive levels throughout North Dakota;

c.    The supply of eggs was improperly reduced; and

d.    Plaintiffs and members of the North Dakota Indirect Purchaser State Class
        were deprived of free and open competition.

494.    As a direct and proximate result of Defendants' unlawful and anticompetitive

practices, including combinations and contracts to restrain trade and monopolize the relevant

markets, Plaintiff and the North Dakota Indirect Purchaser State Class have been injured in their

133

business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## COUNT XVIII

### Claims Under South Dakota Law

### Violations of S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*

495.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

496.    By reason of the foregoing, Defendants and their co-conspirators have engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the South Dakota antitrust statutes, S.D. Codified Laws Ann. §§ 37-1-3.1, *et seq.*

497.    Defendants' unlawful conduct has substantially affected South Dakota trade and commerce and had, *inter alia*, the following effects:

    a.    Egg price competition was restrained, suppressed, and/or eliminated throughout South Dakota;

    b.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout South Dakota;

    c.    The supply of eggs was improperly reduced; and

    d.    Plaintiffs and members of the South Dakota Indirect Purchaser State Class were deprived of free and open competition.

498.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the South Dakota Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

**Unjust Enrichment**

499.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in South Dakota than would have been possible absent the illegal conduct.

500.    The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to South Dakota indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in South Dakota was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in South Dakota.

501.    Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

**COUNT XIX**

**Claims Under Tennessee Law**

**Violations of Tenn. Code Ann. §§ 47-25-101, *et seq.***

502.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

503.     By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Tennessee antitrust statutes, Tenn. Code Ann. §§ 47-25-101, *et seq*.

504.     Defendants' unlawful conduct has substantially affected Tennessee trade and commerce and had, *inter alia*, the following effects:

a.      Egg price competition was restrained, suppressed, and/or eliminated throughout Tennessee;

b.      Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Tennessee;

c.      The supply of eggs was improperly reduced; and

d.      Plaintiff and members of the Tennessee Indirect Purchaser State Class were deprived of free and open competition.

505.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Tennessee Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## **Unjust Enrichment**

506.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Tennessee than would have been possible absent the illegal conduct.

507.     The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Tennessee indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Tennessee was

connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Tennessee.

508.   Defendants were enriched by their illegal activities at the expense of Tennessee indirect purchasers of shell eggs.  Because the parties from whom indirect purchasers bought the shell eggs directly were not, so far as indirect purchasers are aware, a party to Defendants' or involved in Defendants' illegal activities which caused the increased shell egg prices to Tennessee indirect purchasers, Defendants should be ordered to make restitution for the benefit of Tennessee indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT XX

## Claims Under Utah Law

## Violations of U.C.A. 1953 §§ 76-10-911, *et seq.*

509.   Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

510.   By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Utah antitrust statutes, U.C.A. 1953 §§ 76-10-911, *et seq.*

511.   Defendants' unlawful conduct has substantially affected Utah trade and commerce and had, *inter alia*, the following effects:

   a.   Egg price competition was restrained, suppressed, and/or eliminated throughout Utah;

b.      Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Utah;

c.      The supply of eggs was improperly reduced; and

d.      Plaintiff and members of the Utah Indirect Purchaser State Class were deprived of free and open competition.

512.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the Utah Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## COUNT XXI

## Claims Under Vermont Law

## Violations of 9 V.S.A. §§ 2451, *et seq.*

513.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

514.    By reason of the foregoing, Defendants and their co-conspirators engaged in a continuing combination and conspiracy in restraint of trade and commerce in violation of the Vermont Consumer Fraud Act, 9 V.S.A. §§ 2451, *et seq.*

515.    Defendants' unlawful conduct has substantially affected Vermont trade and commerce and had, *inter alia*, the following effects:

a.      Egg price competition was restrained, suppressed, and/or eliminated throughout Vermont;

b.      The supply of eggs was improperly limited, reduced and otherwise manipulated;

c.      Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Vermont; and

d.    Plaintiff and members of the Vermont Indirect Purchaser State Class were
deprived of free and open competition.

516.    Plaintiff and members of the Vermont Indirect Purchaser State Class paid supra-
competitive, artificially inflated prices or portions of the price for shell eggs.

517.    As a direct, proximate and foreseeable cause of Defendants' conduct in violation
of 9 V.S.A. §§ 2451, *et seq.*, Plaintiff and the Vermont Indirect Purchaser State Class have been
damaged in their property in that the price or a portion of the price which they have paid for or in
respect of shell eggs has been inflated to a supra-competitive level.

## Unjust Enrichment

518.    By engaging in the unlawful conduct described herein, Defendants received
higher prices for their shell eggs that were sold to indirect purchasers in Vermont than would
have been possible absent the illegal conduct.

519.    The Defendants were able to achieve their increased revenues and profits from
their sales of shell eggs to Vermont indirect purchasers because the demand for shell eggs by
indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of
Defendants to profit from their sales of shell eggs to indirect purchasers in Vermont was
connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect
purchasers in Vermont.

520.    Defendants were enriched by their illegal activities at the expense of Vermont
indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for
the benefit of Vermont indirect purchasers because it would be unjust to allow Defendants to
retain the benefits of their sales of shell eggs at illegally inflated prices.

