**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MDL No. 2002** |
| **ANTITRUST LITIGATION** | : | **Case No: 08-md-02002** |
| | : | |
| | : | |
| **THIS DOCUMENT APPLIES TO** | : | |
| **ALL DIRECT PURCHASER ACTIONS** | : | |
| | : | |

**DIRECT PURCHASER PLAINTIFFS'**
**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY**
**APPROVAL OF CLASS ACTION SETTLEMENTS BETWEEN PLAINTIFFS AND**
**DEFENDANT NATIONAL FOOD CORPORATION AND PLAINTIFFS AND**
**DEFENDANT MIDWEST POULTRY SERVICES, LP, FOR CERTIFICATION OF**
**CLASS ACTION FOR PURPOSES OF THE SETTLEMENTS, AND FOR LEAVE TO**
**FILE MOTION FOR FEES, EXPENSES, AND INCENTIVE AWARDS**

## TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................................1

II.  BACKGROUND ....................................................................................................3

    A.   The Litigation.............................................................................................3

    B.   Previous Settlement History .....................................................................3

    C.   The NFC Settlement Negotiations ............................................................4

    D.   The Midwest Poultry Negotiations ...........................................................5

III. PROVISIONS OF THE SETTLEMENT AGREEMENTS ...................................7

    A.   The Settlement Class..................................................................................7

    B.   Cash Consideration to the Proposed Class & Rescission Provisions .......8

        1.   NFC.................................................................................................8

        2.   Midwest Poultry.............................................................................8

    C.   The Cooperation Provisions......................................................................9

        1.   NFC.................................................................................................9

        2.   Midwest Poultry...........................................................................10

    D.   Release Provisions ..................................................................................10

IV.  THE PROPOSED SETTLEMENTS ARE SUFFICIENTLY FAIR,
     REASONABLE AND ADEQUATE...................................................................11

    A.   Standard For Granting Preliminary Approval Of The Settlements .........11

    B.   The Settlement Amounts, the Cooperation Provisions and the Terms of the
        Agreements Support Preliminary Approval.............................................13

    C.   The Negotiation Processes Supports Preliminary Approval...................16

    D.   The Extent of Discovery at the Time the Settlement Agreement was
        Negotiated and Agreed to Supports Preliminary Approval. ...................17

    E.   The Expense and Uncertainty of Continued Litigation Against NFC and
        Midwest Poultry Supports Preliminary Approval...................................18

V.    PRELIMINARY CERTIFICATION OF THE PROPOSED NFC AND
      MIDWEST POULTRY SETTLEMENT CLASSES IS WARRANTED .........................19

      A.    This Case Satisfies The Prerequisites Of Rule 23(a). ............................................20

            1.    The Settlement Class is sufficiently numerous. .........................................20

            2.    There are common questions of law and fact. ...........................................22

            3.    The Representative Plaintiffs' claims are typical of those of the
                  Settlement Class. .....................................................................................23

            4.    The Representative Plaintiffs will fairly and adequately protect the
                  interests of the Class. ..............................................................................24

      B.    The Representative Plaintiffs' Claims Satisfy The Prerequisites Of Rule
            23(b)(3). ................................................................................................................25

            1.    Common legal and factual questions predominate. ...................................26

            2.    A class action is superior to other methods of adjudication. ....................31

VI.   PLAINTIFFS' MOTION FOR LEAVE TO FILE MOTION FOR ATTORNEYS'
      FEES AND EXPENSES AND INCENTIVE AWARDS .................................................32

VII.  CONCLUSION.................................................................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor,*
  521 U.S.591 (1997)............................................................................25, 26, 32

*Austin v. Pa. Dept of Corr.,*
  876 F. Supp. 1437 (E.D. Pa. 1995) ..................................................................13

*Baby Neal v. Casey,*
  43 F.3d 48 (3d Cir. 1994) ...............................................................................22

*Bogosian v. Gulf Oil Corp.,*
  561 F.2d 434 (3d Cir. 1977)............................................................................24

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013).....................................................................................30

*Danny Kresky Enter. Corp. v. Magid,*
  716 F.2d 206 (3d Cir. 1983).............................................................................26

*Gates v. Rohm & Haas Co.,*
  248 F.R.D. 434 (E.D. Pa. 2008)........................................................................12

*Girsh v. Jepson,*
  521 F.2d 153 (3d Cir. 1975)..............................................................................12

*Hanrahan v. Britt,*
  174 F.R.D. 356 (E.D. Pa. 1997) ........................................................................16

*Hedges Enters., Inc. v. Cont'l Grp., Inc.,*
  81 F.R.D. 461 (E.D. Pa. 1979)...........................................................................30

*Hoxworth v. Blinder, Robinson & Co., Inc.,*
  980 F.2d 912 (3d Cir. 1992).........................................................................23, 24

*In re Am. Inv. Life Ins. Co. Annuity Mktg. and Sales Practices Litig.,*
  263 F.R.D. 226 (E.D. Pa. 2009).........................................................................11

*In re Auto. Refinishing Paint Antitrust Litig.,*
  MDL NO. 1426, 2004 WL 1068807 (E.D. Pa. May 11, 2004) ...................11, 14, 15

*In re Auto. Refinishing Paint Antitrust Litig.,*
  No. MDL 1426, 2003 WL 23316645 (E.D. Pa. Sept. 5, 2003) .............................16

*In re Auto. Refinishing Paint Antitrust Litig.,*
  617 F. Supp. 2d 336 (E.D. Pa. 2007) ............................................................12, 13

*In re Catfish Antitrust Litig.*,
    826 F. Supp. 1019 (N.D. Miss. 1993) ...................................................................23

*In re Chambers Dev. Sec. Litig.*,
    912 F. Supp. 822 (W.D. Pa. 1995) .......................................................................19

*In re Cmty. Bank of N. Va.*,
    418 F.3d 277 (3d Cir. 2005) ...........................................................................25, 30

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*,
    410 F. Supp. 659 (D. Minn. 1974) .......................................................................15

*In re Corrugated Container Antitrust Litig.*,
    MDL 3101981, WL 2093 (S.D. Tex. June 4, 1982), *aff'd*, 659 F.2d 1322
    (5th Cir. 1981) ......................................................................................................15

*In re Fine Paper Antitrust Litig.*,
    82 F.R.D. 143 (E.D. Pa. 1979) .............................................................................30

*In re Flat Glass Antitrust Litig*,
    191 F.R.D. 472 (W.D. Pa. 1999) ....................................................................22, 29

*In re Gen. Instruments Sec. Litig.*,
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ...................................................................15

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) .............................................................................11, 13

*In re Hydrogen Peroxide Antitrust Litig.*
    552 F.3d 305 (3d Cir. 2008) ...........................................................................26, 27

*In re Ikon Office Supplies Inc. Sec. Litig.*,
    194 F.R.D. 166 (E.D. Pa. 2000) ....................................................................14, 19

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*,
    No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332 (E.D. Pa. Feb. 11, 2013) ......12, 18

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009) ........................................................................ *passim*

*In re Ins. Brokerage Antitrust Litig.*,
    Case No. 04-5184, 2013 WL 3956378 (D.N.J. Aug. 1, 2013) ..............................13

*In re K-Dur Antitrust Litig.*,
    No. 01-1652, 2008 WL 2699390 (D.N.J. Apr. 14, 2008) ................................22, 29

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002) .................................................................................26

*In re Linerboard Antitrust Litig.,*
  292 F. Supp. 2d 631 (E.D. Pa. 2003) .......................................................................... *passim*

*In re Mercedes-Benz Antitrust Litig.,*
  213 F.R.D 180 (D.N.J. 2003)..................................................................................22, 24, 26

*In re Microcrystalline Cellulose Antitrust Litig.,*
  218 F.R.D. 79 (E.D. Pa. 2003)...............................................................................22, 24, 30

*In re Mid-Atlantic Toyota Antitrust Litig.,*
  564 F. Supp. 1379 (D.C. Md. 1983) ..............................................................................11, 15

*In re NASDAQ Market-Makers Antitrust Litig.,*
  169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................................................21

*In re NASDAQ Market-Makers Antitrust Litig.,*
  187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................................19

*In re OSB Antitrust Litig.,*
  2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) ......................................................................22

*In re Pet Food Prods. Liability Litig.,*
  No. 07-2867, 2008 WL 4937632 (D.N.J. Nov. 18, 2008) ......................................................19

