IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : : | MULTIDISTRICT LITIGATION |
| *THIS DOCUMENT APPLIES TO:* DIRECT ACTION PLAINTIFFS' CASES | : : | No. 08-md-2002 |

M E M O R A N D U M   O R D E R

**AND NOW**, this 10th day of June, 2014, upon careful consideration of the Direct Action Plaintiffs' ("DAPs") Motion to Dismiss Cal-Maine Foods, Inc., and Rose Acre Farms, Inc.'s (jointly, "CMRA") Counterclaim (Docket No. 916), oral argument held on April 3 and May 12, 2014, and the parties' briefing, **the Court hereby ORDERS and DECREES that the Motion to Dismiss is GRANTED for the following reasons:**

Last week, in *Bond v. United States*, 134 S. Ct. 2077 (2014), the Supreme Court reminded courts and litigants of the importance of characterization and common sense in the evaluation of claims and litigation generally. That reminder is relevant here, where the parties' industrious and learned briefing has been focused largely on issues that the Court logically cannot reach.

CMRA's Counterclaim (Docket Nos. 896, 924) contains two sets of claims—fraud and promissory estoppel, on the one hand, and abuse of process and extortion, on the other. It relies on the following reasoning and allegations: The DAPs pressured CMRA (as well as other Defendant egg farms) to adopt the United Egg Producer ("UEP") Certified Program ("Program"), and have continued to support the Program by demanding only Certified eggs from CMRA, while at the same time attacking the Program in the instant litigation. The behavior is

1

inconsistent, the syllogism continues, because "[t]he DAPs simply cannot simultaneously, truthfully assert that the Certified Program is a violation of the law *and* that they want their egg suppliers to remain in the Certified Program and to deliver *only* Certified eggs." Counterclaim ¶ 5. Thus, CMRA reason, either the litigation assertions are truthful, in which case the DAPs' dealings with CMRA have been fraudulent, or the DAPs' demand for Certified eggs (and thus their belief in the legality of the Program) is truthful, and the litigation assertions correspondingly fraudulent. Either way, as CMRA tell it, the DAPs have egg on their face—they are liable under either fraud and promissory estoppel theories or abuse of process and extortion theories.

CMRA's entire Counterclaim depends, thus, on their characterization that the DAPs, in the DAPs' several Complaints, alleged that the Program itself was a per se antitrust violation—i.e., that the Program, taken alone, by itself, without more—per se, per se—violated the Sherman Act. And so, if the DAPs' Complaints do not in fact stake out that territory, the Counterclaim must fail because, as a matter of logical reasoning, if the DAPs have alleged that a number of acts taken by CMRA and the other Defendants, *taken together*, constitute a per se violation the Sherman Act, then, of course, the DAPs can still support the Program itself (alone and without supporting the other actions the DAPs allege CMRA took) and demand Certified eggs without any fraud or abuse of process or extortion, let alone inconsistency.

Everyone agrees, as they did at oral argument on May 12, 2014, that the Court may—and indeed must—examine the content of the DAPs' Complaints[1] to ascertain whether CMRA's

---

[1] *E.g.*, *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.").

characterization of them passes muster under *Twiqbal*.[2] And the Court, as it then noted, has examined these Complaints before. In *In re Processed Egg Products Antitrust Litigation* (*Eggs II*), 902 F. Supp. 2d 704 (E.D. Pa. 2012), the Court characterized the Program at issue now as one of *eight* alleged collective actions. *See id.* at 707-08; *cf. also In re Processed Egg Products Antitrust Litig.* (*Eggs I*), 821 F. Supp. 2d 709 (E.D. Pa. 2011) (Direct Purchaser Plaintiffs). In particular, as the Court explained in *Eggs II*:

> While the Court recognizes that egg producers may legitimately choose to increase cage sizes for animal welfare purposes, doing so by reducing chick hatch while agreeing to not increase production capacity would, "in the absence of agreement, . . . be contrary to an *individual* egg producer's business interests." [*Eggs I*,] 821 F. Supp. 2d at 725 (emphasis supplied); *see also id.* at 735 ("[A] producer following the [UEP] guidelines as to chick hatch reduction [while agreeing to not add capacity] would be reducing the supply of its egg-laying hens, and thereby limiting its egg production capabilities. In doing so, a producer would be unable to enlarge its operations, fill additional barns, and expand egg production."). Such a decision would, however, serve the interests of a *group* of producers who want to reduce the overall supply of eggs. When a defendant's action is only economically beneficial if considered from a group perspective, a reasonable inference of conspiracy exists. *See Re/Max Int'l v. Realty One,* 173 F.3d 995, 1009-10 (6th Cir. 1999). Therefore, the Kroger Plaintiffs' allegation that Sparboe participated in a program that involved chick hatch reduction and an agreement to not add production capacity suggests that Sparboe joined the overarching conspiracy.

