IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : : : | MULTIDISTRICT LITIGATION |
| *THIS DOCUMENT APPLIES TO ALL DIRECT PURCHASER ACTIONS* | : : | No. 08-md-2002 |

# O R D E R

---

**(1) GRANTING PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT AGREEMENT BETWEEN DIRECT PURCHASER PLAINTIFFS AND NATIONAL FOOD CORPORATION AND DIRECT PURCHASER PLAINTIFFS AND MIDWEST POULTRY SERVICES, LP;**

**(2) GRANTING PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT AGREEMENT BETWEEN DIRECT PURCHASER PLAINTIFFS AND UNITED EGG PRODUCERS AND UNITED STATES EGG MARKETERS;**

**(3) CERTIFYING THE CLASSES FOR PURPOSES OF SETTLEMENT;**

**(4) GRANTING LEAVE TO FILE MOTION(S) FOR FEES AND EXPENSES;**

**(5) GRANTING PRELIMINARY APPROVAL OF THE PROPOSED SECOND AMENDMENT TO SETTLEMENT AGREEMENT BETWEEN DIRECT PURCHASER PLAINTIFFS AND SPARBOE FARMS, INC.; *and***

**(6) APPROVING THE NOTICE PLAN FOR THE PRELIMINARILY APPROVED SETTLEMENT AGREEMENTS AND THE SECOND AMENDMENT TO THE SPARBOE AGREEMENT**

**AND NOW**, this 30th day of July, 2014, upon consideration of Direct Purchaser

Plaintiffs' Motion for Preliminary Approval of Class Action Settlements Between Plaintiffs and

Defendant National Food Corporation and Plaintiffs and Defendant Midwest Poultry Services,

LP, for Certification of Class Action for Purposes of the Settlements, and for Leave to File

Motion for Fees, Expenses, and Incentive Awards **(Docket No. 952)**; Direct Purchaser Plaintiffs'

Motion for Preliminary Approval of Class Action Settlement Between Plaintiffs and Defendants United Egg Producers and United Egg Marketers, for Certification of Class Action for Purposes of the Settlement, and for Leave to File a Motion for Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards for Class Representation (**Docket No. 997**); and Direct Purchaser Plaintiffs' Motion for: (1) Preliminary Approval of the Second Amendment to the Sparboe Settlement Agreement, and (2) Approval of Notice Plan for the Proposed Settlements with Midwest Poultry Services, LP, National Food Corporation, United Egg Producers and United States Egg Marketers, and the Proposed Second Sparboe Amendment (**Docket No. 998**), and following hearings on these Motions on May 12 and July 14, 2014, **the Court HEREBY ORDERS and DECREES that:**

1.      The preliminary approval determination requires the Court to consider whether "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003) (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785-86 (3d Cir. 1995)); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 233 n. 18 (3d Cir. 2001). If, after consideration of those factors, a court concludes that the settlement should be preliminarily approved, "an initial presumption of fairness" is established. *In re Linerboard*, 292 F.Supp.2d at 638 (citing *In re Gen. Motors Corp.*, 55 F.3d at 785).

2.      In addition, where, as here, the Court has not already certified a class, the Court must also determine whether the proposed settlement class satisfies the requirements of Rule 23. *Amchem v. Windsor*, 521 U.S. 591, 620 (1997). At the preliminary approval stage, the Court may conditionally certify the class for purposes of providing notice. David F. Herr, *Annotated Manual*

*for Complex Litigation* § 21.632 (West, 4th ed. 2013) ("The judge should make a preliminary determination that the proposed class satisfies the criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."). Accordingly, at this stage, the Court must determine whether the proposed class should be conditionally certified, and leave the final certification decision for the Fairness Hearing.

3.      Rule 23(a) requires that the parties moving for class certification demonstrate that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

4.      Further, under Federal Rule of Civil Procedure 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3).

5.      **Direct Purchaser Plaintiffs' Motion for Preliminary Approval of Class Action Settlements Between Plaintiffs and Defendant National Food Corporation and Plaintiffs and Defendant Midwest Poultry Services, LP, for Certification of Class Action for Purposes of the Settlements, and for Leave to File Motion for Fees, Expenses, and Incentive Awards (Docket No. 952) is GRANTED because the legal standards laid out above in paragraphs 1 through 4 are met.**

6.      The background of this consolidated multidistrict litigation has been extensively recounted elsewhere. Defendants, some of the nation's largest egg producers, including National

