**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION** | **MDL No. 2002** **08-md-02002** |
| **THIS DOCUMENT APPLIES TO: ALL INDIRECT PURCHASER ACTIONS** | |

**INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF**
**CLASS ACTION SETTLEMENT BETWEEN INDIRECT PURCHASER**
**PLAINTIFFS' CLASSES AND DEFENDANT NATIONAL FOOD**
**CORPORATION AND FOR CERTIFICATION OF CLASS ACTION**
**FOR PURPOSES OF THE SETTLEMENT**

## TABLE OF CONTENTS

I.       INTRODUCTION .................................................................................................1

II.      BACKGROUND ..................................................................................................2

      A**.**     The Litigation...........................................................................................2

III.     THE NFC SETTLEMENT NEGOTIATIONS.....................................................2

IV.      PROVISIONS OF THE SETTLEMENT AGREEMENT...........................................4

      A.      The Settlement Classes ............................................................................4

V.       CASH CONSIDERATION TO THE PROPOSED CLASSES AND RESCISSION
      PROVISIONS ......................................................................................................4

VI.      THE INJUNCTIVE PROVISIONS .......................................................................5

VII.     THE COOPERATION PROVISIONS ...................................................................5

VIII.    THE RELEASE PROVISIONS .............................................................................6

IX.      NOTICE ..............................................................................................................6

X.       THE PROPOSED SETTLEMENT IS SUFFICIENTLY FAIR, REASONABLE
      AND ADEQUATE ...............................................................................................7

      A.      The Standard for Granting Preliminary Approval of the Settlement................7

XI.      THE SETTLEMENT AMOUNT, THE INJUNCTIVE PROVISIONS, THE
      COOPERATION PROVISIONS AND THE TERMS OF THE AGREEMENT
      SUPPORT PRELIMINARY APPROVAL ..............................................................10

XII.     THE NEGOTIATION PROCESS SUPPORTS PRELIMINARY APPROVAL........12

XIII.    THE EXTENT OF DISCOVERY AT THE TIME THE SETTLEMENT
      AGREEMENT WAS NEGOTIATED AND AGREED TO SUPPORTS
      PRELIMINARY APPROVAL ...............................................................................13

XIV.     THE EXPENSE AND UNCERTAINTY OF CONTINUED LITIGATION
      AGAINST NFC SUPPORTS PRELIMINARY APPROVAL....................................14

XV.      PRELIMINARY CERTIFICATION OF THE PROPOSED NFC SETTLEMENT
      CLASSES IS WARRANTED ................................................................................15

      A.      The Legal Standard ................................................................................15

1.  Rule 23's Requirements for Class Certification. ......................................15

2.  The Purposes of Class Certification............................................................16

XVI.   THIS CASE SATISFIES THE PREREQUISITES OF RULE 23(a) ........................17

1.  The Settlement Classes are sufficiently numerous. ...................................17

2.  There are common questions of law and fact. ...........................................18

3.  The Representative Plaintiffs' claims are typical of those of the
    Settlement Classes. ....................................................................................19

4.  The Representative Plaintiffs will fairly and adequately protect
    the interests of the Settlement Classes. ....................................................20

XVII.  THE PROPOSED INJUNCTIVE CLASS MEETS THE REQUIREMENTS
       OF RULE 23(b)(2)........................................................................................23

XVIII. THE PROPOSED STATE LAW CLASSES MEET THE REQUIREMENTS
       OF RULE 23(b)(3)........................................................................................24

1.  Common legal and factual questions predominate. ...................................25

2.  A class action is superior to other methods of adjudication. .....................29

XIX.   CONCLUSION..............................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Holiday Universal*,
   249 F.R.D. 166 (E.D. Pa. 2008) ........................................................................ 21

*In re Am. Inv. Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*,
   263 F.R.D. 226 (E.D. Pa. 2009) .......................................................................... 8

*Amchem Prodts., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................... *passim*

*Austin v. Pa. Dep't of Corr.*,
   876 F. Supp. 1437 (E.D. Pa. 1995) ...................................................................... 7

*In re Auto. Refinishing Paint Antitrust Litig.*,
   617 F. Supp. 2d 336 (E.D. Pa. 2007) ................................................................. 10

*In re Auto. Refinishing Paint Antitrust Litig.*,
   MDL No. 1426, 2003 U.S. Dist. LEXIS 18123 (E.D. Pa. Sept. 5, 2003) ............... 12

*In re Auto. Refinishing Paint Antitrust Litig.*,
   MDL No. 1426, 2004 U.S. Dist. LEXIS 29162 (E.D. Pa. Oct. 13, 2004) ............... 29

*In re Auto. Refinishing Paint Antitrust Litig.*,
   MDL No. 1426, 2004 U.S. Dist. LEXIS 29163 (E.D. Pa. May 10, 2004) ......... 8, 10

*Baby Neal v. Casey*,
   43 F.3d 48 (3d Cir. 1994) .................................................................................. 18

*Beck v. Maximus, Inc.*,
   457 F.3d 291 (3d Cir. 2006) .............................................................................. 19

*In re Budeprion XL Mktg. & Sales Litig.*,
   MDL No. 2109, 2012 U.S. Dist. LEXIS 91176 (E.D. Pa. July 2, 2012) ............... 24

*In re Certainteed Fiber Cement Siding Litig.*,
   MDL No. 2270, 2014 U.S. Dist. LEXIS 36532 (E.D. Pa. Mar. 20, 2014) ............ 17

*In re Chambers Dev. Sec. Litig.*,
   912 F. Supp. 822 (W.D. Pa. 1995) ..................................................................... 14

*In re Cmty. Bank of N. Va.*,
   418 F.3d 277 (3d Cir. 2005) ......................................................................... 25, 27

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) ................................................................................28

*In re Comty. Bank of N. Va.*,
  622 F.3d 275 (3d Cir. 2010) ........................................................................21

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*,
  410 F. Supp. 659 (D. Minn. 1974) ...............................................................12

*In re Corrugated Container Antitrust Litig.*,
  MDL No. 310, 1981 U.S. Dist. LEXIS 9687 (S.D. Tex. June 4, 1981) ...................11

*Danny Kresky Enter. Corp. v. Magid*,
  716 F.2d 206 (3d Cir. 1983) ........................................................................26

*Dewey v. Volkswagen Aktiengesellschaft*,
  681 F.3d 170 (3d Cir. 2012) ...........................................................20, 21, 22

*In re Flonase Antitrust Litig.*,
  284 F.R.D. 207 (E.D. Pa. 2012) ...................................................................30

*Gates v. Rohm & Haas Co.*,
  248 F.R.D. 434. (E.D. Pa. 2008) ....................................................................9

*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) ........................................................................24

*In re Gen. Instruments Sec. Litig.*,
  209 F. Supp. 2d 423 (E.D. Pa. 2001) ...........................................................11

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ............................................................................8

*Girsh v. Jepson*,
  521 F.2d 153 (3d Cir. 1975) ...........................................................................8

*Hedges Enters., Inc. v. Cont'l Grp., Inc.*,
  81 F.R.D. 461 (E.D. Pa. 1979) ....................................................................27

*Hughes v. Kore of Indiana Enter., Inc.*,
  731 F.3d 672 (7th Cir. 2013) (Pratter, J.) ..............................................16, 17

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ............................................................16, 25, 26

*In re Ikon Office Supplies Inc. Sec. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000) ..............................................................11, 15

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*,
    No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332 (E.D. Pa. Feb. 11, 2013).......................9, 13

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*,
    296 F.R.D. 351 (E.D. Pa. 2013)..........................................................................................17, 18

*In re Ins. Brokerage Antitrust Litig.*,
    297 F.R.D. 136 (D.N.J. 2013)......................................................................................................7

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009)...............................................................................25, 26, 27, 30

*Jackson v. Se. Pa. Transp. Auth.*,
    260 F.R.D. 168 (E.D. Pa. 2009)................................................................................................21

*Krell v. Prudential Ins. Co. of Am.*,
    525 U.S. 1114 (1999)................................................................................................................29

