## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MDL No. 2002 08-md-02002 |
| THIS DOCUMENT APPLIES TO:  ALL INDIRECT PURCHASER ACTIONS | FILED  SEP 16 2014  MICHAEL E. KUNZ, Clerk  By_____ Dep. Clerk |

## INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT BETWEEN PLAINTIFFS AND DEFENDANT NATIONAL FOOD CORPORATION AND FOR CERTIFICATION OF CLASS ACTION FOR PURPOSES OF THE SETTLEMENT

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Indirect Purchaser Plaintiffs ("IP Plaintiffs") respectfully move the Court to:  (1) preliminarily approve a settlement between IP Plaintiffs and National Food Corporation ("NFC") as set forth in the "Settlement Agreement between Indirect Purchaser Plaintiffs' Classes and National Food Corporation" ("NFC Settlement Agreement"), attached as Exhibit 1 to the Declaration of Paul F. Novak; (2) certify the proposed Settlement Classes for purposes of the NFC Settlement Agreement; and (3) appoint Class Counsel as co-lead counsel for the Settlement Classes.

This motion is based on the accompanying Memorandum of Law and the Declaration of Paul F. Novak, submitted herewith, and is made on the following grounds:

1.      The Settlement falls within the range of reasonableness and is sufficiently fair, reasonable and adequate to justify notice to those affected and an opportunity to be heard, the applicable standards for preliminary approval of a class action settlement. *See, e.g. In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, No. 22-md-2284, 2013 U.S.

Dist. LEXIS  8332, at *7 (E.D. Pa. Feb. 11, 2013); *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS 29163, at *5-6 (E.D. Pa. May 10, 2004) (citation omitted).

      2.     The NFC Settlement Agreement will provide the proposed classes with injunctive relief that prohibits NFC from engaging in certain output restrictive and jointly coordinated conduct, provides cash consideration of $300,000, and requires NFC to cooperate with IP Plaintiffs in the continued litigation of the case, as described in the NFC Settlement Agreement and accompanying memorandum.  Interim Co-Lead Counsel believe that this will greatly assist them in further analyzing and prosecuting the claims in this Action. *See e.g., In re Ikon Office Supplies Solutions v. Stuart,* 194 F.R.D. 166, 173 (E.D. Pa. 2000).

      3.     The Settlement is fair to the Classes as a whole, treats Class Representatives the same as other Class Members, and requires Interim Co-Lead Counsel to seek Court approval of an award for attorneys' fees and expenses from the Settlement Amount.

      4.     The Settlement is the result of extensive arm's-length negotiations by experienced antitrust and class action lawyers. *See In re Auto. Refinishing Paint Antitrust Litig.,* 2004 U.S. Dist. LEXIS 29163, at *6; *In re Imprelis,* 2013 U.S. Dist. LEXIS 18332, at *7-9.

      5.     The NFC Settlement Agreement was negotiated and executed after fact discovery was significantly advanced.

      6.     The expense and uncertainty of continued litigation against NFC, and the likelihood of appeals, militates strongly in favor of approval. *See In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003); *In re Remeron End-Payor Antitrust Litig.,* No. 02-2007, 2005 WL 2230314, at *17 (D.N.J. Sept. 13, 2005).

7.    The Classes, as defined in the NFC Settlement Agreement, meet the requirements of Fed. R. Civ. P. 23(a), 23(b)(2)and (b)(3).

DATED:  September 15, 2014                        Respectfully submitted,

/s/ Paul F. Novak
Paul F. Novak
Elizabeth McKenna
Charles Slidders
**MILBERG LLP**
One Penn Plaza
New York, NY  10119
Tel: (212) 594-5300
Fax: (212) 868-1229
pnovak@milberg.com
emckenna@milberg.com
cslidders@milberg.com

***Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs***

Christopher Lovell
Craig Essenmacher
Merrick S. Rayle
**LOVELL STEWART HALEBIAN JACOBSON, LLP**
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4667
clovell@lshllp.com
cessenmacher@lshllp.com
mrayle@sbcglobal.net

***Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs***

Timothy D. Battin
Mark J. Schirmer
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

Krishna B. Narine
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for the Indirect Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MDL No. 2002 08-md-02002 |
| THIS DOCUMENT APPLIES TO: ALL INDIRECT PURCHASER ACTIONS | |

### INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT BETWEEN INDIRECT PURCHASER PLAINTIFFS' CLASSES AND DEFENDANT NATIONAL FOOD CORPORATION AND FOR CERTIFICATION OF CLASS ACTION FOR PURPOSES OF THE SETTLEMENT

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................2

        A.      The Litigation............................................................................................2

III.    THE NFC SETTLEMENT NEGOTIATIONS ......................................................2

IV.     PROVISIONS OF THE SETTLEMENT AGREEMENT.......................................4

        A.      The Settlement Classes ..............................................................................4

V.      CASH CONSIDERATION TO THE PROPOSED CLASSES AND RESCISSION
        PROVISIONS ........................................................................................................4

VI.     THE INJUNCTIVE PROVISIONS.......................................................................5

VII.    THE COOPERATION PROVISIONS ...................................................................5

VIII.   THE RELEASE PROVISIONS..............................................................................6

IX.     NOTICE .................................................................................................................6

X.      THE PROPOSED SETTLEMENT IS SUFFICIENTLY FAIR, REASONABLE
        AND ADEQUATE .................................................................................................7

        A.      The Standard for Granting Preliminary Approval of the Settlement...............7

XI.     THE SETTLEMENT AMOUNT, THE INJUNCTIVE PROVISIONS, THE
        COOPERATION PROVISIONS AND THE TERMS OF THE AGREEMENT
        SUPPORT PRELIMINARY APPROVAL ............................................................10

XII.    THE NEGOTIATION PROCESS SUPPORTS PRELIMINARY APPROVAL.......12

XIII.   THE EXTENT OF DISCOVERY AT THE TIME THE SETTLEMENT
        AGREEMENT WAS NEGOTIATED AND AGREED TO SUPPORTS
        PRELIMINARY APPROVAL ..............................................................................13

XIV.    THE EXPENSE AND UNCERTAINTY OF CONTINUED LITIGATION
        AGAINST NFC SUPPORTS PRELIMINARY APPROVAL .................................14

XV.     PRELIMINARY CERTIFICATION OF THE PROPOSED NFC SETTLEMENT
        CLASSES IS WARRANTED ................................................................................15

        A.      The Legal Standard....................................................................................15

i

1.   Rule 23's Requirements for Class Certification. ........................ ..... .....15

2.   The Purposes of Class Certification.. ......................................... ..... ....16

XVI.   THIS CASE SATISFIES THE PREREQUISITES OF RULE 23(a) ........... ..... ....17

1.   The Settlement Classes are sufficiently numerous. ..................... ..... ....17

2.   There are common questions of law and fact. ............................. ..... ....18

3.   The Representative Plaintiffs' claims are typical of those of the Settlement Classes. ... .............. .... ..................................... ..... ....19

4.   The Representative Plaintiffs will fairly and adequately protect the interests of the Settlement Classes. ........................................ ..... ....20

XVII.   THE PROPOSED INJUNCTIVE CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(2) ..................... ........... .... ...................................... ..... ....23

XVIII.   THE PROPOSED STATE LAW CLASSES MEET THE REQUIREMENTS OF RULE 23(b)(3) ................................................................. . ..... ....24

1.   Common legal and factual questions predominate. .................... . ..... ....25

2.   A class action is superior to other methods of adjudication. ..... . ..... ....29

XIX.   CONCLUSION ................................ ........... .... .............................. . ..... ....31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Holiday Universal*,
249 F.R.D. 166 (E.D. Pa. 2008)............................................................................21

*In re Am. Inv Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*,
263 F.R.D. 226 (E.D. Pa. 2009)...............................................................................8

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................................... *passim*

*Austin v. Pa. Dep't of Corr.*,
876 F. Supp. 1437 (E.D. Pa. 1995)...........................................................................7

*In re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007).......................................................................10

*In re Auto. Refinishing Paint Antitrust Litig.*,
MDL No 1426, 2003 U.S. Dist. LEXIS 18123 (E.D. Pa. Sept. 5, 2003)...............12

*In re Auto. Refinishing Paint Antitrust Litig.*,
MDL No 1426, 2004 U.S. Dist. LEXIS 29162 (E.D. Pa. Oct. 13, 2004)...............29

*In re Auto. Refinishing Paint Antitrust Litig.*,
MDL No 1426, 2004 U.S. Dist. LEXIS 29163 (E.D. Pa. May 10, 2004).........8, 10

*Baby Neal v. Casey*,
43 F.3d 48 (3d Cir. 1994).......................................................................................18

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006)...................................................................................19

*In re Budeprion XL Mktg. & Sales Litig.*,
MDL No 2109, 2012 U.S. Dist. LEXIS 91176 (E.D. Pa. July 2, 2012)................24

*In re Certainteed Fiber Cement Siding Litig.*,
MDL No 2270, 2014 U.S. Dist. LEXIS 36532 (E.D. Pa. Mar. 20, 2014)..............17

*In re Chambers Dev. Sec. Litig.*,
912 F. Supp. 822 (W.D. Pa. 1995)..........................................................................14

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005)...........................................................................25, 27

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013)..............................................................................................28

*In re Comty. Bank of N. Va.,*
    622 F.3d 275 (3d Cir. 2010).......................................................................................21

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,*
    410 F. Supp. 659 (D. Minn. 1974).............................................................................12

*In re Corrugated Container Antitrust Litig.,*
    MDL No. 310, 1981 U.S. Dist. LEXIS 9687 (S.D. Tex. June 4, 1981) ....................11

*Darny Kresky Enter. Corp. v. Magid,*
    716 F.2d 206 (3d Cir. 1983).......................................................................................26

*Dewey v. Volkswagen Aktiengesellschaft,*
    681 F.3d 170 (3d Cir. 2012)............................................................................20, 21, 22

*In re Flonase Antitrust Litig.,*
    284 F.R.D. 207 (E.D. Pa. 2012).................................................................................30

*Gates v. Rohm & Haas Co.,*
    248 F.R.D. 434. (E.D. Pa. 2008)..................................................................................9

*Gates v. Rohm & Haas Co.,*
    655 F.3d 255 (3d Cir. 2011).......................................................................................24

*In re Gen. Instruments Sec. Litig.,*
    209 F. Supp. 2d 423 (E.D. Pa. 2001) ........................................................................11

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995)...........................................................................................8

*Girsh v. Jepson,*
    521 F.2d 153 (3d Cir. 1975).........................................................................................8

*Heages Enters., Inc. v. Cont'l Grp., Inc.,*
    81 F.R.D. 461 (E.D. Pa. 1979)..................................................................................27

*Hughes v. Kore of Indiana Enter., Inc.,*
    731 F.3d 672 (7th Cir. 2013) (Pratter, J.)............................................................16, 17

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008)............................................................................16, 25, 26

*In re Ikon Office Supplies Inc. Sec. Litig.,*
    194 F.R.D. 166 (E.D. Pa. 2000)..........................................................................11, 15

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*,
    No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332 (E.D. Pa. Feb. 11, 2013)........... .... ........9, 13

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*,
    296 F.R.D. 351 (E.D. Pa. 2013)....... .......... ... .. ............................................. .... ......17, 18

*In re Ins. Brokerage Antitrust Litig.*,
    297 F.R.D. 136 (D.N.J. 2013)........ ...... ..... . .. ..................................... .... ............7

*In re Ins. Brokerage Antitrust Litig.*,
    579 F.3d 241 (3d Cir. 2009)............. ....... ... .................................... 25, 26, 27, 30

*Jackson v. Se. Pa. Transp. Auth.*,
    260 F.R.D. 168 (E.D. Pa. 2009)....... .......... ... .. .......................................... .... ...........21

*Krell v. Prudential Ins. Co. of Am.*,
    525 U.S. 1114 (1999)......................... ........... ... .. .............................................. .... ...........29

*Lake v. First Nationwide Bank*,
    156 F.R.D. 615 (E.D. Pa. 1994)....... ........... ... ............................................ . .... ...........12

*Lewis v. Curtis*,
    671 F.2d 779 (3d. Cir. 1982)............ .......... ... .. ............................................. . .... ...........21

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 631 (E.D. Pa. 2003) .............. .. . ............................................. . ...8, 10, 12, 14

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002)................................. ... ............................................. . ...............26

*Mack Trucks, Inc. v. Int'l Union, UAW*,
    No. 07-3737, 2011 U.S. Dist. LEXIS 51514 (E.D. Pa. May 12, 2011)............ .......................9

*McGuiness v. Parnes*,
    No. 87-2728-LFO, 1989 U.S. Dist. LEXIS 3576 (D.D.C. Mar. 21, 1989)........ .....................11

*In re Mercedes-Benz Antitrust Litig.*,
    213 F.R.D. 180 (D.N.J. 2003)............................. ..... ............................................. .............18, 25

*In re Mid-Atl. Toyota Antitrust Litig.*,
    564 F. Supp. 1379 (D. Md. 1983)...................... ...... ............................................. ...............11

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ...................... ...... ........ ................................... ...............14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)................................. .. . ....................................................20

*In re Pet Food Prods. Liability Litig.*,
    No. 07-2867, 2008 U.S. Dist. LEXIS 94603 (D. N.J. Nov. 18, 2008) .......................15

*Petruzzi's Inc. v. Darling-Delaware Co.*,
    880 F. Supp. 292 (M.D. Pa. 1995)..................................................................................12

*In re Processed Egg Prods. Antitrust Litig.*,
    No. 08-md-2002, 2014 U.S. Dist. LEXIS 30150 (E.D. Pa. Feb. 28, 2014).........19, 20

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) ......................................................................................8

*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)...........................................................................................29

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ...................................................................................15

