## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : | |
| ANTITRUST LITIGATION | : | |
| | : | **MDL No. 2002** |
| | : | **08-md-02002** |
| _____ | : | |
| | : | |
| THIS DOCUMENT APPLIES TO: | : | |
| ALL DIRECT PURCHASER | : | |
| PLAINTIFF ACTIONS | : | |

## MEMORANDUM

GENE E.K. PRATTER, J.                                        OCTOBER 10, 2014

Direct Purchaser Plaintiffs seek the Court's final approval of a proposed settlement agreement between Plaintiffs and Defendant Cal-Maine Foods, Inc.[1] Under the proposed Cal-Maine Settlement, Plaintiffs will release Cal-Maine from all pending claims in exchange for monetary consideration as well as for various information and documents to be supplied on behalf of Cal-Maine. For the reasons set forth below, the Court grants the motion for final approval of the Cal-Maine Settlement.

---

[1] Plaintiffs filed a Motion for Final Approval of the Class Action Settlement Between Plaintiffs and Defendant Cal-Maine Foods, Inc. (Docket No. 1036) (hereinafter, "Mot."), accompanied by a Memorandum in Support of the Motion (Docket No. 1036-2) (hereinafter, "Mem. Supp. Mot.").

# I. Factual Background[2]

This litigation embraces numerous consolidated and coordinated actions based upon allegations of a conspiracy in violation of the Sherman Act among egg producers and trade groups to manipulate the supply of eggs and egg products and thereby affect the domestic prices of those goods. *See In re Processed Egg Prods. Antitrust Litig.*, 588 F. Supp. 2d 1366, 1367 (J.P.M.L. 2008). The Plaintiffs are direct purchasers (such as grocery stores, commercial food manufacturers, restaurants, other food service providers, and other entities who purchase directly from Defendants or other egg producers) and indirect purchasers (individual consumers who purchased from other parties along the distribution chain) of shell eggs, egg products, or both. The direct purchaser plaintiffs are categorized as "Direct Purchaser Plaintiffs" who have brought a consolidated class action against Defendants, and "Direct Action Plaintiffs" who are pursuing individual actions against Defendants.

## A. Direct Purchaser Plaintiffs' Suit

The immediate moving Plaintiffs are Direct Purchaser Plaintiffs who accuse defendant egg producers, including Cal-Maine, and certain trade groups, of violating Section 1 of the Sherman Act and seek injunctive relief, treble damages, and attorneys' fees and costs. They have demanded a jury trial. These Plaintiffs filed a twice-amended consolidated class action complaint. The allegations of the Third Consolidated Amended Complaint superseded or replaced all of the previously-filed individual and consolidated complaints.

---

[2] The exhibits and materials submitted in relation to the Motion, the hearing on the Motion, and the overall record of this case provide the sources for the factual background discussed here. The Court also considered the pending Plaintiffs' Motion for an Award of Attorneys' Fees and for Reimbursement of Expenses (Docket No. 999) (hereinafter, "Fees Mot.") and the accompanying Memorandum in Support (Docket No. 999-1) (hereinafter "Mem. Supp. Fees Mot.") in which Plaintiffs seek attorneys' fees and reimbursement of expenses relating to the litigation to be paid from the Cal-Maine Settlement. As for the Fees Motion, the Court does not address here the substantive arguments, which will be considered separately.

After extensive motion activity centered on the Second Consolidated Amended Complaint, the Court partially lifted the previously entered stay of discovery. *See* April 21, 2010 Order (Docket No. 320); Case Mgmt. Orders Nos. 18 and 19 (Doc. Nos. 656 and 676). Fact discovery began in April 2012, and the parties began conducting depositions in April 2013. Mem. Supp. Fees Mot. 3. The Direct Purchaser Plaintiffs and Cal-Maine entered into their Settlement Agreement approximately four months later on August 2, 2013. *Id.*

### B. Cal-Maine Settlement Negotiations and Preliminary Approval

Settlement discussions between Cal-Maine and Direct Purchaser Plaintiffs reportedly began around March 2012, about five months after the Court denied Cal-Maine's Motion to Dismiss under Rule 12(b)(6). *See* Mot., Ex. A, Pizzirusso Decl. ¶ 4 (hereinafter, "Pizzirusso Decl."); Oct. 17, 2011 Mem. and Order (Doc. Nos. 581 and 582). These early settlement negotiations, however, ended in April 2012 after the parties reached an impasse. Pizzirusso Decl. ¶ 4. Negotiations quickly resumed in October 2012 after several months of document production. *Id.* These talks eventually led to a mediation session, which occurred in late June 2013. *Id.* ¶¶ 5-6. Settlement efforts continued, culminating in a July 17, 2013 agreement in principle. *Id.* ¶¶ 6, 9. On August 2, 2013, the parties executed the Settlement Agreement. *Id.* ¶ 9. In advance of entering into the Settlement Agreement, Plaintiffs had reviewed many of the one million documents produced by Defendants and had taken several depositions of key witnesses. *Id.* ¶ 7.

The parties submitted the proposed settlement to the Court for preliminary approval. Following a hearing, the Court entered an Order preliminarily approving the proposed Cal-Maine agreement and preliminarily certifying the class and subclasses for settlement purposes. Order, Feb. 28, 2014 (Docket No. 908) (hereinafter, "Cal-Maine Prelim. Approval Order"). The Order also approved the form of notice of the Cal-Maine Settlement. *Id.*

The Court held the final fairness hearing on the Cal-Maine Settlement as required by Fed. R. Civ. P. 23(e)(2) on September 18, 2014. Plaintiffs had notified the appropriate federal and state officials pursuant the Class Action Fairness Action ("CAFA"), 28 U.S.C. § 1715, in September 2013. *See* Declaration of CAFA Compliance by Cal-Maine Foods, Inc. (Docket No. 1030). No objections were filed to the proposed Settlement. No objectors appeared at the fairness hearing.

### C. Amendment to the Sparboe Settlement Agreement

Direct Purchaser Plaintiffs have also filed a Motion for Final Approval of the First Amendment to the Sparboe Settlement Agreement (Docket No. 1035) (hereinafter "Sparboe Am. Mot."). Plaintiffs and Defendant Sparboe Farms, Inc., previously entered into a settlement agreement in 2009 that required Sparboe Farms to cooperate and assist Plaintiffs in their prosecution of their case. *See* Mot. for Final Approval of Class Action Settlement, Ex. 4 ¶¶ 23-24 (Docket No. 443). The Sparboe Settlement Agreement provides that if and when Plaintiffs enter into later settlements with other Defendants, "Plaintiffs agree to use their best efforts to modify the class definition and Class Period of this Agreement to conform to any and all subsequent expansion of the class definition or Class Period, including moving for approval of an amendment to this Agreement . . . ." *Id.* ¶ 31. Accordingly, the present Motion seeks only to extend the class period for the Sparboe Settlement Agreement to match the class period in the Cal-Maine Settlement Agreement. Sparboe Am. Mot. 1. The Court will separately consider the merits of the amendment to the Sparboe Settlement.

## II. Proposed Cal-Maine Settlement Agreement[3]

The proposed Settlement Class for settlement purposes under the Cal-Maine Settlement is

defined as:

> All persons and entities that purchased Shell Eggs and Egg Products in the United
> States directly from any Producer, including any Defendant, during the Class
> Period from January 1, 2000 through the date on which the Court enters an order
> preliminarily approving the Agreement and certifying a Class for Settlement
> purposes.
>
> a)   Shell Egg SubClass
>
> All individuals and entities that purchased Shell Eggs in the United States directly
> from any Producer, including any Defendant, during the Class Period from
> January 1, 2000 through the date on which the Court enters an order preliminarily
> approving the Agreement and certifying a Class for Settlement purposes.
>
> b)   Egg Products SubClass
>
> All individuals and entities that purchased Egg Products produced from Shell
> Eggs in the United States directly from any Producer, including any Defendant,
> during the Class Period from January 1, 2000 through the date on which the Court
> enters an order preliminarily approving the Agreement and certifying a Class for
> Settlement purposes.
>
> Excluded from the Class and SubClasses are Defendants, Other Settling
> Defendants, and producers, and the parents, subsidiaries and affiliates of
> Defendants, Other Settling Defendants, and Producers, all government entities, as
> well as the Court and staff to whom this case is assigned, and any member of the
> Court's or staff's immediate family.

