# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MDL No. 2002<br>08-md-02002 |
| THIS DOCUMENT APPLIES TO:  ALL INDIRECT PURCHASER ACTIONS | |

**INDIRECT PURCHASER PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENTS WITH DEFENDANT NUCAL FOODS, INC. AND
DEFENDANT MIDWEST POULTRY SERVICES, LP, FOR CERTIFICATION OF THE
CLASSES FOR SETTLEMENT PURPOSES, AND FOR APPROVAL OF THE NOTICE
PLAN FOR THE PROPOSED SETTLEMENTS WITH NATIONAL FOOD
CORPORATION, NUCAL FOODS, INC., AND MIDWEST POULTRY SERVICES, LP**

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................2

        A.      The Litigation.............................................................................................2

        B.      Previous Settlement History ......................................................................2

        C.      The Settlement Negotiations......................................................................3

                1.   NuCal ...............................................................................................4

                2.   Midwest............................................................................................4

III.    PROVISIONS OF THE SETTLEMENT AGREEMENTS .....................................5

        A.      The Settlement Classes ..............................................................................5

        B.      Cash Consideration to the Proposed Classes and Rescission Provisions .........6

                1.   NuCal ...............................................................................................6

                2.   Midwest............................................................................................6

        C.      The Injunctive Provisions .........................................................................7

                1.   NuCal ...............................................................................................7

                2.   Midwest............................................................................................7

        D.      The Cooperation Provisions......................................................................8

                1.   NuCal ...............................................................................................8

                2.   Midwest............................................................................................8

        E.      The Release Provisions .............................................................................9

IV.     THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE....9

        A.      The Standard for Granting Preliminary Approval of the Settlements ..............9

        B.      The Settlement Amounts, the Injunctive Provisions, the Cooperation Provisions and the Terms of the Agreements Support Preliminary Approval .................11

        C.      The Negotiation Process Supports Preliminary Approval ...............................13

D.      The Extent of Discovery at the Time the Settlement Agreements Were Negotiated and Agreed to Supports Preliminary Approval ................................................. 14

E.      The Expense and Uncertainty of Continued Litigation against NuCal and Midwest Supports Preliminary Approval. ..................................................................... 15

V.     CERTIFICATION OF THE PROPOSED SETTLEMENT CLASSES IS WARRANTED .................................................................................................................................. 16

A.      The Legal Standard ................................................................................................ 16

B.      This Case Satisfies the Prerequisites of Rule 23(a) ........................................... 17

       1.   The Settlement Classes are sufficiently numerous. .................................. 17

       2.   There are common questions of law and fact. ........................................... 18

       3.   The Representative Plaintiffs' claims are typical of those of the Settlement Classes .......................................................................................................... 19

       4.   The Representative Plaintiffs will fairly and adequately protect the interests of the Settlement Classes .............................................................................. 20

C.      The Proposed Injunctive Class Meets the Requirements of Rule 23(b)(2) ..... 23

D.      The Proposed State Law Classes Meet the Requirements of Rule 23(b)(3) .... 24

       1.   Common legal and factual questions predominate. ................................... 24

       2.   A class action is superior to other methods of adjudication. .................... 26

VI.    THE NOTICE PLAN ................................................................................................... 28

A.      The Plan and Form of Notice ............................................................................... 28

B.      The Notice Plan Satisfies Federal Rule 23 and Constitutional Due Process ... 30

C.      Timing of Notice ................................................................................................... 32

VII.   CONCLUSION ............................................................................................................. 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Holiday Universal*, 249 F.R.D. 166 (E.D. Pa. 2008) ........................................................ 21

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................ passim

*Austin v. Pa. Dep't of Corr.,* 876 F. Supp. 1437 (E.D. Pa. 1995) .................................................. 9

*Baby Neal v. Casey,* 43 F.3d 48 (3d Cir. 1994) ............................................................................ 18

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006) .................................................................... 20

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) .................................................................. 24

*Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) ........................... 20, 21, 22

*Gates v. Rohm & Haas Co.,* 248 F.R.D. 434 (E.D. Pa. 2008) ....................................................... 10

*Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975) .............................................................................. 10

*Hanrahan v. Britt,* 174 F.R.D. 356 (E.D. Pa. 1997) ..................................................................... 13

*In re Am. Inv. Life Ins. Co. Annuity Mktg. and Sales Practices Litig.,* 263 F.R.D. 226
(E.D. Pa. 2009) .............................................................................................................................. 10

*In re Auto. Refinishing Paint Antitrust Litig.,* 617 F. Supp. 2d 336 (E.D. Pa. 2007) .................... 12

*In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS
29162 (E.D. Pa. Oct. 13, 2004) ..................................................................................................... 27

*In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426, 2004 U.S. Dist. LEXIS
29163 (E.D. Pa. May 10, 2004) ......................................................................................... 10, 11, 12

*In re Budeprion XL Mktg. & Sales Litig.*, MDL No. 2109, 2012 U.S. Dist. LEXIS 91176
(E.D. Pa. July 2, 2012) .................................................................................................................. 24

*In re Certainteed Fiber Cement Siding Litig.*, MDL No. 2270, 2014 U.S. Dist. LEXIS
36532 (E.D. Pa. Mar. 20, 2014) .................................................................................................... 17

*In re Chambers Dev. Sec. Litig.,* 912 F. Supp. 822 (W.D. Pa. 1995) ........................................... 15

*In re Cmty. Bank of N. Va.,* 418 F.3d 277 (3d Cir. 2005) ...................................................... 24, 26

*In re Cmty. Bank of N. Va.*, 622 F.3d 275 (3d Cir. 2010) ............................................................ 21

*In re Corrugated Container Antitrust Litig.,* MDL 310, 1981 U.S. Dist. LEXIS 9687
(S.D. Tex. June 4, 1981), *aff d,* 659 F.2d 1322 (5th Cir. 1981) .................................................... 12

*In re Flonase Antitrust Litig.*, 284 F.R.D. 207 (E.D. Pa. 2012) ................................................. 27

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768 (3d Cir. 1995) ................................................................................................................. 9, 10

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ................................. 17, 25

*In re Ikon Office Supplies Inc. Sec. Litig.,* 194 F.R.D. 166 (E.D. Pa. 2000) ......................... 12, 16

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.,* 296 F.R.D. 351 (E.D. Pa. 2013) .................................................................................................... 17, 18

*In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.,* No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332 (E.D. Pa. Feb. 11, 2013) ........................................ 11, 14

*In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136 (D.N.J. 2013) ............................................. 9

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)......................................... 25, 27

*In re Linerboard Antitrust Litig.,* 292 F. Supp. 2d 631 (E.D. Pa. 2003)............................... passim

*In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180 (D.N.J. 2003)..................................... 19, 25

*In re Mid-Atl. Toyota Antitrust Litig.,* 564 F. Supp. 1379 (D.C. Md. 1983)................................. 12

*In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465 (S.D.N.Y. 1998) ...................... 15

*In re Processed Egg Prods. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 30150 (E.D. Pa. Feb. 28, 2014) ...................................................................................................... 19, 20

*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions,* 148 F.3d 283 (3d Cir. 1998) ................................................................................................................ 26, 31

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450 (D.N.J. 1997) ........... 10

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200 (S.D.N.Y. 1995) ......................... 16

*In re Remeron End-Payor Antitrust Litig.,* No. 02-2007, 2005 U.S. Dist. LEXIS 27011 (D.N.J. Sept. 13, 2005)...................................................................................................... 15

*In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706 (E.D. Pa. 2001), *vacated*, 396 F. Supp. 294 (3d Cir. 2005) ............................................................................................................ 10

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009) .................................... 20

*In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976)............................................. 18

*In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231 (D. Del. 2003)...................................... 26

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 (3d Cir. 2004) ....................................... 10, 30

*Lake v. First Nationwide Bank,* 156 F.R.D. 615 (E.D. Pa. 1994) ................................................. 13

*Lewis v. Curtis*, 671 F.2d 779 (3d. Cir. 1982) ............................................................................. 21

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................................ 31

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ................. 20

*Nichols v. Smithkline Beecham Corp.*, Case No. 00-6222, 2005 U.S. Dist. LEXIS 7061
(E.D. Pa. Apr. 22, 2005) ............................................................................................................. 31

*Richburg v. Palisades Collection LLC*, 247 F.R.D. 457 (E.D. Pa. 2008) ...................................... 18

*Rodriguez v. Nat'l City Bank*, 726 F.3d 372 (3d Cir. 2013) ................................................... 18, 24

*Serrano v. Sterling Testing Systems, Inc.*, 711 F. Supp. 2d 402 (E.D. Pa. 2010) .................... 18, 20

*Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ....................... 17

*Sheinberg v. Sorensen*, 606 F.3d 130 (3d Cir. 2010) .................................................................... 22

*Sheller v. City of Philadelphia*, 288 F.R.D. 377 (E.D. Pa. 2013) ............................................... 23

*Stewart v. Abraham*, 275 F.3d 220 (3d. Cir. 2002) ..................................................................... 17

*Sullivan v. DB Inves., Inc.*, 667 F.3d 273 (3d Cir. 2011) ............................................ 17, 18, 24, 26

*Thomas v. NCO Fin. Sys.,* No. 00-5118, 2002 U.S. Dist. LEXIS 14157 (E.D. Pa. July 31,
2002) ......................................................................................................................................... 10

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................................................. 23

*Weseley v. Spear,* 711 F. Supp. 713 (E.D.N.Y. 1989) ................................................................... 15

*Williams v. Aramark Sports, LLC*, No. 10-1044, 2011 U.S. Dist. LEXIS 102173 (E.D. Pa.
Sept. 8, 2011) ............................................................................................................................. 18

**Rules**

Fed. R. Civ. P. 23 .............................................................................................................. passim

**Statutes**

15 U.S.C. § 1 ........................................................................................................................... 2

**Treatises**

A. Conte & H. Newberg, 2 *Newberg on Class Actions* § 11.41 (3d ed. 1992)............................. 13

A. Conte & H. Newberg, 4 *Newberg on Class Actions* § 11:25 (4th ed. 2002) ......................... 10

Fed. Judicial Ctr, *Judges' Class Action Notice and Class Process Checklist and Plain Language Guide* (2010) ......................................................................................................... 31

William B. Rubenstein et al., 3 *Newberg on Class Actions* § 8:16 (5th ed. 2011) ...................... 32

Indirect Purchaser Plaintiffs ("IP Plaintiffs") respectfully submit this memorandum in support of their motion for: (1) preliminary approval of a settlement between IP Plaintiffs and NuCal Foods, Inc. ("NuCal"); (2) preliminary approval of a settlement between IP Plaintiffs and Midwest Poultry Services, LP ("Midwest"); (3) certification of classes for purposes of the settlements; (4) appointment of interim co-lead counsel as class counsel for the settlement classes; and (5) approval of Notice Plan for the Proposed Settlements with Defendants National Food Corporation, NuCal Foods, Inc., and Midwest Poultry Services, LP.

## I.  INTRODUCTION

After months of arm's-length negotiations, IP Plaintiffs have reached settlements with NuCal and Midwest. *See* Settlement Agreement Between Indirect Purchaser Plaintiffs' Classes and NuCal ("NuCal Settlement Agreement"), attached as Exhibit 1 to the Declaration of Christopher V. Le ("Le Decl."), filed contemporaneously with this memorandum; Settlement Agreement Between Indirect Purchaser Plaintiffs' Classes and Midwest ("Midwest Settlement Agreement"), Le Decl., Exhibit 2. In exchange for a release from this lawsuit, NuCal has agreed to (1) place $450,000 into an escrow fund, (2) cooperate with and assist IP Plaintiffs in their prosecution of this action, and (3) submit to an injunction prohibiting NuCal from entering into agreements to reduce the production of eggs in the aggregate, or to share certain private information with United Egg Producers, Inc. ("UEP"). Similarly, in exchange for a release from this lawsuit, Midwest has agreed to (1) place $750,000 into an escrow fund, (2) cooperate with and assist IP Plaintiffs in their prosecution of this action, and (3) submit to an injunction prohibiting Midwest from entering into agreements to reduce the production of eggs, or to share certain private information with UEP.

In considering whether to grant preliminary approval of a proposed settlement, the Court need determine only whether the settlement is sufficiently fair, reasonable, and adequate to allow

notice to be issued. A final determination of the settlement's fairness would be made at a Fairness Hearing, after class members have received notice of this settlement and have been given an opportunity to object or opt-out. As explained in further detail below, the settlements are a fair and reasonable result for the proposed settlement classes. Not only are the monetary and injunctive terms valuable to the proposed settlement classes, but IP Plaintiffs also believe that cooperation from NuCal and Midwest will materially assist IP Plaintiffs in further prosecuting this action against the non-settling Defendants. Accordingly, IP Plaintiffs respectfully request that the Court grant their motion.

## II.     BACKGROUND

### A.     The Litigation

IP Plaintiffs allege that Defendants and other named and unnamed co-conspirators violated the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, and analogous state antitrust and consumer protection statutes, by engaging in an unlawful conspiracy to reduce output and thereby artificially fix, raise, maintain and/or stabilize the prices of commodity shell eggs in the United States. As a result of Defendants' conduct, IP Plaintiffs and members of the Classes paid more for shell eggs than they would have absent the conspiracy. The lawsuit seeks damages, injunctive relief, attorneys' fees, and costs from Defendants. NuCal and Midwest both deny all allegations of wrongdoing in this action.

### B.     Previous Settlement History

On April 16, 2014, IP Plaintiffs entered into a settlement agreement with National Food Corporation ("NFC") that provided for a cash settlement of $300,000, cooperation in the continued litigation of this case, and injunctive relief. *See* Settlement Agreement Between Indirect Purchasers Plaintiffs' Classes and National Foods Corporation (the "NFC Settlement Agreement"), ECF No. 1055, Exh. 1. On August 15, 2014, IP Plaintiffs moved for preliminary

2

approval of their settlement with NFC. (ECF No. 1055). That motion is pending before this

Court. On October 7, 2014, IP Plaintiffs and NFC agreed to modify the class definition in the

NFC settlement agreement to conform to the class definitions in the NuCal and Midwest

settlement agreements. Le Decl., ¶ 18. On October 17, 2014, IP Plaintiffs and NFC executed the

"Modifications to Settlement Agreement Between Indirect Purchaser Plaintiffs' Classes and

National Food Corporation" (the "NFC Amendment"), attached as Le Decl., Exhibit 3. Le Decl.,

¶ 19.

### C.    The Settlement Negotiations

The NuCal Settlement Agreement and the Midwest Settlement Agreement (collectively

the "Settlement Agreements") are each the result of approximately seven (7) months of extensive

arm's length negotiations between Interim Co-Lead Counsel for IP Plaintiffs ("Class Counsel")

and NuCal's counsel and Midwest's counsel, respectively. Le Decl. at ¶ 3. The scope and details

of both negotiations are described in the Le Declaration attached hereto.

In December 2013, IP Plaintiffs, NuCal, Midwest and other Defendants participated in a

joint mediation session. *Id.* at ¶ 5. While the mediation was unsuccessful, Class Counsel decided

to approach certain Defendants, including NuCal and Midwest, about resolving the case. *Id.*

In February 2014, IP Plaintiffs sent opening settlement offers to NuCal and Midwest. *Id.*

at ¶ 7. By this time, IP Plaintiffs had already participated in approximately twenty (20)

depositions and expended thousands of hours reviewing over a million documents produced by

Defendants and third parties, including documents produced by NuCal and Midwest. *Id.* Shortly

after IP Plaintiffs sent their opening settlement offers, IP Plaintiffs engaged in separate

substantive negotiations with NuCal and Midwest. *Id.*

### 1.     NuCal

In March 2014, NuCal provided additional information regarding its financial condition. *Id*. at ¶ 8. Ultimately, after several months of negotiations, the parties agreed to a $450,000 settlement, injunctive relief, and cooperation from NuCal, based in part on NuCal's limited financial resources. *Id*. at ¶ 9. On May 15, 2014, the parties reached an agreement in principle and counsel began negotiating specific terms and drafting a settlement agreement. *Id.* at ¶ 10. Following several additional rounds of negotiations related to timing, the injunctive provisions, and the scope of the release, the parties executed the NuCal Settlement Agreement on September 17, 2014. *Id.* at ¶ 11.

After a thorough factual investigation and legal analysis, it is the opinion of Class Counsel that the settlement with NuCal, including the settlement amount of $450,000, the injunctive relief, and NuCal's obligation to cooperate with IP Plaintiffs, is fair, reasonable, and in the best interest of the Classes. *Id.* at ¶ 12.

### 2.     Midwest

On May 23, 2014, after several months of negotiations following IP Plaintiffs' opening offer, the parties reached an agreement in principle. *Id.* at ¶ 13. Under the terms of the agreement, which were reached in part because of Midwest's relatively limited financial resources, Midwest agreed to pay $750,000, submit to injunctive relief, and cooperate with IP Plaintiffs in their prosecution of this case. *Id.* After the agreement in principle was reached, counsel began negotiating specific terms and drafting a settlement agreement. *Id.* at ¶ 14. On October 2, 2014, following several additional rounds of negotiations related to timing, the injunctive provisions, and the scope of the release, the parties executed the Midwest Settlement Agreement. *Id.* at ¶ 15.

After a thorough factual investigation and legal analysis, it is the opinion of Class

Counsel that the settlement with Midwest, including the settlement amount of $750,000, the

injunctive relief, and Midwest's obligation to cooperate with IP Plaintiffs, is fair, reasonable, and

in the best interest of the Classes. *Id.* at ¶ 16.

## III.   PROVISIONS OF THE SETTLEMENT AGREEMENTS

### A.   The Settlement Classes

The NuCal Settlement Agreement, the Midwest Settlement Agreement, and the NFC

Settlement Agreement, as amended by consent, each define the proposed settlement classes

(collectively the "Settlement Classes") as follows:

a.   <u>An Indirect Purchaser Injunctive Class (the "Injunctive Class")</u>

All individuals and entities in the Class Jurisdictions[1] that purchased Shell Eggs,[2] for their own use and not for resale, during the Class Period from January 1, 2000 through the present, and who intend to purchase Shell Eggs in the future.

b.   <u>Separate Indirect Purchaser State Law Damages Classes (collectively the "State Law Classes")</u>

All individuals and entities residing in Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin, that purchased Shell Eggs for their own use and not for resale, during the Class Period from January 1, 2000 through the present.

---

[1] "Class Jurisdictions" means Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[2] "Shell Eggs" means eggs purchased in their natural state in the shell, other than "specialty" eggs (certified organic, cage free and free range) and hatching eggs purchased by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

Excluded from the Classes are Defendants, Defendants' subsidiaries and affiliates and all persons who purchased eggs directly from any Defendant or any other producer of eggs. NuCal Settlement Agreement, ¶ 17; Midwest Settlement Agreement, ¶ 18.

> ### B.     Cash Consideration to the Proposed Classes and Rescission Provisions

> #### 1.     NuCal

NuCal is required to pay $450,000 in cash. *See* NuCal Settlement Agreement, ¶¶ 14, 32. This money will be maintained in an escrow account controlled by NuCal and Class Counsel pending approval of the settlement by the Court. NuCal and IP Plaintiffs each have the right and option to rescind the NuCal Settlement Agreement for the reasons described in ¶ 28 of the NuCal Settlement Agreement, including any potential rejection or modification of the Settlement Agreement by this Court or any appellate court.

Additionally, the NuCal Settlement Agreement provides that Class Counsel may, subject to Court approval, seek from the settlement amount an award of attorney's fees and reasonable litigation expenses, and that NuCal shall have no obligation to pay any fees or expenses of Class Counsel. *Id.* at ¶ 34.

> #### 2.     Midwest

Midwest is required to pay $750,000 in cash. *See* Midwest Settlement Agreement, ¶¶ 15, 33. This money will be maintained in an escrow account controlled by Midwest and Class Counsel pending approval of the settlement by the Court. Midwest and IP Plaintiffs each have the right and option to rescind the Midwest Settlement Agreement for the reasons described in ¶ 29 of the Midwest Settlement Agreement, including any potential rejection or modification of the Settlement Agreement by this Court or any appellate court.

Additionally, the Midwest Settlement Agreement provides that Class Counsel may, subject to Court approval, seek from the settlement amount an award of attorney's fees and

reasonable litigation expenses, and that Midwest shall have no obligation to pay any fees or expenses of Class Counsel. *Id.* at ¶ 35.

### C.   The Injunctive Provisions

#### 1.   NuCal

In addition to the settlement amount, the NuCal Settlement Agreement requires that, subject to certain exceptions, for three (3) years after Final Approval and with limited exceptions, NuCal shall not enter into any agreements with competitors, whether through UEP or any similar trade association or agricultural cooperative, to reduce the production of eggs in the aggregate, unless entered into for disease control or other public health concerns. NuCal Settlement Agreement, ¶ 37.

Additionally, subject to certain exceptions, NuCal shall not share or provide egg pricing data or projections of NuCal's future production with UEP or any similar trade association or agricultural cooperative, except to the extent that such information is available from public sources. *Id.* at ¶ 38.

#### 2.   Midwest

Similar to the NuCal Settlement Agreement, the Midwest Settlement Agreement requires that, subject to certain exceptions, for three (3) years after Final Approval and with limited exceptions, Midwest shall not enter into any agreements with competitors, whether through UEPor any similar trade association or agricultural cooperative, primarily designed to reduce the production of eggs, unless entered into for disease control or other public health concerns. Midwest Settlement Agreement, ¶ 38.

Additionally, subject to certain exceptions, Midwest shall not share or provide egg pricing data or projections of Midwest's future production with UEP except to the extent that such information is available from public sources. *Id.* at ¶ 39.

### D. The Cooperation Provisions

#### 1. NuCal

In addition to the settlement amount and injunctive provisions, the NuCal Settlement Agreement requires that NuCal cooperate with IP Plaintiffs in their prosecution of this case. NuCal Settlement Agreement, ¶ 39.

This cooperation includes, *inter alia*, (1) making its counsel available to provide information concerning NuCal's knowledge, and that of its directors, officers, employees and agents, of the facts relating to the events at issue in the Action; (2) making available for interviews up to two of its then-current directors, officers and employees who possess information Class Counsel believe would assist in prosecuting the Action; (3) providing and clarifying transactional data relevant to this Action; (4) establishing the authenticity of documents and business records; (5) making up to two of its current or former directors, officers or employees available to testify at trial in this Action without the need for a subpoena. *Id.*

#### 2. Midwest

The Midwest Settlement Agreement also requires that Midwest cooperate with IP Plaintiffs in their prosecution of this case. Midwest Settlement Agreement, ¶ 40. This cooperation includes, *inter alia*, (1) making its counsel available to provide information concerning Midwest's knowledge, and that of its directors, officers, employees and agents, of the facts relating to the events at issue in the Action; (2) making available for interviews its then-current directors, officers and employees who possess information Class Counsel believe would assist in prosecuting the Action; (3) providing and clarifying transactional data relevant to this Action; (4) establishing the authenticity of documents and business records; (5) making one of its current or former directors, officers or employees available to testify at trial in this Action without the need for a subpoena. *Id.*

E.      **The Release Provisions**

In exchange for the consideration described above, IP Plaintiffs have agreed to release

NuCal and Midwest from any and all claims arising from the facts described in the IP Plaintiffs'

Fifth Amended Consolidated Complaint (ECF No. 866), such as claims resulting from: (1) any

agreement or understanding between or among two or more producers of eggs, including any

Defendants; (2) the reduction or restraint of supply; (3) the reduction of or restrictions on

production capacity; or (4) the pricing, selling, discounting, marketing, or distributing of shell

eggs in the United States or elsewhere. The full text of the proposed releases, including the

limitations thereof, is set forth in NuCal Settlement Agreement, ¶¶ 23-27 and Midwest

Settlement Agreement, ¶¶ 24-28.

## IV.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.      The Standard for Granting Preliminary Approval of the Settlements

"The law favors settlement, particularly in class actions and other complex cases where

substantial judicial resources can be conserved by avoiding formal litigation." *In re Ins.*

*Brokerage Antitrust Litig.*, 297 F.R.D. 136, 144 (D.N.J. 2013) (quoting *In re Gen. Motors Corp.*

*Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir. 1995)); *Austin v. Pa.*

*Dep't of Corr.,* 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) (explaining that "the extraordinary

amount of judicial and private resources consumed by massive class action litigation elevates the

general policy of encouraging settlements to 'an overriding public interest'").

While the law favors settlement of complex litigation, Rule 23 of the Federal Rules of

Civil Procedure requires court approval for any compromise of a class action. Such approval

involves a two-step process. First, counsel must submit the proposed terms of the settlement to

the Court for a preliminary fairness evaluation. Second, after a preliminary fairness finding and

dissemination of notice to the settlement class members, the Court must conduct a formal

fairness and final approval hearing. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.

Supp. 450, 562 (D.N.J. 1997); *In re Auto. Refinishing Paint Antitrust Litig.,* MDL No. 1426,

2004 U.S. Dist. LEXIS 29163, at *1 (E.D. Pa. May 10, 2004); A. Conte & H. Newberg, 4

*Newberg on Class Actions* § 11:25, at 38-39 (4th ed. 2002).

      Preliminary approval of a settlement does not require a definitive determination of the

fairness of a proposed settlement. *In re Gen. Motors Corp.*, 55 F.3d at 785 (holding that the

"preliminary determination establishes an initial presumption of fairness"); *In re Am. Inv. Life*

*Ins. Co. Annuity Mktg. and Sales Practices Litig.*, 263 F.R.D. 226, 238 (E.D. Pa. 2009) (same).

Rather, a definitive determination of the fairness, reasonableness, and adequacy of a settlement is

made at a final approval hearing. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638

(E.D. Pa. 2003).[3] At the preliminary approval stage, "[t]he court must determine whether the

proposed settlement discloses grounds to doubt its fairness or other obvious deficiencies such as

unduly preferential treatment of class representatives or segments of the class, or excessive

compensation of attorneys, and whether it appears to fall within the range of possible approval."

*Thomas v. NCO Fin. Sys.*, No. 00-5118, 2002 U.S. Dist. LEXIS 14157, at *14 (E.D. Pa. July 31,

2002). In determining whether an antitrust settlement falls within a "range of reasonableness," a

---

[3] The factors considered for final approval of a class settlement as "fair, reasonable and adequate" include: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation. *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534-35 (3d Cir. 2004); *In re Prudential*, 962 F. Supp. at 562; *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 713 (E.D. Pa. 2001), *vacated*, 396 F. Supp. 294 (3d Cir. 2005). At the preliminary approval stage, "the Court need not address these factors, as the standard for preliminary approval is far less demanding." *Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 444 n.7 (E.D. Pa. 2008). IP Plaintiffs will thus fully address each of these factors in their memorandum in support of their motion for final approval.

court examines whether (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; and (3) the proponents of the settlement are experienced in similar litigation.[4] *In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, No. 11-md-2284, 2013 U.S. Dist. LEXIS 18332, at *7 (E.D. Pa. Feb. 11, 2013) (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 638 (E.D. Pa. 2003)). After making such findings, a settlement agreement is entitled to a presumption of fairness and should be preliminarily approved. *Id.* at *8.

As discussed below, the proposed settlements are entitled to a presumption of fairness because it provides no preferential treatment of the Class Representatives or segments of the Classes, does not provide for excessive compensation of attorneys, provides significant relief to the Classes, and requires that NuCal and Midwest provide significant additional information regarding the facts and events at issue in this case.

**B.    The Settlement Amounts, the Injunctive Provisions, the Cooperation Provisions and the Terms of the Agreements Support Preliminary Approval**

The settlement amounts are fair and reasonable and represent a favorable result for the Classes. As noted above, NuCal and Midwest will pay $450,000 and $750,000, respectively, into escrow. These amounts were agreed to after several months of negotiations. Le Decl., ¶¶ 9, 13. Class Counsel believe it is in the best interest of the Classes to enter into the Settlement Agreements rather than continuing to pursue judgments against NuCal and Midwest, especially considering the limited financial resources of NuCal and Midwest. *See* Le Decl., ¶¶ 9, 13. Moreover, the damages that IP Plaintiffs suffered due to NuCal's and Midwest's alleged conduct remain in the case and are recoverable from other Defendants under joint and several liability. *See In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29163, at *6

---

[4] A fourth factor, the percentage of the class objecting, is premature at the preliminary approval stage. *In re Imprelis,* 2013 U.S. Dist. LEXIS 18332, at *10.

(preliminarily approving settlement agreement because, *inter alia,* "this settlement does not affect the joint and several liability of the remaining Defendants in this alleged conspiracy").

Also, as described above, the Settlement Agreements require NuCal and Midwest to assist IP Plaintiffs in developing additional factual information and make some of their current or former directors, officers or employees available to serve voluntarily as witnesses at trial. NuCal Settlement Agreement, ¶ 39; Midwest Settlement Agreement, ¶ 40. Class Counsel believe that this cooperation will benefit IP Plaintiffs and assist Class Counsel in prosecuting the claims. *See, e.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 344 (E.D. Pa. 2007); *In re Auto. Refinishing Paint Antitrust Litig.*, 2004 U.S. Dist. LEXIS 29163, at *6-7 (acknowledging the assistance that the settling defendants will provide "in pursuing this case against the remaining Defendants"); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 643 ("The provision of such [cooperation] is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement"); *In re Ikon Office Supplies Inc. Sec. Litig.*, 194 F.R.D. 166, 177 (E.D. Pa. 2000) (noting that cooperation agreements are valuable when settling a complex case).[5]

Additionally, it should be noted that the Settlement Agreements are fair to the Classes as a whole. Neither of the Settlement Agreements provide preferential treatment to Class Representatives vis-à-vis other members of the Classes. And, as noted above, the Settlement

---

[5] *See also In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1386 (D.C. Md. 1983) ("[T]he commitment [the] Distributor defendants have made to cooperate with plaintiffs will certainly benefit the classes, and is an appropriate factor for the court to consider in approving a settlement"); *In re Corrugated Container Antitrust Litig.*, MDL 310, 1981 U.S. Dist. LEXIS 9687, at *47-48 (S.D. Tex. June 4, 1981), *aff'd*, 659 F.2d 1322 (5th Cir. 1981) ("The settlement agreements provided for cooperation from the settling defendants that constituted a substantial benefit to the class. Those provisions were intended to save plaintiffs time and expense in the continuing litigation . . . [and] made certain information and expertise available to the class which might not have been available through normal discovery.").

Agreements provide that Class Counsel must obtain approval from the Court to receive fees and expenses from the settlement amounts, which may not be paid until final approval of the settlements.

Ultimately, given the risk and likely expense of continuing to litigate against NuCal and Midwest, as well as NuCal's limited financial resources, Class Counsel strongly believe that the terms of the settlements are a highly favorable result for the Classes. And, in light of Class Counsel's substantial experience litigating antitrust class actions, this belief, which is based on a thorough analysis of the facts, should be accorded significant weight. *See In re Gen. Instruments Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) ("Significant weight should be attributed to the belief of experienced counsel that the settlement is in the best interests of the class").

### C.      The Negotiation Process Supports Preliminary Approval

A settlement that results from arm's-length negotiations between experienced counsel is generally entitled to deference from a court. *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2003 U.S. Dist. LEXIS 18123, at *4 (E.D. Pa. Sept. 5, 2003); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 640 (holding that "[a] presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel") (citing *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)); *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 628 (E.D. Pa. 1994) (giving "due regard to the recommendations of the experienced counsel in this case, who have negotiated this settlement at arms-length and in good faith"); A. Conte & H. Newberg, 2 *Newberg on Class Actions* § 11.41 (3d ed. 1992) ("There is usually an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval.").

Here, the Settlement Agreements are the result of many months of hard-fought, arm's length negotiations between Class Counsel and counsel for NuCal and Midwest, all of whom are experienced and capable in complex class action and antitrust matters.[6] During the negotiations, Class Counsel and counsel for NuCal and Midwest vigorously advocated their respective clients' positions, and IP Plaintiffs were prepared to litigate the case fully if no settlement was reached. Le Decl., ¶ 4. Nothing in the course of IP Plaintiffs' negotiations with NuCal or Midwest, or in the substance of the proposed Settlement Agreements, presents any reason to doubt the fairness of the Settlement Agreements.

D.    **The Extent of Discovery at the Time the Settlement Agreements Were Negotiated and Agreed to Supports Preliminary Approval**

Courts sometimes look to the amount of factual discovery the parties had undertaken prior to reaching the settlement to determine its fairness. Significant discovery supports a finding that the settlements are within the range of reasonableness. *See In re Imprelis*, 2013 U.S. Dist. LEXIS 18332, at *9 (finding settlement within range of reasonableness where "[a] considerable amount of preliminary discovery was conducted, including the review of some 500,000 pages of documents . . . , the hiring and consultation of several experts, and a deposition of [Defendant's] product manager"). Here, the parties had completed a substantial amount of factual discovery by the time the settlements were reached. Indeed, by the time Class Counsel sent opening settlement offers to NuCal and Midwest in February 2014, Class Counsel had already reviewed millions of pages of documents produced in the litigation and participated in approximately twenty (20) depositions. Le Decl., ¶ 7. Accordingly, the discovery taken here supports a finding that the settlement is within the range of reasonableness.

---

[6] The experience and qualifications of Class Counsel are referred to in Indirect Purchaser Plaintiffs' Memorandum In Support of Their Motion for Class Certification (ECF No. 1043 filed under seal).

**E.    The Expense and Uncertainty of Continued Litigation against NuCal and Midwest Supports Preliminary Approval.**

After weighing the risks and expenses of continued litigation against the guaranteed recovery to the Classes and the significant benefits of cooperation from NuCal and Midwest, Class Counsel have determined that the settlements are in the best interests of the Classes. The limited financial resources of NuCal and Midwest, which makes it unlikely that either would be able to pay any large judgment IP Plaintiffs might obtain at trial, supports this determination.

Additionally, the settlements are particularly reasonable given the inherent risks in moving forward towards trial. It has been often observed that "[a]n antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 639 (citation omitted); *see also Weseley v. Spear*, 711 F. Supp. 713, 719 (E.D.N.Y. 1989) (noting that antitrust class actions are "notoriously complex, protracted, and bitterly fought"). NuCal has asserted numerous defenses, and a jury trial (assuming the case proceeded beyond class certification and pretrial motions) might well turn on questions of proof, making the outcome inherently uncertain for both parties. *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 639; *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable . . . . [T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal"). Moreover, even after trial is concluded, there could be one or more lengthy appeals. *In re Remeron End-Payor Antitrust Litig.*, No. 02-2007, 2005 U.S. Dist. LEXIS 27011, at *49 (D.N.J. Sept. 13, 2005). The degree of uncertainty supports preliminary approval of the proposed Settlement Agreements. *See In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 838 (W.D. Pa. 1995).

Ultimately, the terms of the settlements, the financial condition of NuCal and Midwest, the nature of the negotiations, the degree of discovery at the time of settlements, the experience of Class Counsel and the risks of proceeding against NuCal and Midwest all support a finding that the settlements fall within the range of reasonableness and are entitled to the presumption of fairness.

## V.     CERTIFICATION OF THE PROPOSED SETTLEMENT CLASSES IS WARRANTED

### A.     The Legal Standard

It is well-established that a class may be certified for purposes of settlement. *In re Pet Food Prods. Liability Litig.*, No. 07-2867, 2008 U.S. Dist. LEXIS 94603, at *55 (D.N.J. Nov. 18, 2008) ("Class actions certified for the purposes of settlement are well recognized under Rule 23."); *Ikon*, 194 F.R.D. at 188 (class certified for purposes of settlement of securities class action). In the case of settlements, "tentative or temporary settlement classes are favored when there is little or no likelihood of abuse, and the settlement is fair and reasonable and under the scrutiny of the trial judge." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995) (internal quotation and citation omitted). The settlements here are fair, reasonable, and non-abusive. Therefore the proposed Settlement Classes should be certified by the Court.

Rule 23 governs class certification for both litigation and settlement classes. A settlement class should be certified where the four requirements of Rule 23(a) — numerosity, commonality, typicality and adequacy — are satisfied, and when one of the three subsections of Rule 23(b) is also met. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, IP Plaintiffs are seeking to certify an injunctive class under Rule 23(b)(2) and state monetary remedies classes under Rule 23(b)(3). To be certified under Rule 23(b)(2), IP Plaintiffs must show that the Defendants "acted or refused to act on grounds that apply generally to the class, so that final

16

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). To be certified under Rule 23(b)(3), the classes must meet Rule 23(b)(3)'s "predominance" and "superiority" requirements. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).

The party seeking class certification has the burden of showing by a preponderance of the evidence that each of Rule 23's requirements are met. *Id.* at 307, 320. But once this showing has been made, the Court should certify the class. *Shady Grove Orthopedics Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) (Rule 23 is "a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action"). In determining the propriety of class certification, courts address merits questions "only to the extent" necessary to determine whether the Rule 23 requirements have been met. *Sullivan v. DB Inves., Inc.*, 667 F.3d 273, 305 (3d Cir. 2011).

### B.     This Case Satisfies the Prerequisites of Rule 23(a)

#### 1.     The Settlement Classes are sufficiently numerous.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." However, there is no "magic number" of plaintiffs that make joinder impracticable. *In re Certainteed Fiber Cement Siding Litig.*, MDL No. 2270, 2014 U.S. Dist. LEXIS 36532, at *29-30 (E.D. Pa. Mar. 20, 2014). The Third Circuit has generally held that the numerosity requirement is met "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2002). Moreover, plaintiffs "need not precisely enumerate the potential size of the proposed class, nor are plaintiffs required to demonstrate that joinder would be impossible." *In re Imprelis Herbicide Mktg., Sales Practices & Prods. Liab. Litig.*, 296 F.R.D. 351, 361 (E.D. Pa. 2013) (Pratter, J.).

17

The injunctive class and the state classes consist of consumers who made retail purchases of commodity shell eggs — a product that eighty-nine percent (89%) of U.S. households routinely purchase. Consequently, the injunctive class consists of tens of millions of class members, and each of the State Law Classes consists of hundreds of thousands to several million class members. Joinder of all these class members would be impracticable. *See Serrano v. Sterling Testing Systems, Inc.*, 711 F. Supp. 2d 402, 410 (E.D. Pa. 2010) (joinder of a class of 10,000 members "is impracticable"). Thus, the proposed classes meet the numerosity tests of Rule 23(a)(1). *Imprelis*, 296 F.R.D. at 361 ("Because there at least tens of thousands of class members, [the numerosity requirement] is easily met").

### 2.    There are common questions of law and fact.

The proposed classes also each and collectively meet the commonality requirement of Rule 23(a)(2). *See* Fed. R. Civ. P. 23(a)(2) (there must be "questions of law or fact common to the class"). This requirement, however, is "not onerous." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380-82 (3d Cir. 2013). In fact, commonality may be satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Thus, commonality does not require that "all class members share identical claims," *Sullivan*, 667 F.3d at 301, that there be identical issues and facts for all plaintiffs, or that no individualized issues exist, *Williams v. Aramark Sports, LLC*, No. 10-1044, 2011 U.S. Dist. LEXIS 102173, at *8 (E.D. Pa. Sept. 8, 2011).

As a general matter, "[a]ntitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy." *Richburg v. Palisades Collection LLC*, 247 F.R.D. 457, 462 (E.D. Pa. 2008) (quoting *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 335 (E.D. Pa. 1976)); *see also Amchem*, 521 U.S. at 625 (commonality is "readily met in certain cases alleging . . . violations of

the antitrust laws"); *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 184-85 (D.N.J. 2003) (allegation of conspiracy in the class action context raises "a central issue that will establish common questions of both law and fact").

This case is no different. Effectively all the questions relevant to a determination of Defendants' liability are questions for common, class-wide determination. For example, the following questions are common for all IP Plaintiffs' claims:

- the conspiracy's existence, scope, and nature;

- the illegality of the conspiracy under federal antitrust law as well as state antitrust and consumer protection laws;

- the identity of participants in the conspiracy;

- the length of the conspiracy;

- the effect of the conspiracy, including whether it caused a cognizable injury to class members; and

- the aggregate amount of damages IP Plaintiffs suffered as a result of the conspiracy.

Even the statutory defenses, such as whether Defendants' supposed cooperative meets the requirements for protection under state and federal agricultural cooperative exemptions, will turn on facts and legal questions common to the respective class members. Thus, the proposed Settlement Classes meet Rule 23(a)(2)'s commonality requirement. *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 30150, at *7 (E.D. Pa. Feb. 28, 2014) (order preliminarily approving Direct Purchaser Plaintiffs/Cal-Maine Settlement).

### 3.    The Representative Plaintiffs' claims are typical of those of the Settlement Classes.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requires the Court to determine "whether the named plaintiffs' claims are typical, in common-sense terms, of the class,

thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006). Typicality precludes class certification only "when the legal theories of the named representatives potentially conflict with those of the absentees," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001), or when "the representative is subject to a unique defense that is likely to become a major focus of the litigation," *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Here, IP Plaintiffs (both named class representatives and absent class members) are all retail consumers of commodity shell eggs who have been harmed by paying artificially inflated prices. Their claims all arise from the same illegal conspiracy and are based on the same legal theories. *See In re Processed Egg Prods. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 30150, at *7-8 (when the same legal theories and conduct underlies both the representatives' claims and those of the class, their claims are "typical"); *Serrano*, 711 F. Supp. 2d at 411 (where the representative plaintiffs seek redress for the same course of conduct and the same legal theories as other class members, the representatives "satisfy the typicality requirement of Rule 23(a)(3)"). Additionally, IP Plaintiffs are not subject to any concrete individualized defenses that are likely to become the focus of the litigation. Thus, the typicality requirement of Rule 23(a)(3) is met.

### 4. The Representative Plaintiffs will fairly and adequately protect the interests of the Settlement Classes.

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This "adequacy" requirement has two prongs. First, the interests of the representatives must be aligned with those of the classes they seek to represent. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012). Second, the

representatives must have class counsel who is experienced and is willing to actively litigate the case on behalf of the class. *Id.*

The first prong requires a determination that "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, . . . and that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010). Under this requirement, a class representative must have some commitment to the case, and therefore some minimal knowledge about the case. *Allen v. Holiday Universal*, 249 F.R.D. 166, 184-85 (E.D. Pa. 2008) (Pratter, J.). However, this is not a high bar. *Id.*[7] Moreover, a class representative is not inadequate simply because of the existence of a minor conflict. Rather, "[a] conflict must be 'fundamental' to violate Rule 23(a)(4)." *Dewey*, 681 F.3d at 184. "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.*

The named representatives here clearly meet the first prong of the adequacy requirement. Here, each named representative has the ability and incentive to represent the claims of the class vigorously. They have all responded to interrogatories, in which they have attested to purchasing commodity shell eggs.[8] Nearly all have provided receipts and/or store records verifying their purchases of commodity shell eggs. And all but five were deposed. Additionally, there is no evidence of any conflict, fundamental or otherwise, which would prevent any of the named IP

---

[7] *See also Lewis v. Curtis*, 671 F.2d 779, 788-89 (3d. Cir. 1982) (a class representative is not inadequate simply because he or she cannot recall allegations in the complaint or personally assist class counsel in prosecuting the action).

[8] *See* Declaration of Krishna B. Narine ("Narine Decl.") (ECF No. 1043 filed under seal): Tab 83, IPPs' Responses and Objections to Defendants' First Interrogatories; Tab 84, IPPs' Supplemental Responses and Objections to Defendants' First Interrogatories; Tab 85, IPPs' Second Set of Supplemental Responses and Objections to Defendants' First Interrogatories; Tab 86, IPPs' Third Set of Supplemental Responses and Objections to Defendants' First Interrogatories.

Plaintiffs from fairly and adequately representing absent class members. Thus, there is no basis for finding that class representatives are inadequate under Rule 23(a)(4).

The second prong requires class counsel to be adequate. *See* Fed. R. Civ. P. 23(g); *Sheinberg v. Sorensen*, 606 F.3d 130, 132 (3d Cir. 2010); *see also Dewey*, 681 F.3d at 181 n13. Pursuant to Rule 23(g)(1)(A), a court must consider four criteria when selecting class counsel: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Class Counsel have significant expertise in complex class actions and antitrust litigation and have served in leadership roles in numerous class actions throughout the county.[9] Class Counsel performed a substantial amount of work early in this case investigating the conspiracy, identifying defendants and drafting the consolidated complaints on behalf of the IP Plaintiffs. Since then, they have vigorously represented IP Plaintiffs in this litigation. Class Counsels' effectiveness is exemplified by, among other things, (a) defeating Defendants' motions to dismiss for failure to state a claim, (b) coordinating, overseeing and conducting discovery on behalf of the IP Plaintiffs, (c) overseeing and defending the depositions of the multiple representative plaintiffs, (d) deposing Defendants' witnesses; (e) retaining and coordinating the work of expert economists, and (f) drafting a brief in support of class certification. Class Counsel have committed, and will continue to commit, the resources necessary to vigorously represent the class.

---

[9] Class Counsel outlined their experience and expertise in their motions for appointment as class counsel, *see* ECF Nos. 6, 8 and 14, incorporated herein by reference.

### C.     The Proposed Injunctive Class Meets the Requirements of Rule 23(b)(2)

IP Plaintiffs seek injunctive relief under Section 16 of the Clayton Act and analogous

state statutes ordering the Defendants to cease the illegal activities described in the fifth amended

complaint.[10] Rule 23(b)(2) provides for class treatment where the defendant "has acted or refused

to act on grounds generally applicable to the class, thereby making appropriate final injunctive

relief or corresponding declaratory relief with respect to the class as a whole." *See* Fed. R. Civ. P.

23(b)(2). A Rule 23(b)(2) class seeking injunctive relief does not have to meet predominance or

superiority requirements. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011) ("When a

class seeks an indivisible injunction benefitting all its members at once, there is no reason to

undertake a case-specific inquiry into whether class issues predominate or whether class action is

a superior method of adjudicating the dispute. Predominance and superiority are self-evident").

Consequently, Rule 23(b)(2)'s requirements are "almost automatically satisfied in actions

seeking primarily injunctive relief," at least where the action "seeks to define the relationship

between the defendant(s) and the 'world at large.'" *Id.* at 58 (internal quotation omitted).

Here, Defendants openly sought to reduce the supply of eggs in order to increase the

overall price for eggs. Their conspiracy was aimed at, and continues to be aimed at, the market as

a whole — not at any particular individuals. Consequently, a single injunction will benefit all

class members by ensuring that they do not have to pay artificially inflated prices on commodity

shell eggs. Thus, the proposed injunctive relief would "benefit the entire Class identically," and

no individualized injunctions will be needed. *See In re Budeprion XL Mktg. & Sales Litig.*, MDL

---

[10] The Injunctive Class seeks only equitable relief and certification under 23(b)(2), while the State Law Classes seek only money damages and certification under 23(b)(3). *See Sheller v. City of Philadelphia*, 288 F.R.D. 377, 385 (E.D. Pa. 2013) (noting that the Federal Rules of Civil Procedure allow certification of a class solely for injunctive relief and another solely for damages).

No. 2109, 2012 U.S. Dist. LEXIS 91176, at *28 (E.D. Pa. July 2, 2012). For all the above reasons, Rule 23(b)(2)'s requirements have been met.

### D.    The Proposed State Law Classes Meet the Requirements of Rule 23(b)(3)

Rule 23(b)(3) is "designed to secure judgments binding all class members, save those who affirmatively elect[] to be excluded," where a class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem,* 521 U.S. at 614-15. Rule 23(b)(3) authorizes class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[11] Fed. R. Civ. P. 23(b)(3).

Importantly, however, "certain Rule 23 considerations . . . are not applicable in the settlement class context." *Rodriguez*, 726 F.3d at 378. For example, a settlement obviates many of the manageability concerns present when certifying a litigation class. *Sullivan*, 667 F.3d at 303-04. Moreover, here, class members are protected by a clear class definition, and any due process concerns Defendants might have had are not relevant as Defendants are parties to the class settlements. *See Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.4, 311 (3d Cir. 2013). Therefore, in the context of these settlements, Rule 23(b)(3)'s requirements are readily met.

### 1.    Common legal and factual questions predominate.

The Rule 23(b)(3) predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Sullivan,* 667 F.3d at 297; *In re*

---

[11] "[I]n a settlement-only class action . . . the court certifying the class need not examine issues of manageability. *In re Cmty. Bank of N. Va.,* 418 F.3d 277, 306 (3d Cir. 2005) (citing *Amchem*, 521 U.S.at 620) (explaining that issues of individual liability and damages are even less likely to defeat predominance in settlement-only class actions).

*Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008); *see also Mercedes-Benz,* 213 F.R.D. at 186 ("Predominance requires that common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members.").

Here, IP Plaintiffs allege that Defendants, including NuCal and Midwest, entered into a conspiracy to artificially reduce supply and increase prices of shell eggs, in violation of Section 1 of the Sherman Act and analogous state laws, and that all IP Plaintiffs were injured as a result of this conspiracy. To establish an antitrust violation, "a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *In re Ins. Brokerage Antitrust Litigation*, 579 F.3d 241, 267 (3d Cir. 2009).[12]

Like in other antitrust cases, "the clear focus of [the] action is on the allegedly deceptive conduct of defendant and not on the conduct of individual class members." *Id*. Specifically, the focus of this case is on whether Defendants entered into a conspiracy to reduce commodity shell egg supply and increase prices, whether the purpose and effect of the conspiracy was to decrease commodity shell egg supply and increase prices, and whether this conspiracy was illegal under the laws of the Class Jurisdictions or whether it was protected under an agricultural cooperative exemption. Such questions are common for the members of each of the State Law Classes and predominate over any individual questions that might exist.

IP Plaintiffs allege that Defendants manipulated the commodity shell egg market nationwide. Plaintiffs further allege that common evidence can demonstrate that price increases

---

[12] *See also* IP Plaintiffs' Statement of Law, ECF No. 746 (the elements of state law causes of action are the same as the elements for a claim under Section 1 of the Sherman Act).

were passed through to consumers.  Although the Classes' members may have suffered different magnitudes of injury, they were all harmed.  And individualized damages issues do not defeat predominance. *In re Cmty. Bank of N Va.*, 418 F.3d at 305-06 ("Although the calculation of individual damages is necessarily an individual inquiry, the courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues predominate."); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 242 (D. Del. 2003) ("[T]he need for individual damages calculations does not defeat predominance and class certification") *aff'd*, 391 F.3d 516, 534-35 (3d Cir. 2004). Thus, like in most other antitrust actions, the predominance requirement is readily met here as "common issues necessarily predominate." *Id.* at 267; *see also Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

### 2.     A class action is superior to other methods of adjudication.

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternate available methods of adjudication." *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998). In performing this analysis, Courts can consider the following non-exhaustive list of factors: (a) the interests of individual class members in pursing separate actions; (b) the extent and nature of any other litigation commenced by class members addressing the issues in the litigation; and (c) the desirability of concentrating the litigation in a single forum. Fed. R. Civ. P. 23(b)(3); *Amchem*, 521 U.S. at 615-16.[13]

---

[13] While Rule 23(b)(3) also lists manageability as a factor to be considered, manageability is not an issue when it comes to certification of a settlement class. *Sullivan v. DB Invs., Inc.*, 667 F.3d at 302.

Here, each of these factors favors managing this litigation as a class action. First, as a "general rule," antitrust litigation is "exceedingly complex, expensive, and lengthy." *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *23 (E.D. Pa. Oct. 13, 2004). Here, given the nature of the product and the likely individual consumer's recovery, pursuing "separate individual suits would be impracticable." *Amchem*, 521 U.S. at 616 (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 698). Indeed, because individual damages are too small to make individual actions viable, class certification provides the only meaningful possibility for compensation. *Amchem*, 521 U.S. at 617. Thus, class members have a strong interest in having this case litigated as a class action rather than on an individual basis.

Second, IP Plaintiffs are not aware of any individual consumer litigation involving Defendants' conspiracy. And as the MDL transferee court presiding over multiple related actions, this Court is in the best position to efficiently resolve all claims by indirect purchasers in the Class Jurisdictions.

Finally, there is a strong interest in concentrating this litigation in this forum as a class action. Prosecuting these actions jointly preserves judicial resources and prevents inconsistent results. Absent class action certification, different courts could face the same set of operative facts presenting essentially the same basic legal and factual questions. Thus, a class action is superior to other available methods for the fair and efficient adjudication of class claims, "because litigating all of these claims in one action is . . . far more desirable than numerous separate actions litigating the same issues." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 259 (internal quotation omitted); *see also In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 234 (E.D. Pa. 2012) (finding that "fairness and efficiency" dictated certification because "otherwise, the numerous individual class members would be forced to file suit individually, producing numerous identical issues in

each case that would waste judicial resources and leave all parties vulnerable to unfair inconsistencies"). Moreover, this particular forum is appropriate. Not only was it selected by the Judicial Panel on Multidistrict Litigation, but many of the Defendants resided or transacted business in the district during the Class Period, and a substantial portion of the affected interstate trade and commerce was carried out in the district. IP Plaintiffs' Fifth Amended Consolidated Complaint (ECF No. 866), ¶19. Thus, there is a strong interest in concentrating the litigation as a class action in this forum.

## VI.    THE NOTICE PLAN

IP Plaintiffs respectfully request approval of the forms of notice and the notice plan for the settlements with NuCal, Midwest, and NFC (collectively the "Notice Plan"). *See* Estimate for the Plan of Notice, Le Decl., Exhibit 4; Long-Form Notice, Le Decl., Exhibit 5; Publication Notice, Le Decl., Exhibit 6. The Notice Plan satisfies the requirements of due process and Rule 23. The Federal Rules of Civil Procedure require that for any class certified under Rule 23(b)(3), the best notice practicable must be given to class members. Additionally, notice of a Rule 23(b)(2) class (such as the Injunction Class) may also be ordered by the court, but is not required under the Rules. Fed. R. Civ. P. 23(c)(2)(A) (optional notice for Rule 23(b)(2) classes). However, once a settlement has been reached with any type of class or proposed class, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). The Notice Plan satisfies the requirements of Rule 23 and due process.

### A.    The Plan and Form of Notice

IP Plaintiffs have retained Kinsella Media LLC ("Kinsella"), recognized notice experts, and its affiliate, Rust Consulting, LLC ("Rust"), which has extensive experience in providing notification and administration services, to implement and administer a notice program after IP Plaintiffs seek permission to disseminate notice. *See* Declaration of Kim Schmidt ("Schmidt

Decl."), filed contemporaneously with this memorandum. In consultation with Kinsella and Rust, IP Plaintiffs have prepared a notice program that will consist of publication notice, a website, and a toll-free information line to answer questions from class members.

Kinsella has designed a media campaign to advise class members of the settlements, which Kinsella will implement under the Notice Plan. Le Decl., ¶ 21. This notice will be published in *Parade*, a newspaper supplement that has a circulation of 32 million. Schmidt Decl., ¶ 6. Additionally, internet banner advertisements will be published online for approximately 30 days for a total of 132.85 million gross impressions.[14] *Id.*, ¶ 7. These banner advertisements will appear in English on: (1) Facebook.com; (2) Rocketfuel, a leading media-buying platform using Big Data to improve results; (3) Specific Media, which consists of premium sites such as, news, entertainment, sports, and recreation; (4) Xaxis, a network that represents over 5,000 websites; and (5) Advertising.com, one of the largest online advertising companies, with priority access to AOL inventory. *Id.* Additionally, these banner advertisements will appear in English and Spanish on Batanga Network, a Hispanic ad network, reaching over 15 million U.S. Hispanics on Spanish-language sites. *Id.* While the majority of the internet banner advertisements will be delivered nationally, a portion of the advertisements on Xaxis and all of the advertisements on Advertising.com will be targeted to internet users with IP addresses in the Class Jurisdictions. *Id*, ¶ 8. Moreover, in addition to publishing notice, Kinsella will engage in a social media campaign to try to generate additional media coverage and discussion of the settlements. *Id.*, ¶ 9-10.

Finally, while Kinsella is engaging in a media campaign, Rust will develop and maintain a settlement website to further advise class members about the litigation and settlements. Schmidt Decl., ¶ 11. The website will provide access to the long-form notice, relevant Court documents,

---

[14] Gross Impressions are the total number of times a media vehicle containing the notice is seen.

"Frequently Asked Questions," and any updates concerning the settlements. *Id*. Additionally, Rust

will set-up and staff a toll-free number to answer questions from class members regarding the

settlement. The settlement website and the toll-free number will be listed in both the short-form

notice and the long-form notice.

### B.        The Notice Plan Satisfies Federal Rule 23 and Constitutional Due Process

The form and content of the Notice Plan comply with Federal Rule 23 and constitutional

due process. Under Rule 23, notice of class certification must be "the best notice that is

practicable under the circumstances, including individual notice to all members who can be

identified through reasonable efforts." Fed. R. Civ. P. 23(c)(2)(B). Importantly, neither Rule 23

nor due process require that every class member receives actual notice. *Fry v. Hayt*, 198 F.R.D.

461, 474 (E.D. Pa. 2000). Rather, "notice must be reasonably calculated to reach interested

parties." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 318 (1950).

While Rule 23 expresses a preference for individual notice, as the Third Circuit has

recognized, publication notice is often the best notice that is practicable in consumer cases where

class members cannot be individually identified and located because the parties do not have

"access to the names and addresses of the multitude of [class members] nationwide." *Warfarin*,

391 F.3d at 536-37. Since the Settlement Classes in this case are composed of millions of

purchasers of commodity shell eggs, and IP Plaintiffs cannot identify and locate class members

through reasonable efforts, publication notice is appropriate here.

Additionally, the Notice Plan is reasonably calculated to reach the class members.  Here,

the Notice Plan contemplates publication notice, a website, and a toll-free information line. It is

similar to notice programs approved by Third Circuit courts in other class actions. *See, e.g.*, *id*.

(upholding notice program involving the publication of summary notice in "publications likely to

be read by consumer claimants," a call-center, and a website); *Nichols v. Smithkline Beecham Corp.*, Case No. 00-6222, 2005 U.S. Dist. LEXIS 7061, at *32-33 (E.D. Pa. Apr. 22, 2005).

Regardless of how notice is distributed, Rule 23 requires that the notice use clear, concise and plain language to inform class members of:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Additionally, in the settlement context, notice must be "designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327 (internal quotations omitted); *see also Mullane*, 339 U.S. at 314 ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

Here, both the long-form notice and the short-form notice use easily understood language to concisely and clearly inform class members of the nature of the action, the definitions of the classes certified, the claims and issues, the ability to appear through counsel, the ability and process for requesting exclusion, and the binding effect of the settlement. The notices also explain the terms of the NFC, NuCal and Midwest settlements, the scope of the releases and how class members may object. Additionally, the notices follow the formats and contain language recommended by the Federal Judicial Center. *See* Fed. Judicial Ctr, *Judges' Class Action Notice and Class Process Checklist and Plain Language Guide* (2010), available at

http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf. Consequently, the Notice Plan is appropriate and should be approved.

### C.    Timing of Notice

Although IP Plaintiffs request approval of the Notice Plan, IP Plaintiffs are not presently seeking to disseminate notice at this time. Rather, with the Court's permission, and consistent with the terms of the settlement agreements with NFC, NuCal and Midwest, IP Plaintiffs intend to disseminate the notice at a later time deemed appropriate by Class Counsel and the Court.

While Rule 23(e) of the Federal Rules of Civil Procedure provides that a "class action shall not be dismissed or compromised without the approval of the court and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs," it does not specify when a notice must be issued.[15] Rather, under Rule 23, notice must be approved and distributed prior to final approval of a settlement. Here, it is in the interests of the Classes and judicial economy to issue one notice with as many settling Defendants as possible, and thus to wait until an appropriate time to disseminate such notice. Consequently, with the Court's permission, IP Plaintiffs will not seek leave to distribute notice to the Settlement Classes until such time as settlements are reached with a sufficient number of Defendants to make notice efficient and economical. Although this may ultimately delay final approval of these settlements, as well as the NFC settlement, Class Counsel believe that this provides a benefit to the Classes and conserves judicial and attorney resources.

---

[15] *See* William B. Rubenstein et al., 3 *Newberg on Class Actions* § 8:16 (5th ed. 2011)) (Rule 23 does not dictate the timing of notice). In order to protect class members' right to object to the settlement or attend the fairness hearing, notice merely needs to be issued "sufficiently in advance of the objection deadline and/or fairness hearing to make those opportunities meaningful." *Id*.

**VII.    CONCLUSION**

For the reasons set forth above, IP Plaintiffs request that the Court: (1) preliminarily

approve the NuCal Settlement Agreement; (2) preliminarily approve the Midwest Settlement

Agreement; (3) certify the proposed Settlement Classes for purposes of the Settlement

Agreement; (4) appoint Class Counsel as co-lead counsel for the Settlement Classes; and (5)

approve the Notice Plan.

DATED: October 17, 2014                          Respectfully submitted,

_____
Krishna B. Narine
**MEREDITH & NARINE**
100 S. Broad Street, Suite 905
Philadelphia, PA 19110
Tel: (215) 564-5182
Fax: (215) 569-0958
knarine@m-npartners.com

*Interim Co-Lead and Liaison Counsel for*
*Indirect Purchaser Plaintiffs*

Timothy D. Battin
Mark J. Schirmer
Christopher V. Le
**STRAUS & BOIES, LLP**
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704
tbattin@straus-boies.com
mschirmer@straus-boies.com
cle@straus-boies.com

*Interim Co-Lead Counsel for the Indirect*
*Purchaser Plaintiffs*

Paul F. Novak
Elizabeth McKenna
Charles Slidders
**MILBERG LLP**
One Kennedy Square
777 Woodward Avenue
Suite 890
Detroit, MI 48226
Tel: (313) 309-1760
Fax: (313) 447-2038
pnovak@milberg.com
emckenna@milberg.com
cslidders@milberg.com

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*

Christopher Lovell
Craig Essenmacher
Merrick S. Rayle
**LOVELL STEWART HALEBIAN JACOBSON, LLP**
61 Broadway, Suite 501
New York, NY 10006
Tel: (212) 608-1900
Fax: (212) 719-4667
clovell@lshllp.com
cessenmacher@lshllp.com
msrayle@sbcglobal.net

*Interim Co-Lead Counsel for the Indirect Purchaser Plaintiffs*