## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| ***THIS DOCUMENT APPLIES TO:*** | : | |
| **ALL DIRECT PURCHASER ACTIONS** | : | **No. 08-md-2002** |

### MEMORANDUM

GENE E.K. PRATTER, J.                                              SEPTEMBER 18, 2015

The nation's major egg producers are accused by those who purchase eggs directly from

them of conspiring to control and limit the supply of eggs and thereby increase the prices of

eggs. The claims allege that the Defendants accomplished this objective through three principal

means: (1) a series of explicit, short-term production-restriction programs, such as slaughtering

hens prematurely; (2) a pretextual animal-welfare program; and (3) a series of exports of eggs at

below-market prices.

In addition to a putative class of direct purchasers of eggs ("Direct Purchaser

Plaintiffs"—referred to as "Plaintiffs" in this memorandum) (i.e. those who bought eggs or egg

products directly from Defendants) two other categories of plaintiffs are pursuing the egg

producer defendants, a putative class of indirect purchasers of eggs ("Indirect Purchaser

Plaintiffs") (i.e. those who bought eggs produced by Defendants but sold by a party other than a

Defendant); and plaintiffs who are bringing their own individual actions ("Direct Action

Plaintiffs"). The Direct Purchaser Plaintiffs seek certification of their proposed class.[1] For the

_____

[1] The Indirect Purchaser Plaintiffs also seek certification.  Their motion is address separately.

reasons set forth in this Memorandum, the Court will certify the proposed subclass of purchasers of shell eggs but not the proposed subclass of purchasers of egg products.

## I.    BACKGROUND

### a.   Allegations of Fact

According to Plaintiffs, in mid-1999, the egg industry was facing a "perceived crisis" on account of the expansion of the supply of eggs, which was pushing down egg prices. DPP Mem. in Supp. of Class Cert. 9 (Doc. No. 979). This alarming trend spurred the egg industry's trade groups, United Egg Producers (UEP) and the United States Egg Marketers (USEM), whose members produce more than 90% of the eggs in the United States, to conspire to take steps to "manage" the egg supply. *Id.* This conspiracy consisted of three general tactics: (1) a series of short-term egg-supply reduction programs, (2) a long-term plan to reduce the supply of eggs under the pretext of an "animal-welfare program," and (3) exporting eggs at a loss.

### 1.   Short-term Egg Supply Reduction Programs

Beginning in 1999, UEP members agreed to a series of programs designed to reduce the supply of eggs in the short-term. These programs included agreeing to induce hens to molt early[2], slaughtering flocks of hens earlier than had been done before, and reducing the hatching of chicks. These programs were implemented by the UEP's "marketing committee," and members of UEP were asked to commit to the programs. By 2004, however, these short-term reduction strategies no longer kept egg prices from falling. In November 2004, UEP held an "Egg Economic Summit" where members (and non-members) met to discuss the supply reduction programs. At this meeting, the members agreed to continue with the egg reduction

---

[2] Molting is the process whereby hens lose their feathers and regrow them—hens lay no eggs when molting.

programs. They also recommended adopting "animal-welfare" standards, such as increased cage-space for the hens, to reduce the supply of hens. Moreover, UEP members were encouraged to stop backfilling cages (whereby dead hens are replaced with younger hens). These programs were successful in reducing flock size, and, the prices of eggs rose.

### 2.  The Scheme to Reduce the Supply of Eggs Under the Pretext of a Certified Animal-Welfare Program

Beyond these short-term strategies, the conspiracy allegedly included the creation and implementation of a certified program purporting to improve the welfare of the hens. In fact, claim Plaintiffs, this program was a scheme to reduce the supply of eggs, primarily via requirements for increased cage-space per hen. Compliance with this program was monitored by monthly reporting requirements and periodic audits. The cage-space requirement was supplemented by three additional requirements: (1) the 100% rule, which required that all of a producer's facilities, including those of its affiliates (even affiliates that were not themselves UEP members), comply with the Certified Program's cage-space requirements in order for any egg from that producer to be "certified"; (2) a prohibition on backfilling within the certified program; and (3) a rule that failing to comply with the cage-space or backfilling requirements would result in an "automatic fail" of an audit under the certified program—even though other shortcomings under the program (such as improper lighting or handling) did not result in an automatic failing assessment. The certified program was promoted as an animal-welfare program, with labels on egg packaging certifying that the eggs were "Animal Care Certified." According to Plaintiffs, this was merely a pretextual justification for the price-increase-via-supply-reduction program. In fact, following a Federal Trade Commission investigation

3

concerning whether the "Animal Care Certified" label was misleading, UEP agreed in 2005 to change the name of its certified label from "Animal Care Certified" to "UEP certified."

### 3. Egg Exports at a Loss

The alleged supply restriction program also included a series of egg exports at a loss. The USEM scheme, which was managed through the UEP Export Committee, required the involvement of all USEM members who had to either export their own eggs at a loss or sell their eggs to UEP at domestic prices, later receiving a bill for the difference between the domestic price and the export price. USEM members who did not contribute eggs to this export effort contributed money to help fellow members bear the burden of the export losses. These exports, which were also supported by some non-USEM-members, occurred on multiple occasions between 2000 and 2003, and again from 2006 to 2008.

### b. Proposed Class and Subclasses

Plaintiffs seek certification of the following class and subclasses:

All individuals and entities that purchased eggs, including shell eggs[3] and egg products,[4] produced from caged birds in the United States directly from Defendants during the Class Period from September 24, 2004 through the present.

a.) Shell Egg Subclass

All individuals and entities that purchased shell eggs produced from Defendants during the Class Period from September 24, 2004 through the present.

b.) Egg Products Subclass

---

[3] "Shell eggs" is defined as eggs produced from caged birds that are sold in the shell for consumption or for breaking and further processing.
[4] "Egg products" is defined as the whole or any part of shell eggs that have been removed from their shells and then processed, with or without additives, into dried, frozen, or liquid forms.

All individuals and entities that purchased egg products produced from shell eggs that came from caged birds in the United States directly from Defendants during the Class Period from September 24, 2004 through the present.

Excluded from the Class and Subclasses are the Defendants, their co-conspirators, and their respective parents, subsidiaries, and affiliates, as well as any government entities. Also excluded from the Class and Subclasses are purchasers of "specialty" shell eggs or egg products (such as "organic," "free range," or "cage free")[5] and purchasers of hatching eggs, which are used by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

## II.   CLASS CERTIFICATION STANDARD

Rule 23 of the Federal Rules of Civil Procedure, which reads in relevant part, sets the

standard for class certification:

(a) **Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

. . .

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

---

[5] "Specialty eggs" are further specified to include certified organic, nutritionally enhanced, cage free, free range, and vegetarian fed eggs.

> **(C)** the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum; and
> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23

Certifying a class is not a casual endeavor. Rather, courts must conduct a "rigorous analysis" to ensure that Rule 23's standards are met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). The Court must determine whether each of Rule 23's standards have been met by a preponderance of the evidence. *Id.* at 321. To do so, the Court necessarily needs to examine issues that, to some extent, overlap issues to be decided at the final merits determination. *Id.* at 316. However, calling upon the analytical restraint often demanded of judges, the Court only examines the merits of the underlying case to the extent such an examination is relevant to the Rule 23 standards. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

The standards for Rule 23(a) analysis typically are referred to as "numerosity, commonality, typicality, adequacy, and ascertainability." Every potential class must meet these standards. The Court considers each of these factors before turning to "predominance" under Rule 23(b)(3).

## III.    RULE 23(a) FACTORS

### a.  Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all members be impracticable. Although there is no threshold number, the Third Circuit Court of Appeals has provided some guidance by noting that, in general, a proposed class of more than 40 members will satisfy the numerosity requirement. *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001).

Defendants do not challenge the proposed class as being insufficiently numerous. The Court finds that the proposed class of Direct Purchaser Plaintiffs is sufficiently numerous to satisfy the requirement of Rule 23(a)(1). The proposed class includes members in every state and consists of potentially more than 13,000 members. Joinder of all of these members would certainly be impracticable.

### b. Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. The Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), that Rule 23(a)(2) requires that such a common question "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." That said, the Third Circuit Court of Appeals has noted that the commonality bar "is not a high one." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). Indeed, a single common question can suffice. *Dukes*, 131 S. Ct. at 2556. "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant's conduct was common as to all of the class members." *Rodriguez*, 726 F.3d at 382 (internal quotation marks and citations omitted).

There are common questions of law and fact that are central to this litigation. They can be resolved on a classwide basis. Defendants do not contest this notion. The allegations that Defendants conspired to restrict the supply of eggs in violation of the Sherman Antitrust Act are allegations that are common to each putative class member. Likewise, if, in fact, Defendants did not so conspire, there is, across the board, no claim. Therefore, the commonality requirement is met.

### c. Typicality and Adequacy

7

Rules 23(a)(3) and (4) are the "typicality" and "adequacy" prongs of the class action analysis. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality inquiry ensures "that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009). On this point, courts must investigate both the representative parties and the class as a whole, and focus "on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *Id.* at 597-98.

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry concerns both (1) the "experience and performance of class counsel;" and (2) the "interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted). Defendants do not challenge the experience or performance of class counsel but they do challenge whether the interests and incentives of the representative plaintiffs align with those of the putative class.[6] The other prong of the adequacy inquiry seeks to assure "that the named plaintiffs' claims are not antagonistic to the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006).

---

[6] The Court finds that class counsel meet the standards set forth in Rule 23(g). Counsel are experienced in class action antitrust litigation and have been effective in identifying potential claims and litigating the case.

Although adequacy and typicality are distinct requirements, their analyses tend to merge, given that they both focus on the extent to which the class representatives have potential conflicts with the class members. *See id.* ("[T]he typicality and adequacy inquiries often tend to merge because both look to potential conflicts and to whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." (internal quotations and citation omitted)). Unlike the other Rule 23(a) requirements, the burden of proving that class representatives are inadequate falls to the party challenging the class representation.[7] *See Schwartz v. Avis Rent a Car Sys., LLC*, No. 11-4052, 2014 WL 4272018, at *16 (D.N.J. Aug. 28, 2014).

Here, Defendants argue that the class representatives[8] (1) have widely divergent pricing and purchasing arrangements, (2) are subject to individualized defenses, and (3) lack adequate knowledge and understanding of the case, such that Plaintiffs have not satisfied the adequacy and typicality requirements. Defendants note that the class representatives' purchasing processes differed, as some collected bids and selected the lowest price, others negotiated prices, and others "did not negotiate prices and paid the seller's invoice price." Mem. in Opp. to DPP Mot.

---

[7] While district courts in the Third Circuit generally have held that the party challenging the adequacy of the class representatives bears the burden, this holding is not universal. *See* 6A Fed. Proc., L. Ed. § 12:148 ("While it has commonly been found that the class representatives have the burden of showing that their representation of the class will be adequate within the meaning of Fed. R. Civ. P. 23(a)(4), there is also authority that the burden is on the party challenging representation to prove that representation would be inadequate."). Here, even if Plaintiffs had the burden, the Court would find that the class representatives satisfy the adequacy and typicality requirements.

[8] The class representatives for direct purchasers of shell eggs are T.K. Ribbing's Family Restaurant, LLC; John A. Lisciandro d/b/a Lisciandro's Restaurant; Eby-Brown Company LLC; and Karetas Foods, Inc. The class representatives for direct purchasers of Egg Products are Somerset Industries, Inc.; Goldberg and Solovy Foods, Inc.; Karetas Foods, Inc.; Nussbaum-SF, Inc.; Wixon, Inc.; and Sensory Effects Flavor Co.

for Class Cert. 38 (Doc. No. 1033). Further, some class representatives purchased eggs based on Urner Berry pricing (pricing via a publisher of commodity prices), others purchased eggs based on fixed-price contracts (of varying lengths), and others negotiated alternative arrangements— although none of the class representatives purchased eggs using cost-plus contracts or grain-based contracts.[9]

Defendants assert that these varied purchasing processes, procedures and arrangements create inter-class conflicts that defeat typicality and adequacy. However, Defendants do little to support their argument beyond simply asserting that these differences undercut the ability of the class representatives to represent the class. Differing purchasing methods and prices do not necessarily defeat a finding of typicality and adequacy, provided that the alleged misconduct applies across the array of methods, and prices. *See, e.g.*, *Marcus v. BMW of N. America, LLC*, 687 F.3d 583, 599 (3d Cir. 2012) ("When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of product satisfies the typicality requirement in the alleged misrepresentations or omissions apply uniformly across the different product types."); *In re Chocolate Confectionary Antitrust Litigation*, 289 F.R.D. 200, 217 (M.D. Pa. 2012) ("That customers paid different prices or purchased different brands of products does not defeat typicality. Relevant case law addresses the typicality requirement in terms of liability issues, not damages issues. All members of the putative class are direct purchasers of chocolate confectionary products . . . and allege that they made their purchases at supracompetitive prices."

---

[9] Defendants also note that class representatives T.K. Ribbings and Lisciandro allege that they only purchased eggs from "Hillandale" and not the specific Hillandale defendants— Hillandale-Gettysburg and Hillandale PA. Plaintiffs counter that Ribbings and Lisciandro are nonetheless direct purchasers insomuch as Hillandale-Gettysburg and Hillandale PA are under common control of Hillandale generally.

(citations omitted)); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999) ("The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid."); Newberg on Class Actions § 3:35 (5th ed. ) ("In price-fixing actions, the proposed class representative's claims are generally held to be typical of the class members' claims even if there are variations in the manner in which members of the class purchased from the defendant, variations in the kind of product purchased, differences in price, and other factors."). Here, the different methods for purchasing and pricing the purchased eggs and egg products do not defeat typicality and adequacy, as the prices were all allegedly subjected to and affected by the antitrust conspiracy. Moreover, Defendants offer no coherent theory as to how these differences could create misaligned incentives among class members and the class representatives.

Defendants assert that some class representatives "have specific and individualized defenses based on the bid proposal or bid house procedures at various times during the class period." Mem. in Opp. to DPP Class Cert. 39. However, Defendants provide no support for this notion, and the Court concludes that these purported individualized defenses are nothing but mere speculation, which are insufficient to defeat a finding of typicality and adequacy. *See Allen v. Holiday Universal*, 249 F.R.D. 166, 181 (E.D. Pa. 2008) ("Intraclass conflicts may negate adequacy under Rule 23(a)(4). However such conflicts must not be speculative." (quotation marks and citations omitted)).

Finally, the contention that class representatives lack sufficient knowledge of the facts and theories of the case is unavailing. Defendants point to various deposition statements from class representatives that ostensibly demonstrate that the class representatives "have no actual knowledge of anything and are simply deferring to counsel for everything." Mem. in Opp. to

DPP Class Cert. 41. Defendants quote deposition testimony where the class representatives appear to admit to having little or no firsthand knowledge of the allegations, having little or no understanding of the lawsuit other than knowledge that the case involves a conspiracy to limit the supply of eggs and drive the prices up, and having very limited knowledge of who the defendants are.

But, as Plaintiffs unabashedly note, "A class representative need only possess 'a minimal degree of knowledge necessary to meet the adequacy standard.'" *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007); *see also In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 213 (E.D. Pa. 2001) *aff'd*, 305 F.3d 145 (3d Cir. 2002) ("The adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel."); Newberg on Class Actions § 3:67 (5th ed.) ("A proposed representative's knowledge of the case need not be robust."). Plaintiffs also invoke a litany of evidence that the class representatives have reviewed the complaint, understand the general nature of the allegations, and have participated in the litigation by reviewing pleadings and discovery, searching through their own files, providing information about the case, meeting with counsel, and sitting for depositions. This is sufficient knowledge and participation for Rule 23 purposes.

The Court finds that Plaintiffs have demonstrated by a preponderance of the evidence that the adequacy and typicality standards under Rule 23(a) are met.

### d. Ascertainability

The Third Circuit Court of Appeals recently has explained that certification under Rule 23(b)(3) is inappropriate where the class is not ascertainable. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class if defined with reference to objective

criteria; and (2) there is a 'reliable and administratively feasible mechanism for determining

whether putative class members fall within the class definition.'" *Byrd v. Aaron's Inc.*, 784 F.3d

154, 163 (3d Cir. 2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir.

2013)). "If class members are impossible to identify without extensive and individualized fact-

finding or 'mini-trials' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. Plaintiffs

must prove ascertainability by a preponderance of the evidence, and the Court is obliged to

employ the rigorous analysis applied to Rule 23. *Id.* The proposed method for ascertaining a

class must be supported by evidence—assurances of the ability to ascertain a class in the future

are insufficient. *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).

      Here, the Court finds that the class is defined with reference to objective criteria and is

ascertainable using Defendants' transaction data and Class Members' own purchase records.

Defendants do not contest otherwise.

## IV.    RULE 23(b)(3) FACTORS

      To be certified, a class must not only meet the standards set forth in Rule 23(a), but also

must meet at least one of the Rule 23(b) standards. Plaintiffs here seek certification under Rule

23(b)(3), which provides that a class action may be certified if Rule 23(a) is satisfied and if:

> **(3)** the court finds that the questions of law or fact common to class members
> predominate over any questions affecting only individual members, and that a
> class action is superior to other available methods for fairly and efficiently
> adjudicating the controversy. The matters pertinent to these findings include:
> > **(A)** the class members' interests in individually controlling the prosecution
> > or defense of separate actions;
> > **(B)** the extent and nature of any litigation concerning the controversy
> > already begun by or against class members;
> > **(C)** the desirability or undesirability of concentrating the litigation of the
> > claims in the particular forum; and
> > **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23.

Rule 23(b)(3)'s requirements are commonly referred to as "predominance" and "superiority."

### a.  Predominance

"[D]esigned for situations in which class-action treatment is not as clearly called for," the "predominance" inquiry is a demanding one. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quotation marks and citation omitted). To assess a putative class for certification under Rule 23(b)(3), the Court must do more than merely ask whether there are common questions of law or fact, as it did for the Rule 23(a) commonality standard. Rather, the Court must determine that these common questions predominate over individual questions. *See Chiang v. Veneman*, 385 F.3d 256, 272-73 (3d Cir. 2004) ("However, because the Rule 23(b)(3) predominance requirements incorporate the commonality requirement of 23(a), it is possible that 'even if Rule 23(a)'s commonality requirement is satisfied ... the predominance criterion is far more demanding.'" (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24 (1997))). A Court must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)).

Here, Plaintiffs must eventually prove: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 267 (3d Cir. 2009) (citing *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 207 (3d Cir. 2005)). To put it another way, Plaintiffs must demonstrate "(1) a violation of the antitrust laws-here, § 1 of the Sherman Act, (2) individual

injury resulting from that violation, and (3) measurable damages." *Hydrogen Peroxide*, 552 F.3d at 311-12 (citing 15 U.S.C. § 15). At this stage, Plaintiffs must prove that common issues predominate with respect to these elements. *See id.* at 311 ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001))); *Marcus*, 687 F.3d at 600 ("To assess predominance, a court at the certification stage must examine each element of a legal claim "through the prism" of Rule 23(b)(3)."). Thus, the Court analyzes each element of the antitrust claim and determines whether common issues predominate with respect to the claims asserted.

### 1. Antitrust Violation

Plaintiffs must demonstrate that common issues predominate as to the question of whether Defendants violated the antitrust laws. Plaintiffs have met this burden. The essence of the underlying claim is that Defendants engaged in a nationwide conspiracy to restrict the supply of eggs. Whether this can be proven will turn on evidence common to the class. Similarly, whether such a conspiracy was illegal is a question of law common to the class.

The potential defenses are also susceptible to common proof. Defendants are likely to argue that (1) the UEP certified program was "*bona fide* animal husbandry program that resulted from the purportedly 'independent' work of a 'scientific advisory' committee;" and (2) the conduct was immunized from the antitrust laws by the Capper-Volstead Act, which might provide certain agricultural associations with some extent of immunity from the antitrust laws. These defenses will succeed or fail on evidence and questions of law common to the class. Accordingly, with respect to whether there was an antitrust violation, the questions common to the classes predominate over questions individual to the class members.

15

## 2.  Antitrust Injury

Plaintiffs must show that it is possible to prove with common evidence that the class

members suffered an injury—or impact—from the antitrust violation. In *Hydrogen Peroxide*, the

Third Circuit Court of Appeals articulated it this way:

> Importantly, individual injury (also known as antitrust impact) is an element of
> the cause of action; to prevail on the merits, every class member must prove at
> least some antitrust impact resulting from the alleged violation. In antitrust cases,
> impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s
> predominance requirement because it is an element of the claim that may call for
> individual, as opposed to common, proof. Plaintiffs' burden at the class
> certification stage is not to prove the element of antitrust impact, although in order
> to prevail on the merits each class member must do so. Instead, the task for
> plaintiffs at class certification is to demonstrate that the element of antitrust
> impact is capable of proof at trial through evidence that is common to the class
> rather than individual to its members. Deciding this issue calls for the district
> court's rigorous assessment of the available evidence and the method or methods
> by which plaintiffs propose to use the evidence to prove impact at trial.

*Hydrogen Peroxide*, 552 F.3d at 311-12 (citations omitted).

Plaintiffs propose demonstrating antitrust impact with the following types of common

evidence: (a) Defendants' own documents and witness testimony; (b) the characteristics of the

egg industry, which were demonstrated by Dr. Gordon Rausser, an expert in the field of

agricultural economics, which supposedly are conducive to price manipulation that would have

had an impact on virtually every class member; (c) statistical analysis by Dr. Rausser showing a

common movement of prices over time; (d) a regression analysis by Dr. Rausser showing that

egg pricing is explained by a predominant set of common factors; and (e) a regression analysis

by Dr. Rausser showing that prices during the conspiracy period were higher than they would

have been but for the conspiracy. The Court analyzes separately the element of antitrust impact

with respect to the shell eggs subclass and with respect to the egg products subclass.

### i.   *Shell Eggs Subclass*

The Court concludes that common issues predominate with respect to whether the alleged conspiracy had an impact on the members of the shell eggs subclass. Plaintiffs can use common evidence to demonstrate that (a) Defendants made efforts to reduce the supply of eggs and thereby raise the price of eggs; (b) the egg market was structured so that the alleged conspiracy to restrict the supply of eggs, *if successful*, would have caused all or virtually all Direct Purchaser Plaintiffs to pay higher prices than they would have absent the conspiracy; and (c) the conspiracy was successful in raising prices. This satisfies the requirement that common issues predominate as to antitrust impact, because the structured analysis is capable of proving that all or virtually all class members suffered an injury caused by Defendants' alleged anticompetitive conduct. *Cf. McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 482-83 (E.D. Pa. 2009) ("In other words, [to prove antitrust impact] a plaintiff must prove "three quite independent requirements: (1) that it suffered an injury; (2) that its injury was caused by an antitrust violation; and (3) that the injury qualifies as 'antitrust injury.'" (citing Herbert Hovenkamp, *Federal Antitrust Policy: the Law of Competition and its Practice* § 16.3c (3d ed. 2005))). More specifically, the common evidence offered is capable of proving that Defendants' anti-competitive supply-reduction conspiracy caused an increase in the prices of eggs that affected virtually every member of the shell eggs subclass because of the integrated and commoditized nature of the shell eggs market.

*Defendants' Own Documents and Testimony as Common Evidence of a Conspiracy to Reduce the Supply of Eggs*

Plaintiffs have collected a detailed discovery record common to the class supporting their allegations that Defendants conspired to reduce the supply of eggs. Plaintiffs rely heavily on contemporaneous documents from Defendants discussing the implementation of the various

17

supply-reduction programs, as well as on deposition testimony from key individuals associated with Defendants. Plaintiffs also contend that Defendants' own documents show that the conspiracy resulted in higher prices. For example, in 2003, "UEP boasted that the success of the UEP 'animal welfare' program had led to some of the highest egg product prices in history." DPP Mem. in Supp. of Class Cert. 68 (citing Bell Dep. Ex. 18 at BELL002761). Also, "[n]ow-settled defendant Cal-Maine acknowledged in a public SEC filing that even small reductions in output would result in increased prices for eggs." *Id.* Defendants have not contended that this evidence is not common to the class.

This referenced evidence is probative of whether common issues will predominate with respect to antitrust impact, as it is probative of whether the conspiracy occurred and was anticompetitive. There is also some indirect evidence of the effects of the conspiracy, as some evidence shows that Defendants believed the supply-reduction programs were resulting in higher prices. Of course, this evidence does not directly show that the conspiracy was implemented or that Plaintiffs were injured as a result. Therefore the Court must analyze whether there is other evidence, common to Plaintiffs, of the effects of the alleged supply-reduction program.

*Shell Egg Industry Characteristics as Evidence that a Successful Conspiracy Would Have*
*Affected Virtually All Members of the Proposed Subclass*

Plaintiffs contend that because the shell egg industry "exhibits the well-understood characteristics that facilitate successful collusion . . . Defendants' conspiracy would have resulted in inflated prices to all or virtually all class members." *Id.* at 69. These factors are (i) a lack of close substitutes; (ii) Defendants' domination of the market; (iii) high barriers to entry; (iv) inelastic demand; and (v) ease of communication, coordination, and marketing. The Court finds that these alleged industry characteristics, which are posed by evidence common to the

subclass and virtually uncontested by Defendants, are probative of the extent to which a successful supply-reduction conspiracy would have affected all or virtually all members of the shell egg subclass.

There are no close substitutes for shell eggs or egg products. Eggs have unique nutritional and functional attributes that make them difficult to replace with other products. *See* Rausser Decl. 11-13 (Doc. No. 979). Dr. Rausser reviewed the economic literature and found that potential substitutes like pork, beef, turkey, cereals, and bakery products are "poor" substitutes for eggs. Because of the lack of close substitutes for eggs, class members could not have systematically avoided the effects of a lower supply of eggs by obtaining a substitute for eggs, but would instead have had to pay the increased prices of eggs. *Cf. In re Puerto Rican Cabotage Antitrust Litig.*, 269 F.R.D. 125, 139 (D.P.R. 2010) ("Plaintiffs and other class members have alleged and shown through circumstantial evidence that, because they had no economically viable substitute for the various Puerto Rican cabotage services provided by Defendants, they paid supra-competitive prices for the services purchased.").

There is, however, a high level of demand-side substitutability within the shell eggs market—that is, between different grades and colors of eggs, as well as eggs from different producers. *See* Rausser Decl. 15. Both the economic literature and deposition testimony supports a finding that consumers will substitute between eggs of different grades and colors, and that "eggs are a commodity product and eggs from one producer are interchangeable with eggs from another producer." *See id.* Defendants do not specifically contest the demand-side substitutability of different subsets of the shell egg market. The commoditized nature of the shell egg market is crucial to a finding that common issues predominate as to antitrust impact, because it implies that no increase in price would be isolated to a single subset of the egg industry. Any increase in the

price of, say, brown shell eggs, would result in substitution towards white shell eggs, thereby increasing the price of white shell eggs as well. The commoditized nature of the shell egg market, which is essentially uncontested by Defendants, therefore supports a finding that the alleged conspiracy had an impact on all or virtually all class members.

Plaintiffs' common evidence is also capable of proving that Defendants dominated the market for eggs during the class period, which means that if Defendants acted collusively, they would have been able to successfully restrain the supply of eggs and raise the price of eggs for virtually every class member. Dr. Rausser notes how the U.S. egg industry has become increasingly consolidated over the past 50 years, falling from around 8,000 egg producers in 1968 to only 260 in 2003. By 2004, UEP's 200 members owned over 90% of the nation's egg-laying hens. 83% of the nation's egg-laying hens were included in the UEP animal-care certified program. At least one Defendant sold eggs in every state of the Union. Moreover, "[r]elative to other industries, the egg industry is characterized by high barriers to entry." Rausser Decl. 29. Specifically, Dr. Rausser emphasized high fixed costs of starting a large, new egg laying operation, government and industry regulations that are costly and difficult to comply with, and the maturity and vertical integration of the industry. Dr. Rausser and Plaintiffs also argue that any new entrants into the eggs market would have faced strong pressures to join the cartel. According to Plaintiff's expert, these high barriers to entry would help Defendants control prices as applied to virtually every class member.

Because Defendants controlled such a large share of the market, and because the high costs of entering the egg market would have prevented new producers from entering the marketplace and undercutting the conspiracy, the collusive action of Defendants would have caused a widespread supply shortage that would have had an impact on all or virtually all class

members, as those class members could not have simply shifted (or threatened to shift) all their purchases to producers outside the conspiracy. Thus, these characteristics of the shell egg industry support a finding that the conspiracy affected all, or virtually all, class members.

Plaintiffs next point to the inelastic demand for eggs with respect to price—that is, the demand for eggs by consumers is largely insensitive to changes in the price of eggs. If a 1% increase in the price of a product results in a 1% decrease in the amount sold, the price elasticity of demand is -1.0. The demand is said to be inelastic where, to explain with an example, a 1% increase in the price of eggs will not result in a 1% or more decrease in the amount of eggs sold—that is, the price elasticity of demand will be lower in magnitude than -1.0 (*i.e.*, the price elasticity of demand will be between -1.0 and 0). Dr. Rausser cites "[n]umerous academic studies [that] have found that the demand for eggs is inelastic." Rausser Decl. 33. Estimates for the price elasticity of demand for table eggs range from -0.02 to -0.17, which is "considered highly inelastic." *Id.* at 33. As an easy-to-understand, candid expression of the inelasticity of demand for shell eggs, Plaintiffs also point to Defendants' statements, such as a statement by the President of Defendant Midwest Poultry Services, Bob Krouse, in an industry publication that "[w]e sell as many eggs at $1.70 as we do as 65 cents." DPP Mem. in Supp. of Class Cert. 72. Further, because demand for eggs is inelastic with respect to price, "small changes in supply can lead to large changes in price." Rausser Decl. 34. A UEP representative allegedly wrote that "[t]he domestic demand for eggs is very inelastic and an adjustment in quantity will result in an effect on price at least five times that in quantity." *Id.*

This characteristic of the shell egg industry further supports Plaintiffs' position that a supply-reduction conspiracy would have led to higher prices across the class, as the inelastic demand for eggs shows that class members would not have frustrated the conspiracy's efforts by

buying significantly fewer eggs. Rather, Defendants would have been able to reduce the supply of eggs and yet earn increased profits because class members would still demand the same amount of eggs at the increased prices caused by the conspiracy.

Finally, Plaintiffs point to the ease of communication, coordination, and marketing that UEP provided. Without enforcement mechanisms, producers might have tried to benefit from the conspiracy's efforts while not implementing the conspiracy's policies themselves. The open communication, coordination, and marketing between and among the conspirators allowed them to adjust supply as one. This is, Dr. Rausser notes, crucial to a successful conspiracy, because it prevents buyers from finding producers willing to "cheat" and divert from the supply reductions mandated by the conspiracy. This is probative of a common impact here because Defendants could ensure that their supply reduction programs were implemented across the industry, and therefore class members could not have avoided the effects of any conspiracy by buying from "cheating" producers who were diverting from the supply-reduction programs implemented by Defendants.

The characteristics of the shell egg industry described above are essentially uncontested by Defendants. The Court finds that they are highly probative of the extent to which the alleged conspiracy, if shown to be successful, would have affected virtually every member of the proposed shell eggs subclass.

*Statistical Analysis Corroborating Economic Linkage of Shell Egg Prices As Further Evidence*

*that a Successful Conspiracy Would Have Affected Virtually Every Class Member*

Plaintiffs also offer statistical evidence of how the alleged conspiracy would have had an impact on all subclass members. Plaintiffs offer the statistical analyses of Dr. Rausser, who analyzed both (i) the extent to which the prices of eggs move commonly across regions, types,

and other characteristics; and (ii) whether egg pricing is predominantly explained by a common set of factors. These analyses confirm the industry characteristics observed by Dr. Rausser by showing that the shell egg industry is interconnected so that any increase in price affecting one subset of the class would have been corrected for by substitution effects. In other words, this analysis corroborates that "as expected for the economics of demand-side and supply-side substitutability, prices across different types of shell eggs and egg products, and across different regions, move commonly over time." Rausser Decl. at 81.

Defendants contest this analysis on various grounds. First, they criticize Dr. Rausser's analysis for relying on "visual inspection" of graphs of prices, as opposed to a more rigorous methodology. *Id.* at 9. However, this criticism appears to have been abandoned due to Dr. Rausser's Reply Declaration's use of statistical analysis to confirm the visual inspection's conclusions. *See* Rausser Reply Decl. 33-34 (Doc. No. 1059). Second, Defendants criticize Dr. Rausser's use of averages, because averages "by their very nature mask individual differences between purchasers and preclude the ability to determine any impact on any of the plaintiffs." Mem. in Supp. of Mot. to Exclude Dr. Rausser 9 (Doc. No. 1032). Third, they criticize Dr. Rausser's co-movement analysis because it is "meaningless." They argue that prices can co-move even if not commonly affected by an event, and that the comparisons Dr. Rausser makes (such as comparing prices based on geography, type, and so forth) are meaningless because they do not "fit" the theory of the case.

Plaintiffs counter that "Dr. Rausser is not offering co-movement as a means, by itself, to show impact on all or virtually all class members. Rather the finding of co-movement is one of several bases . . . that support a finding of common impact because they tend to show that there is no subgroup of class members that would have been able to systematically avoid the impact of

the conspiracy." Mem. in Opp. of Mot. to Exclude Dr. Rausser 12 (Doc. No. 1058). Dr. Rausser describes the utility of his co-movement analysis as "support[ing] my conclusion regarding a nationwide market for eggs and egg products, as the prices of eggs and egg products are related to each other, irrespective of differences in grade, size, color, egg product type, and so on. Second, the analysis supports that if the Defendants had market power in such a market . . . then their actions to restrict supply would have caused common price increases, again irrespective of differences in grade, size, color, egg product type, and so on." Rausser Reply Decl. 27.

Defendants' expert, Dr. William C. Myslinski, contests Dr. Rausser's methods and conclusions. Dr. Myslinski explains that using averages can "hide substantial variation across individual cases, which may be key to determining whether there is common impact." Myslinski Decl. 25. Dr. Myslinski then goes on to demonstrate how these averages hide wide variations in the prices actually paid in individual transactions. *Id.* at 26-27. By averaging these transactions to arrive at an average price, the data could be hiding the true cause of the co-movement—suppose that, say, only large eggs were changing in price nationwide and that the prices of small and medium eggs were unchanged. Using Dr. Rausser's analysis, that could make it look like the prices of all eggs, including small and medium eggs, co-move in different regions of the country. This could, Dr. Myslinski argues, hide that the prices paid by individual buyers do not display co-movement. *Id.* at 28. Dr. Myslinski then demonstrates how some sets of prices do not exhibit co-movement, such as between the prices of eggs sold by Michael Foods and those sold by Daybreak. *Id.* at 25-39.

Plaintiffs counter that Defendants are merely speculating about how averaging hides differences among individual buyers. Dr. Rausser contends that Dr. Myslinski's hypotheticals of

how averages can hide co-movement are contrary to the structure of the egg industry[10] and, further, that Dr. Myslinski's examples of a lack of co-movement can be explained by the small sizes of the samples tested. By including the data of multiple defendants, contends Dr. Rausser, the co-movement again reappears.

As with the evaluation of the co-movement analysis presented by the Indirect Purchasers Plaintiffs, the Court recognizes the limited value Dr. Rausser's co-movement analysis. True, the co-movement analysis is conducted at a high level of averaging and across wide swaths of class members. As Defendants note, averages "by their very nature mask individual differences between purchasers." Mem. in Supp. of Mot. to Exclude Dr. Rausser 9. Nonetheless, the co-movement analysis has value because it is probative of the extent to which different subsets of the market are related. That is, the co-movement analysis confirms that the various segments of the market for eggs are subject to the same price movements as the overall market for eggs. The implication of this, when considered in conjunction with Dr. Rausser's finding of a nationwide market for eggs with high levels of substitution between different types of eggs and regions of the nation, is that events that effect one set of eggs, will, typically, affect to some degree all other sets of eggs. *See* Michelle M. Burtis & Darwin V. Neher, *Correlation and Regression Analysis in Antitrust Class Certification*, 77 Antitrust L.J. 495, 512 (2011) ("A measured price correlation that is due to the economic linkage effect indicates that a factor that impacts only one of the prices will lead to an impact on the other of the prices because there are economic relationships,

_____

[10] For example, Dr. Rausser criticizes the hypothetical that the change in the price of large eggs would mask the fact that the prices of small and medium eggs have not changed. He argues that the data and evidence (including Dr. Myslinski's own deposition testimony) show that consumers will quickly switch to small or medium eggs if the price of large eggs jumps up, which means that a significant disequilibrium in price among various sized eggs is impossible. *See* Rausser Reply Decl. 32.

such as substitution relationships between the products. . . . If a measured price correlation captures an economic linkage effect, then the correlation is potentially relevant to the analysis of common impact."); *see also* Rausser Reply Decl. 26 n.45 (citing support for this proposition). As a pair of commentators have explained:

> [I]n order for a correlation analysis to be potentially relevant to class certification, there must be an investigation, or analysis, of the reasons for the observed correlation. . . . An economic linkage may exist between two price series because, for example, the products are substitutes. When the price of one product increases, the demand, and thus the price, of its substitute increases. . . . It might be possible, in certain circumstances where such substitution relationships are integral to price determination, to establish impact using common proof because proof of impact on purchasers of the first product is, via consumer substitution, proof of impact on purchasers of the second product.

Burtis & Neher, *supra*, at 498. Here, the structure of the egg industry is informative as to whether the alleged conspiracy would have affected all or virtually all class members because, if the market for eggs was as integrated as Dr. Rausser's analyses suggest, and if the demand-side substitution in the industry was as pervasive as Dr. Rausser opines that it was, *see* Rausser Decl. 15 (citing economic literature), then the conspiracy's impact would have been felt across the egg industry and would have resulted in higher prices for virtually every direct purchaser of eggs.

The extent to which common factors predominate as to pricing in the egg industry is further confirmed by Dr. Rausser's "common factors" regression, a "reduced form pricing regression" in which Dr. Rausser analyzed how various exogenous factors (*i.e.*, external factors like the price of grain and gasoline) affect the price of eggs. Dr. Rausser analyzed Defendants' transactional data and found that common exogenous factors explained over 60% of the pricing

of eggs and egg products.[11] Those common factors include "product characteristics, product packaging, supply costs, customer size, customer type, brand label, and seasonability." DPP Mem. in Supp. of Class Cert. 73 (quoting Rausser Decl. 82). In his initial Declaration, Dr. Rausser's regressions were based on 32.7 million shell egg transactions and 1 million egg products transactions between 1997 and 2013. From these transactions, Dr. Rausser was able to measure the effect of, for example, the price of gasoline on the price of eggs. If the egg market were not highly integrated and standardized—*i.e.*, if individual purchasers bought at prices set by individual factors—then such a model explaining the pricing of eggs would not be possible, as individualized pricing factors would overwhelm the explanatory value of any common pricing factors. *See* Paul A. Johnson, *The Economics of Common Impact in Antitrust Class Certification*, 77 Antitrust L. J. 533, 535 (2011) ("At the most basic level, I argue that, in antirust cases, the legal standard should be analyzed (at least in part) with the assistance of economic analysis addressing the following question: Are prices paid by putative class members determined in a common way?").

Defendants argue that Dr. Rausser's model is flawed because their expert, Dr. Myslinski, ran Dr. Rausser's regression on various subsets of the data and found inconsistent results. To put it simply, Dr. Rausser's regression was based on all the transactions of all the Defendants for which he had data. Dr. Myslinski tested this regression by seeing if it would apply to just one certain Defendant's transactions. Dr. Myslinski found that even though Dr. Rausser's regression

---

[11] In particular, Dr. Rausser's models in his initial Declaration had an "R-squared"—a statistical measure of the fitness of a model to the data—of 65% for shell eggs and 66% for egg products. In his Reply Declaration Dr. Rausser made several supposedly small adjustments to his models that altered the R-squared values slightly. For example, by including "income" as a Demand variable, Dr. Rausser's R-squared for shell eggs stayed the same but his R-squared for egg products fell to 62%.

implies that an increase in gasoline will increase the price of eggs (which is to be expected), when one tests this regression using just Daybreak's transactions, one sees that the model suggests an increase in gasoline prices would actually decrease the price of eggs. Dr. Myslinski found other curiosities by running the regression on subparts of the Dr. Rausser's model's data, such as, for example, the regression's suggestion that "corn prices had 68 times the effect on shell-egg prices in the benchmark period than they did over the benchmark and alleged conspiracy periods combined." Mem. in Opp. of DPP Class Cert. 30. Moreover, assert Defendants, when running the regression on individual Defendants' data, the overcharge estimates vary from defendant-to-defendant, and one overcharge estimate is negative, implying a lack of antitrust impact. *See id.*

Plaintiffs counter that these curious results demonstrated by Dr. Myslinski are the product of inappropriate "data mining," which "involves applying a model to arbitrary subsets of the transactional data without an economic theory for selecting such subsets." DPP Reply Mem. in Supp. of Class Cert. 30 (Doc. No. 1060). As Dr. Rausser explains, "traditional statistical tests become unreliable under relentless searching to find patterns in data that may merely be the product of chance. Because data mining does not help distinguish between whether a pattern in the data is the result of pure chance or a hypothesis that is relevant to the case, it becomes irrelevant that any results found are statistically significant." Rausser Reply Decl. 96. Further, by narrowing the amount of data, Dr. Myslinski necessarily makes the regression more unstable and unreliable.

The Court does not find Dr. Myslinski's criticisms of Dr. Rausser's model sufficiently convincing to derail class certification at this time. Dr. Myslinski's "sensitivity analysis" involved applying Dr. Rausser's model to isolated subsets of the data. A sensitivity analysis is

28

"[t]he process of checking whether the estimated effects and statistical significance of key explanatory variables are sensitive to inclusion of other explanatory variables, functional form, dropping of potentially out-lying observations, or different methods of estimation." Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach 845 (4th ed. 2009). That is, a sensitivity test looks to determine whether any one factor or variable is driving the observed results in the model—whether the model is "sensitive" to the exclusion of one variable. For instance, one might test whether removing the variable of gasoline prices significantly diminishes the reliability of Dr. Rausser's common factors regression or whether removing Cal-Maine transactions significantly diminishes the reliability of the regression. That is not what Dr. Myslinski did, however. Rather, Dr. Myslinski removed all transaction data except for one subset of the data. At the hearing, Dr. Myslinski could not provide support from the econometric or statistical literature for this form of a sensitivity analysis. *See* Tr. Hr'g 3/11/15 175:7-13.[12]

From the perspective of the Court, a model that purports to describe the pricing of eggs over 32.7 million transactions will not necessarily describe, in a useful way, the pricing of each of its subparts in isolation. The factors in a regression model derive their meaning because of how the data as a whole interacts with respect to these factors. When measuring an isolated subset of the data, those interactions are neglected which can lead to results that appear

---

[12] Dr. Myslinski cited a book for the proposition that "if excluding a group such as a country or a firm or a time period drastically affects the results, this should be reported. Particularly, this type of robustness check will help detect whether the results are drive by one small part of the sample as opposed by the whole sample." Tr. Hr'g 3/11/15 175:7-13. Dr. Myslinski's approach is not the same as that advocated in the book. The approach advocated by the book is for a traditional sensitivity test—*i.e.*, removing one element of a model at a time. Dr. Myslinski removed far more than one element of the model at a time, instead excluding all elements of the model except for the single subset of the model he wanted to test. *See id.* at 177:9-14 (cross examination of Dr. Myslinski) (testifying that "I have excluded . . . all of the other customers except for the ten largest retail customers to see if the model is affected.").

contradictory. *See, e.g.*, Andrea Saltelli *et al.*, Global Sensitivity Analysis: The Primer 42 (2008) (describing "[p]iecewise sensitivity analysis, such as when investigating one model compartment at a time," as a "possible pitfalls for a sensitivity analysis" that "can lead to type II errors if interactions among factors of different compartments are neglected."); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-1175, 2014 WL 7882100, at *16 (E.D.N.Y. Oct. 15, 2014) *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("The true question is whether Kaplan observed reliable principles and methods to estimate these sub-regressions. As already discussed, the defendants and their experts admit that these sub-regressions cannot be relied upon to accurately estimate which class members were and were not impacted."); *Air Cargo*, 2014 WL 7882100, at *17 ("[T]he court is not persuaded that Kaplan's sub-regressions are particularly compelling (first, because they are fundamentally mis-specified, and second, because some degree of intra-class variability is permitted under both the antitrust laws and Rule 23) . . . ."). But putting aside these lay observations from the Court, the Court did not find Dr. Myslinski's "sensitivity analyses" persuasive because, when challenged, Dr. Myslinski could not support his contention that his sensitivity analyses were appropriate and instructive as to any flaws or biases in Dr. Rausser's model.[13]

*Conclusion As to Whether a Successful Conspiracy Would Have Affected Virtually Every Class*

*Member*

---

[13] Additionally, Defendants criticize Dr. Rausser's regression model for finding an inverse relationship between price and population, whereby if the population increases, the price for eggs, according to the model, decreases. But this counterintuitive result appears to be satisfactorily explained by the degree to which population is also related to other variables in the model. *See* Rausser Decl. 86 n. 310; *see also In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *37 (N.D. Ohio Nov. 17, 2014) (making a similar finding about counterintuitive coefficients in a regression model).

Dr. Rausser's industry analysis demonstrates that a supply-reduction conspiracy could have succeeded in the shell egg market largely because it would have affected shell egg buyers across-the-board. If certain egg buyers could have avoided the conspiracy, say, by purchasing substitutes for eggs, the conspiracy would not have succeeded because all rational egg buyers would have taken those steps to avoid the conspiracy. But Dr. Rausser's analysis reveals that egg buyers could not have avoided the conspiracy, making the industry susceptible to precisely the type of conspiracy alleged here. Dr. Rausser shows that "one way or another, every egg produced impacts prices." Rausser Decl. 15 (quoting Don Bell, an egg industry analyst, in an exhibit marked BELL002381-406, at 384). Dr. Rausser's industry analysis was corroborated by his statistical analyses of the extent to which egg pricing patterns are similar across products and geographic regions. Moreover, a common set of supply and demand factors predominate in the pricing of eggs and those factors can be measured and accounted for. Thus, Dr. Rausser's industry analysis and statistical analyse supports a finding that a successful supply-reduction conspiracy would have had an impact on the entire egg industry—*i.e.*, virtually all class members.

Plaintiffs have thus shown (a) that a conspiracy occurred (using documentary evidence); and (b) that if the conspiracy had its desired effect it would have affected virtually every purchaser in the industry because of the structural characteristics of the egg industry. This leaves one step in showing that antitrust impact is capable of proof using common evidence—showing, using evidence common to the class, that the conspiracy had its desired effect and increased prices.

*Regression Model as Evidence that Shell Egg Prices were Higher During the Conspiracy Period Than They Would Have Been But For the Conspiracy*

Dr. Rausser employed his "common factors" regression model to demonstrate that the conspiracy succeeded in increasing the price of eggs. Dr. Rausser divided his model into a benchmark period (1997 to September 2000) and a conspiracy period (September 2000 to the end of December 2013). September 2000 was selected as the beginning of the conspiracy period because in September 2000, "UEP assumed the management of United States Egg Marketers (USEM) primarily for the purpose of coordinating industry-wide export shipments," and "the UEP Scientific Committee published recommendations for animal welfare guidelines that included recommendations to reduce cage density by providing a minimum of 67-86 square inches of cage space per bird." Rausser Decl. 89. Dr. Rausser assigned an "overcharge indicator" valued at "one" for all transactions during the class period and "zero" for all transactions during the benchmark period. *See id.* at 91. This indicator allowed Dr. Rausser to measure the "effect" of the conspiracy period by examining how prices were affected when the indicator value was "one" and not "zero." To put it more simply, Dr. Rausser controlled for all the "common factors" affecting price and determined whether, all else being equal, prices were higher during the conspiracy period than during the benchmark period. Dr. Rausser found (in his initial Declaration) that conspiracy period prices were, on average, 19.3% higher than benchmark period prices for shell eggs. What this implies is that something outside the measured supply and demand factors caused the prices of eggs to be higher during the conspiracy period than they were during the benchmark period.

Plaintiffs and Defendants dispute whether the Court can infer that this "something" causing the inflated prices from 2000-2013 was the effect of the supply-reduction conspiracy. Plaintiffs argue that the Court can look to the documentary evidence of the conspiracy and the factors controlled for in the model and conclude that the price increase is attributable to the

conspiracy. Plaintiffs argue that they need not measure the supply of eggs themselves, as (a) the documentary evidence shows a conspiracy designed to reduce the supply of eggs; and (b) Dr. Rausser's model accounts for the factors other than a conspiracy that could have affected the price of eggs. In the other words, because Dr. Rausser measured how normal supply and demand factors affect the price of eggs and controlled for those effects, the remaining observed increase in price must be attributable to a reduction in supply.

Defendants, for the most part, do not quibble with the logic of Plaintiffs' theory. Instead, they argue (a) that under the Supreme Court's decision in *Comcast Corp. v. Behrend*, Plaintiffs must measure first the decrease in the supply of eggs and then the price effect; and (b) that the price effect is overstated because of certain missing factors in Dr. Rausser's model. The Court declines to accept either of these arguments.

According to Defendants, *Comcast* requires that Plaintiffs first measure the extent to which Defendants' actions decreased the supply of eggs and then measure the effect on the price. Plaintiffs argue that Defendants are reading *Comcast* too broadly and that their model is directly tied to their theory of liability. Plaintiffs contend that the evidentiary record shows a conspiracy to constrain the growth of supply, so their model need not prove that the conspiracy occurred. Rather, the model's purpose is to measure the extent to which the conspiracy caused prices to go up—*i.e.*, measuring the impact, if any, on class members. *See* Rausser Reply Decl. 66 ("Moreover, such an analysis of supply is unnecessary, if one can reliably analyze pricing, in conjuncture with the detailed discovery evidence that the Defendants did act to reduce supply and the industry characteristics . . . which determine that such actions would have been successful and would have increased prices. Analyzing prices is sufficient because . . . price and quantity are co-determined by supply and demand."). Moreover, Plaintiffs' argue, Dr. Rausser's

model does, in fact, measure the conspiracy's effect on supply because it measures the effects of the conspiracy on price, which is determined by supply and demand. Where demand is inelastic, as with eggs, price will be primarily determined by supply (inversely—supply goes up and price goes down).

The Court agrees with Plaintiffs' analysis of the requirements of *Comcast* and the efficacy of their model. In *Comcast*, the plaintiffs sought to certify a class of Comcast subscribers under Rule 23(b)(3) seeking damages for alleged violations of the federal antitrust laws. *See* 133 S. Ct. at 1429-30. The plaintiffs proposed four theories of antitrust impact, but only one was certified as appropriate for class treatment by the district court. *Id.* at 1430-31. The plaintiff's expert, however, had designed a regression model that calculated the damages from all four theories of impact and could not isolate the damages attributable to the sole theory of impact suitable for class treatment. *Id.* at 1431. The district court certified the class despite the limitations of the damages model, but the Supreme Court reversed. *Id.* The Supreme Court held that the district court erred in finding that the proposed damages model could demonstrate Rule 23(b)(3) predominance. *Id.* at 1432. The Supreme Court reasoned that the district court should have resolved the challenges to the damages model, even where those challenges required an inquiry into the merits; and that the model's inability to isolate the damages attributable to the sole theory of impact suitable for class treatment was fatal to a finding that common issues would predominate. *Id.* at 1433-35. *Comcast* "turn[ed] on the straightforward application of class-certification principles," because the regression model was the plaintiffs' sole methodology for demonstrating that antirust impact and damages could be proven using common evidence, and that regression model could not attribute the impact and damages found by the model to the theory of liability proper for class treatment. *See id.*

Notably, however, in *Comcast*, all four proposed theories of liability were alleged to have caused an antitrust impact. Although only one theory of impact was found suitable for class treatment, those other three theories of liability were still viable theories that were part of the alleged conduct of Comcast. *See id.* at 1431 n.3 ("The District Court did not hold that the three alternative theories of liability failed to establish antitrust impact, but merely that those theories could not be determined in a manner common to all the class plaintiffs."). Understanding this posture of *Comcast* is a key to understanding its holding.

Because of this posture, the plaintiff's model in *Comcast* could not reliably demonstrate impact to the class from the theory advanced by the class. In order for the plaintiffs' model in *Comcast* to provide any probative evidence of antitrust impact or damages as to the sole theory found appropriate for class treatment, the model would have needed to have been able to isolate that single theory's effect from the effects of the three theories not suitable for class treatment. Otherwise, there was no evidence that any particular class member was actually affected by that sole liability theory pursued by the class, because any damages found by the model might simply be attributable to the three theories as to which individualized issues predominated. Thus, the model could not determine whether the theory suitable for class treatment caused the damages found by the model. Once the model was found unreliable in isolating the impact attributable to the class's theory, an individualized inquiry would have been necessary to untangle the class's theory from the other three theories in order to actually determine whether any particular class member was affected by the class's theory. Similarly, in order to achieve a reasonably accurate measure of damages, one would have needed to determine, individual-by-individual, which of the four harms affected which class members and by how much.

Here, the posture of the case is different from *Comcast*, because none of the alleged means of reducing the supply of eggs have been found inappropriate for class treatment. In other words, this case is in the realm contemplated by the Supreme Court when it reasoned that "[t]his methodology might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case." *Id.* at 1434. Defendants would have it that Plaintiffs must, at this stage, disaggregate each alleged anticompetitive action and isolate its effect. Such a requirement, Defendants argue, is the only way to ensure that the Court does not face the same difficulties that arose in *Comcast*—that is, "[i]f one or more modes of challenged conduct are found to be lawful, Dr. Rausser's damage model . . . becomes entirely useless, as did the damage model in *Comcast*." Defs. Post-Hr'g Mem. 5 (Doc. No. 1157). But *Comcast* does not stand for the broad proposition Defendants ascribe to it. Although the Court must engage with the merits of the case when they weigh upon the Court's analysis of Rule 23, the Court must not engage in "free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194-95. Here, Defendants' proposed disaggregation requirement is based on hypotheticals that the Court has no basis to consider at this moment, as there was no argument at the class certification stage from Defendants that any disaggregated part of the alleged conspiracy should be found lawful or otherwise incapable of common proof. Defendants nevertheless assert that because "*now* is the time to demonstrate compliance with Rule 23," the Court should refuse certification because of the possibility that some conduct that Dr. Rausser included in his damages measurement will be found to relate to "damages" ultimately held to be unrecoverable.[14] But Defendants are asking

---

[14] Not just any adverse ruling would threaten Plaintiffs' ability to demonstrate antitrust impact and damages using Dr. Rausser's model. A ruling that certain conduct did not occur, or did not actually affect the supply of eggs and thereby affect the price of eggs, for example, would

the Court to do more than ensure compliance with Rule 23—Defendants ask the Court to ensure

that compliance with Rule 23 will withstand any possible development moving forward. That is

not what *Comcast* required, as implied by the Supreme Court's note that the plaintiffs'

methodology in *Comcast* "might have been sound . . . if all four of those alleged distortions

remained in the case." *Id.*; *see also Dial Corp. v. News Corp.*, No. 13-6802 2015 WL 4104624,

at \*8 (S.D.N.Y. June 18, 2015) ("Because the Court declines to reject any of the theories of

anticompetitive injury set forth in the Complaint, Plaintiffs' damages model is consistent with

*Comcast*). That is likewise not what Rule 23 requires, as Rule 23(c)(1)(C) provides that "[a]n

order that grants or denies class certification may be altered or amended before final

judgment"—such a provision would have little utility if the Court had to ensure that a class

certification ruling could withstand any potential future developments in a case. The Court

would, under Defendants' reading of Rule 23, need to determine not just that common issues are

likely to predominate over individual ones, but that Plaintiffs have indeed proven the merits of

every aspect of their case, such that no development in the case could threaten the initial decision

---

not bias Dr. Rausser's findings because his model measures conduct that, in fact, had an impact
on the price of eggs. Only if (a) certain conduct were found to have occurred; and (b) that
conduct had an impact on the price of eggs; but (c) that conduct was not legally cognizable vis-à-
vis the class, would Dr. Rausser's model potentially face a *Comcast* problem. Such a scenario is
not before the Court at this stage.

 Admittedly, Plaintiffs certainly run the risk of decertification should Dr. Rausser's model
not be flexible enough to accommodate future developments in the case. Dr. Rausser has asserted
that "Defendants' alleged conspiracy in this case involved acts that were all designed to serve the
same purpose (*i.e.*, to increase prices) and to complement one another. Therefore it is appropriate
to consider the combined effect of these acts on prices—*i.e.*, the overall effect of the alleged
conspiracy on prices." Rausser Reply Decl. 25. This contention that Defendants' actions are
complementary and should not be disaggregated might suggest a difficulty in maintaining a class
action should some part of those complementary actions be found lawful. Disentangling a knot
of complementary conduct to remove the thread of the lawful conduct might prove beyond even
the apocryphal capabilities of Alexander the Great, not to mention the impossibility of
unscrambling the eggs in an omelet.

on certification of the class. Class certification is not such a free-ranging inquiry. Rather, as

Defendants noted, *now* is the time to consider whether the requirements of Rule 23 have been

met. The Court must consider the record before it and, based on that record, "formulate some

prediction as to how specific issues will play out in order to determine whether common or

individual issues predominate." *Hydrogen Peroxide*, 552 F.3d at 311.

Plaintiffs have shown that common evidence is capable of demonstrating that Defendants

engaged in a series of complementary supply-reducing actions as part of a conspiracy to increase

the price of eggs. Dr. Rausser has measured whether that conspiracy was successful in increasing

the price of eggs. His model fits the theory of liability and satisfies *Comcast. Cf. First Data*

*Merch. Servs. Corp. v. SecurityMetrics, Inc.*, No. 12-2568, 2014 WL 6871581, at *11 n.27 (D.

Md. Dec. 3, 2014) (distinguishing *Comcast* and rejecting the argument that the plaintiffs "failed

to properly disaggregate the damages as they related to the various individual counterclaims,"

because "there has been no ruling on the various motions for summary judgment and all of the

relevant theories still remain at issue in the case."). Defendants have not given the Court reason

to predict that certain actions within this alleged conspiracy will be found to have occurred but

be unrecoverable, and that Plaintiffs will not be able to accommodate such a development.

Plaintiffs have shown that Dr. Rausser's model is reliable enough in attributing the

damages found in Dr. Rausser's model to the conspiracy. Courts frequently recognize that

"regression analysis can be used to isolate the effect of an alleged conspiracy on price, taking

into consideration other factors that might also influence price, like cost and demand." *In re*

*Aftermarket Auto. Lighting Products Antitrust Litig.*, 276 F.R.D. 364, 371 (C.D. Cal. 2011)

(quoting *In re Plastics Additives Antitrust Litig.*, No. 03-2038, 2010 WL 3431837, at *15 n.13

(E.D. Pa. Aug. 31, 2010)). Dr. Rausser's model controls for the majority of the factors that

determine pricing in the eggs industry, thereby allowing him to measure the isolated effect of the supply-reduction conspiracy perpetrated by Defendants. The Court rejects the broad notion that the failure to measure the supply effects of the conspiracy—separate and apart from the price effects of the conspiracy—alone defeats the reliability of the model. Antitrust impact and damages are ultimately concerned with whether plaintiffs paid higher prices. Plaintiffs have shown here that Defendants sought to achieve higher prices by restricting supply. The documentary evidence presented is sufficient to prove that Defendants undertook the supply-reduction programs alleged. What remains is a question as to whether that conspiracy affected prices. To prove that the conspiracy affected prices, an analysis such as the one conducted by Dr. Rausser is appropriate, because a supply reduction program, if successfully implemented, will be reflected in the prices paid by consumers—which is why restricting output equates to fixing prices. *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984) ("An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing output, and dividing markets have the same anticompetitive effects.") *cited with approval in California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 777 (1999); *see also Linerboard*, 305 F.3d at 159 ("[T]he corrugated sheets and boxes contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing agreement.").

Defendants' attempts to decouple the observed price increases from the alleged output restriction do not convince the Court that Dr. Rausser's model is incapable of demonstrating antitrust impact using classwide evidence. Dr. Myslinski used Dr. Rausser's overcharge

regression to attempt to estimate but-for flock size (*i.e.*, Dr. Myslinski took Dr. Rausser's regression, which had used a set of common factors to demonstrate what the price of eggs should have been absent conspiracy behavior, and used the regression to estimate what the quantity of eggs would have been with conspiracy behavior). Dr. Myslinski contends that this analysis revealed that the quantity of eggs was actually higher than the model projects it should have been absent conspiracy behavior. Dr. Myslinski also contends that his results have extraordinarily high R-squared values, meaning that his regression is highly reliable (his R-squares were above 0.95, whereas Dr. Rausser's was .65). But the Court does not find this analysis convincing. The Court notes Dr. Rausser's criticism of Dr. Myslinski's use of the overcharge regression to measure the impact of the conspiracy on flock size. *See generally* Rausser Reply Decl. 72-77. As Dr. Rausser explains, Dr. Myslinski's model uses a different set of data, is based on very few data points, and is an inappropriate application of a pricing model to quantity." Rausser Reply Decl. 75. Dr. Rausser notes that his model included various attributes of eggs that would affect price, but not quantity (such as comparing brown and white eggs, etc.). Dr. Rausser also explains that Dr. Myslinski failed to account for certain important events and factors (such as the alleged anticompetitive exports of eggs, which Dr. Myslinski included as part of the "quantity" of eggs, even though they properly should have been excluded), and that the small number of data points in Dr. Myslinski's regression (203 data points compared to Dr. Rausser's millions of data points) makes the results unreliable. Comparing R-squared values, moreover, would be misleading here because the dependent variables differ. *See* Rausser Reply Decl. 76. Second, the model becomes highly unreliable once organic eggs (which are outside the class definition) and exported eggs are removed from Dr. Myslinski's model. *See id.*

Defendants will certainly be able to argue at summary judgment or at trial that the alleged

conspiracy here was not successful in restricting supply, and therefore that the observed price

increase in Dr. Rausser's model is not attributable to the conspiracy. But that is a common

question as to the merits of Plaintiffs' claims. The key question for the Court now is whether the

model is not a reliable means of proving the impact of the conspiracy on the class.

Defendants additionally argue that Dr. Rausser's model is not a reliable means of proving

impact because (a) the benchmark period data is sparse and unrepresentative; (b) Dr. Rausser

failed to consider that cage spaces would have increased even absent the conspiracy; and (c) Dr.

Rausser failed to account for other important determinants of egg prices, such as consumer

income, dietary demand trends, and avian disease.

Defendants arguments against the reliability of Dr. Rausser's model are unavailing at

present. Defendants argue that Dr. Rausser's regression is flawed because the benchmark period

(i.e. the "normal" years against which he compares the conspiracy years to see if the price of

eggs was inflated—here, 1997-2000 is the benchmark) is allegedly also tainted by some anti-

competitive conduct. As Plaintiffs point out, however, if anything, any anticompetitive activity

during the benchmark period would make Dr. Rausser's results conservative. Either Defendants

were engaged in anti-competitive conduct in the benchmark period, making Dr. Rausser's model

an underestimate of the effect of the conspiracy, or the Defendants were not engaged in anti-

competitive conduct and the flaw disappears. This "flaw" of Dr. Rausser's model therefore is of

little help to Defendants. The Court also finds unpersuasive Defendants' arguments about the

extent to which the benchmark period was "tainted" with anticompetitive conduct. Although

Plaintiffs allege that some anti-competitive conduct began during the benchmark period,

Defendants acknowledge that the earliest of these allegations pertains to March 1999, towards

41

the end of the benchmark period. *See* Defs. Mem. in Opp. to DPP Class Cert. 31. Evidence

supports Plaintiffs' assertions that these alleged anticompetitive activities would not have begun

to yield significant impact on prices until after the end of the benchmark period. *See* DPP Mem.

in Supp. of Class Cert. 31-32 (citing UEP reports about the timing of the effect on pricing of the

alleged anticompetitive actions).

Defendants also argue that the benchmark comparison is flawed because the shell eggs

benchmark period data comes from only four of the Defendants, but the conspiracy period data

comes from 11 of the Defendants in the conspiracy period. For egg products, the benchmark

period data comes from three of the Defendants and the conspiracy period data comes from ten

of the Defendants. Defendants assert that Dr. Rausser has presented no evidence to show that the

few defendants from which he derives his benchmark data are representative of the whole.

Defendants note that the during the alleged conspiracy period, the "average shell egg price of a

Defendant without benchmark-data was 14% higher than the average price of shell eggs

belonging to a Defendant with benchmark-data." Mem. in Opp. to DPP Class Cert. 32.

Dr. Rausser defends his benchmark data by explaining that he tested his regression by

including a set of variables accounting for the defendant-specific differences in pricing. That is,

he ran a regression where any potential bias created by certain defendants just having higher

prices than other defendants would be negated. He found that his overcharge estimates were

robust to the inclusion of variables accounting for the differences in pricing across Defendants.

This robustness test satisfies the Court that Dr. Rausser has accounted for any biases attributable

to the limited number of Defendants' data available during the benchmark period. The Court

finds that the benchmark period used by Dr. Rausser is sufficiently similar to the conspiracy

period and is supported by sufficient data to allow for a probative comparison between benchmark period pricing and conspiracy period pricing.

Defendants' also argue that Dr. Rausser's model is unreliable and cannot show impact because it does not account for whether cage spaces would have increased absent the alleged conspiracy. Defendants point to several pieces of evidence showing that there was a consumer push for animal welfare standards (including ballot initiatives and requirements from retailers). They also argue that the model fails to account for the costs of expanding the cages to accommodate an increase in the bird flock (had there been no conspiracy). Plaintiffs respond by arguing that this is a dispute, common to the class, about the merits of the case—whether the cage space increases were driven by demand or by an output reduction conspiracy.

The Court agrees with Plaintiffs. Defendants' argument that cage space would have increased absent the conspiracy, negating all or part of the overcharge found by Dr. Rausser, is common to the class. Defendants have failed to convince the Court that the failure of Dr. Rausser to (somehow) build into his model the but-for cage space increases of Defendants is a fundamental flaw in his model.[15] Although Defendants have adduced some evidence that certain entities were advocating for additional cage space regulations, Defendants have not demonstrated that those cage space regulations would have actually been implemented absent the conspiracy. Instead, the Court considers the evidence presented by Plaintiffs, tending to demonstrate that the cage space requirements were adopted for the purpose of raising the price of eggs, not for the purpose of meeting customers' demands. *See* DPP Reply Mem. in Supp. of Class Cert. 33-34 &

---

[15] Notably, Dr. Myslinski conceded at the Class Certification Hearing that he was "not sure" there was a reliable way to include the but-for cage space increase in the regression model. Tr. Hr'g 3/11/15 132:2-18. As he testified, "one can imagine making assumptions about what would have been, but they would be pure assumptions." *Id.* at 132:10-12.

43

nn.57-59 (citing to deposition testimony, UEP meetings minutes, and documentary evidence that the cage space requirements were implemented for the purpose of raising prices and were considered successful by Defendants). Common evidence is capable of proving that the increase in cage space was the result of the alleged anticompetitive conspiracy, and the Court does not find convincing the argument that the failure to account for but-for cage space increases makes Dr. Rausser's model unreliable.[16]

Finally, Defendants have not identified any variables materially affecting the price of eggs that were not included in Dr. Rausser's models. Over the course of the litigation, Defendants have argued that Dr. Rausser's model is missing several variables, including consumer income, consumer demand, and avian disease. The Court concludes that none of these variables are so significant as to fundamentally bias Dr. Rausser's model. To test whether consumer income affected his eggs pricing model, Dr. Rausser conducted a sensitivity test and included income as an additional control. Dr. Rausser found that the inclusion of income altered his overcharge rates slightly—dropping the overcharge rate from 19.3% to 18.5% for shell eggs and from 13.8% to 12.7% for egg products. Dr. Rausser has shown that his model can account for income, and that the inclusion of income does not eliminate the finding of a significant and positive overcharge during the conspiracy period.

---

[16] Defendants also reference cage space legislation in California, as well as proposed federal legislation from 2013. *See* Mem. in Opp. to DPP Class Cert. 34. But the California legislation was only implemented in 2015, *see* Cal. Code Regs. tit. 3 § 1350(d), and the proposed federal legislation, which UEP worked on developing, was not adopted into law, *see* Mem. in Opp. to DPP Class Cert. 34 n.25. Similarly, for present analytical purposes, the Court notes the widely disseminated reports of dire consequences resulting from avian flu, which has reportedly gravely reduced flock-size in the industry. None of these events relate to this case. *See infra* note 17.

Defendants have not offered evidence from which the Court could conclude that the overcharges found by Dr. Rausser are materially biased by dietary trends during the conspiracy period. Dr. Rausser has provided a plausible explanation for his decision not to account for dietary trends in his model. Dr. Rausser examined the literature regarding the economics and history of dietary trends regarding eggs and found that dietary trends rarely affect the demand for eggs for more than a few weeks. *See* Rausser Reply Decl. 93 (citing Chang, H.-H., and Just, D.R., *Health Information Availability and the Consumption of Eggs: Are Consumers Bayesians?*, Journal of Agricultural and Resource Economics, Vol. 32, No. 1, 77-92, at 77 (2007)).

The Court is likewise satisfied with Dr. Rausser's explanation for why he declined to include the effects of avian disease in his model. Although recent events suggest that avian disease can have a tremendous effect on the egg supply,[17] Dr. Rausser examined the history of avian disease during the conspiracy and benchmark periods and found that "only Newcastle disease affected flocks during the conspiracy and benchmark period. However, cumulatively over the last 17 years, only 3 million layers [were] affected by Newcastle disease. To put that (conservatively) into perspective, this total number of layers affected over the 17 years represents only 1% of the total number of layers in the US in 2005." Rausser Reply Dec. 94-95. Defendants assert that these 3 million layers affected by Newcastle disease would have increased prices by approximately 4.4% because, according to Dr. Rausser's elasticity measurements, a 1.2% drop in egg layers results in a 4.4% increase in price. But the number of layers affected was not 1.2% of all layers over the course of the conspiracy, but rather 1.2% at one point during the conspiracy. There may have been a 4.4% increase in price in the aftermath of the outbreak, but that increase

---

[17] *See Bird Flu Will Force Egg Prices to a Record, U.S. Says*, N.Y. Times, June 11, 2015, at B2.

in price would not have likely have significantly altered the results found by Dr. Rausser's model, which examined pricing over 17 years and found overcharges of well over 4.4%.[18] Thus, the Court concludes that Dr. Rausser has isolated sufficiently for present purposes the effects of the conspiracy and shown that the class suffered an antitrust injury.

Finally, Defendants argue that even if the model observes an overall impact to the class, the class still includes uninjured parties—namely, class members who bought eggs on a cost-plus basis. Defendants argue that Dr. Rausser's model is fatally flawed, much like his model in *In re Rail Freight Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013), because his model would ascribe impact to putative class members with long-term contracts who were potentially insulated from the alleged conspiracy. In particular, Defendants assert that a large amount of eggs were purchased under long-term contract tied to the price of grain, which would insulate the contracts from a reduction in the supply of eggs. Defendants argue that this is the same flaw that caused the D.C. Circuit to reject Dr. Rausser's model in *Rail Freight*.

---

[18] In their post-hearing submission, Defendants assert, for the first time, that the failure to account for non-USEM exports biased Dr. Rausser's model. However, Defendants do not sufficiently support this theory. Defendants note that over 3.6 billion eggs were exported from the United States in 2012, but Defendants do not quantify what portion of these exports were from Defendants as opposed to non-defendants, and whether these exports increased over the conspiracy and benchmark periods or rather held steady or even decreased.

Defendants also argue that because in Dr. Rausser's testimony he did find any evidence of an agreement to restrict the construction of additional barns, this makes his model inconsistent with the liability case. To so argue, Defendants take language in the Court's June 10, 2014 Order (Doc. No. 987) out of context. The Court was merely commenting that the UEP Certified Program is but one aspect of the alleged supply-reduction conspiracy that encompassed a number of anticompetitive actions. *See* June 10, 2014 Order at 4 ("Instead, as this Court expressly characterized the DAPs' Complaints in *Eggs II*, the DAPs alleged use of the UEP Certified Program, *among and along with other agreed-upon activities*, to suppress or control supply. The supply control, rather than the UEP Certified Program itself, was the per se antitrust violation without procompetitive justification." (emphasis in original)).

In *Rail Freight*, the D.C. Circuit Court of Appeals considered a class action against rail freight shippers who had allegedly conspired to add a "fuel surcharge," violating the antitrust price-fixing prohibition. *Id.* at 247. Dr. Rausser provided a regression estimating an average overcharge and seeking to demonstrate that the class could prove common injury through common proof. *Id.* at 250. Defendants argued that Dr. Rausser's model was flawed because it would have ascribed an injury even to those Plaintiffs who had negotiated legacy contracts with the Defendants before the alleged conspiracy period. *Id.* The Court of Appeals vacated the District Court's certification of the class, finding that the District Court had not adequately considered this flaw. *Id.* at 255.

Plaintiffs here assert that the "small number of contracts cited by Defendants would be impacted by the conspiracy." DPP Reply Mem. in Supp. of Class Cert. 27. Plaintiffs argue that, unlike the contracts in *Rail Freight*, here, the contracts were entered into during the conspiracy, "meaning they embody prices that were already inflated." *Id.* In other words, these contracts would be affected because the conspiracy "set an artificially high baseline for price negotiations." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 346 (D. Md. 2012) *amended*, 962 F. Supp. 2d 840 (D. Md. 2013). Also, Plaintiffs contend, the grain-based contracts were, in fact, "set with regard to market conditions." DPP Reply Mem. in Supp. of Class Cert. 27. Dr. Rausser's Reply Declaration provides support for Plaintiffs counterarguments. *See* Rausser Reply Decl. 99-102. Dr. Rausser examined all the contracts cited by Dr. Myslinski as well as others he located in the discovery record. Dr. Rausser notes that all but one of these challenged contracts were set during the conspiracy period, and that even those set based on grain prices were affected by market prices. He also found that many of the contracts either factored in the market price or gave the seller the option to alter the price due to market

conditions. Finally, even those Defendants with these ostensibly immunized contracts also purchased eggs outside these contracts, meaning they would have been injured by the conspiracy regardless. *Id.*

The Court agrees with Plaintiffs that the cost-plus contracts identified by Defendants do not cause individual issues to predominate. Dr. Rausser's model here does not suffer from the same flaws as his model in *Rail Freight*. The contracts here were set during the conspiracy period, unlike the contracts in *Rail Freight*, which were set prior to the conspiracy period, making injury impossible. *Cf. In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1267 (10th Cir. 2014) ("Second, Dr. McClave's model does not suffer from the same flaw identified in *In re Rail Freight.* There, the appeals court could not credit the expert's opinion because his methodology yielded damages for a time period in which prices had been freely set. Thus, the expert found damages for plaintiffs who could not possibly have suffered injury. Here, by contrast, Dow has not identified a single class member for whom injury was impossible."). This is a significant distinction because the artificially inflated price would have served as the baseline market price for the negotiations. *See Polyurethane Foam*, 2014 WL 6461355, at *33 ("Contract negotiations thus took place in the context of artificially inflated baseline pricing, effects which likely became "baked into" the contracts."). Further, Dr. Rausser's analysis of the cost-plus contracts revealed that the grain-based contracts were tied to market prices because they either factored in the market price or gave the seller the option to alter the price due to market conditions. Finally, even those Defendants with these ostensibly immunized contracts also purchased eggs outside these contracts, meaning they would have been injured by the conspiracy regardless. The Court

48

therefore concludes that cost-plus contracts here would not have immunized more than a de minimis number of class members.[19]

### Conclusion as to Antitrust Impact for the Shell Eggs Subclass

The Court finds by a preponderance of the evidence that common issues predominate as to antitrust impact to the shell eggs subclass. Plaintiffs have shown that Defendants made efforts to reduce the supply of eggs and thereby raise the price of eggs, that the egg market was structured so that the alleged conspiracy to restrict the supply of eggs, *if successful*, would have caused all or virtually all Direct Purchaser Plaintiffs to pay higher prices than they would have absent the conspiracy, and that the conspiracy was successful in raising prices. Plaintiffs' logical progression did require two inferential steps: (1) an inference that because the market was structured in such a way that any price increase would have affected the entire market, that all class members were affected; and (2) an inference that because every significant supply and

---

[19] The Court acknowledges that this conclusion is different from the conclusion reached in the opinion denying class certification for the classes of indirect purchasers. The contrary result here is explained by several factors. For one, Plaintiffs here have examined the cost-plus contracts at issue, unlike the Indirect Purchaser Plaintiffs, who admitted to not knowing the details or prevalence of cost-plus contracts at issue. Dr. Rausser here examined all the contracts cited by Dr. Myslinski as well as others he located in the discovery record. Because he did so, he was able to determine that few lasted longer than one-year, and of the 67 contracts cited by Dr. Myslinski, all but one was entered into during the class period. Part of the difficulty for Indirect Purchaser Plaintiffs in regard to reviewing the contracts at issue was that, unlike Plaintiffs here, Indirect Purchaser Plaintiffs sought to recover for transactions between non-defendant firms and non-plaintiff direct purchasers. The details of these transactions were notably absent from Indirect Purchaser Plaintiffs' materials—let alone details about any cost-plus transactions. A second distinction is that those class members here who bought on cost-plus contracts here also likely bought eggs outside those contracts. *See* Rausser Reply Decl. 101-02. Of the cost-plus contracts cited, many of the most prominent were from firms such as Kroger and GSF also purchased eggs outside of these cost-plus contracts during the class period. Members of the proposed indirect purchaser class did not share this quality, as their purchasing patterns were far less ascertainable. Members of the proposed indirect purchaser class might have bought eggs from Kroger only during the period when Kroger was purchasing eggs on a cost-plus basis, for example. Such a class member might well have not been affected by the conspiracy.

demand factor has been controlled for, the observed increase in the price of eggs can be attributed to the effects of the conspiracy. The Court believes both these inferences are permissible and reasonable here.

The first inferential step is permissible and has been employed in other antitrust class action cases. *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06- 1175, 2014 WL 7882100, at *49 (E.D.N.Y. Oct. 15, 2014) *report and recommendation adopted*, No. 06-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) ("Analogizing to a murder trial, the plaintiffs' evidence of a violation tends to establish the weapon used, while Tollison's market analysis provides a motive and an opportunity. The court should not be deprived of such evidence simply because it does not include a smoking gun."), *53 ("[T]he court finds that Tollison's testimony permits a reasonable inference of classwide impact. Effectively, this section of Dr. Tollison's declaration tends to establish that *if* the defendants implemented an unlawful price-fixing conspiracy, such a conspiracy would likely be successful.");[20] *Titanium Dioxide*, 284 F.R.D. at 346 (D. Md. 2012) ("Having reviewed the submissions and the parties' arguments, this Court concludes that the evidence of the nearly simultaneous price increase announcements, in conjunction with the structural factors present in the $TiO_2$ industry, *see supra,* makes the element of antitrust impact 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'" (quoting *Hydrogen Peroxide,* 552 F.3d at 311–12)); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 220-25 (E.D. Pa. 2012) (making such an inference

---

[20] Although the court in *Air Cargo* later in its opinion declined to infer that the regression model showing aggregate damages permitted an inference of classwide impact, this finding was partially due to "the potential variability within the class,"—a characteristic not shared by the proposed shell eggs subclass here. *See Air Cargo*, 2014 WL 7882100, at *54 (E.D.N.Y. Oct. 15, 2014).

based on similar evidence); *Puerto Rican Cabotage*, 269 F.R.D. at 139 ("Plaintiffs and other class members have alleged and shown through circumstantial evidence that, because they had no economically viable substitute for the various Puerto Rican cabotage services provided by Defendants, they paid supra-competitive prices for the services purchased."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 92 (D. Conn. 2009) (market analysis "lay[s] the groundwork for plaintiffs' argument that, if collusive behavior did occur, it would have been effective in raising prices across the class, thus demonstrating class-wide injury-in-fact"). It is also a reasonable inference because, even though the use of a single average overcharge to demonstrate the impact of a conspiracy across the class can be problematic, Plaintiffs have laid a sufficient foundation for the inferential finding that the impact reflected in the single average overcharge was shared by virtually every class member. As the Court has discussed, Defendants have largely not contested the results of the pricing structure analysis conducted by Dr. Rausser, which found that class members would not have been able to escape the effects of the conspiracy, because the egg industry is an integrated, nationwide commodity with significant demand- and supply-side substitutability.

This finding is also supported by the inability of Defendants to identify any significant subset of class members who might have been uninjured by the conspiracy. Except for purchases made from cost-plus contracts, which the Court finds do not defeat predominance because purchasers on those contracts would have been affected, Defendants have failed to explain how any significant number of class members could have escaped the impact of the conspiracy. This lack of identified potentially uninjured members distinguishes this case from others in which courts declined to infer that an observed price increase would have had an impact on virtually every class member. *See, e.g.*, *Rail Freight*, 725 F.3d at 253 (vacating and remanding because

51

the district court "did not, however, address the defendants' concern that the damages model yielded false positives with respect to legacy shippers."); *Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005, at *18-21 (E.D. Pa. June 10, 2015) *reconsideration denied*, No. 2:06-CV-1833, 2015 WL 4737288 (E.D. Pa. Aug. 4, 2015) (identifying various groups of uninjured members of the putative class).

The second inferential step identified above, that the observed price increase is a result of the conspiracy, is also permissible and reasonable. As the Court has explained, Defendants have not identified any missing variables from Dr. Rausser's model that could preclude his ability to isolate the effects of the conspiracy. Such an inference comports with the economic theory behind treating supply-reduction conspiracies as *de facto* price-fixing conspiracies. *See Gen. Leaseways*, 744 F.2d at 594-95 ("An agreement on output also equates to a price-fixing agreement.").

The Court concludes that common issues predominate with respect to the antitrust injury to the shell eggs subclass.

#### ii.    *Egg Products Subclass*

The egg products subclass, however, is a different story. Plaintiffs have not demonstrated that common issues predominate as to the antitrust impact to the egg products subclass. Essential to the Court's conclusions as to shell eggs was the extensive industry analysis conducted by Dr. Rausser, which demonstrated that the shell eggs industry was a highly consolidated, integrated, and commoditized industry. No such extensive analysis has been conducted for the egg products market, and the Court cannot conclude that common issues predominate as to egg products.

*Egg Product Industry Characteristics*

52

Whereas Dr. Rausser's industry analysis as it pertains to shell eggs is well-supported and supports a finding of common impact, Dr. Rausser's industry analysis as it pertains to egg products lacks the rigor needed for the Court to reach the conclusion that common issues are likely to predominate as to egg products. Dr. Rausser analyzes and opines on the degree to which shell eggs are a commodity product with demand-side substitutability, but his analysis is silent with respect to demand-side substitutability of different types of egg products. *See* Rausser Rep. 15 ("In the egg industry, there is, unsurprisingly, a high degree of demand-side substitution between eggs of different colors (brown and white), and different grades, as confirmed by industry studies and witness testimony."); Defs. Mem. in Opp. to DPP Class Cert. 60 (noting that Dr. Rausser acknowledged at his deposition that he did not analyze demand-side substitutability for egg products (quoting Rausser Dep. at 111:11-25, Defs. Ex. 35)). Dr. Rausser opines that there is supply-side substitutability between shell eggs and egg products, because shell eggs can be easily designated for use in egg products and vice versa, but he does not fully analyze whether, at the egg products processing level, there is supply-side substitutability between differing types of egg products. *See* Rausser Rep. 15-16. Dr. Rausser's report does posit that "[b]reaking eggs can end up as any one of [frozen, dried, or liquid egg products], with the decision largely determined by the relative demand, prices available, and quantity of surplus reported for each product type," *see id.* at 17-18, but it takes more than eggs to make egg products—it takes infrastructure to process those eggs—an aspect of the industry Dr. Rausser does not address. *See* Myslinski Decl. 66-68 (discussing how the equipment and facilities for producing egg products limits the supply-side substitutability of egg products). Dr. Rausser thus stops short of fully analyzing the extent to which producers can substitute between shell and breaking eggs as well as between different types of egg products.

Dr. Rausser also fails to analyze whether egg products prices are integrated across the United States, *see* Rausser Decl. at 20-22 (discussing how shell eggs prices are integrated across the United States). Nor does Dr. Rausser analyze whether the defendant egg-product producers had sufficient market share to effectuate an increase in the price of egg products. Dr. Rausser studied the percentage of egg layers owned by Defendants and within the certified program, *see id.* at 26-27, but did not study whether, at the egg-product level, non-defendants have a large enough market share to combat an attempt to fix prices by Defendants. Dr. Rausser also did not analyze the demand elasticity for egg products—only for the breaking eggs that are processed into egg products. *See id.* at 33.

These gaps in Dr. Rausser's industry analysis significantly hinder his ability to demonstrate that common issues predominate as to the element of antitrust impact to the purchasers of egg products.

### *Statistical Analysis of Egg Products Pricing*

Because Dr. Rausser's industry analysis of egg products is far less extensive than his industry analysis of shell eggs, Dr. Rausser's egg products statistical analyses are far less probative than his shell eggs statistical analyses. As discussed above, co-movement analysis is of limited probative value. Co-movement analysis is capable of corroborating an economic link between two price series, but evidence must demonstrate what that economic link is, and how that economic link is relevant to a finding of antitrust impact across the class. *See* Burtis & Neher, *supra*, at 498 ("[I]n order for a correlation analysis to be potentially relevant to class certification, there must be an investigation, or analysis, of the reasons for the observed correlation."). Dr. Rausser demonstrated that in the shell egg industry those links are demand-side substitutability among egg types, the commoditized nature of eggs, the nationwide

integration of the egg market, and the lack of adequate substitutes for eggs. *See supra* Part
IV.a.2.i. Dr. Rausser has not sufficiently demonstrated what the economic links explaining the
co-movement of egg products are. He has not shown that egg products are substitutable for shell
eggs or that various types of egg products are substitutable. He has likewise not shown that egg
products are commoditized such that branding is immaterial, and he has not shown that the
market for egg products is integrated nationally. Because he has not called upon these baseline
facts about the egg industry, his co-movement analyses are of little probative value as to whether
a conspiracy to fix the price of eggs would have had an antitrust impact across the subclass of
consumers purchasing egg products.

Indeed, Dr. Myslinski's expert analysis on behalf of Defendants provides evidence that
the egg products industry is structure differently than the shell eggs industry. Dr. Myslinski
explains that Dr. Rausser failed to distinguish between low- and high-value-added products. *See*
Myslinski Decl. 68. Dr. Myslinski then demonstrates that the price movements of shell eggs and
the price movements of high-value-added egg products do not resemble each another, as the
high-value-added egg product prices tend to remain constant where shell egg prices fluctuate.
*See id.* at 69. This analysis implies that the market for egg products has different structural
characteristics than the shell eggs market, and suggests that differences in the prices of shell eggs
are not necessarily reflected in the prices of high-value-added egg products. Dr. Rausser's
response to this analysis does not convince the Court that Plaintiffs have adequately assessed
whether purchasers of high-value-added egg products would have been affected by the alleged
conspiracy. Dr. Rausser argues that Dr. Myslinski's analysis is "hardly informative" because "he
is comparing very thinly traded egg products to average prices for the entire shell egg industry."
*See* Rausser Reply Decl. 40-41. But Dr. Rausser does not fully substantiate or explain this

criticism, asserting only that it is "unsurprising that such a comparison will not evidence co-movement." *Id.* at 41. This response fails to address the crucial questions: Why do these prices fail to exhibit co-movement? What does the lack of co-movement say about the market for egg products, and what does it say about whether purchasers of such products would have been affected by the conspiracy? Plaintiffs' failure to answer these questions weighs against a finding that common issues predominate as to the proposed egg products subclass. The common factors regression likewise cannot demonstrate that the antitrust impact would have been common to the egg products subclass, because Plaintiffs have failed to lay the groundwork to show why the prices can be explained by these common factors and what this implies about the likelihood the alleged conspiracy would have had an impact on all or virtually all class members.

Thus, the regression model demonstrating an average overcharge to the class as a whole is not sufficient to demonstrate antitrust impact for virtually all members of the class.

*Conclusion as to Predominance of Antitrust Impact of the Egg Products Subclass*

In the shell eggs context, the Court first determined that the alleged conspiracy, if successful, would have affected virtually every member in the class. The Court then determined, relying on Dr. Rausser's regression, that common evidence could demonstrate that the conspiracy had, in fact, successfully had an impact on the class. The Court then made the reasonable inference that the impact affected virtually every class member. The Court cannot make that same inference here because it is not convinced that the alleged conspiracy, if successful, would have affected virtually every member of the egg products subclass. Plaintiffs have not demonstrated that the egg products industry operates like the shell egg industry in this regard. The Court therefore can only speculate that the demonstrated average antitrust impact

would have affected virtually every class member. This speculation cannot prove by a preponderance of the evidence that common issues predominate as to antitrust impact.[21]

### 3.  Measurable Damages

Plaintiffs also need to demonstrate that common issues predominate as to the element of "measurable damages" on a classwide basis. *Hydrogen Peroxide*, 552 F.3d at 311-12 (citing 15 U.S.C. § 15). "At the class certification stage, the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 144 (E.D. Pa. 2011). That is, Plaintiffs must show that there is a reliable means for measuring damages with reasonable accuracy in the aggregate. *See King Drug Co. v. Cephalon, Inc.*, No. 2:06-1797, 2015 WL 4522855, at *14 (E.D. Pa. July 27, 2015) ("Courts have held that proof of aggregate damages is appropriate in class actions." (citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009)). "Calculations

---

[21] Defendants also contest that the egg products subclass is overbroad because it would include purchasers of egg products made from eggs produced by non-defendants. Defendants contend that the eggs sold by non-defendants are not "price-fixed" and therefore the egg products are not price fixed. To hold otherwise, Defendants argue, would run afoul of the Third Circuit Court of Appeals' prohibition on "umbrella" damages, as announced in *Mid-West Paper Products Co. v. Cont'l Group, Inc.*, 596, F.2d 573 (3d Cir. 1979). The Court does not reach this issue, as it finds that common issues do not predominate as to the egg products subclass. The Court observes, however, that the failure to investigate the effect of the eggs from non-defendants on the prices of egg products weighs against a finding that the conspiracy would have had a common impact on the members of the putative subclass. As noted in *Mid-West Paper*, non-conspiring producers might price their products differently than conspirators. This difference in the prices of non-defendants' eggs might manifest itself in the prices of egg products, even if sold by Defendants, meaning that certain subclass members might not have experienced an impact as a result of the conspiracy. Plaintiffs have not addressed how the Court can reconcile this possibility with a finding of predominance as to antitrust impact.

need not be exact," but must be consistent with the theory of antitrust impact. *Comcast*, 133 S.
Ct. at 1433.

Dr. Rausser's damages calculations are a reliable means for measuring the damages of
the class with reasonable accuracy. As the Court discussed in detail above, Dr. Rausser's model
isolates the effects of the conspiracy on price, allowing for a calculation of "the difference
between the illegal price that was actually charged and the price that would have been charged
'but for' the violation multiplied by the number of units purchased." *See Flonase*, 284 F.R.D. at
232 (citation omitted). The Court rejects Defendants' arguments that Dr. Rausser's model fails to
include significant variables that bias his model, as the model reliably attributes the damages to
the conspiracy. *Cf. Comcast*, 133 S. Ct. at 1433 ("[A] model purporting to serve as evidence of
damages in this class action must measure only those damages attributable to that theory.").
Accordingly, the Court finds that Plaintiffs have met their burden of demonstrating that common
issues predominate as to measurable damages.

The Court also rejects Defendants' arguments premised on the notion that variation of
damages between and among class members defeats predominance, as "[a]t the class
certification stage, the plaintiffs are not required to prove damages by calculating specific
damages figures for each member of the class, but rather they must show that a reliable method
is available to prove damages on a class-wide basis." *Vista Healthplan,* 2015 WL 3623005, at
*22 (citing *In re Wellbutrin XL,* 282 F.R.D. at 144); *23 ("Circuit courts have largely rejected
the interpretation urged by Defendants—that variations in damages calculations between and
among class members defeat predominance." (collecting cases)). Thus, the Court rejects the
argument that Dr. Rausser would have needed to account for the differences in damages of
different class members with respect to the effects of the alleged exports. *See* Mem. in Opp. to

DPP Class Cert. 26. Dr. Rausser does not need to account for each aspect of the conspiracy in

isolation, as explained above, and even if a class member was not affected by a particular export,

that class member would have been affected by the other aspects of the alleged conspiracy. *See*

*SmithKline Beecham Corp. v. Apotex Corp.*, 383 F. Supp. 2d 686, 702 (E.D. Pa. 2004) ("Though

we have found that the Settlement did not produce an antitrust injury, Torpharm alleges that

SmithKline entered into the Settlement as part of a larger scheme to maintain its monopoly in the

market for paroxetine hydrochloride. Because we must consider the anticompetitive effect of

SmithKline's acts as a whole, we cannot conclude as a matter of law that those acts did not

produce an antitrust injury." (citations omitted)).

#### 4.  **Conclusion as to Predominance**

As discussed, the Court concludes that Plaintiffs have demonstrated that common issues

predominate over individual questions with respect to the shell egg subclass. Plaintiffs have not

demonstrated that common questions predominate with respect to the egg products subclass, as

they have not demonstrated that the element of antitrust impact is capable of common proof,

which the Court finds would result in individualized questions predominating overall with

respect to the egg products subclass.

#### b.  **Superiority and Manageability**

The "superiority" requirement asks whether a case is better brought as a class action or in

an alternative form of litigation, such as individual lawsuits. Rule 23(b)(3) sets out four factors

for the Court to consider: (a) the class members' interests in individually controlling the

prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning

the controversy already begun by or against class members; (c) the desirability or undesirability

of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.

Defendants do not contest Plaintiffs' assertion that these considerations weigh in favor of finding that the superiority and manageability requirements are met here. The Court agrees that these requirements are met here. The interests of efficiency and economy favor litigating the antitrust claims of the thousands of class members, who are widely dispersed geographically, in a single forum. Otherwise, scores of individual lawsuits would rely on similar evidence and proof. The Court perceives no prejudice to the interests of class members who might want to individually control the prosecution of a separate action, as such class members will be afforded an opportunity to opt out of the class, as several entities have already done for settlement purposes. The Court also perceives no difficulty in managing this class action, as common issues predominate over common ones and the claims asserted are common to the class.

The Court therefore finds that the elements of superiority and manageability are met.

## V.    CLASS PERIOD DETERMINATION

Plaintiffs and Defendants dispute the appropriate class period. Plaintiffs have proposed a class extending from September 24, 2004 through the present. Defendants propose that the class period should extend only through 2008, arguing that because the Court has partially limited discovery of post-2008 materials, the class period should not extend past 2008. Defendants also argue that the conspiracy's effects must have ended in 2008 when the lawsuit was initiated, as the secrecy essential to the conspiracy was lost.

Despite the extensive briefing of the class certification issue generally, the arguments articulated by both sides as to the proper cutoff date of the class period have thus far not provided the Court with sufficient reasoning justifying the competing cutoff dates proposed for

the Shell Egg Subclass.  Therefore, the Court will grant the motion to certify the Shell Egg

Subclass but will deny without prejudice the Plaintiffs' motion to extend the class period from

September 24, 2004 through the present. The Court requests both sides submit further briefing

addressing their respective proposed cutoff dates for the Shell Egg Subclass.

## VI.    CONCLUSION

For the above reasons, the Court will certify the proposed class in part. The Court will not

certify the Direct Purchaser Plaintiffs' Egg Products Subclass. The Court will certify the Direct

Purchaser Plaintiffs' Shell Egg Subclass but will deny without prejudice with respect to the class

period proposed by the Plaintiffs. The parties are instructed to submit supplemental briefing. An

appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge