# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : : | **MULTIDISTRICT LITIGATION** |
| *THIS DOCUMENT APPLIES TO:* **ALL INDIRECT PURCHASER ACTIONS** | : : | **No. 08-md-2002** |

## AMENDED MEMORANDUM[1]

GENE E.K. PRATTER, J.                                                    NOVEMBER 10, 2015

This case involves an alleged conspiracy by the nation's major egg producers to control

and limit the supply of eggs and thereby increase the prices of eggs. The defendant egg

producers allegedly accomplished this objective through three principal means: (1) a series of

explicit, short-term production-restriction programs, such as slaughtering hens prematurely; (2) a

pretextual animal-welfare program; and (3) a calculated series of exports of eggs at below-

market prices. There are three categories of Plaintiffs seeking to hold Defendants liable for these

actions: a putative class of direct purchasers of eggs ("Direct Purchaser Plaintiffs") (i.e. those

who bought eggs or egg products directly from Defendants); a putative class of indirect

purchasers of eggs  ("Indirect Purchaser Plaintiffs"—referred to as "Plaintiffs" in this

Memorandum) (i.e. those who bought eggs at retail and not directly from Defendants); and

plaintiffs who are bringing their own individual actions ("Direct Action Plaintiffs"). The Indirect

Purchaser Plaintiffs ask the Court to certify their proposed classes. They seek damages under the

antitrust laws of 21 states, the consumer protection laws of seven states, and the unjust

enrichment laws of 17 states, and seek an injunction under Section 16 of the Clayton Act, 15

---

[1] This amended memorandum makes no substantive changes to the Memorandum of
September 18, 2015. It corrects various typographical and/or clerical checking oversights.

U.S.C. § 26. Because these Plaintiffs have failed to demonstrate (a) that their proposed class is clearly defined and ascertainable; (b) that common issues predominate as to their claims; and (c) that their proposed class action is manageable, the Motion for Class Certification will be denied as to the proposed state law classes. The Motion for Class Certification will likewise be denied as to the proposed injunction class, albeit without prejudice should Plaintiffs choose to seek to revise and renew their Motion for Class Certification of the injunctive class, because to date Plaintiffs have failed to demonstrate that a class action under Rule 23(b)(2) is proper.

## I.      FACTUAL BACKGROUND

### a.  Allegations of Fact

As stated above, this alleged conspiracy consisted of three general tactics: (1) a series of short-term egg-supply reduction programs, (2) a long-term plan to reduce the supply of eggs under the pretext of an "animal-welfare program," and (3) exporting eggs at a loss. These tactics allegedly reduced the supply of eggs and resulted in higher prices paid by the putative class of indirect purchasers.

### 1.  Short-term Supply-Reduction Programs

Beginning in 1999, members of the United Egg Producers ("UEP") agreed to a series of programs designed to immediately reduce the supply of eggs. These programs were implemented by a committee within UEP known as the "Marketing Committee." Members of UEP were then to commit to implementing the programs. These programs included inducing hens to molt earlier[2], slaughtering flocks of hens earlier, and reducing the hatching of chicks. UEP members were also encouraged to stop backfilling cages (that is, replacing dead hens with younger hens).

---

[2] Molting is the process whereby hens lose their feathers and regrow them—hens lay no eggs when molting.

These egg supply reduction programs succeeded in reducing flock size and driving the price of eggs up, and were implemented on a number of occasions between 1999 and 2006.

### 2.  The Scheme to Reduce the Supply of Eggs Under the Pretext of a Certified Animal-Welfare Program

The alleged conspiracy to reduce the supply of eggs went beyond these short-term strategies and included the creation and implementation of a certified program purporting to improve the welfare of the hens. In fact, according to Plaintiffs, this program was a scheme to reduce the supply of eggs. The program's goal of reducing the egg supply primarily relied upon requirements for increased cage space per hen. Compliance with this program was monitored by monthly reporting requirements and periodic audits. The cage-space requirement was supplemented by three additional requirements that ensured the certified program would have its intended effect: (1) the 100% rule, which required that all of a producer's facilities, including those of its affiliates, comply with the Certified Program's cage-space requirements in order for any egg from that producer to be "certified;" (2) a prohibition on backfilling within the certified program; and (3) a rule that failing to comply with the cage-space or backfilling requirements would result in an "automatic fail" of an audit under the certified program—even though other shortcomings under the program (such as improper lighting or handling) did not result in an "automatic fail." The certified program was promoted as an animal-welfare program, with labels on egg packaging certifying that the eggs were "Animal Care Certified." But the accusation is that this was merely a pretextual justification for this supply-reduction program. In fact, following a Federal Trade Commission investigation concerning whether the "Animal Care Certified" label was misleading, UEP agreed in 2005 to change the name of its certified label from "Animal Care Certified" to "UEP certified."

### 3. Egg Exports at a Loss

The final component of the alleged supply-restriction program was a series of egg exports at a loss (essentially "dumping" eggs in foreign markets so as to drive the domestic price of eggs up). The scheme, implemented by members of the United States Egg Marketers ("USEM") and managed through the UEP Export Committee, required all USEM members to either export their own eggs at a loss or sell their eggs to UEP at domestic prices and later receive a bill for the difference between the domestic price and the export price. USEM members who did not contribute eggs to the scheme contributed money to help fellow members bear the burden of the export losses. These exports, which were also supported by some non-USEM-members, occurred periodically between 2000 and 2003, and from 2006 to 2008.

### b. Proposed Classes

Plaintiffs seek certification of the following classes:

INJUNCTION CLASS

> All individuals and entities in the Class Jurisdictions[3] that purchased shell eggs during the Class Period from October 1, 2006 through the present from a retailer for their own use and not for resale and that intend to purchase shell eggs in the future. Specifically excluded from this class are Defendants' subsidiaries and affiliates, as well as individuals whose only purchases of shell eggs were purchases of "specialty" shell eggs, such as "organic," "free range," "nutritionally enhanced," "cage-free" and hatching eggs.

INDIRECT PURCHASER STATE LAW CLASSES

[One per each Class Jurisdiction]:

> All individuals and entities that purchased shell eggs from a retailer, for their own use and not for resale, during the Class Period from October 1, 2006 through the

---

[3] "Class Jurisdiction" refers to the following jurisdictions, separately: Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. "Class Jurisdictions" refers to each of these Class Jurisdictions, collectively. IPP Mem. in Supp. of Class Cert. 2 (Doc. No. 1043).

present and while residing in [the respective Class Jurisdiction]. Specifically excluded from this class are Defendants' subsidiaries and affiliates, as well as individuals whose only purchases of shell eggs were purchases of "specialty" shell eggs, such as "organic," "free-range," "nutritionally enhanced," "cage-free," and hatching eggs.

## II.   LEGAL BACKGROUND

### a.  Indirect Purchaser Claims Generally

These Plaintiffs' Fifth Amended Complaint seeks injunctive relief under federal law and damages under the laws of certain states.[4]

The Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), established that there is typically no cognizable federal antitrust injury when indirect purchasers pay higher prices "passed on" to them by direct purchasers.[5] This also tends to be the default rule for state antitrust statutes, unless the state is an "*Illinois Brick* repealer" state, which means the state has either passed a statute repealing *Illinois Brick* or its state antitrust statutes have been judicially interpreted as permitting indirect purchaser classes to recover damages. As of 2011, at least 25 states and the District of Columbia were so-called *Illinois Brick* repealers. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 293 n.17 (3d Cir. 2011); *see generally* Kurtis A. Kemper, *Right of Retail Buyer of Price-Fixed Product to Sue Manufacturer on State Antitrust Claim*, 35 A.L.R.6th 245 (2008). Here, Indirect Purchasers sue for damages under 21 of those states'

---

[4] Plaintiffs' Fifth Amended Complaint provides that "Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 for injunctive relief . . . . Plaintiffs also bring this action pursuant to the state antitrust and consumer protection laws for damages . . . ." IPP Fifth Amended Complaint ¶ 14 (Doc. No. 866).

[5] There are limited exceptions to the general rule that indirect purchasers cannot recover under federal antitrust law, including, potentially, a "co-conspirator" exception (whereby the direct purchasers and defendants are co-conspirators in the illegal scheme). However, in the Third Circuit, the alleged co-conspirators must be joined as defendants in order to make such an argument. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 370 (3d Cir. 2005). Here, Plaintiffs have not joined direct purchasers as co-defendants or even identified them as co-conspirators.

antitrust, consumer protection, and unjust enrichment laws, and for an injunction under federal law.

### b.  Class Certification

The standard for class certification is set forth in Rule 23 of the Federal Rules of Civil Procedure, which reads in relevant part:

> **(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>> **(1)** the class is so numerous that joinder of all members is impracticable;
>> **(2)** there are questions of law or fact common to the class;
>> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>> **(4)** the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
>> **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>> **(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>>> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>>> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23

Rule 23's comparative brevity obscures its labyrinthine nature. Certifying a class is not an easy endeavor, and must not be undertaken casually.  Rather, courts must conduct a "rigorous analysis" to ensure that Rule 23's requirements are met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). The Court must find that each of Rule 23's standards

6

have been met by a preponderance of the evidence. *Id.* at 321. In determining whether these standards have been met, the Court necessarily needs to examine issues that, to some extent, overlap issues to be decided at the final merits determination. *Id.* at 316. However, calling upon the analytical restraint often demanded of judges, the Court only examines the merits of the underlying case to the extent such an examination is relevant to the Rule 23 standards. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

Rule 23(a)'s demands are typically referred to as "numerosity, commonality, typicality, adequacy, and ascertainability," and every potential class must meet these standards. The Court considers each of these factors before turning to "predominance" under Rule 23(b)(3), and then analyzing whether the proposed injunctive class satisfies Rule 23(b)(2).

## III.   RULE 23(a) FACTORS

### a.   Numerosity

Rule 23's first requirement is unchallenged by Defendants. Rule 23(a)(1) requires that a class be so numerous that joinder of all members be impracticable. Though there is no threshold number, the Third Circuit Court of Appeals has provided some guidance by noting that, in general, a proposed class of more than 40 members will satisfy the numerosity requirement. *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001). The Court finds that the proposed classes of Indirect Purchaser Plaintiffs are sufficiently numerous to satisfy the requirement of Rule 23(a)(1). The proposed classes each include, at least, tens of thousands of members. Joinder of all of these members would certainly be impracticable.

### b.   Commonality

Rule 23's second requirement is also unchallenged by Defendants. Rule 23(a)(2) requires that there be questions of law or fact common to the class. As the Supreme Court explained in

7

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule 23(a)(2) requires that such a common question "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." The Third Circuit Court of Appeals has noted that the commonality bar "is not a high one." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013). Indeed, a single common question can suffice. *Dukes*, 131 S. Ct. at 2556. "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendant's conduct was common as to all of the class members." *Rodriguez*, 726 F.3d at 382 (internal quotation marks and citations omitted).

Here, there are common questions of law and fact, central to the litigation, which can be resolved on a classwide basis. The allegations that Defendants conspired to restrict the supply of eggs are allegations that are common to the classes. Therefore, the commonality requirement is met.

### c. Typicality and Adequacy

Rules 23(a)(3) and (4) are referred to as the "typicality" and "adequacy" prongs of the class action analysis. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality inquiry ensures "that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009). To assess typicality, courts must investigate both the representative parties and the class as a whole, and focus "on the similarity of the legal theory and legal claims; the similarity of the individual circumstances on which those

8

theories and claims are based; and the extent to which the proposed representative may face significant unique or atypical defenses to her claims." *Id.* at 597-98.

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry concerns both the (1) the "experience and performance of class counsel;" and (2) the "interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012) (citation omitted). Defendants do not challenge the experience or performance of class counsel but do challenge whether the interests and incentives of the representative plaintiffs align with those of the putative classes.[6] The second prong of the adequacy inquiry seeks to assure "that the named plaintiffs' claims are not antagonistic to the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006).

While adequacy and typicality are distinct requirements, the analyses of the two elements tend to merge, as they both focus on the extent to which the class representatives have potential conflicts with the class members. *See Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d Cir. 2006) ("[T]he typicality and adequacy inquiries often tend to merge because both look to potential conflicts and to whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." (internal quotations and citation omitted)). Unlike other Rule 23(a) requirements, the burden of proving that class representatives are inadequate falls to the party challenging the class's

---

[6] The Court finds that class counsel meet the standards set forth in Rule 23(g). Counsel are experienced in class action antitrust litigation and certainly have been effective in litigating the case. They, like defense counsel and other plaintiffs' counsel, have demonstrated knowledge, expertise, professional courtesy, timeliness, and, as far as the Court can ascertain, a high level of proficiency.

representation.[7] *See Schwartz v. Avis Rent a Car Sys., LLC*, No. 11-4052, 2014 WL 4272018, at *16 (D.N.J. Aug. 28, 2014).

Here, Defendants argue that the class representatives have widely disparate purchasing behavior and are vulnerable to individualized defenses not shared by other members of the proposed classes they seek to represent. Defendants point to testimony from named plaintiff Michael Dobson who testified that he primarily purchased brown, Omega-3 enhanced eggs, which are not commodity eggs (and, hence, likely not eggs at issue in the litigation). Named plaintiff John Ryan testified that he had not bought eggs since 2013 and does not plan to purchase eggs again. Also, only one named plaintiff purports to be a corporation, and, according to Defendants, it is unlikely that the individuals who have been named as plaintiffs would adequately represent the interests of corporations.

Defendants also assert that the named plaintiffs display ignorance of critical aspects of this lawsuit, seriously undermining the adequacy of the named plaintiffs. For example, named plaintiff Glenna Sue King testified that she was unsure "whether she even *believes* a central allegation of the complaint—whether she 'paid too much for the eggs she purchased' during the proposed Class Period." Mem. in Opp. to IPP Mot. for Class. Cert. 74 (Doc. No. 1088) (emphasis in original) (quoting King Dep. 45:4-16, ex. 30). Other plaintiffs testified to having been contacted by counsel and asked to be plaintiffs, even though they had and have no firsthand

---

[7] While district courts in the Third Circuit generally have held that the party challenging the adequacy of the class representatives bears the burden, this holding is not universal. *See* 6A Fed. Proc., L. Ed. § 12:148 ("While it has commonly been found that the class representatives have the burden of showing that their representation of the class will be adequate within the meaning of Fed. R. Civ. P. 23(a)(4), there is also authority that the burden is on the party challenging representation to prove that representation would be inadequate."). Here, even if Plaintiffs had the burden, the Court would find that the class representatives satisfy the adequacy and typicality requirements.

knowledge of the factual allegations, having not read the complaint, and not knowing anything about Defendants or UEP.

Plaintiffs counter that the deficiencies of the proposed class representatives are overstated. Mr. Dobson, for example, did make qualified purchases of eggs during the class period, as did the other class representatives challenged by Defendants. To the extent that the class representatives (such as Mr. Ryan) are challenged for their lack of purchases during some part of the class period, precedent makes clear that "a named plaintiff need not have made purchases from the defendants throughout the class period." *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 209 (E.D. Pa. 2001) *aff'd*, 305 F.3d 145 (3d Cir. 2002).

Plaintiffs also point out, persuasively, that Defendants do not articulate why an individual plaintiff would inadequately represent a corporate plaintiff here. The Court finds no significant distinctions between the interests of corporate and individual plaintiffs in this case. *Cf. id.* at 210 (finding differences between individual and corporate plaintiffs' interests insignificant).

The Court finds that the class representatives here meet the requirements for typicality and adequacy. The evidence appears to support the position that the class representatives are, in fact, in the respective proposed classes of plaintiffs (although the confusion as to whether purchases of certain types of eggs meets the class definition will bear on the Court's ascertainability analysis, *see infra* Part III.d). Differences in purchasing methods and patterns, as argued here, are not significant enough to deny certification. There are a litany of cases finding typicality and adequacy to have been satisfied despite differing purchasing methods and prices, provided that the alleged misconduct applies across the array of methods and prices. *See, e.g.*, *Marcus v. BMW of N. America, LLC*, 687 F.3d 583, 599 (3d Cir. 2012) ("When a class includes purchasers of a variety of different products, a named plaintiff that purchases only one type of

11

product satisfies the typicality requirement if the alleged misrepresentations or omissions apply uniformly across the different product types."); *In re Chocolate Confectionary Antitrust Litigation*, 289 F.R.D. 200, 217 (M.D. Pa. 2012) ("That customers paid different prices or purchased different brands of products does not defeat typicality. Relevant case law addresses the typicality requirement in terms of liability issues, not damages issues. All members of the putative class are direct purchasers of chocolate confectionary products . . . and allege that they made their purchases at supracompetitive prices." (citations omitted)); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999) ("The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid."); Newberg on Class Actions § 3:35 (5th ed. ) ("In price-fixing actions, the proposed class representative's claims are generally held to be typical of the class members' claims even if there are variations in the manner in which members of the class purchased from the defendant, variations in the kind of product purchased, differences in price, and other factors."). Moreover, Defendants offer no coherent theory as to how these differences could create misaligned incentives among class members and the class representatives.

Finally, as Plaintiffs note, "A class representative need only possess 'a minimal degree of knowledge necessary to meet the adequacy standard.'" *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007); *see also In re Linerboard Antitrust Litig.*, 203 F.R.D. at 213 ("The adequacy-of-representation test is not concerned whether plaintiff personally derived the information pleaded in the complaint or whether he will personally be able to assist his counsel.") (internal quotation omitted); Newberg on Class Actions § 3:67 ("A proposed representative's knowledge of the case need not be robust."). Plaintiffs note that here even those class representatives pointed to as inadequate are knowledgeable of the essential facts—for

12

example, Glenna Sue King testified that she believed she overpaid for most of her purchases

during the period in question. The Court also credits Plaintiffs' chart demonstrating that the class

representatives understand and are committed to the case. *See* IPP Mot. for Class Cert. Tab 180

(citing deposition testimony of the challenged class representatives).

The Court finds that Plaintiffs have demonstrated by a preponderance of the evidence that

the adequacy and typicality standards under Rule 23(a) are met for the proposed classes.

### d.  Ascertainability

The Third Circuit Court of Appeals has explained that certification under Rule 23(b)(3) is

inappropriate where the class is not ascertainable.[8] "The ascertainability inquiry is two-fold,

requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and

(2) there is a 'reliable and administratively feasible mechanism for determining whether putative

class members fall within the class definition.'" *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir.

2015) (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). "If class

members are impossible to identify without extensive and individualized fact-finding or 'mini-

trials' then a class action is inappropriate." *Marcus*, 687 F.3d at 593. Plaintiffs must prove

ascertainability by a preponderance of the evidence, and the Court must engage in the rigorous

analysis applied to Rule 23. *Id.* The proposed method for ascertaining a class must be supported

by evidence—assurances of the ability to ascertain a class in the future are insufficient. *Carrera

v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).

Our Court of Appeals's approach to ascertainability was first announced in *Marcus*, but

extended and articulated more fully in *Carrera*. In *Carrera*, the Court of Appeals considered the

---

[8] The ascertainability requirement applies only to Rule 23(b)(3) classes. *See Shelton v.
Bledsoe*, 775 F.3d 554, 563 (3d Cir. 2015) ("[A]scertainability is not a requirement for
certification of a (b)(2) class seeking only injunctive and declaratory relief.").

certification of a class of consumers who had purchased Bayer's One-A-Day WeightSmart diet supplement, which had allegedly been falsely and deceptively advertised. 727 F.3d at 304. It was undisputed that the class members would be unlikely to have receipts for their purchases, and Bayer had no list of the purchasers. Carrera proposed two ways to ascertain the class: first, through records of retailers, which the court found unworkable; and second, by affidavits of class members. In *Carrera* the Court reiterated that "a plaintiff must show, by a preponderance of the evidence, that the class is 'currently and readily ascertainable based on objective criteria.'" *Id.* at 306 (quoting *Marcus*, 687 F.3d at 593). "A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful." *Id.* at 307.

> The Court explained:

> Ascertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action lawsuit. First, at the commencement of a class action, ascertainability and a clear class definition allow potential class members to identify themselves for purposes of opting out of a class. Second, it ensures that a defendant's rights are protected by the class action mechanism. Third, it ensures that the parties can identify class members in a manner consistent with the efficiencies of a class action.

*Id.* The Court then explained that a defendant in a class action "has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues. A defendant has a similar, if not the same, due process right to challenge the proof used to demonstrate class membership as it does to challenge the elements of a plaintiff's claim." *Id.* The Court summed up the ascertainability requirement as requiring that a plaintiff "demonstrate his purported method for ascertaining class members is reliable and administratively feasible, and permits a defendant to challenge the evidence used to prove class membership." *Id.* at 308.

The *Carrera* Court then went on to reject the plaintiff's proposed methods of ascertaining class membership by affidavit. The Court rejected three arguments that favor the use of affidavits for ascertaining class membership. First, plaintiffs argued that because the claims were likely to be of low value, it was unlikely that someone would submit a false claim. *Id.* at 309. The court rejected this argument, reasoning that such an argument ignores one of the "core concern[s] of ascertainability: that a defendant must be able to challenge class membership." *Id.*

Second, plaintiffs argued that affidavits were appropriate because Bayer's total liability would not have increased or decreased based on the amount of affidavits submitted. *Id.* at 309-10. The court rejected this argument as well, reasoning that if an excess of claims were submitted, class members would be injured because their recovery would be "diluted by fraudulent or inaccurate claims." *Id.* at 310 ("It is unfair to absent class members if there is a significant likelihood their recovery will be diluted by fraudulent or inaccurate claims."). Bayer likewise had an interest in this regard, because if true class members' relief was reduced by false claims, those class members could argue that their interests were not adequately represented and reinitiate litigation against Bayer. *Id.*

Finally, the court rejected the third argument put forth by plaintiffs, that the proposed screening methods would ensure Bayer only paid claims based on reliable affidavits. *Id.* at 310-11. The court found that the screening model proposed could not be evaluated for reliability in an objective way, and that the model amounted essentially to "assurances" the model would be effective. *Id.* at 311. "Such assurances that a party 'intends or plans to meet the requirements' are insufficient to satisfy Rule 23." *Id.* However, the court did allow the plaintiffs on remand to "submit a screening model specific to this case and prove how the model will be reliable and how it would allow Bayer to challenge the affidavits." *Id.*

15

The Third Circuit Court of Appeals most recently addressed the ascertainability requirement in *Byrd v. Aaron's Inc*. In *Byrd*, the court clarified that the ascertainability requirement is distinct from the requirements that the class be clearly defined and that common issues predominate. *See* 784 F.3d at 165. In particular, the extent to which a class is under- or over-inclusive is not pertinent to the analysis of whether the class's members are readily ascertainable. *See id.* at 166-68. The court also considered whether a class definition that included the "household members" of purchasers of a particular brand of computer could be ascertainable. *See id.* at 169-71. The Court of Appeals rejected the district court's conclusion that the phrase "household members" was too vague to allow for an ascertainable class. *Id.* at 170. The plaintiffs in *Byrd* proposed identifying those household members using forms completed by the individual class members and cross-checked against the records of the addresses of the purchasers of the computers, along with other records. *Id.* at 170-71. The appellate court reversed the district court's finding that this proposed method was indistinguishable from the proposed method in *Carrera*. *See id.* The appellate court reasoned that in *Carrera*, the plaintiffs were proposing that the court rely on "affidavits alone, without any objective records to identify class members or a method to weed out unreliable affidavits," whereas in *Byrd*, the plaintiffs had proposed a method whereby the forms completed by potential class members could be verified by cross-checking the addresses on the form with the objective records listing the addresses of the purchasers of the computers. *See id.* at 170. Such a process, the court reasoned, would not result in "mini-trials" but would be an administratively feasible undertaking like those "done in most successful class actions." *Id.*

Here, Plaintiffs have not demonstrated that their purported method for ascertaining class membership is reliable and administratively feasible. Plaintiffs propose that potential class

members submit affidavits swearing that they fall within the class definition. Plaintiffs also

propose that a claims administrator could screen these affidavits by "verifying [the affiant's]

address, age, household size, volume of purchases, and location of purchases." IPP Mem. in

Supp. of Class Cert. 46. Plaintiffs also advance the possibility of having claimants provide a

receipt (or some other evidence) as proof of a recent (*i.e.*, not necessarily within the class period)

commodity egg purchase.[9]

---

[9] Plaintiffs have not provided any concrete plan for what their "proof of purchase" requirement would be, but have merely tee'd up several ideas, and have acknowledged that the proven purchase would not need to have occurred during the class period. Plaintiffs' counsel explained at oral argument that "[a] recent purchase of a commodity shell egg is all that we would propose. If this Court decides that the effective conspiracy period ends in 2012, for instance, . . . I would not ask a class—an absent class member who is filing a claim to go to their—to Costco or go to their local store and file a subpoena or make a demand for their purchase history. And I'm reluctant to even ask them to go to their refrigerator and write down the UPC code of that carton of eggs that's in their refrigerator, but I'm willing to do that. And I'm also willing to ask them to go to their receipt that they have. Now their receipt is not going to provide perfect information, and I [can't] even indicate in some cases whether it's a commodity shell egg or whether it's a specialty egg. But they can—they can write down—they can either mail us the receipt as part of their claim process, but they can simply write down what the product was that they purchased and when they purchased it and the amount they spent on it. And now, in the case where the Court has decided that the conspiracy does not go to the present, one would argue, wait, that is not necessarily proof positive of a relevant purchase during the effective period. . . . That is true." Tr. Hr'g 4/20/15 at 99:14-100:12. In this brief statement, Plaintiffs' counsel proposed several different *possibilities* for how the proof of purchase requirement *might* work in practice (*e.g.*, requiring a UPC code, requiring a receipt, requiring that consumers write when they made a purchase), highlighting the extent to which Plaintiffs are merely offering possibilities and not a plan for ascertaining the members of the class.

Although a recent receipt might seem somewhat sensible in light of a proposed class period extending to the "present," if the Court were to certify the proposed classes, it would have a "duty to go behind the pleadings to determine the appropriate class period." *Schering Plough*, 589 F.3d at 602. Even if the Court were to accept the open-ended class period proposed by Plaintiffs (although Plaintiffs have not provided evidence to support a class period extending to the present, *see general infra* Part V), the Court would still close that period, at the very latest, when notice of any judgment was disseminated. Thus, any proof of purchase would still need to be from before the notice date, at the latest, in order for it to have any bearing on class membership. Plaintiffs, in addition to not proposing any specific plan with respect to their proof of purchase requirement, have not discussed the feasibility and fairness of requiring a receipt from prior to the close of the class period, whenever that might ultimately prove to be. The Court observes that such a requirement would likely result in inequities to those who purchased

17

Even though Plaintiffs propose what appears to be a similar method (namely, claims by affidavit) as that rejected in *Carrera*, they argue that the proposal here is distinguishable from that in *Carrera* for three reasons. First, they argue that because commodity eggs are purchased by nearly every individual nationwide, claimants are statistically likely to be class members. Second, they argue that potential claimants will be familiar enough with commodity eggs to know with certainty whether they purchased them during the class period. Third, they argue that their proposed screening method provides the affidavits with sufficient indicia of reliability. Although Plaintiffs are able to alleviate a few of the policy concerns expressed in *Carrera*, they do not address and solve enough of them. This Court must follow the established precedent in the Third Circuit in requiring objective criteria for ascertaining class membership.

Plaintiffs argue here that the fact that 89 percent of households purchase commodity shell eggs (according to an internet survey published by Mintel, *see* Defs. Ex. 64) is "independently sufficient to satisfy the Third Circuit's requirement that claims submitted under oath must bear indicia of reliability." IPP Reply Mem. in Supp. of Class Cert. 21 (Doc. No. 1110). *See generally Carrera*, 727 F.3d at 306 ("Forcing [defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications." (quoting *Marcus,* 687 F.3d at 594)). Defendants dispute the reliability of the 89-percent statistic and argue that, even if true, that still leaves a potential for 15 million false claimants, for which Defendants will lack the ability to challenge their membership in the class. In response, Plaintiffs argue that the small value of each claimant's potential recovery make false claims unlikely.

---

commodity eggs only in the past—say, from 2006-2009—as those class members would be unable to prove class membership under such a plan even though they would be members of the class.

The Court rejects Plaintiffs' arguments on this front. As in *Carrera*, where the plaintiffs argued that false claims were unlikely due to the low value of the claims, here, false claims may be unlikely, but the Court cannot ignore the "core concern of ascertainability: that a defendant must be able to challenge class membership." 727 F.3d at 309. The "indicia of reliability" referred to in the *Carrera* opinion are indicia that allow a defendant to identify and challenge claims lacking those indicia of reliability. Plaintiffs are instead offering indicia that, on the whole, most of the claims will be legitimate, but these indicia do not allow Defendants to identify and challenge false claims, as is, according to the *Carrera* Court, their due process right. *See id.* at 307 ("A defendant has a . . . due process right to challenge the proof used to demonstrate class membership . . . ."). The Court is not able to conclude that an affidavit swearing to having purchased One-a-Day WeightSmart is any less reliable than an affidavit swearing to having purchased commodity eggs in New Mexico during the class period. Both require swearing at risk of perjury to a purchase, and both carry risks of fraud and mistake (although in the Court's view, at least, both are far more likely to be correct than false—the Court retains enough faith in the citizenry and human nature in general to assume that most people do not risk perjury for the sake of a few dollars in a class recovery). But the "core concern" of ascertainability, as the Third Circuit Court of Appeals has explained, is "that a defendant must be able to challenge class membership." *Id.* at 309. And when class membership is challenged, "affidavits alone, without any objective records to identify class members or a method to weed out unreliable affidavits," will not suffice. *Byrd*, 784 F.3d at 170. Here, there are no objective records to identify class members, and the methods proposed to weed out unreliable affidavits are insufficient because they do not allow for Defendants to challenge the core feature of class membership—purchase of a commodity shell egg.

19

Even if the Court were prepared to read an exception into the Third Circuit's ascertainability precedent for classes in which class membership is likely to be a high percentage of the population, the Court would need additional evidence from the Plaintiffs. The Court has not been provided with an analysis of the likelihood that a given individual claimant would have purchased commodity eggs during the class period, other than anecdotal assertions that 89 percent or more of households purchase commodity shell eggs. Perhaps had Plaintiffs demonstrated that those few who did not purchase shell eggs were largely identifiable based on certain characteristics (such as age, family status, and so on), the Court could conclude that Plaintiffs had met their burden. Plaintiffs have not presented evidence that such a method is possible, however. Plaintiffs instead assert that they have met their burden because 89 percent of households purchase commodity shell eggs (How often? In what quantity? Does it vary by state? Vary by age of consumer? Size of family? Make-up of the family unit? What percentage of *individuals* purchase commodity shell eggs? Is there anything about the other 11 percent that makes them identifiable?), and that standard screening methods can identify unreliable affidavits (What methods exactly? What will the screening look for and why? What makes an affidavit more likely to be unreliable?). This does not suffice under Third Circuit precedent. *See Carrera*, 727 F.3d at 306 ("A plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful.").

Plaintiffs also contend that the affidavits are likely to be reliable because potential class members are unlikely to be confused about whether they had purchased commodity shell eggs "especially if the claim form and website provide guidance regarding what constitutes a specialty egg." IPP Reply Mem. in Supp. of Class Cert. 22. But this argument relies on assurances rather than evidence. *Cf. Carrera*, 727 F.3d at 311 ("Such assurances that a party 'intends or plans to

20

meet the requirements' are insufficient to satisfy Rule 23." (quoting *Hydrogen Peroxide*, 552

F.3d at 318)). The Court has not been presented with any evidence of the likelihood or

unlikelihood of confusion about past purchases of commodity eggs, or a proposal for how the

claim form or website would provide guidance on what constitutes a specialty egg. Indeed, as

currently written, the class definition's exclusion of specialty eggs is likely to result in at least

some confusion among class members.[10] The class definition does not provide a conventional

definition for specialty eggs or commodity eggs, but instead provides examples of specialty eggs:

"Specifically excluded from this class are . . . individuals whose only purchases of shell eggs

were purchases of "specialty" shell eggs, such as 'organic,' 'free-range,' 'nutritionally

enhanced,' 'cage-free,' and hatching eggs."[11] Defendants assert that this proposed class

---

[10] The Court's purpose in noting that the class definition has the potential for confusion among the class members is to analyze Plaintiffs' contention that the affidavits are likely to be reliable because there is unlikely to be any confusion about whether a class member purchased commodity eggs. *Cf. Carrera*, 727 F.3d at 309 ("[A] defendant must be able to challenge class membership. This is especially true where the named plaintiff's deposition testimony suggested that individuals will have difficulty accurately recalling their purchases of WeightSmart."). The Court is not examining whether the class definition fails to meet Rule 23(c)(1)(B). Even if the Court were to find that the class definition did not meet Rule 23(c)(1)(B)'s requirements, the Court would not necessarily deny class certification on that basis, as the Court could modify deficiencies in the class definition. *See, e.g., Chiang v. Veneman*, 385 F.3d 256, 268 (3d Cir. 2004) ("We modify the class definition to include all 'Virgin Islanders,' rather than to include only 'persons who are Black, Hispanic, [and/or] female,' because we understand Chiang to be alleging mainly discrimination against *all* Virgin Islanders, rather than racial discrimination *among* Virgin Islanders.") *abrog. on other grounds*, *Hydrogen Peroxide*, 552 F.3d at 318 n.18; *see also* Wright & Miller, 7A Fed. Prac. & Proc. Civ. § 1759 (3d ed.) ("[I]f plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of Rule 23 or it may allow plaintiff to amend in order to limit the class.").

[11] Plaintiffs did include a proposed revision of their class definition in their post-hearing memorandum. The revision clarified that brown eggs would be included as commodity eggs, and also included additional examples of specialty eggs. The revised proposal would define specialty eggs as eggs that "are marketed as having special characteristics that make them different from regular shell eggs." IPP Post-Hr'g Mem. in Supp. of Class Cert. 10. However, the potential for confusion remains as this definition's contours are far from self-apparent. Significant "puffery" on egg cartons reduces the utility of relying on marketing for a distinction between commodity

definition "raise[s] far more questions than answers," and ask, rhetorically, questions that the class definition leaves unanswered: "Are Omega-3 enhanced eggs or 'reduced cholesterol' eggs considered 'specialty' eggs? What about eggs that are marketed as 'all natural' or 'farm fresh?' Eggs that come from hens that receive all-vegetarian feed? Do purchasers of in-shell pasteurized eggs fall within the class definition? Are all brown eggs . . . specialty eggs?" Mem. in Opp. to IPP Mot. for Class Cert. 11. These rhetorical questions asked by Defendants are also likely to be asked by potential class members, leading to at least some level of confusion that could lead to mistaken affidavits.[12]

Class members might also be confused about other aspects of their potential class membership other than whether they bought commodity or specialty eggs. Claimants might be

---

and specialty eggs, and the additional examples of specialty eggs are non-exhaustive. *See* Tr. Hr'g 4/20/15 84:2-3 (Plaintiffs' counsel explaining the prevalence of "puffery" in the egg retail market).

[12] For further support for the notion that the distinction between commodity and specialty eggs could breed confusion, consider that at the class certification hearing, Plaintiffs' counsel suggested that specialty eggs are easily distinguishable from commodity eggs based on price and marketing. Plaintiffs' counsel then offered a photographic comparison of a commodity egg carton with a specialty egg carton, so as to demonstrate the easy distinction between the two. The Court, however, did not find the distinction so easy to make. The top photograph showed an egg carton with the words "cage free" on it, and the bottom photograph showed an egg carton with the words "California Ranch Fresh" and "no hormones. *See* Tr. of 4/20/15 Hearing 83:13-20. According to the Plaintiffs' counsel, the top photograph depicted specialty eggs and the bottom photograph depicted commodity eggs. The Court asked counsel whether the phrase "no hormones" made the egg carton a specialty egg bearing "marketed characteristics" on its packaging allowing for higher prices. *Id.* at 83:18-20. Counsel for the Plaintiffs could not definitively answer, at least in the moment, whether the eggs were specialty eggs because of the phrase "no hormones" on the carton. *Id.* at 83:21-22. Counsel explained that many egg marketers add "puffery" to their egg cartons to attempt to distinguish their eggs from their competitors. *Id.* at 84:2-3. This led counsel to argue that "[t]he ultimate distinction, your honor, really is the price." *Id.* at 84:13-14. But Plaintiffs have offered no guidance that would allow any class member to use price to distinguish commodity eggs from specialty eggs. Likewise, Plaintiffs' claims administrator testified at her deposition that she did not know whether eggs from hens in "enriched cages," vegetarian-fed eggs, or pasteurized eggs are specialty eggs. *See* Defs. Ex. 29 at 20:14-22.The Court is unaware as to what constitutes an "enriched cage."

unsure whether they were "residing" in a particular state when they purchased eggs (does a college student reside where she attends school?), whether they purchased eggs in a given state before or after October 1, 2006, and whether the eggs purchased were for their own use or for resale. The Court notes all these potential points of confusion not because it finds that the class definition is flawed in these respects, but merely because potential class members might mistake whether they meet the class definition in these respects. The ascertainability requirement aims to ensure that those mistakes can be identified without "mini-trials." Here, Plaintiffs have not demonstrated what recourse Defendants would have, other than to engage in a "mini-trial," should potential class members submit an affidavit based on the mistaken belief that they meet the class definition.

Plaintiffs' proposal that proof of class membership could be further supplemented by proof of a purchase and by a screening process that will screen claims based on an individual's age and residence does not represent a sufficient method for culling unreliable affidavits. Plaintiffs outline their plan in the three-page affidavit of Tiffaney Janowicz. Ms. Janowicz proposes (a) asking claimants to provide age and residency information; (b) "cross-indexing claims based on residence to confirm that multiple claims are not emanating from the same household or simply limit claims to a per household basis;" and (c) employing standard fraud detection screening methods including checking for duplicate claims, comparing claims to lists of invalid claimants from other cases, screening for prisoners and other institutionalized claimants, and performing random audits. Tiffaney Janowicz Decl. ¶¶ 12-14. For many of these screening methods, such as the random audits and the proof of purchase requirement (which has been mentioned as a possibility but has not been outlined in any specific proposal), "the district court will not actually see the model in action. Rather, it will just be told how the model will

operate with the plaintiff's assurances it will be effective." *Carrera*, 727 F.3d at 311. As the *Carrera* court explained, "Such assurances that a party intends or plans to meet the requirements are insufficient to satisfy Rule 23." *Id.* Moreover, the proposed screening method does not address the core question of class membership—did the claimant purchase commodity shell eggs in the relevant jurisdiction at the relevant time? For that question, class membership would still rely primarily on the "say-so" of potential class members—a method the Third Circuit Court of Appeals has explicitly rejected, as it does not allow Defendants to meaningfully challenge the affidavits.

Plaintiffs also argue that many of the policy concerns expressed in *Carrera* are not implicated here. For example, Plaintiffs assert that there is not a "'significant likelihood' in this case that fraudulent or inaccurate claims will 'materially reduce' true class members' recoveries and allow these class members to assert that they were not adequately represented." IPP Reply Mem. in Supp. of Class Cert. 25 (quoting *Carrera*, 727 F.3d at 310). In all likelihood, Plaintiffs assert, any recovery will far exceed the money allocated to the submitted claims, which makes it unlikely that any claim would be reduced by a false claim. But the Court cannot accept on good faith or even a lay person's acceptance of "what sounds sensible" the notion that false claims will not reduce the award to the legitimate class members. The ultimate damages award should this case proceed to trial is uncertain, and any award will be divided into the various Class Jurisdictions. The Court simply has no basis for accepting Plaintiffs' argument that false or fraudulent claims will not diminish the award for class members. Moreover, if these actions proceeded individually, each individual plaintiff would need to prove that he or she purchased commodity eggs in the Class Jurisdiction during the class period. Whether cast in terms of protecting Defendants' rights or merely protecting the integrity of the class action mechanism,

the ascertainability requirement ensures that the evidence offered to prove the purchases can be

challenged. Here, as in *Carrera*, evidence relying on unverifiable affidavits is not sufficient.

The Court concludes that class certification is inappropriate because the proposed classes

are not ascertainable. Plaintiffs have not "demonstrate[d] [that their] purported method for

ascertaining class members is reliable and administratively feasible, and permits a defendant to

challenge the evidence used to prove class membership." *Carrera*, 727 F.3d at 308.[13]

---

[13] The Court well understands Plaintiffs' quandary here. As Judge Rendell put it in her
concurring opinion in *Byrd*: "We have effectively thwarted small-value consumer class actions
by defining ascertainability in such a way that consumer classes will necessarily fail to satisfy for
lack of adequate substantiation. Consumers now need to keep a receipt or a can, bottle, tube, or
wrapper of the offending consumer items in order to succeed in bringing a class action." 784
F.3d at 174-75 (Rendell, J., concurring). The disharmony between the Appellate Court's
ascertainability requirement and Rule 23's aims has been noted by courts and commentators
alike. *See, e.g.*, *Mullins v. Direct Digital, LLC*, --- F.3d ----, No. 15-1776, 2015 WL 4546159, at
*2 (7th Cir. July 28, 2015) ("A court must consider the likely difficulties in managing a class
action, but in doing so it must balance countervailing interests to decide whether a class action is
superior to other available methods for fairly and efficiently adjudicating the controversy. The
heightened ascertainability requirement upsets this balance. In effect, it gives one factor in the
balance absolute priority, with the effect of barring class actions where class treatment is often
most needed: in cases involving relatively low-cost goods or services, where consumers are
unlikely to have documentary proof of purchase. These are cases where the class device is often
essential to overcome the problem that small recoveries do not provide the incentive for any
individual to bring a solo action prosecuting his or her rights." (quotation marks and citation
omitted)); Daniel Luks, *Ascertainability in the Third Circuit: Name that Class Member*, 82
Fordham L. Rev. 2393 (student note) (2014) ("The ascertainability doctrine as described in
*Carrera* prohibits a type of representative litigation that, for over forty years, has become an
accepted—albeit controversial—piece of the American legal system.").

In addition to having qualms concerning the disharmony between the Third Circuit Court
of Appeals's heightened ascertainability requirement and Rule 23's goals, the Court poses the
question why affidavits, which are by definition sworn under oath, are, for purposes of
ascertainability, essentially considered incompetent evidence. Affidavits are competent evidence
as to facts, in most other settings—indeed, uncontroverted affidavits are often accepted as
conclusive evidence. *See* 2A C.J.S. Affidavits § 44 ("Courts must accept an affidavit as true if it
is uncontradicted by a counter-affidavit or other evidentiary materials."); *see, e.g.*, *In re Cendant
Corp. PRIDES Litig.*, 235 F.3d 176, 183 (3d Cir. 2000) ("We have accepted the uncontroverted
affidavits of Preston and Figueroa."); *Rodriguez v. Reading Hous. Auth.*, 8 F.3d 961, 966 (3d Cir.
1993) ("In light of this uncontroverted affidavit, we must reject Rivera's argument."). For
purposes of a class action, however, an uncontroverted affidavit swearing to a purchase is not
sufficient evidence to establish class membership. The Court is at a loss to explain why this

## IV.   RULE 23(b)(3)

To be certified, a class must not only meet the standards set forth in Rule 23(a), but also

must meet at least one of the standards under Rule 23(b). Plaintiffs seek to certify a class under

23(b)(2) (for injunctive relief) and to certify 21 classes under 23(b)(3) (for money damages under

various states' antitrust laws). Rule 23(b)(3) provides that a class action may be maintained if

Rule 23(a) is satisfied and if:

> **(3)** the court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available methods for
> fairly and efficiently adjudicating the controversy. The matters pertinent to
> these findings include:
>> **(A)** the class members' interests in individually controlling the
>> prosecution or defense of separate actions;
>> **(B)** the extent and nature of any litigation concerning the
>> controversy already begun by or against class members;
>> **(C)** the desirability or undesirability of concentrating the litigation
>> of the claims in the particular forum; and
>> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23.

Rule 23(b)(3)'s requirements have been dubbed "predominance" and "superiority."

### a.  Predominance

The "predominance" inquiry is a demanding one, as it is "designed for situations in

which class-action treatment is not as clearly called for." *Comcast Corp. v. Behrend*, 133 S. Ct.

---

might be. *Cf. generally Mullins*, 2015 WL 4546159, at *13 ("Why are affidavits from putative
class members deemed *insufficient as a matter of law* to satisfy this burden? In other words, no
one disputes that the plaintiff carries the burden; the decisive question is whether certain
evidence is sufficient to meet it. . . . If not disputed, self-serving affidavits can support a
defendant's motion for summary judgment, for example, and defendants surely will be entitled to
a fair opportunity to challenge self-serving affidavits from plaintiffs." (citation omitted)).
However, having expressed the dilemma and even exposed further disharmony, the Court is left
to observe that it does not fall to the courts to make sure every claimant has a validated platform
from which to dive into litigation.

1426, 1432 (2013) (quotation marks and citation omitted). The Court must consider whether the "proposed classes are sufficiently cohesive to warrant adjudication by representation, and assesses whether a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Sullivan*, 667 F.3d at 297 (quotation marks and citations omitted). In assessing a putative class for certification under Rule 23(b)(3), the Court must do more than merely assess whether there are common questions of law or fact, as it did for the Rule 23(a) commonality standard. Rather, the Court must determine that these common questions predominate over individual questions. *See Chiang*, 385 F.3d at 272-73 (3d Cir. 2004) ("However, because the Rule 23(b)(3) predominance requirements incorporate the commonality requirement of 23(a), it is possible that 'even if Rule 23(a)'s commonality requirement is satisfied . . . the predominance criterion is far more demanding.'" (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 623–24 (1997))). To do so, the Court must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Hydrogen Peroxide*, 552 F.3d at 311 (quoting *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)).

Plaintiffs here are attempting to place 21 square pegs into a single round hole, asking the Court to envision 21 statewide classes under the antitrust laws of 21 states, the consumer protection laws of seven states, and the unjust enrichment laws of 17 states, all tried in a single proceeding as if it were a nationwide class under federal antitrust law. Plaintiffs leave too much to the imagination, failing to adequately demonstrate that common questions predominate as to the claims Plaintiffs seek to bring in each of their proposed classes, and failing to demonstrate that the proposed approach would be manageable.

27

### 1.  Antitrust Laws

Plaintiffs seek to establish that common evidence will predominate as to their claim that Defendants violated the antitrust laws of 21 states. To prevail on these claims, Plaintiffs must eventually demonstrate (1) a violation or violations of the various states' antitrust laws (which, according to Plaintiffs, mirror the elements of the federal antitrust laws), (2) individual injury resulting from that violation or violations, and (3) measurable damages. *See Hydrogen Peroxide*, 552 F.3d at 311-12 (citing 15 U.S.C. § 15).[14] At this stage, Plaintiffs must prove that common issues predominate with respect to these elements. *See id.* at 311 ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001))); *Marcus*, 687 F.3d at 600 ("To assess predominance, a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)."). The Court will begin by analyzing, to the extent the briefing allows, whether Plaintiffs' proposed classes are defined too broadly for common issues to predominate, and, then, will analyze whether common issues predominate as to the three elements set forth in *Hydrogen Peroxide*.

### i.  *Overbreadth*

Defendants first argue that Plaintiff's proposed classes are overbroad because they include individuals who purchased eggs produced by non-conspirators. Defendants argue that

---

[14] Plaintiffs have not provided the Court with an analysis of whether the elements for establishing an antitrust violation under any of the states' antitrust laws differ in such a way that common issues are more or less likely to predominate under those states' antitrust laws than federal antitrust law. To the contrary, Plaintiffs appear to assume that there are no relevant differences for purposes of class certification. The Court will indulge this assumption here merely because common issues do not predominate even as to the federal elements of an antitrust claim.

damages are not recoverable for eggs produced by non-conspirators,[15] because such a claim would rely on an "umbrella" theory of liability, for which Plaintiffs would lack antitrust standing under Third Circuit precedent.[16] Plaintiffs contend that they are not relying on an umbrella theory of liability, and that "there is no blanket rule against recovering damages for purchases from non-conspirators." IPP Reply Mem. in Supp. of Class Cert. 10. Therefore, Plaintiffs argue, under Third Circuit precedent they may recover for purchases from non-conspirators. Plaintiffs also mention that perhaps the state antitrust laws on which the classes' claims are based might allow for umbrella damages, even if federal law does not. The Court rejects Plaintiffs' first argument—that their damages are recoverable under Third Circuit precedent interpreting federal law—and rejects their second argument because Plaintiffs (a) did not adequately address the issue in the materials submitted to the Court and (b) nevertheless lack factual support for their theory of damages.

### Third Circuit precedent

The leading Third Circuit Court of Appeals case addressing the so-called "umbrella" theory is *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979). In *Mid-West Paper*, the Court found that a plaintiff lacked standing to recover for direct purchases from a competitor of a price-fixing defendant. *Id.* at 583. The court relied heavily on *Illinois Brick*, in which the Supreme Court held that indirect purchasers of price-fixed goods lacked standing to recover under the federal antitrust laws, reasoning that indirect purchaser

---

[15] The Court chose the word non-conspirators rather than non-defendants because, in the Court's view, the issue here is most acute as to the inclusion of eggs produced outside the UEP certified program, as they would not have been required to comply with the conspiracy's alleged supply-cutting measures.

[16] Antitrust standing, unlike Article III standing, does not affect the subject-matter jurisdiction of the Court. *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232 (3d Cir. 2013).

claims were too speculative and were better pursued by direct purchasers. *See generally Illinois Brick*, 431 U.S. at 720. The *Mid-West Paper* court analogized "umbrella" claims to indirect purchaser claims, reasoning that damages would be too speculative, as "[t]he outcome of any attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy would at the very least be highly conjectural." *Mid-W. Paper*, 596 F.2d at 584. The *Mid-West Paper* court reasoned:

> Insofar as cost of production is an element in arriving at a price, each manufacturer operates at a different level of efficiency and sustains at least slightly varying expenses, thereby incurring different costs in creating the finished product. And in addition to actual cost, pricing decisions are based on various other considerations, such as marketing strategy and elasticity of demand. Although in selecting a price for its product a manufacturer must also take into account the market price for comparable items, to some extent its pricing decisions remain unaffected by the prices charged by others. This is so because of entry and exit conditions in the industry, the degree of interchangeability among the products, and time lags in adjusting to changes in output, price and demand in the market, to name just a few factors. Thus, the competitors of the price-fixers may well have charged the same price notwithstanding the conspiracy, and purchasers such as Murray would be hard pressed to prove otherwise. Indeed, given the fact that economists have difficulty explaining the patterns of interdependence in any oligopolistic industry, which itself is invariably a necessary condition for successful price-fixing, it cannot be said that the noncompetitive pricing behavior of any manufacturer would not have taken place absent the conspiracy.

*Id.*

Plaintiffs seek to distinguish this case from a typical umbrella theory case in which a group of defendants fix their own prices, thereby creating a "price umbrella" under which non-conspirators can raise their prices should they choose to do so. Here, argue Plaintiffs, Defendants limited their own output of eggs, and, as a result of the commoditized pricing of eggs, Defendants increased the prices of eggs generally. Plaintiffs offer two principle distinctions from *Mid-West Paper*: first, the allegations here are not of a *price-fixing* oligopoly but a *supply-restricting* cartel. At least one court, albeit outside this circuit, embraced this distinction in a

footnote three decades ago. *See Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 719 n.9 (S.D.N.Y. 1981) ("This type of price increase is distinguishable from the 'umbrella' pricing situation in *Mid-West Paper Products*, *supra*. In a market in which supply is restricted, prices move up naturally pursuant to basic laws of supply and demand. In a market in which an oligopoly or price fixing arrangement allows a relatively small seller to raise its price to the level protected by the price 'umbrella', the small seller is not 'compelled' to raise his price to the same extent as a seller in a supply restricted market. Thus, the severe difficulties attendant with proving damages in an 'umbrella' pricing situation, which troubled the court in *Mid-West Paper Products*, *supra*, are not present in the case at bar."). Second, Plaintiffs seek to distinguish *Mid-West Paper* because here they are alleging a direct relationship between the alleged conduct and the increase in the non-conspirators' prices—more particularly, Plaintiffs are alleging the *same* direct relationship between Defendants' conduct and Defendants' prices as between Defendants' conduct and non-conspirators' prices.

The Court finds that this case falls under the prohibition on umbrella damages announced in *Mid-West Paper.* First, the Court does not see *Mid-West Paper*'s holding as being limited to the scenario where two or more sellers agree to sell at some certain inflated price. Antitrust law recognizes no meaningful distinction between an agreement on output and a price-fixing agreement, because economic theory informs that, for the most part, none exists. *See Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984) ("An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price,

31

reducing output, and dividing markets have the same anticompetitive effects.") *cited with approval in California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 777 (1999); *see also In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002) ("[T]he corrugated sheets and boxes contain linerboard that was subject to an agreement on output, which is equivalent to a price-fixing agreement."). In either scenario, to be successful, a conspiracy must have sufficient market share to prevent non-conspiring sellers from undercutting the conspiracy by selling at market prices. *See* Richard J. Pierce, Jr., *Antidumping Law As A Means of Facilitating Cartelization*, 67 Antitrust L.J. 725, 737 (2000) ("A cartel can be effective without including every producer, but its relative efficacy declines as the percentage of the market that it controls declines."). If the conspiracy has sufficient market share to effectively fix prices or reduce output, then, assuming non-conspiring sellers offer goods that are interchangeable with those offered by conspiring sellers, purchasers will seek to avoid the effects of the conspiracy by purchasing from non-conspiring sellers at prices below those offered by the cartel. *See* William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1465 (1985) ("Some potential purchasers, however, may not pay the overcharge for the cartelized product. Instead, they may purchase substitutes that are priced lower than the cartel price but above the competitive price of the cartelized product."). A rational non-conspiring seller would, at that point, either (a) increase its output to account for the increase in demand (thereby increasing its market share and undercutting the conspiracy); (b) increase its own prices so that its supply matches the demand for the products; or (c) some combination of these. *See id.* ("When a cartel controls less than the entire market, the competitive nonmembers will increase output until their marginal cost equals the cartel price. Thus, their output reduces the market power of the cartel by increasing the elasticity of the cartel's residual demand function. At the same time, they will

32

recover an 'overcharge' from their consumers by selling at the cartel price. This has been termed

the umbrella effect of a cartel."); *see also* Tr. Hr'g 4/20/15 36:3-16 (Plaintiffs' counsel

explaining that non-conspiring producers could choose any of these three approaches). The *Mid-*

*West Paper* court was concerned with the speculation involved in this choice facing the non-

conspiring seller. With respect to that choice, economic theory provides no meaningful

distinction between a price-fixing conspiracy and a supply-reduction conspiracy, and, the Court

thus concludes, neither does *Mid-West Paper*.[17]

---

[17] Admittedly, the economic underpinnings of *Mid-West Paper* have been questioned by courts and commentators for decades. Critics have noted that if conspirators hold a truly dominant market share, it would be futile and foolish for a non-conspirator to keep its price at competitive levels and try to increase its supply to meet the increased demand for its product as a result of the cartel. *See* Roger D. Blair & Virginia G. Maurer, *Umbrella Pricing and Antitrust Standing: An Economic Analysis*, 1982 Utah L. Rev. 763, 764 ("[F]ringe firms will not act as though their output decisions have a perceptible influence on price. Accordingly, they charge the current market price and simply adjust their output level to maximize profits. Thus, the fringe firms set their prices under the 'umbrella' of the dominant firms."). Thus, a rational non-conspirator would raise its prices above competitive levels as a result of the cartel's output reduction. *See* Roger D. Blair & William H. Page, *"Speculative" Antitrust Damages*, 70 Wash. L. Rev. 423, 442 (1995) ("Economic theory shows that a rational fringe competitor will match the price increase of a dominant firm (or cartel) in its market; if it did not do so, it would fail to maximize its profits. "). According to critics, it is "self-evident" that "just as the size of the output restriction affects the size of the overcharge to purchasers from cartel members, it also affects the size of the overcharge by the competitive fringe." *See* Page, *Scope of Liability*, *supra* at 1465-67 ("Just as the size of the output restriction affects the size of the overcharge to purchasers from cartel members, it also affects the size of the overcharge by the competitive fringe. As self-evident as the foregoing points are, the leading case denying recovery to purchasers in these instances [*Mid-West Paper*] seriously misconceived the economics of the issue in suggesting that there is no necessary causal relationship between the cartel's price increase and the nonconspiring firm's pricing."); *accord* Blair & Page, *"Speculative" Antitrust Damages*, *supra* at 442 ("Economic theory shows that a rational fringe competitor will match the price increase of a dominant firm (or cartel) in its market; if it did not do so, it would fail to maximize its profits. Consequently, if purchasers from the nonconspiring firm can prove that their supplier increased its price to match the illegally fixed price of the defendants, they should recover."); *Standing of Purchasers from Nonconspirators to Challenge Price-Fixing Conspiracy: Mid-West Paper Products Co. v. Continental Group, Inc.*, 93 Harv. L. Rev. 598, 605 (1980) ("Although causation might have been more difficult to prove in *Mid-West* than in the typical price-fixing case, the court's assertion that only a 'tenuous line of causation' links the prices paid by the plaintiffs to the defendants' conspiracy overlooks important characteristics of price-fixing

Even if the Court were persuaded to try to distinguish this case from *Mid-West Paper*,

perhaps by construing *Mid-West Paper* as driven by a factual scenario presenting a far more

difficult line of causation than is contemplated by orthodox economic theory, Plaintiffs have

failed to provide the Court with the necessary legal or factual support to make such a distinction.

Plaintiffs cite *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993), for

the proposition that the Third Circuit Court of Appeals has left open the possibility for recovery

for purchases from non-conspirators. Indeed, in *Lower Lake Erie*, the court held that "the mere

fact that monies paid to third parties . . . represent a component by which the steel companies

measure their damages does not foreclose further inquiry as to whether standing existed." *Id.* at

1168. However, at least one court has largely limited this aspect of *Lower Lake Erie* to its facts.

*See Skelaxin*, 2014 WL 2002887, at *11 ("Like the plaintiffs in *Lower Lake Erie,* the allegation

here is that Defendant prevented a less expensive alternative from entering the market thus

maintaining its market dominance. But, unlike *Lower Lake Erie,* the generic prices are not

---

conspiracies. . . . The typical price-fixing case occurs in a market for fungible goods in which
producers are sensitive to their competitors' prices. Absent the price umbrella, a nonconspiring
seller could exceed the market price only at the risk of a significant loss in his market share.
Thus, when a purchaser from a nonconspirator pays more than the price that would have
prevailed in the industry absent the conspiracy the defendants' conspiracy is the likely cause.").
Indeed, some courts have embraced the position advocated by these commentators. *See, e.g.*,
*U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) (Easterbrook, J.) ("A cartel
cuts output, which elevates price throughout the market; customers of fringe firms (sellers that
have not joined the cartel) pay this higher price, and thus suffer antitrust injury, just like
customers of the cartel's members."); *In re Uranium Antitrust Litig.,* 552 F. Supp. 518, 525
(N.D. Ill. 1982) ("Once the 'competitive' price of the nonconspirators is determined, it is not
only logical but essential to infer that any price higher than that which the nonconspirators
charged was the result of the cartel, since in a non-cartelized market, a seller can charge a higher
than competitive price only at the risk of losing market share and profits."). Despite these
contrary positions, *Mid-West Paper* remains binding precedent in this circuit. *Cf. In re Skelaxin
(Metaxalone) Antitrust Litig.*, No. 1:12-MD-2343, 2014 WL 2002887, at *11 (E.D. Tenn. May
15, 2014) ("That generic prices typically rise when there are fewer generic suppliers does not
distinguish this case from any other antitrust case in which the laws of supply and demand
suggest that anticompetitive conduct will raise prices on a broad scale.").

34

inherently derivative of the anticompetitive conduct. The price of generics are, like in the cases rejecting 'umbrella' damages, set by third parties."). *Lower Lake Erie* involved a conspiracy by railroads to prevent non-railroad owned docks from unloading ships carrying iron ore on Lake Erie. 998 F.2d at 1168. The court was presented with the question of whether the steel industry could recover for payments to the ship operators for the higher dock fees charged by the railroads. *Id.* The court reasoned that because every component of this industry—the iron, the ships, the docks, and the railroads—existed for the sake of creating steel, the lost profits of the steel industry as a result of the conspiracy were, essentially, damages directly attributable to the defendants. *See id.* ("The steel companies were the sole customers of the industry involved in the transhipment of ore; indeed, the industry existed for them. . . . The relevant question is whether [the defendants'] antitrust activity directly impacted the steel companies. Undeniably it did. . . . The direct nature of the injury absorbs the question of causal connection. There are no missing links in the causation chain here.").

Here, however, Plaintiffs seek recovery for purchases from competitors of Defendants. *Lower Lake Erie* did not involve such a scenario. *Lower Lake Erie* involved something more analogous to an indirect purchaser claim, in that the plaintiffs were able to recover for damages paid to an intermediate party—a recovery permitted only because the intermediate parties were conceived by the Third Circuit Court of Appeals in the aggregate as one industry serving a single customer.[18] Moreover, even under the most generous reading of *Lower Lake Erie* and the most

---

[18] Later in the *Lower Lake Erie* opinion, the court reaffirmed the rule in *Mid-West Paper* that damages paid to non-conspiring competitors are not recoverable. The court considered the defense argument that "the steel companies dock damages are also barred by *Mid–West Paper,* because these damages resulted from amounts paid to non-conspiring competitors of the defendant." *Id.* at 1169-70. The court first reiterated the holding that "direct purchasers from defendants' competitors lack[ ] standing to sue on the grounds that the competitors' prices would have been lower but for the defendants' illegal price fixing." *Id.* Then, the court rejected

parsimonious reading of *Mid-West Paper*, Plaintiffs would still not be able to recover under

Third Circuit precedent for purchases from non-conspirators because Plaintiffs have not adduced

sufficient evidence of how non-conspirators priced their eggs. *See* Tr. Hr'g 4/20/15 40:5-10

(Plaintiffs' counsel responding affirmatively to the question from the Court: "Are you essentially

arguing though that because of the way commodity markets work under economic theory, there

is really no reason and no need to look at the individual decisions of the non-conspirators?"). The

Court does not know whether non-conspirators price eggs based on cost-plus contracts and were

insulated from short-term price changes, whether non-conspirators priced eggs based on a

reported price, whether the prices of non-conspirators increased at a slower or lower rate than did

defendants', or whether non-conspirators undercut the prices of defendants by squeezing ever

more chickens into ever smaller cages, thereby increasing their market share.[19] This level of

speculation asks too much.

---

defendants' argument, but not by rejecting *Mid-West Paper*—rather, the court observed that
"[t]he jury awarded dock damages for the steel companies' inability to utilize the private docks
to handle iron ore. Thus, the damages arose from the conspiracy's effective attempt to eliminate
competition from private docks, not from the charges which might have been paid to those
private docks." *Id.* In other words, in *Lower Lake Erie*, unlike in *Mid-West Paper*, plaintiffs were
not seeking to recover for purchases from competitors of the conspirators.

[19] Although Plaintiffs have produced some evidence that pricing in the eggs market is
often tied to prices listed by Urner Barry, an agricultural price reporting firm, Plaintiffs have not
explained to the Court how the Urner Barry prices are determined, other than by offering the
somewhat circular explanation that Urner Barry posts "where . . . the market is at today, so to
speak." *See* Tr. Hr'g 4/20/15 23-24. Plaintiffs' expert, Dr. Kyle Stiegert's explanation is
similarly unhelpful in explaining Urner Barry pricing: "Urner Barry . . . goes out and collects
information about the market for eggs and establishes a regional price for eggs, reports it, and
makes that claim that that is the price for the region. It uses surveys, it gets on the phone, talks to
buyers and sellers. It may do a number of other things. I'm not entirely sure because it's a
proprietary formula. So from what we have learned there is a process they go through to make
that determination that is reasonably trusted by the industry." Tr. Hr'g 4/20/15 210:24-211:8.
These explanation certainly leave room for egg prices to correlate with Urner Barry pricing even
if insulated from a supply reduction, as Urner Barry might well include feed costs and the prices
of cost-plus contracts in its calculations.

Thus, under Third Circuit precedent, Plaintiffs would not be able to recover the damages they seek for purchases from non-conspirators.

### State laws

The above discussion on federal law, however, is only relevant to the extent the various state laws at issue are interpreted consistently with federal law—in particular, whether the state laws are interpreted consistently with the Third Circuit's bar on umbrella damages. The real question, after all, is whether the various states allow for these umbrella damages to be recovered. The good news, seemingly, for Plaintiffs, is that the Class Jurisdictions all share one feature in common—all have rejected the *Illinois Brick* bar preventing indirect purchasers from collecting damages for antitrust injuries. But Plaintiffs leave the Court to ponder how this feature of state antitrust law should affect the Court's analysis on whether damages are collectible from non-conspirators. The Court's initial research reveals further good news for Plaintiffs—that it would be erroneous to assume, without analyzing each state's applicable antitrust laws, that umbrella damages are barred under the laws of each state. For example, the California Supreme Court has explicitly held that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing" California's antitrust statute, the Cartwright Act, "given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century." *Aryeh v. Canon Bus. Solutions, Inc.*, 292 P.3d 871, 877 (Cal. 2013). At least one federal magistrate judge has examined whether umbrella damages are permitted under the Cartwright Act and concluded that, despite Ninth Circuit precedent barring umbrella damages under the Sherman Act, they are recoverable under the Cartwright Act. *Cnty. of San Mateo v. CSL Ltd.*, No. 10-CV-05686-JSC, 2014 WL 4100602, at *4 (N.D. Cal. Aug. 20, 2014) (Corley, M.J.) ("At bottom, Defendants' argument is that

because the Ninth Circuit has held that umbrella damages are not recoverable under the Sherman

Act, they are not recoverable under the Cartwright Act. The Court disagrees."). The court in *CSL*

reasoned much like the Court has here, observing that both the Ninth and Third Circuits, in

barring umbrella damages under the Sherman Act, relied heavily on the Supreme Court's

reasoning in *Illinois Brick*, making those decisions much less instructive when considering

antitrust statutes in states that have rejected *Illinois Brick. See id.* at \*5 ("Most prominently, the

[Ninth Circuit's] reliance on Illinois Brick for the proposition that tracing overcharges through a

multi-tiered distribution chain is 'unacceptably speculative and complex' is inapposite to claims

under the Cartwright Act because California has rejected *Illinois Brick*.").

       The bad news for the Plaintiffs is that they did not adequately address this issue under

California law, or the laws of any other states, as was their burden. Although the Court sees some

logical appeal to the theory that states that have rejected *Illinois Brick* would likewise reject a bar

on umbrella damages, a number of federal courts have held otherwise. *See, e.g.*, *In re TFT-LCD*

*(Flat Panel) Antitrust Litig.*, No. 09-4997, 2012 WL 6708866, at \*7 (N.D. Cal. Dec. 26, 2012)

("In the absence of any state law authority endorsing umbrella damages claims, and based on the

particular facts of these cases involving a multi-layered distribution chain, the Court finds it

appropriate . . . to preclude plaintiffs from pursuing their alternative umbrella damages theories.

Although the Ninth Circuit's decision in *Petroleum Products* rested on *Illinois Brick,* the

reasoning underlying its decision—that umbrella claims are 'unacceptably speculative and

complex'—applies here."); *F.T.C. v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 42 (D.D.C. 1999) *on*

*reconsideration on different grounds in part*, 99 F. Supp. 2d 1 (D.D.C. 1999) ("Because the

States do not suggest an independent state law approach to the 'umbrella standing' theory and

because state statutes refer to federal antitrust law for guidance, this portion of defendants'

motion is granted under the state laws for the same reasons that it is granted under federal law.").

Also, balanced against the factor that all of the Class Jurisdictions have rejected *Illinois Brick* is

the factor, as noted by Plaintiffs, that many states interpret their antitrust laws in harmony with

federal antitrust law. *See* IPP Reply Mem. in Supp. of Class Cert. 60 ("[N]early all of the

relevant states interpret their antitrust laws in generally the same manner (i.e., in accordance with

federal law) regardless of any textual variations."). *But see In re Flash Memory Antitrust Litig.*,

643 F. Supp. 2d 1133, 1153 (N.D. Cal. 2009) ("This Court, however, is reticent to adopt an

across-the-board rule that a state's harmonization provision, whether created by statute or

common law, is an appropriate means of predicting how a state's highest court would rule

regarding [antitrust standing]."). Ultimately, because Plaintiffs have not provided the Court with

the individualized analysis of the applicable states' laws to allow the Court to determine whether

they would permit the antitrust standing sought by Plaintiffs, the Court will decline to undertake

the "back-breaking labor involved in deciphering the state of antitrust standing in each of those

states." *Cf. Flash Memory*, 643 F. Supp. 2d at 1153.

Thus, because Plaintiffs have not provided the adequate legal and factual support for their

ability to recover damages for purchases from non-conspirators, the Court must find that

common issues do not predominate as to each of the proposed damages classes. Because the

classes are limited to damages for purchases of eggs from Defendants, and because Plaintiffs

have not proposed any method for distinguishing eggs sold by Defendants from eggs sold by

non-conspirators, the Court would need to undertake an individualized inquiry into each

purchase to determine whether the overcharge would be recoverable. Therefore, individualized

issues would predominate over common ones.

###### ii.   *Antitrust Violation*

Plaintiffs must demonstrate that common issues predominate as to the question of whether Defendants violated the applicable antitrust laws. Defendants apparently concede that Plaintiffs have met this burden, although Defendants contend that there may be manageability issues involved in applying each state's antitrust laws (*see infra* Part IV.b). The essence of the underlying claim is that Defendants engaged in a nationwide conspiracy to restrict the supply of eggs. Whether they, in fact, did so will turn on evidence common to the class. Similarly, whether such a conspiracy was illegal is a question of law common to the class.

The potential defenses are also susceptible to common proof. Defendants are likely to argue that (1) the UEP certified program was "*bona fide* animal husbandry program that resulted from the purportedly 'independent' work of a 'scientific advisory' committee;" and (2) the conduct was immunized from the antitrust laws by the Capper-Volstead Act, which provides certain agricultural associations with some extent of immunity from the antitrust laws. Consideration of these defenses will likely depend on evidence and questions of law common to the class.

###### iii.   *Antitrust Impact*

Plaintiffs must also demonstrate that the element of an antitrust injury is capable of proof using evidence that is common to the class. This is a tall task in a case such as this—Plaintiffs must show that it is possible to show through common proof that the individual class members suffered an injury—or impact—from the antitrust violation. As the Third Circuit Court of Appeals put it in *Hydrogen Peroxide*:

> Importantly, individual injury (also known as antitrust impact) is an element of the cause of action; to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation. In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s

predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof. Plaintiffs' burden at the class certification stage is not to prove the element of antitrust impact, although in order to prevail on the merits each class member must do so. Instead, the task for plaintiffs at class certification is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members. Deciding this issue calls for the district court's rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial.

*Hydrogen Peroxide*, 552 F.3d at 311-12 (citations omitted).

Further, because the Plaintiffs are *indirect* purchasers, they must demonstrate that there are two-levels of impact capable of proof using classwide evidence: first, that, as a result of Defendants' anticompetitive activity, all (or virtually all) retailers in the United States were overcharged for their purchases of shell eggs; and, second, that all (or virtually all) retailers passed on the overcharge to the Plaintiffs. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 502-04 (N.D. Cal. 2008).

Plaintiffs propose that they can demonstrate antitrust impact using (1) documentary evidence and witness testimony; (2) an expert analysis conducted by Dr. Kyle Stiegert demonstrating that egg pricing is explained by a common set of factors; and (3) an econometric model developed by Dr. Stiegert showing the classwide impact caused by Defendants' conspiracy and the amount of overcharges borne by consumers in the retail markets.

Plaintiffs contend that Defendants' own documents show that the conspiracy resulted in higher prices. They argue that Defendants "were well aware that reducing the number of hens (and thus the number of eggs) in the domestic market increases the overall market price for eggs." IPP Mem. in Supp. of Class Cert. 57. They assert that Defendants' own internal documents "tout the effectiveness of their coordinated programs to reduce layer numbers and

41

thus egg supply." *Id.* This documentary evidence is probative of a widespread antitrust impact, but not dispositive as to whether antitrust impact is capable of proof using common evidence.

Plaintiffs primarily rely on the expert testimony of Dr. Kyle Stiegert, a professor of Agricultural economics at the University of Wisconsin-Madison. Dr. Stiegert conducted an analysis designed to demonstrate that common evidence can demonstrate antitrust impact and damages. Briefly, Dr. Stiegert's expert report proceeds in the following manner: First, Dr. Stiegert considers the structure of the egg industry and concludes that it is conducive to a conspiracy to restrict supply and thereby raise prices. This conclusion is based on the high consolidation of the egg industry, the lack of competition from imported eggs, the inelastic demand for eggs, the lack of substitutes for eggs, the significant barriers to entering the egg industry, and the ability of the UEP to monitor and enforce a conspiracy.[20] Second, Dr. Stiegert determines that flock size is a key determinant of the price of eggs and that Defendants in fact reduced the flock size, increasing prices. Third, Dr. Stiegert determines that the ban on backfilling and the 100% Rule were essential to the effectiveness of the supply restriction. Fourth, Dr. Stiegert creates a model to predict the size of the laying flock absent any collusion. The model uses the prices of eggs in prior months and the price of feed in those months, along with other variables for seasonality, to determine the but-for flock size at the time of measurement. The model demonstrates the extent to which the conspiracy reduced the flock size and, as a result, total egg production. Fifth, Dr. Stiegert uses a demand elasticity of price of -.2 (meaning a 1% decrease in supply results in a 5% increase in price)[21] to determine the total

---

[20] These findings as to the market structure (at the direct purchaser level) for eggs are largely uncontested by Defendants. These findings are also probative of the extent to which the alleged conspiracy, if proven, would have affected the market.

[21] The formula is: (percent change in supply)/(percent change in price)=demand elasticity.

increase in price attributable to the conspiracy.[22] Sixth, Dr. Stiegert conducts a regression to
estimate the "pass-through rate"—the rate at which the overcharge was passed on to the indirect
purchaser plaintiffs by the retailers. Defendants raise several challenges to this analysis.

<em>Legal standard for evaluation of expert testimony at class certification</em>

The Third Circuit Court of Appeals recently held that "a plaintiff cannot rely on
challenged expert testimony, when critical to class certification, to demonstrate conformity with
Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony
satisfies the standard set out in *Daubert*." *In re Blood Reagents Antitrust Litigation*, 783 F.3d
183, 187 (3d Cir. 2015). *Blood Reagents* further implied that a *Daubert* inquiry was necessary at
class certification even in the absence of a formal *Daubert* motion when expert testimony critical
to a Rule 23 inquiry was challenged on the basis of its reliability. *See id.* at 188 n.9 ("Plaintiffs
contend Ortho waived the opportunity to bring a *Daubert* challenge. But in the trial court
proceedings, Ortho consistently challenged the reliability of plaintiffs' expert's models and the
sufficiency of his testimony to satisfy Rule 23(b)(3)."). Satisfying *Daubert*, however, is a
necessary but not sufficient condition for satisfying Rule 23(b)(3). That is, "opinion testimony
should not be uncritically accepted as establishing a Rule 23 requirement merely because the
court holds the testimony should not be excluded, under *Daubert* or for any other reason." *Id.* at
188 n.10 (quoting *Hydrogen Peroxide*, 552 F.3d at 323).

Defendants here have challenged the reliability of Dr. Stiegert's methods and results. To
certify a class based on Dr. Stiegert's testimony, the Court would have to first consider whether
Dr. Stiegert's testimony meets the standards set forth in *Daubert*. Under *Daubert*, an expert must

---

[22] That is, he multiplies the deficiency in the supply of eggs by -1/.2 (or -5) to determine
the increase in price—*e.g.*, if 1% of eggs were taken out of the supply, the total effect on price
would be $-.01*(-1/.2)=.05=5\%$ increase in price.

satisfy three "restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).[23] Admittedly, there exist unresolved questions with respect to Rule 23, although they do not affect the analysis here. For one, the space between the requirements of *Daubert* and Rule 23(b)(3)'s predominance inquiry, particularly with respect to antitrust cases, can be difficult to discern, as this Court has previously observed. *See In re Processed Egg Products Antitrust Litig.*, No. 08-MD-2002, 2015 WL 337224, at *3 (E.D. Pa. Jan. 26, 2015) ("To be sure, the Court recognizes that in the class certification context, the line between *Daubert* and the ultimate issues might prove somewhat illusory. That is because the reliability of the means of proving classwide impact frequently factors into the predominance determination in antitrust class actions."); *see also generally In re NJOY, Inc. Consumer Class Action Litig.*, No. CV 14-00428, 2015 WL 4881091, at *10-12 (C.D. Cal. Aug. 14, 2015) (collecting cases and discussing the distinction between the *Daubert* standard and the *Comcast* standard). Here, however, the Court need not wade into the murky waters between *Daubert* and Rule 23. Dr. Stiegert's expert testimony, even if admissible under *Daubert*, would not mean Plaintiffs satisfied Rule 23. Plaintiffs, in relying on Dr. Stiegert's testimony, have failed to prove by a preponderance of the evidence that common issues would predominate as to antitrust impact and damages. Accordingly, in reviewing Dr. Stiegert's testimony, the Court will not make formalistic distinctions between the standards of *Daubert* and Rule 23, but will instead consider issues of reliability and fit as they weigh upon Rule 23.

### Dr. Stiegert's co-movement analysis

Defendants challenge Dr. Stiegert's "co-movement" analysis in which he seeks to show that the prices for eggs "co-move" across various regions of the country, sizes of eggs, and colors

---

[23] No challenge has been made to Dr. Stiegert's qualifications.

of eggs. Dr. Stiegert seeks to demonstrate with this analysis that eggs across the country are subject to the same supply and demand factors, such that purchasers of eggs in, say, both Maryland and Arizona would be commonly affected by a restriction in supply. Defendants challenge this analysis on three grounds: "(1) Dr. Stiegert's own data reveals that there are numerous instances where prices do not move in tandem; (2) by using a series of *average* prices, Dr. Stiegert masks individual pricing differences—the very issue he is supposed to test; and (3) two price series may move in tandem even if one is affected by events that have no effect on the other." Mem. in Opp. to IPP Mot. for Class. Cert. 25.

Defendants' first argument relies on an expert analysis by Dr. William Myslinski, a Ph.D. economist and founding principal of Economists Incorporated, a private research and consulting firm. Dr. Myslinski shows that the differences between the prices paid by certain direct purchasers vary dramatically over time. For example, Dr. Myslinski compares the differences in the prices paid by Food Lion and Kroger, and finds that in some months Food Lion paid as much as 45 cents more than Kroger paid, while in other months, Kroger paid as much as 20 cents more than what Food Lion paid. Dr. Myslinski also compares the differences between the prices paid by various retailers and the Urner Barry price, a commodity index price listed by agricultural price reporting firm Urner Barry, noting dramatic differences between the prices paid by retailers on cost-plus contracts and the Urner Barry price. Dr. Stiegert criticizes this analysis, arguing that Dr. Myslinski did not properly consider the timing lag between the Urner Barry prices and the prices paid by the retailers. More generally, Dr. Stiegert responded to this criticism by remarking that "by focusing on the *differences* between the two data series, rather than the *movement* of the two data series, Dr. Myslinski obscures, rather than illuminates, whether the data series are correlated and driven by common factors." Stiegert Reply Decl. 20. The differences in the prices

45

paid, Dr. Stiegert argues, would not reflect whether both prices went up as a result of a supply shortage. Therefore, Dr. Stiegert argues, Dr. Myslinski's analysis on this point does not disprove that the prices are affected by a common set of factors.

Defendants also criticize Dr. Stiegert's use of averages in his co-movement analysis. Dr. Myslinski shows in his report that the averages used by Dr. Stiegert hide the wide variance in the individual data. For example, Dr. Myslinski calculates that in January 2006 the 25th percentile price for a jumbo egg was 69 cents, whereas the 75th percentile price was 91 cents. Because of the averaging these prices, Dr. Myslinski argues, Dr. Stiegert cannot demonstrate that the individual prices are affected by common factors. Plaintiffs counter that the use of averages here was appropriate to illuminate the common trends that would have been obscured by the individual data points. Plaintiffs explain that where the question is whether, for example, extra-large eggs are subject to different pricing patterns than jumbo eggs, it is appropriate to compare the average prices of each over time, which is precisely what Dr. Stiegert did.

Finally, Defendants argue that the co-movement analysis does not imply individual impact. Defendants point to Dr. Myslinski's hypothetical examples of price series where co-movement occurs even though only one of the comparators was affected by a price event. Plaintiffs counter that these hypothetical examples are irrelevant and not based on actual data.

The Court recognizes the limited value of Dr. Stiegert's co-movement analysis. To a large extent, the Court credits both the testimony of both Dr. Stiegert and Dr. Myslinski with regard to the co-movement analysis, recognizing that the two experts are often talking past each other rather than contradicting each other. Yes, the co-movement analysis demonstrates that certain subsets of the egg industry are subject to similar pricing patterns as others (*e.g.*, the pricing patterns in the Midwest and the Northeast co-move), which corroborates Dr. Stiegert's

46

market structure analysis. This is relevant in showing that, on the whole, none of these subsets are immunized from the common pricing forces in the nationwide egg market. But Defendants are also correct when they point out that this co-movement analysis does not establish that the individual purchasers were affected by the same event. For example, two price series might exhibit co-movement because they experience similar month-to-month fluctuations in price attributable to, for example, grain costs. If only one of those two price series experiences a long-term increase of 15% on all its prices because of the conspiracy, those month-to-month fluctuations will nevertheless cause the price series to exhibit co-movement. *See* Myslinski Decl. 43-44. The analysis is based on averages, which allow for large-scale comparisons but do not tell us anything affirmative about the individual purchasers—that is, the analysis excludes certain possible sets of individualized questions, but does not alone establish that common questions will predominate. To show that common questions will predominate as to antitrust impact, Plaintiffs need to rely on more than just the co-movement analysis. The co-movement analysis, at best, is probative of the extent to which the alleged conspiracy, if successful, *would have* affected the class. Indirect Purchaser Plaintiffs must also show that common evidence is capable of proving that the alleged conspiracy was successful and therefore did, in fact, have an identifiable impact on the class members.

### The but-for laying-inventory model

Defendants also challenge Dr. Stiegert's model that purports to estimate the supply of eggs in the "but-for" world, contending that the model is "so fundamentally flawed and unreliable that it must be disregarded." Mem. in Opp. to IPP Mot. for Class. Cert. 30. Defendants' first set of challenges to the model relate to whether Dr. Stiegert's model is consistent with the theory of liability because the model analyzes the reduction in the number of

egg layers of any type across the entire egg industry—not just the reduction in the number of

Defendants' layers of commodity shell eggs. *Cf. Comcast*, 133 S. Ct. at 1433 ("[A]t the class-

certification stage (as at trial), any model supporting a plaintiff's damages case must be

consistent with its liability case, particularly with respect to the alleged anticompetitive effect of

the violation." (quotation marks and citation omitted)). That is, Dr. Stiegert "did not examine

whether companies that produce eggs for use in egg products manage their laying inventory

based on factors that are different than those considered by shell egg producers," or whether

companies producing specialty eggs manage their inventory based on different factors, or

whether non-conspiring producers contributed to, or were responsible for, the drop in the flock

size. Mem. in Opp. to IPP Mot. for Class. Cert. 42. Dr. Stiegert and Plaintiffs argue that the total

laying flock is the appropriate measure here because of the extent to which commodity shell eggs

and other types of eggs are interrelated. They contend that "any increase in the consumption of

specialty eggs comes at the expense of consumption of commodity eggs." IPP Reply Mem. in

Supp. of Class Cert. 43.

The Court agrees with Defendants that Dr. Stiegert and Plaintiffs should have

investigated further how non-conspiring producers and non-commodity eggs affected the supply

of eggs during the relevant period. The Court quibbles not with Plaintiffs' general notion that the

total size of the flock of commodity egg layers is "the key determiner of egg prices." *See id.* at

42. However, any drop in egg supply should be sufficiently tied to Defendants' conduct to make

the model reliable for showing antitrust impact. Here, Plaintiffs did not isolate the effects of

Defendants' conduct on the total egg supply; any supply reduction by non-conspiring producers

has not been controlled for. *See* Tr. Hr'g 4/21/15 21:10-22:3 (cross-examination of Dr. Stiegert)

("Q: Do you have any specific information about the nondefendants in this case? A: . . . That

really wasn't a focus of mine, was the defendant versus nondefendant aspect of those periods. So since I . . . was not able to discern that difference in these readings and in the data that is provided by public agencies, the answer is, I suppose, no."). Although evidence shows that 80-85 percent of eggs were produced within the UEP Certified program during the class period, *see* Stiegert Decl. 12, the failure to account for non-conspiring producers and the failure to account for non-commodity eggs, are both flaws undermining the reliability of Dr. Stiegert's model.

The non-commodity eggs included in the egg-layer model—*i.e.*, specialty eggs—(which were specifically excluded from the class) would appear to warrant particular attention. Specialty eggs are priced differently than commodity eggs and, in many cases, are produced in more resource-intensive ways. *See* IPP Mot. for Class Cert. Tab 229 (Moark presentation explaining that the prices for "regular shell eggs" are based upon the Urner Barry index, whereas the prices for "specialty eggs" are "fixed and are not directly impacted by the Urner Barry market"). Free-range and cage-free eggs, for example, could require more capital per egg to produce. Thus, a shift to these types of specialty eggs could decrease the egg supply absent any conspiratorial conduct. The Court observes that there is some evidence in the record that the number of specialty eggs produced increased significantly during the conspiracy period. *See id.* (showing an increase in the percentage of specialty eggs out of total eggs by volume from 4.9% in 2004 to 12.2% in 2007); Tr. Hr'g 4/21/15 68:24-69:2 (cross-examination of Dr. Stiegert) ("Q: And you are just assuming that specialty eggs comprised 15 percent of the market? A: My posture there is conservative. The reality is it's less in the early years. It kind of trends toward around 15 percent in the later years."). There is also evidence that the portion of egg production devoted to processed eggs products, which are included in the but-for layer model but not the class

49

definition, rose from 15 percent in 1982 to 32 percent in 2013. *See* Myslinski Decl. 23. The way in which layers of egg products bias the model is likewise unexplored.

To some extent, whether the decrease in the supply of eggs is attributable to a rise in specialty eggs or a rise in egg products is a common question that could be presented to a jury, but individualized questions nevertheless arise because, for example, the effect of specialty eggs on the egg supply may well depend upon the specific geographic region, supplier, or retailer. Additionally, the failure to isolate the effect of the conspiracy on the purchases of eggs meeting the class definition weighs against the reliability of the model for demonstrating antitrust impact and damages. The Court thus agrees with Defendants that the modeling of layers of all eggs, rather than just the layers of commodity shell eggs, weighs against the reliability of Dr. Stiegert's model and against a finding that common issues predominate.

With respect to non-conspiring producers of eggs, Plaintiffs have not persuaded the Court to disregard the effects of the inclusion of non-conspiring purchasers in Dr. Stiegert's model. Defendants note that between 2000 and 2001, McDonald's, Burger King, and Wendy's announced their own animal welfare policies, all requiring more cage space per hen (72+ square inches) than did the UEP Certified Program. Whether these additional cage-space requirements were adopted by non-conspiring producers, contributing to the drop in egg supply, is not addressed by Dr. Stiegert. More generally, Plaintiffs did not address at all the flock size of non-conspiring producers during the relevant period. Plaintiffs argue that whether Defendants are responsible for the supply reduction is a question common to the class. The Court acknowledges Plaintiffs' point to some extent (although whether the prices of non-conspiring producers would have affected the class commonly, as opposed to only certain individual purchasers, has not been addressed), but the Court must also consider whether Plaintiffs' evidence that common issues

predominate as to antitrust impact is convincing. Part of that inquiry is determining the extent to which Dr. Stiegert's model, which purports to show a common impact on the putative classes, is reliable. With respect to the failure to isolate the effects of the actions by Defendants on the supply of commodity eggs, the Court finds that Dr. Stiegert's model is flawed in a manner weighing against its reliability. As the Court previously discussed, Plaintiffs have not addressed how non-conspiring producers priced their eggs during the conspiracy period, and it is too speculative to (a) assume, without evidence,[24] that purchases from those non-conspiring producers were affected by the conspiracy; (b) assume, without evidence, that purchases from non-conspiring producers were affected by the conspiracy to a similar extent as purchases from conspiring producers; and (c) assume that any decrease in the flock size is attributable only to conspiring producers and that non-conspiring producers had no effect on the decrease in the flock size. *See id.* Tr. Hr'g 4/21/15 68:9-14 (cross-examination of Dr. Stiegert) (responding affirmatively to the question: "You extrapolated the Defendants' data for the non-defendants' data that you didn't have. And you are assuming the non-defendants are just like the Defendants for purposes of your damage analysis [with respect to the percentage of eggs entering the retail channel]?"). The inclusion of non-conspiring producers' layers in the but-for model, without investigation as to how it might bias the model, weighs against the model's reliability.

Defendants spill considerable ink challenging Dr. Stiegert's model for assuming that there would have been no additional cage-density restrictions but for the conspiracy. The Court agrees with Plaintiffs that assuming additional cage size increases in a hypothetical world in which there was no conspiracy would have made Dr. Stiegert's model less reliable because of the

---

[24] The Court finds unpersuasive, if not borderline hyperbolic, the anecdotal statements to the effect that "100% [of egg producers] have benefitted," *see* IPP Hr'g Binder Tab 16 (citing Baker Dep. at NL001236), as these opinions are unsubstantiated by any direct evidence of how the conspiracy affected non-conspiring producers.

degree of speculation involved. Besides, the failure to include assumed additional but-for cage size increases does not cause individualized questions to predominate, given that the issue of whether cage sizes would have increased regardless appears to be common to the class. *Cf. Neale v. Volvo Cars of N. Am., LLC*, --- F.3d ----, No. 14-1540, 2015 WL 4466919, at *14 (3d Cir. July 22, 2015) ("[P]redominance does not require that common 'questions will be answered, on the merits, in favor of the class.'" (quoting *Amgen*, 133 S. Ct. at 1191)). That said, Plaintiffs should have, at least, examined whether cage sizes in non-conspiring henhouses remained static or increased during the class period. This examination would not necessarily have shown what cage density restrictions Defendants would have adopted absent the conspiracy, but, as previously discussed, it would have provided support for the notion that Defendants' actions were the cause of the drop in the supply of eggs—thereby bolstering the reliability of the model. As is, the model is flawed in its failure to account for the effects on the supply of eggs by producers not involved in the conspiracy.

Defendants also challenge (1) Dr. Stiegert's choice of a benchmark period, (2) Dr. Stiegert's finding that egg producers would have continued to expand, and (3) Dr. Stiegert's model of how egg producers manage their inventory. These particular criticisms are not persuasive.

Dr. Stiegert uses the period of January 1992 through July 2002 to create a model for how the laying flock is determined by certain factors. This benchmark model allows Dr. Stiegert to estimate the but-for flock sizes during the conspiracy period, by comparing how flock size changed with certain factors during the benchmark period and how flock size changed with respect to those same factors during the conspiracy period. Defendants contend that this benchmark period is flawed both because it is arbitrary and because it is a period of atypical

growth in the egg industry. Dr. Myslinski tested Dr. Stiegert's model by beginning the benchmark period in 1988 in one regression and in 1985 in another. In each of these tests, Dr. Myslinski found that actual flock size during the conspiracy exceeded but-for flock size. Plaintiffs, through Dr. Stiegert, respond by arguing that Dr. Myslinski's proposed benchmark periods are inappropriate because they contain "structural breaks," meaning that the variables explaining the market fundamentally changed during the years included in Dr. Myslinski's benchmark period. Stiegert Reply Decl. 30. Dr. Stiegert contends that the structural break in the late 1980s can be attributed to the concerns about cholesterol in the 1980s which depressed demand for eggs. Dr. Stiegert asserts that his benchmark period represents a period of steady demand consistent with the demand during the conspiracy period, making it an appropriate benchmark.

The Court agrees that Dr. Stiegert's benchmark period is an appropriate benchmark period. The benchmark data covers ten years' worth of transactions, which is a sufficiently robust period. Defendants' arguments about the effects of adding an additional four to seven years to the beginning of the benchmark, while not entirely irrelevant, are not especially persuasive. For purposes of class certification, Dr. Stiegert's benchmark period does not make his model unreliable and would not result in individualized questions predominating over common ones.

Defendants criticize Dr. Stiegert's analysis for not investigating whether the egg industry had the capacity to accommodate the more than 22 million additional hens predicted by Dr. Stiegert's but-for model. Defendants argue that Dr. Stiegert inappropriately assumed that Defendants would have expanded their capacity by constructing new facilities for all these additional hens. The Court does not find Defendants' arguments compelling on this point. As Dr.

Stiegert noted in his Declaration, the growth rate he estimated for the but-for world was lower

than the growth rate during the benchmark period. *See* Stiegert Reply Decl. 40. Also, the cage

space program constrained the capacity of the industry, meaning that in the absence of the

conspiracy, the capacity would have able to accommodate more hens. *See id.* at 41-46. The Court

credits these explanations and finds that the defense criticism does not weigh against the

reliability of the model (or against a finding of predominance as to impact, given that this

criticism will succeed or fail on a classwide basis).

Defendants next criticize Dr. Stiegert's model for being divorced from the realities of

how egg producers manage their layer inventory. Defendants point to anecdotal evidence of

individuals who have not altered the size of their laying flocks because of a change in the price

of eggs or chicken feed. This argument, however, is unpersuasive. Of course, there will be

individuals whose decisions do not perfectly match the regression model. The point of a

regression model is to demonstrate how, on the whole, the industry operates. Defendants' efforts

to counter this regression model using anecdotal statements of producers claiming to be

indifferent to certain factors in the regression is unavailing. It would be like arguing that, because

one diehard baseball fan says that she would attend games no matter how good (or bad) the local

team is, attendance at baseball games is unrelated to the local team's winning percentage.

Anecdotal statements, while often colorful or attention grabbing, are rarely informative of how

the industry operates as a whole—for that, drier statistics are far more reliable.

The final criticism leveled by Defendants against the but-for model is that it fails to

account for whether the conspiracy would have affected those purchasing eggs under

commitment and cost-plus contracts, which were set based on production costs and, therefore,

theoretically, "insulated . . . from price effects resulting from fluctuations in market output and

flock size," *see* Myslinski Decl. 37. Defendants contend that these contracts pose individualized

issues about the impact of the conspiracy on retailers. Plaintiffs contend that such contracts were

rare and, because they were negotiated during the conspiracy period, would have been affected

by the conspiracy in any event. Defendants cite *In re Rail Freight Fuel Surcharge Antitrust*

*Litigation*, 725 F.3d 244 (D.C. Cir. 2013), in which the D.C. Circuit Court of Appeals considered

a class action against rail freight shippers who had allegedly conspired to add a "fuel surcharge,"

violating the antitrust price-fixing prohibition. *Id.* at 247. The expert for the putative class

provided a regression estimating an average overcharge and seeking to demonstrate that the class

could prove common injury through common proof. *Id.* at 250. The defendants argued that the

expert's model was flawed because it would have ascribed an injury even to those plaintiffs who

had negotiated legacy contracts with the defendants before the alleged conspiracy period. *Id.* The

court of appeals vacated the district court's certification of the class, finding that the district court

had not adequately considered this flaw. *Id.* at 255.

Plaintiffs argue that Dr. Stiegert's model here does not suffer from precisely the same

flaws as the model in *Rail Freight*. Plaintiffs contend that the contracts here were set during the

conspiracy period, unlike the contracts in *Rail Freight*, which were set prior to the conspiracy

period, making injury impossible. *Cf. In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1267 (10th

Cir. 2014) ("Second, Dr. McClave's model does not suffer from the same flaw identified in *In re*

*Rail Freight.* There, the appeals court could not credit the expert's opinion because his

methodology yielded damages for a time period in which prices had been freely set. Thus, the

expert found damages for plaintiffs who could not possibly have suffered injury. Here, by

contrast, Dow has not identified a single class member for whom injury was impossible."). This

is a potentially significant distinction because, at least in theory, the artificially inflated price

would have served as the baseline market price for the negotiations. *See In re Polyurethane Foam Antitrust Litig.*, No. 1:10-MD-2196, 2014 WL 6461355, at *33 (N.D. Ohio Nov. 17, 2014) ("Contract negotiations thus took place in the context of artificially inflated baseline pricing, effects which likely became 'baked into' the contracts.").

Plaintiffs argue that, at any rate, cost-plus contracts were rare, as evidenced by a Cal-Maine annual report from 2008 stating that 90 percent of shell eggs sold in the United States were sold based on Urner Barry.[25] IPP Reply Mem. in Supp. of Class Cert. 33 n.54. Plaintiffs have not, however, advanced their arguments about cost-plus contracts beyond the theoretical level to the level of sufficient evidence to demonstrate common impact. Plaintiffs have not adequately examined the prevalence of cost-plus pricing (a single annual report from Cal-Maine in 2008 that only indirectly bears on the prevalence of cost-plus contracts does not provide the Court with adequate information for determining how common these types of contracts were). Thus, the Court cannot conclude that all the cost-plus contracts were negotiated during the class period and therefore negotiated from a higher baseline. Plaintiffs did not endeavor to examine how cost-plus pricing was negotiated or calculated, and have not demonstrated that cost-plus pricing was tied to flock size or the price increases caused by the alleged supply reduction conspiracy. As Plaintiffs themselves note: "key details [about cost-plus contracts] remain unclear, such as: (a) the duration of such contracts, (b) the amount of commerce covered by such contracts, overall or for any retailer, and (c) the specific terms of any such contract . . . ." Reply Mem. 34.

---

[25] Plaintiffs also offer anecdotal deposition testimony in support of the prevalence of Urner Barry pricing (although, as previously discussed, Plaintiffs did not explain to the Court how Urner Barry prices are set and appear to be assuming that the prices have a direct and consistent relationship to the conduct alleged here, *see supra*, note 19).

The Court agrees that these are key details that remain decidedly unclear. Indeed, because Defendants have marshaled evidence that more than a de minimis portion of the egg retail industry purchased eggs on a cost-plus basis, it was Plaintiffs' burden to answer these questions and to provide the Court with the evidence needed to determine that common issues predominate as to antitrust impact notwithstanding cost-plus contracts. Dr. Myslinski testified on behalf of Defendants about cost-plus pricing during certain periods for Walmart (which accounts for 25% of grocery sales), Meijer, Trader Joe's, CCF, and Harris Teeter.[26] Dr. Myslinski also demonstrated that, as one might expect, the prices for eggs sold on a cost-plus basis to CCF differed dramatically from the Urner Barry pricing, presumably because the cost-plus prices were insulated from the dramatic spikes in Urner Barry pricing. Plaintiffs needed to provide the Court with further support for their position that these cost-plus contracts were controlled in some demonstrable fashion by the conspiracy, or, at least, that their existence does not cause individualized issues to predominate over common ones.

Thus, the Court finds that the varied types of contracts, particularly cost-plus contracts potentially immune from the effects of the supply reduction, weighs against a finding that common issues predominate. The issue is not dispositive, because Defendants have likewise not proven that cost-plus contracts were so prevalent that they did more than partially immunize a few retailers for a short period from the impact of the supply reduction. *Cf. In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 227 (E.D. Pa. 2012) ("[Courts] have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class." (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D.

---

[26] Defendants posit that from 2011-2013 alone, cost-plus transactions would have totaled at least $470 million, not including sales by non-defendant producers. *See* Defendants' Post-Hr'g Submission 13 n.9.

297, 320–21 (E.D. Mich. 2001))). Nevertheless, the existence of a substantial number of contracts potentially immune from the conspiracy, the prevalence and mechanics of which have not been adequately addressed by Plaintiffs, weighs against class certification. Such contracts could necessitate individualized inquiries into whether purchases from retailers who bought on cost-plus contracts were affected by the conspiracy, and (for purposes of measuring aggregate damages) by how much. *Cf. Vista Healthplan, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1833, 2015 WL 3623005, at *21 (E.D. Pa. June 10, 2015) ("Without a means of identifying these uninjured persons using common evidence, every class member would need to be reviewed on an individualized basis to see if they were impacted by Defendants' alleged anticompetitive actions.").

### *The pass-through model*

Defendants also challenge Dr. Stiegert's pass-through model, which seeks to demonstrate that the overcharge was passed on to the retail customers—*i.e.*, Indirect Purchaser Plaintiffs. Defendants contend the model suffers from a number of flaws that make it unreliable. First, Defendants argue that Dr. Stiegert's pass-through analysis ignores the realities of retail egg pricing, which are highly varied and individualized. The overlooked issues cited by Defendants include cost-plus contracts, the use of eggs as "loss leaders" designed to attract customers, and the use of price points. Second, Defendants criticize Dr. Stiegert's pass-through regression models for calculating a *single* average overcharge for the entire market.

Defendants first criticize Dr. Stiegert's model for failing to account for the varied approaches to egg purchasing and pricing used by retailers. The Court agrees that the evidence shows that the pass-through rates were far more varied and localized than Dr. Stiegert's model demonstrates. Dr. Kevin Murphy, a professor of economics at the University of Chicago,

testified on behalf of Defendants, and the Court credits his testimony. Dr. Murphy explained in his analysis that local competition heavily influences the pricing decisions of retailers and that any accurate measure of overcharge would require accounting for the effects of geography, competition, pricing strategy, and contract type—*i.e.*, conducting individualized analyses that would overwhelm the common issues here. Defendants again give special attention to the cost-plus contracts on which some retailers purchased eggs. The Court finds persuasive Defendants' argument that cost-plus contracts would have affected not just the retailer with the cost-plus contract, but other retailers as well, who would have priced their eggs to compete with the local retailers who did have cost-plus contracts. For example, Dr. Murphy shows in his Declaration that retailers in five geographic areas had lower egg prices if located in close proximity to a Wal-Mart, which, at least for some portion of the class period, bought eggs on a cost-plus basis. Defendants also point to the use of pricing strategies that differentiate the pass-through rates across retailers. Eggs are often sold as "loss leaders" whereby retailers sell eggs below cost in order to attract customers to the store, and the use of price points is common (whereby the sale price ends in a 9—implying that not all changes in wholesale price will be reflected in the retail price). These and other marketing schemes are evidence that the anticompetitive overcharge, if any, cannot be determined on a classwide basis using the limited data by Plaintiffs, especially over the lengthy time period posed by Plaintiffs, undercutting Plaintiffs' common evidence of antitrust impact and measurable damages.

Plaintiffs' defenses of Dr. Stiegert's model do not ameliorate the Court's concerns. Plaintiffs point to various factors supporting consistent, high rates of pass-through to retail purchasers of commodity shell eggs, including the high competition in the retail grocery market, as well as that eggs are a low-value-added product, that the demand for eggs is highly inelastic,

and the ability of retailers to frequently change the price of eggs. Plaintiffs contend that their empirical analysis confirms that Defendants' actions would have been passed onto and harmed all or effectively all consumers.

But Dr. Stiegert's methodology in calculating the single overcharge rate is flawed. First, Dr. Stiegert performed only one regression using actual cost and retail pricing information—a regression on Kroger's data. The Court agrees with Dr. Murphy's criticism that Dr. Stiegert's model is flawed not just because Kroger is the sole retailer examined but also because Dr. Stiegert does not analyze how the pass-through rate varies across Kroger's divisions, thereby masking important individualized differences in pricing. Dr. Stiegert's analysis did not properly assess whether the single, average pass-through rate found for the Kroger data was representative for all Kroger stores, or if the individual stores had wildly varied pass-through rates that were averaged together in Dr. Stiegert's model.

Dr. Stiegert also ran regressions on transactional and retail data provided by IRI, which provides the weekly average price for each UPC (bar code) of eggs sold. This regression, which was used by Dr. Stiegert only to confirm his Kroger regression, was flawed because (a) the IRI data comes only from 2009 to 2013, (b) the IRI data includes only 51 very limited geographic areas and some Class Jurisdictions have no data included in the IRI; and (c) the IRI data is averaged across entire cities and is not individual to the stores. Dr. Murphy, on the other hand, analyzed the store-level data and concluded that significant variation exists between different retailers and even for different types, sizes, and colors of eggs. Dr. Stiegert also ran a regression on Consumer Price Index data as a way of confirming his regression on the Kroger data. This regression is likewise flawed because the Consumer Price Index data includes only the monthly

average prices of large grade A white eggs—that is, only "one size, one grade, and one color of eggs." Mem. in Opp. to IPP Mot. for Class. Cert. 58. Moreover, Dr. Murphy notes that:

> The CPI price data is an index that combines information from various outlets and geographies into a single price estimate, which essentially amounts to assuming away any geographical or egg-type variation in pass-through rates without an ability to test for its relevance. In addition, the CPI data is a compilation that includes prices of specialty eggs, which are not part of the proposed class.

Murphy Decl. 33. The Court finds this explanation of the shortcomings in the Consumer Price Index data persuasive.

Plaintiffs defend these three regressions by asserting that although "[i]n theory, averaged data could be used to conceal a large number of class members that had not suffered any injury. . . . that is not the case here." IPP Reply Mem. in Supp. of Class Cert. 48. Dr. Stiegert conducts an analysis demonstrating that even when retailers used promotional pricing on eggs, those promotional prices were higher during the conspiracy than they would have been otherwise. Plaintiffs argue that any speculative concerns that a few customers were not affected by the conspiracy on certain purchases of eggs is not sufficient to defeat class certification. *See Flonase*, 284 F.R.D. at 227 ("[Courts] have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class." (quoting *Cardizem*, 200 F.R.D. at 320–21)).

But Dr. Murphy's testimony persuades the Court that there is wide variation in the rate at which any overcharge was passed through to consumers, and while Dr. Stiegert did not need to calculate the overcharge for every transaction, he should have at least explored, at the transaction level, the extent to which the overcharge was passed through in each of the Class Jurisdictions and at more than one of the retailers. For example, even among the Kroger data, the pass-through rates across the separate divisions of Kroger vary greatly. *See* Murphy Decl. Figure 6. Further,

Dr. Murphy's Declaration shows that convenience stores price in different ways than grocery stores. *See id.* at 20. The average price of eggs at convenience stores between August 2012 and December 2013 was essentially the same—about $2.35 a dozen. *Id.* at Figure 2. During the same period, the prices of eggs at grocery stores varied from a high price near $2.25 a dozen to low point near $1.75 a dozen. *Id.* This data shows that it is not reliable to assume, without substantiation, that convenience stores will pass along an overcharge at the same rate as Kroger, or even that convenience stores, which apparently hold egg prices steady more so than do grocery stores, passed along the overcharge at all. *See* Tr. Hr'g 4/21/15 197:3-14 (direct examination of Dr. Murphy) (testifying that "even though on average over [a select period] retail prices are going down, it's really composed of a mix of a large number of declining prices and a not quite as large but still large number of places where prices were going up. So it's not like all boats move together.")

The case law understandably allows for averages and aggregations, but only if the court is convinced that the averages and aggregations are not masking individualized issues that are likely to predominate should the class action move forward. Here, the Court is not convinced that Dr. Stiegert's model is not masking individualized questions, such as whether all retailers in fact passed through the overcharges. The pass-through model improperly assumes, without adequate support, that because one retailer passed through the overcharge at a certain rate averaged across its stores, all retailers *nationwide* shared that overcharge rate or, at least, passed along some positive overcharge—averages cannot account for what the pass-through rate was at the individual store level, and averages might mask stores with no pass-through rate at all. *See id.* at 205:2-6 (direct examination of Dr. Murphy) ("Q: Is it possible that even with these average pass through rates that some pass-through rates may be none or negative and some might be positive

62

or higher? A: I think that's absolutely what you'd think. I mean when you look across even gross

categories . . . it tells you that there is not this uniform story of wholesale moves that moves all

retail."). The confirmatory regressions are based on IRI and CPI data that are averaged at such a

high level that they cannot accurately account for whether the individualized differences in

geography, price strategy, retailer, and other variables affect the pass-through rate.[27] Should the

class action be permitted to proceed, the Court believes individualized questions about whether

and how much each retailer passed through the overcharge in each location would predominate

over common questions with respect to the impact of the conspiracy on the retail customer.

*Conclusion as to antitrust impact*

The Court concludes that common issues do not predominate as to antitrust impact.

Defendants have demonstrated too many weaknesses in the reliability of Dr. Stiegert's

testimony, particularly with respect to his pass-through model. Plaintiffs have produced

documentary evidence of a widespread price increase that some within the industry attributed to

---

[27] Dr. Stiegert's analysis of how the retail prices of eggs in 51 locales are correlated is likewise not persuasive that a single pass-through rate is appropriate (let alone this particular pass-through rate). As Dr. Murphy explained in his Declaration:

The fact that prices in two cities are highly correlated does not imply that pass-through rates in the two cities must be similar. Suppose that changes in the wholesale prices in city A always resulted in an equivalent increase in retail prices, implying a pass-through rate of 1. Suppose that changes in wholesale prices in city B always resulted in a change in retail prices that was one half of the change in wholesale prices, implying a pass-through rate of 0.5. Suppose further that the change in wholesale prices in city A always equals the change in wholesale prices in city B—an assumption that is consistent with Dr. Stiegert's view that wholesale prices in different parts of the country are highly correlated because of arbitrage. Under these circumstances, retail prices in cities A and B will be highly correlated (and, indeed, will have a correlation coefficient of 1.0) even though the pass-through rates in the two cities by construction are significantly different (1.0 and 0.5).

Murphy Decl. 11. Dr. Murphy also demonstrates in his Declaration that, "notwithstanding the correlation coefficient of .949 between prices in Columbus and Cleveland, knowing the amount of an increase in egg prices in Cleveland does not allow one to predict reliably in any given case that egg prices in Columbus went up at all." *See* Murphy Decl. 25-26.

Defendants' conduct, and Plaintiffs have shown that egg prices across differing types of eggs and regions of the country move together. This evidence is probative of a common antitrust impact, but it is not dispositive. That prices tend to co-move across various types of eggs and regions of the country does not mean that the conspiracy caused all of those prices to increase or would have caused all prices nationwide to increase. Moreover, it says nothing about who pays the premium from the conspiracy. Plaintiffs' evidence of common impact on the retailers suffers from a number of flaws of varying degrees, including the failure to isolate the effects of the conspiracy, the failure to account for cost-plus contracts, and the inclusion of non-commodity eggs and eggs produced by non-conspirators in the model without an adequate analysis of them. Finally, and most critically, the model does not show that common evidence can prove antitrust impact at the level of the indirect purchasers—*i.e.*, that retail customers were the ones paying the premium resulting from the conspiracy. Plaintiffs attempt to show that the premium resulting from the conspiracy was passed on to consumers, but their model falls short. Their model fails to analyze what appear to be significant individualized differences in pricing across different retailers and regions. Dr. Murphy's testimony, which the Court credits and finds persuasive, shows that pricing at the retail level is far more individualized and complex than Dr. Stiegert's single-pass-through model acknowledges and can accommodate. Thus, after consideration of the evidence from both Plaintiffs and Defendants, and after accounting for the shortcomings of Dr. Stiegert's model, the Court concludes that common issues do not predominate as to antitrust impact.

### *iv.   Measurable Damages*

The final element to which Plaintiffs need to demonstrate that common issues predominate for the alleged antitrust violations is that of "measurable damages" on a classwide

basis. *Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-12 (citing 15 U.S.C. § 15). "At the
class certification stage, the plaintiffs are not required to prove damages by calculating specific
damages figures for each member of the class, but rather they must show that a reliable method
is available to prove damages on a class-wide basis." *In re Wellbutrin XL Antitrust Litig.*, 282
F.R.D. 126, 144 (E.D. Pa. 2011). That is, Plaintiffs must show that there is a reliable means for
measuring damages with reasonable accuracy in the aggregate. *See King Drug Co. v. Cephalon,
Inc.*, No. 2:06-CV-1797, 2015 WL 4522855, at *14 (E.D. Pa. July 27, 2015) ("Courts have held
that proof of aggregate damages is appropriate in class actions." (citing *In re Pharm. Indus.
Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009)). "Calculations need not be
exact," but must be consistent with the theory of antitrust impact. *Comcast*, 133 S. Ct. at 1433.

Plaintiffs offer the overcharge regression of Dr. Stiegert, whose methodology was (a) to
calculate the overcharge paid by the direct purchasers, (b) multiply it by a single rate by which
the overcharge was passed through to the indirect purchasers, and then (c) multiply that number
by the number of purchases to arrive at the total damages. He then divided those total damages
by each of the Class Jurisdictions' population to arrive at total damages in each of the Class
Jurisdictions. Plaintiffs contend that even though some individualized fact-finding will be
necessary in applying these overcharge models to individual defendants, the single overcharge is
a common model for measuring damages that satisfies the predominance requirement.
Defendants argue that this method is flawed not just because the single pass-through method is
itself flawed, but also because the use of state populations rather than state-by-state egg
purchases is inappropriate. Defendants argue that such an approach fails to account for the
differences in egg purchases by state—for example, perhaps people in New York buy more eggs
than people in North Carolina, or buy more specialty eggs than people in New Mexico, or buy

65

eggs from retailers with lower pass-through rates than people in California, or so on. Plaintiffs counter that eggs are bought by nearly every household in the nation and that therefore population is a reasonable proxy for purchases.

Although the Court agrees with the general principles underlying Dr. Stiegert's methodology—*i.e.*, determining "the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation multiplied by the number of units purchased," *Flonase*, 284 F.R.D. at 232 (citation omitted)—the Court finds that many of the flaws in Dr. Stiegert's model identified in this common-impact analysis weigh significantly against the model's utility for measuring classwide damages. The failure to isolate the effect of the conspiracy upon the supply of commodity eggs weighs heavily against the reliability of this model as a tool for measuring classwide damages. *Cf. Comcast*, 133 S. Ct. at 1433 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."). Plaintiffs' theory of the case is that Defendants conspired to increase the costs of commodity shell eggs. Yet their damages model measures the drop in supply of all egg layers—including specialty egg layers and non-conspiring producers' egg layers—without any analysis of how this might bias the model. Plaintiffs did not investigate whether non-conspiring producers maintained their cage sizes and supply levels throughout the class period or whether the inclusion of specialty eggs could explain part of the drop in the flock size. The failure to account for cost-plus contracts and commitment contracts likewise makes the model less reliable, as the Court would be merely speculating that the existence of cost-plus contracts had no effect on the ultimate damages calculation.

The Court is most persuaded by the inability of Dr. Stiegert's pass-through model to reliably determine the extent to which any overcharge was passed through to the consumer. As

the Court detailed above, Dr. Murphy's testimony, which the Court credits and finds persuasive, demonstrates that the use of a single overcharge pass-through rate, without consideration as to whether individual retailers pass through the overcharge at different rates, is flawed. Plaintiffs did not demonstrate to the Court that their single pass-through rate adequately accounts for the variation in pricing and would result in a reasonably accurate measure of damages on a classwide basis. The Court is particularly persuaded by the failure to consider whether the pass-through rate is consistent across the several states under the laws of which Plaintiffs seek to certify a class.

To be clear, the Court recognizes that "individual damages calculations do not preclude class certification under Rule 23(b)(3)," *Neale*, --- F.3d ----, 2015 WL 4466919 at *16 (quoting *Comcast*, 133 S. Ct. at 1437 (Ginsburg, J. & Breyer, J., dissenting)), and the Court is not rejecting the damages model because of the variation in the individual damage calculations between and among the class members. Rather, the Court is rejecting a model that assumes, rather than measures, the aggregate rate at which the overcharge was passed through across countless retailers and diverse regions of the country. While damage "[c]alculations need not be exact," *Comcast*, 133 S. Ct. at 1433, this does not imply that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be. Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* (emphasis in original). The Court is also not rejecting out-of-hand the notion that a single pass-through rate here could have been a "just and reasonable inference" for the amount of damages across the class. *See id.* (quoting *Behrend v. Comcast Corp.*, 655 F.3d 182, 206 (3d Cir. 2011)).

However, Plaintiffs would have needed to demonstrate that this single pass-through rate is not simply speculating that the variation among stores, retailers, and geographic areas is

67

accounted for in that single pass-through rate. This variation in the pass-through rates shows that it is not reasonable to assume that one retailer's pass-through rate will estimate all the others' pass-through rates. To use a single pass-through rate, then, Plaintiffs would need to show some way of estimating the aggregate average pass-through rate. Here, Plaintiffs only examined one retailer's pass-through rates, and attempted to confirm its accuracy by comparing it to data (namely, the IRI and CPI data discussed above) that is not sufficiently tied to the Class Jurisdictions and theory of liability here (the IRI data is averaged at a high level, limited geographically, and contains no data from some Class Jurisdictions, and the CPI data is also averaged, limited to a single size of egg, and includes specialty eggs not included in the class definition). Plaintiffs therefore have shown no reliable way of demonstrating what the pass-through rate for each class as a whole would have been,[28] and therefore have not shown a reliable methodology for calculating the damages of the class as a whole.

---

[28] The Court is also troubled by the use of population as a proxy for egg purchases in each Class Jurisdiction without evidence supporting the assumption that the populations of Class Jurisdictions purchase eggs at the same rate or that the overcharge rates are similar. This concern is exacerbated by the recognition of the lengthy time period for the proposed classes. Also, the Court is troubled that, according to Dr. Murphy, Dr. Stiegert did not properly analyze how the magnitude of the change at the wholesale level affects the magnitude of the change in the pass-through rate. In other words, a 15% increase in price at the wholesale level is perhaps more likely to be passed through at a higher rate than a 1.5% increase, but Dr. Stiegert did not properly account for this. As Dr. Murphy explained on cross examination:

> Q: Do you understand what [Dr. Stiegert] did was the product of the averages?
> A: In some sense, yes, because the average—we had a coefficient. It's not even that good really because the regression coefficient isn't really a matrix weighted average of all of the different changes. So it's [ ] weighted by the degree of changes in the data set that you are looking at, not by the degree of changes in the variables you ultimately get run through it. So—I make this point in my labor class. . . . It's really important actually if you want to understand business cycles, because different groups in the economy have their wages move different amounts over the business cycle. Some groups have very cyclical wages and some groups don't and they also have different responses to those wages. So if you take the average response and multiply it by the average change in wage, you greatly mis-estimate what the impact of wage changes are on the amount people work,

Accordingly, the Court cannot and does not find that common issues predominate as to damages.

### v.   Conclusion

Because the proposed classes are overbroad, and because Plaintiffs have not demonstrated that common issues will predominate as to antitrust impact and/or measurable damages, the Court concludes that Plaintiffs have not met their burden of demonstrating that common issues will predominate as to their claims under the antitrust laws of 21 states.

### 2. Consumer Protection Laws

Plaintiffs bring claims for violations of the consumer protection laws of seven of the states in which they seek to certify a class.[29] Plaintiffs contend that upon demonstrating that they are entitled to relief under the antitrust laws, they will also be entitled to relief under these consumer protection laws. Plaintiffs have brought no other theory under the state consumer protection laws. Because the Court finds that common issues do not predominate as to the antitrust claims brought by Plaintiffs, the Court finds likewise with respect to the state consumer protection claims.

---

because the people who have the biggest response have the biggest change in wages. And if you ignore that and just multiply the average coefficient by the average change, you get way the wrong answer, very, very far off. And this is the point. It's just well known that you can't just take averages across averages and then think you have the right total. It just does not work.

Tr. Hr'g 4/21/15 280:20-281:25.

[29] Those seven states are California, Florida, Massachusetts, Nebraska, New Mexico, North Carolina, and Vermont.

### 3.  Unjust Enrichment Laws

Additionally, Plaintiffs bring claims under the unjust enrichment laws of 17 states.[30]

Plaintiffs assert the elements of the unjust enrichment claims in these 17 states are essentially

identical and are met if an antitrust claim is successful. However, because Plaintiffs have failed

to demonstrate that common issues predominate as to their antitrust claims, and because

Plaintiffs assert no other theory of unjust enrichment, common issues cannot predominate as to

their unjust enrichment claims.[31]

### b.  Superiority and Manageability

The "superiority" requirement asks whether a case is better brought as a class action or in

an alternative form of litigation, such as individual lawsuits. Rule 23(b)(3) sets out four factors

for the Court to consider: (a) the class members' interests in individually controlling the

prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning

the controversy already begun by or against class members; (c) the desirability or undesirability

---

[30] Those 17 states are Arizona, California, Florida, Iowa, Kansas, Massachusetts, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

[31] Moreover, Plaintiffs have not addressed whether common issues are likely to predominate as to the unjust enrichment laws in the 17 states. Plaintiffs have provided citations to the elements of unjust enrichment in these states, but Plaintiffs have not sufficiently analyzed whether these elements are capable of common proof. As Plaintiffs themselves note, there are a variety of state-of-mind requirements in the unjust enrichment laws, *see* Reply Mem. 66 (citing standards ranging from knowledge and appreciation to willfulness), and, as Judge Mitchell Goldberg of this District recently noted, significant differences among the laws of unjust enrichment requires that Plaintiffs provide a detailed accounting of the state variations along with a feasible method for grouping them, *see Vista Healthplan*, 2015 WL 3623005 at *34. More fundamentally, "[n]otwithstanding the variances in the applicable state law, the equitable nature of the unjust enrichment remedy also compounds the predominance issues with Plaintiffs' proposed unjust enrichment class." *Id.* Although Plaintiffs have provided citations to the elements of unjust enrichment in these states, Plaintiffs have not sufficiently analyzed whether these elements are capable of common proof, and, as the Court will discuss with respect to manageability, have not provided the Court with a detailed plan for grouping the differing claims so that they can be presented to the same jury.

of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.

Plaintiffs propose that all 21 of the damages classes can present their claims in a single trial. Defendants do not challenge the first three of the superiority requirements, but do challenge whether the classes here are manageable because of the variation in the state laws. The Third Circuit Court of Appeals has instructed that a case presenting variations in state law can be manageable as a class action if the state laws can be grouped into a set of predictable patterns. *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 183-84 (3d Cir. 2014).

Beyond proposing that all 21 classes could bring their claims in the same action, Plaintiffs have offered little in the way of specifics for how such a trial could be managed. Plaintiffs have provided charts seeking to demonstrate what the requirements of each state are with respect to the claims at issues, but Plaintiffs have not proposed how those state claims would be grouped and managed at trial. Other courts have noted the extent to which unjust enrichment laws vary across states and found them unmanageable in a single class litigation. *See, e.g., Vista Healthplan*, 2015 WL 3623005, at * 35 ("I find that the variations in state law also render class litigation unmanageable. Other courts have reached similar conclusions regarding the manageability of proposed multi-state unjust enrichment classes."); *Donachy v. Intrawest U.S. Holdings, Inc.*, No. 10-4038, 2012 WL 869007, at *10 (D.N.J. Mar. 14, 2012) ("Briefing the unjust enrichment and negligent misrepresentation claims of the three states at issue on the motion to dismiss has already exposed the difficulty in finding common ground between various states' common law claims, given the oftentimes subtle differences between the states."); *Lilly v. Ford Motor Co.*, No. 00 C 7372, 2002 WL 507126, at *2 (N.D. Ill. Apr. 3, 2002) ("[V]ariations in state common laws of unjust enrichment demonstrate that class certification of such a claim

71

would be unmanageable."). Plaintiffs themselves acknowledge that differences exist among the various state law claims at issue here, but urge the Court to find that these differences are minor and can be accounted for at trial. *See, e.g.*, IPP Reply Mem. in Supp. of Class Cert. 64 ("While Defendants point to superficial textual differences [in Cooperative Marketing exemptions], such as 'farmer' [a requirement in New York,] versus 'agricultural business,' [a requirement in Iowa,] they fail to explain how these terms would be interpreted any differently or cause manageability problems."), 66 ("While it is true that ten of the relevant Class Jurisdictions have a state-of-mind requirement, this fact is of little help to Defendants."). Yet Plaintiffs largely appear to base their arguments with respect to manageability on the notion that their evidence will be so overwhelming that any differences in the state laws will pale in the process. *See, e.g.*, *id.* at 63 ("Defendants point out that some states require a showing of willfulness or flagrancy [under their consumer protection laws]. Although some states have this scienter requirement, it does not create manageability problems. There is ample evidence that all Defendants acted 'willfully.' . . . The willfulness requirement can be addressed with a simple jury instruction and possibly a special verdict form."); *id.* at 61 ("[A]ll of the relevant states hold that a violation of federal antitrust law constitutes a violation of their respective consumer protection statutes.").

The Court cannot adopt and act upon such an assumption. Perhaps if presented with a single orator purporting to summarize claims a jury would agree that "[t]here is ample evidence that all Defendants acted 'willfully'" such that any state of mind less than willfulness would be likewise met, *see id.* at 63, and perhaps a jury would find a violation of the federal antitrust laws and therefore find violations of the state consumer protection statutes, *see id.* at 61, but Defendants are certain to demand and then contest Plaintiffs' evidence, and any trial must be

able to manage the possibility that a jury will accept all, some, or none of Plaintiffs' arguments and evidence.

Plaintiffs' "Suggested Trial Options" memorandum, found at tab 218 in the exhibits to their Reply Memorandum, mentions the specific state requirements only in passing, suggesting that "[b]ecause determination of the claims under each of the state laws may be established by individual jury questions, any special factual requisites for multiple damages (such as scienter requirements) may be noted for check off on the individual state verdict forms (including special verdict forms) and explained to the jury during the instructions." However, Plaintiffs do not show, or even suggest, what the jury instructions would look like or how the verdict form could be written to account for the nuanced differences in the state laws. Plaintiffs do not show what grouping of the state law claims would make most sense and how those groups would account for all of the differences in the laws. Because of the significant variability in the state laws Plaintiffs seek to apply, a more detailed plan for managing this proposed "all-in-one" litigation would be necessary to meet the burden of showing this proposed class action is manageable. *See Cf. Grandalski*, 767 F.3d at 183 ("[P]laintiffs face a significant burden to demonstrate that grouping is a workable solution."). Without receiving anything approximating such a plan, the Court must conclude that Plaintiffs have not demonstrated by a preponderance of the evidence that this putative class action would be manageable as proposed.

## V.    RULE 23(b)(2)

Rule 23(b)(2) provides that "[a] class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the class as a whole."[32] Plaintiffs here seek to certify an injunctive class under Rule 23(b)(2) for the alleged violations of the federal antitrust laws (indirect purchasers may not seek damages under the federal antitrust laws, but may seek injunctive relief, as here). Plaintiffs argue that the injunction class is appropriate to prevent Defendants from continuing to violate the federal antitrust laws.

The Court will not certify the injunction class at this time, but will permit Plaintiffs, should they choose to do so, an opportunity to renew their motion for certification of a Rule 23(b)(2) class. Put plainly, the Court does not believe the difficult issues involved in certifying a Rule 23(b)(2) class in this context have been adequately addressed by either party. Plaintiffs and Defendants collectively used 10 pages of briefing to discuss issues pertaining to the proposed injunctive class, out of a combined 262 pages of briefing—the equivalent of one mile out of a marathon. But serious issues bearing critical, detailed analysis confront the proposed injunctive class. The Court will highlight these issues and leave for Plaintiffs to decide whether to continue to pursue a nationwide injunctive class.

### a. Propriety of a Rule 23(b)(2)

"Subsection (b)(2) class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.'" *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998). Defendants assert that this class action seeks primarily monetary damages. Viewing the class action as a whole, the Court agrees. Indeed, the volume of paper and amount of discovery dedicated to the monetary damages classes as opposed to the injunctive class belie any argument that injunctive relief is the primary relief sought in this litigation. Plaintiffs make

---

[32] The Third Circuit Court of Appeals has held that "ascertainability is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief." *Shelton*, 775 F.3d at 563.

no such argument, however, and instead argue that injunctive relief need not be the primary

relief with respect to the proposed class action as a whole, but only with respect to the proposed

Rule 23(b)(2) class. In other words, as Plaintiffs characterize the scenario, because all damages

claims would proceed in the proposed Rule 23(b)(3) actions, the Rule 23(b)(2) class, which

advances a claim under a statute for which injunctive relief is the sole remedy, is not primarily

seeking money damages. Thus, it would be error, according to Plaintiffs, to deny certification

under Rule 23(b)(2), where no monetary damages are sought by the class seeking certification

under that rule, because of additional classes brought under Rule 23(b)(3).

The question over the propriety of certifying a Rule 23(b)(2) class in this context appears

to lack a definitive answer. Courts that have considered the issue have differed in their

conclusions. Some have agreed with Plaintiffs' arguments and found nothing problematic in

certifying an injunctive class alongside classes seeking damages. *See, e.g.*, *In re OSB Antitrust

Litig.*, No. 06-826, 2007 WL 2253425, at \*17-18 (E.D. Pa. Aug. 3, 2007) ("Plaintiffs respond

that I need not even consider this issue because the claims for damages and injunctive relief are

entirely separate—they arise under different statutes (Clayton Act versus state statutes) and are

brought on behalf of different classes. I agree with Plaintiffs. . . . The nationwide class

potentially includes many members from states that do not permit damages actions. Thus, a

significant portion of the nationwide class seeks injunctive relief only. In these circumstances, it

is appropriate to certify two separate classes under Rules 23(b)(2) and 23(b)(3)."). Others have

agreed with Defendants that where monetary damages predominate, certifying an accompanying

injunctive class is inappropriate. *See, e.g.*, *In re Flash Memory Antitrust Litig.*, No. C 07-0086

SBA, 2010 WL 2332081, at \*7 (N.D. Cal. June 9, 2010) (holding that where class had proposed

injunctive classes alongside damages classes that "[c]ertification of any Statewide Classes under

Rule 23(b)(2) likewise is inappropriate in light of the fact that Plaintiffs' primary intent in this litigation is to recover damages for past purchases"); *Graphics Processing*, 253 F.R.D. at 507 ("From the onset of litigation, it has been crystal clear that both groups of plaintiffs have primarily sought monetary damages. Several antitrust decisions have denied certifying under Rule 23(b)(2) where the primary relief sought was money." (collecting cases)). The Court, however, does not believe that a bright-line test is the correct approach to resolving this question.

Instead, the Court believes that when a Rule 23(b)(2) class is proposed alongside Rule 23(b)(3) classes, the correct approach is to rigorously analyze whether the proposed class is appropriate, especially in light of the potential res judicata effects of any judgment. The Court derives its approach from the Third Circuit Court of Appeals's opinion in *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169 (3d Cir. 2009).

*Hohider* considered a district court's decision to certify a class under Rule 23(b)(2) for determining liability, leaving determinations of damages for later adjudication. *Id.* at 172-73. Plaintiffs argue that *Hohider* is inapposite because it dealt with the issue of pulling out specific elements of a claim and certifying them for class treatment, whereas here Plaintiffs propose to deal with a separate claim as a class. *Cf. Kalow & Springut, LLP v. Commence Corp.*, No. 07-3442, 2011 WL 3625853, at *3 (D.N.J. Aug. 15, 2011) ("The Court need not engage in this type of analysis because the inquiry here is not whether *specific elements or issues* within a claim should be partially certified, but rather, whether partial certification of a single *cause of action,* or a claim, is suitable."). The Court agrees that *Hohider* is not a perfect analog and does not definitively address the question presented here. However, *Hohider*'s approach is instructive, standing for the proposition that all certification determinations under Rule 23 "must be supported by rigorous analysis." 574 F.3d at 201. The district court in *Hohider* erred because

"[o]nce the District Court decided that plaintiffs' compensatory and punitive damages claims

were incompatible with Rule 23(b)(2) . . . it did not explain why this determination did not

interfere with certification of the class for other purposes, nor did it address what effect, if any,

such partial certification would have on the class action going forward." *Id.* at 202. Here,

similarly, the Court has refused to certify the damages classes under Rule 23(b)(3) and must

analyze the effect this has on the propriety of certifying a class under Rule 23(b)(2). The factors

identified in *Hohider* for determining when certification of separate Rule 23(b)(2) and Rule

23(b)(3) classes is appropriate are instructive here as well: "the overall complexity of the case

and the efficiencies to be gained by granting partial certification; the substantive law underlying

the claim(s), including any choice-of-law questions it may present; the impact partial

certification will have on the constitutional and statutory rights of both the class members and

the defendant(s); the potential preclusive effect that resolution of the proposed issues class will

have; and so forth." *Id.* at 201-02.

As in *Hohider*, one potential difficulty here is upon the rights of the class members who

might be bound by a ruling against them in a Rule 23(b)(2) action. That is, there is a danger that

those individuals who would have a right to a jury trial to seek damages from Defendants would

lose their ability to bring claims as a result of their being bound to an unsuccessful Rule 23(b)(2)

action. As the Supreme Court put it in *Dukes*:

> Respondents' predominance test, moreover, creates perverse incentives for class
> representatives to place at risk potentially valid claims for monetary relief. In this
> case, for example, the named plaintiffs declined to include employees' claims for
> compensatory damages in their complaint. That strategy of including only
> backpay claims made it more likely that monetary relief would not
> "predominate." But it also created the possibility (if the predominance test were
> correct) that individual class members' compensatory-damages claims would be
> *precluded* by litigation they had no power to hold themselves apart from. If it
> were determined, for example, that a particular class member is not entitled to
> backpay because her denial of increased pay or a promotion was *not* the product

of discrimination, that employee might be collaterally estopped from independently seeking compensatory damages based on that same denial. That possibility underscores the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have.

*Dukes*, 131 S. Ct. at 2559. These concerns articulated in *Dukes* apply here, as any judgment might preclude class members' claims for damages.

The perils of claim preclusion when certifying a Rule 23(b)(2) class alongside Rule 23(b)(3) classes has troubled many courts, as it does this one. In *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 114 (E.D.N.Y. 2012), the court posited that "participation in a Rule 23(b)(2) class seeking injunctive relief does not ordinarily preclude absent class members from bringing their non-litigated claims in subsequent lawsuits," but nevertheless acknowledged that this determination was not universal, and that "the court conducting the action cannot predetermine the res judicata effect of the judgment." *See id.* at 114-15; *see also Skelaxin*, 299 F.R.D. at 578 (recognizing the considerable disagreement and uncertainty among the courts on the res judicata effects of a Rule 23(b)(2) action). At least one court has, in a substantially similar situation to the one before the Court here, refused to certify a Rule 23(b)(2) class where the potential res judicata effects of the action were not adequately addressed. *See Skelaxin*, 299 F.R.D. at 577-79 ("[T]he Court has reservations about the possible preclusive effect of such a class on the damages claims of absent class members. Even if claim-splitting is not implicated by class actions, absent class members may be collaterally estopped from relitigating some issues in a damages action, as the *Dukes* court feared. Accordingly, End Payors' motion will be denied in whole.").[33] Plaintiffs

---

[33] The Court also observes the potential for prejudice to the class members' rights to a jury trial on their damages claims. The Supreme Court has instructed that "[i]f there should be cases where the availability of declaratory judgment or joinder in one suit of legal and equitable causes would not in all respects protect the plaintiff seeking equitable relief from irreparable harm while affording a jury trial in the legal cause, the trial court will necessarily have to use its

here have not addressed this thorny and weighty issue, other than to acknowledge that "a judgment *could* result in issue preclusion" but "given the homogenous nature of a (b)(2) class, this is not problematic." IPP Reply Mem. in Supp. of Class Cert. 76 n.200. Indeed, at the Class Certification Hearing, Plaintiffs' counsel acknowledged, when asked about whether a Rule 23(b)(2) bench trial would have "any kind of an estoppel effect" that he "would have to think about those things." Tr. Hr'g 4/20/15 54:17-18. Indeed. Because these are precisely the issues the Court must consider, Plaintiffs have not met their burden.

The Court believes that this and other difficulties in certifying a Rule 23(b)(2) class alongside a Rule 23(b)(3) class warrant rigorous analysis akin to that mandated by *Hohider*, even when, as here, the Rule 23(b)(2) class represents a separate cause of action. Plaintiffs have not met their burden of demonstrating the propriety of a Rule 23(b)(2) class because they have not

---

discretion in deciding whether the legal or equitable cause should be tried first. Since the right to jury trial is a constitutional one, however, while no similar requirement protects trials by the court, that discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510, 79 S. Ct. 948, 956, 3 L. Ed. 2d 988 (1959); *see also Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 424 (5th Cir. 1998) ("In deciding whether the district court should have temporarily severed the disparate impact claim for class treatment, we must ascertain whether this claim shares any factual issues with the pattern or practice claim, which both parties are entitled to have decided first by a jury."). On the other hand, the refusal to certify the Rule 23(b)(3) classes might render moot the Seventh Amendment issues, because there is no longer a corresponding legal claim from the class on which a jury trial is demanded. *See Coleman v. Gen. Motors Acceptance Corp.*, 220 F.R.D. 64, 85 (M.D. Tenn. 2004) ("Here, the defendant attempts to show that the Seventh Amendment would be violated by determining issues now that might be common to hypothetical, follow-on suits for money damages that may or may not be brought, not live claims for which a jury has been timely and properly demanded. This is not mandated by the Trial by Jury Clause, and the court will not deny class certification on this ground."). At any rate, the Court's reflections cannot replace rigorous analysis of whether the trial rights of the class members are implicated here. Plaintiffs (and Defendants as well, although Plaintiffs bear the burden of demonstrating the propriety of class certification) have not adequately addressed whether these Seventh Amendment concerns apply here and, if so, how this issue weighs upon class certification. The Court has not been presented with the materials to conduct the rigorous analysis required here.

provided the Court with the legal and evidentiary support necessary for the Court to conduct such an analysis and find in favor of certifying the class.

### b. Whether the Class is Properly Defined

An injunctive class must be properly defined. "A properly defined 'class' is one that: (1) meets the requirements of Rule 23(a); (2) is sufficiently cohesive under Rule 23(b)(2) and [the Third Circuit Court of Appeals's] guidance in *Barnes*, 161 F.3d at 143; and (3) is capable of the type of description by a 'readily discernible, clear, and precise statement of the parameters defining the class,' as required by Rule 23(c)(1)(B) and [the Third Circuit Court of Appeals's] discussion in *Wachtel*, 453 F.3d at 187." *Shelton*, 775 F.3d at 563.[34] While a 23(b)(2) class must meet the requirements of Rule 23(a), it need not meet the ascertainability requirements that apply to Rule 23(b)(3) classes. *See id.* ("[A]scertainability is not a requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief, such as the putative class here.").

A Rule 23(b)(2) class must be sufficiently cohesive. *Barnes*, 161 F.3d at 143 ("While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive."). This cohesiveness requirement protects two interests. The first interest is in protecting unnamed class members, who "are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action." *Id.* The cohesiveness requirement protects this interest by ensuring that "significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' claims present different individual issues

---

[34] The Court will assume for purposes of this analysis that the Rule 23(a) factors with respect to the putative injunctive class have been met. That assumption, however, will need to be discarded should Plaintiffs seek reconsideration of the denial of the certification of the Rule 23(b)(2) class. The Court will need to undertake a rigorous analysis of any proposed class, including whether the class definition (including any provision excluding purchasers of specialty eggs) is sufficiently clear.

than the claims of the absent members present." *Id.* (citations and quotation marks omitted). The second interest is in ensuring that the litigation remains manageable. If a class is not sufficiently cohesive, "the suit could become unmanageable and little value would be gained in proceeding as a class action if significant individual issues were to arise consistently." *Id.* (quotation marks, citations, and alterations omitted).

For a court to find a class cohesive, it must find that the "class's claims are common ones and that adjudication of the case will not devolve into consideration of myriad individual issues." Newberg on Class Actions § 4:34. "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Dukes*, 131 S. Ct. at 2557 (emphasis in original). Here, Plaintiffs must show that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," with respect to: "(1) actual or threatened injury 'from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur;' (2) causation; and (3) likelihood that the equitable relief will redress the injury." *OSB*, 2007 WL 2253425, at *17 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130 (1969)).

The Court has not been presented with evidence as to how such relief would provide appropriate final relief to the class as a whole. The ability to fashion relief for the class as a whole is not necessarily as straightforward as Plaintiffs appear to assume. At least one state, California, now mandates that egg layers be housed in cages larger than the 67-inches the UEP certified program had required. *See* Cal. Code Regs. tit. 3 § 1350(d) ("[A]n enclosure containing nine (9) or more egg-laying hens shall provide a minimum of 116 square inches of floor space

per bird."). Defendants assert that other states have passed laws similarly bearing upon animal welfare. *See* Dr. Myslinski Direct Examination Binder Tab 21 (listing animal welfare laws in Arizona, California, Maine, Michigan, New Jersey, Ohio, Oregon, and Washington). Whether an injunction would be appropriate in California or other states with recently passed animal welfare laws is not discussed by Plaintiffs, and given the lack of clarity regarding what present violations of the antitrust laws require what types of injunctive relief, the Court cannot begin to speculate about how such an issue would play out should the case move forward. Also, the Court has now found that Plaintiffs have not demonstrated that common issues predominate as to the impact of the alleged conspiracy and as to the damages from that conspiracy. Although predominance is not a requirement for a Rule 23(b)(2) class, the Court must nevertheless consider whether the individualized issues undermine the cohesiveness of the class. The parties, however, have not sufficiently discussed this difficult issue. That Plaintiffs have failed to demonstrate that the impact of the conspiracy can be demonstrated using common evidence is not necessarily fatal to certification under Rule 23(b)(2), however, as a threatened future injury can be sufficient. *See Neale*, --- F.3d ----, 2015 WL 4466919, at *10 ("Technically speaking, those (b)(2) class members may not have suffered a legal injury and, at best, may only have standing in light of a threatened future injury."). But before the Court can determine whether an injunction could be based on grounds that have general application to the class, it must know what policies of Defendants are ongoing and threaten future injury, and how any injunction could provide relief. Plaintiffs have not provided the Court with sufficient evidence of Defendants' current policies or how an injunction could benefit the class. Instead, their evidence has focused on past actions and past harm. Although some of these activities are *alleged* to be ongoing, for the Court to

82

undertake its rigorous analysis of whether the requirements for class certification are met, more is required.

The Court also finds that Plaintiffs have failed to meet the third of the requirements described in *Shelton*, as they have failed to demonstrate that their proposed class is capable of the type of description required by Rule 23(c)(1)(B). Rule 23(c)(1)(B) requires that "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses." The Court could not presently draft such an order because Plaintiffs have failed to specifically articulate the injunctive relief they seek. Any injunction issued by the Court would need to satisfy the requirements of Federal Rule of Civil Procedure 65(d), which provides: "Every order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." As the Tenth Circuit Court of Appeals put it: "At the class certification stage, the injunctive relief sought must be described in reasonably particular detail such that the court can at least conceive of an injunction that would satisfy Rule 65(d)'s requirements, as well as the requirements of Rule 23(b)(2)." *Shook v. Bd. of Cnty. Commissioners of Cnty. of El Paso*, 543 F.3d 597, 605 (10th Cir. 2008); *see also M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 845 (5th Cir. 2012) ("[T]he injunctive relief sought must be specific."). Moreover, Plaintiffs' sought injunction must be more specific than merely requiring that Defendants follow the law. *See Belitskus v. Pizzingrilli*, 343 F.3d 632, 650 (3d Cir. 2003); *see also Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) ("And individual issues cannot be avoided simply by formulating an injunction at a stratospheric level of abstraction; as we have explained before, injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65." (quotation marks and citation omitted)).

Plaintiffs themselves apparently acknowledge that they are "not specifying the exact nature of the injunctive relief they seek." *See* IPP Reply Mem. in Supp. of Class Cert. 73. In a footnote in their Reply Memorandum, Plaintiffs do provide that they "plan to seek an injunction that, *inter alia*, prohibits Defendants from entering into agreements to limit supply, prohibits the use of the UEP to create or implement supply reduction strategies, and eliminates the 100% rule, the ban on backfilling, as well as the licensing program." *See id.* at 73 & n.195. Although this list of potential relief comes closer to satisfying Rule 23(c)(1)(B), it still falls short of the detail needed for the Court to undertake its analysis. *Cf. Wachtel ex rel. Jesse v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 189 (3d Cir. 2006) ("The very use of the phrase "*inter alia*" ("among other things") in the [Order describing the issues appropriate for class certification] suggests that it is intentionally incomplete.").

### c.  Conclusion as to Injunctive Class

Plaintiffs have not met their burden of demonstrating that certification of the Rule 23(b)(2) class is appropriate. Their failure to adequately address the legal issues presented by their proposed class does not allow for the Court to conduct the rigorous analysis required under Rule 23. Further, Plaintiffs have not adequately demonstrated the cohesiveness of their proposed class or provided the Court with sufficient evidence to be able to meet the requirements of Rule 23(c)(1)(B). The Court will therefore decline to certify the Rule 23(b)(2) class.

Nevertheless, the Court is not convinced that the Rule 23(b)(2) class could not be certified using the evidence already in the record. The Court will thus provide Plaintiffs with the opportunity to renew their motion for certification of their injunction class. However, any such motion should discuss in detail and with citation to the now-existing evidentiary record: (a) what specific claims are appropriate for class treatment; (b) what injunctive relief is sought; (c) how

the passage of animal welfare laws in California and any other jurisdictions affect the cohesiveness of the class; (d) the legal issues surrounding whether the certification of this class will preclude later litigation and whether this bears on the decision to certify the class; (e) whether any other constitutional or statutory rights would be prejudiced by the certification of the proposed class; and (f) why a nationwide class, as opposed to a class limited to states where damages are unrecoverable, or as opposed to an individual action, is the appropriate form for this litigation. Defendants will, of course, be given the opportunity to respond if a renewed effort is mounted.

## VI.    CONCLUSION

Certifying a class, even in a case as seemingly prototypical as one involving a nationwide price-fixing conspiracy, is not an easy task, and the Court cannot certify a class absent the rigorous analyses prescribed by law. Understandably, the difficulties in certifying a class can be frustrating when it appears so unlikely that individuals will bring their own lawsuits. But Rule 23's requirements seek to ensure that the due process rights of litigants are not lost among the tumult of an unwieldy and disorderly class action. That is, Rule 23 recognizes a risk that rough justice can be injustice, and thereby mandates a rigorous analysis to prevent subjecting the class and the class's opponent to it. Here, Defendants are facing liability under the laws of 21 states. Plaintiffs are seeking a massive monetary award on behalf of millions of individuals. Rough justice would indeed lead to injustice here, where millions of people and millions of dollars fall within the wide margins of error. The Court must therefore undertake a rigorous analysis to ensure that Rule 23's requirements are met, even in cases involving many small claims. The Court has undertaken that analysis here and determined that it cannot certify the proposed classes for any of the host of reasons addressed above.

85

Accordingly, the Indirect Purchaser Plaintiffs' Motion to Class Certification is denied.

An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge