# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MDL No. 2002** |
| **ANTITRUST LITIGATION** | : | **Case No: 08-md-02002** |
| | : | |
| | : | |
| **THIS DOCUMENT APPLIES TO** | : | |
| **ALL ACTIONS** | : | |
| | : | |

## CERTAIN DEFENDANTS' POST-HEARING MEMORANDUM IN OPPOSITION TO ALL PLAINTIFFS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. JONATHAN WALKER

In their moving papers, Direct Purchaser Plaintiffs, Indirect Purchaser Plaintiffs, and Direct Action Plaintiffs (hereafter, "Plaintiffs") collectively sought to exclude approximately 85 paragraphs and several tables from the primary and supplemental reports submitted by the undersigned Defendants' expert economist, Dr. Jonathan Walker.[1]  At the December 15 hearing on their motion, however, Plaintiffs changed their position not only as to which precise opinions they seek to exclude, but also, in some instances, the reasons they seek to exclude those opinions. Defendants respectfully submit this post-hearing memorandum to clarify and otherwise respond to some of the new issues raised at the hearing.[2]  None of Plaintiffs' revised arguments justifies exclusion of any portion of Dr. Walker's opinions, and the Court should deny the motion in its entirety.

**I.    The Court Should Deny Plaintiffs' New Request to Exclude Based On Dr. Walker's Use of the Words "Normal," "Revolutionary," and "Speculative"**

In Sections II.A–B, E, and G of their moving brief, Plaintiffs sought to exclude at least 37 paragraphs of Dr. Walker's primary report that contained his opinions concerning: (a) the inability of the alleged conspiracy to succeed given the lack of secrecy in which its "monitoring and enforcement" mechanisms operated; (b) how changes in the demand for products produced under animal welfare standards, as well as changes in state laws and regulations concerning

---

[1]    These Defendants are Michael Foods, Inc., Rose Acre Farms, Inc., Moark LLC, Norco Ranch, Inc., and Cal-Maine Foods, Inc.  Dr. Walker's education, background, and experience are recounted in those Defendants' Response in Opposition to Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Jonathan Walker (hereafter "Defs. Opp."). Defs. Opp. 2 n.1, June 10, 2015, ECF No. 1207.

[2]    As referenced at the hearing, DAPs had originally sought to exclude certain sentences from Dr. Walker's report where he described Dr. Baye's elasticities in a particular way.  After Dr. Baye clarified in his reply report how he used the term "elasticity," Dr. Walker agreed that his particular description of Dr. Baye's elasticities was incorrect.  Defendants and DAPs have agreed to remove from Dr. Walker's report the few sentences that contain this particular description of Dr. Baye's elasticities, mooting DAPs' motion.  It should be noted that removal of these sentences in no way affects Dr. Walker's substantive criticism of Dr. Baye's elasticities and the assumptions Dr. Baye must make in order to employ them in the way he did.

animal welfare, over the course of the alleged conspiracy period render Plaintiffs' economists' models unreliable; and (c) the lack of support in economic theory, empirical analysis, or the discovery record for Plaintiffs' experts' contention that the 100% Rule explains the 5-6 year lag between the commencement of the alleged conspiracy and when the effects of that conspiracy materialize according to their own econometric models.  *See* Mem. in Supp. of All Pls.' Mot. to Exclude the Opinions and Test. of Dr. Jonathan Walker, May 26, 2015, ECF No. 1196 (hereafter "Pls.' Mem.").  Plaintiffs originally sought to exclude these opinions because Dr. Walker supposedly lacked the requisite economic expertise or somehow failed to conduct any economic analysis.

At the hearing on the motion to exclude, Plaintiffs radically scaled back their motion and instead sought to exclude only very "narrow" and "limited" portions of Dr. Walker's testimony, which effectively amount to Dr. Walker's use of the words "normal," "revolutionary," and "speculative."  Hr'g Tr. 93:25-102:4, Dec. 15, 2015 (referenced pages attached hereto as Ex. 1) (argument of counsel for DPPs on behalf of all Plaintiffs).  Plaintiffs' recent admissions as to the subject matters on which Dr. Walker may testify not only confirm the meritless nature of their motion as originally conceived, but also further demonstrate that their true complaint with Dr. Walker's testimony amounts to nothing more than a difference of opinion that the jury, and not the Court on a pre-trial *Daubert* motion, should resolve.  Plaintiffs' admissions include:

***First***, Plaintiffs now admit that Dr. Walker possesses the expertise to analyze whether the conduct challenged in this case is inconsistent with the conditions that economists associate with an antitrust conspiracy.  They therefore admit that he could opine on the alleged conspiracy's likelihood of success given that the alleged enforcement mechanism—the UEP Certified Program's audit—was not secret, but instead was conducted in part by the U.S. government and given to customers at their request.  *Id*. 103:4-104:6 (DPP counsel admitting that this "is the

legitimate squabble between the parties about what happened here").  Rather, Plaintiffs now seek to exclude the word "normal" from the following sentence in paragraph 148 of Dr. Walker's primary report: "This shows that egg producers in the UEP Certified Program were not operating in the *normal* secrecy associated with conspiracies and enforcement mechanisms."  FRCP Rule 26(a)(2)(B) Report of Jonathan Walker ¶ 148, Mar. 13, 2015, attached as Exhibit A to Pls.' Mem. ("Walker Primary Rep."); Hr'g Tr. 101:11-102:2, Ex. 1 (emphasis added).  Put simply, the adjective is superfluous.  Dr. Walker does not quantify the amount of secrecy the alleged conspiracy possessed.  Rather, he states that the alleged enforcement mechanism here possessed *zero* secrecy, which is uncharacteristic of conspiracies and cartel behavior and would undermine the ability of the alleged conspiracy to succeed.  Hr'g Tr. 36:3-17, Ex. 1.

*Second*, Plaintiffs now admit that it is appropriate for Dr. Walker to comment on changes in customers' demand for products (including eggs) produced under animal welfare standards. *Id*. 93:25–94:13.  Plaintiffs now merely seek to preclude Dr. Walker from calling those changes "revolutionary" as he does in paragraph 10 of his primary report—"The shift was *revolutionary* and raised the likelihood of significantly more stringent animal welfare standards than the United Egg Producers ("UEP") incorporated into its animal welfare program than if UEP had done nothing."  Walker Primary Rep. ¶ 10 (emphasis added); Hr'g Tr. 94:9-13, Ex. 1.  Revolutionary means "a sudden, complete, or marked change." Entry for "revolutionary," Dictionary.com, http://dictionary.reference.com/browse/revolutionary (last visited Dec. 29, 2015).  That is precisely what Dr. Walker described and what Plaintiffs now admit he can testify about.

*Third*, in paragraphs 178–180 (and referenced elsewhere in his primary and supplemental reports), Dr. Walker stated that Plaintiffs' experts' unexplained reliance on the 100% Rule to account for why their models do not show an effect of the conspiracy for 5-6 years has no support in economic theory, Plaintiffs' experts' own empirical work, or the discovery record.

Plaintiffs now concede that the jury is entitled to hear Dr. Walker testify to that effect.  Hr'g Tr. 100:6-9, Ex. 1 ("And so, again, we're not suggesting he can't talk about the 100 percent rule or argue that there's something wrong, perhaps, with how the Plaintiffs' experts have used the 100 percent rule.").   In his report, Dr. Walker concluded his opinion on the 100% Rule with the following: "Under these circumstances, it is speculative that the 100% rule ever had an effect on output of shell eggs." Walker Primary Rep. ¶ 180.  Now, rather than seeking to strike three entire paragraphs of Dr. Walker's report, Plaintiffs only seek to prevent Dr. Walker from calling Plaintiffs' experts' reliance on the 100% Rule "speculative."  *Id*. 100:9-11 ("The opinion we believe he should not be allowed to assert is that it's purely ***speculative*** to say that the 100 percent rule had any effect . . . .") (emphasis added).[3]  Plaintiffs do not offer any cogent reason why Dr. Walker should not be able to testify to this.   That they believe the documents tell a different story does not suffice.

Dr. Walker's use of the adjectives "normal," revolutionary," and "speculative" is both appropriate and supported by his economic training, empirical analysis, and reliance on the discovery record.[4]  Plaintiffs provide no legal basis for their "narrow" request to exclude certain

---

[3]    It is actually unclear whether Plaintiffs are still seeking to exclude even the use of the word speculative.  Immediately after the above-quoted statement was made, the following exchange occurred:

> THE COURT: Why is that not really wonderful fodder
> for cross-examining him if he testifies at a trial?
> MR. NEUWIRTH: I have to admit as I'm standing here,
> the same thought crossed my mind.

*Id*. 100:12–15.

[4]    Plaintiffs' experts use similar language in their own reports.  *See, e.g.*, Expert Reply Report of Kyle W. Stiegert, Ph.D. regarding Damages and Liability ¶ 32, April 3, 2015, attached as Tab 46 to Exhibits to Indirect Purchaser Pls.' Ans. to Certain Defs.' Omnibus Statement of Undisputed Material Facts and Counter-Statement of Facts in Opp. to Certain Defs.' Mots. for Summary Judgment Against Indirect Purchaser Pls. on Liability and Damages, Aug. 14, 2015, ECF No. 1285  ("Given ***normal*** advances in agricultural techniques, including understanding and using knowledge of hen biology and productivity, one would expect "real" prices to go down as

descriptive words from his reasonable and admissible conclusions.  Moreover, any argument over the use of these particular words does not provide any grounds for exclusion of the underlying economic opinions.

## II.   Plaintiffs Now Concede That Dr. Walker May Testify About the Change in Demand

Like the topics described above, it now appears that Plaintiffs are no longer seeking to strike paragraphs 83-86 and 203-04 of Dr. Walker's primary report.  Those paragraphs explain that Plaintiffs' experts' justification for not including data from the 1980s—media coverage about health concerns surrounding cholesterol—applies equally to data from the 1990s.  *See also* Hr'g Tr. 21:17-25:6, Ex. 1.  In other words, either data from the 1980s should be included in the benchmark periods found in Plaintiffs' experts' models, in which case the supposed anticompetitive effect generated by their models disappears, *or* data from the 1990s should also be excluded, resulting in no benchmark period, no model, and no proof of anticompetitive effects.  Counsel conceded at the hearing that it would not "be wrong for Dr. Walker to say that very limited point, that you can't -- you shouldn't be able to do something in one period. You have to be consistent."  *See id.* 105:7-22.

Plaintiffs now seek to strike an opinion Dr. Walker never offered.  According to counsel, Plaintiffs' "very narrow point" is that Dr. Walker has no "basis as an expert to draw any connection between those two things"—those "two things" being an increase in demand for eggs and media coverage of reduced concern about cholesterol in diets.  *Id.* 105:22-106:22.  To be clear, it is the increase in demand alone that provides the basis for Dr. Walker's opinion, i.e., because overall demand for eggs shifted significantly over time, Plaintiffs' experts' models are inherently unreliable.  *Id.* 22:21-24:14.  Dr. Walker's reference to popular diet trends was simply

productivity increases over time."); *id.* at ¶ 44 ("To argue for a rapid transition to WE Eggs when consumers are given the choice of a lower priced, standard commodity shell egg is highly unrealistic and ***speculative***.").

a response to Plaintiffs' experts, who attributed the "structural break" in the late 1980s or early 1990s to a decrease in concern for cholesterol *as demonstrated by the number of articles published on the subject during that period of time*. Dr. Walker merely demonstrated that the same held true for the 2000s—the surge in per capita availability occurring in the late 1990s and early 2000s was also accompanied by an increase in publications that would tend to increase the demand for eggs (such as high protein diets). At the end of the day, neither Plaintiffs' experts nor Dr. Walker are experts in nutrition, and none claim to be. Yet if publications concerning cholesterol justify exclusion of data from the 1980s, then such publications should also justify exclusion of data from the 1990s-2000s. That is the simple point Dr. Walker makes, and one needs no expertise in nutrition to make it.

III.   **Plaintiffs' Request to Exclude Dr. Walker's Opinion as to When Legal and Regulatory Changes Would Start Affecting Producers' Investment Decisions Is Without Merit**

As presented in their opening brief, Plaintiffs challenged Dr. Walker's opinion that Plaintiffs' experts fail to account for the impact that changes in animal welfare regulations would have on both egg producers' conduct and the price of eggs. Plaintiffs initially argued that Dr. Walker did not have enough concrete evidence that the changes in animal welfare statutes and regulations actually affected egg producers' investment decisions. Pls.' Mem. 8-9. At the hearing, however, Plaintiffs again narrowed what they seek to exclude. As the Court noted, and Plaintiffs agreed, it is within Dr. Walker's expertise as an economist to opine on how legislation under consideration in year one could immediately impact producers' decisions to invest in infrastructure, even though the law may not become effective until year five. Hr'g Tr. 96:6-18, Ex. 1.

Plaintiffs nonetheless continue to ignore that the public and evidentiary records demonstrate that: 1) legislation requiring increased cage space for egg laying hens was

considered and enacted in the United States during (and not before) the alleged conspiracy period, 2) egg producers were aware of the actual and potential legislation, and 3) those legal changes would (and in fact did) affect producers' willingness to invest in new cages that would soon be rendered obsolete.  *See* Walker Primary Rep. ¶¶ 121-131; Hr'g Tr. 19:23-21:13, Ex. 1.[5] In other words, Dr. Walker's opinions concerning the impact of the various animal welfare laws on producers' investment decisions (and, therefore, supply) are not only within his expertise as an industrial organization economist but also supported by the record.  In fact, the DAPs' economist agrees that new legislation affects producers' construction decisions years before the statutes actually become effective.  Expert Report of Michael R. Baye, Ph.D. ¶ 150, January 22, 2014, attached as Exhibit J to Pls.' Mem.  To the extent Plaintiffs believe that the evidentiary record tells a different story, or that producers would invest in new cages even though those cages would become legally obsolete years before the end of their useful life, they are free to cross-examine Dr. Walker on the issue.

**IV.    Dr. Walker's Use of "Sub-Regressions" to Test Whether Plaintiffs' Experts' Data Pooling Was Appropriate Is Well Supported and Reliable**

Both Dr. Myslinski and Dr. Walker took Dr. Rausser's regression and applied it to logical and discrete "sub-sets" of the larger dataset used by Dr. Rausser.[6]  DPPs originally sought to exclude certain of Dr. Walker's opinions because they were based on similar or identical sub-regressions that had been included in Dr. Myslinski's report for class certification.  In their

---

[5]      For example, California's Prop 2 was first considered in 2004 and was passed in 2008. Cal. Health & Safety. Code § 25990.  The bill to extend Prop 2 to all eggs sold in California was passed in 2010, with compliance by all producers required by January 1, 2015.  Cal. Health & Safety Code § 25996.

[6]      These "subsets" were actually complete datasets in their own right.  For example, Drs. Myslinski and Walker applied Dr. Rausser's regression to each Defendant's complete set of transaction data separately.  For ease of reference, Defendants refer to the application of Dr. Rausser's regression to the various sub-sets as "sub-regressions."

opening briefs, DPPs argued that because these sub-regressions were first contained in Dr. Myslinski's report, the opinions that rely on these sub-regressions were not really Dr. Walker's opinions, as all he did was "parrot" Dr. Myslinski.  Pls.' Mem. 14-22.  On the stand, Dr. Walker refuted the notion that he blindly copied and pasted any analysis or opinions from Dr. Myslinski's reports and further explained that he did not rely in any way on Dr. Myslinski's opinions.  Hr'g Tr. 38:2-39:3, Ex. 1.  To the contrary, Dr. Walker confirmed that he reviewed each and every regression (and sub-regression) in his report, including those that had previously been included in Dr. Myslinski's report, and that he alone made the decision that these regressions were accurate, relevant, and appropriate for inclusion in his report.  Hr'g Tr. 36:18-39:3, Ex. 1.  Dr. Walker also explained that his opinions based on these sub-regressions were different from those offered by Dr. Myslinski.  *Id.* 40:5-42:21.

DPPs have now eschewed their original "parroting" argument and instead challenge the reliability of Dr. Walker's use of sub-regressions.[7]  They base this challenge on a statement made by this Court in the context of its resolution of the DPPs' motion for class certification, namely that it "did not find Dr. Myslinski's 'sensitivity analyses' persuasive because, when challenged, Dr. Myslinski could not support his contention that his sensitivity analyses were appropriate and instructive as to any flaws or biases in Dr. Rausser's model." DPP Class Certification Memorandum 30, Sept. 21, 2015, ECF No. 1324; Hr'g Tr. 87:17-89:6, Ex. 1. The argument that

---

[7]    IPPs did not argue at the hearing.  Given the DPPs' retreat from their challenge that Dr. Walker simply "parroted" Dr. Myslinski, it is unclear whether IPPs still seek to exclude Section V of Dr. Walker's IPP supplemental report, which was similarly based on the claim that Dr. Walker "parroted" Dr. Myslinski.  In any event, as Dr. Walker clearly testified, he reviewed all of the quantitative analyses (including the regressions) presented in his report and he satisfied himself that they were accurate, reliable, and appropriate for inclusion in his report.  Hr'g Tr. 44:23-45:16, Ex. 1.  Moreover, as Dr. Walker testified, his opinion regarding IPPs' experts' benchmark differs from the opinions Dr. Myslinski offered on the subject.  Hr'g Tr. 42:22-44:13, Ex. 1.  Given that IPPs do not challenge the reliability of Dr. Walker's opinions, IPPs are left with no basis to exclude them.

this observation about Dr. Myslinski somehow compels the exclusion of Dr. Walker's use of sub-regressions is unavailing for the two reasons explained below.

      A.    <u>Dr. Walker's opinions are not the same as Dr. Myslinski's</u>

Plaintiffs ignore the fact that although the computer code used by Drs. Myslinski and Walker to run certain regressions was the same, the opinions they reached after analyzing those regression results were very different. Dr. Myslinski ran the sub-regressions as a type of sensitivity test to show that "Dr. Rausser's models . . . do not represent reliable methods to demonstrate common harm or classwide impact." Expert Report of William C. Myslinski, Ph.D. 41, Aug. 6, 2014, ECF No. 1033. Dr. Walker, on the other hand, ran the regressions to test whether pooling all the data, as Plaintiffs' experts did, violates the assumption underlying the type of model each Plaintiffs' expert utilized, a model known as "ordinary least squares" or OLS. FRCP Rule 26(a)(2)(B) Report of Jonathan Walker Supplemental Report Related to Direct Purchaser Plaintiffs ¶ 44, n.30, Mar. 13, 2015, attached as Exhibit B to Pls.' Mem. ("Walker DPP Rep."); Hr'g Tr. 80:23-82:10, Ex. 1. Ordinary least squares is an econometric approach that presumes that all of the data upon which the regression is conducted is affected by supply and demand factors in the same way. By running these "sub-regressions," Dr. Walker demonstrated that the coefficients for the independent variables in each sub-regression varied significantly, indicating that the data in each subset was affected by demand and/or supply factors in different ways and could not be pooled. Walker DPP Report ¶ 44, p. 16 n.30; Hr'g Tr. 80:23-82:10, 77:20-79:14, Ex. 1. Therefore, whatever the Court's opinion may have been regarding Dr. Myslinski's use of sub-regressions as a sensitivity test, the opinion did not (and could not) speak to Dr. Walker's use of sub-regressions and his different opinions based on them.

B.      Dr. Walker's methodology is supported by both case law and economic literature

Plaintiffs ignore the difference between this Court's skepticism regarding Dr. Myslinski's use of sub-regressions to show that DPPs could not establish Rule 23(b)(3) predominance, on the one hand, and preventing a jury from hearing Dr. Walker's opinions that Plaintiffs' experts violated a fundamental assumption of their own OLS models, on the other hand.[8]  Despite skepticism expressed by Plaintiffs' counsel during the hearing, Dr. Walker's analysis is well supported in the economic literature and case law.

As Dr. Walker testified, the OLS models run by every Plaintiff's expert assume that all of the data upon which the models are run are affected by the forces of supply and demand *in the same way*.  Hr'g Tr. 77:20-79:14, Ex. 1.  That OLS is based on this assumption is well documented in the economic literature.  *See*, *e.g.*, Peter Kennedy, *A Guide to Econometrics* 43, 45, 94 (4th ed. 1998), Ex. 2 (identifying fixed coefficients, *i.e.*, parameters, over the entire dataset as one of the first assumptions of *classic linear regression* of which ordinary least squares regression is a specific type); G.S. Maddala, *Introduction to Econometrics* 169 (4th ed. 2009), Ex. 3 ("When we estimate a multiple regression equation and use it for predictions at future points of time, we assume that the parameters are constant over the entire time period of estimation and prediction."); ABA Section of Antitrust Law, *Econometrics* 62 (2d ed. 2014), Ex. 4 ("Using aggregate data in a single econometric model can be problematic when there are

---

[8]      Other courts have rejected a party's attempt to transform a class-certification finding into a *Daubert* exclusion ruling.  For example, at the class certification stage of the *Mushroom* litigation, Judge O'Neil found that defendants' expert's regressions were unpersuasive.  Nevertheless, he refused to exclude those regressions at trial:  "[Dr.] Johnson may present his opinion regarding the effect of making alternative assumptions about those 'murky' periods even if [plaintiffs' expert's] use of agnostic periods might be the better methodology.  While Dr. Johnson's alternative assumptions may not be better than [plaintiffs' expert's] method or may not ultimately show [his] method is flawed, they are not so unreasonable as to warrant exclusion."  *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 U.S. Dist. LEXIS 143328, at *24 (E.D. Pa. Aug. 11, 2015).  Instead, Judge O'Neil concluded that plaintiffs' criticism was "appropriate material for cross-examination at trial."  *Id.* at *25.

different competitive dynamics for different subsets of the data.").   Interestingly, none of the Plaintiffs' experts even attempted to rebut Dr. Walker's opinion regarding their inappropriate pooling of the data.

Because OLS is based on this critical assumption, it is imperative to verify that the various datasets on which the regression is conducted can be pooled, rather than merely assume that pooling is valid, which is what Plaintiffs' experts do.  *See* Walker DPP Rep. ¶¶ 44-45, p. 16 n.30.[9]  As Dr. Walker testified, running the model on distinct subsets of the data is both a valid and standard method of testing whether data may be pooled.  Hr'g Tr. 77:20–79:14, Ex. 1.[10] Indeed, use of "sub-regressions" as a verification method is commonly found in textbooks and refereed journals.[11]  When a regression is run on logical and discrete subsets of the data and

---

[9]      *See, e.g.*, Robert Pindyck & Daniel Rubinfeld, *Econometric Model and Econometric Forecasts* 252 (4th ed. 1997), Ex. 5 ("The difficulty with the least-squares pooling procedure is that that the assumption of constant intercept and slope may be unreasonable.").

[10]      Drs. Pindyck and Rubinfeld explain that when the intercept term is all that varies across groups of data, one way to validly apply OLS is to introduce dummy variables representing the various subsets that have different intercepts between them.  This is called the "fixed effects" model.  *Id*. at 252.  As the authors explain, that methodology is appropriate when the slope coefficients do not vary over the subsets—"If the slopes varied as well, each separate cross-section regression would involve a distinct model and pooling would be inappropriate."  *Id*. Here, in Dr. Rausser's fixed effects model, the intercept term varies across customers, but he has not accounted for it by including customer-specific dummy variables.  Additionally, many of the slope coefficients vary across customers, defendants, and time, thus invalidating his pooling. Demonstrating this by applying the regression to the subsets is perfectly appropriate.  *See infra*, n.11.

[11]      *See* G.S. Maddala, *supra*, at 417, Ex. 3 ("A question often arises as to whether we can pool the different data sets and get more efficient estimates of the parameters. In Section 4.6 we gave some examples where the data sets referred to prewar and postwar years. There we found significant differences in the coefficients between the two periods, which suggested that the data should not be pooled."); Badi Baltagi, George Bresson & Alain Pirotte, *To Pool or Not to Pool?*, The Econometrics of Panel Data 521 (2008), Ex. 6 ("By now, it is well known that pooling in the presence of parameter heterogeneity can produce misleading results. So, it is important to know if the pooling assumption is justified."); G.S. Maddala, Robert Trost, Hongyl Li & Frederick Joutz, *Estimation of Short-Run and Long-Run Elasticities of Energy Demand from Panel Data Using Shrinkage Estimators*, 15 Am. Stat. Ass'n J. Bus. & Econ. Stat. 90 (Jan. 1997), Ex. 7 ("Estimation using pooled data was not valid because the hypothesis of homogeneity of the

produces wildly different coefficients for the independent variables that represent supply and demand (e.g., feed, electricity, wages, population, etc.), which is exactly what happened here, the data cannot be pooled because it is clear that supply and demand factors affect these subsets differently—which is precisely Dr. Walker's opinion here.

Case law also supports the use of sub-regressions for this purpose. *See, e.g., In re Plastics Additives Antitrust Litig.*, No. 03-CV-2038, 2010 U.S. Dist. LEXIS 90135, at *55-72 (E.D. Pa. Aug. 31, 2010); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 U.S. Dist. LEXIS 180914, at *140-43 (E.D.N.Y. Oct. 15, 2014) ("But the defendants' experts convincingly argue that these sub-regressions do have some probative value. They contend that these sub-regressions test whether a regression uses data that has been

coefficients was rejected."); Jae Bong Chang, Jayson L. Lusk & F. Bailey Norwood, *The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices*, J. of Agric. & Res. Econ. 35(3):406–423, 416 (2010), Ex. 8 ("The hypothesis of equality of coefficients on the three data sets is strongly rejected according to a Chow test (p<0.01) . . . Given the rejection of the hypothesis that the data from San Francisco and Dallas can be pooled into a single hedonic price function, one might question the validity of the hedonic model fit to the aggregate U.S. data . . . It is important to note that the hedonic estimates from a U.S. model will not necessarily equal egg price difference in any particular location or market; moreover, the U.S. hedonic coefficients are not equal to the average hedonic coefficients across all locations."); Jeffery Wooldridge, *Introductory Econometrics* 449 (4th ed. 2009), Ex. 9 (describing the Chow test as a tool used to determine whether a regression changes between two groups, specifically between two periods); ABA Section of Antitrust Law, *supra*, at 115–16, Ex. 4 ("Estimating regression models using aggregated data typically requires certain assumptions to be satisfied. When working with aggregated data, a researcher should investigate whether such assumptions are likely to be valid."), *id*. at 312–316, 323–24 ("For example, a model may impose potentially questionable restrictions on the coefficients, such as that the coefficients are the same during two time periods. Specifically, an econometric model of pricing at the customer level might assume that all customers have the same coefficients on the cost and demand variables. However, there may be reason to think that customers have different responses to cost and demand conditions, so there could be different coefficients on the explanatory variables across customers, including the variable measuring damages. In this case, it may be necessary to estimate the model for different groups of customers, or otherwise to employ a more complex model that takes these differences into account."); Laila Haider, *Sub-Regressions: A Rigorous Test For Antitrust Class Cert.*, Law360 (Dec. 5, 2014, 11:26 AM ET), http://www.law360.com/articles/601614/sub-regressions-a-rigorous-test-for-antitrust-class-cert, Ex. 10 (advocating the use of "sub-regressions" to test the underlying assumption that the supply and demand factors had the same effect across all the data to determine if the data can be pooled).

inappropriately 'pooled,' and a 'standard statistical process' for detecting variability within the data.") (citations omitted).[12]

_____

[12]    Although the *Air Cargo* court did not find the results of the defense expert's sub-regression "particularly compelling"—for reasons that are not germane to this case—it still denied plaintiffs' motion to exclude it, finding that "striking this testimony would be draconian." 2014 U.S. Dist. LEXIS 180914, at *144.  The Court reasoned that the "plaintiffs may dispute this testimony using the ordinary tools of litigation, including '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof,' *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. at 596, and need not resort to a gag order on Mr. Kaplan and the defendants' other experts."  *Id*.

For these reasons and all the reasons contained in Defendants' Opposition to All Plaintiffs' Motion to Exclude the Opinions and Testimony of Dr. Jonathan Walker and expressed at the hearing, Plaintiffs' motion should be denied.


Dated:  January 6, 2016                                        Respectfully submitted,


/s/ Carrie Mahan Anderson

Carrie Mahan Anderson
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street NW
Washington, DC  20005
Telephone: (202) 682-7000
carrie.anderson@weil.com

William L. Greene
STINSON LEONARD STREET LLP
150 South Fifth Street, Suite 2300
Minneapolis, MN  55402
Telephone:  (612)335-1500
william.greene@stinsonleonard.com

*Counsel for Defendant Michael Foods, Inc.*

/s/ Veronica S. Lewis

Veronica Smith Lewis
Brian E. Robison
Jason McKinney
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave, Suite 1100
Dallas, TX 75201
Telephone:  (214) 698-3100
VLewis@gibsondunn.com

*Counsel for Defendant Cal-Maine Foods, Inc.*

/s/ Donald M. Barnes

Donald M. Barnes
Jay L. Levine
Jetta C. Sandin
PORTER WRIGHT MORRIS & ARTHUR LLP
1900 K Street, NW, Suite 1110
Washington, DC 20006-1110
Telephone:  (800) 456-7962
DBarnes@porterwright.com

/s/ Nathan P. Eimer

Nathan P. Eimer
Vanessa G. Jacobsen
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone:  (312) 660-7600
neimer@eimerstahl.com

*Counsel for Defendants Moark, LLC and Norco Ranch, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

On this, the 6th day of January, 2016, I hereby certify that CERTAIN DEFENDANTS'
POST-HEARING MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO
EXCLUDE THE OPINIONS AND TESTIMONY OF DR. JONATHAN WALKER was filed
and served via email on all liaison counsel.

<u>/s/ Jay L. Levine</u>
Jay L. Levine
PORTER WRIGHT MORRIS & ARTHUR LLP
1900 K Street, N.W., Suite 1110
Washington, DC  20006
Telephone: (202) 778-3000
Facsimile: (202) 778-3063