IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: PROCESSED EGG PRODUCTS: MDL NO. 2002
ANTITRUST LITIGATION 08-MDL-02002

- - - - -

PHILADELPHIA, PA

DECEMBER 15, 2015

BEFORE: THE HONORABLE GENE E.K. PRATTER, J.

- - - - -

DAUBERT HEARING

- - - - -

KATHLEEN FELDMAN, CSR, CRR, RPR, CM
Official Court Reporter
Room 1234 - U.S. Courthouse
601 Market Street
Philadelphia, PA 19106
(215) 779-5578

(Transcript produced by mechanical shorthand via C.A.T.)

useful life of cages and of new facilities. And by limiting the useful life of these new facilities, they affect the incentives to invest in them, and that again affects the way that producers respond to price and to fuel costs and other input costs, and it would change the underlying structural model.

And it's based on my understanding of the theory of the firm. That's the number one basis for my opinion. I also looked for corroboration in the record, which I think was an appropriate thing to do.

Q. Did you conduct any statistical analyses to corroborate your theory or your opinion?

A. Once -- no, I did not look to conduct a statistical analysis to measure changes in investment patterns among producers. But I did identify lots of different things that the Plaintiffs' experts did not account for that were potential explanations for any changes in price or quantity and that could potentially render their models invalid. And I did do analyses that demonstrated those models actually are invalid.

But, no, I did not specifically conduct an econometric analysis of investment behavior by egg producers.

Q. And what is the basis for your opinion that the investment decisions of producers would have been affected years before the law became effective?

A. Because the law would affect a useful life of equipment. So if you're an egg producer -- well, Dr. Baye actually pointed out if you're an egg producer in 2012 who plans to sell to California in 2015, that you need to make investments in order to have facilities in place that will allow you to continue to sell eggs in 2015. He thought that there was a three-year lag that was required in order to make that happen.

But what he did not look at is your incentive to invest in noncompliant cages in 2012 or 2011 or 2010, and the fact that these cages would become noncompliant long before the normal useful life would be over would diminish your incentive to invest in such cages. So if you're a producer selling eggs into California or a producer that anticipates selling eggs into California in 2015, you're going to think twice about adding facilities in 2011 that are potentially -- they're supposed to last for 20 years, but you know will only last for four because of the law.

So the laws can have effect immediately because you're going to have an immediate effect on the useful life of equipment. An example might be an automobile. If there were some law that was going to disallow, say, current day Volkswagens -- I'm pointing to the current brouhaha -- but it's only going to go into effect in, say, seven years, that's still going to affect the demand for Volkswagens today because it's going to affect the residual value in seven years.

Q. And besides your training in industrial organization, on what do you base your decision that egg producers would have -- their investment decisions would have been affected years prior to the effective passage or the effective date of the laws? Is there anything in the record that you saw that might corroborate that?

A. Yeah. There was deposition testimony talking about diminution in willingness to invest in traditional cages. And there was also an example of Moark scuttling a plan to introduce and build a new cage in California. They scuttled it immediately after Proposition 2, and there were documents suggesting that Proposition 2 was one of the reasons, if not the only reason, that they chose not to build that facility.

Q. Thank you. Let's go to the next opinion Plaintiffs seek to exclude, and if I could ask you to turn to Page 36 of your primary report.

Now, Plaintiffs seek to exclude Paragraphs 83 through 86 and then 203 and 204 of your primary report, but I'm going to ask you to focus on Paragraph -- for right now, Paragraph 86 and Figure 9, and if you could explain to the Court what opinion you are expressing there.

A. Well, Figure 9 is contextual. It's two things. One is context, that the allegations that there was a supply-limiting conspiracy commencing approximately 2000. If that's the case, you'd expect to see some change in the pattern of egg

availability which is -- egg availability is basically egg consumption. You would expect to see some change in that pattern right around 2000 if there were such a conspiracy.

And one way to look at that is to compare the availability of eggs over time to the availability of other food groups, to look to see whether you see such a change in pattern. And that's what Figure 9 does; it puts it into context.

The second thing that Figure 9 does is it addresses directly an opinion expressed by Dr. Rausser that just by looking at the pattern of egg availability, you could discern evidence of an effective supply conspiracy. And I think that this comparison of egg availability to other products directly addresses that assertion.

Q. Now, are you rendering an opinion regarding the demand factors that affect these various food groups including other proteins?

A. No.

Q. Now, can you turn to Page 88 of your report?

A. Yes.

Q. Focusing on Paragraph 204, but Plaintiffs seek to exclude Paragraphs 203 and 204, can you explain to the Court what opinions you're rendering there?

A. Yes. Well, 203, 204, and 205 should be read together, and this is another reason why the Plaintiffs' statistical

models are invalid. This is another set of factors that they ignored. So this is part of my critique, or it's relevant to the critique of their statistical work.

And in Paragraph 203, I recount that the Plaintiffs' experts all point to changes in demand, a structural change in demand as a reason why they can't include the 1980s as a benchmark. And in their expert reports, the way that they justify the existence of a change in demand is by pointing to economic literature indicating that if there's public information linking egg consumption to serum cholesterol, that that can impact the demand for eggs, and then they pointed to a decline in the per capita availability of eggs in comparing 1980s to 1990s.

So in Paragraph 204, I point out that the mirror image of that happened in the 2000s as opposed to the 1990s. There was scientific research linking -- regarding the relationship between the consumption of eggs and serum cholesterol. The AHA, the American Heart Association, changed its guidelines in 2000 in response to an academic article that were public popular press. There were books that were best sellers that talked about how eggs really aren't that bad for you.

And if you go back to -- I don't remember the paragraph number, but I conducted a comparison of that availability and I go over some of the numbers again in

Paragraph 205. There's a marked increase in the consumption of eggs. So it's the mirror image of the set of explanations that Plaintiffs' experts put forward to disallow the 1980s as a benchmark. And so Paragraphs 203 to 205 are pointing out this exact same structural break in demand that suggests that you can't use the '90s as a benchmark either. It tends to suggest a before-and-after method is inappropriate for use in this case, just as the change in welfare -- as to animal welfare treatment demands by the producers -- I'm sorry, by the Direct Purchasers suggests that a before-and-after will not work in this case properly, just as the change in laws suggest that before-and-after will not work properly. This all has to do with the validity of the Plaintiffs' experts' statistical models.

Q. And just to clarify, your analysis of per capita egg availability at different times, is that represented on Page 35 in Figure 8?

A. Yes, it is.

Q. And what expertise are you bringing to bear in expressing the opinions in 83 through 86 and 203 and 204?

A. Well, 83 through 86 talk about demand. 83 in particular introduces the concept of demand elasticity. Other paragraphs through 86 are discussions of demand or they're the groundwork for an economic analysis. Pages -- Paragraphs 203 through 205 go directly to the assumptions that Plaintiffs' experts made

and their justifications for choosing their benchmark period.

So I'm bringing together my expertise as an economist to understand their statistical models, to understand their basic economic framework, and to understand demand. It's my training in statistics and my training in econometrics and my training in industrial organization.

Q. Do you need to be an expert in nutrition to render this opinion?

A. No, you do not.

Q. Let me ask you --

THE COURT: Why not?

THE WITNESS: This has nothing to do with nutrition. I don't know whether the articles that came out in the 2000s, the more recent nutrition information saying eggs are good, I don't know as an expert whether that's true or not. What's relevant for this is that it has an impact on the demand for eggs and that, apparently, when this information got out, demand -- at roughly the same time, demand for eggs increased, and that this is a mirror image of the Plaintiffs' explanation for excluding the 1980s.

And I don't know. I'm not a nutritionist. I have my personal opinions, they're not expert opinions, but I can't tell you that if you eat eggs with abandon that you're not going to suffer some consequences. It's not for me to say.

BY MR. LEVINE:

economics literature of deterrence. And so to be an effective enforcement mechanism, it needs to be secret.

The second thing in Paragraph 148 is that this wasn't secret, that it was well known, you know, what grades people got on their audits. And so, yes, it's known that you got a grade on an audit, you can use the audits to enforce adherence to the UEP guidelines, but if you were -- but if that's not supply, then build new cages.

If it were the case the UEP or the alleged conspirators tried to fail someone on an audit because they built a cage, notwithstanding that they satisfied the Animal Welfare Standards, it would be known. It would be known to the -- to customers because they're reviewing these audit findings. It would be known to the Government because they're conducting them. And that is not the hallmark of a potentially effective enforcement mechanism, a mechanism that would be known and would lead to the exposure of the cartel.

Q. Thank you. Let's turn to the argument that the DPPs and the IPPs make regarding the inclusion in your report of certain regressions that were also contained in Dr. Myslinski's report. Do you remember reading that?

A. I do.

Q. Can you explain to the Court the process you employed in incorporating work or incorporating those regressions that may have been utilized for Class Certification purposes?

A. Sure. When I started in January working on this case, there was the large volume of work to be done and so I got a team of four economists to work with me. These are people that I've known for, in some cases, decades. Dr. Kent Mikkelsen was a former DOJ economist; Dr. Bob Stoner, a former FTC economist; Dr. Clarissa Yeap, who's got a Ph.D. from Chicago and used to teach at Minnesota; and Dr. Su Sun, who's got a Ph.D. from Michigan, and is one of the foremost antitrust experts in relation to Chinese antitrust policy in the world.

And the particular tables that the Plaintiffs are concerned with, I asked Dr. Yeap and Dr. Sun to do lots of the tabulations underlying. When I reviewed Dr. Myslinski's reports, I saw lots of things in there that were relevant to merits, and so I went to Dr. Sun and sometimes Dr. Yeap, and I asked them to run tabulations on the more current data set that were similar to what I had seen in Dr. Myslinski's reports.

So there were regressions. The particular regressions that the Plaintiffs were complaining about are extraordinarily relevant to merits, and I went to Dr. Yeap and I asked for her to run those regressions on the most current data set. In some cases, it was the same data set that she had used to do similar analyses for Dr. Myslinski, in some they were not, because Dr. Rausser had changed his data over

time.

Q. Just to be clear, who determined whether those regressions were relevant and appropriate for inclusion in your report?

A. I did.

Q. Did you approve the inclusion of every single statistical analysis in your report?

A. Yes. Yes, I drafted my report and I asked for these things. In one instance that was brought to my attention, rather than my seeing it in the documents and the report that they had done this work, but then I asked to see -- I asked Dr. Yeap to see underlying tabulations, and based on those tabulations, I had tables prepared for my conclusion in my report.

Q. Now, are you relying on Dr. Myslinski's opinions in any way?

A. No. Dr. Myslinski's opinions, meaning his interpretations of regression results, his interpretations of statistical output, his opinions about how to look for signs of an effective conspiracy, no, I'm not relying on that at all. I am relying -- I was prompted by seeing certain regressions in Dr. Myslinski's reports to go back to the source and have regressions run that were relevant to what I did. Certainly I was prompted by tabulations that were in his reports, but it wasn't his opinions, it wasn't his

interpretations, it wasn't, you know, his reasons for including those tabulations in his reports. That was of no moment to me.

Q. In your deposition, you had testified that your report was independent from Dr. Myslinski's "because it is." Can you explain to the Court what you meant by that?

A. Yes. The specific question I was asked was, "Why is your report independent of Dr. Myslinski's?" And my report is -- covers different topics. His report covers lots of topics mine don't. What was that, the co-movement and lots of discussion of Q sums. Mine talks about entry, it talks about different experts that didn't exist. As I say, they were written at different times. It talks about market structure, it talks about various infirmities in the statistical analysis the Plaintiffs did.

They're just entirely different reports, and if I had been asked how are they different, in what ways are they different, it would have been clear to me. But I was asked why. And to me, that's a very similar question to why are you independent of Dr. Myslinski? Well, we just are. Again, it's a separate question entirely from in what ways is your report independent from Dr. Myslinski's?

And moreover, the question wasn't related to the report where these tables exist. The question had to do with my primary report which did not include any of the things that

the Plaintiffs are complaining about now.

Q. Well, you had said you did not rely on Dr. Myslinski's interpretation of the statistical results of those models and that you weren't asked how your reports are different.

Well, let me ask you. Does your opinion differ from Dr. Myslinski's in any way in interpreting the regressions that are at issue in this case -- at issue in this motion?

A. Yes, they do.

Q. Can you give us an example?

A. Yeah. Well, this whole notion of segregating the data set in different ways and running regressions on different components of the data set, my complaint about that is that it violates the ordinary least squares assumptions. It violates the number one, first underlying principle of ordinary least squares regressions. And virtually --

THE COURT: Ordinary what?

THE WITNESS: I'm sorry. Ordinary least squares.

THE COURT: Okay.

THE WITNESS: It's the specific statistical -- and it's the most commonly used statistical technique in economics. And any introductory economics text and econometrics textbook at its first discussion of regression will say that the number one assumption, the first assumption is that all of the data sets, the data points are being produced by the same process. It's not the case that half of

the data is being produced by one process, meaning you'll get one set of coefficients, and half is being produced by some different process, meaning you'll get some other set of coefficients.

My opinion has to do with pooling, meaning merging together, and it violates the basic ordinary least squares assumptions to pool data that are not being generated by the same process. You can do it. You can run a regression that way and you'll get output and you'll get various statistics, but they're absolutely meaningless. They don't mean anything at all. And that's my number one problem with what Dr. Myslinski -- I'm sorry, Dr. Baye, Dr. Rausser, and Dr. Lamb have done in running their regressions and Dr. Stiegert, as well. It's -- they violated the first principle of OLS regression and I cite in my report to that. And I cite a textbook that talks about this specifically and says exactly that you cannot pool data this way.

Dr. Lusk is one of the DAP Plaintiffs' experts. Dr. Rausser relied on an article that Dr. Lusk wrote. In that article, Dr. Lusk runs across this exact same issue. It had to do with prices of eggs. He had a data set that related to Oakland, he had a data set that related to, I think, Dallas, and he had a data set that related to the whole country. And he found, when he ran his regressions, that he got different coefficients for Oakland when he ran it on the Oakland group

than he did when he ran it on the Dallas group and then different when he ran it on the nation.

And he concluded that you have to take the results from running -- when he found different results, you have to take the results for the nation as a whole as something other than the statistical model that you generally would. He ultimately said you cannot pool these data, it's invalid to pool these data, and that the results from the national regression will not tell you anything about the prices in any particular city in the United States. Moreover, it's not just an average either. It's not a reliable -- a reliable statistical output.

And my understanding of what Dr. Myslinski said about pooling is he was looking at these different regressions as a sensitivity analysis, and he was looking at them for purposes of establishing predominance. I don't talk about these regressions as sensitivity analyses. There's nothing in my report that says these regressions are sensitivity analyses.

So we're just entirely different interpretations about the outcome of these tabulations.

Q. Okay. Thank you.

Let's take the IPP report for a moment, if you could turn to Tab 5. I believe it's on Page 8 of your report. The IPPs seek to exclude Figure 2 and Section 5 of that report.

There, too, I'm just going to ask you in what way does your opinion differ from Dr. Myslinski's with respect to the opinions you rendered in that section?

A. Well, I think in fairness, I have to say that here, the first opinion is the same, that this figure, I think, illustrates with great clarity that Dr. Stiegert's output and flock models are highly sensitive to the benchmark period that's chosen. And this is related back to the discussion we had earlier about including or excluding the '80s, and the fact that if the '90s are a bad benchmark, this is the sort of thing that can happen. You end up with a model that is extraordinarily unreliable, that just goes off, just by changing the benchmark period.

And then the specific differences are what's included in Paragraph 17 and Paragraph 18 that the Plaintiffs seeks to exclude. Paragraph 17 talks about Dr. Stiegert's explanation for this, and Dr. Stiegert's explanation was that the 1980s can be -- can be divorced from the model because there was a structural break in demand. And in Paragraph 17, I point out that that's not a logical, as a matter of economics, explanation for why the flock model wouldn't perform.

What this flock model supposedly tells you is how egg producers respond to different demand, different levels of demand. So changing a level of demand shouldn't cause a model

to be unreliable. I don't recall Dr. Myslinski ever discussing that, certainly not in any detail.

Paragraph 18 talks about some of the academic references that Dr. Stiegert pointed to in justifying his exclusion of the 1980s, and there I'm pointing at what's actually in those articles. And what those articles say is that structural breaks are endemic to time series and it is -- that you need to apply models, like Dr. Stiegert did, which span decades with great caution, because it's very common for structural breaks to occur and therefore the models that are spanning these long periods of time will be unreliable. And it's not my understanding that Dr. Myslinski said anything at all about what was in those articles.

Q. You said structural breaks are endemic to time series. What's a time series?

A. A time series would be data sets over time. So what we have here is a combination of cross-section, which is if we were going to do an analysis of everybody in this room, it would be a cross-section; a whole bunch of different people. If we were going to do an analysis of you every day and how many eggs per day does Mr. Levine eat, that would be a time series. So it's something over time.

Q. Thank you. And in including Figure 2 in your report, did you satisfy yourself that it was run accurately?

A. Yes. Once again, I didn't go to Dr. Myslinski's reports

to get any of this. I went to Dr. Sun or Dr. Yeap and asked them to prepare similar reports for me in cases that already had them, and then I asked them, "Well, who did this and what protocols were applied to ensure that the data were tabulated correctly?" And that's what I did to ensure myself about the reliability of all of the analyses that I had them do for me.

Q. Does your firm have a protocol for checking the accuracy of your statistical models?

A. Yes. All of the coding has to be checked by another economist. Data entry is double entered by two research associates independently. And we expect to check the protocol people follow with any sort of output that's going to go out the door.

Q. And did you satisfy yourself that that protocol was followed for each of the regressions included in your report?

A. Yes, I did.

Q. Thank you.

And, finally, let's turn to the DAP's motion to exclude your analysis of Dr. Baye's model. Do you remember that critique?

A. I do, yes.

Q. Now, I believe they called it a simplistic approach. Can you explain to the Court what Dr. Baye did and what you did in response?

A. Yes. All of the Plaintiffs' expert economists conducted

Q. You said at the beginning of that answer that you understood that what the Court had talked about in its Class Certification opinion related to Dr. Myslinski's use of these regressions as a sensitivity test and you said, however, you do believe that it was reasonable for Dr. Myslinski to use this as a sensitivity test.

So my sole question is, at his deposition, and then at the Court, Dr. Myslinski was not able to identify an authority -- academic, economic, generally, or otherwise -- for the way he did these sensitivity tests. So since you said that you do think it is reasonable just on the question of using it as Dr. Myslinski did as a sensitivity test, are you aware of some authority that Dr. Myslinski wasn't?

A. No. I made no effort to go out and find citations to support Dr. Myslinski's opinions. Those are Dr. Myslinski's opinions. I was plenty busy putting together these several hundred pages of opinions of my own. So, no, I did not go out and search for some citation to support what Dr. Myslinski said.

Q. Okay. And in terms of these opinions of your own, all I'm focusing on now are the tables that you've acknowledged used a methodology similar to Dr. Myslinski's. You say that in your report you identified at least one source for using these regressions the way you did for the purpose you did.

A. Yes.

Q. So can you show us, please, where that source is identified in your report?
A. On Page 16 of my DPP report, Paragraph 44.
Q. Is this the one behind Tab 3?
A. This is Tab 3.
Q. Page 16?
A. It's part of the material that you're seeking to exclude. When you're ready, I'll --
Q. It's Page 16, I'm sorry, or Note 16?
A. Yes. Yes, it's Page 16.
Q. Okay.
A. Paragraph 44.
Q. Yes.
A. Final sentence on the bottom of the page, the text is, "If data are pooled when the underlying relationships between the dependent variable and the independent variables are different for different subsets of observations, then the coefficient estimates will be unreliable. Such differences violate the underlying assumptions of the model that Dr. Rausser applied."

And then there is Footnote 30. Robert Pindyck and Daniel Rubinfeld -- Daniel Rubinfeld is the author of the regression chapter in the Judicial Reference on Scientific Evidence. He writes -- they write, "The difficulty with the least squares pooling procedure is that the assumption of

constant intercept and slope may be unreasonable. The obvious generalization is to introduce dummy variables that allow the intercept term to vary over time and over cross-section units. If the slopes vary as well" -- and the slopes are all of the other variables besides the intercept. "If the slopes vary as well, each separate cross-section regression would involve a distinct model and pooling would be inappropriate."

Q. Now, what are you reading from?

A. I'm reading from my report.

Q. Where is that?

A. Footnote 30.

Q. Okay.

A. It begins on page 16 and carries over to page 17.

Q. Okay. I'm sorry.

THE COURT: Do you know what -- excuse me for interrupting. The proposal that had been keyed up to me was quite reasonable that there would be 45 minutes of examination.

MR. NEUWIRTH: Yes.

THE COURT: How close are you to being done, going over your 45 minutes?

MR. NEUWIRTH: I'm extremely done and I apologize.

THE COURT: Extremely done?

MR. NEUWIRTH: No, no, I'm -- I'm extremely close to being finished.

THE COURT: Then by all means.

MR. NEUWIRTH: This was my fault because I had assumed --

THE COURT: No, no, no.

MR. NEUWIRTH: No, no, I assumed that when the Defendants went over, we would, too, and I apologize. I shouldn't have made that assumption.

THE COURT: Okay. Well, that's bric-a-brac going back and forth, but you needn't worry about trying to drive any wedges between the Court and any given expert. I have no ego involved in any of this. So we don't have to worry about that anyway. So just wrap up.

MR. NEUWIRTH: Yes.

BY MR. NEUWIRTH:

Q. So the issue, as I take it here, is that, as you testified earlier this morning, what you were concerned about was the problem of looking at full sets of data the way Dr. Rausser did. For example, looking at all of the Defendants together as opposed to, as you and Dr. Myslinski did, segregating out the Defendants and looking at each one individually to see if the results were different; correct?

A. I didn't -- I didn't understand the question. I'm sorry.

Q. Okay. I just wanted to make sure that what you were talking about here in your text that you cited when you talk about the problem of data pooling is what you referred to, I

think, at the end of your direct examination this morning, which was to say that the issue, the problem is looking at data, for example, across all of the Defendants without looking at whether for each Defendant the results are different, as you and Dr. Myslinski did, for example, in Table 2A of your report?

A. It's not so much that you should always look. The point is that it's invalid to pool. The problem is that the model assumes that all of the observations are being generated by the same process. And your circumstances are going to determine whether you should look. In this case, I know that Dr. Myslinski talked about reasons why he would suspect that there are going to be differences across Defendants, and much of what my direct testimony this morning had to do with was why you'd expect there to be differences across time.

This footnote applies not only to these subregressions, but this is the basic problem with a before-and-after method in this case. There are different processes generating the outcomes in the so-called conspiracy period as opposed to the benchmark periods, and they cannot be pooled because of that.

You would think, as a matter of economics, that the great recession, the egg price collapse, the changing animal -- demands for animal welfare by producers, by the Direct Purchasers on the producers, the increasing demand by end

users for specialty eggs would all indicate that there's a different -- and the changing laws -- would indicate that there is a changed regime. And if you have a changed regime, you cannot, as a statistical matter, validly pool all the data together. It suggests that a before-and-after method is fundamentally inappropriate for this case. And these various subregressions demonstrated to a statistical certainty, when you compare the benchmark period to the conspiracy period to the results that you get when you look at all the data combined.

Q. Final question. It's correct, isn't it, that when you ran Dr. Rausser's model using Urner Barry prices, you expressly said that it was important to look across the market; right?

A. I don't remember that language, but it's certainly important to look at all the circumstances that are relevant when you're running a regression analysis.

Q. And you -- I take it you wrote the report that's behind Tab 1, which is your main report, what we've described as your main report, Tab 1 in the book; right?

A. Yes.

Q. And so I take it you wrote Paragraph 176 in that report, or that you wrote the whole thing?

A. I certainly wrote the first draft which is now 176. I have no reason to think anybody suggested any edits, but, yes,

talking about bad faith here; we're just talking about something which is not the way the expert process is supposed to use.

THE COURT: Well, would you not agree, though, Mr. Neuwirth, that economics, one of the social sciences that has really come to cross many, many borders, relies on a lot of facts, a lot of social -- sociology, almost, and psychology, and then to separate the wheat from the chaff, and then throws in some math that led people to go to law instead of economics? So that it's really not something that you take a petri dish and you put some science to it and say, "Voila."

And so the area of expertise that we're talking about is not one that has these very well-defined borders that perhaps one could cram into some of the case law, especially some of the case law with the inflammatory language that you've chosen to cite.

MR. NEUWIRTH: Yes, I agree completely and I think that that helps to create the dividing line between what we would like to suggest today is appropriate and not appropriate, and we've tried to be very selective and limited in the specific topics that we seek to have excluded.

So I do just want to very quickly note that we see behind Tabs 13, 14, 15 and 16 what it is that we went over this morning, that there are certain regressions that Dr. Walker ran that I think he's acknowledged were run, at

best, by staff at his company that had also worked with Dr. Myslinski where the same --

THE COURT: What makes that inappropriate?

MR. NEUWIRTH: Well, we believe what makes it inappropriate are two things: First, we believe that the finding that your Honor made at Class Certification about what was wrong with that type of analysis is equally applicable to the work that was done by Dr. Walker, and that --

THE COURT: I'm going to just -- rather than jump in and interrupt you too often, I'm going to caution against taking the Court's opinion out from where it was focused on the precise issue and interpreting it too much.

MR. NEUWIRTH: Right, and, again, our purpose genuinely is not to overread it.

THE COURT: Okay.

MR. NEUWIRTH: It's simply to say that we believe that your Honor, in that opinion, actually addressed what is the relevant question under Daubert, whether a methodology that is accepted in the profession of the expert is being applied in the case. And our submission and, again, our goal is genuinely not to overread your opinion, but simply to say there has been a finding by the Court to which we believe there is no counterweight in this case, that trying to run a regression model on a subset of data like the top ten retailers or one Defendant versus the other is not something

that has methodological support in the profession of economics and econometrics. That's something that I know Dr. Rausser felt strongly about and expressed in his reports, and I think the Court went through the process of trying to find the citation for it that was not available, and the only one that was offered said the opposite of what was done.

And I do think it's important to note that to the extent that Dr. Walker today pointed in his report to a citation that he said supported the purpose for which he did this type of analysis, I think two things are true.

First, there was the language we looked at in the report, at the end of his testimony in his report, discussing how, in fact, it's appropriate to look at the industry as a whole, which he did in defending a regression that he ran.

And, second, I believe, respectfully, that the quote that he has in his report and the text in his report doesn't really stand for the proposition that it's appropriate to take out a subset of data and run the model on it. Presumably Dr. Myslinski would have known about that citation from Economics Incorporated, as well. I believe, respectfully, that that's making a different point, which is that if, when you run the model, you're finding that -- the example I think he gave was when you run the model looking at different geographic areas and you get different results, I don't think that that suggested that what you do is take out some subset of the

was a Daubert motion made to exclude Dr. Rausser's testimony on the basis that he was making fact assertions, and your Honor made a finding at that time -- again, our goal is not to overread, just to explain the distinction. We believe that what the opinion said is that there is an important part of economics, as your Honor alluded to today, of having hypotheses about what happened that can then --

THE COURT: But clearly you would have to agree that that proposition applies to everybody; is that correct?

MR. NEUWIRTH: Correct. And so what I would like to do now is just identify the very narrow aspects of Dr. Walker's report that we believe go beyond those principles and beyond what your Honor had identified correctly at the start of the argument as the overlap between purely economic things that might traditionally be called economics and broader issues about the records.

So behind Tab 25, we just wanted to note that a similar issue came up in another case regarding Dr. Walker where the Court in the National Union Fire Insurance case excluded certain specific portions of his testimony where -- or his opinions where the Court found that there were instances in which his testimony consisted of merely recapping or interpreting the testimony of others as opposed to offering an economic opinion.

So if we look behind Tab 26, we heard this morning

about his opinions on consumer demands related to animal welfare and in his report, he says that he felt that there was what he described in his report as a revolutionary change in demand related to animal welfare. I think he's acknowledged that he's not an expert on animal welfare and that what he did here was review the documentary evidence in the case concerning the conduct by customers and reviewed documents in the record relating to what he considered changes in attitude.

So the sole limited exclusion that we would want to make with respect to this opinion is not that he can't make observations about what was happening, but that his opinion that this was a revolutionary change is not with any basis in economics.

Similarly, behind Tab 27, he offers opinions about changes in Animal Welfare regulations, and he says that future changes in state and federal cage space regulations are unaccounted for in Dr. Rausser's model, and this is based on -- I think he acknowledged in his deposition that this was based on a single --

THE COURT: You're not disputing that there were factually publicly-acknowledged demands about animal welfare during this time period?

MR. NEUWIRTH: We're not disputing that, but this is on a very specific --

THE COURT: No, I understand what you're saying.

MR. NEUWIRTH: -- Animal Welfare regulations.

THE COURT: Okay.

MR. NEUWIRTH: We don't disagree and we believe that we've addressed in the summary judgment context how Dr. Rausser accounts for that. However, on this very narrow issue of Animal Welfare regulations, we would just note that this Court, as we see behind Tab 28, has previously noted that based on the record that was before the Court, that the federal and California cage space legislation, as well as certain issues relating to Avian flu, that none of these events relate to this case based on the timing of where they occurred and their subject matter.

THE COURT: That's just the calendar, frankly. I mean, I don't know what you want to make out of that. That's simply a calendar issue.

MR. NEUWIRTH: I think it is a calendar issue --

THE COURT: Okay.

MR. NEUWIRTH: -- in the sense that it's got to do with when things occurred. Some of the legislation at issue was adopted in 2015 and so I think the Court made the point that given the time period of the conduct at issue in this case, there was not a basis to treat them as connected.

And so, again, we're not suggesting that Dr. Walker shouldn't be able to talk about what the record says about Animal Welfare regulations in referring to that in his

opinions. The sole thing we're trying to prevent here is for him making the argument that he made today, that he has -- that he can offer an opinion on whether prospective changes in Animal Welfare regulations would have caused changes in conduct years before they occurred.

THE COURT: Well, I thought that what he was saying was that if you know in Year 1 that there will be a change in the landscape in Year 5, you will modify your behavior as to how you spend your time and money in Years 1, 2, 3, and 4 in anticipation of Year 5 coming about with a certain known set of facts. And that if you're talking about making purchases -- I mean, it's different. You would not be gauging how you buy chicken feed in Year 1 based on knowing what's going to happen in Year 5, but you might change your behavior about infrastructure.

MR. NEUWIRTH: That is certain that you've stated it, and I think Dr. Walker stated it this morning. I think that those would be valid things to say --

THE COURT: Okay.

MR. NEUWIRTH: -- if -- if there's some factual predicate for it.

THE COURT: Well, you know in Year 1 what would happen in Year 5.

MR. NEUWIRTH: Correct, and I think the problem here as your Honor, I believe, noted -- I don't want to speak for

the Court, but as we understand the Court to have noted in the opinion I cited earlier, that these things don't relate to the case. It's one thing to say there's a discussion about it in Year 1 and then it happened in Year 5. Then you can draw that connection. But if it just happened in Year 5 and you don't have other things in the record to show it being considered in Year 1, an economist can't just come in and deem that there's a relationship. And that's the narrow point we're trying to limit here, the absence of that factual predicate.

I think one of the most important points here substantively has to do with the 100 percent rule which, as your Honor will recall, was the rule that was part of this UEP program which said that in order to be UEP certified, you have to apply these cage space and other restrictions to 100 percent of your egg production.

And the opinion that's at issue here is behind Tab 33. In his primary report, Dr. Walker says, as we highlight, it's speculative that the 100 percent rule ever had an effect on output of shell eggs. That's the opinion we're talking about. And he asserted today, as I think he suggests in his report, how can it be that if this rule was adopted in 2002, it had no impact until 2005, so there's not a good basis in economics to believe that this rule actually had any impact.

We would respectfully submit that Dr. Walker not only lacks any expertise, as he acknowledged this morning, to

be able to determine whether the 100 percent rule --

THE COURT: I thought that what Dr. Walker is saying is that the Plaintiffs' expert reports on the 100 percent rule are not statistically correct, that they are not so valid.

MR. NEUWIRTH: Well, I think everything Dr. Walker is saying I think is intended to challenge what the Plaintiffs' experts did.

THE COURT: Right.

MR. NEUWIRTH: But there isn't anything that Dr. Walker has actually pointed to where the Plaintiffs' experts have done something distinct related to the 100 percent rule.

THE COURT: But as I understand what he's saying is that there's no -- that the Plaintiffs' experts have not demonstrated some statistical significant decrease in egg supply.

MR. NEUWIRTH: Well, I think that he's made the assertion that there isn't any basis for the Plaintiffs' experts to treat the 100 percent rule as having had any impact and perhaps the way you framed it is the reason.

However, the problem is that -- I think Dr. Walker acknowledged this morning that he is not an expert on the 100 percent rule or why it was adopted, but we do have evidence in the record that we would submit is being ignored here. For example, behind Tab 34, you'll recall, your Honor,

that Michael Foods, one of the largest Defendants by volume, challenged the 100 percent rule until 2006 when it agreed to accept it and join the program. And we have evidence in the case that Mr. Baker, one of the senior officials at Michael Foods, acknowledged that if they had adopted -- there was a document, a Michael Foods document during the period when they were challenging the 100 percent rule, where they said if they had done 100 percent compliance, which means participate in the 100 percent rule, "Michael Foods' layer capacity would have dropped by 14,861,094 layers," and he says that was the estimate at that time, which was March 2005.

Behind Tab 35, there's a document that was marked as Baker Exhibit 8 from the period when Michael Foods was challenging this, where they said, about the 100 percent rule, "We should get together with counsel and determine what legal ground we have to fight this resolution in terms of restraint of trade or some other avenue."

We see behind Tab 36 that in March 2006, Michael Foods complained that one of its competitors wasn't having to use this logo with the 100 percent rule, and Michael Foods' Terry Baker informed the president of the UEP, Mr. Gregory, quote, "While we are not currently contemplating any legal issues, we have discussed internally if any of these scenarios could be considered a restraint of trade."

And I believe that the record -- we've just given

some examples here. I believe that in our papers, there's reference to the multiple examples of how Michael Foods had objected to this 100 percent rule precisely on the ground that Dr. Walker wants to opine, without any basis, we would submit, that it didn't matter.

And so, again, we're not suggesting he can't talk about the 100 percent rule or argue that there's something wrong, perhaps, with how the Plaintiffs' experts have used the 100 percent rule. The opinion we believe he should not be allowed to assert is that it's purely speculative to say that the 100 percent rule had any effect on --

THE COURT: Why is that not really wonderful fodder for cross-examining him if he testifies at a trial?

MR. NEUWIRTH: I have to admit as I'm standing here, the same thought crossed my mind.

THE COURT: Even as you're saying it, you're saying, Wow, let me at him when he's in front of a jury; right?

MR. NEUWIRTH: I can't disagree on this one with your point. I do think --

THE COURT: It's not even a point. I'm asking the question.

MR. NEUWIRTH: No, no, I think that is a very reasonable question to ask, perhaps, given how I articulated it. I do believe, though, that within the confines of the Daubert question of whether an expert --

THE COURT: As an aside, the evidence yesterday I had with a prosecutor who was really wound up about an issue, and he says, "Your Honor, I have to concede, we've got this Defendant nailed." You have to concede it? Okay. Well, gee, maybe I'll needlepoint that and put it on --

MR. NEUWIRTH: Okay.

THE COURT: So they're the same point.

MR. NEUWIRTH: I have to admit, I always learn something at every argument in this court, and I now have another one to take with me.

In terms of the normal secrecy issue that your Honor had identified, again, the narrow issue here is that Dr. Walker has sought to introduce, we would respectfully submit, without any basis anywhere, a concept of normal versus nonnormal secrecy in an antitrust conspiracy. And if we look behind Tab 37, we asked Dr. Walker at his deposition if he could tell us what normal secrecy was, because we thought he had no basis to make that distinction, and he said in his answer, "I don't know that I would be in a position to quantify what a level of secrecy is." And then we said, "Well, what is normal secrecy?" And he said, "I mean, that typically in the United States with regard to illegal conspiracies, illegal antitrust conspiracies at least, there's an effort that I've seen to maintain some secrecy to not be open and notorious about how it is that the conspiracy is

enforcing discipline among the alleged cartel members or conspirators."

We don't believe that that really answers the question of what is normal versus not normal. And if we look behind Tab 38, we know that as this Court has identified in its Class Certification opinion -- again, this is not to draw any implications other than the fact that the Court was recognizing something that I believe is indisputable in the antitrust literature, which is that the open communication coordinating and marketing between and among the conspirators, allowed them to adjust supply as one. This is probative of a common impact here because Defendants could ensure that their supply reduction programs were implemented across the industry and, therefore, Class Members could not have avoided the effects of any conspiracy by buying from cheating producers.

And I think it's very significant, Dr. Walker in his report cites to the well-known industrial organization treatise by Dennis Carlton of the University of Chicago, who's also an expert regularly for Defendants from Compass Lexecon, and the actual treatise that he cites says, "Public availability of information can greatly simplify cartel enforcement because cheating is instantly observable by the cartel."

So the reason that we cite your opinion and Dr. Carlton's is not simply to show that the Carlton cite says

the opposite of what we believe it's being cited for by Dr. Walker, but just to say that this concept of normal secrecy doesn't exist. There are circumstances --

THE COURT: Well, isn't the issue on this that there are certain protocols that participants in business or in the commercial world follow, and that that doesn't necessarily mean that by following certain restrained protocols, one is participating in an illegal conspiracy? So that not every business broadcasts on the front door all of their costs data, for example.

But -- and so that that would not bespeak a conspiracy as opposed to meeting in the back room and, you know, smoking the cigars and, you know, writing in code, et cetera, et cetera. Isn't that what this is really a squabble about?

MR. NEUWIRTH: Well, I believe, again, what your Honor just identified is the legitimate squabble between the parties here about whether what happened --

THE COURT: And I understand what you're saying.

MR. NEUWIRTH: Right.

THE COURT: You don't think that Dr. Walker should be -- is a proper vehicle for interpreting conduct and saying it's innocent conduct as opposed to not innocent conduct because he's not a student of that kind of conduct.

MR. NEUWIRTH: Well, I think we're actually making a

more narrow point.

THE COURT: Okay.

MR. NEUWIRTH: I don't think we're seeking to say that Dr. Walker can't look at what happened and try to, as an economist, draw or not draw observations certainly that bear on what type of analysis is appropriate. We're just making the very narrow point that he has introduced a concept called normal secrecy which we don't believe, A, has any predicate anywhere. I think what you describe is more of a -- there's conduct that you evaluated in the context of the industry, but this phrase normal secrecy implies that there is some economic concept that an expert can say whether the normal or not normal has been met here, and that's what we believe is without foundation.

And the cites that we gave, for example, from Dr. Carlton are simply made -- are simply there to make the point that given that communication can be the vehicle that helps enforce a conspiracy, as your Honor noted in the opinion of Class Certification, the suggestion that there has to be some specific bright-line normal-versus-abnormal level of secrecy, we don't think has any foundation and that's the only issue we're seeking to avoid.

THE COURT: So there's not a formula for how much secrecy is an appropriate monitoring mechanism.

MR. NEUWIRTH: That's the sole point.

THE COURT: Okay.

MR. NEUWIRTH: And that Dr. Walker could not at his deposition tell us where that line was drawn, what the basis for it was, and, again, his only citation, very respectfully, we would submit, says the opposite of what he's suggesting it for.

I think that we heard some reference today during the examination to the sources for Dr. Walker's assertions about the demand for eggs based on nutrition, and he observed that there was a period in the 1990s when he felt there were certain diet trends that, if I -- to use what I think is the fair reading to his point was, he said, "Look, the Plaintiffs' experts have said there were things happening with demand for eggs that make the 1980s a bad benchmark. And so since I observed things relating to demand for eggs in the 1990s or 2000s that are similar, that shouldn't be a good benchmark either." I believe that was what Dr. Walker said his point was.

And our very narrow point here, again, is simply not that it would be wrong for Dr. Walker to say that very limited point, that you can't -- you shouldn't be able to do something in one period. You have to be consistent. He's making a different point here. His point that appears in his report is that he has actually reached a conclusion that there was a change in demand for eggs during the period when trends like

the Atkins diet or the Paleo diet took place.

And so we asked him at his deposition what was the basis for this, and he told us that it was principally his own reading for his own interests of books like The Paleo Diet that became very popular during certain periods of time, and he's acknowledged in his deposition -- I don't recall whether he's acknowledged it today, but he's acknowledged he's not a nutrition expert, that he's not someone who's in a position to opine on whether these trends actually had any effect on egg supply.

And I think most tellingly, he said today -- I don't know if this is accurate in terms of what he observed, but he said today that he observed -- at the same time these diet books were becoming popular, he observed an increase in -- increase in demand for eggs. And while, again, I'm not sure the data shows that, but assuming that's right, we don't believe that he has a basis as an expert to draw any connection between those two things, and that's the limited point on this that we're seeking to exclude, his assertion that the popularity of things like these diet books actually shows that there was a change in demand for eggs. And I think that that, again, is a very narrow point.

So I don't want to overstay my welcome, because I know we're getting close to the time that I was supposed to end, so I would just tell the Court that what we sought to do