IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : : | MULTIDISTRICT LITIGATION |
| *THIS DOCUMENT APPLIES TO:* ALL DIRECT PURCHASER ACTIONS | : : | No. 08-md-2002 |

**MEMORANDUM**

PRATTER, J.                                                                                                         FEBRUARY 2, 2016

**I.     INTRODUCTION**

In September 2015, the Court granted in part the Motion for Class Certification by a putative class of direct purchasers of eggs ("Direct Purchaser Plaintiffs"—referred to frequently as "Plaintiffs" in this memorandum) who alleged that the nation's major egg producers conspired to control and limit the supply of eggs in order to increase egg prices. *In re Processed Egg Products Antitrust Litig.*, No. 08-MD-2002, 2015 WL 5610834 (E.D. Pa. Sept. 21, 2015), opinion amended and superseded by *In re Processed Egg Products Antitrust Litig.*, No. 08-MD-2002, 2015 WL 7067790 (E.D. Pa. Nov. 12, 2015) (hereinafter "*Class Cert. I* at __").[1] The Court granted the Plaintiffs' motion as to a subclass of purchasers of shell eggs and denied as to a subclass of purchasers of egg products. *Class Cert. I* at *29. At that time, however, the Court required additional briefing in order to determine the appropriate cut-off date for the shell egg class. Both the Direct Purchaser Plaintiffs and the Defendants submitted simultaneous briefing

---

[1] The Court filed an Amended Memorandum and Order on November 12, 2015 (Doc. Nos. 1346 & 1347) to correct certain typographical errors. This Amended Memorandum and Order did not alter the substance of the Court's earlier ruling.

on October 16, 2015.  (Doc. Nos. 1333 & 1334).  The Court has reviewed this briefing, as well as the record excerpts submitted by both sides, and now returns to address the limited issue of the proper cut-off date for the Direct Purchaser Plaintiff Shell Egg Class.

For the reasons outlined below, the Court holds that the proper cut-off date for the Shell Egg Class is December 31, 2008.

## II.  DISCUSSION

A summary of the relevant factual background and the class certification standard under Rule 23 appears, in detail, in the Court's *Class Cert I* opinion. It is not necessary to rehash that information here, except to the extent that specific issues may bear upon the Court's holding.

The parties were asked to provide support for the length of their respective proposed class periods for the shell egg class.  *Class Cert I*. at *29.  Having reviewed the submissions, the Court perceives that the parties appear to dispute two specific issues: (1) whether the record supports an inference that the conspiracy continued after the lawsuit was filed in 2008 and (2) whether the impact of certain events which took place after 2008 would prevent issues of fact and law common to the class to continue to predominate over individual issues.  Given the Court's holding in *Class Cert I* analyzing the Rule 23 factors, and given the limited scope of the apparent dispute as to the class period, the Court will incorporate its analysis from the prior opinion and address only these two disputed issues in determining the proper length of the class period.

### 1. Length of Conspiracy

The alleged conspiracy to increase egg prices artificially by reducing the supply of shell eggs came to light in late 2008.  Def. Memo at 1 (Doc. No. 1333); *see* John R. Wilke, *Federal Prosecutors Probe Food-Price Collusion*, Wall Street Journal, Sept. 23, 2008 at A1.  The

Plaintiffs contend, however, that the Defendants continued to conspire, even in the face of numerous lawsuits, until at least December 31, 2013. Pl. Memo at 2 (Doc. No. 1334).

The Plaintiffs' position is that, once a conspiracy has been shown to exist, each participant's involvement in the conspiracy continues until such time as the participant can prove it has withdrawn.  Each participant seeking to prove withdrawal must show that he or she "took affirmative action to defeat or disavow the purpose of the conspiracy" and without such action "liability continues for all action in furtherance of the conspiracy by other conspirators."  Pl. Memo at 6 (citing *United States v. Cont'l Grp.*, 603 F.2d 444, 466-67 (3d Cir. 1979); *United States v. Mayes*, 512 F.3d 637, 642 (6th Cir. 1975); *United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003)).  The Plaintiffs argue that the evidence presented by the Defendants in conjunction with their opposition to the class certification motion fails to show any such affirmative withdrawal.   Consequently, they argue, the Court must assume the conspiracy continued even long after the lawsuit was filed. [2]

At this stage of the litigation, the Court need not delve into determining whether any of the Defendants have adequately shown they are entitled to an affirmative defense of withdrawal, or whether a conspiracy has been proven to actually exist. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  Rather, the task is to determine whether the requirements of Rule 23 have been satisfied and, by extension, whether proof of the existence of the alleged conspiracy after 2008 is a question appropriate for class treatment.  While the rigorous analysis

---

[2] The Plaintiffs, in their supplemental briefing, cite to a number of cases for support of this argument.  In *United States v. Con'l Grp.*, the Third Circuit Court of Appeals held that evidence of certain competitive activity among alleged co-conspirators does not prevent the court from finding the existence of a conspiracy.  603 F.2d at 467 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 225 n.59 (1940)).  Similarly, the mere cessation by a co-conspirator of activity in furtherance of the conspiracy is not sufficient to establish withdrawal.  *Id.*  Withdrawal is an affirmative defense, and the defendant must prove that it "took affirmative action to defeat or disavow the purpose of the conspiracy."  *Id.* 466.

required under Rule 23 will frequently require some overlap with the merits of the underlying claim (thus challenging judicial line-drawing capacities), the Court is prohibited from engaging in a "free-ranging" merits inquiry and should consider merits questions at this stage only to the extent they are relevant to determining whether the prerequisites of class certification have been met. *See Class Cert I* at \*3; *Wal-Mart*, 131 S. Ct. at 2551, n. 6; *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013). The focus of the Rule 23 analysis is determining the existence of common *questions*, rather than determining the answers to those questions. *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 152 (3d Cir. 2002) ("[A]t the class certification stage, 'the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law.'") (quoting *Lumco Indus., Inc. v. Jeld-Wen, Inc.*, 171 F.R.D. 168, 174 (E.D. Pa. 1997)).

In order to determine whether there are such common questions, the Court must analyze the relevant elements of the underlying offense which the plaintiff would need to establish in order to prove the existence of an antitrust conspiracy post-2008. *See Amgen,* 133 S. Ct. at 1195. "The gist of the crime of conspiracy to violate the Sherman Act is the agreement itself." *United States v. U.S. Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979). To determine whether the scope of a conspiracy is continuing, one must look to whether the agreement allegedly entered into "contemplates bringing to pass continuous results that will not continue without the continuous cooperation of the conspirators to keep it up." *Id.* (citing *United States v. Kissel,* 218 U.S. 601, 607 (1910). A conspiracy "to maintain high and stable prices" has been found to satisfy that requirement. *Id.*

The Third Circuit Court of Appeals' *Gypsum* decision is instructive. There, the appeals court considered whether the United States could establish the existence of a continuing antitrust conspiracy to fix the price of gypsum. The conspiracy itself was alleged to have started prior to the relevant statute of limitations cut-off but then to have continued into the statutory period. 600 F.2d at 417. The Court ultimately determined that there were sufficient acts in furtherance of the conspiracy during the statutory period to allow a jury to conclude the conspiracy continued in the statutory period. *Id.* at 418. The Court noted that "there is no requirement that the Government prove a new agreement in the statutory period." *Id.* at 418.

As in *Gypsum*, the object of the Defendants' alleged conspiracy here was to maintain high and stable prices of shell eggs. *See* Direct Purchaser Plaintiffs' Memorandum in Support of Motion for Class Certification, 9-12 (May 30, 2014) (Doc. No. 979) (hereinafter "Motion for Class Cert. at __"). In order to accomplish this, the participants are alleged to have agreed to suppress egg production through a variety of means, including the UEP Certified Program. Motion for Class Cert. at 16. The Plaintiffs argue (and Defendants do not dispute) that the UEP Certified Program continued after the lawsuit at issue was filed in 2008. Pl. Memo at 6; Def. Memo at 6. Despite the fact that the Court did not require fact discovery after 2008, the Plaintiff's briefing and exhibits do indicate that the UEP Certification program continued through 2013 and included the same types of instrumentalities as are alleged to have characterized the conspiracy pre-2008. *See* Animal Husbandry Guidelines for U.S. Egg Laying Flocks, 2014 Edition, United Egg Producers.[3] As this Court pointed out in its prior opinion, the Plaintiffs have shown that the existence and impact of the instrumentalities of the conspiracy can be issues appropriate for class certification. *See Class Cert I* at *10-11. The Defendants here

---

[3] Attached as Exhibit 1 to Doc. No. 1334 (filed under seal).

have provided no basis for arguing that the question of the existence of a conspiracy or the implementation of the UEP Certified Program, post-2008, cannot be treated on a class wide basis.

The Defendants' principle counter argument revolves around the assertion that the initiation of the lawsuit in 2008 fundamentally altered the nature of the conspiracy.[4]  Def. Memo at 7.  The Defendants argue that "a conspiracy should not be presumed to continue when the surrounding circumstances have changed significantly.  Def. Memo at 7 (citing Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* at ¶ 1421b3, 164 (3d ed. 2010)).  Absent secrecy, they argue, no such conspiracy could have survived.

As a preliminary matter, while an antitrust conspiracy's success frequently depends upon the conspirators' ability to conceal the conspiracy itself, secrecy is not an element of the antitrust claim and the Defendants do not provide any authority that the initiation of a lawsuit, without more, is sufficient to terminate a conspiracy.  *See In re Magnesium Oxide Antitrust Litig.*, No. CIV. 10-5943 DRD, 2011 WL 5008090, at *21 (D.N.J. Oct. 20, 2011) (citing *In re Aspartame Antitrust Litig.*, No. 06–1732, 2007 WL 5215231, at *5 (E.D.Pa. Jan.18, 2007) and *In re Mercedes–Benz*, 157 F. Supp. 2d at 372)0.  The simple fact that the conspiracy was uncovered in

---

[4]  The Defendants also argue that the Plaintiffs are unable to rely on record evidence to support the existence of a conspiracy extending past 2008.  The lawsuits which make up this current multidistrict litigation were filed at the end of 2008.  In 2009, the Court issued a case management order which relieved the parties of an obligation to preserve documents generated after December 31, 2008 pending the parties' joint proposal regarding preservation of documents. (Doc. No. 24).  The parties attempted to provide a joint proposal as to their respective preservation obligations, but ultimately this proved unsuccessful and the Court appointed a special master to review the parties' respective positions and issue a report and recommendation.  (Doc. No. 63). This was filed on March 9, 2009 (Doc. No. 71) and subsequently adopted (Doc. No. 83). The report stated that the parties had no obligation to preserve records created before January 1, 1999 and after December 31, 2008. (Doc. No. 83 at 9.)  In 2013, however, the parties agreed to exchange post-2008 transactional data and supplement it on an ongoing basis.  (Doc. No. 829).  This data was used by Dr. Rausser in his model, discussed *infra*.

2008 would not prevent the Court from finding that that the conspiracy continued post-2008 for purposes of class certification.

The Court also finds that the parties have failed to establish that the initiation of the lawsuit in 2008 alone constitutes a sufficiently significant changed circumstance in order to justify holding that the conspiracy necessarily terminated at that point.  Professors Areeda and Hovenkamp, cited in the Defendants' brief, note that some positive evidence of abandonment is necessary to find that an antitrust conspiracy had ceased.  Def. Memo at 7; *see* Areeda & Hovenkamp*, supra*.  And while Professors Areeda and Hovenkamp suggest that in certain instances significant changes to the circumstances of the conspiracy can create the presumption that an ongoing conspiracy, once proven, has terminated, they do not propose a rule that is applied.  Indeed, they note that in any event such circumstances would need to be "very significant." *See* Areeda & Hovenkamp*, supra; Basle Theaters, Inc., v. Warner Bros. Pictures Distributing Corp.,* 168 F. Supp. 553 (W.D. Pa. 1958).

In *Basle*, the exemplar case that Areeda and Hovenkamp describe in their treatise, the court held that a variety of changes to the motion pictures market over the course of an alleged 20-year conspiracy among Pittsburgh-area film distributors to maintain a uniform system of movie first runs did not serve to create a presumption that the conspiracy had terminated.  *Basle,* 168 F. Supp. at 558.  These changes in the market included increases in admission prices at Pittsburgh area theaters, increases in the length of time movies were shown during initial runs, the prices of films, closures of certain theaters, population shifts in the area, declines in theater attendance, and even one of the defendants leaving the industry altogether.  *Id.*

The Defendants here have not articulated why the post-2008 events would have sufficiently altered the market or the conspiracy so as to create a presumption that the conspiracy terminated in 2008 for purposes of the Rule 23 analysis.

This, however, does not end the analysis. Even if common evidence can show the continued existence of the alleged conspiracy, the Plaintiffs must also establish that issues of fact or law applicable to their proposed shell egg subclass predominate over individual issues after 2008.

### 2. Predominance Post-2008

At the class certification stage, it is the plaintiff's burden to show that all the requisite elements of Rule 23 have been met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009). The Court has already found that the Plaintiffs have put forward sufficient evidence to establish the requisite elements of Rule 23 for the shell egg subclass for the period 2004 through 2008. *See Class Cert I* at *25. The Plaintiffs' argument in their supplementary memorandum is that the analysis applicable to evaluating the class from 2004 through 2008—principally the analysis of Dr. Rausser—is equally applicable post-2008. For the reasons discussed above, the Court does not disagree that common evidence conceivably could show the existence of a conspiracy existing after 2008. The Defendants, however, have raised two issues in their supplemental memorandum disputing predominance of class issues after 2008.

First, the Defendants argue that certain Plaintiffs continued to purchase UEP Certified Eggs after they became aware of the alleged conspiracy and, in certain circumstances, even *required* any eggs they purchased be UEP Certified. The Defendants argue that the fact that Plaintiffs continued to purchase UEP eggs after the conspiracy came to light compels the Court

to engage in an individual analysis of the motivations of these Plaintiffs and that such an individualized inquiry would overwhelm any common class issues. The Court, however, does not find these arguments, in and of themselves, compelling.

As noted above, a plaintiff's ignorance or awareness of the existence of a conspiracy is not an element that need be proven in order to establish that conspiracy's existence. *See generally Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 (3d Cir. 1999) (listing the elements of a Section 1 violation under the rule of reason test). To the extent that the Defendants argue that their liability for post-2008 purchases depends in some way upon a determination of the Plaintiffs' awareness of the conspiracy—and in turn that this defeats predominance—they are mistaken as to the requirements of the law.

On the other hand, however, the fact that certain Plaintiffs *required* UEP Certified eggs during the 2008 to 2013 period, could raise individualized issues of fact or law as to whether those Plaintiffs suffered cognizable antirust injuries. *See* Def. Memo at 10 (Doc. No. 1333) (citing *Columbia Broad. Sys. Inc., v. Am. Soc. of Composers, Authors & Publishers,* 620 F.2d 930, 936 (2d Cir. 1980) (noting that in the context of non-per se violations of §1 of the Sherman Act, customer preference in favor of an allegedly trade-restraining practice may indicate no violation)). The factual showing by the Defendants, however, is somewhat thin. For example, the Defendants' briefing has not provided the Court with any indication of how many Plaintiffs had such requirements. *See* Def. Memo at 6. In fact, the brief references only a single instance where Plaintiff Purchasers affirmatively required UEP Certified eggs over cheaper alternatives post-2008. *See* Def. Memo at 9.

The fact that certain Plaintiffs may have required producers supply them with UEP certified eggs does not, on its own, alter the underlying nature of the conspiracy or its alleged

impact on supply and prices. Rule 23(b)(3) contemplates that certain individual issues may exist among class members, despite a court finding that class issues predominate. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3d Cir. 2015) ("[T]he presence of individual questions does not per se rule out a finding of predominance."); 7AA Fed. Prac. & Proc. Civ. § 1778 (3d ed.) (explaining that the Court may find that class issues predominate even if certain issues remain to be tried separately or individual affirmative defenses exist). At this point, the Defendants have merely raised the possibility that a subset of one of the Plaintiff's damages may need to be reduced to account for the fact that this Plaintiff may not have suffered antitrust injury for the entire conspiracy period. "Although the calculation of individual damages is necessarily an individual inquiry, the courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues predominate." *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 305-06 (3d Cir. 2005); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985)) ("While individual questions may arise during the course of this litigation, we agree with the district court that the presence of individual questions does not per se rule out a finding of predominance. In particular, the 'presence of individual questions as to the reliance of each investor does not mean that the common questions of law and fact do not predominate.'") In light of the Court's analysis in *Class Cert I,* the Court cannot conclude that this argument by the Defendants, on its own, defeats a finding that class issues predominate post-2008.

There is another—and in the Court's view, more compelling—issue raised by the Defendants in their supplemental briefing, however. Defendants argue that, starting in 2008, state regulatory regimes governing cage space limitations began to be implemented in certain

egg producing states.[5] The existence of such regulatory regimes would have an impact on the ability of Dr. Rausser's model to accurately calculate damages for the entire class, should the Court extend the class through 2013, as Dr. Rausser would contend.

In *Class Cert I,* the Court analyzed whether Dr. Gordon Rausser's damages model supported a finding that class issues predominate with respect to whether the alleged conspiracy had an impact on all members of the shell eggs subclass and consequently whether the requirements of Rule 23(b)(3) had been satisfied. Ultimately, the Court determined that the Plaintiffs could use common evidence to demonstrate that "(a) Defendants made efforts to reduce the supply of eggs and thereby raise the price of eggs; (b) the egg market was structured so that the alleged conspiracy to restrict the supply of eggs, if successful, would have caused all, or virtually all, Direct Purchaser Plaintiffs to pay higher prices than they would have absent the conspiracy; and (c) the conspiracy was successful in raising prices." *Class Cert I*, at *9. Based upon its review of Dr. Rausser's model, the Court found that the Plaintiffs could show, using evidence common to the class, that shell egg prices were higher as a result of the conspiracy than they would have been otherwise. *Class Cert I*, at *16. In order to show this, Dr. Rausser, performed a regression analysis where he attempted to identify, and control for, all the relevant factors influencing the price of shell eggs over time. Having done so, he determined that the

---

[5] While this issue was alluded to in the initial briefing, the Court did not incorporate it into the analysis of the class pre-2008 because there did not appear to be any substantial regulatory regimes in place. The Defendants' initial round of briefing regarding class certification only made reference to legislation passed in California in 2008. Def. Memo Opposing Class Cert at 34 (citing prop 2, Cal Health & Safe Code Ann. 25990). Notably, however, this argument focused on challenging the adequacy of Dr. Rausser's model to show the conspiracy's impact on the egg market. Given this single example, the Court did not find that Dr. Rausser's failure to incorporate it into his model was sufficient to defeat predominance. *Class Cert I*, at *21, n. 17. The Defendants' supplemental briefing on this issue, however, is substantially more comprehensive as to post-2008 legislative action and indicates that multiple state legislatures were pursuing—and implementing—separate legislative schemes regarding laying hen welfare which would have had the effect of reducing the size of flocks. Def. Memo at 7.

amount of price increases he was unable to control for were the result of the alleged conspiracy. *Class Cert I*, at *16-17. In *Class Cert I*, we noted that the Defendants had not "quibbled" with the logic of Dr. Rausser's theory. *Class Cert I*, at *17. Rather, they argued that under *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1428 (2013), the Plaintiffs must first show the decrease in egg production and then measure this decrease on the price of eggs.

Given the arguments raised by the Defendants regarding Dr. Rausser, in *Class Cert I* the Court analyzed the requirement of *Comcast* in detail in order to determine whether Dr. Rausser's model sufficiently measured the extent to which the alleged conspiracy caused an antitrust impact on all the alleged class members. *Class Cert I*, at *17. The Court ultimately determined that Dr. Rausser's model proposed in this matter was distinguishable from the model at issue in *Comcast*—specifically because none of the pre-2008 modes of conduct challenged by the Defendants here were alleged to be lawful. *Id.* at *18. The Court noted, however, that Dr. Rausser could face a *Comcast* problem if "(a) certain conduct [was] found to have occurred; and (b) that conduct had an impact on the price of eggs; but (c) that conduct was not legally cognizable vis-à-vis the class." *Id.* at *18 n. 15.

While the Court found no *Comcast* problem as to the pre-2008 class, the Defendants' supplemental briefing in opposition to class certification appears to have raised such an issue with regards to the post-2008 conspiracy. Def. Motion Opposing Class Cert at 3-4 (Doc No. 1333). The Defendants argue that from December 2008 onward, a number of different egg producing states passed legislation which had the effect of legislating minimum cage size requirements. The Defendants, in their supplemental briefing, have pointed to at least four separate state legislative schemes that were on the books between 2008 and 2013 which provided minimum cage space requirements for eggs either produced or sold in state. The Defendants

12

have also pointed to one additional state—California—which was phasing in cage space requirements during this period. This presents a substantially different question vis-à-vis predominance post 2008 than what was discussed in the Defendants' initial round of briefing.

The Defendants' have identified the following state legislative schemes germane to this issue. In 2009, Arizona became the first state to require compliance with UEP guidelines, followed in 2012 by Oregon and Washington. *See* Arizona Admin. Code § R3-2-907 (effective Oct 2009); Or. Rev. Stat § 632.840(1)(c) (effective Jan. 2012) and Or. Admin R. 603-018-0005-0010 (2012); Wash. Rev Code § 69.25.065 (1)(a) (effective Aug. 2012). In 2011, Ohio, the second largest egg producing state, formally enacted a moratorium on the construction of new egg production facilities housing layers in battery cages, Ohio Admin. Code 901:12-9-03 (F)(6) (effective September 2011), required farms provide 57 square inches per laying hen and prohibited food-withdrawal molting, Ohio Admin Cod 901:12-9-03(C) (effective September 2011). Finally, in 2008, California passed Proposition 2, which prohibited any cage which prevented hens from "[l]ying down, standing up, and fully extending [their] limbs" or "turning around freely." This requirement had an effective date of January 2015. Legislation passed in 2010 extended the Prop 2 requirement to all eggs sold within California. Michigan passed similar restrictions on eggs produced in-state in 2009. Mich. Comp. Laws § 287.746(2) (passed October 2009; effective March 31, 2010).

The significance of such legislation to the class certification analysis was previewed in the Court's discussion of *Comcast* in *Class Cert I. See id.* at *18 n. 15. The Court found that there was no indication that the Defendants engaged in conduct which had an impact on the price of eggs but which was not legally cognizable vis-à-vis the class prior to 2008. The existence, however, of multiple state legislative schemes in place after 2008, mandating producers impose

13

cage-space limitations, would create the possibility that the effect of the Defendants' conduct post-2008 could not be measured using Dr. Rausser's proposed model.

As a preliminary matter, the existence of multiple state legislative schemes impacting a proposed class is certainly a means of defeating predominance. *See e.g. Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Typically, however, the significance of such multiple schemes relates to choice of law questions, such as when a proposed class involves application of state law to claims of members from a number of different jurisdictions. *See* Newberg on Class Actions § 4:61 (5th ed.). While the Court here does not face a choice of law problem, the existence of multiple state legislative schemes in place between 2008 and 2013 could have had the effect of decreasing flock size, but for reasons unrelated to the conspiracy. The Defendants argue that such issues would operate to reduce supply in a manner indistinguishable from the effect of the UEP guidelines. Dr. Rausser's model, however, does not control for the impact of state legislative schemes on the impact of egg prices post-2008.

Dr. Rausser performed a regression analysis using the Defendants' transactional data from February 1997 to December 2013 to measure the effect of anticompetitive behavior on the price of shell eggs. Rausser Report at 91. He concluded that the price of shell eggs between September 2000 and December 2013 was "significantly elevated" due to the anti-competitive behavior of the Defendants. In order to discern this correlation, he employed the concept of "ceteris paribus" or "holding all other relevant factors fixed" in order to determine the relation between the hypothesized causal variable and the effect. *See* Rausser Report at 88, n. 312. The salient factors which he identified included "product characteristics, product packaging, supply costs, customer size, custom type, brand label, and seasonability." Rausser Report at 82-83. Based upon his analysis, Dr. Rausser determined that between 65% and 66% of the price

variability of shell eggs could be attributed to changes in these identified variables. *Id.* at 84. The other 34% to 35% of price variation, Dr. Rausser concludes, must be due to the supply reducing behavior of the conspirators.

This model does not, however, account for changes in regulatory requirements imposed by state governments upon producers. As discussed above, these began to be passed in 2008. While Dr. Rausser's decision to leave out a variable to account for state regulatory activity may not have impacted his regression analysis for the period between 2000 and 2008, his decision presents a problem for the Court when attempting to apply his analysis to the period from 2008 to 2013. As in *Comcast*, the Plaintiffs here would only be entitled to recover damages resulting from the antitrust impact of the alleged conspiracy. *Comcast,* 133 S.Ct. at 1433. Once states began passing regulations imposing cage space limits on producers, it can no longer be said definitively that the 34% to 35% of price variation Dr. Rausser cannot control for using his common factors analysis, must be attributed to conspiratorial behavior. The model fails to specify, after 2008, what component of the alleged price increase is attributable to unlawful antitrust behavior as opposed to imposition of lawful state regulatory schemes. In much the same way the Supreme Court found impermissible in *Comcast*, the price variance Dr. Rausser attributes to the conspiracy intermingles lawful and unlawful behavior between 2008 and 2013. *See id.* at 1434.

For this reason, the Court finds that while the Plaintiffs have established that the Rausser Model is capable of quantifying the damages attributable to Defendants' anticompetitive behavior for 2004 through 2008, the model cannot adequately quantify damages for 2009 through 2013.

### III. CONCLUSION

For the reasons outlined above, the Court finds that the Rausser Model fails to take into account the effect of state legislative schemes instituted after the lawsuit was filed which regulate animal welfare standards in the shell egg industry. Given that the Rausser Model cannot reliably show damages resulting from the alleged conspiracy on a class wide basis after December 31, 2008, the Court finds that the proper class cutoff date for the shell egg subclass is December 31, 2008.

Therefore, based upon the reasoning articulated in *Class Cert I,* as well as the reasoning articulated above, the Court will certify the following class of shell egg purchasers:

> All individuals and entities that purchased shell eggs produced from caged birds in the United States directly from Defendants during the Class Period from September 24, 2004 through December 31, 2008.
>
> Excluded from the Class are the Defendants, their co–conspirators, and their respective parents, subsidiaries, and affiliates, as well as any government entities. Also excluded from the Class are purchasers of "specialty" shell eggs (such as "organic," "certified organic," "free range," "cage free", "nutritionally enhanced," or "vegetarian fed") and purchasers of hatching eggs, which are used by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

\*       \*       \*

An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

16