IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : | MULTIDISTRICT |
| ANTITRUST LITIGATION | : | LITIGATION |
| | : | |
| | : | |
| *THIS DOCUMENT APPLIES TO:* | : | |
| ALL DIRECT PURCHASER ACTIONS | : | No. 08-md-2002 |

## MEMORANDUM

PRATTER, J.                                                               JUNE 30, 2016

Direct Purchaser Plaintiffs move for final approval of two sets of proposed settlement agreements. The first set is between and among the Direct Purchaser Plaintiffs and each of the following defendants: Midwest Poultry Services, LP ("MPS"), National Food Corporation ("NFC"), United Egg Producers ("UEP"), and United States Egg Marketers ("USEM"). *See* Doc. No. 1144. The second set has been entered into by the Direct Purchaser Plaintiffs and defendants NuCal Foods, Inc., ("NuCal") and defendants Hillandale Farms of Pa., Inc., and Hillandale-Gettysburg, L.P., (collectively "Hillandale"). *See* Doc. No. 1199. Under the terms of these proposed settlement agreements, in exchange for certain payments from the defendants to the settlement class, as well as the defendants' ongoing cooperation in the continuing litigation, Plaintiffs agree to release the defendants from any and all claims arising out of, or resulting from, the conduct asserted in the lawsuit.

The terms of these two settlement agreements are similar, so the Court will address the propriety of certifying a settlement class and the fairness of the various settlement agreements in a single opinion. For the reasons set forth below, the Court will grant the motions for final

approval of each settlement agreement and will certify the respective settlement class and subclass.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This litigation embraces a number of consolidated actions, all alleging the existence of an unlawful conspiracy among the nation's egg producers to manipulate the supply and domestic price of eggs, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*. The plaintiffs in this case include both direct purchasers of eggs (such as grocery stores, commercial food manufacturers, restaurants, other food service providers, and other entities who purchase directly from defendants or other egg producers) and indirect purchasers (such as individual consumers who purchased from other parties along the distribution chain) of shell eggs, egg products, or both. The moving plaintiffs here are direct purchasers of shell eggs and egg products.

### A. Proposed Settlement Class

While the parties are requesting approval of five separate settlement agreements, the settlement class is defined the same in each of the settlement agreements. The class and subclasses are:

> All persons and entities that purchased Shell Eggs or Egg Products in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date on which the Court enters an order preliminarily approving the Agreement and certifying a Class for Settlement purposes.

> a.) Shell Egg SubClass
> All individuals and entities that purchased Shell Eggs in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date on which the Court enters an order preliminarily approving the Agreement and certifying a Class for Settlement purposes.

> b.) Egg Products SubClass

All individuals and entities that purchased Egg Products produced from Shell Eggs in the United States directly from any Producer, including any Defendant, during the Class Period from January 1, 2000 through the date on which the Court enters an order preliminarily approving the Agreement and certifying a Class for Settlement purposes.

Excluded from the Class and SubClasses are Defendants, Other Settling Defendants, and Producers, and the parents, subsidiaries and affiliates of Defendants, Other Settling Defendants, and Producers, all government entities, as well as the Court and staff to whom this case is assigned, and any member of the Court's or staff's immediate family.

### B. MPS Settlement Agreement[1]

The Direct Purchaser Plaintiffs agreed to settle their claims with MPS in March of 2014, after several months of arm's length negotiations. According to the declaration of James Pizzirusso, counsel for the DPPs who participated as a principal negotiator, substantive negotiations between the parties began in January 2014. The parties previously had sought a stay of the litigation in order to attend a joint mediation in September 2013. Although this mediation effort was unsuccessful, shortly thereafter counsel for the DPPs began substantive settlement discussions with MPS. These negotiations consisted of several rounds of telephone calls and email exchanges between and among counsel. By February 10, 2014, the DPPs had reached an agreement in principle with MPS. This agreement was executed on March 31, 2014. The Court granted preliminary approval to the settlement on July 30, 2014.

Under the terms of the settlement agreement, MPS agrees to pay $ 2,500,000 to the plaintiff class as well as provide cooperation in the ongoing litigation. The settlement amount was calculated based upon MPS's financial condition at the time of the settlement and in light of

---

[1] The following is taken from the Declaration of James J. Pizzirusso In Support of Direct Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlement Between Direct Purchaser Plaintiffs and Defendant Midwest Poultry Services., Inc., sworn to March 19, 2015, and docketed at number 1144-2 (hereinafter "Pizzirusso MPS Decl., at ¶ __").

the fact that a significant percentage of MPS's sales were made to Direct Action Plaintiffs, who had opted out of the class.

In exchange for this consideration from MPS, the Direct Purchaser Plaintiffs agree that MPS shall be "completely released" from any and all claims that the Direct Purchaser Plaintiffs may have or ever had, arising out of any agreements among the defendants regarding

> (i) any agreement or understanding between or among two or more Producers of eggs, including any Defendants, including any entities or individuals that may later be added as a defendant to the Action, (ii) the reduction or restraint of supply, the reduction of or restrictions on production capacity, or (iii) the pricing, selling, discounting, marketing, or distributing of Shell Eggs or Egg Products in the United States or elsewhere.

Pizzirusso MPS Decl., (Ex. 1 at ¶ 30).

Prior to the settlement, the defendants reportedly had collectively produced over one million documents during on-going discovery, while MPS itself had produced over 40,000 documents. In addition, at the time substantive negotiations began, plaintiffs' counsel had deposed MPS's CEO in both his individual and corporate capacity.

## C. NFC Settlement Agreement[2]

The negotiations which resulted in the proposed NFC settlement agreement commenced somewhat earlier. Mr. Pizzirusso also participated as a principal negotiator for the Direct Purchaser Plaintiffs with regards to the NFC settlement and submitted a declaration in support of the motion for final approval of the settlement.

Preliminary discussions between the Direct Purchaser Plaintiffs and NFC were initiated in late 2012 or early 2013, but the parties were unable to make substantial progress. Subsequent

---

[2] The following is taken from the Declaration of James J. Pizzirusso In Support of Direct Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlement Between Direct Purchaser Plaintiffs and Defendant National Food Corporation, sworn to March 19, 2015, and docketed at number 1144-3 (hereinafter "Pizzirusso NFC Decl., at ¶ __").

4

settlement discussions then took place in May 2013. This included exchanges of NFC's financial information. Discussions continued through mid-2013 and apparently consisted of phone calls and email exchanges. A second set of audited financial statements were circulated to plaintiff's counsel in August 2013. After a joint mediation effort in September 2013, the parties reengaged in settlement talks in November 2013. Following additional rounds of phone calls and emails, in February 2014, the parties reached an agreement in principle. This agreement was fully executed on March 28, 2014. The Court granted preliminary approval of the proposed settlement on July 30, 2014.

Under the terms of the settlement agreement, NFC agrees to pay $1,000,000 to the plaintiffs as well as provide cooperation in the ongoing litigation. In exchange, the Direct Purchaser Plaintiffs agree that NFC shall be "completely released" from any and all claims that the Direct Purchaser Plaintiffs may have or ever had, arising out of any of the alleged anticompetitive conduct outlined in section I.B, *supra*. *See* Pizzirusso NFC Decl., (Ex. 1 at ¶ 29).

The one million dollar settlement amount was calculated based upon NFC's financial condition—which is described as "precarious"—as well as the amount of relevant commerce the company had engaged in. This calculation was based upon substantial discovery; prior to entering into the settlement, plaintiffs' counsel describes reviewing the over 100,000 documents produced by NFC in the litigation.

## D. UEP/USEM Settlement Agreement[3]

---

[3] The following is taken from the Declaration of James J. Pizzirusso In Support of Direct Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlement Between Direct Purchaser Plaintiffs and Defendants United Egg Producers and United States Egg Marketers, sworn to March 19, 2015, and docketed at number 1144-4 (hereinafter "Pizzirusso UEP/USEM Decl., at ¶ __").

5

Initial discussions between plaintiff's counsel and UEP/USEM began in the summer of 2013. Mr. Pizzirusso also participated as a principal negotiator for the DPPs with regards to the UEP/USEM settlement and submitted a declaration in support of the motion for final approval of the settlement.

In August 2013, the parties in the litigation sought a stay to attend a global joint mediation scheduled for October 2013. While this mediation proved unsuccessful, DPP's counsel again reached out to UEP/USEM in January 2014 to begin substantive, arm's length negotiations. In March 2014, the parties reached an agreement in principle. Following this, and in order to ensure that the DPPs were getting adequate consideration for the release, the parties agreed to have Magistrate Judge Timothy Rice facilitate settlement discussions by reviewing various documents *in camera*. On March 25, 2014, after several discussions and letter submissions by the parties, Magistrate Judge Rice concluded that the agreement provided material value to the class. On May 21, 2014, the UEP/USEM Settlement Agreement was fully executed. The Court granted preliminary approval of the UEP/USEM Settlement Agreement on July 30, 2014.

Under the terms of the settlement, the plaintiffs agreed to release UEP/USEM from liability in exchange for a $ 500,000 payment, as well as cooperation in the ongoing litigation. This cooperation includes the release of certain documents previously held back by the defendants based upon assertions of attorney/client privilege. In exchange for such consideration, the DPPs agree that UEP/USEM shall be "completely released" from any and all claims that the plaintiffs may have or ever had, arising out of any of the alleged anticompetitive conduct outlined in section I.B, *supra. See* Pizzirusso UEP/USEM Decl., (Ex. 1 at ¶ 32).

This half a million dollar settlement amount was reached after arm's length negotiations between counsel for the various parties. The specific payment was calculated based upon information regarding UEP/USEM's financial condition and in consideration of the fact that these entities were never egg producers.

### E. NuCal Settlement Agreement[4]

Mr. Pizzirusso also participated as a principal negotiator for the Direct Purchaser Plaintiffs with regards to the NuCal settlement and submitted a declaration in support of the motion for final approval of the settlement. While settlement discussions between plaintiffs' counsel and NuCal began early in the case, these discussions were initially unsuccessful. Following the unsuccessful October 2013 global joint mediation effort, class counsel again approached NuCal regarding the possibility of settlement. Substantive negotiations began in January 2014. In April 2014, NuCal shared its unaudited financial statements with plaintiffs. After several rounds of calls and exchanged emails, the parties eventually reached a settlement in principle in May 2014. On August 1, 2014, counsel for the plaintiffs and NuCal executed the settlement agreement. The Court granted preliminary approval of the NuCal settlement on October 3, 2014.

Under the terms of the settlement agreement, NuCal agrees to pay $1,425,000 to plaintiffs, as well as provide continuing cooperation in the ongoing litigation. In exchange for such consideration, the Direct Purchaser Plaintiffs agree that NuCal shall be "completely released" from any and all claims that the DPPs may have, or ever had, arising out of any of the

---

[4] The following is taken from the Declaration of James J. Pizzirusso In Support of Direct Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlement Between Direct Purchaser Plaintiffs and Defendant NuCal Foods., Inc., sworn to June 1, 2015 (hereinafter "Pizzirusso NuCal Decl., at ¶ __").

alleged anticompetitive conduct outlined in section I.B, *supra*. *See* Pizzirusso NuCal Decl., (Ex. 1 at ¶ 30).

Prior to entering into the settlement agreement, the plaintiffs' counsel reportedly reviewed over 200,000 pages of documents produced by NuCal, deposed NuCal's current president and CEO, the former president, a senior vice president for operations, and a vice president for marketing and sales. While the parties were initially far apart, the ultimate settlement amount was based upon the financial condition and sales data from NuCal.

### F.      Hillandale Settlement Agreement[5]

Finally, the plaintiffs have moved for the final approval of the Hillandale Settlement Agreement. In support, the plaintiffs have submitted the Declaration of Ronald J. Aranoff. Mr. Aranoff was a principal negotiator for the Hillandale defendants. Initial settlement discussions between the plaintiffs and the Hillandale defendants began early in the litigation but initially resulted in little progress. During the summer of 2014, the plaintiffs and counsel for Hillandale re-engaged in substantive settlement discussions, which consisted of several rounds of telephone calls and emails. By September 2014, the parties had agreed to the broad terms of a settlement. This agreement was memorialized in a binding term sheet on September 19, 2014. The formal settlement agreement was executed on October 22, 2014. The Court granted preliminary approval of the settlement on December 18, 2014.

Under the terms of the agreement, the Hillandale defendants agree to pay $3,000,000 to the plaintiffs as well as provide continuing assistance in the ongoing litigation. In exchange for

---

[5] The following is taken from the Declaration of Ronald J. Aranoff In Support of Direct Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlement Between Direct Purchaser Plaintiffs and Defendants Hillandale Farms of Pa., Inc., and Hillandale-Gettysburg, L.P., sworn to June 1, 2015 (hereinafter "Aranoff Decl., at ¶ __").

8

such consideration, the Direct Purchaser Plaintiffs agree that the Hillandale defendants shall be "completely released" from any and all claims that the DPPs may have, or ever had, arising out of any of the alleged anticompetitive conduct outlined in section I.B, *supra. See* Aranoff Decl., (Ex. 1 at ¶ 30).

Prior to entering into the settlement, the plaintiffs had reviewed over 15,000 documents produced by the Hillandale defendants and deposed the Chairman of Hillandale-Gettysburg, the President of Hillandale Pa. and the General Manager of Hillandale-Gettysburg.

### G. Notice Plan & Fairness Hearing

In the Court's orders granting preliminary approval of the various settlements, the Court approved the parties' proposed notice plans and appointed Garden City Group, LLC ("GCG") as claims administrator for all of the settlements at issue. GCG is a legal administrative services firm which has, for about three decades, served as administrator in over 3,000 cases. In support of the parties' two motions for final approval of the various settlements, Jennifer M. Keough, the Chief Operating Officer of GCG, submitted two affidavits which state that GCG has successfully implemented all elements of the Court's Notice Plan with regards to the settlements.[6] The affidavits specifically state that GCG has provided notice to the class members, as ordered by the Court. The notice includes:

> Direct long-form notice by first-class mail to over 19,000 Class Members[7], which includes the long-form notice (the "Mailed Notice");

---

[6] Affidavit of Jennifer M Keough, sworn to on March 18, 2015 (hereinafter "Keough I Aff. at ¶ __"); Affidavit of Jennifer M. Keough, sworn to on May 29, 2015 (hereinafter "Keough II Aff. at ¶ __").

[7] This refers to the number of class members, to whom notice of the MPS, NFC and UEP/USEM Settlements was sent. Several months later, when GCG sent notice regarding the NuCal and Hillandale settlements, the universe of potential recipients consisted of 17,500 class members. The Court has not seen the numerical discrepancy between these two mailings directly addressed in the affidavits or briefing. Nevertheless, the Keough II Affidavit notes that the database used for the class mailing received updated information between October 27, 2014,

9

> Publication of short-form notice (the "Summary Notice") in The Wall Street Journal and a number of industry publications;
> A press release through PR Newswire
> A dedicated website through which Class Members can obtain information concerning the Settlements . . .; and
> A toll-free telephone helpline through which Class members can obtain information concerning the Settlements . . . .

Keough I Aff. at ¶ 5; *accord* Keough II Aff. at ¶ 5.

Pursuant to the Court's preliminary approval orders, any class member who wished to be either excluded from the settlements or objected to the terms of the settlements, was required to submit such an objection or exclusion request to GCG. The deadline for class members opting out of the MPS, NFC and UEP/USEM settlement agreements was March 5, 2015. The deadline for opting out of the NuCal and Hillandale settlement agreements was May 22, 2015. GCG ultimately received 197 timely requests to opt out of the MPS, NFC, UEP/USEM settlement agreements and 193 timely requests to opt out of the NuCal and Hillandale settlement agreements. Of the opt-out entities, however, many appeared to be related entities, given similar names and shared counsel. Additionally, GCG has received *no* objections from class members to the terms of any of the settlements.

Following the submission of the parties' final motions for approval of these two groups of settlement agreements, the Court conducted two fairness hearings regarding the settlement agreements. The first hearing, which addressed the MPS, NFC and UEP/USEM settlement agreements, took place on May 6, 2015. The second, which addressed the NuCal and Hillandale settlement agreements, took place on July 1, 2015.

---

when notice was sent regarding the MPS, NFC and UEP/USEM settlements and February 11, 2015 when the notice was sent regarding the NuCal and Hillandale settlements.

## II.   DISCUSSION

Federal Rule of Civil Procedure 23 provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."   Fed. R. Civ. P. 23(e).   "A class action, however, shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."   *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001) *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).   The Third Circuit Court of Appeals has explained that the trial court is required to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." *Id.*

The "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.   In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257-58 (3d Cir. 2009) (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008)).   "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 299 (3d Cir. 1998) (quoting *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975)).

### A.  Class Certification

#### 1.   Litigation and Settlement Classes

Prior to engaging in a full Rule 23 analysis of the proposed settlement class, the Court will briefly address the procedural posture of this case with regards to class certification.   At first

11

glance, one might have concerns about the possible conceptual impediments to certification of the class proposal. For the reasons outlined below, the present posture really does not pose any substantive problems, but the Court nevertheless will briefly address why the certification of a *limited litigation* class does not present any obstacle for the certification of the *settlement* class.

In September 2015, the Court approved a litigation class of direct purchaser plaintiffs. *In re Processed Egg Products Antitrust Litig.*, 310 F.R.D. 134 (E.D. Pa. 2015), *withdrawn from bound volume, opinion amended and superseded*, 312 F.R.D. 171 (E.D. Pa. 2015) (*hereinafter DPP Litig. Class I*). In approving this litigation class, however, the Court declined to approve a subclass consisting of purchasers of egg products. The Court explained:

> Plaintiffs have not demonstrated that common issues predominate as to the antitrust impact to the egg products subclass. Essential to the Court's conclusions as to shell eggs was the extensive industry analysis conducted by Dr. Rausser, which demonstrated that the shell eggs industry was a highly consolidated, integrated, and commoditized industry. No such extensive analysis has been conducted for the egg products market, and the Court cannot conclude that common issues predominate as to egg products.

*DPP Litig. Class I* at 200. In their motion for class certification, the DPPs failed carry their burden of showing common evidence of an antitrust impact upon the proposed egg products class that was capable of being produced at trial. Consequently, the Court determined that certification of the egg products subclass at that time was improper. When considering the proper time period for the litigation class, the Court made a similar determination as to the shell egg subclass for the period post-2008. *See In re: Processed Egg Products Antitrust Litig.*, No. 08 -2002, 2016 WL 410279, at *1 (E.D. Pa. Feb. 3, 2016) (hereinafter *DPP Litig. Class II.)*

12

Having approved this limited litigation class, however, the Court is now asked to grant final approval to a more expansive settlement class.[8]  Because the preliminary approval of the settlement class and subsequent briefing regarding a request of final approval of the settlement class took place prior to the Court's holding on the litigation class, the Court ordered the parties to brief any potential obstacles that approval of a settlement class now could confront or pose. Doc. No. at 1400.   A hearing on this additional briefing took place on June 13, 2016. Having reviewed the supplemental briefing, and listened to the arguments from the parties at the hearing, the Court finds that approval of the settlement class is proper despite the facially incongruent litigation class certification.

The Court is required to conduct an analysis under Rule 23 prior to certifying a class for purposes of either settlement or litigation. But the considerations relevant to the analysis differ somewhat depending upon the purpose of the class certification.   The foundational case is *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), in which the Supreme Court reviewed a Third Circuit Court of Appeals decision vacating the district court's certification of a settlement class in order to determine the intersection between class certification analysis set out in Rule 23 and settlement classes.   *Id.* at 619.   First, the Court explained that when analyzing whether certification of a settlement class is proper, the trial court must engage in the analysis under Rule 23(a) and (b) in order to ascertain whether such a settlement class adequately protects the interests of absent class members who would be bound by the terms of the settlement.   *Id.* at 621 "Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives. That dominant

---

[8] The Court will address approval of class for purposes of settlement between Direct Purchaser Plaintiffs and National Food Corporation, Midwest Poultry Services, LP, United Egg Producers and Untied States Egg Marketers (Doc. No. 1144), also currently pending, in a separate memorandum and order.

concern persists when settlement, rather than trial, is proposed." *Id.*  Therefore, prior to approving a settlement class, the Court is required to determine whether the requirements of Rule 23(a) and (b) have been met—just as would be required prior to approving a litigation class.

Nevertheless, the Court in *Amchem* also explained that while the structure of the analysis was the same, the questions of law and fact relevant to a settlement class differs somewhat from the questions relevant to a litigation class.  When "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.  *Id.* at 620 (citing Fed. R. Civ. P. 23(b)(3)(D)); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 306 (3d Cir. 2005).  In *Sullivan v. DB Investments, Inc.* 667 F.3d 273, 302-03 (3d Cir. 2011), the Third Circuit Court of Appeals explained the distinction between the predominance inquiry in the context of litigation class certification and the predominance inquiry for proposes of settlement class certification. While differences in varying state regulatory schemes, for example, would relate to the predominance analysis with regards to certification of a litigation class, for purposes of inquiring into the predominance of questions of law and fact relevant to a settlement class, manageability issues that are of obvious concern for anticipated litigation consideration are not similarly relevant.  *Id.* at 303. Settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws" and for purposes of distinguishing litigation from settlement class determination, this difference "is key." *Id.* at 304. Therefore, common questions of fact and law may predominate with regards to a settlement class, while separate individual questions could nevertheless prevent certification of a litigation class. *See In re Dynamic Random Access Memory Antitrust Litig.,* No. 02-1486, 2013 U.S. Dist. LEXIS 188116, at *254 (N.D. Cal. Jan. 7, 2013) (holding that nothing in the court's prior ruling

denying class certification as to a proposed litigation class prevented the court from subsequently

granting certification for settlement purposes) (citing *Sullivan,* 667 F.3d at 306); *Columbus*

*Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 553 (N.D. Ga. 2007) (denying class

certification as to a proposed litigation class but granting as to a proposed settlement class).

Given this, the Court's previous holding excluding certain purchasers of egg products or

post-2008 shell egg purchasers from the litigation class is not dispositive for the Court's

determination as to whether to certify the proposed settlement class. In *DPP Litig. Class I* and

*DPP Litig., Class II,* the Court explained that the plaintiffs failed to meet their burden of

showing that issues of law and fact would predominate at trial with regards to the availability of

evidence of antitrust impact, common to the entire class. Under *Amchem* and *Sullivan,* such

consideration of trial management and common evidence would not apply, however, when

determining whether issues of law and fact common to the settlement class predominate.

The Court will therefore turn to the requirements of Rule 23(a) and (b) and analyze these

in the context of the proposed settlement class. The Court, in the course of granting preliminary

approval to the various proposed settlement classes, has already found that the requirements

under Rule 23(a) and (b) have been satisfied for the purposes of both the MPS/NFC/UEP/USEM

proposed settlement class, (Doc. No. 1027 at 3, 8), as well as the NuCal and Hillandale proposed

settlement classes, (Doc. No. 1073 at 5; 1108 at 5-6). The Court is also mindful that it has

approved two settlement classes in this matter already. *See In re Processed Egg Products*

*Antitrust Litig.*, 284 F.R.D. 249 (E.D. Pa. 2012) (*Settlement Class I*); *In re Processed Egg*

*Products Antitrust Litig.*, 302 F.R.D. 339 (E.D. Pa. 2014) (*Settlement Class II*). The Court finds

that the proposed settlement classes at issue here raise essentially the same issues and

considerations as the prior settlement classes and are appropriate for certification for the reasons outlined in those prior opinions.[9]

### 2. Rule 23(a)

In order to certify a class for purposes of settlement, the first step is to determine whether the requirements of Rule 23(a) have been satisfied. *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 341 (3d Cir. 2010). Certification is proper under Rule 23(a) if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." The Court will address these four issues in turn.

#### a. Numerosity

The Court finds that the proposed class is sufficiently numerous that joinder of all members is impracticable. The proposed settlement class comprises purchasers of hundreds of millions of shell egg cases, as well as purchasers of egg products. While there is no threshold number, the Third Circuit Court of Appeals has found that a class of 40 or more members will typically satisfy. *In re Nat'l Football League Players Concussion Injury Litig.*, No. 15-2206, 2016 WL 1552205, at *7 (3d Cir. Apr. 18, 2016), *as amended* (May 2, 2016); *see also Settlement Class II,* at 348 (citing 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1762 (3d ed. 2005) ("'[I]mpracticable' does not mean 'impossible.' The representatives only need to show that it is extremely difficult or inconvenient to join all the

---

[9] The Plaintiffs have filed two separate motions, seeking approval of five separate settlement agreements. Each of these agreements, however, define the relevant class of individual plaintiffs who are covered in identical terms. Moreover, implicit in the analysis below, the issues relevant to the certification of these settlement classes are the same with regards to Rule 23. Consequently, the Court will conduct a single analysis for purposes of determining whether the requirements of Rule 23 have been met as to each of the settlements.

members of the class."). The putative class at issue here includes thousands of potential individual plaintiffs. Notice of the MPS/NFC/UEP/USEM settlement agreements was sent to over 19,000 potential class members. Notice of the NuCal and Hillandale settlement agreements was sent to over 17,500 potential class members. Under the circumstances, the Court finds that a potential class made up of thousands of plaintiffs renders joinder impractical and the numerosity element fully met.

### b. Commonality

The Court next finds that there exist questions of law and fact common to the class. Rule 23(a)(2) requires that such a common question "be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). While class members' claims must share common questions of law or common questions of fact, this standard is not a stringent one. *NFL Concussion Injury Litig.*, 307 F.R.D. at 371 (citing *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)). "Commonality does not require an identity of claims or facts among class members; instead, the commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) (citing *Prudential*, 148 F.3d at 310); *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)).

As the Court has held previously, there are common questions of law and fact at issue in this litigation. *See DPP Litig. Class I*, at 178. The plaintiffs have alleged that the defendants collectively engaged in a conspiracy to violate Section 1 of the Sherman Act. This claim is

17

common among all the plaintiffs included within the proposed settlement class. The Court therefore finds that the commonality requirement of Rule 23(a) is met as well.

### c.  Typicality

Third, in order to certify a class pursuant to Rule 23(a), the claims and defenses of the representative parties must be typical for the class as a whole. "The concepts of commonality and typicality are broadly defined and tend to merge, because they focus on similar aspects of the alleged claims." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir. 2001), *as amended* (Oct. 16, 2001). "In considering the typicality issue, the district court must determine whether 'the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Johnston*, 265 F.3d at 184 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985)). This does not require that all claims be identical, "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton*, 259 F.3d at 183-84 (citing *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998).

Here, the claims of the Class Representatives rely on the same legal theories, and arise from the same alleged illegal agreement, as do those of the absent class members. The plaintiffs allege that all potential class members were injured as a result of the defendants' allegedly anticompetitive conduct. Under these circumstances, and as the Court has found previously, the typicality requirement has been met with regards to the class.

### d.  Adequacy of Representation

Finally, the court finds that the class representatives will "fairly and adequately protect the interests of the class." Rule 23(a)(4). In analyzing this element, the Court must determine

18

whether the class representatives' interests conflict with those of the class and whether the class

attorney is capable of representing the class. *Johnston*, 265 F.3d at 185 (citing *Amchem*, 521

U.S. at 625–26). Here the Court has already found that class counsel has extensive experience in

class action antitrust disputes. Moreover, the Court finds that the parties engaged in good faith,

reportedly vigorous, arm's length negotiations in reaching each of the settlements here.

Consequently, the Court finds that the requirement of adequate representation under Rule

23(a)(4) is satisfied.[10]

### 3. Rule 23(b)

In addition to satisfying the requirements of Rule 23(a), the plaintiffs must also show that

the putative class satisfies the additional requirements set out for one of the three types of class

actions listed in Rule 23(b). Here the plaintiffs have moved to certify the settlement class under

Rule 23(b)(3).

> To qualify for certification under Rule 23(b)(3), a class must meet two
> requirements beyond the Rule 23(a) prerequisites: Common questions must
> predominate over any questions affecting only individual members; and class
> resolution must be superior to other available methods for the fair and efficient
> adjudication of the controversy. In adding predominance and superiority to the
> qualification-for-certification list, the Advisory Committee sought to cover cases
> in which a class action would achieve economies of time, effort, and expense, and
> promote . . . uniformity of decision as to persons similarly situated, without
> sacrificing procedural fairness or bringing about other undesirable results.

*Amchem*, 521 U.S. at 615 (citations omitted); *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D.

166, 178 (E.D. Pa. 2000). The predominance inquiry "tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation, and assesses whether a class

action would achieve economies of time, effort, and expense, and promote uniformity of decision

---

[10] The Court finds that its analysis regarding Rule 23(a) in the litigation class certification opinion applicable to the class certification analysis here. Doc. Nos. 1027 & 1073.

as to persons similarly situated," *Sullivan*, 667 F.3d at 297 (citations omitted).  The Supreme

Court in *Amchem* expressly noted that "[p]redominance is a test readily met in certain cases

alleging consumer or securities fraud or violations of the antitrust laws." *Sullivan,* 667 F.3d at

298; *Prudential Ins.*, 148 F.3d at 314 (citing *Amchem*, 521 U.S. at 623-24; *accord Ins. Brokerage*

*Antitrust Litig.*, 579 F.3d at 266 ("because the clear focus of an antitrust class action is on the

allegedly deceptive conduct of defendant and not on the conduct of individual class members,

common issues necessarily predominate.").

> Rule 23 lists the following considerations relevant to the inquiry:

> (A) The class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The Supreme Court has explained, however, that not all of these

proposed factors are relevant when considering certification of a settlement class.

> In *Amchem*, the Supreme Court held "a district court [determining whether to
> certify a class for settlement purposes only] need not inquire whether the case, if
> tried, would present intractable management problems . . . for the proposal is that
> there be no trial." But at the same time the Court noted that "other specifications
> of the rule—those designed to protect absentees by blocking unwarranted or
> overbroad class definitions—demand undiluted, even heightened, attention in the
> settlement context."

*Prudential*, 148 F.3d at 308 (citing *Amchem*, 521 U.S. at 620).

The Court has already held that the predominance requirement has been met in order to

certify two previous settlement classes pursuant to Rule 23(b)(3).  *See Settlement Class I,* at 263

(analogizing to the holding *Insurance Brokerage*, the Court explained that"[b]ecause each of the

elements of a Sherman Act violation involves common questions of law and fact, . . .  common

questions predominate over individual ones with respect to the federal antitrust claim."); *see also*

*Settlement Class II*, at 351-52. Here, as in the context of approval of previous settlements, the Court finds that the questions of law and fact applicable to all members of the settlement class predominant over individualized issues. The plaintiffs' claims against the defendants all rely on the same overarching theory and the same core set of operative facts. While questions of common evidence is not necessarily relevant for purposes of trial management, the commonality of the allegations indicates that the analysis of the fairness and adequacy of the settlement of these claims would apply equally s to both present and absent parties. As this fairness inquiry is the central issue relevant to the settlement of the claims here, the commonality of factual and legal issues underlying this question establishes that the predominance prong of Rule 23(b)(3) has been met.

Rule 23(b)(3) also requires that the Court determine that certification of a settlement class is superior to other methods of adjudication. "The superiority requirement asks the court 'to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication.'" *NFL Concussion Injury Litig.*, 2016 WL 1552205, at \*15; *accord Prudential*, 148 F.3d at 316 (citing *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)).

As the Court has explained previously with regards to certification of the two similar settlement classes, the class action mechanism is a superior method of adjudicating the settlement of the claims. *See Settlement Class II*, at 352; *Settlement Class I,* at 264. The superiority of class treatment here is a product of both the large size of the class as well as limited interest among the class members for pursuing individual claims. Notice of the settlement was sent to many thousands of class members, all of whom are geographically

dispersed throughout the United States. If even a fraction of these members chose to litigate their claims individually, this would substantially overburden the courts. Likewise, individual class members would not find it economical to bring these claims individually. When "each consumer has a very small claim in relation to the cost of prosecuting a lawsuit, a class action facilitates spreading of the litigation costs among the numerous injured parties and encourages private enforcement of the statutes." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004). A class action device enables individual direct purchasers to pursue their claims in an economically feasible manner, with greater efficacy in achieving enforcement and deterrence goals, and with greater bargaining power for settlement purposes. Given this volume of claimants, the class action is far superior to separate litigation. *C.f. Good v. Nationwide Credit, Inc.*, 314 F.R.D. 141, 155 (E.D. Pa. 2016).

In addition, the putative class members were free to opt out of the settlement and pursue their own claims. Here only 197 class members requested to be excluded from the MPS/NFC/UEP/USEM settlement agreement while only 193 class members requested to be excluded from the NuCal and Hillandale Settlement agreement. Given the many thousands of potential class members at issue here, such an opt-out is *de minimus*. That only a small number of individual claimants have chosen to pursue individual claims indicates a general lack of interest in individual prosecution of the claims. This weighs in favor of approval of the settlement motions as well.

### 4. Conclusion as to Class Certification for Settlement Purposes

Because the Court concludes that all of the Rule 23(a) and (b)(3) requirements have been met, the Court certifies the Class and Subclasses, as defined above for settlement purposes.

### B. NOTICE

22

"In the class action context, the district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class." *Prudential*, 148 F.3d 306 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985)).

Rule 23 contains two requirements for providing proper notice to putative class members. First, under Rule 23(c)(2)(B), for classes certified under Rule 23(b)(3), the Court must notify class members using "the best notice that is practicable under the circumstances," which includes notice of all class members who can be identified through reasonable effort. Notice must include, in concise, plain and easily understood language:

(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). In addition, under Rule 23(e), the settlement class members are entitled to notice of the purpose of settlement and the opportunity to be heard. This "notice is designed to summarize the litigation and the settlement" and "to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 327.

The plaintiffs here utilized the same notice plan—combining direct mail, publication, press release, website and toll free telephone number—used to provide notice of the plaintiffs' previous settlements, both of which were approved by the Court. *See Settlement Class II*, at 354 (Cal-Maine Settlement); *Settlement Class I,* at 266 (Morak Settlement). As there appear to be no issues relevant to settlement plan here which would render the prior notice plans inadequate,

23

the Court therefore finds that the notice plan complies with the requirements of due process with regards to this class.

## C. SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

Before granting final approval, the Court must conclude that the proposed settlement is fair, reasonable and adequate. Fed. R. Civ. P. 23(e)(2); *Prudential*, 148 F.3d at 316; *Ins. Brokerage*, 579 F.3d at 258. Trial courts generally are afforded broad discretion in determining whether to approve a proposed class action settlement. *Eichenholtz v. Brennan*, 52 F.3d 478, 482 (3d Cir.1995).

### 1.   Initial Presumption of Fairness

In evaluating a settlement, the Court acts as a fiduciary, responsible for protecting the rights of absent class members. *Warfarin*, 391 F.3d at 534. The Third Circuit Court of Appeals, however, has "directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: '(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.' " *Id.* at 535 (citing *In re Cendant Corp. Litig.,* 264 F.3d 201, 232 n. 18 (3d Cir. 2001)).

Here the Court finds that the proposed settlement agreements satisfy each of these requirements. The settlement negotiations were conducted at arm's length and over an extended period of time. The settlements were negotiated by counsel with significant antitrust litigation experience, all of whom recommend approval of the settlement. Additionally, at the time negotiations were entered into, the parties had already conducted substantial document and deposition discovery, which included substantial discovery from the settling defendants. Given that class counsel had this discovery at its disposal prior to settlement discussions, the parties

24

would have been able to more accurately evaluate the strengths and weaknesses of the case and by extension agree to settlement amounts which better reflected such strengths and weaknesses. Finally, with regards to both sets of settlement agreements, there have been no objections to the terms of the agreements from class members and only a *de minimums* number of plaintiffs have chosen to opt out. *See* Keough Aff. I at ¶¶15-16; Keough Aff. II at ¶¶15-16.

Given that the Court finds that the four factors are sufficiently met, the presumption of fairness applies to the settlement.

### 2. Standards for Determining Fairness of Proposed Settlement

When evaluating the fairness of a proposed settlement, the Third Circuit Court of Appeals has set forth nine factors, known as the *Girsh* factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations and punctuation marks omitted); *Prudential*, 148 F.3d at 317. "The settling parties bear the burden of providing that the *Girsh* factors weigh in favor of approval of the settlement." *Pet Food*, 629 F.3d at 350 (citing *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995)).

In *In re Prudential Insurance Company of America Sales Practice Litigation Agent Actions*, the Third Circuit Court of Appeals explained that, given the "sea-change in the nature of class actions" after *Girsh,* it might be helpful to expand the analysis somewhat to include certain

additional factors. *See Pet Food*, 629 F.3d at 350. Those factors—referred to as the *Prudential*

factors—include:

> [T]he maturity of the underlying substantive issues, as measured by experience in
> adjudicating individual actions, the development of scientific knowledge, the
> extent of discovery on the merits, and other factors that bear on the ability to
> assess the probable outcome of a trial on the merits of liability and individual
> damages; the existence and probable outcome of claims by other classes and
> subclasses; the comparison between the results achieved by the settlement for
> individual class or subclass members and the results achieved—or likely to be
> achieved—for other claimants; whether class or subclass members are accorded
> the right to opt out of the settlement; whether any provision for attorneys' fees are
> reasonable; and whether the procedure for processing individual claims under the
> settlement is fair and reasonable.

*See Prudential*, 148 F.3d at 323.

Ultimately, the Court is required to make an independent analysis of the settlement, using

these factors as outlined above, to determine whether the settlement is fair, reasonable, and

adequate. The Court "cannot substitute the parties' assurances or conclusory statements for its

independent analysis of the settlement terms." *Pet Food Products Liab. Litig.*, 629 F.3d at 350-

51.

### 3. Application of *Girsh* and *Prudential* Factors.

The Court's analysis of the *Girsh* factors, and the *Prudential* factors, as appropriate, leads

to the conclusion that the relevant considerations weigh in favor of a finding of fairness under

Rule 23(e).

#### a. *Complexity, Expense and Likely Duration of the Litigation*

The first *Girsh* factor, which calls for the Court to evaluate the complexity, expense, and

likely duration of the litigation, "captures the probable costs, in both time and money, of

continued litigation." *Warfarin*, 391 F.3d at 536 (citation omitted).

26

As the Court has recognized previously in the context of approving a settlement class, antitrust suits, such as this one, are often complex. *Settlement Class II* at 356 (citing *In re Linerboard Antitrust Litig.*, 292 F.Supp.2d 631, 639 (E.D. Pa. 2003). Consequently, by settling the claims now, the parties have avoided a lengthy, complex, and ultimately expensive legal battle. Consequently, this factor weighs in favor of approval of the settlements.

### b.  Reaction to the Settlement

Next, the Court considers the reaction to the settlement among the class. "In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors." *Gen. Motors*, 55 F.3d at 812.  A lack of substantial objections or requests for exclusion by class members is highly significant to the determination as to whether the settlement is fair.  *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313, n. 15. (3d Cir. 1993).

There have been no objections to the settlements.  Moreover, of the 17,500 notices which were sent regarding the NuCal and Hillandale settlements and the 19,000 notices sent regarding the MPS/NFC/UEP/USEM settlements, the administrator has only received 193 and 197 requests for exclusion respectively.  The lack of objections and *de minimus* number of requests for exclusion certainly weighs in favor of approving the settlement.  As such, this factor weighs in favor of the proposed settlements' fairness and adequacy.  *See Settlement Class II*, at 357 (citing *Cendant Corp.*, 264 F.3d at 234–35 (recognizing that low number of objectors and opt-outs strongly favors settlement and that "[t]he vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement").

### c.  Stage of Proceedings

Analysis of the third *Girsh* factor is intended to ensure that "a proposed settlement is the product of informed negotiations" and that "the parties . . . have an adequate appreciation of the merits of the case before negotiating." *Prudential*, 148 F.3d at 319.

Here the settlement agreements were executed in 2014, over five years after the class action was consolidated before the Court.   Class counsel has represented that it has spent significant time assessing the merits of the claims and that each of the settlements draws upon counsel's review of the substantial discovery produced in this matter.   Given this, the Court finds that that the record indicates that counsel had sufficient time and information to form an accurate appreciation of the claims before engaging in negotiations.   Therefore this factor weighs in favor of approving the settlements.

### d. *Risks of Establishing Liability and Damages*

The next two *Girsh* factors concern the risks of establishing liability and damages. The factors require the Court to "survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement." *Warfarin*, 391 F.3d at 537. The inquiry requires balancing "the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement." *Prudential*, 148 F.3d at 319. The Court assesses the risks of establishing liability to "examine what the potential rewards (or downside) of litigation might have been had class counsel decided to litigate the claims rather than settle them." *Gen. Motors*, 55 F.3d at 814. Put another way, the inquiry into establishing damages "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Id*. at 816.

As the Court has previously recognized, the settlements at issue here only cover a subset of the defendants and are presented for approval in the context of an ongoing litigation. Given this,

> the parties may be reluctant to disclose fully and candidly their assessment of the proposed settlement's strengths and weaknesses that led them to settle separately. The adequacy of the settlement depends in part on the relative exposure and resources of other parties. An informed evaluation is extremely difficult if discovery is incomplete or has been conducted against only a few of the defendants.

*Settlement Class II*, at 358 (citing David F. Herr, The Manual for Complex Litigation § 21.651, at 505 (4th ed.2011)). While plaintiffs' counsel does not go into detail regarding recognized weaknesses in the case, they at least recognize that "here, as in every case, Plaintiff face the general risk that they may lose at trial." *Lazy Oil Co. v. Wotco Corp.* 95 F. Supp. 2d 290, 337. This is most certainly the case in the context of the complexity of an antitrust suit. Moreover, while discovery is technically complete, the Court has yet to decide the parties' various summary judgment motions. The defendants, for their part, have evidenced a determination to vigorously defend the case. Consequently, the Court finds that there is a not insubstantial uncertainty as to the outcome of this litigation with regards to both lability and damages.

Similarly, with regards to the ability to maintain class certification, the Court recognizes that, had the defendants opted not to settle, they would have joined the other, non-settling defendants in contesting class certification, which would have added to the uncertainty as to the plaintiffs' ability to maintain the class certification. Consequently, the Court concludes that its analysis of these factors supports approval of the settlement.

### e.  *Risks of Maintaining Class Status Through Trial*

The next *Girsh* factor looks at the likelihood the plaintiffs will be able to maintain and keep class certification if the action were to proceed to trial. One might wonder as to the role for

such a step in the context of an application to approve settlement. Wonder or not, the process calls for consideration of this factor.

Here a partial litigation class has been certified, comprising thousands of purchasers of shell eggs, situated throughout the United States. Nevertheless, the Court retains the authority to decertify or modify a class at any time during the litigation if it proves unmanageable. The question of whether the plaintiffs will be able to maintain a class through trial remains an open issue. *Warfarin*, 391 F.3d at 537; *General Motors*, 55 F.3d at 817; *Prudential*, 148 F.3d at 321. Managing such a large and geographically diverse class is no small feat, and there exists a not insubstantial risk that intractable management problems could arise, necessitating decertification. Put otherwise, the defendants may reach a day when they elect to file a motion for decertification. Given the existence of such uncertainty, consideration of this factor weighs in favor of settlement.

### f. *Ability of Defendants to Withstand Greater Judgment*

"The seventh *Girsh* factor considers 'whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement.'" *Warfarin*, 391 F.3d at 537-38 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 240 (3d Cir. 2001). The briefing of the plaintiffs fails to point to any evidence on the record indicating the defendants' ability (or inability) to withstand a greater judgment, should the case go to trial. As the Third Circuit has explained, however, whether or not defendants would be able to pay more does not necessary imply that the defendants could or would be *obligated* to pay more. *Id.* at 538. Even if the Court were to presume that the defendants' resources far exceeded the settlement amount, in light of the balance of the other factors considered which indicate the fairness, reasonableness, and adequacy of the settlement, the ability of the defendants to pay more, does not weigh against approval of

the settlement. *C.f. Lazy Oil Co. v. Wotco Corp.*, 95 F. Supp. 2d 290, 318 (W.D. Pa. 1997), *aff'd sub nom. Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581 (3d Cir. 1999).

> ### g.   The Range of Reasonableness of the Settlement Funds in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The final two *Girsh* factors assess the reasonableness of the settlement fund—namely "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538; *Prudential*, 148 F.3d at 322.   The Court analyzes the settlement in light of its monetary and nonmonetary consideration.

As with the two settlements approved by the Court previously, each of the settlement agreements at issue here are structured to include monetary and non-monetary consideration in exchange for the plaintiff releasing the defendants from lability.  As these settlements involve not simply money, but also promises to assist in the litigation, the true value of the settlements are not easily ascertainable.  *DPP Litig. Class I,* at 360 (citing *Prudential*, 148 F.3d at 323).  In addition, the Court has not been provided specifics as to the monetary compensation relative to the best possible recovery.  Nevertheless, as explained in the declarations of Mr. Pizzirusso and Mr. Aranoff, the monetary compensation awarded in each of the settlements is based upon  a review of the relevant financial condition of the individual settling defendants.  Moreover, the negotiations took place well into discovery which provided the parties a more accurate picture of both the strength of the claims and the defendants' finances.  While the settlement amounts ultimately reached likely do not represent the absolute highest dollar-figure that may have been extracted from the defendants at trial, the parties' counsel have attested that the proposed payments are reasonable, given the defendants' resources.

Moreover, the settlements also include the promise by the settling defendants to assist in the ongoing litigation, which would provide tangible—if not readily ascertainable—economic

31

benefits to the plaintiffs. Such assistance would impart both clear tactical advantage in the ongoing litigation as well as reduce litigation costs associated with analyzing discovery or authenticating documents. Consequently, given both the monetary and intangible advantages to the class associated with the settlement agreements, the Court finds that this factor weighs in favor of settlement approval as well.

Consequently, a review of the *Girsh* factors argues that they all either weigh in favor of settlement, or, at worst, are neutral to the analysis. Having determined that a review of *Girsh* supports approval of the settlements at issue, the Court will briefly address the *Prudential* factors as well.

### h. Prudential *Factors*

The additional factors identified in *Prudential* likewise either support approval of the settlement or are neutral, for much the same reasons. Many of the facts relevant to the analysis have been discussed above. First, as discussed above in section I, *supra,* at the time the settlements were negotiated, the parties had access to substantial discovery on the merits to allow assessment of the reasonableness of the settlement amount. Moreover, class counsel was able to draw upon its own substantial experience in negotiating the settlement. The settlements here provide a definite and immediate benefit for class plaintiffs. This is in contrast to the Direct Action Plaintiffs who have opted to pursue their individual claims and thereby run the risk of recovering nothing from the lawsuit. Similarly, the agreements provided for notice to the class members of their ability to object or opt out of the settlement. The record shows that no class members have objected to the settlement agreements. Indeed, only a *de minimus* number sought to opt out. As discussed above, each of these factors weighs in favor of approval of the settlements.

32

One factor which *Prudential* raises, which was not addressed in the Court's discussion of the *Girsh* factors, above, is the applicability of attorney's fees. Here the settlement agreements provide simply that class counsel may seek approval for attorney's fees from the Court at a later date, and that the defendants agree not to object to the petition as long as the fees do not exceed 33 1/3% of the Settlement Amount. Therefore, at this point the Court need not make a determination as to the reasonableness of any specific award of attorney's fees, only that the defendant's conditional agreement not to challenge such a petition is reasonable in light of the work done by both sides in conducting discovery and negotiating the settlement. At worst, therefore, the attorney's fees payable under the settlement would be a neutral issue with regards to the fairness of the settlement.

Upon considering the settlement agreements in light of all of the *Girsh* and the relevant *Prudential* factors, the Court is satisfied that the settlements are fair, reasonable, and adequate. As discussed, a few of the factors are neutral or weigh against settlement approval. Nevertheless, on balance, the factors as considered above weigh conclusively in favor of settlement, and the Court now concludes that approval of the settlements are appropriate pursuant to Fed. R. Civ. P. 23(e).

## III.  CONCLUSION

For the foregoing reasons, the Court determines that the Class and Subclasses meet the certification requirements of Rule 23 for settlement purposes, and concludes that the proposed settlement agreements are fair, reasonable, and adequate. Accordingly, the Court grants Plaintiffs' motion for final approval of the class action settlements with Defendants MPS, NFC,

and UEP/USEM and the Court grants the Plaintiffs' motion for final approval of the class action settlements with Defendants NuCal and Hillandale.

An Order consistent with this Memorandum follows.

BY THE COURT:

GENE E. K. PRATTER
United States District Judge