## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| ***THIS DOCUMENT APPLIES TO:*** | : | **No. 08-md-2002** |
| **ALL ACTIONS** | : | |

### M E M O R A N D U M

PRATTER, J.                                                                         AUGUST___, 2016

The nation's major egg producers are accused by those who purchase eggs, both directly and indirectly, of conspiring to control and limit the supply of eggs and thereby increase egg prices. All Plaintiffs have jointly moved to exclude the testimony and opinions of Dr. Michael Darre, a proposed animal welfare expert retained by Defendants United Egg Producers, Inc. ("UEP"), United States Egg Marketers, Inc. ("USEM"), Cal-Maine Foods, Inc., Rose Acre Farms, Inc., R.W. Sauder, Inc., Moark, LLC, and Norco Ranch Inc. (collectively, for purposes of this memorandum, Defendants). Defendants responded in opposition to this motion, and the Plaintiffs filed a reply.

Plaintiffs challenge Dr. Darre on all three *Daubert* prongs – qualifications, reliability, and fit. They argue that Dr. Darre lacks the qualifications to testify as an animal welfare expert, that his opinions are not based on any methodology, let alone a reliable one, and that his opinions usurp the function of the jury and therefore do not fit the case. Defendants counter that Plaintiffs have concocted an impossible standard for an animal welfare expert that no one person could meet, that Dr. Darre relies properly on his extensive personal experience, and that his specialized testimony will help the jury to understand an issue that is at the very heart of this case – whether

1

the UEP guidelines serve to promote animal welfare. Because of the liberal standards that apply

to expert admissibility, the Court will deny the motion.

## I.   STANDARD OF REVIEW

The trial judge has a special obligation under Federal Rule of Evidence 702 to ensure that

any and all expert testimony is not only relevant, but reliable. *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589

(1993)).  Rule 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles
> and methods; and (d) the expert has reliably applied the principles and methods to
> the facts of the case.

Fed. R. Evid. 702.  The purpose of the gatekeeping obligation is to ensure that the expert,

whether basing her testimony on professional studies or personal experience, is employing the

same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire,* 526 U.S. at 152.  The Third Circuit Court of Appeals has characterized Rule 702 as

embodying "a trilogy of restrictions on expert testimony: qualification, reliability and fit."

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations

omitted).  While specialized knowledge is a requirement, the basis of such knowledge can be

"practical experience as well as academic training and credentials."  *Betterbox Commc'ns Ltd. v.

BB Techs., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002) (Alito, J.) (noting that the specialized

knowledge requirement has been construed "liberally") (citing *Waldorf v. Shuta*, 142 F.3d 601,

625 (3d Cir. 1998)).

2

## II.   ANALYSIS[1]

Plaintiffs challenge Dr. Darre on his qualifications, the reliability of his methods, and the

"fit" of his testimony to the case at hand.  The Court will discuss each of these prongs of the

basic *Daubert* test in turn.

### a.   *Qualifications*

To be "qualified" to render expert testimony under *Daubert*, a proffered expert must

merely "possess specialized expertise," and this requirement is interpreted "liberally."  *Pineda v.*

*Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir. 2008) (citation omitted).

> Rule 702 requires the witness to have specialized knowledge regarding the area of
> testimony.  The basis of this specialized knowledge can be practical experience as well as
> academic training and credentials.  [The Court of Appeals for the Third Circuit] ha[s]
> interpreted the specialized knowledge requirement liberally, and ha[s] stated that this
> policy of liberal admissibility of expert testimony extends to the substantive as well as the
> formal qualification of experts.  However, at a minimum, a proffered expert witness must
> possess skill or knowledge greater than the average layman.

*Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir. 2000) (quoting *Waldorf v. Shuta,* 142 F.3d

601, 625 (3d Cir. 1998)) (internal punctuation and quotations omitted).

Dr. Darre has been employed as a Professor of Animal and Poultry Science at the

University of Connecticut since 1981, and he teaches courses such as Introduction to Animal

Science, Principles of Poultry Science, and Behavior and Training of Domestic Animals, all of

which address animal welfare issues.  He has a B.S. in Animal Science, an M.S. in Animal

Physiology, and a Ph.D. in Environmental Animal Physiology.  He is board certified in avian

physiology by the American Registry of Professional Animal Scientists.  He is a member of

several animal science organizations.  Dr. Darre is also a Cooperative Extension Poultry

Specialist, and through that role, he has worked and consulted with commercial and non-

---

[1] Because this Court has written extensively about the facts of this case and the Plaintiffs' claims, the
Court will assume familiarity with those facts in discussing the parties' arguments here.

3

commercial poultry farmers to educate them on best practices in poultry welfare management. He has lectured on animal welfare issues relating to poultry and poultry production, and he has researched and published on that topic numerous times. He has also been actively involved in studying, educating egg producers, and testifying before state legislative committees about the animal rights movement.

Despite his resume, Plaintiffs challenge Dr. Darre's qualifications to testify about animal welfare in this case. They argue that "animal welfare is a multi-disciplinary subject that includes the fields of philosophy, science, and economics," and therefore requires expertise in economics and "other fields beyond just animal or poultry science." Pls. Mot. at 6. In conjunction with their claim that Dr. Darre is not an "animal welfare" expert, Plaintiffs contend that Defendants attempt to offer Dr. Darre to testify on topics that are far broader than his limited area of expertise allows. For instance, they argue that Dr. Darre's opinions about whether producers would have complied with the UEP program with or without the 100% rule are inappropriate because that issue is one of economics, not animal physiology. They also take issue with Dr. Darre's opinions about the UEP's audit program, arguing that Dr. Darre has no experience in conducting or designing audit or compliance programs. Finally, they argue that the four pages of Dr. Darre's report devoted to chronicling the history of the animal rights movement are inappropriate because Dr. Darre lacks expertise as an historian or appropriate experience in the topic, as is evidenced by the fact that the bulk of the seven paragraphs outlining the history of the animal rights movement are string quotes from other sources.

While the Court agrees that "animal welfare" can be approached from a variety of viewpoints, the Plaintiffs' expansive multi-disciplinary definition of "animal welfare" would eliminate virtually all attempts at offering expert testimony on the topic, as it is hard to conceive

of anyone who has expertise in all of the many subjects Plaintiffs include in their definition. At its core, as Defendants argue, "animal welfare" concerns the well-being of animals, and certainly a person with Dr. Darre's experience and credentials is qualified to opine on that topic. As to Plaintiffs' specific arguments about Dr. Darre's qualifications to testify about the history of the animal rights movement, Dr. Darre's personal experience, as evidenced by, for instance, his testimony about the animal rights movement before state legislative committees and his experience educating others about that topic, is sufficient to qualify him to opine on that topic. To the extent that Plaintiffs assert that Dr. Darre is speaking to only one discipline in a multi-disciplinary field, Plaintiffs may employ cross-examination and rebuttal experts to highlight that limitation, including as to the specific examples they cite as demonstrating Dr. Darre's supposed lack of appropriate expertise. *See, e.g., Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 509, 543 (E.D. Pa. 2007) (allowing rebuttal expert testimony despite objections to rebuttal expert's qualifications when the parties proffered experts for the same issue from different scientific disciplines). However, construing the requirement of "qualification" liberally, the bottom line is that Dr. Darre does have specialized expertise that may assist the finder of fact.

### b. *Reliability*

Turning to the reliability prong, when an expert testifies to "scientific knowledge," the expert's opinions "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *In re Paoli Railroad Yard Litigation,* 35 F.3d 717, 743 (3d Cir. 1994). The Supreme Court has noted that the district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152. That is to say, a trial court should consider the specific factors identified in

*Daubert* where they are "reasonable measures of the reliability" of expert testimony. *Id.* at 138. However, "[a] trial court has some latitude in determining what it needs in order to investigate the reliability of a proposed expert, and where the reliability of a witness's testimony depends heavily on only the knowledge and experience of the expert, some courts have found that the *Daubert* factors are not always applicable." *See United States v. Sosa*, No. 05-44, 2006 WL 166557, at *3 (E.D. Pa. Jan. 20, 2006) (citing *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000).

Plaintiffs argue that Dr. Darre's report and testimony are not reliable for several reasons. First, Plaintiffs take issue with Dr. Darre's failure to use mathematical models to assess the animal welfare benefits of the UEP program, with his failure to adopt a widely used conceptual system called the "Five Freedoms" to measure the welfare of chickens, and with Dr. Darre's reliance on his own experience and selective review of literature and the record to form his opinions. Plaintiffs also claim there is a disconnect between the studies that Dr. Darre considers and his conclusions, noting that, for example, Dr. Darre opines that the cage space requirements provide for humane treatment and then cites studies that suggest that adequate cage space is actually greater than that required by the UEP guidelines. They also contend that Dr. Darre simply applied his conclusions about the Scientific Advisory Committee ("SAC") recommendations to the UEP guidelines without accounting for the differences between them.

Defendants counter that Dr. Darre's methodology, largely based on his own personal experience and a review of the record, is sound. Dr. Darre started with a commonly-accepted definition of "animal welfare" – "meeting the animals' physiological and psychological needs to assure comfort and freedom from suffering." Darre Report, ¶ 38, Pls.' Mot., Ex. A. Based on this definition, his experience, and his training, Dr. Darre determined that hen welfare can be

6

determined by looking at stress or the absence thereof. With this framework in mind, he examined literature on animal welfare available at the time the guidelines were drafted, both literature relied upon by the SAC and other contemporary resources, and he reviewed other record evidence, such as deposition testimony, notes from an SAC meeting, correspondence between SAC members, and UEP meeting minutes. Dr. Darre then reviewed the SAC recommendations and the UEP guidelines as they evolved over time and determined whether they were consistent with animal welfare, as he defined it.

Once again, Plaintiffs' criticisms sound more like insistence that there is only one way to look at a multi-faceted issue than proof that Dr. Darre's opinions are inherently unreliable. Plaintiffs' insistence on Dr. Darre's use of mathematical models and a particular definition of "animal welfare" ignores that animal welfare can be analyzed using many different approaches and, as they themselves note, is a multi-disciplinary field. That Dr. Darre used only one of many possible approaches goes to the weight of his testimony, not its reliability.

Moreover, the Court disagrees with Plaintiffs' characterizations of Dr. Darre's work. As to their criticism that Dr. Darre only selectively reviewed the record and relevant literature, the Court has previously rejected a similar argument when asserted by the Defendants in their attempt to exclude Dr. Rausser: "The Court rejects Defendants' contention that Dr. Rausser's testimony should be excluded because he failed to consider certain aspects of the record . . . The record in this case is voluminous, to say the least, and no expert will be able to include every document in his analysis." *See In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 425 (E.D. Pa. 2015). Indeed, while Dr. Darre may not have read every study on which the SAC based its conclusions, he testified at his deposition that while he did not read all of the literature cited, he was familiar with most of it, understood it, and knew and worked with many of the

7

authors. Furthermore, he did, in fact, acknowledge and discuss the differences between the SAC

recommendations and adopted guidelines in setting forth his opinions. To the extent that

Plaintiffs claim there is a disconnect between the studies Dr. Darre cited regarding humane cage

space requirements and the UEP cage space requirements, Plaintiffs ignore Dr. Darre's personal

observations of hens in cages of various sizes, the distinctions that exist between the types of

chickens involved in the studies cited and their respective sizes, and Dr. Darre's reliance on

production data as an indicator of welfare. Once again, this supposed disconnect is appropriate

territory for cross examination but not exclusion.

   Plaintiffs also argue that Dr. Darre did not apply a reliable methodology in setting forth

the history of the animal rights movement. Plaintiffs cite various cases dealing with historical

expert testimony, some in which non-historians were excluded because they failed to use a

reliable method of historical analysis, *see, e.g., Waterhouse v. R.J. Reynolds Tobacco Co.*, 162 F.

App'x. 231 (4th Cir. 2006), and some in which non-historians were allowed to testify because

they had completed sufficiently rigorous reviews of historical documents, *see, e.g., Langbord v.*

*U.S. Dept. of Treasury*, Civil Action No. 06-05315, 2009 WL 1312576 (E.D. Pa. May 7, 2009).

In those cases, however, the experts appear to have been opining directly about historical issues

as the main focus of their reports. Here, the history of the animal rights movement is

background information that Dr. Darre discusses as the context for his opinions about the UEP

guidelines and their impact on animal welfare. Thus, the question should not be whether Dr.

Darre, an animal welfare expert, used the same methodology an historian would employ, but

whether Dr. Darre relied upon sources and information that an animal welfare expert would.

Moreover, as Defendants counter, in setting forth this background material, Dr. Darre relied

upon his contemporaneous personal experience, which this Court previously noted includes his

8

testimony about the animal rights movement before state legislative committees and his experience educating others about that topic, as well as following the animal rights movement firsthand as a professional in the field of animal physiology. Any qualms Plaintiffs have about the sources he used or how he gathered information are best left to cross examination under these circumstances.

Plaintiffs contend that Dr. Darre plagiarized significant portions of his report. In several instances, Dr. Darre failed to use quotation marks to indicate that he was quoting verbatim from a source, and on a few occasions, he failed to cite a source for a particular statement. Plaintiffs questioned Dr. Darre about these issues at his deposition, and following the deposition, Dr. Darre issued an errata report correcting these errors. Plaintiffs point to specific examples, such as Dr. Darre's initial failure to credit a grammar website for the definitions of "human" and "humane" used in his report, and his failure to include quotation marks to indicate that portions of his opinion on beak trimming were direct quotations of the sources he cited in a footnote to those paragraphs. Plaintiffs argue that, not only was the plagiarism itself a problem, but the extent to which Dr. Darre quotes sources rather than puts forth his own ideas, as revealed by the errata report, undermines the reliability of his opinion because it shows that Dr. Darre is simply parroting the ideas of others.

Defendants counter that each of Dr. Darre's failures to cite to sources were in the context of non-material background information, and that although he failed to include quotation marks initially in some places in his report, he did provide clear citations to the source material. They argue that, if anything, this is an issue for cross examination and not exclusion. The Court agrees. There does not appear to have been any attempt to mislead in Dr. Darre's initial failure to include quotation marks or his neglect of including citations for a few background facts, and

9

he corrected the issue promptly when it came to light. Moreover, regardless of the number of quotations, it is clear that Dr. Darre synthesized a variety of sources to prepare his report and applied his own expertise. As the Court has noted before in this case, "[t]here is no prohibition against an expert relying upon the work of another expert so long as the expert is otherwise qualified." *In re: Processed Egg Prods. Antitrust Litig.*, No. 08-MD-2002, 2016 WL 3912843, at *1 (E.D. Pa. July 19, 2016). Thus, some quotations alone are not enough to call into question the reliability of Dr. Darre's entire report, although they may provide Plaintiffs with good material for cross examination.

### c.  *Fit*

Plaintiffs' final argument is that Dr. Darre's opinions do not "fit" the case. They argue that Dr. Darre's report and testimony would usurp the function of the jury because he reviewed a limited selection of documents, recited the history of the formation of the SAC and UEP certified program, and then opined based on this that the UEP certified program was formed in response to customer demand and pressure from animal rights activists. They argue that the jury is just as capable as Dr. Darre of reviewing and analyzing this factual background and reaching conclusions about the Defendants' intent. Thus, they take issue with both his opinion that the UEP guidelines resulted from the pressure of customers and the animal rights movement, as well as his recounting of the factual background that led to the adoption of the guidelines. Plaintiffs also object to Dr. Darre's opinions regarding whether the 100% rule, phased implementation, and house averaging make sense, again arguing that Dr. Darre uses no particular expertise in reaching these conclusions.

Defendants argue that, as to the facts surrounding the development of the guidelines, Dr. Darre is not opining on "intent," but rather is objectively describing contemporaneous events that

occurred in the animal rights movement at the same time that the SAC and UEP began developing the guidelines and noting the consistency of this factual background with his own conclusions that the UEP guidelines promote animal welfare. Defendants point out that this Court allowed Dr. Rausser to consider the factual record because it was "an examination of the factual record . . . to confirm that the stories [Dr. Rausser] dr[ew] from the data and from the factual record are consistent." *See In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 424 (E.D. Pa. 2015). Likewise, they argue, Dr. Darre should be permitted to use the factual background to support his opinions regarding the guidelines.

As to Dr. Darre's opinions regarding the 100% rule, phased implementation, and house averaging, Defendants argue that Dr. Darre does support his conclusions using more than mere common sense. For instance, with respect to the 100% rule, they point to Dr. Darre's experience regarding other animal welfare guidelines that require 100% participation. Defendants note that even if Dr. Darre's opinions regarding these aspects of the UEP certified program were solely based on what makes sense to him, Dr. Darre's wealth of practical experience in animal welfare far exceeds that of a lay person, giving him a decided advantage in evaluating the impact of these implementation protocols.

Once again, Plaintiffs' criticisms go to the weight of Dr. Darre's testimony, and not to its admissibility. Dr. Darre's review of the factual record, as Defendants note, serves to put his conclusions in context, and to the extent he failed to incorporate particular documents or facts, the Plaintiffs can cross examine Dr. Darre about those omissions. Likewise, his practical experience in poultry management and hen welfare underscore his opinions on the implementation protocols, and Plaintiffs will have ample opportunity to present their own

experts' analysis, as well as to lay out any limitations they perceive with respect to Dr. Darre's anaylsis.

## III.   CONCLUSION

For the reasons discussed above, the Court will deny the Plaintiffs' motion to exclude the testimony of Dr. Michael Darre.  An appropriate Order follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge