IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : MULTIDISTRICT : LITIGATION : : : |
| *THIS DOCUMENT APPLIES TO:* ALL DIRECT ACTION PLAINTIFF CASES ALL DIRECT PURCHASER CASES | : No. 08-md-2002 : : |

### MEMORANDUM

PRATTER, J.                                                                                                    SEPTEMBER 6, 2016

In this motion for summary judgment, Defendants argue that Plaintiffs[1] cannot recover damages for egg products sales because Plaintiffs fail to distinguish egg products made with Defendant-produced eggs from egg products made with eggs produced by non-conspirators, and recovery for damages relating to the latter type of egg products is barred by the prohibition on "umbrella" damages. Plaintiffs oppose the motion, arguing that they are insulated from the "umbrella" damages rule because they seek to recover directly from conspirators and because, according to their experts, the price of egg products rose due to the conspiracy alleged in this suit. Because the Court concludes that Plaintiffs are indeed at odds with the "umbrella" damages rule, the Court will grant the motion.

---

[1] Plaintiffs, in the context of this memorandum, encompass Direct Action Plaintiffs ("DAPs") and Direct Purchaser Plaintiffs ("DPPs"). Because the Court previously denied class certification for an egg products subclass in considering the Direct Purchaser Plaintiffs' class certification motion, "Direct Purchaser Plaintiffs" is shorthand for the six class representatives still seeking damages for purchases of egg products.

1

FACTUAL BACKGROUND[2]

During the alleged conspiracy period, at least 18 companies, including 15 non-defendants, sold processed egg products. At least some of these companies do not themselves own any layers. Sales of Michael Foods egg products make up the majority of egg products sold to these Plaintiffs. Most of the eggs used in Michael Foods' egg products come from outside suppliers and of those eggs, the record shows that the great majority were supplied by non-Defendants. Of the eggs purchased by Michael Foods, 72% were from companies that are not UEP-certified. Michael Foods also paid decidedly different prices for eggs from different suppliers, given that some were tied to, for instance, grain prices, while others were pegged to egg market prices. Plaintiffs purchased egg products from Rose Acre Farms, as well. Rose Acre purchased as many as 21.6% of its eggs for egg products from outside suppliers, including non-Defendants.

Plaintiffs also assert that prices of egg products rose as shell egg prices rose and that egg products are fungible with shell eggs. In the Court's class certification opinion, however, the Court found that DPPs' expert Dr. Rausser's examination of the egg products industry was lacking in rigor and failed to show that egg products are substitutable for shell eggs or even for other types of egg products, that the egg products market is integrated nationally, or that egg products are commoditized. *See In re Processed Egg Products Antitrust Litig.*, 312 F.R.D. 171, 200-02 (E.D. Pa. 2015). Dr. Baye, DAPs' expert, also opined on these topics, however, and no party has challenged the admissibility of his expert report or testimony. Dr. Baye claims to have isolated overcharges for each egg product purchased by each Direct Action Plaintiff from a

---

[2] This case has been pending for a number of years, during which all the allegations and various industry terms, as well as parties, events and such, have been repeatedly discussed in a host of opinions. Accordingly, this opinion assumes familiarity with the prior pertinent material.

Defendant, and he has concluded that the conspiracy directly caused the prices of egg products to rise.

## LEGAL STANDARD

Summary judgment is appropriate only when the record fails to demonstrate a genuine dispute as to material fact that would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) ("The movant's burden on a summary judgment motion in an antitrust case is no different than in any other case."). "The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must point to evidence – beyond the pleadings – showing that a genuine dispute as to an issue of material fact exists, necessitating at trial. *Id* at 324. "On summary judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material fact." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex*, 477 U.S. at 322–23). Summary judgment is not necessarily disfavored in the antitrust context, and the entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which itself may have a chilling effect on competitive market forces. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010).

## DISCUSSION

"The umbrella theory is essentially a consequential damages theory. It seeks to hold price-fixers liable for harm allegedly flowing from the illegal conduct even though the price-fixing defendants received none of the illegal gains and were uninvolved in their competitors'

pricing decisions." *In re Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1339 (9th Cir. 1982). The leading Third Circuit Court of Appeals case on the issue is *Mid-West Paper Prods. Co. v. Cont'l Group, Inc.*, 596 F.2d 573 (3d Cir. 1979). In that case, plaintiffs sought to recover damages from defendants for alleged overcharges paid to non-conspirators, on the theory that the non-conspirators' prices were inflated by the defendants' illegal activities. *Id.* at 580-81. Finding that the defendants did not reap any illegal gains from the products sold by their competitors, that the plaintiff's injury "cannot readily be said with any degree of economic certitude" to have been caused by the defendants' conduct, and that determining what defendants' competitors would have charged in the absence of the conspiracy is a "highly conjectural" inquiry, the *Mid-West Paper* court held that these so-called umbrella damages cannot be recovered and that a plaintiff who sought only these damages lacked standing. *Id.* at 583-87.

This is not the first time that the issue of umbrella damages has been raised in this litigation. The Defendants made similar arguments with respect to their challenge to class certification, and although the Court did not then reach the issue, and rather declined to certify an egg products subclass for other reasons, the following footnote in the Court's opinion addressed the umbrella damages argument:

> Defendants also contest that the egg products subclass is overbroad because it would include purchasers of egg products made from eggs produced by non–defendants. Defendants contend that the eggs sold by non–defendants are not "price–fixed" and therefore the egg products are not price fixed. To hold otherwise, Defendants argue, would run afoul of the Third Circuit Court of Appeals' prohibition on "umbrella" damages, as announced in *Mid–West Paper* []. The Court does not reach this issue, as it finds that common issues do not predominate as to the eggs products subclass. The Court observes, however, that the failure to investigate the effect of the eggs from non–defendants on the prices of egg products weighs against a finding that the conspiracy would have had a common impact on the members of the putative subclass. As noted in *Mid–West Paper*, non–conspiring producers might price their products differently than

> conspirators. This difference in the prices of non–defendants' eggs might manifest itself in the prices of egg products, even if sold by Defendants, meaning that certain subclass members might not have experienced an impact as a result of the conspiracy. Plaintiffs have not addressed how the Court can reconcile this possibility with a finding of predominance as to antitrust impact.

*In re Processed Egg Products Antitrust Litig.*, 312 F.RD. at 202 n.22.

Here, Defendants argue that all of the wrongful conduct alleged by Plaintiffs took place in the shell egg market, as opposed to the egg products market. Thus, they argue that no damages can be recovered for the purchase of egg products made with eggs produced by a non-conspirator. Because Plaintiffs have not limited their damages model to only egg products produced with certified eggs, Defendants argue that Plaintiffs cannot carry their burden on damages, and their claims must fail. Defendants point to a "significant disparity" in the prices charged by different egg producers for unpasteurized liquid egg to support their argument that linking damages from egg products purchases to the conspiracy here would be speculative.

The DPPs counter that Defendants intended with their conspiracy to raise both the prices of shell eggs and the prices of egg products. They point to *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978) and *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002), and argue that in these cases courts allowed recovery of damages for purchases of downstream products when the defendants were vertically-integrated producers who conspired to fix prices of component parts of the downstream products. However, in each of those cases, the defendants produced *both* the raw material and the finished product, unlike here, in which eggs from non-conspirators were often used to produce the finished egg products.

All Plaintiffs argue that the prohibition of umbrella damages relies on the principle that it would be unfair to seek damages for purchases from non-defendants when the defendants did not reap the benefits of those sales. Here, Plaintiffs argue, the Defendants *did* reap the benefits

because they were the ones selling the egg products at inflated prices. The DAPs, in particular, contend that Dr. Baye has shown that the conspiracy raised the prices of both shell eggs and egg products at issue and that shell eggs and egg products are part of the same market. They contend that, to the extent Defendants argue otherwise, the disagreement between experts is a question of fact for the jury.

Plaintiffs, however, have not shown that it was the Defendants who reaped ill-gotten gains from the egg products sales, nor can they show this, at least without more data. Plaintiffs' theory of the case is that Defendants conspired to reduce the supply of eggs. This, in turn, raised the price of eggs, and, consequently, the price of egg products.[3] A significant portion of the egg products at issue here is made with eggs purchased from non-conspirators. Thus, without analyzing, for example, the prices that Defendants paid for those non-conspirators' eggs, the proportion of those eggs used in specific egg products, and the resulting egg products' price, it is impossible to tell whether the *Defendants* profited unduly from these egg products, given that the overcharge could have been paid by Defendants to their egg suppliers.

The situation here is not as distinguishable from a classic umbrella damages case as Plaintiffs argue. At the end of the day, Plaintiffs are relying on the theory that the conspiracy raised prices for all eggs, even those produced by non-conspirators, which is a quintessential restatement of the umbrella theory. Indeed, Plaintiffs' theory of damages with respect to egg products sounds like a combination of an "umbrella damages" theory and an *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), problem: Attempting to link the raw egg prices of non-conspirators to the conspiracy is, under *Mid-West Paper*, too attenuated, and recovering overcharges when the Plaintiffs have not presented evidence that the Defendants, and not the

---

[3] As Defendants note, no one argues that there was any additional wrongdoing with respect to the production of egg *products*. The alleged misconduct all took place in the production of *eggs*.

6

non-conspirators, pocketed those overcharges creates a situation in which Plaintiffs are seeking recovery of pass-through overcharges, something prohibited by *Illinois Brick*. As much as the DAPs insist that their expert has isolated the effects of the conspiracy on the prices of egg products, he cannot have done so without any analysis whatsoever of the non-conspirator egg producers' pricing decisions and without any knowledge of which eggs went into which egg products, and in what proportion.[4]

The DPPs do contend that they can separate egg product damages resulting from egg products made with certified eggs from egg product damages resulting from egg products made with non-certified eggs. Thus far, they have not done so. Their proposed method, however, is speculative, as it involves simply multiplying the damages by the percentage of certified eggs used by Defendants overall. As just one observation that highlights Plaintiffs' problems, Michael Foods, for instance, made egg products other than the ones at issue in this litigation. If the method of isolating egg products made with certified eggs involves merely analyzing what overall percentage of breaking eggs came from certified producers and then applying that percentage to damages calculations, that would fail to account for the fact that a higher proportion of certified eggs may have been used to make egg products not at issue in this suit as opposed to egg products at issue. No discovery has been delineated for the Court's consideration that would assist in a determination as to which egg products used which eggs, so it appears that Plaintiffs do not even have the tools necessary to perform the necessary analysis.

---

[4] The DAPs also detour into the general principles of antitrust standing. Because they cannot distinguish their damages theory from prohibited umbrella damages, however, a discussion of general standing issues is unnecessary here.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion. An appropriate Order follows.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge