## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| ***THIS DOCUMENT APPLIES TO:*** | : | **No. 08-md-2002** |
| **ALL DIRECT ACTION PLAINTIFF CASES** | : | |
| **ALL INDIRECT PURCHASER CASES** | : | |

### M E M O R A N D U M

PRATTER, J.                                                    SEPTEMBER 8, 2016

Direct and indirect buyers of eggs accuse the nation's major egg producers of conspiring to control and limit the nation's egg supply and thereby increase egg prices through a number of allegedly interrelated programs. Specifically, the egg producers are accused of violating Section 1 of the Sherman Act by developing and implementing an egg certification program, exporting eggs at a loss, and reducing egg production in periods of oversupply through certain coordinated actions such as reducing chick-hatch, early molting, and hen disposals. The defendants deny that these programs violate the Sherman Act.

Certain defendants have filed two related summary judgment motions against the Indirect Purchaser Plaintiffs (IPPs) and the Direct Action Plaintiffs (DAPs) (collectively "plaintiffs") respectively, challenging the plaintiffs' theories of liability.[1] These motions assert three general

---

[1] The motion for summary judgment against Indirect Purchaser Plaintiffs (Doc. No. 1246) was brought by the following defendants: United Egg Producers, Inc., United States Egg Marketers, Inc., Cal-Maine Foods, Inc., Morark, LLC, Norco Ranch, Inc., and Ohio Fresh Eggs. The motion for summary judgment against the Direct Action Plaintiffs (Doc. No. 1245) was brought by the following defendants: United Egg Producers, Inc., United States Egg Marketers, Inc., Cal-Maine Foods, Inc., and Ohio Fresh Eggs. Cal-Maine Foods, Inc., also expressly states that it does not join in the summary judgment motion as to *Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P., v. Michael Foods, Inc., et al.*, Case No. 11-0510.

arguments. First, the defendants argue that neither the DAPs nor the IPPs can, as a matter of law, state a claim for a *per se* violation of the Sherman Act based upon the defendants' participation in the UEP Certified Program. Second, the defendants argue that the IPPs and DAPs have failed to identify evidence of any agreement among defendants to refrain from new construction of hen facilities. Finally, the moving defendants argue that application of the rule of reason to the plaintiffs' claims regarding the UEP Certified Program requires dismissal of all the plaintiffs' remaining claims. The defendants contend that the plaintiffs have waived pursuit of the UEP claims under the rule of reason and, thus, these claims must be dismissed. Furthermore, they argue that, in the event the Court were to grant summary judgment on the UEP claims, the damages models offered by the plaintiffs would no longer provide a reliable estimate of damages because the models fail to disaggregate the effects of the various alleged restrictions; that is, because the models do not allow for backing out damages attributable to any individual program, the models necessarily fail.

For the reasons outlined below, the Court finds that the UEP Certified Program must be evaluated under the rule of reason. The Court also finds that the plaintiffs have failed to produce evidence indicating a genuine dispute of material fact as to the existence of a "side agreement" among the defendants to refrain from new barn construction. Nevertheless, the Court finds that the plaintiffs are able to proceed under the rule of reason and that, for this reason, the Court need not address the remaining arguments regarding the disaggregation of the damages model.

## I.    STATEMENT OF FACTS

---

As noted during the hearing on the motions, the defendants have not filed a motion for summary judgment against the Direct Purchaser Plaintiffs on the issue of liability. Nevertheless, the Court allowed the DPPs to file post hearing briefing, addressing the defendants' arguments on liability.

The factual allegations in this case are extensive and complex, but given the narrowly tailored nature of the arguments presented in the extant motions, the amount of operative facts here is not excessive.

Starting in the early 2000s, the plaintiffs – including the DAPs and IPPs who are respondents to the motions here – allege that the defendants, under the auspices of two industry groups, the United Egg Producers and the United States Egg Marketers, conspired to reduce the domestic supply of shell eggs, and thereby increase their price. The participants in the alleged conspiracy supposedly accomplished this through the implementation of three interrelated programs. The centerpiece of this alleged conspiracy is the UEP Animal Care Certified Program ("Certified Program"). The plaintiffs claim that, under the Certified Program, the UEP issued certifications to producers if those producers complied with certain animal husbandry guidelines adopted by the UEP. According to the plaintiffs, these guidelines depressed egg supply by, among other things, establishing a minimum cage space allowance per bird in the defendants' facilities, which had a knock-on effect of reducing flock size.

Plaintiffs also allege that, in addition to the Certified Program, the defendants engaged in two other programs designed to reduce domestic egg supply. The first was an egg export program. The second consisted of collective short-term production restrictions. Because the pending summary judgment motions only address the UEP Certified Program, the Court will not go into any more detail regarding the alleged egg exports or short term supply reduction agreements.

The UEP Certified Program consists of a series of production standards related to animal husbandry and welfare, which a producer must meet in order to become "Certified." The program is voluntary; producers can choose to join or drop the program at any time, regardless of

3

their membership in the UEP. The guidelines do not address the number of barns, cages, or hens any producer might have; and the guidelines do not prohibit the construction of new cages or new barns.

While the plaintiffs allege that the impetus for the supply controlling aspects of the Certified Program began much earlier, the UEP Certified Program itself was initiated in 1999 with the formation of the UEP's Scientific Advisory Committee (SAC). The members of the SAC were professors, scientists, and veterinarians, with experience in the area of animal welfare and poultry management. The specifics of the defendants' motivation for creating the SAC is hotly disputed, but it is generally agreed that at the time the SAC was formed, egg producers were facing mounting pressure from animal rights groups (and consumers) to modify their egg production practices to address concerns about animal welfare. One of the principle issues raised by these animal rights groups was the amount of cage space per chicken in the defendants' barns.

In September 2000, the SAC issued its formal recommendations for animal welfare guidelines, which suggested implementation of a cage space minimum size of between 67 and 86 inches per caged bird. The guidelines also included recommendations in other areas of production. The UEP Producer Committee on Animal Welfare used the SAC recommendations to develop a working draft for the UEP Animal Welfare Guidelines for Egg Laying Hens. In 2002 the UEP issued guidelines which created the UEP Certified Program. In the subsequent years, these guidelines have been modified several times.

There are several relevant components of the UEP Certified Program. The cornerstone component of the program is the minimum cage space requirement. As of April 2008, the guidelines required 67 inches per white leghorn hen and 76 inches per brown egg layer. The record includes evidence that increasing cage space reduces the stress on the birds and thereby

4

increases their individual productivity and output. According to certain literature highlighted by the defendants, an increase from 48 inches per bird used in 2002 to 67 inches in 2006 would have had the effect of improving hen welfare.

These cage space limits were not imposed overnight, however. The initial version of the guidelines included a ten-year phase-in schedule for the cage space requirements. This phase-in schedule was reviewed by FMI, a grocery store trade group, and was ultimately shortened to a six-year phase-in period. In April 2002, the UEP issued final guidelines that required leghorn chicks born after April 1, 2002 to be housed in a facility providing at least 56 inches per bird. This cage space minimum was then to increase by 3 square inches every 18 months up to the 67 inch minimum requirement after April 1, 2008.

In addition to the cage space requirements, in 2005, the UEP released an updated version of the guidelines, which included new requirements restricting a practice called "backfilling." Backfilling refers to removal of birds from a flock which have either died mid-production cycle or which have otherwise reached the end of their productive (i.e. egg producing) lives. These removed birds are replaced in the flock by younger birds. Prior to adopting the restriction regarding backfilling, the SAC provided a written report expressing "extreme opposition" to the practice. Their 2004 memorandum states in relevant part that: "Science has shown that mixing birds from older flocks with different ages increases the susceptibility to disease. Older hens may harbor disease-causing pathogens that are easily transmitted to younger [chickens] that may have not been fully vaccinated or have had the opportunity to develop full immune-competency. In addition, the introduction of unfamiliar birds to resident birds increases social competition and stress, which can increase mortality and decrease production." SMF ¶ 75.

Finally, the guidelines required that "[a] certified company must implement the Animal Husbandry Guidelines on 100% of the company's production facilities regardless of where or how eggs may be marketed. This 100% commitment is intended to be inclusive of all company entities, affiliates, etc." SMF ¶ 61. The SAC supported this rule because a producer would not be able to demonstrate commitment to treating birds humanely while treating only some of those birds according to the standards. UEP Certified producers, however, were allowed to buy and resell non-Certified eggs to the extent customers wished to purchase them.

In order to confirm that producers were in fact acting in compliance with the guidelines, the UEP also developed an auditing procedure. Such audits were conducted annually by the USDA, as well as other independent companies. FMI and various members supported these audits and grocery retailers requested the results of these audits.

While many producers eventually joined the Certified Program, the record contains evidence indicating that many producers did not. These nonparticipants included Kreider Farms and Daybreak Foods. In addition, at least one participant in the UEP Certified Program withdrew during the relevant period. Sparboe Farms initially joined the UEP Certified Program, but took its flocks out of the program in 2005 and instituted its own animal welfare program. Sparboe later rejoined the program in 2011. Overall, throughout the relevant time period, roughly between 10 and 20% of the nation's total egg production came from non-certified producers.

The record also shows that new producers entered the market after the UEP Certified Program was started. Rembrant Foods entered the market after the alleged conspiracy began. It is now the third largest egg producer in the country. Also, the record reflects that Rembrant did not join the UEP Certified program.

6

In June 2002, after the initial guidelines were released, FMI announced that its own "independent expert advisors" had reviewed the UEP guidelines and recommended the program to its members.  Many retailers appear to have incorporated the guidelines into their supplier agreements. For example, Wal-Mart mandated compliance with the UEP Certified Program among its suppliers.  Other retailers such as Safeway, A&P, Albertsons, Publix, and Kroger entered into agreements with suppliers which included requirements that eggs supplied must comply with the guidelines or that suppliers must be UEP Certified.

Finally, in the years since the UEP Certified Program began, the record indicates that certain states have passed a regulation requiring compliance with the UEP Certified Program.  In 2009, the State of Arizona passed a regulation that "[a]ll egg-laying hens. . . shall be raised according to the United Egg Producers Animal Husbandry Guidelines."  Ariz. Admin. Code R3-2-907(A).  These regulations also required that "all eggs sold in [Arizona] shall be from hens raised according to the UEP guidelines and shall display the United Egg Producers Certified Logo on their cases." *Id.* at 907(B). Other states, such as Oregon, Washington and Ohio, have adopted similar regulations incorporating aspects of the guidelines or requiring eggs sold in the state be produced according to the guidelines.

## II.    STANDARD OF REVIEW

The defendants seek partial summary judgment on certain aspects of the claims brought by the DAPs and IPPs.  Summary judgment is appropriate only when the record fails to demonstrate a genuine dispute as to material fact that would permit a reasonable jury to find in favor of the nonmoving party.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) ("The movant's burden on a summary judgment motion in an antitrust case is no different than in any other case.") "The

moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must point to evidence –beyond the pleadings – showing a genuine dispute as to an issue of material fact exists, necessitating at trial. *Id.* at 324. "On summary judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material fact." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex*, 477 U.S. at 322–23). Summary judgment is not disfavored in the antitrust context and the entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010).

## III. ANALYSIS

### A. Proper Mode of Legal Analysis

The defendants first argue that, as a matter of law, their alleged participation in the UEP Certified Program cannot constitute a *per se* violation of the Sherman Act and must, rather, be analyzed under the rule of reason. "The selection of a mode of antitrust analysis is a question of law . . . ." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 829 n. 7 (3d Cir. 2010) (citing *Arizona v. Maricopa County Med. Soc'y.*, 457 U.S. 332, 337 n. 3 (1982)). Determination as to the proper mode of legal analysis is an appropriate subject of summary judgment. *See King Drug Co. of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 412 (E.D. Pa. 2015). Therefore, the Court will first address this argument.

#### i. *Defining the Legal Standard Applicable to Individual Alleged Practices within the Conspiracy*

8

The Court must decide whether it is permissible to compartmentalize the legal analysis of the alleged conduct in the manner proposed by the defendants. The plaintiffs emphasize throughout this case that the allegations relate to an overarching conspiracy which can only be properly understood when evaluated singularly. While recognizing that the plaintiffs have alleged conduct which goes beyond mere participation in the UEP program, the defendants' motion focuses solely on the UEP program and whether the Court should find that this program is *per se* anticompetitive, or conversely, whether it should be analyzed under the rule of reason. The plaintiffs, however, argue that the Court cannot engage in such compartmentalized legal analysis and must apply the same legal standard to evaluating the legality of the entirety of the conduct alleged. They assert that collective actions in furtherance of the conspiracy must be viewed as a singular attempt by the defendants to artificially reduce egg supply and that conspiracies to reduce egg supply are *per se* unlawful.[2]

On the surface, the plaintiffs' argument against compartmentalizing the legal analysis may appear compelling. However, upon closer examination, the patina of logic begins to rub off. Essentially, the plaintiffs' contention is that, given the allegation that the defendants engaged in a single, overarching conspiracy to reduce supply, the defendants may be found *per se* liable for all manner of conduct which may otherwise singly be evaluated under the rule of reason. This cannot possibly be correct. Allowing the plaintiffs' characterization of the defendant's conduct as comprising a single conspiracy as dispositive for purposes of application of *per se* or rule of reason analysis would completely subsume the rule of reason in most, if not

---

[2] The Court notes that both the IPPs and the DAPs assert in their responsive briefing that the defendants' failure to raise any arguments regarding the standard which must be applied to the alleged instrumentalities of the conspiracy that are not formal components of the UEP program—such as the export program, the agreement to limit new construction, the chick-hatch reductions, the forced molts, and the coordinated slaughter of hens—should be interpreted as an implicit acknowledgement that these actions are *per se* unlawful. The Court does not see any such concession in Defendants' briefing; nor have Plaintiffs articulated a legal basis for finding an implicit concession. The Court has not been asked to determine what standard applies to these components of the conspiracy and, therefore, the Court will refrain from engaging this issue *sua sponte*.

all circumstances. Moreover, while certain practices are said to be *per se* unlawful, the rule of reason is the "usual standard" to be applied when determining if challenged conduct unreasonably restrains trade. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007)); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 6322383, at \*15 (E.D. Pa. May 26, 2015), *reconsideration denied*, No. 06-0620, 2015 WL 6324596 (E.D. Pa. Aug. 31, 2015). ("[E]ven if the agreement is horizontal in the way Plaintiffs now claim, applying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of *per se* violations.") (citing *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014), *cert. denied sub nom. Dean Foods Co. v. Food Lion, LLC*, 135 S. Ct. 676 (2014)). The *per se* rule is appropriate only in instances where "the business practice in question is one, which on its face, has no purpose except stifling of competition." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001), *as amended* (June 12, 2001) (citing *White Motor Co. v. United States*, 372 U.S. 253, 262 (1963)). It is the plaintiffs' position, however, that any business practice associated with an allegedly unlawful purpose must be sucked into a *per se* analysis. However, requiring an assumption of illegality, as posited by the plaintiffs, would hamstring the factfinders' ability to properly evaluate the purpose and effect of the challenged business practices alleged.

The plaintiffs' argument against evaluating the legality of the UEP Program on its own—as opposed applying a *per se* analysis to the whole of alleged components of the conspiracy—relies principally on *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690 (1962). *Continental Ore*, however, is distinguishable from the question at issue here. The plaintiffs emphasize the admonition of the Supreme Court that: "plaintiffs should be given the

full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore*, 370 U.S. at 699. The holding, however, focuses on whether the lower court applied the proper appellate review standard to evaluate the sufficiency of the evidence at trial, not whether separate conduct by the defendants in a given conspiracy can or should be evaluated under the *per se* analysis or rule of reason. Moreover, the Supreme Court has since explained the necessity of applying different modes of legal analysis (i.e. *per se* versus rule of reason) when analyzing the legality of separate aspects of a single conspiracy. *See Leegin*, 551 U.S. at 895.

Consideration of the relevant facts of *Continental Ore* is helpful to understand the distinction between that case and the question at hand. In *Continental Ore*, the defendants were engaged in the mining and distribution of ferrovanadium and vanadium oxide, materials used by steel manufacturers to harden certain alloys. They were accused by Continental—which was in the business of buying and selling of metals, including vanadium products—of conspiring to restrain the trade and commerce of vanadium. Continental alleged that as a result of the defendants' monopolistic and restrictive practices, independent producers and distributors of vanadium oxide were eliminated from the market. Continental pointed to five separate instances when its attempts to engage in joint ventures or other arrangements with producers were frustrated by the defendants' practices.

At trial, the jury returned a verdict for the defendants and Continental appealed. The Ninth Circuit affirmed, but not based upon the evidentiary rulings and instructions Continental had challenged. Rather, the court held that, based upon its review of the record, there simply was insufficient evidence to justify a ruling in favor of Continental. The Supreme Court reversed, holding that the lower court had erred in its review of the evidence. Specifically, using

11

the language favored by the plaintiffs here as quoted above, the Court stated that the lower court's seriatim evaluation of the effects of the alleged conspiracy on the five joint ventures was improper. *Continental Ore*, 370 U.S. at 699. The Court expressed concern that, when deciding that a directed verdict would be proper, the court of appeals excluded from its consideration relevant evidence showing a conspiracy. *Id.* Looking at all the relevant evidence, the Supreme Court found that "the record discloses sufficient evidence for a jury to infer the necessary causal connection between respondents' antitrust violations and the petitioners' injuries." *Id.* at 700.

The analysis applied in *Continental Ore* is distinguishable from the question at issue here. *Continental Ore* focuses on the use of evidence—namely whether evidence of certain discrete impacts on the plaintiff's business could be analyzed separately to determine whether sufficient evidence had been presented to show an antitrust injury. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1364 (3d Cir. 1992) (citing to *Cont'l Ore* in the context of evaluating sufficiency of evidence of concerted action); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1167 (E.D. Pa. 1981). Subsequent decisions have acknowledged that the holding in *Continental* Ore was not intended to limit a court's individual assessment of the legality of various components of an alleged conspiracy.

The Supreme Court in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), noted that the probing inquiry into the legal basis for an antitrust conspiracy claim could include the application of separate standards to evaluate the legality of discrete types of conduct which allegedly make up a single conspiracy. In *Leegin*, the Court explained that a vertical agreement to fix minimum resale price is not *per se* unlawful, but should be analyzed under the rule of reason rubric. *Id.* at 889. The Court explained that the rule of reason was the appropriate mode of analysis for such vertical agreements because such agreements could

increase competition in certain circumstances, even though they could have anticompetitive effects in others. *Id.* at 892-93. The Court explained that a vertical resale price maintenance agreement could very well be a component of a horizontal conspiracy among a group of manufacturers. Even if the horizontal aspects of the agreement would be subject to a *per se* analysis, the Court stated that "[t]o the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason" *Id.* at 893.

In *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* Judge Edward Becker, then a trial court judge, expressly rejected an argument similar to the one proposed by the plaintiffs here. The plaintiffs in *Zenith* sought to prevent "fragmentation" of their conspiracy allegations and cited to *Continental Ore* as support. *Zenith*, 513 F. Supp. at 1166. Judge Becker explained that "it is clear from the facts and reasoning of *Continental Ore* itself that the Supreme Court never intended . . . to bar a probing analysis of antitrust conspiracy claims." *Id.* at 1167. Thus, *Continental Ore* stands for the principle that the jury is entitled to give whatever weight it chooses to the repetitive nature of the alleged injuries to the plaintiffs. Nevertheless, Judge Becker recognized that, despite the fact that the jury is entitled to evaluate the effects of the unitary conspiracy, *Continental Ore* is not intended to preclude analysis of the legal basis for the conspiracy allegation in the plaintiffs' claim.

> In *Continental Ore* itself, the Supreme Court engaged in a detailed analysis of the record with respect to three of the four ventures which the Court of Appeals had addressed on their facts, concluding with respect to each of the three considered separately that there was enough evidence of causation to preclude a directed verdict. If the warning against "compartmentalizing" an antitrust conspiracy case were meant to prevent a court from breaking down a plaintiff's allegation of a "unitary" conspiracy into its component parts for purposes of analysis, the Court would not have engaged in the "forbidden" analysis in the very same opinion in which it issued the warning. We conclude that the *Continental Ore* admonition

against fragmentation of a conspiracy case does not preclude our analysis of the alleged "unitary" conspiracy.

*Id.* at 1167–68 (citations omitted); *c.f. Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 6322383, at *14 ("The presence of the integrated defendants prevents me from simply bifurcating my consideration of the claimed agreement to fix mushroom distribution prices into horizontal and vertical components with the former being subject to *per se* liability and the latter subject to consideration under the rule of reason.")

Evaluating the legality of the individual business practices making up the alleged conspiracy is entirely consistent with the Supreme Court's directive that use of the *per se* analysis should be sparing and deliberate. Ultimately, then, the Court here may find that some or all of the alleged practices in question should be analyzed under the *per se* rule, but cannot, and will not assume that they all are woven together via the allegation of a single, overarching conspiracy. At this point, the Court is only called upon to evaluate the UEP Certified Program and determine whether this program is *per se* unlawful, or whether it must be considered under the rule of reason. That is the question next addressed.

### ii. *The Court Must Analyze the UEP Certified Program Under the Rule of Reason*

Having reviewed the parties' submissions and the record, the Court finds that the legality of the UEP Certified Program under the antitrust laws must be analyzed pursuant to the rule of reason.

To establish an actionable antitrust violation, a plaintiff must show concerted action by the defendants, that this concerted action resulted in a restraint on trade, and that this restraint was unreasonable. 15 U.S.C. § 1; *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 131 (3d Cir. 2005). Because every agreement among competitors will inevitably

14

restrain trade in some manner, however, the Court has read into the Sherman Act a "reasonableness requirement."

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.'

*White Motor Co. v. United States*, 372 U.S. 253, 261–62 (1963) (citing *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238 (1918)).

The "rule of reason" standard is more than a default rule that the courts will apply when evaluating the lawfulness of a challenged business practice. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8 (1979) (noting that the rule of reason is generally applied in Sherman Act cases); *Guerrero v. Bensalem Racing Ass'n, Inc.*, 25 F. Supp. 3d 573, 588 (E.D. Pa. 2014) ("Most alleged restraints are analyzed under the 'rule of reason' standard"); *see also In re Ins. Brokerage*, 618 F.3d at 315–16 (rule of reason is the "usual standard."). Pursuant to this rule of reason analysis, in order to succeed on his or her claim, a plaintiff alleging a violation of § 1 must show:

> (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464–65 (3d Cir. 1998). In addition to proving the existence of a conspiracy "the plaintiff must show that the conspiracy to which the defendant

was a party imposed an unreasonable restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010).   The plaintiff "bears the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant geographic market." *Id.* (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005)).  The plaintiff typically needs to proffer evidence showing either (1) the defendants have sufficient market power or (2) the existence of actual detrimental effects, such as a reduction of output. *See Ins. Brokerage*, 618 F.3d at 315; *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986).  Once this initial showing is made, the Court must decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits.   *Ins. Brokerage*, 618 F.3d at 315 (citing *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir. 2001), *Leegin*, 551 US. at 886).

To be sure, certain agreements or practices are so "plainly anticompetitive" and so often lack any redeeming virtue that they are conclusively presumed anticompetitive *per se*, without need for further examination.  *Broad. Music*, 441 U.S. at 8; *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 50 (1977); *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5 (1958).  When applying the *per se* rule to an alleged restraint, the Court utilizes the same analysis as discussed above, but is to presume that the restraints in question are anticompetitive and that the object of the agreement is illegal. *Rossi*, 156 F.3d at 465.

While *per se* condemnation of certain business practices offers certain efficiencies for both plaintiffs and the courts, it is limited in its applicability.  *See Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000) (citing *Arizona v. Maricopa County Med. Society*, 457 U.S. 332, 344 (1982)).  The possible temptation must be tempered.  A "departure

16

from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *Leegin,* 551 U.S. at 887 (citing *GTE Sylvania*, 433 U.S. at 58–59). "*Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *Guerrero*, 25 F. Supp. 3d at 587 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 103–04 (1984)). A *per se* unlawful practice is one which has "no purpose except stifling of competition." Application of the *per se* rule is appropriate "only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886–87 (citation omitted). "A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." *Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 6322383, at \*16 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 298 (1985)).

With this in mind, the Court now turns to the determination of whether the UEP Certified Program is *per se* unlawful, or whether it should be analyzed under the rule of reason.

As discussed above, the UEP Certified Program and accompanying guidelines lay out a series of animal husbandry requirements that a participating egg producer must meet in order to become "certified." In their motion, the defendants *only* argue that three specific components of the UEP Certified Program should be analyzed under the rule of reason rather than the *per se* rule, and so the Court will limit its review of the facts to these components. These three components of the program consist of (1) cage space requirements, (2) the "100% rule," and (3) restrictions on backfilling. The plaintiffs have alleged that the defendants' collective agreement

to abide by these requirements—in addition to certain other conduct which is not addressed in this motion—should be considered *per se* unlawful because it is an agreement among competitors to restrict the domestic supply of eggs. The Court, however, finds that the UEP Certified Program does not involve an express agreement among competitors to restrain supply and that the record contains evidence indicating that the certified program provided certain procompetitive benefits. For this reason, the Court finds it is not appropriate to presume that this conduct is *per se* unlawful.

Plaintiffs here remind the Court that "[h]orizontal price fixing and output limitation are ordinarily condemned as a matter of law under an 'illegal *per se*' approach because the probability that these practices are anticompetitive is so high; a *per se* rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'" *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984) (citing *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 19–20 (1979)). The plaintiffs argue that the UEP Certified Program functioned solely to impose restraints on supply and should therefore be considered *per se* unlawful. The record, however, demonstrates that the purpose and operation of the UEP Certified Program is not as clear as the plaintiffs assert, calling to mind that the "*per se* illegality rule applies when a business practice 'on its face, has no purpose except stifling competition.'" *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016).

While the plaintiffs have characterized the Certified Program as a simple output-limitation agreement, they are unable to point to any evidence that, on its face, the agreement to enter into the UEP Certified Program constituted an express agreement among competitors to restrict egg supply. Moreover, the record suggests the specific challenged components of the

UEP program do plausibly have procompetitive benefits. First, the cage space requirement established a minimum amount of cage-space per bird. Assuming that facility size did not change, increasing the amount of space dedicated to each bird logically reduces the total number of birds in a given facility. While this might reasonably be expected to reduce the number of eggs produced in proportion, the record contains evidence that greater cage space increased hen welfare and thereby improved hen productivity, and by extension egg output. SMF ¶¶ 56, 58. To the point, the defendants' animal and poultry science expert proposes to testify that increasing cage space has a positive impact on the health of the chickens, and that "healthy, stress-free birds produce more eggs." SMF ¶ 100.[3]

In addition, while limiting cage space per bird, the UEP standards did not establish a limit on the total number of hens a producer may own. This obviously leaves open the possibility that UEP participants would be free to expand production to take advantage of the higher prices that supply reduction might produce. The record also includes evidence that the UEP Program specifically provided a phase-in period, during which producers could adjust to any supply effects that the cage space requirement could have had. As noted above, the record contains evidence that the aggregate national egg supply increased during the conspiracy period.

Undaunted, the plaintiffs challenge the requirement under the UEP which limits "backfilling." This refers to the practice of replacing hens that die mid-production cycle with new, younger hens from outside the flock. The record includes evidence that integrating birds from separate flocks in this manner may increase the transmission of disease among the

---

[3] The plaintiffs' opposition to the defendants' statement of material fact states that these facts are disputed, yet the argument and citations presented in support do not directly address the statements as articulated by the defendants. Both the IPPs and the DAPs argue that this statement about hen health and productivity is misleading, because they have proffered evidence indicating that any efficiency increases were offset by reductions in flock size. This argument, however, addresses the ultimate question of how the fact-finder should evaluate the procompetitive aspects of the programs—the evidence identified by the plaintiffs does not challenge that the agreement could offer such a procompetitive benefit, and should therefore be considered under the rule of reason.

chickens. The defendant's animal husbandry expert, Dr. Darre, stated in his deposition that the generally accepted husbandry practice is to only place birds of the same age, and thus the same vaccination schedule, in the same house. In addition to improving welfare of the animals, for purposes of the antitrust claims, the reduction of disease among the chickens would have the effects of preventing hen deaths, guarding against flock reduction and/or increasing productivity.

Finally, the third feature at issue in this motion, the 100% rule, requires that, in order to be certified under the UEP program, all of a certified producer's facilities must comply with the requirements of the program. "A certified company must implement the Animal Husbandry Guidelines on 100% of the company's production facilities regardless of where or how eggs may be marketed." In effect, this prevents the producer from producing both certified and non-certified eggs. The defendants argue that the certified program was a response to consumer demand for humanely produced eggs, and that the increased value of this product was ultimately based upon the defendant's ability to certify not only their compliance with the standards as articulated by the UEP, but also their total renunciation of the harmful practices these standards sought to remedy. In that sense, then, the success of the program was dependent upon full compliance.

Similarly, while the plaintiffs argue that the supply reducing effects of the conspiracy are essentially undisputable, the record includes evidence that egg supply actually *increased* during the conspiracy period. While the plaintiffs counter that the national egg supply would have increased more rapidly in the absence of the challenged conduct, they ultimately will have to rely upon econometric analysis and expert opinion in order to present evidence of this effect. "Because 'empirical analysis is required to determine [the] challenged restraint's net competitive effect, neither a *per se* nor a quick-look approach is appropriate because those methods of

analysis are reserved for practices that facially appear to be ones that would always or almost always tend to restrict competition and decrease output.'" *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011) (citing *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 n. 10 (2d Cir. 2008).

The plaintiffs dispute the veracity of the defendant's evidence, arguing that the UEP guidelines provide no procompetitive market impacts in practice. This argument, however, simply highlights a disputed issue of material fact, which must ultimately be decided by the fact-finder. In light of the evidence marshalled by the defendants, however, the Court cannot conclude that, on its face, the challenged agreement has "no purpose except stifling of competition." *Guerrero v. Bensalem Racing Ass'n, Inc.*, 25 F. Supp. 3d 573, 587 (E.D. Pa. 2014); (citing *Eichorn v. AT & T Corp.*, 248 F.3d 131, 142 (3d Cir. 2001), *as amended* (June 12, 2001)). Ultimately, the plaintiffs' counter arguments in favor of the application of a *per se* rule consist of little more than an argument that they will win at the end of the day when the fact-finder considers whether the defendants' agreements violated the antitrust law. This may very well be the case, but it is not the question the Court is faced with here. The Court cannot hold at this point that the UEP Certified Program could offer no pro-competitive benefits, so as to avoid the need to engage in a full rule of reason analysis.[4] Despite the plaintiffs' arguments as to why

---

[4] The IPPs argue that the "Defendants' ability to point to plausible procompetitive benefits does not preclude the application of the *per se* rule" and that even if the application of the *per se* rule results in an erroneous outcome in some cases, it is nevertheless appropriate in light of "business certainty and litigation efficiency." IPP Memo at 31 (citing *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 351 (1982), *N. Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008)). Here, the plaintiffs have not alleged that the defendants explicitly agreed to fix prices—rather they allege that the defendants entered into a series of interrelated agreements, all of which ultimately had the effect of reducing supply. The Supreme Court repeatedly has emphasized that the application of the *per se* rule is only proper in instances where there has been experience dealing with the specific challenged business practices at issue and where the Court can determine, from the face of the agreement, it is of the type which will always or almost always restrain trade. *Leegin*, 551 U.S. at 886–87 ("The *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue."); *Broadcast Music*, 441 U.S. at 9; *Maricopa County Medical Soc.*, 457 U.S. at 344.

the defendants are liable, the Court finds that the plausible presence of certain procompetitive aspects of the conspiracy, which have been highlighted by the defendants, renders it necessary and appropriate to evaluate the plaintiffs' claims under the rule of reason.[5]

### B. Side Agreements Not to Build Additional Barns

The next argument raised in the defendants' motions relates to certain side agreements to refrain from building additional barn space, which the plaintiffs allege the defendants entered into as a corollary to their participation in the UEP Certified Program. While an agreement not to build new barns is not alleged to have been an explicit component of the UEP Certified Program's guidelines, the plaintiffs have claimed that, in order to ensure that members of the conspiracy did not expand production to take advantage of any price increases which might have occurred as the result of cage space regulations, certain defendants entered into "side agreements" to refrain from expanding their flock size. *See* SUF ¶ 98 (referencing DAP interrogatory responses indicating DAPs allege the existence of an agreement not to "add new cages to their existing production facilities to house the layer hens displaced by the larger cage space requirement."); SUF ¶ 150 (referencing IPP interrogatory response indicating that IPPs contend the defendants agreed not to "replace hens lost through the [UEP Certified Program] cage-space restrictions."). In their motions, the defendants argue that the plaintiffs failed to put forward sufficient evidence of the existence of such side agreements. For this reason, they assert that any claims based upon the existence of side agreements not to expand barn capacity should be dismissed.

---

[5] As noted *supra,* while not named in the defendant's motions, the Direct Purchaser Plaintiffs were allowed to submit post hearing briefing addressing the arguments regarding the applicability of the *per se* rule. The arguments raised are essentially the same as those put forward by the other plaintiffs groups—namely that the subjective purpose of the conspiracy was to reduce supply and that supply reduction conspiracies are *per se* unlawful. Consequently, the Court need not separately address them.

A plaintiff may, of course, establish the existence of an agreement to violate the Sherman Act either through direct or circumstantial evidence. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003). "Because direct evidence, the proverbial 'smoking gun,'[6] is difficult to come by, 'plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy.'" *Id* (citing *Rossi*, 156 F.3d at 465). Unlike the plaintiffs' claims based upon the defendants' participation in the UEP Certified Program, the plaintiffs have only sought to establish the existence of a side agreement through circumstantial evidence. *See* IPP Br. at 40; DAP Br. at 63-69. To survive a motion for summary judgment, however, an antitrust plaintiff seeking damages for a violation of § 1 of the Sherman Act, based upon circumstantial evidence, must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 51 (3d Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

The record here does not include evidence which tends to exclude the possibility that the individual conspirators acted independently with regards to any decisions not to build new barns. The DAPs brief in opposition highlights two categories of evidence, which they claim show the existence of a side agreement, sufficient to defeat summary judgment.[7] First, the DAPs point to

---

[6] While the term "smoking gun" is typically associated with the clearest, most direct type of evidence, its use in this context is somewhat misleading. A "smoking gun," in truth, is circumstantial evidence of a shooting as it requires certain additional inferences, namely, seeing the *post*-trigger pulling, puffs of smoke and deducing the immediate preceding events.

[7] While the IPPs state in their brief that there is circumstantial evidence of a side agreement, they fail to provide any substantive opposition on this point. Rather, the focus of their argument is that they need not prove the existence of a side agreement in order to prove anticompetitive conduct. *See* IPP Br. at 40. This, however, is not responsive to the defendants' motion. Ultimately, for the reasons discussed below, the Court finds that neither the DAPs nor the IPPs have come forward with evidence to establish the existence of a genuine dispute of material fact regarding the existence of a side agreement to refrain from expanding and for this reason grants the defendants' motion on this point as to both plaintiffs groups.

certain statements by UEP President Gene Gregory as circumstantial evidence of the existence of an agreement among *producers* to refrain from building additional facilities.[8]  These statements caution producers not to overproduce in response to supply reductions which were expected to result from the new animal welfare standards included within the UEP program.  Notably, these statements make no mention of coordinated agreements to refrain from building additional facilities—and even go so far as to state that producers will not be able to meet market demand without building additional facilities—but instead encourage individual producers to "attempt to meet this market demand without over producing." DAP Br. at 64.  The DAPs also cite to UEP statements, directed to its members, recommending that they "don't build brand new facilities or "add on facilities to what they've already got," but instead "buy someone else out." The plaintiffs assert that such statements are evidence of an agreement.  CSF ¶ 237 (citing to statements by Donald Bell, a UEP-retained poultry specialist).[9]

In addition to the statements by Messrs. Gregory and Bell, the DAPs also point to certain actions and statements by individual defendants, which the plaintiffs contend are additional evidence of coordinated behavior. These statements included minutes from Cal-Maine's 2003 directors meeting where Cal-Maine's CEO and Chairman stated that it was "Cal-Maine's position that the Company will not plan to build anything or add any production for at least the

---

[8] The DAPs acknowledge that the defendants did expand production via purchasing existing facilities.  Again, there is no circumstantial evidence indicating that this decision was the result of an agreement, rather than motivated by individual economic incentives.

[9] The issue of conscious parallel behavior was not raised by the plaintiffs as a basis for dismissing the defendants' summary judgment motion.  Nevertheless, the Court notes that the record does not appear to provide evidence supporting this theory. Demonstrating conscious parallelism requires showing the following: "(1) the defendants' behavior was parallel; (2) the defendants were aware of each other's conduct and that this awareness was an element in their decision-making process; and (3) certain 'plus factors,' which must include that the actions were contrary to the defendants' economic interests, and that there was some motivation to enter into such an agreement." *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 53–54 (3d Cir. 2007) (citing *InterVest*, 340 F.3d at 165).  Based upon the evidence highlighted by the DAPs, there is no evidence that the defendants were aware of each other's conduct and that this awareness was an element of their decision-making process.

next year, even though this could be justified in four or five locations. . . ." CSF ¶ 240 (DAP Br. at 64). The DAPs also assert that, prior to 2003, Michael Foods had planned a large expansion of its capacity, but subsequently dramatically reduced this expansion. *See* CSF ¶ 243. Similarly they argue that while Rose Acre expanded its capacity through acquisition of three farms between 2002 and 2004, if this expansion is deducted (along with pre-conspiracy construction), Rose Acre Farms' capacity decreased over the conspiracy period. *See* CSF ¶ 244.

The defendants dispute the accuracy or meaning of this evidence and the inferences which the plaintiffs argue should be drawn from it. More pertinent to the issue at hand, even viewing this evidence in the light most favorable to the plaintiffs, it fails to tend to exclude the possibility the defendants were acting independently. "Evidence that does not exclude the possibility of independent action or that relies on a factual context that is implausible is insufficient to withstand summary judgment." *Cosmetic Gallery*, 495 F.3d at 5 (citing *Matsushita*, 475 U.S. at 587). Rather than demonstrating the existence of a supply reduction agreement, the only reasonable inference to draw from the statements by the UEP officials cautioning members to avoid expansion is that there was *no agreement* to refrain from building new barns. That is, if there was an agreement there would be no point to an exhortation by the UEP. At most, such evidence could suggest that the defendants had the opportunity to conspire to refrain from expanding production. *See id.* The additional evidence that individual defendants chose to refrain from expansion, or expanded through acquisition of existing facilities, certainly does not foreclose the possibility that these actions were undertaken independently. The DAPs acknowledge that the record may suggest that these defendants "may have increased the number of hens they owned during the conspiracy" but that this expansion was the result of acquisition.

The DAPs also do not contest the defense contention that the industry as a whole added 20 million birds between 2000 and 2008. *See* DAP Br. at 65. Given this, there appears to be a serious flaw in the DAPs' logic—rather than support the inference of the existence of an agreement to refrain from building new barns, given the producers' acknowledged concerns about supply, it obviously would be in the defendants' *individual* economic interests to attempt to meet their own customer demands through acquisition of existing stock if possible, rather than engage in new barn construction. The DAPs' argument on this issue relies on unsupported logical extrapolations from the evidence on the record. For example, the plaintiffs argue that evidence of Cal-Maine's decision to not expand supply was somehow a signal to other co-conspirators that they "would be reciprocated and rewarded." DAP Br. at 66. The Court finds *no* evidence whatsoever supporting such an inferential flight.

Ultimately, the circumstantial evidence presented by the plaintiffs could support an inference of a side agreement to refrain from expanding supply. But this evidence does not even tend to foreclose the possibility that any decision by the defendants to refrain from expanding production was the product of individual, rather than collective action. Consequently, the Court will grant the defendants' motion in part.

### C. Plaintiffs May Proceed Under Rule of Reason

While the defendants argue that substantively they are only asking the Court to find that the rule of reason applies to the analysis of the UEP Certified Program, they also argue that such a holding will have the practical effect of requiring dismissal of the entirety of the plaintiffs' claims. This argument has two steps. First, the defendants contend that, once the Court has determined the UEP program must be analyzed under the rule of reason, the Court must dismiss any claims based upon the defendants' participation in the UEP Certified Program because the

plaintiffs have limited their claims to a *per se* theory. Second, having dismissed the UEP claims in their entirety, the defendants argue that the remaining claims must also be dismissed because the plaintiff's damages model fails to attribute specific damages to the individual component parts of the larger conspiracy and that the dismissal of the claims under any one part renders the remainder of the damages model unreliable. Without a reliable damages model, the defendants conclude, the jury would have no basis to decide damages. For this reason, argue the defendants, the remaining claims should be dismissed.

The defendants' argument fails at step one. Holding that the UEP Certified Program must be analyzed under the rule of reason does not necessitate dismissal of the plaintiffs' claims at this point. Consequently, the Court need not address the argument regarding the significance of the disaggregation of the plaintiffs' damages model.

A plaintiff may seek to lighten his litigation burden by exclusively pleading that the challenged conspiracy is *per se* unlawful. If the plaintiff chooses to so limit his claims, and the Court holds on summary judgment that *per se* treatment of the restraint is improper, he risks the possibility that his claim may be dismissed. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) (citing *AT & T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006); *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 n. 2 (2006)). An antitrust plaintiff, however, does not waive his ability to pursue a rule of reason claim simply by arguing that a conspiracy should be found *per se* unlawful. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 25 (1979). In order for a plaintiff to be prevented from pursuing a claim under a rule of reason theory following summary judgment on a *per se* claim, that plaintiff must have expressly disavowed reliance on the rule of reason. For example, in *Insurance Brokerage*, 618 F.3d at 318 the Third Circuit dismissed a claim after finding *per se* treatment improper because the plaintiffs

27

had "abjure[d] a full-scale rule of reason analysis." While these plaintiffs had initially pled a full rule-of-reason claim in their First Amended Complaint, their Second Amended Complaint omits any reference to the rule of reason and their papers make clear they intended to proceed exclusively on a *per se* analysis. *Id.* at 319 n. 16. Similarly, in *AT & T Corp. v. JMC Telecom, LLC*, the court noted that the plaintiff "stipulated that it would not bring a claim under the rule of reason; rather, JMC argued that the arrangement between AT & T and JMC was a *per se* violation of the Sherman Act." 470 F.3d at 531. Finally, the Supreme Court in *Texaco Inc. v. Dagher,* held that a joint venture to sell separately branded gasoline was not a *per se* horizontal price fixing agreement and reversed the circuit court decision. The district court in that case had granted summary judgment in favor of the defendant because it held that the "plaintiffs disclaimed any reliance on the traditional 'rule of reason' test, instead resting their entire claim on either the *per se* rule or a 'quick look' theory of liability." *Dagher v. Saudi Ref., Inc.*, 369 F.3d 1108, 1113 (9th Cir. 2004), *rev'd sub nom. Texaco Inc. v. Dagher*, 547 U.S. 1 (2006). The case was dismissed because the plaintiffs failed to adequately plead either a *per se* or rule of reason theory.

The defendants here have failed to show that the plaintiffs waived their claims under rule of reason by exclusively pleading a *per se* theory or expressly disavowing the rule of reason. While the defendants assert that the plaintiffs' have "disclaimed any intent to utilize the rule of reason in this case," the only evidence cited in the defendants' moving papers in support of their argument on this point is a statement by DPP counsel that the DPPs were "definitely sticking with the *per se* standard for this case." *See* SMF at ¶ 99. As a preliminary matter, the defendants' briefing provides no explanation for why the statements by an attorney for the Direct

Purchaser Plaintiffs would be applicable the IPPs.[10]  But even assuming that this statement was an expression of intent on behalf of all plaintiff groups, the substance does not appear to express a bottom line, definitive intention on behalf of any plaintiffs to affirmatively waive their claims under rule of reason or pursue the claims solely under a *per se* theory.

The strongest argument in favor of finding the plaintiffs did not waive their rule of reason argument is found in the evidence that they have presented in opposition to defendants' motions. Despite the plaintiffs' strenuous arguments in favor of application of a *per se* rule, they have nevertheless developed evidence of the effect of the conspiracy and its unlawful nature; such arguments would only be relevant to a rule of reason inquiry. *See Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000) ("We believe that requiring a plaintiff to demonstrate that an injury stemming from a *per se* violation of the antitrust laws caused an actual, adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a *per se* violation into a case to be judged under the rule of reason."). As the DAPs state in their briefing, "the econometric analysis performed by DAPs economic expert, Dr. Michael Baye confirms that Defendants had the power and ability to reduce the nation's flock size and to raise egg and egg product prices above competitive levels, which they did with great success." DAP Br. at 32. Dr. Baye explained that the demand for eggs is highly inelastic and that decrease in supply would have an inordinate effect on prices.  He concluded that the defendants' conduct "is consistent with the actions of the UEP resulting in coordinated output reductions and higher prices." *Id.*  Similarly, the IPPs experts propose to testify that, based upon the analysis of two related economic models, the defendants' actions

---

[10] In the omnibus reply briefing, the Defendants note that, at the time DPP counsel made the referenced statement concerning the DPPs continued intention to pursue a *per se* theory, the DAPs had not opted out of the DPP class. Even if the Court were to find that the DAPs were bound by Mr. Hausfeld's statements, this argument does not explain why the Court should find that the IPPs would also be so bound.

resulted in a dramatic increase in egg prices in the United States. *See* IPP Br. at 16. The IPPs first expert, Dr. Lamb, analyzed the structure of the U.S. egg market and used regression analysis to isolate the impact of the defendants' actions on the market. He concluded that wholesale shell egg prices were increased by more than $ 5 billion over the period. Similarly, the IPPs other expert, Dr. Stiegert, conducted his own multivariate analysis and determined that egg prices were increased by more than $3.8 billion as a result of defendants' actions. *See* IPP Br. at 17.

As noted above, the significance of a *per se* analysis is that the Court presumes the anticompetitive and unlawful character of the agreement which must otherwise be proven under the rule of reason. *See supra* at 16. While characterizing the conspiracy as a facially anticompetitive agreement to reduce supply, the UEP Certified Program does not include an express agreement to reduce supply. Plaintiffs' arguments have been consistently dependent upon their proffering evidence showing that the effects of the agreements were to reduce supply and thereby increase prices. The plaintiffs' arguments in favor of application of a *per se* rule largely has been that the challenged agreement will ultimately be found unlawful so *per se* treatment is proper. It is precisely the dispute between the parties as to the significance of the evidence of the supply reducing effects of the conspiracy which supported the Court's previous holding that rule of reason is proper when evaluating the UEP. While the argument and evidence offered by the plaintiffs thus far does not tend to prove that a *per se* treatment is proper, it certainly does not foreclose a rule of reason analysis.

\*       \*       \*

Despite the strenuous arguments presented by the plaintiffs in favor of finding *per se* liability, the Court finds that they have not waived or disclaimed proceeding in this matter under a rule of reason. Therefore, the Court will not dismiss the plaintiffs' claims regarding the UEP

Certified Program. Given that, there is no need to reach the defendants' arguments regarding the plaintiffs' damages model.

## IV.    CONCLUSION

For the reasons outlined above, the Court will grant in part and deny in part the Defendants' Motion for Summary Judgment as to Liability against the Individual Producer Plaintiffs (Doc. No. 1246) and will likewise grant in part and deny in part the Defendants' Motion for Summary Judgment as to Liability against the Direct Action Plaintiffs (Doc. No. 1245).

An appropriate Order reflecting the above will be forthcoming.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge

31