## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| ***THIS DOCUMENT APPLIES TO:*** | : | **No. 08-md-2002** |
| **ALL DIRECT ACTION PLAINTIFF CASES** | : | |
| **ALL DIRECT PURCHASER CASES** | : | |

### M E M O R A N D U M

PRATTER, J.                                                   SEPTEMBER 12, 2016

Direct and indirect buyers of eggs accuse major egg producers of conspiring to control and limit the nation's egg supply and thereby increase egg prices through a number of allegedly interrelated, anticompetitive programs. Specifically, the defendant egg producers are accused of violating Section 1 of the Sherman Act by developing and implementing an unlawful egg certification program, exporting eggs at a loss, and colluding to reduce egg production in periods of oversupply through coordinated actions, such as reducing chick hatch, promoting early molting, and expediting hen disposal. The defendants deny that these programs are unlawful.

Certain defendants[1] have filed a summary judgment motion against the Direct Action Plaintiffs (DAPs) and the Direct Purchaser Plaintiffs (DPPs) (collectively "plaintiffs") respectively, challenging the plaintiffs' ability to recover certain damages. Both the DAPs and the DPPs filed briefs opposing the motion and the defendants submitted a reply brief in further support of their motion. The Court heard oral argument on the motion, following which the

---

[1] The moving defendants are United Egg Producers, Inc., United States Egg Marketers, Inc., Cal-Maine Foods, Inc., Rose Acre Farms, Inc., R.W. Sauder, Inc., and Ohio Fresh Eggs. Cal-Maine Foods is no longer a party to, and does not join the motion as to *Winn-Dixie Stores, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc.,, and H.J. Heinz Company, L.P., v. Michael Foods., Inc., et al.*, No. 11-00510.

parties were permitted to submit supplemental briefing.  For the reasons discussed below, the Court will grant the motion in part and deny it in part.

## I.        FACTUAL BACKGROUND

This memorandum is limited to addressing two discrete issues raised, by the defendants, relevant to damages.[2]  Consequently, the majority of the factual allegations, and much of the record, are not relevant for purposes of this motion and the Court therefore need only provide a brief overview of the limited factual matters relevant here.

The first question raised by the defendants relates to the plaintiffs' ability to recover damages for conduct after the plaintiffs (and the public generally) became aware of the allegedly conspiratorial conduct at issue in the litigation.  The plaintiffs became aware of the defendants' actions as a result of public disclosures of government antitrust investigations in September 2008.   The earliest complaint in connection with this multidistrict litigation was filed on September 25, 2008.[3]  *See T.K. Ribbing's Family Restaurant, et al., v. United Egg Producers, Inc., et al.,* No. 08-4653.  It is undisputed that the defendants continued to participate in the UEP Certified Program after the filing of the initial complaint, and, indeed, after the designation of a number of cases as appropriate for multidistrict litigation status.  Both the DAPs and the DPPs seek damages for egg sales after 2008.  The plaintiffs allege both that the conspiracy itself continued after this point and that, regardless of when the conspiracy may or may not have ended, the effects of the conspiracy continued to be felt in the market well after 2008.  The DAPs proffer damages expert Dr. Michael Baye, who has calculated the alleged overcharge that DAPs allegedly paid as a result of the conspiracy.  Dr. Baye calculates a damages period extending

---

[2] Because the motion with regards to the DAPs claims for damages from non-parties is being granted as unopposed, *see* Section III, *infra,* the Court will not recount the full factual record relevant to that argument here.

[3] The DAPs filed their complaints later, between November 16, 2010 and January 25, 2011.

from August 2005 to 2012. Similarly, the DPPs proffer an expert, Dr. Gordon Rausser, who proposes to testify regarding damages caused by the defendants conduct between September 24, 2004 and December 31, 2013. At a minimum, the plaintiffs contend, they were harmed by the conspiracy as late as 2012.

The second issue raised by defendants relates to the impact of a regulation adopted by the state of Arizona, mandating compliance with United Egg Producer (UEP) guidelines for egg producers. On October 1, 2009, Arizona issued a regulation expressing that the "consistency of poultry husbandry practices" is an issue of statewide concern requiring that "[a]ll egg-laying hens . . . shall be raised according to the United Egg Producers Animal Husbandry Guidelines. . ." and that, "[a]ll eggs sold in this state shall be from hens raised according to the UEP guidelines, [and] shall display the United Egg Producers Certified logo on their cases." Ariz. Admin. Code R3-2-907. Under the regulation, the United Egg Producers' Animal Husbandry Guidelines" is defined as the 2008 edition of the UEP Guidelines, which includes the three cage space limitations at issue in the litigation.

These two issues are at the center of the instant motion.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate where, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") The Court must not "weigh the

3

evidence and determine the truth of the matter but . . . determine whether there is a genuine issue

for trial." *Anderson*, 477 U.S. at 249.  The moving party has the burden of establishing the basis

of its motion and identifying the portions of the record which demonstrate the absence of a

genuine issue of material fact.  After the moving party has made this initial showing, then the

non-moving party must then "make a showing sufficient to establish the existence of [every]

element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex*, 477 U.S. at 322; *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir.

2016) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("[W]here a

non-moving party fails sufficiently to establish the existence of an essential element of its case

on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a

material fact and thus the moving party is entitled to judgment as a matter of law." )

## III.    ANALYSIS

The defendants' motion for summary judgment raises three arguments regarding the

DAPs' and DPPs' damages models.[4]  First, they argue that the DAPs should be prevented from

recovering damages for purchases made by DAPs from certain non-defendant egg producers.

Next, the defendants contend that the plaintiffs are not entitled to injunctive relief or damages for

purchases after September 25, 2008, the date the first complaint was filed in this matter, because

the record contains no evidence indicating that the conspiracy continued after it was uncovered.

Finally, the defendants argue that the plaintiffs are not entitled to injunctive relief or recovery of

damages for eggs produced or purchased in Arizona after October 1, 2009.

The DAPs, in response, state that they no longer intend to seek damages from the

identified non-defendant egg producers.  *See* DAP Br. at 1 n.3 ("DAPs will not seek to recover

---

[4] While the defendants' briefing generally only references the DAPs model, the motion itself is directed against both the DPPs and DAPs.

4

damages based on each of their respective purchases from the eight non-defendant co-conspirators identified in section IV. A of the CDMD"); *see also* DPP Br. at 1 n.2 (noting that the motion as to recovery for purchases from non-defendants is not brought against them). Counsel for the DAPs reiterated at oral argument that they do not intend to pursue damages based upon these non-defendant purchases. *See* Feb 22, 2016 Hr. Tr. at 198. Consequently, the Court will grant the defendants' motion as to this issue as unopposed.

The remaining two arguments, however, require a somewhat more in-depth analysis.

## A.    Plaintiffs' Ability to Recover for Damages after September 25, 2008

The defendants argue that the plaintiffs should be prohibited from recovering damages for egg sales that occurred after the first lawsuit in this matter was commenced. Generally, they contend that the plaintiff cannot point to any evidence that the alleged conspiracy continued after 2008.[5] They further argue the corollary that the plaintiffs are judicially estopped from claiming the conspiracy continued after the alleged conspiracy was uncovered in 2008 because the plaintiffs have previously argued that secrecy was essential to the existence of the conspiracy. Ultimately, the defendants assert that, without any evidence of a conspiracy after 2008, the plaintiffs are unable to recover damages for sales thereafter and are likewise not entitled to injunctive relief.

### i.    *Continued Effects of Conspiracy Post-2008*

The defendants' primary argument in favor of partial summary judgment is that the plaintiffs have not come forward with any evidence of specific overt acts in furtherance of a conspiracy after 2008. Based upon this, they argue, the Court should conclude that the conspiracy must have ended prior to 2009. As a preliminary matter, this defense argument is

---

[5] While the DAPs contend that the conspiracy is ongoing, they seek to recover damages through the end of 2012. Their damages expert, Dr. Baye, uses a December 2012 end date for his analysis.

contradicted by the defendants' own briefing, which acknowledges—while attempting to minimize—the defendants' continued participation in the UEP Certified Program, which constitutes the centerpiece of the plaintiffs' claims.

No doubt aware of the challenge this poses for their position, the defendants attempt to thread a very narrow needle by arguing that, assuming a conspiracy to reduce supply is shown to have come into being between 2000 and 2008, the defendants' continued participation in the UEP program *alone* after 2008 is insufficient to establish the continued existence of the conspiracy. Ultimately, the Court finds this argument unpersuasive.

The principle challenge for the defendants is that the plaintiffs have not alleged a conspiracy which is necessarily bounded in some specific and limited time span; rather, the plaintiffs have alleged a continuing conspiracy. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 (1968). "In the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010) (*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). The Third Circuit Court of Appeals in *West Penn* addressed an argument similar to that raised by the defendants here. The complaint there was filed on April 21, 2009 and the Court noted that the relevant four-year limitations period extended back only to April 21, 2005. While the complaint alleged that the defendants performed injurious acts in furtherance of the conspiracy within this limitations period, the conspiracy itself was alleged to have commenced well before. The defendants in *West Penn* argued the injurious actions during the limitations period were mere "reaffirmations" of prior acts or prior decisions occurring before

6

the expiration of the limitations period and that such evidence merely showed a manifestation of prior decisions by the defendants and not the existence of an ongoing conspiracy.

Citing to *Hanover Shoe* and *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993), however, the Court of Appeals held that a plaintiff can recover damages incurred during the statute of limitations period for a continuing conspiracy that began well before the limitations period. "Taken together, *Hanover Shoe* and *Lower Lake Erie* leave no room for Highmark's proposed rule. In each case, the plaintiff's suit was timely even though the acts that occurred within the limitations period were reaffirmations of decisions originally made outside the limitations period." *West Penn*, 627 F.3d at 107. The appellate court rejected the argument that manifestations of a policy established prior to the statute of limitations period did not constitute evidence of a continuing conspiracy for which a plaintiff could recover.

Turning to the facts of this case, it is undisputed that the defendants continued to operate as members of the UEP Certified Program after the lawsuits were filed. Moreover, the plaintiffs have put forward evidence that allows them to argue that the effects of this conspiracy continued through at least 2012. *See* CSF ¶ 293. The plaintiffs identified evidence that this program involved restrictions on cage space which had the effect of reducing supply, and involved monitoring and compliance mechanisms which "limit[ed] the ability of individual egg producers to compete in their unilateral self-interest." *See* CSF ¶ 292. The record supports the conclusion that the defendants' continued participation in the UEP Certified Program had the effect of artificially depressing egg prices. The DAPs point out that as recently as 2014, the UEP issued a revised set of guidelines which continue to mandate 100% compliance, provide for audits, and ban backfilling. *See* CSF ¶ 299. All of these are practices challenged in the plaintiffs' complaints. The DAPs also point to tables, compiled by their expert Dr. Michael Baye, showing that, starting

in 2001 and lasting till 2012, the defendants' conspiracy had the effect of depressing actual flock size. The DPP's expert, Dr. Gordon Rausser, likewise provides an actual/but-for comparison of both hens as well as egg production which demonstrates depressed egg production through 2013. Both experts' proposed testimonial evidence supports the argument that supply reducing effects continued through 2008 and until at least 2012.

Aside from a naked assertion that adherence to the UEP Certified Program alone is insufficient to establish the existence of an ongoing conspiracy, the defendants have made no attempt to explain why such continued participation by co-conspirators would not constitute a reaffirmation of the conspiracy, sufficient to defeat summary judgment. *See West Penn,* 627 F.3d at 106-07; *Lower Lake Erie,* 998 F.2d at 1172 ("[E]ach time a plaintiff is injured by an act of the defendants, a cause of action accrues to him to recover the damages caused by that act.") Rather than attempt to confront this case law, the defendants' assertion that their alleged adherence to the UEP Certified Program alone after 2008 is insufficient to support the inference of the continued existence of an antitrust conspiracy is based, in part, upon a mistaken attempt to invoke this Court's prior holdings. Thus far this Court has *not* held that continued adherence to the UEP Certified Program alone is insufficient to support liability under the Sherman Act *as a matter of law. See* Def. Br. at 9 (citing *In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-2002, 2014 WL 2586934, at *4 (E.D. Pa. June 10, 2014) (*Eggs II*); *In re Processed Egg Prod. Antitrust Litig.*, 902 F. Supp. 2d 704, 713 (E.D. Pa. 2012) (*Eggs I*)). In both of these earlier decisions, the Court considered the allegations regarding the supply reducing effects of the conspiracy as alleged. In *Eggs I*, the Court's analysis was focused on the impact of an alleged side agreement to expand capacity and the holding was limited to an acknowledgement that establishing the existence of such a side agreement to refrain from building barns would

8

foreclose the defendants' ability to argue that participation in the UEP Certified Program offered pro-competitive effects. Similarly, in *Eggs II*, the Court considered whether the DAPs alleged that the UEP Certified Program alone could constitute a *per se* violation of the antitrust laws. The Court did not in these prior opinions (nor does it now) take the position that the UEP Certified Program could not violate the Sherman Act under a rule of reason analysis. Moreover, reasonably invoking these decisions, the defendants have provided no basis to make the inferential leap between a determination that the UEP Certified Program should not be evaluated under the *per se* rule, to a conclusion that continued adherence—assuming the existence of a conspiracy has been established—to the program cannot constitute a "reaffirmation" of the defendants' involvement in the conspiracy.

The defendants also argue that the plaintiffs' previous position regarding the significance of secrecy to the viability of the conspiracy estops them from now arguing that the conspiracy could have continued after it was uncovered in 2008. "Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, is a 'judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding.'" *Hardee-Guerra v. Shire Pharm.*, 737 F. Supp. 2d 318, 328 (E.D. Pa. 2010) (citing *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996)). When deciding whether to apply judicial estoppel, the Court shall undertake a three part analysis.

> First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position 'in bad faith—i.e., with intent to play fast and loose with the court.' Finally, a district court may not employ judicial estoppel unless it is 'tailored to address the harm identified' and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

*Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. General Motors*, 337 F.3d 314, 319 (3d Cir.2003).  Notably, estoppel only applies to unequivocal, binding admissions of fact and *not* to statements of legal theories.  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 377 (3d Cir. 2007), *as amended* (Oct. 12, 2007); *see* 30B Fed. Prac. & Proc. Evid. § 7026 (2014 ed.) ("[A judicial admission] does not extend to counsel's statement of his conception of the legal theory of a case, i.e., legal opinion or conclusion.").  Judicial estoppel is an "extraordinary remedy" which is invoked in order to stop a "miscarriage of justice."  *Hardee-Guerra*, 737 F. Supp. 2d at 328. It should not be used as a "technical defense for litigants seeking to derail potentially meritorious claims." *Id.* (citing *Ryan Operations*, 81 F.3d at 356).  Ultimately, the decision as to whether to apply judicial estoppel against a litigant rests within the sound discretion of the district court. *See In re Kane*, 628 F.3d 631, 637 (3d Cir. 2010).

The defendants argue that the plaintiffs' assertions during oral argument and in their papers, regarding the necessity of secrecy for the operation of the alleged conspiracy, foreclose their arguments that the conspiracy existed after the initiation of this lawsuit.  However, these statements appear to be an articulation of the plaintiffs' theory of the case.  Fairly read, the statements are not unequivocal assertions of fact, but rather hypothetical conjectures as to how the alleged conspiracy would have operated in the event it was uncovered.  The defendants themselves even acknowledge that they are not admissions of fact but rather "the DAPs own theory and arguments to this Court."  Def. Br. at 10.

Additionally, plaintiffs' counsel made the statements in question arguing in favor of application of the doctrine of fraudulent concealment.  The Court has since rejected the plaintiffs' assertions regarding the secrecy inherent in the alleged conspiracies, noting that the DPP's "complaint alleges that the Defendants informed the DPPs, albeit through alleged

misrepresentations, that the Defendants were cooperating to increase the cage space allotted to hens through the UEP Certified Program." *In re Processed Egg Products Antitrust Litig.* No. 08-2002, at 9 (E.D. Pa. Aug. 23, 2013) (Doc. No. 846). Given that the Court has reasoned the plaintiffs could not argue that secrecy prevented them from uncovering the conspiracy sooner, it seems inconsistent to allow the defendants to argue that transparency must have destroyed the conspiracy.

Finally, even if the Court were to find that the statements in question were unequivocal admissions of fact, the defendants have failed to allege bad faith on the part of the plaintiffs. The defendants' moving papers provide no argument or analysis as to why the Court should conclude that the plaintiffs changed their position regarding the necessity of secrecy in bad faith. If anything, the plaintiffs' position is consistent with the Court's finding that the plaintiffs have alleged facts suggesting that the alleged conspiracies were not concealed and that the plaintiffs were aware of facts which reasonably should have put them on notice of the supply reducing effects of the conspiracy.

For all these reasons, the Court finds no reason necessitating the invocation of judicial estoppel against the plaintiffs' arguments regarding post 2008 damages.

Finally, based upon the defendants' assertion that their alleged continued adherence to the UEP Certified Program after 2008 is insufficient to establish the existence of an ongoing conspiracy, they also argue that the Court must dismiss the plaintiffs' Clayton Act claims seeking injunctive relief. This argument is based entirely on the Court's finding the DAPs are unable to demonstrate any ongoing illegal conspiracy after 2008. The Court has rejected this argument, and therefore, Court finds that the defendants' Clayton Act argument is moot.

**B.**     ***State Action Doctrine***

The defendants next argue that the plaintiffs may not recover damages for eggs that were either produced or sold in Arizona after October 1, 2009.

In 2009, the Arizona Department of Agriculture promulgated a regulation requiring that "All egg-laying hens . . . shall be raised according to the United Egg Producers' Animal Husbandry Guidelines. . . ," and that "[a]ll eggs sold in this state shall be from hens raised according to UEP guidelines, [and] shall display the United Egg Producers Certified logo on their cases." SMF ¶ 93 (citing Ariz. Admin. Code § R3-2-907 (effective Oct. 1, 2009). The regulations define the "United Egg Producers' Animal Husbandry Guidelines" as the 2008 edition. § R3-2-901. This edition includes the three cage-space parameters at issue in this litigation: the minimum cage space and phase in, the backfilling ban and the 100% rule. *See* SMF ¶ 93.

The defendants point out that the plaintiffs' damages model includes sales for eggs produced or sold in Arizona after this regulation was issued and argue that they cannot be liable under the Sherman Act for complying with the Arizona regulation. The defendants invoke what is referred to as *Parker* Immunity, after the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341 (1943). Stated simply, this immunity would mean that the Sherman Act does not apply to anticompetitive restraints imposed by the States "as an act of government." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 370 (1991) (citing *Parker*, 317 U.S. at 352). The Supreme Court has recognized that "[i]f every duly enacted state law or policy were required to conform to the mandates of the Sherman Act, thus promoting competition at the expense of other values a State may deem fundamental, federal antitrust law would impose an impermissible burden on the States' power to regulate." *N. Carolina State Bd. of Dental Examiners v. F.T.C.*,

12

135 S. Ct. 1101, 1109 (2015) (citing *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133, (1978)).  Consequently, in *Parker v. Brown*, 317 U.S. 341, 350 (1943), the Supreme Court held that the antitrust laws confer immunity to anticompetitive conduct by the States, when acting in their sovereign capacity. "State legislation and 'decision[s] of a state supreme court, acting legislatively rather than judicially,' will satisfy this standard, and '*ipso facto* are exempt from the operation of the antitrust laws' because they are undoubted exercise of state sovereign authority." *Bd. of Dental Examiners*, 135 S. Ct. at 1110 (citing *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984)).  A private defendant will also enjoy immunity if relief is sought solely for injury as to which the state would enjoy immunity under *Parker. See Armstrong Surgical Ctr., Inc. v. Armstrong Cty. Mem'l Hosp.*, 185 F.3d 154, 159 (3d Cir. 1999) (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988)).  However, this immunity is not all-encompassing with regards to any and all state government related conduct.  Where a state delegates control over a market to a non-sovereign actor, such as a state regulatory agency, *Parker* immunity may not attach. *See Bd. of Dental Examiners*, 135 S. Ct. at 1111; *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1010 (2013) (citing *Hoover*, 466 U.S. at 568) (Given the fundamental national values of free enterprise and economic competition embodied in the federal antitrust laws, "[c]loser analysis is required when the activity at issue is not directly that of" the State itself, but rather "is carried out by others pursuant to state authorization.").

In instances where a non-sovereign is delegated authority to regulate a market, the court will examine whether the non-sovereign's actions are the product of procedures that suffice to show the conduct in question should be deemed the State's own. *Bd. of Dental Examiners*, 135 S. Ct. at 1111 (citing *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106 (1980); *see also Rivera-Nazario v. Corporacion del Fondo del Seguro del Estado*, No.

14-1533, 2015 WL 9484490, at \*3 (D.P.R. Dec. 29, 2015). The Supreme Court has articulated a two-part test for this analysis: "A state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear policy to allow the anticompetitive conduct, and second, the State provides active supervision of [the] anticompetitive conduct." *Bd. of Dental Examiners*, 135 S. Ct. at 1112 (citing *Midcal*, 445 U.S. at 105); *see also Mariana v. Fisher*, 338 F.3d 189, 202 (3d Cir. 2003) ("In [*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 256 (3d Cir. 2001)], we recognized that it is unnecessary to undertake a *Midcal* analysis if the alleged antitrust injury was the direct result of a clear sovereign state act.").

The plaintiffs argue that Arizona's regulatory scheme fails to satisfy either part of the *Midcal* test. They first contend that this regulation is not a "clear articulation" of state policy to allow anticompetitive conduct insomuch as "*Midcal's* clear articulation requirement is satisfied 'where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *Bd. of Dental Examiners*, 135 S. Ct. at 1112. Here, the Court must determine that the anticompetitive effects were foreseen and implicitly endorsed by Arizona as consistent with its policy goals. *Id.* (citing *Phoebe Putney*, 133 S. Ct. at 1013). The DAPs assert that the regulation in question does not "clearly and affirmatively articulate the displacement of competition or demonstrate that the State had foreseen or implicitly endorsed anticompetitive effects." DAP Br. at 16. However, even putting aside the supply reducing effects that the plaintiffs have asserted are merely inherent in the UEP Certified Program, the Arizona regulation clearly has an anticompetitive effect, based upon its *express* function to eliminate non-UEP Certified eggs from the Arizona market. Indeed, this regulation goes much farther than to simply express a "neutral statement expressing concern that hens be raised in conformity with husbandry guidelines" as the DAPs claim. DAP Br. at 16.

14

Rather, the regulation is clear in its purpose of removing noncomplying eggs from the Arizona market. *See Midcal,* 445 U.S. at 105. As a result, the Court finds the clear articulation prong satisfied.

The plaintiffs' argument as to the second *Midcal* prong is similarly unavailing. They contend that there is no provision in the Arizona regulation[6] vesting state officials with authority to review particular anticompetitive acts undertaken by private parties. The active supervision rule "stems from the recognition that where a private party is engaging in anticompetitive activity, there is a real danger that he is acting to further his own interest, rather than the governing interest of the state." *Bd. of Dental Examiners*, 135 S. Ct. at 1112. There are, however, instances in which an actor can be excused from *Midcal*'s active supervision requirement. *See id.*; *Town of Hallie v. Eau Claire*, 471 U.S. 34, 45 (1985).

In *Town of Hallie*, the Supreme Court held that actions by a non-sovereign entity that is not controlled by market participants, such as a municipality, does not need to meet the *Midcal* "active supervision" requirement in order to be covered by *Parker* immunity. This is due to the recognition that actions undertaken by such entities pose little or no danger of private price fixing.

> The only real danger is that [such an entity] will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Town of Hallie*, 471 U.S. at 47.

---

[6] The plaintiffs repeatedly refer to the Arizona "statute," but the Court assumes these are references to the Arizona regulation mandating that eggs sold or produced in the state comply with the 2008 UEP Guidelines. There has been no other argument or citation to a relevant Arizona "statute," so the Court will interpret this to refer to the regulations cited by the defendants in their briefing.

The Court observed, without precisely so holding, that "[i]n cases in which the actor is a state agency, it is likely that active state supervision would also not be required." *Id.* at 47 n 10. Subsequently, in *Board of Dental Examiners*, the Court clarified *Town of Hallie,* and specifically elaborated on the Court's assessment of the role of state agencies. *See* 135 S. Ct. at 1112-14. The Supreme Court explained that the formal designation of a state agency, as such, is not dispositive for determining whether its actions could be immunized under *Parker*. *Id.* at 1114. Rather, the analysis must turn on "the risk that active market participants will pursue private interests in restraining trade." *Id.* Specifically, the Court found that the North Carolina Dental Board, while a state agency, was controlled by individuals and entities involved in the dental industry. "State agencies controlled by active market participants, who possess singularly strong private interests, pose the very risk of self-dealing *Midcal*'s supervision requirement was created to address." *Id.*; *accord Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791 (1975) ("The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members."). Consequently, the Court's holding finding the actions of the board were not protected under *Parker* turned on its assessment of the lack of state supervision.

Turning to the facts of this case, the regulations in question were promulgated by the Arizona Department of Agriculture. The Court finds that the Department is a public, non-sovereign entity, more analogous to the municipality discussed in *Town of Hallie,* as opposed to either the North Carolina Dental Board in *Bd. of Dental Examiners* or the Virginia State Bar in *Goldfarb.* There is no argument, suggestion, or suspicion that the Arizona Department of Agriculture is controlled by egg producers or would be motivated to pursue anticompetitive conduct in its own private interest. Like the municipality in *Hallie,* the Department's authority

16

covers a wide variety of different markets, thus substantially reducing the risk that it would pursue private interests in the regulation of any one market. *Hallie*, 471 U.S. at 45.

The problem with the plaintiffs' argument appears to be a somewhat confused interpretation of which entities are the relevant actors for purposes of the analysis. The plaintiffs take as a starting point for their argument the assertion that Arizona has somehow delegated regulatory authority to the UEP. There is no evidence of any such delegation. The only delegation of rulemaking authority, of which the Court has been made aware, is the Arizona Department of Agriculture's rulemaking authority. *See* Ariz. Rev. Stat. Ann. § 3-107 ("The director shall: Formulate the program and policies of the department and adopt administrative rules to effect its program and policies.").

While the Department of Agriculture regulations adopt the 2008 edition of the United Egg Producers Animal Husbandry Guidelines as the state standard, the regulation also expressly states that it does not automatically adopt "any later amendments or editions." *See* R3-2-901.[7] While the Department has relied upon the work done by UEP in developing the 2008 guidelines,

---

[7] The DPPs do present one argument on this point which merits some additional discussion. The DPPs contend that there are two ways to read the relevant regulation. The first is that, by mandating that producers comply with the UEP guidelines, the state of Arizona has delegated authority to the UEP to extra-legislatively amend the regulations by adopting new guidelines—something which the UEP has done twice since the Arizona regulations were passed. The regulations, however, expressly foreclose this reading. The plaintiffs' general contention that the UEP guidelines are a "living document subject to changes as new scientific information becomes available" may very well be accurate, but this does not imply that the state of Arizona has abdicated rule making authority to the UEP. *See* DPP Exhibit 8 at 2. While the guidelines have been amended twice since 2008, the regulation in question indicates that these amendments are *not* covered by the definition of UEP Certified Program for purposes of Arizona's rule.

Alternatively, the DPPs argue that if the Court were to conclude—as it does—that the regulations simply adopted the 2008 guidelines as the State's own, then a defendant's compliance with the UEP guidelines in force now would have nothing to do with compliance with the Arizona regulations, and therefore these regulations could not be invoked by the defendants as a shield against liability. While the DPPs correctly point out the wording of the regulation *could* lead to a somewhat confusing situation wherein the Arizona requirements of "UEP Certification" under the regulation differ from the requirements set out in the UEP's most recent guidelines, the Court finds that for present case purposes, this potential incongruity does not alter the ultimate conclusion. The plaintiffs have not disputed the fact that both the 2008 and 2014 guidelines include the three principle supply reducing practices challenged in this case: namely, cage space limits, the 100% rule, and restrictions on backfilling. Consequently, regardless of whether there are any other inconsistences between the Arizona regulations and the currently effective UEP guidelines, Arizona has nevertheless mandated that, in order to sell or produce eggs in the state, the defendants would have to engage in these specified practices.

the State has not delegated any power to the UEP to modify or change the rules applicable to producers in the state. Consequently, the Court finds much of the plaintiffs' arguments regarding the applicability of *Midcal* to be irrelevant.

*     *     *

The Court will grant the defendants' motion for summary judgment in part. The Court will allow the plaintiffs to supplement their expert reports so as to remove any damages based upon eggs either produced or sold in Arizona after October 1, 2009.

## IV.     CONCLUSION

For the reasons outlined above, the Court will grant in part and deny in part the Defendants' Motion for Summary Judgment as to Damages against the Direct Action Plaintiffs and Direct Purchaser Plaintiffs (Doc. No. 1244). The Court will grant, as unopposed, the arguments contained in Section IV.A. of the memorandum of law attached to the motion. The Court will deny as the arguments contained in Section IV.B of the memorandum of law attached to the motion. Finally, the Court will grant the motion as to the arguments contained in Section IV.C of the memorandum of law attached to the motion.

An appropriate Order reflecting the above will be forthcoming.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge

18