## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| *THIS DOCUMENT APPLIES TO:* | : | **No. 08-md-2002** |
| **ALL ACTIONS** | : | |

### M E M O R A N D U M

PRATTER, J.                                                        SEPTEMBER 13, 2016

Direct and indirect purchasers of eggs accuse major egg producers of conspiring to control and limit the nation's egg supply, thereby increasing egg prices through a number of allegedly interrelated, anticompetitive programs. Specifically, the defendant egg producers are accused of violating Section 1 of the Sherman Act by developing and implementing an unlawful egg certification program, exporting eggs at a loss, and colluding to reduce egg production in periods of oversupply through coordinated action, such as reducing chick hatch, promoting early molting, and expediting hen disposal. The defendants deny that these programs violate the Sherman Act.

The Direct Purchaser Plaintiffs (DPPs), Indirect Purchaser Plaintiffs (IPPs) and Direct Action Plaintiffs[1] (DAPs) (collectively, "plaintiffs") have moved for summary judgment as to the affirmative defenses asserted by Defendants United Egg Producers, Inc., ("UEP"), United States Egg Marketers, Inc. ("USEM"), Cal-Maine Foods, Inc., Ohio Fresh Eggs, LLC, Daybreak Foods, Inc., Morak, LLC, Michael Foods, Inc., Rose Acre Farms, Inc., and R.W. Sauder, Inc., based

---

[1] The DAPs include Kroger Co., Safeway Inc., Albertsons LLC, Great Atlantic & Pacific Tea Company, Inc., H.E. Butt Grocery Company, Conopco, Inc., Publix Super Markets, Inc., Supervalu, Inc., Giant Eagle, Inc., Kraft Foods Global, Inc., Kellogg Company General Mills, Inc., Nestle USA, Inc., Winn-Dixie, Inc., Roundy's Supermarkets, Inc., and H.J. Heinz Company.

upon statutory agricultural cooperative exemptions from the federal antitrust laws. This motion specifically alleges that neither UEP nor USEM are so-called Capper-Volstead agricultural collectives and therefore are not shielded from antitrust liability. The defendants have filed opposition memoranda addressing the arguments relevant to UEP and USEM, respectively. The plaintiffs submitted reply papers. The Court heard oral argument on the motion and permitted additional briefing.

For the reasons discussed below, the Court will grant the plaintiffs' motion as to UEP but deny the motion as to USEM.

## I.      FACTUAL BACKGROUND

As noted in the Court's prior opinions on the various motions for summary judgment, the issues raised in connection with this motion are limited in scope, and, therefore, the Court need only discuss the factual background relevant to the pertinent arguments presented. Here, that consists of the nature and membership of the two agricultural cooperatives named as defendants in this case.

United Egg Producers ("UEP") came into existence in 1998. The defendants allege that UEP was created as a Capper-Volstead Agricultural Cooperative comprised of five regional marketing cooperatives. The UEP's primary activities include providing a variety of services its members, related to lobbying and marketing, animal welfare, food safety, and environmental issues. The UEP, its president, and its staff reflect and serve the interests of its members. During the alleged conspiracy period, UEP membership included R.W. Sauder, Inc., Hillandale Farms, Inc., and Michael Foods, Inc.

For reasons that will be explained in greater detail below, the parties are at pains to describe with some particularity the nature of the operations of certain of the UEP members.

2

Briefly, the reason for this focus is that Capper-Volstead's shield only immunizes actual farmers. While Sauder interacted closely with its contract farmers, during the conspiracy period the company itself did not own any farms which produced eggs. The plaintiffs also contend that the record establishes Hillandale did not own any farms which produced eggs, but, rather, was engaged principally in marketing and selling eggs as a distributor. Similarly, Michael Foods was engaged primarily in egg processing.    The company was vertically integrated, securing approximately 30% of its egg requirements from company-owned chickens. The remaining eggs it purchased from third parties.

United States Egg Marketers ("USEM") is a cooperative involved in the export of eggs. In 2000, UEP entered into an agreement to provide management services and staff to USEM. The defendants likewise claim that USEM is a Capper-Volstead cooperative.    The plaintiffs identify five separate entities which were members of USEM, which the plaintiffs contend were principally engaged something other than egg farming.

## II.       STANDARD OF REVIEW

The applicable standard of review here should be familiar. Summary judgment is appropriate where, viewing the record in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). The Court must not "weigh the evidence and determine the truth of the matter but . . . determine whether there is a genuine issue for trial." *Id.*

at 249. The moving party has the burden of establishing the basis of its motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. After the moving party has made this initial showing, then the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (citing *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." ).

## III.     ANALYSIS

The defendants have asserted affirmative defenses based upon alleged agriculture cooperative exemptions to the antitrust laws found in Sections 1 and 2 of the Capper-Volstead Act, 42 Stat. 388, 7 U.S.C. §§ 291, 292 (West), Section 6 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 17, and Section 455 of the Cooperative Marketing Act, 44 Stat. 803, 7 U.S.C. § 455. The pending motion attacks these affirmative defenses from several different angles.

### A.  Capper-Volstead Act and Clayton Act Section 6[2]

The defendants assert that they cannot be liable under the antitrust laws for the actions of UEP or USEM because each is a cooperative protected by Section 1 of the Capper-Volstead Act and Section 6 of the Clayton Act. The motion raises a number of separate challenges to the

---

[2] The defendants argue, as a preliminary matter, that consideration of the applicability of the Capper-Volstead affirmative defenses is somehow premature. They contend that the question of who qualifies as a producer for purposes of the statutory agricultural cooperative exemptions is complex and unsettled and therefore not appropriate for summary judgment. Any determination as to the scope of these exemptions, they argue, depends upon a prerequisite finding that the defendants entered into an unlawful agreement to restrain trade. The Court disagrees that such a finding would be required before addressing the issue of the applicability of Capper-Volstead, an issue that has been well known since the inception of this litigation.

applicability of Capper-Volstead, most of which need not be addressed here for reasons explained below.

The statute is clear that the relevant exemption only covers cooperatives comprised *exclusively* of egg farmers. Based upon the record here, UEP counted as members at least one, and very likely more than one, non-producer. Consequently, the Court finds, as a matter of law, UEP is not protected under Capper-Volstead or Section 6 of the Clayton Act.

To explain: the Capper-Volstead Act provides an exemption from some of the antitrust prohibitions of the Sherman Act and the Clayton Act. *In re Mushroom Direct Purchaser Antitrust Litig.*, 655 F.3d 158, 165 (3d Cir. 2011)*; see* 7 U.S.C. § 291. In relevant part, this Act provides

> Persons engaged in the production of agricultural products *as farmers, planters, ranchmen, dairymen, nut or fruit growers* may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes: Provided, however, That such *associations are operated for the mutual benefit of the members thereof,* as such producers . . . .

7 U.S.C.A. § 291 (West) (emphasis added). The Capper–Volstead Act exempts certain agricultural cooperatives, made up of farmers, planters, ranchmen, dairymen, or nut or fruit growers, from some of the provisions of the antitrust laws, allowing such farmers to act through agricultural cooperatives with "the same unified competitive advantage—and responsibility— available to businessmen acting through corporations as entities." *Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 466 (1960) (discussing both Capper-Volstead and Section 6 of the Clayton Act); *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 823, (1978); *Mushroom Antitrust Litig.*, 655 F.3d at 166.

Section 6 of the Clayton Act preceded Capper-Volstead, but operates in much the same manner. The statute was adopted in 1914 in order to clarify that the antitrust laws did not extend to certain agricultural organizations or labor unions. It states in relevant part:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

*Maryland & Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 466 n.11 (1960) (citing 38 Stat. 731 (1914), 15 U.S.C. § 17). Capper-Volstead, adopted in 1922, had the effect of extending Section 6 of the Clayton Act to capital stock agricultural operations, which had previously not been covered. *Id.* at 466.

The plaintiffs contend that Capper-Volstead and Section 6 of the Clayton Act do not apply to UEP or USEM because these cooperatives included member entities that were not agriculture producers, as defined under the statute. As is generally—and understandably—the case with protectionist exemptions, the statute is generally limited in scope. Not all those involved in bringing agricultural products to market may join cooperatives exempt from the antitrust laws under Capper-Volstead. *Nat'l Broiler*, 436 U.S. at 824; *Case–Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 395-96 (1967); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1152 (D. Idaho 2011). The Act was intended to provide protection only to a subset of agricultural producers; it is "very definitely, special-interest legislation." *Nat'l Broiler*, 436 U.S. at 826. As explained by the Supreme Court, in adopting the Act, Congress intended to "make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a

6

business corporation without thereby violating the antitrust laws." *Maryland & Virginia Milk Producers*, 362 U.S. at 466. The Act was not meant to aid the full spectrum of the agricultural sector even if some industry participants bore some of the risk of production. *Nat'l Broiler*, 436 U.S. at 826. Farmers were perceived to be in a particularly harsh economic position and "caught in the hands of processors and distributors who, because of their position in the market and their relative economic strength, were able to take from the farmer a good share of whatever profits might be available from agriculture production." *Id.* at 825. The statute was intended to aid "only those whose economic position rendered them comparatively helpless." *Id.* at 826. "Congress did not intend to extend the benefits of the Act to the processors and backers to whom the farmers sold their goods, even when the relationship was such that the processor and packer bore a part of the risk." *Id.* at 827.

In order for an agricultural cooperative to enjoy the limited exception to the antitrust law afforded by Capper-Volstead, it is not enough that a typical member of the cooperative qualifies under the statute, or that most members qualify—*all* members of the cooperative must be shown to be qualified in order for the statute to apply. *Nat'l Broiler,*436 U.S at 822-23; *see In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 693 (E.D. Pa. 2007). The Supreme Court has explained that organizations with non-producer interests are not permitted to avail themselves of Capper-Volstead's exemption. *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 396 (1967); *Nat'l Broiler,* 436 U.S at 828-29. For example, the Supreme Court in *National Broiler,* explained that members of a cooperative association of producers and marketers of broiler chickens, who neither owned their own breeder flocks nor maintained facilities at which their flocks were raised, were not producers for purposes of Capper-Volstead. As such, the cooperative association to which these non-producers belonged was not entitled to

the limited protections of the Act. *Nat'l Broiler,* 436 U.S. at 828-29. Subsequent decisions from the lower courts have consistently held that a single non-producer member in a cooperative renders the cooperative ineligible under Capper-Volstead. *See Alexander v. Nat'l Farmers Org.,* 687 F.2d 1173, 1186 (8th Cir. 1982) ("The 'not even one' language in *National Broiler* cannot be divorced from that Court's emphasis on the economic role of such middlemen and on the intent of Congress not to permit such middlemen to participate in price-fixing.") (citing *Nat'l Broiler*, 436 U.S. at 827-829); *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 283 (E.D. Pa. 2009) ("The Supreme Court held that even one non-farmer member in a cooperative disqualifies a cooperative from claiming the Capper–Volstead exemption.").

According to the plaintiffs, UEP allowed at least two non-producers to join the cooperative: defendants R.W. Sauder and Hillandale Farms, Inc. While the defendants have raised a question of material fact as to whether Hillandale Farms constituted a producer for purposes of the statute, as presented to the Court, the record fails to include any evidence that indicates Sauder owned any egg farms or produced any eggs itself, during the conspiracy period.

The record indicates that R.W. Sauder joined the UEP in 2004 and participated in the Certified Program from 2002 through 2008. The company's president, Paul Sauder, served on various UEP committees. While the company did produce eggs *prior* to the conspiracy period, during the relevant time at issue in this litigation, the company acted solely as a processor and distributor. Sauder does not own the farms where its eggs are produced; the last time a Sauder-affiliated entity owned a farm was in 1996 or 1997. During the conspiracy period, the company focused on sales and marketing and contracted with third party farmers to produce eggs on Sauder's behalf.

8

The defendants do not argue that Sauder owned the farms where its eggs were produced, but rather argue that Sauder actively "managed" these farms and that such management is sufficient to claim Capper-Volstead statutory status as a farmer. The defendants claim that the plaintiffs misapply *National Broiler* and that Sauder, unlike the broiler chicken producers at issue there, was deeply involved in the husbandry of the flocks. In their responsive briefing, the defendants contend that Sauder employees "work[] with the individual farms to select the breed of layers to use in the first place", and "work[] with the [farms] about when [the farms] put the flocks in, when [the farms] took the flock out, when [the farms] molted" and "work[] with its contract growers to comply with animal welfare and food safety guidelines." UEP Br. at 32.

The Court cannot agree with the defendants' interpretation of *National Broiler*. The reasoning of that decision did not turn on the stage at which the chicken producers entered the production process, rather, *National Broiler* turned on the character of the defendant's involvement in the process. The Court held that members of a cooperative which neither owned breeder flocks nor hatcheries and maintained no grow-out facilities where flocks to which they had titled were raised, could not be considered "farmers" for purposes of the Act. The Court explained:

> The economic role of such a member in the production of broiler chickens is indistinguishable from that of the processor that enters into a preplanting contract with its supplier, or from that of a packer that assists its supplier in the financing of his crops. Their participation involves only the kind of investment that Congress clearly did not intend to protect. We hold that such members are not "farmers," as that term is used in the Act, and that a cooperative organization that includes them-or even one of them-as members is not entitled to the limited protection of the Capper-Volstead Act.

*Nat'l Broiler*, 436 U.S. at 827–29.

Justice Brennan, who joined the majority in *National Broiler* would have gone even further, however. In his concurrence in *National Broiler*, he argued in favor of exempting large

9

integrated agricultural producers from protection under the statute, even if they did, in fact, own some farms.  Justice Brennen explained that, when adopted, the industry was not vertically integrated and "the economic model was a relatively large number of small, individual, economic farming units which actually tilled the soil and husbanded animals, on the one hand, and, on the other hand, the relatively small number of large economic units which process the agricultural products and resold them for wholesale and retail distribution."  *Id.* at 830-32 (Brennen, J. Concurring).  The Act was designed to protect these individual farmers, who, it was thought, were beholden to the large middlemen on the one hand, and the vagaries of nature on the other.  To allow the large middlemen themselves to enjoy antitrust protection under the statute, simply by purchasing a farm, would contradict the Act's stated purpose.[3]  *Id.*

We need not decide whether or not this is an accurate statement of the law because the record is clear that, despite their involvement in the husbanding of the chickens, and even the ownership of some chickens, Sauder did not own any of the farms where its eggs were produced. Under the circumstances, the Court finds this arrangement is indistinguishable from a preplanting contract, which the Court in *National Broiler* held was not the kind of investment Congress intended to protect under Capper-Volstead.

The plaintiffs also argue that Hillandale Farms also did not own or operate any egg farms and that this company's participation in the UEP likewise forecloses the cooperative's invocation of Capper-Volstead.  In support, they cite to the deposition testimony of Gary and Orland Bethal, the owners of Hillandale.  The Bethals testified that the company did not produce any eggs, but rather operated as an egg distributor.  The defendants dispute the accuracy of this testimony. They contend the record establishes that, throughout the conspiracy period, Hillandale Farms

---

[3] In short, the exemption was intended for those with the greatest economic risk, the farmer who had the most skin in the game.

reported to UEP that its hen-house capacity was 16,000 layers. This reported capacity was used by UEP to calculate membership dues.

The Court cannot find that the record unequivocally shows that Hillandale did not own egg producing farms during the conspiracy period, and therefore was excluded from Capper-Volstead under *National Broiler*. For purposes of this motion, however, this does not matter as the precedent is clear that participation by even a single non-producer, here, Sauder, is sufficient to remove Capper-Volstead protection for the entire cooperative. This record shows that Sauder was not a statutory producer and therefore its participation in the UEP prevents the cooperative from claiming Capper-Volstead protection.[4]

\*     \*     \*

While the plaintiffs focus the majority of their attention in the briefing on the UEP, they do also argue that the USEM is not protected under Capper-Volstead or Section 6 of the Clayton Act. The plaintiffs contend that USEM, like UEP, included certain non-producers as members. In addition, the plaintiffs argue that USEM conspired with non-members, such as Sauder, in a manner which prohibits USEM from finding protection under Capper-Volstead.

---

[4] The plaintiffs also argue that Michael Foods and Morak were both large, multi-faceted corporations which, despite producing some eggs, functioned primarily as processors and distributors of eggs and other products from third parties. They contend that Capper-Volstead does not protect such vertically integrated agribusiness. The plaintiffs' argument is based upon Justice Brennan's concurrence in *National Broiler,* as well as *United States v. Hinote*, 823 F. Supp. 1350 (S.D. Miss 1993) and *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141 (D. Idaho 2011). Applying the reasoning of Justice Brennan's concurrence, the Mississippi District Court in *Hinote* held that two vertically integrated catfish producers were not covered by Capper-Volstead. The court pointed out that, despite growing some catfish in their own ponds, the defendants purchased much of their production from third parties—in effect acting in a manner indistinguishable from traditional distributors or middlemen. *Id.* at 1358. More recently, in *In re Fresh & Process Potatoes Antitrust Litigation,* the District of Idaho similarly adopted Justice Brennan's reasoning. The court held that, protecting a vertically integrated producer under Capper-Volstead "would read 'the farmer' requirement out of the statute, ignore congressional intent, and create the potential for abuse." *Id.* at 1154. While the reasoning in these decisions may be compelling to some, the Court need not rule on the issue, given the finding that R.W. Sauder fails to meet the statutory definition of a producer.

The plaintiffs argue first that five members of USEM[5] were not engaged in egg production and their participation in the cooperative prevents the application of Capper-Volstead. The evidence pointed to by the plaintiffs, however, simply discloses that these entities were engaged in certain businesses in addition to farming, *not* that they were not engaged in egg farming. The defendants, for their part, also point to evidence that each of the companies identified by the plaintiffs did, in fact, own significant numbers of chickens. The plaintiffs do not respond to this evidence in their reply, and during oral argument, counsel conceded that each of the subject entities owned layers. Hr. Tr. at 237. Based upon these facts, the Court finds that there is insufficient evidence to accept plaintiffs' motion that the defendants' are unable to assert a Capper-Volstead defense as to USEM.

The plaintiffs also contend that the USEM's conspiracy with non-members—specifically R.W. Sauder—prevents it from relying on the Capper-Volstead defense. While Sauder was not a member of USEM, the plaintiffs contend that Sauder was involved in the egg exports, which are alleged to have comprised part of the challenged conspiracy. The Act itself, however, states that a cooperative "shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U.S.C.A. § 291 (West). There is no evidence that the Sauder eggs outnumbered USEM member eggs. Consequently, the Court finds that the plaintiffs have failed to show why the Capper-Volstead defense is unavailable to USEM, and will deny the motion as to USEM.[6]

---

[5] These challenged entities consist of: Active Feed Company, Hoyleston Feed Store, English River Pellets, Brown Brothers Produce and Pilgrim's Pride.

[6] The plaintiffs contend that the defendants' affirmative defenses based upon Section 455 of the Cooperative Marketing Act and Section 2 of the Clayton Act should be denied for the same reasons as with regards to Section 1 of the Capper-Volstead Act. Notably, both Capper-Volstead and the Cooperative Marketing Act use similar language when describing the entities that may form protected associations. *See* 7 U.S.C.A. § 455 (West) ("Persons engaged, as original producers of agricultural products, such as farmers, planters, ranchmen, dairymen, nut or fruit growers, . . ."). The defendants do not attempt to invoke any separate arguments in support of their affirmative

## IV.     CONCLUSION

For the reasons outlined above, the Court will grant in part and deny in part the Plaintiffs'

Motion for Summary Judgment as to the Defendants' affirmative defenses based upon statutory

agricultural cooperative exemptions from the federal antitrust law.  Specifically, the Court will

grant the motion as to UEP but will deny the motion as to USEM.

An appropriate Order reflecting the above will be forthcoming.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge

---

defense under Section 455, as opposed to the Capper-Volstead claims.  Consequently, having found that UEP cannot
be a Capper-Volstead entity, the Court likewise grants the plaintiffs' motion as the defendants' affirmative defense
under Section 455 with regards to UEP.