## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| ***THIS DOCUMENT APPLIES TO:*** | : | **No. 08-md-2002** |
| **ALL ACTIONS** | : | |

### M E M O R A N D U M

PRATTER, J.                                                    SEPTEMBER 28, 2016

According to those who purchase eggs, the nation's major egg producers directly and indirectly conspired to control and limit the nation's egg supply and thereby increase egg prices through a number of allegedly interrelated programs. Specifically, the defendant egg producers are accused of violating Section 1 of the Sherman Act by developing and implementing an egg certification program, exporting eggs at a loss, and reducing egg production during times of oversupply through certain coordinated actions, such as reducing chick hatch, instituting early molting, and facilitating hen disposals.

Defendants Rose Acre Farms, Inc. ("Rose Acre"), Ohio Fresh Eggs, LLC ("Ohio Fresh Eggs"), R.W. Sauder, Inc. ("Sauder"), and Michael Foods Inc. ("Michael Foods") move for summary judgment against the Direct Purchaser Plaintiffs, the Indirect Purchaser Plaintiffs, and the Direct Action Plaintiffs (collectively "Plaintiffs"). The moving Defendants argue that the Plaintiffs lack sufficient evidence to present their case(s) to a jury. The Plaintiffs oppose the motions. Because the Court concludes that similar conduct by all four moving Defendants— mainly joining and participating in the United Egg Producers ("UEP") Certified Program— constitutes sufficient evidence to frustrate the motions for summary judgment, the Court will

address all four motions in this opinion.[1]  Recognizing the Plaintiffs' burden of providing

evidence that each individual Defendant participated in the alleged illegal conduct, the Court will

discuss the relevant evidence against each Defendant that establishes a genuine dispute of

material fact as to whether each Defendant participated in an illegal conspiracy in violation of

section 1 of the Sherman Act.

## I.   FACTUAL BACKGROUND[2]

### A.  Rose Acre

Rose Acre is the second largest egg producer in the United States.  It is family-owned,

with Marcus Rust serving as the chief executive officer.  Rose Acre is vertically integrated,

consisting not only of egg farms, but also including its own chick hatcheries, pullet farms, feed

mills, breeding flocks, and egg processing facilities.

Rose Acre joined the UEP in February 2002, and joined the UEP Certified Program

("Certified Program") in April 2002.  Mr. Rust has been a member of the UEP's Board of

Directors since 2002.  Mr. Rust was present at various meetings where the UEP members

discussed supply-reduction in connection with the Certified Program.  In an email from John

Rust, an employee of Rose Acre to Marcus Rust, John wrote:

> I don't think we have anything to be ashamed of by putting as many hens per cage
> as conditions permit as that is doing what is economically right for consumers . . .
> rather than trying to restrict cage space to boost prices under the alleged agenda of
> animal rights.  [W]e lost the moral right to argue for the continued right of low
> production costs when we ourselves are manipulating the system under false
> pretenses.

---

[1]  Because the Court finds that each moving Defendants' participation in the UEP Certified
Program precludes summary judgment, it will not address the evidence related to the Defendants'
participation, or lack thereof, in the coordinated short-term supply reduction program and the export
program.  By declining to address the evidence relating to those issues, however, the Court in no way
suggests that the parties will be precluded from presenting such evidence, pro and con, at trial.

[2]  In addition to the facts laid out below, the Court also references the fact section in the Court's
memorandum  addressing the defendants' arguments as to issues of liability.  *See* Doc. No. 1438.

*See* Rust Dep. Ex. 20.  In response to this email, however, Mr. Marcus Rust stated that:

> We have to have a defensible dimension that bears out the numbers so we can prove we are not hurting the bird which something around 63-70 [square inches per bird] is a very defensible position scientifically and numerically provable – 60 and under is not defendable – higher mortality and less production per chicken – we can defend the 67" and justify pricing to customer – egg market is not high because of reduced birds but because of economic meltdown we had[.]

*See* Rust Dep. Ex. 33.

In addition, Rose Acre employee, Bryan Hendrix, was a member of the UEP Animal Welfare Committee and was involved in voting for the approval of the 100% rule.[3]

Despite evidence that UEP's Gene Gregory and Don Bell recommended that UEP members not build new facilities in order to replace the hens lost due to the cage space requirements of the UEP Certified Program, Rose Acre claims that its operations and layer count grew substantially during the relevant time period.  From 2002-2008, Rose Acre acquired and improved existing facilities and also constructed three new facilities.  Two of the new facilities were focused on producing only specialty eggs.[4]  The third, a "massive" new farm known as the Hyde County facility, allegedly was at least contemplated before Rose Acre joined the UEP 2002.  The Hyde County facility accounted for 90% of Rose Acre's growth during the relevant time period.  Planning for the construction of the facility, including the process of applying for and obtaining the necessary permits, was underway before Rose Acre became a certified producer.  However, actual physical construction of the Hyde County facility began after Rose Acre joined the Certified Program.  The parties dispute whether Rose Acre's overall hen count,

---

[3] Briefly, the 100% rule provided that certified producers must implement the UEP guidelines in all of their production facilities.

[4] "Specialty eggs" for purposes of this litigation include certified organic, nutritionally enhanced, cage free, free range, and vegetarian fed eggs.

3

after deducting increases due to purchases of already-existing farms and depending on whether the layers from the Hyde County facility are included, increased during the relevant time period.

### B. Ohio Fresh Eggs

Ohio Fresh Eggs is a Pennsylvania LLC and was formed in April 2003. Ohio Fresh Eggs's predecessor, Buckeye Farm, L.P ("Buckeye"), was purchased by Orland Bethel and Donald Hershey who then formed Ohio Fresh Eggs. Mr. Bethel owned 70% of Ohio Fresh Eggs and Mr. Hershey owned 30%, however, Austin "Jack" DeCoster held an option to purchase all of Ohio Fresh Eggs and this option could be exercised at any time. Mr. DeCoster funded the great majority of the purchase price of Ohio Fresh Eggs. In 2005, the State of Ohio became aware that Mr. DeCoster was the true owner and sued Ohio Fresh Eggs to revoke its permits. While the State of Ohio won at the trial level, Ohio Fresh Eggs appealed the decision and ultimately prevailed, retaining its permits.

Mr. DeCoster was one of the UEP incorporators and served as a director of the UEP. Mr. DeCoster also owned many other egg businesses, some of which were a part of the UEP since the 1990's. From 2003 until approximately 2005 or 2006, Ohio Fresh Eggs was run in part by 30% owner, Mr. Hershey, with input from John Glessner. After 2005 or 2006, Mr. Glessner ran the company. With instructions from Mr. DeCoster and Mr. Bethel, Ohio Fresh Eggs joined the UEP as well as the UEP Certified Program in December 2003.

Several Ohio Fresh Eggs employees testified that, during the relevant time period, Ohio Fresh Eggs was constructing new barns or renovating old barns in order to increase capacity. Despite the construction and renovations, there is some evidence that Ohio Fresh Eggs decreased its overall hen count during 2005-2008. Based on Ohio Fresh Eggs reports to the USDA, on May 1, 2005, OFE had 7,445,323 layer hens and on May 1, 2008, Ohio Fresh Eggs had

4

6,581,014 layer hens. While these numbers fluctuated from month to month, they generally trended downward.

For most of its existence, Ohio Fresh Eggs was operating under a Marketing and Output Agreement with its main customer, Hillandale Farms of PA, Inc. ("Hillandale"). The agreement required Hillandale to purchase all of Ohio Fresh Eggs's shell eggs. The price of Ohio Fresh eggs was tied to the Urner Barry[5] market price.

Due to environmental violations previously committed by its predecessor, Buckeye, Ohio Fresh Eggs was operating under state and federal consent decrees during the relevant time period. The state decree placed limits on the number of birds housed at Ohio Fresh Eggs's facilities, recognizing, however, that those limitations expired in part in 2004 and in full in 2006. Furthermore, Ohio Fresh Eggs could have sought permission from the State of Ohio for any expansions when the decree was still in effect. The state decree limited Ohio Fresh Eggs to 11,500,352 layers on its farms, and the federal decree dealt with environmental issues that did not limit Ohio Fresh Eggs's layers at all.

In 2006, Ohio Fresh Eggs passed a UEP Certified Program animal welfare audit despite several violations observed by the auditors. The auditors stated, "Employees dumping birds in dumpster after being in Modified Atmosphere Killing System were observed beating birds with what looked like a 1 to 6 board. They also were stomping and stepping on birds still moving around in dumpster." Plf's Ohio Fresh Eggs CSOF ¶ 68 (Docket No. 1282).

### C. Sauder

Sauder began attending UEP meetings as early as the 1970's. It adopted the UEP Certified Program at its inception in 2002, however, the company did not officially join the UEP

---

[5] Urner Barry is an agricultural price reporting firm that publishes egg price quotations that are widely relied upon in the industry.

until 2004. Sauder's President, Paul Sauder, became a member of the UEP Animal Welfare Committee when Sauder joined the UEP in 2004. Mr. Sauder testified that prior to joining the Certified Program, Sauder maintained its flocks at one bird per 53 square inches, rather than the industry standard of one bird per 48 square inches. Even before joining the UEP Certified Program, Sauder did not use the technique of backfilling. Mr. Sauder also testified that Sauder joined the Certified Program because its customers were beginning to demand more humane treatment of laying hens. Regarding expansion during the relevant time period, Mr. Sauder testified that several of his farms expanded, with one farmer claiming to have fully complied with the guidelines while nearly doubling the size of his flock. Additionally, Mr. Sauder claims to get three dozen more eggs out of each hen due to the effects of the Certified Program. In 2006, Mr. Sauder sent an email where he attributed an up-cycle in the industry to the Certified Program and Michael Foods' recent decision to join the Certified Program. SUF at ¶ 44.

### D. Michael Foods

Michael Foods has participated in the UEP since the 1970s. At least three Michael Foods employees have served on committees or as officers. Michael Foods initially did not join in the UEP Certified Program. As early as 2000, however, Michael Foods was receiving some pressure from animal rights groups like PETA and the Humane Society to treat its hens more humanely. In 2001, Burger King, a Michael Foods customer, demanded that egg suppliers provide a minimum of 75 square inches of usable floor space per bird. Michael Foods responded in 2002 by increasing cage space in its Gaylord, MN facility and segregating that facility's egg production to ensure that all eggs and egg products sold to Burger King would come from that facility. This move decreased the total number of layer hens at that particular facility.

Also in 2002, UEP developed its certification program. Gregg Ostrander (Michael Foods CEO) decided not to join the UEP Certified Program in 2002, but instead moved forward with a

6

strategy of responding to individual customers. In 2005, the UEP began contemplating a change to the certification program guidelines that would allow egg products companies that did not produce their own eggs to market products as UEP certified, but would not extend that same marketing license to egg products companies that did produce their own eggs if their laying facilities did not comply with all of the UEP certification guidelines, including the 100% rule. This meant that Michael Foods' competitors Cargill and ConAgra would be able to market certain products as UEP certified, while Michael Foods would not, even if the particular products from Michael Foods were made with only UEP certified eggs purchased from other producers. This change caused a firestorm of activity at Michael Foods, which included contemplating suing the UEP for "restraint of trade," and exploring starting a new animal welfare program with Sparboe Farms that would not include a 100% rule.

Also in 2005, Wal-Mart and Sam's Club announced that they would no longer sell egg products that did not include a UEP seal. Wal-Mart was the second largest purchaser of Michael Foods' branded low- and no-cholesterol egg products, Better'N Eggs and AllWhites. These products accounted for $69 million in sales in 2005 and had relatively high profit margins. At around the same time, Sysco (another large buyer) started requesting certified egg products, as did Conopco/Unilever, another large egg product customer. Because of all this customer pressure, Michael Foods pushed for the UEP to rescind the 100% rule or at least allow marketing licenses to non-certified producers, but those efforts failed.

Michael Foods finally joined the UEP Certified Program in 2006, with the added agreement that although it would convert all its layer facilities to comply with the program it could still buy non-Certified eggs to use in non-Certified egg products. Complying with the certification program reduced Michael Foods' internal layers by a little more than 2 million,

7

reducing its internal egg production by 55 million pounds. Michael Foods claims that it made up for at least some of those losses by contracting with outside producers to build layer facilities and committing to purchase all output for periods of six to ten years. Many of these contracts, however, were signed in 2003 or 2004, before Michael Foods joined the UEP Certified Program. Michael Foods did add 480,000 company-owned layers between 2006 and 2008, and it built a new layer house with added capacity for 200,704 layers in 2007. In 2008, a contract grower built a new layer house with capacity for 280,000 Michael Foods-owned layers.

In 2005, Michael Foods entered into a contract with IPRO, whereby IPRO would build facilities for 4 million layers and Michael Foods would purchase the output for 10 years. In 2006, just after Michael Foods joined the UEP Certified Program, the IPRO developers ran into roadblocks in obtaining site approvals, which gave Michael Foods the opportunity to back out of the contract. Michael Foods instead granted an extension to the developers. Ultimately, however, the project failed because IPRO was unable to obtain necessary government permits.

## II.   **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular

8

issue at trial, the moving party's initial burden can be met simply by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255.

In opposing a motion for summary judgment in an antitrust case, "'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard. Additionally, a court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993) (citing *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992)). However, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). *See also Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (mandating that when the plaintiff relies solely on circumstantial evidence, the plaintiff must produce "evidence that tends to exclude the possibility [alleged conspirators] were acting independently" to prevail at the summary judgment stage).

## III.   DISCUSSION

In order to prove a violation of section 1 of the Sherman Act, a plaintiff must prove: "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant

9

product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action." *Petruzzi's*, 998 F.2d at 1229. A plaintiff may establish the existence of an agreement to violate the Sherman Act either through direct or circumstantial evidence. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003). "Because direct evidence, the proverbial 'smoking gun,' is difficult to come by, 'plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy.'" *Id* (citing Rossi, 156 F.3d at 465).

The moving Defendants argue that, regardless of whether the Court decides to apply the *per se* or rule of reason analysis to determine whether the alleged restraint on trade was unreasonable, they are entitled to summary judgment because the Plaintiffs have failed to produce sufficient evidence implicating each Defendant in an agreement to restrict trade. In order to evade summary judgment, the Plaintiff must come forth with sufficient evidence such that a reasonable jury could conclude that each Defendant "had a conscious commitment to a common scheme designed to achieve an unlawful purpose." *Monsanto*, 465 U.S. at 764.

### A.   Concerted Action

The Defendants argue that their membership in the UEP, and specifically their participation in the UEP Certified Program, does not amount to concerted action under section 1 of the Sherman Act. Regardless of whether courts have referred to various arrangements as contracts, combinations, conspiracies, or even more generally, "agreements," what a plaintiff must demonstrate in order to bring conduct within the confines of section 1 is concerted action. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314–15 (3d Cir. 2010) ("First, the plaintiff must show that the defendant was a party to a 'contract, combination ... or conspiracy.' Instead

10

of assigning each of these last three terms a distinct meaning, courts have interpreted them collectively to require "some form of concerted action" (internal citations omitted)). "To show concerted action, a plaintiff must produce evidence that would allow a jury to infer that 'the alleged conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds.'" *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 219 (3d Cir. 2008).

The Plaintiffs argue that they have satisfied their burden of proving concerted action, or that the evidence at least creates a genuine dispute of material fact. In support, they purport to offer both direct and circumstantial evidence. With respect to each of the moving Defendants, the Plaintiffs argue that the commitment to and participation in the UEP Certified Program serves as direct evidence of concerted action. It is undisputed that each moving Defendant became a certified producer by committing to the UEP Certified Program. As opposed to a case in which the evidence merely shows parallel conduct—that each of the defendants implemented the same cage space guidelines, decided not to backfill, and decided to apply those and other practices to 100% of their facilities—the Plaintiffs claim that the UEP Certified Program is direct evidence of the agreement between the Defendants to adhere to those practices. But for the development and implementation of the various features of the UEP Certified Program, the Plaintiffs argue, the individual moving Defendants would not have all independently decided to take the various actions required by the program, such as implementation of the exact cage space requirements, completely banning backfilling, and ensuring that all facilities complied with the guidelines. Consequently, the Plaintiff's argue that the evidence establishes concerted, not merely parallel, action between and among the Defendants.

11

According to the moving Defendants, because the UEP Certified Program is not facially anticompetitive, it cannot serve as direct evidence of each Defendant's participation in an illegal conspiracy. Therefore, because the Plaintiffs cannot provide direct evidence of concerted action, the Defendants argue that standard set forth in *Monsanto* and *Matsushita* applies. Under that standard, when a plaintiff offers only ambiguous circumstantial evidence, the evidence offered must "'tend[] to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto*,465 U.S. at 764).

The parties to these motions delve deeply into the holdings in *Matsushita*, *Monsanto*, and their progeny, arguing about the type of evidence needed for the Plaintiffs to survive summary judgment and the types of inferences that may be drawn from that evidence. Under the precedent in this circuit, "the *Matsushita* standard applies only when the plaintiff has failed to put forth direct evidence of conspiracy." *Rossi*, 156 F.3d at 466. "Two important circumstances underlying the Court's decision in *Matsushita* were (1) that the plaintiffs' theory of conspiracy was implausible and (2) that permitting an inference of antitrust conspiracy in the circumstances 'would have the effect of deterring *significant* procompetitive conduct.'" *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993) (citing *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990)).

The Plaintiffs argue that the limitation on inferences is not applicable because they have adduced direct evidence of the Defendants' concerted action in the form of their commitments to join the UEP Certified Program. The Defendants, on the other hand, argue that no direct evidence of concerted action has been produced because the UEP Certified Program was not an agreement to limit or reduce supply on its face. While the Defendants are correct that the

12

program was not facially a commitment to reduce the supply of eggs, such a conclusion does not necessarily imply that a certified producer's commitment to the program was not direct evidence of concerted action. In this respect, the Court believes a review of *Matsushita* is helpful before studying the various arguments asserted in these motions.

In *Matsushita*, the respondents, two American television manufacturers, alleged that the petitioners, 21 Japanese television manufacturers, conspired together to drive the respondents out of the market through the use of predatory prices. 475 U.S. at 577-78. The respondents claimed to have direct evidence of agreements between the petitioners which supported the allegation that they had conspired to use predatory prices. *Id.* at 580. In refusing to apply the restrictions on inferences made from circumstantial evidence, the court of appeals in *Matsushita* held that "there is both direct evidence of certain kinds of concert of action and circumstantial evidence having some tendency to suggest that other kinds of concert of action may have occurred." *Id.* (quoting *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 304-05 (3d Cir. 1983)). The "direct evidence" of concerted action proffered by the respondents was that the petitioners formed a cartel in Japan which allowed them to charge higher than market prices, that the petitioners had check-price agreements which fixed minimum prices for the sale of televisions in America, and that the petitioners had explicit agreements which limited each company's distribution to only five retailers in America. *Id.* at 598-97. In holding that the court of appeals had erred in considering the evidence of these agreements as "direct evidence" of an agreement between petitioners to drive the respondents out of the market with predatory prices, the Court reasoned:

> The "direct evidence" on which the court relied was evidence of *other* combinations, not of a predatory pricing conspiracy. Evidence that petitioners conspired to raise prices in Japan provides little, if any, support for respondents' claims: a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another. Evidence that petitioners agreed to fix *minimum* prices (through the check-price agreements) for the American market

13

actually works in petitioners' favor, because it suggests that petitioners were seeking to place a floor under prices rather than to lower them. The same is true of evidence that petitioners agreed to limit the number of distributors of their products in the American market-the so-called five company rule. That practice may have facilitated a horizontal territorial allocation, see *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), but its natural effect would be to raise market prices rather than reduce them. Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to charge below-market prices in the American market over a period of two decades.

*Id.* (internal footnote omitted). Because this direct evidence had no bearing on, and in some respects even served to discredit the respondents' claims that the petitioners had illegally agreed to use predatory prices, the Court reversed the court of appeals and remanded with instructions to grant summary judgment for the petitioners if the respondents could not provide evidence which tended to exclude the possibility that the petitioners illegally used predatory prices to drive the respondents out of the market. *Id.* at 597-98. The Court further elaborated that the defendants' behavior was equally consistent with lawful conduct because "cutting prices in order to increase business often is the very essence of competition." *Id.* at 594.

In this case, as in *Matsushita*, the Plaintiffs have offered direct evidence of "other combinations." While the Plaintiffs have alleged that the Defendants illegally conspired to reduce the domestic supply of eggs, the direct evidence that the Plaintiffs have produced thus far shows only that the Defendants agreed to cage space restrictions, a ban on backfilling, the 100% rule, and various other animal husbandry requirements that are not relevant to these motions. Unlike the direct evidence in *Matsushita*, however, the direct evidence in this case does not "say[] little, if anything, about the existence of a conspiracy to [reduce the domestic supply of eggs]." Rather, the direct evidence of these agreements or commitments by the moving defendants is much more closely related to a conspiracy to reduce the domestic supply of eggs than any of the alleged "other combinations" in *Matsushita* were related to an illegal predatory

14

pricing scheme. Indeed, none of the aspects of the UEP Certified Program cut against the possibility of an agreement to reduce or limit the domestic supply of eggs. To the extent any added inferences are needed based on the evidence that each moving Defendant joined and committed itself to the UEP Certified Program, an inference that the various features of the program support the notion that the Defendants conspired to limit the supply of eggs may well be more reasonable than the inferences required in *Matsushita*. Furthermore, unlike in *Matsushita* where evidence that the defendants cut prices in order to increase business was generally conduct displaying "the very essence of competition," *Matsushita*, 475 U.S. at 594, the evidence in this case that the Defendants agreed to reduce the capacity of all of their facilities is not generally conduct which forms "the very essence of competition."

While the Defendants certainly can offer arguments to suggest possible procompetitive justifications for most, if not all, of the features of the UEP Certified Program, an inference that the features evidence an overall purpose to limit the supply of eggs is not unreasonable or implausible. *See Petruzzi's*, 998 F.2d at 1232 (holding that *Matsushita* concerns were not present when plaintiff's theory was plausible and when the alleged conduct was not "the very essence of competition"). Consequently, such inferences are not the types that *Monsanto* and *Matsushita* caution against and the Court finds it unnecessary to require the Plaintiffs to put forth additional evidence that "tends to exclude the possibility" that the alleged conspirators acted independently. The Court will now discuss the arguments made as to each of the alleged features of the UEP Certified Program and why they can reasonably support the Plaintiffs' theory in this case.

## 1.    *The Express Provisions of the UEP Certified Program*

First, the Plaintiffs argue that certain aspects of the UEP Certified Program, known to each of the Defendants when they committed to implement the requirements of the program, serve as sufficient evidence to create a genuine dispute of material fact that each Defendant had a conscious commitment to a program which was designed to limit the domestic supply of eggs. Specifically, the Plaintiffs point to four features of the UEP Certified Program which raise a genuine dispute of material fact that the program was designed as a restraint on trade—the cage space requirements, the ban on backfilling, the 100% rule, and the enforcement mechanisms, including the automatic fail features.

The Plaintiffs assert that the cage space restrictions necessarily served to decrease the domestic supply of eggs because a mandatory increase in the amount of space per hen in each barn means that each barn houses fewer chickens, hence, "fewer chickens" means "fewer eggs." As was addressed in the Court's opinion on liability, such an assertion is not necessarily true. *See* Doc. No 1437. For one, nothing in the UEP Certified Program precludes the participants from constructing new barns in order to account for the decrease in the number of chickens in each barn. The cage space requirements were to be phased in over the course of several years, offering participants with at least the opportunity to account for the decreased supply.[6] Furthermore, as claimed by Sauder and others, the record reflects evidence that at least suggests that chickens with more space produce more eggs. While the Court finds that the cage space requirements associated with the UEP Certified Program do not necessarily decrease the domestic supply of eggs, the inclusion of the cage space requirements and the motivations

_____

[6] The evidence on this point is disputed. The Plaintiffs have submitted expert testimony that, even with the phase-in period, due to the time necessary to complete the construction of a brand new barn and introduce egg laying chickens into that barn, it was impossible for the Defendants to completely make up for the lost capacity due to the cage space restrictions. *See* Pl. Resp. Br. at 31 (Doc. No. 1279). Furthermore, the Plaintiffs claim that there is no evidence that the Defendants even attempted to do so.

behind the inclusion of such requirements may reasonably serve as evidence from which the jury might conclude that the program was designed for the purpose of decreasing the domestic supply of eggs. Unlike the agreements in *Matsushita* claimed to be "direct evidence," the Plaintiffs' direct evidence in this case that each of the moving Defendants agreed to maintain at least 67 square inches per bird is reasonably related to an overall agreement to limit or reduce supply. Such a commitment certainly does not work against the alleged conspiracy to limit supply.

Likewise, the Plaintiffs argue that the inclusion of the ban on backfilling in the UEP Certified Program supports the conclusion that the program was designed to decrease the amount of eggs produced, and thus serves as direct evidence of such a conspiracy. In support, the Plaintiffs rely on expert testimony that backfilling may be done without necessarily exposing any chickens to disease or decreased production. Consequently, a complete ban on backfilling precludes each certified producer from acting independently in assessing when backfilling would best serve that individual producer in maintaining its flocks efficiently. The Defendants on the other hand offer expert testimony detailing the various dangers of backfilling, arguing that such a ban validly promotes animal welfare and productivity because the practice can have detrimental effects on the population of chickens in a given barn. Therefore, the inclusion of a ban on backfilling within the program does not establish that the purpose and design of the program was to reduce supply. While the evidence is certainly disputed, an agreement by each of the moving Defendants to never backfill again can be reasonably related to an overall agreement to reduce the supply of eggs. Additionally, the fact that each certified producer committed to abandoning the practice regardless of the circumstances highlights the collective nature of the certified program.

17

The Plaintiffs also assert that the 100% rule serves as evidence that the UEP Certified Program was designed to achieve an unlawful purpose—limiting the domestic supply of eggs. The Defendants counter that the 100% rule merely demonstrates the desire of the certified producers to not only be consistent in their aims at achieving increased animal welfare, but also to signal to the consumers that the certified producers were actually committed to animal welfare. Both sides submit compelling arguments. On the one hand, the Plaintiffs rightly suggest that the 100% rule has the effect of precluding each certified producer from independently assessing the needs of its customers and supplying some portion of certified eggs and some portion of non-certified eggs, depending on the demands of the markets. The Defendants likewise provide support for their position in arguing that, because some consumers in the market had shown a desire for producers to focus on promoting animal welfare, simply dedicating a portion of their farms to producing certified eggs does not necessarily signal to the consumers that the producer was actually committed to animal welfare. Again, an agreement which ensures that every facility of each certified producer reduces its capacity is reasonably related to the alleged conspiracy and does not cut against its existence.

Finally, the Plaintiffs point to the various enforcement mechanisms of the UEP Certified Program to argue that each of the Defendants consciously committed to a program with supply-reducing goals. In support of this proposition, the Plaintiffs highlight the provisions of the auditing systems which resulted in an automatic fail for violations of only certain provisions of the UEP Certified Program, while allowing other violations to have only a minimal effect on a certified producer's audit score. For example, the auditing system was designed in a fashion so that a certified producer who failed to meet the cage space restrictions, engaged in backfilling, or violated the 100% rule would automatically fail and lose its certified status. A certified producer

who, on the other hand, was cited for various forms of animal abuse, would receive small deductions in its score so that a passing score was easily possible. *See* Plf's CSOF to Ohio Fresh Eggs ¶ 68 (Docket No. 1282) (demonstrating that Ohio Fresh Eggs passed an April 28, 2006 UEP Certified audit despite notations that "[e]mployees were observed kicking and throwing live birds" and "[e]mployees were observed stepping on and beating live birds." Those violations resulted in a six (6) point deduction, where thirty (30) points-worth of deductions were necessary to fail an audit). This permissive and lenient auditing and enforcement system, argue the Plaintiffs, supports the proposition that the UEP Certified Program was focused on and designed to reduce the supply of eggs rather than increase animal welfare. The Defendants' decisions to become certified producers, knowing of the existence and effects of these provisions, serve as evidence that each Defendant who pledged to and maintained its certified status was consciously committed to a program that restrained trade. Like the cage space requirements, ban on backfilling, and 100% rule, the Defendants' commitments to be subject to these auditing systems is reasonably related to an alleged conspiracy to limit or reduce supply.

Upon consideration of the various provisions of the UEP Certified Program and the parties' arguments as to whether those provisions support a finding that the program was designed for and had the effect of reducing the domestic supply of eggs, the Court concludes that the Plaintiffs have put forth sufficient evidence to create a genuine dispute of material fact that each of the Defendants consciously committed itself to a program designed to achieve an unlawful purpose. It is undisputed that each of the moving Defendants consciously committed to joining and maintaining its respective status within the UEP Certified Program. The actual components of the UEP Certified Program, of which the Defendants were undisputedly aware, could be used by a reasonable jury to determine that each of the Defendants consciously

19

committed to a program designed to reduce supply. If the "direct evidence" put forth in

*Matsushita* was ambiguous so that the Supreme Court necessitated a finding that the evidence

tended to exclude the possibility of independent action, the direct evidence provided by the

Plaintiffs in this case is far less ambiguous as to the possibility that each of the moving

Defendants entered into a conspiracy to restrain trade. *See Petruzzi's*, 998 F.2d at 1233 ("[I]n

section 1 cases, it is unnecessary for a court to engage in the exercise of distinguishing strong

circumstantial evidence of concerted action from direct evidence of concerted action for both are

'sufficiently unambiguous.'"). Indeed, all of the features of the program highlighted by the

Plaintiffs are *reasonably* related to a conspiracy to reduce or limit supply. Consequently, the

evidence here is distinguishable from that produced in *Matsushita*.

Similarly, the Plaintiff's case here is distinguishable from cases where courts have held

that mere membership in a trade group or trade association, even when coupled with

implementations of suggestions made by that group, does not qualify as concerted action. The

Defendants are correct to point out that such conduct is not sufficient to satisfy the Plaintiffs'

burden. Indeed, the Court has already explained as much. *See In re Processed Egg Prod.*

*Antitrust Litig.,* 821 F. Supp. 2d 709, 753 (E.D. Pa. 2011) ("[M]ere attendance at a meeting is not

enough to sustain liability for an individual corporate defendant, and certainly could not extend

to UEA merely through its members' alleged attendance.") The Plaintiffs, however, have

marshaled evidence not simply that the moving Defendants were members of a trade group and

all complied with recommendations from that trade group. Rather, the evidence shows that the

various Defendants *agreed* to comply not just with recommendations, but requirements

developed by the UEP. *See In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d 709,

724 (E.D. Pa. 2011) ("Hence, agreement to the overarching conspiracy is plausibly suggested

20

when a company, such as Michael Foods, that attended meetings where allegedly key decisions

instrumental to the conspiracy were made or where effects of alleged coordinated actions were

extolled, is alleged *also* to have been certified under and participated in the UEP Certification

Program and concomitantly followed the Program's guidelines" (emphasis in original)).

> The Supreme Court has held that:

> [T]rade associations or combinations of persons or corporations which openly and
> fairly gather and disseminate information as to the cost of their product, the
> volume of production, the actual price which the product has brought in past
> transactions, stocks of merchandise on hand, approximate cost of transportation
> from the principal point of shipment to the points of consumption as did these
> defendants and who, as they did, meet and discuss such information and statistics
> without however reaching or attempting to reach any agreement or any concerted
> action with respect to prices or production or restraining competition, do not
> thereby engage in unlawful restraint of commerce.

*Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 586 (1925). The UEP Certified

Program was much more than a set of recommendations from the UEP or a dissemination of

information to its members. In exchange for receiving UEP Certification, the Defendants were

obligated to comply with the various requirements of the program. Along with the commitment

of each Defendant to abide by the rules for certification, the program included enforcement

measures which ensured that all certified producers maintained the established cage space

parameters, did not backfill, and implemented the program's requirements at 100% of the

producer's facilities. These enforcement measures specifically ensured that a certified producer

would fail its audit if it did not comply with the cage space requirements, ban on backfilling, or

the 100% rule. In addition, the moving Defendants (all members of the UEP) were well aware

that their fellow certified producers were required to play by the same rules.

The Defendants also argue that the fact that the agreement or concerted action—joining

the UEP Certified Program and continued compliance with its requirements—was not facially

21

anticompetitive leads to the conclusion that the Defendants did not enter into an agreement to reduce supply. In the same vein, the moving Defendants argue that because the "agreement" was not facially anticompetitive, the Plaintiffs must produce evidence that tends to exclude the possibility that each moving Defendant became a certified producer through independent business decisions. As explained above, such proof is necessary only when a plaintiff relies exclusively on ambiguous indirect evidence of conspiracy. *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 770 (E.D. Pa. 2015) (citing *Matsushita*, 475 U.S. at 588). Here, the Court has already determined that the evidence offered by the Plaintiffs that each of the moving Defendants agreed to the requirements of the UEP Certified Program, unlike the evidence submitted in *Matsushita*, is not ambiguous circumstantial evidence.

The court in *In re Wellbutrin* rejected a similar argument, holding that a signed settlement agreement by which the defendant waived its rights to offer a product was direct evidence of a conspiracy, thus obviating the need to determine the defendant's individual motivations in signing the agreement. *Id.* at 770. The moving Defendants attempt to distinguish *In re Wellbutrin*, claiming that their agreement to participate in and abide by the rules of the UEP Certified Program was not evidence of a commitment to anyone that they would pursue an unlawful objective. There is an important distinction, however, in arguing that it was in each conspirator's independent interest to join the agreement, and that each conspirator acted independent of any agreement. *See id.* ("GSK appears to be arguing that it was in its independent interest to join the agreement, not that it acted independent of any agreement."). Here, the Court has decided that each moving Defendant's commitment to the UEP Certified Program may serve as evidence available to a reasonable jury for concluding that such an action was a commitment to reduce or limit supply. Consequently, the moving Defendants' arguments

that they each respectively decided to become a certified producer through independent business decisions may be presented to the jury, but does not prove as a matter of law that each Defendant was acting independent of any agreement. The jury must be asked to determine whether each Defendant entered into an agreement to restrain trade and whether that restraint on trade was reasonable. *See In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2011 WL 5883772, (N.D. Cal. Nov. 23, 2011), *aff'd sub nom. In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914 (9th Cir. 2015) (concluding that, because an agreement was not facially anticompetitive, defendants were entitled to summary judgment as to plaintiffs *per se* claims, but leaving the possibility open that alleged conspiracy could be found illegal under a rule of reason analysis before ultimately deciding that the plaintiffs had not satisfied their burden as to antitrust injury).

In its post-hearing brief, Defendant Rose Acre argues that the conduct alleged by the Plaintiffs is not analogous to a "hub and spoke" conspiracy, and thus cannot avoid the need for further evidence of a horizontal agreement between the certified producers. Rose Acre, citing *In re Insurance Brokerage*, posits that even if the UEP is identified as the "hub" and the certified producers as the "spokes," the Plaintiffs' claims still fail due to a lack of evidence connecting the spokes. *See* 618 F.3d at 327 (holding that *per se* "hub and spoke" theory was not properly pled when complaint detailed specific agreements between multiple insurers and a single broker, but did not allege facts such that the court could infer that the insurers had agreed horizontally to enter into their respective agreements with the broker). "Hub and spoke" conspiracies, however, consist of "a hybrid of both vertical and horizontal conspiracies." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010). The facts alleged in *In re Insurance Brokerage* and *Howard Hess* are distinguishable from those put forth in this case. The main

distinction lies in the very nature of the "hub" alleged in each case. The Plaintiffs' theory and evidence in this case involves no vertical agreements between a buyer and seller. Instead, the agreements alleged and documented here are agreements between the certified producers and the UEP. The various "spokes" in *In re Insurance Brokerage* and *Howard Hess* did not have employees sitting on the board or serving on various committees within the "hub."[7] Consequently, the "hub and spoke" cases which require further evidence of agreement between the "spokes" are distinguishable. A reasonable jury may decide, based on the express provisions of the UEP Certified Program, that the program was a restraint on trade in the form of a reduction or limitation of supply. Based on such a finding, an individual certified producer's decision to join the program would be irrational but for the participation of the other certified producers. Regardless, the Plaintiffs here have collected sufficient direct or unambiguous circumstantial evidence of an agreement to restrain trade to allow a jury to make those determinations.

The Defendants (particularly Rose Acre and Michael Foods) also argue that the fact that some of their major clients were demanding certified eggs or demanding that the Defendants join the certified program serves as evidence that the Defendants did not join a conspiracy to restrain trade. Such an argument is misplaced, however. The notion that a defendant or group of defendants could conspire to restrain trade is not mutually exclusive with the notion that there are outside pressures encouraging such behavior. *See In re Wellbutrin*, 133 F. Supp. 3d at 770 ("Even reluctant participants, however, can be held liable for conspiracy." (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 212 (3d Cir.1992))). In other words, the choice to please a paying customer is no less a choice. Of course, while such an argument does not carry

---

[7] For example, Rose Acre CEO Marcus Rust was a member of the UEP Board of Directors, beginning in 2002 and Rose Acre employee Brian Hendrix was a member of the UEP Animal Welfare Committee.

the day, as a matter of law, in proving that the Defendants did not agree to restrain trade, it will be available to the Defendants to argue to the jury under the rule of reason standard when the jury is to balance procompetitive and anticompetitive effects of the alleged conspiracy. "The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010).

### 1. *Capper-Volstead Good Faith Reliance*

Rose Acre includes an argument in its briefing (which is joined by the other moving defendants), that even if the Court should find UEP or USEM are not covered by Capper-Volstead, Rose Acre (and the other moving defendants) should nevertheless be allowed to avail themselves of the statute's protections, given their good faith belief that the cooperatives were protected. The Court has already held that UEP is not protected under Capper-Volstead. *See* Doc. No. 1442. The Court is not persuaded by the Defendant's arguments as to the existence of a good-faith exception to the statute.

As a general matter, the Court will reemphasize the point made in its prior holding that Capper-Volstead provides an exemption from the antitrust laws and, consequently, should be narrowly construed. *See* Doc. No. 1442 (citing *Maryland & Virginia Milk Producers*, 362 U.S. at 446); *see also Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231, 99 S. Ct. 1067, 1083, 59 L. Ed. 2d 261 (1979) ("It is well settled that exemptions from the antitrust laws are to be narrowly construed."); *Jefferson Cty. Pharm. Ass'n, Inc. v. Abbott Labs.*, 460 U.S. 150, 157–58, 103 S. Ct. 1011, 1017, 74 L. Ed. 2d 882 (1983) ("[T]he Court observed that 'our cases have repeatedly established that there is a heavy presumption against implicit exemptions' from the antitrust laws.") (citing *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 787 (1975)).

25

Additionally, a court in this district recently addressed an argument essentially identical to the one articulated by the Defendants and held that *no* good faith reliance exception to the requirements of Capper-Volstead exists. *See In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382, 391 (E.D. Pa. 2014). In *Mushroom*, Judge O'Neill denied the defense motion for reconsideration after granting summary judgment to the plaintiffs. The defendants argued that

> [N]otwithstanding any defects in the structure of the [challenged cooperative], reconsideration of [Judge O'Neill's] prior decision [was] warranted because it did not address whether an immunity from claims under § 1 of the Sherman Act should apply to "agricultural producers who come together in good faith and form an agricultural cooperative based on counsel's advice that the cooperative was properly constituted and could package and deliver mushrooms through affiliated companies to customers.

*Id.* (citations omitted). The court explained that an affirmative defense based upon good-faith is typically only recognized in the context of finding an exception to the antitrust laws because such a defense is generally only warranted when the underlying offense itself involves willful behavior or a showing of specific intent. *Id.* Because a violation of the Sherman Act does not require establishing the existence of specific intent, good faith reliance on advice of counsel is not a proper defense to such claims. *Id.* at 392.

The Defendants attempt to distinguish *Mushrooms* in their reply papers, but it appears that their arguments regarding the impact of "intent" are largely a distinction without a difference. Unlike the defendants in *Mushrooms,* they assert that their argument does not turn on the elements of a Sherman Act violation, but on whether "good faith" is an inherent component of Capper-Volstead. Regardless of how it is teed up, however, what the Defendants are ultimately asking the Court to do in both cases is to establish an implicit exception to the Sherman Act. As Judge O'Neill explained, creation of such implicit exceptions based upon good

26

faith typically exist only in the context of specific intent offenses.  The *Mushrooms* decision

holds that good faith was *not* an inherent component of Capper-Volstead.  Judge O'Neill stated

in the *Mushrooms* opinion that the defendants failed to direct the court to any relevant authority

establishing the existence of a good faith exception to Capper-Volstead.  The Defendants here,

similarly, have provided no authority compelling the Court to so hold.

The Court is not necessarily unsympathetic to the position that this puts members of

agricultural collectives in.  *See Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 397

(1967) ("The chief result would be to allow windfall treble damage recoveries to persons with

whom Sunkist dealt at arm's length and in good faith. The main burden would ultimately fall on

the growers at the base of the Sunkist organization.").  And certainly the Court recognizes that

Congress has expressed concern regarding the risks that farmers faced in the past.  *See, e.g.,*

*Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1043 (2d Cir. 1980) (noting that

agricultural cooperatives may be a "favorite child" of Congress).  Yet, implicit in the

Defendants' argument is the somewhat obvious counter-position that Congress's failure to

expressly provide a good faith exception given the apparent risks to farmers as well as other

instances of congressional action in the area, supports an inference that no such exception was

intended.  Given the lack of express direction from Congress, the Court cannot find the existence

of an implicit exception to the antitrust laws that the Defendants' request.  Until Congress may

be motivated to turn its attention to this gaping hole, diligent policing by co-operative members

of the membership rules is the only available protection.

### B.    Specific Arguments Made by the Individual Moving Defendants

The Court will also address, to the extent necessary, any arguments made by the

individual Defendants that relate exclusively to the Plaintiffs' case against that Defendant.

### 1.  *Rose Acre*

Rose Acre argues that any circumstantial evidence that it entered into an agreement to reduce the supply of eggs is contradicted by the evidence of Rose Acre's growth and expansion during the relevant time period. *See In re Citric Acid Antitrust Litig.*, 996 F. Supp. 951, 960 (N.D. Cal. 1998) (finding inference of conspiracy unreasonable when evidence showed defendant's production increased by half over the course of the relevant time period). While the evidence of growth may be presented to the jury in arguing that Rose Acre (or any other Defendant with purported growth and expansion) did not in fact join the alleged conspiracy, such evidence is not dispositive as a matter of law, nor was it the only evidence relied on in *In re Citric Acid. See id.* at 955-56 (noting that there was direct testimonial evidence from admitted co-conspirators that the particular defendant did not participate with the others in the conspiracy). As discussed above, the Court has found that the evidence provided by the Plaintiffs should either be considered direct evidence or at least the type of circumstantial evidence from which *reasonable* inferences can be made to support the proposition that Rose Acre and the other certified producers entered into an agreement to reduce or limit supply. That being said, Rose Acre's proffered evidence of expansion is disputed by the Plaintiffs.[8] As a result, Rose Acre's arguments that their evidence of growth and expansion negate the possibility that it entered into a supply reduction or limiting agreement are arguments that cannot carry the day on summary judgment and should properly be submitted to a jury.

Rose Acre also argues that its rejection of the UEP's voluntary supply recommendations negates any inference that it entered into a supply restricting agreement. Indeed, the Plaintiffs

---

[8]  The Plaintiffs claim that much of Rose Acre's alleged expansion after it joined the UEP Certified Program was actually planned and initiated before Rose Acre joined the program. Rose Acre, on the other hand, disputes that claim and also argues that even if plans for the construction for a new barn had already begun, nothing prevented Rose Acre from halting those plans if it were really to have engaged in a conspiracy to reduce or limit supply.

28

have not come forth with evidence showing that Rose Acre participated in any of the early molt, slaughter, or chick hatch "recommendations." However, "[p]articipation by each conspirator in every detail in the execution of the [antitrust] conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) (citing *Am. Tobacco Co. v. United States,* 147 F.2d 93, 119 (6th Cir.1945)). Again, such evidence may be considered by a jury, but does not, as a matter of law, preclude a reasonable jury from concluding that Rose Acre participated in a conspiracy to restrain trade. Or not.

### 2.   *Ohio Fresh Eggs*

Ohio Fresh Eggs argues that several factual circumstances unique to Ohio Fresh Eggs entitle it to summary judgment because the circumstances demonstrate that the Plaintiffs' theory that Ohio Fresh Eggs joined a conspiracy to restrict supply make no economic sense or are not economically plausible. *See Matsushita*, 475 U.S. at 587 ("[I]f the claim is one that simply makes no economic sense-[Plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary").

First, since its inception, Ohio Fresh Eggs operated under a marketing and output agreement with Hillandale which required Hillandale to purchase all shell eggs produced by Ohio Fresh Eggs. Ohio Fresh Eggs claims that the only reason that it joined the UEP Certified Program was because Hillandale requested certified eggs. Consequently, Ohio Fresh Eggs asserts that, because of its agreement with Hillandale, Ohio Fresh Eggs had no incentive to participate in a conspiracy to limit supply and increase the price of eggs. What Ohio Fresh Eggs fails to mention when making this argument, however, is that the price of eggs under its agreement with Hillandale was directly tied to the Urner Barry market price. Therefore, a rise in

the market price of eggs would directly benefit Ohio Fresh Eggs, even under its agreement with Hillandale.

Second, since its inception, Ohio Fresh Eggs claims that it was always constructing new barns and expanding capacity. As with Rose Acre, Ohio Fresh Eggs's evidence of expansion is disputed and is an argument appropriate to be made to a jury, but does not carry the day at summary judgment.

Third, since its inception, Ohio Fresh Eggs was operating pursuant to federal and state decrees which limited its expansion and construction. Ohio Fresh Eggs avers that the decrees placed specific conditions and limits on the total number of birds which could be housed at Ohio Fresh Eggs facilities and that Ohio Fresh Eggs's construction and remodeling plans were limited by those decrees as well. While the Plaintiffs do not dispute the existence of the decrees, they argue that the decrees were not, in reality, limiting Ohio Fresh Eggs's flock size. They argue that the state decree permitted Ohio Fresh Eggs to maintain a total bird population exceeding 11.3 million layers and 3.6 million pullets, numbers which Ohio Fresh Eggs never even approached (Ohio Fresh Eggs layers population ranged between 7.4 million and 6.5 million between 2005 and 2008).[9] While perhaps a closer call if Ohio Fresh Eggs's layer count had been up against the limit established by the state decree, the fact that the decree established an upper limit of roughly 1.5 times the number of layers actually maintained by Ohio Fresh Eggs is not enough to convince the Court that any reasonably jury would decide that Ohio Fresh Eggs did not participate in a conspiracy to limit supply.

The Count finds that none of the three factual circumstances relied upon by Ohio Fresh Eggs overcome the Plaintiffs' direct or unambiguous circumstantial evidence to entitle Ohio

---

[9] It is undisputed that the federal consent decree involved pollution control and emission issues and did not regulate or limit the number of birds that Ohio Fresh Eggs was permitted to house in any of its facilities.

Fresh Eggs to summary judgment. Such evidence as the parties have should be submitted to the jury, which will need to decide whether Ohio Fresh Eggs did indeed join a conspiracy to restrict trade and whether that restriction on trade ultimately was unreasonable.

### 3.   *Sauder*

Sauder specifically argues that because it had a policy against backfilling even before it joined the UEP Certified Program, a commitment not to backfill cannot serve as evidence that Sauder joined a conspiracy to restrain trade. Such an argument misses the mark. It is true that "unilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation." *Intervest*, 340 F.3d at 159. However, the key distinction here is that, while Sauder's decision not to backfill before joining the UEP Certified Program was indeed unilateral, once Sauder joined the program and committed itself to abide by the various rules of the program, its decision not to backfill can no longer be viewed as unilateral. Certainly, the maintenance of the decision after joining the Program may take on a different dynamic. Indeed, before Sauder joined the UEP Certified Program it was free to independently decide that backfilling was never beneficial to its operations. However, if a hypothetical situation arose in which Sauder decided that backfilling would efficiently allow it to produce more or better eggs; it would have been free to engage in such a practice. Committing to the UEP Certified Program precluded Sauder from taking such action, and, hence, this is the essence of the collective nature of the program.

### 4.   *Michael Foods*

Michael Foods argues that it joined the UEP certified program only after customer pressure forced it to do so and that it continued to pursue expansion opportunities even after joining the UEP certified program. Both of these issues have been discussed at length elsewhere in this opinion. Michael Foods also argues that because it primarily makes egg products, which

31

do not necessarily follow the same pricing trends as shell eggs, joining a conspiracy with the intent of driving up the price of a necessary product ingredient would not make economic sense. This argument, however, falls into the same category as alleged customer demand and the other procompetitive justifications and independent interests offered as evidence by the other producers and addressed by the Court above. The Court notes that to the extent that the claims against Michael Foods rest on sales of egg products, issues relating specifically to egg products have been addressed in another opinion. *See In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2016 WL 4670983 (E.D. Pa. Sept. 9, 2016).

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny the motions for summary judgment filed by Defendants Rose Acre, Sauder, Ohio Fresh, and Michael Foods. An appropriate Order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

32