IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MDL No. 2002<br>08-md-02002 |
| THIS DOCUMENT APPLIES TO: ALL INDIRECT PURCHASER ACTIONS | |

**INDIRECT PURCHASER PLAINTIFFS' 23(B)(2) POST-HEARING SUBMISSION**

Indirect Purchaser Plaintiffs ("IPPs") respectfully submit this Post-Hearing Memorandum in support of their Renewed Motion for Class Certification.

**I.    IPPS WILL DEMONSTRATE A THREAT OF INJURY AT TRIAL**

To obtain injunctive relief, IPPs will need to show that they face a threat of injury from an "[antitrust] violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). This threat of injury standard presents a lower bar than the actual injury requirement for obtaining damages.[1] As an initial matter, whether IPPs face a threat of injury is a merits question that should not be resolved at the class certification stage. Indeed, the Court already found that an issue for trial exists regarding DAPs' injunctive claims.[2]

At trial, perhaps jointly with a direct purchaser group, IPPs will seek to establish that the UEP Certified Program was anticompetitive under the rule of reason. There is a mountain of evidence, common to all plaintiff groups, showing that the UEP Certified Program, and the

---

[1] *In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395, 399 (3d Cir. 2000); *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 210 (3d Cir. 1980).

[2] *See In re: Processed Egg Prod. Antitrust Litigation*, 2016 WL 4771865, at *1, 4, 6 (E.D. Pa. Sept. 12, 2016) (denying Defendants' summary judgment motion on DAPs' injunction claims).

1

100% Rule in particular, had anticompetitive effects.[3] This includes Defendants' documents and expert testimony showing that the UEP Certified Program reduced supply and increased prices at the wholesale level.[4] Again, this Court has already ruled for the DPPs and DAPs that a question of fact exists as to whether the UEP Certified Program harmed purchasers at the wholesale level, and deemed the question appropriate for class treatment.[5] Further, IPPs will present documentary and expert evidence demonstrating that the short-term flock reductions and joint exports also impacted supply and price at the wholesale level, issues that are likewise before the court in the DAP and DPP cases.[6]

Once harm to the wholesale level is established, pass-through of this harm to IPPs may be presumed as a matter of elementary economics. *See Mid-W. Paper Prod. Co. v. Cont'l Grp.,*

---

[3] Contrary to Defendants' assertions that IPPs recently reengineered their cage space challenges to focus on the 100% rule, IPPs' experts expressly linked the 100% rule to the Certified Program's anticompetitive effects, enabling the cage space limitations to effect a reduction in supply. *See, e.g.*, Exhibits to IPPs' Counter Statement of Facts, ECF No. 1285 (hereinafter "CSF") Tab 197, January 22, 2015 Russell Lamb Declaration, pp. 40-43, 51-71, 77-88 (the 100% Rule and the backfilling ban enabled the cage space restrictions to work, reducing egg supply and increasing prices); Sept. 5, 2014 Declaration of Kyle W. Stiegert, Dkt. No. 1049, pp. 49-54 (the 100% Rule is the lynchpin of the UEP Certified Program's anticompetitive effects).

[4] *See, e.g.*, IPPs' Counter Statement of Facts, Dkt. No. 1285 at ¶¶ 169-182; Exhibits to Indirect Purchaser Plaintiffs Class Certification Brief and Class Reply Brief (ECF Nos. 1043 and 1110) (hereinafter "Class" Tab) Tab 172, Dec. 22, 2014 Report of Kyle Stiegert ("Stiegert Class Reply"), pp. 5, 42, 47, 50-51 (the 100% Rule and backfilling ban were "integral" to the supply reduction in the Certified Program); *see also In re Processed Egg Prod. Antitrust Litigation*, 312 F.R.D. 124, 150 (E.D. Pa. 2015) (noting documentary evidence shows "widespread" antitrust impact).

[5] *See In re: Processed Egg Prod. Antitrust Litig.*, 2016 WL 4771865, at *1, 4, 6 (E.D. Pa. Sept. 12, 2016) (denying Defendants' summary judgment motion on DPPs' and DAPs' damages claims) and *In re: Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 199 (E.D. Pa. 2015) (certifying DPPs' damages class).

[6] *See, e.g.* Class Tab 24, CM00413147 at 147 (exports impacted prices); Class Tab 138, UE0135635 at 638 (same); Class Tab 144, UE0211918 at 919 (same); Class Tab 26, CM00416556 at 557 (short term flock reductions increased prices); Tab 37, UE0064456 at 457-58 (same); CSF Tab 19 Lamb Report, pp 30-38 (short term flock reductions and joint exports increased prices); Class Tab 172, Stiegert Class Reply, pp. 23-25 (exports led to increased prices). Moreover, given that the short term flock reduction agreements and joint exports constitute *per se* violations, the anticompetitive effects of those agreements are presumed. *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 433-34 (1990).

*Inc.*, 596 F.2d 573, 593 (3d Cir. 1979).[7] And this presumption is buttressed by the evidence in the record. Dr. Lamb and Dr. Stiegert both found high pass through rates in general.[8] Defendants' expert, Dr. Murphy, also found impact on retail consumers across brands, retailers and regions.[9] And Defendants acknowledged through the Agralytica report they submitted to Congress that increased wholesale prices lead to increased retail prices.[10]

In the injunctive context, IPPs are not required to show common impact or provide a methodology to show harm to all or virtually all class members.[11] Accordingly, the Court's prior concerns in the 23(b)(3) context do not nullify Dr. Stiegert's ability to testify as to whether Defendants' conduct not only reduced competition at the wholesale level but impacted class

---

[7] Defendants argue that *Mid-West Paper*'s pass-through presumption "is no longer followed." Mar. 7, 2017 Hr'g Tr. at 60:18-20 ("Hr'g Tr."). However the cases cited by Defendants say no such thing. Instead they merely reinforce the general standard for obtaining injunctive relief—that a plaintiff must face a threat of harm. In the *Howard Hess* case, which Defendants deemed their "most important" for demonstrating that IPPs must affirmatively prove pass through to the indirect purchaser level, Hr'g Tr. at 54:6, there was no proof that *any purchasers*—direct or indirect—were threatened with harm. *Howard Hess* case *Dental Labs. Inc. v. Dentsply Intern., Inc.*, 602 F.3d 237, 247-49 (2010). Indeed, defendant's conduct had already been enjoined in a separate DOJ action. *Id.* at 249. Further, in *Warfarin*, the Third Circuit not only did not abandon the principles espoused in *Mid-West Paper*, but noted that if not for ultimate consumers, prices charged to wholesalers (the supposed object of the conspiracy) would be irrelevant. *See Warfarin*, 214 F.3d at 401.

[8] *See* IPPs' Memorandum in Support of Their Renewed Motion for Class Certification, Dkt. No. 1336 ("IPPs' Br.") at 6 & n.20; IPPs' Reply Memorandum in Support of Their Renewed Motion for Class Certification, Dkt. No. 1359 ("Reply") at 10-11. Defendants attempt to discredit Stiegert's ability to testify to pass through based on this Court's previous (b)(3) ruling. But that ruling related to Stiegert's ability to measure the precise impact on class members which is not at issue here. The fact that Dr. Stiegert's model used average pass-through rates cannot be problematic in demonstrating pass through in the injunctive relief context where as a matter of law pass through is expected to occur "under all circumstances prevalent in the real economic world." *Mid. W. Paper*, 596 F.2d at 593.

[9] Reply at 11 n.22.

[10] Class Tab 59 at 10.

[11] Defendants attack Dr. Stiegert's and Dr. Lamb's models, claiming that they will not be able to filter out any harm caused by the short-term programs and exports. But both experts' models can sufficiently filter out those effects. *See, e.g.,* Apr. 3, 2015 Lamb Dec., ¶¶ 101-02, p. 49; Apr. 3, 2015 Stiegert Report, ¶¶ 108-110, p. 46 (Stiegert's model allows him to generally remove effects of short term reductions and exports if either is found legal).

3

members.[12] This testimony in combination with Dr. Lamb's testimony, Dr. Murphy's admissions of wide-spread pass through, and Defendants' extensive documents and admissions at the very least create an issue of fact for trial.[13]

Once it has been established that the UEP Certified Program harmed consumers, IPPs merely need to show that the program continues intact today to demonstrate the threat of future harm. *See, e.g.*, *Zenith*, 395 U.S. at 131 (where plaintiff established anticompetitive conduct and injury during an earlier period and "there was nothing indicating that this clear violation of the antitrust laws had terminated or that the threat to Zenith inherent in the conduct would cease in the foreseeable future," injunctive relief was "perfectly proper."). Although the short term flock reductions and joint exports ceased due to the start of this litigation, voluntary cessation does not extinguish the threat of harm. *See* IPPs' Br. at 2-8; Reply at 7-10.

In addition to the evidence of past harm, IPPs will demonstrate that the conditions that allowed the UEP Certified Program to harm consumers in the past continue to exist today. For example, IPPs will show that the majority of layers remain in cages,[14] the UEP Certified

---

[12] Much of Dr. Stiegert's analysis was unaffected by the Court's prior decision. For example, Dr. Stiegert should still be able to testify regarding his qualitative analysis, as well as his findings regarding widespread impact at the wholesale and retail level. Likewise, the Court noted that Dr. Stiegert's co-movement analysis could show that any changes in supply and price would be felt nationwide. *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 152 (E.D. Pa. 2015). Ultimately, Dr. Stiegert's testimony will be probative of whether past harm occurred and whether a future threat exists.

[13] Indeed, in its decision on IPPs' prior motion for class certification, the Court stated that "Plaintiffs have produced documentary evidence of a widespread price increase that some within the industry attributed to Defendants' conduct, and Plaintiffs have shown that egg prices across differing types of eggs and regions of the country move together." *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. at 160.

[14] USDA figures show that, as of March 1, 2017, approximately 88% of laying hens remain in cages. *See* USDA AMS Weekly Shell Egg Demand Indicator for March 15, 2017, https://www.ams.usda.gov/mnreports/pywsedi.pdf (the national table egg layer flock has 320,529,720 layers) (last visited March 17, 2017); Monthly USDA Cage-Free Shell Egg Report for the Month of February 2017, https://www.ams.usda.gov/mnreports/pymcagefree.pdf (of the national table egg layer flock, 38.5 million are cage-free layers) (last visited March 17, 2017).

Program covers more than 80% of the country's hens,[15] and the market remains inelastic, meaning that small restrictions on supply will cause proportionately larger increases in price.[16] In addition, IPPs' experts will testify that the mechanisms that allowed the 100% Rule to restrain trade in the past by reducing farmers' flexibility to produce cheaper eggs as well as preventing them from quickly and competitively responding to market conditions, continue today.[17]

Defendants, however, argue that IPPs lack standing because changes in the egg industry have significantly reduced or even eliminated the threat of injury. As the Third Circuit noted in *Boyle v. International Broth. of Teamsters Local 863 Welfare Fund*, this argument is best "understood as invoking the mootness doctrine." 579 Fed.Appx. 72, 75 (3d Cir. 2014) ("While the doctrine of standing concerns whether a plaintiff is permitted to bring suit at the pleading stage, the central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief."). Here, the Court has already determined that whether DAPs and DPPs suffered antitrust injury is a question of fact. This issue is not materially different for IPPs, and once injury is established, the burden shifts to Defendants to show "(1) the alleged violation has ceased, and there is no reasonable expectation that it will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violations." *Providence Pediatric Med. Daycare Inc v. Poonam Alaigh*, No. 16-1883, 2016 WL 7104910 (3d Cir. Dec. 6, 2016). Even if the

---

[15] *See* Animal Welfare, United Egg Producers, http://www.unitedegg.com/AnimalWelfare/default.cfm (last visited March 14, 2017). Further, Dr. Stiegert has testified that this percentage will be higher when only shell eggs for retail distribution are included. *See*, *e.g.*, May 19, 2015 Stiegert Deposition, pp: 162:8-163:15 (over 90% of the shell eggs sold at retail are covered by the UEP Certified Program).

[16] *See*, *e.g.*, Cal-Maine Foods, Inc., Annual Report on Form 10-K for the Fiscal Year Ending May 28, 2016, filed July 18, 2016, pp. 6, 23  (Egg demand is "generally price inelastic. Thus, small increases in production or decreases in demand can have a large adverse effect on prices and vice versa.") (available at http://calmainefoods.com/investors/sec-filings/).

[17] *See, e.g., supra* note 3.

Court disagrees with Plaintiffs and does not shift the burden to Defendants, IPPs will readily prove a threat of harm by demonstrating that the UEP Certified Program and the 100% Rule remain in effect, a vast majority of the nation's layers are subject to its terms, and the market conditions, which allowed the program to harm consumers in the past, continue today.

## II.     THE CLASS IS COHESIVE

As demonstrated above, all Plaintiffs will establish their claims using the same evidence regarding the existence and effects of Defendants' market-wide agreements. IPPs' claims do not involve the type of disparate, individualized factual issues that sometimes undermine class cohesion.[18] Further, once a jury finds Defendants liable, the resulting injunction will prohibit illegal conduct that affects class members and the market generally.[19] Accordingly, class members will not require separate individualized injunctions.

Nevertheless, Defendants attempt to derail 23(b)(2) certification by contriving a "common impact" requirement and demanding that IPPs demonstrate all class members will be harmed.[20] But Defendants' novel requirement cannot be reconciled with *Neale*, 794 F.3d at 367-68, which holds that (b)(2) certification is proper even if "the defendant's action or inaction has taken effect or is threatened *only as to one or a few* members of the class, provided it is based on grounds which have general application to the class."[21] If proved, Defendants' alleged conduct

---

[18] *Cf. Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141-49 (3d Cir. 1998) (disparate, individualized factual situations prevent cohesion).

[19] *See Shelton v. Bledsoe*, 775 F.3d 554, 561 (3d Cir. 2015); *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 367-68 (3d Cir. 2015); *Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (the cohesiveness requirement is "almost automatically satisfied" when plaintiffs seek an indivisible injunction).

[20] *See* Defs.' Br. at 22 ("IPPs simply have not presented . . . analysis that demonstrates that all putative class members will suffer harm as a result of Defendants' allegedly unlawful conduct.").

[21] At the hearing, Defendants cited several district court cases in support of their "common impact" argument. In the first, *In re Pharmacy Benefit Managers Antitrust Litig.*, 2017 WL 275398, at *27 (E.D. Pa. Jan. 18, 2017), the court held that because some class members actually benefitted relative to others, no common equitable remedy would be appropriate for all plaintiffs. In *In re Managerial, Prof'l & Tech.*

restraining supply in the nationwide market for UEP certified eggs, a staple food product, would as a matter of basic economic theory threaten harm to tens of millions of class members, which is more than required for (b)(2) certification.

Defendants further argue that the class lacks cohesion because it includes residents in states with cage space laws who may face little risk of future injury.  First, *Neale* makes clear that the possibility of unthreatened class members does not defeat certification of an otherwise cohesive class.  Second, consumers in these states may face some threat of harm due to the nationwide nature of the egg market and the fact that some may purchase eggs in other states. Third, as argued below, class certification will not prejudice consumers in states with cage space laws.  In any event, if the Court believes that residents of some states lack antitrust injury, the Court can exclude those residents from the injunctive class.

Finally, Defendants argue that some class members may not benefit from the injunction because, for example, their local grocery store may decide against offering non-certified eggs.[22] Defendants misinterpret the redressability requirement.  IPPs must show only that the Court can issue an injunction that redresses the *threat* of harm from Defendants' illegal activities. [23]

---

*Employees*, 2006 WL 38937, at *7-9 (D.N.J. Jan. 5, 2006), a pre-*Neale* case, the court similarly found the class lacked cohesion because there were disparate factual issues and a unitary injunction would "have potentially conflicting effects on different [class] members." *Id.* *6-7, 9.  However, the *Managerial* court repeatedly recognized that cohesion is almost always satisfied when, as here, the class seeks an indivisible injunction. *Id.* at *7-9.

[22] *See, e.g.*, Hr'g Tr. 69:15-17, 7:15-20, 75:2-19.

[23] *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 79 (1978); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185-86 (2000) (For "a plaintiff who is injured or faces the threat of future injury due to illegal conduct *ongoing at the time of suit*, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress" sufficient to create standing. (emphasis added)).  Defendants argue that enjoining illegal conduct might be difficult to enforce because a producer might continue to unilaterally decide to use some of the UEP Guidelines in running their own business, so the Court wouldn't know whether a producer continues to maintain 67 inch cages because of independent business decisions or continuation of the agreement.  Hr'g Tr. at 94:24-95:20.  But any case where agreements could continue faces the same issue.

Eliminating the agreement to the 100% Rule and prohibiting agreements to short-term flock reductions and joint exports would do just that.

### III. THE INJUNCTION WILL NOT IMPOSE CONFLICTING OBLIGATIONS ON DEFENDANTS

The Court will not need to tailor an injunction to accommodate a particular state's regulatory requirements because the injunction *will not* impose any obligations on Defendants that conflict with their obligations under state law.[24]  As the Court aptly stated, once Defendants' agreements are found anticompetitive at trial, "the injunction simply is, stop making [those illegal] agreements."  Hr'g Tr. at 71: 3-12.   Defendants will remain free to comply with any obligations imposed by state laws and determine for themselves, based on their own profit-maximizing behavior, the density in which they house their hens and whether to backfill.

### IV. IPPS DO NOT HAVE TO SHOW THAT CERTIFICATION IS NECESSARY

Defendants also argue that injunctive class certification is unnecessary.  However, "necessity is not a freestanding requirement justifying the denial of class certification."  *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 310 (3d Cir. 2016).  While a court can consider "necessity" when determining whether injunctive relief is "appropriate respecting the class as a whole," necessity justifies denying class certification only when "there would be no meaningful additional benefit to prospective class members in ordering classwide relief."  *Id.*

Here, class certification (1) provides finality for all parties by binding absent class members, thereby reducing the risk of repetitious litigation and inconsistent adjudications, (2) ensures that any binding settlement will be subject to Court approval.  *See* Fed. R. Civ. Pro.

---

[24] At the hearing, the Court asked about whether the injunctive relief would need to be tailored around the mandates of states with cage space laws, such as Arizona. Hr'g Tr. at 40:13-23.

23(e), and (3) enables absent class members to enforce an injunction in IPPs' favor. *See Gayle*, 838 F.3d at 312. Accordingly, necessity is not an appropriate basis to deny class certification.

## V. THE POSSIBILITY OF PRECLUSION DOES NOT JUSTIFY DENYING CERTIFICATION

Defendants argue that allowing IPPs to bring a 23(b)(2) injunctive class could harm absent class members by exposing them to issue preclusion and threatening their Seventh Amendment Rights. As a practical matter, this is not a serious concern because individual damages actions are not viable. IPPs' 23(b)(3) class certification motion was denied a year and a half ago, and unsurprisingly, not a single indirect purchaser class member has filed an individual damages action.[25]

Nevertheless, Defendants insist that the mere possibility of preclusion prevents certification of a (b)(2) class whenever class members who possess damages claims are prevented from opting out of a (b)(2) class.[26] But where the class is cohesive—as it is here—the potential for preclusion does not counsel against certifying a (b)(2) class.[27] Indeed, Rule 23

---

[25] At the hearing, Defendants suggested IPPs had effectively disavowed their injunctive relief claims by arguing, as part of their 23(f) appeal, that the denial of their 23(b)(3) certification sounded a death knell. But IPPs had merely argued that the Court's 23(b)(3) decision had effectively terminated IPPs' *state law damages claims*— and had expressly indicated that reconsideration of their 23(b)(2) injunctive claims was pending and they were seeking to protect their right to appellate review of the 23(b)(3) certification denial in the meantime. *See* IPPs' November 4, 2015 Supplemental Brief, pp. 2, 4 (emphasis added), Appeal No. 15-8094, Document No. 003112121453 (3d Cir.).

[26] The Court has discretion to allow absent class members to opt-out of the (b)(2) action. *See* Newberg on Class Actions § 4:36 (5th ed.) ("notice and opt out rights are not required in (b)(2) class actions, but they are discretionary, may be permitted, and have been employed."). However, since class members do not have an interest in individually litigating their claims, granting them the right to opt-out will not serve any purpose. *See* Newberg on Class Actions § 9:39 (5th ed.) (the ability to opt-out merely serves to protect absent class members' interests in individually litigate their claims).

[27] *See*, *e.g.*, *Baby Neal for and by Kanter v. Casey*, 443 F.3d 48, 59 (3d Cir. 1994). The cases cited by Defendants in oral argument are unavailing. *Dukes* merely speaks to the dangers of preclusion when the class is not cohesive and putative class members' claims turn on disparate factual circumstances. Likewise, in *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 562, 576-77 (E.D. Tenn. 2014), preclusion would have been unfair since—unlike here—the court found individualized issues that prevented a finding of typicality, adequacy and cohesiveness. In *Hohider v. United Parcel Serv., Inc.*,

represents a determination that, in general, preclusion's advantages outweigh any perceived inequity created by preventing repeated litigation of the same issue.[28] Further, allowing this case to go forward on a (b)(2) basis does not implicate class members' Seventh Amendment rights.[29] Consequently, Defendants' preclusion arguments in no way support denying certification of the (b)(2) class.

## VI. CONCLUSION

The IPPs respectfully submit that the class should be certified under Federal Rules of Civil Procedure 23(b)(2).

Dated:  March 17, 2017                                    Respectfully submitted,


                                             _/s/ Christopher V. Le_
                                             Christopher V. Le
                                             Timothy D. Battin
                                             **STRAUS & BOIES, LLP**
                                             4041 University Drive, 5th Floor
                                             Fairfax, VA 22030
                                             Tel.: (703) 764-8700
                                             Fax: (703) 764-8704
                                             cle@straus-boies.com
                                             tbattin@straus-boies.com

                                             ***Interim Co-Lead Counsel for the Indirect Purchaser IP Plaintiffs***

---

574 F.3d 169, 201 (3d Cir. 2009), the Third Circuit discussed the requirements for certification of an issue only class under 23(c)(4), and did not address whether possible preclusion issues justify denying certification of a cohesive (b)(2) class. Finally, in *Montgomery Cty., Pa. ex rel. Becker v. MERSCORP, Inc.*, 298 F.R.D. 202, 215-18 (E.D. Pa. 2014), the court *certified* a class for injunctive relief and damages under Rule 23(b)(3) and thus it did not need to address the appropriateness of 23(b)(2) certification in instances where class members may subsequently bring individual damage claims.

[28] *See Barnes*, 161 F.3d at 143; *Yearsley v. Scranton Hous. Auth.*, 487 F. Supp. 784, 787 (M.D. Pa. 1979).

[29] *B & B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S.Ct. 1293, 1304 (2015) (Rejecting constitutional challenges to preclusion from administrative tribunals noting "[t]he Court has already held that the right to a jury trial does not negate the issue-preclusive effect of a judgment, even if that judgment was entered by a juryless tribunal."); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).