# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : : : | MULTIDISTRICT LITIGATION |
| *THIS DOCUMENT APPLIES TO:* ALL INDIRECT PURCHASER CASES | : : | No. 08-md-2002 |

# M E M O R A N D U M

PRATTER, J.                                                                 JUNE 27, 2017

The Court's resolution of the Indirect Purchaser Plaintiffs' motion for class certification in this multidistrict antitrust litigation left open the possibility of certifying an injunctive relief class, noting that the parties had failed to adequately brief the issues surrounding such a class and expressing some skepticism that certification would be appropriate. The parties then separately briefed the issue in the wake of the denial of certification of the Indirect Purchaser Plaintiffs' damages class. After reviewing the parties' submissions and hearing oral argument, the Court denies the renewed motion and declines to certify an injunctive relief class.

## BACKGROUND

Because the Court has written extensively on the factual background of this case, the following background discussion will be brief.

### a.   Allegations of Fact

The alleged conspiracy in this antitrust action consisted of three general tactics: (1) a series of short-term egg-supply reduction programs, (2) a long-term plan to reduce the supply of eggs under the pretext of an "animal-welfare program," and (3) exporting eggs at a loss. These

1

tactics allegedly reduced the supply of eggs and resulted in higher prices paid by the putative class of indirect purchasers.

### 1. Short-term Supply-Reduction Programs

Beginning in 1999, members of the United Egg Producers ("UEP") agreed to a series of programs designed to immediately reduce the supply of eggs. These programs were implemented by a committee within UEP known as the "Marketing Committee." Members of UEP were then to commit to implementing the programs. These programs included inducing hens to molt earlier[1], slaughtering flocks of hens earlier, and reducing the hatching of chicks. UEP members were also encouraged to stop or slow considerably backfilling cages (that is, replacing dead hens with younger hens). These egg supply reduction programs reportedly succeeded in reducing flock size and driving the price of eggs up, and were implemented on a number of occasions between 1999 and 2006.

### 2. The Scheme to Reduce the Supply of Eggs Under the Pretext of a Certified Animal-Welfare Program

The alleged conspiracy to reduce the supply of eggs went beyond these short-term strategies and included the creation and implementation of a certified program purporting to improve the welfare of the hens. In fact, according to Plaintiffs, this program was a scheme to reduce the supply of eggs. The program's goal of reducing the egg supply primarily relied upon requirements for increased cage space per hen. Compliance with this program was monitored by monthly reporting requirements and periodic audits. The cage-space requirement was supplemented by three additional requirements that ensured the certified program would have its intended effect: (1) the 100% Rule, which required that all of a producer's facilities, including

---

[1] Molting is the process whereby hens lose their feathers and regrow them—hens lay no eggs when molting.

those of its affiliates, comply with the Certified Program's cage-space requirements in order for any egg from that producer to be "certified;" (2) a prohibition on backfilling within the certified program; and (3) a rule that failing to comply with the cage-space or backfilling requirements would result in an "automatic fail" of an audit under the certified program—even though other shortcomings under the program (such as improper lighting or handling) did not result in an "automatic fail." The certified program was promoted as an animal-welfare program, with labels on egg packaging certifying that the eggs were "Animal Care Certified." But the accusation is that this was merely a pretextual justification for this supply-reduction program. In fact, following a Federal Trade Commission investigation concerning whether the "Animal Care Certified" label was misleading, UEP agreed in 2005 to change the name of its certified label from "Animal Care Certified" to "UEP certified."

### 3. Egg Exports at a Loss

The final component of the alleged supply-restriction program was the exporting of eggs at a loss (essentially "dumping" eggs in foreign markets so as to drive the domestic price of eggs up). The scheme, implemented by members of the United States Egg Marketers ("USEM") and managed through the UEP Export Committee, required all USEM members to either export their own eggs at a loss or sell their eggs to UEP at domestic prices and later receive a bill for the difference between the domestic price and the export price. USEM members who did not contribute eggs to the export scheme contributed money to help fellow members bear the burden of the export losses. These export efforts, which were also supported by some non-USEM-members, occurred periodically between 2000 and 2003, and from 2006 to 2008.

### b. Proposed Class

The Court previously denied the IP Plaintiffs' motion for class certification. However, as to the proposed Rule 23(b)(2) injunctive relief class, the Court permitted the IP Plaintiffs to file a renewed motion, after determining that all parties' briefing on that particular issue lacked the rigor necessary for the Court to decide that certification question. In their renewed motion, the IP Plaintiffs propose the following national injunctive relief class, seeking relief under Section 1 of the Sherman Act and Section 16 of the Clayton Act:

> All individuals and entities in the United States that regularly purchase brown or white shell eggs from a retailer for their own use. Specifically excluded from this class are Defendants' subsidiaries and affiliates, as well as individuals and entities whose only purchases of shell eggs are purchases of "specialty" shell eggs (such as "organic," "free range," "cage free," "nutritionally enhanced," "free-roaming," "reduced cholesterol," "omega-3," "pastured," "pasture-raised," or "fertile") or hatching eggs, which are used by poultry breeders to produce breeder stock or growing stock for laying hens or meat.

In their original class certification motion, IP Plaintiffs only sought certification of an injunction class comprised of individuals and entities in the "Class Jurisdictions," or a collection of 21 states. Now that only injunctive relief is potentially subject to class treatment, however, the IP Plaintiffs have expanded their proposed class to cover the entire United States. The IP Plaintiffs seek to enjoin the Defendants from making certain agreements with other egg producers – more specifically, the IP Plaintiffs target the 100% Rule, the ban on backfilling, short-term coordinated flock reductions, and egg exports at a loss.

### LEGAL STANDARD

The standard for class certification is set forth in Rule 23 of the Federal Rules of Civil Procedure, which reads in relevant part:

> A class action may be maintained if Rule 23(a) is satisfied and if:
> **(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . .

Fed. R. Civ. P. 23.

Rule 23's comparative brevity obscures its labyrinthine nature. Certifying a class is not an easy endeavor, and must not be undertaken casually. Rather, courts must conduct a "rigorous analysis" to ensure that Rule 23's requirements are met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). The Court must find that each of Rule 23's standards has been met by a preponderance of the evidence. *Id.* at 321. In determining whether these standards have been met, the Court necessarily needs to examine issues that, to some extent, overlap issues to be decided at the final merits determination. *Id.* at 316. However, exercising the analytical restraint often demanded of judges, the Court only examines the merits of the underlying case to the extent such an examination is relevant to the Rule 23 standards. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013).

Rule 23(a)'s demands are typically referred to as "numerosity, commonality, typicality, adequacy, and ascertainability," and every potential class must meet these standards. Because the Court has already determined that the IP Plaintiffs have satisfied the demands of 23(a), s*ee In re Processed Egg Prods. Antitrust Litig. ("Eggs I")*, 312 F.R.D. 124, 132-35 (E.D. Pa. 2015), the Court will not revisit that inquiry here. At issue, then, is only whether the IP Plaintiffs have satisfied the demands of Rule 23(b)(2).

**DISCUSSION**

"Subsection (b)(2) class actions are 'limited to those class actions seeking primarily injunctive or corresponding declaratory relief.'" *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998). As this Court already stated in its earlier class certification decision, it is abundantly clear that in filing this case, the IP Plaintiffs' primary aim was to recover monetary damages. *See Eggs I*, 312 F.R.D. at 165-66. Also as the Court acknowledged, several courts

have denied class certification of similar proposed 23(b)(2) classes on this financial goal finding alone. *See, e.g., In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *7 (N.D. Cal. June 9, 2010) (holding that where class had proposed injunctive classes alongside damages classes that "[c]ertification of any Statewide Classes under Rule 23(b)(2) likewise is inappropriate in light of the fact that Plaintiffs' primary intent in this litigation is to recover damages for past purchases"); *Allen v. Holiday Universal*, 249 F.R.D. 166, 189-90 (E.D. Pa. 2008) (denying certification of a 23(b)(2) class when the primary relief sought was monetary damages); *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 507 (N.D. Cal. 2008) ("From the onset of litigation, it has been crystal clear that both groups of plaintiffs have primarily sought monetary damages. Several antitrust decisions have denied certifying under Rule 23(b)(2) where the primary relief sought was money." (collecting cases)); *Contawe v. Crescent Heights of Am., Inc.*, No. Civ. A. 04-2304, 2004 WL 2966931, at *4 (E.D. Pa. Dec. 21, 2004) (refusing to certify 23(b)(2) class because monetary damages were the primary relief sought, and, at the same time, refusing to certify 23(b)(3) class). *See also Babarin v. Aramark Corp.*, No. 02-8057, 2003 WL 355417, at * (3d Cir. 2003) (upholding denial of 23(b)(2) certification when monetary damages sought were not incidental to the requested injunctive or declaratory relief). *Cf., e.g., In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425, at *17-18 (E.D. Pa. Aug. 3, 2007) ("Plaintiffs respond that I need not even consider this issue because the claims for damages and injunctive relief are entirely separate—they arise under different statutes (Clayton Act versus state statutes) and are brought on behalf of different classes. I agree with Plaintiffs. . . . The nationwide class potentially includes many members from states that do not permit damages actions. Thus, a significant portion of the nationwide class seeks injunctive

relief only.  In these circumstances, it is appropriate to certify two separate classes under Rules 23(b)(2) and 23(b)(3).")

Initially, the Court declined to deny certification based on this reason alone, in light of the parties' failure to adequately brief 23(b)(2) class certification issues.  *See Eggs I*, 312 F.R.D. at 165.  However, consideration of the type of relief so unabashedly sought in this case – monetary damages – does weigh heavily against class certification.  Indeed, "[c]ourts infrequently certify classes under Rule 23(b)(2) in antitrust litigation" for this very reason, and, as commentators have observed, the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 360 (2011) (holding that claims for monetary relief may not be certified under 23(b)(2) when "monetary relief is not incidental to the injunctive or declaratory relief") may make certification of 23(b)(2) classes in antitrust cases, which at their core seek relief from economic harm, even more rare.  *See* Newberg on Class Actions § 20.49 (5th Ed. 2017).

Once again, however, the Court will not decide the issue on this basis alone.  In the earlier decision, the Court laid out a number of concerns for the parties to address if the IP Plaintiffs decided to renew their motion for certification of a 23(b)(2) class.  *See Eggs I*, 312 F.R.D. at 170.  Among those concerns, the Court specifically admonished the parties to discuss in greater detail the issue of cohesiveness, particularly in light of the passage of animal welfare laws in various jurisdictions that invoke or exceed the standards set forth by the UEP.  *Id.* at 168-69.  "Although Rule 23(b)(2) classes need not meet the additional predominance and superiority requirements of Rule 23(b)(3), 'it is well established that the class claims must be cohesive.'" *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 263–64 (3d Cir. 2011) (quoting *Barnes*, 161 F.3d at 143).  The cohesiveness inquiry provides an important protection for absent class members, who

have no opportunity to opt out of a 23(b)(2) class and may not even receive notice of the litigation at all.

While it is true, as IP Plaintiffs point out, that the Third Circuit Court of Appeals stated in *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58-59 (3d Cir. 1994) that cohesiveness is "almost automatically satisfied in actions primarily seeking injunctive relief,"[2] later Third Circuit Court of Appeals cases have made it clear that the cohesiveness inquiry is not without teeth. *See, e.g., Barnes*, 161 F.3d at 143 ("[A] 'court should be more hesitant in accepting a (b)(2) suit which contains significant individual issues than it should under subsection 23(b)(3)'") (quoting *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D. Pa. 1976)). To demonstrate cohesiveness, Plaintiffs must show that the following elements are "susceptible of common proof": (1) actual or threatened injury "from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur"; (2) causation; and (3) likelihood that the equitable relief will redress the injury. *See In re OSB*, 2007 WL 2253425, at *17 (denying certification of part of a (b)(2) class for the same reasons the court denied certification of part of a (b)(3) class – because plaintiffs "have not shown that they can prove actual or potential injury, causation, or redressability *on a common basis* because of the disparate factual circumstances among" that portion of the class) (internal quotations and citations omitted; emphasis added).

For many of the same reasons that the Court previously found that the IP Plaintiffs failed to show that common issues predominated over individual ones as to their proposed (b)(3) class, the IP Plaintiffs have failed to show that their proposed (b)(2) class is cohesive. As mentioned

---

[2] In making this observation, the *Baby Neal* court was discussing the quintessential (b)(2) cases – "civil rights actions and other institutional reform cases." *See Baby Neal*, 43 F.3d at 59. Thus, the observation is that much less meaningful – it is tautological to say that a particular requirement is automatically satisfied in cases for which that requirement is designed. Antitrust cases, which, at their core, revolve around money, do not really fit the paradigm. This is not to say that a (b)(2) class could never be certified if the underlying claim is one under the antitrust laws, but the very nature of antitrust claims does provide good cause for a court to examine a request for (b)(2) certification with some good faith skepticism.

above, to prove their injunction claim, the IP Plaintiffs would not need to show past harm (as they would have needed to show to make out their claims for monetary damages), but they are required to demonstrate at least a threat of future injury and to do so through common proof. The Court's November 10, 2015 Memorandum addressing class certification identified a number of ways in which the IP Plaintiffs' evidence fell short of demonstrating that they could provide common proof of antitrust impact or injury. *See Eggs I*, 312 F.R.D. at 150-161. For instance, their economic models failed to "isolate the effects of Defendants' conduct on the total egg supply." *Id.* at 153-155. They also failed to account for the effect of cost-plus contracts on egg prices and to present a reliable pass-through model. *Id.* at 155-60. That IP Plaintiffs could not show past harm through common proof virtually dooms any hope of showing a threat of future harm through common proof. Moreover, given the changes in the market, including significant regulations passed in several states that require compliance with UEP standards or that introduce cage space requirements even more indulgent than those required by the UEP, the task of showing common proof of impact across a nationwide class has become even more problematic, and none of the econometric evidence presented by the IP Plaintiffs has accounted for this changing landscape.

Indeed, the IP Plaintiffs have not provided any meaningful analysis of the threat of future harm, much less shown how future harm could be proven on a class-wide basis. Instead, they wave off the need to provide that analysis by pointing to *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015), in which the Third Circuit Court of Appeals stated that "certification is appropriate even if the defendant's action or inaction has taken effect or is threatened only as to one or a few members of the class, provided it is based on *grounds* which have general application to the class." *Id.* at 367. IP Plaintiffs take this quote out of context,

9

however. In *Neale*, the question before the Third Circuit Court of Appeals was whether plaintiffs in a proposed class action suit must demonstrate that all putative class members have Article III standing.[3] *Id.* at 358. More specifically, the defendant in that case argued that the plaintiffs could not show that all class members met the injury-in-fact requirement. *Id.* After a detailed discussion of the history of representative actions, the *Neale* court held that plaintiffs need only show that at least one named plaintiff has standing to sue in order to meet Article III's standing requirement. *See id.* at 367. However, the *Neale* court did not relieve plaintiffs from meeting any other requirement of class certification. Indeed, the court noted that the defendant's arguments "demonstrate[d] that [the defendant] may have legitimate Rule 23 challenges," and that "[r]ather than shoehorn these questions into an Article III analysis, we will continue to employ Rule 23 to ensure that classes are properly certified. In this case, certification requires the District Court to determine what differing factual and legal circumstances might mean for the class . . ." *Id.* at 368.

IP Plaintiffs also argue that causation can be presumed when they need to prove only a risk of injury. In so arguing, they rely on *Mid-West Paper Prods. Co. v. Cont'l Group, Inc.*, 596 F.2d 573, 592-94 (3d Cir. 1979), which they claim stands for the proposition that in injunctive relief cases, a court may presume injury to indirect purchasers if there is proof of injury to direct purchasers. *See id.* at 593 ("[I]ndirect purchasers can state unequivocally that under all

---

[3] Defendants here also argue that the IP Plaintiffs' proof of a threat of future harm is so lacking that the Named Plaintiffs do not have Article III standing. However, the Court allowed the Direct Action Purchaser Plaintiffs' Clayton Act injunctive relief claim to survive summary judgment because the Defendants' continued participation in the UEP program could be evidence of an ongoing conspiracy. *See In re Processed Egg Prods. Antitrust Litig. ("Eggs II")*, 08-md-2002, 2016 WL 4771865, at *6 (E.D. Pa. Sept. 12, 2016). This ruling on the possible continuation of a price fixing conspiracy, coupled with Dr. Stiegert's pass-through model, which, although inadequate to show common impact, did at least show that *some* of the indirect purchasers arguably paid higher prices for eggs because of the alleged conspiracy, is enough to satisfy the Court that it would not be appropriate to dismiss this case for lack of Article III standing. *See Eggs I*, 312 F.R.D. at 158 (discussing Dr. Stiegert's pass-through model, which used actual cost and retail pricing information to evaluate the pass-through rate of one retailer).

10

circumstances prevalent in the real economic world, money is passing from their hands into the pockets of the price fixers as a result of the conspiracy, and that no rational pricing decisions by any intermediary will erase this fact."). IP Plaintiffs cannot square this dicta with subsequent Third Circuit Court of Appeals cases, however. For instance, in *Howard Hess Dental Labs. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247-48 (3d Cir. 2010), the Third Circuit Court of Appeals upheld the denial of summary judgment in favor of the plaintiffs, holding that despite the fact that in a previous case brought by the government against the same defendant the appellate court held that the defendant had monopoly power and used that power to foreclose competition, this prior finding did not compel a finding of antitrust injury to plaintiffs for purposes of their injunctive relief claim. Indeed, in that case, the Third Circuit Court of Appeals cited *Mid-West Paper* for the principle that "a plaintiff bears the obligation of presenting evidence demonstrating injury even when another injunction is already in place." *See id.* at 250. *See also In re OSB*, 2007 WL 2253425, at *18 (requiring common proof of antitrust injury and denying class certification to certain indirect purchaser plaintiffs, even as to proposed 23(b)(2) class and even after certifying other classes). The Court has not found any evidence that *Mid-West Paper* has been applied in any other case to create a presumption of injury, nor have the IP Plaintiffs cited to such authority. The Court will not interpret dicta in *Mid-West Paper* as having such a profound effect. Because the IP Plaintiffs have not escaped their failure to present a means of determining antitrust impact through common proof, the Court therefore will decline to certify their proposed injunctive relief class.[4]

---

[4] Although the Court has decided this issue on other grounds, the IP Plaintiffs' blithe dismissal of the potential preclusive effect of a trial on their injunction claim is troubling. Plaintiffs argue that the question of whether litigation of injunctive claims would have a preclusive effect on future damages claims is "largely an academic inquiry" because of the Court's denial of certification of a 23(b)(3) class – they claim that no individual plaintiffs would undertake an antitrust suit for the relatively small monetary damages an individual plaintiff could recover, while at the same time acknowledging that a judgment in

**CONCLUSION**

For the foregoing reasons, the Court will deny IP Plaintiffs' Renewed Motion for Class Certification. An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

an injunctive class case would have a preclusive effect for all class members and Defendants. As Defendants point out, the proposed class almost certainly includes corporations and institutional entities that could have substantial damages claims. Rather than counter with evidence of the absence of potential large claimants, the IP Plaintiffs' primary response is that the Defendants are speculating.