**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**IN RE: PROCESSED EGG PRODUCTS
ANTITRUST LITIGATION**

**THIS DOCUMENT APPLIES TO:
ALL DIRECT ACTION PLAINTIFF
ACTIONS**

**MDL No. 2002
Case No.: 08-md-02002**

**DEFENDANTS' RESPONSE IN OPPOSITION TO
DAPS' MOTION TO STRIKE DEFENDANTS' MOTION IN
LIMINE TO EXCLUDE DR. BAYE'S DAMAGES CALCULATIONS**

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................... 1

II.    BACKGROUND .................................................................................................. 2

III.   ARGUMENT ....................................................................................................... 4

      A.     Defendants' Motion *in Limine* and Supporting Walker Declaration Are
             Timely ............................................................................................................. 4

            1.     Defendants' Motion is Timely .................................................................. 4

            2.     The Walker Declaration is Timely ............................................................ 5

      B.     Good Cause Exists to Accept the Motion *in Limine* and Walker
             Declaration ..................................................................................................... 7

            1.     Legal Standard .......................................................................................... 7

            2.     The Motion and Declaration Respond to Events That Occurred
                After the Close of Expert Discovery ......................................................... 9

            3.     Defendants Will Be Prejudiced if the Court Strikes Either the
                Motion or the Supporting Declaration ..................................................... 10

            4.     The DAPs Are Not Prejudiced by the Motion and Declaration .............. 12

            5.     Defendants Have Proceeded in Good Faith ............................................ 16

      C.     The DAPs Fail to Justify Dr. Baye's Use of USDA Data and Refusal to
             Control Adequately for the Effects of Animal Welfare Laws ........................... 18

            1.     Dr. Baye, Like Dr. Stiegert, Fails to Isolate the Effects of the
                *Defendants'* Conduct on *Commodity* Eggs ............................................. 18

            2.     Dr. Baye Fails to Control Adequately for the Effects of the Arizona
                Regulation ............................................................................................... 20

IV.    CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott Labs. v. Lupin Ltd.*,
  No. 09-152-LPS, 2011 WL 1897322 (D. Del. May 19, 2011) ..................................................8

*Apotex, Inc. v. Cephalon, Inc.*,
  No. 2:06-cv-2768, 2014 WL 4933009 (E.D. Pa. Oct. 1, 2014) ............................................16

*Apotex, Inc. v. Cephalon, Inc.*,
  No. 2:06-CV-2768, 2015 WL 12645745 (E.D. Pa. May 26, 2015)........................................16

*Argue v. David Davis Enterprises, Inc.*,
  No. 02-9521, 2008 WL 450097 (E.D. Pa. Feb. 15, 2008) ......................................................5

*In re Asbestos Prods. Liab. Litig. (No. VI)*,
  289 F.R.D. 424 (E.D. Pa. 2013)..............................................................................................6

*Bauder v. Phila., Bethlehem & New Eng. R.R. Co.*,
  No. 96-7188, 1998 WL 633651 (E.D. Pa. Aug. 28, 1998), *aff'd*, 189 F.3d 463
  (3d Cir. 1999)...................................................................................................................13, 16

*Bedingfield v. Deen*,
  No. 09-369, 2011 WL 2712950 (W.D. La. July 8, 2011) ......................................................15

*Borden v. Ingersoll-Rand Co.*,
  No. 01-CV-5455, 2003 WL 21488511 (E.D. Pa. Jan. 17, 2003)......................................14, 17

*Bridgestone Sports Co., Ltd. v. Acushnet Co.*,
  No. CIVA 05–132 JJF, 2007 WL 521894 (D. Del. Feb. 15, 2007)........................................17

*Buddy's Plant Plus Corp. v. Centimark Corp.*,
  No. 10-670, 2012 WL 5254910 (W.D. Pa. Oct. 24, 2012) ....................................................12

*Carnegie Mellon Univ. v. Marvell Tech. Grp.*,
  No. 09-290, 2012 WL 6562221 (W.D. Pa. Dec. 15, 2012) *aff'd*, 807 F.3d 1283
  (Fed. Cir. 2015).................................................................................................................5, 9

*Christopher v. Cutter Labs.*,
  53 F.3d 1184 (11th Cir. 1995) ...............................................................................................15

*Cloud Farm Assocs., L.P. v. Volkswagen Grp. of Am., Inc.*,
  No. 10-502-LPS, 2012 WL 3069390 (D. Del. July 27, 2012)............................................8, 12

*Cochran v. Jackson*,
No. 14-2165, 2015 WL 3555291 (E.D. Pa. June 8, 2015)....................................................8, 12

*Community Ass'n Underwriters of Am., Inc. v. Rhodes Dev. Grp., Inc.*,
No. 1:09-CV-0257, 2013 WL 3510714 (M.D. Pa. July 11, 2013) ..........................................11

*Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*,
650 F. Supp. 2d 387 (E.D. Pa. Aug. 21, 2009), *aff'd*, 399 F. App'x 711
(3d Cir. 2010)........................................................................................................................9, 14

*Dole v. Arco Chem. Co.*,
921 F.2d 484 (3d Cir. 1990)........................................................................................................8

*Edmonds-Lambert v. Metro Auto Sales, Inc.*,
No. 14-4151, 2015 WL 12806502 (E.D. Pa. Mar. 18, 2015) ...................................................13

*Energy & Env't Legal Inst. v. Epel*,
793 F.3d 1169 (10th Cir. 2015) ................................................................................................24

*Everwine v. Nemours Found.*,
No. 05-3004, 2006 WL 5116707 (E.D. Pa. May 24, 2006).........................................................4

*Gregory v. Sewell*,
Nos. 4:04-2438, 4:04-2439, 4:04-2440, 2006 WL 5186521
(M.D. Pa. Aug. 23, 2006)..........................................................................................................14

*Harrison Beverage Co. v. Dribeck Imps., Inc.*,
133 F.R.D. 463 (D. N.J. 1990)...................................................................................................12

*Healy v. Beer Institute, Inc.*,
491 U.S. 324 (1989)...................................................................................................................24

*Joseph v. Hess Oil Virgin Islands Corp.*,
651 F.3d 348 (3d Cir. 2011)........................................................................................................7

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
No. 08 Civ. 9116(PGG), 2009 WL 1357946 (S.D.N.Y. May 12, 2009) ..................................12

*Konstantopoulos v. Westvaco Corp.*,
112 F.3d 710 (3d Cir. 1997)........................................................................................................8

*Kremsky v. Kremsky*,
No. 16-cv-04474, 2017 WL 1198760 (E.D. Pa. Feb. 21, 2017)...............................................16

*Krueger v. Wyeth, Inc.*,
No. 03CV2496 JAH (MDD), 2016 WL 3981126 (S.D. Cal. May 19, 2016)..............................9

*Lithuanian Commerce Corp. v. Sara Lee Hosiery*,
   202 F. Supp. 2d 371 (D.N.J. 2002) ........................................................................15

*Lopez v. Bucks Cty.*,
   No. 15-5059, 2016 WL 3612056 (E.D. Pa. July 5, 2016) ......................................16

*Macsenti v. Becker*,
   237 F.3d 1223 (10th Cir. 2001) .............................................................................15

*Mann v. Mack Trucks, Inc.*,
   No. 06-3738, 2007 WL 7947894 (E.D. Pa. July 3, 2007) ......................................15

*Marbled Murrelet v. Babbitt*,
   83 F.3d 1060 (9th Cir. 1996) .................................................................................15

*McGrath v. Rust-Oleum Corp.*,
   No. 12-1719, 2013 WL 2896966 (E.D. Pa. June 12, 2013)......................................6

*Meyers v. Pennypack Woods Home Ownership Assn.*,
   559 F.2d 894 (3d Cir. 1977), *overruled on other grounds by Goodman v.*
   *Lukens Steel Co*., 777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (1987) ............8

*Moore v. Vangelo*,
   No. 03-4718, 2005 WL 2178918 (E.D. Pa. Sept. 6, 2005)......................................15

*nCube Corp. v. SeaChange Int'l, Inc.*,
   809 F. Supp. 2d 337 (D. Del. 2011).........................................................................6

*Novartis Pharms. Corp. v. Actavis, Inc.*,
   No. 12-366-RGA-CJB, 2013 WL 7045056 ....................................................8, 13, 14

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)........................................................................8, 13, 16

*Perkasie Indus. Corp. v. Advance Transformer, Inc.*,
   143 F.R.D. 73 (E.D. Pa. 1992)...............................................................................16

*Peshlakai v. Ruiz*,
   No. CIV 13-0752 JB/ACT, 2013 WL 6503604, at *15 (D.N.M. Nov. 20,
   2013) ......................................................................................................................16

*Pfeiffer v. Eagle Mfg. Co.*,
   137 F.R.D. 352 (D. Kan. 1991)...............................................................................12

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970)................................................................................................24

*In re Processed Egg Prods. Antitrust Litig.*,
  130 F. Supp. 3d 945 (E.D. Pa. 2015) ...........................................................................15, 17

*In re Processed Egg Prods. Antitrust Litig.*,
  2016 WL 410279 (E.D. Pa. Feb. 3, 2016) ...............................................................................2

*In re Processed Egg Prods. Antitrust Litig.*,
  2016 WL 4771865 (Sept. 12, 2016)....................................................................................2, 23

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015).....................................................................................2, 3, 19

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  75 F. Supp. 3d 94 (D.D.C. 2014) ....................................................................................10, 12

*Reynolds v. Borough of Avalon*,
  799 F. Supp. 442 (D.N.J. 1992) ..............................................................................................8

*Rimbert v. Eli Lilly & Co.*,
  647 F.3d 1247 (10th Cir. 2011) .............................................................................................14

*Rivera v. Lehigh Cty.*,
  No. 13-CV-04748, 2015 WL 12819147 (E.D. Pa. Oct. 9, 2015) ........................11, 14, 16, 17

*Schreck v. Walmart*,
  No. 08–5729 (DMC), 2009 WL 4800225 (D. N.J. Dec. 8, 2009) .........................................12

*Senese v. Liberty Mut. Ins. Co.*,
  661 F. App'x 771 (3d Cir. 2016) ..............................................................................................4

*Southco, Inc. v. Fivetech Tech. Inc.*,
  611 F. App'x 681 (Fed. Cir. 2015) .........................................................................................16

*Stored Value Sols., Inc. v. Card Activation Techs., Inc.*,
  No. 09-495-LPS, 2010 WL 3834457 (D. Del. Sept. 27, 2010) ..............................................11

*SuperMedia LLC v. Morley*,
  Nos. 13-176, 12-2329, 2014 WL 5023386 (E.D. Pa. Oct. 8, 2014) .......................................17

*Taylor v. Shields*,
  No. 13-2241, 2017 WL 2633427 (E.D. Pa. June 19, 2017), *appeal docketed*,
  No. 17-2439 (3d Cir. July 6, 2017)......................................................................................9, 15

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999)....................................................................................................17

*United States v. Wen Chyu Liu*,
  716 F.3d 159 (5th Cir. 2013) ....................................................................................................9

*White v. Gerardot*,
   No. 1:05-CV-382, 2008 WL 4724004 (N.D. Ind. Oct. 24, 2008)...........................9

*Withrow v. Spears*,
   967 F. Supp. 2d 982 (D. Del. 2013)...................................................................17

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)...............................................................8, 10, 11

**Other Authorities**

WRIGHT AND MILLER, MODIFYING SCHEDULING ORDERS, 6A FED. PRAC. & PROC.
   CIV. § 1522.2 (3d ed.)..........................................................................................9

3-16 MOORE'S FEDERAL PRACTICE-CIVIL § 16.03 (2017)..........................................10

**Rules**

Fed. R. Civ. P. 16(b)(4)...................................................................................................7

Fed. R. Civ. P. 23.............................................................................................19, 20

Fed. R. Civ. P. 26(a)(3)(B)..............................................................................................5

Fed. R. Civ. P. 26(e)(1)(A).............................................................................................5

Fed. R. Civ. P. 26(e)(2)...................................................................................................5

Fed. R. Civ. P. 37.............................................................................................................8

**Regulations**

Ariz. Admin. Code R3-2-901.........................................................................................23

Ariz. Admin. Code R3-2-907(B)....................................................................................23

# I.     INTRODUCTION

The Direct Action Plaintiffs (the "DAPs") seek to dodge the substantive merit of Defendants' Motion *in Limine* to Exclude Dr. Baye's Damages Calculations by contending that it is an untimely *Daubert* motion.  The DAPs simply ignore the facts that (1) courts in this district frequently treat motions seeking to preclude expert testimony as motions *in limine* and grant such motions provided there is no prejudice to the opposing party, (2) this Court issued important rulings bearing on the admissibility of Dr. Baye's testimony, and (3) Dr. Baye supplemented his report, after the May 26, 2015 deadline for *Daubert* motions.  The DAPs believe it is preferable to ignore these facts and waste time on a trial that is doomed because their expert's testimony on issues critical to their case is ultimately inadmissible.

In an effort to depict the Defendants' entire Motion and the Walker Declaration as untimely, the DAPs assert that the Motion and Declaration represent "a desperate attempt to delay the trial of DAPs' claims based on the improper re-litigation of settled issues in the case and the assertion of baseless new arguments."  Mot. to Strike at 4.  Yet the opposite is true.  Defendants' Motion and Declaration are an effort to confront and resolve the impact of the Court's prior rulings on the admissibility of Dr. Baye's testimony before any trial on the DAPs' claims has even been set.  Bringing the Motion now allows a timely response by the DAPs and consideration by the Court well in advance of any future trial.  The arguments and opinions contained in the Motion and Declaration and the flaws in Dr. Baye's analysis will not simply go away if the Court were to grant the Motion to Strike.  Therefore, the most appropriate time for the Court to consider the arguments and opinions in the Motion and Declaration is *now*, rather than during trial.  Resolving these issues in advance of trial will benefit all parties and the Court.  And because a trial date has not yet been scheduled, the DAPs can claim no prejudice by the timing of the Motion and Declaration.  The DAPs' Motion should be denied.

## II.   <u>BACKGROUND</u>

Following the original deadline for *Daubert* motions, the Court issued three decisions that bear on the Motion to Strike:

- **First**, on September 18, 2015, the Court denied IPPs' motion for class certification, in part because of Dr. Stiegert's use of overbroad USDA data – specifically holding that "the failure to account for non-conspiring producers and the failure to account for non-commodity eggs[ ] are both flaws undermining the reliability of Dr. Stiegert's model." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa. 2015).

- **Second**, on February 3, 2016, this Court established December 31, 2008 as the class cutoff date for the shell egg subclass in the DPP action because the DPPs' expert's "model fails to specify, after 2008, what component of the alleged price increase is attributable to unlawful antitrust behavior as opposed to imposition of lawful state regulatory schemes." *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 410279, at *8 (E.D. Pa. Feb. 3, 2016).

- **Third**, on September 12, 2016, the Court ruled that the DAPs and DPPs cannot recover damages for sales affected by the Arizona regulation, and ordered plaintiffs "to supplement their expert reports so as to remove any damages based upon eggs either produced or sold in Arizona after October 1, 2009." *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 4771865, at *9 (Sept. 12, 2016).  On November 4, 2016, DAPs served their supplemental expert report, with backup, which purports to remove the effects of the Arizona regulation from Dr. Baye's damages calculations.

The Motion *in  Limine* and supporting Declaration (ECF Nos. 1529, 1530) comprise three principal and distinct arguments, each of which relates to a decision by this Court that post-dates any *Daubert* deadline.  Each argument also responds, in part, to Dr. Baye's October 2016 Arizona Supplement, which the Defendants obviously could not have responded to by the 2015 *Daubert* deadline in CMO 22 (ECF No. 1111).

First, the Motion and Declaration explain that Dr. Baye failed to adjust his damages analysis properly to take into account the Arizona regulation, which became effective October 1, 2009.  Motion at 15–18; Declaration at ¶¶ 32–38 (the "Arizona Arguments and Opinions").  Without properly controlling for the effects of the Arizona regulation, Dr. Baye cannot testify about damages after September 30, 2009.  Because the DAPs did not file the Arizona

Supplement until over a year after the *Daubert* deadline, Defendants could not have filed their response to Dr. Baye by the *Daubert* deadline.

Second, Dr. Baye uses USDA egg production data for the regression ("production model") that forms the foundation for his antitrust injury and damages analysis. USDA egg production data includes data from all producers – including non-conspirators – and all eggs – including egg products and specialty eggs, which are unrelated to the subject of this action. Accordingly, Dr. Baye (like Dr. Stiegert) is incapable of isolating the impact of the allegedly unlawful conduct, as he must do under traditional antitrust injury and damages case law. Motion at 8–14; Declaration at ¶¶ 14–31 (the "USDA Data Arguments and Opinions") This Court recognized that point in rejecting Dr. Stiegert's analysis and denying IPPs' motion for class certification. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 161.

Additionally, in his Arizona Supplement, Dr. Baye revised the list of producers whose sales he is using to support his damages estimates and recalculated the DAPs' alleged damages. *See* Mem. Supp. Certain Defs.' Motion *in Limine* to Exclude Dr. Baye's Damages Calculations (ECF No. 1530), Ex. 4 ("Baye Arizona Supp. Rep."), at 1, n.1. The Motion and Declaration point out that this revised, narrowed group of producers, which includes the Defendants, actually *increased* its flock size while the remaining producers in the nation decreased their flock size, refuting any notion that a conspiracy to reduce supply existed. Motion at 10, n.19; Declaration at ¶¶ 21–28. Again, Defendants could not have brought this to light until after Dr. Baye revised the list of producers whose sales form the basis of his damages calculation, which he presented well after the *Daubert* deadline.

Third, the Motion and Declaration seek to exclude any testimony about damages after 2008 because of Dr. Baye's failure to control for the effects of the animal welfare laws (besides

Arizona) that states began passing in 2008. Motion at 18–34; Declaration at ¶¶ 39–62 (the "Animal Welfare Arguments and Opinions").[1] In his Arizona Supplement, Dr. Baye attempted to adjust his production model estimates due to the effects of the Arizona regulation, but did not even attempt to adjust his estimates to account for any of the other laws. Instead, he stated it was unnecessary to adjust his estimates to control for the effects of these other laws. Baye Arizona Supp. Rep. ¶ 5. The Defendants could not have responded to that position until after the Arizona Supplement was served.

## III.   ARGUMENT

### A.   Defendants' Motion *in Limine* and Supporting Walker Declaration Are Timely

#### 1.   Defendants' Motion is Timely

As stated in Defendants' Motion (*see* Motion at 36), although the Court's Case Management Order ("CMO") No. 21 (ECF No. 869) and CMO No. 22 (ECF No. 1111) established a May 25, 2015 deadline for *Daubert* motions, there is no deadline in the operative CMOs for motions *in limine*. As the Court has not yet set a trial date, Defendants' Motion to exclude Dr. Baye's opinions and testimony and the Walker Declaration in support thereof are timely and provide the DAPs, and the Court, ample time to consider Defendants' arguments several months before trial.

Courts in the Third Circuit frequently hear motions *in limine* directed toward excluding expert testimony immediately preceding trial. *See, e.g.*, *Senese v. Liberty Mut. Ins. Co.*, 661 F. App'x 771, 773 (3d Cir. 2016) (affirming district court's granting of motion *in limine* to preclude plaintiff's expert testimony filed less than one month before trial with other pretrial motions); *Everwine v. Nemours Found.*, No. 05-3004, 2006 WL 5116707, at *1 (E.D. Pa. May 24, 2006)

---

[1]  The fact that there was a structural break in 2008 provided an independent reason to cut off damages in 2008. Mot. at 34–36; Declaration at ¶¶ 77–84 (the "Structural Break Arguments and Opinions").

(considering motion *in limine* to exclude plaintiffs' expert witness under *Daubert* among a panoply of pre-trial motions).[2]  This fulfills the Court's "gatekeeping" function under *Daubert* to ensure that the jury does not hear expert testimony that fails to satisfy the requirements of the Federal Rules of Evidence.  Here, it will avoid the wasted time and expense of preparing for a trial in which the DAPs' central expert testimony will be deemed inadmissible.

This Court has recognized as much.  In *Argue v. David Davis Enterprises, Inc.*, No. 02-9521, 2008 WL 450097, at *4-6 (E.D. Pa. Feb. 15, 2008) (Pratter, J.), this Court treated a motion *in limine* to exclude expert testimony under *Daubert* as a motion *in limine* days before trial and considered the motion's merits.  Even though the Court's scheduling order had set a separate deadline for *Daubert* motions, there was no consideration of whether the motion *in limine* was untimely because it was filed before the Court's motion *in limine* deadline. *Id.*; *see Argue v. David Davis Enterprises, Inc.*, No. 02-9521, ECF No. 55, ¶ 5, Dec. 11, 2006.

## 2.      The Walker Declaration is Timely

For similar reasons, the Walker Declaration is timely.  Pursuant to Fed. R. Civ. P. 26(e)(1)(A), expert party may supplement an expert's report when "additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  An expert may disclose any additions or changes "by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e)(2).  "Unless the court orders otherwise [pretrial] disclosures must be made at least 30 days before trial."  Fed. R. Civ. P. 26(a)(3)(B).

---

[2]  *See Carnegie Mellon Univ. v. Marvell Tech. Grp.*, No. 09-290, 2012 WL 6562221, at *2 (W.D. Pa. Dec. 15, 2012) ("Closer to trial, Marvell also timely filed a number of motions in limine which challenged Lawton's expert testimony" under *Daubert*), *aff'd*, 807 F.3d 1283 (Fed. Cir. 2015).

Treating the Walker Declaration as offering a single opinion, the DAPs also seek to strike the entire Declaration as untimely, failing to recognize that different portions of the Declaration respond to different submissions made by the DAPs and that an opinion-specific analysis is required.  A significant portion of the Walker Declaration fulfills the obligation to supplement expert reports and add "information that was not available at the time of the initial report."  *In re Asbestos Prods. Liab. Litig. (No. VI)*, 289 F.R.D. 424, 425 (E.D. Pa. 2013).  For example, all of Dr. Walker's Arizona and some of his USDA Data Opinions could not have been offered at the time of his initial report because they directly respond to an expert report that did not exist at that time, namely Dr. Baye's Arizona Supplement.  Because the Court has not set this case for trial or set a deadline for the pre-trial statement, the deadline for Dr. Walker to supplement his report and respond to subsequent material has not passed, and his supplemental opinions are timely. *See McGrath v. Rust-Oleum Corp.*, No. 12-1719, 2013 WL 2896966, at *4, n.2 (E.D. Pa. June 12, 2013) (denying motion to strike supplemental expert report filed after expert report deadline and without leave of court).

As to the remaining opinions, particularly the Animal Welfare and Structural Break Opinions, even the DAPs acknowledge that the current Walker Declaration and his initial reports "cover[]" the same "themes."  Mot. to Strike at 6, n.7.  Contrary to the DAPs' argument, however, the recognition that the remainder of the Walker Declaration constitutes mere elaboration on previous opinions favors allowing the Declaration into the record.  Dr. Walker would be permitted to offer those opinions at trial even if the Defendants had not filed this Declaration.  *See nCube Corp. v. SeaChange Int'l, Inc.*, 809 F. Supp. 2d 337, 347 (D. Del. 2011) ("[C]ourts do not require verbatim consistency . . . , but . . . allow[ ] testimony which is

consistent with the report and is a reasonable synthesis and/or elaboration of the opinions

contained in the expert's report." (internal quotation and citation omitted)).

   In sum, the DAPs are simply incorrect that the Motion and Declaration are untimely

because they were not disclosed during expert discovery and brought prior to the *Daubert*

deadline.  *See* Mot. to Strike at 5.  To the contrary, it is clear that Defendants' Motion and the

supporting Walker Declaration are timely under the rules of this Court and guidance of

analogous precedent, and in some cases are mere elaborations of prior opinions.

**B.    Good Cause Exists to Accept the Motion *in Limine* and Walker Declaration**

   Defendants also have good cause to file the Motion and Declaration because a substantial

portion of the filings respond to Dr. Baye's supplemental report on Arizona and the remainder

relate to Court rulings in the direct and indirect purchaser actions, all of which transpired after

the close of expert discovery.  The Motion and Declaration raise critical pre-trial issues

concerning the viability of Dr. Baye's injury and damages opinions that should be resolved at

this stage of the litigation, rather than during trial or post-trial proceedings.  In sharp contrast, the

DAPs will not be prejudiced by either filing, because a trial date has not yet been set and they

have plenty of time to respond.  Furthermore, Defendants filed the Motion and Declaration

relying on the good faith belief that the filings were timely under this Court's rules and

precedent.

   **1.    Legal Standard**

   Federal Rule of Civil Procedure 16(b)(4) provides that "[a] schedule may be modified

only for good cause and with the judge's consent."  "'Good cause' is understood to mean '[a]

legally sufficient reason,' and it reflects 'the burden placed on a litigant . . . to show why a

request should be granted or an action excused.'"  *Joseph v. Hess Oil Virgin Islands Corp.*, 651

F.3d 348, 351 (3d Cir. 2011).  Courts must consider the importance of the untimely filing and

evidence in determining whether a litigant has good cause. *See, e.g.*, *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997); *Reynolds v. Borough of Avalon*, 799 F. Supp. 442, 450 (D.N.J. 1992). Good cause exists where the opposing party will not be prejudiced by an amendment or supplementation. *Cloud Farm Assocs., L.P. v. Volkswagen Grp. of Am., Inc.*, No. 10-502-LPS, 2012 WL 3069390, at *5 (D. Del. July 27, 2012).

Similarly, prior to excluding untimely expert opinions under Rule 37, a district court must consider: (1) the prejudice or surprise of the party against whom evidence is offered; (2) the ability to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case; (4) bad faith or willfulness in failing to comply with a court order or discovery obligation; (5) the importance of the evidence in question; and (6) the explanation for the failure to disclose. *Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894, 904-05 (3d Cir. 1977), *overruled on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656 (1987). As with the determination of whether good cause has been shown, the ultimate decision to exclude evidence is in the court's discretion. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994). However, "exclusion of critical evidence is an 'extreme' sanction, and thus, a district court's discretion is not unlimited." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 297–300 (3d Cir. 2012); *Cochran v. Jackson*, No. 14-2165, 2015 WL 3555291, at *4 (E.D. Pa. June 8, 2015) (finding expert testimony "an important part of the defense," militating in favor of admission).

Moreover, the Third Circuit has recognized the importance of deciding a claim "on the merits rather than on technicalities." *See Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990); *Novartis Pharms. Corp. v. Actavis, Inc.*, No. 12-366-RGA-CJB, 2013 WL 7045056, at *9–12 ("Courts favor the resolution of disputes on their merits.") (quoting *Abbott Labs. v. Lupin*

*Ltd.*, No. 09-152-LPS, 2011 WL 1897322, at *5 (D. Del. May 19, 2011)).  For this reason, district courts have frequently exercised their discretion to resolve the admissibility of expert testimony, whenever it may arise, because of the court's critical gatekeeping function.  *Daddio v. A.I. DuPont Hosp. for Children of Nemours Found.*, 650 F. Supp. 2d 387, 401-02, 407 (E.D. Pa. Aug. 21, 2009) (holding that "the Court is not obliged to permit unreliable expert testimony to be presented to the jury," and excluding expert testimony under *Daubert*), *aff'd*, 399 F. App'x 711 (3d Cir. 2010); *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 n.19 (5th Cir. 2013) (concluding that district court did not abuse its discretion in ruling on the *Daubert* motion at trial).[3]  As demonstrated below, all of the relevant factors weigh in Defendants favor.

## 2. The Motion and Declaration Respond to Events That Occurred After the Close of Expert Discovery

The arguments and underlying opinions raised in the Motion and Declaration arise from different litigation events that all *post-date* the close of expert discovery in May 2015.  *See supra* § II.  Defendants, therefore, have good cause for not filing the Motion or Declaration earlier.

The Arizona, and some of the USDA Data, Arguments and Opinions challenge opinions raised for the first time in Dr. Baye's Arizona Supplement, which was served in October 2016.  *See Carnegie Mellon Univ.*, 2012 WL 6562221, at *9-10 (defendant had good cause for its untimely *Daubert* motion because the testimony of plaintiff's expert had "evolved beyond the initial proffer"); WRIGHT AND MILLER, MODIFYING SCHEDULING ORDERS, 6A FED. PRAC. & PROC. CIV. § 1522.2 (3d ed.) ("When the modification is necessitated by acts of the opposing party . . ., relief also has been deemed appropriate."); *Krueger v. Wyeth, Inc.*, No. 03CV2496

---

[3]   *See also White v. Gerardot*, No. 1:05-CV-382, 2008 WL 4724004, at *1 (N.D. Ind. Oct. 24, 2008) (denying a motion to strike a motion *in limine* to exclude expert testimony as an untimely *Daubert* motion, invoking the court's role as gatekeeper); *Cf. Taylor v. Shields*, No. 13-2241, 2017 WL 2633427, at *3–4 (E.D. Pa. June 19, 2017) (refusing to strike an untimely *Daubert* motion "solely upon the procedural deficiency of Taylor's failure to present his *Daubert* motion in a timely manner"), *appeal docketed*, No. 17-2439 (3d Cir. July 6, 2017).

JAH (MDD), 2016 WL 3981126, at *2-3 (S.D. Cal. May 19, 2016) (denying motion to strike untimely *Daubert* motion filed as a motion *in limine*, in part, because "new developments throughout the litigation [] provided [them with] a new ground to exclude" the expert testimony).

In addition, the remainder of the USDA Data Arguments and Opinions simply demonstrate that this Court's post-*Daubert* deadline determination in the IPP action that the IPPs' expert's egg production model was unreliable is equally applicable to Dr. Baye's virtually identical egg production model. Similarly, the portions of the Motion and Declaration that relate to the Animal Welfare Arguments and Opinions demonstrate that the rationale for cutting off damages in 2008 in the DPP action, which was issued after the *Daubert* deadline, is equally applicable to the DAP action. Therefore, Defendants have good cause for not raising these arguments and opinions earlier. 3-16 MOORE'S FEDERAL PRACTICE-CIVIL § 16.03 (2017) ("[T]he judge is directed not to assume that a plan fashioned at an early stage should remain rigidly fixed over the entire pretrial period. Instead, the judge should actively consider making adjustments . . . in response to new informational or situational developments, such as through disclosures, discovery, [or] *rulings on motions* . . . .") (emphasis added).[4]

### 3.    Defendants Will Be Prejudiced if the Court Strikes Either the Motion or the Supporting Declaration

Good cause exists for the Court to decide the Motion on its merits and to admit the Walker Declaration because they include critical arguments and evidence, and thus Defendants "would suffer significant prejudice" if they were excluded. *In re Rail Freight Fuel Surcharge*

---

[4]    *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 295–300 (3d Cir. 2012) (reversing rejection of plaintiff's late expert opinions where the opinions were proffered in response to a ruling from the district court on the viability of expert's original damages calculations).

*Antitrust Litig.*, 75 F. Supp. 3d 94, 98–99 (D.D.C. 2014) (finding good cause).[5] Courts must

consider the importance of the requested amendment in determining whether a litigant has good

cause.  *See ZF Meritor*, 696 F.3d at 298 (discussing the so-called *Pennypack* factors).[6]  Indeed,

in the Third Circuit, "exclusion of critical evidence is an 'extreme' sanction," and courts

regularly reject attempts to exclude important evidence even where there has been a scheduling

violation.  *Id.* at 297–300 (concluding that the district court abused its discretion in denying

plaintiffs' request to allow their expert to submit his alternate damages estimates).[7]

This factor strongly counsels in favor of considering the Motion on its merits and

admitting the supporting Declaration.  The merits of Defendants' Motion and supporting

Declaration go to critical and dispositive issues that could inject error into any trial.  Specifically,

the Motion contends that Dr. Baye's egg production model faces a host of fundamental problems

requiring exclusion of his opinions regarding antitrust injury and damages or, at minimum, a

dramatic reduction in the damages sought.  Given the important issues presented, Defendants

respectfully urge the Court to exercise its discretion, hear the Motion as part of its gatekeeping

function, and admit the supporting Walker Declaration.

---

[5]  *Community Ass'n Underwriters of Am., Inc. v. Rhodes Dev. Grp., Inc.*, No. 1:09-CV-0257, 2013 WL 3510714, at *3 (M.D. Pa. July 11, 2013) (stating, "The procedural history of this case is lengthy, and rushing to trial at this point at the expense of potentially critical evidence would be a disservice to the efforts of counsel and the court," despite the fact that the new expert report was untimely by three years and would likely disrupt the trial setting).

[6]  Even though the *Pennypack* factors are the controlling standard in this Circuit, the DAPs fail to mention those factors in their brief, all of which support Defendants' position.

[7]  *See also Rivera v. Lehigh Cty.*, No. 13-CV-04748, 2015 WL 12819147, at *1, n.8 (E.D. Pa. Oct. 9, 2015) (denying motion to preclude untimely expert report where the report was important because it established certain portions of the plaintiff's case); *Stored Value Sols., Inc. v. Card Activation Techs. , Inc.*, No. 09-495-LPS, 2010 WL 3834457, at *2 (D. Del. Sept. 27, 2010) (denying motion to preclude untimely rebuttal report as it was "critical evidence" of the validity of the patent-in-suit); *accord Community Ass'n Underwriters*, 2013 WL 3510714, at *3.

4.      **The DAPs Are Not Prejudiced by the Motion and Declaration**

Good cause exists for Defendants to file the Motion and supporting Walker Declaration

because the DAPs will not be prejudiced by the Court's consideration of the merits of the Motion

and Declaration.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 75 F. Supp. 3d 94, 98–99

(D.D.C. 2014) (lack of prejudice justified good cause conclusion).[8]  The DAPs maintain that the

Motion and Declaration prejudice them as they have been "actively preparing for trial" and this

"surprise" may "undo much of DAPs' trial preparations."  Mot. to Strike at 2.  However, setting

aside the conclusory nature of the DAPs' statements, it is plainly not the "11th hour" before trial.

*Id.*  No trial date has been scheduled, and the pretrial order has not yet been entered by the Court.

The lack of prejudice to DAPs weighs heavily in favor of finding good cause.  *See Cloud Farm*

*Assocs., L.P. v. Volkswagen Grp. of Am., Inc.*, No. 10-502-LPS, 2012 WL 3069390, at \*5 (D.

Del. July 27, 2012) (finding good cause to amend scheduling order where there was no prejudice

to opposing party as no trial date had been set); *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,

No. 08 Civ. 9116(PGG), 2009 WL 1357946, at \*5 (S.D.N.Y. May 12, 2009) (similar); *Buddy's*

*Plant Plus Corp. v. Centimark Corp.*, No. 10-670, 2012 WL 5254910, at \*3 (W.D. Pa. Oct. 24,

2012) ("In cases where the timeliness of disclosing expert identities and reports is at issue,

exclusion is proper only where the trial date is fast approaching," and collecting cases standing

for same proposition).[9]

---

[8]  *See also Schreck v. Walmart*, No. 08–5729 (DMC), 2009 WL 4800225, at \*2 (D. N.J. Dec. 8, 2009) (good cause found where "[m]ost important[ly]" the amendment would not cause prejudice); *Harrison Beverage Co. v. Dribeck Imps., Inc.*, 133 F.R.D. 463, 469 (D. N.J. 1990) (good cause found where filing would not cause prejudice nor affect the court's scheduling order).

[9]  *See also Cochran*, 2015 WL 3555291, at \*3 ("[A] finding of prejudice is more likely the closer to trial the submission of the late evidence takes place. . . ."); *Pfeiffer v. Eagle Mfg. Co.*, 137 F.R.D. 352, 355 (D. Kan. 1991) (concluding that because the trial date had not yet

Nor are Defendants' filings fairly characterized as a "surprise."  As demonstrated above, a significant portion of the Motion and Declaration address opinions raised for the first time in Dr. Baye's Arizona Supplemental Report, and the remainder are either elaborations of Dr. Walker's previous opinions or predicated on rulings issued by the Court in the direct and indirect purchaser litigations.  *See Novartis Pharms. Corp.*, 2013 WL 7045056, at *9–12 (finding no surprise where untimely report rebutted opposing party's expert, as well as elaborated on a previous report from the same expert).[10]  Indeed, the fact that the DAPs *already* have provided substantive responses to the arguments and opinions contained in the Motion and Declaration (*see* Mot. to Strike at 13-19) undermines any notion that they were surprised, much less prejudiced, by the filings.  *Cf. Bauder v. Phila., Bethlehem & New Eng. R.R. Co*., No. 96-7188, 1998 WL 633651, at *4 (E.D. Pa. Aug. 28, 1998) ("Courts have looked with disfavor upon parties who claim surprise and prejudice but who do not ask for a recess so that they may attempt to counter the opponent's testimony."), *aff'd*, 189 F.3d 463 (3d Cir. 1999) (table).

It is also not true that the filings would "deprive the DAPs of the benefits of the last word."  Mot. to Strike at 7.  Nothing is preventing the DAPs from responding substantively and presenting any counter-opinions.  If anything, by filing this Motion now, Defendants are affirmatively not playing "litigation by ambush" but instead are ensuring that both sides know what exactly will be presented at trial, should a trial be necessary.  Given that no trial date has been scheduled, the DAPs have ample time to engage in any additional expert discovery they

---

been scheduled, there was no indication that plaintiff had suffered any prejudice).  Even where trial had been set to begin in four months, the Third Circuit found that the district court erred when it excluded the untimely expert testimony, reasoning that four months provided an "abundant time to depose" the expert and cure any prejudice.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 792 (3d Cir. 1994).

[10]  *Edmonds-Lambert v. Metro Auto Sales, Inc.*, No. 14-4151, 2015 WL 12806502, at *1 (E.D. Pa. Mar. 18, 2015) (concluding no surprise where report only offered "more in-depth explanation of the underlying methodology").

believe is necessary.[11]  In similar circumstances, courts have found that claims of prejudice were

not cognizable and that good cause for an amendment existed.  *Rimbert v. Eli Lilly & Co.*, 647

F.3d 1247, 1254-56 (10th Cir. 2011) (reversing as an abuse of discretion a trial court's

determination that good cause did not exist because there was no trial date set and any prejudice

could be cured by reopening expert discovery); *Gregory v. Sewell*, Nos. 4:04-2438, 4:04-2439,

4:04-2440, 2006 WL 5186521, at *4 (M.D. Pa. Aug. 23, 2006) (noting that any prejudice is

curable by opening discovery for depositions of the underlying expert); *Rivera*, 2015 WL

12819147, at *1 (concluding that any prejudice was curable where there was time for depositions

before trial).[12]

In addition, the Court has a "duty to screen expert opinion testimony for relevance and

reliability" before allowing that testimony to be submitted to the jury.  *Daddio*, 650 F. Supp. 2d

at 402.  Parties are therefore responsible for defending the experts they put forth at trial and

should expect to do so.  Therefore, any work the DAPs must undertake to defend the reliability

and admissibility of Dr. Baye's opinions is not cognizable prejudice.  *Gregory*, 2006 WL

5186521, at *3 (finding no prejudice because "the plaintiffs incur no additional expense in

refuting the belated reports.  If the defendants had timely disclosed the reports, the plaintiffs

---

[11]  While Defendants would not oppose limited discovery on the Motion and Declaration, it
should be noted that the DPPs required *no* discovery to oppose Certain Defendants' Motion
for Decertification and were able to submit an opposition, including an expert declaration, in
two months.  The DAPs claim that drafting a response to the Motion and Declaration will
"distract from trial preparations that are proceeding at full steam."  Mot. to Strike at 7.
Surely, the DAPs' trial preparations have focused on addressing the issues identified in this
Court's prior decisions, which as explained by the Motion and Declaration, directly apply to
their expert's damages model.  As such, DAPs should be well-positioned to respond to Dr.
Walker's declaration.  The point of the Motion and Declaration is that Dr. Baye does not
have an adequate response to these issues, which is why his report is fundamentally flawed
and should be excluded.

[12]  *See also Novartis*, 2013 WL 7045056, at *11 (similar); *Borden v. Ingersoll-Rand Co.*, No.
01-CV-5455, 2003 WL 21488511, at *2 (E.D. Pa. Jan. 17, 2003) (similar).

would still have had to refute them"); *In re Processed Egg Prods. Antitrust Litig.*, 130 F. Supp. 3d 945, 954 (E.D. Pa. 2015) ("[W]hen the claimed prejudice is, in reality, the loss of a windfall rather than an affirmative injury to the non-movant, there is no real prejudice to the non-movant."). Thus, the narrowly tailored Motion and Declaration do not prejudice the DAPs in any cognizable manner.

The authorities cited in the DAPs' brief do not alter this conclusion. The DAPs conspicuously fail to cite *any* case in which a court struck an untimely *Daubert* motion or a timely motion *in limine* where there was no trial setting. In the cases cited by the DAPs, the challenged motions were filed, at the earliest, within a month of trial. *See Taylor*, 2017 WL 2633427, at *8-11 (filed untimely motion *in limine* one month before trial date).[13] Indeed, a number of the DAPs' authorities involve *Daubert* challenges that were first made *during* trial or post-trial proceedings, a far cry from the situation here. *See Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 202 F. Supp. 2d 371, 376 (D.N.J. 2002) (party challenged expert testimony for the first time at retrial after remand).[14]

The cases the DAPs cite in support of excluding the Walker Declaration likewise do not support their claim of prejudice. In each and every case, the opposing party had very limited time to respond to the challenged expert report because trial was imminent. For example, in *Moore v. Vangelo*, No. 03-4718, 2005 WL 2178918, at *1–2 (E.D. Pa. Sept. 6, 2005) (Pratter, J.), the plaintiffs submitted an expert report only two months before the trial date. *See also*

---

[13] *See also Bedingfield v. Deen*, No. 09-369, 2011 WL 2712950, at *1 (W.D. La. July 8, 2011) (same); *Mann v. Mack Trucks, Inc.*, No. 06-3738, 2007 WL 7947894, at *1 (E.D. Pa. July 3, 2007) (same).

[14] *See also Christopher v. Cutter Labs.*, 53 F.3d 1184 (11th Cir. 1995) (party challenged expert testimony for the first time on appeal); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996) (same); *Macsenti v. Becker*, 237 F.3d 1223, 1234 (10th Cir. 2001) (*Daubert* motion filed at the close of evidence).

*Perkasie Indus. Corp. v. Advance Transformer, Inc.*, 143 F.R.D. 73, 75–76 (E.D. Pa. 1992) (preventing plaintiff from presenting three new experts who proffered entirely new theories three months before trial).[15]  Here, there is no trial date, leaving the DAPs ample time to respond to the Declaration.[16]  In short, the Court should not "infer phantom prejudice" from a "phantom trial setting."  *Peshlakai v. Ruiz*, No. CIV 13-0752 JB/ACT, 2013 WL 6503604, at *15 (D.N.M. Nov. 20, 2013).

### 5.    Defendants Have Proceeded in Good Faith

Applying the *Pennypack* factors and Rule 16's good cause standard, the Court should allow the Motion and Declaration because the Defendants have proceeded in good faith.  *See Lopez v. Bucks Cty.*, No. 15-5059, 2016 WL 3612056, at *5 (E.D. Pa. July 5, 2016) (finding good cause to grant extension where litigant pursued a strategy under a good faith belief).  Relying on the plain language of the Court's pre-trial procedures, the plain language of Rule 26(e), and precedent, the Defendants proceeded in good faith to file the Motion and supporting

---

[15]  Moreover, even where a trial date has been scheduled, multiple courts have held that two to four months to respond to an untimely expert report is sufficient to moot any legitimate claim of prejudice.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 792; *Rivera*, 2015 WL 12819147, at *1, n.8 (untimely expert report admitted where no prejudice existed because there were still four months before trial); *Bauder*, 1998 WL 633651, at *4–5 (no prejudice where there were two months before trial to prepare for cross-examination or request additional time); *Kremsky v. Kremsky*, No. 16-cv-04474, 2017 WL 1198760 (E.D. Pa. Feb. 21, 2017) (expert report served after deadline and 49 days before trial did not prejudice defendant).

[16]  The other cases relied upon by the DAPs are readily distinguishable. For instance, in *Southco, Inc. v. Fivetech Tech. Inc.*, 611 F. App'x 681, 688 (Fed. Cir. 2015), the defendant attached an expert report to a motion for summary judgment, and the court granted the motion – thus denying plaintiff the opportunity to respond.  And in *Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-cv-2768, 2014 WL 4933009, at *1–2 (E.D. Pa. Oct. 1, 2014), on which the DAPs place great weight, the magistrate judge excluded the report on grounds not applicable here, namely that the untimely expert report was truly served "after the 11th hour" of expert discovery and after multiple extensions of that deadline and, moreover, was not vital.  *See Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-CV-2768, 2015 WL 12645745, at *2 (E.D. Pa. May 26, 2015).

Declaration, which addressed important issues for the Court's consideration.  *See supra* § III.A.

Moreover, many of the opinions in the Declaration were in direct response to Dr. Baye's Arizona

Supplement, and, therefore, the Defendants had no opportunity to raise them before the *Daubert*

deadline.[17]

Importantly, this is *not* a case involving fraud, *see SuperMedia LLC v. Morley*, Nos. 13-

176, 12-2329, 2014 WL 5023386, at *11–12 (E.D. Pa. Oct. 8, 2014) (cited in Mot. to Strike at 9),

or a case where Defendants have serially violated the Court's scheduling orders, *see Rivera*,

2015 12819147, *1, n.8 (allowing untimely expert report where "plaintiff does not appear to

have engaged in any willful deception or pattern of late filings which would have constituted a

flagrant violation of pre-trial orders") (citing *In re TMI Litig.*, 193 F.3d 613, 722 (3d Cir. 1999)).

Courts find that a party acted willfully or in bad faith only in cases of clear, extreme examples of

such conduct.  *Withrow v. Spears*, 967 F. Supp. 2d 982, 1006 (D. Del. 2013) (concluding that a

party acts willfully or in bad faith "only in extreme circumstances" when the party's conduct is

"flagrant" or "egregious"); *Bridgestone Sports Co., Ltd. v. Acushnet Co.*, No. CIVA 05–132 JJF,

2007 WL 521894, at *4 (D. Del. Feb. 15, 2007) (noting that "evidence should be excluded

sparingly and only in circumstances involving litigation conduct that is clearly unprofessional or

inappropriate").[18]  Indeed, Defendants' aim was to avoid ambush.  That is why Defendants filed

---

[17]  Indeed, the DAPs concede that the Arizona Opinions could not have been part of the original
report that Dr. Walker prepared and, therefore, their inclusion in the Walker Declaration must
have been in good faith.  Mot. to Strike at 6 & n.6.

[18]  *See Borden*, 2003 WL 21488511, at *2 ("Said another way, exclusion of testimony is
appropriate only if a party (1) has revealed previously undisclosed evidence when trial was
either imminent or in progress, or (2) acted in bad faith.")  *Cf. In re Processed Egg Prods.
Antitrust Litig.*, 130 F. Supp. 3d at 955 (allowing untimely opt-out notice where there was
"no evidence that [the party] delayed in bad faith or for tactical reasons").

the Motion and accompanying Walker Declaration well before a trial date, providing the DAPs with ample time to respond.

**C.     The DAPs Fail to Justify Dr. Baye's Use of USDA Data and Refusal to Control Adequately for the Effects of Animal Welfare Laws**

The DAPs also address the merits of the Defendants' Motion, in an effort to convince the Court that disposing of the Motion on procedural grounds would lead to the same result as a more substantive consideration of the Motion's merits.  But in doing so, the DAPs address only two of the three substantive arguments contained in the Motion.[19]   At the end of the day, however, none of the DAPs' arguments justifies the use of overbroad USDA data, nor do their arguments justify Dr. Baye's treatment of the Arizona regulation.

**1.     Dr. Baye, Like Dr. Stiegert, Fails to Isolate the Effects of the *Defendants' Conduct* on *Commodity* Eggs**

As discussed in the Defendants' Motion, Dr. Baye's regression suffers from at least one of the same flaws as the model that the IPPs' class certification expert, Dr. Kyle Stiegert, proposed – it uses overbroad USDA data that includes non-conspirators, specialty eggs, and egg products.  The DAPs argue that they should not have to rebut this central argument against Dr. Baye's regression analysis – even though they somehow could do so "easily" – because the argument purportedly rests "on a misrepresentation of the Court's prior rulings."  Mot. to Strike at 17.  Although Plaintiffs concede the Court took issue with Dr. Stiegert's "reliance on nationwide USDA data" (*id.* at 18), they argue the Court's ruling is irrelevant to Dr. Baye

---

[19]   The Defendants' Motion is premised on three arguments: (1) Dr. Baye's use of USDA data (like Dr. Stiegert) makes it impossible for him to isolate the purported conspiracy's effect on commodity shell egg production, the only product at issue; (2) Dr. Baye failed to properly adjust his damages analysis to remove the effect of the Arizona regulation; and (3) Dr. Baye failed to adjust his damages analysis to account for the effect that all of the other state animal welfare laws would have had on post-2008 egg production.  DAPs address only the first two of these arguments and do not even attempt to justify Dr. Baye's inability and refusal to control for other animal welfare laws.

because it hinged on "the predominance requirement of Rule 23" rather than *Daubert*.  *Id*. at 17-

18.  This distinction is both incorrect and irrelevant.

      The Court's opinion made clear that, where plaintiffs rely on expert testimony to support

class certification, *Daubert*'s "qualification, reliability, and fit" requirements effectively overlap

with the requirements of Rule 23(b)(3)'s predominance requirement.  *In re Processed Egg*

*Prods. Antitrust Litig.*, 312 F.R.D. at 151.  For that reason, the Court said it would "not make

formalistic distinctions between the standards of *Daubert* and Rule 23, but [would] instead

consider issues of reliability and fit as they weigh upon Rule 23."  *Id.*  The Court then went on to

hold that "the failure to account for non-conspiring producers[,] and the failure to account for

non-commodity eggs, are both flaws undermining the *reliability* of Dr. Stiegert's model."  *Id.* at

153 (emphasis added).  Indeed, the very quote the DAPs offer to support their argument (Mot. to

Strike at 18) – with two omitted sentences restored – shows that the Court's concerns related

both to the IPPs' failure to demonstrate that common issues predominated *and* to their expert's

failure to meet *Daubert*'s "reliability" standard:

> To some extent, whether the decrease in the supply of eggs is
> attributable to a rise in specialty eggs or a rise in egg products is a
> common question that could be presented to a jury, but
> individualized questions nevertheless arise because, for example,
> the effect of specialty eggs on the egg supply may well depend
> upon the specific geographic region, supplier, or retailer.
> *Additionally, the failure to isolate the effect of the conspiracy on*
> *the purchases of eggs meeting the class definition weighs against*
> *the reliability of the model for demonstrating antitrust impact and*
> *damages.* The Court thus agrees with Defendants that the modeling
> of layers of all eggs, rather than just the layers of commodity shell
> eggs, weighs against the reliability of Dr. Stiegert's model *and*
> against a finding that common issues predominate.

*Id.* at 154 (emphasis added).  The DAPs quote only the first part of the Court's holding, rather

than the portion explicitly addressing the reliability of Dr. Stiegert's analysis.  The Court then

made the same point regarding Dr. Stiegert's "inclusion of non-conspiring purchasers in [his] model:"

> Plaintiffs did not address at all the flock size of nonconspiring producers during the relevant period. Plaintiffs argue that whether Defendants are responsible for the supply reduction is a question common to the class. The Court acknowledges Plaintiffs' point to some extent . . ., but the Court must also consider whether Plaintiffs' evidence that common issues predominate as to antitrust impact is convincing. *Part of that inquiry is determining the extent to which Dr. Stiegert's model*, which purports to show a common impact on the putative classes, *is reliable*. With respect to the failure to isolate the effects of the actions by Defendants on the supply of commodity eggs, *the Court finds that Dr. Stiegert's model is flawed in a manner weighing against its reliability*.

*Id.* (emphasis added).

Thus, although the Court did not explicitly rule that Dr. Stiegert's testimony was inadmissible under *Daubert*, the court clearly applied *Daubert*'s reliability requirement in finding that IPPs' proposed class did not satisfy Rule 23.  Indeed, the distinction the DAPs attempt to draw between the IPP case and the instant action is ultimately irrelevant.  As evident from the above, the flaw identified by the Court was not simply a failure to show, using common evidence, that the allegedly unlawful conduct affected all or virtually all of the class.  Rather, the identified flaw was a failure to connect the allegedly unlawful conduct to **any** effect on the market – *i.e.*, the model was unreliable for showing the requisite antitrust injury to anyone.  In other words, using overbroad USDA data weighs against the reliability of Dr. Baye's model for the same reasons that Dr. Stiegert's use of USDA data rendered his model unreliable because both experts failed to isolate the effects of the Defendants' actions on commodity eggs.  Neither expert was able to isolate the effects of the Defendants' (and alleged co-conspirators') actions on commodity eggs, and hence neither can show antitrust injury.

### 2. Dr. Baye Fails to Control Adequately for the Effects of the Arizona Regulation

The DAPs offer two "high-level" arguments about their interpretation of the Arizona egg production standards: that (1) although Arizona law required compliance with the 2008 UEP Guidelines, that did not include the 100% Rule; and (2) it would have been unconstitutional for Arizona to require companies producing or selling eggs in Arizona to comply with the 100% Rule. Mot. to Strike at 14 & n.10. Both of these arguments are based on a fundamental misunderstanding of the flaws in Dr. Baye's attempt to control for the effects of the Arizona regulation. Moreover, the first of these arguments misrepresents the plain language of the Arizona regulation and the Court's prior rulings, while the second argument overstates the alleged constitutional concerns with the Arizona regulation.

The DAPs' focus on the 100% rule reveals their fundamental misunderstanding of how Dr. Baye's adjustments of his production regression estimates fail to control for the effects of the Arizona regulation. Even putting aside the 100% rule, in order to avoid comingling of eggs and ensure compliance with the Arizona regulation, the entire facility in which the eggs destined for Arizona were produced would have to comply with the Arizona cage-space restrictions. And eggs produced from those facilities were definitely sold into other states. As but one example, Rose Acre sold into Arizona from 11 different facilities after October 1, 2009, representing just over 3% of the eggs produced from those facilities. During that time period, it also sold eggs into 39 other states.[20] The sales of eggs into those 39 states were affected by the Arizona statute whether or not compliance with the 100% rule was mandatory. Rose Acre could not apply different cage-space requirements from egg to egg, or even hen to hen, depending on each egg's ultimate destination. Consequently, even an Arizona regulation that did not include the 100%

---

[20]  Defendants' transaction data produced to DAPs pursuant to Court order.

Rule would affect egg sales to other states, and Dr. Baye never even attempted to adjust for that effect.

Focusing on the 100% rule, the DAPs' arguments still fall short for two primary reasons. First, even if Arizona had not required compliance with all of the 2008 UEP Guidelines, it still explicitly *permitted* companies to demonstrate compliance with Arizona law by marking their products with the UEP Certified logo.  According to the DAPs, "all Defendants and co-conspirators" were UEP Certified, Mot. to Strike at 15, and as much as "95 percent of the eggs produced in the U.S. came from producers participating in the UEP Certified program."[21] Plaintiffs concede that "a company cannot sell or market 'UEP Certified Eggs' without complying with the 100% Rule."  Mot. to Strike at 15.  Consequently, any Defendant or co-conspirator (and most other companies) producing or selling eggs in Arizona complied with the state's egg production standards by becoming or staying UEP Certified.  The "state action" doctrine would still, therefore, shield the Defendants from antitrust liability for producing eggs in compliance with the requirements of the UEP Certified Program, including the 100% Rule, under Arizona law.[22]

---

[21]   Mem. Supp. Certain Defs.' Motion *in Limine* to Exclude Dr. Baye's Damages Calculations (ECF No. 1530), Ex. 1 (Baye Rep.), ¶ 67.  As a matter of fact, certified producers represented at most 85% of the nation's flock.

[22]  The fact that egg producers may demonstrate compliance with Arizona's egg production standards by displaying the UEP Certified logo on their products also means that Dr. Baye cannot distinguish between lawful and "conspiratorial" conduct by companies producing or selling eggs in Arizona.  In other words, an egg producer that decided to become (or stay) UEP Certified after Arizona's regulation went into effect may have done so to comply with Arizona law, in furtherance of the alleged conspiracy, or for other reasons entirely.  Dr. Baye's model does not account for non-conspirators simply using UEP Certification to comply with state law.  Dr. Baye's decision to assign damages for the DAPs' purchases of eggs that were produced in compliance with the 100% Rule, and his failure to account for such production in his regression model, still requires the rejection of his opinions.

Second, the DAPs attempt to draw a distinction between the UEP Animal Husbandry Guidelines and the Certified Program where none exists.  Properly read, the Arizona regulation requires compliance with the 100% rule.  Arizona requires all eggs sold in that state to be "from hens raised according to the United Egg Producers Animal Husbandry Guidelines."  Ariz. Admin. Code R3-2-907(B).  Arizona's regulations define 'United Egg Producers Animal Husbandry Guidelines" as "the United Egg Producers Animal Husbandry Guidelines for U.S. Egg Laying Flocks, 2008 Edition."  Ariz. Admin. Code R3-2-901.  And although Plaintiffs now argue that the 100% Rule "exists outside of the UEP's animal husbandry guidelines," the 100% Rule is literally *printed inside the Guidelines*.[23]

Therefore, it is not surprising that this Court held that "the [Arizona] Department of Agriculture regulations adopt the 2008 edition of the United Egg Producers Animal Husbandry Guidelines as the state standard," and "the 2008 . . . guidelines include . . . the 100% rule."  *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 4771865, at *9 & n.7 (Sept. 12, 2016); *see also id.* at *6 (noting that Arizona law required egg-laying hens to be raised according to the 2008 edition of the United Egg Producers' Animal Husbandry Guidelines, which "includes . . . the 100% rule").  The DAPs did not contest that point, either before or after the Court's ruling.  *See id.* at *9, n. 7 ("The plaintiffs have not disputed the fact that both the 2008 and 2014 guidelines include the three principal supply reducing practices challenged in this case: namely, cage space limits, the 100% rule, and restrictions on backfilling.").  To the contrary, the DAPs and Dr. Baye repeatedly and affirmatively described the Guidelines as *including* the 100% rule[24] and have

---

[23]   *See United Egg Producers Animal Husbandry Guidelines for U.S. Egg Laying Flocks* (2008 Ed.) at 26 (Mem. Supp. Mot. to Strike, Ex. 2).

[24]   *See, e.g.,* Pls.' Mem. of Law in Opp. to Certain Defs.' Mot. for Part'l Summ. Judg. Against DAPs on Damages (ECF No. 1268) at 2-3 ("These supply-restricting features of the UEP

gone so far as to ask the Court to issue an injunction "to modify the Guidelines to *eliminate* the 100% Rule."[25]  If the Guidelines include the 100% Rule, then Arizona law requires companies producing or selling eggs in Arizona to comply with the 100% Rule.

As a backstop, the DAPs also argue that interpreting the Arizona regulation to mean what it says would render Arizona law unconstitutional, because it would effectively regulate "commerce" in other states.  But the line of cases on which the DAPs rely does not apply to laws, like Arizona's, that regulate production standards.  Instead, those cases apply to laws that regulate *prices*.  Under the line of cases that includes *Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989), "state laws setting non-price standards for products sold in-state (standards concerning, for example, quality, labeling, health, or safety)" are not necessarily unconstitutional, even if they produce extraterritorial effects.  *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1173 (10th Cir. 2015).  Instead, such laws are unconstitutional only if they "burden[ ] interstate commerce" without "[ ]sufficient offsetting local benefits."  *Id.* at 1171 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)). The DAPs make no effort to balance the burden of compliance with the 100% Rule against Arizona's interest in adopting an animal welfare certification program that the DAPs contend applies to up to 95% of eggs produced in the United States.

---

Guidelines were modified over time *with the 100% Rule . . . being adopted in the 2005 edition of the Guidelines*.") and 13 ("in 2014, the UEP issued its latest edition of the Guidelines, *which still include the 100% Rule . . . .*") (emphases added).  *See also* Mem. Supp. Certain Defs.' Motion *in Limine* to Exclude Dr. Baye's Damages Calculations (ECF No. 1530), Ex. 1 (Baye Rep.), Ex. 12, n. 2 ("The 100% Rule first appeared in the 2003 edition of the UEP guidelines."); *id.*, Ex. 3 (Baye Reply Rep.), ¶ 69 (opining that "aspects of the UEP Guidelines, particularly the 100% Rule, limit consumer choice").

[25]  Pls.' Mem. of Law in Opp. to Certain Defs.' Mot. for Part'l Summ. Judg. Against DAPs on Damages (ECF No. 1268) at 14 n.9 ("were the Court inclined to enjoin portions of the UEP Certified Program, it should direct the UEP to *modify the Guidelines to eliminate the 100% Rule*") (emphases added).

Moreover, the DAPs mistake the entire purpose of controlling for factors that affect egg production.  In order for Dr. Baye to estimate any shortfall in production, he must make the "benchmark period" mirror what it would look like in the "but for" world.  To accomplish this, he must control for all of the factors that would affect egg production beyond the purported conspiracy.  If the Arizona regulation had effects beyond Arizona, Dr. Baye's model would have to control for those effects.  The DAPs assert the regulation had no extra-territorial effects because a regulation having such effects would be unconstitutional.  But that argument asks the Court to assume that *egg producers* would have interpreted the 2009 Arizona regulation the same way the DAPs do.  In other words, it assumes that any egg producer that wants to sell eggs into Arizona after the regulation's effective date would have somehow concluded that the 100% Rule was unconstitutional and thus would have ignored it.  There is no basis for such an assumption.  Even if the Court were now to conclude that Arizona could not constitutionally require compliance with the 100% Rule, producers may still have assumed otherwise during the damages period.  That compliance would have affected egg production and would not have been caused by Defendants, but Dr. Baye did nothing to control for this effect.

## IV.   <u>CONCLUSION</u>

Accordingly, Defendants respectfully request that the Court deny the Direct Action Plaintiffs' Motion to Strike in its entirety.

DATED:  September 8, 2017                    Respectfully submitted,

*/s/ Jan P. Levine*                          */s/ Brian E. Robison*
Jan P. Levine                                Veronica Smith Lewis
Robin P. Sumner                              Brian E. Robison
PEPPER HAMILTON LLP                          Jason C. McKenney
3000 Two Logan Square                        Olivia A. Adendorff
Philadelphia, PA 19103                       GIBSON, DUNN & CRUTCHER LLP
Telephone:  (215) 981-4000                   2100 McKinney Ave, Suite 1100
levinej@pepperlaw.com                        Dallas, TX 75201
sumnerr@pepperlaw.com                        Telephone: (214) 698-3100
                                             VLewis@gibsondunn.com
*Counsel for Defendants UEP and USEM*        BRobison@gibsondunn.com

                                             Robin Locke Nagele
                                             POST & SCHELL, P.C.
                                             Four Penn Center, 14th Floor
                                             1600 John F. Kennedy Blvd.
                                             Philadelphia, PA 19103
                                             Telephone: (215) 587-1155
                                             rnagele@postschell.com

                                             *Counsel for Defendant Cal-Maine Foods, Inc.*

*/s/ Donald M. Barnes*                       */s/ Christine C. Levin*
Donald M. Barnes                             Joseph A. Tate
Jay L. Levine                                Christine C. Levin
PORTER, WRIGHT, MORRIS & ARTHUR              DECHERT LLP
LLP                                          Cira Centre, 2929 Arch Street
1900 K Street, NW, Suite 1110                Philadelphia, PA 19104
Washington, DC 20006-1110                    Telephone: (215) 994-4000
Telephone: (202) 778-3056                    christine.levin@dechert.com
dbarnes@porterwright.com
jlevine@porterwright.com                     *Counsel for Defendant R.W. Sauder, Inc.*

*Counsel for Defendant Rose Acre Farms, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September, 2017, the foregoing document was filed using the CM/ECF system.   In addition, (1) the filing is available for viewing and downloading via the CM/ECF system, and (2) the CM/ECF system will send notifications of this filing to all attorneys of record who have registered for CM/ECF.

*/s/ Brian E. Robison*
Brian E. Robison