IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : : : : : | MULTIDISTRICT LITIGATION |
| *THIS DOCUMENT APPLIES TO:* ALL DIRECT ACTION PLAINTIFF CASES | | No. 08-md-2002 |

**M E M O R A N D U M**

PRATTER, J.                                                                                                     NOVEMBER 7, 2017

In December of 2014, this Court issued an order requiring *Daubert* motions to be filed by May 25, 2015. More than two years after the deadline, on August 11, 2017, the defendants filed a *Daubert* motion to exclude the plaintiffs' expert Dr. Michael Baye. The defendants claimed that recent opinions of this Court and a Court-ordered 2016 supplement to Dr. Baye's initial report rendered Dr. Baye's testimony inadmissible. In support, they submitted their own expert report from Dr. Walker disputing Dr. Baye's findings. The direct action plaintiffs moved to strike the motion and rebuttal expert report as untimely. The defendants claim those Court opinions and the 2016 supplement not only render the testimony admissible, but constitute good cause to file after the deadline.

The defendants have shown good cause to challenge only Dr. Baye's 2016 supplement, but no more; the defendants' challenge to the rest of Dr. Baye's report fails. To reach that conclusion, this Court is called to answer an age-old question: which came first, the chicken or the egg?[1] The defendants argue that the chicken came first, and created the egg. They claim that the opinions issued by this Court (collectively, the chicken) *created* persuasive reasons that Dr.

---
[1] This question was first contemplated as far back as Aristotle. Thankfully, this Court will finally resolve the question in the Federal Reports.

1

Baye's analysis was flawed (the resulting egg), and those reasons did not come into existence until after the *Daubert* deadline. The plaintiffs counter that the defendants have scrambled the matter. They argue that the egg (the reasons) preexisted both the chicken (the opinions) and the *Daubert* deadline. They argue that those reasons were present at the *Daubert* deadline, and the defendants simply failed to raise them.

This Court will settle the age-old debate once and for all: the egg came before the chicken.[2] The defendants cannot show good cause by poaching the reasoning from this Court's recent opinions when that reasoning was available at the *Daubert* deadline. Similarly, the defendants cannot yolk a permissible challenge of Dr. Baye's supplement to a broader challenge of Dr. Baye's overall conclusions when they failed to challenge those conclusions by the deadline.

The defendants' *Daubert* motion is stricken as untimely, with the exception of the challenges to Dr. Baye's 2016 post-*Daubert* supplement. However, the *Daubert* challenge to that supplement ultimately fails on the merits, and Dr. Baye may testify regarding the supplement at trial. Accordingly, the portion of Dr. Walker's rebuttal report addressing the post-*Daubert* supplement is also admissible because Dr. Walker could not have filed that report by the *Daubert* deadline.

**BACKGROUND**

**I.     Factual Background**

The parties are already well familiar with the factual background of this case, which the Court will not reiterate here. Relevant to the issue at hand, the plaintiffs claim an overarching

---

[2] This answer is also true as an evolutionary matter. Eggs preceded chickens by nearly 190 million years. Chicken eggs slowly came about as other birds evolved into what we understand as the modern-day chicken. At some point in the genetic line, a bird very similar to a chicken laid an egg that hatched what we understand as the modern-day chicken. *See generally* Charles Darwin, On the Origin of the Species (1859).

egg price-fixing conspiracy throughout the United States starting around 2001. This conspiracy was allegedly conducted using a certification program run by the United Egg Producers (UEP) in which egg producers achieved a decrease in supply by requiring increased cage space for chickens and mandating 100% compliance with the program (among other tactics).

In support of their allegations, the direct action plaintiffs (DAPs) hired Dr. Michael Baye, a business economist from the University of Indiana, to give his expert opinion on whether this UEP Certified Program affected supply significantly enough to increase prices. Dr. Baye concluded that the UEP requirements increased prices in a measurable way.

## II.     Dr. Baye's Initial Report

On behalf of the DAPs, Dr. Baye filed a report quantifying the impact of the alleged conspiracy on egg production. He began by explaining that the market for eggs is inelastic, meaning that a small decrease in supply would lead to a drastic increase in prices (because demand stays relatively constant). This inelasticity not only makes the alleged conspiracy more effective, but it also simplifies the economic analysis because there are so few substitutes for eggs. In other words, the regression analysis has far fewer variables to account for.

Dr. Baye analyzed the egg market in the United States between 1992 and 2012. His regression analysis accounted for variables like the real prices of feed, electricity, diesel, agricultural wages, national income, population, interest rates, changes in consumer preferences and seasonal fluctuations. He also allowed "for the possibility that changes in other excluded or unobserved factors impacted flock size, and allow the influence of these other factors to be independent as well as correlated over time." Baye Rep. ¶ 154.

After controlling for these factors, Dr. Baye broke these periods into pre-conspiracy (1990-2001) and post-conspiracy (2001-2012) time periods.[3] Before the conspiracy, flock sizes in the United States grew fairly constantly. After the conspiracy, however, flock growth decreased substantially. Dr. Baye isolated five different restrictions that the UEP program imposed, and the dates on which they were imposed. He observed that as each restriction was implemented, flock size progressively decreased. In the end, once all five restrictions were in place, flock size was 6.7% lower than projected.

He repeated this analysis using egg consumption, rather than flock size, as the metric. The inelasticity in market demand for eggs makes this an attractive metric, given that egg consumption also controls for increased productivity in laying chickens from the increased cage space.[4] Dr. Baye accounted for similar variables outlined above, and found that egg production was 5.2% lower than it should have been. Dr. Baye ran six different models, all of which produced statistically significant reductions in supply. Dr. Baye filed his report prior to the May 2015 deadline for *Daubert* motions. That month came and went without a challenge to Dr. Baye's qualifications or report.

### III. Dr. Baye's Arizona Supplement

Over a year later, on September 12, 2016, this Court ruled that the DAPs could not recover damages for sales affected by an Arizona regulation governing cage space restrictions. *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 4771864, at *9 (E.D. Pa. Sept. 12, 2016). As part of that ruling, the Court instructed the plaintiffs to supplement their expert report to remove damages based upon eggs produced or sold in Arizona after October 1, 2009. Dr. Baye filed his

---

[3] Dr. Baye stops his calculations in 2012 because emerging animal welfare laws made it too difficult for him to isolate the UEP variables from other changes to predict the impact of the alleged conspiracy with certainty.

[4] Chickens produce more eggs when given more space, though the production increase per chicken does not offset the decrease in chickens from the expanded cage space.

4

supplemental report (the Arizona Supplement) on November 4, 2016. In that supplement, Dr. Baye explained that "adjustments for Arizona require no additional regressions or economic analysis of the overall impact of Defendants' and their co-conspirators' coordinated conduct." Ariz. Suppl. ¶ 2.

To remove the impact of Arizona's regulation, Dr. Baye effectively assumed that Arizona did not exist. To do so, he isolated the supply side (eggs produced in Arizona) and demand side (eggs purchased in Arizona). In adjusting the supply-side impact, Dr. Baye found that Arizona produced 0.25% of the nation's eggs during the relevant time period, but conservatively assumed that Arizona really produced 2.3% of the eggs in the United States. He then took Arizona's share of the population (2.1%) and added it to that estimate. After some other minor changes, Dr. Baye reduced his overall damages calculations by 4.2%.

In effect, Dr. Baye's conservative approach assumes that all eggs consumed in Arizona are imported from other states, and all eggs produced in Arizona are exported to other states. By doing so, he effectively eliminates any possible impact from the Arizona law, since it only applies to eggs either consumed or produced in Arizona.

Another year passed after this report before the defendants brought their *Daubert* motion to exclude both Dr. Baye's Arizona Supplement and his initial report. The defendants attached their own supplemental report of Dr. Jonathan Walker, an economist working for Economists Incorporated. Dr. Walker's report purported to undermine Dr. Baye's report and supplement. The plaintiffs moved to strike the motion and Dr. Walker's report as untimely.

## IV. Legal Standard & Challenge

This opinion addresses two separate motions, each of which bear on the admissibility of these reports.

## A. Expert Testimony (Defendants' *Daubert* Motion)

The Third Circuit Court of Appeals has characterized Rule 702 as embodying "a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). While specialized knowledge is a requirement, the basis of such knowledge can be "practical experience as well as academic training and credentials." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002) (Alito, J.) (noting that the specialized knowledge requirement has been construed "liberally") (citing *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). To meet the requirements of Federal Rule of Evidence 702, an expert must have the "knowledge, skill, experience, training, or education" sufficient to form an expert opinion. Fed. R. Evid. 702.

Neither side disputes that Dr. Baye has the requirements to be an expert. Instead, the parties focus on the four requirements of Rule 702. Namely, that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id*.

Federal Rule of Evidence 702 supplanted the *Frye* "generally accepted" standard, creating a stronger gatekeeping role for the Court. In *Daubert*, the Supreme Court interpreted Rule 702 to require the trial court to assess the admissibility of expert testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). This interpretation and its progeny led to the modern-day Rule 702. Rule 702 "affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Fed. R. Evid. 702, advisory cmte. note (2000). The "proponent has

the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Id*.; *see also*, Fed. R. Evid. 104(a).

The factors in *Daubert* still serve as a guiding light when interpreting Rule 702. Among them are:

> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;
> (2) whether the technique or theory has been subject to peer review and publication;
> (3) the known or potential rate of error of the technique or theory when applied;
> (4) the existence and maintenance of standards and controls; and
> (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Evid. 702, advisory cmte. note (2000) (summarizing the *Daubert* factors).

The trial judge has a special obligation under Rule 702 to ensure that all expert testimony is not only relevant, but also reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589). As a gatekeeper, the Court ensures that the expert, whether basing her testimony on professional studies or personal experience, is employing the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. Even so, case law since *Daubert* has shown that "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory cmte. note (2000).

The defendants' challenge here must fall under Rule 702(d).[5] Rule 702(d) requires that courts scrutinize not only the methodology used by the expert, but also its application to the facts of this specific case. Such an inquiry is fact-intensive, and requires the Court to assess whether the principles and methods used by the expert were applied adequately to the facts in the case. If the methodology used by the expert is sound, but misapplied to the facts, it cannot pass muster

---

[5] As the Court will discuss below, the defendants waived any challenges under 702(b) or 702(c) by not bringing their motion at the deadline.

under 702(d). These challenges are rare. Most expert challenges contest the methodology, not the application of the methodology to the facts. However, as discussed below, the defendants waived their challenge to the methodology (702(c)) by not challenging the *Daubert* report at the 2015 deadline. Therefore, their only remaining avenue of attack is a 702(d) challenge.

## B. Modification of Scheduling Orders (Plaintiffs' Motion to Strike)

A scheduling order "may only be modified for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The "Rule 16(b) standard controls *any* decisions to alter a scheduling order . . . and it must [even] be satisfied before determining whether an amendment should be permitted under [the more lenient] Rule 15." CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1522.2, at 312 (emphasis added). "In general, if a party seeking relief can show that the deadlines cannot reasonably be met despite the party's diligence, relief may be given." *Id*. at 313.

The good-cause standard "will not be satisfied if the court concludes that the party seeking relief (or that party's attorney) has not acted diligently in compliance with the schedule." *Id*. at 322; *see also* Fed. R. Civ. P. 16, advisory cmte. note (1983) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."); *Inge v. Rock Fin. Corp*., 281 F.3d 613, 625 (6th Cir. 2002) (holding that Rule 16(b)'s "good cause" standard focuses on a party's diligence); *Johnson v. Mammoth Recreations, Inc*., 975 F.2d 604, 609 (9th Cir. 1992) ("Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment."). However, "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief." *Johnson*, 975 F.2d at 609.

# DISCUSSION

## I. Good Cause For Late Filing

The defendants point to two reasons for good cause: (1) this Court's opinions issued after the *Daubert* deadline, and (2) Dr. Baye's Arizona Supplement, also written after the deadline.

### A. Opinion-Related Arguments

The defendants first point to a September 2015 ruling by this Court that held "the failure to account for non-conspiring producers and the failure to account for non-commodity eggs[] are both flaws undermining the reliability of Dr. Stiegert's models." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 153 (E.D. Pa. 2015). These supposed shortcomings in Dr. Baye's analysis were present in the initial report, and present before the *Daubert* deadline. Moreover, the citation to the Court's reasoning is inapposite, given that the Court was answering a different question: whether common issues predominate under the IPP class, not whether damages could be calculated writ large.

Second, this Court issued a February 2016 ruling holding that another expert's "model fails to specify, after 2008, what component of the alleged price increase is attributable to unlawful antitrust behavior as opposed to imposition of lawful state regulatory schemes." *In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 410279, at *8 (E.D. Pa. Feb. 3, 2016). Even if this were new information (which it is not) it is inapplicable here as a factual matter because Dr. Baye specifically explains that he accounted for the state regulatory schemes in both his initial model and in his Arizona Supplement.

Both of these supposed flaws in Dr. Baye's reasoning were present before the *Daubert* deadline. The defendants have pointed to nothing in these opinions that was not discoverable before the deadline. That this Court identified similar flaws in different experts, even though the

defendants failed to, does not constitute good cause. Therefore, these intervening opinions are insufficient to establish good cause for bringing the present motion two years late.

### B. The Arizona Supplement

The second reason the defendants give to satisfy good cause is Dr. Baye's Arizona Supplement, which was filed after the *Daubert* deadline. The defendants are correct that the emergence of the Arizona Supplement is good cause to challenge the Arizona Supplement itself because they could not have brought the challenge at the *Daubert* deadline.[6] But the defendants attempt to bootstrap an Arizona Supplement challenge into a challenge to the entirety of Dr. Baye's report. As the defendants explain it, the Arizona Supplement changes everything in Dr. Baye's initial report.

The defendants are correct in a narrow respect: all of the *numbers* change in Dr. Baye's report after the Arizona Supplement. Ultimately, this difference is irrelevant. Dr. Baye's fundamental analysis—and thus the defendants' challenge under 702(c)—is no different. Dr. Baye notes that the "adjustments described in [the Arizona] supplement are based on the same economic and econometric results detailed in [his] original reports." Ariz. Suppl. ¶ 2. For the defendants to prevail in this challenge, they must show that the application of these economic principles to the changed facts in the Arizona Supplement renders Dr. Baye's conclusions unreasonable, *even though they were reasonable before the Arizona Supplement*. In other words, at this stage, their challenge can only be under 702(d).

Rule 702(d) requires an expert to "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702(d). Such an inquiry is fact-intensive, and requires the Court to not only analyze whether the economic principles employed by Dr. Baye were sound, but whether they were properly applied to the facts at hand. In this case, the principles and methods employed

---

[6] Neither side disputes this point.

10

by Dr. Baye did not change in the Arizona Supplement. The only changed circumstances were the facts he used. A challenge here requires the defendants to make a showing that Dr. Baye's analyses, while reasonable pre-*Daubert*, are unreasonable when applied in the context of the Arizona Supplement. The defendants do not attempt to do so. Instead, they focus on the failings of Dr. Baye's initial report.

Perhaps the reason the defendants sidestep the necessary inquiry is because they have no good answer. It would be quite perplexing if the Arizona Supplement—which the Court ordered to make Dr. Baye's model *more* reliable—could somehow make his model *less* reliable. As the DAPs point out, the defendants' critiques of Dr. Baye's Arizona Supplement were available to the defendants when the Court issued the order to create the supplement, but the defendants failed to raise them then.

This is not to say that Dr. Baye's Arizona Supplement is correct in all respects, as discussed below. But the changes are not so egregious that it calls the initial expert report by Dr. Baye into question. Therefore, the DAPs' motion to strike is granted as to all of the *Daubert* motion except that portion challenging the Arizona Supplement. Accordingly, this Court must analyze the defendants' substantive challenge to the Arizona Supplement.

## II. Substantive Challenges to the Arizona Supplement

Dr. Walker filed a supplemental report criticizing the entirety of Dr. Baye's analysis. Although his report is 38 pages and 85 paragraphs, the analysis of the Arizona Supplement only takes up 3 pages and 7 paragraphs. Those challenges break down into three main arguments, none of which render the report inadmissible.

First, Dr. Walker claims that Dr. Baye's analysis relied on the invalid assumption that the Arizona regulation's effect on U.S. production would be related *solely* to (1) Arizona's share of

U.S. egg production and (2) its share of the U.S. population. Dr. Walker argues that this regulation had ripple effects for any production facility that sold eggs into Arizona. For example, a company with a small number of eggs sold into Arizona would presumably structure a greater proportion of their facilities to comply with the Arizona restrictions. In other words, they would produce a greater number of eggs that comply with the Arizona restrictions than the number of eggs they send into Arizona.

Dr. Walker's unwritten assumption is that companies seeking to comply with the Arizona statute altered entire facilities, not just small subsections of facilities. Dr. Walker is critical of Dr. Baye for his assumption that facilities would not do so, but offers no support for why they would change their entire facilities, either. In sum, this is a question of weight, not admissibility, and can effectively be addressed on cross examination.

Second, Dr. Walker explains that the above point is exacerbated because of the 100% rule. He explains that any "producer selling into Arizona after enactment of the law would have to manage its entire flock according to the UEP Guidelines, not just the specific hen houses or facilities sending eggs to Arizona." Walker Rep. ¶ 36. This seems to be an assertion to shore up the above critique, but it falls short. Dr. Walker's claim that the 100% rule would affect the entire facility has nothing to do with the Arizona law. That requirement still derived from the UEP. To say that the UEP Guidelines established greater compliance requirements than the Arizona law does not explain why Dr. Baye fails to accurately remove the effect of the Arizona law. For Dr. Walker's argument to have force, the 100% rule would need to be tied to the enactment of laws in different states, instead of simply mandating requirements to achieve UEP certification. This argument misunderstands the nature of the conspiracy and the UEP requirements.

Third, Dr. Walker criticizes Dr. Baye's supply and demand estimates. As discussed above, Dr. Baye arrived at his 4.2% impact by isolating the supply side (eggs produced in Arizona) and demand side (eggs purchased from DAPs in Arizona). He conservatively assumed that Arizona produced 2.3% of the eggs in the United States and added Arizona's 2.1% share of the population before arriving at 4.2%. Dr. Walker criticizes Dr. Baye's calculation of the eggs produced in Arizona because Dr. Baye failed to take into account that Arizona could have a disproportionate number of producers in Arizona who were members (or not) of the alleged scheme. He similarly criticizes Dr. Baye's demand-side estimate because it took the share of the United States population and assumed consistent egg consumption in Arizona. Dr. Walker explained that that it "is impossible to confirm that Dr. Baye correctly identified all of the eggs destined for Arizona." Walker Rep. ¶ 38.

These points criticize Dr. Baye's assumptions that Arizona's rate of (1) participation in the conspiracy and (2) egg consumption were both the same as the nationwide rate. This criticism is accurate as an empirical matter. The percentage of Arizona egg producers in the conspiracy probably are slightly different than the nationwide percentage, and egg consumption probably is slightly different than the other states. Such differences are slight, and Dr. Walker has pointed to no facts that would explain why Arizona's numbers would be significantly different than the nation as a whole. In general, a random sampling (such as a given geographic area at issue here) will account for differences in variables like egg consumption, such that the random sampling eliminates any statistical differences. Absent a showing that Arizona is somehow different than the rest of the states in the union in terms of egg consumption or production, Dr. Walker's argument fails to undermine Dr. Baye's Arizona Supplement to render it inadmissible. The Arizona Supplement is therefore admissible.

### III. The Admissibility of Dr. Walker's Supplemental Report

The DAPs moved to strike Dr. Walker's supplemental report because it should have been filed as part of his pre-*Daubert* report. The admissibility of Dr. Walker's report rises and falls with the permissible challenge to Dr. Baye's report. As the Court explained above, and the DAPs do not dispute, Dr. Baye's supplement is the only change after the *Daubert* deadline that can be challenged. Given that fact, the defendants must be able to respond to the supplement.

Therefore, the portion of Dr. Walker's expert report responding specifically to the Arizona Supplement (paragraphs 32 through 38) is admissible, but the rest of the report is stricken as untimely.

### CONCLUSION

For the foregoing reasons, Dr. Baye's Arizona Supplement is permissible, as is the portion of Dr. Walker's expert report challenging the supplement. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE