IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MULTIDISTRICT LITIGATION |
| *THIS DOCUMENT APPLIES TO:* ALL DIRECT PURCHASER ACTIONS | No. 08-md-2002 |

**MEMORANDUM**

PRATTER, J.                                                                                                                                                      APRIL 6, 2018

In anticipation of the upcoming trial among the Direct Purchaser Class Plaintiffs and remaining defendants, the parties filed 21 motions *in limine*. The Court has ruled on 18 of those motions. This memorandum opinion addresses the remaining three motions from the defendants, all raising hearsay issues.

In addressing the hearsay issues, the Court cannot overlook a German proverb: "He who treads on eggs must tread lightly." The plaintiffs rely heavily on notice arguments in offering or arguing for hearsay, suggesting that the evidence is "not offered for the truth of the matter asserted." While some evidence may be offered to help the jury resolve disputes as to notice, this argument must be used sparingly. Over time, this evidence becomes duplicative, and its relevancy wanes. The plaintiffs must tread lightly in advancing such evidentiary arguments, and these will not serve as cart blanche to circumvent the hearsay rule.

First, the defendants move (Doc. No. 1608) to exclude emails and letters from parties who have already settled with the Direct Purchaser Class Plaintiffs, arguing that these materials are inadmissible hearsay. In the main, the Court agrees and excludes the documents, but will

allow the plaintiffs to submit copies that are redacted in accordance with this memorandum opinion and accompanying order.

Next the defendants move (Doc. No. 1609) to exclude reports from Donald Bell, an economic consultant who worked for the United Egg Producers. They argue that these documents are inadmissible hearsay. However, according to the plaintiffs, these Bell reports are not being offered for the truth of the matters they assert. They are being offered to show that the United Egg Producers program, supposedly designed at least in part by Mr. Bell, was actually a price-fixing program, not an animal welfare one. Therefore, these are not hearsay and are admissible.

Finally, the defendants move (Doc. No. 1610) to exclude complaints filed by animal rights groups with the Federal Trade Commission and Better Business Bureau, arguing that they are irrelevant hearsay. These complaints allege that the UEP Certified Seal placed on egg cartons was misleading. The Court finds that the fact of the making of such complaints is admissible, and the text of the complaints themselves may also be permitted, but the Court will await receipt of the actual complaint(s) before making any final ruling. Depending upon the timing and the text, the complaints themselves may be relevant and admissible. However, the agencies' adjudications of the complaints are inadmissible.

## BACKGROUND

The defendants in this case are accused of a multi-year, multi-faceted price-fixing scheme to decrease the supply of eggs and drive up prices. The Direct Purchaser Class Plaintiffs (DPPs) allege that beginning in the early 2000s, the defendants conspired to reduce the domestic supply of shell eggs (thereby increasing egg prices) under the auspices of two industry groups, the United Egg Producers (UEP) and the United States Egg Marketers.

2

The centerpiece of the scheme was the UEP Animal Care Certified Program. Under the Certified Program, the UEP issued certifications to producers if those producers complied with certain animal husbandry guidelines adopted by the UEP. According to the DPPs, these guidelines depressed egg supply by, among other things, establishing a minimum cage space allowance per bird in the defendants' facilities, which then reduced flock size, and accordingly, meant there would be fewer eggs in the marketplace.[1]

## DISCUSSION

At issue are three motions to exclude hearsay evidence. First are emails and letters from co-conspirators who have since settled with the plaintiffs. Next are reports from the UEP's economic consultant, Donald Bell. Finally at issue are complaints by animal rights groups filed with the Federal Trade Commission and the Better Business Bureau.

### I.     Motion to Exclude Hearsay by Settled Co-Conspirators

The defendants move first to exclude, as inadmissible hearsay, six emails and letters written by settled former co-defendants. These documents are statements by certain UEP members asserting that the UEP Certified Program is actually a pretext to fix prices. The documents fall into two groups: first, emails within a single producer, namely Michael Foods, and second, letters from Sparboe Farms representatives to the UEP. The Court finds that these documents are inadmissible, but some may be admissible if properly redacted.

The Michael Foods documents are four email chains recounting UEP meetings and discussions with UEP personnel. The Sparboe documents are formal letters to the UEP outlining misgivings about the Certified Program. The DPPs argue that these are "business records" and thus an exception to hearsay, or in the alternative, they represent or contain then-existing mental,

---

[1] A more detailed discussion of the relevant portions of the UEP Certified Program can be found in this Court's summary judgment ruling addressing the same issue. *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033 (E.D. Pa. 2016).

3

emotional or physical conditions. For the reasons outlined below, the Court finds that neither exception applies. The Court grants the motion to exclude the documents as currently constituted. However, as outlined below, the parties may submit some redacted exhibits to the Court for document-by-document or even line-by-line approval.

### A. 803(6) Business Records

The DPPs first argue that the four Michael Foods emails[2] are business records. A business record is a record (1) made at or near the time by someone with knowledge (2) that was kept in the course of a regularly conducted activity of a business where (3) it was a regular practice of that activity to make the record. FED. R. EVID. 803(6). These emails between Michael Foods employees discuss recent UEP meetings and discussions with UEP members. The DPPs claim that these emails, summarizing meetings that other Michael Foods employees did not attend, qualify as business records. The Court disagrees.

First, the documents were not made "at or near the time" of the activity they discuss. FED. R. EVID. 803(6). Exhibit D was made 13 days after the meeting it supposedly describes; Exhibits A and F were made the day after the meetings; Exhibit E refers to meetings both from earlier in the day and from three days earlier. Exhibit E *could* satisfy this requirement (because it was written the same day as a meeting it recounts) but it is unclear how close in time it was made to the meetings it supposedly discusses. The business records exception requires a near-contemporaneous logging of information. Multiple hours of delay will not suffice. Thus the DPPs have not sufficiently shown that this email was made "at or near the time" of the activity it addresses; nor have they shown that any information arguably imparted in the writing was, essentially, static and impervious to the vagaries of the writers' memory or subjectivity. *See* FED. R. EVID. 803(6).

---

[2] Exhibits A, D, E and F to the motion *in limine*.

4

Second, there is no evidence that it was a "regular practice" to send these emails summarizing what happened in the meetings. Although the declarants may have wanted to keep their superiors and co-workers apprised of what happened in the meetings, business records are the type of automatic, discretionless tasks that are triggered every time an action occurs, such as time-stamping packages that come into a mailroom, or logging inventory or expenditures in a spreadsheet. No party has produced evidence of a policy to send an email following these meetings. Nor is there a common structure to the emails that evince a required log at or following each meeting. Therefore, none of these emails qualify as business records. *Cf. In re Deepwater Horizon Oil Spill*, No. 10-cv-2179, 2012 WL 85447, at *3 (E.D. La. Jan. 11, 2012) (explaining the admissibility of emails under Rule 803(6)).

### B. 803(3) Then-Existing Mental State

The DPPs alternatively argue that both the Michael Foods emails and the Sparboe letters constitute then-existing mental states under Federal Rule of Evidence 803(3). This argument is also inapt. Federal Rule of Evidence 803(3) allows a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." FED. R. EVID. 803(3).

This rule encompasses evidence offered to show the declarant's mental state at the time the statement was made. For example, a victim saying "I am scared" can be used to show that the victim was scared. However, the statements cannot be used to prove that there was a *reason* for her to be scared (for example, someone standing over her with a knife). Nor can the statements be used to show a "fact remembered." For example, the statement "I was just robbed" is not admissible to show that the declarant was recently robbed.

5

Generally, forward-looking statements are admissible to prove the fact they assert but backward looking statements are not. For example, "I am going to Washington next Monday, June 29th" *can* be used to show that the declarant was in Washington on June 29. However, the statement "I was in Washington last Monday, June 15th" *cannot* be used to show that the declarant was in Washington on June 15. *Mutual Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285 (1892).

*i. Michael Foods Emails*

The DPPs claim that the Michael Foods emails, summarizing past meetings, satisfy this requirement.[3] The Court finds that these emails, as a whole, do not qualify as then-existing mental states under Federal Rule of Evidence 803(3). The emails detail previous meetings with other companies, and how Michael Foods representatives voted in the meetings. The vast majority of the statements in these emails are backward-looking statements and therefore inadmissible as state-of-mind statements, given that the exception does not apply to a "fact remembered." FED. R. EVID. 803(3).[4]

But the Court has identified some statements in Exhibit D that may qualify as then-existing mental states.[5] For example, one email expresses concerns about other companies not complying with the UEP Certified Program and says that the parties should meet with legal

---

[3] The Court notes the circularity of the DPPs arguments. On the one hand, they argue that these are business records, which are backward-looking logs of events that already transpired. But the DPPs also argue that these emails satisfy the "existing mental state" exception, which allows *forward-looking* hearsay.

[4] Moreover, most of these documents are chain emails, where the "quoted text" at the bottom must satisfy Federal Rule of Evidence 805, which requires each level of hearsay to be independently admissible. These quoted emails must satisfy "hearsay within hearsay" analysis, which the DPPs do not undertake. Federal Rule of Evidence 803(3) certainly would not apply to hearsay within hearsay, because one person cannot testify to another person's mental state. Should the parties wish to offer redacted copies of these older quoted emails as discussed below, they would need to either satisfy any hearsay within hearsay analysis, or produce the initial emails.

[5] The Court finds that Exhibits A, E and F have no statements within them that qualify as mental states, and therefore these are excluded in their entirety.

counsel to discuss the concerns. *See* Exhibit D ("we should get together with counsel . . . .") Even if this statement did qualify under Federal Rule of Evidence 803(3), it would have questionable relevance. The parties have not briefed this type of line-by-line analysis.

Therefore, the Court grants the motion to exclude the Michael Foods emails. However, the Court will allow the DPPs to offer redacted copies of Exhibit D so long as the remaining hearsay statements are (1) admissible in accordance with the above guidance, not the capacious reading advocated in the briefing (2) relevant for the purposes shown and (3) otherwise admissible under the Federal Rules of Evidence. The parties are encouraged to discuss the redacted copies in advance of trial to resolve any prospective issues in accordance with the timeline outlined in the accompanying order.

*ii. Sparboe Letters*

Like the Michael Foods emails, most of the information contained in the Sparboe letters[6] is backward-looking and inadmissible. The letters largely outline concerns with the UEP Certified Program. As above, some statements could be admissible. For example, in Exhibit B, the declarant indicated that he and his colleagues "simply do not feel comfortable with the program as it is now structured." Ex. B to Motion *in Limine*. This could be a statement of a mental state if offered for the right reasons. As discussed above, this statement could be used to show that the declarant was uncomfortable, but cannot be used to show the *reason* that the declarant was uncomfortable. In another example, the lawyer for Sparboe notes that "the Capper-Volstead Certification form you wanted us to sign will be signed and returned soon." This can be used to show that the form was signed and returned, but its relevance is unclear.

Therefore, like the Michael Foods emails above, the Court grants the motion to exclude the Sparboe letters. As with the Michael Foods emails, the Court will allow the DPPs to offer

---

[6] Exhibits B and C to the motion *in limine*.

7

redacted copies so long as the remaining hearsay statements are (1) admissible in accordance with the above guidance, not the capacious reading advocated in the briefing (2) relevant for the purposes shown and (3) otherwise admissible under the Federal Rules of Evidence. Once again, the parties are encouraged to discuss the redacted copies in advance of trial to resolve any prospective issues in accordance with the timeline in the accompanying order.

### C. Notice

The DPPs alternatively argue that the Sparboe letters are admissible only to show that the UEP was on "notice" that members were concerned the program was illegal, and not for the truth of the matter asserted. But notice to the UEP is irrelevant because the UEP is not a defendant. To be sure, the remaining defendants are three *members* of the UEP. But neither party has asserted that these defendants themselves received these letters, nor is there a reason why the Court should assume they did. Without such evidence, the Court finds that it would be too attenuated to admit such inflammatory statements (accusing the UEP Program of being a price-fixing scheme) as "not for the truth" but as circumstantial evidence to show "notice." As the Court discussed above, the DPPs' notice argument can only go so far before it becomes duplicative, not to mention misleading to the jury.

Seeing these letters would make it nearly impossible for the jury to understand them solely for the purpose of notice. It is more likely that the jurors will simply take these letters as evidence of liability, rather than circumstantial evidence of "notice." Absent evidence that these letters or emails were relayed to the remaining defendants, the Court finds the "probative value is substantially outweighed by a danger . . . of confusing the issues [or] misleading the jury." FED.

R. EVID. 403. If the DPPs can show at trial that the defendants received these letters, they may request reconsideration of this ruling.[7]

## II. Motion to Exclude Reports from Mr. Bell

The defendants next move to exclude reports from Mr. Bell, an economist who worked for the UEP, as hearsay. The DPPs argue that these are not being offered for the truth of the matter, but to show that the UEP members knew the economic ramifications of their actions. The Court agrees with the DPPs and denies the motion to exclude as hearsay, because these reports are not being offered to prove the truth of their assertions, but show an alleged blueprint of the scheme to fix prices.

### A. Hearsay of Reports

The defendants argue that these reports are hearsay. The DPPs concede that the reports should not be offered as substantive evidence for their truth, but offer them as evidence of the plan the UEP used to construct the Certified Program, which according to the plaintiffs' theory of the case, is the centerpiece of the alleged scheme. By showing that the UEP received these reports, the jury can infer that the UEP was on notice that the cage-space restrictions would reduce supply and increase profits. In effect, these reports were a blueprint for how to fix prices. Because this type of knowledge is a crucial part of the case,[8] the Court admits the documents, but will instruct the jury that they are not offered for the truth of the matter asserted. The DPPs are already calling an expert economist to testify substantively to the economic considerations surrounding the alleged scheme. This will allow the jury to understand that they need not take

---

[7] The Court expresses no view on whether this request would be meritorious.

[8] Although normally the importance of the evidence does not matter in a hearsay analysis, it carries special weight here, where the evidence is not being offered for its truth value. This requires the Court to look at how the evidence is being used, and whether it may mislead or confuse a jury to admit the evidence in this manner. For tangential arguments, the jury may be confused by evidence not for the truth. In contrast, for points central to the case, it will be easier for the jury to grasp and understand why they should not take this information for its truth value, but merely for the effect on the recipient.

9

these documents for their truth value, but instead to show that the UEP members understood (or were at least told) the program would cause price increases. Should the DPPs stray into argument regarding the substance of these economic calculations—that is, argument beyond the narrow purpose of "notice" and "blueprint"—the defendants may renew their objection.

### B. Sparboe Comparison

The Court notes three major differences between this holding and the holding to the contrary regarding the Sparboe letters. Here, the Court admits the Bell Reports for purposes other than their truth, but denied the same argument to admit the Sparboe letters.

First, as the plans for trial seem to be shaping up, the Bell reports will very likely be the first evidence at trial outlining the blueprint of this scheme. Despite this, the Court will not allow this "notice" argument to be determinative for every hearsay document at trial. Over time, as the Court has observed, the evidence becomes duplicative and loses its admissible qualities.

Second, the Bell reports are the alleged lynchpin of the price-fixing program and form the basis for the origins of the alleged scheme itself. The centrality of these reports thus makes it far more likely that the defendants would have knowledge of the theories in these documents (or, at least, that the UEP Certified Program was a price-fixing scheme). The reports may show why the scheme was enacted in the first place. But, on the other hand, the Sparboe letters were simply a party complaining in private to the UEP after the alleged scheme was put into motion. This type of correspondence is unlikely to be disseminated to the individual members of the organization. Even if it were, these letters are less likely to be heeded by the individual members. Unlike the Bell reports, the Sparboe letters were not expert reports, but simply statements expressing one company's opinion.

Third, the value when offered to show notice is greater with the Bell material than with the Sparboe letters. With the Sparboe letters, the defendants (if they saw the letters at all) may have been on notice that a *single* company thought the UEP Program *could* be a price-fixing scheme. In contrast, the Bell reports give economic models (whether they are true or not) that purportedly explain what actions *would* increase prices. The suggestions in the Bell reports were then arguably implemented by the UEP. In other words, although the Sparboe documents show that a company thought this could be interpreted as a price-fixing scheme *after* the program already existed, the Bell reports show that the parties arguably thought the UEP Program would increase prices *before* the program was enacted. This crucial distinction makes it more likely that the jury will understand that the Bell reports are not being offered for the truth of the matter.

### C. Mr. Bell's Title

The defendants also argue that Mr. Bell should not be referred to as an economist because he holds no economics degrees and has no special economics training. Although they cite no rules for this argument, it must be that referring to him as an economist would be more prejudicial than probative under Federal Rule of Evidence 403. The DPPs do not intend to argue that Mr. Bell is an "economist," but instead request that Mr. Bell be called an "economic consultant" because that is the title the defendants gave him in their retention agreement. The DPPs are ultimately correct here, and the Court finds that Mr. Bell may be referred to as an "economic consultant," but not as an economist.

### III. Motion to Exclude Complaints in Other Cases

Finally, the defendants ask the Court to exclude complaints with the Federal Trade Commission (FTC) and Better Business Bureau (BBB). These complaints, filed by animal rights groups, claimed that the UEP Certified Seal, placed on egg cartons in compliance with the UEP

11

Certified Program, was misleading because it falsely advertised a higher level of animal care than was actually provided under the UEP Certified Program. The defendants argue that these complaints are irrelevant hearsay.[9]

## A. Complaints

Although the defendants' argument deals with both hearsay and relevancy, the inquiries collapse into one. The DPPs argue that the complaints are not being offered for the truth of the matter, but show that the defendants were on notice that their actions were not to the satisfaction of animal rights groups, and that the purported animal welfare purpose of the program was a mere pretext to fix prices. The DPPs intend to use these documents to rebut the defendants' contention that they enacted these programs under pressure from animal rights groups. They claim that the complaints show that the animal rights groups believed the UEP Certified Seal misleadingly suggested that the hens were treated more humanely than they were. Therefore, these complaints show that the defendants were on notice that their program was not meeting the demands of the animal rights groups they sought to assuage. The Court concludes that these documents may be admissible if they are not offered for the truth of the matter, but only if the defendants claim that they joined the UEP Certified Program under pressure from animal rights groups. These complaints, depending on their text and timing, can be used to rebut that assertion. A final ruling on any given complaint must await developments during trial.

## B. Associated Files

Although the complaints by animal rights groups are possibly admissible for this narrow purpose, the adjudications by the agencies are inadmissible.[10] After the complaints were filed,

---

[9] The defendants also moved to exclude certain settlement agreements (including a letter from the FTC settling the claims and the settlement between the UEP and 16 States) as inadmissible under Federal Rule of Evidence 408. The DPPs have conceded that these are inadmissible, and the Court grants the defendants' motion (Doc. No. 1610) to exclude these documents.

the FTC, the BBB and the National Advertising Review Board all generated documents and findings. These filings largely agreed with the animal rights programs and found the UEP Seal to be misleading. But the only way these adjudications are relevant is if they are offered for their truth value—to lend legitimacy to the animal rights groups' claims. The DPPs claim that these agency determinations, even if not offered for the truth, *showed the defendants* that the animal rights groups' claims had some legitimacy. Although the Court finds this plausible as a logical matter, such a nuanced argument would be hard for a jury to understand without separating it from the impermissible uses. When coupled with the supposed imprimatur of authority that a ruling by the BBB and FTC carries, it makes this tangential argument more prejudicial than probative. Therefore, the Court grants the motion to exclude the statements made by the Bureau and Commission.

## CONCLUSION

For the foregoing reasons, the motions *in limine* are variously granted or denied as outlined above. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[10] In their briefing, the DPPs do not address these subsequent filings by the FTC, BBB and Review Board. Instead, their entire brief focuses on the admissibility of the complaints. At oral argument, counsel did not concede that these were inadmissible, so the Court addresses them here.