IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | MULTIDISTRICT LITIGATION |
| *THIS DOCUMENT APPLIES TO:* ALL DIRECT PURCHASER ACTIONS | No. 08-md-2002 |

**MEMORANDUM**

PRATTER, J.                                                                                             JUNE 1, 2018

### INTRODUCTION[1]

This is a straightforward case of statutory interpretation where the plain language dictates the result. After ten years of incubating, and on the eve of closing arguments of a month-long trial, the parties suggest that the outcome of the case hinges on the meaning of one word in a little-used 1922 statute partially protecting farmers from antitrust laws. The Court is called upon to answer the deceptively simple question: how should one calculate the "value" of something?

In a certain sense, value is ephemeral. There are many types of value. Black's Law Dictionary lists 54 different types of value, 53 of which contain an adjective preceding it. But there is only one definition of "value" that can be used here: the amount a good can demand in exchange. The Court finds that "value" must mean the price for which it is purchased by the cooperative, and therefore concludes that, on the basis of the evidence, volume cannot serve as an adequate substitute for value. For this reason, the Court finds that there is insufficient

---

[1] Because the Court has issued many opinions already in this case, and because of the exigencies of trial, this memorandum necessarily does not set out all of the background facts of this litigation. The parties know them well. Generally, however, the Court makes reference to the Court's September 2016 opinion on a different question on the Capper-Volstead Act, as well as the Court's summary judgment ruling. *See In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033 (E.D. Pa. 2016).

1

evidence to grant a directed verdict at this time in favor of the defense. However, because the defendants have not rested their case, the Court also declines to grant the motion for a directed verdict to the plaintiffs. The defendants may still attempt to present evidence of the value of goods to the jury that would otherwise satisfy the statutory requirements as outlined below.

## BACKGROUND

In 1922, as the effects of the Sherman and Clayton Acts were coming into greater focus, Congress passed the Capper-Volstead Act to "remove the threat of antitrust restrictions on certain kinds of collective activity." *National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 824 (1978). The grant was not absolute. Among the limitations imposed was a requirement that "the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U.S.C. § 291. In other words, the immunity only applies to agricultural cooperatives that have the majority of their products handled by members. This is the so-called "50% rule." The 50% is determined by the value of the products handled by the cooperative.

There is scant case law on the rule. Few courts have even addressed this provision, and none have done so with such a novel fact pattern as presented here. In most agricultural commodity businesses, volume and price paid are directly proportional—economic laws dictate that market forces command relatively similar prices for similar goods in a market. But here, the United States Egg Marketers (USEM) was expressly designed (or, if not designed, then operated) to bridge two different markets by allowing USEM to export eggs from the U.S. market to the foreign market. USEM coordinated bulk shipments to sell eggs overseas for less than the prices eggs demanded domestically, while sharing the losses *pro rata* amongst members. The plaintiffs allege that this "dumping" scheme was done to raise prices domestically so that, even though

2

so that, even though there was (or could be) a short-term loss for all members on a specific export, the resulting buoyed egg prices would nevertheless increase domestic profits to justify the export losses.

USEM members were obligated to supply eggs for the export in accordance with their *pro rata* size, and were paid the foreign price of export.[2] Usually, not all USEM members would have enough domestic eggs to cover USEM's export commitments. When this happened, members could ask USEM to go into the open market to purchase eggs and would then be invoiced for the loss in the market purchase. This provision meant that *non-members* were paid a higher price by USEM than *members* were paid to export their eggs. As an example, in a given export, USEM members who had eggs could sell their eggs overseas for $0.50, but to fulfill the export requirement, USEM would go into the market and buy eggs from non-members at the going domestic rate of $1.50. USEM would then turn around and export these "$1.50 eggs" at $0.50 and bill the $1.00 loss to the members.

Thus, even when USEM would ensure that the *volume* of each egg shipment from members made up more than 50% of the total, the *price paid* for the eggs could be drastically different. This means that the precise question presented to the Court is binary. If the Court concludes that "value" means "volume," the defendants have presented sufficient evidence for their affirmative defense to go to the jury. But if the Court concludes that "value" means "price paid for the goods" then there is insufficient evidence on the record (as currently constituted at the moment of the issuance of this memorandum) to support the defense.

---

[2] Thus, for example, if a USEM member owned 10% of the total hen-laying eggs in USEM, that producer would be required to supply 10% of the eggs for the proposed export.

3

DISCUSSION

The Court concludes that the word "value" in the statute must mean the price the buyer pays for it domestically. Such a reading is compelled by the statute.

I.      Definition of Value

As in any question of statutory interpretation, the Court must start with the text of the statute. The Capper-Volstead Act requires that "the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U.S.C. § 291. At the time Capper-Volstead was drafted, value, when "applied without qualification to property of any description," which is how the statute used the word, "necessarily means the price which it will command in the market." Bouvier's Law Dictionary and Concise Encyclopedia, *Value* (8th Ed. 1914); *accord* Baldwin's Century Edition of Bouvier's Law Dictionary, *Value* (1926). This common sense meaning has changed little today.[3]

The defendants argue that volume is the same as value, but that cannot be true. "Volume" is synonymous with quantity, and while quantity is often directly proportional to value, that is not necessarily true. Congress could have written the statute to encompass an "amount greater in volume," or an "amount greater than the fair market value." It did not. Instead, it used plain language to define value in the common sense way: the price of the good. This plain reading of the statute is buttressed by the goal of the Capper-Volstead Act. It was enacted to partially protect agricultural cooperatives from the threat of antitrust laws so the association could operate "for the mutual benefit of the members thereof." 7 U.S.C. § 291. It would certainly be curious for the statute to allow the cooperative to discriminate *against* its members by giving dispositive preference to non-members.

---

[3] The operative definition in Black's Law Dictionary notes that value means the "monetary worth or price of something; the amount of goods, services, or money that something commands in an exchange." Black's Law Dictionary, *Value*.

4

However, even this plain reading, defining value as "the price which it will command in the market," begs two questions. First, how does the Court determine the price a good will command in the market? And, second, which market should the Court look to? The Court finds that the most reliable way to determine the price a good will command is by looking at the price for which it was purchased, and the market the Court must look to is the domestic market.

## II. Determining the Price a Good Demands

The defendants argue that, in determining the price a good demands, the Court should look to the market price (and thus, volume).[4] The plaintiffs argue that the most reliable indicator for the price a good demands is the price a buyer pays for the good itself.

This debate over the interpretation of the word "value" has been addressed before by the Supreme Court. In interpreting whether a property sold in a foreclosure sale was for "reasonably equivalent value," the Court held that "the only legitimate evidence of the property's value at the time it is sold is the foreclosure-sale price itself." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 549 (1994) (Scalia, J.). In dismissing the metric of assessment advocated by the defense here—the fair market price of the good—the Court noted that the "term 'fair market value,' though it is a well-established concept, does not appear in" the text of the statute. *Id.* at 537. The same is true in the Capper-Volstead Act—the statute does not mention "fair market value."

The defendants argue that, as a practical matter, "fair market value" is a reliable indication of the value of something. But "fair market value cannot—or at least cannot *always*—be the benchmark." *Id.* at 537. For example, in *BFP*, the Supreme Court found that fair market value cannot be used as a proxy for the value of a house in foreclosure because the phrase

---

[4] If the Court uses market price as the correct way to determine the price a good commands, it necessarily follows that volume is an adequate proxy. This is because volume multiplied by price equals value, and the market price becomes a constant. Therefore, volume would be directly proportional to value.

5

"presumes market conditions that, by definition, simply do not obtain in the context of a forced sale." *Id.* at 538. In other words, "the fact that a piece of property is legally subject to forced sale, like any other fact bearing upon the property's use or alienability, necessarily affects its worth." *Id.* at 548.

Given the nature of the facts here, and the fact that the USEM export scheme explicitly crossed markets in selling the eggs, the Court cannot presume "market conditions that, by definition, simply do not obtain." *BFP*, 511 U.S. 531 at 548.

The same is true of the USEM export program. In attempting to interpret the word value, the Court must consider the context to determine value. Although often times volume is a good—sometimes the best—proxy for value, there are often more reliable determinants for value. The fact that the member eggs were contractually obligated for export, "like any other fact bearing upon the property's use or alienability, necessarily affects its worth." *Id.*

The parties debate at great length over two cases with dueling interpretations of how to calculate value in the context of Capper-Volstead. *Compare Bd. Of Trade of City of Chicago v. Wallace*, 67 F.2d 402 (7th Cir. 1933) (determining value from price) with *Ewald Bros., Inc. v. Mid-America Dairymen, Inc.*, 877 F.2d 1384 (8th Cir. 1989) (determining value through volume). Neither case is particularly on point. Although *Wallace* dealt with wheat prices, the case took place at the height of Congressional price regulation of such commodities. *See, e.g., Wickard v. Filburn*, 317 U.S. 111 (1942). Thus, price in that instance not only was synonymous with volume, but the value of the commodity was controlled entirely by the federal government.

The defendants' proffered case fares no better. *Ewald* dealt with milk producers who joined together to purchase options contracts to buy milk. *Ewald*, 877 F.2d at 1389. Importantly, the option prices were not tied to the actual purchase of milk—they were speculative hedging

6

mechanisms to protect against milk shortfalls. The options were purchased in advance, and when the time came to exercise the option, members could either exercise the option, at which point the milk would be purchased at the pre-determined option price, or it could allow the option to expire, and simply pay the price of the option. *Id.*

Therefore, the *Ewald* Court had no reliable indicator for price. The Court only had the prices for the option contracts, which are a poor proxy for the value of the milk. Indeed, an option contract is simply a bet about where the market is going—it has no bearing on what the actual price of the good is. Given the fact that the options were bought in advance to speculate on milk prices, the Eighth Circuit Court of Appeals was forced to use volume as a proxy for value.

This was reasonable for the *Ewald* Court to do. Absent information about price to determine value, volume can sometimes be a reliable indicator, especially when a court lacks more reliable information to gauge the value of the product. For example, if a court has no price with which to determine the value of widgets, perhaps finding that a group of 10 widgets is more valuable than a group of 5 widgets is a perfectly acceptable conclusion. However, if a court knows that the 10 widgets were bought for a total of $10, but the 5 widgets were bought for a total of $100, a court cannot simply substitute volume for value and claim that the cheaper widgets were more valuable. After all, there is a far more reliable indication for value: that the marketplace assessed the group of 5 widgets as more valuable than the group of 10. Perhaps the group of 10 widgets had defects. Perhaps the group of 5 widgets was comprised of superior quality widgets, or they were "brand name" widgets. But one thing is for certain: the market valued the 5 widgets higher because the consumers paid more.

Indeed, the defendants' argued at trial that the member eggs were of lower value than the market prices. The defendants argued that they were forced to export the eggs precisely because

7

they could not find a domestic buyer and the eggs were in danger of rotting if they were not sold expeditiously. No such evidence is present regarding non-member eggs. These non-member eggs were purchased at a much higher price in the marketplace, in part because they had a willing buyer: USEM. Accepting the defendants' own arguments as true, it shows that the member eggs actually had less value than the non-member eggs.

Therefore, the Court determines that the most reliable indicator of the price a good demands is the price that the goods are actually purchased for.

### III. Market to Assess Value

The Court's inquiry cannot stop there. Here, non-member eggs were purchased twice: once by USEM, and once by the export buyer. The defendants urge the Court to look to the export buyer's purchase price, but the plaintiffs urge the Court to look to USEM's purchase price. The Court must look to the relevant market, which in this case is the domestic market. Indeed, the Capper-Volstead Act requires the Court to look at the value of the goods *handled* by the cooperative. The goods are handled by the cooperative once they are purchased, and they are purchased domestically. The eggs are handled while they are in the domestic market, and cease to be handled by the cooperative once they are exported. The text of the statute mandates this conclusion.

Such a reading is underscored by the very aims of antitrust law. Antitrust law focuses on domestic markets and the prices paid in those markets. It attempts to limit *domestic* price fixing, not international violations. Even in this case, the plaintiffs allege, and must prove, harm in the relevant domestic market. It makes little sense, when assessing an antitrust statute, to look to foreign prices to determine value. Therefore, the Court must look to the price of the goods paid

8

by USEM in the domestic purchase of the eggs from non-members, not the price paid by foreign buyers.

## CONCLUSION

For the foregoing reasons, the Court finds that the value of the goods handled by non-members must be calculated by the price that USEM paid to purchase the eggs domestically. The motion for a directed verdict on the affirmative defense of Capper-Volstead immunity for USEM is denied for both parties. An appropriate order follows.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE