## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| **THIS DOCUMENT APPLIES TO:** | : | **No. 08-md-2002** |
| **ALL DIRECT ACTION PLAINTIFF CASES** | : | |

## **M E M O R A N D U M**

PRATTER, J. JUNE 11, 2019

### INTRODUCTION

In 2016, the Court granted the defense motion for summary judgment on Direct Action Plaintiffs' egg product-related claims on the grounds that they lacked standing. The DAPs successfully appealed that ruling and the Court of Appeals for the Third Circuit remanded the case for further disposition. The defendants then filed joint and individual motions for summary judgment on the DAPs' egg product-related claims. This Memorandum addresses those motions.

The defendants jointly argue that the DAPs failed to demonstrate that any alleged antitrust violation caused injuries. The Court must deny this motion because the DAPs have proffered enough evidence that a reasonable jury could arguably rule in their favor.

Certain defendants also filed individual motions for summary judgment on the grounds that, given the opinion from Court of Appeals for the Third Circuit, some or all of the DAPs lack standing. The Court denies these motions because under the theory being pursued by the DAPs (a theory that is permitted by current applications of antitrust law) the defendants can be jointly and severally liable for damages even if certain DAPs did not directly purchase egg products from them.

1

This motion focuses on egg products as opposed to shell eggs. The DAPs[2] are purchasers of egg products who claim that they paid more for those egg products than they should have because of the defendants' alleged conspiracy. The discussion of the facts relevant to the pending motions proceeds in three parts: (1) information about egg products during the alleged conspiracy; (2) a review of each of the remaining defendants, and; (3) a brief summary of the expert report by Dr. Michael R. Baye as it relates to the DAPs' egg products claims.

## I. Egg Products

For the most part, the facts regarding egg products are undisputed. Shell eggs are eggs that are processed by being cleaned, packaged, and sold in their shells. Egg products are eggs, either whole or separated, that have been removed from their shells and are then processed into dried, frozen, or liquid forms. The primary purchasers of egg products are food manufacturers that use the egg products as ingredients in goods ranging from frozen waffles to salad dressing to mayonnaise. During the alleged conspiracy period, at least 18 companies, including 15 non-defendants, sold processed egg products. At least some of these companies do not themselves own any egg-laying hens.

Some facilities produce shell eggs, which leave the facility still in the shell and can be used for either shell eggs or be broken "off-line" for use in egg products. Other facilities, called "in-line" facilities, break the eggs in the facility and then transport the raw unpasteurized liquid

---

[1]    This case has been pending for a number of years, during which all the allegations and various industry terms, as well as parties, events and such, have been repeatedly discussed in a number of opinions. Accordingly, this opinion assumes familiarity with the prior pertinent material docketed generally under this action.

[2]    The DAPs include the Kroger Co., Safeway Inc., Walgreen Co., Hy-Vee, Inc., Albertsons LLC, Great Atlantic & Pacific Tea Company, Inc., H.E. Butt Grocery Company, Conopco, Inc., Publix Super Markets, Inc., Supervalu, Inc., Giant Eagle, Inc., Kraft Foods Global, Inc., the Kellogg Company, General Mills, Inc., Nestlé USA, Inc., Winn-Dixie, Inc., Roundy's Supermarkets, Inc., C&S Wholesale Grocers, Inc., and H.J. Heinz Company, L.P.

2

egg via produce tankers. The defendants allege that eggs from in-line facilities are better for egg products because they have a lower bacterial count than liquid eggs broken off-line. This raw unpasteurized liquid egg is unfit for human consumption and cannot legally be sold to anyone in that form other than egg products manufacturers, who then process the raw egg. Not every egg products company both produces and processes raw liquid egg—some companies only produce the raw liquid egg and others only process it. The latter companies have no layers of their own and must purchase the raw liquid egg they then process.

During the alleged conspiracy, the DAPs contend that overall egg production increased at a slower rate than it would have had the conspiracy not been in place. However, as is allegedly important for understanding the dynamics of this case, egg production in Iowa increased at a much higher rate than it did in other parts of the country. Between 2000 and 2008, the U.S. flock size increased by about 3%, from 328 million layers to 339 million layers. During that same period, the flock size in Iowa increased by about 88%, from 28 million layers to 53 million layers. The defendants contend that this rapid growth in Iowa was particularly important for egg products because Iowa producers are well-positioned to supply eggs to egg products companies. For example, Iowa producers are advantaged by low feed costs but are at a disadvantage in supplying shell eggs to urban areas because of increased transportation costs relative to other egg-producing states such as California, Ohio, Georgia, and Pennsylvania. This leads Iowa producers to break eggs near production locations and sell liquid egg to egg products companies, such as Michael Foods.

## II.  Defendants

The defendants remaining in this portion of the case are Michael Foods, Rose Acre, Cal-Maine, R.W. Sauder, United Egg Producers, Inc. (UEP), and United States Egg Marketers

3

(USEM).[3]   Each of these defendants, with the exception of Michael Foods, also filed an individual motion for summary judgment.

## A. Michael Foods[4]

Sales of egg products by Michael Foods make up the majority of sales for most of the DAPs' damages. Most of the eggs used in Michael Foods' egg products come from outside suppliers, and of those eggs, the great majority were supplied by non-Defendants. Seventy-two percent (72%) of the eggs purchased by Michael Foods were from companies that are not UEP certified. And Michael Foods paid very different prices for eggs from different suppliers because it negotiated prices based on grain prices (in some cases) and egg market prices (in other cases). Michael Foods contends that it entered into long-term contracts based on grain prices because grain prices are historically more stable than egg prices. Michael Foods also entered into such long-term contracts with suppliers from Iowa to take advantage of the inherent advantages of that market.

## B. Rose Acre

Certain DAPs also purchased egg products from Rose Acre Farms. Rose Acre produces both shell eggs and eggs for breaking into egg products, and the company can move eggs between shell eggs and eggs for breaking with some ease. With that being said, Rose Acre purchased as much as 21.6% of its eggs for egg products from outside suppliers, including from non-Defendants.

---

[3]     At the time these summary judgment motions were filed, Ohio Fresh Eggs, LLC was still a defendant in the DAPs' case. Ohio Fresh and the DAPs have since entered into a stipulation of dismissal. *See* Doc. No. 1861.
[4]     The Kroger Co., Safeway Inc., Walgreen Co., Hy-Vee, Inc., Albertsons LLC, Great Atlantic & Pacific Tea Company, Inc., H.E. Butt Grocery Company, Publix Super Markets, Inc., Supervalu, Inc., Giant Eagle, Inc., Winn-Dixie, Inc., and Roundy's Supermarkets, Inc., entered into a stipulation of dismissal with Michael Foods. *See* Doc. Nos. 1495, 1503.

Rose Acre contends that the following DAPs did not purchase any egg products directly from it: Giant Eagle, Hy-Vee, Publix, and Safeway. Although the DAPs admit that Safeway did not purchase egg products directly from Rose Acre, they dispute whether Hy-Vee, Publix, and Giant Eagle did. All parties agree that the remaining DAPs made egg product purchases from entities other than Rose Acre.

## C. Cal-Maine Foods, Inc.

Cal-Maine has resolved disputes related to both shell eggs and egg products with all DAPs other than Conopco, Inc. and the four DAPs in the Kraft case (Kraft Foods Global, Inc., Nestlé USA, Inc., General Mills, Inc, and the Kellogg Company). It is undisputed that the five DAPs with remaining claims against Cal-Maine did not purchase egg products directly from Cal-Maine.

## D. R.W. Sauder

R.W. Sauder alleges that none of the DAPs purchased egg products directly from the company. The DAPs contend that Supervalu purchased egg products from R.W. Sauder.

## E. United Egg Producers, Inc. and United States Egg Marketers

As discussed in detail in previous opinions, UEP and USEM do not produce eggs or egg products. UEP is a cooperative that provides services to its members, including lobbying and marketing, concerning principally animal welfare, food safety, and environmental issues. USEM is a cooperative involved in the export of eggs. UEP and USEM did not sell egg products in any capacity, let alone to the DAPs.

## III. Dr. Baye's Expert Report as It Pertains to Egg Products

The DAPs used Dr. Michael Baye, a PhD economist and Professor of Business Economics and Public Policy at Indiana State University Kelley School of Business, to produce an expert report in this case. At the first step of his analysis, Dr. Baye used USDA data to look

at the overall production of eggs during the relevant time frame. Dr. Baye conducted two separate regression analyses to determine whether the alleged conspiracy reduced the total size of the U.S. layer flock and total number of eggs produced compared to what these data points would have been without the conspiracy. Dr. Baye found that, even though egg producers increased production during the alleged conspiracy, the conspiracy limited the amount of growth during that time frame to fall short of what unrestrained growth would have been.

Dr. Baye analyzed both flock size and egg production to ensure, he contends, that a decrease in flock size was not offset by an increase in the number of eggs laid per hen. In addition to the elements of the conspiracy, Dr. Baye's model allows for a number of supply and demand factors such as grain prices, electricity, diesel, and agricultural wages, real national income, population, interest rates, changes in consumer preferences over time (such as increased preferences for cage-free or other specialty eggs), and seasonal fluctuations. Dr. Baye concluded that the conspiracy—in particular, the cage-size restrictions and ban on backfilling—was statistically significant in reducing the overall flock size and egg production.

Dr. Baye then used a two-stage least squares model to isolate the effect of the supply reduction on the prices of 68 separate egg products and shell eggs. In the first stage of the analysis, Dr. Baye created a regression model that controlled for changes in supply and demand factors that affect the quantity of eggs, and used that model to determine the reduction in supply caused by the conspiracy. In the second stage, Dr. Baye used the supply data from the first stage, pricing data, and econometric methods to estimate an inverse demand. Which is to say, Dr. Baye asserts that he eliminated the impact of other supply and demand factors so that he could determine the impact of the various components of the alleged conspiracy. Dr. Baye ran this model on 68 different types of eggs and egg products and found that the Urner Barry price for

6

each type increased as a result of the reduction in the supply of eggs caused by the alleged conspiracy. In doing so, Dr. Baye quantified exactly how much each of the 68 types of shell eggs and egg products was affected by the reduction in the number of eggs. He found that, although the availability of each of the shell eggs and egg products responded differently to the conspiracy, the conspiracy impacted each one in a statistically significant manner.[5]

## PROCEDURAL HISTORY

In 2016, the Court granted summary judgment on the grounds that the DAPs lacked standing to pursue egg product-related claims. *In re: Processed Egg Prod. Antitrust Litig.*, 2016 WL 4670983 (E.D. Pa. Sept. 6, 2016). The Court concluded that the plaintiffs failed to distinguish between egg products made with Defendant-produced eggs from egg products made with eggs produced by non-conspirators and found that recovery for the latter type of egg products was barred by the prohibition on "umbrella" damages. *Id.* at \*4.

On appeal, the Court of Appeals for the Third Circuit concluded that this litigation actually presented a case of first impression, allowing the appellate court to find that the DAPs had "antitrust standing to pursue overcharge damages from the Defendants-Appellees from whom they purchased egg products, regardless of whether those products were made with internal eggs, non-conspirator eggs, or both." *In re Processed Egg Products Antitrust Litig.*, 881 F.3d 262, 276 (3d Cir. 2018). The court came to this conclusion because the purchasers in this case were bringing price-fixing claims against suppliers "from whom they directly purchased products that incorporate a price-fixed component." *Id.* at 274 ("The direct relationship between the Purchasers and their Suppliers, and the fact that the Suppliers are alleged price-fixing

---

[5]      For example, Dr. Baye calculated that the cage-size restrictions in place from August 2005 through January 2007 increased the price of Liquid Eggs, Whites, Pasteurized, West Coast by 55%, but raised the price of Frozen Yolk Salt 43% Solids by only 20.92%. Dr. Baye Expert Report ¶ 199 (Ex. 20 to Dr. Baye Report).

7

conspirators and not merely competitors of those conspirators, are key distinctions from the scenario we confronted in *Mid-West Paper [Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979)].").

The court explicitly limited its holding to the issue of standing and remanded the case for this Court to decide whether the DAPs could "prove 'actual causation' with 'reasonable certainty,' and provide the trier of fact enough to 'make a reasonable estimate of damages.'" *Id.* at 276 (quoting *Mid-West Paper*, 596 F.2d at 584 n.43).

In light of this ruling, the defendants filed both joint and individual motions for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate only when the record fails to demonstrate a genuine dispute as to material fact that would permit a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) ("The movant's burden on a summary judgment motion in an antitrust case is no different than in any other case."). "The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must point to evidence—beyond the pleadings—showing that a genuine dispute as to an issue of material fact exists, necessitating at trial. *Id* at 324. "On summary judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material fact." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex*, 477 U.S. at 322–23).

Summary judgment is not necessarily disfavored in the antitrust context, and the entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent

8

lengthy and drawn-out litigation, which itself may have a chilling effect on competitive market forces. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 73 (3d Cir. 2010).

## JOINT MOTION FOR SUMMARY JUDGMENT

"The primary issue actually before us on the antitrust claims is whether the plaintiffs have proffered sufficient evidence to raise a genuine issue of material fact as to whether the defendants' alleged antitrust violations caused harm to the plaintiffs." *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 250 (3d Cir. 1999). "In other words, a plaintiff must prove a causal connection between the [antitrust violation] and actual damage suffered." *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1273 (3d Cir. 1995); *see also Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 483 (3d Cir.1998) ("To recover damages, an antitrust plaintiff must prove causation, described in our jurisprudence as 'fact of damage or injury.'") (citations omitted).

The basis for the joint summary judgment motion here rests on whether the DAPs have demonstrated that a reduction in the overall supply of eggs *caused* an increase in the price of egg products. The DAPs' theory has always been that there was a conspiracy to reduce the total supply of eggs, which led to an increase in the price of both shell eggs and egg products. The DAPs rely on two main areas to support their claims. First, they rely on documentary evidence that they argue demonstrates that the defendants intended for the conspiracy to impact egg products prices. Second, they rely on Dr. Baye's expert report, which they contend is grounded in sound economic principles and shows that the alleged conspiracy actually impacted egg products prices.

9

The defendants dispute that there is evidence that an aggregate reduction in the national flock[6] reduced the supply of liquid egg for the egg products industry. The defendants assert that the DAPs' failure to look at how liquid egg and egg products were specifically affected by the conspiracy means that the DAPs cannot prove causation.[7] The alleged misstep was caused by the fact that Dr. Baye used USDA data that encompasses nationwide egg production. According to the defendants, because "the USDA data that Dr. Baye relies upon include[s] far more than the eggs that go into egg products and far more producers than those who produce eggs destined for egg products, Dr. Baye cannot isolate the effect of the alleged conspiracy on the production of eggs available for processing into egg products [as opposed to those available for distributing shell eggs]." Defs.' Mot. for Summ. J. at 17 (Doc. No. 1812).

The defendants urge the Court not to consider shell eggs and egg products together and to consider a number of factors that make them inherently different. For example, it is undisputed that producers of egg products acquired raw egg from non-defendants (who are not alleged to be co-conspirators and were not UEP certified) and also that egg products producers entered into long-term output contracts, which means those shell eggs were always designated for egg products. At least one major egg products company used long-term, grain-based contracts to ensure a reliable supply of raw egg at prices immune from volatility in the shell egg market. The defendants also contend that Dr. Baye failed to consider increased production in Iowa. During the alleged conspiracy, the flock size in Iowa increased by 88% even though the flock size in the

---

[6]     For the purposes of this motion only, the defendants do not quarrel with the DAPs' contention that nationwide production of eggs was lower from August 2005 to December 2012, relative to Dr. Baye's benchmark period. Defendants' Mot. for Summ. J. at 14 n.4 (Doc. No. 1812).

[7]     This argument is best demonstrated with a hypothetical involving 100 eggs laid. Prior to the conspiracy, 50 of these eggs were used for shell eggs and 50 were used for egg products. After the conspiracy, the number of eggs laid (hypothetically) decreased to 80. The fact that there are only 80 eggs available after the conspiracy does not necessarily mean that 40 were allotted for shell eggs and 40 for egg products. It could be that 30 became shell eggs and 50 were used in egg products, meaning that egg products might not have been affected by the alleged conspiracy at all.

10

rest of the country only increased by 3%. This growth was allegedly due to long-term contracts between egg products companies and non-UEP certified egg producers. The defendants argue that Iowa's increase would have had a much larger impact on the egg products industry because Iowa is geographically favored for producing liquid egg.

All of this may be true. Indeed, the DAPs admit as much. However, the DAPs have also produced evidence that allows them to argue that an overall reduction in the supply of eggs could have affected egg products prices. There is some documentary evidence to support looking at the overall reduction in the supply of eggs and considering its impact on egg products. Furthermore, Dr. Baye accounted for many of the factors that the defendants argue would have impacted egg products when he calculated the damages as to each of the 68 types of shell eggs and egg products he tested.

## I. Documentary Evidence

Although it ought to go without saying, the DAPs resist the notion that the Court does have some appreciation for food stuffs to remind the Court that eggs are a necessary prerequisite to egg products. Thus, if there are less overall eggs available, there are inherently less eggs available for egg products.

In the past, demonstrating at least a rudimentary appreciation for recipes, this Court has noted that "it also takes more than eggs to make egg products." *In re Processed Egg Products Antitrust Litig.*, 312 F.R.D. 171, 200 (E.D. Pa. 2015). There is, however, some evidence that egg producers considered eggs used for shell eggs and egg products to be somewhat fungible. Statements indicate that industry insiders viewed them together, i.e., as a commodity. *See* Don Bell Presentation on Supply/Demand Challenges, at 2384, DAP Ex. 29 (stating "An egg is an egg is an egg" and "In one way or another, every egg produced impacts prices."); Gene Gregory Deposition Tr. 558:9–12, DAP Ex. 8 (discussing the egg market as "just one pie"). Some

11

producers, such as Rose Acre, have the capacity to sell eggs as either shell eggs or breakers. Producers who have this capacity decide how to sell the eggs based on whether there is a surplus of shell eggs or a change in price for breakers or egg products. *See* DAP Ex. 29, at 2385; Marcus Rust Deposition Tr. 237:3–13, 258: 2–13, DAP Ex. 32; Don Bell December 3, 2004 e-mail, DAP Ex. 33.

The defendants also appear to credit what the DAPs characterize as the conspiracy with increasing the price of both shell eggs and egg products. *See* Gene Gregory, An Economic Perspective, DAP Ex. 21. In a 2007 review of egg prices, Gene Gregory of UEP wrote that the industry was benefiting from "record egg prices." Jan. 3, 2008 United Voices, at 619780, DAPs Ex. 42. Mr. Gregory partially attributed those prices to the fact that the "UEP's animal welfare guidelines continued to reduce the number of hens per house." *Id.* He further concluded that "[shell] egg prices likely were the driving force for all forms of eggs." *Id.* In a 2004 earnings call, Michael Foods told investors that "Urner Barry shell egg prices rose by about 35 percent year-over-year in the first-quarter, pushing certain products quite a bit higher as well," and industrial egg product profits were "enhanced by record market-driven price environment as these products are priced off of the Urner Barry markets." Michael Foods Q2 2004 Earnings Call, at 11182–83, DAP Ex. 34.

Defendant Rose Acre likewise partially attributed an increase in egg product prices to increased production costs caused by the animal welfare program. May 30, 2007 Rose Acre Letter, DAP Ex. 37. Rose Acre decision-makers were also allegedly upset before Michael Foods began participating in the UEP program because the company's representatives felt that Michael Foods was reaping the benefits of higher egg product prices without decreasing its own flock size. Marcus Rust April 21, 2006 e-mail, DAP Ex. 40.

12

The defendants refute the admissibility[8] of most of the documentary evidence. For example, when certain defendants credited the animal welfare program with increased prices, they did so along with a multitude of other reasons, such as ethanol driving up grain prices and better management in response to changes in supply and demand. DAP Ex. 42. The defendants argue that statements like "An egg is an egg is an egg," DAP Ex. 29, or "the egg market is just one pie," DAP Ex. 8, make for pithy phrases but say almost nothing about the production of shell eggs and egg products or how they relate with one another. Furthermore, although it is possible for companies like Rose Acre to "switch hit" by moving eggs from shell eggs to egg products and vice versa, there is no evidence as to how often this happens and to what extent. The Court notes that, although the defendants may be correct that the DAPs are misinterpreting the

---

[8]      The defendants argue that, in addition to being irrelevant, many of the exhibits that the DAPs attached to their response are inadmissible hearsay. For example, the DAPs cite to twelve UEP United Voices newsletters. *See* DAP Exs. 4, 5, 10, 12, 13, 14, 20, 31, 42, 43, 44, & 51. During the DPPs' trial, the Court ruled that these documents contained inadmissible hearsay as to the producer Defendants and could only be admitted for the limited purpose of notice of the statements contained in them and not the truth of the statements themselves. *See In re Processed Egg Products Antitrust Litig.*, 08-MD-2002, 2018 WL 1725802, *2–3 (E.D. Pa. Apr. 9, 2018).

     "Evidence submitted with a motion for summary judgment must be reducible to admissible evidence at trial." *Agrizap, Inc. v. Woodstream Corp.*, 450 F. Supp. 2d 562, 567 (E.D. Pa. 2006) (citing *Williams v. Borough of West Chester*, 891 F. 2d 458, 465 n.12 (3d Cir. 1989)). The Court notes that "the Federal Rules of Evidence are to be liberally construed in favor of admissibility . . . ." *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir. 1992). In this case, the Court conditionally admits the evidence for two reasons. First, unlike in the DPPs case, every document cited was authored by a current defendant, making the documents non-hearsay party admissions as to some party at least. Fed. R. Evid. 801(d)(2)(A). The Court notes that, in this regard, limiting instructions may be needed. Second, however, those statements appear, pending further evidence, to be admissible against co-defendants because they are statements of co-conspirators made in the furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E).

     Co-conspirator statements are admissible under the exemption when the district court finds by a preponderance of the evidence that: "(1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Ellis*, 156 F.3d 493, 496 (3d Cir. 1998); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 375 (3d Cir. 2004). A district court "has 'considerable discretion' to admit the statements conditionally, subject to their later being connected up." *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 201 (E.D. Pa. 2016) (quoting *United States v. Mobile Materials, Inc.*, 881 F.2d 866, 869 (10th Cir. 1989)). This Court chooses to exercise such discretion at this juncture, though this is without prejudice for further argument should circumstances warrant.

13

documentary evidence, this is ultimately an issue for the factfinder, or at least for evaluation when the claim and defenses take their final shape at trial.

## II.    Expert Report

The DAPs rely on their expert, Dr. Baye, to prove that both shell eggs and egg products were affected by the alleged conspiracy.[9] There is no dispute that the types of models Dr. Baye used are considered sound if used properly. PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 399c (3rd and 4th Eds. 2010–2018) (stating that multiple regression analysis has been deemed reliable so long as it is used in a reliable fashion).[10] However, the Court recognizes that regressions do not demonstrate causation in and of themselves. A regression "may suggest that one variable is related to or correlated with another, but this does not translate directly into a causal effect." *Id.* at ¶ 394d. "Causation must be based on some justification rooted in economic theory. Regression alone cannot satisfy the requirements for proving causality. Rather, regression analysis enables us to empirically test a hypothesis based on what economic theory would predict." *Id.*

---

[9]    The defendants did not challenge Dr. Baye's expert report under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); however, this does not preclude the defendants from arguing that his opinions do not establish a genuine issue of material fact. In *Daubert*, the Supreme Court of the United States explicitly concluded that "conventional devices" such as directed verdict and summary judgment "are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." 509 U.S. at 596. "Even a theory that might meet certain *Daubert* factors, such as peer review and publication, testing, known or potential error rate, and general acceptance, should not be admitted if it does not apply to the specific facts of the case." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S., 137, 154 (1999); *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)) (internal footnote omitted).

[10]    Courts have found a multiple regression analysis to be useful in quantifying the relationship between a dependent variable and independent variables. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 285 (6th Cir. 2014) (citing *Wiesfeld v. Sun Chemical Corp.*, 84 Fed. App'x 257, 261 n.3 (3d Cir. 2004)). "This type of model can also 'control for other independent variables so as to isolate and identify the effect of a single independent variable on the dependent variable.'" *Id.* (quoting *Wiesfeld,* 84 Fed. App'x. at 261 n.3).

14

Dr. Baye analyzed egg products more closely than the DPPs' expert, Dr. Rausser. *See In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. at 200 (concluding at the class certification consideration stage that the industry analysis of egg products in the DPPs' case lacked rigor). Which is not to say he looked at them with the same depth that he considered shell eggs. He did not. The DAPs for the most part emphasize one paragraph of Dr. Baye's report that they say adequately addresses the issue of causation. Dr. Baye Expert Report ¶ 194. There is no doubt that the DAPs could have—and perhaps will later find they should have—focused more on the ins and outs of the egg products industry. As much as the DAPs argue that the egg market is all one pie (or, perhaps, quiche), it is not clear that this is true. There are undoubtedly different realities when it comes to making egg products than there are when it comes to producing shell eggs.

With that being said, Dr. Baye looked at how producers decide which eggs remain shell eggs and which become egg products, how egg products are processed, the entire spectrum of egg producers, demand for egg products, and the substitutability of shell eggs and egg products. He found that some producers, like Rose Acre, have the ability to shift eggs between shell eggs and egg products.[11] Dr. Baye also looked at Michael Foods, a major producer of egg products, specifically.

Finally, he also considered the impact of the alleged conspiracy on 68 different types of shell eggs and egg products. In doing so, he allowed, as he necessarily would have to, for the possibility that the conspiracy would not affect every product in the same way, if at all. Dr. Baye asserts that this method eliminated the impact of other supply and demand factors and it measured the precise extent to which the overall egg reduction impacted each egg product at

---

[11]     The Court again notes that it is not entirely clear how much or how often or under what circumstances this happens.

issue. He found that each product responded differently, but that the conspiracy was statistically significant in each.

## III.     A Reasonable Jury Could Conclude that a Reduction in the Overall Supply of Eggs Caused an Increase in the Price of Egg Products

Based on the documentary evidence and Dr. Baye's report, the Court cannot say that a jury would be unreasonable to find in favor of the DAPs, especially considering that the DAPs must benefit from all reasonable inferences at this stage See *In re Se. Milk Antitrust Litig.*, 739 F.3d at 283–86 (reversing grant of summary judgment and concluding that evidence of a conspiracy and a regression analysis was sufficient evidence to submit to a jury); *Rozema v. Marshfield Clinic*, 977 F. Supp. 1362, 1381 (W.D. Wis. 1997) (denying summary judgment even though the district court was not thoroughly convinced by the expert). The defendants direct the Court to examples of cases in which courts concluded that an expert's analysis was insufficient to prove causation; however, those cases are distinguishable from the facts currently before this Court. *See Stelwagon*, 63 F.3d 1267; *In re eBay Seller Antitrust Litig.*, 433 F. App'x 504 (9th Cir. 2011).

In *Stelwagon*, the Court of Appeals for the Third Circuit reversed a jury verdict awarding treble damages for failure to prove causation. 63 F.3d at 1275. The case involved a claim under the Robinson-Patman Act, which prohibits anticompetitive price discrimination. The court concluded that the plaintiff's expert's opinions were insufficient in and of themselves to support a finding of actual damage. *Id.* The court found that the only other evidence of causation, anecdotal testimony from the plaintiff's employees, should not have been admitted. *Id.* at 1274–75. In particular, the court was troubled that the expert did not consider reasons why the plaintiff may have lost sales other than the price discrimination, such as plaintiff's higher overhead costs. *Id.* at 1275. Furthermore, the plaintiff undisputedly experienced other business complications,

16

such as an embezzlement scheme, during the relevant time period. *Id.* Notably, the court did not agree with the defendant that the district court erred in admitting the expert's testimony at trial, or in failing to strike the testimony in response to a motion by the defendant at the conclusion of the direct examination. *Id.*

In *eBay*, the plaintiffs alleged that eBay charged "supracompetitive" fees for its online auction platform, which resulted in antitrust injury. *In re eBay Antitrust Litig.*, 07-cv-1882, 2010 WL 760433, at *10 (N.D. Ca. Mar 4, 2010). The plaintiffs' expert used eBay's "take rate"—a measure of the fees that eBay collected across all of its transactions—and compared it to what eBay's take rate would have been but for the alleged overcharge in fees, which meant that the expert used the take rate as a proxy for eBay's fees. *Id.* at *12–14. The take rate, however, was determined not only by eBay's fees but also by other factors such as the volume of goods sold on its site, the number of total listings, the number of successful listings, the features that sellers use to present their listings to potential buyers, and eBay's rate schedule. *Id.* at *13. As such, it was undisputed that the expert's model did "not measure fees, or at the very least [did] not measure them alone" and, thus, was insufficient to present to a jury. *Id.* at *14. The Court of Appeals for the Ninth Circuit affirmed the district court's grant of summary judgment because the model did "not connect the allegedly anticompetitive acts with the charging of supracompetitive fees." 433 F. App'x at 506.

This case is different because Dr. Baye's model accounted for many of the discrepancies the defendants are now raising. Although the defendants contend that many of the eggs used in egg products comes from non-certified producers, Dr. Baye concluded that non-certified producers account for a small share of egg production and that it was unlikely that non-certified

17

producers would have been able to counteract the effects of the alleged conspiracy.[12] The DAPs also argue that, by using the USDA data for total egg production, Dr. Baye inherently included eggs produced in Iowa and those bound for in-line facilities in his calculations. Dr. Baye also controlled for factors such as grain prices and national income. If those factors had impacted the price of egg products, as opposed to the conspiracy, he contends that his model would have shown an impact of zero. According to Dr. Baye, there is a less than 1% chance his model found an effect when there was not one. It remains for the jury to decide which of these competing explanations carry the day.

Furthermore, unlike in *Stelwagon*, the DAPs do not rely entirely on Dr. Baye's report. They also rely on the documentary evidence, which the Court is required at this time to interpret in favor of the DAPs. An expert report, in addition to other evidence, can provide enough to bolster a plaintiff's case in the face of summary judgment. *Callahan*, 182 F.3d at 260 (reversing a grant of summary judgment on antitrust claims because the court was satisfied that the expert report, in conjunction with other evidence, "constitutes sufficient evidence of causation"); *Rossi*, 156 F.3d at 485–87 (same).

There is no dispute that this Court has been troubled in the past by the relative lack of attention the DAPs have paid to the differences between shell eggs and egg products. *See In re: Processed Egg Prod. Antitrust Litig.*, 2016 WL 4670983, at \*3. However, the Court made these observations in the context of whether the DAPs had standing and concluded they did not. At

---

[12]     The defendants also argue that summary judgment is warranted because the DAPs cannot establish a causal link between the alleged conspiracy and higher Urner Barry prices. Dr. Baye calculated damages based on the Urner Barry price sheets, which reflect market-wide transactions, but the defendants contend that he did not look at how the pricing decisions of at least 15 non-defendants who sold processed egg products impacted Urner Barry. At most, the defendants argue that Dr. Baye's model shows a correlation between a decrease in the overall number of eggs and an increase in egg product prices. Because Dr. Baye concluded that non-certified producers would not have been able to counteract the effects of the alleged conspiracy, this creates a material dispute of fact.

this juncture, the Court is now tasked instead with determining whether the DAPs have presented a genuine dispute of material fact regarding causation. Although it is clear enough that the Court is not thoroughly convinced of the DAPs' case, it need not be. *See Rozema*, 977 F. Supp. at 1381 (denying summary judgment because the district court could not "say that a jury would be unreasonable to conclude from [the] expert report, combined with findings of a market allocation conspiracy and strong market power, that plaintiffs paid more . . . because of defendants' unlawful conduct.").

This case is, undoubtedly, unique. It does not fit neatly into the mold of antitrust cases, leaving this Court to parse through a complicated set of facts and econometric models to determine whether a reasonable jury could rule in the DAPs' favor. "[O]ur jurisprudence does not require the summary judgment opponent to match, item for item, each piece of evidence proffered by the movant, but rather he or she must only exceed the 'mere scintilla' standard." *Rossi,* 156 F.3d at 466 (citations and some quotations omitted); *see also Callahan*, 182 F.3d at 253. Indeed, this uniqueness, in part, makes it an excellent candidate—again—for trial and again the cause for additional development of antitrust law outside the mold. The defendants make compelling arguments, but these arguments are better suited for a jury. The defendants can raise these arguments again at trial as "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

19

## INDIVIDUAL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Rose Acre, Cal-Maine, R.W. Sauder, UEP, and USEM also filed individual motions for summary judgment.[13] They argue that, under the opinion by the Court of Appeals for the Third Circuit, some or all of the DAPs lack standing to make claims against them because those DAPs did not purchase egg products from those defendants. This reading plucks favorable language from the opinion, however, and is incompatible with the well-settled principle of joint and several liability in antitrust law.

In its opinion, the Court of Appeals for the Third Circuit stated, "In sum, we conclude that Plaintiffs-Appellants have antitrust standing to pursue overcharge damages from the Defendants-Appellees from whom they purchased egg products, regardless of whether those egg products were made with internal eggs, non-conspirator eggs, or both." *In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d at 276. The defendants particularly focus on the phrase "from whom they purchased egg products" (and other similar phrasing in the opinion)[14] and argue that each DAP only has standing to bring egg product-related claims against the individual defendants they purchased egg products from directly.[15]

---

[13]     R.W. Sauder's motion (jointly filed with then-defendant Ohio Fresh) is filed at Doc. No. 1808. UEP and USEM filed a notice joining R.W. Sauder's motion. Doc. No. 1810. Rose Acre's motion is filed at Doc. No. 1811. And Cal-Maine's motion is docketed at Doc. No. 1813.

[14]     *See e.g. In re Processed Egg Prod. Antitrust Litig.*, 881 F.3d at 274 ("Crucially, unlike the plaintiff in *Mid-West Paper*, who sued price-fixing suppliers *from whom it made no purchases and with whom it had no direct relationship*, here the Purchasers are pressing claims against price-fixing suppliers from whom they directly purchased products that incorporate a price-fixed component.") (emphasis in original); *id.* ("The direct relationship between the Purchasers and their Suppliers, and the fact that the Suppliers are alleged price-fixing conspirators and not merely competitors of those conspirators, are key distinctions from the scenario we confronted in *Mid-West Paper*."); *id.* at 275 ("Here, the Purchasers are in a direct relationship with the antitrust violators and seek to recover for higher prices set by those violators, and paid by the Purchasers to those very parties.").

[15]     In their individual motions, each defendant outlined which DAPs never purchased egg products directly from that defendant. Those relationships are summarized in the Background section of this Memorandum. *See supra* pp. 4–5.

This interpretative reading is not in line with relevant case law. Under antitrust law, a defendant who participated in a conspiracy can be liable for damages even if the plaintiff only purchased from the defendants' co-conspirators and not from the defendant itself. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 448 (3d Cir. 1977); *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 632–34 (7th Cir. 2002); *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 208 (E.D. Pa. 2001), *aff'd*, 205 F.3d 145 (3d Cir. 2002). "The fact that a customer has not made purchases from every co-conspirator does not prevent him from suing all for each co-conspirator contributed to the charging of the supracompetitive price paid by the purchaser." *Bogosian*, 561 F.2d at 448. This principle of "joint and several liability simply ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants." *Texas Indus.*, 451 U.S. at 646.

In *Nippon Paper*, Judge Easterbrook of the Court of Appeals for the Seventh Circuit addressed a set of facts suitably analogous to the ones at hand. In that case, the plaintiffs alleged that Nippon Paper participated in a conspiracy to reduce the output—and raise prices—of thermal facsimile paper. *Nippon Paper Indus.*, 281 F.3d at 632. Although the companies that directly purchased from Nippon Paper opted not to participate in the lawsuit, the court concluded that the district court improperly dismissed Nippon Paper from the case. *Id.* The court reasoned that the plaintiffs, who purchased from co-conspirators, were entitled "to collect damages not just firm-by-firm according to the quantity each sold, but from all conspirators for all sales." *Id.* The Court further explained that, if "Nippon Paper participated in a cartel of thermal fax paper . . . . then it is jointly and severally liable for the cartel's entire overcharge. That the plaintiffs did not buy from Nippon Paper directly, or at all, does not matter." *Id.* at 634. The only thing that

21

mattered was whether "Nippon Paper's direct customers [held] the exclusive right to damages for its own output," thereby satisfying "the holding and goals of *Illinois Brick [Co. v. Illinois*, 431 U.S. 720 (1977)]" by preventing double recovery. *Id.*

In this case, the defendants ask the Court to ignore relevant case law and interpret the language from the Court of Appeals for the Third Circuit as a "newly articulated test." Ohio Fresh Eggs & R.W. Sauder's Individual Motion for Summary Judgment, p. 3 (Doc. No. 1808). However, the court did not explicitly or implicitly state that it was creating a new test for antitrust standing. Nor did it overrule (or even address) the principle of joint and several liability in antitrust case law. As such, this Court reads the Court of Appeals' opinion for what it says: that the DAPs have antitrust standing to pursue egg products claims.[16]

Furthermore, like in *Nippon Paper*, this case does not present a situation in which the DAPs may potentially recover twice for their purchases of egg products. The DAPs allege that the defendants conspired to reduce the supply of eggs and thereby increase the price of egg products. The individual DAPs can only recover damages for the egg products they actually purchased and they can do so only once from defendants who are found to have participated in the conspiracy. Those defendants are jointly and severally liable for damages that resulted from the conspiracy. This is true even if an individual defendant did not directly sell egg products to an individual plaintiff.

---

[16]     Under the defendants' interpretation, UEP and USEM could never be held liable for their participation in a conspiracy because those entities do not sell eggs or egg products. It is unreasonable to think that UEP and USEM could have participated in conspiratorial conduct but are protected from contributing to any damages by what would essentially be a loophole.

22

## CONCLUSION

For the foregoing reasons, the Court will deny the outstanding joint and individual motions for summary judgment. An appropriate Order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE