## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PROCESSED EGG PRODUCTS** | : | **MULTIDISTRICT** |
| **ANTITRUST LITIGATION** | : | **LITIGATION** |
| | : | |
| | : | |
| | : | |
| *THIS DOCUMENT APPLIES TO:* | : | **No. 08-md-2002** |
| **ALL DIRECT ACTION PLAINTIFF CASES** | : | |

## **MEMORANDUM**

PRATTER, J.                                                                          OCTOBER 31, 2019

### **INTRODUCTION**

In an effort to crack an alleged conspiracy, the Direct Action Plaintiffs (DAPs) in this antitrust action seek to admit hundreds of co-conspirator statements against Defendants United Egg Producers (UEP), United States Egg Marketers (USEM), and Rose Acre Farms, Inc. To do so, the DAPs must prove the existence of the conspiracy they allege—a multi-pronged scheme to reduce the domestic supply of eggs as a means of increasing egg prices—by a preponderance of the evidence. To use the statements against each defendant, the DAPs must prove that each individual defendant knowingly agreed to join this overarching conspiratorial scheme. Finally, the DAPs must show that the statements were made by a co-conspirator in the course of and in furtherance of the overarching conspiracy.

Because the DAPs have proven the existence of the conspiracy and each defendant's participation as required for this evidentiary ruling, many of these co-conspirator statements will be admissible at trial.

1

## I.    Background

This memorandum analyzes within the confines of the applicable rules of evidence whether an alleged conspiracy to reduce the domestic supply of eggs existed and if so, which defendants, if any, were members of the conspiracy. Because the analysis requires an extensive review of the evidence submitted by the parties, the Court provides only a brief Background.

The DAPs allege that the defendants participated in a single conspiracy to reduce domestic egg supply to increase egg prices by using three general tactics: (1) a series of short-term egg-supply reduction measures, (2) a long-term plan to reduce the supply of eggs under the pretext of an "animal welfare program," and (3) exporting eggs at a loss.

### A.  Short-term Supply-Reduction Measures

The DAPs' conspiracy theory begins with UEP. UEP is a cooperative that provides services to its members, including lobbying and marketing, concerning principally animal welfare, food safety, and environmental issues. The DAPs allege that UEP members agreed to a series of short-term programs designed to immediately reduce the supply of eggs beginning in 1999. These measures were implemented by a committee within UEP known as the "Marketing Committee." Members of UEP were then to commit to implementing the measures. These measures included inducing hens to molt earlier than they naturally would,[1] slaughtering hens earlier, and reducing the hatching of chicks. UEP members were also encouraged to stop or slow considerably backfilling cages (that is, replacing dead hens with younger hens). These egg supply reduction measures reportedly succeeded in reducing flock size and driving the price of eggs up, and were implemented on a number of occasions.

---

[1]    Molting is the process whereby hens lose their feathers and regrow them. Hens do not lay eggs when molting.

## B. The Scheme to Reduce the Supply of Eggs Under the Pretext of a Certified Animal Welfare Program

The DAPs allege that UEP went beyond these short-term measures to create and implement its own certified animal welfare program intended to reduce egg supply but operating under the guise of improving the welfare of hens. The program's alleged goal of reducing the egg supply primarily relied upon requirements for increased cage space per hen. Compliance with this program was monitored by monthly reporting requirements and periodic audits. The cage-space requirement was supplemented by three additional requirements that ensured the certified program would have its intended effect: (1) the "100% Rule," which required that all of a producer's facilities, including those of its affiliates, comply with the Certified Program's cage-space requirements in order for any egg from that producer to be "certified;" (2) a prohibition on backfilling within the certified program; and (3) a rule that failing to comply with the cage-space or backfilling requirements would result in an "automatic fail" of an audit under the certified program—even though other shortcomings under the program (such as improper lighting or handling) did not result in an "automatic fail." The Certified Program was promoted as an animal welfare program with labels to that effect on egg packaging.

## C. Egg Exports at a Loss

The final component of the alleged conspiracy was the exporting of domestic eggs at a loss. The DAPs allege that egg producers exported their eggs into foreign markets to drive up the domestic price of eggs. The scheme, implemented by members of USEM and managed through UEP's Export Committee, required all USEM members to either export their own eggs at a loss or sell their eggs to UEP at domestic prices and later receive a bill for the difference between the domestic price and the export price. USEM members who did not contribute eggs to the export scheme contributed money to help fellow members bear the burden of the export losses.

3

## II. Legal Standard

Typically, out-of-court statements offered for the truth of the matter asserted are inadmissible hearsay. FED. R. EVID. 801(c). As explained in in *United States v. Weaver*, 507 F.3d 178 (3d Cir. 2007), out-of-court statements can be admitted as non-hearsay co-conspirator statements if the moving parties—here, the DAPs—prove "by a preponderance of evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy."[2] *Id.* at 181 (citations omitted); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987). When deciding preliminary questions concerning the admissibility of evidence, "Third Circuit law requires [that] the Court make rulings favorable to Plaintiffs if Plaintiffs have presented, by a preponderance of evidence, sufficient facts to warrant admissibility." *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 229 (E.D. Pa. 2016). The Federal Rules of Evidence similarly favor admissibility. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 375-76 (3d Cir. 2004).

For purposes of applying Federal Rule of Evidence 801(d)(2)(E), the quantity of evidence used to prove a conspiracy need not be great. The Third Circuit Court of Appeals "has held that the trial court's determination need only be supported by 'slight evidence.'" *United States v. Savage*, Nos. 7-550-03, 07-550-04, 07-550-05, 07-550-06, 2012 WL 5866068, at *2 (E.D. Pa. Nov. 20, 2012) (quoting *United States v. Provenzano*, 620 F.2d 985, 999 (3d Cir. 1980)). In making these factual determinations, a district court can consider the disputed hearsay statements themselves. *See* FED. R. EVID. 801(d)(2); *Bourjaily*, 483 U.S. at 181 ("[A] court, in making a

---

[2]     In making its determination, the Court's ruling "is one of admissibility of evidence only, and is not a ruling as to sufficiency of Plaintiffs' evidence to prove liability as to any specific Defendant." *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 229 (E.D. Pa. 2016).

4

preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted."). However, the statements cannot on their own establish "the existence of the conspiracy or participation in it." FED. R. EVID. 802(d)(2). Finally, the district court is to create a clear record of its preliminary factual findings.[3] *See Domestic Drywall*, 163 F. Supp. 3d at 203.

## III. Discussion

### A. Defining Co-Conspirator "Statements"

Before the Court can complete the required *Weaver* analysis for the disputed co-conspirator statements, it must first determine what constitutes a "statement" for the purposes of Rule 801(d)(2)(E).

#### 1. Scope of "Statement"

The parties agree that the Court must determine the admissibility of each statement. They disagree, however, as to how narrowly the Court must construe the term "statement" in completing this determination. The defendants insist that the Court must engage in a sentence-by-sentence analysis, analyzing whether each one meets all the requirements of Rule 801(d)(2)(E). The DAPs contend that the Court can examine all of the statements in a single document together and then admit the whole document.

In *Williamson v. United States*, 512 U.S. 594 (1994), the Supreme Court adopted a narrow definition of "statement" for the purposes of determining a statement's admissibility under Rule

---

[3]     In determining the admissibility of co-conspirator statements, the Third Circuit Court of Appeals has noted a preference for a district court to conduct a pretrial evidentiary hearing and make its determination prior to trial. *See Weaver*, 507 F.3d at 187; *United States v. Continental Grp., Inc.*, 603 F.2d 444, 457 (3d Cir. 1979). Accordingly, this Court held an evidentiary hearing concerning the admissibility of the co-conspirator statements on September 27, 2019. The Court examined the evidence presented at this hearing to educate its pre-trial determination on the statements' admissibility.

804(b)(3), the "statement against interest" exception to hearsay. In determining whether an out-of-court confession was admissible, the Supreme Court held that "statement" means "a single declaration or remark" rather than "a report or narrative" under Rule 804(b)(3). *Id.* at 599. This precludes a district court from "assum[ing] for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession." *Id.* at 601. Rather, the district court must evaluate whether each statement in a confession is "truly self-inculpatory," a sometimes "fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved." *Id.* at 604.

Whether the Supreme Court's "single declaration or remark" definition of "statement" applies broadly to all the hearsay-related rules or only to Rule 804(b)(3) as applied in *Williamson* is an open question. Promptly after *Williamson*, the Sixth Circuit Court of Appeals held that this narrow definition "extends to the other hearsay exceptions delineated in Rule 804," as well as "Article VIII (Hearsay) of the Federal Rules of Evidence, entirely." *United States v. Canan*, 48 F.3d 954, 960 (6th Cir. 1995). The court reasoned that "[t]his determination is consistent with the idea implicit in Rule 801(a): that there is an overarching and uniform definition of 'statement' applicable under all of the hearsay rules." *Id.* In contrast, the First Circuit Court of Appeals "has not yet determined whether the definition of 'statement' adopted for Rule 804(b)(3) in *Williamson* also applies Rule 804(b)(5)," let alone all the hearsay rules. *United States v. Sposito*, 106 F.3d 1042, 1048 (1st Cir. 1997). Neither the DAPs, the defendants, nor the Court have located any Third Circuit Court of Appeals precedent directly addressing this specific question. Courts in the Third Circuit, however, approach hearsay statements narrowly. *See, e.g.*, *Ciccarelli v. Gichner Sys. Grp., Inc.*, 862 F. Supp. 1293, 1298–99 (M.D. Pa. 1994) (finding immediately post-

*Williamson* that a hearsay analysis under Rule 804(b)(3) requires the district court determine which *words* within individual sentences qualify as self-inculpatory).

Due to the open nature of this question, the Court does not decide today whether the term "statement" must always be narrowly construed to require a sentence-by-sentence analysis under the hearsay and hearsay-related evidence rules. However, given the abundance of "statements" at issue here, however one might set the bar, and because the great number, length, and animated nature of the documents presented in this application to the Court, the Court accepts the task of analyzing each sentence individually for its admissibility. The Court's sentence-by-sentence analysis is detailed in the Appendix to this Memorandum.

Even a sentence-by-sentence analysis, however, does not take place in a vacuum. The Supreme Court instructed in *Williamson* that determining whether a statement is self-inculpatory for the purposes of Rule 803(b)(3) "can only be determined by viewing it in context." 512 U.S. at 603. Such context is also required under Rule 801(d)(2)(E) for determining whether a statement is in furtherance of the conspiracy. *See United States v. Duka*, 671 F.3d 329, 348–49 (3d Cir. 2011) (finding that district court did not abuse its discretion in holding statements were made in furtherance of the conspiracy where the district court "found that, *in the context of the overall conversation*, the . . . statements [were] intended to reassure . . . and maintain trust within the conspiracy") (emphasis added); *United States v. Gutierrez*, 48 F.3d 1134, 1137 (10th Cir. 1995) ("When determining whether a statement was made in furtherance of a conspiracy we focus on the declarant's intent in making the statement. The determination must be made by examining the context in which the statement was made.") (citations omitted). Therefore, the Court will consider the context in which the statements were made.

### 2. Non-Statements

The defendants hope to save some of the disputed co-conspirator statements from admission under Rule 801(d)(2)(E) by arguing that they are not statements at all, rendering the hearsay rules inapplicable. The defendants are correct that if the offered evidence does not meet the definition of "statement," the hearsay rules do not control its admissibility. *See* FED. R. EVID. 801 advisory committee's note ("The effect of the definition of 'statement' is to exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not intended as an assertion.").

Rule 801(a) defines "statement" as an "assertion" and "hearsay" as a statement that, in relevant part, "a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(a), (c). The defendants contend that a selection of the disputed co-conspirator "statements" are not assertions at all, but "questions, inquiries, requests, directions, or other types of statements *that are not being offered for their truth*." Def.s' Post-Hearing Mem. at 26 (Doc. No. 2007) (emphasis added). Therefore, the defendants argue that Rule 801(d)(2)(E) cannot justify admission because each is not a "*statement* . . . offered against an opposing party and made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E) (emphasis added).

To be sure, Rule 801(d)(2)(E) is not the proper tool for admitting non-statements. But the defendants eluded a fox in the henhouse only to run straight into the butcher. Breaking their argument down to its core, the defendants are telling the Court that some of the disputed co-conspirator statements are not admissible under the hearsay rules *because they are not hearsay to begin with. See United States v. Edwards*, 792 F.3d 355, 357 n.2 (3d Cir. 2015) ("[A] statement is hearsay only if it is offered 'to prove the truth of the matter asserted.'") (quoting FED. R. EVID.

8

801(c)(2)); *United States v. Daniels*, 48 F. App'x 409, 412 (3d Cir. 2002) ("If a party does not offer a statement into evidence for the purpose of establishing the statement's truth, such statement does not constitute hearsay.") (citing *United States v. Reynolds*, 715 F.2d 99, 101 (3d Cir. 1983)). If the statements are not hearsay, then they are admissible evidence if relevant.[4] *See* FED. R. EVID. 402; *see, e.g.*, *United States v. Ballou*, 59 F. Supp. 3d 1038, 1073 (D.N.M. 2014) (admitting seven paragraphs of "commands, directives, or mandates" that "have no truth value, because they assert no facts" into evidence "because they are not 'assertions,' and thus not 'statements' under rule 801").

Relatedly, the defendants argue that if the DAPs cannot admit the non-hearsay statements under Rule 801(d)(2)(E), then the jury should be instructed to consider the statements for only whatever limited purpose they are offered. A limiting instruction is appropriate when a statement that does have a truth value is offered for a purpose other than that truth, such as to show the effect on the listener. *See, e.g.*, *Marks v. Marina Dist. Dev. Co., LLC*, 213 F. App'x 147, 153–54 (3d Cir. 2007) (finding "consistent with the sound exercise of discretion" the district court's admission of testimony about a dispatch call that "was not being offered for the truth of the contents of the call, but to demonstrate their effect on the listener" where that testimony was immediately followed by a limiting instruction that "this aspect of [the witness's] testimony was only admissible for a limited purpose"). Here, however, the defendants' argument is that these statements are non-hearsay because they have no truth value to begin with. The Court fails to see why it would instruct the jury that it cannot consider statements for a truth value that they do not possess. Of course, should the DAPs seek to offer a hearsay statement for a non-hearsay purpose, the Court will consider a proper limiting instruction.

---

[4]     Subject to objections other than hearsay.

Having decided on a context-driven sentence-by-sentence statement determination, the Court turns to the traditional *Weaver* analysis.

## B. Whether a Conspiracy Existed

To admit co-conspirator statements, the Court must find "by a preponderance of proof" that a conspiracy existed. *Bourjaily*, 483 U.S. at 175. To prevail on a Section 1 Sherman Act claim, a plaintiff must establish a "contract, combination . . . or conspiracy" in the restraint of trade. 15 U.S.C. § 1. Two or more entities enter into a conspiracy when they reach an agreement or understanding to commit a common illicit scheme. *Flat Glass*, 385 F.3d at 356. "[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendants] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quotation marks and citations omitted); *see Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) ("[T]he plaintiff must show that the defendant was a party to a contract, combination . . . or conspiracy . . . . in other words, a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme.") (citations and quotation marks omitted).

Direct evidence is evidence that "a reasonable finder of fact must be able to use . . . to find a conspiracy with no further extrapolation." *In re K-Dur Antitrust Litig.*, No. 1-1652, 2016 WL 755623, at *19 (D.N.J. Feb. 25, 2016) (citing *Ins. Brokerage*, 818 F.3d at 324 n. 23); *see In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (defining direct evidence in a Section 1 conspiracy to be "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted"). A "document or conversation explicitly manifesting the existence of the agreement in question" is direct evidence. *Ins. Brokerage*, 818 F.3d at 324 n. 23. However,

10

of course, a plaintiff need not demonstrate the existence of a formal or written agreement to evidence a commonly held agreement between co-conspirators. *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 182 (3d Cir. 1970). A plaintiff can also rely upon circumstantial evidence, evidence which requires the finder of fact to make additional logical leaps to determine that a conspiracy occurred. *Id.*

In determining whether a single conspiracy exists, the Third Circuit Court of Appeals has focused on "(1) whether there was a common goal among the conspirators; (2) whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators; and (3) the extent to which the participants overlap in the various dealings." *United States v. Fattah*, 914 F.3d 112, 168 (3d Cir. 2019). However, as already addressed in this litigation, "[a]ntitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy." *In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d 709, 719 (E.D. Pa. 2011) (citations and quotation marks omitted) (alterations in original).

The evidence issue raised here is all the more challenging because the statements are almost all presented in newsletters and similar publications disseminated by a trade association. A trade association "can only be held liable for concerted action if it acted as an entity[,]" and concerted action does not necessarily "exist every time a trade association member speaks or acts." *Alvord-Polk, Inc. v. F. Schumacher & C.*, 37 F.3d 996, 1007 (3d Cir. 1994) (citing *Nanavati v. Burdette Memorial Hosp.*, 857 F.2d 96, 117-18 (3d Cir. 1988)). Likewise, "pertinent legal authority is clear that participation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of *agreement* to the conspiracy." *Processed Egg Prods.*,

11

821 F. Supp. 2d at 722 (collecting cases) (emphasis in original).[5] Common membership, meeting attendance, and "adoption of the trade groups' suggestions" can, however, evidence "an *opportunity* to conspire" that the conspirator can then act upon to establish the common agreement. *Ins. Brokerage*, 618 F.3d at 349 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 n. 12 (2007); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007)) (emphasis added); *see also Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1242 n. 15 (3d Cir. 1993) ("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place.") (citations and quotation marks omitted).

In addition to establishing an opportunity to conspire, a plaintiff must evidence that alleged co-conspirators "acted other than independently" in adhering to the trade association's programming or guidelines.[6] *Ins. Brokerage*, 618 F.3d at 349. Joint action taken by competing

---

[5]     *See Ins. Brokerage*, 618 F.3d at 321 (noting that although common membership in a trade association and "common adoption of the trade groups' suggestions" can evidence "an opportunity to conspire," they are insufficient on their own to evidence a conspiracy under Section 1).

[6]     A prior ruling of this Court is instructive here.  In reference to a defendant no longer in this case, this Court already noted that although a defendant's membership to the UEP, leadership positions within the UEP, and attendance at various meetings in which the conspiracy was discussed "are not enough, in and of themselves, to support an inference that [the defendant] joined a conspiracy, they [did] indicate that [the defendant] had an opportunity to do so." *In re Processed Egg Products Antitrust Litig.*, 902 F. Supp. 2d 704, 716 (E.D. Pa. 2012) (citing *In re Static Random Access Memory Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008)).  This Court ultimately denied that defendant's motion to dismiss, determining that allegations of the defendant's participation in UEP's chick hatch reduction and a supply adjustment program plausibly suggested that the defendant "took advantage of this opportunity and agreed to a common scheme to restrict the supply of eggs." *Id.*

At an earlier stage in this litigation, this Court also denied a separate motion to dismiss from another defendant that "was a UEP member and held positions on the UEP Board and certain committees, and attended meetings, noting that allegations that "[the defendant] was in a position to observe and be aware of what other Defendants were doing, knew the implications of restricted supply and increased prices, and even likely benefited from the increased market prices" could not, on their own, solidify the defendant's agreement to and participation in the conspiracy. *Processed Egg Prods.*, 821 F. Supp. 2d at 735.  However, this Court again focused on the defendant's "alleged adoption of the guidelines on chick hatch reduction, in conjunction with the

12

members of a trade association on behalf of the association as an entity can satisfy the conspiratorial element of a Section 1 claim. *Weiss v. York Hosp.*, 745 F.2d 786, 815-16 (3d Cir. 1984) (holding that coordinated actions by group of doctors, although each "an independent economic entity in competition with other doctors . . . . are subject to scrutiny under Section 1 of the Sherman Act") (citing *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 339 (1982); *Nat'l Soc'y of Prof'l Eng'r v. United States*, 435 U.S. 679, 682 (1978)); *see also Alvord-Polk, Inc. v. F. Schumacher & C.*, 37 F.3d 996, 1007 (3d Cir. 1994) (noting that if individual competitors act together for a trade association that the association "has engaged in concerted action so as to trigger potential Section 1 liability").

### 1. Overview

Because the DAPs must prove that the conspiracy existed by a preponderance of the evidence, the Court examines the arguments and evidence presented by both the DAPs and the defendants. The DAPs presented an array of evidence[7] at the evidentiary hearing held on September 27, 2019 that they believe establishes the formation of the conspiracy.[8] In doing so, the DAPs submitted documents setting the stage for the conspiracy long before it was alleged to have officially hatched on May 15, 2000. In the 1980s, UEP called for an egg marketing order to restrict egg supply. The United States Department of Justice denied UEP's request because

---

allegations of the defendant's UEP membership, positions held on the UEP Board and committees, meeting attendance, "and expressed pointed comments about the egg market and industry practices" to plausibly show that the defendant did in fact assent to the overarching conspiracy. *Id.* at 735-36.

[7]     Federal Rule of Evidence 104 permits a Court to consider any unprivileged evidence that may otherwise be inadmissible when deciding preliminary questions of admissibility. Therefore, the Court considers all of the evidence submitted by the parties, regardless of whether the evidence itself is admissible.

[8]     The defendants likewise presented supplemental evidence after the hearing.

allowing the order would violate antitrust laws. Without assistance from the federal government to rely upon, the DAPs allege that UEP would later take its own measures to reduce egg supply.

As early as 1999, UEP and its members apparently were facing a period of great oversupply in egg production that drove the cost of egg products down. Scrambling to increase profit margins, UEP and its horizontal competitors allegedly settled upon a conspiratorial scheme to reduce domestic egg supply as a means to increase domestic egg prices. Through its "United Voices" newsletters—the UEP-produced publication dispersed to UEP members and others—UEP urged its members to review their supply demand needs as a first step to maximizing economic returns. Soon thereafter, UEP also recommended that its members to do their part to reduce the egg supply. *See* DAPs' Formation Binder (hereinafter DAPs' Form. Bind.), United Voices Newsletter at 2 (July 5, 1999) (Tab 14) (noting that "[i]t's up to the individual producers to make [the] decision" whether they would "make the necessary adjustments to bring supply more in balance with demand"). UEP's general urging reductions for supply were soon followed by UEP's encouragement and instruction to participate in a broad supply-reducing conspiracy through three means: various short-term measures, the certified animal welfare program, and exporting eggs at a loss.

Because the existence of a conspiracy cannot be established exclusively by the statements themselves, the focus is upon the evidence presented independent from the alleged co-conspirator statements. However, the admissible individual statements themselves—as detailed in the Appendix to this Memorandum—underscore the existence of the conspiracy. For the purposes of admitting co-conspirator statements, the DAPs have successfully proven to the Court for this purpose by a preponderance of the evidence that a conspiracy existed. By this ruling the Court is *not* usurping the jury's function of this point.

14

## 2. Short-Term Supply Reduction Measures

Facing oversupply throughout the egg industry, UEP turned first to short-term measures—including the early molting and slaughtering of hens—as a means to quickly reduce the egg supply. Through its "United Voices" newsletters, UEP implored its members to "do [their] part in early molting and early slaughter" to "adjust[] the supply side of the business" and ensure higher prices. DAPs' Form. Bind., United Voices Newsletter at 2 (Apr. 19, 1999) (Tab 7).[9] In May 1999, the UEP Board approved both of the short-term supply-reducing measures recommended by the Marketing Committee.[10] After receiving the Board's approval, UEP continued to heavily encourage its members to participate in additional molting and slaughtering initiatives.[11] At least some members did as instructed. *See* DAPs' Form. Bind., United Voices Newsletter at 1 (June 7, 1999) (Tab 11). Finally, Board members were further "urged . . . to maintain their supply reduction programs," DAPs' Bind., UEP Bd. Of Dir. Meeting Minutes (Feb. 24, 2000) (Tab 22). According to the DAPs, UEP also knew early on that these short-term measures would not be enough on their own to achieve long-term supply reduction. *See* DAPs' Form. Bind., United Voices Newsletter at

---

[9]     In this same newsletter, UEP Chairman Ken Looper also urged members to "do [their] part and make [the] industry profitable for everyone" through the "total disappearance" of 201.1 million old hens. *Id.* at 1.

[10]     Two months later, the Marketing Committee agreed to recommend that members continue early molting and slaughtering.

[11]     *See, e.g.*, DAPs' Form. Bind., United Voices Newsletter at 3 (May 24, 1999) (Tab 10) ("Waiting for someone else to make adjustments to their flock size only adds to your losses. Make the necessary adjustments and minimize your losses now without waiting for someone else to do the job."); *id.* ("Follow UEP's recommended early molt and early slaughter program. If possible take an additional 5% of your hens out of production. If everyone disposed of an additional 5% of their hens, this would reduce our current flock size to about 245 million hens and a profitable industry for all."); DAPs' For. Bind., United Voices Newsletter at 1 (June 7, 1999) (Tab 11) ("(1) Continue to molt hens at 60 weeks of age for the next 5 weeks. (2) Continue to slaughter or dispose of hens 5 weeks earlier than normal for the next 5 weeks.").

15

2 (Apr. 3, 2000) (Tab 24) "(A massive sell-off of hens or molting must occur following Easter week in order to avoid severe depressed prices. Long-term, the industry must address this over-supply problem or face continued survival of the fittest.").

The defendants did not submit any evidence to demonstrate their lack of participation in implementing these short-term measures. Instead, they argue that UEP merely recommended voluntary actions—not agreements—and that the DAPs insufficiently showed any producers' adherence to the recommendations. The defendants' argument is unavailing. First, albeit voluntary, these joint actions taken by competing members of a trade association can be evidence of a conspiracy. *See Weiss*, 745 F.2d at 815-16. Second, UEP admitted that at least some producers did in fact adhere to UEP recommendations for the early molt and slaughtering of hens which were made as means to reduce supply. *See* DAPs' For. Bind., United Voices Newsletter at 1 (June 7, 1999) (Tab 11) ("The [Marketing] Committee applauded the actions taken by the members in following the early molt program . . . ."). Third, regardless of the official "voluntary nature" of the requested actions, UEP's communications suggest that the plan would only work if the members worked together. The Court is satisfied that the DAPs have shown by a preponderance of the evidence that the UEP-led short-term early molt and slaughter efforts were methods employed to advance a broader agreement to reduce the supply of eggs.

### 3. Certified Animal Welfare Program

The DAPs' theory of the conspiracy largely focuses on the UEP's adoption of its animal welfare guidelines and the creation of its Certified Program as a means to reduce egg supply under the guise of ensuring animal welfare. Disgruntled by the economic downturn in the egg market and realizing that short-term fixes would not be enough to alleviate his "concern[s] with the current economic conditions," UEP Chairman Ken Looper sought to develop a "supply program for board

16

review." DAPs' Form. Bind., UEP Bd. of Dir. Meeting Minutes (May 12-13, 1999) (Tab 9). UEP created a Scientific Advisory Committee to recommend suggestions that the UEP's Producer Committee would later draft into UEP's animal welfare guidelines.[12] The DAPs argue that UEP created its Scientific Advisory Committee solely to lend artificial legitimacy to UEP's animal welfare guidelines. Among the Scientific Advisory Committee members was poultry specialist Donald Bell, an early advocate for implementing various supply-reducing measures into the poultry industry.[13]

Gene Gregory, the Senior Vice President of the UEP, solicited Mr. Bell for a "12-month Supply Plan to Meet the Market Needs That Provides a Reasonable Return on Investment" and welcomed "any additional ideas." DAPs' Form. Bind., Letter from Gene Gregory to Don Bell and Lee Schrader (July 1, 1999) (Tab 12). In response, Mr. Bell wrote that "[c]orrection in the size of the nation's layer flock can be attained by one of several ways:

---

[12]     The UEP's Producer Committee would incorporate the Scientific Advisory Committee's recommendations into the guidelines.

[13]     In the early 1990s, Mr. Bell advocated for various supply reducing methods in the poultry industry. In a 1992 presentation Mr. Bell wrote that cage density, molting programs, age restrictions, and export initiatives were the most substantial factors impacting national egg production. DAPs' Form. Bind., Don Bell, *Managing the Nation's Laying Flock 1992* at sl. 14 (Tab 3). To alleviate an increase in egg production, Mr. Bell suggested implementing "[g]uidelines (e.g. welfare)" and "persuasion based upon sound data (e.g. UEP)" as potential "supply management systems." *Id.* at sl. 37. In another report dated April 15, 1994, Mr. Bell urged that "more means less" in the egg industry: that "[t]he U.S. has no way to control its flock size other than through the persuasive influence of trade associations such as UEP. . . . Remember – in the egg industry, 'more means less' – it always has and it will always be so." Don Bell, *An Eggs Economic Update* at 4 (Apr. 15, 1994) (Tab 4).

     The defendants challenge Mr. Bell's affiliation with UEP prior to signing his formal consulting agreement with UEP in February 2001. Although both the 1992 presentation and the 1994 report mention UEP, the DAPs have not established that these presentations were made to or on behalf of UEP. However, these early documents authored by Mr. Bell are indicative of the ideas he would later bring to the attention of UEP and its Scientific Advisory Committee.

17

1. A sensible industry-wide growth policy must be adhered to. This requires industry-wide commitment to a "reasonable" growth rate at no more than 3 million hens per year.
2. Extra birds must be removed from the nation's flock permanently. An early molt is only a stop-gap way of correcting the problem. . . .
3. A 2-3% reduction in chick purchases would help to lower the future flock size, but the results would be slow.
4. An industry-wide policy of a minimum floor space allowance would result in a more ideal national flock size. It is currently estimated that 15-20% of the nation's birds are housed at less than 48 square inches. If 48 square inches were adopted as the minimum space allowance, millions of extra birds would be eliminated.

DAPs' Form. Bind., Letter from Don Bell to Gene Gregory (July 2, 1999) (Tab 13). Here, Mr. Bell explained that short-term methods, such as the early molting program already implemented, would fail to provide UEP's desired long-term supply reduction effects. Instead, Mr. Bell focused on executing a longer-term solution to alleviate the UEP's economic woes: requiring larger cage spaces per hen. According to the DAPs, UEP's efforts were largely focused on reducing egg supply by requiring an increase in cage space per hen.

After receiving Mr. Bell's guidance, UEP conducted a survey of its members to see whether they were interested in participating in a "supply adjustment program" adopting the methods suggested by Mr. Bell. DAPs' Form. Bind., United Voices Newsletter at 3 (Aug. 2, 1999) (Tab 16); *see* DAPs' Form. Bind., *Economic Survey of UEP Members* (Tab 17) (referring to the survey as inquiring into "whether the marketing committee should make recommendations to correct the over supply of eggs for the next 12-18 month [sic]."). The Marketing Committee described this survey as a method "to determine [membership] interest in UEP developing a program to adjust supply to meet the expected demand as well as their willingness to participate." DAPs' Form. Bind., UEP Marketing & Price Discovery Committee Meeting Minutes (July 15, 1999) (Tab 15). When encouraging its members to complete this survey, UEP reproduced Mr.

Bell's suggested methods to "correct[] . . . the nation's flock size" in a United Voices newsletter. DAPs' Form. Bind., United Voices Newsletter (Aug. 2, 1999) (Tab 16). UEP received overwhelmingly positive responses from those members that responded.[14] UEP also solicited additional comments and recommendations from its members. The members recommended, among other suggestions, to increase cage space requirements and decrease density.

Backed by the support of its members, UEP's various committees focused their efforts upon bringing this plan to fruition. In a presentation to the Board, UEP Chairman Ken Looper and Marketing Committee Chairman Dolph Baker explained that egg producers "would realize severe financial losses" in the event "the egg industry did not voluntarily adjust the supply side of [the] business." DAPs' Form. Bind., UEP Annual Bd. Meeting and Exec. Conference Minutes (Oct. 14-15, 1999) (Tab 18). At this same Board meeting, Animal Welfare Committee Chairman Jeff Armstrong also presented the Scientific Advisory Committee's report "detailing the challenges of the industry and the opportunities to write humane guidelines to address these challenges," recommending in part "space allocation" as a solution. *Id.*

Finally, on May 15, 2000, the Animal Welfare Committee met to accept the recommendations and goals of the Scientific Advisory Committee and commit to creating official animal welfare guidelines. Participation in the UEP Certified Program requires compliance with

---

[14]    Sixty-eight members representing approximately 90 million laying hens—about 30% of the UEP members—responded to this survey. Of the responding members, the vast majority responded positively.    Information on precisely which members responded is unknown. Additionally, the Court notes that besides inquiring into "some type of chick hatch reduction program," the survey did not solicit information on whether the members agreed to the specific methods suggested by Mr. Bell. Instead, the questions were phrased in more generalized terms— *i.e.* whether members agreed with Mr. Bell's predictions and whether a program should be developed to address said predictions. DAPs' Form. Bind., Economic Survey of UEP Members (Tab 17). As already noted, Mr. Bell's suggested methods were reproduced in the August 1999 United Voices newsletter promoting participation in the survey.

these guidelines. The Committee committed to increasing cage space per hen despite acknowledging that (1) it was not in any individual producers' economic self-interest to do so; (2) most or all of the producers in the industry would have to commit to justify the program; (3) the program would be perceived as a "pro-welfare" industry decision; and (4) "[a]n increase in space allowance would inevitably reduce the layer population and thereby reduce the surplus production problems affecting the industry over the past 20 years." DAPs' Form. Bind., UEP Animal Welfare Committee Meeting (May 15, 2000) (Tab A). The UEP implemented its initial guidelines, including its cage space restrictions, in 2002. Over the next few years, the guidelines would later add the 100% Rule, a prohibition on backfilling, and the audit system to enforce compliance. The DAPs assert that these additions—justified under the pretext of animal welfare—were similarly created to decrease the supply of eggs.

The defendants, however, contend that UEP developed its Certified Program to meet its customers' demands for a humane egg product. According to the defendants, the Certified Program's development and the producers' adherence to the guidelines were therefore a legitimate response to an industry crisis, not a part of an overarching conspiracy to reduce the supply of eggs.

In 1999, People for the Ethical Treatment of Animals (PETA) launched a public relations campaign against various fast-food companies and later grocery chains and retailers demanding the adoption of guidelines ensuring the humane treatment of animals used in creating food products. These demands included providing increased cage space for egg-laying hens. McDonald's (and later other fast food chains) acquiesced, requiring its egg suppliers to provide at least 72-75 square inches per bird and submit annual compliance audits. Concerned over potential public image issues, retailers—including some of the DAPs—turned to the Food Marketing Institute (FMI) to form an Animal Welfare Group composed of primarily animal scientists and

veterinarians to identify universal "scientific best practices" to ensure adequate animal welfare.[15] Def.s' Ex. 11, Hollingsworth Dep. 332:25-333:16. After FMI publicly announced its animal welfare policy, a couple of the DAPs urged egg suppliers to implement animal welfare reforms.

The defendants assert that around this same time period, egg producers were concerned that the attention given to animal welfare issues could lead to overly restrictive regulations or inconsistent contractual requirements. According to the defendants, this concern prompted UEP to form its Scientific Advisory Committee in part to develop an animal welfare program. As noted above, the Scientific Advisory Committee's recommended, among other improvements, requiring more space per caged bird. UEP representatives also consulted FMI about UEP's guidelines. In fact, FMI also considered cage space to be a "big issue" and urged UEP to reduce its phase-in schedule for implementing cage space restrictions from ten to six years. Def.s' Ex. 20, Animal Welfare Conference Call (June 6, 2001). FMI's independent expert advisors on its own animal welfare committee later recommended FMI members to follow the 2002 UEP Guidelines (incorporating the Scientific Advisory Committee's recommendations) concerning egg and egg product suppliers. As recently as 2013, FMI again endorsed UEP's guidelines.

The defendants assert that the guidelines' cage space requirements,[16] the 100% Rule, the backfilling limitation, and the audit requirements were all implemented solely for legitimate reasons. The Scientific Advisory Committee justified the 100% Rule on the basis that producers

---

[15]    FMI also worked with the National Counsel of Chain Restaurants in an effort to achieve more uniform standards throughout the industry.

[16]    Although the defendants assert that published university research demonstrates that these space requirements improve hen productivity and livability, they failed to submit the evidence they cited to substantiate their assertion. *See* Def.s' Post-Hearing Mem. at 10 (Doc. No. 2007) (citing Defs.' Ex. 17, Armstrong Dep. 79:21-81:2).

participating in a voluntary certified program should treat all of their birds in an equally humane manner. According to Dr. Armstrong, the Scientific Advisory Committee strongly opposed backfilling. Dr. Armstrong explained that backfilling negatively impacts bird welfare by exposing younger birds to disease-causing pathogens transmitted by older hens and increases social competition and stress. Def.s' Ex. 33, Letter from Jeff Armstrong to Paul Bahan (Oct. 4, 2004). Further, the defendants contend that the audits were simply legitimate initiatives to verify compliance with the guidelines.[17] Finally, the defendants suggest that their non-conspiratorial intentions are demonstrated by the omission of explicit supply reducing restrictions in its guidelines, the voluntary nature of the Certified Program, and continued customer demands for the Certified Program.

Overall, the defendants do present evidence that the implementation of the UEP Guidelines and Certified Program could have been a response to customer demands, and they will be presenting such evidence and arguments to the jury. However, for the purpose of admitting co-conspirator statements, the evidence presented by the DAPs ultimately overcomes the argument now. Mr. Bell's recommendations—that UEP would later act upon—were vehicles by which he urged the producers to reduce egg supply, particularly through implementing cage space restrictions. UEP members supported and participated in this industry-wide supply reducing plan as recommended by Mr. Bell. The evidence can show that it is more likely than not that the

---

[17]     Although the defendants suggest that FMI and the DAPs support the audit program, they again omit the very deposition testimony cited for this proposition. *See* Def.s' Post-Hearing Mem. Memo at 11 (Doc. No. 2007) (citing Ex. 11, Hollingsworth Dep. 99:11-25; 356:22-364:5). Moreover, the defendants suggest that the DAPs' support for the audit program is evidenced by their demands to have audits performed. The DAPs' audit requests could easily—and logically— show that the DAPs sought to fulfill the steps required of them to secure UEP Certification, not because they believed the audits to be legitimate.

defendants acted upon a great opportunity to hide their true supply-reducing motivations under the guise of reacting to public animal welfare concerns.

The defendants' other arguments similarly fail at this juncture. Surely a supply-reducing measure need not label itself as such to reduce supply as intended. Moreover, voluntary participation of UEP members further *substantiates* the conspiracy. The fact that so many producers voluntarily joined the Certified Program—after receiving blatant solicitations that doing so would reduce supply—demonstrates that the producers knowingly joined in on the plan. The Court is satisfied that a preponderance of the evidence demonstrates for the present purposes that UEP's implementation of, and membership participation in, UEP's Certified Program was a part of an overarching conspiracy to reduce supply.

### 4. *Egg Exports*

The DAPs assert that UEP and its members exported eggs at a loss to reduce the domestic supply of eggs. Through UEP's management, USEM members exported domestic eggs to international markets. Mr. Gregory first urged UEP members in a letter dated February 2000 to participate in an export program "[i]in order to maximize the impact upon the domestic price for eggs." DAPs' Form. Bind., Letter from UEP to UEP Members (Feb. 1, 2000) (Tab 20). Through its newsletters, UEP similarly urged members to participate in a second export order. Mr. Gregory also linked the exports to other alleged conspiratorial actions by writing to the UEP members:

> In order to correct our over-supply problem and return to long-term profits for the industry, we must maintain our supply managements programs of reducing the flock size and reducing out chick hatch placements during 2000. Don't be mislead [sic] by short term price increases as a result of filling export orders. Do not plan your production based upon the potential of exporting large volumes. These export orders are a tremendous benefit but certainly not the final solution to our over-supply problem.

*Id.*

23

Conversely, the defendants argue that UEP focused exclusively upon removing surplus eggs from the domestic market, not exporting eggs at a loss.[18] But they do not acknowledge that UEP advertised commitment to export orders to remove domestic eggs as a means "to improve the domestic price." DAPs' Form. Bind., United Voices Newsletter at 2 (Mar. 20, 2000) (Tab 21). The defendants also contend that UEP focused on receiving only "short-term benefits" from the exports and that short-term price efforts cannot be linked to a larger, overarching conspiracy. Mr. Gregory's message quoted above, however, undermines this argument. Although UEP acknowledged the short-term benefits that the export provides, it further called for members to engage in "long-term plans of reducing the nation's flock size . . . to return to profitable prices." *Id.* Moreover, the success of a particular conspiratorial action is irrelevant to the larger inquiry into whether the conspiracy existed in the first place. Thus, a preponderance of the evidence similarly shows that USEM exports run managed by UEP were a part of an overarching conspiracy to reduce egg supply as a means to drive up domestic egg prices.

Therefore, the DAPs have sufficiently established the existence of a supply-reducing conspiracy through independent evidence. The admissible individual statements themselves also prove the existence of the conspiracy and are discussed in detail in the attached Appendix.

---

[18]     The defendants also assert that USEM began exporting eggs in 1981, long before the formation of the alleged conspiracy. However, for support they cite to a deposition reference that has nothing to do with the USEM exports. Def.s' Post-Hearing Mem. at 16 (Doc. No. 2007) (citing Def.s' Ex. 24a, D. Baker 67:1-22).

## C. Whether the Party Against Whom the Statement is Offered is a Member of the Conspiracy[19]

The DAPs brought suit against UEP, Rose Acre, and USEM. As previously discussed, the DAPs sufficiently showed UEP's role in the conspiracy for purposes of admitting the co-conspirator statements. For the DAPs to use these statements against Rose Acre and USEM under Rule 801(d)(2)(E), the Court must also find that both Rose Acre and USEM were participants of the same overarching conspiracy to reduce egg supply. *See Weaver*, 507 F.3d at 181. "Many cases hold that a defendant who joins a conspiracy after it has been formed is responsible for statements made by existing co-conspirators prior to that defendant joining the conspiracy, assuming the prior statements were made during and in furtherance of the conspiracy. *United States v. Kemp*, 360 F. Supp. 2d 697, 703 (E.D. Pa. 2005) (citing *United States v. Jackson*, 757 F.2d 1486, 1490 (4th Cir. 1985)).

To participate in a conspiracy, the entity must have "knowledge of the conspiracy's illicit purpose when [it] performs acts which further that illicit purpose." *United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975) (collecting cases); *see In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 769 (E.D. Pa. 2015) (citing *Petruzzi's*, 998 F.2d at 1242-43). "The Supreme Court has explained that a party progresses from mere knowledge of an endeavor to intent to join it when there is informed and interested cooperation, stimulation, instigation. And there is also a stake in the venture which, even if it may not be essential, is not irrelevant to the question of conspiracy." *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 17 (D.C. Cir. 2004) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943) (quotation marks omitted)); *see In re Magnesium Oxide*

---

[19] Participation in a conspiracy cannot be shown solely by the alleged co-conspirator statements themselves. Therefore, the Court focuses its analyses here on the evidence presented during, and supplementing, the evidentiary hearing.

*Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at \*17 (D.N.J. 2011)). "Knowledge of all particular aspects, goals, and participants of a conspiracy" is not necessary to establish an entity's involvement in a conspiracy. *United States v. Adams*, 759 F.2d 1099, 1114 (3d Cir. 1985) (citing *Blumenthal v. United States*, 332 U.S. 539, 558 (1947)); *see Magnesium Oxide*, 2011 WL 5008090, at \*17 (D.N.J. Oct. 20, 2011) (noting that a meeting of minds or a conscious commitment to a common scheme "does not require a showing that [the defendant] knew of or participated in every transaction in furtherance of or related to the alleged conspiracy") (collecting cases). As discussed below, the Court finds that both Rose Acre and USEM had sufficient knowledge of the supply-reducing conspiracy.

### 1. Rose Acre

The Court finds that the DAPs have proven Rose Acre's participation in this alleged conspiracy by a preponderance of the evidence. As discussed above, participation in trade associations and attending trade association meetings, on their own, do not establish an inference of an alleged co-conspirator's agreement to the conspiracy. *See Processed Egg Prods.*, 821 F. Supp. 2d at 722. A defendant's decision to act on the illicit opportunity it discovered through its associations and meeting attendance, however, can show agreement. The Court is satisfied that the DAPs demonstrated Rose Acre's informed participation in the alleged conspiracy by a preponderance of the evidence.

### a. Certified Animal Welfare Program

Rose Acre is the second largest egg producer in the United States. It is family-owned, with Marcus Rust serving as its chief executive officer. Rose Acre is vertically integrated, consisting not only of egg farms, but also including its own chick hatcheries, pullet farms, feed mills, breeding flocks, and egg processing facilities.

Rose Acre joined the UEP in February 2002 and joined the Certified Program in April 2002. Mr. Rust has been an active member of the UEP's Board of Directors since 2002. *See* DAPs' Rose Acre Knowledge Binder (hereinafter DAPs' Rose Acre Know. Bind.), Rust Dep. 220:7-9 (Mar. 5, 2014) (Tab 1) (telling UEP prior to joining that "[Rose Acre] had to be very involved or [it] [wasn't] going to be involved."). Mr. Rust is also a member of the UEP Animal Welfare Committee and Marketing Committee, the latter committee being one in which "[Rose Acre] wanted to make sure [it] [was] involved in every aspect[,] . . . mak[ing] sure [it] knew every part of the function that was going on." DAPs' Rose Acre Know. Bind., Rust Tr. Trans. 201:21-25 (May 11, 2018) (Tab 3). Rose Acre executive Greg Hinton also joined UEP's Marketing Committee. Another Rose Acre executive, Bryan (KY) Hendrix, joined the Producer and UEP Animal Welfare Committee.

Before Rose Acre applied to become a UEP certified producer, Mr. Hendrix wrote Mr. Rust and his family about the animal welfare program and audits:

> This kind of reminds me of the 1980s when David Rust was fighting these Marketing Order problems here in America. I don't really know what this whole motive is but I think there is more to it than Animal Welfare. I think some people think it will make them rich or something. I have never been or never will be for quotas an [sic] it seems to me that is somewhat of the path they are taking.

DAPs' Rose Acre Know. Bind., Letter from KY Hendrix to Marcus Rust *et al.* (Mar. 14, 2002) (Tab 4). Less than two weeks later, Mr. Hinton attended an Animal Welfare Committee meeting[20]

---

[20]     At this same meeting, the committee moved to recommend various changes to the audit forms concerning the grade required to pass the audit; the amount of points allotted to the space allowance requirement, beak trimming, molting, handling & transportation; and a phase-in plan.

where the committee voted in favor of recommending the 100% Rule to the Board.[21] The next day, Lois Rust wrote Mr. Hendrix a handwritten note:

> Talked to Marcus last night [about the] UEP guidelines. They are good but we are concerned with the what [sic] looks like, the underlying purpose of the whole thing.

DAPs' Rose Acre Know. Bind, Letter from Lois Rust to KY Hendrix (Mar. 27, 2002) (Tab 7) (emphasis in original). Shortly thereafter, Rose Acre applied to become an "Animal Husbandry Certified Company."[22] Rose Acre then participated in the audit program annually from 2003 to 2008.[23]

Throughout the years, Mr. Rust and the other Rose Acre executives attended other various UEP Board and committee meetings. The DAPs assert that Rose Acre gained knowledge of UEP's supply-reducing conspiracy in large part through attending these meetings. Over the years, Messrs. Rust, Hendrix, and Hinton attended many meetings where the following topics, albeit among many others, were discussed: the cage space allowance; reconfirmation of the 100% Rule; the implementation of the backfilling prohibition; the establishment of a sub-committee to further develop the Certified Program; and general goals of reducing the nation's flock inventory.

---

[21] In addition, Mr. Rust testified that he believes he voted in favor of approving the 100% when it was initially proposed. DAPs' Rose Acre Know. Bind., Rust Dep. 491:1-11 (Mar. 6, 2014) (Tab 2).

[22] Rose Acre's application was celebrated by Mr. Gregory boasting—through both a United Voices newsletter and an email sent to Mr. Hendrix—that 100 companies representing the ownership of approximately 155 million layers committed to implementing UEP's guidelines. *See, e.g.*, Email from Gene Gregory to KY Hendrix *et al.* (Apr. 2, 2002) (Tab 10) ("Well we have hit a magic threshold. 100 companies have now filed the Application for Certification. Our total layers is now at about 155 million. They keep coming in.").

[23] The DAPs particularly focus upon Rose Acre's 2008 audit, an audit Rose Acre still passed after receiving 0 out of 10 points for the daily removal of dead, injured, euthanized, and depopulated layers in a humane way and in accordance with the UEP Guidelines.

28

During one Animal Welfare Committee meeting Mr. Hendrix attended, one opponent to the Certified Program raised concerns that the program is "not free market driven[,] may not be scientifically sound[,] [is] destroying industry production design, technology, and expertise[,] is deceptive and dishonest," and urged members to eliminate the 100% Rule. DAPs' Rose Acre Know. Bind., UEP Prod. Comm. for Animal Welfare (Jan. 23, 2006) (Tab 22). Another opponent expressed similar concerns questioning the Scientific Advisory Committee's makeup and the 100% Rule. Though the Court would not credit silence as indicative of assent for these purposes, in response, Mr. Hendrix spoke in support of the Certified Program.

The DAPs also submit additional inculpatory correspondence. For instance, Mr. Hinton received an email from Mr. Gregory that stated:

> The animal care certified program gave us a good roadmap for the future like no supply demand program could have. While it was never intended as a supply demand program it can be a good way to manage our business if we just return to the old days of flock disposal and molt schedules.

DAPs' Rose Acre Know. Bind., Email from Gene Gregory to Greg Hinton *et al.* (May 6, 2004) (Tab 16). Moreover, John Rust, Marcus Rust's brother, sent an email to Marcus expressing his view on the Certified Program. At the time John sent his email, he was a Rose Acre shareholder, but not yet an executive. John's letter stated, in relevant part:

> I don't think we have anything to be ashamed of by putting as many hens per cage as conditions permit as that is doing what is economically right for consumers . . . rather than trying to restrict cage space to boost prices under the alleged agenda of animal rights.
>
> We lose the moral right to argue for the continued right of low cost production costs when we ourselves are manipulating the system under false pretenses.

Def.'s Ex. 56, Email from John Rust to Marcus Rust (Feb. 13, 2008). Marcus defended the cage space requirements, responding:

> [W]e have to have a defensible dimension that bears out the numbers so we can prove we are not hurting the bird which something around 63-70 is a very defensible position scientifically and numerically proveable-60 and under is not defendable-higher mortality and less production per chicken-we can defend the 67" and justify pricing to consumer—egg market is not high because of reduced birds but because of economic meltdown we had.

Def.'s Ex. 56, Email from Marcus Rust to John Rust (Feb. 13, 2008).

In response, the defendants argue that Rose Acre joined the Certified Program not to reduce supply but because its customers sought certified eggs.[24] The defendants assert that Rose Acre focused on increasing its supply during the alleged conspiracy period. For instance, Rose Acre expanded its layer size by acquiring and improving existing facilities and constructing new facilities, including the large Hyde County facility. Although Rose Acre began planning for this facility before becoming a certified producer, physical construction of the Hyde County facility did not begin until after Rose Acre already joined the Certified Program. The defendants contend that Rose Acre created its expansion plan as a means to offset any potential disruptions in egg supply that customers would experience as a result of implementing the Certified Program.[25] After Rose Acre executed its expansion plan, the defendants' assert that Rose Acre's layer inventory generally steadily increased annually throughout the alleged conspiracy period. The defendants

---

[24]     In making this assertion, the defendants cite to another omitted deposition page. Rose Acre did, however, at least point to evidence to the effect that Walmart and Dutch Farms adjusted their egg prices by $0.02 as a means of defraying costs associated with Rose Acre's compliance with the Certified Guidelines. *See* Def. Ex. 50, Hinton Dep 255:8-257:23.

[25]     Mr. Rust asserted that "[t]he whole design of the [Certified] [P]rogram was to allow a time period for [participants] to replace the housing." Def.s' Ex. 38, Rust Dep. 180:3-6.

argue that Rose Acre's supply and facility growth during the alleged conspiracy period evidences that it never joined in on a supply-reducing scheme.[26]

Overall, the DAPs presented sufficient evidence to substantiate Rose Acre's knowledge of the broader conspiratorial plan to reduce supply for the pending evidence issue. Rose Acre attempts to counteract this evidence with its own documentation that Rose Acre offered "legitimate" rationales for the programs in response to opposition, [27] but it also could be that Rose Acre's expansion efforts could be an attempt to cheat the conspiracy it joined in on. On balance, therefore, the DAPs presented sufficient evidence to demonstrate that Rose Acre likely knew that the Certified Program was part of a broader supply-reducing conspiracy.

b. Short-Term Supply Reduction Measures

The DAPs point to Mr. Rust's attendance at both a UEP Board meeting and Marketing Committee conference call concerning the early molting of flocks and disposing of hens. During the conference call, a motion to recommend molting and disposal of spent hens six weeks earlier passed unanimously.[28] The defendants point to the fact that Rose Acre never participated in early molting, nor did it vote for the implementation of a proposed 5% flock size reduction between December 1, 2004 and July 1, 2005. However, a co-conspirator need not participate in every action

---

[26]   In suggesting that the other egg producers knew of Rose Acre's expansion, Rose Acre cites to Mr. Baker's reference to Rose Acre's expansion as being "[i]n [his] opinion[,] . . . a downer on the market." Def.'s Ex. 24b, Baker Dep. 483:1-14. Although Mr. Baker's opinion alone does not represent the entire egg producer community's knowledge of Rose Acre's expansion, the Court credits it as some evidence of Rose Acre's contention.

[27]   Nonetheless, a desire to coverup this conspiracy could be represented by Mr. Rust's concerns over the confidentiality of the USEM exports. *See* DAPs' Rose Acre Know. Bind., Email from Marcus Rust to Larry Seger (Aug. 9, 2007) (Tab 33).

[28]   Mr. Rust suggests his vote against this recommendation was not recorded because he must have accidentally muted his phone during the call. However, Mr. Rust never pointed out any "mistake" in the meeting minutes referencing this vote as being unanimous.

31

taken in furtherance of the conspiracy. *See Magnesium Oxide*, 2011 WL 5008090, at *17. Although Rose Acre itself did not *act* upon the conspiratorial opportunity of which it was aware through Mr. Rust's attendance, Mr. Rust's attendance can be some evidence of Rose Acre's awareness of the supply-reducing purpose behind the short-term measures.

### c. Egg Exports

The DAPs also focus on Rose Acre's involvement in USEM exports in 2007 and 2008. Mr. Rust attended a Marketing Committee meeting where an increase in price as a result of the export was reported. UEP also reported price increases resulting from the exports in a United Voices newsletter, "conclud[ing] that these exports have had a major positive impact upon shell prices and the financial conditions of shell egg producer/markers." DAPs' Rose Acre Know. Bind., United Voices Newsletter at 1 (Feb. 14, 2007) (Tab 31); *see* DAPs' Rose Acre Know. Bind., United Voices Newsletter at 1 (Apr. 27, 2007) (Tab 32).

Additionally, the DAPs highlight Rose Acre's concern over too many people discovering the specific details of the exports. In an email to Larry Steger, Mr. Rust expressed concern over the confidentiality of discussions concerning USEM exports and "issues that would stabilize and possibly influence the market." DAPs' Rose Acre Know. Bind., Email from Marcus Rust to Larry Seger (Aug. 9, 2007) (Tab 33).[29]

In response, the defendants point out that Rose Acre has been exporting eggs since 1982. The defendants assert that Rose Acre joined USEM at a time when it was producing surplus eggs.[30] Mr. Rust testified that Rose Acre shipped only surplus eggs which have no domestic customer and

---

[29]     In response, Mr. Seger agreed with Mr. Rust, noting that "a little peddler should not know our details." *Id.*

[30]     The defendants cite to an omitted page of Mr. Rust's deposition. Def.s' Post-Hearing Mem. at 20 (Doc. No. 2007) (citing Ex. 38, Rust Dep. 128:6-20).

exported eggs only if prices received from exporting were better than what they could sell for in the domestic egg products market. These are arguments Rose Acre can make at trial. However, a preponderance of the evidence can show that Rose Acre more likely than not had knowledge of the coordinated export's role in the broader conspiracy and participated in the coordinated efforts anyway. The admitted co-conspirator statements can therefore be used against Rose Acre.

### 2. USEM

USEM is an entity organized to coordinate egg exports. According to the DAPs, UEP members were urged to join USEM as a means to export their own eggs at a loss. USEM argues that it intended to operate as an export cooperative that coordinated and facilitated exports in times of excess supply, not to join an overarching supply-reducing conspiracy. USEM argues that the DAPs therefore cannot summon sufficient evidence of its knowledge of an overarching conspiracy.

USEM and UEP entered into a renewable management agreement in which UEP agreed "to provide management services and the staff necessary to provide an export program and marketing conference calls for the members of USEM." DAPs' USEM Knowledge Documents (hereinafter DAPs' USEM Know. Docs.), UEP-USEM Management Agreement, Ex. D, § 2. The agreement provides the following language in its Membership section:

> Upon execution of this Agreement and during the term hereof, UEP shall solicit its members to become members of USEM for participation in the Export Program and Marketing Conference Calls. As a condition of membership, the applicant (current UEP or USEM member or any other qualified egg producer) must sign a new membership agreement and agree to an export commitment. USEM members shall not be required to pay annual dues providing they are dues paying members of UEP. Any member that is not a UEP member will be required as a condition of membership to pay USEM membership dues equal to those of UEP's dues rate schedule. Membership dues paid directly to USEM will be received in USEM's bank account.

33

*Id.* at § 5. The agreement otherwise states that both entities are independent Capper-Volstead Cooperatives, that UEP is not an agent of USEM, *Id.* at § 12, and that "UEP shall not participate in or have any responsibility for USEM activities or decisions in connection with its shell egg export or marketing conference call programs," *id.* at § 9. USEM relies upon this language to suggest that it had no awareness of or participation in any overarching conspiracy orchestrated by UEP.[31] These provisions, however, do not shield USEM from being knowledgeable (1) that Mr. Gregory encouraged UEP members to join USEM as agreed upon in the UEP-USEM contract, *Id.* at § 5, nor (2) that Mr. Gregory sent a USEM document to USEM members congratulating them for doing what they "intended and that was to improve domestic prices" through accepting an export order, DAPs' USEM Know. Docs., Ex. H, Letter from Gene Gregory to All USEM Members (Nov. 25, 2002).

Pursuant to the agreement, Mr. Gregory communicated to UEP members in a letter that UEP "assume[d] the management of United States Egg Marketers (USEM) primarily for the purpose of coordinating industry-wide export shipments." DAPs' Rose Acre Know. Bind., Ex. E.,

---

[31]     USEM also urges the Court to treat this relationship similarly to how it treated an alleged relationship between UEP and the United Egg Association (UEA) in a prior ruling. *See generally Processed Egg Prods..*, 821 F. Supp. 2d at 750-55. In this prior ruling, the plaintiffs alleged that Mr. Gregory was the president of both UEP and UEA and that his joint leadership dragged UEA into the conspiracy. Among other things, the plaintiffs unsuccessfully alleged that Mr. Gregory's joint leadership sufficiently linked his inculpatory writings published in the UEP United Voices newsletters to UEA's alleged involvement in the conspiracy.

The situation UEA faced is distinguishable from the situation USEM now faces. Unlike USEM, UEA never entered into an agreement with UEP requiring UEP to provide the necessary management services of an export program alleged to be part of the conspiracy. Nor did UEA sign a contract requiring UEP to "solicit [UEP] members" to engage in potentially conspiratorial activities. DAPs' USEM Know. Docs., UEP-USEM Management Agreement, Ex. D, § 5.

Letter from Gene Gregory to UEP Members (Aug. 29, 2000).[32] To stress the importance of becoming a USEM member and committing to coordinated exports, Mr. Gregory explained:

> We are hopeful that all UEP members including those not previously committed will recognize the benefit of the industry having a legal means by which we can collectively move eggs from the domestic supply to improve domestic prices.

*Id.* The attachment included with Mr. Gregory's letter explained that "[t]he intent of taking a large volume export order for a short period of delivery is to reduce the domestic supply and thereby increase the domestic price of eggs." DAPs' Rose Acre Know. Bind., Ex. E., Attach. to Letter from Gene Gregory to UEP Members (Aug. 29, 2000). The attachment explained: "The primary reason to be a supporter of the export effort is to help improve your egg price and thereby create a greater return to your business." *Id.* (emphasis in original); *see also id.* ("A substantial order usually tightens supply and results in a higher market for all eggs sold domestically."). Mr. Gregory stressed that industry-wide involvement is required for the export program to work as intended. *See id.* ("The success of any program is the involvement of the industry and therefore we call upon every egg producer to become involved.").

Through its "United Voices" newsletters, UEP updated its members on the UEP's Export Committee's decisions to reject one and accept two export orders. These newsletters again referenced supply reduction and its effect on prices. In an effort to solicit "[a]ny [UEP] member that is supportive of these initiatives to improve domestic prices through cooperative export efforts," UEP suggested it would not have had to deny one export order if only it had greater support of its members. DAPs' USEM Know. Docs., Ex. F, United Voices Newsletter at 1 (June

---

[32]     *See also* DAPs' Rose Acre Know. Bind., Ex. E., Attachment to Letter from Gene Gregory to UEP Members (Aug. 29, 2000) ("Under the management of UEP[,] [UEP] will strive to establish a United States Egg Marketers (USEM) committed shell egg export program for egg producers all across the U.S.").

12, 2000). The other newsletters reported on the approved export orders and commended USEM members that "have done their part to help improve egg prices," thereby "tak[ing] [the] initiative to not only help themselves but to help the entire industry." DAPs' USEM Know. Docs., Ex. J, United Voices Newsletter at 1 (Nov. 4, 2002).

USEM argues that UEP's solicitations of its own members to join USEM cannot demonstrate USEM's knowledge of the conspiracy. USEM also argues that the letter Mr. Gregory sent "is a *memorandum on UEP letterhead addressed to UEP Members*" and can therefore only represent UEP's knowledge. USEM's Mem. at 4 (emphasis in original). However, the DAPs also present *a memorandum on USEM letterhead addressed to USEM Members* from Mr. Gregory which stated: "Congratulations! You did what you intended and that was to improve domestic prices with your decision to accept the 250-container export order." DAPs' USEM Know. Docs., Ex. H, Letter from Gene Gregory to All USEM Members (Nov. 25, 2002). USEM concedes that the document in question is in fact, "a USEM document." USEM Mem. at 4. This USEM letter, on its own and particularly as supported by the other documents, establishes by a preponderance of the evidence for immediate purposes that USEM knew of the illicit purpose behind its agreement with UEP.

Realizing the inculpatory nature of the USEM letter, USEM reframes its argument. USEM contends that because this USEM document exclusively references only coordinated exports, it cannot show knowledge of a larger conspiracy to reduce supply. This argument misses the mark for two reasons. First, explicit within USEM's "congratulation" to its members for doing what they "intended"—"to improve domestic prices" through its exports—is its intention to facilitate an overarching effort to reduce domestic egg supply, arguably as a means to raise egg prices. *Id.* Second, USEM's argument concedes, as it must, that this USEM document—at the very least—

36

pertains to its coordinated exports. In doing so, USEM neglects the fact that the DAPs need not prove USEM's knowledge of *every* aspect of the common scheme. *See, e.g., Vitamins*, 320 F. Supp. 2d at 15 ("Although Plaintiffs must show that each Defendant had knowledge of an agreement as to the overall conspiracy, they need not show . . . knowledge, on behalf of the Defendant, of every detail of the alleged conspiracy."); *In re Mercedez-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J. 2001) ("That a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy . . . does not affect its status as a conspirator."). This concession—along with the plain language of the letter—inevitably links USEM's role in facilitating the exports to the overall supply-reduction plan.

Finally, USEM suggests that its role in the export prong of the conspiracy cannot be foreseeably linked to the other two prongs of the conspiracy—the short-term measures and Certified Program. USEM's argument relies upon the following exception laid out in *Pinkerton v. United States*: "A defendant may not be held liable for the offenses of his co-conspirators if . . . the substantive offense committed by one of the conspirators 'could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" *United States v. Bailey*, 840 F.3d 99, 112 (3d Cir. 2016) (quoting *Pinkerton v. United States*, 328 U.S. 640, 648 (1946); *see Fattah*, 914 F.3d at 169). The application of this *Pinkerton* exception here requires analyzing whether UEP's and other co-conspirator's actions in facilitating the short-term measures and Certified Program naturally flowed from the overall agreement to reduce egg supply. Both the UEP Certified Program and the short-term measures employed by UEP and its members are entirely foreseeable natural consequences of an agreement to reduce supply—they are in fact *direct means* of attempting to reduce the egg supply.

37

USEM's argument seemingly focuses on the foreseeability of the specific means taken in furtherance of an overarching conspiracy. But the purpose of this *Pinkerton* exception is to ensure that co-conspirators are not liable for the actions of other co-conspirators that reasonably fall entirely outside of the scope of an overarching conspiratorial goal. The three alleged prongs of the supply-reducing conspiracy seek to achieve the very same goal, albeit through differing means. Therefore, this *Pinkerton* exception is entirely inapplicable here.

Accordingly, the DAPs have established USEM's knowledge of and participation in the broader conspiracy by a preponderance of the evidence for purposes of the Court's consideration of the question of whether the admitted co-conspirator statements can therefore be used against USEM.

### D. Whether the Declarant Was a Member of the Conspiracy

To admit a statement under Rule 801(d)(2)(E), the DAPs must prove the declarant was a member of the conspiracy. FED. R. EVID. 801(d)(2)(E). As detailed above, the DAPs have met this burden with regard to UEP, Rose Acre, and USEM.

The DAPs also seek admission of statements made by Cal-Maine Foods, Inc.; Sparboe Farms, Inc.; Mid-West Poultry Services; and Moark, LLC.[33] Admitting statements made by these entities therefore requires determining by a preponderance of the evidence whether they were also members of the co-conspiracy.[34] All five entities participated in the Certified Program and

---

[33] The DAPs also seek to admit a statement made *to* Tampa Farm Service, Inc. Although whether an addressee is a member of the conspiracy only becomes relevant in some limited circumstances under the "in furtherance" prong, the standard is the same: the DAPs must prove by a preponderance of the evidence that the addressee is a member of the conspiracy.

[34] The Court notes that the DAPs submitted various timeline exhibits with its post-hearing memorandum. These timelines were intended to show all five entities' participation and knowledge in the overarching conspiracy. However, the timelines heavily rely upon documents that the DAPs never submitted to the Court for consideration. In making its determination, the

completed the audits required of them through the program.[35] All five entities had a representative present at the UEP Annual Board Meeting and Executive Conference Meeting on October 14-15, 1999 and the Board of Directors meeting held on February 24, 2000.

During the October 14-15, 1999 meeting, Marketing Committee Chairman Baker and UEP Chairman Looper "suggested that if the egg industry did not voluntarily adjust the supply side of our business, very quickly, that prices would be at record low figures and all those producing eggs would realize severe financial losses." DAPs' Form. Bind., UEP Annual Bd. Meeting and Exec. Conference Minutes (Oct. 14-15, 1999) (Tab 18). Opening the meeting, Mr. Looper stated "that this meeting was extremely important because of so many pressing issues that needed to be addressed including the current supply/demand problem." *Id.* Similarly, Randy Nelson, a UEP egg trader, presented at the February 24, 2000 Board "urg[ing] everyone to maintain their supply reduction programs" and announcing that a completed export order "had been a tremendous financial benefit for the industry." DAPs' Form. Bind., UEP Bd. of Dir. Meeting Minutes (Feb. 24, 2000) (Tab 22). Every entity except Midwest Poultry also attended other various meetings where details concerning both the Certified Program and the short-term measures were discussed. The DAPs show that Midwest Poultry attended meetings concerning only the Certified Program. Because these entities at least participated in the Certified Program, the DAPs have sufficiently shown their knowing involvement in the conspiracy.

Court therefore examines only the documents that the DAPs actually submitted through its "Conspiracy Formation" and "Rose Acre Knowledge" evidentiary submissions.

[35]     The DAPs show that Cal-Maine, Tampa Farm Service, Mid-West Poultry Services, and Moark, LLC participated in audits from 2003 to 2008. Sparboe stopped completing audits in 2005.

### E. Whether the Statements Were Made in the Course of the Conspiracy

To be admissible under Rule 801(d)(2)(E), a statement must have been made during the course of the conspiracy. *See Weaver*, 507 F.3d at 181. The DAPs allege that the conspiracy began on May 15, 2000 and continues through the present. Oral Arg. Tr. 156:3–4, Doc. No. 1972. All but one of the documents the DAPs seek to admit are dated from May 15, 2000 through July 16, 2008, placing them within the course of the conspiracy. One document, Tab 93,[36] is undated. However, the statements therein describe various discussions and motions from 2001 and 2002. The Court is satisfied that this document postdates May 15, 2000. Therefore, the Court finds that all the individual statements made in each document the DAPs seek to admit were made during the course of the conspiracy and that prong of admissibility is met.

### F. Whether the Statements Were Made in Furtherance of the Conspiracy

To be admissible under Rule 801(d)(2)(E), a statement must have been made in furtherance of the conspiracy. As noted above, the Court has elected to perform a sentence-by-sentence analysis of the disputed co-conspirator statements. Due to the number of statements the DAPs seek to admit, this analysis is extensive. Whether each statement was made in furtherance of the conspiracy is analyzed in an Appendix to this Memorandum.

However, there is one overarching issue the Court will address here related to the "United Voices" newsletters. These newsletters are bi-weekly communications from UEP to its members. These members included Rose Acre, among many others. The DAPs seek to admit these statements on the grounds that they furthered the conspiracy by updating its members as to the status of the conspiracy. Statements explaining the current status of the conspiracy are admissible

---

[36] This "Tab" citation refers to DAPs' Pre-Hearing Mem., App. A. (Doc. No. 1965-2).

as non-hearsay co-conspirator statements, but "only if the addressee is also a co-conspirator." *Weaver*, 507 F.3d at 185 (citing *Ammar*, 714 F.2d at 252).

The defendants argue that the newsletters cannot ever be in furtherance of the conspiracy because they were widely distributed publications that reached beyond co-conspirators or even UEP members broadly. However, they cite no case law to support this narrow reading, and the Court has not uncovered any in its independent research.

The DAPs argue that regardless of the scope of their distribution, the "United Voices" newsletters were UEP's primary method of communication with its members, and therefore with members of the conspiracy. DAPs' Post-Hearing Supp. Mem. at 4 n.5 (Doc. No. 2008) ("Q. As the UEP president today, how do you communicate with UEP members? A. Mostly the United Voices Newsletter that goes out every two weeks") (quoting C. Gregory Dep. At 64:20-23).

Although the Court certainly does not find that all UEP members were necessarily members of the conspiracy, the DAPs have established that at least some were. The Court agrees that the "United Voices" newsletters were a form of communication to and among, and between co-conspirators. Although each statement within the "United Voices" newsletters must still be proven to be "in furtherance" of the conspiracy, the Court will not exclude the statements therein on the grounds of who they were made by or made to.

## G. Whether the Co-Conspirator Statements are Cumulative and Prejudicial

A district court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or needlessly presenting cumulative evidence. FED. R. EVID. 403. The defendants argue that the co-conspirator statements, specifically the "United Voices" newsletters, will result in both and should be limited on those grounds.

41

The cumulative or prejudicial nature of the statements will turn on how the DAPs seek to use them at trial, which the Court cannot now predict. However, the Court cautions that just because a statement was held in the Appendix to meet the requirements of Rule 801(d)(2)(E) does not mean the Court may not exclude it under Rule 403 if it determines the statements' arguable probative value is being substantially outweighed by prejudice, a decided risk if only because of the cumulative effect of these exhibits.

## CONCLUSION

For the foregoing reasons, the Court finds that the DAPs have met their burden to justify potential admission of the disputed co-conspirator statements. An appropriate Order follows.

BY THE COURT:

GENE E/K. PRATTER
UNITED STATES DISTRICT JUDGE

42