## COUNT XXII

## Claims Under West Virginia Law

## Violations of W. Va. Code §§ 47-18-1, *et seq.*

521.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

522.     By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the West Virginia antitrust statutes, W. Va. Code §§ 47-18-1, *et seq*.

523.     Defendants' unlawful conduct has substantially affected West Virginia trade and commerce and had, *inter alia*, the following effects:

       a.      Egg price competition was restrained, suppressed, and/or eliminated throughout West Virginia;

       b.      Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout West Virginia;

       c.      The supply of eggs was improperly reduced; and

       d.      Plaintiff and members of the West Virginia Indirect Purchaser State Class were deprived of free and open competition.

524.     As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiff and the West Virginia Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

**Unjust Enrichment**

525.     By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in West Virginia than would have been possible absent the illegal conduct.

526.     The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to West Virginia indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in West Virginia was connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in West Virginia.

527.     Defendants were enriched by their illegal activities at the expense of West Virginia indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of West Virginia indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

**COUNT XXIII**

**Claims Under Wisconsin Law**

**Violations of Wis. Stat. § 133.01, *et seq.***

528.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively fixing, raising, stabilizing, and maintaining prices of, allocating markets for, and restraining and manipulating the supply of eggs at supra-competitive levels.

529.    By reason of the foregoing, Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in an unreasonable restraint of trade and commerce in violation of the Wisconsin antitrust statutes, Wis. Stat. § 133.01, *et seq.*

530.    Defendants' unlawful conduct has substantially affected Wisconsin trade and commerce and had, *inter alia*, the following effects:

   a.    Egg price competition was restrained, suppressed, and/or eliminated throughout Wisconsin;

   b.    Egg prices were raised, fixed, maintained, and stabilized at artificially high, non-competitive levels throughout Wisconsin;

   c.    The supply of eggs was improperly reduced; and

   d.    Plaintiffs and members of the Wisconsin Indirect Purchaser State Class were deprived of free and open competition.

531.    As a direct and proximate result of Defendants' unlawful and anticompetitive practices, including combinations and contracts to restrain trade and monopolize the relevant markets, Plaintiffs and the Wisconsin Indirect Purchaser State Class have been injured in their business and/or property in that they paid supra-competitive, artificially inflated prices for shell eggs.

## **Unjust Enrichment**

532.    By engaging in the unlawful conduct described herein, Defendants received higher prices for their shell eggs that were sold to indirect purchasers in Wisconsin than would have been possible absent the illegal conduct.

533.    The Defendants were able to achieve their increased revenues and profits from their sales of shell eggs to Wisconsin indirect purchasers because the demand for shell eggs by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of shell eggs to indirect purchasers in Wisconsin was

connected to and due to the illegally inflated prices paid for Defendants' shell eggs by indirect purchasers in Wisconsin.

534.    Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of shell eggs and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of shell eggs at illegally inflated prices.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request the following:

A. That the Court determine that the claims alleged herein under the Sherman Act, the state antitrust laws, and the state consumer protection and/or unfair competition laws may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

B. That the Court adjudge and decree that the unlawful conduct, contract, combination and conspiracy alleged herein constitutes:

    1.    A violation of the Sherman Act, 15 U.S.C. § 1, as alleged in Count I;

    2.    A violation of the state antitrust, consumer protection and unfair competition laws as alleged in Counts II – XXIII, and

    3.    Acts constituting unjust enrichment as alleged in Counts II – XXIII.

C. That Plaintiffs and the Class members recover damages, as provided by the state antitrust laws and the state consumer protection and unfair competition laws, including actual damages, multiple damages where provided by law and/or statutory minimum damages where provided by law, and that a joint and several judgment in favor of Plaintiffs and the Classes be entered against the Defendants in an amount of damages in accordance with such laws;

D. That Plaintiffs and the relevant Class members obtain any penalties, punitive or exemplary damages, and/or full consideration, where the laws of the respective states identified herein so permit;

E. That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations,

conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

F.   That Plaintiffs and Class members be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition, acts of unjust enrichment and where statutorily authorized;

G.   That Plaintiffs and Class members be awarded pre-judgment and post-judgment interest as permitted by law;

H.   That Plaintiffs and Class members recover their costs of suit, including reasonable attorneys' fees as provided by law; and

I.   That Plaintiffs and Class members be awarded such other and further relief as may be necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED:  February 27, 2013

Respectfully submitted,

/s/ *Paul F. Novak*

Paul F. Novak
Elizabeth McKenna
Charles Slidders
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY  10119
Tel: (212) 594-5300
Fax: (212) 868-1229
pnovak@milberg.com
emckenna@milberg.com
cslidders@milberg.com

Christopher Lovell
Craig Essenmacher
**LOVELL STEWART HALEBIAN LLP**
500 Fifth Avenue, Floor 58
New York, NY 10110
Tel: (212) 608-1900
Fax: (212) 719-4667
craigessenmacher@yahoo.com

Timothy D. Battin
Mark J. Schirmer
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com

***Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs***

145

Krishna B. Narine
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for
Indirect Purchaser Plaintiffs*