*In re Plywood Antitrust Litig.,*
  76 F.R.D 570 (E.D. La. 1976)...........................................................................................29

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
  962 F. Supp. 450 (D.N.J. 1997) ...................................................................................11, 12

*In re The Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions,*
  148 F.3d 283 (3d Cir. 1998).............................................................................................31

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
  163 F.R.D. 200 (S.D.N.Y. 1995) ......................................................................................19

*In re Remeron End-Payor Antitrust Litig.,*
  No. Civ. 02-2007, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) ..............................................19

*In re Rite Aid Corp. Sec. Litig.,*
  146 F. Supp. 2d 706 (E.D. Pa. 2001) .................................................................................12

*In re Sumitomo Copper Litig.,*
  189 F.R.D. 274 (S.D.N.Y. 1999) ..................................................................................21, 22

*In re Warfarin Sodium Antitrust Litig.,*
  391 F.3d 516 (3d Cir. 2004)........................................................................................12, 20, 23

*In re Warfarin Sodium Antitrust Litigation*,
    212 F.R.D. 231 (D. Del 2003) *aff'd*, 391 F.3d 516 (3d Cir. 2004)..........................................31

*Krell v. Prudential Ins. Co. of Am.*,
    525 U.S. 1114 (1999)..................................................................................................31

*Lake v. First Nationwide Bank*,
    156 F.R.D. 615 (E.D. Pa. 1994)..................................................................................16

*Marsden v. Select Med. Corp.*,
    246 F.R.D. 480 (E.D. Pa. 2007)..................................................................................21

*McGuiness v. Parnes*,
    No. 87-2728-LFO, 1989 WL 29814 (D.D.C. Mar. 22, 1989) ..................................15

*Petruzzi's Inc. v. Darling-Delaware Co.*,
    880 F. Supp. 292 (M.D. Pa. 1995)..............................................................................16

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)........................................................................................21

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001)........................................................................................21

*Stewart v. Rubin*,
    948 F. Supp. 1077 (D.D.C. 1996), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997)..............15

*Sullivan v. DB Inv., Inc.*,
    667 F.3d 273 (3d Cir. 2011) *cert. denied*, 132 S. Ct. 1876 (2012)....................26, 27

*Thomas v. NCO Fin. Sys.*,
    No. CIV.A. 00-5118, 2002 WL 1773035 (E.D. Pa. July 31, 2002).........................12

*Transamerican Refining Corp. v. Dravo Corp.*,
    130 F.R.D. 70 (S.D. Tex. 1990)..................................................................................22

*Wal-Mart Stores Inv. v. Dukes*,
    131 S. Ct. 2541 (2011)................................................................................................27

*Weisfeld v. Sun Chem. Corp.*,
    210 F.R.D 136 (D.N.J. 2002).......................................................................................22

*Weseley v. Spear*,
    711 F. Supp. 713 (E.D.N.Y. 1989) .............................................................................18

## STATUTES

15 U.S.C. § 1.................................................................................................................3

**RULES**

Rule 23(a)............................................................................................................ *passim*

Rule 23(b) ...............................................................................................20, 25, 26, 31

Rule 23(e).......................................................................................................1, 2, 17

**OTHER AUTHORITIES**

2 NEWBERG ON CLASS ACTIONS, § 11.41 (3d ed. 1992)....................................................16

4 NEWBERG ON CLASS ACTIONS, § 11.25 (4th ed. 2002)....................................................11

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Direct Purchaser Plaintiffs ("Plaintiffs") respectfully submit this memorandum in support of their motion: (1) for preliminary approval of a settlement between Plaintiffs and National Food Corporation ("NFC") as set forth in the "Settlement Agreement Between Direct Purchaser Plaintiffs and Defendant National Food Corporation" ("NFC Agreement" or "NFC Settlement Agreement"), attached as Exhibit 1 to the Declaration of James J. Pizzirusso (NFC); (2) for preliminary approval of a settlement between Plaintiffs and Midwest Poultry Services, LP ("Midwest Poultry") as set forth in the "Settlement Agreement Between Direct Purchaser Plaintiffs and Defendant Midwest Poultry Services, LP" ("Midwest Poultry Agreement" or "Midwest Poultry Settlement Agreement"), attached as Exhibit 1 to the Declaration of James J. Pizzirusso (Midwest Poultry); (3) for certification of a class for purposes of each Settlement Agreement; and (4) for leave to file motions for attorney's fees, reimbursement of expenses, and reasonable incentive awards.

## I.   __INTRODUCTION__

After many months of intense arm's-length negotiations, Plaintiffs successfully obtained mutually agreeable settlements with both NFC and Midwest Poultry.[1] In exchange for a release from this lawsuit, NFC has agreed to pay $1,000,000 into a fund to provide for the claims of members of the proposed Settlement Class. The NFC Agreement also requires that NFC authenticate documents, provide a witness to testify at trial, and provide additional factual information relating to the issues and events relevant to this action.

---

[1] The NFC and Midwest Poultry settlement agreements were negotiated and executed completely separate and independent from one another. Plaintiffs file one brief in support of both settlements for purposes of efficiency and because the same legal standards apply to both settlements.

In exchange for a release from this lawsuit, Midwest Poultry has agreed to pay $2,500,000 into a fund to provide for the claims of members of the proposed Settlement Class. The Midwest Poultry Agreement also requires that Midwest Poultry authenticate documents, provide a witness to testify at trial, and provide additional factual information relating to the issues and events in this action.

Plaintiffs believe these commitments by NFC and Midwest Poultry, which are in addition to paying money damages, will materially assist Plaintiffs in further analyzing and prosecuting this action against the remaining Defendants: Daybreak Foods, Inc., Hillandale Farms of Pa., Inc., Hillandale-Gettysburg, L.P., Rose Acre Farms, Inc., Michael Foods, Inc., NuCal Foods, Inc., Ohio Fresh Eggs, LLC, United Egg Producers, Inc., United States Egg Marketers, Inc., and R. W. Sauder, Inc. ("Non-Settling Defendants").

Plaintiffs respectfully move the Court for an Order ("Preliminary Approval Order"), for each of the Settlement Agreements, in substantially the same form as the proposed orders submitted herewith, that provides, among other things:

- the settlement proposed in the Settlement Agreement has been negotiated at arm's length and is preliminarily determined to be fair, reasonable, adequate, and in the best interests of the Settlement Class;

- the Settlement Class defined in the Settlement Agreement be certified, designating Class Representatives and Settlement Class Counsel as defined therein, on the condition that the certification and designations shall be automatically vacated in the event that the Settlement Agreement is not approved by the Court or any appellate court; and

- a hearing on the settlement proposed in the Settlement Agreement shall be held by the Court to determine whether the proposed settlement is fair, reasonable, and adequate, and whether it should be finally approved by the Court.

These provisions will set in motion the procedures necessary to obtain final approval of the proposed settlements as required by Rule 23(e) of the Federal Rules of Civil Procedure.

At this time, in considering whether to grant preliminary approval of a proposed settlement, the Court need determine only whether the settlement is sufficiently fair, reasonable, and adequate to allow notice of the proposed settlement to be disseminated to the Settlement Class. A final determination of the settlement's fairness will be made at or after the Fairness Hearing, after Class Members have received notice of the settlement and have been given an opportunity to object to it or opt-out of the class. As set forth below, Plaintiffs submit that both the NFC Agreement and the Midwest Poultry Agreement amply satisfy the required standards.

## II.   **BACKGROUND**

### A.   **The Litigation**

This case concerns an alleged conspiracy among the nation's largest egg producers. Plaintiffs allege that Defendants and other named and unnamed co-conspirators violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*., by engaging in an unlawful conspiracy to reduce output and thereby artificially fix, raise, maintain and/or stabilize the prices of shell eggs and egg products in the United States.  As a result of Defendants' alleged conduct, Plaintiffs and members of the Class paid prices for shell eggs and egg products that were higher than they otherwise would have been absent the conspiracy.  The lawsuit seeks treble damages, injunctive relief, attorneys' fees, and costs from Defendants. Midwest Poultry and NFC deny all allegations of wrongdoing in this action.

### B.   **Previous Settlement History**

On June 8, 2009, Sparboe Farms, Inc. ("Sparboe") entered into a settlement agreement with Plaintiffs providing for cooperation in the continued litigation of the case, and on July 16, 2012, this Court granted final approval of the settlement.  ECF No. 698.  On May 21, 2010, Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc. entered into a settlement agreement with Plaintiffs providing for both continued cooperation and a cash settlement of

$25,000,000.00, and on July 16, 2012, this Court granted final approval of the settlement.  ECF No. 700. On August 2, 2013 Cal-Maine Foods, Inc., ("Cal-Maine") entered into a settlement agreement with Plaintiffs providing for continued cooperation and a cash settlement of $28,000,000.00. ECF No. 848-2. This Court granted preliminary approval of that settlement on February 28, 2014. ECF No. 908.

###### C.    The NFC Settlement Negotiations

Interim Co-Lead Counsel for Plaintiffs ("Class Counsel") and NFC's counsel, Davis Wright Tremaine, LLP, engaged in extensive arm's length negotiations over the course of  nearly a year to reach the current settlement. The scope and details of the negotiations are described in the Pizzirusso Declaration (NFC) attached hereto. Class Counsel and NFC's counsel, both highly experienced and capable, vigorously advocated their respective clients' positions in the settlement negotiations.

Preliminary settlement discussions began in late 2012 and early 2013, but quickly stalled. Pizzirusso Decl. (NFC) ¶ 5. The parties renewed discussions in May 2013, and by July 2013 were working towards a joint mediation. *Id.* at ¶¶ 6–7. At that point, Class Counsel had also reviewed NFC's financial statements, which were provided by NFC's counsel so that Class Counsel would consider NFC's financial status when forming its demand.

Settlement discussions with NFC were put on hold shortly thereafter for a variety of reasons, including the parties' consideration of a global mediation with all Defendants. Plaintiffs continued to pursue discovery of NFC in the interim by attempting to schedule NFC depositions and by pursuing additional information regarding NFC transactional data, among other things. *Id.* at ¶ 8.  NFC also produced a new round of financial statements, which demonstrated that NFC's financial condition was not improving.  *Id.* at 9.

Class Counsel and NFC's counsel renewed settlement discussions in November 2013 after an unsuccessful global mediation in October in which NFC did not participate. *Id.* at ¶ 11. The parties engaged in several more rounds of telephone calls and email exchanges, and eventually agreed to a settlement requiring that NFC pay $1,000,000.00 and cooperate with Plaintiffs in the continued litigation of the case. The settlement amount was based primarily on NFC's precarious financial status and the amount of its commerce in the case. *Id.* At the time of the agreement, Class Counsel had reviewed over 100,000 documents produced by NFC—as well as the productions of many other defendants, and therefore had extensive knowledge of Defendants' antitrust conspiracy and the strengths and weaknesses of their claims and Defendants' asserted defenses.

The parties reached an agreement in principle on February 28, 2014. *Id.* at ¶ 12. The Settlement Agreement was fully executed by Class Counsel and NFC's counsel on March 28, 2014. *Id.* at ¶ 13. After factual investigation and legal analysis, it is the opinion of Class Counsel that the Settlement Amount of $1,000,000.00, combined with NFC's obligation to cooperate with Plaintiffs, is fair, reasonable, and adequate to the Class. Plaintiffs respectfully submit that the Settlement is in the best interest of the Class and should be preliminarily approved by the Court, and that a class should be certified for purposes of the Settlement.

## D.      The Midwest Poultry Negotiations

Class Counsel and Midwest Poultry's counsel, Faegre Baker Daniels LLP, engaged in arm's length negotiations over a period of roughly two months to reach the current settlement. The scope and details of the negotiations are described in the Pizzirusso Declaration (Midwest Poultry) attached hereto. Class Counsel and Midwest Poultry's counsel are both highly experienced and capable, and both vigorously advocated their respective client's positions in the settlement negotiations.

Midwest Poultry attended the global mediation session in October 2013.  Although unsuccessful, Class Counsel decided to approach Midwest Poultry about reaching a possible resolution. The parties began substantive negotiations in January 2014. Pizzirusso Decl. (Midwest Poultry) ¶ 6.  After several rounds of telephone calls and email exchanges, the parties eventually agreed to a settlement requiring that Midwest Poultry pay $2,500,000.000 and cooperate with Plaintiffs in the continued litigation of the case. *Id.* The amount of money damages was based primarily on Midwest Poultry's financial condition and that a significant percent of the company's sales had been to Direct Action Plaintiffs. *Id.* At the time the parties reached an agreement, Class Counsel had spent significant time reviewing Midwest Poultry's production—consisting of over 40,000 documents, of which approximately 20% had been reviewed when the parties reached an agreement—and had deposed Midwest Poultry's CEO in his personal capacity and in his capacity as the corporate representative of Midwest Poultry. This, along with comprehensive review of the other Defendants' production, provided Class Counsel with extensive knowledge of Defendants' antitrust conspiracy and the strengths and weaknesses of Plaintiffs' claims and Defendants' asserted defenses.

Plaintiffs and Midwest Poultry reached an agreement in principle on February 10, 2014, and executed the Settlement Agreement on March 31, 2014. *Id.* at ¶¶ 7–8. After factual investigation and legal analysis, it is the opinion of Class Counsel that the Settlement Amount of $2,500,000.00, combined with Midwest Poultry's obligation to cooperate with Plaintiffs, is fair, reasonable, and adequate to the Class. Plaintiffs respectfully submit that the Settlement is in the best interest of the Class and should be preliminarily approved by the Court, and that a class should be certified for purposes of the Settlement.

III.    **PROVISIONS OF THE SETTLEMENT AGREEMENTS**

    A.    **The Settlement Class**

       Both the NFC Settlement Agreement and the Midwest Poultry Settlement Agreement

define the proposed Settlement Class as follows:

> All persons and entities that purchased Shell Eggs and Egg Products in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date on which the Court enters an order preliminarily approving the Agreement and certifying a Class for Settlement purposes.
>
> a.) Shell Egg SubClass
>
> All individuals and entities that purchased Shell Eggs in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date on which the Court enters an order preliminarily approving the Agreement and certifying a Class for Settlement purposes.
>
> b.) Egg Products SubClass
>
> All individuals and entities that purchased Egg Products produced from Shell Eggs in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date on which the Court enters an order preliminarily approving the Agreement and certifying a Class for Settlement purposes.
>
> Excluded from the Class and SubClasses are Defendants, Other Settling Defendants, and Producers, and the parents, subsidiaries and affiliates of Defendants, Other Settling Defendants, and Producers, all government entities, as well as the Court and staff to whom this case is assigned, and any member of the Court's or staff's immediate family.

NFC Settlement Agreement, ¶ 22 (Pizzirusso Decl. (NFC), Ex. 1); Midwest Poultry Settlement

Agreement, ¶ 23 (Pizzirusso Decl. (Midwest Poultry), Ex. 1). The Cal-Maine, Moark, and

Sparboe settlement agreements all similarly define the Settlement Class.[2]

---

       [2] All of the settlement agreements define the Settlement Classes as "all persons and entities that purchased eggs . . . including Shell Eggs and Egg Products . . . directly from any producer . . . ." And all of the Settlement Agreements exclude from the class those who purchased exclusively "specialty shell eggs" or "hatching shell eggs." The Moark and Sparboe

**B.** **Cash Consideration to the Proposed Class & Rescission Provisions**

    1.   <u>NFC</u>

The NFC Settlement Agreement provides that, within 5 days of its execution, NFC will pay $1,000,000.00 in cash (the "Settlement Amount"). *See* NFC Settlement Agreement ¶¶ 19, 37. This money shall be maintained in an escrow account controlled by NFC and Class Counsel pending approval of the settlement by the Court. The NFC and Plaintiffs each have the right and option to rescind the Settlement Agreement for the reasons described in ¶ 34 of the Agreement, including in the event that the Court refuses to approve the Agreement or any part thereof, or if such approval is modified or set aside on appeal.

Additionally, the NFC Settlement Agreement provides that Class Counsel may, at a time approved by the Court, seek from the Settlement Amount an award of attorney's fees, expenses, and incentive awards for class representatives, and that NFC shall have no obligation to pay any fees or expenses of Class Counsel. *Id.* at ¶ 39.

    2.   <u>Midwest Poultry</u>

The Midwest Poultry Agreement provides that within 20 days of its execution, Midwest Poultry will pay $2,500,000.00 in cash (the "Settlement Amount"). *See* Midwest Poultry Agreement ¶¶ 19, 38. This money shall be maintained in an escrow account controlled by Midwest Poultry and Class Counsel pending approval of the settlement by the Court. Midwest Poultry and Plaintiffs each have the right and option to rescind the Settlement Agreement for the reasons described in ¶ 34 of the Agreement, including in the event that the Court refuses to

---

Agreements provide for those exclusions in the class definitions themselves, whereas the Settlement Agreement with Cal-Maine simply defines "shell eggs" and "egg products" as excluding specialty and hatching shell eggs in the definition of those terms in the Agreement, thus incorporating those exclusions into the class definition by reference. *Compare* Cal-Maine Settlement Agreement (ECF 848-2) ¶¶ 8, 18, 20 *with* Moark Settlement Agreement (ECF No. 349-1) ¶ 19, *and* Sparboe Settlement Agreement (ECF No. 172-2) ¶ 11.

approve the Agreement or any part thereof, or if such approval is modified or set aside on appeal.

Midwest Poultry also has the right and option to rescind the Agreement should class members whose combined purchases of Shell Eggs and Egg Products equal or exceed a percentage of Midwest Poultry's total sales decide to exclude themselves from the Settlement Class. *Id.* at ¶ 37. The Opt-Out threshold is set forth in a Supplement Agreement between the parties, which will be disclosed to the Court and offered for an *in camera* inspection prior to entry of the preliminary approval order. *Id.*

Additionally, the Midwest Poultry Settlement Agreement provides that Class Counsel may, at a time approved by the Court, seek from the Settlement Amount an award of attorney's fees, expenses, and incentive awards for class representatives, and that NFC shall have no obligation to pay any fees or expenses of Class Counsel. *Id.* at ¶ 39.

### C.    The Cooperation Provisions

In addition to the Settlement Amount, both the NFC Agreement and the Midwest Poultry Agreement require that the respective settling Defendants cooperate with Plaintiffs in their prosecution of this case..

### 1.    NFC

The NFC Agreement requires that NFC provide an attorney proffer of up to five hours with information concerning, *inter alia*, NFC, its operations, and identification of potential NFC witnesses with knowledge of the matters at issue in this case. NFC Agreement ¶ 43. The Agreement also requires that NFC make available for interview with Class Counsel up to two current directors, officers, and employees of NFC, and up to one former director, officer, or employee, who Class Counsel believe would assist Plaintiffs in prosecuting this case. *Id.* The Agreement further requires that NFC: (1) clarify transactional data produced by NFC; (2) establish the authenticity of and/or admissibility as business records of documents produced

by NFC and, to the extent possible, documents produced by Non-Settling Defendants that were sent to or received by NFC; and (3) make available from its current or former directors, officers, or employees up to two representatives who will testify at trial regarding the facts and issues in dispute. *Id.*

### 2. Midwest Poultry

The Midwest Poultry Agreement requires that Midwest Poultry provide an attorney proffer of up to eight hours with information concerning Midwest Poultry's knowledge, and that of its directors, officers, employees, and agents, of the facts and events at issue in this case. Midwest Poultry Agreement ¶ 44. The Agreement also requires that Midwest Poultry make available for interview with Class Counsel each of the current directors, officers, and employees of Midwest Poultry who Class Counsel believe would assist Plaintiffs in prosecuting this case. *Id.* Midwest Poultry shall use its best efforts to assist Class Counsel in arranging interviews with former Midwest Poultry directors, officers, employees, and agents. *Id.* The Agreement further requires that Midwest Poultry: (1) clarify transactional data produced by Midwest Poultry; (2) establish the authenticity of and/or admissibility as business records of documents produced by Midwest Poultry and, to the extent possible, documents produced by Non-Settling Defendants that were sent to or received by Midwest Poultry; and (3) make available from among its current or former directors, officers or employees a representative who will testify at trial regarding the facts and issues in dispute. *Id.*

### D. Release Provisions

In exchange for the consideration described above, Plaintiffs have agreed to release NFC and Midwest Poultry from any and all claims arising out of or resulting from: (i) any agreement or understanding between or among two or more Producers of eggs, including any Defendants; (ii) the reduction or restraint of supply, the reduction of or restrictions on production capacity; or

(iii) the pricing, selling, discounting, marketing, or distributing of Shell Eggs or Egg Products in the United States or elsewhere. The full text of the proposed releases, including the limitations thereof, is set forth in the Settlement Agreements. NFC Agreement ¶¶ 29–33; Midwest Poultry Agreement ¶¶ 30–33.

## IV.    THE PROPOSED SETTLEMENTS ARE SUFFICIENTLY FAIR, REASONABLE AND ADEQUATE

### A.    Standard For Granting Preliminary Approval Of The Settlements

The approval of class action settlements involves a two-step process: (1) preliminary approval; and (2) a fairness hearing, after notice to the class, to determine final approval of the proposed settlement. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL NO. 1426, 2004 WL 1068807, at *1 (E.D. Pa. May 11, 2004); 4 NEWBERG ON CLASS ACTIONS § 11:25, at 38-39 (4th ed. 2002).

When deciding preliminary approval, a court does not conduct a "definitive proceeding on fairness of the proposed settlement." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D.C. Md. 1983); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) (holding that the "preliminary determination establishes an initial presumption of fairness"); *In re Am. Inv. Life Ins. Co. Annuity Mktg. and Sales Practices Litig.,* 263 F.R.D. 226, 238 (E.D. Pa. 2009) (same). That definitive determination must await the final hearing, at which the fairness, reasonableness, and adequacy of the settlement are more fully assessed. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003).[3]  Indeed, as one court noted:

---

[3]   The factors considered for final approval of a class settlement as "fair, reasonable and adequate" include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of

In evaluating a settlement for preliminary approval, the court need not reach any ultimate conclusions on the issues of fact and law that underlie the merits of the dispute . . . . Instead, the court must determine whether "the proposed settlement discloses grounds to doubt its fairness or otherwise obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and whether it appears to fall within the range of possible approval . . . . The analysis often focuses on whether the settlement is the product of 'arms-length negotiations.'

*Thomas v. NCO Fin. Sys.*, No. CIV.A. 00-5118, 2002 WL 1773035, at *5 (E.D. Pa. July 31, 2002) (internal citations omitted).  In determining at the preliminary approval stage whether an antitrust settlement falls within a "range of reasonableness," a court examines whether "'(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'"[4]  *In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig*., No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332, at *7 (E.D. Pa. Feb. 11, 2013) (*quoting In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003) and *citing In re Gen. Motors Corp.*, 55 F.3d at 784).  After making such findings, a settlement agreement is entitled to a presumption of fairness and should be preliminarily approved.  *Id.* at *8.

Additionally, in reviewing a proposed settlement, courts may also consider the amount of relief provided, *see, e.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 344

discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.  *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534-35 (3d Cir. 2004); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 713 (E.D. Pa. 2001).  At the preliminary approval stage, "the Court need not address these factors, as the standard for preliminary approval is far less demanding." *Gates v. Rohm & Haas Co.,* 248 F.R.D. 434, 444 n.7 (E.D. Pa. 2008). Plaintiffs will thus fully address each of these factors in in their memorandum in support of their motion for final approval.

[4] The last factor, the percentage of objections, is premature at this stage.  *In re Imprelis*, U.S. Dist. LEXIS 18332, at *10.

(E.D. Pa. 2007), and commitments of settling defendants to provide information or cooperation that assists the class in prosecuting the action against non-settling defendants, *see e.g., In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 643.

Finally, the Court should consider that "settlement of litigation is especially favored by courts in the class action setting." *In re Ins. Brokerage Antitrust Litig*., Case No. 04-5184, 2013 WL 3956378 (D.N.J. Aug. 1, 2013) (citing *In re Gen. Motors Corp.*, 55 F.3d at 784 (holding that "the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation")); *Austin v. Pa. Dept of Corr.*, 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) (explaining that "the extraordinary amount of judicial and private resources consumed by massive class action litigation elevates the general policy of encouraging settlements to 'an overriding public interest'").

As discussed below, the proposed Settlement Agreements with NFC and Midwest Poultry are entitled to a presumption of fairness because they provide no preferential treatment of class representatives or segments of the class, do not provide for excessive compensation of attorneys, provide significant relief to the Settlement Class, and require that NFC and Midwest Poultry provide significant additional information regarding the facts and events at issue in this case, which will assist Plaintiffs in prosecuting the case against the Non-Settling Defendants.

**B.      The Settlement Amounts, the Cooperation Provisions and the Terms of the Agreements Support Preliminary Approval.**

The settlement  amounts provided in both proposed settlement agreements are fair and reasonable and represent a favorable result for the class. As noted above, the NFC Agreement requires that NFC pay $1,000,000.00. This amount was agreed to after almost a year of back and forth negotiations, and is based on NFC's amount of commerce in the case and its precarious financial position as established in the audited financial statements provided by NFC. Class

Counsel believes it is in the best interest of the class to enter into the NFC Agreement rather than continuing to pursue a judgment against NFC that may prove to be uncollectible. The Midwest Poultry Agreement requires that Midwest Poultry pay $2,500,000. This amount was also hard fought on both sides, and is based primarily on Midwest Poultry's financial condition and the fact that a significant portion of Midwest Poultry's sales had been to Direct Action Plaintiffs. Moreover, the damages Plaintiffs suffered due to NFC's and Midwest Poultry's alleged conduct remain in the case and are recoverable from other Defendants under joint and several liability. *See In re Auto. Refinishing Paint Antitrust Litig.*, MDL NO. 1426, 2004 WL 1068807, at *2 (preliminarily approving settlement agreement because, *inter alia*, "this settlement does not affect the joint and several liability of the remaining Defendants in this alleged conspiracy").

Also, as described above, the settlement agreements require that NFC and Midwest Poultry cooperate with Plaintiffs in prosecuting this case, which includes providing immediate assistance in developing additional factual information regarding the issues and events relevant to this case. Class Counsel believe that this assistance will strengthen Plaintiffs' claims in this case while at the same time avoiding the risk and expense of continuing litigation against NFC and Midwest Poultry. Class Counsel believes that the proposed settlements with NFC and Midwest Poultry will significantly benefit Plaintiffs and will assist Class Counsel in analyzing and prosecuting their claims in this case. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 643 ("The provision of such [cooperation] is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement."); *In re Ikon Office Supplies Inc. Sec. Litig.*, 194 F.R.D. 166, 177 (E.D. Pa. 2000) (noting that cooperation agreements are valuable when settling a complex case); *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 WL 1068807,

at *2 (acknowledging the assistance that the settling defendants will provide "in pursuing this case against the remaining Defendants").[5]

Class Counsel have substantial experience litigating antitrust class actions and strongly believe that the settlement amounts are appropriate cash consideration for the discharge of the claims against NFC and Midwest Poultry, and are a highly favorable result of the Class. This determination is based in part on Class Counsel's review of NFC's and Midwest Poultry's sales figures and market share during the damages period, as well as the risk and likely expense of continuing to litigate the claims against NFC and Midwest Poultry. Courts have accorded significant weight to the opinion of Class Counsel based on a thorough analysis of the facts. *See, e.g., In re Gen. Instruments Sec. Litig.,* 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001); *Stewart v. Rubin,* 948 F. Supp. 1077, 1099 (D.D.C. 1996), *aff'd,* 124 F.3d 1309 (D.C. Cir. 1997) ("A court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof."); *McGuiness v. Parnes,* No. 87-2728-LFO, 1989 WL 29814, at *1 (D.D.C. Mar. 22, 1989) ("While the evaluation of the fairness and adequacy of a settlement such as this is anything but a scientific process, there is nothing about this Settlement suggesting that the Court should second-guess the product of the negotiations between the skilled and conscientious lawyers who represented parties on both sides of this litigation."); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F. Supp. 659, 667 (D.

---

[5]   *See also In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1386 (D.C. Md. 1983) ("[T]he commitment [the] Distributor defendants have made to cooperate with plaintiffs will certainly benefit the classes, and is an appropriate factor for the court to consider in approving a settlement"); *In re Corrugated Container Antitrust Litig.*, MDL 3101981, WL 2093, at *16 (S.D. Tex. June 4, 1981), *aff'd*, 659 F.2d 1322, 1329 (5th Cir. 1981) ("The settlement agreements provided for cooperation from the settling defendants that constituted a substantial benefit to the class. Those provisions were intended to save plaintiffs time and expense in the continuing litigation . . . [and] made certain information and expertise available to the class which might not have been available through normal discovery.").

Minn. 1974) ("The recommendation of experienced antitrust counsel is entitled to great weight.").

Finally, the NFC and Midwest Poultry settlements are fair to the class as a whole. They provide no preferential treatment to Class Representatives, and Class Counsel anticipate the allocation of settlement funds will be distributed pro-rata based on each class member's (including Class Representative's) purchases of shell eggs and egg products.  Class representatives benefit from the Settlement Agreement in the same way as any other Settlement Class member.  *See* Allocation Order, Nov. 9, 2012 (ECF No. 761) (finding pro rata allocation of settlement funds to be fair, reasonable, and adequate).  And, as noted above, both Agreements provide that Class Counsel must obtain approval from the Court to receive fees and expenses from the Settlement Amounts, which may not be paid until final approval of the Agreements.

### C.    The Negotiation Processes Supports Preliminary Approval.

Settlements that result from arm's-length negotiations between experienced counsel are generally entitled to deference from the court.  *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2003 WL 23316645, at *6 (E.D. Pa. Sept. 5, 2003); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 640 (holding that "[a] presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel" (*citing Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997))); *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628 (E.D. Pa. 1994) (giving "due regard to the recommendations of the experienced counsel in this case, who have negotiated this settlement at arms-length and in good faith"); *Petruzzi's Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 301 (M.D. Pa. 1995) ("[T]he opinions and recommendations of such experienced counsel are indeed entitled to considerable weight"); 2 NEWBERG ON CLASS ACTIONS, § 11.41 (3d ed. 1992) ("There is usually an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's

length by counsel for the class, is presented for court approval."). This deference reflects the understanding that vigorous negotiations between seasoned counsel protect against collusion and advance the fairness considerations of Rule 23(e).

As discussed above and in the accompanying Pizzirusso Declarations, the settlements with NFC and Midwest Poultry are the result of hard-fought, arm's length negotiations between NFC's and Midwest Poultry's counsel and Class Counsel, all of whom are experienced and capable in complex class action and antitrust matters.[6] NFC's counsel, Midwest Poultry's counsel, and Class Counsel vigorously advocated their respective clients' positions in the settlement negotiations and were prepared to litigate the case fully if no settlement was reached. Nothing in the course of Plaintiffs' negotiations with NFC or Midwest Poultry, or in the substance of the proposed Settlement Agreements, presents any reason to doubt the Agreements' fairness.

**D.     The Extent of Discovery at the Time the Settlement Agreement was Negotiated and Agreed to Supports Preliminary Approval.**

Fact discovery was well advanced when these Settlement Agreements were reached. When Class Counsel and NFC resumed settlement discussions in November 2013, Class Counsel had reviewed over 100,000 documents produced by NFC. When Class Counsel and Midwest Poultry began settlement discussions in February 2014, Midwest had produced over 40,000 documents, which were in the process of being reviewed by Class Counsel. Class Counsel had also already deposed Midwest Poultry's CEO, both in his individual and corporate capacity. Additionally, at the time of these Settlement Agreements, Defendants collectively had produced over 1 million documents, much of which had already been reviewed by Class Counsel.

---

[6] The experience and qualifications of Interim Co-Lead Class Counsel are described in Interim Co-Lead Counsel's Submission in Support of Permanent Appointment of Interim Leadership Structure. No. 08-cv-4653 (E.D. Pa.), ECF No. 26, and accompanying exhibits.

Accordingly, the amount of discovery completed supports a finding that the Settlement is within the range of reasonableness. *In re Imprelis*, 2013 U.S. Dist. LEXIS 18332, at *9-10 (finding settlement within range of reasonableness where "[a] considerable amount of preliminary discovery was conducted, including the review of some 500,000 pages of documents . . . , the hiring and consultation of several experts, and a deposition of [Defendant's] product manager").

### E.   The Expense and Uncertainty of Continued Litigation Against NFC and Midwest Poultry Supports Preliminary Approval.

Class counsel have considered the complexities of this litigation, the risks, expense and duration of continued litigation against NFC  and Midwest Poultry, and the likely appeals if Plaintiffs do prevail at trial.  After weighing these against the guaranteed recovery to the Class and the significant benefits of NFC's and Midwest Poultry's obligations to cooperate with Plaintiffs in the continued litigation of this case, Class Counsel strongly believes the Settlements are favorable to and in the best interests of the Plaintiffs and the Class.

The settlements with NFC and Midwest Poultry are particularly reasonable given the inherent risks in moving forward with litigation towards trial. It has been often observed that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 639 (citation omitted); *see also Weseley v. Spear*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (noting that antitrust class actions are "notoriously complex, protracted, and bitterly fought").  Continuing this litigation against either party would entail a lengthy and expensive legal battle, which has already consumed over five years.  This case does not follow a Department of Justice investigation or any public indictment.  Additionally, both NFC and Midwest Poultry have asserted various defenses, and a jury trial (assuming the case proceeded beyond pretrial motions) might well turn on questions of proof, making the outcome inherently uncertain for both parties. *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 639; *In*

*re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998)

("Antitrust litigation in general, and class action litigation in particular, is unpredictable. . . .

[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at

trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.").

Moreover, even after trial is concluded, there could be one or more lengthy appeals.  *In re*

*Remeron End-Payor Antitrust Litig.*, No. Civ. 02-2007, 2005 WL 2230314, at *17 (D.N.J. Sept.

13, 2005).  The degree of uncertainty supports preliminary approval of the proposed Settlement

Agreement.  *See In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

All of the relevant factors—the terms of the settlement itself, the nature of the

negotiations, the degree of discovery at the time of settlement, the experience of Class Counsel

and the risks of proceeding against NFC and Midwest Poultry—support the conclusion that the

Settlement falls within the range of possible final approvals and is entitled to the presumption of

fairness, permitting notice to issue to the Class.

## V.   PRELIMINARY CERTIFICATION OF THE PROPOSED NFC AND MIDWEST POULTRY SETTLEMENT CLASSES IS WARRANTED

It is well-established that a class may be certified for purposes of settlement.  *In re Pet*

*Food Prods. Liability Litig.*, No. 07-2867, 2008 WL 4937632, at *3 (D.N.J. Nov. 18, 2008)

("Class actions certified for the purposes of settlement are well recognized under Rule 23.");

*Ikon*, 194 F.R.D. at 188 (class certified for purposes of settlement of securities class action).  In

the case of settlements, "tentative or temporary settlement classes are favored when there is little

or no likelihood of abuse, and the settlement is fair and reasonable and under the scrutiny of the

trial judge."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995)

(internal quotation and citation omitted).  The settlements here are fair, reasonable, and non-

abusive.  Therefore the Settlement Class—which is the same in both the NFC Agreement and the Midwest Poultry Agreement—should be certified by the Court.

Rule 23 governs the issue of class certification for both litigation and settlement classes. A settlement class should be certified where the four requirements of Rule 23(a)—numerosity, commonality, typicality and adequacy—are satisfied, and when one of the three subsections of Rule 23(b) is also met.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 527-30.

## A.     This Case Satisfies The Prerequisites Of Rule 23(a).

Certification is appropriate under Rule 23(a) if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  This Court has already held that the similarly-defined settlement class satisfies Rule 23(a)'s prerequisites in its July 16, 2012 Order granting final approval to the Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc. settlement agreement:

> The Settlement Class is so numerous that joinder of all members is not practicable, there are questions of law and fact common to the Settlement Class, the claims of the Class Representatives are typical of the claims of the Settlement Class, and the Class Representatives will fairly and adequately protect the interests of the Settlement Class. For purposes of this settlement, questions of law and fact common to the members of the Settlement Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Order, July 16, 2012 (ECF No. 700) ¶ 4. The Court also found that Rule 23(a)'s requirements were satisfied for purposes of preliminary approval of the Settlement Class set forth in the Cal-Maine Settlement Agreement, which used the same Settlement Class provided in the NFC and Midwest Poultry agreements. *See* Order, February 28, 2014 (ECF No. 908) ¶ 9.

### 1.     The Settlement Class is sufficiently numerous.

Class certification under Rule 23(a)(1) is appropriate where a class contains so many members that joinder of all would be "impracticable." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). There is no threshold number required to satisfy the numerosity requirement and the most important factor is whether joinder of all the parties would be impracticable for any reason. *Stewart v. Abraham*, 275 F.3d 220, 227-28 (3d Cir. 2001) (noting that there is no minimum number to satisfy numerosity and observing that generally the requirement is met if the number of plaintiffs exceeds 40). Moreover, numerosity is not determined solely by the size of the class but also by the geographic location of class members. *Marsden v. Select Med. Corp.*, 246 F.R.D. 480, 484 (E.D. Pa. 2007).

Here, the proposed Settlement Class is comprised of purchasers of hundreds of millions of cases of shell eggs and of purchasers of egg products. Third Consolidated Amended Class Action Complaint ("3CAC"), ¶ 108 (ECF No. 779). In the Moark Settlement, notice of the Settlement Agreement was sent to more than 13,000 potential class members, and nearly 700 class members filed claims and received distributions from the Settlement Fund. *See* Mem. in Supp. of DPP's Motion to Pay Costs of Settlement Administration (ECF No. 823-2) at 2, 6. Moreover, Class Representatives are located in California, Illinois, Missouri, New York, North Carolina, Pennsylvania and Wisconsin. 3CAC, ¶¶ 32-38. Putative class members are also geographically dispersed. Thus, joinder of all class members would be impracticable and the Settlement Class is sufficiently numerous to satisfy Rule 23(a)(1). *Stewart*, 275 F.3d at 227-28 (observing that generally the requirement is met if the number of plaintiffs exceeds 40); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 508-09 (S.D.N.Y. 1996) (holding that class members numbering a million made joinder impracticable); *In re Sumitomo Copper Litig.*,

189 F.R.D. 274, 278 (S.D.N.Y. 1999) (numerosity requirement met where potential class

exceeded 20,000).

        2.      <u>There are common questions of law and fact.</u>

Antitrust cases like this one easily meet the commonality requirement of Rule 23(a)(2).

*See In re K-Dur Antitrust Litig.*, No. 01-1652, 2008 WL 2699390, at *4 (D.N.J. Apr. 14, 2008)

(holding that common issues predominate with respect to whether defendants violated antitrust

law); *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D 136, 141 (D.N.J. 2002) (holding that conspiracy

to restrain trade subject to common proof); *In re OSB Antitrust Litig.*, 2007 WL 2253418, at *4

(E.D. Pa. Aug. 3, 2007); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D 180, 186-87 (D.N.J.

2003) (holding that common issues predominated on issue of alleged antitrust violation).

Moreover, to satisfy commonality:

> The members need not have identical claims to have common legal or factual
> issues that satisfy commonality. Instead, all that is required is that the litigation
> involve some common questions and that plaintiffs allege harm under the same
> theory.

*In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 83-84 (E.D. Pa. 2003) (internal

citations omitted).

Whether Defendants entered into an illegal agreement to reduce production and fix the

prices of eggs is a factual question common to all class members because this question is an

essential element of proving an antitrust violation.  Common legal questions include whether, if

such an agreement was reached, Defendants violated antitrust laws. "Indeed, consideration of the

conspiracy issue would, of necessity focus on Defendants' conduct, not the individual conduct of

the putative class members." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 484 (W.D. Pa.

1999); *Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70, 75 (S.D. Tex. 1990)

("[T]he conspiracy issue … is susceptible of generalized proof since it deals primarily with what

the Defendants themselves did and said."); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1039

(N.D. Miss. 1993) ("Evidence of a national conspiracy . . . would revolve around what the

defendants did, and said, if anything, in pursuit of a price fixing scheme."); *In re Warfarin*, 391

F.3d at 528 ("In other words, while liability depends on the conduct of DuPont, and whether it

conducted a nationwide campaign of misrepresentation and deception, it does not depend on the

conduct of individual class members.").  Because there are several common legal and factual

questions related to potential liability, the commonality requirement of Rule 23(a)(2) is met.

> 3.     The Representative Plaintiffs' claims are typical of those of the Settlement
>        Class.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class."  As the Third Circuit described in *Baby Neal v. Casey*, 43

F.3d 48 (3d Cir. 1994):

> The typicality inquiry is intended to assess whether the action can be efficiently
> maintained as a class and whether the named plaintiffs have incentives that align
> with those of absent class members so as to assure that the absentees' interests
> will be fairly represented.   The typicality criterion is intended to preclude
> certification of those cases where the legal theories of the named plaintiffs
> potentially conflict with those of the absentees by requiring that the common
> claims are comparably central to the claims of the named plaintiffs as to the
> claims of the absentees."
>
> Typicality entails an inquiry whether "the named plaintiff's individual
> circumstances are markedly different or . . . the legal theory upon which the
> claims are based differs from that upon which the claims of other class members
> will perforce be based." Commentators have noted that cases challenging the
> same unlawful conduct which affects both the named plaintiffs and the putative
> class usually satisfy the typicality requirement irrespective of the varying fact
> patterns underlying the individual claims.

*Id.* at 57-58 (internal citations omitted).

Moreover, "factual differences will not render a claim atypical if the claim arises from

the same event or practice or course of conduct that gives rise to the claims of the class members,

and if it is based on the same legal theory."  *Hoxworth v. Blinder*, *Robinson & Co., Inc.*, 980

F.2d 912, 923 (3d Cir. 1992) (internal citations omitted).  "Even if there are 'pronounced factual differences among the plaintiffs, typicality is satisfied as long as there is a strong similarity of legal theories and the named plaintiff does not have any unique circumstances.'" *Microcrystalline*, 218 F.R.D. at 84; *see also Mercedez-Benz*, 213 F.R.D at 185 ("[W]hile the Court must ensure that the interests of the plaintiffs are congruent, the Court will not reject the plaintiffs' claim of typicality on speculation regarding conflicts that may arise in the future.").

Here, typicality is satisfied because the claims of the Class Representatives and absent class members rely on the same legal theories and arise from the same alleged conspiracy and illegal agreement by Defendants, namely, Defendants' agreement to reduce production and artificially fix and/or inflate the prices of eggs.  3CAC, ¶¶ 536.  Moreover, Plaintiffs allege that all putative class members were direct purchasers of eggs and/or egg products and suffered injury as a result of Defendants' alleged anticompetitive conduct.  *Id.* ¶¶ 32-38.  The Class is also divided into subclasses to address any differences between shell egg purchases and purchases of processed egg products.  Accordingly, the Rule 23(a)(3) typicality requirement is satisfied.

4. <u>The Representative Plaintiffs will fairly and adequately protect the interests of the Class.</u>

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  As the Third Circuit explained in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), the adequate representation requirement of Rule 23(a)(4):

> [guarantees] that the representatives and their attorneys will competently, responsibly, and vigorously prosecute the suit and that the relationship of the representative parties' interest to those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit.

*Id.* at 449.

Here, Class Counsel have extensive experience and expertise in antitrust disputes, complex litigation and class action proceedings throughout the United States.  Class Counsel are qualified and able to conduct this litigation, as this Court recognized when appointing them as Interim Co-Lead Counsel.  Class Counsel have vigorously represented Plaintiffs in the settlement negotiations with NFC and Midwest Poultry and have vigorously prosecuted this action. Moreover, the named Class Representatives have adequately represented the absent Class Members' interests, actively participating in discovery by responding to document production requests and interrogatories, and have no conflicts with them.  Adequate representation under Rule 23(a)(4) is therefore satisfied.

### B.   The Representative Plaintiffs' Claims Satisfy The Prerequisites Of Rule 23(b)(3).

In addition to satisfying Rule 23(a), Plaintiffs must show that each putative class falls under at least one of the three subsections of Rule 23(b).  Here, the Settlement Class qualifies under Rule 23(b)(3), which authorizes class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[7]  Fed. R. Civ. P. 23(b)(3). This Court has already found that a similar settlement class satisfies Rule 23(b)'s prerequisites in its July 16, 2012 Order approving the Moark, LLC, Norco Ranch, Inc., and Land O'Lakes, Inc. settlement classes. Order, July 16, 2012 (ECF No. 700); *see also* Mem. in Supp. of Order (ECF No. 699). This

---

[7] Since this is a settlement class, the Court need not examine the manageability of the class at trial. "[I]n a settlement-only class action . . . the court certifying the class need not examine issues of manageability. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir. 2005) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S.591, 620 (1997)) (explaining that issues of individual liability and damages are even less likely to defeat predominance in settlement-only class actions).

Court has also already found that Rule 23(b)(3)'s requirements were satisfied for purposes of preliminary approval of the Settlement Class in the Cal-Maine Settlement Agreement, which defines the same Settlement Class provided in the NFC and Midwest Poultry Settlement Agreements. *See* Order, February 28, 2014 (ECF No. 908) ¶ 9(b).

Rule 23(b)(3) is "designed to secure judgments binding all class members, save those who affirmatively elect[] to be excluded," where a class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614-15 (1997). Certification of the proposed Settlement Class under Rule 23(b)(3) will serve these purposes.

<u>1.     Common legal and factual questions predominate.</u>

The Rule 23(b)(3) predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation . . . ." *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) *cert. denied,* 132 S. Ct. 1876 (2012) (quoting *In re Ins. Broker. Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009) (internal quotations omitted)); *In re Hydrogen Peroxide Antitrust Litig.* 552 F.3d 305, 311 (3d Cir. 2008); *see also Mercedes-Benz*, 213 F.R.D. at 186 ("Predominance requires that common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members.").

A plaintiff seeking certification of an antitrust class action must show that common or class-wide proof will predominate with respect to: "(1) a violation of the antitrust laws… ,(2) individual injury resulting from that violation, and (3) measurable damages." *In re Hydrogen Peroxide*, 552 F.3d at 311; *Danny Kresky Enter. Corp. v. Magid*, 716 F.2d 206, 209-10 (3d Cir. 1983); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002). The Rule 23(b)(3) test of predominance can be "readily met" in antitrust cases. *Amchem Products*, 521 U.S. at 625.

The Third Circuit discussed the predominance inquiry in the specific context of Section 1 antitrust settlements in *In re Ins. Brokerage Antitrust Litigation*, 579 F.3d 241 (3d Cir. 2009) (applying *Hydrogen Peroxide* in a settlement context).   That case involved allegations of bid rigging and steering among brokers and insurers in the property and casualty insurance industry.   As here, plaintiffs brought class action claims arising under Section 1 of the Sherman Act.   On review, the Third Circuit examined the propriety of the standards applied by the district court in certifying two settlement-only classes against individual defendants.   The district court had granted certification to both classes.

In evaluating a challenge to the predominance of common issues for each settlement class, the Third Circuit first noted that "because the 'clear focus' of an antitrust class action is on the allegedly deceptive conduct of defendant and not on the conduct of individual class members, common issues necessarily predominate."   *In re Ins. Brokerage Antitrust Litig.*,  579 F.3d at 267; *see also Sullivan*, 667 F.3d at 299 (finding that *Wal-Mart Stores Inv. v. Dukes*, 131 S. Ct. 2541 (2011), bolstered a finding that common issues predominated in an antitrust case where the answers to the questions of alleged anticompetitive conduct and the harm it caused are common as to all class members).   The court then turned to the specific common issues identified by the district court with respect to the antitrust claims:

> (1) whether the … Defendants entered into a conspiracy to allocate the market for the sale of insurance; (2) whether the … Defendants' alleged conspiracy had the purpose and effect of unlawfully restraining competition in the insurance industry; [and] (3) whether the . . . Defendants' conduct violated Section 1 of the Sherman Act.

*In re Ins. Brokerage Antitrust Litig.*,  579 F.3d at 267.

Finding these issues satisfied predominance, the court "examine[d] [each of] the elements of plaintiffs' claim through the prism of Rule 23."   The court analyzed whether common questions of law or fact existed with respect to the four elements of a Sherman Act Section One

conspiracy claim, which require a plaintiff to show:  "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action."  *Id.*

The court found that "[b]ecause the first and third elements of a Sherman Act violation focus on the conduct of the defendants . . . common questions abound with respect to whether the defendants engaged in illegal, concerted action"  and that "[t]he second element of a Sherman Act violation, which focuses on the effects of the defendants' challenged conduct, also involves common questions in the present case, including whether the …Defendants' actions reduced competition for insurance, whether the . . . Defendants' actions resulted in a consolidation of the insurance industry, and whether the . . . Defendants' actions produced an increase in the cost of premiums for commercial insurance."  *Id.* at 268.

Thus, as here, the issues common to the class in *Insurance Brokerage* concerned whether Defendants "engaged in illegal concerted action" and whether that action "reduced competition," and "produced an increase in the cost" of the commodity in the relevant market.  *Id*.  There, as here, it is clear that the same core set of operative facts and theory of liability apply to each class member.  As discussed above, whether Defendants entered into an illegal agreement to reduce production and artificially fix, raise, maintain, and/or stabilize the prices of eggs is a factual question common to all class members.  If Class Representatives and potential class members were to bring individual actions, they would each be required to prove the same wrongdoing by Defendants in order to establish liability.  Therefore, common proof of the first three elements of Defendants' violation of antitrust law will predominate.

After examining the first three elements of the Sherman Act conspiracy claim, the court in *Insurance Brokerage* turned to the final element: injury or antitrust impact.  The court found that "the task for plaintiffs is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.*  The plaintiffs in that case argued antitrust injury was a common question because the overcharge attributable to the conspiracy was "built into every commercial premium for commercial insurance products, and the conspiratorial conduct of all Defendants reduced or eliminated competition for insurance products, thereby raising the insurance premiums paid by Plaintiffs and all members of the class." *Id.*  The court agreed, finding that "whether the named plaintiffs and absent class members were proximately injured by the conduct of the . . . Defendants is a question that is capable of proof on a class-wide basis" *Id.*  After a brief discussion of the flow of injury through the insurance brokerage market, the court concluded that "we are satisfied that the element of antitrust injury—that is, the fact of damages—is susceptible to common proof, even if the amount of damage that each plaintiff suffered could not be established by common proof." *Id.*

The *Insurance Brokerage* decision, expressly accounting for the Third Circuit's earlier ruling in *Hydrogen Peroxide*, also accords with earlier cases holding that the fact of antitrust injury is susceptible to common proof, even where individual damages may differ.  *See e.g., K-Dur*, 2008 WL 2699390, at *20; *Flat Glass*, 191 F.R.D. at 486 ("[T]he proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants' base price was higher than it would have been absent the conspiracy, would be common to all class members."); *In re Plywood Antitrust Litig.*, 76 F.R.D 570, 584 (E.D. La. 1976) ("[I]f the members of each of the classes prove they purchased softwood plywood during the relevant period and that defendants

conspiratorially increased or stabilized plywood prices, then the trier of fact may conclude that the requisite fact of injury occurred."); *Hedges Enters., Inc. v. Cont'l Grp., Inc.*, 81 F.R.D. 461, 475 (E.D. Pa. 1979) (proof of a conspiracy to establish a "base" price would establish at least the fact of damage, even if the extent of the damages suffered by the plaintiffs would vary).

Moreover, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) poses no barrier to certification here. In that case, injury was premised on four theories of impact (each theory may have affected some but not all class members); although all but one theory was rejected by the court, the damages model did not isolate injury tied to the remaining theory and thus impact could not be proven class-wide. 133 S. Ct. at 1430, 1434-35. Here, DPPs offer just one theory of liability—Defendants conspired to curtail supply and thus artificially inflated egg prices—which will be capable of measurement on a class-wide basis since all class members purchased eggs or egg products.

Here, the alleged conspiracy is the overriding predominant question in this case. And, as alleged in the Complaint, the conspiracy permitted all Defendants to artificially maintain or inflate the price of eggs by eliminating the risk that customers would be able to avoid the non-competitive price, thus working an antitrust injury onto the entire class. *See* 3CAC, ¶¶ 496, 530-531. Accordingly, common or class-wide proof will also predominate with respect to the fact of injury or impact in this case.[8]

---

[8] Regarding the amount of damages, "[a]ntitrust cases nearly always require some speculation as to what would have happened under competitive conditions, to estimate the damage done by restraints on trade or other collusion, but this is not fatal to class certification." *Microcrystalline*, 218 F.R.D. at 92 (*citing In re Fine Paper Antitrust Litig.*, 82 F.R.D 143, 151-52 (E.D. Pa. 1979)) (noting that diversity of product, marketing practices, and pricing have not been fatal to class certification in numerous cases where conspiracy is "the overriding predominant question"). Accordingly, the need to determine the amount of damage sustained by each plaintiff is an insufficient basis for which to decline class certification. *In re Cmty. Bank of N. Va.*, 418 F.3d at 305-306 ("Although the calculation of individual damages is necessarily an

2.     A class action is superior to other methods of adjudication.

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternate available methods of adjudication." *In re The Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998), *cert. denied*, *Krell v. Prudential Ins. Co. of Am.*, 525 U.S. 1114 (1999).  In evaluating the superiority of a class action, the Court should inquire as to the class members' interest in individually controlling the prosecution of separate actions, the extent and nature of any litigation concerning the controversy already commenced by members of the class, and the desirability or undesirability of concentrating the litigation of the claims in the particular forum.  Fed. R. Civ. P. 23(b)(3).

Here, a class action is superior to other available methods for the fair and efficient adjudication of class claims, "because litigating all of these claims in one action is far more desirable than numerous separate actions litigating the same issues."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 259.  Absent class action certification, the Court may be faced with dozens of individual lawsuits, all of which would arise out of the same set of operative facts.  By proceeding as a class action, resolution of common issues alleged in one action will be a more efficient use of judicial resources and bring about a single outcome that is binding on all class members.  Also, as in most antitrust lawsuits, potential plaintiffs are likely to be geographically dispersed, as are the Class Representatives.  As such, the realistic alternative to a class action is many scattered lawsuits with possibly contradictory results for some plaintiffs and Defendants.  These very issues led the Supreme Court to acknowledge that the unique qualities of antitrust

individual inquiry, the courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues predominate."); *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 242 (D. Del 2003) ("[T]he need for individual damages calculations does not defeat predominance and class certification") *aff'd*, 391 F.3d 516, 534-35 (3d Cir. 2004).

litigation often mean that a class action is superior to individual lawsuits. *Amchem*, 521 U.S. at 617. Finally, this is an appropriate forum to litigate the case because two of the Class Representatives are located in the district, many of the Defendants resided or transacted business in the district during the Class Period, and a substantial portion of the affected interstate trade and commerce was carried out in the district. 3CAC, ¶ 26. This is also the forum selected by the Judicial Panel on Multidistrict Litigation.

## VI. PLAINTIFFS' MOTION FOR LEAVE TO FILE MOTION FOR ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARDS

Plaintiffs also seek leave to file a motion for an award of attorneys' fees, reimbursement of expenses, and for reasonable incentive awards, as appropriate, from the Settlement Amount.[9] As specified in the Proposed Orders filed herewith, Class Counsel's motion for attorneys' fees and for reimbursement of expenses shall be filed 45 days in advance of the Settlement objection and opt-out deadline, and shall be posted on the www.eggproductssettlement.com website. The timing and form of notice will provide the potential class members with both sufficient notice of the motion and a reasonable opportunity to review it prior to determining whether to object to the motion or Agreement or to opt-out of the class.[10] Additionally, as set forth in the proposed Orders, the Class Notice of the Settlement Agreement shall include the date on which the motion for fees and costs shall be filed, and inform the Class that the motion will be made available on the settlement website.

---

[9] *See* Order, July 18, 2012 (ECF No. 704) n.1 (directing Plaintiffs, pursuant to CMO No. 1, to seek leave of Court prior to filing a motion for fees and expenses).

[10] *See* Order, Aug. 15, 2013 (ECF No. 727) n.2 (concluding that the class must have sufficient notice of, and adequate opportunity to object to, a motion for fees and expenses prior to the objection deadline).

VII.    **CONCLUSION**

For the reasons set forth above, Plaintiffs request that the Court: (1) preliminarily approve the Settlement Agreements; (2) certify a class for purposes of each Settlement Agreement; and (3) grant Plaintiffs leave to file a motion for attorneys' fees and reimbursement of expenses and reasonable incentive awards as provided in the proposed Order.

Dated:          April 25, 2014                    Respectfully submitted,

/s/       *Steven A. Asher*

Steven A. Asher
**WEINSTEIN KITCHENOFF & ASHER LLC**
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
(215) 545-7200
(215) 545-6536 (fax)
asher@wka-law.com
*Interim Co-Lead Counsel and Liaison Counsel for Direct Purchaser Plaintiffs*

Michael D. Hausfeld
**HAUSFELD LLP**
1700 K Street NW
Suite 650
Washington, DC  20006
(202) 540-7200
(202) 540-7201 (fax)
mhausfeld@hausfeldllp.com
*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

Stanley D. Bernstein
**BERNSTEIN LIEBHARD LLP**
10 East 40th Street, 22nd Floor
New York, New York 10016
(212) 779-1414
(212) 779-3218 (fax)
bernstein@bernlieb.com
*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

Stephen D. Susman
**SUSMAN GODFREY LLP**
654 Madison Avenue, 5th Floor
New York, NY 10065-8404
(212) 336-8330
(212) 336-8340 (fax)
ssusman@susmangodfrey.com

*Interim Co-Lead Counsel for Direct Purchaser
Plaintiffs*