*Eggs II*, 902 F. Supp. 2d at 713 (first alteration added).

Although the Court's observation above was directed at certain parties, its observations hold across the DAPs' several Complaints. Indeed, the Court has again reviewed the DAPs' Complaints, with particular care given to those paragraphs cited by CMRA in the Counterclaim. *See, e.g.*, Counterclaim ¶¶ 84–87 and accompanying footnotes (citing specific paragraphs of the DAPs' Complaints). And, as the DAPs argue, "[t]he Counterclaim does not quote to or reference any of the DAPs' complaints for its repeated assertion that the DAPs contend the UEP Program

---

[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

to be illegal. This is because no DAP actually makes this allegation." Mot. Dismiss 2. Instead, as this Court expressly characterized the DAPs' Complaints in *Eggs II*, the DAPs alleged use of the UEP Certified Program, *among and along with other agreed-upon activities*, to suppress or control supply. The supply control, rather than the UEP Certified Program itself, was the per se antitrust violation without procompetitive justification. The Program, in other words, was not allegedly "per se per se."

These cracks in CMRA's characterization of the DAPs' Complaints appear even in CMRA's own briefing. CMRA note that "all Defendants deny the existence of any side agreement to stop building new barns" and that "[t]he UEP Certified Program does not dictate flock size, chick hatch, or barn construction." CMRA Resp. 7 n.3 (Docket No. 935). And precisely so—the DAPs' allegations on those matters (and others) are, thusly, necessary to create the alleged per se supply control scheme. CMRA's disclaimer that their "Counterclaim is not based on some non-existent agreement not to build new barns," *id.*, for instance, then, is inaccurate, or at least imprecise. Although the Court must accept CMRA's well-pleaded facts and any reasonable inferences to be drawn therefrom as true, it cannot accept CMRA's inaccurate characterization of the DAPs' undisputedly authentic (if substantively contested) Complaints. The DAPs' claim is based on such alleged *other* restrictions on supply that patently lack any procompetitive justification; the Counterclaim, therefore, is in that refracted respect, as well.

CMRA contest this point: "the DAPs repeatedly attack the UEP Certified Program itself as a sham and an antitrust violation having no animal welfare benefits." Resp. 4. *See also generally* Cal-Maine Supp. Resp. 6-9 (Docket No. 971). But that is simply not the case. The Complaints CMRA quote in fact allege, for instance, that "[t]he '100% rule' was implemented

4

solely as an additional measure to the already existing conspiracy," Kroger Compl. ¶ 124 (Civ. Action No. 10-6705, Docket No. 1), and that "[t]hese activities were unconnected to any perceived animal husbandry benefits that might result from increased cage space," *id.* ¶ 122. But CMRA have taken this latter statement, like a number of others, out of context—not only out of the more general context of the DAPs' Complaints, but also out of the numbered paragraph itself, in which the "activities" that are alleged to be "unconnected to any perceived animal husbandry benefits" consist not of the 100% rule alone, but also the agreement "neither to 'backfill' nor to make up for the hens lost as a result of increased cage space," i.e., terms *not* part of the Program.

CMRA also cite DAP briefing in support of their characterization that the DAPs' Complaints challenge the Program per se as a per se violation. But, again, these selective quotations cannot bear the weight of CMRA's Counterclaim. In fact, as the DAPs explained, "this case does not challenge merely the adoption of a product standard. Rather, it involves Defendants' *concerted efforts to use* industry guidelines, *along with other conduct*, in order to jointly restrict output." Direct Plaintiffs' Statement of Law 61 (Docket No. 747) (second emphasis added); *see also, e.g.*, *id.* at 59 ("Defendants agreed to use the UEP Certified Program, *along with* an agreement not to replace lost supply and other restraints such as the 100% rule and the backfilling ban, to suppress the size of the domestic laying flock in order to reduce output and raise price." (emphasis added)).

The DAPs' Complaints make no contention that the 100% rule, standing alone, or those other aspects of the UEP Certified Program CMRA say the DAPs knew of and supported at the time of its implementation, was or is, without more, a per se antitrust violation. The DAPs' continuing demand for Certified eggs is no more availing to CMRA here. The Court cannot

infer, even viewing the allegations in both CMRA's Counterclaim and the DAPs' Complaints in the light most favorable to CMRA, that the DAPs are contending that the UEP Certified Program, standing *alone*, violates antitrust law. And only that characterization—that the DAPs actually believed the Program alone constitutes an antitrust violation—could form the basis, when supplemented by other necessary predicates (no change of mind; no problem with inconsistency of beliefs, reasonable or justifiable reliance, etc.), for the conclusion that the DAPs could have been (or are currently) lying about their support *for the UEP Certified Program alone*.

The DAPs do not contend that the Program alone, or even the 100% rule, is anticompetitive conduct (without procompetitive benefits) and therefore a per se violation. In fact, at oral argument, Mr. Barnes implicitly recognized the unviability of such a theory.[3] Only when the Defendants have engaged in some agreement to limit supply, as by backfilling—or agreed to do something without procompetitive benefits that also has the effect of limiting supply—have they completed a per se offense (if, in fact, agreeing to do so is what they did). There is simply no way CMRA can sever the DAPs' allegations in the DAPs' Complaints to say

---

[3] The specific colloquy:

> MR. BARNES: Your Honor raised a question about cage space and indeed, indeed, the heart of the animal care certified program is giving hens more space. That's what they are complaining about, because their argument is, if you give the hens more space, you have less hens in the same cage.
>
> JUDGE PRATTER: Unless you build more cages.
>
> MR. BARNES: Your Honor, you hit the nail on the head.

May 12, 2014 Argument Tr. N.T. 93:13–23.

The point is that the DAPs' Complaints, as pleaded, rely on restrictions other than cage space guidelines to lower or keep suppressed the supply of eggs, even though the cage space guidelines may also, in the absence of these other allegedly agreed-upon restrictions, have temporarily lowered the egg supply. Mr. Barnes's response would seem to recognize that point: it takes conduct such as an agreement not to build more cages or barns, in turn, to keep the supply down thereafter. The chickens come before the eggs, but the barns must come before the chickens.

that the DAPs thought or think the UEP Certified Program (or its components, such as the 100% rule) is a per se antitrust violation. And without that characterization they implausibly advance, CMRA cannot successfully ask this Court to infer that the DAPs statements of support for the Program—regardless of the specificity or generality of those statements—were false.[4] Nor could those statements of support implicitly include a promise not to sue based on a scheme, the sine qua non (viz., no backfilling, etc.) of which the DAPs did *not* explicitly support through their allegedly fraudulent statements. And, further and similarly, no basis remains on which to consider the DAPs' litigation assertions extortionate or abusive of process.

With its characterization of the DAPs' Complaints implausible, CMRA are left with no syllogism on which to base otherwise conclusory allegations. Without inconsistency, there is no inference of falsity; accordingly, there can be no inference of fraud or extortionate conduct. And no other basis remains for the conclusory allegations and the structure they were used to create (the Court can hardly infer, for instance, some decade-long fraudulent plan to induce CMRA and other Defendants to use the Program and then, ten years later, sue the Defendants for having done so).

For these reasons, the Counterclaim must be dismissed in its entirety, with prejudice, for the Court has examined the DAPs' Complaints, and amendment would be futile. *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

---

[4] This point makes clear why CMRA's reasoning that "misrepresentations regarding the Program infect the core of the allegations concerning the Program," Rose Acre Supp. Mem. 10 n.15 (Docket No. 969), is bootstrapping: statements about the Program are not inferably misrepresentations at all unless CMRA's characterization is plausible, and it is not. CMRA's reasoning puts the egg before the chicken—but, as this litigation demonstrates, the chicken comes before the egg. *Cf. supra* note 3.

Consequently, **it is FURTHER ORDERED that the DAPs' Motion to Strike (Docket Nos. 914 & 915) is DEEMED MOOT.**

*IT IS SO ORDERED.*

                                                  BY THE COURT:

                                                  <u>S/Gene E.K. Pratter</u>
                                                  GENE E.K. PRATTER
                                                  United States District Judge