Food Corporation ("NFC") and Midwest Poultry Services, LP ("Midwest Poultry"), allegedly conspired to reduce egg output and thus fix, raise, maintain, and/or stabilize the prices of eggs and egg products in the United States, and they allegedly did so, inter alia, through the Defendant trade groups United Egg Producers and United States Egg Marketers. Direct Purchaser Plaintiffs allegedly paid higher prices as a result of this conspiracy, and they now seek treble damages, injunctive relief, attorneys' fees, and costs. Earlier in this litigation, Direct Purchaser Plaintiffs reached settlement agreements, approved by the Court, with the Moark Defendants and Sparboe Farms, Inc. ("Sparboe"). *See generally, e.g., In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012) (Moark); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 278 (E.D. Pa. 2012) (Sparboe). More recently, the Direct Purchaser Plaintiffs reached a settlement agreement with Cal-Maine Foods, Inc; the Court has preliminarily approved that agreement and final approval proceedings are pending. *See In re Processed Egg Prods. Antitrust Litig.*, 2014 WL 828083 (E.D. Pa. Feb. 28, 2014).

7.     After almost a year of arm's-length negotiations between experienced counsel and fact discovery of over 100,000 documents produced by NFC, the Direct Purchaser Plaintiffs and NFC have reached a settlement agreement ("NFC Settlement Agreement," Docket No. 952-2, Ex. 1) for which they now seek the Court's preliminary approval.

8.     Direct Purchaser Plaintiffs and Midwest Poultry engaged in two months of arm's-length negotiations. Direct Purchaser Plaintiffs reviewed over 20% of 40,000 documents produced by Midwest Poultry and deposed Midwest's Poultry's CEO before reaching a settlement agreement ("Midwest Poultry Settlement Agreement," Docket No. 952-3, Ex. 1) for which they and Midwest Poultry now seek Court's preliminary approval.

4

9.      Both the NFC and Midwest Poultry Settlement Agreements define the Settlement

Class as follows:

> All persons and entities that purchased Shell Eggs and Egg Products in the United
> States directly from any Producer, including any Defendant, during the Class
> Period from January 1, 2000 through the date on which the Court enters an order
> preliminarily approving the Agreement and certifying a Class for Settlement
> purposes.
>
> (a) Shell Egg SubClass
>
> All individuals and entities that purchased Shell Eggs in the United States directly
> from any Producer, including any Defendant, during the Class Period from
> January 1, 2000 through the date on which the Court enters an order preliminarily
> approving the Agreement and certifying a Class for Settlement purposes.
>
> (b) Egg Products SubClass
>
> All individuals and entities that purchased Egg Products produced from Shell
> Eggs in the United States directly from any Producer, including any Defendant,
> during the Class Period from January 1, 2000 through the date on which the Court
> enters an order preliminarily approving the Agreement and certifying a Class for
> Settlement purposes.
>
> Excluded from the Class and SubClasses are Defendants, Other Settling
> Defendants, and Producers, and the parents, subsidiaries and affiliates of
> Defendants, Other Settling Defendants, and Producers, all government entities, as
> well as the Court and staff to whom this case is assigned, and any member of the
> Court's or staff's immediate family.

10.     The NFC Settlement Agreement establishes $1,000,000 as the Settlement

Amount. Class members will receive distributions from the Settlement Amount based pro-rata on

each Class member's purchases, and a portion of the cost of the Notice Plan[1] and any award of

attorneys' fees and litigation expenses will be paid from the Settlement Amount.

11.     The NFC Settlement Agreement requires NFC to provide an attorney proffer

concerning its operations and identification of NFC witnesses with knowledge of the issues in

the case. NFC agrees to provide for interview by Class Counsel two current directors, officers,

---

[1] *See infra* ¶ 35.h.

and employees, and one former director, officer, or employee. Further, NFC must clarify transactional data it produces; authenticate business records; and make available up to two representatives to testify at trial.

12.    The Midwest Poultry Settlement Agreement establishes $2,500,000 as the Settlement Amount. As under the NFC Settlement Agreement, Midwest Poultry's Settlement Amount will be distributed among Class members on a pro-rata basis according to their purchases and will be the source for any award of attorneys' fees and litigation expenses, as well as for a portion of the cost of the Notice Plan.[2]

13.    The Midwest Poultry Agreement also requires Midwest Poultry to cooperate by providing an attorney proffer concerning its knowledge of the facts and events at issue. Midwest Poultry must also make available for interview each of the current directors, officers, and employees who Class Counsel believes will be of assistance. Further, Midwest Poultry must clarify transactional data it produces; authenticate business records; and make available up to two representatives to testify at trial.

14.    In exchange for this consideration, the Direct Purchaser Plaintiffs release NFC and Midwest Poultry from any and all claims they raised or could have raised, regarding any agreement or understanding among Defendant Producers; the reduction or restraint of supply; or the pricing, selling, discounting, marketing, or distributing of Shell Eggs and Egg Products in the United States or elsewhere.

15.    Upon consideration of the fact that "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4)" no members of the classes have yet objected, *In re Linerboard Antitrust*

---

[2] *See infra* ¶ 35.h.

*Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003), the Court concludes that the Proposed NFC and Midwest Poultry Settlement Agreements fall within the range of reasonableness.

16.     The NFC and Midwest Poultry Settlement Agreements also satisfy the requirements of Federal Rule of Civil Procedure 23(a) because:

> a.  The members of the NFC and Midwest Poultry Settlement Class, defined above, are ascertainable from objective criteria, such as NFC and Midwest Poultry's records, and that they are so numerous that their joinder before the Court would be impracticable.
>
> b.  The commonality requirement is satisfied insofar as Direct Purchaser Plaintiffs have alleged one or more questions of fact and law common to the NFC and Midwest Poultry Settlement Class, including whether NFC and Midwest Poultry violated federal antitrust law.
>
> c.  The Class Representatives have claims that are typical of the claims of the Class, because the Representatives' claims rely on the same legal theories and arise from the same illegal agreement. All putative Class members were direct purchasers of Shell Eggs or Egg Products, as reflected in the two SubClasses.
>
> d.  The requirement of adequacy of representation is met because Class Counsel are extensively experienced litigators and there are no apparent conflicts of interest.

17.     Further, "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3).

18.     The Court makes no determination concerning the manageability of this action as a class action if it were to go to trial. *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir. 2005).

19.     **Direct Purchaser Plaintiffs' Motion for Preliminary Approval of Class-
Action Settlement between Plaintiffs and Defendants United Egg Producers and United
States Egg Marketers, for Certification of Class Action for Purposes of the Settlement, and
for Leave to File a Motion for Attorney's Fees, Reimbursement of Expenses, and Incentive
Awards for Class Representatives (Docket No. 997) is GRANTED because the legal
standards laid out above in paragraphs 1 through 4 are met.**

20.     After almost a year of arm's-length negotiations between experienced counsel;
fact discovery of over 200,000 documents produced by United Egg Producers ("UEP") and
United States Egg Marketers ("USEM"); and deposition of fact witnesses, the Direct Purchaser
Plaintiffs and UEP and USEM have reached a Settlement Agreement ("UEP & USEM
Settlement Agreement," Docket No. 997-2, Ex. 1) for which they now seek the Court's
preliminary approval.

21.     The UEP & USEM Settlement Agreement defines the Settlement Class the same
way the NFC and Midwest Poultry Settlement Agreements define their respective Classes, i.e.,
as follows:

> All persons and entities that purchased Shell Eggs and Egg Products in the United
> States directly from any Producer, including any Defendant, during the Class
> Period from January 1, 2000 through the date on which the Court enters an order
> preliminarily approving the Agreement and certifying a Class for Settlement
> purposes.
>
> (a) Shell Egg SubClass
>
> All individuals and entities that purchased Shell Eggs in the United States directly
> from any Producer, including any Defendant, during the Class Period from
> January 1, 2000 through the date on which the Court enters an order preliminarily
> approving the Agreement and certifying a Class for Settlement purposes.
>
> (b) Egg Products SubClass

All individuals and entities that purchased Egg Products produced from Shell Eggs in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date on which the Court enters an order preliminarily approving the Agreement and certifying a Class for Settlement purposes.

Excluded from the Class and SubClasses are Defendants, Other Settling Defendants, and Producers, and the parents, subsidiaries and affiliates of Defendants, Other Settling Defendants, and Producers, all government entities, as well as the Court and staff to whom this case is assigned, and any member of the Court's or staff's immediate family.

22.     The UEP & USEM Settlement Agreement establishes $500,000 as the aggregate Settlement Amount, which Class Counsel has confirmed is appropriate cash consideration (in total and as apportioned), based on careful review of UEP's and USEM's financial conditions, for the discharge of the claims against UEP and USEM.[3] Class members will receive distributions from the Settlement Amount based pro-rata on each Class member's purchases, and a portion of the cost of the Notice Plan[4] and any award of attorneys' fees and litigation expenses will be paid from the Settlement Amount.

23.     The UEP & USEM Settlement Agreement requires that UEP and USEM cooperate with Direct Purchaser Plaintiffs in their prosecution of this case. The Agreement stipulates that UEP and USEM will produce certain documents formerly withheld on grounds of attorney-client privilege or work product protection. UEP and USEM must also clarify transactional data produced by UEP or USEM in discovery, establish the authenticity of and/or admissibility as business records of documents produced, and make available their current employees designated by Class counsel to testify at trial regarding the facts and issues in dispute.

---

[3] At the Court's direction at the July 14, 2014 hearing, Class Counsel reviewed the allocation of the UEP & USEM Settlement Amount and thereupon "reconfirm[ed] their belief that it is in the best interest of the class to enter into the Settlement Agreement." DPPs' Notice Supp. Info. 1 (Docket No. 1019).

[4] *See infra* ¶ 35.h.

24.     In exchange for the Settlement Amount, the Direct Purchaser Plaintiffs release UEP and USEM from any and all claims arising out of any agreement or understanding between or among two or more Producers of eggs, including any Defendants; the reduction or restraint of supply; or the pricing, selling, discounting, marketing, or distributing of Shell Eggs and Egg Products in the United States or elsewhere.

25.     Upon consideration of the fact that "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) [no members of the classes have yet] objected," *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003); *see also supra* note 3 and accompanying text, the Court concludes that the Proposed UEP & USEM Settlement Agreement falls within the range of reasonableness.

26.     The UEP & USEM Settlement Agreement also satisfies the requirements of Federal Rule of Civil Procedure 23(a) because:

  a.  The members of the UEP & USEM Settlement Class, defined above, are ascertainable from objective criteria, such as the records of the various Defendants who are settling or who have settled, and that they are so numerous that their joinder before the Court would be impracticable.

  b.  The commonality requirement is satisfied insofar as Direct Purchaser Plaintiffs have alleged one or more questions of fact and law common to the UEP & USEM Settlement Class, including whether UEP and USEM violated federal antitrust law.

  c.  The Class Representatives have claims that are typical of the claims of the Class, because the Representatives' claims rely on the same legal theories and arise from the same illegal agreement. All putative Class members were direct purchasers of Shell Eggs or Egg Products, as reflected in the two SubClasses.

     d.  The requirement of adequacy of representation is met because Class Counsel are extensively experienced litigators and there are no apparent conflicts of interest.

27.    Further, "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3).

28.    The Court makes no determination as to the manageability of this action as a class action if it were to go to trial. *See In re Cmty. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir. 2005).

**29.    For all of the Settlement Agreements—i.e., the NFC, Midwest, and UEP & USEM Settlement Agreements—**

    a.  Plaintiffs T.K. Ribbing's Family Restaurant, LLC; Eby-Brown Company LLC; Goldberg and Solovy Foods, Inc.; Karetas Foods, Inc.; Nussbaum-SF, Inc.; Somerset Industries, Inc.; Wixon, Inc.; John A. Lisciandro d/b/a Lisciandro's Restaurant, and SensoryEffects Flavor Co. d/b/a Sensory Effects Flavor Systems (collectively, "Plaintiffs") will serve as Class Representatives on behalf of the Settlement Classes.

    b.  The Court confirms the appointment as Class Counsel for purposes of the Settlement Classes of the law firms Weinstein Kitchenoff & Asher LLC, 1845 Walnut Street, Suite 1100, Philadelphia, PA 19103; Hausfeld LLP, 1700 K Street NW, Suite 650, Washington, DC 20006; Bernstein Liebhard LLP, 10 East 40th Street, 22nd Floor, New York, NY 10016; and Susman Godfrey, 654 Madison Avenue, 5th Floor, New York, NY 10065-8404.

**30.    Direct Purchaser Plaintiffs' request for leave to file one or more Motion(s) for Attorneys' Fees and Litigation Expenses in connection with the Settlement Agreements preliminarily approved here is GRANTED** and such Motion(s) shall be filed according to the schedule set out below. Class Counsel for Direct Purchaser Plaintiffs shall include in the text of

their proposed Direct Mail Notice and Publication Notice of the Settlement Agreement the

deadline by which Direct Purchaser Plaintiffs must file their Motion for Attorneys' and

Litigation Expenses and a statement that Class members may review the Motion for Attorneys'

Fees and Litigation Expenses at the www.eggproductssettlement.com website prior to the

objection and opt-out deadlines set forth below.

**31.    Direct Purchaser Plaintiffs' Motion for: (1) Preliminary Approval of the**
**Second Amendment to the Sparboe Settlement Agreement, and (2) Approval of Notice Plan**
**for the Proposed Settlements with Midwest Poultry Services, LP, National Food**
**Corporation, United Egg Producers and United States Egg Marketers, and the  Proposed**
**Second Sparboe Amendment (Docket No. 998) is GRANTED.**

32.    The Sparboe Settlement Agreement contains a provision requiring the Sparboe

Settlement Class Period to expand to meet the characteristics of more expansive definitions in

any subsequent settlements with other Defendants (Docket No 172-2, -3, at ¶ 31). Accordingly,

because the Proposed NFC, Midwest Poultry, and UEP & USEM Settlement Agreements class

runs from January 1, 2000, to the date of this Order, the Sparboe Settlement Class Period must

also be temporally extended to the date of this Order, as reflected in the Proposed Second

Sparboe Amendment.

        a.    Under the Proposed Second Sparboe Amendment, any existing members of

the Sparboe Settlement Class, as well as any class members who become

members of the Sparboe Settlement Class solely because of the expansion of

the Class Period, may object to the Second Sparboe Amendment. Persons or

entities who become members of the Sparboe Settlement Class solely on

account of the expansion of the Class Period may opt out.

b. Pursuant to the Sparboe Settlement Agreement, Sparboe shall bear none of the cost of notice of the Proposed Second Sparboe Amendment. Notice of the Proposed Second Sparboe Amendment shall be provided together with notice of the Proposed NFC, Midwest Poultry, and UEP & USEM Settlement Agreements, as detailed below.

33.   The Court finds, consistent with its earlier findings, *see generally* 284 F.R.D. 249; 284 F.R.D. 278, that the Proposed Second Sparboe Amendment is sufficiently fair, reasonable, and adequate so as to warrant preliminary approval and dissemination of notice of the Amendment.

**34.   The Court hereby approves the Proposed Notice Plan for the Proposed NFC, Midwest Poultry, and UEP & USEM Settlement Agreements and the Proposed Second Sparboe Amendment as "the best notice that is practicable under the circumstances," as required by Federal Rule of Civil Procedure 23(c)(2)(B).** The Notice Plan includes Direct Mail Notice, Publication Notice, a website, and a toll-free hotline.

**35.   The Notice Plan, the Proposed NFC, Midwest Poultry, and UEP/USEM Settlement Agreements, and the Proposed Second Sparboe Amendment shall proceed in the following manner and on the following schedule:**

a. **Garden City Group ("GCG") is appointed Claims Administrator and is approved to implement the Notice Plan for, and/or administer claims under, the NFC, Midwest Poultry, and UEP & USEM Settlement Agreements and the Second Sparboe Amendment.**

b. **By September 19, 2014**, each Defendant shall provide to GCG a supplemental production that shall include the names and addresses of all

customers in the United States (i) to whom that Defendant sold Shell Eggs or Egg Products in the United States between the date of that Defendant's most recent customer name and address production to GCG and the date of the entry of this Order; and (ii) that were not included in that Defendant's most recent customer name and address production to GCG. The customer information transmitted by Defendants to GCG:

    i. Shall be produced in a mutually agreeable electronic format or, if not available electronically, in the form in which such information is regularly maintained;

    i. shall be treated as confidential, and shall only be used by GCG for purposes of creating and maintaining a customer database and for disseminating notice; and

    ii. shall not be shared with Direct Purchaser Plaintiffs, Indirect Purchaser Plaintiffs, their counsel, or their experts.

c. **By October 31, 2014**, GCG will staff a toll-free hotline, 866-881-8306, to answer any Settlement Class member's questions.

d. **By November 7, 2014**, GCG shall send notice by U.S. First Class mail, postage prepaid, to all individuals whose names and addresses were produced by Defendants to GCG (Direct Mail Notice). The Direct Mail Notice shall be in substantially the same format as that proposed at **Docket No. 998-5**.

e. **By November 7, 2014**, GCG shall publish Direct Mail Notice, relevant Court documents, the Midwest Poultry, NFC, and UEP/USEM Settlement Agreements, the Second Sparboe Amendment, any Settlement updates, and answers to "Frequently Asked Questions" at www.eggproductssettlement.com.

 f. GCG shall publish notice, in substantially the same format as that proposed at **Docket No. 998-6**, as follows:

  i. **By November 14, 2014**, on one occasion, in the National Edition of *The Wall Street Journal*, on one-sixth of the page.

  ii. **By November 14, 2014**, or as close thereto as publication schedules permit, on one occasion, in the following industry publications: Restaurant Business, Convenience Store News, Hotel F&B, Nation's Restaurant News, Food Service Director, Progressive Grocer, Food Manufacturing, Supermarket News, Stores, Egg Industry, Bake, Food Processing, Long Term Living, Pet Food Industry, and School Nutrition.

  iii. **By November 14, 2014**, GCG shall issue press releases, consisting of substantially the same language of the Publication Notice, through (a) PR Newswire and (b) 1000 journalists in the restaurant and food industry.

 g. **By December 19, 2014**, Direct Purchaser Plaintiffs shall file an affidavit prepared by GCG that details the process engaged in by GCG to effect the Notice Plan, and confirms that the requirements regarding Direct Mail Notice, Publication Notice, the website, and the toll-free hotline have been completed in accordance with this Order.

 h. **The costs of implementing the Notice Plan** and administering these settlements shall be paid from the Midwest Poultry, NFC, and UEP & USEM Settlement Amounts according to the following allocation: $25,000 from the UEP & USEM Settlement Amount, with any additional costs over $25,000 paid equally from the Midwest Poultry Settlement Amount and the NFC Settlement Amount.

i.   Direct Purchaser Plaintiffs shall submit any Motion for Attorneys' Fees, Litigation Expenses, and Incentive Awards by **January 15, 2015**, which date shall be inserted in the Direct Mail Notice and Publication Notice.

j.   **Requests for exclusion from the Midwest Poultry, NFC, and UEP & USEM Settlements** must be First-Class Mail postmarked or hand-delivered to GCG, at the address indicated in the relevant notice, **by March 6, 2015**, which date shall be inserted in the Direct Mail Notice and Publication Notice.

k.   **Objections to the Midwest Poultry, NFC, and UEP & USEM Settlements** must be First-Class Mail postmarked or hand-delivered to the Court, Counsel for Direct Purchaser Plaintiffs, and Counsel for the relevant settling defendant, at the addresses indicated in the notice, **by March 6, 2015**, which date shall be inserted in the Direct Mail Notice and Publication Notice.

l.   **Requests for exclusion from the Sparboe Settlement, as amended by the Second Sparboe Amendment,** by individuals or entities who become members of the Sparboe Settlement Class solely by virtue of the Second Sparboe Amendment (*i.e.*, those who had no direct purchases of Shell Eggs or Egg Products from any Producer in the United States between January 1, 2000, and February 28, 2014, but that did make such purchases between March 1, 2014, and the date of this Order) must be First-Class Mail postmarked or hand-delivered to GCG, at the address indicated in the relevant notice, **by March 6, 2015**, which date shall be inserted in the Direct Mail Notice and Publication Notice.

m. **Objections to the Second Sparboe Amendment** by any member of the Sparboe Settlement Class, as amended, must be First-Class Mail postmarked or hand delivered to the Court, Counsel for Direct Purchaser Plaintiffs, and Counsel for Sparboe, at the addresses indicated in the relevant notice, **by March 6, 2015**, which date shall be inserted in the Direct Mail Notice and Publication Notice.

n. **By March 20, 2015**, the Direct Purchaser Plaintiffs must file their:

    i.   Motion for Final Approval of the Midwest Poultry, NFC, and UEP & USEM Settlement Agreements, and

    ii.   Motion for Final Approval of the Second Sparboe Amendment.

o. The Court will hold a **Fairness hearing for the Midwest Poultry, NFC, and UEP & USEM Settlements and the Second Sparboe Amendment at 9:30 AM on Wednesday, May 6, 2015**, in Courtroom 10B, United States Courthouse, 601 Market Street, Philadelphia, PA 19106. This date shall be inserted into the Direct Mail Notice and Publication Notice. The date, time, and location of this hearing are subject to change, and Settlement Class members are advised to check www.eggproductssettlement.com for any updates.

*IT IS SO ORDERED.*

BY THE COURT:

GENE E.K. PRATTER
United States District Judge