*Lake v. First Nationwide Bank*,
    156 F.R.D. 615 (E.D. Pa. 1994)................................................................................................12

*Lewis v. Curtis*,
    671 F.2d 779 (3d. Cir. 1982).....................................................................................................21

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) ...................................................................8, 10, 12, 14

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002)......................................................................................................26

*Mack Trucks, Inc. v. Int'l Union, UAW*,
    No. 07-3737, 2011 U.S. Dist. LEXIS 51514 (E.D. Pa. May 12, 2011) ...................................9

*McGuiness v. Parnes*,
    No. 87-2728-LFO, 1989 U.S. Dist. LEXIS 3576 (D.D.C. Mar. 21, 1989)..............................11

*In re Mercedes-Benz Antitrust Litig.*,
    213 F.R.D. 180 (D.N.J. 2003)..............................................................................................18, 25

*In re Mid-Atl. Toyota Antitrust Litig.*,
    564 F. Supp. 1379 (D. Md. 1983) ..............................................................................................11

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...............................................................................................14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001).......................................................................................................20

*In re Pet Food Prods. Liability Litig.*,
    No. 07-2867, 2008 U.S. Dist. LEXIS 94603 (D.N.J. Nov. 18, 2008) ....................................15

*Petruzzi's Inc. v. Darling-Delaware Co.*,
    880 F. Supp. 292 (M.D. Pa. 1995) ......................................................................................12

*In re Processed Egg Prods. Antitrust Litig.*,
    No. 08-md-2002, 2014 U.S. Dist. LEXIS 30150 (E.D. Pa. Feb. 28, 2014)......................19, 20

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) ............................................................................................8

*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)................................................................................................29

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................................................15

*In re Remeron End-Payor Antitrust Litig.*,
    No. 02-2007, 2005 U.S. Dist. LEXIS 27011 (D.N.J. Sept. 13, 2005) ....................................14

*Richburg v. Palisades Collection LLC*,
    247 F.R.D. 457 (E.D. Pa. 2008)..........................................................................................18

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) .....................................................................................8

*Rodriguez v. National City Bank*,
    726 F.3d 372 (3d Cir. 2013)................................................................................................18

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009)................................................................................................20

*Serrano v. Sterling Testing Sys., Inc.*,
    711 F. Supp. 2d 402 (E.D. Pa. 2010) ..............................................................................18, 20

*Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)............................................................................................................16

*Sheinberg v. Sorensen*,
    606 F.3d 130 (3d Cir. 2010)................................................................................................22

*Sheller v. City of Philadelphia*,
    288 F.R.D. 377 (E.D. Pa. 2013)..........................................................................................23

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2002)................................................................................................17

*Stewart v. Rubin,*
   948 F. Supp. 1077 (D.D.C. 1996) ..........................................................................11

*Sullivan v. DB Inves., Inc.,*
   667 F.3d 273 (3d Cir. 2011).......................................................................... *passim*

*United States Gypsum Co. v. Indiana Gas Co.,*
   350 F.3d 623 (7th Cir. 2003) ...............................................................................28

*Wal-Mart Stores, Inc. v. Dukes,*
   131 S. Ct. 2541 (2011)..............................................................................23, 26

*In re Warfarin Sodium Antitrust Litig.,*
   391 F.3d 516 (3d Cir. 2004)..............................................................................8, 27

*In re Warfarin Sodium Antitrust Litigation,*
   212 F.R.D. 231 (D. Del. 2003) .............................................................................27

*Weseley v. Spear,*
   711 F. Supp. 713 (E.D.N.Y. 1989) .......................................................................14

*Williams v. Aramark Sports, LLC,*
   No. 10-1044, 2011 U.S. Dist. LEXIS 102173 (E.D. Pa. Sept. 8, 2011) ..................18

## Statutes

Fed. R. Civ. P. 23..................................................................................... *passim*

Section 16 of the Clayton Act.................................................................................23

Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.* ........................................................2

Indirect Purchaser Plaintiffs ("IP Plaintiffs") respectfully submit this memorandum in support of their motion:  (1) for preliminary approval of a settlement between IP Plaintiffs and National Food Corporation ("NFC"), as set forth in the Settlement Agreement Between Indirect Purchaser Plaintiffs and Defendant National Food Corporation ("NFC Settlement Agreement"), attached as Exhibit 1 to the Declaration of Paul F. Novak ("Novak Decl."); and (2) for certification of classes for purposes of the NFC Settlement Agreement.

## I.      INTRODUCTION

After months of arm's-length negotiations, IP Plaintiffs have reached a mutually agreeable settlement with NFC.  In exchange for a release from this lawsuit, NFC has agreed to (1) place $300,000 U.S. dollars into a fund to provide for the claims of members of the proposed classes; (2) cooperate with and assist IP Plaintiffs in their prosecution of this action; and (3) submit to an injunction prohibiting NFC from entering into agreements to reduce the production of eggs, or to share or provide current or future eggs supply, shipment or price information to United Egg Producers or any similar trade association or agricultural cooperative.  IP Plaintiffs now seek preliminary approval of the NFC Settlement Agreement under Federal Rule of Civil Procedure 23(e).

In considering whether to grant preliminary approval of a proposed settlement, the Court need determine only whether the settlement is sufficiently fair, reasonable, and adequate to allow notice of the proposed settlement to be disseminated to the classes.  A final determination of the settlement's fairness would be made at or after a Fairness Hearing, after class members have received notice of this Settlement and have been given an opportunity to object to the Settlement and an opportunity to opt-out of the classes.  As explained in further detail below, IP Plaintiffs believe that the Settlement Agreement is a fair and reasonable result for the proposed settlement classes.  Not only do IP Plaintiffs believe the monetary and injunctive terms are fair and valuable

to the proposed settlement classes, but IP Plaintiffs also believe that NFC's cooperation commitments will materially assist IP Plaintiffs in further analyzing and prosecuting this action against the remaining non-settling Defendants.

Accordingly, IP Plaintiffs respectfully request that the Court: (1) preliminarily approve the NFC Settlement Agreement; (2) conditionally certify the classes defined in the NFC Settlement Agreement; and (3) appoint interim co-lead counsel as class counsel for the settlement classes.

## II.   BACKGROUND

### A.     The Litigation

This case concerns an alleged conspiracy among the nation's largest egg producers. IP Plaintiffs allege that Defendants and other named and unnamed co-conspirators violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.,* and analogous state antitrust and consumer protection statutes, by engaging in an unlawful conspiracy to reduce output and thereby artificially fix, raise, maintain and/or stabilize the prices of commodity shell eggs in the United States. As a result of Defendants' alleged conduct, IP Plaintiffs and members of the Classes paid prices for shell eggs that were higher than they otherwise would have been absent the conspiracy. The lawsuit seeks damages, injunctive relief, attorneys' fees, and costs from Defendants. NFC denies all allegations of wrongdoing in this action.

## III.   THE NFC SETTLEMENT NEGOTIATIONS

Interim Co-Lead Counsel for IP Plaintiffs ("Class Counsel") and NFC's counsel, Davis Wright Tremaine, LLP, engaged in extensive arm's length negotiations over the course of approximately ten (10) months to reach the current settlement. The scope and details of the negotiations are described in the accompanying Novak Declaration. Class Counsel and NFC's

counsel, both highly experienced and capable, vigorously advocated their respective clients' positions in the settlement negotiations.

Preliminary settlement discussions began in July 2013, at which time the parties were considering a global settlement negotiation with NFC. While IP Plaintiffs expressed their willingness to participate in these negotiations, the global negotiations ultimately did not materialize. *Id*. at ¶ 5. IP Plaintiffs continued to pursue discovery of NFC in the interim by attempting to schedule NFC depositions and by pursuing additional information regarding NFC transactional data, among other things. *Id*. at ¶ 6. In November 2013, NFC produced a round of financial statements, which demonstrated that NFC's financial condition was not improving, and invited settlement offers. However, settlement discussions quickly stalled. *Id*. at ¶ 7.

By early 2014 (after IP Plaintiffs had already participated in approximately twenty (20) depositions and expended thousands of hours reviewing several hundred thousands, if not millions, of pages of documents produced by Defendants and third parties, including documents produced by NFC), NFC and IP Plaintiffs reengaged in substantive negotiations and NFC provided additional information regarding its financial condition. Ultimately, after several months of negotiations via teleconferences and email exchanges, the parties agreed to a $300,000 settlement, injunctive relief, and cooperation from NFC, based largely on NFC's solvency issues and the risks of litigation. *Id.* at ¶¶ 8, 9. On February 28, 2014, the parties reached an agreement in principal and counsel began negotiating and drafting a settlement agreement. On April 16, 2014, the parties executed a settlement agreement. *Id.* at ¶¶ 10, 11.

After factual investigation and legal analysis, it is the opinion of Class Counsel that the settlement amount of $300,000 (the "Settlement Amount"), combined with NFC's obligation to cooperate with IP Plaintiffs and provide injunctive relief, is fair, reasonable, and adequate to and

for the Classes.  IP Plaintiffs respectfully submit that the Settlement is in the best interest of the

Classes and should be preliminarily approved by the Court, and that the Classes should be

certified for purposes of the Settlement.

## IV.     PROVISIONS OF THE SETTLEMENT AGREEMENT

### A.      The Settlement Classes

The NFC Settlement Agreement defines the proposed settlement classes (collectively the

"Settlement Classes") as follows:

> a.)  <u>Indirect Purchaser Injunctive Class</u>
>
> All individuals and entities in the Class
> Jurisdictions that purchased Shell Eggs, for their
> own use and not for resale, during the Class Period
> from January 1, 2000 through the present, and who
> intend to purchase Shell Eggs in the future.
>
> b.)  <u>Indirect Purchaser State Classes</u>
> All individuals and entities residing in Arizona, California, Florida, Iowa
> Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska,
> Nevada, New Mexico, New York, North Carolina, North Dakota, South
> Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, that
> purchased Shell Eggs for their own use and not for resale, during the Class
> Period from January 1, 2000 through the present, and that intend to
> purchase shell eggs in the future.

Excluded from the Classes are Defendants' subsidiaries and affiliates and all persons who

purchased eggs directly from any Defendant or any other producer of eggs.  NFC Settlement

Agreement (Novak Decl., Ex. 1.), ¶ 17.

## V.     CASH CONSIDERATION TO THE PROPOSED CLASSES AND RESCISSION
       PROVISIONS

NFC has paid $300,000 in cash.  *See* Novak Decl, Ex. 1 at ¶¶ 14, 32.  This money is

being maintained in an escrow account controlled by NFC and Class Counsel pending approval

of the settlement by the Court.  NFC and IP Plaintiffs each have the right and option to rescind

the NFC Settlement Agreement for the reasons described in paragraph 28 of the NFC Settlement

Agreement, including in the event that the Court refuses to approve the Agreement or any part thereof, or if such approval is modified or set aside on appeal.

Additionally, the NFC Settlement Agreement provides that Class Counsel may, at a time approved by the Court, seek from the Settlement Amount an award of attorney's fees and reasonable litigation expenses, and that NFC shall have no obligation to pay any fees or expenses of Class Counsel. *Id.* at ¶ 34.

## VI.    THE INJUNCTIVE PROVISIONS

In addition to the Settlement Amount, the NFC Settlement Agreement requires that, for three (3) years after Final Approval, NFC shall not enter into any agreements with competitors, whether through United Egg Producers, Inc. or any similar trade association or agricultural cooperative, to reduce the production of eggs, unless entered into for disease control or other public health concerns. *Id.* at ¶ 37.

Additionally, NFC shall not share or provide current or future eggs supply, shipment or price information to United Egg Producers, Inc. or any similar trade association or agricultural cooperative, except to the extent that such information is available from public sources, subject to certain exceptions. *Id.*

## VII.    THE COOPERATION PROVISIONS

In addition to the Settlement Amount and Injunctive Provisions, the NFC Settlement Agreement requires that NFC cooperate with IP Plaintiffs in their prosecution of this case. *Id.* at ¶ 39.

This cooperation includes, *inter alia*, making Roger Deffner, Vice President of NFC, available for an interview; providing affidavits consistent with NFC employees' recollection and understanding of the facts as reasonably required by the needs of the case, including but not limited to the authentication of documents; providing up to two of its employees as witnesses at

trial at NFC's expense, as IP Plaintiffs may reasonably require; and using its best efforts to encourage attendance at trial by former employees whom IP Plaintiffs wish to use as witnesses. *Id.*

## VIII.   THE RELEASE PROVISIONS

In exchange for the consideration described above, IP Plaintiffs have agreed to release NFC from any and all claims arising out of or resulting from:  (1) any agreement or understanding between or among two or more producers of eggs, including any Defendants; (2) the reduction or restraint of supply, the reduction of or restrictions on production capacity; or (3) the pricing, selling, discounting, marketing, or distributing of shell eggs in the United States or elsewhere. The full text of the proposed releases, including the limitations thereof, is set forth in the NFC Settlement Agreement.  *Id.* at ¶¶ 23-27.

## IX.   NOTICE

Consistent with the terms of the NFC Settlement Agreement, IP Plaintiffs are not presently seeking approval of the form of the notice to be issued and will file the appropriate motion at a at a time deemed appropriate by Class Counsel and the Court as to the date for its dissemination.[1]  While Rule 23(e) provides that a "class action shall not be dismissed or compromised without the approval of the court and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs," it does not require that a notice plan be considered and approved as part of the *preliminary*

---

[1] The IP Plaintiffs anticipate that additional settlements will be submitted to the Court shortly and that submission of a notice plan should await joint consultation with counsel for the additional settling Defendants because the cost of notice will be distributed over more than one settlement.  However, if the Court requires a notice plan to be submitted to it *before* the submission of these additional settlements, IP Plaintiffs can and will do so.

approval papers.[2]  Rather, under Rule 23, notice must be approved and distributed, where

required, prior to *final* approval of a settlement.

Subsequent to the entry of a settlement agreement between IP Plaintiffs and NFC, as

noted in status reports to the Court, IP Plaintiffs have entered into settlement negotiations with

Midwest Poultry Services, L.P. and Nucal Foods.  As such, it is in the interests of the Classes

and judicial economy to issue one notice with as many settling Defendants as possible, and to

wait until an appropriate time to disseminate such notice.

Thus, IP Plaintiffs will seek leave to distribute notice to the NFC Settlement Classes until

such time as settlements are reached with other Defendants, making notice more efficient and

economical.  Although this may ultimately delay final approval of this settlement, IP Plaintiffs'

Counsel believe that this provides a benefit to the Classes, while similarly providing efficiencies

and conservation of judicial and counsel's resources.

## X.   THE PROPOSED SETTLEMENT IS SUFFICIENTLY FAIR, REASONABLE AND ADEQUATE

### A.   The Standard for Granting Preliminary Approval of the Settlement

"The law favors settlement, particularly in class actions and other complex cases where

substantial judicial resources can be conserved by avoiding formal litigation."  *In re Ins.*

*Brokerage Antitrust Litig.*, 297 F.R.D. 136, 144 (D.N.J. 2013) (quoting *In re Gen. Motors Corp.*

*Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir. 1995)); *Austin v. Pa.*

*Dep't of Corr.,* 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) (explaining that "the extraordinary

amount of judicial and private resources consumed by massive class action litigation elevates the

general policy of encouraging settlements to 'an overriding public interest'").

---

[2] Indeed, courts have recognized that in some instances, notice is not required at all as part of preliminary approval. *See generally* "Notice to Class Members," 3 Newberg on Class Actions § 8:18 (4th ed.).

While the law favors settlement of complex litigation, Rule 23 of the Federal Rules of Civil Procedure requires court approval for any compromise of a class action.  Such approval involves a two-step process.  First, counsel submits the proposed terms of the settlement to the court for a preliminary fairness evaluation.  Second, after a preliminary finding of fairness has been made and notice has been disseminated to the settlement class members, the Court must conduct a formal fairness and final approval hearing after notice has been disseminated to the settlement class members.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 562 (D.N.J. 1997), *aff'd,* 148 F.3d 283 (3d Cir. 1998); *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 29163, at *1 (E.D. Pa. May 10, 2004); 4 Newberg on Class Actions § 11:25, at 38-39 (4th ed. 2002).

When deciding preliminary approval, a court does not conduct a definitive proceeding on fairness of the proposed settlement.  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir. 1995), *aff'd,* 134 F.3d 133 (3d Cir. 1998) (holding that the "preliminary determination establishes an initial presumption of fairness"); *In re Am. Inv. Life Ins. Co. Annuity Mktg. and Sales Practices Litig.,* 263 F.R.D. 226, 238 (E.D. Pa. 2009) (same). That definitive determination must await the final hearing, at which the fairness, reasonableness, and adequacy of the settlement are more fully assessed.  *See In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003).[3]   Rather, at the preliminary approval stage, the court

---

[3] The factors considered for final approval of a class settlement as "fair, reasonable and adequate" include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.  *Girsh v. Jepson,* 521 F.2d 153, 157 (3d Cir. 1975); *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 534-35 (3d Cir. 2004); *Prudential,* 962 F. Supp. at 562; *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 713 (E.D. Pa. 2001), *vacated,* 396 F. Supp. 294 (3d Cir. 2005).  At the preliminary approval stage, "the Court need not address these factors, as the standard for

must determine whether the "proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval." *Mack Trucks, Inc. v. Int'l Union, UAW*, No. 07-3737, 2011 U.S. Dist. LEXIS 51514, at *8 (E.D. Pa. May 12, 2011) (quoting *Thomas v. NCO Fin. Sys., Inc.*, No. 00-5118, 2002 U.S. Dist. LEXIS 14157, at *14 (E.D. Pa. July 31, 2002)).

In determining whether an antitrust settlement falls within a "range of reasonableness," a court examines whether (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; and (3) the proponents of the settlement are experienced in similar litigation.[4] *In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332, at *7 (E.D. Pa. Feb. 11, 2013) (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003)). After making such findings, a settlement agreement is entitled to a presumption of fairness and should be preliminarily approved. *Id.* at *8.

As discussed below, the proposed NFC Settlement Agreement is entitled to a presumption of fairness because it provides no preferential treatment of the Class Representatives or segments of the Classes, does not provide for excessive compensation of attorneys, provides significant relief to the Classes, and requires that NFC provide significant additional information regarding the facts and events at issue in this case, which will assist IP Plaintiffs in prosecuting the case against the Non-Settling Defendants.

---

preliminary approval is far less demanding." *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 444 n.7. (E.D. Pa. 2008). IP Plaintiffs will thus fully address each of these factors in their memorandum in support of their motion for final approval.

[4] A fourth factor, the percentage of the class objecting, is premature at the preliminary approval stage. *In re Imprelis*, 2013 U.S. Dist. LEXIS 18332, at *10.

**XI.   THE SETTLEMENT AMOUNT, THE INJUNCTIVE PROVISIONS, THE COOPERATION PROVISIONS AND THE TERMS OF THE AGREEMENT SUPPORT PRELIMINARY APPROVAL**

The settlement amount is fair and reasonable and represents a favorable result for the Classes.  As noted above, under the NFC Settlement Agreement, NFC has paid $300,000 into escrow.  This amount was agreed to after ten (10) months of negotiations, and is based on NFC's precarious financial position as established in the audited financial statements provided by NFC. Novak Decl., ¶¶ 4, 7, 8, 9.  Class Counsel believes it is in the best interest of the Classes to enter into the NFC Settlement Agreement rather than continuing to pursue a judgment against NFC that may prove to be uncollectible.  Moreover, the damages that IP Plaintiffs suffered due to NFC's alleged conduct remain in the case and are recoverable from other Defendants under joint and several liability.  *See In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29163, at *6 (preliminarily approving settlement agreement because, *inter alia,* "this settlement does not affect the joint and several liability of the remaining Defendants in this alleged conspiracy").

Also, as described above, the NFC Settlement Agreement requires that NFC cooperate with IP Plaintiffs in the prosecution of this action, which includes providing assistance in developing additional factual information regarding the issues and events relevant to this case through an interview of NFC's Vice President, affidavits consistent with NFC's recollection and understanding of the facts as reasonably required by case needs, and up to two NFC employees provided as witnesses at trial.  Novak Decl., Ex. 1 at ¶ 39.  Class Counsel believes that this cooperation will significantly benefit IP Plaintiffs and will assist Class Counsel in prosecuting their claims.  *See, e.g., In re Auto. Refinishing Paint Antitrust Litig.,* 617 F. Supp. 2d 336, 344 (E.D. Pa. 2007); *In re Auto. Refinishing Paint Antitrust Litig.,* 2004 U.S. Dist. LEXIS 29163, at *6-7 (acknowledging the assistance that the settling defendants will provide "in pursuing this case against the remaining Defendants"); *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d at

10

643 ("The provision of such [cooperation] is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement"); *In re Ikon Office Supplies Inc. Sec. Litig.,* 194 F.R.D. 166, 177 (E.D. Pa. 2000) (noting that cooperation agreements are valuable when settling a complex case).[5]

Additionally, it should be noted that the NFC Settlement Agreement is fair to the Classes as a whole.  The NFC Settlement Agreement provides no preferential treatment to Class Representatives vis-à-vis other members of the Classes.  And, as noted above, the NFC Settlement Agreement provides that Class Counsel must obtain approval from the Court to receive fees and expenses from the Settlement Amount, which may not be paid until final approval of the Settlement.

Ultimately, given NFC's precarious financial position as well as the risk and likely expense of continuing to litigate against NFC, Class Counsel strongly believe that the terms of the settlement are a highly favorable result for the Classes.  And, in light of Class Counsel's substantial experience litigating antitrust class actions, this belief should be accorded significant weight based on a thorough analysis of the facts.  *See, e.g., In re Gen. Instruments Sec. Litig.,* 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001); *Stewart v. Rubin,* 948 F. Supp. 1077, 1099 (D.D.C. 1996), ("A court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof."); *McGuiness v. Parnes,* No. 87-2728-LFO, 1989 U.S. Dist.

---

[5] *See also In re Mid-Atl. Toyota Antitrust Litig.,* 564 F. Supp. 1379, 1386 (D. Md. 1983) ("[T]he commitment [the] Distributor defendants have made to cooperate with plaintiffs will certainly benefit the classes, and is an appropriate factor for the court to consider in approving a settlement"); *In re Corrugated Container Antitrust Litig.,* MDL No. 310, 1981 U.S. Dist. LEXIS 9687, at *47-48 (S.D. Tex. June 4, 1981), *aff d,* 659 F.2d 1322 (5th Cir. 1981) ("The settlement agreements provided for cooperation from the settling defendants that constituted a substantial benefit to the class.  Those provisions were intended to save plaintiffs time and expense in the continuing litigation . . . [and] made certain information and expertise available to the class which might not have been available through normal discovery.").

LEXIS 3576, at *2 (D.D.C. Mar. 21, 1989) ("While the evaluation of the fairness and adequacy

of a settlement such as this is anything but a scientific process, there is nothing about this

Settlement suggesting that the Court should second-guess the product of the negotiations

between the skilled and conscientious lawyers who represented parties on both sides of this

litigation."); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.

Supp. 659, 667 (D. Minn. 1974) ("The recommendation of experienced antitrust counsel is

entitled to great weight.").

## XII.   THE NEGOTIATION PROCESS SUPPORTS PRELIMINARY APPROVAL

Settlements that result from arm's-length negotiations between experienced counsel are

generally entitled to deference from the court.  *In re Auto. Refinishing Paint Antitrust Litig.,*

MDL No. 1426, 2003 U.S. Dist. LEXIS 18123, at *4 (E.D. Pa. Sept. 5, 2003); *In re Linerboard*

*Antitrust Litig.,* 292 F. Supp. 2d at 640 (holding that "[a] presumption of correctness is said to

attach to a class settlement reached in arm's-length negotiations between experienced, capable

counsel") (citing *Hanrahan v. Britt,* 174 F.R.D. 356, 366 (E.D. Pa. 1997)); *Lake v. First*

*Nationwide Bank,* 156 F.R.D. 615, 628 (E.D. Pa. 1994) (giving "due regard to the

recommendation of the experienced counsel in this case, who have negotiated this settlement at

arms-length and in good faith"); *Petruzzi's Inc. v. Darling-Delaware Co.,* 880 F. Supp. 292, 301

(M.D. Pa. 1995) ("[T]he opinions and recommendations of such experienced counsel are indeed

entitled to considerable weight"); 2 Newberg on Class Actions, § 11.41 (3d ed. 1992) ("There is

usually an initial presumption of fairness when a proposed class settlement, which was

negotiated at arm's length by counsel for the class, is presented for court approval.").

Here, the NFC Settlement Agreement is the result of hard-fought, arm's length

negotiations between NFC's counsel and Class Counsel, all of whom are experienced and

capable in complex class action and antitrust matters.[6]  During the negotiations, NFC's counsel and Class Counsel vigorously advocated their respective clients' positions, and were prepared to litigate the case fully if no settlement was reached.  Nothing in the course of IP Plaintiffs' negotiations with NFC, or in the substance of the proposed NFC Settlement Agreement, presents any reason to doubt the Agreement's fairness.

## XIII.  THE EXTENT OF DISCOVERY AT THE TIME THE SETTLEMENT AGREEMENT WAS NEGOTIATED AND AGREED TO SUPPORTS PRELIMINARY APPROVAL

A factor that courts sometimes look to when determining whether a settlement agreement is fair is the amount of factual discovery the parties had undertaken prior to reaching the settlement.  When the parties have engaged in a considerable amount of discovery, this fact supports a finding that that the settlement is within the range of reasonableness.  *See In re Imprelis,* 2013 U.S. Dist. LEXIS 18332, at *9 (finding settlement within range of reasonableness where "[a] considerable amount of preliminary discovery was conducted, including the review of some 500,000 pages of documents . . . , the hiring and consultation of several experts, and a deposition of [Defendant's] product manager").  Here, the parties had completed a substantial amount of factual discovery by the time the settlement was reached.  Indeed, by the time Class Counsel and NFC resumed settlement discussions in January 2014, Class Counsel had already reviewed hundreds of thousands of documents produced in the litigation and participated in approximately twenty (20) depositions.  Novak Decl., ¶ 8.  Accordingly, the amount of discovery completed supports a finding that the Settlement is within the range of reasonableness.

---

[6] The experience and qualifications of Class Counsel are described in Indirect Purchaser Plaintiffs' Memorandum In Support of Their Motion for Class Certification (ECF No. 1043 filed under seal).

XIV.   **THE EXPENSE AND UNCERTAINTY OF CONTINUED LITIGATION AGAINST NFC SUPPORTS PRELIMINARY APPROVAL**

After weighing the risks and expenses of continued litigation against the guaranteed recovery to the Classes and the significant benefits of NFC's cooperation obligations, Class Counsel have determined that the Settlements are favorable to and in the best interests of the IP Plaintiffs and the Classes.  And this determination is buoyed by NFC's precarious financial position, which makes it unlikely that NFC would be able to pay any judgment IP Plaintiffs might obtain at trial.

The settlement with NFC is particularly reasonable given the inherent risks in moving forward with litigation toward trial.  It has been often observed that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d at 639 (citation omitted); *see also Weseley v. Spear,* 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (noting that antitrust class actions are "notoriously complex, protracted, and bitterly fought"). NFC has asserted various defenses, and a jury trial (assuming the case proceeded beyond pretrial motions) might well turn on questions of proof, making the outcome inherently uncertain for both parties.  *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d at 639; *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable . . . . [T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal").  Moreover, even after trial is concluded, there could be one or more lengthy appeals.  *In re Remeron End-Payor Antitrust Litig.,* No. 02-2007, 2005 U.S. Dist. LEXIS 27011, at *49 (D.N.J. Sept. 13, 2005).  The degree of uncertainty supports preliminary approval of the proposed NFC Settlement Agreement.  *See In re Chambers Dev. Sec. Litig.,* 912 F. Supp. 822, 838 (W.D. Pa. 1995).

Ultimately, the terms of the settlement, the financial condition of NFC, the nature of the negotiations, the degree of discovery at the time of settlement, the experience of Class Counsel and the risks of proceeding against NFC all support the Court finding that the NFC Settlement falls within the range of possible final approvals and is entitled to the presumption of fairness.

## XV.   PRELIMINARY CERTIFICATION OF THE PROPOSED NFC SETTLEMENT CLASSES IS WARRANTED

### A.   The Legal Standard

#### 1.   Rule 23's Requirements for Class Certification.

It is well-established that a class may be certified for purposes of settlement.  *In re Pet Food Prods. Liability Litig.,* No. 07-2867, 2008 U.S. Dist. LEXIS 94603, at *55 (D.N.J. Nov. 18, 2008) ("Class actions certified for the purposes of settlement are well recognized under Rule 23."); *Ikon,* 194 F.R.D. at 188 (class certified for purposes of settlement of securities class action).  In the case of settlements, "tentative or temporary settlement classes are favored when there is little or no likelihood of abuse, and the settlement is fair and reasonable and under the scrutiny of the trial judge."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 205 (S.D.N.Y. 1995) (internal quotation and citation omitted).  The settlement here is fair, reasonable, and non-abusive.  Therefore the proposed Settlement Classes should be certified by the Court.

Rule 23 governs the issue of class certification for both litigation and settlement classes.  A settlement class should be certified where the four requirements of Rule 23(a) — numerosity, commonality, typicality and adequacy — are satisfied, and when one of the three subsections of Rule 23(b) is also met.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Here, IP Plaintiffs are seeking to certify an injunctive class under Rule 23(b)(2) and state monetary remedies classes under Rule 23(b)(3).  To be certified under Rule 23(b)(2), IP Plaintiffs must show that the Defendants "acted or refused to act on grounds that apply generally to the class, so

that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). To be certified under Rule 23(b)(3), the classes must meet Rule 23(b)(3)'s "predominance" and "superiority" requirements. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).

The party seeking class certification has the burden of showing by a preponderance of the evidence that each of Rule 23's requirements are met. *Hydrogen Peroxide*, 552 F.3d at 307, 320. But once this showing has been made, the Court should certify the class. *Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (Rule 23 is "a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action"). In determining the propriety of class certification, courts address merits questions "only to the extent" necessary to determine whether the Rule 23 requirements have been met. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011).

## 2. The Purposes of Class Certification

When determining whether a proposed class meets the requirements of Rule 23, courts frequently consider the policy considerations underlying the Rule. *See, e.g.*, *Amchem*, 521 U.S. at 617; *Sullivan*, 667 F.3d at 302. And as the Supreme Court has explained, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617; *see also Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013) (Pratter, J.) ("when what is small is not the aggregate but the individual claim, [] that's the type of case in which class action treatment is most needful . . . . A class action, like litigation in general, has a deterrent as well as a compensatory objective"). By aggregating the "relatively paltry potential [individual] recoveries," Rule 23 provides incentives for class attorneys to pursue an action and accomplish the dual policies of deterring illegal behavior and compensating

harmed purchasers. *Amchem*, 521 U.S. at 617 (provides incentives for attorneys); *Hughes*, 731 F.3d at 677 (deters illegal behavior and compensates harmed purchasers).

Not only do Rule 23's policy considerations support granting IP Plaintiffs' motion, but, as explained below, the Settlement Classes meet the formal requirements of Rule 23 and should be certified.

## XVI.   THIS CASE SATISFIES THE PREREQUISITES OF RULE 23(a)

Certification is appropriate under Rule 23(a) if:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

### 1.    The Settlement Classes are sufficiently numerous.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  However, there is no "magic number" of plaintiffs that make joinder impracticable.  *In re Certainteed Fiber Cement Siding Litig.*, MDL No. 2270, 2014 U.S. Dist. LEXIS 36532 at *29-30 (E.D. Pa. Mar. 20, 2014).  The Third Circuit has generally held that the numerosity requirement is met "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2002).  Moreover, plaintiffs "need not precisely enumerate the potential size of the proposed class, nor are plaintiffs required to demonstrate that joinder would be impossible."  *In re Imprelis Herbicide Mktg.*, *Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 361 (E.D. Pa. 2013).

The injunctive class and the state classes consist of consumers who made retail purchases of commodity shell eggs — a product that eighty-nine percent (89%) of U.S. households routinely purchase.  Consequently, the injunctive class consists of tens of million class members,

17

and the membership of each state class numbers in the hundreds of thousands to millions.

Joinder of all these class members, either nationally or on a state by state basis, would be

impracticable. *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402 (E.D. Pa. 2010)

(joinder of a class of 10,000 members "is impracticable"). Thus, the proposed Settlement

Classes meet the numerosity tests of Rule 23(a)(1). *Imprelis*, 296 F.R.D. at 361 ("Because there

at least tens of thousands of class members, [the numerosity requirement] is easily met").

2.   <u>There are common questions of law and fact.</u>

The proposed Settlement Classes also each and collectively meet the commonality

requirement of Rule 23(a)(2). *See* Fed. R. Civ. P. 23(a)(2) (there must be "questions of law or

fact common to the class"). This requirement, however, is "not onerous." *Rodriguez v. National

City Bank*, 726 F.3d 372, 380-82 (3d Cir. 2013). In fact, commonality may be satisfied "if the

named plaintiffs share at least one question of fact or law with the grievances of the prospective

class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Thus, commonality does not require

that "all class members share identical claims," *Sullivan*, 667 F.3d at 301, that there be identical

issues and facts for all plaintiffs, or that no individualized issues exist, *Williams v. Aramark

Sports, LLC*, No. 10-1044, 2011 U.S. Dist. LEXIS 102173, at *8 (E.D. Pa. Sept. 8, 2011).

As a general matter, "[a]ntitrust, price-fixing conspiracy cases, by their nature, deal with

common legal and factual questions about the existence, scope and effect of the alleged

conspiracy." *Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 462 (E.D. Pa. 2008)

(quoting *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 335 (E.D. Pa. 1976)); *see also

Amchem*, 521 U.S. at 625 (commonality is "readily met in certain cases alleging . . . violations of

the antitrust laws"); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 184-85 (D.N.J. 2003)

(allegation of conspiracy in the class action context raises "a central issue that will establish

common questions of both law and fact").

18

This case is no different.  Effectively all the questions relevant to a determination of Defendants' liability are questions for common, class-wide determination.  For example, the following questions are common for all IP Plaintiffs' claims:

- the conspiracy's existence, scope, and nature;

- the illegality of the conspiracy under federal antitrust law as well as state antitrust and consumer protection laws;

- the identity of participants in the conspiracy;

- the length of the conspiracy;

- the effect of the conspiracy, including whether it caused a cognizable injury to class members; and

- the aggregate amount of damages IP Plaintiffs suffered as a result of the conspiracy.

Even the statutory defenses, such as whether Defendants' supposed cooperative meets the requirements for protection under state and federal agricultural cooperative exemptions, will turn on facts and legal questions common to the respective class members.  Thus, the proposed Settlement Classes meet Rule 23(a)(2)'s commonality requirement.  *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2014 U.S. Dist. LEXIS 30150, at *7 (E.D. Pa. Feb. 28, 2014) (order preliminarily approving Direct Purchaser Plaintiffs/Cal-Maine Settlement).

      3.    <u>The Representative Plaintiffs' claims are typical of those of the Settlement Classes.</u>

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This requires the Court to determine "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class."  *Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006).  Typicality precludes class certification only "when the legal theories of the named representatives potentially conflict with those of the

absentees," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001), or when "the representative is subject to a unique defense that is likely to become a major focus of the litigation," *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Here, IP Plaintiffs (both named class representatives and absent class members) are retail consumers of commodity eggs who have been harmed by having to pay artificially inflated prices resulting from Defendants' conspiracy. Thus, the named plaintiffs' and the unnamed class members' claims arise from the same illegal conspiracy and are based on the same legal theories. *See In re Processed Egg Prods. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 30150 at *7-8 (when the same legal theories and conduct underlies both the representatives' claims and those of the class, their claims are "typical"); *Serrano*, 711 F. Supp.2d at 411 (where the representative plaintiffs seek redress for the same course of conduct and the same legal theories as other class members, the representatives "satisfy the typicality requirement of Rule 23(a)(3)"). Additionally, IP Plaintiffs are not subject to any concrete individualized defenses that are likely to become the focus of the litigation. Thus, the typicality requirement of Rule 23(a)(3) is met.

    4.    <u>The Representative Plaintiffs will fairly and adequately protect the interests of the Settlement Classes.</u>

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "adequacy" requirement has two elements. First, the interests of the representatives must be aligned with those of the classes they seek to represent. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012). Second, the representatives must have class counsel who is experienced and is willing to actively litigate the case on behalf of the class. *Id.*

The first prong requires a determination that "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re Comty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010).  Under this requirement, a class representative must have some commitment to the case, and therefore some minimal knowledge about the case. *Allen v. Holiday Universal*, 249 F.R.D. 166, 184-85 (E.D. Pa. 2008) (Pratter, J.).  However, this is not a high bar. *Id.*[7]  Moreover, a class representative is not inadequate simply because of the existence of a minor conflict.  Rather, "[a] conflict must be 'fundamental' to violate Rule 23(a)(4)." *Dewey*, 681 F.3d at 184.  "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* But "[a] conflict that is unduly speculative . . . is generally not fundamental." *Id.*  Finally, it should be noted that Defendants bear the burden of establishing that the proposed class representatives do not meet Rule 23(a)(4)'s adequacy requirement. *Jackson v. Se. Pa. Transp. Auth.*, 260 F.R.D. 168, 192 (E.D. Pa. 2009) ("Unlike the other Rule 23(a) factors, '[a] party challenging the class representation has the burden to prove that the representation is not adequate'").

The named representatives here clearly meet the first prong of the adequacy requirement. Here, each named representative has the ability and incentive to represent the claims of the class vigorously.  They have all responded to interrogatories, in which they have attested to purchasing commodity eggs.[8]  Nearly all of them have provided receipts and/or store records verifying their

---

[7] *See also Lewis v. Curtis*, 671 F.2d 779, 788-89 (3d. Cir. 1982)  (a class representative is not inadequate simply because he or she cannot recall allegations in the complaint or personally assist class counsel in prosecuting the action).

[8] *See* Declaration of Krishna B. Narine ("Narine Decl.") (ECF No. 1043 filed under seal):  Tabs 83-86.

purchases of commodity eggs.  And all but five of them were deposed and testified that they had

reviewed the complaint.  Additionally, there is no evidence of any conflicts, fundamental or

otherwise, which would prevent any of the named IP Plaintiffs from fairly and adequate

representing absent class members.  Thus, there is no basis for finding that class representatives

are inadequate under Rule 23(a)(4).

Turning to the second prong, Rule 23(g) outlines the standards for evaluating proposed

class counsels' adequacy.  *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010); *see also*

*Dewey*, 681 F.3d at 181 n13.  Pursuant to Rule 23(g)(1)(A), a court is to consider the following

four criteria when selecting class counsel:  "(i)  the work counsel has done in identifying or

investigating potential claims in the action; (ii) counsel's experience in handling class actions,

other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge

of applicable law; and (iv) the resources that counsel will commit to representing the class."

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

The below-signed Class Counsel satisfy Rule 23's requirements and request appointment

as co-lead counsel for the Settlement Classes.  Class Counsel have significant expertise in

complex class actions and antitrust litigation and have served in leadership roles in numerous

class actions throughout the county.[9]  Class Counsel performed a substantial amount of work

early in this case investigating the conspiracy, identifying defendants and drafting the

consolidated complaints on behalf of the IP Plaintiffs.  And since then, they have vigorously and

effectively represented IP Plaintiffs in this litigation.  Class Counsel's vigor and effectiveness has

been exemplified by, among other things, (a) defeating Defendants' motions to dismiss for failure

---

[9] Class Counsel outlined their experience and expertise in their motions for appointment as class counsel, *see* ECF Nos. 6, 8 and 14, incorporated herein by reference.

to state a claim, (b) coordinating, overseeing and conducting discovery on behalf of the IP Plaintiffs, (c) overseeing and defending the depositions of the multiple representative plaintiffs, (d) drafting extensive statements of law regarding the major issues in the case, and (e) finding, evaluating and overseeing the work of expert economists.  Class Counsel have committed, and will continue to commit, the resources necessary to vigorously represent the class.

## XVII.  THE PROPOSED INJUNCTIVE CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(2)

IP Plaintiffs seek to certify the Injunctive Class for the purpose of obtaining injunctive relief under Section 16 of the Clayton Act and analogous state statutes ordering the Defendants to cease the illegal activities described in the fifth amended consolidated complaint.[10]  Rule 23(b)(2) provides for class treatment where the defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  *See* Fed. R. Civ. P. 23(b)(2).  Importantly, unlike a class seeking damages, a Rule 23(b)(2) class seeking injunctive relief is not require to meet any predominance or superiority requirements.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011) ("When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident").  Consequently, Rule 23(b)(2)'s requirements are "almost automatically satisfied in actions seeking primarily injunctive relief," at least where the

---

[10] The Injunctive Class seeks only equitable relief and certification under 23(b)(2), while the State Law Classes seek only monetary relief and certification under 23(b)(3).  *See Sheller v. City of Philadelphia*, 288 F.R.D. 377, 385 (E.D. Pa. 2013) (noting that the Federal Rules of Civil Procedure allow certification of a class solely for injunctive relief and another solely for damages).

action "seeks to define the relationship between the defendant(s) and the 'world at large.'" *Id.* at 58 (internal quotation omitted).

Here, Defendants conspired to reduce the supply of eggs in order to increase the overall price for eggs. Their conspiracy was aimed at, and continues to be aimed at, the market as a whole — not at any particular individuals. Consequently, a single injunction will benefit all class members by ensuring that they do not have to pay artificially inflated prices on commodity eggs. Thus, the proposed injunctive relief would "benefit the entire Class identically," and no individualized injunctions will be needed. *See In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 2109, 2012 U.S. Dist. LEXIS 91176, at *28 (E.D. Pa. July 2, 2012).[11] For all the above reasons, Rule 23(b)(2)'s requirements have been met.

## XVIII. THE PROPOSED STATE LAW CLASSES MEET THE REQUIREMENTS OF RULE 23(b)(3)

Rule 23(b)(3) is "designed to secure judgments binding all class members, save those who affirmatively elect[] to be excluded," where a class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 614-15. Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods

---

[11] Because the requested injunctive relief is not individualized, this case differs from *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), a toxic chemical exposure case where the 3d Circuit affirmed this Court's determination that causation and any injunctive relief in the form of medical monitoring would vary by individual. *Id*. at 264-67.

for the fair and efficient adjudication of the controversy."[12]  Fed. R. Civ. P. 23(b)(3).  Here,

common questions of law and fact predominate for all members of the proposed State Law

Classes, and certifying the State Law Classes will advance the policy goals of Rule 23(b)(3).  A

more detailed and fulsome discussion of the proposed State Law Classes' satisfaction of the

requirements of Rule 23(b)(3) is found in the IP Plaintiffs' Class Certification Brief ("Class

Certification Brief"), filed under seal on August 29, 2014 (ECF Nos. 1042-43), and which IP

Plaintiffs incorporate by reference.

       1.    <u>Common legal and factual questions predominate.</u>

The Rule 23(b)(3) predominance requirement "tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation."  *Sullivan,* 667 F.3d 273, 297 (3d

Cir. 2011); *In re Hydrogen Peroxide Antitrust Litig.* 552 F.3d 305, 311 (3d Cir. 2008); *see also*

*Mercedes-Benz,* 213 F.R.D. at 186 ("Predominance requires that common issues be both

numerically and qualitatively substantial in relation to the issues peculiar to individual class

members.").

"To establish a violation of Section 1, a plaintiff must prove:  (1) concerted action by the

defendants; (2) that produced anti-competitive effects within the relevant product and geographic

markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate

result of the concerted action."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 267 (3d Cir.

2009) (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citation omitted)).

A plaintiff seeking certification of an antitrust class action must show that common or class-wide

---

[12] Since this is a settlement class, the Court need not examine the manageability of the class at trial.  "[I]n a settlement-only class action . . . the court certifying the class need not examine issues of manageability."  *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir. 2005) (citing *Amchem*, 521 U.S.at 620) (explaining that issues of individual liability and damages are even less likely to defeat predominance in settlement-only class actions).

proof will predominate with respect to each of these elements.  *In re Hydrogen Peroxide,* 552

F.3d at 311; *Danny Kresky Enter. Corp. v. Magid,* 716 F.2d 206, 209-10 (3d Cir. 1983); *In re*

*Linerboard Antitrust Litig.,* 305 F.3d 145, 155-56 (3d Cir. 2002).

      As the Third Circuit has recognized, "because the 'clear focus' of an antitrust class action

is on the allegedly deceptive conduct of defendant and not on the conduct of individual class

members, common issues necessarily predominate."  *In re Ins. Brokerage Antitrust Litigation,*

579 F.3d 241, 267 (3d Cir. 2009) (citations omitted); *see also Amchem Products,* 521 U.S. at 625

(the Rule 23(b)(3) test of predominance can be "readily met" in antitrust cases); *Sullivan,* 667

F.3d at 299-300 (finding that *Wal-Mart Stores Inv. v. Dukes,* 131 S. Ct. 2541 (2011), bolstered a

finding that common issues predominated in an antitrust case where the answers to the questions

of alleged anticompetitive conduct and the harm it caused are common as to all class members).

      Here, like in most antitrust cases, "common questions abound with respect to whether the

defendants engaged in illegal, concerted action," as both of these elements (elements one and

three) "focus on the conduct of the defendants."  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at

268.  Specifically, whether Defendants entered into a conspiracy to reduce commodity shell egg

supply and increase prices, and whether Defendants' conspiracy was illegal under the laws of the

Class Jurisdictions or whether it was protected under an agricultural cooperative exemption are

all questions common for the members of each of the State Law Classes.  Moreover, if this case

were to go to trial, these questions would be answered using evidence common to all class

members, such as Defendants' own documents and testimony from Defendants' executives.

      Common questions also predominate for the second element, "which focuses on the

effects of the defendants' challenged conduct."  *Id*.  Here, Defendants conspired to restrict the

domestic supply of commodity shell eggs by agreeing to emergency flock reductions, exporting

eggs at a loss, and implementing cage space guidelines designed to reduce the size of the

nation's laying flock.  Additionally, Defendants' conspiracy was designed to and did affect the

entire market for commodity shell eggs nationwide.  Defendants did not engage in a simple

price-fixing scheme of their own eggs.  Rather, they manipulated supply and prices in the

commodity shell egg market as a whole.  And because eggs are commodities that producers can

move between regions, these supply manipulations affected prices nationwide.

Finally, common questions also predominate for the fourth element.  Under the fourth

element, "the task for plaintiffs is to demonstrate that the element of antitrust impact is capable

of proof at trial through evidence that is common to the class rather than individual to its

members."  *Id.*  Put another way, IP Plaintiffs must show that "the fact of damages . . . is

susceptible to common proof, even if the amount of damage that each plaintiff suffered could

not be established by common proof."  *Id.* at 269; *see also Hedges Enters., Inc. v. Cont'l Grp.,*

*Inc.,* 81 F.R.D. 461, 475 (E.D. Pa. 1979) ("Proof of a conspiracy to establish a 'base' price would

establish at least the fact of damage, even if the extent of the damages suffered by the plaintiffs

would vary").[13]  In this case, any individual or entity that purchased commodity shell eggs in a

Class Jurisdiction during the Class Period was injured by Defendants' conspiracy.  First,

---

[13] Regarding the amount of damages, "[a]ntitrust cases nearly always require some speculation as to what would
have happened under competitive conditions, to estimate the damage done by restraints on trade or other collusion,
but this is not fatal to class certification."  *Microcrystalline,* 218 F.R.D. at 92 *(citing In re Fine Paper Antitrust*
*Litig.,* 82 F.R.D 143, 15152 (E.D. Pa. 1979)) (noting that diversity of product, marketing practices, and pricing have
not been fatal to class certification in numerous cases where conspiracy is "the overriding predominant question").
Accordingly, the need to determine the amount of damage sustained by each plaintiff is an insufficient basis for
which to decline class certification.  *In re Cmty. Bank of N Va.,* 418 F.3d at 305-306 ("Although the calculation of
individual damages is necessarily an individual inquiry, the courts have consistently held that the necessity of this
inquiry does not preclude class action treatment where class issues predominate."); *In re Warfarin Sodium Antitrust*
*Litigation,* 212 F.R.D. 231, 242 (D. Del. 2003) ("[T]he need for individual damages calculations does not defeat
predominance and class certification.") (quoting *In re Prudential Ins. Co. of America*, 962 F. Supp. 450, 517 (D.N.J.
1997)) *aff'd,* 391 F.3d 516, 540 (3d Cir. 2004).

movements in retail commodity shell egg prices closely parallel movements in the wholesale markets, indicating that there is a high rate of pass-through. Thus, Defendants' conspiracy harmed members of each of the State Law Classes even though they purchased the eggs at retail. Second, because Defendants manipulated the commodity shell egg market as a whole rather than entering into a simple price-fixing agreement, members of each of the State Law Classes were injured regardless of which brand of eggs they purchased. *See United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627-628 (7th Cir. 2003) (when a cartel cuts output and elevates prices throughout the market, even those individuals who purchased only from non-cartel members have suffered a cognizable antitrust injury). Consequently, common evidence will show that any individual or entity that purchased commodity shell eggs in a Class Jurisdiction during the Class Period paid more for the eggs than they would have but for Defendants' conspiracy.

Moreover, *Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (2013) poses no barrier to certification here. In that case, injury was premised on four theories of impact (each of which may have affected some but not all class members). However, all but one of these four theories were rejected by the court, and the damages model put forward by plaintiffs could not isolate the injury caused by the sole remaining theory of liability from any injuries caused by the other rejected theories. Thus, the Court found that impact could not be proven class-wide. 133 S. Ct. at 1430, 1434-35. By contrast, in this case IP Plaintiffs offer just one theory of liability — Defendants conspired to curtail supply and thus artificially inflated egg prices — which will be capable of measurement on a class-wide basis since all class members purchased shell eggs.

Ultimately, predominant questions abound in this case. Whether Defendants entered into a conspiracy, whether Defendants' conspiracy had the purpose and effect of increasing egg

28

prices, whether Defendants' conspiracy is illegal under the laws of the given Class Jurisdiction, and whether members of each of the State Law Classes were injured are all common questions that can be answered using common proof for all members of each of the State Law Classes.

> 2.  A class action is superior to other methods of adjudication.

"The superiority requirement asks the court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of "alternate available methods" of adjudication.'"  *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions,* 148 F.3d 283, 316 (3d Cir. 1998) (citations omitted), *Krell v. Prudential Ins. Co. of Am.,* 525 U.S. 1114 (1999).  In performing this analysis, Courts can consider the following non-exhaustive list of factors:  (a) the interests of individual class members in pursing separate actions; (b) the extent and nature of any other litigation commenced by class members addressing the issues in the litigation; and (c) the desirability of concentrating the litigation in a single forum.  Fed. R. Civ. P. 23(b)(3); *Amchem,* 521 U.S. at 615-16.[14]

Here, each of these factors favors managing this litigation as a class action.  First, as a "general rule," antitrust litigation is "exceedingly complex, expensive, and lengthy."  *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *23 (E.D. Pa. Oct. 13, 2004).  Here, given the nature of the product and the likely individual consumer's recovery, pursuing "separate individual suits would be impracticable."  *Amchem*, 521 U.S. at 616 (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 698).  Indeed, because individual damages are too small to make individual actions viable, class certification provides the only meaningful

---

[14] While Rule 23(b)(3) also lists manageability as a factor to be considered, manageability is not an issue when it comes to certification of a settlement class.  *Sullivan v. DB Invs., Inc.*, 667 F.3d at 302.

possibility for compensation.  *Amchem*, 521 U.S. at 617.  Thus, class members have a strong

interest in having this case litigated as a class action rather than on an individual basis.

Second, IP Plaintiffs are not aware of any individual consumer litigation involving

Defendants' conspiracy.  And as the MDL transferee court presiding over multiple related

actions, this Court is in the best position to efficiently resolve all claims by indirect purchasers in

the Class Jurisdictions.

Finally, there is a strong interest in concentrating this litigation in this forum as a class

action.  Prosecuting these actions jointly preserves judicial resources and prevents inconsistent

results.  Absent class action certification, the Court may be faced with millions of individual

lawsuits, all of which would arise out of the same set of operative facts presenting largely the

same basic legal questions.  Thus, a class action is superior to other available methods for the fair

and efficient adjudication of class claims, "because litigating all of these claims 'in one action is .

. . far more desirable than numerous separate actions litigating the same issues.'"  *In re Ins.*

*Brokerage Antitrust Litig.,* 579 F.3d at 259; *see also In re Flonase Antitrust Litig.*, 284 F.R.D.

207, 234 (E.D. Pa. 2012) (finding that "fairness and efficiency" dictated certification because

"otherwise, the numerous individual class members would be forced to file suit individually,

producing numerous identical issues in each case that would waste judicial resources and leave

all parties vulnerable to unfair inconsistencies").  Moreover, this particular forum is appropriate.

Not only was it selected by the Judicial Panel on Multidistrict Litigation, but many of the

Defendants resided or transacted business in the district during the Class Period, and a

substantial portion of the affected interstate trade and commerce was carried out in the district.

IP Plaintiffs' Fifth Amended Consolidated Complaint (ECF No. 866), ¶ 19.  Thus, there is a

strong interest in concentrating the litigation as a class action in this forum.

XIX.   CONCLUSION

For the reasons set forth above, IP Plaintiffs request that the Court:  (1) preliminarily approve the NFC Settlement Agreement; (2) certify the proposed Settlement Classes for purposes of the NFC Settlement Agreement; and (3) appoint Class Counsel as co-lead counsel for the Settlement Classes.

DATED:  September 15, 2014                              Respectfully submitted,


                                                                 */s/ Paul F. Novak*
                                                                 Paul F. Novak
                                                                 Elizabeth McKenna
                                                                 Charles Slidders
                                                                 **MILBERG LLP**
                                                                 One Penn Plaza
                                                                 New York, NY 10119
                                                                 Tel: (212) 594-5300
                                                                 Fax: (212) 868-1229
                                                                 pnovak@milberg.com
                                                                 emckenna@milberg.com
                                                                 cslidders@milberg.com

                                                                 ***Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs***
                                                                 Christopher Lovell
                                                                 Craig Essenmacher
                                                                 Merrick S. Rayle
                                                                 **LOVELL STEWART HALEBIAN JACOBSON, LLP**
                                                                 61 Broadway, Suite 501
                                                                 New York, NY 10006
                                                                 Tel: (212) 608-1900
                                                                 Fax: (212) 719-4667
                                                                 clovell@lshllp.com
                                                                 cessenmacher@lshllp.com
                                                                 msrayle@sbcglobal.net

                                                                 ***Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs***

31

Timothy D. Battin
Mark J. Schirmer
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com

*Interim Co-Lead Counsel for the Indirect
Purchaser Plaintiffs*

Krishna B. Narine
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for
Indirect Purchaser Plaintiffs*