*In re Remeron End-Payor Antitrust Litig.*,
    No. 02-2007, 2005 U.S. Dist. LEXIS 27011 (D. N.J. Sept. 13, 2005) ...........................14

*Richburg v. Palisades Collection LLC*,
    247 F.R.D. 457 (E.D. Pa. 2008) .....................................................................................18

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001) ...............................................................................8

*Rodriguez v. National City Bank*,
    726 F.3d 372 (3d Cir. 2013)...........................................................................................18

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009)...........................................................................................20

*Serrano v. Sterling Testing Sys., Inc.*,
    711 F. Supp. 2d 402 (E.D. Pa. 2010) .......................................................................18, 20

*Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010).......................................................................................................16

*Sheinberg v. Sorensen*,
    606 F.3d 130 (3d Cir. 2010)...........................................................................................22

*Sheiler v. City of Philadelphia*,
    288 F.R.D. 377 (E.D. Pa. 2013).....................................................................................23

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2002)...........................................................................................17

*Stewart v. Rubin*,
    948 F. Supp. 1077 (D.D.C. 1996) ...................................................................... 11

*Sullivan v. DB Inves., Inc.*,
    667 F.3d 273 (3d Cir. 2011).................................................................... *passim*

*United States Gypsum Co. v. Indiana Gas Co.*,
    350 F.3d 623 (7th Cir. 2003) ........................................................................ 28

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)........................................................................... 23, 26

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)...................................................................... 8, 27

*In re Warfarin Sodium Antitrust Litigation*,
    212 F.R.D. 231 (D. Del. 2003) ...................................................................... 27

*Wesley v. Spear*,
    711 F. Supp. 713 (E.D.N.Y. 1989) ................................................................. 14

*Williams v. Aramark Sports, LLC*,
    No. 10-1044, 2011 U.S. Dist. LEXIS 102173 (E.D. Pa. Sept. 8, 2011) ............... 18

**Statutes**

Fed. R. Civ. P. 23 ......................................................................................... *passim*

Section 16 of the Clayton Act............................................................................ 23

Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.* ......................................................... 2

Indirect Purchaser Plaintiffs ("IP Plaintiffs") respectfully submit this memorandum in support of their motion: (1) for preliminary approval of a settlement between IP Plaintiffs and National Food Corporation ("NFC"), as set forth in the Settlement Agreement Between Indirect Purchaser Plaintiffs and Defendant National Food Corporation ("NFC Settlement Agreement"), attached as Exhibit 1 to the Declaration of Paul F. Novak ("Novak Decl."); and (2) for certification of classes for purposes of the NFC Settlement Agreement.

I.      INTRODUCTION

After months of arm's-length negotiations, IP Plaintiffs have reached a mutually agreeable settlement with NFC. In exchange for a release from this lawsuit, NFC has agreed to (1) place $300,000 U.S. dollars into a fund to provide for the claims of members of the proposed classes; (2) cooperate with and assist IP Plaintiffs in their prosecution of this action; and (3) submit to an injunction prohibiting NFC from entering into agreements to reduce the production of eggs, or to share or provide current or future eggs supply, shipment or price information to United Egg Producers or any similar trade association or agricultural cooperative. IP Plaintiffs now seek preliminary approval of the NFC Settlement Agreement under Federal Rule of Civil Procedure 23(e).

In considering whether to grant preliminary approval of a proposed settlement, the Court need determine only whether the settlement is sufficiently fair, reasonable, and adequate to allow notice of the proposed settlement to be disseminated to the classes. A final determination of the settlement's fairness would be made at or after a Fairness Hearing, after class members have received notice of this Settlement and have been given an opportunity to object to the Settlement and an opportunity to opt-out of the classes. As explained in further detail below, IP Plaintiffs believe that the Settlement Agreement is a fair and reasonable result for the proposed settlement classes. Not only do IP Plaintiffs believe the monetary and injunctive terms are fair and valuable

to the proposed settlement classes, but IP Plaintiffs also believe that NFC's cooperation commitments will materially assist IP Plaintiffs in further analyzing and prosecuting this action against the remaining non-settling Defendants.

Accordingly, IP Plaintiffs respectfully request that the Court: (1) preliminarily approve the NFC Settlement Agreement; (2) conditionally certify the classes defined in the NFC Settlement Agreement; and (3) appoint interim co-lead counsel as class counsel for the settlement classes.

## II.  BACKGROUND

### A.   The Litigation

This case concerns an alleged conspiracy among the nation's largest egg producers. IP Plaintiffs allege that Defendants and other named and unnamed co-conspirators violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, and analogous state antitrust and consumer protection statutes, by engaging in an unlawful conspiracy to reduce output and thereby artificially fix, raise, maintain and/or stabilize the prices of commodity shell eggs in the United States. As a result of Defendants' alleged conduct, IP Plaintiffs and members of the Classes paid prices for shell eggs that were higher than they otherwise would have been absent the conspiracy. The lawsuit seeks damages, injunctive relief, attorneys' fees, and costs from Defendants. NFC denies all allegations of wrongdoing in this action.

## III.  THE NFC SETTLEMENT NEGOTIATIONS

Interim Co-Lead Counsel for IP Plaintiffs ("Class Counsel") and NFC's counsel, Davis Wright Tremaine, LLP, engaged in extensive arm's length negotiations over the course of approximately ten (10) months to reach the current settlement. The scope and details of the negotiations are described in the accompanying Novak Declaration. Class Counsel and NFC's

counsel, both highly experienced and capable, vigorously advocated their respective clients' positions in the settlement negotiations.

Preliminary settlement discussions began in July 2013, at which time the parties were considering a global settlement negotiation with NFC. While IP Plaintiffs expressed their willingness to participate in these negotiations, the global negotiations ultimately did not materialize. *Id.* at ¶ 5. IP Plaintiffs continued to pursue discovery of NFC in the interim by attempting to schedule NFC depositions and by pursuing additional information regarding NFC transactional data, among other things. *Id.* at ¶ 6. In November 2013, NFC produced a round of financial statements, which demonstrated that NFC's financial condition was not improving, and invited settlement offers. However, settlement discussions quickly stalled. *Id.* at ¶ 7.

By early 2014 (after IP Plaintiffs had already participated in approximately twenty (20) depositions and expended thousands of hours reviewing several hundred thousands, if not millions, of pages of documents produced by Defendants and third parties, including documents produced by NFC), NFC and IP Plaintiffs reengaged in substantive negotiations and NFC provided additional information regarding its financial condition. Ultimately, after several months of negotiations via teleconferences and email exchanges, the parties agreed to a $300,000 settlement, injunctive relief, and cooperation from NFC, based largely on NFC's solvency issues and the risks of litigation. *Id.* at ¶¶ 8, 9. On February 28, 2014, the parties reached an agreement in principal and counsel began negotiating and drafting a settlement agreement. On April 16, 2014, the parties executed a settlement agreement. *Id.* at ¶¶ 10, 11.

After factual investigation and legal analysis, it is the opinion of Class Counsel that the settlement amount of $300,000 (the "Settlement Amount"), combined with NFC's obligation to cooperate with IP Plaintiffs and provide injunctive relief, is fair, reasonable, and adequate to and

3

for the Classes. IP Plaintiffs respectfully submit that the Settlement is in the best interest of the Classes and should be preliminarily approved by the Court, and that the Classes should be certified for purposes of the Settlement.

## IV.   PROVISIONS OF THE SETTLEMENT AGREEMENT

### A.   The Settlement Classes

The NFC Settlement Agreement defines the proposed settlement classes (collectively the "Settlement Classes") as follows:

> a.) Indirect Purchaser Injunctive Class
>
> All individuals and entities in the Class Jurisdictions that purchased Shell Eggs, for their own use and not for resale, during the Class Period from January 1, 2000 through the present, and who intend to purchase Shell Eggs in the future.
>
> b.) Indirect Purchaser State Classes
> All individuals and entities residing in Arizona, California, Florida, Iowa Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, that purchased Shell Eggs for their own use and not for resale, during the Class Period from January 1, 2000 through the present, and that intend to purchase shell eggs in the future.

Excluded from the Classes are Defendants' subsidiaries and affiliates and all persons who purchased eggs directly from any Defendant or any other producer of eggs. NFC Settlement Agreement (Novak Decl., Ex. 1.), ¶ 17.

## V.   CASH CONSIDERATION TO THE PROPOSED CLASSES AND RESCISSION PROVISIONS

NFC has paid $300,000 in cash. *See* Novak Decl, Ex. 1 at ¶¶ 14, 32. This money is being maintained in an escrow account controlled by NFC and Class Counsel pending approval of the settlement by the Court. NFC and IP Plaintiffs each have the right and option to rescind the NFC Settlement Agreement for the reasons described in paragraph 28 of the NFC Settlement

Agreement, including in the event that the Court refuses to approve the Agreement or any part thereof, or if such approval is modified or set aside on appeal.

Additionally, the NFC Settlement Agreement provides that Class Counsel may, at a time approved by the Court, seek from the Settlement Amount an award of attorney's fees and reasonable litigation expenses, and that NFC shall have no obligation to pay any fees or expenses of Class Counsel. *Id.* at ¶ 34.

## VI.   THE INJUNCTIVE PROVISIONS

In addition to the Settlement Amount, the NFC Settlement Agreement requires that, for three (3) years after Final Approval, NFC shall not enter into any agreements with competitors, whether through United Egg Producers, Inc. or any similar trade association or agricultural cooperative, to reduce the production of eggs, unless entered into for disease control or other public health concerns. *Id.* at ¶ 37.

Additionally, NFC shall not share or provide current or future eggs supply, shipment or price information to United Egg Producers, Inc. or any similar trade association or agricultural cooperative, except to the extent that such information is available from public sources, subject to certain exceptions. *Id.*

## VII.   THE COOPERATION PROVISIONS

In addition to the Settlement Amount and Injunctive Provisions, the NFC Settlement Agreement requires that NFC cooperate with IP Plaintiffs in their prosecution of this case. *Id.* at ¶ 39.

This cooperation includes, *inter alia*, making Roger Deffner, Vice President of NFC, available for an interview; providing affidavits consistent with NFC employees' recollection and understanding of the facts as reasonably required by the needs of the case, including but not limited to the authentication of documents; providing up to two of its employees as witnesses at

5

trial at NFC' expense, as IP Plaintiffs may reasonably require; and using its best efforts to encourage attendance at trial by former employees whom IP Plaintiffs wish to use as witnesses. *Id*

## VIII.   THE RELEASE PROVISIONS

In exchange for the consideration described above, IP Plaintiffs have agreed to release NFC from any and all claims arising out of or resulting from: (1) any agreement or understanding between or among two or more producers of eggs, including any Defendants; (2) the reduction or restraint of supply, the reduction of or restrictions on production capacity; or (3) the pricing, selling, discounting, marketing, or distributing of shell eggs in the United States or elsewhere. The full text of the proposed releases, including the limitations thereof, is set forth in the NFC Settlement Agreement. *Id.* at ¶¶ 23-27.

## IX.   NOTICE

Consistent with the terms of the NFC Settlement Agreement, IP Plaintiffs are not presently seeking approval of the form of the notice to be issued and will file the appropriate motion at a at a time deemed appropriate by Class Counsel and the Court as to the date for its dissemination.[1]  While Rule 23(e) provides that a "class action shall not be dismissed or compromised without the approval of the court and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs," it does not require that a notice plan be considered and approved as part of the *preliminary*

---

[1] The IP Plaintiffs anticipate that additional settlements will be submitted to the Court shortly and that submission of a notice plan should await joint consultation with counsel for the additional settling Defendants because the cost of notice will be distributed over more than one settlement. However, if the Court requires a notice plan to be submitted to it *before* the submission of these additional settlements, IP Plaintiffs can and will do so.

6

approval papers.[2]   Rather, under Rule 23, notice must be approved and distributed, where required, prior to *final* approval of a settlement.

Subsequent to the entry of a settlement agreement between IP Plaintiffs and NFC, as noted in status reports to the Court, IP Plaintiffs have entered into settlement negotiations with Midwest Poultry Services, L.P. and Nucal Foods.  As such, it is in the interests of the Classes and judicial economy to issue one notice with as many settling Defendants as possible, and to wait until an appropriate time to disseminate such notice.

Thus, IP Plaintiffs will seek leave to distribute notice to the NFC Settlement Classes until such time as settlements are reached with other Defendants, making notice more efficient and economical.  Although this may ultimately delay final approval of this settlement, IP Plaintiffs' Counsel believe that this provides a benefit to the Classes, while similarly providing efficiencies and conservation of judicial and counsel's resources.

## X.   THE PROPOSED SETTLEMENT IS SUFFICIENTLY FAIR, REASONABLE AND ADEQUATE

### A.   The Standard for Granting Preliminary Approval of the Settlement

"The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 144 (D.N.J. 2013) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995)); *Austin v. Pa. Dep't of Corr.*, 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) (explaining that "the extraordinary amount of judicial and private resources consumed by massive class action litigation elevates the general policy of encouraging settlements to 'an overriding public interest'").

---

[2] Indeed, courts have recognized that in some instances, notice is not required at all as part of preliminary approval. *See generally* "Notice to Class Members," 3 Newberg on Class Actions § 8:18 (4th ed.).

While the law favors settlement of complex litigation, Rule 23 of the Federal Rules of Civil Procedure requires court approval for any compromise of a class action. Such approval involves a two-step process. First, counsel submits the proposed terms of the settlement to the court for a preliminary fairness evaluation. Second, after a preliminary finding of fairness has been made and notice has been disseminated to the settlement class members, the Court must conduct a formal fairness and final approval hearing after notice has been disseminated to the settlement class members. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29163, at *1 (E.D. Pa. May 10, 2004); 4 Newberg on Class Actions § 11:25, at 38-39 (4th ed. 2002).

When deciding preliminary approval, a court does not conduct a definitive proceeding on fairness of the proposed settlement. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995), *aff'd*, 34 F.3d 133 (3d Cir. 1998) (holding that the "preliminary determination establishes an initial presumption of fairness"); *In re Am. Inv. Life Ins. Co. Annuity Mktg. and Sales Practices Litig.*, 263 F.R.D. 226, 238 (E.D. Pa. 2009) (same). That definitive determination must await the final hearing, at which the fairness, reasonableness, and adequacy of the settlement are more fully assessed. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003).[3] Rather, at the preliminary approval stage, the court

---

[3] The factors considered for final approval of a class settlement as "fair, reasonable and adequate" include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534-35 (3d Cir. 2004); *Prudential*, 962 F. Supp. at 552; *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 713 (E.D. Pa. 2001), *vacated*, 396 F. Supp. 294 (3d Cir. 2005). At the preliminary approval stage, "the Court need not address these factors, as the standard for

must determine whether the "proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys, and whether it appears to fall within the range of possible approval." *Mack Trucks, Inc. v. Int'l Union, UAW*, No. 07-3737, 2011 U.S. Dist. LEXIS 51514, at *8 (E.D. Pa. May 12, 2011) (quoting *Thomas v. NCO Fin. Sys., Inc.*, No. 00-5118, 2002 U.S. Dist. LEXIS 14157, at *14 (E.D. Pa. July 31, 2002)).

In determining whether an antitrust settlement falls within a "range of reasonableness," a court examines whether (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; and (3) the proponents of the settlement are experienced in similar litigation.[4] *In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332, at *7 (E.D. Pa. Feb. 11, 2013) (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003)). After making such findings, a settlement agreement is entitled to a presumption of fairness and should be preliminarily approved. *Id.* at *8.

As discussed below, the proposed NFC Settlement Agreement is entitled to a presumption of fairness because it provides no preferential treatment of the Class Representatives or segments of the Classes, does not provide for excessive compensation of attorneys, provides significant relief to the Classes, and requires that NFC provide significant additional information regarding the facts and events at issue in this case, which will assist IP Plaintiffs in prosecuting the case against the Non-Settling Defendants.

---

preliminary approval is far less demanding." *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 444 n.7. (E.D. Pa. 2008). IP Plaintiffs will thus fully address each of these factors in their memorandum in support of their motion for final approval.

[4] A fourth factor the percentage of the class objecting, is premature at the preliminary approval stage. *In re Imprelis*, 2013 U.S. Dist. LEXIS 18332, at *10.

9

XI.   **THE SETTLEMENT AMOUNT, THE INJUNCTIVE PROVISIONS, THE COOPERATION PROVISIONS AND THE TERMS OF THE AGREEMENT SUPPORT PRELIMINARY APPROVAL**

The settlement amount is fair and reasonable and represents a favorable result for the Classes.  As noted above, under the NFC Settlement Agreement, NFC has paid $300,000 into escrow.  This amount was agreed to after ten (10) months of negotiations, and is based on NFC's precarious financial position as established in the audited financial statements provided by NFC.  Novak Decl., ¶¶ 4, 7, 8, 9.  Class Counsel believes it is in the best interest of the Classes to enter into the NFC Settlement Agreement rather than continuing to pursue a judgment against NFC that may prove to be uncollectible.  Moreover, the damages that IP Plaintiffs suffered due to NFC's alleged conduct remain in the case and are recoverable from other Defendants under joint and several liability.  *See In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29163, at *6 (preliminarily approving settlement agreement because, *inter alia,* "this settlement does not affect the joint and several liability of the remaining Defendants in this alleged conspiracy").

Also, as described above, the NFC Settlement Agreement requires that NFC cooperate with IP Plaintiffs in the prosecution of this action, which includes providing assistance in developing additional factual information regarding the issues and events relevant to this case through an interview of NFC's Vice President, affidavits consistent with NFC's recollection and understanding of the facts as reasonably required by case needs, and up to two NFC employees provided as witnesses at trial.  Novak Decl., Ex. 1 at ¶ 39.  Class Counsel believes that this cooperation will significantly benefit IP Plaintiffs and will assist Class Counsel in prosecuting their claims.  *See, e.g., In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 344 (E.D. Pa. 2007); *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29163, at *6-7 (acknowledging the assistance that the settling defendants will provide "in pursuing this case against the remaining Defendants"); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at

643 ("The provision of such [cooperation] is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement"); *In re Ikon Office Supplies Inc. Sec. Litig.*, 194 F.R.D. 166, 177 (E.D. Pa. 2000) (noting that cooperation agreements are valuable when settling a complex case).[5]

Additionally, it should be noted that the NFC Settlement Agreement is fair to the Classes as a whole. The NFC Settlement Agreement provides no preferential treatment to Class Representatives vis-à-vis other members of the Classes. And, as noted above, the NFC Settlement Agreement provides that Class Counsel must obtain approval from the Court to receive fees and expenses from the Settlement Amount, which may not be paid until final approval of the Settlement.

Ultimately, given NFC's precarious financial position as well as the risk and likely expense of continuing to litigate against NFC, Class Counsel strongly believe that the terms of the settlement are a highly favorable result for the Classes. And, in light of Class Counsel's substantial experience litigating antitrust class actions, this belief should be accorded significant weight based on a thorough analysis of the facts. *See, e.g., In re Gen. Instruments Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001); *Stewart v. Rubin*, 948 F. Supp. 1077, 1099 (D.D.C. 1996), ("A court should defer to the judgment of experienced counsel who have competently evaluated the strength of the proof."); *McGuiness v. Parnes*, No. 87-2728-LFO, 1989 U.S. Dist.

---

[5] *See also In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 379, 1386 (D. Md. 1983) ("[T]he commitment [the] Distributor defendants have made to cooperate with plaintiffs will certainly benefit the classes, and is an appropriate factor for the court to consider in approving a settlement"); *In re Corrugated Container Antitrust Litig.*, MDL No. 310, 1981 U.S. Dist. LEXIS 9687, at *47-48 (S.D. Tex. June 4, 1981), *aff'd*, 659 F.2d 1322 (5th Cir 1981) ("The settlement agreements provided for cooperation from the settling defendants that constituted a substantial benefit to the class. Those provisions were intended to save plaintiffs time and expense in the continuing litigation . . . [and] made certain information and expertise available to the class which might not have been available through normal discovery.").

LEXIS 3576, at *2 (D.D.C. Mar. 21, 1989) ("While the evaluation of the fairness and adequacy of a settlement such as this is anything but a scientific process, there is nothing about this Settlement suggesting that the Court should second-guess the product of the negotiations between the skilled and conscientious lawyers who represented parties on both sides of this litigation."); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 667 (D. Minn. 1974) ("The recommendation of experienced antitrust counsel is entitled to great weight.").

## XII.   THE NEGOTIATION PROCESS SUPPORTS PRELIMINARY APPROVAL

Settlements that result from arm's-length negotiations between experienced counsel are generally entitled to deference from the court. *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2003 U.S. Dist. LEXIS 18123, at *4 (E.D. Pa. Sept. 5, 2003); *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d at 640 (holding that "[a] presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel") (citing *Hanrahan v. Britt,* 174 F.R.D. 356, 366 (E.D. Pa. 1997)); *Lake v. First Nationwide Bank,* 156 F.R.D. 615, 628 (E.D. Pa. 1994) (giving "due regard to the recommendation of the experienced counsel in this case, who have negotiated this settlement at arms-length and in good faith"); *Petruzzi's Inc. v. Darling-Delaware Co.,* 880 F. Supp. 292, 301 (M.D. Pa. 1995) ("[T]he opinions and recommendations of such experienced counsel are indeed entitled to considerable weight"); 2 Newberg on Class Actions, § 11.41 (3d ed. 1992) ("There is usually an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval").

Here, the NFC Settlement Agreement is the result of hard-fought, arm's length negotiations between NFC's counsel and Class Counsel, all of whom are experienced and

capable in complex class action and antitrust matters.[6]  During the negotiations, NFC's counsel and Class Counsel vigorously advocated their respective clients' positions, and were prepared to litigate the case fully if no settlement was reached.  Nothing in the course of IP Plaintiffs' negotiations with NFC, or in the substance of the proposed NFC Settlement Agreement, presents any reason to doubt the Agreement's fairness.

## XIII.  THE EXTENT OF DISCOVERY AT THE TIME THE SETTLEMENT AGREEMENT WAS NEGOTIATED AND AGREED TO SUPPORTS PRELIMINARY APPROVAL

A factor that courts sometimes look to when determining whether a settlement agreement is fair is the amount of factual discovery the parties had undertaken prior to reaching the settlement.  When the parties have engaged in a considerable amount of discovery, this fact supports a finding that that the settlement is within the range of reasonableness.  *See In re Imprelis*, 2013 U.S. Dist. LEXIS 18332, at *9 (finding settlement within range of reasonableness where "[a] considerable amount of preliminary discovery was conducted, including the review of some 500,000 pages of documents . . . , the hiring and consultation of several experts, and a deposition of [Defendant's] product manager").  Here, the parties had completed a substantial amount of factual discovery by the time the settlement was reached.  Indeed, by the time Class Counsel and NFC resumed settlement discussions in January 2014, Class Counsel had already reviewed hundreds of thousands of documents produced in the litigation and participated in approximately twenty (20) depositions.  Novak Decl. ¶ 8.  Accordingly, the amount of discovery completed supports a finding that the Settlement is within the range of reasonableness.

---

[6] The experience and qualifications of Class Counsel are described in Indirect Purchaser Plaintiffs' Memorandum In Support of Their Motion for Class Certification (ECF No. 1043 filed under seal).

## XIV.   THE EXPENSE AND UNCERTAINTY OF CONTINUED LITIGATION AGAINST NFC SUPPORTS PRELIMINARY APPROVAL

After weighing the risks and expenses of continued litigation against the guaranteed recovery to the Classes and the significant benefits of NFC's cooperation obligations, Class Counsel have determined that the Settlements are favorable to and in the best interests of the IP Plaintiffs and the Classes. And this determination is buoyed by NFC's precarious financial position, which makes it unlikely that NFC would be able to pay any judgment IP Plaintiffs might obtain at trial.

The settlement with NFC is particularly reasonable given the inherent risks in moving forward with litigation toward trial. It has been often observed that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d at 639 (citation omitted); *see also Weseley v. Spear,* 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (noting that antitrust class actions are "notoriously complex, protracted, and bitterly fought"). NFC has asserted various defenses, and a jury trial (assuming the case proceeded beyond pretrial motions) might well turn on questions of proof, making the outcome inherently uncertain for both parties. *In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d at 639; *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable . . . [T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal"). Moreover, even after trial is concluded, there could be one or more lengthy appeals. *In re Remeron End-Payor Antitrust Litig.,* No. 02-2007, 2005 U.S. Dist. LEXIS 27011, at *49 (D.N.J. Sept. 13, 2005). The degree of uncertainty supports preliminary approval of the proposed NFC Settlement Agreement. *See In re Chambers Dev. Sec. Litig.,* 912 F. Supp. 822, 838 (W.D. Pa. 1995).

14

Ultimately, the terms of the settlement, the financial condition of NFC, the nature of the negotiations, the degree of discovery at the time of settlement, the experience of Class Counsel and the risks of proceeding against NFC all support the Court finding that the NFC Settlement falls within the range of possible final approvals and is entitled to the presumption of fairness.

## XV. PRELIMINARY CERTIFICATION OF THE PROPOSED NFC SETTLEMENT CLASSES IS WARRANTED

### A. The Legal Standard

#### 1. Rule 23's Requirements for Class Certification.

It is well-established that a class may be certified for purposes of settlement. *In re Pet Food Prods. Liability Litig.*, No. 07-2867, 2008 U.S. Dist. LEXIS 94603, at *55 (D.N.J. Nov. 18, 2008) ("Class actions certified for the purposes of settlement are well recognized under Rule 23."); *Ikon,* 194 F.R.D. at 188 (class certified for purposes of settlement of securities class action). In the case of settlements, "tentative or temporary settlement classes are favored when there is little or no likelihood of abuse, and the settlement is fair and reasonable and under the scrutiny of the trial judge." *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 205 (S.D.N.Y. 1995) (internal quotation and citation omitted). The settlement here is fair, reasonable, and non-abusive. Therefore the proposed Settlement Classes should be certified by the Court.

Rule 23 governs the issue of class certification for both litigation and settlement classes. A settlement class should be certified where the four requirements of Rule 23(a) — numerosity, commonality, typicality and adequacy — are satisfied, and when one of the three subsections of Rule 23(b) is also met. *Amchem Prodts., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). Here, IP Plaintiffs are seeking to certify an injunctive class under Rule 23(b)(2) and state monetary remedies classes under Rule 23(b)(3). To be certified under Rule 23(b)(2), IP Plaintiffs must show that the Defendants "acted or refused to act on grounds that apply generally to the class, so

15

that final injunctive relief or corresponding declaratory relief is appropriate respecting the class

as a whole." Fed. R. Civ. P. 23(b)(2).  To be certified under Rule 23(b)(3), the classes must meet

Rule 23(b)(3)'s "predominance" and "superiority" requirements.  *See In re Hydrogen Peroxide*

*Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).

 The party seeking class certification has the burden of showing by a preponderance of the

evidence that each of Rule 23's requirements are met.  *Hydrogen Peroxide*, 552 F.3d at 307, 320.

But once this showing has been made, the Court should certify the class.  *Shady Grove*

*Orthopedics Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (Rule 23 is "a categorical

rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class

action").  In determining the propriety of class certification, courts address merits questions

"only to the extent" necessary to determine whether the Rule 23 requirements have been met.

*Sullivan v. DB Inves., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011).

## 2.  The Purposes of Class Certification

 When determining whether a proposed class meets the requirements of Rule 23, courts

frequently consider the policy considerations underlying the Rule.  *See, e.g., Amchem*, 521 U.S.

at 617; *Sullivan*, 667 F.3d at 302.  And as the Supreme Court has explained, "[t]he policy at the

very core of the class action mechanism is to overcome the problem that small recoveries do not

provide the incentive for any individual to bring a solo action prosecuting his or her rights."

*Amchem*, 521 U.S. at 617; *see also Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th

Cir. 2013) (Posner, J.) ("when what is small is not the aggregate but the individual claim, [] that's

the type of case in which class action treatment is most needful . . . . A class action, like litigation

in general, has a deterrent as well as a compensatory objective").  By aggregating the "relatively

paltry potential [individual] recoveries," Rule 23 provides incentives for class attorneys to pursue

an action and accomplish the dual policies of deterring illegal behavior and compensating

16

harmed purchasers. *Amchem*, 521 U.S. at 617 (provides incentives for attorneys); *Hughes*, 731 F.3d at 677 (deters illegal behavior and compensates harmed purchasers).

Not only do Rule 23's policy considerations support granting IP Plaintiffs' motion, but, as explained below, the Settlement Classes meet the formal requirements of Rule 23 and should be certified.

## XVI. THIS CASE SATISFIES THE PREREQUISITES OF RULE 23(a)

Certification is appropriate under Rule 23(a) if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

### 1.    The Settlement Classes are sufficiently numerous.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." However, there is no "magic number" of plaintiffs that make joinder impracticable. *In re Certainteed Fiber Cement Siding Litig.*, MDL No. 2270, 2014 U.S. Dist. LEXIS 36532 at *29-30 (E.D. Pa. Mar. 20, 2014). The Third Circuit has generally held that the numerosity requirement is met "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2002). Moreover, plaintiffs "need not precisely enumerate the potential size of the proposed class, nor are plaintiffs required to demonstrate that joinder would be impossible." *In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 361 (E.D. Pa. 2013).

The injunctive class and the state classes consist of consumers who made retail purchases of commodity shell eggs — a product that eighty-nine percent (89%) of U.S. households routinely purchase. Consequently, the injunctive class consists of tens of million class members,

17

and the membership of each state class numbers in the hundreds of thousands to millions. Joinder of all these class members, either nationally or on a state by state basis, would be impracticable. *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402 (E.D. Pa. 2010) (joinder of a class of 10,000 members "is impracticable"). Thus, the proposed Settlement Classes meet the numerosity tests of Rule 23(a)(1). *Imprelis*, 296 F.R.D. at 361 ("Because there at least tens of thousands of class members, [the numerosity requirement] is easily met").

2.   There are common questions of law and fact.

The proposed Settlement Classes also each and collectively meet the commonality requirement of Rule 23(a)(2). *See* Fed. R. Civ. P. 23(a)(2) (there must be "questions of law or fact common to the class"). This requirement, however, is "not onerous." *Rodriguez v. National City Bank*, 726 F.3d 372, 380-82 (3d Cir. 2013). In fact, commonality may be satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Thus, commonality does not require that "all class members share identical claims," *Sullivan*, 667 F.3d at 301, that there be identical issues and facts for all plaintiffs, or that no individualized issues exist, *Williams v. Aramark Sports, LLC*, No. 10-1044, 2011 U.S. Dist. LEXIS 102173, at *8 (E.D. Pa. Sept. 8, 2011).

As a general matter, "[a]ntitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy." *Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 462 (E.D. Pa. 2008) (quoting *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 335 (E.D. Pa. 1976)); *see also Amchem*, 521 U.S. at 625 (commonality is "readily met in certain cases alleging . . . violations of the antitrust laws"); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 184-85 (D.N.J. 2003) (allegation of conspiracy in the class action context raises "a central issue that will establish common questions of both law and fact").

18

This case is no different. Effectively all the questions relevant to a determination of Defendants' liability are questions for common, class-wide determination. For example, the following questions are common for all IP Plaintiffs' claims:

- the conspiracy's existence, scope, and nature;

- the illegality of the conspiracy under federal antitrust law as well as state antitrust and consumer protection laws;

- the identity of participants in the conspiracy;

- the length of the conspiracy;

- the effect of the conspiracy, including whether it caused a cognizable injury to class members; and

- the aggregate amount of damages IP Plaintiffs suffered as a result of the conspiracy.

Even the statutory defenses, such as whether Defendants' supposed cooperative meets the requirements for protection under state and federal agricultural cooperative exemptions, will turn on facts and legal questions common to the respective class members. Thus, the proposed Settlement Classes meet Rule 23(a)(2)'s commonality requirement. *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2014 U.S. Dist. LEXIS 30150, at *7 (E.D. Pa. Feb. 28, 2014) (order preliminarily approving Direct Purchaser Plaintiffs/Cal-Maine Settlement).

> 3. The Representative Plaintiffs' claims are typical of those of the Settlement Classes.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requires the Court to determine "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006) Typicality precludes class certification only "when the legal theories of the named representatives potentially conflict with those of the

absentees," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001), or when "the representative is subject to a unique defense that is likely to become a major focus of the litigation," *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Here, IP Plaintiffs (both named class representatives and absent class members) are retail consumers of commodity eggs who have been harmed by having to pay artificially inflated prices resulting from Defendants' conspiracy. Thus, the named plaintiffs' and the unnamed class members' claims arise from the same illegal conspiracy and are based on the same legal theories. *See In re Processed Egg Prods. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 30150 at *7-8 (when the same legal theories and conduct underlies both the representatives' claims and those of the class, their claims are "typical"); *Serrano*, 711 F. Supp.2d at 411 (where the representative plaintiffs seek redress for the same course of conduct and the same legal theories as other class members, the representatives "satisfy the typicality requirement of Rule 23(a)(3)"). Additionally, IP Plaintiffs are not subject to any concrete individualized defenses that are likely to become the focus of the litigation. Thus, the typicality requirement of Rule 23(a)(3) is met.

> 4.   The Representative Plaintiffs will fairly and adequately protect the interests of the Settlement Classes.

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "adequacy" requirement has two elements. First, the interests of the representatives must be aligned with those of the classes they seek to represent. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012). Second, the representatives must have class counsel who is experienced and is willing to actively litigate the case on behalf of the class. *Id.*

The first prong requires a determination that "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re Comty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010). Under this requirement, a class representative must have some commitment to the case, and therefore some minimal knowledge about the case. *Allen v. Holiday Universal*, 249 F.R.D. 166, 184-85 (E.D. Pa. 2008) (Pratter, J.). However, this is not a high bar. *Id.*[7] Moreover, a class representative is not inadequate simply because of the existence of a minor conflict. Rather, "[a] conflict must be 'fundamental' to violate Rule 23(a)(4)." *Dewey*, 681 F.3d at 184. "A fundamenta[l] conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* But "[a] conflict that is unduly speculative . . . is generally not fundamental." *Id.* Finally, it should be noted that Defendants bear the burden of establishing that the proposed class representatives do not meet Rule 23(a)(4)'s adequacy requirement. *Jackson v. Se. Pa. Transp. Auth.*, 260 F.R.D. 168, 192 (E.D. Pa. 2009) ("Unlike the other Rule 23(a) factors, '[a] party challenging the class representation has the burden to prove that the representation is not adequate'").

The named representatives here clearly meet the first prong of the adequacy requirement. Here, each named representative has the ability and incentive to represent the claims of the class vigorously. They have all responded to interrogatories, in which they have attested to purchasing commodity eggs.[8] Nearly all of them have provided receipts and/or store records verifying their

---

[7] *See also Lewis v. Curtis*, 671 F.2d 779, 788-89 (3d. Cir. 1982) (a class representative is not inadequate simply because he or she cannot recall allegations in the complaint or personally assist class counsel in prosecuting the action).

[8] *See* Declaration of Krishna B. Narine ("Narine Decl.") (ECF No. 1043 filed under seal): Tabs 83-86.

purchases of commodity eggs. And all but five of them were deposed and testified that they had reviewed the complaint. Additionally, there is no evidence of any conflicts, fundamental or otherwise, which would prevent any of the named IP Plaintiffs from fairly and adequate representing absent class members. Thus, there is no basis for finding that class representatives are inadequate under Rule 23(a)(4).

Turning to the second prong, Rule 23(g) outlines the standards for evaluating proposed class counsels' adequacy. *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010); *see also Dewey*, 681 F.3d at 181 n13. Pursuant to Rule 23(g)(1)(A), a court is to consider the following four criteria when selecting class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

The below-signed Class Counsel satisfy Rule 23's requirements and request appointment as co-lead counsel for the Settlement Classes. Class Counsel have significant expertise in complex class actions and antitrust litigation and have served in leadership roles in numerous class actions throughout the county.[9] Class Counsel performed a substantial amount of work early in this case investigating the conspiracy, identifying defendants and drafting the consolidated complaints on behalf of the IP Plaintiffs. And since then, they have vigorously and effectively represented IP Plaintiffs in this litigation. Class Counsel's vigor and effectiveness has been exemplified by, among other things, (a) defeating Defendants' motions to dismiss for failure

---

[9] Class Counsel outlined their experience and expertise in their motions for appointment as class counsel. *see* ECF Nos. 6, 8 and 14, incorporated herein by reference.

te state a claim, (b) coordinating, overseeing and conducting discovery on behalf of the IP
Plaintiffs, (c) overseeing and defending the depositions of the multiple representative plaintiffs,
(d) drafting extensive statements of law regarding the major issues in the case, and (e) finding,
evaluating and overseeing the work of expert economists.  Class Counsel have committed, and
will continue to commit, the resources necessary to vigorously represent the class.

## XVII. THE PROPOSED INJUNCTIVE CLASS MEETS THE REQUIREMENTS OF RULE 23(b)(2)

IP Plaintiffs seek to certify the Injunctive Class for the purpose of obtaining injunctive
relief under Section 16 of the Clayton Act and analogous state statutes ordering the Defendants
to cease the illegal activities described in the fifth amended consolidated complaint.[10]  Rule
23(b)(2) provides for class treatment where the defendant "has acted or refused to act on grounds
generally applicable to the class, thereby making appropriate final injunctive relief or
corresponding declaratory relief with respect to the class as a whole."  *See* Fed. R. Civ. P.
23(b)(2).  Importantly, unlike a class seeking damages, a Rule 23(b)(2) class seeking injunctive
relief is not require to meet any predominance or superiority requirements.  *Wal-Mart Stores, Inc.
v. Dukes*, 131 S. Ct. 2541, 2558 (2011) ("When a class seeks an indivisible injunction benefitting
all its members at once, there is no reason to undertake a case-specific inquiry into whether class
issues predominate or whether class action is a superior method of adjudicating the dispute.
Predominance and superiority are self-evident").  Consequently, Rule 23(b)(2)'s requirements are
"almost automatically satisfied in actions seeking primarily injunctive relief," at least where the

---

[10] The Injunctive Class seeks only equitable relief and certification under 23(b)(2), while the State Law Classes seek only monetary relief and certification under 23(b)(3).  *See Snell v. City of Philadelphia*, 288 F.R.D. 377, 385 (E.D. Pa. 2013) (noting that the Federal Rules of Civil Procedure allow certification of a class solely for injunctive relief and another solely for damages).

action "seeks to define the relationship between the defendant(s) and the 'world at large.'" *Id.* at 58 (internal quotation omitted).

Here, Defendants conspired to reduce the supply of eggs in order to increase the overall price for eggs. Their conspiracy was aimed at, and continues to be aimed at, the market as a whole — not at any particular individuals. Consequently, a single injunction will benefit all class members by ensuring that they do not have to pay artificially inflated prices on commodity eggs. Thus, the proposed injunctive relief would "benefit the entire Class identically," and no individualized injunctions will be needed. *See In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 2109, 2012 U.S. Dist. LEXIS 91176, at *28 (E.D. Pa. July 2, 2012).[11] For all the above reasons, Rule 23(b)(2)'s requirements have been met.

## XVIII. THE PROPOSED STATE LAW CLASSES MEET THE REQUIREMENTS OF RULE 23(b)(3)

Rule 23(b)(3) is "designed to secure judgments binding all class members, save those who affirmatively elect[] to be excluded," where a class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 614-15. Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods

---

[11] Because the requested injunctive relief is not individualized, this case differs from *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011), a toxic chemical exposure case where the 3d Circuit affirmed this Court's determination that causation and any injunctive relief in the form of medical monitoring would vary by individual. *Id.* at 264-67.

for the fair and efficient adjudication of the controversy."[12] Fed. R. Civ. P. 23(b)(3). Here, common questions of law and fact predominate for all members of the proposed State Law Classes, and certifying the State Law Classes will advance the policy goals of Rule 23(b)(3). A more detailed and fulsome discussion of the proposed State Law Classes' satisfaction of the requirements of Rule 23(b)(3) is found in the IP Plaintiffs' Class Certification Brief ("Class Certification Brief"), filed under seal on August 29, 2014 (ECF Nos. 1042-43), and which IP Plaintiffs incorporate by reference.

1.    Common legal and factual questions predominate.

The Rule 23(b)(3) predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Sullivan,* 667 F.3d 273, 297 (3d Cir. 2011); *In re Hydrogen Peroxide Antitrust Litig.* 552 F.3d 305, 311 (3d Cir. 2008); *see also Mercedes-Benz,* 213 F.R.D. at 186 ("Predominance requires that common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members.").

"To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 267 (3d Cir. 2009) (quoting *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 207 (3d Cir. 2005) (citation omitted)). A plaintiff seeking certification of an antitrust class action must show that common or class-wide

---

[12] Since this is a settlement class, the Court need not examine the manageability of the class at trial. "[I]n a settlement-only class action . . . the court certifying the class need not examine issues of manageability." *In re Cmty. Bank of N. Va.,* 418 F.3d 277, 306 (3d Cir. 2005) (citing *Amchem,* 521 U.S. at 620) (explaining that issues of individual liability and damages are even less likely to defeat predominance in settlement-only class actions).

25

proof will predominate with respect to each of these elements. *In re Hydrogen Peroxide,* 552 F.3d at 311; *Danny Kresky Enter. Corp. v. Magid,* 716 F.2d 206, 209-10 (3d Cir. 1983); *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 155-56 (3d Cir. 2002).

As the Third Circuit has recognized, "because the 'clear focus' of an antitrust class action is on the allegedly deceptive conduct of defendant and not on the conduct of individual class members, common issues necessarily predominate." *In re Ins. Brokerage Antitrust Litigation,* 579 F.3d 241, 267 (3d Cir. 2009) (citations omitted); *see also Amchem Products,* 521 U.S. at 625 (the Rule 23(b)(3) test of predominance can be "readily met" in antitrust cases); *Sullivan,* 667 F.3d at 299-300 (finding that *Wal-Mart Stores Inc. v. Dukes,* 131 S. Ct. 2541 (2011), bolstered a finding that common issues predominated in an antitrust case where the answers to the questions of alleged anticompetitive conduct and the harm it caused are common as to all class members).

Here, like in most antitrust cases, "common questions abound with respect to whether the defendants engaged in illegal, concerted action," as both of these elements (elements one and three) "focus on the conduct of the defendants." *In re Ins. Brokerage Antitrust Litig.,* 579 F.3d at 268. Specifically, whether Defendants entered into a conspiracy to reduce commodity shell egg supply and increase prices, and whether Defendants' conspiracy was illegal under the laws of the Class Jurisdictions or whether it was protected under an agricultural cooperative exemption are all questions common for the members of each of the State Law Classes. Moreover, if this case were to go to trial, these questions would be answered using evidence common to all class members, such as Defendants' own documents and testimony from Defendants' executives.

Common questions also predominate for the second element, "which focuses on the effects of the defendants' challenged conduct." *Id.* Here, Defendants conspired to restrict the domestic supply of commodity shell eggs by agreeing to emergency flock reductions, exporting

eggs at a loss, and implementing cage space guidelines designed to reduce the size of the nation's laying flock. Additionally, Defendants' conspiracy was designed to and did affect the entire market for commodity shell eggs nationwide. Defendants did not engage in a simple price-fixing scheme of their own eggs. Rather, they manipulated supply and prices in the commodity shell egg market as a whole. And because eggs are commodities that producers can move between regions, these supply manipulations affected prices nationwide.

Finally, common questions also predominate for the fourth element. Under the fourth element, "the task for plaintiffs is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* Put another way, IP Plaintiffs must show that "the fact of damages . . . is susceptible to common proof, even if the amount of damage that each plaintiff suffered could not be established by common proof." *Id.* at 269; *see also Hedges Enters., Inc. v. Cont'l Grp., Inc.*, 81 F.R.D. 461, 475 (E.D. Pa. 1979) ("Proof of a conspiracy to establish a 'base' price would establish at least the fact of damage, even if the extent of the damages suffered by the plaintiffs would vary")[13] In this case, any individual or entity that purchased commodity shell eggs in a Class Jurisdiction during the Class Period was injured by Defendants' conspiracy. First,

---

[13] Regarding the amount of damages, "[a]ntitrust cases nearly always require some speculation as to what would have happened under competitive conditions, to estimate the damage done by restraints on trade or other collusion, but this is not fatal to class certification." *Microcrystalline*, 218 F.R.D. at 92 (*citing In re Fine Paper Antitrust Litig.*, 82 F.R.D 143, 15152 (E.D. Pa. 1979) (noting that diversity of product, marketing practices, and pricing have not been fatal to class certification in numerous cases where conspiracy is "the overriding predominant question"). Accordingly, the need to determine the amount of damage sustained by each plaintiff is an insufficient basis for which to decline class certification. *In re Cmty. Bank of N Va.* 418 F.3d at 305-306 ("Although the calculation of individual damages is necessarily an individual inquiry. the courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues predominate."); *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 242 (D. Del. 2003) ("[T]he need for individual damages calculations does not defeat predominance and class certification.") (quoting *In re Prudential Ins. Co. of America*, 962 F. Supp. 450, 517 (D.N.J. 1997)) *aff'd*, 39 F.3d 516, 540 (3d Cir. 2004).

movements in retail commodity shell egg prices closely parallel movements in the wholesale markets, indicating that there is a high rate of pass-through. Thus, Defendants' conspiracy harmed members of each of the State Law Classes even though they purchased the eggs at retail. Second, because Defendants manipulated the commodity shell egg market as a whole rather than entering into a simple price-fixing agreement, members of each of the State Law Classes were injured regardless of which brand of eggs they purchased. *See United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627-628 (7th Cir. 2003) (when a cartel cuts output and elevates prices throughout the market, even those individuals who purchased only from non-cartel members have suffered a cognizable antitrust injury). Consequently, common evidence will show that any individual or entity that purchased commodity shell eggs in a Class Jurisdiction during the Class Period paid more for the eggs than they would have but for Defendants' conspiracy.

Moreover, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) poses no barrier to certification here. In that case, injury was premised on four theories of impact (each of which may have affected some but not all class members). However, all but one of these four theories were rejected by the court, and the damages model put forward by plaintiffs could not isolate the injury caused by the sole remaining theory of liability from any injuries caused by the other rejected theories. Thus, the Court found that impact could not be proven class-wide. 133 S. Ct. at 430, 1434-35. By contrast, in this case IP Plaintiffs offer just one theory of liability — Defendants conspired to curtail supply and thus artificially inflated egg prices — which will be capable of measurement on a class-wide basis since all class members purchased shell eggs.

Ultimately, predominant questions abound in this case. Whether Defendants entered into a conspiracy, whether Defendants' conspiracy had the purpose and effect of increasing egg

28

prices, whether Defendants' conspiracy is illegal under the laws of the given Class Jurisdiction, and whether members of each of the State Law Classes were injured are all common questions that can be answered using common proof for all members of each of the State Law Classes.

### 2. A class action is superior to other methods of adjudication.

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of "alternate available methods" of adjudication." *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions,* 148 F.3d 283, 316 (3d Cir. 1998) (citations omitted), *Krell v. Prudential Ins. Co. of Am.,* 525 U.S. 1114 (1999). In performing this analysis, Courts can consider the following non-exhaustive list of factors: (a) the interests of individual class members in pursing separate actions; (b) the extent and nature of any other litigation commenced by class members addressing the issues in the litigation; and (c) the desirability of concentrating the litigation in a single forum. Fed. R. Civ. P. 23(b)(3); *Amchem.* 521 U.S. at 615-16.[14]

Here, each of these factors favors managing this litigation as a class action. First, as a "general rule," antitrust litigation is "exceedingly complex, expensive, and lengthy." *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426. 2004 U.S. Dist. LEXIS 29162, at *23 (E.D. Pa. Oct. 13, 2004). Here, given the nature of the product and the likely individual consumer's recovery, pursuing "separate individual suits would be impracticable." *Amchem*, 521 U.S. at 616 (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 698). Indeed, because individual damages are too small to make individual actions viable, class certification provides the only meaningful

---

[14] While Rule 23(b)(3) also lists manageability as a factor to be considered, manageability is not an issue when it comes to certification of a settlement class. *Sullivan v. DB Invs. Inc.* 667 F.3d at 302.

possibility for compensation. *Amchem*, 521 U.S. at 617. Thus, class members have a strong interest in having this case litigated as a class action rather than on an individual basis.

Second, IP Plaintiffs are not aware of any individual consumer litigation involving Defendants' conspiracy. And as the MDL transferee court presiding over multiple related actions, this Court is in the best position to efficiently resolve all claims by indirect purchasers in the Class Jurisdictions.

Finally, there is a strong interest in concentrating this litigation in this forum as a class action. Prosecuting these actions jointly preserves judicial resources and prevents inconsistent results. Absent class action certification, the Court may be faced with millions of individual lawsuits, all of which would arise out of the same set of operative facts presenting largely the same basic legal questions. Thus, a class action is superior to other available methods for the fair and efficient adjudication of class claims. "because litigating all of these claims 'in one action is . . . far more desirable than numerous separate actions litigating the same issues.'" *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 259; *see also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 234 (E.D. Pa. 2012) (finding that "fairness and efficiency" dictated certification because "otherwise, the numerous individual class members would be forced to file suit individually, producing numerous identical issues in each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies"). Moreover, this particular forum is appropriate. Not only was it selected by the Judicial Panel on Multidistrict Litigation, but many of the Defendants resided or transacted business in the district during the Class Period, and a substantial portion of the affected interstate trade and commerce was carried out in the district. IP Plaintiffs' Fifth Amended Consolidated Complaint (ECF No. 866), ¶ 19. Thus, there is a strong interest in concentrating the litigation as a class action in this forum.

## XIX.   CONCLUSION

For the reasons set forth above, IP Plaintiffs request that the Court:  (1) preliminarily approve the NFC Settlement Agreement; (2) certify the proposed Settlement Classes for purposes of the NFC Settlement Agreement; and (3) appoint Class Counsel as co-lead counsel for the Settlement Classes.

DATED:  September 15, 2014                    Respectfully submitted,

                              */s/ Paul F. Novak*
                              Paul F. Novak
                              Elizabeth McKenna
                              Charles Slidders
                              **MILBERG LLP**
                              One Penn Plaza
                              New York, NY 10119
                              Tel: (212) 594-5300
                              Fax: (212) 868-1229
                              pnovak@milberg.com
                              emckenna@milberg.com
                              cslidders@milberg.com

                              ***Interim Co-Lead Counsel for the Indirect
                              Purchaser Plaintiffs***
                              Christopher Lovell
                              Craig Essenmacher
                              Merrick S. Rayle
                              **LOVELL STEWART HALEBIAN
                              JACOBSON, LLP**
                              61 Broadway, Suite 501
                              New York, NY 10006
                              Tel: (212) 608-1900
                              Fax: (212) 719-4667
                              clovell@lshllp.com
                              cessenmacher@lshllp.com
                              msrayle@sbcglobal.net

                              ***Interim Co-Lead Counsel for the Indirect
                              Purchaser Plaintiffs***

31

Timothy D. Battin
Mark J. Schirmer
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com

*Interim Co-Lead Counsel for the Indirect
Purchaser Plaintiffs*

Krishna B. Narine
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for
Indirect Purchaser Plaintiffs*

32

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MDL No. 2002 08-md-02002 |
| THIS DOCUMENT APPLIES TO:  ALL INDIRECT PURCHASER ACTIONS | |

**DECLARATION OF PAUL F. NOVAK IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT BETWEEN INDIRECT PURCHASER PLAINTIFFS AND DEFENDANT NATIONAL FOOD CORPORATION**

I, Paul F. Novak, declare as follows:

1.      I am a partner of the law firm Milberg LLP and one of the attorneys at my firm principally responsible for handling this case. My firm is appointed Interim Co-Lead Counsel for Indirect Purchasers in the above captioned action, along with counsel from Straus & Boies, LLP, Lovell Stewart Halebian Jacobson, LLP and Meredith & Narine.

2.      I submit this declaration in support of the accompanying motion for preliminary approval of the proposed settlement agreement between National Food Corp. ("NFC") and Indirect Purchaser Class Plaintiffs ("IP Plaintiffs").

3.      I was among the principal negotiators of the proposed Settlement Agreement with NFC, along with other Interim Co-Lead Counsel for IP Plaintiffs, who were actively and directly involved in these negotiations.

4.      The settlement negotiations with NFC were conducted by experienced counsel on both sides at arm's length over a period of approximately ten (10) months.

5.      Preliminary settlement discussions began in July 2013, at which time the parties were considering a global settlement negotiation with NFC. While IP Plaintiffs expressed their willingness to participate in these negotiations, the global negotiations ultimately did not materialize.

6.      IP Plaintiffs continued to pursue discovery of NFC in the interim by attempting to schedule NFC depositions and by pursuing additional information regarding NFC transactional data, among other things.

7.      In November 2013, NFC produced a round of financial statements, which demonstrated that NFC's financial condition was not improving, and invited settlement offers. However, settlement discussions quickly stalled.

8.      By early 2014 (after IP Plaintiffs had already participated in approximately twenty (20) depositions and expended thousands of hours reviewing several hundred thousands, if not millions, of pages of documents produced by Defendants and third parties, including documents produced by NFC), NFC and IP Plaintiffs reengaged in substantive negotiations and NFC provided additional information regarding its financial condition.

9.      Ultimately, after several months of negotiations via teleconferences and email exchanges, the parties agreed to a $300,000 settlement, injunctive relief, and cooperation from NFC, based largely on NFC's solvency issues and the risks of litigation.

10.     On February 28, 2014, the parties reached an agreement in principal and counsel began negotiating and drafting a settlement agreement.

11.     On April 16, 2014, the "Settlement Agreement between Indirect Purchaser Plaintiffs' Classes and National Food Corporation" ("NFC Settlement Agreement") was fully executed by IP Plaintiffs' counsel and NFC's counsel. A true and complete copy of the NFC Settlement Agreement is attached as Exhibit 1.

12.     Pursuant to ¶¶ 37-38 of the NFC Settlement Agreement, NFC agreed to provide injunctive relief for three (3) years after Final Approval prohibiting: (1) its ability to enter into agreements with competitors, whether through United Egg Producers, Inc. or any similar trade association or agricultural cooperative, to reduce the production of eggs unless entered into for disease control or other public health concerns; and (2) its ability to share or provide current or future eggs supply, shipment or price information to United Egg Producers, Inc. or any similar trade association or agricultural cooperative, subject to certain exceptions.

13.     Pursuant to ¶ 39 of the NFC Settlement Agreement, NFC agreed to provide cooperation with IP Plaintiffs in the prosecution of this Action, including, *inter alia*, providing

3

significant information concerning its knowledge of the facts relating to documents, witnesses, meetings, communications, conduct and events at issue in the Action, to authenticate documents, and to provide witnesses to be interviewed and to testify at trial.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 15, 2014                    /s/ Paul F. Novak
                                             Paul F. Novak

4

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PROCESSED EGG PRODUCTS          :
ANTITRUST LITIGATION                   :          MDL No. 2002
                                       :          08-md-02002
_____      :
                                       :
THIS DOCUMENT APPLIES TO:              :
All Indirect Purchaser Actions         :

## SETTLEMENT AGREEMENT BETWEEN INDIRECT PURCHASER PLAINTIFFS' CLASSES AND NATIONAL FOOD CORPORATION

This Settlement Agreement ("Agreement") is made and entered into this 16th day of April, 2014 (the "Execution Date"), by and between National Food Corporation ("National Food"), together with its past and present parents, subsidiaries and affiliates, and plaintiff class representatives ("Plaintiffs"), as defined herein at Paragraph 11, both individually and on behalf of Classes of indirect purchasers of Shell Eggs (as described herein at Paragraph 17) in the Class Jurisdictions during the period January 1, 2000 through the present.

WHEREAS, Plaintiffs are prosecuting the above-captioned action currently pending and consolidated in the Eastern District of Pennsylvania, and including all actions transferred for coordination, and all indirect purchaser actions pending such transfer (including, but not limited to, "tag-along" actions) on their own behalf and on behalf of the Classes against National Food and other Defendants (the "Action");

WHEREAS, Plaintiffs allege that National Food participated in an unlawful conspiracy to raise, fix, maintain, and/or stabilize the price of Shell Eggs in the United States at artificially high levels in violation of Section 1 of the Sherman Act;

WHEREAS National Food has denied these allegations;

WHEREAS, Plaintiffs have conducted an investigation into the facts and the law regarding the Action and have concluded that a settlement with National Food according to the terms set forth below is fair, reasonable, and adequate, and beneficial to and in the best interests of the Plaintiffs and the Classes;

WHEREAS, National Food, despite its belief that it is not liable for and has good defenses to the claims alleged in the Action, desires to settle the Action, and thus avoid the risk, exposure, inconvenience, and distraction of continued litigation of the Action, or any action or proceeding relating to the matters being fully settled and finally put to rest in this Agreement;

WHEREAS, arm's-length settlement negotiations have taken place between Class Counsel (as defined below) and counsel for National Food, and this Agreement has been reached as a result of those negotiations;

WHEREAS, Class Counsel has evaluated the ability of National Food to pay a significant judgment and has reached settlement terms reflecting National Food's financial condition;

WHEREAS, as part of the Agreement, National Food agrees to provide witnesses and relevant information that Plaintiffs believe will materially assist Class Counsel and the Classes in the prosecution of the Action;

NOW, THEREFORE, in consideration of the covenants, agreements, and releases set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed by and among the undersigned that the Action be settled, compromised and dismissed on the merits with prejudice as to National Food only, without costs as to Plaintiffs or the Classes or National Food, subject to the approval of the Court, on the following terms and conditions:

A.     **Definitions.**

The following terms, as used in this Agreement, have the following meanings:

2

1.    "Claims Administrator" shall mean a firm retained by Class Counsel and appointed by the Court to administer the Settlement.

2.    "Class Counsel" shall refer to the law firms of Milberg LLP, One Penn Plaza, New York, NY 10119-0165; Lovell Stewart Halebian Jacobson, LLP, 61 Broadway, Suite 501, New York, NY 10006; Straus & Boies, LLP, 4041 University Drive, 5th Floor, Fairfax, VA 22030; and Meredith & Narine, 100 S. Broad Street Suite 905, Philadelphia, PA 19110.

3.    "Class Jurisdictions" means Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

4.    "Class Member" means each member of the Classes, as defined in Paragraph 17 of this Agreement, who does not timely elect to be excluded from the Classes, and includes, but is not limited to, Plaintiffs.

5.    "Class Period" means the period from and including January 1, 2000 up to and including the date when Notice of the Court's entry of an order preliminarily approving this settlement and certifying classes for settlement purposes is first published.

6.    "Counsel" means both Class Counsel and National Food's Counsel, as defined in Paragraphs 2 and 9.

7.    "Defendant(s)" refers to the persons or entities who are now or are prior to the time of notice added as Defendants in this Action, including, but not limited to, United Egg Producers, Inc.; United Egg Association; United States Egg Marketers, Inc.; Michael Foods, Inc.; Papetti's Hygrade Egg Products, Inc.; Moark LLC; Norco Ranch, Inc.; Rose Acre Farms, Inc.; Cal-Maine Foods, Inc.; Hillandale Farms of Pa., Inc.; Hillandale-Gettysburg, L.P.; Ohio Fresh

Eggs, LLC; Midwest Poultry Services, L.P.; NuCal Foods, Inc.; R.W. Sauder, Inc., and each of their corporate parents, subsidiaries, and affiliated companies, as well as all individuals, partnerships, corporations and associations not named as Defendants but which participated as co-conspirators in the alleged violations.

8.    "Final Approval" shall mean the definition given to that phrase in Paragraph 22 hereof.

9.    "National Food's Counsel" shall refer to the law firm of Davis Wright Tremaine LLP, 1201 Third Avenue, Suite 2200, Seattle, WA 98101-3045.

10.    "Non-Settling Defendants" refers to the persons or entities, other than National Food, who are now or are prior to the time of notice added as Defendants in this Action, including, but not limited to, United Egg Producers, Inc.; United Egg Association; United States Egg Marketers, Inc.; Michael Foods, Inc.; Papetti's Hygrade Egg Products, Inc.; Moark LLC; Norco Ranch, Inc.; Rose Acre Farms, Inc.; Cal-Maine Foods, Inc.; Hillandale Farms of Pa., Inc.; Hillandale-Gettysburg, L.P.; Ohio Fresh Eggs, LLC; Midwest Poultry Services, L.P.; NuCal Foods, Inc.; and R.W. Sauder, Inc., and each of their corporate parents, subsidiaries, and affiliated companies, as well as all individuals, partnerships, corporations and associations not named as Defendants but which participated as co-conspirators in the alleged violations.

11.    "Plaintiffs" means each of the following named class representatives:  Nathan Levi Esquerra; Scott Friedson; John Ryan; Morris Clement; Jessica Swift; Pilar M. De Castro & Co., Inc.; Jeanne Rice; Joan Gibbons; Julia McGuire; Donn Camlin; Thomas Williams; Patricia Flynn; Elizabeth Priest; Martin Gojcaj; Thomas Roth; Sharon Defren; Leanne Hardin; John Anthony Spracklin; Dustin Crenshaw; Rachelle L. Hagendorf; Charles Shoten; Trudy Solo; Thomas McManus; Mark Moynahan; Lynsey Allen; Amy Fairchild; Rhonda McGrath; James

4

Anderson; Glenna Sue King; Michael Dobson; Sandra Drown; Lester Skinner; Robert Nelson; and Jason Oldenburg.

12.     "Releasees" shall refer, jointly and severally, and individually and collectively to National Food, its parents, subsidiaries, and affiliated companies, and their past and present officers, directors, employees, agents, insurers, attorneys, shareholders, joint venturers that are not Non-Settling Defendants, partners and representatives, as well as the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

13.     "Releasors" shall refer jointly and severally and individually to the Plaintiffs, the Class Members and to each of their respective past and present officers, directors, parents, subsidiaries, affiliates, partners, and insurers, and to the predecessors, successors, heirs, executors, administrators, and assigns of each of the foregoing.

14.     "Settlement Amount" shall refer to $300,000 in U.S. dollars.

15.     "Settlement Fund" shall mean the funds accrued in the escrow account established in accordance with Paragraph 32 below.

16.     "Shell Eggs" shall mean eggs purchased in their natural state in the shell, other than "specialty" eggs (certified organic, cage free and free range) and hatching eggs purchased by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

**B.     Settlement Class Certification**

17.     Subject to Court approval, the following classes shall be certified for settlement purposes only as to National Food:

> a.) Indirect Purchaser Injunctive Class
> All individuals and entities in the Class
> Jurisdictions that purchased Shell Eggs, for their
> own use and not for resale, during the Class Period
> from January 1, 2000 through the present, and who
> intend to purchase Shell Eggs in the future.

b.) Indirect Purchaser State Classes

All individuals and entities residing in Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, that purchased Shell Eggs for their own use and not for resale, during the Class Period from January 1, 2000 through the present, and that intend to purchase shell eggs in the future.

Excluded from the Classes are Defendants' subsidiaries and affiliates and all persons who purchased eggs directly from any Defendant or any other producer of eggs.

## C.   Approval of this Agreement and Dismissal of Claims

18.   Plaintiffs and National Food shall use their best efforts to effectuate this Agreement, including at the appropriate time cooperating in seeking Court approval of the Settlement and securing both the Court's certification of the Classes and the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e)) to secure the complete and final dismissal with prejudice of the Action as to National Food.

9.   Within (2) two business days after the execution of this Agreement by National Food, Counsel shall jointly file with the Court a stipulation for suspension of all proceedings against National Food pending a petition for preliminary approval of this Agreement. Plaintiffs shall, at a time deemed appropriate by them but not later than July 31, 2014, submit to the Court a motion: (a) for certification of the Classes for settlement purposes; and (b) for preliminary approval of the settlement, and authorization to disseminate notice (at a time deemed appropriate by Class Counsel and the Court) of class certification, the settlement, and the final judgment contemplated by this Agreement to all potential Class Members. The Motion shall include: (a) the definition of the Classes for settlement purposes as set forth in Paragraph 17 of this Agreement; (b) a proposed form of notice combined with a proposed method and date for its dissemination; and (c) a proposed form of final judgment order. A substantially final draft of the

6

Motion shall be shared with National Food at least two business days before submission. Plaintiffs will move for dissemination of notice at such time as it may be combined with notice of other settlement agreements. If notice is combined with notice of other settlement agreements, then, for purposes of Paragraph 44, the costs of notice and claims administration shall be prorated with any such other settlement agreements, in proportion to the financial terms of the settlement amounts.

20. Within twenty (20) business days after the end of the opt-out period established by the Court and set forth in the notice, Plaintiffs shall provide National Food, through its counsel, Davis Wright Tremaine LLP, a written list of the names and addresses of all potential Class Members who have exercised their right to request exclusion from the Classes.

21. If the Court approves this Agreement, Plaintiffs and National Food shall jointly seek entry of an order and final judgment, the text of which Plaintiffs and National Food shall agree upon as provided for in Paragraphs 18 and 19 of this Agreement:

(a) as to the Action, approving finally this Agreement and its terms as being a fair, reasonable, and adequate settlement as to the Class Members within the meaning of Rule 23 of the Federal Rules of Civil Procedure and directing its consummation according to its terms;

(b) directing that, as to National Food, the Action be dismissed with prejudice and, except as explicitly provided for in this Agreement, without costs;

(c) reserving exclusive jurisdiction over the settlement and this Agreement, including the administration and consummation of this settlement;

(d) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing that the final judgment of dismissal as to National Food shall be entered; and

(e) requiring Class Counsel to file with the Clerk of the Court a record of the names and addresses of potential Class Members who timely excluded themselves from the Classes, and to provide a copy of the record to counsel for National Food.

22.     This Agreement shall become final only when (a) the Court has entered an order approving this Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Action against National Food on the merits with prejudice as to all Class Members and without costs has been entered, and (b) the time for appeal or to seek permission to appeal from the Court's approval of this Agreement and entry of a final judgment as described in clause (a) above has expired or, if appealed, approval of this Agreement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review ("Final Approval").  It is agreed that neither the provisions of Rule 60 of the Federal Rules of Civil Procedure nor the All Writs Act, 28 U.S.C. §1651, shall be taken into account in determining the above-stated times.  On the Execution Date, Plaintiffs and National Food shall be bound by the terms of this Agreement, and the Agreement shall not be rescinded except in accordance with Paragraph 28 of this Agreement.

**D.     Release and Discharge**

23.     In addition to the effect of any final judgment entered in accordance with this Agreement, upon Final Approval of this Agreement, and for other valuable consideration as described herein, the Releasees shall be completely released, acquitted, and forever discharged from any and all claims, demands, actions, suits and causes of action, whether class, individual or otherwise in nature, that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of or arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries or damages, and the consequences thereof, arising out of or resulting from conduct concerning any agreement among Defendants, the reduction or restraint of supply, the reduction of or restrictions on production capacity, or the pricing, selling, discounting, marketing, or distributing of Shell Eggs in the Class Jurisdictions, including but not

limited to any conduct alleged, and causes of action asserted, or that could have been alleged or asserted, whether or not concealed or hidden, in the Complaints filed in the Action (the "Complaints"), which arise from or are predicated on the facts and/or actions described in the Complaints under any federal, state or foreign antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice, consumer protection, fraud, RICO, civil conspiracy law, or similar laws, including, without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, from the beginning of time to the date of this Agreement (the "Released Claims"). The Releasors shall not, after the date of this Agreement, seek to recover against any of the Releasees for any of the Released Claims. Notwithstanding anything in this Paragraph, Released Claims shall not include, and this Agreement shall not and does not release, acquit or discharge, claims based solely on purchases of Shell Eggs outside of the Class Jurisdictions on behalf of persons or entities located outside of the Class Jurisdictions at the time of such purchases. This Release is made with full recognition of the possibility of subsequent discovery or existence of different or additional facts.

24.     Each Releasor waives California Civil Code Section 1542 and similar provisions in other states. Plaintiffs hereby certify that they are aware of and have read and reviewed the following provision of California Civil Code Section 1542 ("Section 1542"): "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." The provisions of the release set forth above shall apply according to their terms, regardless of the provisions of Section 1542 or any equivalent, similar, or comparable present or future law or principle of law of any jurisdiction. Each Releasor may hereafter discover facts other than or different from those which he, she, or it knows or believes

to be true with respect to the claims that are the subject matter of this Settlement Agreement, but each Releasor hereby expressly and fully, finally and forever waives and relinquishes, and forever settles and releases any known or unknown, suspected or unsuspected, contingent or non-contingent, claim whether or not concealed or hidden, with full recognition of the possibility of the subsequent discovery or existence of such different or additional facts, as well as any and all rights and benefits existing under (i) Section 1542 or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction and (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above because of the subsequent discovery or existence of such other or different facts or otherwise.

25.    In addition to the provisions of Paragraphs 23 and 24, each Releasor hereby expressly and irrevocably waives and releases, upon Final Approval of this Agreement, any and all defenses, rights, and benefits that each Releasor may have or that may be derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the releases contained in Paragraphs 23 and 24. Each Releasor also expressly and irrevocably waives any and all defenses, rights, and benefits that the Releasor may have under any similar statute in effect in any other jurisdiction that, absent such waiver, might limit the extent or effect of the Release.

26.    The release and discharge set forth in Paragraphs 23 and 24 herein do not include claims relating to payment disputes, physical harm, defective product or bodily injury (the "Excepted Claims") and do not include any Non-Settling Defendant.

27.    Upon Final Approval of this Agreement, and for other valuable consideration as described herein, Plaintiffs, all other Class Members and Releasors, and their counsel shall be

completely released, acquitted, and forever discharged from any and all claims, demands, actions, suits and causes of action that the Releasees, or each of them, ever had, now has, or hereafter can, shall, or may have arising out of or relating in any way to the institution, prosecution, or settlement of the Action, except for claims to enforce this Agreement. This Release is made with full recognition of the possibility of subsequent discovery or existence of different or additional facts.

### E.    Rescission if the Agreement is Not Approved

28    If the Court refuses to approve this Agreement or any part hereof, or if such approval is modified or set aside on appeal, or if the Court does not enter the final judgment provided for in Paragraph 21 of this Agreement, or if the Court enters the final judgment and appellate review is sought, and on such review, such final judgment is not affirmed, then National Food and Plaintiffs shall each, in their sole discretion, have the option to rescind this Agreement in its entirety within ten (10) business days of the action giving rise to such option. If this Agreement is rescinded, all amounts in the escrow created pursuant to Paragraph 32 hereof, less any expenses authorized pursuant to this Agreement, shall be wire transferred to National Food, pursuant to their instructions, within ten (10) business days of the notice of rescission.

29.    In the event of rescission, if Final Approval of this Agreement is not obtained, or if the Court does not enter the final judgment provided for in Paragraph 21 of this Agreement, Class Counsel agrees that this Settlement Agreement, including its exhibits, and any and all negotiations, documents, information and discussions associated with it shall be without prejudice to the rights of National Food, shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing, or of the truth of any of the claims or allegations made in this Action in any pleading, and shall not be used

11

directly or indirectly, in any way, whether in this Action or in any other proceeding except as otherwise subsequently and independently obtained by Class Counsel pursuant to the Federal Rules of Civil Procedure.

30.     Class Counsel further agrees that, in the event of rescission and unless publically available or otherwise subject to discovery, the originals and all copies of documents provided by or on behalf of National Food pursuant to the cooperation provisions of this Agreement, together with all documents and electronically stored information containing information provided by National Food pursuant to the cooperation provisions of this Agreement, including but not limited to, notes, memos, records, interviews, shall be returned or produced to National Food, provided that attorney notes or memoranda may be destroyed rather than produced if an affidavit of such destruction is promptly provided to National Food through its counsel.

31.     If this Agreement is rescinded, all amounts in the escrow created pursuant to Paragraph 32 hereof, less any expenses, fees, or taxes authorized pursuant to this Agreement, shall be wire transferred to National Food, pursuant to its instructions to the Escrow Agent; provided, however, that simultaneous with its written instructions to the Escrow Agent, National Food shall provide to Class Counsel notice of such instructions, and Class Counsel shall, within five days of receipt of such notice, notify the Escrow Agent of any objections to National Food's instructions and funds shall not be wired until expiration of that objection deadline.

F.     Payment

32.     National Food shall pay or cause to be paid the Settlement Amount in settlement of the Action. The Settlement Amount shall be wire transferred by National Food or their designee within five (5) business days of the Execution Date into the Settlement Fund, which shall be established as an escrow account at a bank designated by Class Counsel.

a.      Notwithstanding any other provision of this Agreement, until Final Approval, directions for the withdrawal of funds from the Settlement Fund shall require both the signature of the Escrow Agent and the countersignature of Davis Wright Tremaine LLP.   After Final Approval, Davis Wright Tremaine LLP shall resign as a required co-signer on the Settlement Fund, and thereafter transactions in the Settlement Fund shall require only the signature of the Escrow Agent.

b.      The Settlement Fund, net of any Tax Expenses (as defined in paragraph 45 of this Agreement) on the income thereof, shall be used to pay (i) the Court-approved notice and administration costs referred to in paragraphs 19 and 44 of this Agreement, (ii) the attorneys' fees and litigation expenses pursuant to the terms of the Fee and Expense Order referred to in paragraph 35 of this Agreement; and (iii) any Court-approved administration expenses involved in distributing funds to members of the Classes.  The balance of the Settlement Fund after the above payments shall be the "Net Settlement Fund."

c.      The Net Settlement Fund shall be distributed to members of the Classes pursuant to a plan of distribution approved by the Court.  Class Counsel, either before or after final settlement approval for the benefit of the Classes, shall propose to the Court a reasonable plan of distribution for the Net Settlement Fund designed to effectuate the Settlement and may require Class Members to submit Proof of Claim forms to the Claims Administrator.

d.      Any sums required to be held in escrow prior to Final Approval shall be held for the purposes of this Settlement by Milberg LLP.  With the express consent of National Food Corporation, which shall not be unreasonably withheld, Milberg LLP may

establish an independent entity to act as successor custodian.  Milberg LLP, or the successor custodian, as the case may be, is referred to herein as the "Escrow Agent".

e.      All funds required to be held in escrow hereunder shall be deemed to be in the custody of the Court and shall remain subject to the jurisdiction of the Court until such time as the funds shall be distributed or returned to the persons paying the same pursuant to this Agreement and/or further order of the Court. The Escrow Agent shall not hold any equitable interest in the Settlement Fund prior to Final Approval. The Escrow Agent shall hold only legal title and not an equitable interest in the Settlement Fund.  If the Escrow Agent becomes subject to any bankruptcy, insolvency, receivership, or other similar proceeding, the parties hereto agree that the Settlement Fund shall not be deemed property of any estate created by that proceeding.  Under no circumstances may the Settlement Fund be used to satisfy the debts of Milberg LLP or any other entity except as expressly permitted by this Agreement.  Milberg LLP agrees that it shall faithfully comply with all requirements of Treasury Regulation § 1.468B-1 with respect to the Settlement Fund, including, without limitation, the requirement that the Settlement Fund qualify as a trust under applicable state law, or is otherwise segregated from the assets of Milberg LLP, and administrators of the Settlement Fund acknowledge and agree that they may be held personally liable for damages resulting from a breach of their fiduciary duties in the administration of the Settlement Fund pursuant to this Settlement Agreement.

f.      The Escrow Agent shall invest any funds held in escrow in short-term United States Agency or Treasury Securities (or a mutual fund invested solely in such

14

instruments), or in a fully US Government-insured account, and shall collect and reinvest any and all interest accrued thereon.

33.     Each Class Member shall look solely to the Settlement Amount for settlement and satisfaction, as provided herein, of all claims released by the Releasors pursuant to this Agreement.

34.     Subject to Court approval, Class Counsel may seek an award of attorneys' fees and reasonable litigation expenses to be paid out of the Settlement Amount. National Food shall have no obligation to pay any fees or expenses of Class Counsel.

35.     Upon entry of an order by the Court approving the request for an award of attorneys' fees and litigation expenses ("Fee and Expense Order"), attorneys' fees and litigation expenses may be distributed from the Settlement Fund pursuant to the terms of the Fee and Expense Order, subject to Class Counsel's obligation to make appropriate refunds or repayments to the Settlement Fund plus accrued interest at the same net rate as is earned by the Settlement Fund, if and when, as a result of any appeal and/or further proceedings on remand, or successful collateral attack, the Settlement is terminated or the fee or cost award is reduced or reversed. The Fee and Expense Order becomes final when the time for appeal or to seek permission to appeal from the Fee and Expense Order has expired or, if appealed, has been affirmed by the Court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.

36.     Disbursements for any payments and expenses incurred in connection with taxation matters relating to this Settlement Agreement shall be made from the Settlement Amount and such amounts shall not be refundable to National Food in the event that this Settlement Agreement is disapproved, rescinded, or otherwise fails to become effective.

15

## G.    Injunctive Relief

37.    For three (3) years after Final Approval, National Food shall not enter into any agreements with competitors, whether through United Egg Producers, Inc. or any similar trade association or agricultural cooperative, to reduce the production of eggs. The following types of agreements are prohibited unless entered into for disease control or other public health concerns:

- A schedule, timetable or commitment to any pattern of molting for hen populations;

- A schedule, timetable or commitment to limit the populations of egg-producing hens;

- A schedule, timetable or commitment to hen termination; and

- A schedule, timetable or commitment to certain chick hatching rates.

Additionally, National Food shall not share or provide current or future eggs supply, shipment or price information to the United Egg Producers, Inc. or any similar trade association or agricultural cooperative except to the extent that such information is available from public sources; provided, however, that nothing in this paragraph or in the injunction shall prevent National Food from agreeing, as part of otherwise lawful joint ventures or marketing cooperatives, on the production capacity required to serve common customers or the prices to be charged such customers; and provided further, that nothing shall prevent National Food from buying or selling eggs in the ordinary course of business from or to other producers, through clearinghouses or directly.

38.    This injunction against National Food will not prohibit National Food's continued membership in United Egg Producers, Inc. or its continued participation in the UEP Certified program so long as National Food complies with Paragraph 37 of the Agreement. Additionally, National Food agrees to be bound by the terms of any injunction hereafter entered against UEP, whether by consent or by adjudication, with regard to the UEP Certified program or any other

behavior related to managing the supply of eggs, for so long as National Food remains a member of UEP or a participant in the UEP Certified program, as the case may be.

**H.     Cooperation Agreement**

59     Following the Execution Date of this Agreement, and continuing through the conclusion of this litigation, National Food will cooperate with Plaintiffs in the prosecution of the Action as follows:

a.      National Food will make Roger Deffner available for an interview in Seattle, at a mutually convenient date and time. The interview will occur on a single day, will not last longer than seven hours, and to the extent feasible will be held concurrently with interviews of Mr. Deffner by other plaintiff groups.

b.      National Food will provide affidavits consistent with its employees' recollection and understanding of the facts as reasonably required by the needs of the case, including but not limited to the authentication of documents. Plaintiffs will prepare the initial drafts of such affidavits.

c.      National Food will not be expected to waive its attorney-client privilege or the protection of the work-product doctrine, and it will not be required to disclose matters subject to a joint-defense privilege.

d.      National Food will provide up to two of its employees as witnesses at trial at its expense, as Plaintiffs may reasonably require, and it will use its best efforts to encourage attendance at trial by former employees whom Plaintiffs wish to use as witnesses.

e.      Except as expressly stated above, National Food will not be required to participate in further discovery. Plaintiffs' pending interrogatories to National Food are hereby withdrawn.

40.     Plaintiffs and Class Counsel agree not to assert that National Food waived its attorney-client privilege, work product immunity or any other privilege or protection with respect to information or documents National Food identifies or provides pursuant to this Agreement. Nor should anything in this Agreement be construed as a waiver of any such privilege, immunity or protection.

**I.      Confidentiality and Non-Use of Information and Documents**

41.     All information and documents provided by National Food to Class Counsel shall be subject to the protective order entered in this Action, and any documents or electronically stored information designated as "Confidential" or "Attorneys Eyes Only" by National Food shall have the same equivalent protection under the protective order.

42.     Class Counsel agrees to use any and all of the information obtained from National Food only for the purpose of this litigation, and agrees to be bound by the terms of the protective order entered in this Action. Any other counsel for Plaintiffs who receives information or documents produced in accordance with this Agreement agrees to be bound by all of the terms of this Agreement.

**J.      Notice of Settlement to Class Members**

43.     Class Counsel shall take all necessary and appropriate steps to ensure that notice of this Settlement Agreement and the date of the hearing scheduled by the Court to consider the fairness, adequacy and reasonableness of this Settlement Agreement is provided in accordance with the Federal Rules of Civil Procedure and Court order. Notice of this Settlement will be issued at the appropriate time after Preliminary Approval of this Settlement Agreement and subject to any Court orders regarding the means and timing of dissemination of notice

44.     Subject to Court approval, and to the provisions of Paragraph 19 above with regard to pro-ration, disbursements for any payments and expenses incurred in connection with the costs

13

of Notice and administration of the Settlement Agreement shall be made from the Settlement Amount, in accordance with Paragraph 32.a above, upon written notice of such payments and expenses, and such amounts shall not be refundable to National Food in the event that this Settlement Agreement is disapproved, rescinded, or otherwise fails to become effective.

**K.    Taxes**

45      The Escrow Agent or its designee will file all informational and other tax returns necessary to report any taxable and/or net taxable income earned by the Settlement Amount. The Settlement Fund will make any tax payments, including interest and penalties due, on income earned by the Settlement Fund ("Tax Expenses"). In accordance with Paragraph 32.a above, the Escrow Agent will pay from the Settlement Fund customary and reasonable Tax Expenses, including reasonable professional fees and expenses incurred in connection with carrying out their responsibilities as set forth in this Paragraph. National Food shall have no responsibility to make any tax filings relating to this Agreement.

46.     For the purpose of § 468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "Administrator" of the Settlement Amount shall be the Escrow Agent or its designee, who shall timely and properly file or cause to be filed on a timely basis, all tax returns necessary or advisable with respect to the Settlement Amount (including, without limitation, all income tax returns, all informational returns, and all returns described in Treas. Reg. § 1.468B 2(1)).

47.     The parties to this Agreement and their Counsel shall treat, and shall cause the Claims Administrator or its designee to treat, the Settlement Amount as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B 1. In addition, the Claims Administrator or its designee and, as required, the parties, shall timely make such elections as necessary or advisable to carry out the provisions of this Paragraph, including the

19

"relation-back election" (as defined in Treas. Reg. § 1.468B 1(j)) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Escrow Agent, the Claims Administrator or its designee to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties and thereafter to cause the appropriate filing to occur. All provisions of this Agreement shall be interpreted in a manner that is consistent with the Settlement Amount being a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B 1.

**L.   Miscellaneous**

48    This Agreement does not settle or compromise any claim by Plaintiffs or any Class Member asserted in the Action against any Non-Settling Defendant or any unnamed co-conspirator other than the Releasees.   All rights of any Class Member against Non-Settling Defendants or unnamed co-conspirators or any other person or entity other than the Releasees are specifically reserved by Plaintiffs and the Class Members.   The indirect sales of Shell Eggs by National Food to Class Members shall remain in the case against the Non-Settling Defendants in the Action as a basis for damage claims and shall be part of any joint and several liability claims against Non-Settling Defendants in the Action or other persons or entities other than the Releasees.

49.    The United States District Court for the Eastern District of Pennsylvania shall retain jurisdiction over the implementation, enforcement, and performance of this Agreement, and shall have exclusive jurisdiction over any suit, action, proceeding, or dispute arising out of or relating to this Agreement or the applicability of this Agreement that cannot be resolved by negotiation and agreement by Plaintiffs and National Food.   This Agreement shall be governed

20

by and interpreted according to the substantive laws of the State of Pennsylvania without regard to its choice of law or conflict of laws principles

50.     This Agreement constitutes the entire agreement among Plaintiffs (and the other Releasors) and National Food (and the other Releasees) pertaining to the settlement of the Action against National Food only and supersedes any and all prior and contemporaneous agreements and undertakings of Plaintiffs and National Food in connection therewith.  In entering into this Agreement, Plaintiffs and National Food have not relied upon any representation or promise made by Plaintiffs or National Food not contained in this Agreement.  This Agreement may be modified or amended only by a writing executed by Plaintiffs and National Food, and approved by the Court.

51     This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of Releasors and Releasees.  Without limiting the generality of the foregoing:  (a) each and every covenant and agreement made herein by Plaintiffs or Class Counsel shall be binding upon all Class Members and Releasors; and (b) each and every covenant and agreement made herein by Releasees shall be binding upon all Releasees.

52.     This Agreement may be executed in counterparts by Class Counsel and National Food's Counsel, and a facsimile signature or an electronically-scanned (in either .pdf or .tiff format) signature will be considered as an original signature for purposes of execution of this Agreement.

53.     The headings in this Agreement are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect its construction.

54.     In the event this Agreement is not approved or is terminated, or in the event that the Order and Final Judgment approving the settlement is entered but is substantially reversed,

21

modified, or vacated, the pre-settlement status of the litigation shall be restored and the Agreement shall have no effect on the rights of the Settling Parties to prosecute or defend the pending Action in any respect, including the right to litigate fully the issues related to class certification, raise personal jurisdictional defenses, or any other defenses, which rights are specifically and expressly retained by National Food.

55.    Neither National Food nor Plaintiffs, nor any of them, shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement.

56.    Nothing expressed or implied in this Agreement is intended to or shall be construed to confer upon or give any person or entity other than Class Members, Releasors, National Food, and Releasees any right or remedy under or by reason of this Agreement.

57.    Where this Agreement requires any party to provide notice or any other communication or document to any other party, such notice, communication, or document shall be provided by facsimile or letter by overnight delivery to:

For the Classes:                          For National Food:

Paul F. Novak                             Marvin L. Gray, Jr.
**MILBERG LLP**                           **DAVIS WRIGHT TREMAINE LLP**
One Penn Plaza                            1201 Third Avenue, Suite 2200
New York, NY 10119                        Seattle, WA 98101-3045
Tel: (212) 594-5300                       Tel: (206) 622-3150
Fax: (212) 868-1229                       Fax: (206) 757-7700
pnovak@milberg.com                        montygray@dwt.com

58.    Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Agreement, subject to Court approval.

22

DATED: _April 16_, 2014

Paul F. Novak
Elizabeth McKenna
Charles Slidders
**MILBERG LLP**
One Penn Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229
pnovak@milberg.com
emckenna@milberg.com
cslidders@milberg.com

*Interim Co-Lead Counsel for the Indirect
Purchaser Plaintiffs*

DATED: _____, 2014

Christopher Lovell
Craig Essenmacher
**LOVELL STEWART HALEBIAN
JACOBSON, LLP**
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4667
clovell@lshllp.com
cessenmacher@lshllp.com

*Interim Co-Lead Counsel for the Indirect
Purchaser Plaintiffs*

23

DATED: _____, 2014

Paul F. Novak
Elizabeth McKenna
Charles Slidders
**MILBERG LLP**
One Penn Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229
pnovak@milberg.com
emckenna@milberg.com
cslidders@milberg.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

DATED: 9/16_____, 2014

Christopher Lovell
Craig Essenmacher
**LOVELL STEWART HALEBIAN JACOBSON, LLP**
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4667
clovell@lshllp.com
cessenmacher@lshllp.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

DATED: _____4/16_____, 2014

_____
Timothy D. Battin
Mark J. Schirmer
STRAUS & BOIES, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com

*Interim Co-Lead Counsel for the Indirect
Purchaser Plaintiffs*

DATED: _____, 2014

_____
Krishna B. Narine
MEREDITH & NARINE
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for
Indirect Purchaser Plaintiffs*

DATED: _____, 2014

_____
Marvin L. Gray, Jr.
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700
montygray@dwt.com

*Counsel for National Food Corporation*

24

DATED: _____, 2014

_____
Timothy D. Battin
Mark J. Schirmer
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com

*Interim Co-Lead Counsel for the Indirect
Purchaser Plaintiffs*

DATED: April 16, 2014

_____
Krishna B. Narine
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for
Indirect Purchaser Plaintiffs*

DATE D: _____, 2014

_____
Marvin L. Gray, Jr.
**DAVIS WRIGHT TREMAINE LLP**
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700
montygray@dwt.com

*Counsel for National Food Corporation*

24

DATED: _____, 2014

Timothy D. Battin
Mark J. Schirmer
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

DATED: _____, 2014

Krishna B. Narine
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for Indirect Purchaser Plaintiffs*

DATED: April 15, 2014

Marvin L. Gray, Jr.
**DAVIS WRIGHT TREMAINE LLP**
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
Tel: (206) 622-3150
Fax: (206) 757-7700
montygray@dwt.com

*Counsel for National Food Corporation*

74

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PROCESSED EGG PRODUCTS
ANTITRUST LITIGATION

MDL No. 2002
08-md-02002

THIS DOCUMENT APPLIES TO: ALL
INDIRECT PURCHASER ACTIONS

## CERTIFICATE OF SERVICE

I, Paul F. Novak, hereby certify that on September 15, 2014, true and correct copies of

the following:

1   Indirect Purchaser Plaintiffs' Motion for Preliminary Approval of Class Action
    Settlement Between Plaintiffs and Defendant National Food Corporation and for
    Certification of Class Action for Purposes of the Settlement;

2.  Indirect Purchaser Plaintiffs' Memorandum of Law in Support of Motion for
    Preliminary Approval of Class Action Settlement Between Indirect Purchaser
    Plaintiffs' Classes and Defendant National Food Corporation and for Certification
    of Class Action for Purposes of the Settlement;

3.  Declaration of Paul F. Novak in Support of Indirect Purchaser Plaintiffs' Motion
    for Preliminary Approval of Class Action Settlement Between Indirect Purchaser
    Plaintiffs and Defendant National Food Corporation; and

4.  [Proposed] Order Preliminarily Approving the Proposed Settlement Between
    Indirect Purchaser Plaintiffs' Classes and Defendant National Food Corporation
    and Certifying the Classes for Purposes of Settlement

were filed with the Clerk of the Court, per the Local Rules, and will be available for viewing and

downloading via the CM/ECF system and the CM/ECF system will send notification of such

filing to all attorneys of record.

Dated: September 15, 2014

By:  /s/  Paul F. Novak
          Paul F. Novak

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PROCESSED EGG PRODUCTS
ANTITRUST LITIGATION

MDL No. 2002
08-md-02002

THIS DOCUMENT APPLIES TO: ALL
INDIRECT PURCHASER ACTIONS

## [PROPOSED] ORDER PRELIMINARILY APPROVING THE PROPOSED SETTLEMENT BETWEEN INDIRECT PURCHASER PLAINTIFFS' CLASSES AND DEFENDANT NATIONAL FOOD CORPORATION AND CERTIFYING THE CLASSES FOR PURPOSES OF SETTLEMENT

It is hereby ORDERED AND DECREED as follows:

1. The motion of Indirect Purchaser Plaintiffs ("IP Plaintiffs") for preliminary approval of the proposed settlement between IP Plaintiffs' Classes and Defendant National Food Corporation ("NFC"), which NFC does not oppose, is hereby GRANTED.

2. The Court finds that the proposed settlement with NFC, as set forth in the "Settlement Agreement between Indirect Purchaser Plaintiffs' Classes and National Food Corporation" ("NFC Settlement Agreement"), subject to final determination following an approved form of and plan for notice and a Fairness Hearing, falls within the range of reasonableness and is sufficiently fair, reasonable and adequate to the following Classes of indirect purchasers of Shell Eggs, for settlement purposes only:

   a.) Indirect Purchaser Injunctive Class

   All individuals and entities in the Class Jurisdictions that purchased Shell Eggs, for their own use and not for resale, during the Class Period from January 1, 2000 through the present, and who intend to purchase Shell Eggs in the future.

> b.)    Indirect Purchaser State Classes
>
> All individuals and entities residing in Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, that purchased Shell Eggs for their own use and not for resale, during the Class Period from January 1, 2000 through the present, and that intend to purchase shell eggs in the future.

Excluded from the Classes are Defendants' subsidiaries and affiliates and all persons who purchased eggs directly from any Defendant or any other producer of eggs.

3        For purposes of settlement and on the basis of the entire record before the Court, the Court finds that the Classes fully comply with the requirements of Federal Rule of Civil Procedure 23. Specifically, the Court finds: (1) the Classes are so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the Classes; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the Classes; and (4) the representative parties will fairly and adequately protect the interests of the Classes. Additionally, for purposes of settlement, the Court finds that Defendant "has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Federal Rule of Civil Procedure 23(b)(3) is also met and that there are questions of law or fact common to class members which predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. In accordance with the holding in *In re Com. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir. 2005), this Court makes no determination concerning the manageability of this action as a class action if it were to go to trial.

4.     IP Plaintiffs Nathan Levi Esquerra; Scott Friedson; John Ryan; Morris Clement; Jessica Swift; Pilar M. De Castro & Co., Inc.; Jeanne Rice; Joan Gibbons; Julia McGuire; Donn Camlin; Thomas Williams; Patricia Flynn; Elizabeth Priest; Martin Gojcaj; Thomas Roth; Sharon Defren; Leanne Hardin; John Anthony Spracklin; Dustin Crenshaw; Rachelle L. Hagendorf; Charles Shoten; Trudy Solo; Thomas McManus; Mark Moynahan; Lynsey Allen; Amy Fairchild; Rhonda McGrath; James Anderson; Glenna Sue King; Michael Dobson; Sandra Drown; Lester Skinner; Robert Nelson; and Jason Oldenburg, collectively, will serve as Class Representatives on behalf of the Classes.

5.     The Court confirms the appointment of Class Counsel for purposes of the Settlement Classes as the law firms Milberg LLP, One Penn Plaza, New York, NY 10119-0165; Lovell Stewart Halebian Jacobson, LLP, 61 Broadway, Suite 501, New York, NY 10006; Straus & Boies, LLP, 4041 University Drive, 5th Floor, Fairfax, VA 22030; and Meredith & Narine, 100 S. Broad Street, Suite 905, Philadelphia, PA  9110.

6.     Class Counsel shall submit for the Court's approval (a) a Proposed Notice to the Classes, including a proposed schedule for Class Members to opt out or object to the proposed Settlement, (b) a proposed Plan of Notice that includes the proposed manner of Notice, a proposed Administrator for Notice and Claims, (c) a proposed date for the Court's Fairness Hearing to determine whether the Settlement is fair, reasonable, and adequate, and whether it should be finally approved by the Court, (d) a proposed deadline by which IP Plaintiffs must file their motion for an award of attorneys' fees, reimbursement of litigation expenses, and incentive awards, (e) a proposed deadline by which IP Plaintiffs must file their Motion for Final Approval of the NFC Settlement Agreement, and (f) proposed deadlines by which Class Members must object to or request exclusion from the NFC Settlement Agreement.

3

7.      Co-Lead Counsel for IP Plaintiffs shall include in the text of their proposed

Publication Notice and their proposed Long-Form Notice to be posted on a website for the

Settlement the deadline by which IP Plaintiffs must file their motion for an award of attorneys'

fees, litigation expenses, and incentive awards (if any), and a statement that Class Members may

review the motion at the website before the objection and opt-out deadlines.

BY THE COURT:


Gene E.K. Pratter
United States District Judge

4