Mot., Ex. A.1, Settlement Agreement between Direct Purchaser Plaintiffs and Defendant Cal-

Maine Foods, Inc. ¶ 20 (hereinafter, "Cal-Maine Settlement Agreement"). As mentioned earlier,

the Court preliminarily certified the Settlement Class for settlement purposes under Fed. R. Civ.

P. 23(b)(3). *See* Cal-Maine Prelim. Approval Order.

---

[3] The terms used in this Order that are defined in the Cal-Maine Settlement Agreement
are, unless otherwise defined herein, used in this Order consistent with the definitions of the
Agreement.

The settlement's key provision requires Cal-Maine to pay Direct Purchaser Plaintiffs $28,000,000.00, which is currently being held in escrow pending final approval of the settlement. *See* Cal-Maine Settlement Agreement ¶ 34. This amount will be distributed on a *pro rata* basis to the Class Members who submit a timely, valid claim. *See* Mot., Ex. B.1, Notice of Cal-Maine Settlement 4 (hereinafter "Notice"). The *pro rata* share is based upon the dollar amount of a Class Members' direct purchases of shell egg and egg products in the United States from any producer, including Defendants, during the period designated in the Agreement. *See* Notice at 4. The Claims Notice provides that "[b]ecause the alleged overcharge is only a portion of the price paid for eggs and egg products, your recovery will be less than the total amount you paid." Notice at 4.

Additionally, pursuant to the agreement, Cal-Maine will cooperate with Plaintiffs' preparation for and prosecution of their class action. *See* Cal-Maine Settlement Agreement ¶¶ 40-43. The Agreement details the extent of Cal-Maine's cooperation, which includes providing factual information through an attorney proffer, clarifying transactional data provided during discovery, establishing the authenticity of documents, and producing a knowledgeable representative for trial from among its current or former directors, officers, and employees. *See id.*

In consideration, Plaintiffs agree to release Cal-Maine from further litigation relating to the alleged conduct. *See id.* ¶ 26. That is, Cal-Maine shall be released from claims arising out of:

> (i) any agreement or understanding between or among two or more Producers of eggs, including any Defendants, including any entities or individuals that may later be added as a defendant to the Action, (ii) the reduction or restraint of supply, the reduction of or restrictions on production capacity, or (iii) the pricing, selling, discounting, marketing, or distributing of Shell Eggs and Egg Products in the United States or elsewhere . . . from the beginning of time to the date on which the Court enters an order preliminarily approving the Settlement and certifying a Class for settlement purposes.

*Id.* The Agreement specifically notes that the "Released Claims" include, but are not limited to, claims that "in whole or in part arise from or are related to the facts and/or actions described in the Complaints, including under any federal or state antirust, unfair competition, unfair practices, price discrimination, unitary pricing, trade practice, consumer protection, fraud, RICO, civil conspiracy law, or similar laws, including without limitation, the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*" *Id.* Plaintiffs also agree to waive California Civil Code Section 1542 and similar provisions in other states. *Id.* ¶ 27. Additionally, Plaintiffs agree to waive and release "all defenses, rights, and benefits that [Plaintiffs] may have or that may have been derived from the provisions of applicable law which, absent such waiver, may limit the extent or effect of the release" of the aforementioned claims. *Id.* ¶ 28. The release excludes "claims relating to payment disputes, physical harm, defective product or bodily injury . . . and do[es] not include any Non-Settling Defendant." *Id.* ¶ 28.

The settlement proposes an opt-out provision detailing how potential Class Members can exclude themselves from the settlement. *Id.* ¶ 23; *see also* Notice at 1-2, 7-8. Class Members had until August 1, 2014, to request exclusion by sending a written request for exclusion to the Claims Administrator. Notice at 8. Class Members also had until August 1, 2014, (108 days after the posting of the notice), to postmark the Claim Form requesting to share in the settlement. Notice at 4.

Finally, the parties set forth certain provisions in their Agreement concerning attorneys' fees, specifically:

> Class Counsel may seek an award of attorneys' fees and reasonable litigation expenses approved by the Court, to be paid out of the Settlement Amount after the Final Approval of the Agreement. Cal-Maine agrees not to object to Class Counsel's petition to the Court for payment of attorneys' fees, costs, expenses, and incentive awards for class representatives from the Settlement Amount.

> Except to the extent that the Court may award attorneys' fees and litigation
> expenses to be paid out of the Settlement Amount, Cal-Maine shall have no
> obligation to pay any fees or expenses from Class Counsel.

Cal-Maine Settlement Agreement ¶ 36.

### III.  Notice

Notice of the Cal-Maine Settlement was disseminated to possible members of the Settlement Class through a variety of means, including direct mailings, publications, press releases, a website, and a toll-free information and request telephone line. *See* Mot., Ex. B, Affidavit of Jennifer M. Keough re: Notice and Settlement Administration ¶¶ 5 (Docket No. 1036-4) (hereinafter, "Keough Aff."). The Notice explained how potential Class Members could exclude themselves from, or object to, the terms of the Cal-Maine Settlement. *See* Notice at 1-2, 7-8. Potential Class Members had until August 1, 2014, (48 days before the final fairness hearing and 108 days from the date of the mailing of the notices) to postmark their exclusion requests or objections. *See id.* at 7-8; *see also* Am. Decl. of Mindee J. Reuben re: Mot. for Attorneys' Fees ¶ 4 (Docket No. 1046) (hereinafter, "Am. Reuben Decl."). The parties agreed that up to $350,000 of the Settlement Amount could be spent on the notice expenses. Cal-Maine Settlement Agreement ¶ 45.

The Claims Administrator mailed Notice and Claim Forms (the "Notice Packet") to approximately 16,796 direct purchasers of Shell Egg and Egg Products, who were identified using the sales data from the Defendants. Mem. Supp. Mot. 7. Of those nearly 17,000 Notice Packets, 65 were returned by the U.S. Postal Service with forwarding address information and were re-mailed; 2,961 were returned without forwarding address information. *Id.* at 7 & n.4.

A Summary Notice was published in *The Wall Street Journal* as well a variety of trade magazines of the restaurant and food industries—specifically: *Restaurant Business, Convenience*

*Store News*, *Hotel F&B*, *Nation's Restaurant News*, *FoodService Director*, *Progressive Grover*, *Food Manufacturing*, *Supermarket News*, *Sores*, *Egg Industry*, *Bake, Food Processing*, *Long Term Living*, *PetFood Industry*, and *School Nutrition*. Keough Aff. ¶ 11. A press release about the Settlement was distributed to over 1,000 journalists in the Restaurant and Food Industries, US1 Newsline, and the Hispanic Newsline. *Id.* ¶ 12. The Claims Administrator also created a website allowing for public access to the Notice Packet, Order, Settlement Agreement, and other relevant Court documents. *Id.* ¶ 13. The web address was included in the Notice Packet and received 7,348 visits between April 4, 2014 and August 14, 2014. *See id.* The Claims Administrator and Plaintiffs established a toll-free 24-hour telephone number and call center for potential Class Members to obtain information about the settlement and to request the Notice and Claim Form. *See id.* ¶ 14. The automated number received 644 calls during the relevant period. *See id.*

The Claims Administrators received 470 Claim Forms by August 14, 2014. Mem. Supp. Mot. 8. Class Members who submitted a Claim Form in the Moark Settlement were not required to submit an additional Claim Form for the Cal-Maine Settlement, and there are, as of August 14, 2014, a total of 1,185 claims on file for the Cal-Maine Settlement. *Id.* The Claims Administrator did not receive any objections, but received 61 requests for exclusion, ostensibly without substantive explanation. *Id.* at 7-8.

Cal-Maine provided sufficient notice to federal and state officials of the settlement as required by CAFA, 28 U.S.C. § 1715(d). *Id.* at 10. No federal or state officials filed objections to the Cal-Maine Settlement, nor did any request a hearing following the issuance of the CAFA notice. The statutory period following the CAFA notice elapsed prior to the date of this Memorandum and accompanying Order.

The Claims Notice explained that the "Court retains the power to approve or reject, in part or in full, any individual claim of a class member based on equitable grounds," and that the Settlement Amount "may be reduced by court-ordered attorneys' fees and reimbursement of litigation expenses, including administration of the Settlement, as approved by the Court" and reduced "by the expense of providing notice to the Class." Cal-Maine Notice at 4. The Claims Notice explained that the lawyers for the Class intended to apply for award of fees "in an amount not to exceed thirty percent of $28 million as well as the costs and expenses incurred." *Id.* at 6.

## IV.  Discussion

Federal Rule of Civil Procedure 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1)  The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2)  If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3)  The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4)  If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5)  Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection maybe withdrawn only with the court's approval.

*Id.* The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009) (quoting *In*

*re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998) (quoting *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975)).

## A.  Class Certification

Where, as here, the Court has not already certified a class prior to evaluating a settlement, the Court initially must determine whether the proposed settlement classes satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010) ("[A] district court first must determine that the requirements for class certification under Rule 23(a) and (b) are met."). The Third Circuit Court of Appeals has summarized the demands of Rule 23 as follows:

> Rule 23(a) contains four threshold requirements, which every putative class must satisfy:
>
> > (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Fed. R. Civ. P. 23(a); *see also Amchem*, 521 U.S. at 613. Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b).
>
> As mentioned, Rule 23(b)(2) authorizes class actions seeking injunctive relief in instances where the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see In re Comm. Bank of N. Va.* (*Comm. Bank I*), 418 F.3d 277, 302 n.14 (2005). Separately, certification pursuant to Rule 23(b)(3) seeking monetary compensation is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Fed. R. Civ. P. 23(b)(3); *see Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 180 (3d Cir. 1994). These twin requirements are commonly referred to as predominance and superiority.

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc).

1.   Federal Rule of Civil Procedure 23(a)

First, under Rule 23(a), the Court determines that the Class Members are ascertainable from objective criteria. *See Marcus v. BMW of North America, LLC*, 687 F.3d 583, 592-93 (3d Cir. 2012) ("Many courts and commentators have recognized that an essential prerequisite of a class action . . . is that the class must be currently and readily ascertainable based on objective criteria."). Class Members can be ascertained from various electronic data files that contain names and addresses of customers that purchased shell eggs or egg products produced from caged birds in the United States, which were provided by the egg producer Defendants. *See id.* at 594 (explaining that class members must be ascertainable by a reliable, feasible method, such as by examining the defendants' records, and not merely "by potential class members' say so"). Use of company databases constitutes a reliable and feasible method for ascertaining Class Members—no "mini trial" is necessary for each potential Class Member, as it is merely the act of purchasing the shell eggs or egg products that qualifies Class Members. *See id.* at 593 ("If class members are impossible to identify without extensive and individualized fact-finding or "mini trials," then a class action is inappropriate."). Those excluded from the class are also readily and reliably identifiable.

Class Members thus ascertained are so numerous that their joinder here would be impracticable. Plaintiffs "need not precisely enumerate the potential size of the proposed class, nor [are] plaintiff[s] required to demonstrate that joinder would be impossible." *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 543 (D.N.J. 1999) (citation omitted); *see also* 7A

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2005) ("'[I]mpracticable' does not mean 'impossible.' The representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class."); 1 A. Conte & H. Newberg, *Class Actions* § 3:14 (5th ed. 2011) ("Plaintiffs bear the burden of demonstrating that joinder is impracticable, but *impracticable* does not mean *impossible*."). "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (citation omitted). Here, thousands of direct purchasers of shell eggs and egg products located across the United States were identified as proposed members of the Settlement Class, and 1,185 Claim Forms have been submitted to the Claims Administrator.[4] This information certainly demonstrates that a class of this size makes individual joinder of all members impracticable and that the numerosity requirement is satisfied.

Second, the commonality requirement is satisfied insofar as Plaintiffs have alleged one or more questions of fact and law common throughout the Class. The commonality prerequisite does not require that all members of the prospective class share identical claims. *Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988) (relying on *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)). Rather, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Also, Class Members can assert such a single common complaint if they demonstrate that all Class Members are subject to the same harm. *Id.*[5]

---

[4] This figure includes new Claim Forms filed for the Cal-Maine settlement, of which there are 470, as well as prior claims (e.g. from the Moark Settlement) and supplemental submissions. Mem. Supp. Mot. 7-8.

[5] The Supreme Court explained: "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the

As is also further discussed in regards to the superiority requirement under Rule 23(b)(3), *infra*, Plaintiffs' claims here are based upon Cal-Maine's alleged conduct during the period in question, which Plaintiffs contend constituted an agreement to, and furtherance of, an unlawful conspiracy to manipulate the supply and prices of domestic eggs and egg products in violation of Section 1 of the Sherman Act. *See generally* Sept. 26, 2011 Mem. and Order, 821 F. Supp. 2d 709, 713-15 (Doc. Nos. 562 and 563) (discussing the specific alleged conduct of Defendants generally in furtherance of alleged conspiracy). Additionally, Plaintiffs allegedly were subjected to the same type of harm by directly purchasing eggs and egg products at artificially inflated prices due to the alleged conspiracy. Because the Class Members' claims arise from the same nucleus of operative facts and involve the same legal theories against Cal-Maine, the Court finds that the commonality prong under Rule 23(a)(2) is met.

Third, the Court finds that the claims of the named Plaintiffs—companies, corporations, and businesses that purchased shell eggs, egg products, or both, from one or more of the Defendants—are typical of the claims of the Class Members and the respective Subclass Members. "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001). The Third Circuit Court of Appeals has recognized that the "jurisprudence 'assures that a claim framed as a violative practice can support a class action embracing a variety of injuries so long as those injuries can all be linked to the practice.'" *Id.* at 184 (quoting *Baby Neal*, 43 F.3d at 63). In this action, the claims of the Class Representatives are aligned with those of the Class Members, and members of the Subclasses, inasmuch as the claims of the Representatives arise out of the same

proposed class are what have the potential to impede the generation of common answers." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

alleged misconduct of the Defendants and core facts and events. Further, the representative Plaintiffs' claims and the absent Class Members' claims rely on the same legal theories and arise from the same alleged "conspiracy" and "illegal agreement" by Defendants. Moreover, named Plaintiffs, like all putative Class Members, allegedly have suffered the same injury—namely, economic damages arising from alleged artificially-inflated purchase prices—as a result of the Defendants' alleged anticompetitive conduct.

Fourth, the final prerequisite under Rule 23(a), the adequacy of the representative parties requirement, "has two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 182 (3d Cir. 2012) (citing *Comm. Bank I*, 418 F.3d at 303). Essentially, the inquiry into the adequacy of the representative parties examines whether "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, that he or she has obtained adequate counsel, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *Hassine*, 846 F.2d 169 at 179 (citations omitted); *see also Dewey*, 681 F.3d at 182 (recognizing that "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class"). In other words, "Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. If any conflicts "undercut the representative plaintiffs' ability to adequately represent the class" they are "fundamental," such that class representation is structurally faulty and Rule 23(a)(4) cannot be satisfied. *Dewey*, 681 F.3d at 184-85.

The Court concludes that the representative Plaintiffs indeed will fairly and adequately protect the interests of the Settlement Class. Here, the interests of the representative Plaintiffs are

consistent with those of the Class Members, and respective Subclass Members, and there appear to be no conflicts between or among these groups. As discussed, the representative Plaintiffs were damaged as a result of the Defendants' allegedly unlawful conduct, including Cal-Maine's alleged conduct, and the named Plaintiffs would have had to prove the same wrongdoing as the putative Class Members to establish the Defendants' (and Cal-Maine's) liability. Moreover, all representative Plaintiffs and Class Members have present claims (and no future claims) and have suffered economic damages. Furthermore, there is no apparent conflict among Class Members, or Subclasses, with respect to the allocations for distribution of the Settlement Amount because such allocations are based upon a *pro rata* share determined by purchases of shell eggs and egg products from any producer, including any Defendant, in the United States during the period designated in the Agreement. The representative and putative Class Members have a common interest in Cal-Maine's cooperation in assisting with the prosecution of the class claims against the non-settling Defendants. It follows that the representative Plaintiffs' interests are directly aligned with those of other members of the Class and Subclasses.

Additionally, the representative Plaintiffs have been, have the incentive, and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this suit against Cal-Maine, if the case had continued, and against the remaining Defendants. To assist them, Plaintiffs have retained attorneys who are highly qualified, experienced, and able to conduct this litigation. The Court analyzes the capabilities and performance of Interim Co-Lead Counsel under Rule 23(a)(4) based upon the factors set forth in Rule 23(g). *See Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010) ("Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) of the Federal Rules of Civil Procedure, those questions have, since

2003, been governed by Rule 23(g)." (citing Fed. R. Civ. P. 23(g), advisory comm. note (2003))).

Here, the Court concludes that Interim Co-Lead Counsel satisfies Rule 23(g)'s requirement of consideration of four factors: "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation, and "the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). The Court "must also ensure that '[c]lass counsel [will] fairly and adequately represent the interests of the class.'" *Sheinberg*, 606 F.3d at 132-33 (quoting Fed. R. Civ. P. 23(g)(4)).[6]

Interim Co-Lead Counsel have extensive documented experience in complex class action litigation, including those based upon violations of antitrust law, and are well-respected law firms in the plaintiffs' class action bar who have demonstrated considerable dedication and ability thus far in this litigation. Interim Co-Lead Counsel have capably managed this suit on behalf of Plaintiffs since the Court formally appointed them to that role. Their work has included the consolidation of the individual cases, negotiating the Moark, Sparboe, and Cal-Maine Settlements, handling the motion to dismiss stage, and preparing for and undertaking discovery. In sum, Interim Co-Lead Counsel's work on behalf of Plaintiffs has been extensive and involved the dedication of substantial resources and energy. Interim Co-Lead Counsel's work thus far in this suit and prior experience demonstrate that these attorneys have fairly and adequately represented the interests of the Cal-Maine Settlement Class and Subclasses.

---

[6] The Court may also consider other possibly relevant information as to the adequacy of counsel, such as proposed terms for attorneys' fees and nontaxable costs and "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B), (C).

Accordingly, the Court finds that four threshold requirements of Rule 23(a) have been satisfied.

## 2.  Federal Rule of Civil Procedure 23(b)

Having determined that the requirements of Rule 23(a) are met, the Court next must consider whether the requirements of at least one subsection of Rule 23(b) are met. Here, Plaintiffs are seeking certification under Rule 23(b)(3). *See* Mem. Supp. Mot. 10. Rule 23(b)(3) permits class actions where "the court finds that the questions of law or fact common to Class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are commonly separated into the so-called "predominance" and "superiority" requirements. *See Ins. Brokerage*, 579 F.3d at 257-58.

### a.  Predominance

To evaluate the predominance requirement, a court must determine whether common questions of law or fact predominate over any questions affecting only individual members. *See Hydrogen Peroxide*, 552 F.3d at 311-12. "Rule 23(b)(3)'s predominance requirement imposes a more rigorous obligation [than Rule 23(a)(2)'s commonality element] upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Sullivan*, 667 F.3d at 297 (quoting *Ins. Brokerage*, 579 F.3d at 266). As such, the Third Circuit Court of Appeals "consider[s] the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement, and therefore deem[s] it appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.'" *Id.* Third Circuit precedent "provides that the focus of the

predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Id.*

"Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem*, 521 U.S. at 625. This is because these types of claims typically arise from an alleged common course of conduct on the part of the defendant, and depend upon common proof of liability, such as evidence of the defendants' conduct. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (questions of fact and law are common to the class because the claims at issue and proof of liability depend upon the defendants' alleged conduct). Furthermore, Plaintiffs have allegedly suffered "purely an economic injury"—in contrast to a physical injury. Plaintiffs' overpayment for a product on account of the Defendants', and more specifically, Cal-Maine's, alleged anticompetitive conduct can "further support[] a finding of commonality and predominance because there are little or no individual proof problems in this case otherwise commonly associated with physical injury claims." *Id.*

Indeed, this same rationale leads the Court to conclude here that the common issues of Class Members predominate over any individual issues as to their antitrust claim against Cal-Maine. This requires the Court to "examine the elements of plaintiffs' claim through the prism of Rule 23." *Hydrogen Peroxide*, 552 F.3d at 311 (internal quotation marks omitted). Here, Plaintiffs' claim arises under Section 1 of the Sherman Act. "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

The reasoning in *In re Insurance Brokerage Antitrust Litigation* is applicable here in which the Court of Appeals concluded that "[b]ecause each of the elements of a Sherman Act violation involves common questions of law and fact, . . . common questions predominate over individual ones with respect to the federal antitrust claim." 579 F.3d at 269. The Court determined that since "the first and third elements of a Sherman Act violation focus on the conduct of the defendants, we find that common questions abound with respect to whether the defendants engaged in illegal, concerted action." *Id.* at 268. This is true in this case, because the common questions relevant to these elements include, *inter alia*, whether Cal-Maine and the other Defendants agreed to the alleged conspiracy to manipulate the supply and prices of domestic eggs and egg products in violation of Section 1 of the Sherman Act, and whether the alleged conspirators' conduct amounted to an illegal restraint of trade. Furthermore, with respect to the second element of Plaintiffs' Section 1 claim, there are at the very least the common questions relating to whether the alleged conspirators' actions reduced the supply of and increased prices for domestic eggs and egg products.

Also, like *Insurance Brokerage*, here, the fourth element of the Sherman Act claim "focuses on whether the plaintiffs were injured by the defendants' conduct," and as a result "it may still involve common questions of law and fact if proof of injury can be established on a class-wide basis." *Id.* at 268. As the Court of Appeals recognized, "for purposes of class certification pursuant to Rule 23(b)(3), 'the task for plaintiffs . . . is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Id.* (citing *Hydrogen Peroxide*, 552 F.3d at 311-12). The issue here is whether the Class Members were proximately injured by the conduct of Cal-Maine and other Defendants, which is a question that is capable of proof common to the Class

Members. Thus, even though the amount of damage that each plaintiff allegedly suffered could not necessarily be established by common proof, nonetheless, "the element of antitrust injury— that is, the fact of damages—is susceptible to common proof." *Id.* The reasoning in *Insurance Brokerage* applies here:

> [W]e are not as concerned with "formulat[ing] some prediction" as to how this element of a Sherman Act violation would "play out" at trial, 552 F.3d at 311 (internal quotation marks omitted), "for the proposal is that there be no trial," *Amchem*, 521 U.S. at 620, and instead our inquiry into the element of antitrust injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones. As the foregoing analysis demonstrates, common questions exist even with respect to the element of antitrust injury and therefore any individual issues do not overwhelm the common ones.

*Id.*

Furthermore, the Court does not find that the use of Subclasses of direct purchasers of eggs and direct purchasers of egg products alters any of the foregoing analysis because the claims with respect to each Subclass rely upon the same alleged conduct of Cal-Maine and other Defendants, common proof of such conduct, and economic harm of overpayment for the respective products resulting from such conduct. Accordingly, the Court concludes that the predominance requirement is satisfied here because each element of Plaintiffs' federal antitrust violation involves common questions of law and fact, and these common questions predominate over individual issues.

*b.  Superiority*

To meet the superiority requirement, Plaintiffs must show that a class action, rather than individual litigation or other available methods of adjudication, is the best method for achieving a fair and efficient adjudication of the controversy. *See Newton*, 259 F.3d at 191. Several factors are relevant to the superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any

litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). In effect, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Prudential*, 148 F.3d at 316 (internal quotations omitted).

The Court makes no determination at this time concerning the manageability of Plaintiffs' suit as a class action if this action were to go to trial in a single forum or, to the extent this possibility remains, be remanded to the various transferor courts. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

In considering the other relevant factors, the Court finds that the Class and Subclasses satisfy the superiority requirements of Rule 23(b)(3). Here, there is a potentially large number of Class Members—perhaps numbering over 16,000—who are geographically widely disbursed. *See* Mem. Supp. Mot. 7-8. These factors represent a potentially crushing strain on, and an inefficient application of, judicial resources if the putative Class Members' claims were prosecuted individually. Furthermore, when "each consumer has a very small claim in relation to the cost of prosecuting a lawsuit. . . , a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes." *Warfarin*, 391 F.3d at 534. Under the present circumstances, a class action device enables individual direct purchasers to pursue their claims in an economically feasible manner, with

greater efficacy in achieving enforcement and deterrence goals and with greater bargaining power for settlement purposes.[7]

Putative Class Members were free to opt out of the settlement to pursue their own claims individually if they so chose. However, there were only 61 requests for exclusion from the Cal-Maine settlement. Some of those choosing to opt out are already pursuing individual claims against Cal-Maine. However, compared to the class size, relatively few potential Class Members have chosen to bring their claims against Cal-Maine separately (at last count, only 17 separate actions against Cal-Maine are pending in this litigation). This suggests a general lack of interest in the individual prosecution of claims among Class Members on the whole.

Thus, a class action resolution in the manner proposed in the Cal-Maine Settlement would be superior to other available methods for a fair and efficient adjudication of the case against Cal-Maine.

---

[7] For these same reasons, to the extent that consideration of Rule 23(b)(3)(C) is pertinent here, and, for now, without regard to the remand mechanisms for an MDL action, it would be preferable to adjudicate these claims in one judicial proceeding and in one forum as a class action. *See Amalgamated Workers Union of Virgin Islands v. Hess Oil Virgin Islands Corp.*, 478 F.2d 540, 543 (3d Cir. 1973) ("The 'superiority requirement' was intended to refer to the preferability of adjudicating claims of multiple-parties in one judicial proceeding and in one forum, rather than forcing each plaintiff to proceed by separate suit, and possibly requiring a defendant to answer suits growing out of one incident in geographically separated courts."). *See generally* Fed. R. Civ. P. 23(b)(2) 1966 note ("Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought."). However, as one commentator has discussed, in light of 28 U.S.C. § 1407, as a general matter, "[t]his factor should . . . be of little or no significance in resolving the superiority issue." Newberg, *supra*, §4:31. Indeed, this factor appears to have limited bearing under the present circumstances because the United States Judicial Panel on Multidistrict Litigation previously considered, pursuant to 28 U.S.C. § 1407, the desirability of centralizing the various initially-filed direct purchaser class action suits in this particular forum, *see Processed Egg*, 588 F. Supp. 2d at 1367, and a consolidated class action complaint was filed which superseded all previously-filed direct purchaser complaints.

3.  Conclusion as to Class Certification for Settlement Purposes

Because the Court concludes that all of the Rule 23(a) and (b)(3) requirements have been

met, the Court certifies the Class, and Subclasses, as defined above for settlement purposes.

**B.  Notice**

"In the class action context, the district court obtains personal jurisdiction over the

absentee class members by providing proper notice of the impending class action and providing

the absentees with the opportunity to be heard or the opportunity to exclude themselves from the

class." *Prudential*, 148 F.3d at 306. Rule 23 sets forth two provisions concerning notice to class

members.

First, Rule 23(c)(2)(B) requires that class members be given the best notice practicable

under the circumstances, including individual notice to all potential class members identifiable

through reasonable effort. This notice is to be given to all potential members of a Rule 23(b)(3)

class. *Prudential*, 148 F.3d at 326. Specifically, the Rule provides that such notice

> must, in clear, concise and plain language, state: (i) the nature of the action; (ii)
> the definition of the class certified; (iii) the class claims, issues or defenses; (iv)
> the class member's right to enter an appearance by an attorney; (v) the class
> member's right to be excluded from the class; (vi) the time and manner for
> requesting exclusion; and (vii) the binding effect of settlement on class members.

Fed. R. Civ. P. 23(c)(2)(B).

Second, Rule 23(e) requires all members of the class be notified of the terms of any

proposed settlement. Fed. R. Civ. P. 23(e). This "notice is designed to summarize the litigation

and the settlement" and "to apprise class members of the right and opportunity to inspect the

complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148

F.3d at 327 (quoting 2 Newberg, *supra*, § 8.32 at 8-109).

Here, the Notice of the Cal-Maine Settlement met the requirements of Rules 23(c)(2) and 23(e). The Notice appropriately detailed the nature of the action, the Class claims, the definition of the Class and Subclasses, the terms of the proposed settlement agreement, and Class Members' right to object or request exclusion from the settlement and the timing and manner for doing so. The Notice also informed Class Members of their opportunity to be heard at the fairness hearing and to enter an appearance through an attorney, and stated that the settlement would be binding on Class Members who did not opt out of it.

Furthermore, the extent of Plaintiffs' efforts to notify potential Class Members is adequate. The Notice was mailed to potential Class Members individually based upon consumer information provided by Cal-Maine and the other Defendants. *See Larson v. AT&T Mobility LLC*, 687 F.3d 109, 123-24 (3d Cir. 2012) (recognizing that "'individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23. . . . Accordingly, each class member who can be identified through reasonable effort must be notified. . . .'" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974))). In addition, the parties published a notice of the settlement on the same day in several appropriate publications, and distributed a press release concerning the Cal-Maine Settlement to approximately 1,000 journalists in the restaurant and food industries. *See Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation first-class mail and publication in the press fully satisfy the notice requirement of both Fed. R. Civ. P. 23 and the due process clause.").

Accordingly, the Court determines that the notice provided to the putative Class Members constitutes adequate notice in satisfaction of the demands of Rule 23.

## C. Fair, Reasonable, and Adequate

To grant final approval, the Court must conclude that the proposed settlement is fair, reasonable and adequate. Fed. R. Civ. P. 23(e)(2); *Ins. Brokerage*, 579 F.3d at 258. Trial courts generally are afforded broad discretion in determining whether to approve a proposed class action settlement. *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir. 1995).

Although no opposition has been filed to the Motion and no objectors have contested the settlement, pursuant to Rule 23(e), the Court has the duty of protecting absentee Class Members, and the Court executes this duty by independently "assuring the settlement represents adequate compensation for the release of the class claims." *Prudential*, 148 F.3d at 316-317.[8] Indeed, certain requirements of Rule 23 "demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620. Cognizant of this duty, the Court evaluates the fairness, reasonableness, and adequacy of the Cal-Maine Settlement as follows.

---

[8] The *Manual for Complex Litigation* observes that the "task is demanding because the adversariness of litigation is often lost after the agreement to settle." David F. Herr, *The Manual for Complex Litigation* § 21.61, at 487 (4th ed. 2011). Indeed, the observation that "'[c]ourts applying [a multifactor] test [ ] often recite the litany and engage in pro forma analyses, but their hearts are not in it,'" could be an equally a propos statement for those parties advancing unopposed motions for final settlement approval. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 605 n.10 (3d Cir. 2010) (dissenting, Smith, J.) (quoting *Jonathan R. Macey & Geoffrey P. Miller, Judicial Review of Class Action Settlements*, 1 J. of Legal Analysis 167, 172 (2009)).

Here, there is an absence of any objectors or any adversarial challenge to the Motion for Final Approval, just as there were no objectors to the earlier settlements between Plaintiffs and Moark and Sparboe. *See* July 16, 2012 Memorandum 32. The lack of objectors leaves the Court with no meaningful arguments in the record criticizing this settlement. Nonetheless, the Court recognizes that "[w]hether or not there are objectors or opponents to the proposed settlement, the court must make an independent analysis of the settlement terms." Herr, *supra*, at 488. The Court, recognizing that a lack of adversariness at the final approval stage does not bear on whether the settlement negotiations themselves were hard-fought and sufficiently adversarial, must look past the lack of objectors and determine itself whether the settlement negotiations were fair, reasonable and adequate.

1.  Initial Presumption of Fairness

Based upon the record, the Court concludes that an initial presumption of fairness attaches to this Settlement. The Third Circuit Court of Appeals has "directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Warfarin*, 391 F.3d at 535 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001)).

These criteria have been met. Interim Co-Lead Counsel and counsel for Cal-Maine engaged in arms-length negotiations for about a year and a half before reaching a settlement. The parties exchanged offers and counteroffers, discussed settlement, and eventually took part in a formal mediation session. This mediation session spurred further negotiations, eventually resulting in the Settlement Agreement. Plaintiffs had access to substantial discovery by the time the parties settled. Defendants produced more than one million documents, a substantial portion of which Plaintiffs reviewed by the time of the Settlement Agreement. Plaintiffs deposed several key witnesses, including current and former leaders of Defendant United Egg Producers. This discovery informed the Settlement Agreement reached by the litigants through their experienced counsel. As previously discussed, Interim Co-Lead Counsel are experienced not only in class action litigation, but, specifically, in similar antitrust litigation. Furthermore, no member of the purported class objected to the settlement.

Given that the Court finds that the four factors are sufficiently met, the presumption of fairness applies to the settlement.

2.  Standards for Determining Fairness of Proposed Settlement

The Third Circuit Court of Appeals has set forth nine factors, known as the *Girsh* factors,

to be considered when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction
> of the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through trial;
> (7) the ability of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible recovery; (9) the
> range of reasonableness of the settlement fund to a possible recovery in light of all
> the attendant risks of litigation.

*Girsh*, 521 F.2d at 157 (internal quotations and punctuation marks omitted); *Prudential*, 148 F.3d

at 317. "The settling parties bear the burden of providing that the *Girsh* factors weigh in favour

of approval of the settlement." *Pet Food*, 629 F.3d at 350 (citing *In re General Motors Corp.*

*Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).

In *In re Prudential Insurance Company of America Sales Practice Litigation Agent*

*Actions*, the Third Circuit Court of Appeals also identified additional non-exclusive factors to

consider for a "thoroughgoing analysis of settlement terms." *See Pet Food*, 629 F.3d at 350.

Those factors, known as the *Prudential* factors, include:

> [T]he maturity of the underlying substantive issues, as measured by
> experience in adjudicating individual actions, the development of scientific
> knowledge, the extent of discovery on the merits, and other factors that bear on
> the ability to assess the probable outcome of a trial on the merits of liability and
> individual damages; the existence and probable outcome of claims by other
> classes and subclasses; the comparison between the results achieved by the
> settlement for individual class or subclass members and the results achieved—or
> likely to be achieved—for other claimants; whether class or subclass members are
> accorded the right to opt out of the settlement; whether any provision for
> attorneys' fees are reasonable; and whether the procedure for processing
> individual claims under the settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323.[9] While the Court must make findings as to the *Girsh* factors to approve a settlement as fair, reasonable, and adequate, the *Prudential* factors are illustrative of additional factors that may be useful even though they are not essential or inexorable depending upon the specific circumstances.

Although there is public interest in settling class actions, district courts should apply "an even more rigorous, heightened standard in cases where settlement negotiations precede class certification, and approval for settlement and class certification are sought simultaneously." *Pet Food*, 629 F.3d at 350 (internal quotations omitted). "This heightened standard is designed to ensure that class counsel has demonstrated 'sustained advocacy' throughout the course of the proceedings and has protected the interests of all class members." *Prudential*, 148 F.3d at 317.

Thus, the Court is required to make an independent analysis of the settlement to determine whether it is fair, reasonable, and adequate by independently evaluating all of the *Girsh* factors (and the *Prudential* factors, as appropriate), recognizing that the Court cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms. *Pet Food*, 629 F.3d at 351. Accordingly, the Court "may find it necessary to drill down into the case and into the agreement to make an independent 'scrupulous' analysis of the settlement terms" and affirmatively seek out information to the extent that the parties have either not supplied it or have provided only conclusory statements. *See id.*

3.  Discussion of *Girsh* and *Prudential* Factors

The Court's analysis of the *Girsh* factors, and the *Prudential* factors, as appropriate, leads to the conclusion that the relevant considerations weigh in favor of a finding of fairness under Rule 23(e).

---

[9] The Court of Appeals invites individualized analysis by noting that "[o]ther related factors . . . also may be relevant to this inquiry." *Prudential*, 148 F. 3d at 323 n.73.

*a.  The Complexity, Expense, and Likely Duration of the Litigation*

The first *Girsh* factor, which evaluates the complexity, expenses, and likely duration of the litigation, "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 536 (citation omitted). The Court appreciates that antitrust suits, like this one, are often complex. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003). Hence, Plaintiffs have avoided significant expense and delay in litigating against Cal-Maine, as this settlement preempts significant litigation costs associated with the middle-stages of a large antitrust case. If Cal-Maine and Plaintiffs opted to go forward with this litigation, they would both incur considerable expenditures of financial resources and hundreds of hours of attorney time relating to discovery for liability and damages, including further electronic discovery and witness depositions, as well as issues concerning experts, class certification, further pre-trial motions, and potentially a trial on the merits. The Court determines that such an undertaking "would not only further prolong the litigation but also reduce the value of any recovery to the class." *Warfarin*, 391 F.3d at 536. Accordingly, this factor weighs in favor of the Cal-Maine Settlement.

*b.  The Reaction of the Class to the Settlement*

"In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors." *Gen. Motors*, 55 F.3d at 812. Considering this factor from a somewhat different angle, the Third Circuit Court of Appeals has recognized the practical conclusion that it is generally appropriate to assume that "silence constitutes tacit consent to the agreement" in the class settlement context. *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313 n.15 (3d Cir. 1993). By using these considerations as a gauge of class reaction to the Cal-Maine Settlement, the Court determines that the class reaction here favors

settlement. Indeed, there were no objections, and thus no negative feedback, to the settlement.

Moreover, as Interim Co-Lead Counsel has represented, many of the Class Members are

sophisticated entities with their own in-house counsel, and ostensibly have the resources and

ability to assess the settlement agreement beyond the average layperson or enterprise.

Moreover, there were only 61 requests for exclusion from the Class of thousands,

certainly *di minimis* in light of the over 16,700 Notices of settlement that were sent (as well as

published notices and press releases about the settlement). Additionally, 61 opt-outs is low in

comparison to the 470 new Claims Forms that were returned (Class Members who filed a claim

in the Moark Settlement did not have to refile a Claim Form for the Cal-Maine Settlement—the

total number of claims now on file is 1,185).[10] As such, this factor weighs in favor of the

proposed settlement's fairness and adequacy. *See Cendant Corp.*, 264 F.3d at 234-35

(recognizing that low number of objectors and opt-outs strongly favors settlement and that "[t]he

vast disparity between the number of potential class members who received notice of the

Settlement and the number of objectors creates a strong presumption that this factor weighs in

favor of the Settlement").

c.  *The Stage of the Proceedings and the Amount of Discovery Completed*

This *Girsh* factor requires the Court to evaluate whether Plaintiffs have an "adequate

appreciation of the merits of the case before negotiating" settlement. *Prudential*, 148 F.3d at 319

(quoting *Gen. Motors*, 55 F.3d at 813). "To ensure that a proposed settlement is the product of

---

[10] Although the response rate to the Notice of Settlement (as measured by the number of
Claim Forms returned in relation to number of Notices distributed) is low, the Court does not
draw any inferences of some sort of negative class reaction to the settlement from this response
rate. *Cf. Zimmer*, 758 F.2d at 92-93 (3d Cir.1985) (recognizing that an ostensibly low response
rate may not in fact be low in light of other similar settlements). As previously discussed, the
Court has determined that Class Members had adequate notice and opportunity to submit claims,
opt out, or file objections.

informed negotiations, there should be an inquiry into the type and amount of discovery the
parties have undertaken." *Id.*

The Court is satisfied that Interim Co-Lead Counsel conducted sufficient discovery to
appreciate the merits of the litigation and to adequately inform negotiations. Interim Co-Lead
Counsel began investigating the merits of this litigation even before filing a complaint by
interviewing industry personnel, analyzing economic data, and reviewing other materials. *See*
Mem. Supp. Mot. 18. By the time settlement discussions began, the Court had already denied
Cal-Maine's Motion to Dismiss. *See* October 17, 2011 Order (Docket No. 582); Mem. Supp.
Mot. at 18. The Court's ruling on the Motion to Dismiss provided experienced Counsel with
additional information with which to assess the legal strength of the claims. Counsel's
understanding of the factual strength of the claim was aided by the substantial discovery
undertaken prior to the Settlement—Interim Co-Lead Counsel had reviewed many of the over
one million documents produced by Defendants and had deposed several key witnesses. Mem.
Supp. Mot. at 18-19. In addition, Plaintiffs had the benefit of information obtained in prior
settlements with Sparboe, Moark, Land O' Lakes, and Norco, all of which also informed
Plaintiffs' Third Amended Complaint and helped Counsel assess the merits of the litigation. *See*
Direct Purchaser Plaintiffs' Third Consolidated Amended Class Action Complaint ¶ 3 (Docket
No. 779). This expansive body of information provided Interim Co-Lead Counsel, experienced
antitrust class-action litigators, an adequate appreciation of the merits before the Settlement was
reached.

#### d.  Risks of Establishing Liability, Damages, and Maintaining the Class Action Through Trial

These three *Girsh* factors concern the risks of establishing liability, damages, and
maintaining a class action through trial. The factors require the Court to "survey the potential

risks and rewards of proceeding to litigation in order to weigh the likelihood of success against
the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537. The inquiry requires
balancing "the likelihood of success and the potential damage award if the case were taken to
trial against the benefits of immediate settlement." *Prudential*, 148 F.3d at 319. That is, the Court
assesses the risks of establishing liability to "examine what the potential rewards (or downside)
of litigation might have been had class counsel decided to litigate the claims rather than settle
them." *Gen. Motors*, 55 F.3d at 814. Put another way, the inquiry into establishing damages
"attempts to measure the expected value of litigating the action rather than settling it at the
current time." *Id.* at 816.

> In cases of settlements with only a subset of defendants to the suit, as is the case here:
>
> [g]iven that the litigation might continue against other defendants, the parties may
> be reluctant to disclose fully and candidly their assessment of the proposed
> settlement's strengths and weaknesses that led them to settle separately. The
> adequacy of the settlement depends in part on the relative exposure and resources
> of other parties. An informed evaluation is extremely difficult if discovery is
> incomplete or has been conducted against only a few of the defendants.

Herr, *supra*, § 21.651, at 505. Thus, the Court understands why Plaintiffs decline to provide a
detailed assessment of any risks perceived in establishing liability and damages, and instead
emphasize that the Court should consider Interim Co-Lead Counsel's estimation of the
probability of success in assessing these factors. *See* Mem. Supp. Mot. at 20 & n.11. Indeed, the
Court gives credence to counsel's representation that although they "believe [Plaintiffs] will
prevail at trial, they recognize that antitrust cases, like all complex litigation against large
companies with highly talented defense counsel, have inherent risks." *Id.* at 20. The record
demonstrates that counsel have significant experience in antitrust cases such as this one which
ought to enable them to appreciate the strengths and weakness of the case and the risks of
maintaining the action through trial.

Furthermore, antitrust class action litigation is complex, and, especially at its early stages, inherently rife with risk and unpredictability in terms of ultimately prevailing to establish liability and damages and achieve class certification. The Court finds that this suit presents no exception. Still looming in this case are class certification, dispositive motion practice, and trial, each bringing genuine risks that threaten Plaintiffs' ability to establish a class, liability, and damages. And, as all experienced litigators and jurists know, when it comes to a jury trial, not even death and taxes are certain.

Based on the detailed allegations in the Third Consolidated Amended Class Action Complaint, Plaintiffs appear to have evidence to support their theory that Defendants conspired to reduce the supply of eggs and egg products, and thereby increase prices. *See* Fed. R. Civ. P. 11(b) (concerning representations to the Court in pleadings). Nonetheless, even assuming Plaintiffs could establish their theory of an overarching conspiracy at trial, their success in establishing liability and damages as to individual defendants, such as Cal-Maine, is by no means assured.

The cooperation of Moark and Sparboe is no guarantee to success in proving liability and damages in this complex litigation, and Plaintiffs still must show that Defendants individually agreed to join the alleged conspiracy. Indeed, individual motions to dismiss have already raised issues concerning whether certain individual defendants actually joined the conspiracy. Furthermore, Defendants jointly challenged at the motion to dismiss stage whether Plaintiffs could recover damages outside the statute of limitations. These issues remain live subjects for discovery and additional dispositive motion practice, and any trial on these issues would be protracted and involve a significant amount of testimony and documentary evidence, particularly given the time period at issue, which spans almost a decade, and the number of parties involved.

In addition to challenging Plaintiffs' complaints, Defendants also have demonstrated an intent to vigorously defend against this suit. Defendants have indicated an intent to advance defenses, such as an agricultural cooperative immunity defense under the Capper-Volstead Act and a defense involving standard-setting conduct, that will present difficult factual and legal issues for the parties, creating their own brand and quantity of uncertainty for Plaintiffs' case. The parties also contemplate expert discovery on damages, which likely will result in competing expert opinions representing very different damage estimates that will present further ambiguity as to resolution on damages as to each Defendant.

Finally, Plaintiffs face not only the risk that they will not succeed in establishing liability and damages, but also the risks associated with certifying and maintain a class. *See Warfarin*, 391 F.3d at 537. Indeed "'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action.'" *Id.* (quoting *Gen. Motors*, 55 F.3d at 817). "The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *Gen. Motors*, 55 F.3d at 817. Thus, this *Girsh* "factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial," recognizing that a "district court retains the authority to decertify or modify a class at any time during the litigation if it proves to be unmanageable." *Id.* (citing *Prudential*, 148 F.3d at 321).

Cal-Maine, if it had remained in this litigation, would have joined the efforts of its fellow Defendants in challenging Class Certification. *See* Mem. Supp. Mot. at 21. Cal-Maine is indeed vigorously defending itself against the other groups of plaintiffs in this litigation. The Court of Appeals for the Third Circuit has recognized: "There will always be a 'risk' or possibility of

decertification, and consequently the court can always claim this factor weighs in favor of settlement." *Prudential*, 148 F.3d at 321.[11]  Thus, there are inherent difficulties in bringing a class action to trial that apply here.

Because Plaintiffs would face genuine risks and uncertainties in establishing liability and damages against Cal-Maine, and in obtaining and maintaining class certification, should the claims against Cal-Maine continue without settlement, these three factors weigh in favor of settlement.

*e.  The Ability of the Defendant to Withstand a Greater Judgment*

This factor "is concerned with whether the defendants could withstand a judgment for an amount significantly greater than the Settlement." *Cendant*, 264 F.3d at 240. Thus, the Court must consider here whether Cal-Maine could withstand a judgment for an amount significantly greater than $28 million and the costs associated with the proposed cooperation.

Interim Co-Lead Counsel seemingly acknowledge that "Cal-Maine could withstand a larger judgment," but argue that this fact should not weigh heavily enough in the Court's analysis to prevent approval of the Settlement. Mem. Supp. Mot. 21-22. The Court does find that Cal-Maine could pay substantially more than the Settlement Amount, but also acknowledges that a settlement, by its nature, is a compromise, and class action settlements would indeed be rare if courts required defendants to pay the maximum amount they could withstand. And of course, that Cal-Maine "could afford to pay more does not mean that it is obligated to pay any more than what the [Plaintiffs] are entitled to under the theories of liability that existed at the time the settlement was reached." *Warfarin*, 391 F.3d at 538. In other words, this factor is most heavily weighted in circumstances where the parties use the defendant's ability to pay as a ceiling on a

_____

[11] Based on this observation, the Court of Appeals has questioned the significance of this factor in "settlement-only" class actions following the Supreme Court's decision in *Amchem. See Prudential*, 148 F.3d at 321.

settlement that would otherwise be higher. In circumstances such as these, where the settlement is otherwise fair, reasonable, and adequate, a defendant's ability to withstand a greater judgment will not alone defeat final approval. *See Sullivan*, 667 F.3d at 323 ("[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the instant settlement." (quoting *Weber v. Gov't Emp. Ins. Co.*, 262 F.R.D. 431, 447 (D.N.J. 2009))). This factor, while important, is but one factor of many in the determination of a fair settlement amount.

Accordingly, the Court finds that while this factor does not weigh in favor of approval, neither does it warrant rejection of the Settlement.

*f. The Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation*

"The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322. In other words, the Court evaluates "whether the settlement represents a good value for a weak case or a poor value for a strong case. The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin*, 391 F.3d at 538 (citing *Prudential*, 148 F.3d at 322).

Here, the Court evaluates the settlement in light of its monetary and nonmonetary consideration. Ordinarily, "[i]n order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *Prudential*, 148 F.3d at 322. (citing *Gen. Motors*, 55 F.3d

at 806).[12] "Settlements involving nonmonetary provisions for class members . . . deserve careful scrutiny to ensure that these provisions have actual value to the class," which can be accomplished through a Rule 23(e) analysis. Fed. R. Civ. P. 23(h) advisory committee note (2003). "Despite the difficulties they pose to measurement, nonpecuniary benefits . . . may support a settlement." *Bolger*, 2 F.3d at 1311.

As this settlement is structured to provide both monetary and nonmonetary consideration, it is difficult to determine accurately the actual total value of the proposed settlement. The traditional calculus for ascertaining the value of monetary settlements under Third Circuit law is inappropriate under these circumstances because it would not entirely capture the value of the relief afforded by this settlement. *Cf. Prudential*, 148 F.3d at 323 (recognizing that "both the structure of the settlement and the uncapped nature of the relief provided make it difficult to determine accurately the actual value of the settlement" and as such, "the traditional calculus suggested by the *Manual for Complex Litigation 2d* and adopted by this Court in *G.M. Trucks* [*Gen. Motors*] cannot be applied to this case").[13]

The Court determines that the $28 million monetary relief in conjunction with the additional, valuable consideration of Cal-Maine's agreement to cooperate with Plaintiffs is reasonable both in light of the best possible recovery against Cal-Maine and in light of the risks the parties would face if the case went to trial. Certainly, calculating the best possible recovery against Cal-Maine for the class in the aggregate is "exceedingly speculative" at this point in time

---

[12] The Third Circuit Court of Appeals expects that "settling parties should provide[] information to determine the range of reasonableness of the [settlement] allocation 'in light of the best possible recovery,' and 'in light of all the attendant risks of litigation.'" *Pet Food*, 629 F.3d at 354 (citations omitted). The Court further explains that "'[t]his figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside.' Precise value determinations are not required.'" *Id.*

[13] Plaintiffs have not proffered any evidence for the record concerning such a present value analysis.

given the previously-discussed risks of establishing liability and damages associated with this complex litigation, even when considering that treble damages are technically available for recovery under Plaintiffs' Sherman Act claim.

Further, the Court recognizes that Cal-Maine's agreement to cooperate with Plaintiffs throughout the course of pre-trial proceedings and trial is valuable consideration in light of the risks in proceeding with this suit against the remaining Defendants.[14] Granted, it seems that much of this non-privileged information would otherwise be available eventually through discovery as required under the federal rules, if Cal-Maine remained in this suit. Nonetheless, such cooperation reduces costs and time associated with formal discovery. Indeed, the Cal-Maine Settlement likely has mitigated at least some of the expense and delay of future discovery by securing Cal-Maine's cooperation and removing the Cal-Maine forces from those who would contest or complicate Plaintiffs' discovery efforts. Additionally, Plaintiffs gain a clear tactical advantage in obtaining such information through non-traditional discovery mechanisms, including, by way of example, the advantage of having this information to formulate strategy in taking discovery from the remaining Defendants, specific tailoring the scope and focus of discovery, and so forth.

Given the substantial monetary award and the value of Cal-Maine's cooperation in light of the entire record, the Court is persuaded that the Settlement confers real and substantial benefits upon the Class. The Court concludes that the Settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial against Cal-Maine. These factors, therefore, weigh in favor of approval of the Settlement.

---

[14] The Court does not comment on whether the information and facts that Cal-Maine may provide would be established, or even admissible, at trial, based upon counsel's representations.

*g.* Prudential *Factors*

The relevant *Prudential* factors weigh in favor of approving the Cal-Maine Settlement, or, at worst, are neutral factors. First, the Court has already addressed the impact of several factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages. Second, the settlement achieved here provides the Class with an immediate and concrete award, larger than any other yet achieved in this litigation, that might not be achieved by the other litigants in this matter. The Direct Action Plaintiffs, who are pursuing individual claims after opting out of the Class, might not ultimately succeed in their claims, and, even if they do succeed, such success might be bought at a steep price that includes the time and expenses of complex litigation. Therefore, the Court cannot say whether the parties who opted out of the Class are likely to achieve a better outcome against Cal-Maine than the Class.

Third, the settlement agreement allows putative Class Members the right to opt out of the settlement. This right to opt out was noted explicitly in the notice sent to the Class Members and distributed through various media. Indeed, some parties exercised this right by filing requests for exclusion.

Fourth, all segments of the class are being treated equally relative to the monetary relief under the Cal-Maine Settlement. The distribution of the Settlement Amount, after administrative costs and expenses and counsel fees, is a *pro rata* share proportionate to the dollar amount of a Class Member's direct purchases of shell egg and egg products in the United States during the period designated in the Agreement. There is no differentiation among Class Members in terms of subclasses or class representatives.

The Cal-Maine Settlement sets forth a method for calculating the distribution for recovery by Class Members based upon *pro rata* allocations, which appears to conform with a common formula used in class actions:

> [A] common formula in class actions for damages is to distribute the net settlement fund after payment of counsel fees and expenses, ratably among class claimants according to the amount of their recognized transactions during the relevant time period. A typical requirement is for recognized loss to be established by the filing of proofs of claim, or statements of intention to prove claims, based on a specified value of transactions involved. . . . [I]n antitrust class actions, a proof of claim form may be utilized in disseminating the settlement proceeds among class members.

*Newberg*, supra, § 12.35. Although the record demonstrates that the distribution allocation will be based upon *pro rata* shares after costs and expenses and that the amount of recovery "will be less than the total amount you paid" for the eggs and egg products, given that the recovery represents "overcharge," Notice at 4, Plaintiffs have not submitted a formal plan of allocation with the settlement agreement concerning the procedure for processing individual claims under the settlement, addressing administrative costs and fees for the settlement, and so forth. "The plan of allocation is usually submitted with the settlement agreement for consideration at the settlement hearing, though it may be deferred until a later date with court approval." Newberg, *supra*, § 12.35. Here, the Court expects Plaintiffs to separately apply to the Court to approve a final plan of allocation following settlement approval, as they did following final approval of the Moark Settlement.[15]

Fifth, the Cal-Maine Settlement's provision for the possible award of attorneys' fees and costs from the Settlement Amount is a neutral factor at this time. The Court cannot ascertain

---

[15] *See generally In re Ikon Office Solutions, Inc., Secs. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("Approval of a plan of allocation of a settlement fund in a class action is 'governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate.'" (quoting *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 321 (D.N.J. 1998)); Newberg, *supra*, § 12.35 (same).

based upon the Agreement, which merely provides that Plaintiffs may seek attorneys' fees, whether such unspecified fees and costs impact the fairness, reasonableness, and adequacy of the settlement.[16] As a general matter, that the parties have agreed the attorneys' fees and costs may be awarded from the Settlement Amount would not weigh against approving the settlement. *Cf.* Newberg, *supra*, § 12:3 ("The defendants in a class action settlement may properly agree to pay the plaintiffs' attorneys' fees and expenses . . . . Such an agreement may take the form of an agreement to pay reasonable fees, to be subsequently determined by the court . . . ."). The Settlement Agreement specifically provides that "Class Counsel may seek an award of attorneys' fees and reasonable litigation expenses and incentive awards for class representatives approved by the Court, to be paid out of the Settlement Amount after the Final Approval of the Agreement." Cal-Maine Settlement ¶ 36. The Notice of Settlement expands upon the agreement's language, stating that "Class Counsel, in compensation for their time and risk in prosecuting the litigation on a wholly contingent fee basis, intend to apply to the Court for an award, from the Cal-Maine Settlement Fund, of attorneys' fees in an amount not to exceed thirty percent of $28 million, as well as the costs and expenses incurred (the "Fee Petition"), including fees and costs expended while providing notice to the Class and while administering the Settlement Fund (including the plan of allocation)." Notice at 6. Because, here, the Cal-Maine Settlement Agreement provides that the attorneys' fees and expenses ultimately will be determined upon approval of the Court, which will require the assessment of the reasonableness

---

[16] As discussed earlier, following the final fairness hearing Plaintiffs filed a Motion for an Award of Attorneys' Fees and for Reimbursement of Expenses, in which Plaintiffs seek specific amounts for attorneys' fees and reimbursement of expenses relating to the litigation to be paid from the Cal-Maine Settlement. The Court intends to address this Motion separately and does not consider here the substantive arguments presented in that Motion in relation to considering whether the Cal-Maine Settlement is fair, reasonable, and adequate. After all, the Court's inquiry as to this *Prudential* factor focuses on whether the settlement agreement's *provision* for attorneys' fees are reasonable, and that provision only sets forth that attorneys' fees and expenses are subject to Court approval.

of any such fees and expenses sought pursuant to Fed. R. Civ. P. 23(h) (and Fed. R. Civ. P. 54(d)(2)), the Cal-Maine Settlement's provisions concerning attorneys' fees and expenses do not raise issues at this time that would weigh against approving the settlement.

h.  *Summary of* Girsh *and* Prudential *Factors*

Upon considering the Cal-Maine Settlement Agreement in light of all of the *Girsh* and the relevant *Prudential* factors, the Court is satisfied that the settlement is fair, reasonable, and adequate. As discussed, a few of the factors are neutral or weigh against settlement approval. However, all of the factors considered in determining the fairness of a settlement "are a guide; an unfavorable conclusion regarding one or more factors does not automatically render the settlement unfair." 2 Joseph M. McLaughlin, *McLaughlin on Class Actions:  Law and Practice* § 6:8 (6th ed. 2010); *see also Ehrheart*, 609 F.3d at 605 (dissenting, Smith, J.) (quoting same). Accordingly, not every factor need weigh in favor of settlement in order for the settlement to be approved by the Court. *See Cendant*, 264 F.3d at 242-43 (affirming a final settlement approval when not all factors weighed in favor of approval). Because, on balance, the factors as considered above weigh in favor of settlement, the Court concludes that approval of the settlement is appropriate pursuant to Fed. R. Civ. P. 23(e).

**V.  Conclusion**

For the foregoing reasons, the Court determines that the Class and Subclasses meet the

certification requirements of Rule 23 for settlement purposes, and concludes that the proposed

settlement agreement is fair, reasonable, and adequate. Accordingly, the Court grants Plaintiffs'

motion for final approval of the class action settlement with Defendant Cal-Maine

An Order consistent with this Memorandum follows.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge